IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| BARBARA H. LEE, et al.,<br><br>        **Plaintiffs,**<br><br>v.<br><br>VIRGINIA STATE BOARD OF<br>ELECTIONS, et al.,<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 3:15-cv-357<br>)<br>)<br>)<br>)<br>)<br>) |

<u>**REPLY IN SUPPORT OF**</u>
<u>**MOTION TO INTERVENE OF SENATOR MARK OBENSHAIN,**</u>
<u>**VIRGINIA COUNTY ELECTION OFFICIALS, AND VIRGINIA VOTERS**</u>

      Plaintiffs' and Defendants' Oppositions resoundingly confirm that the Court should grant Proposed Intervenors' Motion to Intervene. Defendants wisely concede that Proposed Intervenors "each have several strong interests related to the integrity and orderly operation of Virginia's electoral process" and that these interests are strong enough to warrant intervention under Federal Rule of Civil Procedure 24. (Def. Opp'n. (DE 44) at 10.) Plaintiffs, by contrast, deny the sufficiency of those interests, but their reasoning merely regurgitates their merits allegations that abandoning Voter ID laws will not (as Proposed Intervenors maintain) promote voter fraud or sap public confidence in the electoral system. (*See* Pl. Opp'n (DE 46) at 3−8.) But the assessment of Proposed Intervenors' interests cannot be based on Plaintiffs' hotly contested merits arguments and, in any event, the Supreme Court unequivocally rejected Plaintiffs' assertions in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).

1

Plaintiffs and Defendants thus retreat to the claim that Defendants—who oppose Proposed Intervenors' intervention—somehow nonetheless adequately represent Proposed Intervenors' interests. But that argument founders on Defendants' admission that Virginia's Attorney General, Mark Herring, is an outspoken public opponent of the laws challenged in this case; their admission that Mr. Herring has previously abandoned the defense of duly enacted Virginia laws; and their demonstrated unwillingness to raise the equal-protection arguments against Plaintiffs' attempt to read an "effects" test into Section 2 of the Voting Rights Act that Proposed Intervenors will make linchpins of their defense of the challenged law. (*See* Def. Opp'n at 3–5, 9.) Proposed Intervenors have, in short, more than satisfied their "minimal" burden, *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972), of showing that no party adequately represents their interests. (Mem. (DE 35) at 8–14.)

Finally, Plaintiffs' and Defendants' fallback suggestion that Proposed Intervenors' filing of briefs and participation in depositions would cause "inefficiency and delay," (Def. Opp'n at 12; *see* Pl. Opp'n at 10–11), ignores governing case law, and would render Rule 24 a nullity because *every* intervenor seeks such involvement in litigation. The Court should grant intervention as of right, or at least permissive intervention.[1]

## I. THE COURT SHOULD GRANT INTERVENTION AS OF RIGHT

The Court should grant intervention as of right because Proposed Intervenors have strong interests in defending Virginia's voter-integrity measures that will be impaired if Plaintiffs prevail in this lawsuit and that no party to the case adequately represents. (*See* Mem. at 4–14.)

---

[1] Proposed Intervenors have filed their proposed Answer to Plaintiffs' Amended Complaint as an attachment to this Reply. Proposed Intervenors did not file their proposed Answer as an attachment to their Motion to Intervene because Plaintiffs had not yet filed their Amended Complaint at the time that Proposed Intervenors filed the Motion. (*See, e.g.*, Mem. at 3 n.1.)

### A. Plaintiffs' Arguments That Proposed Intervenors Lack An Interest In This Case Contradict Controlling Supreme Court Precedents

Defendants correctly concede that each Proposed Intervenor has "several strong interests" related to the integrity and orderly operation of Virginia's electoral system. (Def. Opp'n at 10.) Plaintiffs, for their part, deny the sufficiency of Proposed Intervenors' interests, but their arguments to that effect directly contradict controlling precedents.

*First*, Senator Mark Obenshain has a powerful interest in ensuring that fraudulent ballots do not cancel out his supporters' votes in future elections. (*See* Mem. at 4–5.) Plaintiffs denigrate this interest as "speculative," (Pl. Opp'n at 3, 5–6), but in *Crawford*, the Supreme Court explained that "flagrant examples" of "in-person voter impersonation at polling places" "have been documented throughout this Nation's history," and that "occasional examples have surfaced in recent years." 553 U.S. at 195 (opinion of Stevens, J.). The Court continued that "the risk of voter fraud [is] real" and "could affect the outcome of a close election." *Id.* at 196; *see also id.* at 209 (opinion of Scalia, J.). The Court's conclusion that the risk of voter fraud is "real" defeats any suggestion that Senator Obenshain's interest is "speculative."

Moreover, Plaintiffs' counterintuitive assertion that Virginia's voter-integrity law does not combat that risk because a would-be impersonator need only submit a name, date of birth, and Social Security number in order to obtain a free voter ID, (*see* Pl. Opp'n at 5), contradicts the very gravamen of their suit. Indeed, Plaintiffs allege that Virginia's voter ID requirement "severely burdens" the right to vote because obtaining an ID is unduly "burdensome." (Am. Comp. (DE 36) ¶ 55). These purportedly "sever[e] burdens" of obtaining an ID also fall on would-be impersonators, thereby decreasing the risk of fraudulent voting. In fact, because a would-be impersonator will ordinarily find it difficult to collect names, dates of birth, and Social

3

Security numbers, Virginia's voter-integrity law makes impersonation considerably harder than it otherwise would be.

Further, Senator Obenshain also has an interest in avoiding even the *appearance* of corruption or fraud, lest there be a cloud on the legitimacy of his office. (*See* Mem. at 5.) Plaintiffs argue that voter-ID laws do not promote voter confidence and thus will not affect the legitimacy of Senator Obenshain's election. (Pl. Opp'n at 6.) But once again, their theory squarely contradicts *Crawford*, which held that voter-ID laws *do* promote "public confidence in the integrity of the electoral process." 553 U.S. at 197.

In all events, even if it could be credibly *asserted* that Virginia's Voter ID law does nothing to preclude fraudulent votes, that assertion is a hotly disputed issue at the heart of the merits challenge. Needless to say, the Court cannot prematurely resolve that merits question by automatically accepting Plaintiffs' liability claims as true, and then using that as a premise for denying Intervenors the opportunity to present a different factual and legal view of the merits. Just the opposite, the Court "must accept [Proposed Intervenors'] allegations as true" for purposes of resolving this motion. *Chesapeake Bay Foundation v. American Recovery Co.*, 769 F.2d 207, 209 n. * (4th Cir. 1985); *see also Sw. Center for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001) ("[A] district court is required to accept as true the non-conclusory allegations made in support of an intervention motion.").

*Second*, the County Registrars and Electoral Board Members have an obvious interest even—indeed, especially—if Plaintiffs' merits claims are correct. These officials' power and responsibilities under state law will be directly affected if Plaintiffs' liability theory is accepted and a remedy altering the status quo is entered. Thus, Intervenors as a group have interests that will be affected if Plaintiffs' attacks on the Voter ID law are either accepted *or* rejected.

4

Plaintiffs seek to avoid this fatal problem by contending that, under Plaintiffs' view of the law, a remedial order will *benefit* these Intervenor officials because an injunction striking down Virginia's voter-integrity law would "simplify, not complicate, the process of voting." (Pl. Opp'n at 7.) But the dispositive point is that these officials' responsibilities will be *changed* by a remedial order—this substantial interest cannot be denied on the merits grounds that the changed regime is more efficient. A government official has a sufficient interest to intervene "in adjudications which will directly affect his own duties and powers," regardless of whether those duties or powers are simplified or complicated in the plaintiffs' estimation. *Blake v. Pallan*, 554 F.2d 947, 953 (9th Cir. 1977). Whether or not a ruling in Plaintiffs' favor would make the electoral process simpler, it would undeniably affect the County Registrars' and Board Members' duties and powers, because it would preclude them from enforcing voter ID requirements. In addition, such a ruling would require the County Registrars and Electoral Board Members to engage in new training and to adopt new election procedures. (*See* Mem. at 7.) Plaintiffs' and Defendants' response—that election officials must go through training every year anyway, (Pl. Opp'n at 7–8; Def. Opp'n at 11 n.6)—ignores the common-sense point that training for an entirely new regime is more burdensome than retraining under procedures that are already familiar to poll workers and other election officials.

*Finally*, the Virginia voters seeking to intervene have a strong interest in ensuring that fraudulent ballots do not cancel out their votes. (*See* Mem. at 7.) Plaintiffs attempt to dismiss this right as a "generalized" interest shared by the entire populace. (Pl. Opp'n at 8.) But this attempt is irreconcilable with the Supreme Court's conclusion that "[t]he right to vote is personal," and includes protection against "dilut[ion] by ballot-box stuffing," *Reynolds v. Sims*,

377 U.S. 533, 555, 560 (1964). In short, each Proposed Intervenor has established a sufficient stake in this case to merit intervention.

> **B.     Defendants' Own Concessions Establish That Defendants Do Not Adequately Represent Proposed Intervenors' Interests**

In order to satisfy Rule 24's inadequacy requirement, a proposed intervenor need only "sho[w] that the representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich*, 404 U.S. at 538 n. 10; (*see* Mem. at 8). Proposed Intervenors have easily satisfied this "minimal" burden in at least three separate ways: Neither Attorney General Herring nor Defendants will adequately represent Proposed Intervenors' interests, nor will they mount a constitutional defense to Plaintiffs' "effects test" reading of Section 2. (*See* Mem. at 8–14.) Plaintiffs make no independent arguments about the adequacy of representation, instead merely piggybacking Defendants' Opposition. (*See* Pl. Opp'n at 9–10.) But Defendants' own concessions demonstrate that they are not adequate representatives and, in fact, dramatically underscore the very reasons why the Court should grant intervention here.

*First*, Proposed Intervenors have established that Attorney General Herring is unlikely to mount as vigorous a defense of the challenged measures—which he publicly opposes—as they will. (*See* Mem. at 8–12.) Although they quibble over factual details, Defendants nowhere dispute Proposed Intervenors' essential point that Mr. Herring led the opposition to the challenged law when he served in the Virginia Senate. Nor do they dispute that he publicly restated his opposition to the law after becoming Attorney General. Nor, finally, do they deny that the lawyer who represents Plaintiffs in this case has represented Mr. Herring elsewhere. (*See* Def. Opp'n at 3–8.) (Plaintiffs likewise do not deny any of these facts. (*See* Pl. Opp'n at 9–10.))

6

Defendants nonetheless claim that Mr. Herring can be trusted to defend the voter-integrity laws with full vigor because he takes seriously his statutory commitment to "represent the interests of the Commonwealth." (Def. Opp'n at 4 (citing Va. Code. Ann. § 2.2–513).) But this contention is directly contradicted by Defendants' *own* simultaneous assertion that "the 'duty to defend the Commonwealth's laws' . . . *is nowhere to be found*" among the Attorney General's duties under Virginia law. (*Id.* (emphasis added).) Thus, all agree that the Attorney General will defend a state law only if he determines, in his unfettered discretion, that such a defense of Virginia's sovereign enactments is in "the interests of the Commonwealth." (*Id.*)

But that, of course, is precisely why the Attorney General is not an adequate representative to mount an unconditional, sustained defense of the law. Defendants cannot assert that the Attorney General will zealously defend the laws here because they contend he has no *duty* to mount such a defense. As he has done elsewhere, Mr. Herring could determine, for whatever mix of ideological or legal factors motivate him, that the "interests of the Commonwealth" require him to abandon the defense of duly enacted Virginia laws he disfavors, (*see id.* 3–4), leaving those laws with no advocate in this case other than Proposed Intervenors, (*see* Mem. at 8–12).

The prospect of a less-than-vigorous defense is hardly fanciful. As Defendants themselves recognize, (Def. Opp'n at 3–4), Mr. Herring and Defendants abandoned their defense of a state redistricting statute on appeal in *Page v. Virginia State Board of Elections*, No. 3:13-cv-00678, even though one of the judges on the three-judge district court had sided with the Commonwealth after trial, *Page v. Virginia State Board of Elections*, 58 F. Supp. 3d 533, 555 (E.D. Va. 2014) (Payne, J., dissenting). (*See* Mem. at 11.) That abandonment left the intervenor-defendants in that case as the only parties who appealed the invalidation of the duly

7

enacted state statute to the United States Supreme Court.  (*See id.*)  Defendants also recognize that Mr. Herring likewise recently abandoned his office's defense of Virginia's laws against same-sex marriage.  (*See* Def. Opp'n 5; Mem. at 11.)  Taken together, Mr. Herring's record and publicly stated opposition to Virginia's Voter ID requirement establish, at the very least, a "significant chance" that he "might be less vigorous" than Proposed Intervenors in defending the law against Plaintiffs' challenges—which is all it takes to show inadequacy of representation.  *Teague v. Bakker*, 931 F.2d 259, 262 (4th Cir. 1991).

Defendants try to escape Mr. Herring's demonstrated inadequacy as a representative of Proposed Intervenors' interests by claiming that the hiring of outside counsel cures any inadequacy.  (Def. Opp'n at 6–7.)  But if anything, the hiring of outside counsel cuts the other way, because it underscores that Mr. Herring himself recognizes that he and his Office are not fully committed to the defense of the challenged law.  If it were clear that Mr. Herring would defend the law with full vigor, the Attorney General's Office would presumably have defended the law itself; there would have been no need to incur the expense of outside counsel.

More importantly, the hiring of outside counsel does not change the reality that Mr. Herring remains the ultimate decisionmaker in this litigation.  As Proposed Intervenors have observed and as Plaintiffs and Defendants never dispute, Mr. Herring retains the power to supervise outside counsel, determine their budget, and control their legal strategy.  (*See* Mem. at 9–10.)  Proposed Intervenors do not question outside counsel's qualifications or good faith, (*see* Def. Opp'n at 6–7), but even so there remains a significant chance that the Attorney General's strategic and budgetary decisions will result in capitulation, an unfavorable settlement or a less vigorous defense than Proposed Intervenors plan to put on, (*see* Mem. at 9–10).

8

*Second,* quite apart from concerns about the Attorney General, Proposed Intervenors have established a significant chance that Defendants themselves will not zealously defend the challenged law. Defendants have displayed a lack of interest in upholding the integrity of Virginia's voter rolls by proposing to eliminate the requirement that voters certify they are United States citizens and are not convicted felons. (*See id.* 12.) Defendants claim that they have "abandoned" that proposal, (Def. Opp'n at 8), but the newspaper article they cite says only that the State Board of Elections has "postponed action" on the plan (DE 44-6). That postponement came after "[h]undreds of people flocked to a board meeting to oppose [the proposal]," (*id.*), and the proposal received "nearly universal skepticism . . . from registrars and election officials . . . and from politicians and ordinary Virginians."[2] Left to their own devices, in other words, Defendants may well have adopted a plan that would have compromised the integrity of Virginia's electoral register. That is reason enough to doubt whether Defendants will defend the challenged law with full vigor.[3]

*Finally*, Proposed Intervenors have explained that they intend to argue that Plaintiffs' reading of Section 2 of the Voting Rights Act raises serious concerns under the Equal Protection

---

[2] Laura Vozzella, *Questions About Citizenship and Felony Status Would Become Optional on Virginia Voter Registration Forms*, Wash. Post, July 28, 2015, *available at* http://www.washingtonpost.com/local/virginia-politics/voter-registration-changes-proposed-for-va-draw-hundreds-to-hearing/2015/07/28/f42af2ca-3566-11e5-94ce-834ad8f5c50e_story.html.

[3] Defendants' vacillation regarding their position on Proposed Intervenors' Motion further underscores their inadequacy as representatives of Proposed Intervenors' interests. Even on Defendants' version of events, Proposed Intervenors reasonably understood Defendants, through counsel, to have consented to their intervention. (*See* Def. Opp'n at 2 n. 1.) Defendants now say that they changed their mind about the proposed intervention because they interpreted Proposed Intervenors' Motion as an "attac[k]" on "a political opponent" (presumably the Attorney General). *Id.* Defendants' politically motivated about-face through parsing of their counsel's representations not only belies the assertion that outside counsel are litigating this case independently of the Attorney General, but also underscores that Defendants may abandon their current defense of the voter-integrity laws in the name of their (or the Attorney General's) political preferences.

Clause because it requires States to shape their policies on the basis of racial outcomes. (*See* Mem. at 13.) It is clear by now that Defendants have no intention of advancing this argument. For one thing, Defendants had every opportunity to state that they will raise an equal-protection argument, but their Opposition noticeably makes no such commitment. (*See* Def. Opp'n at 9.) For another, Defendants have now filed a motion to dismiss Plaintiffs' Complaint, but they make no mention of this equal-protection issue in their supporting brief. (*See* Def. Mem. in Support of Motion to Dismiss (DE 49) at 5–8.)

Defendants' reticence is unsurprising. Virginia has an interest in enforcing the Voter ID law challenged here, but so too does it have an interest in preserving its future authority to enact its own race-conscious measures. Any equal-protection challenge to Plaintiffs' reading of Section 2 would compromise the latter interest. Thus, this case does not merely involve the "use of different arguments as a matter of litigation judgment." (Pl. Opp'n at 10 n.4.) Rather, Proposed Intervenors plan to raise an argument that *is not in Defendants' interest to raise*. That divergence of interests amply demonstrates the inadequacy of Defendants' representation. (*See* Mem. at 13.)

Plaintiffs and Defendants attempt to avoid this result by invoking, respectively, the Fourth Circuit's decisions in *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), and *Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214 (4th Cir. 1976). Both cases are plainly inapposite. In *Westinghouse*, the proposed intervenor expressly conceded that its interests "would be adequately represented at trial," and the Fourth Circuit "fail[ed] to see how a party, which admittedly is adequately represented at trial . . . , is somehow entitled as of right to participation in settlement proceedings." *Id.* at 216. Here, by contrast, Proposed Intervenors have never conceded that Defendants would adequately represent them at any stage of litigation. Similarly,

10

in *Stuart*, there was no reasonable or cognizable basis to doubt that the Attorney General would defend the challenged law with the same vigor and scope as proposed intervenors; to the contrary, the Attorney General had consistently defended the law "'zealously' and 'vigorously.'" 706 F.3d at 355. Here, by contrast, there *is* every reason to doubt whether the Attorney General shares Proposed Intervenors' interest, because he has consistently *opposed* the challenged law. (*See* Mem. at 8–12.)

Plaintiffs and Defendants nonetheless claim that *Stuart* and *Westinghouse* establish a "presumption of adequacy" where "the party seeking intervention has the same ultimate objective as a party to the suit." 542 F.2d at 216; *see* 706 F.3d at 350. Of course, no such presumption could override the Supreme Court's holding that the burden of showing inadequacy "should be treated as minimal." *Trbovich*, 404 U.S. at 538 n. 10. Even on Plaintiffs' and Defendants' own terms, moreover, any such presumption has been rebutted because, as established above, there is ample reason to doubt that Defendants or the Attorney General *do* share Proposed Intervenors' "ultimate objective" of successfully defending Virginia's voter-integrity laws. Moreover, it is especially clear that Proposed Intervenors have directly rebutted any presumption of adequacy by showing actual "adversity of interest," 706 F.3d at 304. While Defendants have an interest in avoiding any equal-protection challenge to Plaintiffs' reading of Section 2, Proposed Intervenors will make that challenge a linchpin of their defense of the challenged law. The Court should grant intervention as of right.[4]

---

[4] Defendants mount a cursory argument that "Proposed Intervenors' interests will not be impaired if their motion is denied" "because" Defendants will provide adequate representation. (Def. Opp'n 10) (capitalization altered). This argument fails on its own terms, because, as explained, Defendants' representation is *not* adequate. Moreover, Defendants conflate Rule 24's impairment requirement with its separate inadequacy-of-representation requirement. Proposed Intervenors plainly satisfy the former requirement, because "disposing of the action" in favor of

## II.   IN THE ALTERNATIVE, THE COURT SHOULD GRANT PERMISSIVE INTERVENTION

The Court should alternatively grant permissive intervention because Proposed Intervenors' defense of the Voter ID law involves the very same questions of law and fact as does Plaintiffs' challenge to that law. (*See* Mem. at 14.) Defendants argue that the Court should deny permissive intervention "for all of the reasons cited . . . in opposition to Proposed Intervenors' attempts to intervene as of right." As just shown, those arguments fail on their own terms. *See supra* Part I. More importantly, they do not even respond to the standard for permissive intervention. Rule 24(b) does not require inadequacy of representation; it merely requires that the intervenor have a claim or defense in common with the lawsuit. *See* Fed. R. Civ. P. 24; (Mem. at 14). Neither Plaintiffs nor Defendants attempt to argue that Proposed Intervenors fall short of that standard.

## III.   NEITHER PLAINTIFFS' AND DEFENDANTS' UNSUPPORTED FORECASTS OF INEFFICIENCY AND DELAY, NOR THE POSSIBILITY OF AMICUS FILINGS, WARRANTS DENYING INTERVENTION

Proposed Intervenors have acted promptly to protect their interests, and allowing them to intervene would not prejudice any party. (*See* Mem. at 3.) Plaintiffs and Defendants nonetheless claim that intervention would cause "delay and inefficiency" because Proposed Intervenors will file briefs, participate in depositions, and serve discovery requests. (Def. Opp'n at 13; *see also* Pl. Opp'n at 10–11.) To begin with, these arguments are beside the point with respect to intervention as of right because Rule 24 makes judicial economy considerations relevant only to *permissive* intervention. *See* Fed. R. Civ. P. 24(b)(3). Once a proposed intervenor makes a

---

Plaintiffs would impair their ability to protect their interests in the integrity and orderly operation of Virginia's election system. Fed. R. Civ. P. 24(a); (*see* Mem. at 4–8).

timely motion that satisfies the prerequisites for intervention as of right, the court "must" permit intervention, regardless of any resulting "delay" or "inefficiency." Fed. R. Civ. P. 24(a).

Moreover, even with respect to permissive intervention, Plaintiffs' and Defendants' "delay and inefficiency" reasoning proves too much. *Every* intervenor in *every* case is apt to file its own briefs, participate in depositions, and serve discovery requests because *that is the entire point of intervention*. Thus, on Plaintiffs' and Defendants' theory, *every* intervention would lead to unacceptable "inefficiency" and "delay," and intervention could never be granted, even though Rule 24 exists precisely to provide for intervention by interested parties who seek to participate in the litigation. *See* Fed. R. Civ. P. 24; (Def. Opp'n at 13; Pl. Opp'n at 10–11).

In any event, the parties vastly overstate the burden that would attend intervention. Proposed Intervenors have already made a commitment to "work closely with Defendants to minimize any duplicative, overlapping, or additional discovery and testimony." (Mem. at 3.) Any alleged inefficiency or delay is more than outweighed by the benefits of intervention: a zealous defense of the challenged law and the presentation of equal-protection arguments that the State has an interest in avoiding. Plaintiffs point out the importance of resolving this case before the November 2016 election, (Pl. Opp'n at 11), but the election is still more than a year away, and there is no reason to believe that Proposed Intervenors' filing of briefs or participation in depositions will somehow delay the Court's adjudication to the point of precluding a timely remedy.

Finally, Plaintiffs' and Defendants' suggestion that Proposed Intervenors be allowed to file amicus briefs rather than to intervene, (*see* Pl. Opp'n at 10 n. 4; Def. Opp'n at 14–15), contradicts the plain text and purpose of Rule 24. The rule guarantees a right to intervene, not merely to file an amicus brief, upon the proper showing. That distinction has practical

consequences. For example, because a court may not consider an argument raised only in an amicus brief, *Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009), granting Proposed Intervenors only amicus status would likely preclude the Court from considering whether Plaintiffs' interpretation of Section 2 violates the Equal Protection Clause. In all events, the parties' suggestion that Proposed Intervenors be allowed to participate as amici directly contradicts their opposition to intervention: the parties nowhere explain why the submission of additional briefing would be acceptable if Proposed Intervenors participate as amici, but somehow would produce unacceptable "delay and inefficiency" if they participate as intervenors, (Def. Opp'n at 13).

## CONCLUSION

The Court should grant intervention as of right or, in the alternative, permissive intervention.

Dated: September 1, 2015              Respectfully submitted,

/s/ Mark R. Lentz
Michael A. Carvin (admitted *pro hac vice*)
John M. Gore (admitted *pro hac vice*)
Anthony J. Dick (admitted *pro hac vice*)
Michael Murray (admitted *pro hac vice*)
Stephen A. Vaden (admitted *pro hac vice*)
Mark R. Lentz (VSB No. 77755)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
macarvin@jonesday.com
ajdick@jonesday.com
jmgore@jonesday.com
mmurray@jonesday.com
svaden@jonesday.com
mrlentz@jonesday.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 1, 2015, a copy of the Reply in Support of the Motion to Intervene was filed electronically with the Clerk of Court using the ECF system which will send notification to the following ECF participants:

Marc Erik Elias
Bruce V. Spiva
Elisabeth C. Frost
Aria C. Branch
Amanda R. Callais
PERKINS COIE, LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005-3960
Tel. (202) 434-1627
Fax (202) 654-9106
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ABranch@perkinscoie.com
ACallais@perkinscoie.com

Joshua L. Kaul
PERKINS COIE, LLP
1 East Main Street, Suite 201
Madison, WI 53703-5118
Tel. (608) 663-7460
Fax (608) 283-1007
JKaul@perkinscoie.com

*Counsel for Plaintiffs*

Mark Fernlund (Thor) Hearne, II
ARENT FOX LLP
112 S. Hanley Road
Clayton, MO 63105
Tel. (314) 296-4000
Fax (202) 857-6395
thor.hearne@arentfox.com

Stephen Gerard Larson
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Tel. (213) 443-7616
Fax (202) 857-6395
stephen.larson@arentfox.com

Dana Johannes Finberg
ARENT FOX LLP
55 2nd Street, 21st Floor
San Francisco, CA 94150
Tel. (650) 798-0375
Fax (650) 798-0310
dana.finberg@arentfox.com

*Counsel for Defendants*

Dated: September 1, 2015

/s/ Mark R. Lentz
Mark R. Lentz
*Counsel for Proposed Intervenors*