**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| BARBARA H. LEE, *et al.*, | |
| Plaintiffs, | Civil Action No. 3:15-CV-357 |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................II

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

    I.   THE AMENDED COMPLAINT STATES CLAIMS FOR RELIEF UNDER
       THE VRA AND THE CONSTI2015-09-TUTION................................................. 2

       A. Legal Standard for 12(b)(6) ........................................................... 2

       B. Plaintiffs Allege Cognizable Intentional Race and Age Discrimination
          Claims ................................................................................................ 3

       C. Plaintiffs Allege Cognizable Claims Under the VRA and the First and
          Fourteenth Amendments .................................................................. 5

       D. Plaintiffs Allege a Cognizable Partisan Fencing Claim ................... 7

       E. Plaintiffs Allege a Cognizable Claim Regarding Felon Re-
          enfranchisement .............................................................................. 9

    II.  PLAINTIFFS HAVE ESTABLISHED STANDING ........................................... 10

       A. Legal Standard for Standing .......................................................... 11

       B. DPVA Has Organizational Standing .............................................. 12

       C. DPVA Has Associational Standing ................................................ 15

       D. Lee and Brescia Have Standing As Individuals ............................. 20

       E. Plaintiffs Have Statutory Standing to Sue Under the VRA............. 23

    III. PLAINTIFFS' LONG WAIT TIMES CLAIMS ARE RIPE FOR
       ADJUDICATION ............................................................................................ 27

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015)...................................... 19

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .......................................................... 7, 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 2

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)...................................... 27, 29

*Bishop v. Bartlett,* 575 F.3d 419 (4th Cir. 2009) .......................................... 23

*Burdick v. Takushi*, 504 U.S. 428 (1992)........................................................ 7

*Carrington v. Rash*, 380 U.S. 89 (1965) ......................................................... 8

*Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203 (4th Cir. 1992)............... 27

*Chisom v. Roemer*, 501 U.S. 380 (1991) .......................................................... 24

*City of Memphis v. Hargett*, 414 S.W.3d 88 (Tenn. 2013) ............................................. 16

*Coal for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395 (8th Cir. 1985) ...................... 20

*Common Cause v. Bolger*, 512 F. Supp. 26 (D.D.C. 1980).......................................... 23

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ....................... 12, 16, 18, 20

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ......................................... 27

*Crawford v. Bd. of Educ.*, 458 U.S. 527 (1982)...................................................... 9

*Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007)................................ passim

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ...................................... 26

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).................................... 2, 14

*El-Amin v. McDonnell*, No. 12-00538, 2013 WL 1193357 (E.D. Va. March 22, 2013)............. 22

*Ex parte Young*, 209 U.S. 123 (1908).............................................................. 10

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) ....................................... 15

*Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014).......................................................... passim

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ..................................................................... 6

*Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315 (4th Cir. 2002) ................................ 11

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)................. 11

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ......................................................... 18

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .............................................................. 12

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977).......................................... 11, 16

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003) ...................................... 5

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ............ 5, 6, 30

*League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723 (N.D. Ohio 2005)............. 28

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008).............................. 28

*Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135 (2d Cir. 2000) ........................... 22

*Libertad v. Welch,* 53 F.3d 428 (1st Cir. 1995) ......................................................................... 13

*Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013)............................................................... 12

*Lopez v. Merced Cnty., Cal.*, No. 06-1526, 2008 WL 170696 (E.D. Cal. Jan. 16, 2008) ........... 24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 11, 13, 14, 20

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006)..................................................................... 27, 29

*N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322 (M.D.N.C. 2014) ................ passim

*NAACP State Conf. v. Cortés*, 591 F. Supp. 2d 757 (E.D. Pa. 2008) ......................................... 28

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ....................................................... 20

*NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ......................................................... 12, 22

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ...................................... 27

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ....................................................................................... 9

*Parker v. Ohio*, 263 F. Supp.2d 1100 (S.D. Ohio 2003) ............................................. 25

*People Organized for Welfare & Emp't Rights (P.O.W.E.R.) v. Thompson*,
    727 F.2d 167 (7th Cir. 1984) ..................................................................... 21

*Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348 (E.D. Va. 2009) ................................... 5, 7, 25

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ....................................................... 29

*Raines v. Byrd*, 521 U.S. 811 (1997) ......................................................... 13

*Renne v. Geary*, 501 U.S. 312 (1991) ........................................................ 30

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) .................................... 3

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992) ...................... 2, 6, 10

*Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989) ...................................... 25

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ..................................................................... 20

*Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) ...................... 16

*Shaw v. Reno*, 509 U.S. 630 (1993) ......................................................... 20

*Shays v. Federal Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005) ....................... 15

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) .............................................................................. 16

*Ury v. Santee*, 303 F. Supp. 119 (N.D. Ill.1969) ......................................... 28

*Veasey v. Perry*, 29 F. Supp. 3d 896 (S.D. Tex. 2014) ...................................... 4, 24, 26

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ...................................................... 8

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) ................... 3, 9

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ..................................................... 1

*Williams v. Rhodes*, 393 U.S. 23 (1968) ...................................................... 8

**Statutes**

1 U.S.C. § 1 ................................................................................................. 24

30 Va. Reg. Regs. 2770 (Aug. 25, 2014) ................................................... 17

52 U.S.C. § 10302(a) ................................................................................. 24

**Other Authorities**

Amy Goldstein, *Democrats Predict Voter ID Problems*, Washington Post, Nov. 3, 2006 .......... 20

Clare Kim, *Pro-Voter ID Candidate Asa Hutchinson Forgets ID Needed to Vote*,
   May 20, 2014 ........................................................................................ 20

S. Rep. 94-295, 39-40, 1975 U.S.C.C.A.N. 774, 806-07 ............................ 28

## INTRODUCTION

"[N]o right is more precious . . . than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). This case is about Virginia's efforts to undermine, and in some circumstances completely suppress, the exercise of that basic, fundamental right through the passage of its voter ID law and its failure to address the Commonwealth's recurring problem with long wait times to vote. The Amended Complaint alleges that the General Assembly, in enacting voter ID and failing to address long wait times to vote, violated Section 2 of the Voting Rights Act ("VRA") (Count I); intended to suppress the vote of Democrats in violation of the First and Fourteenth Amendments (Count III); intended to suppress the vote of African Americans and Latinos in violation of the Fourteenth and Fifteenth Amendments (Count IV); and intended to suppress the vote of young voters in violation of the Twenty-Sixth Amendment (Count V). It also alleges that the voter ID law unduly burdens the right to vote in violation of the First and Fourteenth Amendments and that there is no rational basis for the law's refusal to permit certain types of ID to be used for voting or for Virginia's requirement that voting rights be restored to certain felons on an individual basis (Count II).

Defendants' attempt to avoid adjudication of these claims on the merits should be rejected. Defendants' contention that the 39-page, 126-paragraph Amended Complaint fails to state claims for relief ignores numerous allegations that, taken as true, prove the claims asserted; relies on misunderstandings of the law and of Plaintiffs' allegations; and raises factual disputes that are not appropriate for determination at this stage of the litigation. Likewise, Defendants' challenge to Plaintiffs' standing overlooks the Amended Complaint's allegations that the challenged practices will cause competitive harm to Plaintiffs, will burden Plaintiffs' right to associate and/or to vote, and will cause Plaintiffs to divert resources. Further, Defendants'

ripeness challenge fails—Plaintiffs' claims are fit for review and failure to review them will result in significant hardship. Accordingly, the motion to dismiss should be denied.[1]

**ARGUMENT**

## I.   THE AMENDED COMPLAINT STATES CLAIMS FOR RELIEF UNDER THE VRA AND THE CONSTITUTION

### A.   Legal Standard for 12(b)(6)

Consistent with Federal Rule of Civil Procedure 8(a)'s notice pleading standard, a court's motion to dismiss inquiry "is limited to whether the allegations constitute a short and plain statement of the claim showing that the pleader is entitled to relief." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotations omitted). "[I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* (citation omitted). A motion to dismiss "should only be granted if, after accepting all well-pleaded allegations [] as true and drawing all reasonable factual inferences in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The motion must be denied if sufficient facts are pled to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[1] It appears that Defendants' have not moved to dismiss Plaintiffs' partisan fencing claim as it applies to long wait times to vote, Am. Compl. ¶¶ 114-16, or Plaintiffs' rational basis claim with respect to voters with expired versus non-expired IDs as well as voters with in-state IDs versus out-of-state IDs, *id.* ¶ 111. *See* Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Am. Compl., ECF No. 49, at 5–9 ("Defs.' Br.").

**B.      Plaintiffs Allege Cognizable Intentional Race and Age Discrimination Claims**

Defendants' argument that Plaintiffs have not alleged "any" facts supporting their intentional race and age discrimination claims is without merit.[2] Defs.' Br. at 5. To plead claims of intentional discrimination, Plaintiffs must allege sufficient facts for the Court to infer that the targeting of the group at issue was a "motivating" factor for the challenged action. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The Supreme Court has identified several factors courts should consider in determining if an act was motivated by discriminatory intent—including a law's disproportionate impact, statements by legislators, and the historical background and sequence of events leading to the law's enactment. *Id.*; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (disproportionate impact of legislation "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions").

The Amended Complaint is replete with allegations that are relevant to discriminatory intent under *Arlington Heights*. To begin with, the Amended Complaint details Virginia's history of discrimination against minorities and its ongoing effects. *See* Am. Compl. ¶¶ 16-38. It also demonstrates that the sequence of events leading to the enactment of voter ID and the failure to address long wait times to vote provided Virginia Republicans with a strong motive to suppress minority and youth voting. *See, e.g., id.* ¶ 1 ("President Obama was the first Democrat to carry the Commonwealth in a presidential election in over 40 years. His success was based in part on significant increases in turnout among African-American, Latino, and young voters.") (footnote

---

[2] Defendants' arguments regarding intentional discrimination focus solely on Plaintiffs' racial and age discrimination claims. Defs.' Br. at 4-5. Defendants separately challenge Plaintiffs' partisan discrimination claims. *Id.* at 8-9. Those arguments are addressed *infra* at 7.

omitted); *id.* ¶ 36 (Republican State Sen. Watkins: "[n]o one can dispute that racially polarized voting is present in Virginia"); *see also id.* ¶¶ 2, 37-39, 42.

The Amended Complaint also alleges that voter ID and Virginia's long wait times disproportionately burden minority and young voters, *see* Am. Compl. ¶¶ 60-69, 71, 85-86, 88-89; it alleges that there is no legitimate justification for the voter ID law, *see, e.g.*, *id.* ¶ 3 (voter ID "does not materially further any legitimate state interest" and "Judge Richard Posner recently explained that '[t]he one form of voter fraud known to be too rare to justify limiting voters' ability to vote by requiring them to present a photo ID at the polling place is in-person voter impersonation'"); *see also id.* ¶¶ 73-77; and that any cost savings associated with the policies that have resulted in long wait times to vote are outweighed by the burden these policies impose on voters generally and minority and young voters specifically, *id.* ¶ 87. Taken together, these allegations plainly can (and, for purposes of this motion to dismiss, must) support the inference that the General Assembly enacted the voter ID law and failed to address the recurring problem of long lines with the intent, at least in part, to suppress the vote of minority and young voters. *Accord Veasey v. Perry*, 29 F. Supp. 3d 896, 920-21 (S.D. Tex. 2014) (pleading facts consistent with *Arlington Heights* sufficient to state intentional discrimination claim).

Moreover, the Amended Complaint expressly alleges that Virginia acted with discriminatory intent in enacting voter ID and taking no action with respect to long wait times. *See* Am. Compl. ¶¶ 3, 82, 91, 117-26. And, the Amended Complaint supports the conclusion that voter ID laws generally and the allegations of fraud used to justify those laws are motivated by an intent to deter voting by minorities. *See id.* ¶ 81 (studies have found "'a very substantial [] association between the racial composition of a state's residents or active electorate and both the

proposal and passage of voter restriction legislation'"); *see also id.* ¶¶ 79-80. In short, the Amended Complaint adequately alleges claims of intentional race and age discrimination.

### C.    Plaintiffs Allege Cognizable Claims Under the VRA and the First and Fourteenth Amendments

Defendants' challenge to the Section 2 and First and Fourteenth Amendment undue-burden claims also fails. As an initial matter, Defendants' appear to conflate these distinct claims, which are addressed differently under the law and in the Amended Complaint. Further, Defendants' argument that Plaintiffs have failed to plead a Section 2 claim is not well-founded.

A Section 2 claim requires allegations of: "(1) the use of an electoral standard, practice or procedure, and (2) a resulting diminution of the opportunity to African American and Latino voters to participate in the political process and to elect representatives of their choice." *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 370 (E.D. Va. 2009) (internal quotations and citations omitted); *see also Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040-41 (D.C. Cir. 2003). In a vote-denial case, plaintiffs may also be required to establish that the challenged practice is linked to social or historical discrimination.[3] *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). Consistent with Rule 8(a), plaintiffs "in a Section 2 case are not required on the face of their complaint to allege every legal element or fact that must be proven." *Perry-Bey*, 678 F. Supp. 2d at 370-71 (citing *Kingman Park Civic Ass'n*, 348 F.3d at 1040).

---

[3] The Fourth Circuit's two-part test was established fairly recently, and Plaintiffs have not found a case applying it in the context of *pleading* a VRA claim. Earlier cases within this circuit held that plaintiffs are only required to plead the statutory elements of a Section 2 claim—a challenged practice and diminution of the opportunity for a protected class—to survive a motion to dismiss. *See, e.g.*, *Perry-Bey*, 678 F. Supp. 2d at 370 n.16. Nevertheless, Plaintiffs address this second element of the Fourth Circuit Section 2 test as if it were a required element for pleading purposes, and have included allegations to meet it in their Amended Complaint.

Here, Plaintiffs expressly allege that the voter ID law and failure to address long wait times diminishes African Americans' and Latinos' opportunity to participate in the political process. Am. Compl. ¶¶ 60, 85. Plaintiffs also allege facts supporting the inference that these policies diminish these protected classes' ability to participate. *See, e.g.*, *id.* ¶ 61 (residents in predominantly African-American and Latino counties are less likely to have a DMV-issued ID); ¶ 62 (minorities disproportionately lack ID); ¶ 64 (voter ID depresses minority turnout); ¶ 69 (voter ID decreases minority turnout); ¶ 85 (minorities have less time for voting); ¶ 86 (precincts with long wait times are predominantly minority). Plaintiffs have also alleged that Virginia has a well-documented history of discrimination against African Americans and Latinos, *id.* ¶¶ 16-30; this history has on-going effects, *id.* ¶¶ 31-38; and these on-going effects are directly linked to the burdens that voter ID and long wait times place on these protected classes, *id.* ¶¶ 63, 85, 88. These allegations are more than sufficient to state a Section 2 claim.

Defendants' assertion that the Amended Complaint is insufficient because Plaintiffs did not provide statistics from the 2014 election is wrong. *First*, to the extent that Defendants dispute Plaintiffs' allegations that voter ID and long wait times disproportionately burden African-American and Latino voters in Virginia, Am. Compl. ¶¶ 60-65, 69, 71, 85-86, 88, that position represents a factual dispute that cannot be resolved at this stage. *See Republican Party of N.C.*, 980 F.2d at 952. *Second*, Defendants' position is inconsistent with controlling law. In resolving a Section 2 claim, a court must consider the *totality* of the circumstances, which may include evidence such as past discrimination, its on-going effects, and election statistics. *League of Women Voters of N.C.*, 769 F.3d at 240. That test does not *require* that statistics from any particular election (or state)—much less a midterm election—be used. *See id.*; *see also Frank v. Walker*, 768 F.3d 744, 747 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015) (noting plaintiffs

could have produced national statistics regarding photo ID or in-state statistics in proving their claim). If there were a requirement that statistics from a particular election be alleged, no law could ever be enjoined under Section 2 before the law went into effect. *Third*, Defendants misunderstand Plaintiffs' burden at this stage. Plaintiffs are not required to "allege every legal element or fact that" would potentially prove their case. *Perry-Bey*, 678 F. Supp. 2d at 370-71. Thus, whatever merit Defendants' argument regarding the 2014 election might have at summary judgment or trial, it cannot provide grounds for dismissal here.

Lastly, Defendants' argument that Plaintiffs failed to plead cognizable First and Fourteenth Amendment claims focuses exclusively on disparate impact on the basis of race, but Plaintiffs have not pled such a claim. Rather, *Anderson-Burdick* governs Plaintiffs' First and Fourteenth Amendment claims. Am. Compl. ¶¶ 109-10. Under *Anderson-Burdick*, Plaintiffs must allege that voters are burdened by a law and that the State's justifications for imposing those burdens are inadequate. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). No showing of disparate impact is required. *See generally Id.*; *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Plaintiffs have pleaded ample facts demonstrating that the burdens voter ID and long lines places on voters, including minority voters, far outweighs Virginia's interests. *Compare* Am. Compl. ¶¶ 56-57, 61-62, 64, 69, 85-86, 88 *with*, *e.g.*, *id.* ¶¶ 72, 75, 77, 87, 90.

### D.    Plaintiffs Allege a Cognizable Partisan Fencing Claim

Defendants' argument that Plaintiffs have failed to allege a partisan fencing claim with respect to voter ID because Plaintiffs have not defined how Democrats vote and because the voter ID law is facially neutral is not well founded.

First, Plaintiffs explicitly allege that the General Assembly enacted the voter ID law and failed to take action to prevent long wait times to vote from recurring with the intent "to suppress

the vote of Democrats because of the way they are expected to vote." Am. Compl. ¶ 116; *see also id.* ¶ 3 (Republican majorities in the General Assembly enacted the voter ID law, which was "designed to reduce disproportionately the turnout of . . . core Democratic constituencies and Democratic voters more broadly," because they were "[d]etermined to stall, if not reverse, the growing success of the Democratic Party in Virginia").[4] Plaintiffs plainly allege that the General Assembly sought to suppress the vote of Democrats because they were voting for Democrats.

Second, Defendants fail to cite any case law that restricts to facially discriminatory laws the equal protection theory announced by the Supreme Court in *Carrington v. Rash*, 380 U.S. 89 (1965), which held that "'[f]encing out from the franchise a sector of the population *because of the way they may vote* is constitutionally impermissible," *id.* at 94 (emphasis added). This is not surprising. Such a limitation would be inconsistent with the Court's rationale that the fundamental right to vote "cannot constitutionally be obliterated because of a fear of the political views of a particular group." *Id.*; *see also Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) ("First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views" and a State may not "burden[] or penalize[] citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views.") (Kennedy, J., concurring); *Anderson*, 460 U.S. at 792-93 (1983) ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status."); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (discussing "the

---

[4] The Amended Complaint is replete with factual allegations that support this conclusion. Am. Compl. ¶¶ 3, 27, 36, 40-41, 44-46, 71, 79, 80-81, 91, 114-16.

right of qualified voters, regardless of their political persuasion, to cast their votes effectively"). It would also be at odds with Supreme Court precedent finding intentionally discriminatory laws unconstitutional even if their discriminatory intent was not facially evident. *See, e.g.*, *Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982) (recognizing a facially neutral statute may contravene the Fourteenth Amendment if enacted with discriminatory purpose); *Arlington Heights*, 429 U.S. at 265-68 (explaining equal protection claims may be maintained against a facially neutral statute motivated in whole or in part by discriminatory intent). In short, Defendants' arguments with respect to Plaintiffs' partisan fencing claim fail.[5]

### E.     Plaintiffs Allege a Cognizable Claim Regarding Felon Re-enfranchisement

Defendants misunderstand Plaintiffs' felon re-enfranchisement claim, erroneously casting it as an undue-burden claim. Plaintiffs in fact challenge the felon re-enfranchisement policy under the equal protection clause, asserting that the requirement that voting rights be restored on an individual basis is arbitrary and not rationally related to the Commonwealth's legitimate interests. Am. Compl. ¶ 112. To survive scrutiny under the equal protection clause, any law that distinguishes between similarly situated groups must at least be rationally related to a legitimate state interest. *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). Here, the Amended Complaint alleges that the rule requiring ex-offenders to be re-enfranchised on an individual basis and the

---

[5] To the extent Defendants also argue that it is impossible to bring a partisan fencing claim in Virginia because Virginia does not have party registration and, therefore, Democrats cannot be targeted by the law, the Amended Complaint contains ample discussion of the long history of racially polarized voting in Virginia, *see* Am. Compl. ¶¶ 1, 2, 27-28, 36-39, 42, pursuant to which the General Assembly could have used race as a proxy for party. Moreover, as alleged, voter ID was intended to suppress the vote of groups that predominately vote for Democrats—facts that if proven support a finding that, not only was it entirely possible to target Democrats but that that is what occurred. That *Carrington* concerned a registration law and this case concerns a voter ID law is of no consequence because, in both cases, the intent of the law was to suppress the vote of a sector of the population precisely because of how that group was expected to vote. *Carrington*, 380 U.S. at 93.

Governor's policy of re-enfranchising all nonviolent felons who have completed their sentences and do not have pending felony charges has resulted in a system in which nonviolent offenders are re-enfranchised not based on any factor rationally related to their qualification to vote but based on whether they can be located by the Governor's office. Am. Compl. ¶¶ 95-99.

Defendants also grossly mischaracterize the process of felon re-enfranchisement as equivalent to "re-registering to vote." Defs.' Br. at 10. To the extent that Defendants dispute this process, it amounts to a factual dispute that is not appropriate for consideration at the motion-to-dismiss stage. *Republican Party of N.C.*, 980 F.2d at 952.

Lastly, Plaintiffs' request that the Court declare the individualized re-enfranchisement requirement unconstitutional and enjoin its enforcement is neither vague nor unconstitutional. *See* Am. Compl. ¶¶ A-B, *prayer for relief*. Not only are declaratory and injunctive relief typically issued by courts in response to constitutional violations, but the Supreme Court has found that such relief is constitutional. *See Ex parte Young*, 209 U.S. 123, 166 (1908). Contrary to Defendants' assertions, Plaintiffs do not request that these individuals be "swept" onto Virginia's voting rolls, nor that they automatically be registered to vote. Rather, in practice, Plaintiffs' request means only that eligible ex-offenders would not have to file an initial application for re-enfranchisement. Upon meeting the required criteria, those individuals would be automatically re-enfranchised and eligible to file a voter registration application. Thus, the cases cited by Defendants, which pertain to the right not to vote, are irrelevant.

## II. PLAINTIFFS HAVE ESTABLISHED STANDING

Plaintiffs have alleged facts demonstrating that they (and, in the case of the Democratic Party of Virginia ("DPVA"), its members and constituents) have suffered and will suffer legally cognizable injuries as a result of the challenged laws sufficient to confer standing under Article

III and the VRA. DPVA has suffered and will continue to suffer injury to its organizational interests because: (1) it has had to and will continue to have to divert resources to combat the effects of the challenged policies; and (2) it has been the target of intentionally discriminatory policies aimed at harming its mission and members. DPVA also has associational standing on behalf of its constituents and members, whose voting and civic rights are harmed by these discriminatory laws. With respect to the individual Plaintiffs, both will be imminently harmed as voters by the voter ID law and in their work as Democratic organizers by all challenged policies. All Plaintiffs are "aggrieved persons" under the VRA.

> A.      **Legal Standard for Standing**

To have Article III standing, a plaintiff must be able to demonstrate that he has suffered or will suffer a concrete, particularized injury that is (1) actual or imminent; (2) "fairly traceable to the challenged action of the defendant"; and (3) likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). An organization may also bring suit either on its own behalf or on behalf of its members or constituents when: (1) its members and constituents would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members or constituents in the suit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 345 (1977) (constituency); *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 319-20 (4th Cir. 2002) (members); *Veasey*, 29 F. Supp. 3d at 904 (constituency). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct" suffice to establish standing, because the Court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89-

90 (4th Cir. 2013) (same), *cert. denied*, 134 S. Ct. 683 (2013). Where injunctive relief is sought, "only one plaintiff with standing is required." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

Thus, Defendants' standing arguments must be rejected if the Amended Complaint alleges facts establishing that there is at least one Plaintiff with standing to pursue the claims therein. Plaintiffs have sufficiently alleged facts establishing that *each* of them has standing to pursue their claims. Defendants' arguments rely on an insupportably narrow conception of "injury" that runs contrary to well-established law, and would require that the Court turn the presumption afforded Plaintiffs' factual allegations at this stage of the proceedings on its head.

### B.     DPVA Has Organizational Standing

An organization suffers an Article III injury when it must divert resources from its usual activities to lessen the harm caused by an act that causes injury to the organization's mission or members. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("[T]he consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding NAACP injured based on diversion of resources from regular activities to educate and assist voters in complying with photo ID law); *NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (organizations "made a sufficient showing that they will suffer a concrete injury [where they] reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [voting law]."); *Frank v. Walker*, 17 F. Supp. 3d 837, 864 (E.D. Wis. 2014) ("[A]n organization suffers a cognizable injury in fact when it devotes resources, however minimal, to dealing with effects of a law that are adverse to its interests."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015). Consistent with this principle, courts have found that, because the

- 12 -

Democratic Party has a direct and particular interest in the outcome of elections, it satisfies Article III's standing requirements when it diverts resources to ameliorate the effects of a challenged law. *Crawford*, 472 F.3d at 951 ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *see also N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322, 342 (M.D.N.C. 2014) (recognizing political parties have a cognizable interest in outcomes of elections), *aff'd in part, rev'd in part on other grounds*, *League of Women Voters of N. C.*, 769 F.3d 224 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015).

Contrary to Defendants' assertion,[6] the Amended Complaint plainly states that DPVA has been directly injured by the challenged laws because, to be successful in its efforts to elect Democratic candidates, it must divert resources from their normal use to educate Virginians about voter ID, as well as to combat long wait times. Am. Compl. ¶ 11. At the pleading stage, these allegations alone are sufficient to establish DPVA's standing. *Lujan*, 504 U.S. at 560-61. But, the specific facts alleged also bear this out. Plaintiffs have pled that, in Virginia, African Americans, Latinos, and young voters are overwhelmingly Democrats and, in turn, vote

---

[6] Defendants also assert that DPVA's allegation that the electoral policies in question will disproportionately reduce the turnout of Democratic voters and decrease the likelihood that DPVA will be successful in its efforts to help elect Democratic candidates is insufficient because it is conjectural, not actual and imminent, and DPVA has not alleged that the challenged laws had any disparate impact on the 2014 elections. As explained *supra* at 6, this argument raises a factual dispute, the resolution of which is not appropriate on a motion to dismiss and is *never* appropriate in a standing analysis. *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (explaining that standing does not depend on the merits but, rather, on who brings suit); *Libertad v. Welch*, 53 F.3d 428, 437 n. 5 (1st Cir. 1995) ("An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry.").

overwhelmingly for Democratic candidates. Am. Compl. ¶¶ 27-28, 36, 39, 42, 71. DPVA *must* turn out these populations to successfully elect its candidates. Yet, it is precisely these voters who are most burdened by voter ID and long wait times. *Id.* ¶¶ 56, 62, 69, 61 (African-American and Latino populations less likely to have IDs than whites); ¶¶ 67, 69 (young voters are less likely to have voter ID); ¶¶ 84-85, 87 (long wait times disproportionately "burden the right to vote of African Americans, Latinos, citizens in poverty, young people, and Democrats"); ¶ 86 (former Secretary of SBOE stated long lines are predominantly located in "urban, high-growth areas" with "highly transient voters" or in "university precincts"). It is not merely inferable that DPVA has had to and will have to divert resources to help these core constituencies overcome the burdens placed on them by these policies to get out the Democratic vote, *see, e.g.*, Am. Compl. ¶ 10, but DPVA's diversion of resources is fairly traceable to Defendants' conduct and sufficient to establish standing.[7] *See id.* ¶¶ 64 - 65, 69, 71.

In addition, DPVA has been and will continue to be directly injured by voter ID and long wait times because these policies were intended to directly harm DPVA, its mission, and its constituents. The challenged policies were enacted with the intent of harming Democrats and suppressing the Democratic vote. *See* discussion *supra* at 7–9. DPVA's central purpose is supporting, promoting, and helping elect Democrats as well as ensuring that Democrats have the ability to elect the candidates of their choice. *See* Am. Compl. ¶ 11. Thus, any policy that intentionally discriminates against Democrats necessarily discriminates against DPVA and it is directly injured. Accordingly, it has standing to sue on these grounds.

---

[7] To the extent Defendants argue that DPVA fails to allege a direct injury because it would "presumably undertake[] these expenditures . . . no matter what the law is," Defs.' Br. at 16, Defendants raise a factual dispute not appropriate for resolution at this stage of the proceedings, where the Court must accept Plaintiffs' allegations as true and draw all inferences in Plaintiffs' favor. *See Lujan*, 504 U.S. at 560-61 (1992); *Edwards*, 178 F.3d at 244.

DPVA has also sufficiently alleged that it is directly injured by the felon re-enfranchisement policy. DPVA has suffered and continues to suffer a concrete injury to its associational rights because the policy disproportionately disenfranchises Democratic voters, disproportionately decreases Democratic turnout, and makes it more difficult for DPVA to help elect its candidates to office. Am. Compl. ¶ 11; *see Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) ("If a . . . political party can marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III."); *id.* (explaining in *Crawford* the challenged law injured the Democratic Party by "preventing and discouraging [Party] members and supporters from voting"). Political parties have a concrete and particularized interest in the outcomes of elections sufficient to confer standing. *See McCrory*, 997 F. Supp. 2d at 342; *cf. Shays v. Federal Election Comm'n*, 414 F.3d 76, 84–85 (D.C. Cir. 2005) (candidates suffer constitutional injury where regulations have a negative effect on a competitive environment).

DPVA's interest in having felons re-enfranchised is not merely an abstract social interest, nor is it "hypothetical" or "conjectural." As the facts alleged demonstrate, it is an actual injury to DPVA's particular interest in the outcomes of elections that DPVA faces each election cycle that these individuals are not re-enfranchised. Over half of the 100,000 estimated Virginians who are disenfranchised by the individualized felon re-enfranshisement law are African American and, given Virginia's history of racially polarized voting, if re-enfranchised they would vote disproportionately Democratic. Am. Compl. ¶¶ 19, 27-28, 35-36, 39, 42, 93, 95. Accordingly, the policy directly injures DPVA not only by suppressing the turnout of a core Democratic constituency, but also by making it more difficult for DPVA to exercise its associational rights.

## C.    DPVA Has Associational Standing

DPVA has alleged facts sufficient to establish associational standing for all claims pled.

Even assuming that Defendants are correct that DPVA must identify specific DPVA members to support associational standing, the Amended Complaint does just that by identifying Plaintiffs Lee and Brescia, who have and will suffer injuries as a result of the challenged laws and thus have standing to sue in their own right.[8] Both Lee and Brescia have standing to challenge the voter ID law, long wait times, and felon re-enfranshisement policy as voters and as organizers whose individual constitutional rights have been infringed. Specifically, the felon re-enfranchisement policy injures Brescia's interest in registering voters; the long wait times force Brescia to divert his time and efforts to turnout Democratic voters; and voter ID makes Lee's get-out-the-vote ("GOTV") efforts more difficult, causing her to have to exert more effort in turning out the Democratic vote. *See* discussion *infra* at 22–23.

With respect to voter ID specifically, Lee and Brescia have individual standing because, as Virginia voters, the law burdens their voting rights simply by requiring that they *present* identification—regardless of whether they currently possess the required ID. *See Common Cause/Georgia,* 554 F.3d at 1351–52 (holding "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing"); *Frank,* 17 F. Supp. 3d at 866 (same); *City of Memphis v. Hargett*, 414 S.W.3d 88, 99-100 (Tenn. 2013) (applying *Billups* in holding that plaintiffs had standing to

---

[8] Defendants challenge DPVA's associational standing solely on the grounds that DPVA's *members* have not been shown to meet the injury requirement, *see* Defs.' Br. at 17; therefore, Plaintiffs focus on that element of associational standing in response. Nevertheless, the injuries suffered by DPVA's members in this suit—*i.e.*, harm to their right to vote as well as harm to their ability to organize—are germane to DPVA's central purposes of helping to elect Democratic candidates and assisting its members in electing the candidates of their choice. *See* Am. Compl. ¶ 11. Further, because the suit seeks injunctive relief there is no need for individual DPVA members to participate. *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004) (citing *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996)); *see also Hunt*, 432 U.S. at 342-45.

pursue claims "which are predicated upon their entitlement to vote in person, free of the photo ID requirement," even though they "could have procured a valid photo ID card free of charge or avoided the photo ID requirement by casting an absentee ballot"); *Crawford*, 472 F.3d at 951 (noting standing requires only minimal showing of injury). Plaintiffs have challenged Virginia Code § 24.2-643B, which requires all voters "to present" certain types of photo ID to vote. Am. Compl. ¶ 46. Thus, it is the law's requirement that the voter *present* the photo ID that injures the voter and, consequently, confers standing to sue, not—as Defendants have mistakenly argued— the voter's *inability to obtain* the required identification. This is particularly true for Virginia's law, which requires that the voter present an *unexpired* ID. *See* 30 Va. Reg. Regs. 2770 (Aug. 25, 2014). Thus, voters who have the proper ID also bear the burden of ensuring that it remains up to date every election in order to have their vote counted. *See Frank*, 17 F. Supp. 3d at 866 n.24 (explaining that the injury to voters increases where they must maintain unexpired IDs).

Virginia voters who possess acceptable photo ID under the law also bear the burden of bringing it with them to the polls on Election Day. If it is lost or stolen, or if they forget to bring it, they face greater hurdles to voting and, in many cases, may find themselves completely disenfranchised.[9] Likewise, individuals who believe they have the required ID, but learn at the

---

[9] There have been several news reports of politicians who have forgotten to bring voter ID. In Indiana, Julia Carson was told that her congressional ID, which had a photo but no expiration date, was not acceptable; she was only able to vote after a poll worker telephoned a superior, and confirmed that Carson was a member of the U.S. Congress. *See* Amy Goldstein, *Democrats Predict Voter ID Problems*, Washington Post, Nov. 3, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/11/02/AR2006110201897.html. In Arkansas, Asa Hutchinson, who was running in the Republican primary for Governor, was only able to vote after a staffer retrieved his ID. *See* Clare Kim, *Pro-Voter ID Candidate Asa Hutchinson Forgets ID Needed to Vote*, May 20, 2014, *available at* http://www.msnbc.com/the-last-word/asa-hutchinson-forgets-photo-id-vote. Hutchinson's spokesperson described the experience as a "little bit of an inconvenience." *Id.* Needless to say, average voters are normally not recognizable or influential enough to have a poll worker's rejection of their ID overruled at

polls on Election Day that they do not, are disenfranchised the moment they are asked to present the ID. Further, many voters—particularly in the classes discussed in the Amended Complaint—are discouraged in general by the imposition of the voter ID law and, therefore, it is the requirement that they present ID—whether they have the required ID or not—that causes them not to vote. Accordingly, it is clear that the finding that presentation of an ID is an injury is not only sufficient to confer standing, but necessary to prevent greater disenfranchisements and burdens from occurring.

As the court explained in *Common Cause/Georgia*, "[a] plaintiff need not have the franchise wholly denied to suffer injury; rather, *[a]ny* concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." 554 F.3d at 1351-52 (emphasis added). Much like a challenge to a statute imposing a poll tax does not require a plaintiff to show that she cannot pay the tax to challenge it, *see Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966), lack of the required identification is not required to establish constitutional standing to challenge a photo ID law. *Id.* Accordingly, Lee and Brescia, who have alleged that they are minorities, registered Virginia voters, active participants in the Virginia electorate, and intend to vote in the future, are directly and imminently harmed by the voter ID law and its requirement that they present photo ID to vote. *See* Am. Compl. ¶¶ 8-9. As a result, both have individual standing and, consequently, so does DPVA.

Even if the Court were to find Lee's and Brescia's grounds for standing not satisfactorily alleged, the Amended Complaint pleads facts sufficient to infer that individual members of

---

the polls, nor do they travel with staffers who can quickly retrieve forgotten driver's licenses. In similar situations, their burden could be quite significant, and they may be completely disenfranchised—especially in Virginia, which severely restricts absentee voting and has no early voting such that virtually all voters cast their ballots on Election Day.

DPVA have standing even under the Defendants' myopic characterization of injury. That is, DPVA's individual members are: (1) unable to obtain identification; (2) unable to have their rights restored; or (3) subjected to unreasonably long wait times. As discussed, the Amended Complaint is replete with allegations of fact about Virginia's long history of racially polarized voting and that African American and Latino voters in the Commonwealth are disproportionately Democrats and disproportionately vote Democratic. Am. Compl. ¶¶ 1-2, 27-28, 39, 42, 71. More recently, young voters have also disproportionately voted Democratic. *Id.* ¶¶ 1-2, 42, 71. Likewise, as noted, over 100,000 disenfranchised felons are African American and, in keeping with Virginia's long history of racially polarized voting, disproportionately vote Democratic. *Id.* ¶¶ 19, 27-28, 35-36, 39, 42, 93, 95. As alleged, all of these populations are either: (1) disproportionately unlikely to have ID, *id.* ¶¶ 56, 60-64, 66-67, 69, 71; (2) unable to have their voting rights restored, *id.* ¶¶ 93-99; and/or (3) disproportionately likely to have been subjected to unreasonably long lines, *id.* ¶¶ 85-86, 88.

To establish organizational standing, DPVA is not required, as Defendants' erroneously assert, to name a specific, individual member who has suffered the injuries discussed above in their Amended Complaint. In *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1269 (2015), the Supreme Court held that the circuit court erred in finding that an organizational plaintiff did not have standing in a racial gerrymandering suit because it failed to specifically identify the districts in which its individual members (who would have standing to sue in their own right) resided. *Id.* The Court, examining the evidentiary record, found that testimony that the organization "had members in almost every county" and that it operated "statewide" sufficient to "support an inference that the organization has members in all of the State's majority-minority districts . . . which is sufficient to meet the Conference's burden of establishing standing." *Id.*

- 19 -

Under the Court's analysis in *Alabama*, Plaintiffs have organizational standing. Plaintiffs allege that DPVA has members statewide, many of whom are eligible voters. Am. Compl. ¶ 11. Further, Plaintiffs allege numerous facts supporting the inference that these same eligible voters are African Americans, Latinos, young people, and poor people who, consequently, are also disproportionately affected by the very laws challenged in this suit. *See generally* Am. Compl. At this juncture, this is more than enough. Indeed, *Alabama* found that similar allegations would be sufficient to infer standing at the evidentiary stage. There can be no serious argument, therefore, that such allegations are insufficient to survive a motion to dismiss, when Plaintiffs' factual allegations must be credited.[10] *See also Lujan*, 504 U.S. at 560-61.

### D.      Lee and Brescia Have Standing As Individuals

*First*, as previously noted, both Lee and Brescia suffer injury as a result of Virginia's voter ID law by requiring Lee and Brescia to present ID. *See, e.g., Common Cause/Georgia*, 554 F.3d at 1351–52. *Second*, Brescia has standing to challenge the felon re-enfranchisement law because, as a result of the law, he has suffered and will continue to suffer an imminent injury to his ability to register voters. Harm to a plaintiff's interest in registering voters confers standing. *McCrory*, 997 F. Supp. 2d at 341; *see also Coal for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395, 398-99 (8th Cir. 1985) (stating organizational plaintiff had standing, but only "on the basis of" its individual members, who were injured by "the Board's refusal to appoint [them]

---

[10] Plaintiffs note that even without *Alabama* it is a long standing rule that where all of an organizations' members are injured, there is no need to identify any one individual member who was injured. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183-84 (4th Cir. 2013) (recognizing no individual members must be named pursuant to *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) where all members are harmed). As discussed, the laws in question decrease Democrats' likelihood of electoral success and thereby injure *all* of DPVA's members. *See Shaw v. Reno*, 509 U.S. 630, 650 (1993). In addition, because the General Assembly enacted voter ID and failed to address Virginia's recurring long wait times to vote with the intent to discriminate against Democrats, Virginia's voter ID law and wait times to vote directly injure all of the DPVA's members.

as deputy registration officials . . . *preventing them from registering new voters*") (emphasis added); *cf. People Organized for Welfare & Emp't Rights (P.O.W.E.R.) v. Thompson*, 727 F.2d 167, 170 (7th Cir. 1984) (explaining it "might be a persuasive basis for standing if P.O.W.E.R. had been trying to advance its goal [of improving the lot of the poor and unemployed] by registering new voters itself" that "[a]nyone who prevented it from doing that would have injured it"). By the same logic, Brescia, who has alleged that his own voter registration efforts have been harmed by the restrictive felon re-enfranchisement laws, Am. Compl. ¶ 10, has standing to sue on the basis of the same injury-in-fact.[11] Indeed, the court in *NAACP v. McCrory* considered this same argument in relation to a challenge to North Carolina's repeal of preregistration. The court found that individuals who had engaged in preregistration activities in the past and intended to engage in such activities in the future have an interest in preregistering voters. 997 F. Supp. 2d at 341. Further, the court explained that harm to that interest—i.e., the repeal of a preregistration law (or imposition of a registration law) that prevented them from engaging in their registration activities—constituted a type of civic harm sufficient to confer standing. *Id.* Thus, it found that the individual intervenor-plaintiffs challenging the repeal of that law had standing to sue. *Id.*

Much like the intervenors in *McCrory*, Brescia alleges he has engaged in registration activities and will continue to engage in registration activities in the future. Am. Compl. ¶ 9. He further alleges that this policy has interfered with his voter registration activities and prevented him from registering the maximum amount of voters that he could, and the specific facts alleged

---

[11] Although Plaintiffs recognize that it was not alleged in the Amended Complaint, they submit that Plaintiff Lee also registers ex-offenders and, in doing so, must make extra efforts to register them in light of the individualized felon re-enfranchisement policy. These steps necessarily burden her First Amendment right to register these voters. *See McCrory*, 997 F. Supp. 2d at 341–342. Should the Court find that Plaintiffs do not have standing on their felon re-enfranchisement claims, Plaintiffs would request leave to amend to add these allegations.

support this assertion. *Id.* ¶ 10. As alleged, an estimated 100,000 Virginians are eligible to have their rights restored and, accordingly, register to vote. *Id.* ¶ 95. Nevertheless, because of Virginia's individually-based restoration policy, it is not only difficult, but in most cases impossible to refranchise these individuals as they cannot be located. *See id.* ¶¶ 96-97. Until these individuals are re-enfranchised, not only are they unable to register to vote, but organizers such as Brescia are prevented from registering them as well. Thus, as alleged, the felon re-enfranchisement policy imminently harms Brescia's individual right to register voters and is sufficient to confer standing in this case.[12]

Third, Lee and Brescia also have standing to challenge Virginia's voter ID law and long wait times, respectively, because these policies will imminently injure their ability to conduct GOTV efforts. *Id.* ¶¶ 8, 10. The expenditure of resources to respond to laws adverse to a party's interests constitutes an injury-in-fact. *Browning*, 522 F.3d at 1165-66; *Frank*, 17 F. Supp. 3d at 864. As Democratic organizers, both Lee and Brescia both have an interest in getting Democratic candidates elected. *cf. Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 142 (2d Cir. 2000) (finding that plaintiff had standing to sue where she associated with a candidate to help

---

[12] Defendants citation to *El-Amin v. McDonnell*, No. 12-00538, 2013 WL 1193357 (E.D. Va. March 22, 2013), is also misplaced. First, Plaintiffs bring their felon re-enfranchisement claim because their own rights (even where they are not felons) are directly injured by the Commonwealth's policy. Thus, the timing of an ex-offenders' exercise of rights is inconsequential. Second, the felon re-enfranchisement claim in this case (as discussed *supra* at 9–10) is distinct from the claim in *El-Amin*. There the court considered the ex-offender's standing with respect to substantive and procedural due process claims and found no injury because the ex-offender had not availed himself of the process. *Id.* at *4.-5. Here, Plaintiffs do not assert a due process challenge. They allege that because the policy discriminates between ex-offenders based on whether they can be located, it cannot be justified on any rational basis. Am. Compl. ¶¶ 112-13. Nothing in this claim requires that an ex-offender attempt to utilize the re-enfranchisement policy. In fact, it is precisely because the process is not accessible that it serves no rational purpose. *See id.* ¶¶ 95-98.

him gain access to the ballot and was deprived of the opportunity to do so). Thus, because they are forced to expend more resources and put forth more effort to achieve that interest as a result of the challenged laws, they are directly injured. *See Crawford*, 472 F.3d at 951 (finding the Democratic Party suffered cognizable injury from a voter ID law that "compel[ed] the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"); *cf. Common Cause v. Bolger*, 512 F. Supp. 26, 30 (D.D.C. 1980) (candidates challenging incumbents were injured by congressional franking privilege because they were forced to raise additional funds).

Moreover, because Lee's and Brescia's individual rights to vote as well as their actual interests in registering voters and getting Democrats elected are directly injured by the voter ID law, long wait times, and felon re-enfranchisement policy, contrary to Defendants' assertions, Plaintiffs' claims do not constitute "generalized grievances" or third-party interests. Further, Plaintiffs are members of classes—African Americans, Latinos, young persons, and Democrats—that were directly discriminated against and targeted by the challenged policies. Consequently, they have suffered and will continue to suffer a direct, intentional injury as a result of these policies. As explained in *Bishop v. Bartlett*, 575 F.3d 419 (4th Cir. 2009), (relied upon by Defendants), where a plaintiff suffers a "concrete harm," such as the government's interference with a right to vote, regardless of whether that harm is "widely shared" the injury still constitutes an injury-in-fact sufficient to confer standing. *Id.* at 424-25. Plaintiffs suffer from such concrete harms and have standing to assert the claims alleged.

### E.   Plaintiffs Have Statutory Standing to Sue Under the VRA

Defendants also appear to challenge Plaintiffs' statutory standing under Section 2 of the VRA, asserting, without any further discussion, that Plaintiffs are not "aggrieved persons" under the statute because their "voting rights have [not] been denied or impaired." Defs.'Br. at 12. This

argument is fatally flawed. Consistent with the Act's "broad remedial purpose of ridding the country of racial discrimination in voting," Plaintiffs are exactly the type of "aggrieved persons" authorized to bring suit under the statute. *See Chisom v. Roemer*, 501 U.S. 380, 403-04 (1991) (internal quotations and alterations omitted).

The VRA provides that either the Attorney General or an "aggrieved person" may institute a proceeding under the Act. 52 U.S.C. § 10302(a). Pursuant to 1 U.S.C. § 1, unless the statute indicates otherwise, when the word "person" is used in an act of Congress it is presumptively interpreted to include organizations as well as individuals. The underlying legislative history confirms that this presumption also applies to the VRA. Senate Report No. 94-295 in support of the amendment that added the aggrieved person language to the VRA explains that "[a]n 'aggrieved person' is any person injured by an act of discrimination[,]" including "an individual" or "an organization representing the interests of injured persons." S. Rep. 94-295, 39-40, 1975 U.S.C.C.A.N. 774, 806-07. Accordingly, both the individual Plaintiffs as well as DPVA constitute "aggrieved persons" under the VRA. *See, e.g., Frank*, 17 F. Supp. 3d at 864 (finding organizations have standing to sue as aggrieved persons under the VRA); *Veasey*, 29 F. Supp. 3d at 906-07 (same); *Lopez v. Merced Cnty., Cal.*, No. 06-1526, 2008 WL 170696, at *10-11 (E.D. Cal. Jan. 16, 2008) ("History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly-beyond the common-law interests and substantive statutory rights upon which "prudential" standing traditionally rested. The 1975 Amendment's use of the term 'aggrieved person' [] cited by the Senate Report, support[s] an expansive interpretation.") (internal citations omitted).

As alleged and discussed herein, DPVA has been directly injured by the voter ID law and long wait times. It has had to expend additional resources in an attempt to overcome the burdens

that these laws and policies place on the voting rights of the very minority groups—African Americans and Latinos—that the VRA was designed to protect. Am. Compl. ¶ 11. Indeed, *Perry-Bey v. Norfolk, Va.*, the very case that Defendants cite in support of their argument that Plaintiffs lack standing supports this reading of the VRA.

In *Perry* the Court explained that a plaintiff who satisfies Article III standing requirements under the Fourteenth and Fifteenth Amendments, also satisfies Section 2's statutory standing requirements. 678 F. Supp. 2d at 362; *see also Parker v. Ohio*, 263 F. Supp.2d 1100, 1107 (S.D. Ohio 2003) (explaining the same standing rules apply to Fourteenth Amendment cases and Section 2 cases since Section 2 "was enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments") (Graham, J., concurring), *aff'd* 540 U.S. 1013 (2003). Thus, because numerous cases have found that an organization's diversion of resources to combat discriminatory laws is sufficient to establish Article III standing, *see* discussion *supra* at 12–13, it only follows that injuries are also sufficient to establish standing under the VRA.[13]

Not only has DPVA established that it is directly injured but, it has also demonstrated—as contemplated by the Senate Report—that it is an organization representing the rights of individuals injured by the challenged laws and policies and, therefore, has standing under the VRA on those grounds as well. As alleged, DPVA is challenging voter ID and long wait times on behalf of its constituent voters, including many African-American and Latino voters, whose

---

[13] *Perry* is also factually distinct. It did not involve an organization that had suffered a recognized, constitutional injury as a result of a discriminatory act, nor did it involve an organization seeking to sue on behalf of injured persons. Instead, it considered whether a *pro se* plaintiff had properly asserted standing on a vote dilution claim. 678 F. Supp. 2d at 362. The specific language that Defendants cite in *Perry* for the proposition that Plaintiffs do not constitute "aggrieved persons" is also inapposite. That language comes from a line of Eighth Circuit cases concerning a failed candidate's standing to bring an action under the VRA on his *own* behalf, not on behalf of injured voters or on behalf of those voters' interests. *See Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989).

rights to vote have been or will be abridged or denied as a result of the challenged laws and policies. *See* discussion *supra* at 5–6. As a result, these minority voters are unable to elect the candidates of their choice which, as Virginia's history of racially polarized voting demonstrates, are predominately Democrats. Am. Compl. ¶¶ 1-2, 27-28, 36-39, 42. Thus, DPVA is well situated to represent these voters' interests in this action because its interests are completely aligned with theirs.

Finding DPVA has standing under the VRA is also consistent with the Seventh Circuit's opinion in *Crawford v. Marion County Election Board*. There, the court upheld the Democratic Party's standing to challenge a voter ID law, which was brought under the VRA and Fourteenth Amendment, finding that the Party had standing based on a diversion of resources theory and an associational standing theory. 472 F.3d at 951; *see also Veasey*, 29 F. Supp. 3d at 906-07 (citing *Crawford* as a case in which an organization—the Democratic Party—had been permitted to enforce Section 2). The Supreme Court expressly affirmed that finding, stating that it "agreed" that the Democratic Party had standing. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008). Thus, *Crawford* reinforces Plaintiffs' standing argument under the VRA.

Lee and Brescia also constitute aggrieved parties. Both have alleged they are minority voters who have been injured by the voter ID law and long wait times policy. With respect to voter ID, as discussed *supra*, Lee's and Brescia's right to vote has been injured by the requirement that they present a photo ID to vote in person. Accordingly, both have standing to bring a Section 2 voter ID claim. Further, Brescia has also alleged that he has been injured by Virginia's discriminatory policy with respect to long lines. In the same vein as DPVA, which has had to divert resources to combat the long lines at Virginia's polling locations to ensure that African-American and Latino voters could vote, Brescia has also had to divert resources and

expend more energy in order to assist African-American and Latino voters vote. Accordingly, an Article III injury is sufficient to confer standing under the VRA, and Brescia has standing to bring an action under Section 2 with respect to Virginia's long wait times to vote.

## III.   PLAINTIFFS' LONG WAIT TIMES CLAIMS ARE RIPE FOR ADJUDICATION

Defendants' argument that Plaintiffs' long wait times claims are not yet ripe must also be rejected. The doctrine of ripeness "concerns the appropriate timing of judicial intervention." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (internal quotations omitted). Traditionally, when determining ripeness, courts balance "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). When evaluating ripeness in the context of election procedures, both the Supreme Court and the Fourth Circuit have explained that "[c]hallengers to election procedures often have been left without a remedy in regard to the most immediate election because the election is too far underway or actually consummated prior to judgment." *Miller*, 462 F.3d at 319 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 n.12 (1979)). Thus, "[j]usticiability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election." *Id.*

Plaintiffs' challenges to Virginia's long wait times meet both prongs of the ripeness test. First, the constitutionality of Virginia's failure to act with respect to its long wait times is a pure legal question that is appropriate for the court to review, for which there is judicial precedent.[14] *See, e.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (finding that waiting in line to vote for two to four hours, among other things, could effectively deprive plaintiff of their right to vote); *NAACP State Conf. v. Cortés*, 591 F. Supp. 2d 757, 764 (E.D. Pa. 2008) ("[s]ome waiting in line . . . is inevitable and must be expected, . . . there can come a point when the burden of standing in a queue ceases to be an inconvenience or annoyance and becomes a constitutional violation because it, in effect, denies a person the right to exercise his or her franchise"); *League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 728 (N.D. Ohio 2005) ("Inaction that diminishes the right to vote equally may be as actionable as direct and overt acts treating the franchise unequally."), *aff'd in part, rev'd in part on other grounds*, *Brunner*, 548 F.3d 463 (6th Cir. 2008); *Ury v. Santee*, 303 F. Supp. 119, 125-27 (N.D. Ill. 1969) (making a factual finding that, among other things, lines of two to four hours deprived voters' of their right to vote).

To the extent that there are factual questions as to the cause of the long wait times in prior elections, or uncertainty as to potential conditions in 2016, the Fourth Circuit's decision in *Miller* indicates that this is of no consequence. In *Miller*, the court found that in an election case, if it waited until no uncertainty existed to hear the case, the harm in question would likely occur

---

[14] Defendants' assertion that Plaintiffs' claims concerning wait times were vague because Plaintiffs had not alleged a basis for measuring how long of a line is too long and the Court cannot award relief, Defs.' Br. at 14, is also baseless. As the cited cases demonstrate, it is entirely appropriate for a court to determine whether the length of a line is constitutionally impermissible (and the court generally does so after hearing all of the facts). Accordingly, this is also a factual question that is not appropriate to consider at this stage of the case.

before any final decision could be reached. 462 F.3d at 319. Thus, it found that "[t]he case [wa]s fit for judicial review despite this uncertainty." *Id.*; *see also Babbitt*, 442 U.S. at 301 (finding that plaintiffs' challenge to election procedures that frustrated rather than facilitated democratic selection was ripe because of the nature of the claim).

The threat of long wait times is immediate and the burden imposed on both Plaintiffs and Virginia voters will be severe if the Court waits to adjudicate Plaintiffs' challenge. As Plaintiffs have pleaded, and Virginia's election history demonstrates, Virginia has a history of unacceptably long wait times to vote, particularly in presidential election years. Am. Compl. ¶ 83. No action has been taken by the state to remedy this problem. *Id.* ¶ 90. Rather, the General Assembly has defeated attempts to address it. *Id.* (noting that just months after voters were forced to wait in lines for up to 4 1/2 hours to vote, state senators voted against two bills intended to address long lines in future elections). Given that Virginia has had long wait times to vote in the last three presidential elections and nothing has been done to address the problem, Plaintiffs' claim that Virginians will again suffer long wait times in the 2016 elections is not, as Defendants allege, "speculative" or "uncertain." Rather, it is a concrete, imminent event ripe for review.

Failure of the Court to take action would significantly affect non-parties as well. Numerous Virginians would be forced, yet again, either to wait in lines that impose an unconstitutional burden or be wholly disenfranchised because factors outside of their control force them to leave the polls without voting. Am. Compl. ¶ 88; *see Miller*, 462 F.3d at 320. Waiting until closer to the election to adjudicate Plaintiffs' claims would also impose hardship because courts are reluctant to disrupt elections. *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Lastly, as a practical reality, if Defendants' argument were to be accepted it would lead to both absurd and unjust results because, presumably, no one could ever bring a claim challenging

the constitutionality of long wait times. Claims brought immediately after an election would not be ripe as to the next election and/or would be moot as to the preceding election. Thus, the only day that such claims could be justiciable would be on Election Day, at which point any meaningful remedy would come too late. Therefore, Plaintiffs' challenge to long wait times is ripe for adjudication at this time.[15]

## CONCLUSION

For the reasons stated above, and based on the allegations of the Amended Complaint, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss on all grounds. In the event that the Court finds that dismissal of any claim in Plaintiffs' Complaint is warranted, which it is not, Plaintiffs' respectfully request that they be granted leave to amend the Complaint under Rule 15(a)(2).

---

[15] The cases that Defendants cite are inapposite. First, the statement quoted in *League of Women Voters of North Carolina* is taken out of context. The court in that case was not confirming that Plaintiffs' long lines allegations were speculative. 769 F.3d at 237. Rather, it found that it could not say that the lower court's overall factual findings with respect to the soft roll out of a voter ID program were not speculative. *Id. McCrory* is also distinguishable. The court's statement in that case with respect to long lines being speculative was not made in the context of a justiciability determination. 997 F. Supp. 2d at 377. Rather, the court was making a factual finding about an argument made during a hearing on a motion for preliminary injunction. *Id. Renne v. Geary*, 501 U.S. 312, 320-21 (1991), is also inapplicable because Plaintiffs' claims are not based on past illegal conduct with no continuing present effects. Rather, Plaintiffs' claims are focused on the ongoing, present, and imminent problems in Virginia elections administration due to the  failure to fix historically long wait times.

DATED:  September 15, 2015

By: */s/ Amanda R. Callais*

Marc Erik Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Elisabeth C. Frost (admitted *pro hac vice*)
Aria Branch (VSB # 83682)
Amanda R. Callais (VSB # 85891)
Ceridwen Cherry (admitted *pro hac vice*)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: EFrost@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: ACallais@perkinscoie.com
Email: CCherry@perkinscoie.com


Joshua L. Kaul (admitted *pro hac vice*)
**PERKINS COIE** LLP
1 East Main Street, Suite 201
Madison, WI 53703-5118
Telephone: 608.663.7460
Facsimile: 608.283.1007
Email: JKaul@perkinscoie.com


*Attorneys for Plaintiffs*

- 31 -

## CERTIFICATE OF SERVICE

On September 15, 2015, I will electronically file the foregoing with the Clerk of Court

using the CM/ECF system, which will then send a notification of such filing to the following:

Dana J. Finberg
Arent Fox LLP
55 Second Street, 21st Floor
San Francisco, CA 94105
Tel: 415.757.5500
Fax: 415.757.5501
dana.finberg@arentfox.com

Mark F. (Thor) Hearne, II
Arent Fox LLP
112 S. Hanley Road, Suite 200
Clayton, MO 63105
Tel: 314.296.4000
Fax: thornet@ix.netcom.com

Stephen G. Larson
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Tel: 213.629.7400
Fax: 213.629.7401
stephen.larson@arentfox.com

*Attorneys for Defendants*

By */s/ Amanda R. Callais*
Amanda R. Callais (VSB # 85891)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone:  (202) 654-6338
Fax:  (202) 654-9106
ACallais@perkinscoie.com

*Attorney for Plaintiffs*