IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BARBARA H. LEE, *et al.*,      )
                         )
       Plaintiffs,       )
                         )
       v.               )     Civil Action No. 3:15CV357–HEH
                         )
VIRGINIA STATE BOARD OF     )
ELECTIONS, *et al.*         )
                         )
       Defendants.      )

## MEMORANDUM OPINION
### (Defendants' Motion to Dismiss Plaintiffs' Amended Complaint)

This is an action filed by the Democratic Party of Virginia and two affiliated democratic activists against the Virginia State Board of Elections and the Virginia Department of Elections, challenging the constitutionality of certain voting procedures that allegedly suppress core Democratic constituencies.  (Am. Compl. at 2, ECF No. 36.) The underlying dispute encompasses two discrete—but closely related—facets of Virginia's voting laws and processes.  These include Virginia's law requiring voters to show photographic identification when voting and the alleged recurring problem of long wait times to vote in some precincts.  In Plaintiffs' view, this law and alleged long lines disproportionately burden African-Americans, Latinos, young voters, and Democrats. (*Id.*)

This case is presently before the Court on the Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion," ECF No. 48).  The Motion has two components.  First, Defendants urge the Court to dismiss all claims under Federal Rule of

Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, specifically, absence of Article III standing. Second, Defendants argue that the Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Both parties have filed extensive memoranda detailing their respective positions. The Court also granted the Public Interest Legal Foundation leave to file a brief supporting dismissal, as amicus curie. This Court heard oral argument on October 23, 2015.[1] For the reasons discussed below, the Motion to Dismiss will be granted in part and denied in part.

## I.  BACKGROUND

The Amended Complaint contains five causes of action for which Plaintiffs seek relief. Count One alleges violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a). This claim has two strands. First, Plaintiffs allege that "[t]he voter ID law has had and, if not declared illegal and enjoined, will continue to have an adverse and disparate impact on African-American and Latino citizens of Virginia." (*Id.* at 32.) Second, Plaintiffs contend that "Virginia's long wait times to vote have had and, absent a finding that these wait times are illegal and an order directing Virginia to take the steps necessary to ensure that wait times will not abridge or deny the right to vote, will continue to have an adverse and disparate impact on African-American and Latino citizens of Virginia." (*Id.*)

Count Two focuses on the requirement that voters present photographic

---

[1] The issuance of this Memorandum Opinion was significantly delayed in order to give the parties a full opportunity to settle as many of the issues as possible.

identification. Plaintiffs maintain that the voter identification law unduly burdens the

right to vote and results in disparate treatment of individuals, in violation of the First

Amendment and the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at 33–

35.)

Count Three, alleging partisan fencing, is a bit more nuanced.

Upon information and belief, the General Assembly, in enacting the voter ID law and failing to take action to prevent long wait times to vote from recurring, intended to suppress (that is, fence out), has suppressed, and will continue to suppress the vote of Democrats because of the way they are expected to vote. Accordingly, the voter ID law and policies that result in long wait times to vote have violated and, absent the relief requested, will continue to violate the First Amendment and the Equal Protection Clause.

(*Id.* at 36.)

Count Four of the Amended Complaint alleges intentional discrimination on the

basis of race. Plaintiffs assert that

The voter ID law and long wait times to vote, individually and jointly, have resulted and, absent the remedies requested below, will continue to result in the abridgement and denial of the right to vote for African Americans and Latinos on account of race. Accordingly, the voter ID law and policies that result in long wait times to vote have violated and, absent the relief requested, will continue to violate the Fourteenth and Fifteenth Amendments.

(*Id.* at 37.)

Lastly, Count Five alleges violations of the Twenty-Six Amendment which,

provides in pertinent part, that "[t]he right of citizens of the United States, who are

eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on

account of age." (*Id.*) Plaintiffs contend that the General Assembly's action in enacting

the voter ID law and failing to take action to reduce wait times to vote was intended, at

3

least in part, to suppress the number of votes cast by young voters. "The voter ID law and long wait times to vote, individually and jointly, have resulted and, absent the remedies requested below, will continue to result in the abridgement and denial of the right to vote for young voters on account of age." (*Id.* at 38.)

Plaintiffs seek both declaratory and injunctive relief. They ask the Court to declare the voter ID law and the failure to adequately address long wait lines at the polls to be unconstitutional. Furthermore, they request that the Court issue a permanent injunction enjoining the Defendants and their agents, employees, and successors, and all persons acting in concert with any of them, from enforcing or giving effect to the voter ID law. Finally, they seek judicial hearings "to determine what changes must be made to prevent long wait times to vote from recurring in future elections and order that such changes be implemented and effectuated." (*Id.*)

## II.    STANDING

Before turning to the facial sufficiency of Plaintiffs' claims, the Court must first assess the adequacy of the parties' Article III standing. Because Plaintiffs challenge the constitutionality of the voter ID law and long lines in multiple counts, the Court first addresses Plaintiffs' standing to bring those claims generally. The Court will then focus on Plaintiffs' standing to bring the intentional discrimination claims in Counts IV and V.

Under Article III of the Constitution, this Court's power is limited to cases and controversies. As the United States Supreme Court restated in *Summers v. Earth Island Institute*, "the traditional role of Anglo-American courts...is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.

4

Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." 555 U.S. 488, 492 (2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992)). The initial standing inquiry "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Id.* at 493 (internal quotation marks and citations omitted).

As the court noted further in *Summers*, the alleged injury "must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Environ. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)). "[A]llowing courts to oversee legislative or executive action [without proof of the requisite need] 'would significantly alter the allocation of power . . . away from a democratic form of government.'" *Id.* (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

Although the Plaintiffs assert both organizational and individual standing to prosecute their claims, each must demonstrate the requisite case or controversy and also satisfy the requirements of prudential standing which encompasses "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

In *Doe v. Virginia Dep't of State Police*, the United States Court of Appeals for the Fourth Circuit reiterated the irreducible elements of Article III standing. First, Plaintiffs "must be able to show that (1) [they] suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the

challenged conduct; and (3) the injury is likely to be redressed by a favorable decision."

713 F.3d 745, 753 (4th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61).

With respect to prudential standing, the judicially-imposed limits on jurisdiction

"founded in concern about the proper—and properly limited—role of the courts in a

democratic society," the Fourth Circuit staked out the following boundaries. *Id.* (citing

*Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[P]rudential standing encompasses 'the

general prohibition of a litigant's raising another person's legal rights, the rule barring

adjudication of generalized grievances more appropriately addressed in the representative

branches, and the requirement that a plaintiff's complaint fall within the zone of interests

protected by the law invoked.'" *Id.* (quoting *Elk Grove Unified School Dist. v. Newdow*,

542 U.S. 1, 12 (2004)).

In addition to the time-honored prerequisites for Article III standing, organizations

such as the Democratic Party of Virginia ("DPVA") in the immediate case, must satisfy

additional requirements when bringing suit in a representative capacity.

> To plead representational standing, an organization must allege that "(1) its
> own members would have standing to sue in their own right; (2) the
> interests of the organization seeks to protect are germane to the
> organization's purpose; and (3) neither the claim nor the relief sought
> requires the participation of individual members in the lawsuit."

*S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands*, 713 F.3d 175,

184 (4th Cir. 2013) (quoting *Md. Highway Contractors Ass'n v. Maryland*, 933 F.2d

1246, 1251 (4th Cir. 1991)); *see also Hunt v. Washington State Apple Advert. Comm'n*,

432 U.S. 333, 343 (1977).

6

## A. VOTER ID LAW AND LONG LINES

The Amended Complaint describes the DPVA as "a political organization dedicated to electing candidates of the Democratic Party to public office throughout the Commonwealth of Virginia." (Am. Compl. at 5.) It alleges that it has

> members from across the Commonwealth, including many eligible voters, who regularly support and vote for candidates affiliated with the Democratic Party. Virginia's voter ID law [and] long wait times to vote...harm the DPVA by disproportionally reducing the turnout of Democratic voters and decreasing the likelihood that the DPVA will be successful in its efforts to help elect candidates of the Democratic Party to public office.

(*Id.*) The DPVA further contends that it

> has also devoted resources that otherwise would have been, and will devote resources that otherwise would be, put to other productive uses educating Virginians about the voter ID law. And long lines at the polls have caused the DPVA to divert resources that otherwise would have been put to other productive uses.

(*Id.*)

Relying in part on *Southern Walk*, the Defendants maintain that the DPVA has failed to identify a single member who has suffered harm. (Defs.' Mem. Supp. Mot. Dismiss at 17, ECF No. 49.) As the Fourth Circuit stressed in *Bishop v. Bartlett*, "the party invoking the jurisdiction of the court must include the necessary factual allegations in the pleading, or else the case must be dismissed for lack of standing." 575 F.3d 419, 424 (4th Cir. 2009) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). Defendants are correct that in *Southern Walk*, Judge Motz writing for the court stated unequivocally that "an organization must 'make specific allegations establishing that at least one *identified member* had suffered or would suffer harm.'" 713 F.3d at 184

(quoting *Summers*, 555 U.S. at 498) (emphasis in original).[2] The court in *Summers*, however, drew a distinction between harm to the organization and individual injury to its collective members. *Id.* at 183; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Md. Highways Contractors Ass'n*, 933 F.2d at 1250 (noting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). In the immediate case, the DPVA claims direct injury to its raison d'être—electing candidates who support the democratic platform, as opposed to the individualized interests of its members.[3] It would also appear that the individual members of the DPVA, as political activists, would be sufficiently burdened to sue in their own right. *See Ala. Legis. Black Caucus v. Ala.*, ___U.S.___, 135 S. Ct. 1257, 1268–70 (2015).

This Court is mindful that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, . . . [and that this Court will presume] that general allegations embrace those specific facts that are necessary to support the claim." *Lujuan*, 504 U.S. at 561 (internal quotation marks and citations omitted). At this stage, the DPVA has demonstrated standing to pursue this claim.

The individual Plaintiffs in this case identify themselves as two people who are registered voters in Virginia, affiliate themselves with the Democratic party, and express an intention to vote for Democratic candidates in the future. Barbara H. Lee ("Lee")

---

[2] Since the Plaintiffs are the parties invoking federal jurisdiction, they bear the burden of establishing all elements of standing. *Va. Dep't of State Police*, 713 F.3d at 753.

[3] "Associations can allege standing based upon two distinct theories. First, the association 'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" *Warth v. Seldin*, 422 U.S. at 511. Second, the association may have standing as the representative of its members who have been harmed. *Id.*; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

states that she has been involved in voter registration, voter education, and Get-Out-The-Vote ("GOTV") efforts. (Am. Compl. at 4.) She further maintains that "Virginia's voter ID law [and] long wait times to vote…disproportionately suppress the vote of Democrats[4] and thereby harm Lee's efforts to help elect Democratic candidates. In addition, Lee believes that the voter ID law will negatively impact her GOTV efforts." (*Id.*)

Plaintiff Gonzalo J. Aida Brescia ("Aida") identifies himself as a member of a number of Democratic organizations and has been involved in voter registration, voter education, and GOTV efforts. (*Id.*) He is a member of the Virginia Latino Advisory Board ("the Advisory Board") and anticipates that during his time on the Advisory Board, its work "will include communicating information to members of the Latino community to assist Latino citizens in Virginia in registering to vote and voting." (*Id.*) Aida also maintains that "Virginia's voter ID law [and] long wait times to vote…burdens Aida's efforts to help elect Democratic candidates." (*Id.* at 5.) He asserts that long wait times to vote and the necessity for him to encourage voters to stay in line to vote, detracts from "time working on getting people out to vote." (*Id.*)

Significant to the standing analysis is the individual harm alleged by Plaintiffs. Both individual Plaintiffs contend that as a result of Virginia's voter ID law and the long wait times to vote, they will be required to expend additional resources and effort. This includes both an educational component as well as the need to encourage voters to remain in line to casts their votes despite the time required. Importantly, the Amended

---

[4] Justice Scalia noted in *Vieth v. Jubelirer* that "[p]olitical affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." 541 U.S. 267, 287 (2004).

Complaint makes no claim that either the voter ID or the long wait times deprives any individual of an equal opportunity to cast their vote. Although mere inconvenience is insufficient to support standing, it would appear that the burden alleged is sufficient to demonstrate the minimal injury required for standing with respect to the those counts pertaining to the constitutionality of the Virginia voter ID law and the effect of long wait lines on voters. At this stage, Plaintiffs need only demonstrate a minimal showing of injury to withstand a challenge under Fed. R. Civ. P. 12(b)(1). *See Crawford v. Marion Cty. Elec. Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *affirmed*, 553 U.S. 181 (2008) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–84 (2000)); *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008); *Lerman v. Bd. of Elec.*, 232 F.3d 135, 142 (2d Cir. 2000).[5]

## B. COUNTS IV AND V: INTENTIONAL DISCRIMINATION

Counts Four and Five allege intentional discrimination on the basis of race (Count Four) and age (Count Five). (Am. Compl. at 36–38.) Plaintiffs contend that the General

---

[5] *Although the Court finds that Plaintiffs have standing to challenge the allegedly long lines*, given the unpredictability and myriad reasons for long lines at the polls, *the Court questions whether* the problem could be effectively redressed by a favorable decision of this Court. Redressability is a critical subset of the required standing inquiry. *Va. Dep't of State Police*, 713 F.3d at 755. The examples of long wait times offered in the Amended Complaint center mainly on the surge of voters in the 2008 and 2012 presidential elections, which the Democrats won. (Am. Compl. at 26.) Lines of up to four and a half hours were allegedly reported in one area. (*Id.*) Plaintiffs, presumably based upon their personal forecast, project reoccurrence of such lines in 2016. (*Id.* at 28.) While admittedly some corrective steps may be appropriate in planning for the 2016 presidential election, forecasting voter turnout is far from an exact science. Furthermore, since neither the Supreme Court nor any federal circuit has held that long lines standing alone violate either Section 2 of the Voting Rights Act or the Equal Protection Clause, this Court would necessarily need to craft its own standard of tolerable voter burden. *See Vieth v. Jubelirer*, 541 U.S. at 276–81 (plurality opinion of Scalia, J.); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (discussing circumstances warranting a finding of constitutionally intolerable burden).

Assembly's consideration of race and age "in enacting the voter ID law and failing to take action to reduce wait times to vote was not justified by a legitimate state interest, much less narrowly tailored to a compelling state interest." (*Id.* at 36–37.) The clear import of these claims is that the alleged action or inaction of the Virginia General Assembly was based on intentional and conscious discrimination, in violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments.

The epicenter of Counts Four and Five is not a standard practice or procedure promulgated or administered by any of the named Defendants in this case. The wellspring of discrimination is the voting practices of the Virginia General Assembly, which Plaintiffs contend evinces a discriminatory voting pattern.

Under the architectural design of the Amended Complaint, Counts Four and Five appear to present freestanding claims of constitutional violations, not merely additional theories of proving other contentions. It is unclear from the Amended Complaint what specific relief Plaintiffs are seeking in these counts, which do not appear to invoke the Civil Rights Act. Furthermore, viewed as untethered claims, Counts Four and Five appear to focus on actions of the General Assembly, whose members are not parties to this case.

A vital prerequisite to Article III standing is some showing that Plaintiffs' injury is fairly traceable to the actions of the Defendants. *Va. Dep't of State Police*, 713 F.3d at 753, 755. "An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control." *Id.* (quoting *Mirant Potomac River, LLC v. EPA*,

577 F.3d 223, 226 (4th Cir. 2009)); *see also Bishop*, 575 F.3d at 425. Counts Four and Five will therefore be dismissed in their present form.

## III.   FAILURE TO STATE A CLAIM

Turning next to the Defendants' Motion to Dismiss for failure to state an actionable claim, this Court's review of a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6) is both informed and constrained by the well-pleaded facts contained in the complaint. The task at hand is to determine the sufficiency of the complaint, "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, plaintiff's well-pleaded allegations are taken as true and the complaint must be viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004). Legal conclusions, however, enjoy no deference by the reviewing court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive Rule 12(b)(6) scrutiny, a complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (brackets omitted)).

## A. COUNTS I AND II

### 1. VOTER ID

Count One of the Amended Complaint targets the adverse impact of the Virginia

voter ID law and long wait lines to vote on African-American and Latino citizens. They

attribute this in part to socio-economic disparities between African-Americans, Latinos,

and Caucasians in Virginia. This claim is grounded in Section 2 of the Voting Rights Act

which disallows any voting qualification, prerequisite, or standard practice or procedure

that results in a denial or abridgement of the right of any citizen of the United States to

vote on account of race or color. 52 U.S.C. § 10301(a). In the Amended Complaint,

Plaintiffs contend that they will present evidence that the voter ID law and long wait

lines, individually and collectively, have diminished the opportunity of minorities to

exercise their right to vote. (Am. Compl. at 32–33.) The Amended Complaint further

maintains that the deliberate actions and inactions of the Virginia General Assembly

support a reasonable inference of a specific intent to suppress the vote of minority and

young voters. These allegations are thinly supported by anecdotal evidence, historical

trends, and statistics.

Net of factual disputes, the Defendants counter that mere proof of disparate impact

is insufficient to establish a violation of Section 2 of the Voting Rights Act, citing *Frank

v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014), or the Equal Protection Clause. Moreover,

Defendants argue that any burden occasioned by the inconvenience of obtaining or

displaying identification at the polls affects all voters equally. Defendants also point out

that the Supreme Court in *Crawford* upheld the constitutionality of Indiana's voter

identification law as an appropriate exercise of state power to protect the integrity and

reliability of its electoral process. 553 U.S. at 204.

> The essence of the voter ID claim is well captured in the Amended Complaint:

> The voter ID law imposes burdens on voters generally and severe burdens on African-American, Latino, young, poor, and Democratic voters, as well as the class of voters who lack an ID that can be used for voting. Given that the law does not materially benefit Virginia or plausibly further any permissible interest, the burdens imposed by the voter ID law outweigh the benefits of the law and it must therefore be invalidated under the Equal Protection Clause.

> The voter ID law does not permit certain expired IDs or IDs issued by states other than Virginia or universities outside of Virginia to be used for voter identification, and it thereby distinguishes between individuals who have an ID that can be used for voting in Virginia and individuals who do not have such ID . . . .

(Am. Compl. at 34.)

In *Crawford*, the Supreme Court upheld the constitutionality of a similar voter

identification law enacted in the State of Indiana. 553 U.S. at 204. In conducting its

analysis in *Crawford*, the court employed the balancing test articulated in *Anderson v.

Celebrezze*, 460 U.S. 780 (1983), as well as in *Burdick v. Takushi*, 504 U.S. 428 (1992).

Speaking for the court in *Crawford*, Justice Stevens explained, "a court must identify and

evaluate the interests put forward by the State as justifications for the burden imposed by

its rule, and then make the 'hard judgment' that our adversary system demands."

*Crawford*, 553 U.S. at 190. Employing this flexible standard in that case, the Supreme

Court acknowledged that voter identification requirements may place a heavier burden on

a limited number of persons. However, such burden was insufficient to outweigh the

state's broad interest in protecting election integrity. *Id.* at 199.

Although the court's analysis in *Crawford* is instructive, it is distinguishable from the case at hand. *Crawford* was a facial challenge to the Indiana voter ID statute, focusing on a broader statutory sweep. It appears that Count Two of the Amended Complaint in this case includes both a facial challenge on behalf of voters generally, a class of voters who lack ID that could be used for voting, and African-American, Latino, young, poor, and Democratic voters. With respect to voters generally and those who simply lack an ID that can be used for voting, *Crawford* would appear to preclude a challenge on their behalf. The court in *Crawford* clearly concluded that such limited burdens on voter's rights generally are insufficient to trump the state's interest in protecting the integrity of the electoral process. Interestingly, the court also cautioned that "[w]hen evaluating a neutral, nondiscriminatory regulation of voting procedure, we must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 203 (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (internal quotation marks omitted)).

Counts One and Two seem to plead a combination of facial and class-based challenges to Virginia's voter ID law. To prove an actionable voter denial claim under Section 2 of the Voting Rights Act, Plaintiffs must demonstrate a discriminating burden on members of a protected class caused by or linked to social or historical conditions. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239–40 (4th Cir. 2014). Although the factual support for the voter ID claims are thin, viewed in Plaintiffs' favor they appear sufficient to survive Rule 12(b)(6) scrutiny. Their ultimate viability, of course, must await the development of a more fulsome record. Therefore, as far as they

relate to voter identification, Counts I and II will survive.

## 2. LONG LINES

Plaintiffs' challenge to Virginia's long wait times to vote, however, is more problematic on a number of fronts. They contend "[u]pon information and belief . . . [that] Virginia precincts with long wait times to vote have disproportionately been precincts with large minority and/or college-student populations." (Am. Compl. at 27.) Again, predicated on "information and belief," Plaintiffs allege that

> the General Assembly has not taken action to prevent long wait times to vote from recurring in the 2016 election because the voters who have had, and in the future will have, to wait a long time to vote are disproportionately minorities, students, and Democrats. In other words, the General Assembly's decision not to take action to address long wait times to vote was made with the intent to suppress the vote of minorities, young voters, and Democrats.

(*Id.* at 29.)

As additional background and context, the Amended Complaint describes various bills rejected by the General Assembly which they contend could have reduced the length of lines at affected precincts. For example, Plaintiffs highlight selected bills enabling "no-excuse in-person absentee voting," extending operating hours for polls, and requiring individualized strategic plans by each electoral board to reduce voter inconvenience. (*Id.* at 28–29.) In each instance, Plaintiffs maintain that the failure of such remedial legislation to clear committee or be enacted by the Virginia State Senate was attributable to Republican majorities. Not all of these bills, however, were dealt with on a purely party-line vote. (*Id.*)

The Defendants point out in their response that Plaintiffs' claims are animated by

16

skeletal accusations of purposeful and invidious discrimination targeting African-American, Latinos, and young voters.[6] Even viewed in the light most favorable to Plaintiffs, the Amended Complaint provides no factual support for such an inference other than pure speculation. As the Fourth Circuit noted in *Francis v. Giacomelli*, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). While a complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions." *Twombly*, 550 U.S. at 555. On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Defendants also stress in their Motion to Dismiss that occasional long lines in some precincts are not necessarily a product of a state imposed standard, practice or procedure as required under Section 2 of the Voting Rights Act. While a violation of Section 2 can "be established by proof of discriminatory results alone," *Chisom v. Roemer*, 501 U.S. 380, 404 (1991), the appropriate inquiry "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal *opportunity* to participate in the political processes and to elect candidates of their choice.'" *League of Women*

---

[6] Consistent with *League of Women Voters of N.C. v. North Carolina*, Plaintiffs describe a number of social and historical conditions allegedly contributing to discrimination against members of the relevant protected class. 769 F.3d at 239. These historical facts, however, cast minimal light on the cause of long lines at some polls in recent presidential elections. *Shelby Cty. v. Holder*, ___ U.S. ___, 133 S. Ct. 2612, 2619 (2013). Again, Plaintiffs assume that the majority of voters in these segments of the population uniformly support democratic candidates.

*Voters of N.C.*, 769 F.3d at 238 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (emphasis added)). While the Amended Complaint is replete with allegations that African-Americans and young voters were inconvenienced and perhaps discouraged by long wait lines, there is no plausible contention that they were denied the opportunity to vote. Inconvenience alone does not qualify as a substantial burden on the right to vote. *Crawford*, 553 U.S. at 198. Plaintiffs' suggestion that African-Americans and young voters are more adversely impacted than any other class of voters impatiently waiting in line is simply a vacuous conclusion. Plaintiffs' abstract demographic statistics add minimal vitality to the argument.

Absent concrete factual allegations that minorities and young voters are denied access to the electoral process, rather than merely inconvenienced like every other voter,[7] this Court must avoid trespassing on the rights of the Commonwealth of Virginia to administer its elections. As Chief Justice Roberts admonished in *Shelby County*, "States have 'broad powers to determine the conditions under which the right of suffrage may be exercised.'" 133 S. Ct. at 2623 (quoting *Carrington v. Rash*, 380 U.S. 89, 91 (1965)). The allocation of resources, personnel, and facilities for voting is best left to the states. Even if this Court were to posit that long wait lines are redressable by judicial fiat, and further assume that the Virginia General Assembly would appropriate sufficient money to purchase additional resources, the Amended Complaint still falls short of pleading a plausible claim of voter denial or a violation of equal protection with respect to projected

---

[7] The burden asserted by Plaintiffs is arguably a generalized grievance shared in substantially equal measure by all or a large class of citizens. *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009).

long lines at certain polls in 2016. Those portions of claims in the Amended Complaint seeking relief for projected long lines at the polls in 2016 will be dismissed for failure to state a plausible or justiciable claim.

### B. COUNT III: PARTISAN FENCING

Count Three is predicated on a judicially-crafted construct sometimes referred to as "partisan fencing." The theory is derived from the opinion of Justice Stewart in *Carrington*. In that case, a sergeant in the United States Army challenged a provision of the Texas Constitution that "prohibit[ed] any member of the Armed Forces of the United States who moves his home to Texas during the course of his military duty from ever voting in any election in that State so long as he or she is a member of the Armed Forces." 380 U.S. at 89 (internal quotation marks omitted). The State of Texas defended this constitutional provision as necessary to prevent the danger of a takeover of the civilian community resulting from concentrated voting by large numbers of military personnel in bases placed near Texas towns and cities. The Texas legislature was of the opinion that only bona fide residents with an intention of making Texas their home indefinitely should qualify to vote. *Id.* at 93–34. The court in *Carrington* concluded that "'[f]encing' out from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Id.* at 94.

Plaintiffs contend upon information and belief that "the General Assembly, in enacting the voter ID law and failing to take action to prevent long wait times to vote from recurring, intended to suppress (that is, fence out), has suppressed, and will continue to suppress the vote of Democrats because of the way they are expected to vote" in

19

violation of the First Amendment and the Equal Protection Clause. (Am. Compl. at 36.) The Defendants perceptively point out that Plaintiffs' partisan fencing theory necessarily assumes homogeneity of viewpoint among all Democratic voters.

A careful reading of the *Carrington* opinion would seem to reveal that the term "partisan fencing" does not create an independent cause of action aside from a typical First Amendment and Equal Protection Clause claim. Count Three simply provides a different theory of proving virtually the same claim pled in Count Two in a slightly different wrapper and it will be treated accordingly.

## IV. CONCLUSION

Based on the foregoing analysis of the Amended Complaint, the Court finds that the Plaintiffs have pleaded facts supporting Article III standing on portions of most counts. Specifically, Plaintiffs have demonstrated sufficient harm, albeit minimal, to pursue their various challenges to the Virginia Voter Identification law as applied to African-American, Latino, and young voters.

Counts Four and Five allege intentional discrimination by the General Assembly as to African-American, Latino, and young voters. These are freestanding claims, focusing on actions of the General Assembly, whose members are not parties to this case. Therefore, Counts Four and Five will be dismissed because the alleged injury is not traceable to any named Defendant.

With respect to the Rule 12(b)(6) component of Defendants' Motion to Dismiss, the Court concludes as follows:

Count One:    The Amended Complaint, viewed in the light most favorable to

Plaintiffs, states a sufficiently plausible claim as to the voter identification requirement to survive Rule 12(b) scrutiny. The Motion to Dismiss will be granted, however, as to the alleged targeted long lines at some voting precincts during presidential elections. Not only does the Amended Complaint fail to state a plausible, factually-supported claim of purposeful discrimination, but the alleged grievance rises no higher than an inconvenience experienced equally by all voters.

Count Two:  The Motion to Dismiss pursuant to Rule 12(b)(6) will be denied as to the challenge to the voter identification requirement for the reasons discussed above.[8]

Count Three:  As discussed *ante*, Count Three merely states a theory of proof for claims contained in other counts and seeks no independent relief. The Defendants' Rule 12(b)(6) motion will be denied for this count as related to voter identification, but granted as related to alleged long lines.

Those portions of the Amended Complaint which are dismissed pursuant to Rule 12(b)(6) are dismissed without prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Dec. 18, 2015
Richmond, Virginia

---

[8] Count II originally included an Equal Protection Clause challenge to the requirement that non-violent felons, who have been released from supervised probation or parole and have no pending felony charges, apply for restoration of their voting rights on an individual basis. (*See* Va. Code Section 53.1-231.2). This portion of Count II was voluntarily dismissed by Plaintiffs.

21