IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

BARBARA LEE, et al.,                    )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )        No. 3:15CV357 HEH
                                        )
VIRGINIA STATE BOARD OF ELECTIONS,      )
et al.,                                 )
                                        )
        Defendants.                     )

**VIRIGINIA'S RESPONSE TO THE DEMOCRAT PARTY OF VIRGINIA, LEE
AND AIDA'S MOTION ASKING THIS COURT TO RECONSIDER THIS
COURT'S DECISION DISMISSING COUNTS FOUR AND FIVE**

**BACKGROUND**

In June 2015 the Democrat Party of Virginia (DPVA) and two Democrat party

political operatives, Barbara H. Lee (Lee) and Gonzalo Aida Brescia (Aida), sued the

Virginia State Board of Elections (Board), the Virginia Department of Elections

(Department) and their respective members in their official capacities.[1]

---

[1]     The **Board** is comprised of three members, appointed by the governor to four-year terms.  Two of the Board members are of the same political party as the sitting governor and the third member is from the same political party as the gubernatorial candidate taking second-place.  Va. Code §§24.2-102, 24.2-103.

The **Department** conducts the Board's administrative operations and other duties the Board delegates to the Department, including drafting and adopting regulations governing Virginia elections, supervising and coordinating local election boards and county registrars, providing and maintaining an automated system for voter registration, delivering absentee ballots to eligible military and overseas voters, and maintaining records for registrants no longer qualified to vote.  The Department is led by a Commissioner of Elections appointed by the governor.  *Id.* §24.2-102.  The Board, though the Department, supervises and coordinates the work of local Electoral Boards.  *Id.* §24.2-103.  Each independent city and county has a three-member Electoral Board that governs elections.  *Id.* §24.2-109.  Electoral Boards are appointed by the judicial circuit court for that city or county for a three-year term.  *Id.* §24.2-106.  As with the

1

The Plaintiffs claim Virginia's voter identification requirements and a supposed "recurring problem of long wait times to vote in some precincts…disproportionately burden African-Americans, Latinos, young voters and Democrats."[2]  The Plaintiffs also allege Virginia's requirement that felons individually apply for restoration of their voting rights violated the Equal Protection Clause.[3]

Plaintiffs asserted five causes of action:

1. Virginia's "voter ID law has had…and will continue to have an adverse and disparate impact on African-American and Latino citizens of Virginia."[4]  And Virginia's "long wait times to vote have…an adverse and disparate impact on African-American and Latino citizens of Virginia.[5]

2. Virginia's "voter identification law unduly burdens the right to vote and results in disparate treatment of individuals in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment."[6]

3. Virginia's voter identification requirements and Virginia's alleged failure to prevent "long wait times to vote from recurring" is an act of "partisan fencing."[7]

4. Virginia's voter identification requirements and "long wait times to vote" are "intentional discrimination on the basis of race" by the Commonwealth

---

Board, Electoral Boards are comprised of two members of the governor's political party and one member from the same political party as the gubernatorial candidate taking second-place.  *Id.* §24.2-106.  Each Electoral Board appoints a General Registrar for its city or county, who serves a four-year term.  *Id.* §§24.2.-109, 24.2-110.  General Registrars are charged with facilitating voter registration and educating the public regarding voter registration.  *Id.* §24.2-114.

[2]     Amended Compl. ¶ 3 (Dkt. No. 36); Opinion p. 1.

[3]     Memorandum Opinion p. 21, n.8 (Dkt. No. 110); Amended Compl. ¶¶ 112-113.

[4]     Amended Compl. ¶ 102.

[5]     *Id.* ¶ 105.

[6]     Opinion pp. 2-3 (citing Amended Compl. pp. 33-35).

[7]     *Id.* at 3; Amended Compl. 36.

against "African Americans and Latinos…violat[ing] the Fourteenth and Fifteenth Amendments."[8]

5.   Virginia's voter identification requirements and the Board and Commission's failure "to take action to reduce wait times to vote" violates the Twenty-Sixth Amendment, which provides, "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by…any State on account of age."  Plaintiffs further contend the Virginia General Assembly's "action enacting the voter ID law and failing to take action to reduce wait times to vote was intended, at least in part, to suppress the number of votes cast by young voters."[9]

The Board and Commission asked this Court to dismiss the lawsuit for lack of subject matter jurisdiction under Article III because the Plaintiffs do not have standing and because the lawsuit fails to state a claim upon which relief can be granted.[10]  Both sides "filed extensive memoranda detailing their respective positions."[11]  The Court also granted the Public Interest Legal Foundation leave to file a brief supporting dismissal as amicus curie.  [And the]  Court heard oral argument" in October 2015.[12]  The Court delayed issuing its decision in order to provide the parties "a full opportunity to settle as many of the issues as possible."[13]

After argument, the Plaintiffs dismissed with prejudice their "felon-re-enfranchisement" claim which was part of Count Two.[14]  This Court then issued its decision dismissing Counts Four and Five of the Plaintiffs' complaint because these "are

---

[8]   Opinion p. 3; Amended Compl. ¶ 118.

[9]   Opinion pp. 3-4; Amended Compl. ¶¶ 123-24.

[10]   Dkt. No. 48 (relying upon Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6)).

[11]   Opinion p. 2.

[12]   *Id.*

[13]   *Id.*

[14]   Dkt. No. 97.

freestanding claims, focusing on actions of the General Assembly, whose members are not parties to this case."[15]  This Court also dismissed the allegations of long lines in Counts One, Two and Three.  The claims as to voter identification survived.[16]  As to Count Three this Court noted it is "Count Two in a slightly different wrapper and it will be treated accordingly."[17]  After this Court issued its decision the parties proposed, and this Court entered, a consent decree resolving the "long lines" allegations.[18]  In light of that consent decree, the plaintiffs dismissed with prejudice those claims relating to long lines.[19]

Thus we are left with just the remaining challenge to Virginia's voter identification requirements divorced from the allegations of long lines.  This Court concluded, "Plaintiffs have demonstrated sufficient harm, albeit minimal, to pursue their various challenges to the Virginia Voter Identification law as applied to African-American, Latino, and young voters."[20]

The Plaintiffs now ask this Court to reconsider its dismissal of Counts Four and Five.[21]  The Plaintiffs say this Court's decision to dismiss Counts Four and Five was "not

---

[15]     Opinion p. 20 (Dkt. 110).

[16]     Order of December 18, 2015 (Dkt. No. 111).

[17]     Opinion p. 20 (Dkt. No. 110) ("[T]he term 'partisan fencing' does not create an independent cause of action aside from a typical First Amendment and Equal Protection Clause claim.").

[18]     Dkt. No. 117.

[19]     Dkt. No. 118.

[20]     Opinion p. 20.

[21]     Dkt. No. 124.

briefed," was "clear error," and "is manifestly unjust."[22]  Plaintiffs' argument is wrong on all points.  We are glad to address the substance of the Plaintiffs' arguments.  This Court directed, however, that before considering the substance of the Plaintiffs' motion we first address the propriety of the Plaintiffs' motion for rehearing.  Thus, while reserving opportunity to address the merits of Plaintiffs' motion for reconsideration within the time provided, we confine our response below to the threshold point of whether Plaintiffs have satisfied the legal standard necessary for this Court to reconsider its decision.[23]  And we show they have not.  Thus it is unnecessary for this Court to reach the merits.

## ARGUMENT

### I.      Reconsideration is only appropriate in three specific circumstances.

Fourth Circuit "case law makes clear…that Rule 59(e) motions can be successful in only three situations:  (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice."  *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (quoting *Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006)) (internal quotations omitted).

"Moreover, the court should not reevaluate the basis upon which it made a prior ruling, if the moving party merely seeks to reargue a previous claim."  *Evans v. Trinity Industries, Inc. & Trinity Highway Products*, 2015 WL 8331944, *1 (E.D. Va. Nov. 25, 2015) (quoting *Smithfield Foods*, 969 F. Supp. 975, 977 (E.D. Va. 1997)) (internal quotation omitted).  A motion for reconsideration that is "merely an attempt to reargue" a

---

[22]      *Id.*

[23]      E.D. Va. Rule 7(F)(1) provides eleven days to respond to Plaintiffs' motion for reconsideration.  Fed. R. Civ. P. 6(d) provides an additional three days for service.  The deadline for submitting such a substantive response is January 25, 2016.

prior motion and which "fails to demonstrate any clear error by the Court" is deficient. *United States v. Roberts*, 2012 WL 4801795, at *2 (E.D. Va. 2012) (Hudson, J.). "[I]n deciding a motion to reconsider, the Court must not reevaluate the basis upon which it made a prior ruling, if the moving party is simply 'rearguing' a prior claim…" *Brainware, Inc. v. Scan-Optics, Ltd.*, 2012 WL 3555410, at *2 (E.D. Va. 2012).

This Court has long emphasized that meritorious motions for reconsideration are rare. "Such problems [justifying reconsideration] rarely arise and the motion to reconsider should be equally rare." *Smithfield Foods*, 969 F. Supp. at 977 (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983).

## II.    Plaintiffs fail to meet the legal standard for

### A.    There has been no "intervening change in controlling law" warranting reconsideration.

Plaintiffs allege no intervening change in controlling law. And in the month since this Court's order dismissing the Plaintiffs' claims, the Middle District of North Carolina issued its decision in *North Carolina State Conference of the NAACP, et al. v. McCrory, et al.*, No. 1:13CV658, Dkt. No. 403 (Memorandum Opinion and Order of January 15, 2016) (copy attached as Exhibit A).

*North Carolina NAACP* involved a challenge to North Carolina's voter identification law that is remarkably similar to the challenge the Plaintiffs are making to Virginia's voter identification law. North Carolina's voter identification law and Virginia's voter identification law are similar in relevant respects and the legal theories

upon which both sets of plaintiffs premise their challenge is the same.  Indeed counsel for the Plaintiffs in this Virginia case are counsel for some of the North Carolina plaintiffs.

In *North Carolina NAACP* the NAACP sought to preliminarily enjoin North Carolina officials from implementing North Carolina's voter photo-identification requirement.  *Id*. at 3.  To be granted a preliminary injunction the NAACP must establish, inter alia, that it is likely to succeed on the merits.  *Id*. at 28.  In the context of a three-week trial with 114 witnesses and 23,000 pages of exhibits, reports and deposition transcripts, the Court concluded "the NAACP Plaintiffs are not likely to succeed on the merits."  *Id.* at 54.[24]

Thus the "intervening law" in the period since this Court's decision does not justify reconsideration but rather supports this Court's analysis.

**B.      There is no "new evidence to consider."**

Plaintiffs allege no "new evidence" and there is no "new evidence" in the record. Plaintiffs say they "have produced expert reports that provide detailed support for [their] allegations."[25]  These expert reports have been produced in the pre-trial discovery stage and are not yet "evidence."  The Board and Department have likewise produced expert reports and conducted discovery.  When this additional evidence is brought into the record at trial, it will support this Court's decision to dismiss Counts Four and Five.  But

---

[24]     *See North Carolina NAACP* p. 7 for the Court's description of the trial and the substantial body of evidence the Court considered in coming to this conclusion.  The trial was "on the merits of all claims except those challenging the merits of the photo-ID provisions."  But, "Plaintiffs presented evidence related to the Photo-ID claims insofar as it related to proof of discriminatory intent."  *Id.* n.4.

[25]     Memorandum p. 2.

it is not in the record now and it does not yet provide a basis for this Court to reconsider its decision.

**C.      There is no "clear error of law" or "manifest injustice."**

We understand Plaintiffs disagree with this Court's decision to dismiss Counts Four and Five.  But the Plaintiffs' disagreement with the Court's decision does not mean it is legal error" or a "manifest injustice" sufficient to justify reconsideration under the standards of Rule 59 and the Federal Rules of Civil Procedure.  Plaintiffs devote much of their brief to rearguing standing and the causation and redressability aspects of Counts Four and Five.

As this Court noted, "both parties have filed extensive memoranda detailing their respective positions" and the Court heard about two hours of oral argument.[26]  The Court also granted an *amicus curie* leave to file a brief supporting dismissal.  The issues and reasoning upon which this Court reached its decision was presented in the course of this briefing and argument.

Plaintiffs claim that "at no time during the hearing were Plaintiffs or Defendants asked whether Plaintiffs' intentional discrimination claims were fairly traceable to Defendants" is of no significance.  There is no question that Defendants motion to dismiss went to all five counts in Plaintiffs complaint and whether DPVA, Lee and Aida had standing to bring these counts was before the Court.  A challenge to these three Plaintiffs' standing went to all aspects of this Court's jurisdiction to hear these claims under the Article III "case or controversy" clause.

---

[26]      Opinion p. 2.

Whether the Plaintiffs stated a claim (and whether this Court could grant the relief requested) given that the only defendants the Plaintiffs named were the Board and Department was an issue specifically addressed during argument.

For example, during the discussion about felon-reenfranchisement this Court asked Plaintiffs, "Do I have the authority to do that [order a mass reenfranchisement of felons when the Virginia constitution gives only the Governor the authority to do it?  Am I going to overrule the constitution of Virginia?"  To which Plaintiffs answered, "Well, we are not asking you to order the Governor to do anything."[27]  Later, in the context of the voter identification challenge, this Court asked, "So I don't know that I can correct the problem if it requires a different statute.  Even if I declare it unconstitutional, I couldn't make it happen unless the legislature passes the law, right?"[28]

Finally, in context of the long lines allegation this Court expressed concern about the redressability of the Plaintiffs' claim given the relief Plaintiffs sought.

> MR. SPIVA:  "I don't know how I'm going to solve it.  Your idea of me conducting a public hearing and creating regulations for the State, I don't want to dampen your expectations, but that is not going to happen."  The Plaintiffs replied, "Well, that wouldn't be necessary be necessary, Your honor.  I mean, oftentimes in other context, sometimes things are sent back to the legislature.  I mean one thing I will say is that the legislature has had before it several proposals to fix this, and they've been rejected on party line vote.  And it's ---
>
> THE COURT: Well, if you think the legislature is the key to this, don't you think they should be a party?  Are they an indispensable party?
>
> MR. SPIVA:  They are not, your honor.  If the elections – Department of Elections and the State Board of Elections has the authority they need to fix the problem  -- but this goes to the issue of is there – do we point to the cause and

---

[27]     Transcript p. 29 (11-14, 16-17).

[28]     Transcript p. 33 (9-12).

potential solution?   And there were at least three bills that related to this problem.[29]

It is simply not accurate to contend that this issue was not before the Court or was not briefed or argued as part of the Defendants' motion to dismiss.

## III.    Reconsidering the motion to dismiss is untimely and would frustrate the pending trial and pre-trial schedule.

### A.    Plaintiffs unreasonably delayed seeking reconsideration.

This Court issued its order dismissing Counts Four and Five a week before Christmas.   Trial is set to begin in a month.   Yet Plaintiffs waited until now – more than three weeks after this Court issued its order – to request reconsideration.

Rule 59(c) provides that a motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.   Plaintiffs filed their motion 26 days after this Court's order so they are, technically, timely.   But, while a three week delay in seeking reconsideration may not have been unreasonable if this case were still in its preliminary stages and numerous discovery and pretrial deadlines were not imminent, under the circumstances such a delay is inexcusable.   As explained below if this Court were to grant the relief Plaintiffs seek, it would throw the pre-trial and trial schedule into disarray.

---

[29]    Transcript pp. 38-39 (24-18).

**B.      Granting Plaintiffs' motion to reconsider this Court's December order will frustrate the current trial schedule.**

This lawsuit is now entering the final hectic period before trial.  Trial is set for February 22.  More than twenty expert and fact witness depositions have still to be completed and the pre-trial deadlines include the following:

| | |
|---|---|
| January 27 | Motions regarding experts are due |
| February 1 | Motions in limine are due |
| February 5 | Witness and Expert lists are due |
| February 8 | Discovery designations are due and subpoenas served |
| February 11 | Trial stipulations are due |
| February 12 | Findings of fact and conclusions of law are due |

While Plaintiffs' intent in seeking reconsideration may not have been to disrupt the parties efforts to complete discovery and prepare for trial, the dilatory manner in which Plaintiffs have moved for reconsideration has had that effect.  The parties and this Court now must divert time and resources from their trial preparations, expert and fact witness depositions as well as other pretrial activities, to prepare this response and, potentially, a response on the merits due January 25.

**CONCLUSION**

The Plaintiffs' ask this Court to reargue the Defendants' motion to dismiss.  But Plaintiffs have failed to meet the legal standard for reconsideration.  There is no "intervening change in controlling law," there is no "new evidence," and there is no "clear error of law" or "manifest injustice."  Accordingly, this Court should deny Plaintiffs' motion to reconsider.  In the alternative, should this Court grant Plaintiffs' motion, we seek leave to address Plaintiffs' substantive claims.

11

DATED:  January 19, 2016                    Respectfully submitted,

                                            */s/ Mark F. (Thor) Hearne, II*
                                            MARK F. (THOR) HEARNE, II
                                            Arent Fox LLP
                                            112 S. Hanley Road, Suite 200
                                            Clayton, MO 63105
                                            Tel:  (314) 296-4000
                                            Fax:  (202) 857-6395
                                            thornet@ix.netcom.com

                                            DANA J. FINBERG
                                            Arent Fox LLP
                                            55 Second Street, 21st Floor
                                            San Francisco, CA 94105
                                            Tel:  (415) 757-5500
                                            Fax:  (415) 757-5501
                                            dana.finberg@arentfox.com

                                            *Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the Court's CM/ECF

system on January 19, 2016, to the following:

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Aria C. Branch
Perkins Coie LLP
700 13th Street, NW, Suite 600
Washington, DC 20005-3690

Joshua L. Kaul
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, WI 53703

                                            */s/ Dana J. Finberg*
                                            DANA J. FINBERG

                                            *Counsel for Defendants*

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE,      )
OF THE NAACP, EMMANUEL BAPTIST        )
CHURCH, BETHEL A. BAPTIST CHURCH,     )
COVENANT PRESBYTERIAN CHURCH,         )
BARBEE'S CHAPEL MISSIONARY BAPTIST    )
CHURCH, INC., ROSANELL EATON,         )
ARMENTA EATON, CAROLYN COLEMAN,       )
JOCELYN FERGUSON-KELLY, FAITH         )
JACKSON, MARY PERRY, and MARIA        )
TERESA UNGER PALMER,                  )
                                      )
          Plaintiffs,                 )
                                      )
          v.                          )          1:13CV658
                                      )
PATRICK LLOYD MCCRORY, in his         )
Official capacity as Governor of      )
North Carolina, KIM WESTBROOK         )
STRACH, in her official capacity      )
as Executive Director of the          )
North Carolina State Board of         )
Elections, RHONDA K. AMOROSO,         )
in her official capacity as           )
Secretary of the North Carolina       )
State Board of Elections, JOSHUA      )
D. MALCOLM, in his official           )
Capacity as a member of the North     )
Carolina State Board of Elections,    )
PAUL J. FOLEY, in his official        )
Capacity as a member of the North     )
Carolina State Board of Elections     )
and MAJA KRICKER, in her official     )
capacity as a member of the North     )
Carolina State Board of Elections,    )
                                      )
          Defendants.                 )
_____)

LEAGUE OF WOMEN VOTERS OF NORTH       )
CAROLINA; A. PHILIP RANDOLPH          )
INSTITUTE; UNIFOUR ONESTOP            )
COLLABOARATIVE; COMMON CAUSE NORTH    )
CAROLINA; GOLDIE WELLS; KAY           )
BRANDON; OCTAVIA RAINEY; SARA         )



```
STOHLER; and HUGH STOHLER,          )
                                    )
          Plaintiffs,               )
                                    )
     and                            )
                                    )
LOUIS M. DUKE; JOSUE E. BERDUO;     )
NANCY J. LUND; BRIAN M. MILLER;     )
BECKY HURLEY MOCK; LYNNE M.         )
WALTER; and EBONY N. WEST,          )
                                    )
          Plaintiff-Intervenors,    )
                                    )
          v.                        )          1:13CV660
                                    )
THE STATE OF NORTH CAROLINA,        )
JOSHUA B. HOWARD, in his official   )
capacity as a member of the State   )
Board of Elections; RHONDA K.       )
AMOROSO, in her official capacity   )
as a member of the State Board of   )
Elections; JOSHUA D. MALCOLM, in    )
his official capacity as a member   )
of the State Board of Elections;    )
PAUL J. FOLEY, in his official      )
capacity as a member of the State   )
Board of Elections; MAJA KRICKER,   )
in her official capacity as a       )
member of the State Board of        )
Elections; and PATRICK L.           )
MCCRORY, in his official capacity   )
as the Governor of the State of     )
North Carolina,                     )
                                    )
               Defendants.          )
_____)


UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
          v.                        )          1:13CV861
                                    )
THE STATE OF NORTH CAROLINA,        )
THE NORTH CAROLINA STATE BOARD      )
OF ELECTIONS; and KIM W. STRACH,    )
in her official capacity as         )
```

2

```
Executive Director of the North    )
Carolina State Board of Elections, )
                                   )
            Defendants.            )
_____  )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In these consolidated cases, Plaintiff North Carolina State Conference of the NAACP and certain other organizations and individual plaintiffs ("NAACP Plaintiffs") in case 1:13CV658 move to preliminarily enjoin Defendants from implementing North Carolina's voter photo-identification ("ID") requirement in the March 2016 primary election.  (Doc. 390.)[1]  No other Plaintiff, including the United States of America, has joined this motion. Trial is set to begin January 25, 2016.  Defendants oppose the motion, pointing out that North Carolina's current law permits those without a qualifying photo ID to vote under a broad "reasonable impediment" exception identical to that approved by a three-judge court in South Carolina v. United States, 898 F. Supp. 2d 30 (D.D.C. 2012).  For the reasons set forth below, the motion will be denied.

---

[1] All citations herein are to case 1:13cv658 unless otherwise indicated.

I.    **BACKGROUND**

  A.    **Procedural History**

On August 12, 2013, North Carolina enacted North Carolina Session Law 2013-381 ("SL 2013-381"), which made a number of changes to North Carolina's voting laws. (Pl. Ex. 121.) All changes were to take effect immediately except for the voter photo-ID requirement, which would not be effective until January 1, 2016. That same day, NAACP Plaintiffs joined several groups in suing to overturn several provisions: the photo-ID requirement, elimination of same-day registration ("SDR"), reduction of seven days of early voting, prohibition on counting out-of-precinct ("OOP") provisional ballots, elimination of mandatory pre-registration of sixteen-year-olds, and expansion of poll observers and ballot challenges.[2]   (Docs. 1, 52.)   NAACP Plaintiffs allege that these

---

[2] The League of Women Voters of North Carolina, along with several organizations and individuals, filed their complaint in case 1:13cv660, alleging that the elimination of SDR, changes to the early voting schedule, prohibition on counting OOP provisional ballots, and elimination of county board of election ("CBOE") discretion to extend poll hours one hour on Election Day discriminate against African Americans and impose an unjustified burden on all North Carolinians, in violation of § 2 of the VRA and the Fourteenth Amendment. (Doc. 1 in case 1:13cv660.)   On September 30, 2013, the United States of America filed its complaint in case 1:13cv861, alleging that the law's early voting, SDR, OOP voting, and photo-ID provisions discriminate against African Americans in violation of § 2 of the VRA. (Doc. 1 in case 1:13cv861.)   On January 27, 2014, the court permitted a group of "young voters" over the age of eighteen and others to intervene as Plaintiffs in case 1:13cv660.   Intervenors allege that the elimination of pre-registration, reduction in early voting, repeal of SDR, prohibition on counting OOP ballots, elimination of CBOE discretion to keep the polls open an extra hour on Election Day, and implementation of the photo-ID requirement violate the Fourteenth and Twenty-Sixth Amendments. (Doc. 63 in case 1:13cv660.)

4

provisions discriminate against African Americans and Hispanics in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, as well as § 2 of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973. At the parties' request, this case was consolidated with related claims made in the captioned cases for discovery and later for trial. (Doc. 267.)

On May 19, 2014, all Plaintiffs moved to preliminarily enjoin the challenged provisions, and the United States sought the appointment of federal observers. (Docs. 108, 110.) As to the photo-ID requirement, however, NAACP Plaintiffs (and those challenging the photo-ID requirement) moved to enjoin only its "soft rollout" in which voters would be advised that the photo-ID requirement would apply starting in 2016.

On August 8, 2014, after considering the testimony of multiple fact and expert witnesses and an extensive record of over 11,000 pages of exhibits and materials, this court issued a 125-page opinion denying the motions for preliminary injunction but refusing to dismiss any claims. 997 F. Supp. 2d 322 (M.D.N.C. 2014). Certain Plaintiffs appealed, and on October 1, 2014, a divided panel of the Fourth Circuit issued an opinion affirming in part, reversing in part, and remanding with instructions. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224 (4th Cir. 2014). The majority found that Plaintiffs had demonstrated a likelihood of success on the claim that the repeal of SDR and OOP

voting violated § 2 of the VRA, but left the denial of an injunction as to the remaining provisions in place.  Id. at 230. Due to a stay by the Supreme Court, SDR and OOP remained in place for the 2014 midterm general election before the stay was lifted.[3]

Trial was set for July 13, 2015.  On June 18, 2015, the North Carolina General Assembly passed House Bill 836, and on June 22, 2015, the Governor signed it into law as North Carolina Session Law 2015-103 ("SL 2015-103").  The law relaxed the photo-ID requirement created by SL 2013-381 by providing an additional exception that permits individuals to vote without a photo ID so long as they sign a reasonable impediment affidavit.  The court immediately held a status conference to address how this change in law might affect the pending cases.  Plaintiffs desired additional time to assess the new law but urged the court not to delay trial on the remaining claims; Defendants argued that the amendment rendered the challenge to the photo-ID requirement moot.  The court proposed continuing the trial to September 2015 rather than bifurcating the photo-ID claim but, at Plaintiffs' urging, carved out the challenge to the photo-ID law (except as it related to Plaintiffs' intent claims) from the July 13 trial setting and agreed to proceed to trial on the balance of the consolidated claims.  (Doc. 299.)  Thereafter, Defendants moved to dismiss the

---

[3] Consequently, SDR and OOP remain in place pending this court's final decision on the merits.

photo-ID challenge as moot (Doc. 316); the court denied the motion, setting trial for January 25, 2016.

Beginning July 13, 2015, this court held a trial on the merits of all claims except those challenging the merits of the photo-ID provisions.[4]  Over the course of three weeks, the court took the testimony of 114 witnesses.  Following trial, the parties submitted almost 300 pages of proposed findings of fact and conclusions of law.   (Docs. 364, 365.)   Including the evidence from the preliminary injunction hearing, which the parties have stipulated to be considered part of the trial record pursuant to Federal Rule of Civil Procedure 65(a)(2), the record consists of over 23,000 pages of exhibits, reports, and deposition transcripts.

On November 24, 2015, five months after the photo-ID law was modified by the reasonable impediment exception and two months before trial, NAACP Plaintiffs filed the present motion to preliminarily enjoin the implementation of the photo-ID provision of SL 2013-381, as amended by the reasonable impediment provision, for the March 15, 2016 primary.  (Doc. 390.)  The United States has not joined this motion.  Briefing was completed on December 21, 2015.  (Doc. 395.)

NAACP Plaintiffs limit their present motion to their claims of intentional discrimination and the alleged unconstitutional

---

[4] As noted, Plaintiffs presented evidence related to the photo-ID claims insofar as it related to proof of discriminatory intent.

7

burden the photo-ID requirement with the reasonable impediment exception will have on the right to vote under the Fourteenth Amendment pursuant to the <u>Anderson</u>-<u>Burdick</u> line of cases. <u>See Anderson v. Celebrezze</u>, 460 U.S. 780, 788-89 (1983); <u>Burdick v. Takushi</u>, 504 U.S. 428, 433-34 (1992). The motion is not based on their "results" claim under § 2 of the VRA. (Doc. 391 at 6-7.) NAACP Plaintiffs make three principal contentions in support of their motion. First, they argue that the State has not sufficiently educated voters and election officials on the reasonable impediment exception. Second, they argue that the reasonable impediment provision has not been sufficiently defined by Defendants to prevent it from being applied in a discriminatory and burdensome manner. Third, they claim that SL 2013-381's version of photo ID was passed with discriminatory intent.

**B.  Original Photo-ID Requirement and Reasonable Impediment Exception**

Session Law 2013-381 established the requirement that North Carolina voters "present photo identification bearing any reasonable resemblance to that voter to a local election official at the voting place before voting." N.C. Gen. Stat. § 163-166.13(a). As modified by SL 2015-103, acceptable photo identification[5] in North Carolina includes (1) a North Carolina

---

[5] Any voter seventy years of age or older is permitted to vote using an expired form of any of the acceptable forms of identification so long

8

driver's license, learner's permit, or provisional license (not expired more than four years);[6] (2) a special non-operator's identification card (not expired more than four years); (3) a United States passport; (4) a United States military identification card; (5) a Veterans Identification Card issued by the United States Department of Veterans Affairs; (6) a tribal enrollment card issued by a federally recognized tribe; (7) a tribal enrollment card issued by a tribe recognized by North Carolina, so long as it is signed by an elected official of the tribe and the requirements for obtaining it are equivalent to the requirements for obtaining a special identification card from the DMV; and (8) a driver's license or non-operator's identification card issued by another State or the District of Columbia so long as the voter registered to vote within ninety days of Election Day. Id. § 163-166.13(e).

Session Law 2013-381 required the State to provide a special photo ID free of charge to any registered voter who executes a declaration "stating the registered voter is registered and does not have other photo identification [that is] acceptable." Id. § 20-37.7(d)(5). The State must also provide a free photo ID to

---

as that identification expired at any point after the voter's seventieth birthday. N.C. Gen. Stat. § 163-166.13(e1).

[6] SL 2015-103 added the ability to use an expired license, learner's permit or provisional license (and an expired non-operator's identification, as noted next) for up to four years. 2015 N.C. Sess. Laws 103, § 8.(a).

anyone appearing before the North Carolina Department of Motor Vehicles ("DMV") for purposes of registering to vote who declares that she does not have an acceptable photo ID.   Id. § 20-37.7(d)(6).

If an election official determines that a voter's photo ID "does not bear any reasonable resemblance to that voter," SL 2013-381 requires the election official to "notify the judges of election of the determination."   Id. § 163-166.14(a).   The judges of election present must review the photo ID and determine if it bears any reasonable resemblance to the voter.    Id. § 163-166.14(b).   The judges may take into account additional evidence proffered by the voter and must construe all evidence in the light most favorable to the voter.   Id.   Unless the judges present unanimously determine that the voter's photo ID bears no reasonable resemblance to him or her, the voter will be allowed to vote.   Id. § 163-166.14(c).   If the judges do so unanimously agree, the voter is permitted to cast a provisional ballot.   Id. § 163-166.14(d).

Voters who do not comply with the photo-ID requirement are permitted to cast a provisional ballot, which will be counted so long as the voter appears at his or her county board of elections ("CBOE") before noon on the day prior to the convening of the election canvass and presents a form of photo ID bearing a reasonable resemblance to them.   Id. § 163-182.1A(b)-(c).

Session Law 2013-381 provided three exceptions which permitted certain groups of individuals to vote without presenting photo ID: (1) voters who are permitted to vote curbside; (2) those who have a religious objection to being photographed; and (3) those who have been the victim of a natural disaster occurring within sixty days of Election Day.   Id. § 163-166.13(a).

Further, rather than implement the photo-ID provision immediately, SL 2013-381 provided for a two-year "soft-rollout" so that the requirement would not take effect until January 1, 2016. This was consistent with the bipartisan recommendation of former President Jimmy Carter and former Secretary of State James A. Baker, III, see Commission on Federal Election Reform, Building Confidence in U.S. Elections 19 (Sept. 2005) ("Carter-Baker Report"), and is evidence that the legislature attempted to soften any burden imposed by the photo-ID requirement by giving voters two years to acquire a free photo ID.

Session Law 2015-103 modified this scheme by creating the reasonable impediment exception.[7]   The reasonable impediment exception permits voters who do not have an acceptable photo ID to nevertheless cast a provisional ballot so long as they complete a

---

[7] North Carolina's photo-ID law does not apply to voters who vote absentee by mail.  In addition, until the deadline for submission of requests for absentee ballots provided in N.C. Gen. Stat. § 163-230.1, a voter who fails to present qualifying identification can complete a written request form for an absentee ballot at a one-stop (early voting) absentee voting location.  N.C. Gen. Stat. § 163-227.2(b1).

11

declaration stating a reasonable impediment prevented them from acquiring qualifying photo ID. N.C. Gen. Stat. § 163-166.15(a)-(b). In addition to declaring that they suffer from a reasonable impediment, voters must appear to vote in person and present alternate identification. Id. § 163-166.15(b)-(c). The alternate identification can consist of "the voter registration card issued to the voter by the county board of elections" or "a current utility bill, bank statement, government check, paycheck, or other government document"[8] that shows the name and address of the voter. Id. §§ 163-166.15(c), 166.12(a)(2). Alternatively, voters may provide their date of birth and the last four digits of their Social Security number. Id. § 163-166.15(c).

Although a reasonable impediment voter casts a provisional ballot, the ballot must be counted unless one of the following is true: the impediment described in the declaration is "factually false, merely denigrate[s] the photo identification requirement, or [is an] obviously nonsensical statement[]"; the voter fails to provide one of the alternate forms of identification discussed above; the CBOE could not confirm the voter's registration using the alternate form of identification provided; or the "voter is disqualified for some other reason provided by law." Id. § 163-

---

[8] These are the same methods of identification that were required for SDR when it was in place. 2007 N.C. Sess. Laws 253, § 1 (permitting SDR-registrants to use any of the documents listed in N.C. Gen. Stat. § 163-166.12(a)(2)).

182.1B(a).

Session Law 2015-103 expressly clarifies what can constitute a reasonable impediment. At a minimum, all reasonable impediment declarations are required to include separate boxes listing the following reasonable impediments to acquiring a photo ID: (1) "Lack of transportation; (2) "Disability or illness"; (3) "Lack of birth certificate or other documents needed to obtain photo identification"; (4) "Work Schedule"; (5) "Family responsibilities"; (6) "Lost or stolen photo identification"; and (6) "Photo identification applied for but not received by the voter voting in person." Id. § 163-166.15(e). In addition, the form must list a box for "other reasonable impediment," which the voter can check and provide a "brief written identification of the reasonable impediment."[9] Id. § 163-166.15(e)(1)h.

Under the law, a voter's stated reasonable impediment cannot be rejected on the ground that it is not reasonable. See id. § 163-182.1B(b)(6). Instead, the law provides that, if a voter's reasonable impediment declaration is challenged, the CBOE is required to "construe all evidence presented in the light most favorable to the voter submitting the reasonable impediment declaration" and can only reject a declaration for the reason provided by the declarant if the statement "merely denigrate[s]

---

[9] The voter can also indicate that State or federal law prohibits listing the impediment. N.C. Gen. Stat. § 163-166.15(e)(1)h.

13

the photo identification requirement," is "obviously nonsensical," or is "factually false."  Id. § 163-182.1B(a)(5),(7).

NAACP Plaintiffs contend that a preliminary injunction is necessary because the reasonable impediment exception may not be applied as written.  For example, NAACP Plaintiffs are concerned about the breadth of discretion that will be afforded CBOEs in evaluating reasonable impediment declarations under the factual falsity exception.  (Doc. 391 at 29.)  But in a recent Rule 30(b)(6) deposition of the State Board of Elections ("SBOE"),[10] Executive Director Kim Strach provided the following representations on how the reasonable impediment exception will be applied:

- the reasonable impediment declaration provision should be interpreted very broadly (Doc. 395-6 at 12);

- the provision should be construed with all inferences in favor of the voter (id.);

- election officials should err on the side of viewing declarations in the light most favorable to the voter (id.);

- the provision should be construed with all inferences in favor of protecting the fundamental right to vote (id. at 13);

- if CBOE officials have doubts, such doubts should be resolved in favor of the vote being counted (id. at 15);

- it is up to the voter to determine if he or she has a reasonable impediment and a voter's belief that he or she has a reasonable impediment should not be second-guessed (id.);

---

[10] Excerpts of this deposition were not provided to this court until NAACP Plaintiffs' reply brief was filed on December 21, 2015.  (Doc. 395-6.)  The full deposition transcript has not been provided.  (Id.)

14

- poll workers and CBOEs do not have discretion to determine if a voter's explanation is not reasonable (id.);

- poll workers and CBOE officials should not investigate or question voters regarding the reasonableness of the impediments that they identify (id.);

- voters may get assistance from a person of their choosing when executing a reasonable impediment declaration, without first determining they are illiterate or suffer from a disability (id. at 62-63).

(See also Doc. 396 at 4-5.)[11]

NAACP Plaintiffs concede Director "Strach's Rule 30(b)(6) deposition testimony establishes both the State Board's interpretation of the reasonable impediment exception, including the position that a broad reading of the exception in favor of the voter is clearly required by the statute, and its plans for implementation of the exception." (Id. at 5.) Nevertheless, even though the SBOE is responsible for administering elections in North Carolina, NAACP Plaintiffs believe that the clear language of the statute and Director Strach's Rule 30(b)(6) deposition do not provide adequate assurances because Defendants have declined to stipulate to or more formally memorialize the position articulated

_____

[11] Plaintiffs also represent that Director Strach established the following during her Rule 30(b)(6) deposition: "voters will not be required to execute their reasonable impediment declaration in the presence of a notary"; and "voters wishing to execute a Reasonable Impediment Declaration will have their identifying information (including name, address, and phone number) populated electronically on their declaration form." (Doc. 396 at 4.) Plaintiffs did not provide the portions of the deposition containing these propositions.

15

by Director Strach.  (Id.)  In fact, in a telephonic hearing on
January 7, 2016, NAACP Plaintiffs suggested to the court that their
motion for preliminary injunction, at least as to their Anderson-
Burdick claims, might be unnecessary if the statements made by
Director Strach were memorialized.

    **C.   Voter and Poll Worker Education**

        **1.   Education Efforts from SL 2013-381's Enactment
until SL 2015-103's Enactment**

Defendants engaged in substantial efforts to educate voters
about the State's photo-ID requirement prior to when SL 2015-103
enacted the reasonable impediment exception.  There were three
elections during this time period (municipal elections in November
2013, midterm primary elections in May 2014, and midterm general
elections in November 2014).

SL 2013-381 contains an education mandate to inform and
educate voters about the new law.  See 2013 N.C. Sess. Laws 381,
§ 5.3.  The General Assembly appropriated approximately $2 million
to implement this requirement.[12]  (Doc. 394-1 at 2.)  To oversee
and effectuate these efforts, SBOE hired election specialists to
"create a mechanism to inform and provide education to the public
on the requirements for [SL 2013-381], and to assist voters who do
not have a photo ID for the purpose of voting in obtaining a photo

---

[12] Director Strach testified that $900,000 remains, most of which will
be spent on media this year.  (Doc. 395-6 at 58.)

16

ID." (Doc. 390-3 at 4-5.) The SBOE has created a number of materials to educate voters. For the 2014 general election, it developed a color poster that depicts the photo IDs that will be accepted in 2016 and states that voters will need a photo ID to vote beginning in 2016. (Id. at 8.) To accompany the poster, the SBOE developed a "two-sided color card that [could be handed out] to people who want[ed] information about photo ID and how to obtain it." (Id.) These materials were distributed to every CBOE and used at voting sites across North Carolina. (Id. at 8-9.) In order to avoid confusion that photo ID was needed prior to 2016, the SBOE also developed a large sign to be displayed at the entrance of voting sites stating that voters did not need photo ID to vote in the current election. (Id. at 9.) A similar sign faced voters as they left the voting site but stated that voters would need a photo ID to vote in 2016, and encouraged voters to ask poll workers for more information. (Id.) In addition, at least by the 2014 primary, poll workers were directed to tell voters that they will need a photo ID to vote in 2016, show the color poster illustrating qualifying IDs, and ask voters whether they had access to one of the approved forms of photo ID. (Id. at 17-19.) Voters who said they had a qualifying ID were asked to sign the poll book; if they said they did not, they were asked to sign the poll book with a line on it that says, "I do not have a photo ID" and were informed that they would need one starting in 2016. (Id. at 19-

17

20.)   In the general election, poll workers gave them the two-sided color push card noted above with instructions on how to get a free ID.   (Id. at 20-21.)   The State kept track of those who claimed they did not have access to an acceptable photo ID and sent a mailing to each.   (Id. at 20-22.)   That mailing asked voters whether they needed assistance in acquiring an acceptable photo ID.   (Id. at 22.)

In addition to efforts to educate voters at polling sites, the SBOE created a special website dedicated to the photo-ID requirement and sent a mailing to more than 218,000 registered voters who could not be matched to having an acceptable DMV-issued photo ID.   (Doc. 390-4 at 5.)   The mailing stated that photo ID would be needed to vote in 2016, listed resources for obtaining free photo ID, and provided a postage pre-paid response card where recipients could indicate they needed assistance in acquiring a photo ID.   (Doc. 394-1 at 9 & Ex. 5.)

In sum, over the course of the last two years, North Carolina has been continually notifying voters that, unless certain exceptions apply, they will need photo ID to vote in 2016.

### 2.   Education Efforts Since SL 2015-103's Enactment of the Reasonable Impediment Exception

On June 22, 2015, SL 2015-103 added the reasonable impediment exception, thus rendering the prior information provided to voters incomplete.   Session Law 2015-103 requires the SBOE to educate

voters on the availability of the reasonable impediment declaration, 2015 N.C. Sess. Laws 103, § 8.(g), and the SBOE has engaged in substantial efforts to do so.

### Creation and Distribution of Updated Materials

Director Strach testified that "[i]mmediately after the enactment of S.L. 2015-103 in June 2015, SBOE staff developed new materials which would inform the public of modifications to the photo identification requirements and the availability of the reasonable impediment declaration option." (Doc. 394-1 at 16.)

These new materials "were delivered to every county board of elections for posting and distribution at early voting and Election Day polling locations during the 2015 municipal elections"; "have been distributed to groups and associations by the SBOE Outreach Team"; "have been made available to candidates filing for the 2016 election contests"; and can be "download[ed] from the SBOE's dedicated 'Voter Id' website." (Id. at 16-17.)  As of December 11, 2015, the "SBOE ha[d] distributed 105,000 copies of these materials, including Spanish-language materials."  (Id. at 17.)  The SBOE also represents that within two weeks of December 11, 2015, it will have implemented statewide distribution of an additional "300,000 flyers and 13,000 full-size posters" to CBOEs for

> posting in public buildings throughout the State, such
> as county courthouses and offices, municipal government
> offices, town or city halls, health departments, public

19

> assistance agencies, vocational rehabilitation and
> mental health centers, hospitals, schools, police
> stations, libraries, chambers of commerce, public
> transit and bus stations, senior centers, community
> centers, shelters and temporary/emergency housing, and
> other facilities open to the public.

(Id.)  The SBOE also plans to further disseminate these materials

by having outside partners[13] post them at targeted locations,

"includ[ing] educational institutions, food banks and pantries,

retail and business establishments, churches, and other locations

open to the public." (Id. at 17-18.)  Pursuant to "agreements

reached with the University of North Carolina system, the North

Carolina Community College system, and the North Carolina

Independent Colleges and Universities, print materials will also

be disseminated to the campuses of every institution of higher

learning in the State." (Id. at 18.)

Further, on or about November 2, 2015, the State mailed a

letter to those organizations who received a prior version of

---

[13] The SBOE has further sought to disseminate information through
partnerships with outside organizations. (Doc. 394-1 at 19-20.) For
example, as a result of the SBOE's partnership with the United Way, the
helpline system operated by the United Way will include photo-ID related
messaging. (Id.) Last year this helpline assisted 125,000 callers with
needs such as "gaining access to affordable child care, counseling and
support groups, health care . . . and help locating local food pantries
and homeless shelters." (Id. at 19) While callers are on hold, the
helpline will play a recorded message containing information about the
current photo-ID requirements for voting. (Id. at 20.) Agent counselors
will also provide answers to basic information about the photo-ID
requirements based on training from the SBOE. (Id.) United Way's
partnerships means that statewide distribution of election informational
materials have extended to approximately twenty to sixty different
affiliated agencies in each county. (Id.)

educational materials not including the reasonable impediment provision stating "that recipients should provide updated current information to any individuals to whom they disseminated the original materials or information." (Id. at 17.) The letter also offered the assistance of SBOE staff and included a form to order new materials. (Id.)

### Statewide Media Campaign

The State also has a substantial media outreach program regarding the current version of the photo-ID law.[14] As of December 11, 2015, "radio ads [were] airing on at least 45 AM and FM stations of varying programming formats" and on major television stations across the State. (Id. at 12.) These ads inform the public that

> (1) photo ID will be required for most voters beginning in 2016; (2) exceptions to the requirements exist; (3) assistance obtaining free acceptable identification is available; and (4) voters who could not obtain acceptable identification will still be able to vote and should present at the polls for assistance casting a ballot or vote by mail.

(Id. at 12-13.) The State plans to air "[f]uture television and radio ads . . . which will provide information regarding exceptions

---

[14] NAACP Plaintiffs' own exhibits indicate that the reasonable impediment exception has received significant news coverage. (Doc. 390-1 (Daily Tar Heel article titled, "Law creates alternatives to photo ID for voting: Voters fulfilling certain requirements may cast a provisional ballot"); Doc. 390-5 (Raleigh News and Observer article titled, "NC legislature votes to soften voter ID requirement"); (Doc. 390-6 (WRAL article titled, "Lawmakers agree to allow affidavit at polls in lieu of photo ID").)

21

and alternative voting options." (Id. at 13.)  For example, the SBOE plans to start airing "Be Recognized" television commercials Statewide in early January 2016. (Doc. 395-6 at 57.)  These ads will state, "And if there's something preventing you from getting [a photo ID], no worries — you'll still be able to vote.  Just come to the polls and we'll help you cast your ballot."[15] (Id. at 60.)  The radio ads will use the same script. (Id. at 57.)

The State also intends to implement "an expansive outdoor advertising campaign to promote general awareness of the photo-ID requirements and exceptions." (Doc. 394-1 at 14.)  As of Director Strach's December 11, 2015 declaration, the SBOE projected that this "message will be displayed throughout North Carolina in rural, suburban, and urban areas on 40 vinyl billboards through November 2016, and 100 printed billboards through roughly August 2016." (Id.)  Forty digital electronic billboards across the State will also bear the message from January through March 2016. (Id.)  The

---

[15]  NAACP Plaintiffs criticize the SBOE for not including the phrase "reasonable impediment" in its ads (Doc. 395-6 at 60-61) while simultaneously claiming that many voters will not understand what "reasonable impediment" means (Doc. 395 at 4-5).  SBOE engaged MSA Advertising, a professional advertising group, to develop the script for the ads. (Doc. 395-6 at 51.)  The SBOE relied upon the ad agency's expertise in determining, in light of the length of the advertisements, what language would be the most effective in communicating to voters that there are ways to vote without photo ID. (Id.)  MSA Advertising ultimately determined that it would be more effective to say that there are still ways to vote without photo ID than it would be to use the phrase "reasonable impediment." (Id. at 53.)  Accordingly, the SBOE's ads seek to "drive people to the message that they can vote and provide[] a way they can get more information." (Id. at 59.)

State estimates that 16.5 million passersby viewed its billboard messages on 52 billboards over a 5-week period leading up to the 2014 general election.  (Id.)

<strong>Information Provided on SBOE and CBOE Websites</strong>

The State has also used the SBOE's website, CBOE websites, and the stand-alone website dedicated to the photo-ID requirement to educate voters about the reasonable impediment exception.  (Id. at 13.)  The first result of a Google search for "North Carolina voting ID" is the dedicated photo-ID website.  At the top of that site is the statement, "Beginning in 2016, Most Voters Will Need to Show Acceptable Photo ID at the Polls."  See N.C. State Bd. of Elections, www.voterid.nc.gov (last visited January 15, 2016).  Below that statement is an image of acceptable forms of photo ID.  Id.  Below that statement in bold, pink letters is the statement, "Reasonable Impediment: Can't Get a Photo ID? Click Here."  Id.  Clicking on the accompanying link produces the following prominently-displayed statement:

> Declaration of Reasonable Impediment
>
> Voters who are unable to obtain an acceptable photo ID due to a reasonable impediment may still vote a provisional ballot at the polls. (Examples of a reasonable impediment include but are not limited to the lack of proper documents, family obligations, transportation problems, work schedule, illness or disability, among other reasonable impediments faced by the voter.)
>
> Voters must also:

23

1. Sign a declaration describing their impediment; and

2. Provide their date of birth and last four digits of their Social Security number, or present their current voter registration card or a copy of an acceptable document bearing their name and address. (Acceptable documents include a current utility bill, bank statement, government check, paycheck, or other government-issued document.)

The provisional ballot will be counted when the information on the declaration is verified and all other eligibility requirements are met.

Id.   A video on the home page also concludes with the statement "if you don't have an ID or if you are unable to obtain one, voting options are available. For more information on exceptions, or for help getting a free ID, visit voterid.nc.gov or call 866-522-4723."   Id.

### Judicial Voter Guide

The SBOE also intends to educate voters about the reasonable impediment declaration through the State's "Judicial Voter Guide," which is required by statute to be mailed to "every household in North Carolina not more than twenty-five days prior to the start of early voting in each election in which there is a statewide judicial contest." (Doc. 394-1 at 14.)  The SBOE represents that "[i]nformation regarding the reasonable impediment declaration option and other exceptions will be a primary focus" of the guide and that its front cover "will bear a prominent statement that important information regarding photo-ID requirements and

24

exceptions for 2016 elections is contained inside." (<u>Id.</u> at 14-15.)

### Targeted Mailing of Those Previously Contacted

Most importantly, the SBOE has taken specific steps to re-educate those individuals that it previously contacted regarding the photo-ID requirement.  As noted above, individuals who signed the "Acknowledgment of no Photo ID" form while voting and individuals appearing on "no-match" lists were mailed information about the need for photo ID in 2016 and how to acquire it.  (<u>Id.</u> at 7-10.)  These mailings predated SL 2015-103.  (<u>Id.</u> at 11.) However, and of critical importance here, after the fall elections in November 2015, the SBOE sent every individual who received a prior mailing (315,755 voters) — except those who had reported they already possess acceptable photo ID and those for whom prior mailings were returned to the SBOE as undeliverable — an additional mailing describing the reasonable impediment exception and other exceptions to the photo-ID requirement.  (<u>Id.</u>)

### Election Official Training

NAACP Plaintiffs claim that the SBOE will not be able to sufficiently train election officials and poll workers on the reasonable impediment exception.  The SBOE claims that it has already begun to educate CBOEs on the reasonable impediment exception, and, in any case, that the appropriate time to train

25

poll workers is in the months leading up to an election.[16]  (Id. at 5.)  According to Director Strach, CBOEs "are responsible for providing in-person training to the local election workers and officials who will staff polling places," while the SBOE's role is to "provide[] oversight and resources to the counties' training efforts, including developing training materials and programs for use by county boards of elections."  (Id.)  CBOE training of election workers has "historically [been] conducted in the months immediately preceding an election," and, Director Strach says, there is "no precedent for county boards of elections to train elections workers on new elections procedures before the training they will receive for the 2016 elections."  (Id. at 5-6.) "Training election officials immediately in advance of an election," Director Strach says, "is preferable to conducting the training at any earlier time . . . [as it] allows the training to be fresh in the minds of election workers."  (Id. at 6.)  In addition, given that elections workers "typically work only a few days each year, . . . they receive training only on the procedures which will be in effect during the election for which they are being trained."  (Id.)

        As noted above, the SBOE began to develop and disseminate

---

[16] This likely explains why NAACP Plaintiffs' poll worker declarants claim they had not received training on the reasonable impediment declaration as of November 24, 2015.  (Doc. 390-15; Doc. 390-16.)

26

information on the reasonable impediment provision as soon as it was enacted.  In addition, SBOE staff began to provide training to CBOE officials on the reasonable impediment exception as early as August 2015, at the most recent statewide conference for CBOE members and staff.[17]  (Id.)  In January 2016, the SBOE plans to conduct regional training sessions for the CBOE elections personnel who will conduct the poll worker and election official training for the March 2016 primary.  (Id. at 5.)  The SBOE represents that CBOEs have "been encouraged to invite poll workers and elections officials to attend these training sessions in addition to the mandatory scheduled training which they will receive from their county boards."  (Id.)  The State also intends to conduct additional training at the next statewide conference on February 1-2, 2016.[18]

In addition to in-person training, the SBOE provided CBOEs with a training video on the photo identification requirement, including the reasonable impediment exception, "in early December

---

[17] According to Director Strach, attendance was mandatory for CBOE members and election directors.  (Doc. 394-1 at 6.)  In her Rule 30(b)(6) deposition, Director Strach conceded that she does not know with certainty that every CBOE election official received the specific training session on the reasonable impediment.  (Doc. 395-6 at 44-45.) According to her, "there might have been one or two counties that were not" at the conference.  (Id. at 45.)  Nevertheless, there is no reason for this court not to believe that the vast majority of counties were present and that the vast majority of officials received training.  (Id.)

[18] The court has allowed Plaintiffs to supplement the record post-trial with evidence from this training session.  (Doc. 402.)

2015 for use in their training of elections workers for the Primary Election in March 2016." (Id. at 3.) The training video includes "11 separate modules lasting a combined total of approximately one hour." (Id. at 4.) The SBOE also represents that an "Election Official Handbook," which is "an operations manual for the administration of elections," "will be provided to county boards of elections for distribution to every precinct polling place and one-stop early voting location in the State." (Id.) Each polling place will also be provided a 123-page "station guide" containing "step-by-step procedures for processing voters both with and without acceptable photo ID," several pages of which address the reasonable impediment situation. (Id. at 4-5.)

## II. ANALYSIS

To prevail on their motion for preliminary injunction, NAACP Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without an injunction; (3) the balance of the equities favors an injunction; and (4) an injunction is in the public interest. Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Granting a preliminary injunction is "an extraordinary and drastic remedy" that cannot be provided absent a plaintiff establishing each element by a clear showing. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (finding that "[a]ll

28

four requirements must be satisfied" in order for relief to be granted), <u>vacated on other grounds</u>, 559 U.S. 1089 (2010).  It is also not enough that Plaintiffs show a grave or serious question for litigation; they must make a "clear" demonstration they will "likely" succeed on the merits.  <u>Real Truth About Obama, Inc.</u>, 575 F.3d at 346-47.

On the present record, NAACP Plaintiffs have failed to clearly demonstrate that they are likely to succeed on the merits or that the balance of the equities or public interest favors an injunction.

### A.    Likelihood of Success on the Merits

North Carolina's photo-ID law, as amended, is judged against the standard set forth by the Supreme Court in <u>Crawford v. Marion Cnty. Election Bd.</u>, 553 U.S. 181 (2008).[19]  SL 2013-381, as amended, is clearly less burdensome than that found acceptable by the Supreme Court there.   There was no accommodation in <u>Crawford</u> for

---

[19] Although decided on § 2 grounds, <u>Frank v. Walker</u>, 768 F.3d 744, 747 (7th Cir. 2014) (Wisconsin), makes clear that any burden imposed by North Carolina's photo-ID requirement is less than that sustained by the Seventh Circuit.   Any burden is also less than that which the Fifth Circuit found to violate § 2 in <u>Veasey v. Abbott</u>, 796 F.3d 487, 513 (5th Cir. 2015) (Texas).  Neither Wisconsin's nor Texas's photo-ID requirement provided an exception for those with a reasonable impediment.  This court is not aware of any case where a photo-ID requirement with a reasonable impediment exception (like North Carolina's) has been found to violate either § 2 or § 5 of the VRA or the Fourteenth or Fifteenth Amendments to the United States Constitution.  This is likely because a reasonable impediment exception is designed to accommodate those who Plaintiffs claim are disparately burdened by an identification requirement.

those with a reasonable impediment; nevertheless, the Supreme Court held that Indiana's photo-ID law did not impose "a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." Id. at 198. To the extent that Crawford contemplates burdens imposed on subclasses,[20] including the socioeconomically disadvantaged, the reasonable impediment declaration is directly designed to accommodate these individuals.

NAACP Plaintiffs, relying on the testimony of Lorraine Minnite, Ph.D., Associate Professor of Public Policy and Director of the Urban Studies Program in the Department of Public Policy and Administration at Rutgers University, assert that North Carolina's photo-ID law "serves no rational public policy purpose" because no actual voter fraud has been shown to exist in North Carolina. (Doc. 395-1 at 6-7.) This position fails in light of Crawford, where the Supreme Court thoroughly laid out the benefits

---

[20] Justice Scalia viewed Justice Steven's opinion as assuming that the voter identification law "'may have imposed a special burden on' some voters." Crawford, 553 U.S. at 204 (Scalia, J., concurring)(quoting 553 U.S. at 199 (Stevens, J., lead opinion)). Justice Scalia and two other Justices would have considered only the burden the law imposed on voters generally, as opposed to any particular class of voters. Id. at 208. To the extent that debate remains as to whether the applicable burden under Anderson-Burdick is to be evaluated for subclasses, this court's analysis assumes as much because, even under that standard, Plaintiffs have not proved a likelihood of success. See Ohio State Conference of N.A.A.C.P. v. Husted, 768 F.3d 524, 543-44 (6th Cir. 2014) (discussing the fractured opinion from Crawford and whether Anderson-Burdick contemplates subclasses), vacated, 2014 WL 10384647 (6th Cir. 2014).

of a photo-ID requirement. 533 U.S. at 192-200 (election modernization, avoidance of potential voter fraud, and safeguarding voter confidence). The legislative history of SL 2013-381 and the law itself indicate that the North Carolina General Assembly sought to achieve the same end. (Pl. Ex. 549 at 2-4 ("North Carolina is one of the last in the Southeast to introduce [photo ID] for honesty and integrity in the electoral process and we believe it will go a long way to building confidence back in our voters and our citizens.")); 2013 N.C. Sess. Laws 381 (stating that its purpose was to "to protect the right of each registered voter to cast a secure vote with reasonable security measures that confirm voter identity as accurately as possible without restriction"); 2015 N.C. Sess. Laws 103 (stating that its purpose was to "authorize voters who suffer from a reasonable impediment preventing the voter from obtaining photo identification to complete reasonable impediment declarations when voting").

Dr. Minnite simply disagrees with the Supreme Court and did not even reference Crawford in her report, instead citing a Missouri Supreme Court case predating Crawford. (Doc. 355 at 47-48; Pl. Ex. 232 at 22.) Indeed, at trial in this case, she testified that the United States Supreme Court's discussion of fraud "doesn't constitute an informed opinion or an informed knowledge about voter fraud" because "it doesn't sort of meet my

31

standards of having a correct understanding about the evidence."
(Doc. 355 at 48.)  Even Dr. Minnite conceded at trial, however,
that the risk of voter fraud is "real in the sense that it could
happen" and while "[t]here is no evidence of extensive fraud in
U.S. elections or of multiple voting, . . . both occur and it could
affect the outcome of a close election."  (Id. at 50-51.)  She
nevertheless discounts it, however, "in the sense that it likely
happens."  (Id. at 49.)

North Carolina has sought to accommodate those expressing
genuine difficulties in acquiring photo ID, but it still has a
photo-ID requirement.  When the State did not have a reasonable
impediment exception, NAACP Plaintiffs claimed the burden imposed
on the socioeconomically disadvantaged was too severe.  Now that
the State has sought to accommodate these voters with the
reasonable impediment exception, Plaintiffs claim that the
exception swallows the rule and that the State need not have a
photo-ID requirement.  This court finds any alleged diminution in
achieving the State's purported interest to be more than offset by
the reduction of burden achieved by the reasonable impediment
exception.

Second, North Carolina's reasonable impediment exception is
materially indistinguishable from South Carolina's exception in
its photo-ID law that received judicial preclearance in South
Carolina, 898 F. Supp. 2d 30.  There, a three-judge panel

32

considered the alleged burden under § 5 of the VRA imposed by South Carolina's photo-ID law with a reasonable impediment provision. South Carolina's reasonable impediment provision permitted voters to vote without photo ID "so long as they fill[ed] out an affidavit at the polling place and indicate[d] the reason that they [had] not obtained" a qualifying photo ID. Id. at 35. A key question in that case was whether the exception would be interpreted broadly or narrowly. Id. Although the law provided that a voter's statement of reasonable impediment must be accepted unless it is false, merely denigrating the photo-ID law, or nonsensical,[21] the law did not provide examples of what might constitute a reasonable impediment or establish how the law was to be construed. Id. at 36 & n.5. Accordingly, the court leaned heavily on representations by the South Carolina Attorney General and the Executive Director of the State Board of Elections, who provided an official interpretation of the law and described how it would be implemented. Id. at 35-36. Both officials provided a broad interpretation of the provision and stated that a driving principle of its implementation would be "erring in favor of the voter." Id. at 36. The Attorney General also provided examples of reasons

---

[21] To the extent NAACP Plaintiffs are concerned about the scope of the "merely denigrates," "obviously nonsensical," and "factually false" provisions in North Carolina's reasonable impediment exception, these track exactly the provisions in South Carolina's law precleared by the three-judge panel based on the broad interpretation provided by the State. South Carolina, 898 F. Supp. 2d at 36-37 & n.5.

33

Case 1:13-cv-00658-TDS-JEP   Document 403   Filed 01/15/16   Page 33 of 54

that would constitute a reasonable impediment and convinced the court that, so long as the statement was not false, "[a]ny reason that the voter <u>subjectively</u> deems reasonable will suffice."  <u>Id.</u> at 36.  The court ultimately adopted this broad interpretation as a condition of preclearance.  <u>Id.</u> at 37.  The court required that "filling out [the affidavit] must not become a trap for the unwary, or a tool for intimidation or disenfranchisement of qualified voters."  <u>Id.</u> at 40.  Further, the court required the reasonable impediment form to "have separate boxes that a voter may check for 'religious objection'; 'lack of transportation'; 'disability or illness'; 'lack of birth certificate'; 'work schedule'; 'family responsibilities'; and 'other reasonable impediment.'"  <u>Id.</u> at 41. Finally, the court mandated that the form may "require a further brief written explanation from the voter <u>only if</u> he or she checks the 'other reasonable impediment' box."  <u>Id.</u>  So implemented, the court found that filling out the form would not constitute a material burden, at least under the VRA.  <u>Id.</u>

Upon close examination, North Carolina's reasonable impediment provision is effectively a codification of the three-judge panel's holding in <u>South Carolina</u>.  As noted above, a voter's reasonable impediment declaration can only be rejected if it is false, denigrating to the photo-ID requirement, or obviously nonsensical.  The law does not permit a voter's declaration to be denied on the ground that it is not reasonable.  N.C. Gen. Stat.

34

§ 163-182.1B(b)(6).    Only the voter's subjective belief is relevant to the issue of reasonableness.  See id.  Further, the law clearly provides that in considering a challenge to a reasonable impediment declaration, "the county board shall construe all evidence presented in the light most favorable to the voter submitting the reasonable impediment declaration."  Id. § 163-182.1B(b)(5).    Finally, the law requires all reasonable impediment forms to, "at a minimum," contain practically the exact same categories required by the panel in South Carolina.  The only omission is that the law does not require a box for "religious objection," id. § 163-166.15(e), but this is because a separate provision of the law grants an exception for those with religious objections to having their photo taken, id. § 163-166.13(a)(2). In fact, the law goes a step beyond what was required in South Carolina by requiring that a box be listed for "[l]ost or stolen photo identification."  Id. § 163-166.15(e)(1)f.  As in South Carolina, a voter need only provide a written explanation if one of the provided boxes does not apply.  Id. § 163-166.15(e)(1)h.

In this sense, the plain language of North Carolina's reasonable impediment exception establishes that it is to be broadly applied in favor of the voter.  Nevertheless, as noted above, Director Strach has provided assurances under oath that every advantage will be given to the voter in implementing the exception.  Specifically, in a Rule 30(b) deposition on behalf of

35

the SBOE, Director Strach provided that the reasonable impediment provision should be interpreted very broadly (Doc. 357-6 at 12); the provision should be construed with all inferences in favor of the voter (id.); election officials should err on the side of viewing declarations in the light most favorable to the voter (id.); the provision should be construed with all inferences in favor of protecting the fundamental right to vote (id. at 13); if CBOE officials have doubts, such doubts should be resolved in favor of the vote being counted (id. at 15); it is up to the voter to determine if he or she has a reasonable impediment, and a voter's belief that he or she has a reasonable impediment should not be second-guessed (id.); poll workers and CBOEs do not have discretion to determine if a voter's explanation is not reasonable (id.); poll workers and CBOE officials should not investigate or question voters regarding the reasonableness of the impediments that they identify (id.); and voters may get assistance from a person of their choosing when executing a reasonable impediment declaration, without first determining they are illiterate or suffer from a disability (id. at 62-63).

NAACP Plaintiffs express some concern over the fact that reasonable impediment declarants will be provided provisional ballots. Here, too, this issue was addressed by the panel in South Carolina, which did not view it as problematic:

36

> [T]he word 'provisional' is a bit of a misnomer in this instance. [Provisional ballots cast due to a reasonable impediment] must be counted and will be counted, at least so long as the voter does not lie when he or she fills out and signs the reasonable impediment affidavit. Counting the reasonable impediment ballots will not differ in substance from the counting of absentee ballots. When the provisional ballot process operates this way, casting a provisional ballot instead of a regular ballot does not burden the right to vote.

898 F. Supp. 2d at 41. Here, the text of the statute and the SBOE's representations require provisional ballots to be counted so long as (1) an acceptable alternate form of identification can be verified (last four digits of social security number and date of birth, etc.) and (2) the stated reason is not factually false, merely denigrating the requirement, or obviously nonsensical. As NAACP Plaintiffs indicate, although the Help America Vote Act of 2002, 52 U.S.C. §§ 20901–21145 (formerly 42 U.S.C. §§ 15301–15545), requires provisional ballots to be given to voters in certain circumstances, it only requires those ballots be counted "in accordance with State law." 52 U.S.C. § 21082(a)(4). The problem with NAACP Plaintiffs' argument is two-fold. First, it is in conflict with Plaintiffs' position at trial in July 2015, where they advocated for OOP provisional ballots on the grounds that they ameliorate burdens. Accord South Carolina, 898 F. Supp. 2d at 42 ("[T]he Supreme Court characterized provisional ballots as curing problems and alleviating burdens, not as creating problems and imposing burdens."). Second, with regard to reasonable

37

impediment declarants, North Carolina law provides for counting these ballots. Thus, Plaintiffs have failed to show that giving reasonable impediment declarants a provisional ballot is likely to impose a material burden on the right to vote.

For all these reasons, including the SBOE's assurances on how it will implement the reasonable impediment exception, NAACP Plaintiffs have failed to make a clear showing that the law will be applied in a discriminatory manner.[22]

Finally on this issue, NAACP Plaintiffs have failed to show that there has been insufficient time to implement the reasonable impediment provision in the March 2016 primary election. Plaintiffs rely on South Carolina for this proposition, but that case is clearly distinguishable in this respect. First, when South Carolina was decided, § 5's preclearance requirement had prevented South Carolina from initiating any steps to implement it. Once the law was precleared, preparations had to begin with the 2012 presidential general election fewer than four weeks away. Id. at 49. Although South Carolina had had a voter-ID requirement for several decades, it had never had a photo-ID requirement. Id. at 32. Accordingly, the court expressed concern that the reasonable impediment provision would be greatly relied upon, as there was

---

[22] Defendants note that South Carolina's photo-ID law, including the reasonable impediment provision, was "enforced during elections in 2013 and 2014 without any evidence of an adverse effect on African American turnout." (Doc. 394 at 3 n.2.)

38

very little time for those without photo ID to acquire it.  Id. at 50.  Second, election officials in that case represented to the court that it was too late for the law to be properly implemented for the upcoming election.  Id. at 49.  Third, the law itself called for nearly a year of education and training.  Id.

None of these is true here.[23]  Even though North Carolina has not held an election requiring a photo ID, for over two years it has engaged in extensive efforts to educate voters about the need for photo ID, offered free photo ID, and assisted individuals in getting a photo ID.  In addition, the SBOE is confident that it can implement the provision in the March 2016 primary.  The evidence submitted by the parties indicates that as of November 4, 2014 - one year into the two-year education cycle — approximately 94% to 96% of registered North Carolina voters already possessed qualifying identification.[24]  (Doc. 394-1 at 8; Pl. Ex. 242 at 16, 43 (tbl. 7).)  As noted above, the SBOE sent those registrants who

---

[23] To the extent NAACP Plaintiffs are asserting that the State is not equipped to handle the burden of administering the reasonable impediment exception in March 2016, it is noteworthy that voter turnout in North Carolina presidential primaries is historically low.  (See Def. Ex. 309 at 62 (tbl. 3) (stating that African American turnout was 25.4% in the 2012 presidential primary, compared to 70% in the 2012 presidential general election).)  Thus, the number of voters expected to present without photo ID will likely be a manageable number.

[24] Plaintiffs' expert, Dr. Charles Stewart estimated that, based on a July 16, 2014 snapshot of the data, 6.1% of registered voters did not have access to a qualifying ID.  (Pl. Ex. 242, at 16, 43 (tbl. 7).)  The State's no-match result, based on a November 4, 2014 snapshot of the data, produced an estimate of approximately 3.9%.  (See Doc. 394-1 at 8; Pl. Ex. 242 at 43 (tbl. 7).)

39

could not be matched to a qualifying photo ID a mailing regarding the photo-ID requirement.  (Doc. 394-1 at 8-9.)   The mailing "included a postage pre-paid response card that recipients were asked to complete by confirming whether they had acceptable photo ID, and indicating whether, if they did not, they would like assistance in obtaining one." (Id. at 9.)  The SBOE went through the same mailing process for those voters who claimed they did not have a qualifying photo ID while voting in 2014.  (Id. at 7-8.) An overwhelming majority of those who responded to the mailings claimed they already have an acceptable photo ID.[25]  (Id. (Exs. 4, 6, and 8).)  In addition, the SBOE has made substantial efforts to assist those who responded that they needed assistance in acquiring

---

[25] Based on the State's no-match list, 218,097 registered voters were contacted: 42,588 (19.5%) were returned undeliverable, 154,929 (71.0%) did not respond, and 20,580 (9.4%) responded.  (Doc. 394-1 (Ex. 6).)  Of those who responded, 18,729 (91%) claimed to have a photo ID, 633 (3%) claimed they needed help in getting one, and 324 claimed they did not have one but did not need help.  (Id.)  Based on Plaintiff's expert Dr. Charles Stewart's no-match list, 209,253 registered voters were contacted: 42,382 (20.3%) were returned undeliverable, 158,431 (75.7%) did not respond, and 8,440 (4.0%) responded.  (Id. (Ex. 8).)  Of those that responded, 6,427 (76%) claimed to have a qualifying photo ID, 782 (9%) claimed to need help, and 369 (4%) claimed they did not have one but did not need help.  (Id.)  Based on those who claimed they did not have qualifying photo ID while voting in 2014, 10,675 registered voters were contacted: 34 (0.3%) were returned undeliverable, 8,288 (77.6%) did not respond, and 2,353 (22%) responded.  (Id. (Ex. 4).)  Of those who responded, 2,230 (95%) claimed they have a qualifying ID, 54 (2%) claimed they needed help, and 28 (1%) claimed they did not have a photo ID but did not need help.  (Id.)  Although the majority of contacted individuals did not respond, the data nevertheless show that the no-match list data overestimate the number of registered voters who do not have a qualifying ID.

40

a photo ID.[26]

Next, the SBOE has been creating educational materials about
the reasonable impediment provision since at least July 2015 (eight
months before the election), educating CBOEs about the provision
since August 2015 (seven months before the election), and educating
voters about the provision since at least November 2015 (four
months before the election).  Although many poll workers will need
to be educated, the reasonable impediment provision is an exception
to the photo-ID requirement that poll workers have been instructed
to describe to voters for the last four elections.  Consequently,
this is not a wholly new voter-ID law that needs to be implemented,
as in South Carolina.  Training on the photo-ID provision has been
ongoing, and the SBOE has held public hearings in nine cities
across North Carolina during the two-year roll-out.  (Doc. 395-6
at 36-37; Doc. 390-17 at 3-4.)  Based on the record, the training
on the reasonable impediment exception involves an issue likely to

---

[26] For example, the SBOE represents that it has "been conducting follow-
up with every voter who returned a response card indicating a need for
assistance or who received the mailing [described above but] opted to
contact SBOE by phone."  (Doc. 394-1 at 9.)  Based on this effort, 1,592
cases were identified for follow-up based on the SBOE no-match mailing.
(Id.)  As of December 11, 2015, the State represents that "all but eight
of those cases have been closed"; 212 indicated they already possess a
qualifying ID, 236 "obtained or will obtain acceptable photo ID after
receiving the information in the mailer," and 620 had either "moved,
were deceased, or informed the SBOE staff that a voting method which
does not require photo ID was their preferred method."  (Id.)  Similar
efforts have been made for those who claimed they did not have qualifying
ID while voting in 2014 and those identified by Dr. Stewart's no-match
list.  (See id. at 8-11.)

41

involve a small fraction (between 0% and 6%) of voters.  In light of these facts, Plaintiffs have failed to demonstrate why the court should discount Director Strach's representation that training election workers in the months preceding the March 2016 primary will be sufficient, especially given her representation that such training has "historically [been] conducted in the months immediately preceding an election," and that there is "no precedent for county boards of elections to train elections workers on new elections procedures before the training they will receive for the 2016 elections." (Doc. 394-1 at 5-6.)

Finally, NAACP Plaintiffs seek to enjoin the photo-ID provision of SL 2013-381 on the grounds it was adopted with discriminatory intent.  The question of discriminatory intent in these cases – including as it related to the photo-ID requirement – was fully tried by this court in July 2015.  As noted above, the record in that case is extensive (over 20,000 pages), and the court is working diligently to decide all claims related to all of the other challenged provisions of SL 2013-381.  Thus, the court is not prepared to definitively resolve that claim here, especially since evidence as to the reasonable impediment exception has yet to be heard at trial.  But the court has considered all evidence of intent (including that related to other the challenged provisions) and can say that, based on its current review, NAACP

42

Plaintiffs have not demonstrated that they are likely to succeed on the merits of the photo-ID intent claim.

Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (citation and footnote omitted); Veasey v. Abbott, 796 F.3d 487, 498-99 (5th Cir. 2014) ("The appropriate inquiry is not whether legislators were aware of [a law's] racially discriminatory effect, but whether the law was passed because of that disparate impact.  Importantly, although discriminatory effect is a relevant consideration, knowledge of a potential impact is not the same as intending such an impact." (internal citations omitted)).  According to the Supreme Court, "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  In making such an inquiry, courts look to a non-exhaustive list of factors from Arlington Heights: whether the law bears more heavily on one race, id. at 266; whether there is evidence of a consistent pattern of actions by the decisionmaking body disparately impacting members

43

of a particular class of persons, id. at 267; the historical background of the decision, id.; and contemporary statements by decisionmakers on the record or in minutes of their meetings, id. at 268.[27] This court has considered all of these in its totality of the circumstances review.

Central to NAACP Plaintiffs' intent claim is the argument that any form of photo-ID requirement is not defensible on the merits and thus must be pretext for racial motivation. As is evident by the discussion above, however, the Supreme Court has already rejected that claim in Crawford and permitted Indiana's form of photo-ID requirement. Moreover, proponents of North Carolina's photo-ID requirement campaigned on the issue, citing popular constituent support. At the time legislators were considering North Carolina's bill, some twenty other States had enacted a photo-ID requirement. (Pl. Ex. 231 at 135 (tbl. 47).) A photo-ID requirement was not only countenanced, but actually recommended by the 2005 bipartisan Carter-Baker Report, and SL 2013-381 provided for a two-year roll-out and for a free photo ID to alleviate any burden on those who did not have a qualifying photo ID, as recommended by the report.

Plaintiffs point to the fact that sponsors of the photo-ID

---

[27] These statements should generally be by proponents and contemporaneous with the legislature's consideration of the bill. Veasey, 796 F.3d at 502. Plaintiffs do not point to any contemporaneous statements by any proponent of the law as it relates to the photo-ID provision.

44

bill requested a cross-matching of registered voters who "have neither a NC Driver's License nor a NC Identification Card," broken down by all possible demographics that SBOE captures, including "party affiliation, ethnicity, age, gender, etc." (Pl. Ex. 72 at 3-4.) But this is not as nefarious as Plaintiffs suggest. First, at the time of Representative Harry Warren's request on March 5, 2013, legislators would have been preparing for the first public hearing on photo ID on March 12, 2013. (See Pl. Ex. 127.) Opponents frequently challenge voter photo-ID bills on the basis of racial disparities in photo-ID possession. Any responsible legislator would need to know the disparities in order to properly assess the bill and account for such challenges. In fact, during the preliminary injunction stage of this case, the United States could not tell this court whether it would have been better or worse for the State not to have requested demographic data. (Doc. 179 at 219-20.) Second, given that North Carolina was at the time subject to preclearance under § 5, legislators would have needed to know the racial impact of the voting changes in order to evaluate whether they were even feasible. In other words, evaluating racial impact is always an issue but was especially so as it was a prerequisite to evaluating the likelihood that any voting change would not be retrogressive and thus could be precleared by the Attorney General. Accordingly, while Plaintiffs seek the inference that legislators requested demographic

45

information <u>because</u> they sought to discriminate against African Americans, alternative explanations are considerably more persuasive.

As for the process, the legislation followed all General Assembly rules and procedures.[28]  The bill was initially introduced in April 2013 and passed all three readings under House Rule 41(a). (Pl. Ex. 548 at 178.)  Those included public hearings during which over seventy-five citizens from across the political spectrum had the opportunity to speak (Pl. Ex. 130), a second hearing during which the bill was discussed and additional public comments were received (Pl. Ex. 545), and further debate where amendments were adopted (Pl. Ex. 546).  The bill advanced, as amended, from the various House committees and was debated on the House floor on April 24, 2013.  (<u>Id.</u>; Pl. Exs. 547–48.)  Three amendments were adopted, six others were rejected, and the bill passed "second reading" on a roll-call vote of 80-36.  (Pl. Ex. 121; Pl. Ex. 548

---

[28] While Plaintiffs criticize the later addition to the bill of the other challenged provisions under a legislative process known as "gut and amend," <u>see</u> <u>North Carolina State Conference of the N.A.A.C.P. v. McCrory</u>, 997 F. Supp. 2d 322, 367 (M.D.N.C. 2014), the evidence further showed that the procedure is not uncommon in the General Assembly.  (Doc. 177 at 133 (testimony of Senator Dan Blue, an opponent of the bill, acknowledging that gut-and-amend happens "quite a bit" and "too often" in the General Assembly).)  Such a process occurs because the General Assembly must meet a "cut-off" date – known as the "cross-over date" – by which a piece of legislation must be approved by one House lest it die for the remainder of the session.  (<u>Id.</u> at 131-33.)  Plaintiffs' legislator-witnesses admitted that it is not uncommon for a bill to return to its originating house with significant material not originally part of the bill.  (<u>Id.</u> at 133; Doc. 178 at 85-89 (testimony of Rep. Glazier).)

46

at 177.)  The bill subsequently passed "third reading," on a vote of 81-36, and was passed by the House.  (Pl. Ex. 548 at 178.)  Five House Democrats joined all present Republicans in voting for the photo-ID bill (Pl. Ex. 122 (noting roll call vote on April 24 third reading)); Pl. Ex. 138 at 67–68, 77, 88), but none of the African American members of the House supported it (Pl. Ex. 154). Representative Rick Glazier, who strongly opposed the bill, nevertheless acknowledged that "[f]or a large bill," HB 589 received up to this point "the best process possible" in the House, one he characterized as "excellent."  (Doc. 178 at 56-57; see also Pl. Ex. 25 at 8.)

NAACP Plaintiffs point to amendments to the bill made in July 2013, before its adoption but after the Supreme Court's June 25, 2013 decision in Shelby County v. Holder, 133 S. Ct. 2612 (2013), declaring the enforcement formula for § 5 of the VRA unconstitutional.  The majority of the amendments were additions relating to the other challenged provisions in these cases.  As related to the photo-ID provision particularly, Plaintiffs point to a reduction in certain forms of photo ID that previously had been included in the bill.  For example, Plaintiffs' expert Dr. Allan Lichtman, Distinguished Professor of History at American University, presented evidence that certain forms of photo ID that were retained by SL 2013-381 — DMV IDs, expired IDs for those over age seventy, U.S. passports, and veteran and military IDs — are

47

disproportionately held by whites, while the forms of photo ID not retained by SL 2013-381 — student IDs, government employee IDs, public assistance IDs, and expired IDs — are disproportionately held by African Americans.  (Pl. Ex. 231 at 99 (tbl. 32); Pl. Ex. 716, AL 6.)  There is, however, no evidence that the legislature knew that government employee IDs or expired IDs were disproportionately held by African Americans.  In addition, it would have been reasonable for the legislature to view expired IDs as less secure and to strike a balance by allowing them for those over age seventy but not allowing them for younger individuals.[29] It is reasonable to assume that those over age seventy are more likely than younger individuals to suffer from negative health making a DMV visit, or continued driving, more difficult. Moreover, although Representative David Lewis sought data on the number of student IDs created and the percentage of those who were African American, the data that he was provided actually suggested that African Americans were less likely to hold college IDs.[30]  If

---

[29] The General Assembly modified this balance in SL 2015-103 by permitting certain DMV-issued IDs to be expired up to four years.  2015 N.C. Sess. Laws 103, § 8.(a).

[30] Representative Lewis's original request was for system-wide numbers. (Pl. Ex. 334 at 2.)  But given that the University of North Carolina did not have a way to pull the numbers for all seventeen campuses, Representative Lewis was provided an estimate.  (Id. at 1.)  Assuming that "you have to have [a student ID] for everything — library, food, etc.," the university system reasoned that an adequate approach would be to provide numbers on the enrollment of African American students. (Id.)  Accordingly, Representative Lewis was informed that African

48

Dr. Lichtman is correct that student IDs are disproportionately held by African Americans (see Pl. Ex. 716, AL 6), then this result is counterintuitive given Plaintiffs' evidence on racial disparities in education. Further, the legislature offered a plausible explanation for excluding student IDs: (1) there was inconsistency in the way college IDs were done (Pl. Ex. 202 at 68-69) and (2) permitting student IDs would be redundant because some schools require a photo ID to get a student ID (Pl. Ex. 138 at 13). The removal of public assistance IDs, however, is somewhat suspect. While there is no evidence that the legislature was aware that public assistance IDs were disproportionately held by African Americans, a reasonable legislator aware of the socioeconomic disparities endured by African Americans could have guessed as much.

Nevertheless, in light of all the evidence — including Crawford, the legislature's decision to provide free ID and for a two-year soft roll-out, and the substantial evidence of State interest submitted during trial[31] — this court cannot say that Plaintiffs have carried their burden of showing SL 2013-381 was

---

Americans were 8.9% of students at UNC-Chapel Hill and 21.1% of students at the UNC System as a whole. (Id.)

[31] This court has also considered the evidence of intent as it relates to the other challenged provisions of SL 2013-381. In light of the State's proffered reasons for the law, this court cannot say that the evidence establishes improper intent.

49

passed with discriminatory intent.[32]  Further, even if this court were to conclude otherwise, NAACP Plaintiffs are still not entitled to a preliminary injunction in light of the balance of the equities and public interest considerations discussed below.

### B.   Balance of the Equities

NAACP Plaintiffs argue that the State will not suffer any burden in continuing to administer elections under the "existing regime" without a photo-ID requirement, while Plaintiffs will suffer the burden of denial or abridgement of their right to vote "due to confusion and intimidation."  (Doc. 391 at 35.)  NAACP Plaintiffs claim that voters will be deterred because they believe a photo ID is required.  These arguments are unpersuasive.

As noted above, the State has engaged in substantial voter

---

[32] Due to the findings above, this court need not consider how SL 2015-103's adoption of the reasonable impediment amendment — two years after SL 2013-381 — reflects on the legislature's intent.  NAACP Plaintiffs argue that the General Assembly's intent in passing the amendment is insufficient to carry Defendants' burden of demonstrating that they would have acted anyway in the absence of this improper factor, citing Hunter v. Underwood, 471 U.S. 222, 228 (1985) ("Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). More precisely, NAACP Plaintiffs argue that there is no evidence that SL 2015-103 was intended to "undo[] the racial intent" of SL 2013-381. (Doc. 391 at 15.)  Because Plaintiffs have not shown racially discriminatory intent sufficient to shift the burden to Defendants, the court need not decide whether Plaintiffs' limited consideration of SL 2015-103's intent, which they do not support with any authority, is correct.  It is clear that SL 2015-103 significantly ameliorates any burden imposed by SL 2013-381, both laws were signed by the same governor, and both will be enforced by the same SBOE.  Moreover, the photo-ID requirement North Carolina voters will actually encounter in March 2016 will accommodate individuals with reasonable impediments.

50

education on the photo-ID requirement for over two years.  There has been great publicity of the requirement, both in the public eye and indeed through this litigation.  The State has also engaged in substantial efforts to implement the law.  Significantly, the State has contacted every voter that it previously contacted — who did not indicate they had a photo ID and for whom the SBOE had a deliverable address — and advised them of the reasonable impediment exception.  This mailing prominently listed the reasonable impediment exception as the first exception to the photo-ID requirement. (Doc. 394-1 at 80-81.)  In addition, since July 2015, the State has also publicized, and is in continuing to publicize, the reasonable impediment provision.  This latter education is accelerating as the primary election approaches.  So, to the extent NAACP Plaintiffs seek to halt the effort now, two weeks before trial and seven weeks before early voting is set to begin on March 3, it would impose substantial hardship on the Defendants.  And while NAACP Plaintiffs seek to characterize their request as preserving the status quo, the calculus has changed over the passage of time.  The State's active engagement in implementing the photo-ID requirement has led voters to come to expect some form of it.  At this late stage, it is the NAACP Plaintiffs who are seeking to change the rules close to the election.

    NAACP Plaintiffs are at least partially to blame for their own emergency.  They declined this court's urging to try the photo-

51

ID issues in a September 2015 trial and chose not to move to enjoin implementation of the photo-ID requirement, including the reasonable impediment provision, earlier. Rather, they waited until now, on the eve of the January 25, 2016 trial, to do so. They have been less than diligent in pursuing their rights in this regard. Indeed, even now, and considering the significant efforts underway to conduct the March 2016 primary election, NAACP Plaintiffs present substantial questions about whether this court could even act. See Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006); Veasey v. Perry, 769 F.3d 890, 894-95 (5th Cir. 2014).

Finally, there is a fundamental flaw in Plaintiffs' request. NAACP Plaintiffs seek to enjoin the photo-ID requirement on the grounds that voters without a qualifying photo ID will be deterred by past education efforts and publicity from voting. But an injunction will not fix this alleged problem. Merely eliminating the photo-ID requirement will not encourage those voters to appear at the polls. Put another way, an injunction against the photo-ID provision will have no benefit to a voter who wrongly believes he needs a photo ID. The only way to prevent the stay-at-home voter under these circumstances would be for the court to also order Defendants to educate voters that photo ID will not be required for the March 2016 primary. But NAACP Plaintiffs have not requested this relief, nor have they explained how educating these voters in that fashion will encourage them to appear at the

52

polls any more than advising them that they need not present a photo-ID because they can sign a reasonable impediment affidavit. Moreover, insofar as Plaintiffs' argument is that there is insufficient time to adequately educate voters of the reasonable impediment exception, their position is even weaker in support of the education necessary to effectuate an injunction.

Given the substantial efforts underway for two years — including those on the reasonable impediment exception since at least November 2015 — and those to be conducted before the primary, the court cannot say that the balance of the equities clearly tips in favor of Plaintiffs.

### C.   Public Interest

Finally, NAACP Plaintiffs argue that the public interest is served by the prevention of the denial or abridgement of the right to vote.  (Doc. 391 at 36.)

The public interest is served by "permitting as many qualified voters to vote as possible" and "upholding constitutional rights." League of Women Voters of N.C., 769 F.3d at 247-48 (citations and internal quotation marks omitted).  But the public interest is also served by permitting legitimate and duly enacted legislation to be enacted and by reducing voter confusion.  See, e.g., Serv. Emps. Int'l Union Local 1 v. Husted, 698 F.3d 341, 346 (6th Cir. 2012).  As noted above, NAACP Plaintiffs' claim on voter deterrence is speculative and, in any case, cannot be cured by an injunction.

53

In addition, NAACP Plaintiffs have failed to clearly demonstrate that the State's substantial educational efforts, including those relating to the reasonable impediment exception, have failed to prepare North Carolina voters for the photo-ID law.  Quite the opposite.  Changing course in midstream will likely serve to confuse voters as to the state of the law.

                              *    *    *

    In sum, granting an injunction at this time would (1) negate substantial and adequate educational efforts by the State, (2) increase rather than ameliorate voter confusion, (3) offer only a speculative benefit, and (4) excuse Plaintiffs' delay.  As such, in addition to finding above that the NAACP Plaintiffs are not likely to succeed on the merits, the balance of the equities and public interest do not favor an injunction.

## III. CONCLUSION

    For the reasons set forth above, NAACP Plaintiffs' motion to preliminarily enjoin SL 2013-381's photo-ID requirement, as amended by SL 2015-103 and its reasonable impediment exception, (Doc. 390) will be DENIED.


                              /s/   Thomas D. Schroeder
                              United States District Judge

    January 15, 2016


                              54