IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

BARBARA LEE, *et al.*,

      Plaintiff,

v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

      Defendants.

No. 3:15CV357 HEH

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DPVA'S STANDING TO ASSERT CLAIMS ON BEHALF OF INDIVIDUAL VOTERS ALLEGEDLY IMPACTED BY VIRGINIA'S VOTER IDENTIFICATION LAW**

Defendants ask this Court to enter summary judgment, under Rule 56 and this Court's Local Rules, against the Democratic Party of Virginia (DPVA). DPVA lacks standing to bring claims on behalf of individual voters who allegedly were affected by Virginia's voter identification requirement in Virginia Code § 24.2-643. We realize, of course, that we previously filed a motion to dismiss DPVA under Rule 12(b)(1) and 12(b)(6). A party's standing goes to this Court's jurisdiction to hear this "case or controversy" under Article III § 1. As such, lack of jurisdiction due to lack of standing may be raised at any stage of the litigation. Our previous motion to dismiss under Rule 12 was evaluated on the pleadings alone and this Court assumed all of DPVA's

allegations to be true.  This motion for summary judgment is brought under Rule 56 and is based upon uncontroverted facts developed during pre-trial discovery.[1]

Based on uncontroverted evidence adduced in discovery, DPVA is not a traditional membership organization and cannot establish that it is the functional equivalent.  Accordingly, DPVA does not have associational standing necessary to bring claims on behalf of any "affected voters" alleging that they were unable to cast a vote by reason of Virginia's voter identification requirements.[2]  This Court rightly noted the distinction between DPVA's *associational* standing and DPVA's *organizational* standing.[3]  DPVA's organizational standing only allows DPVA to assert those claims within the ambit of its interest as an organization.  As this Court said, the DPVA's *raison d'etre* is to elect candidates who support the Democrat platform.  This interest is not the same as that interest an individual Virginia voter may assert.  But, as DPVA's Executive Director testified, DPVA's organizational purposes do not include filing lawsuits for persons who are not members of DPVA.

---

[1] During a status call in December 21, 2015, we told this Court we did not anticipate filing a motion for summary judgment.  However, the DPVA's executive director's testimony during a deposition after the status call demonstrates that the DPVA lacks associational standing, and that this Court therefore lacks subject matter jurisdiction over claims involving a supposed class of affected voters.

[2] We are simultaneously filing a memorandum opposing plaintiffs' motion to extend the length of the trial (D.I. 133).  We incorporate this motion by reference and note that if the Court finds that DPVA lacks associational standing, then at least half of the witnesses plaintiffs intend to call are irrelevant and the justification to extend the trial fails.

[3] In note 3 of this Court's December 18, 2015 Opinion the Court explained, "Associations can allege standing based upon two distinct theories.  First, the association 'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'  Second, the association may have standing as the representative of its members who have been harmed." (citations omitted).  *See* D.I. 110, December 18, 2015 Memorandum Opinion ruling on Defendants' Motion to Dismiss (Mem. Op.), p. 8 n.3.

Thus, even assuming DPVA can assert organizational standing, this would extend at most to the First Amendment claim and not allow DPVA to assert an Equal Protection Clause or Section 2 Voting Rights Act claim of individual Virginia voters.

## BACKGROUND

It is the DPVA's burden, as the party invoking this Court's subject matter jurisdiction, to establish all elements of standing.[4]   In its Memorandum Opinion, this Court explained that under Fourth Circuit precedent, "an organization must 'make specific allegations establishing that at least one *identified member* had suffered or would suffer harm.'"[5]   The Court went on to note that "*[i]mportantly, the Amended Complaint makes no claim that* either *the voter ID* or the long wait times *deprives any individual of an equal opportunity to cast their vote*."[6]

The absence of such a claim is critical, and dispositive.  As the Court explained in its earlier standing analysis the claims DPVA asserts are for:

> direct injury to its *raison d'etre* – electing candidates who support the democratic platform, as opposed to the individualized interests of its members.  It would also

---

[4] Memo. Op., p. 8 n.2 (citing *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013)).

[5] *Id.* at 7 (emphasis in original) (citing *S. Walk at Broadlands Homeowner's Assoc. v. Openband at Broadlands*, 713 F.3d 175, 184 (4th Cir. 2013)).

[6] Mem. Op. at 9-10 (emphasis added).  The claims related to long lines are no longer at issue – they were dismissed from the case in the Memorandum Opinion, the parties entered into a Consent Decree that dismissed those claims with prejudice.  The two individual plaintiffs, Lee and Aida, do not claim that they were deprived an equal opportunity to cast their votes as a consequence of the voter ID law.  In fact, both individual plaintiffs have voted – and their votes have been counted – since the implementation of the voter ID law at issue in this case.  *See* **Ex. A** (Lee Voter Record)(filed under seal pursuant to the Agreed Protective Order and Local Rule 5); **Ex. B** (Aida Voter Record)(filed under seal pursuant to the Agreed Protective Order and Local Rule 5).  Rather, and like the DPVA, the individual plaintiffs claim that the voter ID law had burdened their efforts to elect Democratic candidates and that they will have to expend additional time and resources in pursuit of such efforts as a consequence of the law.  *See* Mem. Op. at 9.  Like DPVA, the individuals have at most a First Amendment claim and do not have standing themselves to assert an Equal Protection Clause claim or a Section 2 Voting Rights Act claim.

appear that the individual members of the DPVA, as political activists, would be sufficiently burdened to sue in their own right.[7]

Plaintiffs have not further amended their complaint to add additional claims by DPVA or to add new individuals with distinct claims. And, importantly, DPVA has not identified any "member" of DPVA whose right to vote has been, or will be, denied by reason of Virginia's voter identification law. Hence, DPVA fails to establish associational standing. Consequently, less than one month before the start of the trial, *there is no claim that Virginia's voter identification law deprives any individual of an equal opportunity to cast their vote*.

The Court also noted DPVA purports to assert claims not only on its own behalf, but also "on behalf of  voters generally, a class of voters who lack ID that could be used for voting, and African-American, Latino, young, poor, and Democratic voters." *See* Mem. Op. at 15. However, before it can assert claims for a "class of voters," DPVA must establish it has standing to bring claims on behalf of that "class of voters." The undisputed facts demonstrate DPVA cannot make this showing, and summary judgment should be entered in Defendants' favor on these claims.

---

[7] *Id.* at 8 (citing *Ala. Legis. Black Caucus v. Ala.*, 135 S. Ct. 1257, 1268-70 (2015)).

**STATEMENT OF UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT**

The DPVA is not a traditional membership organization. As stated in its Party Plan, "*Every resident* of the Commonwealth of Virginia *who believes in the principles of the Democratic Party is hereby declared to be a member* of the Democratic Party of Virginia." *See* **Ex. C** (Party Plan, section 2.1) (emphasis added). Putting to one side whether it would be possible to clearly define "the principles of the Democratic Party" in a manner that would allow an informed assessment regarding any individual's affinity with the goals of the DPVA, the fact that the DPVA "declares" people to be members curiously ignores whether those "members" even want to be associated with the organization.

The DPVA designated its Executive Director, Rebecca Slutsky, as its corporate representative under Rule 30(b)(6). When asked about DPVA's membership, Slutsky testified as follows:

> Q: Let me ask you some questions about the DPVA. Who is a member of the Democratic Party in Virginia?
>
> A: Honestly I would say anyone who generally votes Democratic we would consider, you know, someone we speak for.[8]

Slutsky further testified DPVA does not maintain a list of its members:

> Q: Is there a membership roll for the Democratic Party?
>
> A: We have what I would consider kind of a board of directors along those lines. We have more active members and less active members, but again, I would consider anyone that votes Democratic to be, you know, a member of our party. If they, you know, show up to vote, if they volunteer. I mean, there is som [sic] activities that could make someone be considered a member that I would really open it up to, you know, the act of voting Democratically, even voting in Democratic primary would make me think of them as part of our constituency.[9]

---

[8] *See* **Ex. D** (Deposition of Rebecca Sluzky, 1/14/16, Transcript Excerpts) at p. 13:16-20.

[9] *Id.* at 13:21-14:8.

Slutsky was asked if there is a list of the supposed "members" of the DPVA:

Q:  You know, cutting to the chase, if someone were to ask you to produce a list of all the members of the democratic party of Virginia tomorrow, could you identify under your standards of membership every member of the Democratic Party of Virginia?

A:  I think it would be exceptionally burdensome to provide such a list.  I, you know, I do think that we would have metrics that we could, you know, generally, yes.  If a ton of time and energy was spent doing that, we could come up with, you know, a – I mean, I think we could get close.  Probably not every single member, but we would have a pretty good idea.

Q:  Again, this goes back to, I think, a question when I think this line of questioning started.  Do you maintain a roll of all of your members?  I understand you have lists of people who are active in the party and hold positions within the DPVA or committees.

A:  Uh-huh.

Q:  But putting aside the people who, you know, have actively decided to get involved with the Democratic Party of Virginia, separate from that, do you maintain a role [sic] of all the people that you consider to be member of the Democratic Party of Virginia?

A:  We have a – we have a metric system on how we identify a – the likely party affiliation to every voter in the state.  Does that answer your question?

Q:  I guess –

A:  I mean, there is – there is, you know, data inputted into a system that quantifies the likelihood of what party an individual is and it's generally fairly accurate.[10]

---

[10] *See Id*. at 18:6-19:14.

Slutsky's testimony establishes that not only does DPVA lack members in any traditional sense of the term, DPVA does not know at any given time who its supposed "members" are.[11]

DPVA does not require any application form or application process to gain membership status in DPVA:

> Q:  Is there an enrollment form?
>
> A:  There is no enrollment form unless, I mean, obviously our local committees have different rules.  We have organizations set up on the city/county level and there are different bylaws for all of those different groups on how they could become members of those specific committees, but generally speaking I would say anyone, you know, even if you – even if you're just voting, I would say you know that you're a member of the party because, you know, you've probably looked at our website before or you've probably been handed a leaflet, you know, ideally we've reached out to you in some way so you know that we exist and we know that – they know that we have their backs.[12]

Slutsky also testified there is no application form or process for "membership" in the DPVA:

> Q:  So an individual does not need to submit an application to become a member of the Democratic Party of Virginia?
>
> A:  No.[13]

---

[11] Moreover, DPVA does not take action to tell any person they are a "member" of DPVA:

> Q:  And, I guess, in addition to declaring those residents to be a member of the Democratic Party of Virginia, does the DPVA do anything to notify individuals that they have been declared to be a member?
>
> A:  No.  Although [the Party Plan] is obviously a public document so anybody that looks up the Democratic party online could see this and see that we've publically put it out there that they're a member.

*Id*. at 25:5-13.

[12] *Id.* at 14:13-15:1.

[13] *Id.* at 19:15-18.

The best that can be said of DPVA's view of its "membership" is that DPVA considers its "members" to be persons who do not know themselves to be members and who have taken no action to be members.  In short, DPVA has no "members" in the sense the Supreme Court evaluates associational standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and *Alabama Legislative Black Caucus*, 135 S. Ct. 1257, 1268 (2015) (an association may have standing to "bring a suit on behalf of its members when its members would have standing to sue in their own right.").  In those cases the Court considered "members" to be persons who had taken some affirmative action to affiliate with the organization.  This is not so for DPVA.

Slutsky testified:

> Q:  So individuals in the Commonwealth of Virginia don't have to submit an application to become a part of the DPVA, they don't have to pay any dues to be a member of the DPVA.  Other than kind of this holistic sympathy with Democratic candidates, are there any other requirements for membership in the Democratic Party of Virginia?
>
> MR. SPIVA:  Objection to form, but you can answer.
>
> THE WITNESS:  I mean, I – I – in my mind I think I have been very vocal in this.  Not here, but elsewhere.  You know, in my – the Democratic party serves two roles, to get Democrats elected and to support our Democrats once they're in office.
>
> So I think you've mentioned the first one, but anyone that supports our current Democratic elected is also a member.  And, yes, it's holistic.  We welcome everybody.  We're the party of inclusion.[14]

Slutsky then tried to analogize membership in the DPVA to membership in a labor union.  Slutsky's attempted analogy highlights the extent to which the DPVA is not a traditional membership organization or the functional equivalent of one:

---

[14] *Id.* at 20:5-22.

Q:  Does the Democratic Party of Virginia believes [sic] that it's possible to identify with Democratic candidates, but yet not want to belong to an organization such as the DPVA?

A:  I think you have to ask those individuals, you know.  We – we would want to be inclusive.

Q:  I guess what I'm getting at, isn't it a little bit presumptuous to presume that every voter who happens to cast a ballot for a Democratic candidate automatically would want to be a member of the DPVA or to be considered a member of the DPVA?

MR. SPIVA:  Objection to the form, but – but you can – you can answer.

THE WITNESS:  So, I guess, you know, the analogy that immediately comes to mind for me is if you, you know, think of a labor union.  There are dues-paying labor union members; however, you know, anyone that's in that workplace that is benefitting from the activities of that labor union, you know, is receiving benefits and is a part of the union even if they're not, necessarily, you know, directly members and I would say the same is similar for the Democratic party.  You know, I don't necessarily know that it's presumptuous.  You know, I think that people hope to be a part – people want to belong to different groups and I would hope that people would want to be a part of our group.  WE think we're a great group.

BY MR. FINBERG:

Q:  I'm sure you are.  But, working with your analogy, you're not a union member unless you sign up for the union and you pay your union dues.

A:  But I would argue that there is still, you know, speaking on behalf of the other individuals in the workplace and, you know, the other individuals are having the benefits of the existence of the union so they're still affiliated.[15]

Slutsky's testimony as DPVA's designated corporate representative establishes DPVA does not: (1) maintain a list of members; (2) have an application or application process for membership; (3) issue membership cards or otherwise notify any resident of the Commonwealth of Virginia that they have been "declared to be a member of the Democratic Party of Virginia;" nor (4) charge or collect membership dues.  Slutsky's testimony about DPVA's "membership" and

---

[15] *Id.* at 16:6-17:16.

her admission that DPVA could not provide a list of current members demonstrates DPVA's "membership" is not composed of a discrete or identifiable group of persons who have taken any affirmative action to identify with DPVA.

Highlighting the vague and amorphous nature of the DPVA's "membership," Slutsky testified that DPVA considers a Virginia resident who splits his or her vote among Democrat and Republican candidates to still be a member of the DPVA:

> Q:  Would a voter who splits his vote among Democratic candidates and Republican candidates or even third-party candidates be considered a member of the Democratic party?
>
> A:  I don't know if an appropriate answer is it depends.  I mean, I would say if you tend, I mean, I think somebody who generally votes Democratic and might vote for a different party once I would, you know, wouldn't think of them as not being a part of our constituency anymore.[16]

Thus, not only is the "membership" of the DPVA unstable and incapable of being accurately identified, it would also appear to be composed – at least in the DPVA's own view – of persons lacking any definable set of common interests.

## ARGUMENT

### I.  STANDARD

"[S]ince standing is an essential element of any federal case, [the plaintiff] bears the burden of establishing standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  *Mgt. Ass'n for Priv. Photogrammetric Surveyors v. United States*, 492 F. Supp.2d 540, 548 (E.D. Va. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "Accordingly, to survive summary judgment on standing grounds, [the plaintiff] must set forth by affidavit or otherwise specific facts sufficient to prove its standing."  *Id.* (citing Fed. R.

---

[16] *Id.* at 15:2-11.

Civ. P. 56(e); *Lujan*, 504 U.S. at 561).  Upon "a substantive challenge to subject matter jurisdiction, the nonmoving party must set forth facts demonstrating that a genuine issue of material fact exists, and '[t]he moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  *Qimonda AG v. LSI Corp.*, 857 F. Supp.2d 570, 574 (E.D. Va. 2012) (quoting *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).  Here, the uncontroverted facts preclude any such showing by the DPVA.

## II.   DPVA LACKS ASSOCIATIONAL STANDING TO ASSERT CLAIMS OF A CLASS OF VOTERS WHO ARE NOT ITS MEMBERS.

An organizational plaintiff, such as DPVA, may establish standing to bring suit either on its own behalf or on behalf of its members.  *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005).  Here, DPVA purports to assert claims not only on its own behalf, but also "on behalf of voters generally, a class of voters who lack identification that could be used for voting, and African-American, Latino, young, poor, and Democratic voters."[17]  However, before it can assert such claims, DPVA must establish that it has standing to bring claims on behalf of this "class of voters" as its "members."

As this Court correctly noted, "[i]n addition to the time-honored prerequisites for Article III standing, organizations such as the Democratic Party of Virginia ("DPVA") in the immediate case, must satisfy additional requirements when bringing suit in a representational capacity."[18]  This Court supported this statement with settled precedent from the Supreme Court and the Fourth Circuit :

---

[17] *See* Mem. Op. at 15.

[18] *See* Mem. Op. at 6.

To plead representational standing, an organization must allege that "(1) its own members would have standing to sue in their own right; (2) the interests of [sic] the organization seeks to protect are germane to the organization's purpose; and neither the claim nor the relief sought requires the participation of individual members in the lawsuit."[19]

The uncontested testimony of DPVA's Executive Director establishes DPVA cannot satisfy these requirements necessary to establish associational standing. DPVA is not a membership organization. "Membership organization" refers to any organization that allows people to subscribe, and often requires them to pay a membership fee or subscription. *See Alabama Leg. Black Caucus*, 135 S. Ct. at 1268, where the Court required the [name] to identify specific members. DPVA has no application or application process for individuals wishing to join the DPVA and no dues paid by the "members." *Supra* at 8-9.

"[A]n organization with no formal members can still have associational standing if it is the functional equivalent of a traditional membership organization." *See Heap v. Carter*, 112 F. Supp. 3d 402, 2015 WL 39999077, *10 (E.D. Va. July 1, 2015) (quoting *Washington Legal Found. v. Leavitt,* 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (internal quotations omitted). To determine whether an organization is the "functional equivalent" of a traditional membership organization, courts examine "if the organization (1) serves a specialized segment of the community; (2) represents individuals that have all the indicia of membership, including (i) electing the entity's leadership, (ii) serving in the entity; and (iii) financing the entity's activities; and (3) its fortunes are tied closely to those of its constituency." *Id*. (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977)). In the instant case, the DPVA fails the functional equivalency test.

---

[19] *Id.* (quoting *S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands*, 713 F.3d 175, 184 (4th Cir. 2013); *Md. Highway Contractors' Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991); and *Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

**A.      The DPVA does not serve a specialized segment of the community.**

DPVA cannot claim to serve "a specialized segment of the community."  Because the DPVA does not maintain a list of its "members," it is impossible to determine if those members constitute the type of "specialized segment of the community" required under the associational standing test.  It is possible, however, to reach the conclusion that the DPVA does not serve a specialized segment of the community from the fact that it claims as members not only individuals who support Democrat candidates, but also voters who support candidates from other political parties.  **Ex. D**, Slutsky Dep. at 15:2-11.

Moreover, a Quinnipiac University survey shows that fifty-seven percent of Democrats in the Commonwealth of Virginia (a category of voters the DPVA must consider among its members if its definition of membership is to be accepted) and sixty-six percent of African Americans (who the DPVA also claims to represent as among its members) support Virginia's voter identification law.  *See* **Ex. E** (Quinnipiac University survey) and **Ex. F** (Expert Report of Karen Owen), pp. 12-13.  So how can DPVA credibly claim to bring this litigation on behalf of its "members" if a significant proportion of its "members" favor the law the DPVA is challenging?

**B.      DPVA has no "members."**

Because the DPVA does not serve a "discrete, stable group of persons with a definable set of common interests," it does not bear the indicia of a traditional membership organization required to establish associational standing.  *See American Legal Foundation*, 808 F.2d 84, 90 (D.C. Cir. 1987) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977)).  In *American Legal Foundation v. F.C.C.*, the plaintiff was a non-profit legal foundation which sought judicial review, on behalf of its "members," of the FCC's refusal to conduct an investigation.

American Legal Foundation (ALF) claimed to represent the interests "of all members of the public who regularly watch ABC News (and other network news broadcasts)." *Id*. at 88. Applying the Supreme Court's test for associational standing articulated in *Hunt* and *International Union, UAW v. Brock,* 477 U.S. 274 (1986), the D.C. Circuit "directly confront[ed] the issue whether an organization can premise associational standing on the claims of individuals who are not *members* of the organization." *Id*. at 89 (emphasis in original). The Court of Appeals explained ALF lacked standing because "[t]he assumption that an organization litigates on behalf of its members is, after all, implicit in the three-part test articulated in *Hunt*…." *Id*.

> ALF's relationship to its "supporters" bears none of the indicia of a traditional membership organization discussed in *Hunt*. With its broadly defined mission as a "media watchdog," ALF *serves no discrete, stable group of persons with a definable set of common interests*…. Furthermore, it does not appear from the record that ALF's "supporters" play any role in selecting ALF's leadership, guiding ALF's activities, or financing those activities. Finally, we can discern no linkage between ALF's interest in the outcome of this kind of litigation and those of its supporters. Lacking a definable membership body whose resources and wishes help steer the organization's course, ALF "may have reasons for instituting a suit…other than to assert the rights of its [supporters]," and so cannot be described as "but the medium through which individual[s]…seek to make more effective the expression of their views."

*Id*. at 90 (emphasis added) (citing *Telecomm's Research & Action Center v. Allnet Commc'n Services, Inc.*, 806 F.2d 1093, 1095-96 (D.C. Cir. 1986).

According to the testimony of its Executive Director, DPVA – like ALF – lacks a "definable membership body whose wishes and resources help steer the organization's course." *Id*. Not only is the DPVA's membership body *practically undefinable* (Slutsky testified it would be "exceptionally burdensome" to even attempt to create a list of members **(Ex. D**, 18:6-13), because the DPVA "members" do not pay any dues (*Id.* at 20:5-22) it cannot be said those members

14

finance the organization's activities.[20]   Finally, the "members" of the DPVA – many of whom have no idea they have been "declared" members of DPVA – play no role in directing DPVA's activities.[21]

Washington Legal Foundation v. Leavitt, 477 F. Supp.2d 202 (D.D.C. 2007), is similarly instructive.  Washington Legal Foundation (WLF) was an independent legal foundation attempting to assert First Amendment claims against the US Department of Health and Human Services.  WLF claimed associational standing to bring the claims on behalf of its alleged members.  Id. at 206.[22] The district court described WLF's definition of a member as follows:

> that person [who] has expressed an interest in associating himself with WLF and/or to work with WLF in achieving common goals.  Those individuals who make a monetary contribution to WLF are not deemed members of WLF solely on that contribution; rather, individuals are granted indicia of membership (including, most importantly, inclusion on mailing lists for WLF's publications and/or periodic reports regarding WLF's activities) only if they provide some additional indication that they wish to associate themselves with WLF.  Such an indication would include a request to be placed on one or more of WLF mailing list [sic].[23]

The district court also considered WLF's statement that "[i]n general, members include all those who have asked to be sent copies of WLF's publications on a regular basis and/or periodic reports regarding WLF's activities."  Id.  The court found that these allegations, even if accepted as true, did not confer associational standing on WLF.

---

[20] It is apparent that the DPVA is not itself financing this litigation.  See pp. 18-19, infra.

[21] As is clear from the DPVA Party Plan, DPVA's activities are guided by a small group of party activists.  See Ex. C, Section 4.9.  Slutsky explained that even DPVA's leadership committee did not participate in the decision to file this lawsuit.  See p. 18, infra.

[22] Unlike DPVA in this case, in WLF the organization brought the suit on behalf of two named individuals it claimed were among its members.  Id. at 208.

[23] Id. at 210.

The district court further noted "WLF's broad definition of membership, claiming that every person who is on its mailing list is a 'member,' has been rejected by the D.C. Circuit."[24] Here, the DPVA claims as "members" *individuals who have not taken any affirmative steps to join*. Unlike DPVA, WLF at least claimed a list of members who had to subscribe to a mailing list or had expressed an interest in associating themselves with the organization. DPVA's "members," therefore, have even less indicia of membership than the "members" of WLF – where the court held there was no associational standing. The district court also rejected WLF's argument that "work[ing] with WLF in achieving common goals" constituted membership for standing purposes. *Id.* And, the court explained that WLF's associational standing claim was "further weakened by the fact that it manufactured 'members' for the purposes of [the] lawsuit after the fact – that is, WLF first determined to bring this suit and only then identified [the named individual plaintiffs] as persons on whose behalf it would litigate." *Id.* at 211.

DPVA only identified the hypothetical "affected voters" on whose behalf it is attempting to bring claims *after* the complaint was filed; moreover, it has been adding individuals to its list of affected voters as the litigation has progressed. *Compare* **Ex. G** (Excerpt from Plaintiffs' Supplemental Responses to Defendants' First Interrogatories to Plaintiffs, identifying four affected voters) *with* **Ex. H** (Sixth Amended Initial Disclosures identifying twenty-nine affected voters).[25] But, none of these individuals are members of DPVA nor are they parties to this lawsuit.

---

[24] *Id.* (citing *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002)). In *Gettman*, the D.C. Cir. held that a magazine (High Times) did not have standing based on the alleged membership of readers and subscribers who did not select the organization's leadership, guide the organization's activities, or finance activities of the organization). The purported "members" of DPVA also do not select the leadership, guide the activities, or finance the activities of DPVA.

[25] Because Exhibits G and H contain the names of individual voters, out of an abundance of caution Defendants are filing these exhibits under seal pursuant to the Agreed Protective Order and Local Rule 5.

This Court recently examined the claimed associational standing of an organization that was not a traditional membership organization.  *See Heap v. Carter*, 112 F. Supp.3d 402, 2015 WL 39999077, *10 (E.D. Va. July 1, 2015).  In *Heap*, Judge Cacheris applied *WLF* and *Hunt* to hold the Humanist Society (THS) was not the functional equivalent of a membership organization. THS did not provide any details about who its membership was or "whether THS truly can be considered a voluntary membership organization or a functional equivalent." *Id*. at *10.  The Court explained that the lack of factual allegations in the complaint in that case did not permit a finding that THS had "the kind of leadership and financial structure that is closely tied to that of its members or that its members exert any control over the direction of the organization" that would support associational standing.[26]  Here DPVA similarly fails to provide any basis upon which to find associational standing.  DPVA simply is not a membership organization nor can it be considered a functional equivalent.

## C.    DPVA's fortunes are not closely tied to those of its constituency.

In order to determine whether the DPVA's "fortunes are tied closely to those of its constituency," *see Heap* at *10 (citing *Hunt* and *Brock*), it is necessary to identify the organization's actual constituency.  For reasons previously explained, DPVA's constituency cannot be identified because:  (a) DPVA itself does not know who its members are; and (b) the claimed constituency of the DPVA (every resident of the Commonwealth of Virginia who believes in the principles of the Democratic Party) is diverse and includes fifty-seven percent of self-

---

[26] *Id.*  One of the factors considered by Judge Cacheris in *Heap* was whether the organization claiming to have associational standing is a "voluntary membership organization."  *Id*.  Here, it cannot be said that "membership" in the DPVA is voluntary.  As shown by the Rule 30(b)(6) testimony of the DPVA's Executive Director, the DPVA "declares" individuals to be members; there is no application or application process; and the "members" are not told that they are, in fact, considered by the DPVA to belong.

described Democrats in Virginia who support the laws DPVA is challenging in this litigation. Lacking any identifiable constituency sharing common goals, it cannot be said that the DPVA's fortunes are closely tied to the fortunes of *any* constituency capable of definitive identification.

## III. DPVA'S CLAIMS ARE NOT GERMANE TO ITS ORGANIZATIONAL PURPOSE.

DPVA's organizational standing is also on shaky ground.  This Court correctly noted DPVA exists to elect Democrat candidates.  No one disputes this point.  That purpose may justify a First Amendment claim but it does not extend to litigation asserting equal protection or voting rights claims of persons who are not members.

Slutsky testified that DPVA has two purposes.  Neither purpose involves litigating on behalf of "members" claiming their right to vote has been "burdened" by Virginia's voter identification law or any other election regulation.

Slutsky said "the Democratic party serves two roles, to get Democrats elected and to support our Democrats once they're in office."[27]  While litigation such as the present case might arguably further the political aims of the DPVA (and of the national Democratic party) by publicizing an issue that could mobilize the base and increase voter turnout – and thus indirectly help "get Democrats elected" – it cannot be said that filing and prosecuting litigation such as this case is germane to the DPVA's organizational purpose.

Neither the DPVA's steering committee nor the DPVA's central committee authorized this lawsuit.[28]  It further appears that the DPVA is not paying the attorney fees associated with the prosecution of the claims it purports to bring on behalf of its members:

---

[27] **Ex. D**, Slutsky dep. at 20:16-18.

[28] *See Id.* at 29:15-23.

> Q:  Is the DPVA paying attorney's fees to Perkins Coie or any other law firm in connection with the representation of the DPVA in relation to this lawsuit?

> A:  I do not believe so.[29]

When pressed on the question of who, if anyone, was footing the DPVA's legal bills in  the case, Slutsky professed to be unable to recall.[30]

The Court of Appeals for the DC Circuit has explained, "one principle underlying the standing doctrine is that 'the decision to seek review must be placed in the hands of those who have a direct stake in the outcome,' … not in the hands of 'concerned bystanders' who will use it simply as a 'vehicle for the vindication of value interests.'" *American Legal Foundation v. F.C.C.*, 808 F.2d 84, 91 (D.C. Cir. 1987) (citing *Diamond v. Charles*, 476 U.S. 54 (1986)).

The DPVA fails to satisfy this principle.  There is little question that if anyone has a "direct stake in the outcome" of the challenge to Virginia's voter identification law, it would be a Virginia resident who is an eligible Virginia voter and whose right of suffrage is denied by reason of Virginia's requirement a voter identify themselves before casting a ballot.  Yet, despite having had every opportunity to join such a person as either an individual plaintiff or as an identified member of DPVA, DPVA has failed to do so.[31]  Instead DPVA decided to frame its challenge to Virginia's

---

[29] *Id.* at 30:10-13.

[30] *Id.* at 30:14 – 31:15.  Slutsky's statement – as the Executive Director of the DPVA charged with the day-to-day operation of the organization – that she does not know who is paying DPVA's legal fees to bring this lawsuit strains credulity.  *Id.* at 10:18-23 ( "I'm the Executive Director so I oversee everything that the party does and all of the staff, you know, the day-to-day operations.  I run the organization, so to speak.").

[31] The Court should recall that when Plaintiffs moved for leave to amend the original complaint in this case, they represented that one reason for the amendment was to add additional parties.  DI 23.  Surprisingly, though allowed to amend their complaint, Plaintiffs did not add any individual Virginia voter claiming to have been adversely burdened by Virginia's voter identification law.

voter identification law as a "concerned bystander" and to attempt to assert associational standing to bring claims on DPVA's own behalf.  As explained above, those efforts fail.

## CONCLUSION

DPVA's standing to bring claims on behalf of individual voters has been on shaky ground since it filed its original complaint.  This Court found standing had been sufficiently alleged at the pleading stage and allowed those claims to proceed.  But testimony of DPVA's Executive Director and designated corporate representative has since established DPVA does not possess associational standing to bring this lawsuit on behalf of individual Virginia voters.  Accordingly, this Court should enter partial summary judgment holding DPVA lacks standing to assert the Equal Protection Clause and Voting Rights Act claims of individual Virginians who are not members of DPVA and who are not parties to this lawsuit.

DATED:  February 5, 2016

Respectfully submitted,

*/s/ Dana J. Finberg*
DANA J. FINBERG (VSB 34977)
Arent Fox LLP
55 Second Street, 21st Floor
San Francisco, CA 94105
Tel:  (415) 757-5500.
Fax:  (415) 757-5501
dana.finberg@arentfox.com

MARK F. (THOR) HEARNE, II (*pro hac vice*)
Arent Fox LLP
112 S. Hanley Road, Suite 200
Clayton, MO 63105
Tel:  (314) 296-4000
Fax:  (202) 857-6395
thornet@ix.netcom.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the Court's CM/ECF system

on February 5, 2016, to the following:

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Aria C. Branch
Perkins Coie LLP
700 13th Street, NW, Suite 600
Washington, DC 20005-3690

Joshua L. Kaul
Perkins Coie LLP
1 East Main Street, Suite 201
Madison, WI 53703

/s/ Dana J. Finberg
DANA J. FINBERG