**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| **BARBARA H. LEE**, et al., | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Case No. 3:15-cv-00357-HEH** |
| | : | |
| **VIRGINIA STATE BOARD OF** | : | **Judge Hudson** |
| **ELECTIONS**, et al., | : | |
| | : | **Magistrate Judge Young** |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**BRIEF OF *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS**

Michael A. Carvin (admitted pro hac vice)
John M. Gore (admitted pro hac vice)
Anthony J. Dick (admitted pro hac vice)
Michael Murray (admitted pro hac vice)
Stephen A. Vaden (admitted pro hac vice)
Mark R. Lentz (VSB No. 77755)
JONES DAY
51 Louisiana Ave, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com

*Counsel for Amici Curiae*

## INTRODUCTION

Section 2 of the Voting Rights Act provides that no State may "impos[e] or appl[y]" any voting practice that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). A challenger may establish a violation of Section 2 by showing that, under "the totality of circumstances," "the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). Section 2 contemplates two types of claims: a "vote-denial" claim that voting practices unlawfully deny protected individuals the opportunity to cast ballots and a "vote-dilution" claim that, despite equal ballot access, districting practices unlawfully dilute minority voting power.

In the vote-denial setting, Section 2 prohibits states from imposing voting practices that cause minority voters to be disproportionately *excluded* from the political process. But it does not require states to maximize minority opportunities by eliminating the usual burdens of voting to overcome socio-economic disparities. Nor does it invalidate voting practices because they "ha[ve] a disparate effect on minorities." *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014). The difficulty of showing that a law causes a disproportionate *exclusion* of minority voters depends on the nature of the law. In a challenge to a voting *qualification*—a law defining eligibility to vote—the showing is relatively easy to make. A voting qualification by definition "den[ies]" unqualified people the "opportunity" to vote. By contrast, in a challenge to a race-neutral law that defines how eligible voters go about voting, showing a Section 2 violation is far more difficult. A regulation of the time, place, and manner of elections does not deny anyone the *opportunity* to vote; it merely regulates when, where, and how that opportunity must be exercised.

Plaintiffs propose a radically different theory of Section 2. They challenge the State's race-neutral regulation of the time, place, and manner of voting through its voter ID law. They claim that minorities are less likely to take advantage of the equal opportunity to vote under Virginia law due to underlying socio-economic inequalities, which will lead to a statistical disparity in minority voter participation. Consequently, Plaintiffs argue that Virginia's race-neutral election process violates Section 2 and must be replaced with a system that best enhances minority voting convenience and best ameliorates the underlying disparity. This novel theory contradicts both Section 2's plain language and Supreme Court and Fourth Circuit precedent identifying the sort of discriminatory "results" proscribed by the statute for at least five reasons.

*First*, Section 2 plainly does not prohibit a regulation of the time, place, or manner of voting merely because it "results" in less minority *participation*. It prohibits such a regulation only if it "results" in minorities' having "less *opportunity*" to vote because the system is not "equally open" to them. Regulations do not do so, *i.e.*, they do not *deny or abridge* anyone's right to vote, when they impose only the "usual burdens of voting," which is all that photo ID laws impose. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (Stevens, J.).

*Second*, and relatedly, if the State's voting system *is* "equally open" and provides equal "opportunity," any relative shortfall in minority participation cannot be the "result" of, or caused by, any voting "practice" "imposed" by the State. The difference is instead attributable to different levels of electoral interest or underlying socio-economic disparities.

*Third*, Section 2 plaintiffs must establish that the challenged practice results in less minority opportunity compared to what would result from an "*objective*" "benchmark," not compared to what would result from a minority-maximizing alternative. *Holder v. Hall*, 512 U.S. 874, 881 (1994) (Kennedy, J.). Plaintiffs do not and cannot point to any "benchmark" of ID

2

requirements that are *objectively superior* to the challenged practices but instead propose alternatives that are purportedly superior only because they *enhance* minority participation.

*Fourth*, Plaintiffs' reading of Section 2 contradicts *Irby v. Virginia State Board of Elections*, in which the Fourth Circuit upheld against a similar Section 2 challenge Virginia's requirement that school boards be appointed rather than elected. Just like in *Irby*, there is "no proof that the [challenged] process caused the disparity." 889 F.2d 1352, 1358 (4th Cir. 1989).

*Finally*, Plaintiffs' reading of Section 2 would render it unconstitutional. Requiring states not only to refrain from adopting laws that cause minority voters to have less opportunity but also to rearrange their laws to maximize or achieve proportional minority participation would exceed Congress's power to enforce the Fifteenth Amendment's prohibition against intentional discrimination. Moreover, requiring States to base their laws on what most benefits minority voters, rather than on race-neutral considerations, or to act in a racially-conscious way to remedy societal discrimination would violate the Equal Protection Clause. The Court should avoid these grave constitutional concerns by rejecting Plaintiffs' interpretation of Section 2.

## I.    PLAINTIFFS MISINTERPRET SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 originally prohibited States from "impos[ing] or appl[ying]" any voting practice "to deny or abridge the right . . . to vote on account of race or color."  Because that language parallels the Fifteenth Amendment and that Amendment prohibits only "purposeful" discrimination, the Supreme Court concluded that Section 2 likewise prohibited only purposeful discrimination. *City of Mobile v. Bolden*, 446 U.S. 55, 60–61 (1980) (plurality op.). In 1982, however, Congress revised the law to make a showing of purposeful discrimination unnecessary. It amended what is now subsection (a) to prohibit States from imposing or applying voting practices "in a manner which *results in* a denial or abridgment of the right . . . to vote on account

of race or color." 52 U.S.C. § 10301(a) (emphasis added). Congress also added what is now subsection (b), which provides that

> [a] violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id*. § 10301(b). Section 2 now only requires a showing that the challenged law causes minorities to be disproportionately excluded from voting, not that the racial exclusion was intentional.

A.    **Plaintiffs Must Show That Virginia's Voter ID Law Excludes Minority Voters from the Political Process by Imposing Disparate Burdens**

The text and history of Section 2 show that, in the vote-denial context at issue here, the law prohibits only those voting practices that disproportionately exclude minority voters from the political process. It does not require States to adopt practices to enhance minority voting rates.

*First*, Section 2(a) provides that a voting practice may not be "*imposed or applied* by any State . . . in a manner which *results* in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). Section 2 thus applies only when a State "impose[s] or applie[s]" a voting practice that "results in," or *causes*, a forbidden result. *See Irby*, 889 F.2d at 1358. It must be the *state-imposed voting practice* that causes the forbidden result, not socio-economic inequalities or "other persons' discrimination." *Frank*, 768 F.3d at 755. As this Court put it, "the appropriate inquiry is whether *as a result* of the challenged practice or structure plaintiffs do not have an equal opportunity."  (*See* Mem. Op., ECF No. 110, at 17 (Dec. 18, 2015) (emphasis added and removed, quotation marks omitted).) Put another way, Section 2 does not require affirmative action to "overcome societal effects of private discrimination that affect the income or wealth of potential voters." *Frank*, 768 F.3d at 753.

4

*Second*, Section 2(b) provides that a challenger may show a violation of Section 2(a) by demonstrating that "the political processes . . . are not *equally open to participation* by members of a [protected class] . . . in that its members have less *opportunity . . . to participate* in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). A political process is "equally open to participation" by members of all races if everyone "has the same opportunity" to vote free from state-imposed barriers that impose differential burdens. *Frank*, 768 F.3d at 755. As the Supreme Court has emphasized, "the ultimate right of § 2 is equality of *opportunity*." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) (emphasis added). It plainly does not require "electoral advantage," "electoral success," "proportional representation," or electoral "maximiz[ation]" for minority groups. *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009). An opportunity does not become unequal because some groups "are less likely to *use* that opportunity." *Frank*, 768 F.3d at 753 (emphasis in original).

*Third*, Section 2(a) prohibits only those voting practices that "result[] in a *denial or abridgment of the right . . . to vote* on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). This language clarifies that Section 2 does not prohibit ordinary race-neutral regulations of the time, place, and manner of elections because such regulations do not deny or abridge anyone's right to vote. "Election laws will invariably impose some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), because the State must determine when and where voting must occur, how voters must establish their eligibility, what kind of ballots they must use, how the ballots must be counted, and so on. Shouldering these "usual burdens of voting" is an inherent part of voting. *Crawford*, 553 U.S. at 198 (Stevens, J.). Because such baseline requirements are an inherent *part of* the right to vote, they cannot be said to *deny or abridge* the right to vote. This principle applies directly to photo ID laws: As the court that

5

recently refused to enjoin North Carolina's photo ID law recognized, *Crawford* held that Indiana's photo-ID law, which is stricter than Virginia's law, did not "'represent a significant increase over the usual burdens of voting.'" *N.C. State Conf. of the NAACP v. McCrory*, No. 1:13CV658, 2016 WL 204481, at *10 (M.D.N.C. Jan. 15, 2016) (quoting *Crawford*).

*Fourth*, for these reasons, Section 2 "does not condemn a voting practice just because it has a disparate effect on minorities." *Frank*, 768 F.3d at 753. For example, the mere fact that requiring voters to register might make voting less *convenient* for a certain racial group does not make registration requirements subject to attack under Section 2. (*See* ECF No. 110, at 18 (contrasting voters who are "inconvenienced" with voters who are "denied the opportunity to vote.").) If Congress wanted to prohibit *all* disparate effects, it could have simply said so. "[T]here wouldn't have been a need for" subsection (b) to ask whether the political process is "equally open," or whether members of minority races have "less opportunity" to participate. *Frank*, 768 F.3d 753 (emphasis and internal quotations removed). Terms such as "impose," "denial," "abridgement," "equally open," and "less opportunity" show that Section 2 does not target *any* disparate result; it targets only the disparate *exclusion* of minority voters caused by the voting practice. Such disparate exclusion can occur only if the state-imposed voting qualification disproportionately "denies" minorities the vote or if the state-controlled processes for voting disparately "abridge" the right to vote by imposing unequal burdens on minorities—such as making polling places relatively inaccessible to them.

*Fifth*, the legislative history of the 1982 amendments confirms that Congress meant what it said. "It is well documented" that the 1982 amendments were the product of "compromise." *Holder*, 512 U.S. at 933 (Thomas, J., concurring in the judgment); *e.g.*, *id.* at 956 (Ginsburg, J., dissenting); *Thornburg v. Gingles*, 478 U.S. 30, 84 (1986) (O'Connor, J., concurring in the

6

judgment). The original version of the 1982 amendments proposed by the House of Representatives would have prohibited "all discriminatory 'effects' of voting practices," but "[t]his version met stiff resistance in the Senate," which feared that it would "lead to requirements that minorities have proportional representation, or . . . devolve into essentially standardless and ad hoc judgments." *Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002, 1010 (1984) (Rehnquist, J., dissenting) (citing H.R. Rep. No. 97-227, at 29 (1981)). Senator Dole stepped in with a compromise. *See Gingles*, 478 U.S. at 84 (O'Connor, J., concurring in the judgment). He assured his colleagues that, under the enacted compromise, Section 2 would "[a]bsolutely not" allow challenges to a jurisdiction's voting mechanisms "if the process is open, if there is equal access, if there are no barriers, direct or indirect, thrown up to keep someone from voting . . . , or registering . . . ." 128 Cong. Rec. 14133 (1982). It would do violence to this legislative compromise to invalidate a voting practice that allows members of all races to have equal "access" to the political process simply because members of some races happen to use that "access" more than members of other races.

Plaintiffs' theory would fundamentally rewrite Section 2. It replaces a ban on *state-imposed barriers* to minority voting with an affirmative duty of *state facilitation* of minority voting. It converts a prohibition on *abridging* minority voters' right to vote into a mandate for *boosting* minority voter turnout. It transforms a guarantee of equal *opportunity* into a guarantee of equal *outcomes*. And it revamps a law about disproportionate *exclusionary* effects into a law about *all* disproportionate effects. None of this is consistent with the statutory text or the legislative compromise underlying its passage.

The consequences of Plaintiffs' interpretation vividly illustrate that Congress could not have intended it. If (as Plaintiffs say) Section 2 really forbade all voting practices under which

7

majority and minority voters participate at different rates, it would "swee[p] away almost all registration and voting rules," not just voter ID. *Frank*, 768 F.3d at 754. For example, the requirement of registration itself would be invalid because minority voters may find it disproportionately difficult to assemble the documents that registration typically requires. Yet the practice of voter registration was ubiquitous in 1982 and dates to the 1800s. Nat'l Conf. of State Legislators, *The Canvass*, Voter Registration Examined (March 2012). It is unthinkable that, when Congress amended Section 2 in 1982, it meant to prohibit a voting practice such as registration especially when not a single proponent, opponent, or commentator even mentioned it anywhere in the 1982 Amendments' extensive and divisive legislative history. *See Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("Congress'[s] silence in this regard can be likened to the dog that did not bark."). Any reading of Section 2 that would eliminate such a wide swath of hitherto uncontroversial voting laws must be rejected. Congress enacted Section 2 to put a stop to discrimination, not to put a stop to ordinary election laws.

### B.   Plaintiffs Must Show That Virginia's Voter ID Law Proximately Causes the Disparate Burdening of Minority Voters

To violate Section 2, a voting practice must proximately cause harm to minority voters. That is so because Section 2 liability is established only if a voting practice "*imposed . . . by* [the] *State*" "*results in* a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added); (*see* ECF No. 110, at 17 ("[T]he appropriate inquiry is whether as a result of the challenged practice or structure plaintiffs do not have an equal *opportunity* . . . .") (quotation marks omitted).) Thus, if the alleged "abridgement" "results" from something *other* than the *state-imposed practice*, Section 2 does not reach it.

In *Thornburg v. Gingles*, Justice Brennan's majority opinion emphasized this requirement: Section 2, it held, "only protect[s] racial minority vote[r]s" from denials or abridgements that are

"proximately caused by" the challenged voting practice. 478 U.S. at 50 n.17. Applying this basic rule in the vote-dilution context, *Gingles* held that Plaintiffs challenging at-large, multi-member districts must show, as a "necessary precondition[]" to establishing a potential Section 2 violation, that it was the state-imposed voting practice—*i.e.*, the multi-member electoral system—that caused the disparate exclusion of minority candidates from the relevant offices. *Id.* at 50. Accordingly, Section 2 plaintiffs must show that challenged vote dilution is *not* attributable to a general socio-economic condition—*i.e.*, the absence of a minority community "sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* If they cannot, then the state-imposed "*multi-member form* of the district cannot be responsible for minority voters' inability to elect its [*sic*] candidates." *Id.* (emphasis in original). And if the *voting procedure* "cannot be blamed" for the alleged dilution, there is no cognizable Section 2 problem because the "results" standard does "*not assure racial minorities proportional representation*" but only protection against "diminution proximately caused by the districting plan." *Id.* at 50 n.17 (emphasis in original). In the vote *denial* context, correspondingly, *Gingles* requires that a Section 2 plaintiff show that the alleged deprivation is the result of a state-imposed voting practice rather than some socio-economic factors such as, for example, fewer minority voters having cars or photo ID.

Applying this requirement, the Fourth Circuit rejected a Section 2 challenge against Virginia's decision to choose school-board members by appointment rather than election because, although there was a "significant disparity . . . between the percentage of blacks in the population and the racial composition of the school boards," there was "no proof that the appointive process caused the disparity." *Irby*, 889 F.2d at 1358 (internal quotations removed). The disparity was attributable only to the reality that black people were "not seeking school board seats in numbers

9

consistent with their percentage of the population." *Id.* Similarly, the Ninth Circuit recently explained that "a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification *causes* that disparity, will be rejected." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) (emphasis added) (citation and quotation marks omitted), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013).

Because Section 2 reaches only racial disparities caused by the challenged *voting* practice—not even other *governmental* discrimination—it plainly does not reach disparities attributable to *private*, *societal* discrimination. Because "units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination," courts must "distinguish discrimination by the defendants from other persons' discrimination." *Frank*, 768 F.3d at 753, 755. Indeed, even in cases where a court looked (improperly) to those effects "caused by or linked to social and historical conditions," it has focused exclusively on those "social and historical conditions" related to *government-based* discrimination. In *League of Women Voters of North Carolina v. North Carolina*, for example, the Court listed only one relevant "social and historical condition": "overtly discriminatory practices" in North Carolina's "history of *voting-related discrimination*." 769 F.3d 224, 245 (4th Cir. 2014) (emphasis added). In contrast, socio-economic statistical disparities were not independently actionable, but merely *evidence* of the "effects of past discrimination." *Id.*

Here, Plaintiffs have not shown that any practice adopted by Virginia proximately causes the exclusion of minority voters. They have not demonstrated that Virginia has "imposed or applied" a barrier—such as a literacy test or a poll tax—that "results in" the disproportionate denial of the right to vote to members of minority races. Quite the contrary, Virginia allows all

adult citizens to vote. Although members of minority races may disproportionately choose, for socio-economic or other reasons, not to take advantage of this equal opportunity, Virginia's practices are not the proximate cause of this phenomenon. Plaintiffs' claims must therefore fail.

C.     **Plaintiffs Must Show That Virginia's Voter ID Law Harms Minorities Relative to an Objective Benchmark**

In order to demonstrate that a voting practice violates Section 2, a challenger must first identify an "objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice." *Holder*, 512 U.S. at 881 (Kennedy, J.). This requirement of an "objective standard" to select a benchmark follows from Section 2's text. Section 2(a) prohibits practices that result in the "denial or abridgement" of voting rights on account of race or color. The concept of "abridgement" "necessarily entails a comparison." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) (*Bossier II*). "It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." *Id.* In Section 2 cases, "the comparison must be made with . . . what the right to vote *ought to be.*" *Id.*; *see Holder*, 512 U.S. at 880 (Kennedy, J.). And the benchmark for measuring "how hard it should be" must be "objective," not one that is purportedly superior only because it enhances minority voting power or participation. *Holder*, 512 U.S. at 880. In some cases, "the benchmark for comparison . . . is obvious." *Id.* For example, the effect of a poll tax can be evaluated by comparing a system with a poll tax to a system without one. In other cases, however, there may be "no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice," and if that is so, "the voting practice cannot be challenged . . . under § 2." *Id.* at 881.

In *Holder*, for example, the Supreme Court rejected a Section 2 challenge asserting that the use of a single-member commission instead of a five-member commission "resulted" in vote

dilution. Although the five-member alternative clearly would "enhance" minority voting strength because the minority community was large enough to elect one out of five commissioners, *id*. at 878, and five-member commissions were used in Georgia over 90 percent of the time, *id*. at 876-77, 881, there was "no principled reason" why the five-member alternative ought to be the "benchmark for comparison" as opposed to a "3-, 10-, or 15-member body." *Id.* at 881. *Holder* plainly establishes that Section 2 plaintiffs must show that the State has deprived minorities of voting opportunity compared to an "objective" alternative, not merely alternatives that would *enhance* minority participation.

In this case, Plaintiffs did not and cannot identify any objective benchmarks for the proper form of voter ID. The fifty states have chosen a cornucopia of methods to verify voters' identities. *See* Nat'l Conf. of State Legislatures, Voter ID, *available at* http://www.ncsl.org/ research/elections-and-campaigns/voter-id.aspx. Thirty-three states require voters to show some form of ID at the polls. Of those, seventeen require photo ID; sixteen will accept non-photo ID. When a voter appears without proper ID, eleven states require voters to take additional steps. The remaining twenty-two states require state officials to act. And those steps vary state-by-state. "The wide range of possibilities makes the choice inherently standardless." *Holder*, 512 U.S. at 889 (O'Connor, J., concurring in part). There is simply "no objective and workable standard for choosing a reasonable benchmark." *Holder*, 512 U.S. at 881 (Kennedy, J.).

Against this straightforward application of *Holder*, Plaintiffs argue that Virginia's voting practices harm minorities *relative to a conceivable alternative that would be better for minorities* such as non-photo ID. But this is not how Section 2 works. It is always possible to hypothesize an alternative practice that would increase the minority voting rates. For example, *even more* minority voters would vote if Virginia required no ID at all and accepted voters' say-so about

where they live. Yet Section 2 plainly does not require Virginia to adopt those alternatives for the same reason that *Holder* did not require a five-member commission: "Failure to maximize cannot be the measure of § 2." *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994).

Plaintiffs also argue that Virginia's voter ID law harms minorities *relative to Virginia's prior laws*. In effect, Plaintiffs suggest that the benchmark for a Section 2 challenge should be whatever laws the State had in place before. *See, e.g.*, Am. Compl. ¶¶ 3; 44-45. That approach conflates Section 2 with Section 5 of the Voting Rights Act. Section 5 proceedings "uniquely deal only and specifically with *changes* in voting procedures," so the appropriate baseline of comparison "is the status quo that is proposed to be changed." *Bossier II*, 528 U.S. at 334. Section 2 proceedings, by contrast, "involve not only changes but (much more commonly) the status quo itself." *Id.* Because "retrogression"—*i.e.*, whether a change makes minorities worse off—"is not the inquiry [under] § 2," the fact that a state *used to have* a particular practice in place does not make it the benchmark for a § 2 challenge. *Holder*, 512 U.S. at 884 (Kennedy, J.). In short, Plaintiffs seek to do exactly what the challengers in *Holder* sought to do. The Supreme Court rejected this argument in *Holder*, and this Court should reject it here.

### D. Fourth Circuit Precedent Requires Plaintiffs to Prove the Voter ID Law Proximately Causes the Racial Disparity

To support their sweeping interpretation of Section 2, Plaintiffs rely heavily on *League of Women Voters*, 769 F.3d at 245. But there is no justification for this Court to defer to a preliminary-injunction opinion that clashes with earlier Fourth Circuit precedent and that the Supreme Court disagrees with and wiped off the books for practical purposes. First, to the extent that *League of Women Voters* suggests that a Section 2 challenger need only show a "lin[k]" between the racially disparate effect and "*social and historical conditions*," 769 F.3d at 245 (emphasis added), it contradicts *Irby*'s earlier holding that a Section 2 challenger must show a

"causal link" between the racially disparate effect and the *challenged practice itself*, 889 F.2d at 1359. Because *Irby* was "the first case to decide the issue," it "is the one that must be followed," *McMellon v. United States*, 387 F.3d 329, 332-34 (4th Cir. 2004) (en banc), especially because *League of Women Voters* involved a preliminary injunction ruling that is "not binding" on the merits, even as law of the case. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Second, the preliminary injunction in *League of Women Voters* was stayed by the Supreme Court. *See North Carolina v. League of Women Voters of N.C.*, 135 S. Ct. 6 (2014). The grant of a stay not only reflects a judgment that a majority of the Justices likely "would . . . set the order aside," *I.N.S. v. Legalization Assistance Project of L.A. Cnty. Fed. of Labor*, 510 U.S. 1301, 1303 (1993) (O'Connor, J., in chambers), but also drained the decision of virtually all practical effect because it rendered the preliminary injunction inapplicable to the 2014 midterm elections.

In any event, Plaintiffs would lose even under the relaxed standards of *League of Women Voters*. They have not shown that any disparate effect of Virginia's photo ID law is "caused by or linked to" any *discrimination*, historical or otherwise, as opposed to neutral socio-economic factors. *See infra* Part II.

E.       **Plaintiffs' Interpretation of Section 2 Would Violate the Constitution**

As Justice Kennedy has repeatedly emphasized, the Supreme Court has never confronted whether Section 2's "results" test complies with the Constitution. *See, e.g., Chisom*, 501 U.S. at 418 (Kennedy, J., dissenting) ("Nothing in today's decision addresses the question whether § 2 . . . is consistent with the requirements of the United States Constitution."); *DeGrandy*, 512 U.S. at 1028–29 (1994) (Kennedy, J., concurring in the judgment) (same). *Cf. Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring) (it would be a "fundamental flaw" to require "consideration[] of race" in order to "compl[y] with a statutory directive" under the

Voting Rights Act). Justice Kennedy's pointed reminders underscore that Section 2's results test teeters at the edge of constitutionality. Interpreting Section 2 to prohibit Virginia's race-neutral voting laws, and to require Virginia to adopt new laws for the racial purpose of enhancing minority voting, would render it unconstitutional.

1.      First, if Plaintiffs' interpretation of Section 2 is accepted, the statute would exceed Congress's power to enforce the Fifteenth Amendment. The Fifteenth Amendment prohibits only "purposeful discrimination," and does not prohibit laws that only "resul[t] in a racially disproportionate impact." *City of Mobile*, 446 U.S. at 63, 70 (quoting *Arlington Heights v. Metrop. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977)). Congress has power to "enforce" that prohibition "by appropriate legislation." U.S. Const. amend. XV, § 2. This allows Congress to go beyond proscribing purposeful discrimination, but only if the discriminatory "results" ban is a "congruent and proportional" "means" to "prevent or remedy" the unconstitutional "injury" of intentional discrimination. *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). Here, the enforcement power does not allow Congress to "alte[r] the meaning" of the Fifteenth Amendment's protections. *Id*. at 519. Accordingly, if Section 2 is not a congruent and proportional effort to weed out purposeful discrimination, but instead requires states to alter race-neutral laws in order to maximize minority voting participation or render their participation proportional, it is not a legitimate effort to "enforce" the Constitution, but a forbidden attempt to "change" the Fifteenth Amendment's ban on purposeful discrimination to a ban on disparate effects. *Id.* at 532.

Properly interpreted, the Section 2 "results" test is appropriate enforcement legislation. It prohibits only practices that depart from an "*objective* benchmark" in a manner that proximately causes minorities to have "*less opportunity*" to vote than non-minorities. Such harmful

departures from the objective norm are "actions . . . from which one can infer, if [they] remain unexplained, that it is more likely than not that such actions were [purposefully] discriminatory." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978). This is particularly true if the practice has a racist history, as do poll taxes or literacy tests. By ensuring that Section 2 is "limited to those cases in which constitutional violations [are] most likely," the Section 2 "results" test stays within the bounds of Congress's enforcement power. *City of Boerne,* 521 U.S. at 533.

For this reason, in the vote-dilution context, the Supreme Court has been careful to interpret Section 2's "results" test in a way that prohibits districting efforts only where there is a strong inference of a discriminatory purpose. The very first *Gingles* "pre-condition" requires plaintiffs to establish that minority voters could naturally constitute a "geographically compact" majority in a district adhering to "traditional districting principles, such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 92 (1997); *see LULAC*, 548 U.S. at 433. Because districts *normally* encompass identifiable "geographically compact" groups, the failure to draw such a district when a *minority* community is involved gives rise to a plausible inference of intentional discrimination. Conversely, the Supreme Court's interpretation of Section 2 does not require States to engage in *preferential* treatment by *deviating* from traditional districting principles in order to create majority-minority districts. *LULAC*, 548 U.S. at 434. The same holds true in the vote-denial context: Section 2 cannot be interpreted to require departure from ordinary race-neutral election regulations in order to *enhance* minority voting participation.

2.     Interpreting Section 2 to require states to boost minority voting participation also would affirmatively violate the Constitution's equal-treatment guarantee. Subordinating "traditional districting principles" for the purpose of enhancing minority voting strength violates

16

the Constitution. *See Shaw v. Hunt*, 517 U.S. 899, 905 (1996). Section 2 thus cannot require States to abandon neutral electoral practices such as requiring voter ID for the "predominant" purpose of maximizing minority voter participation. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Yet requiring States to adjust their race-neutral laws to enhance minority participation rates would require exactly that "sordid business" of "divvying us up by race" through deliberate race-based decision-making. *LULAC*, 548 U.S. at 511 (Roberts, C.J., concurring in part and dissenting in part). This is especially true because, under Plaintiffs' interpretation, any failure to enhance minority voting opportunity constitutes a discriminatory "result," and Section 2's text flatly prohibits all such "results," *regardless* of how strong the State's justification. *Cf. Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring).

Moreover, interpreting Section 2 to require states to remedy the effects of private, societal discrimination also contravenes the Equal Protection Clause requirement that race-based government action be justified by "some showing of prior discrimination by the *governmental unit* involved." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) (plurality opinion) (emphasis added); *see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007) (Roberts, C.J.) ("[R]emedying past societal discrimination does not justify race-conscious government action"). Requiring States to adjust their voting laws because of private discrimination would require just that forbidden course.

3.   Because Plaintiffs' interpretation raises "serious constitutional question[s]" concerning both Congress's enforcement powers and the Fourteenth Amendment's equal-treatment guarantee, it must be rejected if it is "fairly possible" to interpret Section 2 as outlined above. *Crowell v. Benson*, 285 U.S. 22, 62 (1932). This is particularly true because Plaintiffs' interpretation rearranges "the usual constitutional balance of federal and state powers," and

therefore must be rejected unless Congress's intent to achieve this result has been made "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation omitted). Of course, the Constitution reserves to the States the power to fix and enforce voting qualifications and procedures. *See Inter Tribal Council of Ariz.*, 133 S. Ct. at 2259. If Section 2 truly did authorize the federal judiciary to override state election laws as extensively as Plaintiffs claim, Congress, at a minimum, would have needed to say so clearly.

In sum, Plaintiffs' interpretation of Section 2 contradicts its text and history, clashes with binding Supreme Court precedent, and violates the Constitution. It should be rejected.

## II.   VIRGINIA'S VOTER ID LAW COMPLIES WITH SECTION TWO

Even if Plaintiffs' unbounded interpretation of Section 2 were correct, Plaintiffs still could not prevail: They cannot prove that Virginia's voter ID law will have even a bare disparate effect on minority voting. Plaintiffs' arguments have never progressed beyond what this Court already termed, when dismissing Plaintiffs' long wait times claim, "abstract demographic statistics" and "vacuous conclusion[s]." (ECF No. 110, at 18.) In many cases, Plaintiffs' arguments boil down to little more than baseless stereotypes, portraying minorities as incapable of basic tasks such as traveling to an office to obtain a free ID.

1. Plaintiffs primarily rely on the assertion that minorities are "less likely than the population of Virginia as a whole to have a form of ID that can be used for voting." Am. Compl. ¶ 60; *see id.* ¶¶ 61-63, 66, 71, 104. Plaintiffs cite a ten-year-old, lawyer-sponsored, national survey about government-issued IDs, *see id.* ¶ 62, and county DMV statistics (notably, without *any* racial breakdowns), *see id.* ¶ 61. But Virginia does not require drivers' licenses or even government-issued IDs; it also accepts *any photo ID issued by a Virginia college or a public or private employer. See* Va. Code § 24.2-643. Virginia's photo ID law is simply more generous

than that assumed by Plaintiffs' evidence—and the laws upheld in *Crawford*, 553 U.S. at 185 (government-issued ID), and *Frank*, 768 F.3d at 746 (government or university-issued ID). Plaintiffs do not even attempt to show that the persons without government IDs in their studies also do not have other acceptable photo IDs. And there is reason to believe they do: The locations for which Plaintiffs provide DMV statistics—Richmond, Fairfax, and Arlington—house many universities, government facilities, and private employers that issue photo IDs.

2.      In any event, even if Plaintiffs' assertion of *current* statistical disparities in the ownership of photo ID was supported by evidence, it would not suffice. Under Section 2, the key question is whether Virginia's photo ID law will "cause an inequality in the opportunity of African Americans and Latinos to *vote* in Virginia."  Am. Compl. ¶ 104 (emphasis added); *see Gingles*, 478 U.S. at 44. Thus, the relevant question is not whether there is *currently* a racial disparity in *photo IDs,* but whether there will be a racially disparate opportunity to *vote* because minorities face disparate obstacles in *obtaining* photo IDs.

On that question, Plaintiffs offer that Virginia's law has made voting opportunities unequal "by adding a cost to voting for individuals who do not possess an ID" and that increasing "costs of voting depress[es] turnout especially for racial and ethnic minorities."  Am. Compl. ¶ 64. But Virginia photo IDs are *free. See* Va. Code § 24.2-404(A)(3); 1 Va. Admin. Code § 20-40-90. Plaintiffs imply that they mean something else by "cost," asserting that "individuals in poverty . . . are less able than wealthier individuals to expend time that could be put to other productive uses, tend to have less flexible job schedules, and have less access to convenient means of transportation." Am. Compl. ¶ 70. But Plaintiffs have not introduced a shred of evidence that these stereotypes are in fact true, *i.e.*, that minorities are less able than other racial groups to *obtain* a free photo ID. And stereotypes can just as easily be turned the

other way:  Wealthier individuals are less able or willing to expend time that could be put to other uses because of their higher hourly wages and less likely to take time off from demanding work schedules.  Similarly, non-minority rural inhabitants have less access to public transportation and nearby government offices than people in urban centers. Conversely, poor individuals may have a disproportionately greater ability to obtain a voter ID because they are not as constrained by full-time employment commitments; they may have significant experience enrolling in government programs; and they may be familiar with navigating government offices and public transportation in close proximity to their residences.

Plaintiffs' unsupported assertion also wrongly implies that a voter photo ID is difficult to obtain. More forgiving than the Indiana law upheld as constitutional in *Crawford* and the Wisconsin law upheld under Section 2 by the Seventh Circuit, Virginia does *not* require a birth certificate (or, indeed, any document) or the payment of any fee. *Compare Crawford*, 553 U.S. at 198 (Stevens, J.), *and Frank*, 768 F.3d at 746, *with* Va. Code § 24.2-404, *and* 1 Va. Admin. Code § 20-40-90. *Cf. N.C. State Conf.*, 2016 WL 204481, at *10 (observing North Carolina photo ID law is "less burdensome than that found acceptable" in *Crawford*). In addition, Virginia voter ID cards do not expire; and they may be obtained before, after, or during an election period from any registrar. Va. Code §§ 24.2-404, -653; 1 Va. Admin. Code § 20-40-90. Indeed, Plaintiffs themselves (contradictorily) maintain that the photo ID requirements are so minimally burdensome that they will not prevent fraud at all, Am. Compl. ¶ 75. *But see N.C. State Conf.*, 2016 WL 204481, at *11 (rejecting similar plaintiffs' argument because any "diminution" in the State's interest is "more than offset by the reduction of burden").

## CONCLUSION

For all the foregoing reasons, the Court should reject Plaintiffs' claims *in toto*.

Dated:  February 17, 2016          Respectfully submitted,

/s/ Mark Lentz
Michael A. Carvin (admitted pro hac vice)
John M. Gore (admitted pro hac vice)
Anthony J. Dick (admitted pro hac vice)
Michael Murray (admitted pro hac vice)
Stephen A. Vaden (admitted pro hac vice)
Mark R. Lentz (VSB No. 77755)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
macarvin@jonesday.com
ajdick@jonesday.com
jmgore@jonesday.com
mmurray@jonesday.com
svaden@jonesday.com
mrlentz@jonesday.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 17, 2016, a copy of the foregoing was filed electronically with

the Clerk of Court using the ECF system which will send notification to the following ECF

participants:

Marc Erik Elias
Bruce V. Spiva
Elisabeth C. Frost
Aria C. Branch
Amanda R. Callais
PERKINS COIE, LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005-3960
Tel. (202) 434-1627
Fax (202) 654-9106
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ABranch@perkinscoie.com
ACallais@perkinscoie.com

Joshua L. Kaul
PERKINS COIE, LLP
1 East Main Street, Suite 201
Madison, WI 53703-5118
Tel. (608) 663-7460
Fax (608) 283-1007
JKaul@perkinscoie.com

*Counsel for Plaintiffs*

Dated:  February 17, 2016

Mark Fernlund (Thor) Hearne, II
ARENT FOX LLP
112 S. Hanley Road
Clayton, MO 63105
Tel. (314) 296-4000
Fax (202) 857-6395
thor.hearne@arentfox.com

Stephen Gerard Larson
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Tel. (213) 443-7616
Fax (202) 857-6395
stephen.larson@arentfox.com

Dana Johannes Finberg
ARENT FOX LLP
55 2nd Street, 21st Floor
San Francisco, CA 94150
Tel. (650) 798-0375
Fax (650) 798-0310
dana.finberg@arentfox.com

*Counsel for Defendants*

/s/ Mark R. Lentz
Mark R. Lentz
*Counsel for* Amici