| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | Richmond Division |

```
 3
   BARBARA H. LEE, et al.            }
 4                                   }
   v.                                }   Civil Action No.
 5                                   }   3:15 CV 357
   VIRGINIA STATE BOARD OF ELECTIONS,}
 6 et al.                            }

 7                                       February 22, 2016

 8          COMPLETE TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE HENRY E. HUDSON
 9           UNITED STATES DISTRICT COURT JUDGE

10 APPEARANCES:

11 Bruce V. Spiva, Esquire
   Joshua L. Kaul, Esquire
12 Aria C. Branch, Esquire
   Ceridwen Cherry, Esquire
13 Amanda R. Callais, Esquire
   PERKINS COIE, LLP
14 700 13th Street NW
   Suite 600
15 Washington, DC  20005
        Counsel on behalf of Barbara Lee, Gonzalo Brescia,
16      and the Democratic Party of Virginia

17
   Mark F. (Thor) Hearne, II, Esquire
18 Dana J. Finberg, Esquire
   Sara Schneider, Esquire
19 Kirsten Hart, Esquire
   Stephen Davis, Esquire
20 ARENT FOX
   55 2nd Street, 21st Floor
21 San Francisco, CA  94105
        Counsel on behalf of James B. Alcorn, Dr. Wheeler,
22      Singleton McAllister, Virginia Department of
        Elections, and Edgardo Cortes

23

24               KRISTA L. HARDING, RMR
                OFFICIAL COURT REPORTER
25             UNITED STATES DISTRICT COURT
```

# E X A M I N A T I O N S

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Josephine Okiakpe | 46 | 62 | -- | -- |
| Megan Cotten | 67 | 85 | -- | -- |
| Jennifer Tidd | 91 | 105 | --- | --- |
| Ellen Lamb | 112 | 118 | --- | --- |
| Pettus Hilt | 122 | 127 | --- | --- |
| Laning Polatty | 131 | 138 | --- | --- |
| Bobbie Smith | 141 | 149 | 151 | 152 |
| Jack Etheredge | 154 | 161 | --- | --- |
| Dr. J.D. Smith | 166 |  |  |  |
| Delegate Lopez | 205 | 221 | --- | --- |
| Dr. J.D. Smith | 229 | 248 | 271 | --- |

1       (The proceeding commenced at 9:06 a.m.)

2       (Krista Harding is now the court reporter.)

3       THE COURT:  Good morning.

4       MR. HEARNE:  Good morning.

5       MR. KAUL:  Good morning.

6       THE COURT:  All right, Ms. Pizzini, call our case for

7    trial today.

8       THE CLERK:  Case Number 15 CV 357.  *Barbara H. Lee et*

9    *al v. Virginia State Board of Elections, et al.*

10      Plaintiffs are represented by Mr. Bruce Spiva,

11   Mr. Joshua Kaul, Ms. Aria Branch and Ms. Amanda Callais.

12      Defendants are represented by Mr. Thor Hearne,

13   Mr. Dana Finberg, Ms. Sara Schneider, Ms. Kirsten Hart and

14   Mr. Stephen Davis.

15      Are counsel ready to proceed?

16      MR. SPIVA:  Yes, Your Honor.

17      MR. FINBERG:  We're ready, Your Honor.

18      THE COURT:  The matter is before the Court this

19   morning for a trial on the merits.  I sent to counsel

20   Friday our daily schedule.  Did everyone receive that, and

21   have a working idea of how we'll operate this trial today?

22      MR. HEARNE:  Yes, Your Honor.

23      MR. FINBERG:  Yes, Your Honor.

24      MR. SPIVA:  Yes, sir.

25      THE COURT:  Any issues before I hear opening

1  statements?

2      MR. FINBERG:  Your Honor, we just have a couple of

3  housekeeping matters to raise with the Court.

4      THE COURT:  Sure, Mr. Finberg.  Come forward.

5      MR. FINBERG:  Yes, Your Honor.  Thank you.

6      Your Honor, Dana Finberg on behalf of the defendants.

7      THE COURT:  Yes, sir.  Nice to have you here.

8      MR. FINBERG:  Good to be back, Judge Hudson.

9      I've just got three matters to raise with the Court

10  this morning.  The first is both the parties have

11  submitted as part of their trial exhibits in this case the

12  reports from the expert witnesses.  Ordinarily, if this

13  were a jury trial, I don't think the parties would be

14  putting them on the exhibit lists.  We'd like to inquire

15  of the Court whether or not the Court wants to receive the

16  expert reports as exhibits in this case.  The parties are

17  certainly amenable to that.

18      THE COURT:  I would be fine with that.  And, frankly,

19  gentlemen, I'll take it in lieu of the testimony.  If you

20  want to put the testimony on you can, but it may be far

21  more instructive for me to have a chance to read the

22  details of the report.  But you-all may do it however you

23  wish.

24      MR. FINBERG:  Your Honor, what I think it will lead

25  to is a truncated direct.  I think both sides feel like

1  they want the opportunity to conduct their

2  cross-examination.

3       THE COURT:  That's fine.

4       MR. FINBERG:  But, you know, I'm here to tell you

5  that it's not our intention to have our expert witness to

6  essentially read the report into the record when Your

7  Honor is going to have it back in Chambers to read at your

8  leisure.

9       THE COURT:  That's fine.

10      MR. FINBERG:  But I do think it will help speed up

11 the direct.  Both sides, obviously, are going to want to

12 do a fulsome cross.  But in this case, since it's a Bench

13 trial, and given the issues that are involved, we think it

14 does make sense for Your Honor to have those expert

15 reports to consider.

16      THE COURT:  That's fine.

17      MR. SPIVA:  And I agree.

18      THE COURT:  Thank you.

19      MR. FINBERG:  Your Honor, the second matter is you

20 may have noticed the parties have submitted a fair number

21 of deposition designations to the Court.

22      THE COURT:  You know, I did notice that.

23      MR. FINBERG:  And our thought is, particularly

24 because most of these depositions are not videotaped, it

25 would make for dry reading in the courtroom.  Our

1  suggestion would be that unless Your Honor somehow wants

2  them put into the record some other way, that those simply

3  be submitted to the Court as trial evidence for the Court

4  to consider, again, at its leisure, rather than taking up

5  the time during these two weeks that we're here in front

6  of you.

7      THE COURT:  All right.  What would be helpful to the

8  Court is if you could point out what portions of those

9  depositions I should review.  I don't know that I want to

10  spend every evening reading all these depositions,

11  particularly those portions that aren't pertinent to the

12  immediate issues in this case.  So direct my attention to

13  that, okay?

14      MR. FINBERG:  Your Honor, the parties submitted

15  highlighted depositions.  And the way that we highlighted

16  it is the portions that both sides agreed on are in one

17  color.  Plaintiffs' designations are in a separate color

18  if they weren't agreed on.  Defendants' are in another

19  color if they weren't agreed on.  I think there was a key

20  supplied with the designations.

21      THE COURT:  Okay.

22      MR. FINBERG:  That would let the Court know which

23  party is proffering which evidence.

24      THE COURT:  All right.  That's very helpful.  Thank

25  you.

1        MR. SPIVA:  And those have been filed, Your Honor.

2   At some point, do you want us to actually label them with

3   an exhibit sticker and submit them as an exhibit, or is it

4   fine that they've been filed on the record?

5        THE COURT:  If they're going to be made a part of the

6   record, and could be referred to in future proceedings,

7   they probably ought to have an exhibit number.

8        MR. SPIVA:  Will do, Your Honor.

9        MR. FINBERG:  Probably the easiest thing would be to

10  give each one a separate exhibit number.

11       THE COURT:  And you can coordinate that with

12  Ms. Pizzini, because she is responsible for keeping track

13  of the numbers of the exhibits, okay?

14       MR. SPIVA:  Will do.

15       THE COURT:  All right.

16       MR. FINBERG:  And the final item on my list, Your

17  Honor, would be that we'd like -- we would like to make a

18  motion to exclude witnesses after the opening statements

19  are done.  We're fine with the witnesses being here for

20  the openings.

21       THE COURT:  I do that as a matter of course.

22       MR. FINBERG:  Thank you.

23       MR. SPIVA:  And, Your Honor, I assume that that's

24  excepting expert witnesses and party representatives?

25       THE COURT:  I ordinarily don't exclude expert

1  witnesses because they're not going to be rebutting

2  another witness' testimony or touching on it.  Do you

3  agree?

4      MR. FINBERG:  That's what we had in mind, Your Honor.

5  Each party's representative can be here, and the expert

6  witnesses can be here.

7      THE COURT:  That's fine.

8      MR. FINBERG:  Thank you, Your Honor.

9      THE COURT:  On that note, are we ready to proceed?

10     MR. SPIVA:  We are, Your Honor.

11     THE COURT:  Okay.  Very well.

12     Who'll be giving the opening statement on behalf of

13  the plaintiffs?

14     MR. SPIVA:  I will, Your Honor.

15     THE COURT:  All right.  Go right ahead.

16     MR. SPIVA:  Good morning, Your Honor.  Bruce Spiva.

17  Good to be before you again.  And you've been introduced

18  to the team already, so I won't go through that again.

19     Your Honor, I wanted to start with a brief quote.

20  *"Many of the issues of civil rights are very complex and*

21  *most difficult. But about this there can and should be no*

22  *argument: every American citizen must have an equal right*

23  *to vote. There is no reason which can excuse the denial of*

24  *that right. There is no duty which weighs more heavily on*

25  *us than the duty we have to insure that right."*

1       And that was a quote Your Honor may be familiar with

2  from President Johnson in an address to the joint session

3  of Congress 10 days after the Selma March, what has become

4  to be known as Bloody Sunday, where he was introducing the

5  Voting Rights Act.   And I wanted to talk for a minute

6  about the significance of history because that is the

7  subject of the motion, and there will be some testimony on

8  that.

9       The Voting Rights Act was passed largely to enforce

10 the guarantees of equal voting rights provided by the

11 Fifteenth Amendment, which had been ratified almost 100

12 years earlier.   The Fifteenth Amendment, coming on the

13 heels of the Civil War, was a promise of equal voting

14 rights, regardless of race.   It was a promise, though,

15 that has not been kept.   And indeed, has been denied not

16 only through violence and intimidation, but ostensibly

17 through race-neutral measures, such as poll taxes and

18 literacy tests.

19      In President Johnson's words, again, Your Honor,

20 "*Every device of which human ingenuity is capable, has*

21 *been used to deny this right.*"   And Virginia was no

22 exception, Your Honor.   Virginia tried to circumvent the

23 Twenty-Fourth Amendment which barred poll taxes until the

24 Supreme Court unanimously struck down that law.   The

25 Virginia State Constitutional requirement that individuals

1  registering to vote present proof of literacy was in

2  effect until 1974.  The requirement to obtain, maintain,

3  keep current, and present a valid photo ID, Your Honor, I

4  submit to you, is another device that is being used to

5  deny the right to vote in Virginia.

6      It is no accident that there was a sudden hue and cry

7  about voter fraud among Republican lawmakers after

8  President Obama, the first black president, was elected to

9  office, and the first Democrat to win Virginia's

10 electorial since Lyndon Johnson in 1964.  It is no

11 coincidence that after his reelection in 2012, where he

12 won the Commonwealth of Virginia for the second time, that

13 the Republicans in the General Assembly pushed through a

14 photo ID law, even though they had just passed a strict

15 non-photo ID requirement one year earlier in 2012.

16     The then Governor, Governor McDonnell, had called

17 that 2012 law a huge success.  And his staff made clear

18 that the Governor thought it *worked as designed to*

19 *prevent voter fraud, and to ensure that registered voters*

20 *were able to cast their ballots and have their vote*

21 *counted."*

22     I'm continuing the quote from one of the Governor's

23 staff.  And this is in Plaintiffs' Exhibit 119.  *"The*

24 *Governor believes Virginia's system as currently*

25 *constructed, has strong safeguards against any voter*

1 *fraud, and has proven successful and therefore he supports*

2 *it in its current form."*

3     And this was an e-mail from --

4     THE COURT:  Mr. Spiva, I don't want to interrupt you,

5 but I assume the exhibits that you're publishing there's

6 no objection to?

7     MR. SPIVA:  This one there is no objection, Your

8 Honor.

9     THE COURT:  Fine.  Just want to make sure you're not

10 publishing exhibits that are not in evidence.

11     But go right ahead.  Sorry for interrupting you.

12     MR. SPIVA:  Not at all.

13     Nonetheless, the Republican-controlled General

14 Assembly pushed through a strict photo ID law in 2013

15 which the Governor ultimately signed, despite having

16 express support for the 2012 law and misgivings about the

17 photo ID law being perceived as a measure to suppress

18 voting rights.

19     You can take that one down.

20     Our expert, Dr. Lichtman, will explain that over the

21 past 15 years, both nationally and in Virginia, white

22 voters have accounted for a declining share of the

23 electorate.  At the same time, there has been a marked

24 shift in the voting patterns of young votes, while the

25 role of young voters in the Obama coalition nationally has

1   been extensively discussed, it is important to note that

2   in Virginia, age has become the demographic factor, other

3   than race, that best predicts how an individual will vote,

4   and the importance of that factor has been increasing.

5       These changes have had a clear partisan effect.  They

6   have improved the landscape for Democrats.  Dr. Lichtman's

7   analysis on nine elections for President, U.S. Senate, or

8   Governor in Virginia during the period from 2004 to 2014,

9   shows that Republicans won two of the three elections with

10  higher levels of white turnout, but they lost all the

11  elections with a relatively low white turnout.

12      The evidence will show that the photo ID law has

13  substantial disproportionate affects on these very

14  consistencies that vote heavily Democratic.  The changing

15  demographics of the electorate, in fact in favor of these

16  consistencies, African-Americans, Latinos, young voters,

17  who vote heavily Democratic, certainly provide a powerful

18  motive for Republicans to attempt to slow that trend.

19      Now, the Supreme Court has recognized in *Arlington*

20  *Heights*, and in many other cases, that politicians will

21  rarely admit that they are motivated by a racially or

22  ethnically discriminative motive, which is why it set

23  forth a framework for determining discriminatory intent

24  that looks at the context and the history of the decision.

25      The same can also be said about discrimination

1 against young people and Democrats.  Rarely do politicians

2 openly discuss to rein in the youth vote, or deliberately

3 making it more difficult for Democrats to vote.  And

4 although one rarely finds a smoking gun, admission of

5 discriminatory purpose, and *Arlington Heights* acknowledges

6 that intent can be shown through a multifactor analysis

7 that may not include direct evidence, we will show you

8 some explicit statements that strongly suggest the real

9 motive behind the voter ID law was to suppress the vote of

10 these groups.

11      Your Honor, I was going to mention an e-mail that I

12 believe there is an objection to.  Is it all right if I

13 talk about it --

14      THE COURT:  You can mention it, but you cannot

15 publish it if it is not in evidence.

16      MR. SPIVA:  All right.  Thank you, Your Honor.

17      THE COURT:  All right.

18      MR. SPIVA:  Republic Congressman, Rob Wittman, sent

19 an e-mail to Virgina GOP Caucus Consultant Paul Houghton

20 on March 1, 2013, which was entitled *"Work plan for voter*

21 *ID registration and turnout."*  And in that e-mail, he

22 states that in 2012, the new voters that registered 12

23 months prior to the election voted 62 to 30 for Obama.

24 The Democrats have a very sophisticated voter registration

25 and turnout effort.  The Hispanic turnout was a

1  significant part of the new voter turnout.  The Obama

2  folks are now reaching out to 16 year olds, and they are

3  focusing on these youth in the community, the minority

4  communities.

5      Mr. Houghton passed on the e-mail to Delegate Kirk

6  Cox and said Bob Wittman visited with me and the speaker

7  on Friday.  This is some info he wanted us to have as we

8  move forward in 2013.

9      And this e-mail certainly shows what should be

10 obvious, that Republican lawmakers were well aware of the

11 effects that Virginia's changing demographics were having

12 on their prospects.  But it also suggests that

13 implementing a new voter ID law in 2013, was part of their

14 plan to do something about it.

15     Now, defendants may tell you that most people in

16 Virginia have an acceptable form of photo identification.

17 But the Constitution, Your Honor, and the Voting Rights

18 Act, do not protect the rights only of most people.  They

19 protect the rights of every eligible Virginian to vote.

20 And our experts will tell you something that the

21 Commonwealth's own internal documents confirm, that at

22 least tens of thousands, and perhaps hundreds of

23 thousands, of people do not have an acceptable form of

24 photo ID to vote.

25     So even though the case law we've cited to you in our

1  conclusions of law correctly says that this Court should

2  be concerned about the denial of even one person's right

3  to vote by this photo ID law, this Court should know that

4  "*most people*" excludes tens, probably hundreds of

5  thousands, of people.

6      We will present evidence that these burdened and

7  disenfranchised voters include disproportionately large

8  shares of African-American, Latino, young, and Democratic

9  voters.  The burden cannot be justified by the mere

10  invocation of the specter of voter fraud.  The evidence at

11  trial will show that in-person voter impersonation fraud,

12  only type of fraud that a voter ID law can theoretically

13  prevent, is exceedingly rare in American elections, and

14  has not been documented in any recent election in

15  Virginia.

16      Dr. Minnite will testify that her extensive analysis,

17  and research over more than a decade, shows that there's

18  little to no voter fraud.  Dr. Lichtman also points to

19  additional studies showing no voter impersonation fraud,

20  including the national study by the Republican National

21  Lawyer's Association that set out to prove the existence

22  of voter fraud, but ended up unable to uncover even a

23  single incident of impersonation in Virginia during the

24  10-year time period, the RNLA study.

25      And in addition to the overwhelming expert evidence

1   that voter impersonation fraud is strategically

2   nonexistent, most of defendants' own fact witnesses will

3   also admit that they know of no specific instances of

4   voter impersonation fraud.

5        You will hear from one defense expert, Dr. Richman,

6   of a theory that he has based on a survey meant to track

7   and analyze the voting behavior of citizens that

8   potentially thousands of non-citizens have been voting in

9   American elections, risking not only a felony charge, but

10  deportation.  But Dr. Richman's report is based on an

11  article that he wrote that has been roundly criticized and

12  discredited by several scholars in the field, and in

13  particular, the researchers that founded and maintain the

14  survey database from which he purports to draw his

15  conclusions.

16       Now, Your Honor, you may hear testimony from some of

17  the defendants' witnesses that the burden of obtaining,

18  and presenting an ID, is slight.  But you're also going to

19  hear from several witness that will completely undermine

20  that claim.  You will hear from witnesses like Josephine

21  Okiakpe, an African-American woman who attempted to vote

22  in 2014 with several forms of ID, such as a North Carolina

23  driver's license, a voter registration card, birth

24  certificate, social security card, a Costco card, and some

25  mail she had in her purse.  And even though several of

1  those forms of ID, Your Honor, would have been plenty to

2  establish her identity, and many would have been

3  sufficient under the 2012 voter ID law, she was still

4  turned away.

5        She doesn't have a car, and has to rely on her

6  daughter for transportation.  Her daughter, ultimately,

7  had to take time off from work to take Ms. Okiakpe to the

8  registrar's office to get a free ID.  The burden to her,

9  the Virginia's new voter ID law, was not slight.  It was

10  severe, and it almost cost her her vote.

11        She will tell you that she grew up during a time when

12  there was still white and colored signs on bathroom doors.

13  And that she experienced that same type of shame being

14  turned away from the voting booth because she didn't have

15  the type of ID required by the new voter ID law.

16        You'll hear from Megan Cotten, a young Arlington

17  resident who doesn't have a Virginia driver's license.

18  Ms. Cotten, like so many thousands of other Virginians,

19  was not aware of the new photo ID requirement when she

20  went to vote last fall.  That's not surprising, because,

21  as the evidence will show, the funds for outreach

22  concerning the new law were entirely inadequate, unlike

23  the implementation of the 2012 law where the governor

24  required that all voters be contacted.

25        Commissioner Cortes, Department of Election

1   Commissioner, Commissioner Cortes, will tell that you that

2   the state election officials were provided only about

3   $200,000 per year for outreach relating to the 2013 voter

4   ID law.  That it's compared to about $2.3 million for the

5   2012 law.  And that beyond that, the General Assembly did

6   nothing to ensure that voters were aware of the change in

7   the law.

8       This outreach failure, and the irrational and

9   unjustified photo ID requirement, had severe consequences

10  for Ms. Cotten.  She has an Alabama's driver's license,

11  which could prove her identity, but that did not matter

12  because an out-of-state license is not an acceptable form

13  of ID under the law.  She had a piece of mail with her

14  that likely would have sufficed under the 2012 voter ID

15  law, but of course that didn't have a photo on it, and it

16  was therefore unacceptable under the 2013 law.

17      And like so many others, the poll worker she

18  encountered did not inform her that she had the right to

19  vote provisionally.  She left and headed to her job, which

20  was located in Bethesda, Maryland.  She was so upset about

21  it that she communicated with the Secretary of the

22  Commonwealth, Levar Stoney, who had someone on his staff

23  write her back, and inform her about her right to vote

24  provisionally.  But it was too late because she could not

25  take the time from work to go all the way back to

1  Arlington to her polling place to cast a provisional
2  ballot.  We'll show you the documents in which the staff
3  member acknowledges that Ms. Cotten was disenfranchised.
4      You'll hear from people who were too poor to renew a
5  license that was expired for more than one year and didn't
6  have the time, transportation, or knowledge to go to the
7  registrar's office to get a free ID.  The imposition of a
8  requirement that a license not have expired longer than 12
9  months prior to voting is completely irrational.  And as
10 the Commissioner of the defendant, the Department of
11 Elections has testified, completely unrelated to the
12 purported rationale for this law to verify one's identity.
13     If I'm Bruce Spiva 13 months ago, I remain Bruce
14 Spiva today, regardless of whether my license has expired.
15 And this irrational hoop that some people must jump
16 through to vote was regulated into the law at the
17 instigation of the law's main sponsor, Senator Obenshain,
18 who pressured the VSBE to deny the use of any expired
19 license, regardless of the length of time.
20     And this definition of "*valid*" in relation to a
21 license had not been in the original version of the
22 regulation which permitted the use of a driver's license
23 without regard to their expiration date.  After pressure
24 from Senator Obenshain, the two Republican SBE members
25 voted for the 12-month expiration requirement in the

1   absence of the Democratic member of the SBE.  And that was

2   a chance -- even that was longer than Senator Obenshain

3   wanted.  He wanted a 30-day period.

4        This regulation, and the sponsor's participation in

5   its promulgation, really lays bare the irrationality and

6   discriminatory purpose behind this law because there are

7   other forms of ID, like the free voter ID, for instance,

8   that have no expiration date and that are perfectly

9   permissible under the photo ID law.  That makes no sense

10  except as a vehicle to burden people with limited means,

11  and to put up an additional unjustified barrier in front

12  of the ballot box.

13       You're going to hear from some Virginia citizens with

14  disabilities, Your Honor, for whom this law also imposes a

15  severe burden on their constitutional right to vote.

16  You'll hear from Laning Polatty, whose disability requires

17  him to be homebound for most of the year, and in bed

18  typically 23 hours a day.  His disability causes him

19  cognitive issues, and voting is a struggle under the best

20  of circumstances.

21       He realized when he got to the polls in 2015 that he

22  did not have his voter ID.  *Luckily,* and I put that in

23  quotes, Your Honor, his wife had brought him there and was

24  able to take him to the registrar's office that day where

25  he obtained another voter ID, which he could get, by the

1   way, with an affirmation of identity.  A fact that, again,

2   lays bare that this is just a barrier to voting, not fraud

3   prevention, because once he got to the registrar's office,

4   all he had to do was affirm his identity, no

5   documentation, no ID, and go right back to the polls.  His

6   wife then had to drive him back to the polling place the

7   same day to cast a ballot.

8       The entire experience took well over two hours of

9   both Mr. Polatty's, and his wife's time.  The burden that

10  this law caused them was not slight.  Thank goodness they

11  owned a car, unlike the thousands of other Virginia

12  citizens who were burdened by this law.  Thank goodness

13  his wife was able to take time from work to take him.

14      The franchised should not be protected only for the

15  fortunate, for those without disabilities, or for those,

16  like Mr. Polatty, who can scale overwhelming odds made

17  more difficult, and without justification, in Virginia's

18  photo ID law.

19      You will also hear from a woman who's

20  high-functioning autistic adult son was turned away

21  because he had forgotten his ID.  And he, like so many

22  others, was not informed about the possibility of voting

23  provisionally.  Because of his disability, he is

24  conflict-averse.  He would have left without voting but

25  for the fact that his mother went back up to the polling

1  place and helped advocate for him so he could vote

2  provisionally.  She then went through the same routine

3  that the Polattys did.  She took him through the odyssey

4  of the registrar's office to get another ID, and then back

5  again to cure his ballot.  And she'll tell you that for

6  that young man, and for her, the burden of this photo ID

7  law is a heavy burden indeed.

8       You will hear from these Virginia citizens, and many

9  more, about the heavy price that Virginia's ID law imposed

10 on them in time, in dignity, money, and for some, outright

11 disenfranchisement.  For these Virginians -- and there is

12 no dispute, Your Honor, that they are eligible voters with

13 a constitutional right to vote.  The burden imposed by the

14 voter ID law is in no way slight.

15      And that is true not only of the individuals that

16 will come into this courtroom to testify, but of thousands

17 of other Virginians.  Our experts are going to explain

18 that there are hundreds of thousands of registered voters

19 who do not have an acceptable form of photo ID.  And

20 that's not surprising, Your Honor, because the

21 Commonwealth essentially reached the same conclusion in

22 its internal analysis prior to the law going into effect.

23      But what's worse is that this likely significantly

24 understates the number of people whose right to vote will

25 be denied under this law, because the available data, Your

1  Honor, only permits analysis of those people who are

2  actually registered.  But our experts will tell you, there

3  are many people who won't register because they either

4  know that they don't, or think that they don't, have the

5  proper ID to actually vote.

6      And many among the registered will not vote because

7  they know, or they think that they don't, have the proper

8  ID.  And the reason I emphasize *think that they don't,*

9  Your Honor, is, as Dr. Lichtman will explain, in a recent

10 study of the effect of a voter ID law on Texas'

11 Twenty-Third congressional district, it was determined

12 that 5.8% of registered non-voters cited lack of

13 acceptable voter ID as the principal reason for not

14 voting.  And 12.8% cited not having an ID as one reason

15 for not voting.

16     But perhaps more disturbing is that the vast majority

17 of non-voters did indeed possess an approved form of ID in

18 Texas.  In Texas.  But through some combination of

19 misunderstanding, doubt, or lack of knowledge, believed

20 that they did not possess the necessary photo

21 identification.  And the point here, Your Honor, as

22 Dr. Lichtman will tell you, is this means that photo ID

23 laws, like Virginia's, causes a substantial number of

24 people to not vote, even if they have the required ID,

25 just because of the confusion and misinformation caused by

1  these laws.

2      Now, these facts, Your Honor, were not a secret at

3  the time the General Assembly was considering this bill.

4  Opponents of SB1256, including civil rights groups,

5  emphasized that a photo ID law would make voting more

6  burdensome, particularly for minorities, the elderly,

7  young people, and those without driver's licenses.

8      The Advancement Project provided testimony before the

9  Privileges and Elections Committees in the House and the

10 Senate explaining that photo ID laws had a disproportional

11 impact on communities of color, but the General Assembly

12 did not do anything to take into account the specific

13 objections raised by those like The Advancement Project

14 and the NAACP, and others.  And senators and delegates

15 warned during the debates on the floor over the photo ID

16 law that obtaining a free voter ID in person at a general

17 registrar's office would be a substantial burden for many

18 voters.

19     In the House, Delegate Krupicka, and apologies for

20 the pronunciation, I'm not sure I have it right, explained

21 that his district in northern Virginia is close to a metro

22 stop, and that a lot of folks in his area were elderly or

23 poor, and rely on the metro as their only form of

24 transportation.  He states on the House floor that a voter

25 in his district, without access to a car, would have to

travel between two to three hours by bus each way to reach
the general registrar's office.

Delegate Surovell, who will testify here, also stated
on the floor of the House that voters in his district
without a driver's license would have to take probably
four buses on a trip that would last up to three hours
each way.  Even for voters traveling by car, the trip to
reach the registrar's office might take 45 minutes each
way.

Where the Commonwealth places a severe burden on the
fundamental right to vote, the Court should evaluate the
law for strict scrutiny.  And we would submit, Your Honor,
that these fanciful non-evidence based assertions of voter
fraud don't begin to justify the heavy burden that this
discriminatory voter ID law put on thousands of Virginia's
citizens right to vote.  There is not a rational basis for
this law.  It definitely cannot meet strict scrutiny.

Without evidence of voter impersonation fraud, the
last refuge of defenders of the photo ID law is to claim
that the measure increases voter confidence in the
election process, because at least people will know that
election officials are protecting against even the
possibility of such fraud.  But the social science which
we will present, Your Honor, confirms what common sense
should tell us, that voter ID laws do nothing to increase

1  confidence in the integrity of the election system.

2  Indeed, it appears that the public is not paranoid about a

3  chimerical concern that thousands of people are risking a

4  felony conviction in an attempt to steal elections by

5  committing voter impersonation fraud one person at a time.

6  And the social science also tells us, although we need to

7  be careful about drawing conclusions from raw voter

8  turnout figures, that indeed these laws tend to have a

9  suppressive effect on the voter.

10      The Department of Elections commissioner, Edgardo

11  Cortes, expressly testified that as chief election officer

12  of Virginia, he does not believe that the photo ID has

13  increased voter confidence in Virginia's election system.

14  And even the defendants' experts who relied on the Courts

15  to establish that there is simply no relationship between

16  the presentation of a photo ID, and the public's

17  confidence, in the electoral system.

18      But perhaps more importantly, Your Honor, when we

19  hear the proponents of this law refer to voter confidence,

20  they seem to ignore what the photo ID law does to the

21  confidence and the integrity of our democracy to the

22  people who the law burdens, to those who believe based on

23  substantial evidence that this law was enacted to suppress

24  the votes of blacks and Latinos, young people, urban

25  dwellers and Democrats.  If their faith in the system is

1  shaken because they see this law -- that this law is

2  targeted at them, then their confidence in the integrity

3  of our electorial system is profoundly shaken.  That must

4  count as much as those few who may believe against all

5  evidence that their voters are devalued by phantom voter

6  fraud.

7       In conclusion, Your Honor, I believe in the end we

8  will show you through the evidence we will present that

9  Virginia's photo voter ID law should be enjoined on at

10  least six independent grounds.

11       We will establish, Number 1, that Virginia's photo ID

12  law imposes substantial and severe burdens on the right to

13  vote, warranting high scrutiny.  In contrast, the benefits

14  of the Commonwealth from the imposition of the photo ID

15  law are non-existent.  The facts we will develop in this

16  case will demonstrate that voter impersonation fraud, the

17  only type of fraud preventable by photo ID law, does not

18  exist or is very rare in Virginia.

19       Moreover, the evidence will also make clear that such

20  forms of fraud did not exist at the time SB1256 was

21  passed.  And then not surprisingly, the photo voter ID law

22  does not improve confidence in the voting system.

23  Weighing substantial and severe burdens on the fundamental

24  right to vote on the one hand against no benefit, or

25  little benefit to the Commonwealth on the other hand,

1  should lead the Court to strike down the law under the

2  First and Fourteenth Amendment.

3      Secondly, we will establish, Your Honor, through the

4  evidence that Virginia's photo ID law resulted in, and is

5  intended to result in, the denial or abridgment of the

6  right to vote by African-American and Latino Virginians in

7  violation of the Voting Rights Act.  The challenge,

8  standard, or practice, the voter ID law imposes a

9  discriminatory burden on a protected class, and that

10 burden is at least, in part, caused by, or linked to,

11 social and historical conditions that have, or currently

12 produce, discrimination against members of those protected

13 classes.  And we will show through the testimony of

14 Dr. Lichtman and Dr. Smith that almost all of the

15 so-called Senate Factors apply in Virginia, and that they

16 are causally connected to the burden the photo ID law

17 places on the rights of African-Americans and Latinos in

18 Virginia.

19     Thirdly, Your Honor, we're going to show you that the

20 voter ID law was enacted with the intent to discriminate

21 on the basis of race in violation of the Fourteenth and

22 Fifteenth Amendments.

23     Fourth, we're going to prove that the General

24 Assembly enacted the photo ID law to discriminate against

25 Democrats in a restrictive political participation in

1  violation of the First and Fourteenth Amendments.

2      Fifth, we will prove that the General Assembly has

3  deliberately sought to abridge the rights of young people

4  to vote in violation of the Twenty-Sixth Amendment.

5      And finally, Your Honor, under the rational basis

6  test, we believe we will show you that Virginia's photo ID

7  law irrationally distinguishes between voters who have a

8  photo ID that can be used for voting, and individuals who

9  have an expired photo ID, or an ID issued by another

10  state, or out-of-state educational institution.   The

11  distinction between these two groups, there is no rational

12  relationship to any legitimate state interests.

13      For each of these reasons, at the end of this case,

14  we will ask you to enjoin enforcement of Virginia's photo

15  ID law.

16      Thank you, Your Honor.

17      THE COURT:   Thank you, Mr. Spiva.

18      MR. HEARNE:   Good morning, Your Honor.

19      THE COURT:   Good morning, Mr. Hearne.   Go right

20  ahead.

21      MR. HEARNE:   Following the 2000 presidential

22  election, our nation, as well as most states, undertook

23  significant evaluation of our election administration

24  nationally, and at the state level.   We learned in the

25  *Bush v. Gore* litigation that literally several hundred

1  votes in the administration of an election could turn the

2  outcome of a presidential race.  That prompted national

3  reform that we're familiar with at the federal level, and

4  the Help America Vote Act.  The Help America Vote Act was

5  an Act that was adopted by Congress with bipartisan

6  support.  It included a number of factual findings, as

7  well as recommendations for states, and then specific

8  requirements that states adopt.

9       Among its findings, among the bipartisan reason that

10 Help America Vote Act adopted a provision, which included

11 the requirement of what's now call HAVA ID, was the

12 finding that there was substantial vote fraud, or

13 likelihood of vote fraud, occurring in the form of voter

14 registration fraud.  Meaning somebody would send in a

15 registration, that registration is famously attested to

16 during Senate hearings even in the name of a dog named

17 Ritzy Meckler was found -- was put on the voter rolls.

18 Somebody could then cast a ballot in the name of that

19 fraudulent registrant.

20      But there was significant fraudulent registration

21 occurring in states around the country prior to the 2000,

22 2004 election that was the subject of obvious concern.

23 Registration fraud was addressed in HAVA by requiring

24 states, which Virginia does require, to adopt a HAVA ID to

25 be provided for a first time voter who registers to prove

1  that it's really a voter.   Now, HAVA ID does not require

2  photo ID, but it allowed --

3        THE COURT:   When you use the term *"HAVA,"* you're

4  referring to the legislation, Help America Vote Act, is

5  that right?

6        MR. HEARNE:   Correct.   It's HAVA, for the record.

7        THE COURT:   Go right ahead.

8        MR. HEARNE:   Not hava nice day, but the Help America

9  Vote Act.

10        Because of that fraud, which Congress found was

11  significant and of concern, they adopted the Help America

12  Vote Act identification requirements.   But those were a

13  first step.   And Congress specifically said that states

14  were allowed, and encouraged even, to adopt more stringent

15  requirements, or requirements for identification, in

16  addition to those required by the Help America Vote Act.

17        Following the 2004 election, President Carter and

18  Secretary of State, James Baker, convened the Carter-Baker

19  Commission, which was cosponsored by a number of

20  organizations, including American University, the Pew

21  Foundation, the Carter Foundation, President -- I mean,

22  Secretary Baker's foundation as well.

23        The Carter-Baker Commission conducted hearings

24  nationally, heard testimony from experts throughout the

25  academic world, many election officials, secretaries of

1   state, in terms of best practices that states should

2   follow in the conduct of federal elections.  Carter-Baker,

3   and their findings, are noted.  And I have the graphic

4   that's in evidence.  Just a coversheet of the Carter-Baker

5   Commission.  That will be discussed.  All the experts

6   refer to that famously.

7       The Supreme Court itself in the *Crawford* decision

8   considered the Carter-Baker recommendations and findings

9   to be of great weight in the Supreme Court's decision.

10  Among the Carter-Baker decision -- or the recommendations

11  was for photo ID.  That was a recommendation that was

12  supported very strongly by President Carter, and by a

13  fellow, Bob Pastor, who is one of President Carter's

14  assistants who was head of the Election Law Center at

15  American University.  He was Democrat like.  The

16  recommendation for photo ID was supported by, among

17  others, Andrew Young.

18      So it was not a Republican partisan recommendation.

19  Nor was it one that was thought to be racially

20  discriminatory in any way.  The recommendation that

21  Carter-Baker had was for states to require photo ID that

22  satisfied the federal real ID law, which is far stricter

23  than what Virginia has in fact adopted.

24      The Carter-Baker recommendation was then followed by

25  many states in various iterations.  States began to review

1   those recommendations.  The recommendation was made for --

2   by the Carter-Baker Commission for really two reasons.

3   First, they found that there was a legitimate concern

4   about vote fraud.

5       And then, secondly, as the Supreme Court also

6   recognized in *Crawford*, there's a desire to restore and

7   enforce public confidence in our election process.  And

8   that was one of the findings particularly that President

9   Carter noted in the Carter-Baker Commission, was the

10  confidence that having a uniform consistent system of

11  photo identification for all citizens, would actually

12  encourage participation and increase confidence, as well

13  as prevent vote fraud, or prevent the possibility of vote

14  fraud, being accomplished through voter registration

15  fraud.

16      So those recommendations of Carter-Baker were

17  accepted by many states, and followed by many states,

18  including Indiana.  Indiana, of course, was the state that

19  was the subject of the challenge in the Supreme Court

20  *Crawford* decision.  Indiana included a voter

21  identification requirement stricter than that of Virginia.

22  In Indiana, to obtain a voter identification, you had to

23  also provide some supporting documents, such as a birth

24  certificate.  Some of those documents cost money, $25 or

25  so, and created an additional burden, if you will, on

 1  obtaining the identification necessary to vote.

 2      Virginia has none of that.  Virginia allows, as we

 3  discussed, or will discuss in the evidence in the form

 4  that will be presented, just requires self-authentication

 5  of identity.  No one needs to pay for a birth certificate,

 6  or present a birth certificate.  PID is provided to them

 7  for free simply upon their signature, the last four digits

 8  of their social security number, and their birth date.

 9      So it was in that context, the context of the

10  Carter-Baker Commission, the context of the *Crawford*

11  decision, that Virginia adopted its voter identification

12  requirements.  The laws that we've talked about in the

13  course of preparing for trial -

14      THE COURT:  In both 2012 and 2013?

15      MR. HEARNE:  Correct.

16      THE COURT:  Okay.

17      MR. HEARNE:  - variously in the depositions and

18  discussion, those two statutes will be referred to by, for

19  example, SB1256.  But for purposes of convenience, we've

20  adopted the nomenclature, we're calling them the 2012 law

21  and the 2013 law.  And I will use that in my remarks.  And

22  I think much of the testimony will refer to them in that

23  context as well.

24      Both laws are facially and racially neutral laws.

25  Both laws require the difference significantly being the

1  2012 law allowed for a form of non-photo identification

2  which was a voter registration card sent to the registrant

3  at the address when a registration was submitted.

4       This raised some concerns because -- it raised

5  concerns because it would have allowed somebody to file a

6  registration form, then a voter identification card would

7  have been sent to that registrant or that address, which

8  could then be used for ID.  The local registrars had

9  concerns of complying with HAVA identification.  To comply

10  with HAVA, they had to have some additional identification

11  in order to satisfy HAVA for a first time voter.  So there

12  was confusion about that.

13       THE COURT:  They were satisfied in 2012 or 2013?

14       MR. HEARNE:  That would be the 2012 law would have

15  raised those concerns.

16       THE COURT:  All right.

17       MR. HEARNE:  At the same time, there was also concern

18  because of a video that was being circulated which was

19  referred to as the Patrick Moran video.  That will be

20  evidence that's presented to this Court that the experts

21  have considered.  In that video, there's a discussion of a

22  Democrat operative explaining how you can commit vote

23  fraud, discussing with an operative how to commit vote

24  fraud by using utility bills, and other non-photo forms of

25  identification.  This was the environment in which

1    Virginia adopted the 2012 -- excuse me, the 2013 law.

2        The significant changes in the 2013 law were the

3    elimination of non-photo identification, particularly the

4    non-photo ID card that raised those HAVA ID problems.  The

5    other change in 2013 was that it actually added additional

6    forms of identification that allowed, for example,

7    identification -- student IDs, photo IDs from

8    non-government schools.  It had --

9        THE COURT:  All of which had to feature a photograph,

10   is that correct?

11       MR. HEARNE:  That is correct.  All of which had to

12   feature a photograph.

13       It also provided for the free photo ID requirement.

14   And if I could show the form for the free photo ID just to

15   indicate to the Court, this is in evidence, the simplicity

16   of obtaining a free photo ID.  It is the bottom part of

17   the form is all that needs to be completed by the voter,

18   which would be the voter's first name, last name, middle

19   name if they have one, the last four digits of their

20   social security, and their birth date, and then they sign

21   it.

22       That form is -- upon filling out that form at their

23   registrar - there is 133 different registrars throughout

24   Virginia - the individual is given a free photo ID that's

25   sufficient to vote.  If they don't -- if it's within 30

1 days of the election, they don't have to wait for it to be

2 mailed to them.  They get it immediately, and can use it

3 the same day.

4      Now, somebody who doesn't have any ID at all --

5      THE COURT:  Doesn't have any what?

6      MR. HEARNE:  Any ID at all, as Mr. Spiva testified

7 some of his witnesses will be explaining, can go to the

8 polling place, still cast a provisional ballot, and still

9 have that ballot counted provided they provide such ID

10 before Friday of the same week.

11      Now, they can provide that ID either --

12      THE COURT:  Friday succeeding Election Day?

13      MR. HEARNE:  Correct.  Succeeding Election Day.

14      THE COURT:  Okay.

15      MR. HEARNE:  So if it's just a case of somebody

16 forgetting their ID, then all they need to do is fax it

17 in, mail it in, send it in by e-mail, or hand deliver it

18 to the election officials, and their provisional ballot

19 will be counted.  In fact, Mr. Spiva indicated, two of the

20 people that he intends to have testify, that's exactly

21 what they had happen.

22      If they didn't have any ID at all, they can go to the

23 general registrar, the registrar will issue that ID the

24 same day.  That ID would then be sufficient for that

25 provisional ballot to be counted.  That's the purported

1  burden that is suggested to be unconstitutional as I've

2  outlined the 2013 Virginia voter identification law.

3       Now, there's a list of different IDs - and I'm not

4  going to show the demonstrative - that count in Virginia.

5  When you compare Virginia to other states, you find that

6  Virginia allows many more forms of identification, and

7  provides an easier ability to obtain free identification

8  than states such as Wisconsin, or states such as Indiana,

9  where the voter law has been upheld.  Virginia is more

10 generous, in other words, in terms of avoiding the

11 creation of a burden for that.

12      It includes photo IDs from employers that are in

13 Virginia, includes state, as well as private schools,

14 student photo identification.  It includes a variety of

15 other non-Virginia-issued photo identification.

16      So it is -- and you heard discussion about how it is

17 several hundred thousand people may not possess this.

18 Well, that is a false statistic.  And the experts will

19 testify to this, because that's based on a comparison with

20 driver's licenses.  Well, a driver's license is just one

21 set of the ID.  If you want a true comparison of how many

22 people actually possess one of the forms of ID that is

23 acceptable under Virginia's law, you have to consider a

24 much more broad universe of all the ID that are required

25 or allowed, which would include student ID.

1     The plaintiffs' own expert testifies as it relates --

2   Dr. Lichtman, that as it relates to student IDs, the

3   African-American members of Virginia actually have a

4   higher rate of enrollment, and are more likely to have

5   student IDs than non-minority students because of the

6   enrollment figure.

7     You have numerous military-issued IDs where all

8   government-issued IDs would satisfy the requirement.  So a

9   lot of that has not been taken into account by the

10  plaintiffs' experts when they make this conclusion that

11  there's some substantial body of people that don't possess

12  an ID.  And when we look at the actual results of the

13  election, the number of people who were unable to vote

14  because they lacked an ID, are very, very small.  And even

15  those individuals cast provisional ballots, and those

16  provisional ballots would have been counted had they gone

17  and submitted the ID after the election.

18    You will also hear the testimony, Your Honor, of the

19  steps and measures Virginia has taken.  Particularly,

20  Mr. Cortes will describe the steps to make sure everybody

21  does have access to a free ID.  They've had mobile units

22  make available the ID to members of the community, which

23  is in addition to having to go to the actual registrar.

24  There's been outreach efforts that has been made to

25  support both informing people of the need for an ID, as

1   well as providing them the free ID, if they don't possess

2   one.

3        The Virginia election law also includes -- and when

4   we talk about the Section 2 Voting Rights Act complaint

5   that's been made, as the Court is aware, Section 2

6   requires us to consider the totality of the circumstances.

7   So when we consider the totality of the circumstances in

8   Virginia, it's not just what happens with an individual on

9   Election Day going into the polling place, but it's the

10  entire process by which Virginia has set up to administer

11  its elections to provide fair, safe elections that allow

12  and protect the right of every Virginian who's eligible to

13  vote.  But at the same time, the Supreme Court has noted

14  in *Burdick*, to make sure that states' compelling interest

15  in preventing either vote fraud, or encouraging

16  confidence, are achieved.

17       So the election administration system in Virginia

18  also includes absentee balloting so people who are unable

19  to vote at the polling place can cast an absentee ballot

20  that will be counted.

21       So those who would say that it's a burden, and when

22  this Court evaluates the burden that is alleged by the

23  photo identification law in the 2013 law, --

24       THE COURT:  An individual wishing to cast an absentee

25  ballot, are they also required to go to the registrar's

1  office to get that ballot?

2       MR. HEARNE:  No.  They can request that by mail.

3       THE COURT:  Okay.  All right.

4       MR. HEARNE:  So somebody can request an absentee

5  ballot by mail.  It will be mailed to them.  They will be

6  able to vote that.  If they've not previously provided one

7  of the HAVA forms of identification, they would provide

8  that.

9       THE COURT:  Okay.

10      MR. HEARNE:  So when we look -- speaking of the Equal

11 Protection claim that's been made, the Fourteenth

12 Amendment claim, we look at that, as plaintiffs have

13 admitted, under the *Burdick* standard.  The *Burdick*

14 standard recognizes the states' compelling interest in

15 maintaining honest and orderly elections.  Maintaining

16 public confidence in the election process.

17      And when we look at Virginia's 2013 law, and evaluate

18 it under that *Burdick* standard, what we find is that there

19 are a host of legitimate reasons why Virginia adopted it,

20 including the Carter-Baker recommendation, which the

21 Supreme Court found compelling in *Crawford*.  The fact

22 that -- and experts will testify, that the concept of

23 photo identification enjoys very strong public support,

24 including, by public opinion, in Virginia.  Voters,

25 including majority's minority voters, all support the

1   concept of adopting photo identification laws.

2        So when the General Assembly, and the legislators in

3   the General Assembly, adopted this law, they're in part

4   responding to the public opinion of their constituents.

5        The other states, as we indicated, when Virgina's

6   General Assembly adopted the 2013 law, they did in the

7   context of the environment at that point.  They could look

8   at the other states that had adopted it.  They could look

9   at the Supreme Court's opinion in *Crawford*.  They could

10  look at the Carter-Baker Commission.

11       And as I noted, the evidence will testify, and the

12  experts will demonstrate, and the law itself when you just

13  read the different states' statutes will show, that

14  Virginia has a more lenient photo identification law than

15  other states.  The legislators, when they adopted it, also

16  were aware of the recommendation of Carter-Baker, and

17  other sources saying that these kind of administrative --

18  election administrative measures increased public

19  confidence.

20       And then finally, particularly between the 2012 and

21  2013 law, one of the advantages is you have a uniform

22  standard for the administration of the election so that

23  every election official more easily can say here's a list

24  of IDs.  We require these.  We're having less discretion

25  than they would have had under the earlier 2012 law

1 because certain groups of voters were classified as

2 non-HAVA ID voters, others as HAVA ID voters.  It made the

3 process less efficient.

4      So this is a racially neutral law that is

5 nondiscriminatory, that is a law that was adopted by the

6 Virginia General Assembly for a host of compelling

7 reasons, none of which are to disadvantage particular

8 minorities.  The discussion of the Twenty-Sixth Amendment

9 in the young voter allegation that's been made by the

10 plaintiffs, the evidence that they present on that, Your

11 Honor, is very confusing between as to what --

12      THE COURT:  Mr. Hearne, I want to hear whatever you

13 feel your evidence will show, but I want to reserve a lot

14 of these issues for final argument.  There seems to be a

15 bit of confluence here between those two missions.

16      MR. HEARNE:  Certainly.  I will try to speak to your

17 evidence, Your Honor.

18      THE COURT:  All right.

19      MR. HEARNE:  And I was trying to put it into context

20 as to the legal standard.

21      THE COURT:  Understood.  I just don't want to argue

22 the legal issues at this point without a factual

23 foundation to support it before I hear the evidence.

24      MR. HEARNE:  Certainly, Your Honor.  What I will

25 refer to is the evidence.

1    Even the plaintiffs' own expert, Dr. Minnite, has

2  indicated that it's impossible to try to show any -- with

3  the social science available, a suppressive effect of a

4  voter ID requirement.  In other words, one of the

5  principal premises the plaintiffs bring forward is that

6  there will be a suppressive effect on particular

7  minorities because Virginia adopted the 2013 law.  The

8  evidence will not bear that out.  In fact, their own

9  expert will say that we can't make that conclusion.

10    Their other expert, Dr. Lichy -- Lichtman.  Excuse

11  me.  Dr. Lichtman will say that he came to his conclusion

12  as to the intent of the legislature in adopting this

13  without considering the effect of the legislation.  In

14  other words, he says -- and he also further said that

15  whether or not there was a suppressive effect in fact was

16  irrelevant to his conclusion that there was a suppressive

17  intent of the legislature.  That kind of evidence will not

18  support a claim under the law for either a violation of

19  Equal Protection, or of Section 2 of the Voting Rights Act

20  claim.

21    Finally, and again going back to the actual

22  requirements of the law itself, the one thing that has not

23  been identified, and we, I know, briefed the issues of

24  standing, but the one piece of evidence that will not be

25  presented that we're not aware of is any witness who will

1  testify that they in fact were eligible to vote, and were

2  denied the right to vote, because of this law.  And that

3  while they could say that they were inconvenienced, they

4  may have had to wait for an hour or two to get the photo

5  ID, the law does not deny anyone.  And there has been no

6  one identified that we know of who has been denied the

7  right to cast a ballot by reason of this law when you

8  consider the totality of Virginia's election

9  administration laws.  And for that reason, it fails to

10 satisfy the requirements of stating a claim.

11      THE COURT:  Thank you, sir.

12      MR. HEARNE:  Thank you, Your Honor.

13      THE COURT:  Before we hear our first witness, I want

14 all witnesses who are present in the courtroom who have

15 not been designated as experts to please retire to the

16 witness rooms until you are called to testify in the case.

17 Experts may remain in the courtroom.

18      I want each side to look around the courtroom and

19 make sure all your fact witnesses have in fact retired to

20 the witness rooms.

21      Mr. Hearne, none of your witnesses are in the

22 courtroom, is that correct, sir?

23      MR. HEARNE:  That is correct.

24      THE COURT:  Mr. Spiva, none of your witnesses are in

25 the courtroom, sir?

1          MR. SPIVA:  Yes, Your Honor.

2          THE COURT:  All right.  Very well.

3          Who will be the plaintiffs' first witness?

4          MR. SPIVA:  Josephine Okiakpe, Your Honor.

5          THE COURT:  All right.

6          Ms. Okiakpe, if you would raise your right hand,

7    place your left hand on the Bible, and face the Clerk of

8    the Court.  Can you do that okay?

9          MS. OKIAKPE:  Yes.

10         THE COURT:  Okay.

11         THE CLERK:  You do solemnly swear that the testimony

12   which you are about to give, in this case, before this

13   Court, shall be the truth, the whole truth, and nothing

14   but the truth, so help you God?

15         MS. OKIAKPE:  I do.

16         THE COURT:  Have a seat on the witness stand.

17         MS. OKIAKPE:  Thank you.

18         THE COURT:  Are you ready to proceed?

19         MS. OKIAKPE:  Yes.

20         THE COURT:  Go right ahead with your examination.

21         MR. KAUL:  Thank you, Your Honor.

22         THE COURT:  Excuse me, Mr. Kaul.

23         Start off, if you would, by giving us your full name,

24   and spelling your last name for the benefit of my court

25   reporter, okay?

1    MS. OKIAKPE:  All right.

2    THE COURT:  Go right ahead.

3    MS. OKIAKPE:  My name is Josephine Leeks Okiakpe.

4  O-K-I-A-K-P-E.

5    THE COURT:  All right.

6    Go right ahead with your examination.

7    Whereupon, **Josephine Okiakpe**, having been

8  duly sworn in, testifies as follows:

9                    **DIRECT EXAMINATION**

10 BY MR. KAUL:

11 Q    And just for the record, that ended with a P-E,

12 right?

13 A    Yes.

14 Q    Ms. Okiakpe, would you please tell the Court where

15 you live.

16 A    I live at XXXXX Xxxxxxxxx Drive, Xxxxxxxxxx,

17 Virginia.

18 Q    And for the record, what is your race?

19 A    African-American.

20 Q    And do you consider yourself to be a member of a

21 political party?

22 A    Yes.

23 Q    What party is that?

24 A    I'm a Democrat.

25 Q    And is there a party whose candidates you typically

1  vote for?

2  A    Typically, Democrats.

3  Q    And do you have any health issues?

4  A    Yes, I do.

5  Q    Could you describe those for the Court, please.

6  A    I have COPD, congestive heart failure, gout, and

7  arthritis, among other things.

8  Q    All right.  And what is COPD?

9  A    It's -- it's a pulmonary disease that obstructs the

10  ability of the lungs to handle air properly.  It's like my

11  lungs have a lot of fluid in them.  And it makes me cough,

12  and I have to take breathing treatments, respiratory

13  treatments.

14  Q    And do you have any trouble getting around?

15  A    Yes, I do.

16  Q    Do you own a car?

17  A    No.  Not now I don't.

18  Q    Do any of your family members own a car?

19  A    My daughter.

20  Q    So if you need to get around by vehicle, how do you

21  do that?

22  A    Well, my daughter and I share.  If, for instance,

23  when her son has a basketball game, I have to drive her to

24  work and then I take him to his basketball game.  And we

25  go home, and I pick her up at whatever time she gets off.

1    THE COURT:  So I assume you do have a valid Virginia

2  driver's license?

3    MS. OKIAKPE:  No, I don't.  I have a North Carolina

4  valid driver's license.

5    THE COURT:  All right.  Yes, ma'am.

6    Go right ahead.

7  BY MR. KAUL:

8  Q    And that actually gets to my next question.  Where

9  did you grow up?

10  A    In North Carolina.

11  Q    What year were you born?

12  A    1946.

13  Q    And what -- where in North Carolina did you grow up?

14  A    Clinton.

15  Q    Can you describe what Clinton is like?

16  A    It's just a tiny little town with just a little bit

17  of industry.  Just a little bit.  And where everybody

18  knows most everybody else, white or black.

19  Q    And what kind of financial circumstances did you grow

20  up in?

21  A    Well, we were poor but proud.  My folks -- my

22  grandmother, for instance, was widowed at an early age and

23  she opened a restaurant and supported her children by

24  cooking and selling food.  My dad followed in the same

25  pattern by opening a grocery store in our neighborhood.

1  It was the only one in our neighborhood, so we had all

2  kinds of customers.  But our family was a little bit

3  better off than the others because of the fact that we had

4  food all the time and we were able to share with others

5  that my dad raised up.

6       Always had a garden, and his uncles raised pigs and

7  chickens, and things like that.  And we got things from

8  them.  And then we raised vegetables in our garden.  My

9  mom and dad canned.

10      And when people came wanting credit at the store, a

11 lot of times dad would send me and my brother to the

12 garden and he would -- we would harvest whatever was

13 available and, you know, give to the people so that he

14 didn't have to give them a lot of credit.

15      THE COURT:  Why don't you go ahead to your next

16 question.

17 BY MR. KAUL:

18 Q    Were there other African-American families in your

19 town?

20 A    Yes.

21 Q    Did you see what kinds of financial circumstances

22 they had?

23 A    Yes, because of the fact that we had the neighborhood

24 store.  And our street was kind of odd.  Okay, the store

25 was kind of in the middle.  The white people lived on down

1  this way, and blacks lived this way.  It was the projects

2  and the school that I went to.

3      And so a lot of people came and asked for credit or

4  asked for help in times of need.  So I was privy to a lot

5  of inside workings of many families.  And I learned at a

6  very early age you don't run your mouth.  You see things

7  and you shut up.

8  Q   Was your town -- I think you indicated this, but was

9  your town residentially segregated?

10 A   Yes.  Except for our street.  Now, that was the only

11 street that I knew of that had blacks and whites living on

12 it.  They didn't get together.  The whites lived in this

13 section, the blacks lived in this section, but were still

14 all on the same street.

15 Q   And did you go to public schools growing up?

16 A   Uh-huh.

17 Q   Is that yes, for the record?

18 A   Yes.

19     THE COURT:  Now, we're not dealing -- we're dealing

20 with laws in Virginia.  And I understand that this lady

21 was raised in North Carolina, but we're not dealing with

22 the laws in North Carolina.  We're dealing with Virginia.

23 So please stay inbounds here and keep on track.  We have a

24 lot of witnesses and a lot of exhibits here, and please

25 confine your testimony to something that is arguably

1   relevant to the issues before the Court.

2       MR. KAUL:  Your Honor, our position would be that

3   this is relevant for two reasons.  First of all, there are

4   a lot of people in Virginia who grew up in neighboring

5   southern states in circumstances of discrimination, and so

6   that impacts their ability to do a number of things today,

7   which I think we'll talk about throughout the trial.

8       THE COURT:  Well, you will be able to argue that in

9   the end.  But since this is so far removed from Virginia,

10  and 2012 and 2013, and history is relevant, I agree with

11  you it's relevant, but I'm going to impose some reasonable

12  limitations here.  So I think you can go ahead and inquire

13  into the community.  That is fine.

14      But to go into, in a agranular fashion, a lot of the

15  details simply doesn't help this Court with respect to the

16  issues I've got to resolve.  So with that preface, go

17  right ahead, sir.

18      MR. KAUL:  Okay.

19  BY MR. KAUL:

20  Q    The schools you went to, were they segregated?

21  A    Yes.

22  Q    Did you notice any difference between white and black

23  schools?

24  A    Yes.  The white schools had more books.  They got

25  books more often then we did.  And we got a lot of their

 1  books when they were through using them.  When they got

 2  new books, we got their older ones.

 3  Q    Let me move forward a little bit.  What did you do

 4  after graduating high school?

 5  A    I went to college.

 6  Q    And was that an integrated college?

 7  A    No.  It became -- yeah, it -- I'll put it like this.

 8  It was for the simple reason we had one white student on

 9  campus.

10  Q    What did you do after college?

11  A    I came back to my home town, and I taught school for

12  several years.  And then I went to graduate school.

13  Q    And after you graduated, what did you do for a

14  living?

15  A    I still continued to teach.  I taught at Livingstone

16  College prior to my leaving North Carolina.  Prior to my

17  leaving North Carolina.

18  Q    You refer to leaving North Carolina.  Can you explain

19  what you mean by that?

20  A    Well, my daughter was working here in Virginia at

21  Channel 3 in Norfolk, and she had a baby.  And she didn't

22  have anybody to help her with it, and so we - my mom and

23  I - decided, well, why not let's go and take care of her

24  and the baby and, you know, make sure she is able to

25  continue working without having to -- because she was

1  making just a pittance at the time, and not enough funds

2  to pay child support -- I mean, child care.  And so,

3  anyway, we just packed up and moved the family to

4  Virginia.

5  Q    So when did you first move to Virginia?

6  A    2000.

7  Q    And how long did you stay in Virginia the first time

8  you moved here?

9  A    Three years.

10 Q    And then what happened after?

11      THE COURT:  I didn't hear her answer.

12      How long were you here the first time?

13      MS. OKIAKPE:  Three years.

14      THE COURT:  Yes, ma'am.  Thank you.

15      Go right ahead.

16 A    My mother had a stroke and she wanted to go home.

17 She wanted to be in her home.  So I honored her wishes.

18 And when they told me that she was dying, I took her home

19 and she stayed there until she passed.

20 Q    And when you say *home*," are you referring to North

21 Carolina?

22 A    North Carolina.

23 Q    So how long did you stay in North Carolina?

24 A    Okay.  I stayed there until -- she died in 2003.  And

25 I got a job and went to work and stayed there until 2010.

DIRECT EXAMINATION OF JOSEPHINE OKIAKPE

1   December of 2010 is when we came back to Virginia.  My

2   daughter wanted her son to be with her, so we came back to

3   Virginia.

4   Q    Okay.  So you moved back to Virginia in December of

5   2010?

6   A    Yes.

7   Q    Have you been here since then?

8   A    Yes.

9   Q    When you moved back to Virginia, did you register to

10  vote?

11  A    Yes.

12  Q    Why did you do that?

13  A    Because I consider it a right and a privilege to be

14  able to vote.  That's how -- you know, I don't have any

15  titles and I'm not anybody special, so that's how I can

16  put my little input into who is supposed to be speaking

17  for me or representing me, to vote for them or not to vote

18  for them.

19  Q    I want to ask you about the 2014 election in

20  particular.

21  A    All right.

22  Q    Do you remember that election?

23  A    Very -- very well.

24  Q    Can you explain what happened when you tried to vote

25  in that election?

1 A    Well, I had been in and out of the hospital.  And I

2 really wasn't cognisant of the change of requirements for

3 the photo ID.  I had been sent my -- you know, the little

4 voting card that says you can -- you have the right to

5 vote.

6 Q    Are you referring to a voter registration card?

7 A    Voter registration card.

8 Q    And I don't think you need to pull that out.

9 A    I was not aware of the voter ID thing.  But when I

10 went -- I always carry in my pocket my birth certificate,

11 my Medicare card, my social security.  All of that's in my

12 wallet.  So I pulled out all of that.  And then I had a

13 bank statement.

14 Q    And let me stop you.  We need to go through this in

15 parts.  So first of all, did you attempt to cast a ballot

16 in person in 2014?

17 A    Yes.

18 Q    And when you did that, what happened when you first

19 encountered the poll workers?

20 A    Well, they -- they wanted to see my identification.

21 And I pulled out all the ID I had, which I thought was

22 more than sufficient.

23 Q    And can you tell the Court which types of ID you

24 presented?

25 A    My birth certificate, my social security card, my

1  voter ID, the little card they sent me through the mail.

2  Q    The registration card?

3  A    The registration card.  My old Virginia ID.  But it

4  was expired.  They told me they couldn't take it.

5      THE COURT:  Your old Virginia registration card?

6      MS. OKIAKPE:  No.  No.  I had the new one.  I didn't

7  have the photo one.

8      THE COURT:  Okay.

9      MS. OKIAKPE:  But the one that I had from the DMV.

10     THE COURT:  Oh, your driver's license?

11     MS. OKIAKPE:  It wasn't a driver's license.  It was

12 just an ID card.

13 BY MR. KAUL:

14 Q    And you said that ID card was expired?

15 A    It expired in 2008.  Yes.  And so they told me they

16 couldn't accept that, nor -- I had my Costco card, my BJ

17 card, my Sam's card, all those with pictures on them, but

18 they didn't take any of that stuff.  They told me that it

19 wasn't acceptable.

20 Q    Did you have a driver's license from North Carolina?

21 A    Yeah.  My North Carolina driver's license.  I

22 presented that also.  But it was from a different state,

23 so they couldn't take it.

24 Q    Did you have any bank papers with you?

25 A    Yeah, I had my bank statement.  And I pulled out a

1   plethora of stuff, and tried to give it to them, along

2   with the utility bill that had my name on it.  And they

3   weren't having it.  They weren't accepting any of that.

4        So, you know, I felt very frustrated and very upset.

5   And I've -- of course there was a room full of people, a

6   line all around, and here I am pulling out all this stuff.

7   And a few of the people looked at me kind of snickering.

8   I felt really bad, you know.  And in fact, I went in the

9   bathroom and I cried a little bit because, again, I'm from

10  the era where voting was considered a privilege and a

11  right that we all ought to exercise.  And my dad taught

12  me, and my mom -- we were NAACP members from childhood.

13  And so I really felt strongly about -- and I'm sorry.

14  Q    Let me ask you about a different topic to switch to.

15  A    Okay.

16  Q    When you were unable to provide a photo ID, what

17  options were you provided?

18  A    They told me to go to the -- to the -- to Manassas to

19  the voter place, voter registration place, and have a

20  picture made.  And after that, I was sick for a couple of

21  days so I couldn't go.  And my daughter finally --

22  Q    Let me just -- I'll come back to that in just a

23  second.

24  A    Okay.

25  Q    Were you offered a provisional ballot?

DIRECT EXAMINATION OF JOSEPHINE OKIAKPE     59

1   A     Yes.

2   Q     And did you cast one?

3   A     Yes.

4   Q     So, I'm sorry, you were saying something about going

5   somewhere a couple days later?

6   A     They told me -- well, it was several days later

7   before my daughter was off.  And she took me to Manassas

8   to get the photo ID made.

9   Q     So let me ask you about Manassas.  First of all, can

10  you explain how Manassas plays into this?

11  A     Well, that was where I had to go to get my photo ID

12  made because I had the, you know, the old voter

13  registration card with no picture on it.  And so I just

14  presented that, and showed them my birth certificate and a

15  piece of mail, and they didn't ask me any questions.  I

16  had less problem getting that photo ID made then I did

17  trying to vote.  And that was the thing that really kind

18  of knocked me for a loop.  I said, well, you know -- I

19  didn't quite understand that.

20  Q     So let me ask you about the date that you voted.  You

21  mentioned before you cast a provisional ballot.  Did you

22  go that same day to Manassas?

23  A     No.

24  Q     Why not?

25  A     Because I wasn't feeling very well after I left

1  there.  My blood pressure had gone up.  My daughter was

2  not happy, and I didn't want to go.  I didn't want to go.

3  I went on back home and got myself together.

4  Q    And I think you said before you waited a few days

5  before you went.  Why?

6  A    Because my daughter didn't have -- she wasn't off for

7  several days.  She is vacation relief for the job that she

8  works now, and she's only off when somebody who's supposed

9  to be there is there.  She has to fill in for everybody.

10 So she works all shifts and schedules.  And her schedule

11 this week is not what it is next week.  So we don't ever

12 know until they give her her schedule.  She has to ask off

13 if it's really important.

14 Q    And why did it matter whether your daughter was off?

15 A    Because she has to take me most of the time.  See, I

16 can't go places by myself usually because of my health

17 issues and depending on how I'm doing at the time.  We

18 have to share a car.  I don't have a car anymore, and --

19 Q    And how far is it to Manassas from where you live?

20 A    Maybe about 15 miles.

21 Q    So you can't walk that, right?

22 A    No.

23 Q    Is there public transportation that you take

24 sometimes in Manassas?

25 A    I can't take it because I can't walk that far.  I'd

1  have to walk to a bus stop, and my breathing will not

2  allow me to go so far, but then I have to stop and rest.

3  And if I don't time it just right, or if I don't have the

4  rest time in between there, the bus is gone and I'm trying

5  to get to the bus stop.  So I can't take the bus like

6  that.  I have to be carried or drive myself.

7  Q    All right.  Now, you mentioned you did go to Manassas

8  eventually?

9  A    Yes.

10 Q    And did you say that you obtained an ID there?

11 A    Uh-huh.

12     THE COURT:  You have to answer yes or no so this

13 young lady can take it down.

14 A    Yes.  I'm sorry.

15     THE COURT:  That's okay.  Thank you.

16     Go right ahead.

17     MS. OKIAKPE:  Please forgive me.

18 BY MR. KAUL:

19 Q    And what form of identification did you present to

20 obtain that ID?

21 A    I presented the old ID that they had sent me, and my

22 birth certificate.  And I don't know.  Oh, my driver's

23 license from North Carolina.

24 Q    Did you present anything that you hadn't presented

25 when you went to vote at the polls?

CROSS-EXAMINATION OF JOSEPHINE OKIAKPE      62

1   A    I didn't present as much as I presented.

2   Q    And did you get something as a result of showing --

3   A    I got the picture ID done.

4   Q    And did you then cure your provisional ballot?

5   A    Yes.

6   Q    Prior to the events you've been describing from 2014,

7   did you see any advertising about the voter ID law?

8   A    No.

9   Q    Did you hear any radio commercials about it?

10  A    No.

11  Q    Did you know that a picture ID was required?

12  A    No.

13  Q    How did this process impact your confidence in the

14  electoral system in Virginia?

15  A    It kind of -- well, it made me feel very frustrated

16  and very -- I just felt as if maybe I didn't matter quite

17  as much as other people.  It was -- it really kind of

18  undermined my confidence.

19       Thank you, Your Honor.  No further questions.

20       THE COURT:  Cross-examination.

21       MR. HEARNE:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23  BY MR. HEARNE:

24  Q    Ms. Okiakpe, I want to make sure I pronounce your

25  name right.  So if you could assist me and say it one more

1    time, I'll make sure I try to do that.

2    A    Okiakpe.

3    Q    Ms. Okiakpe, you indicated that you share a car with

4    your daughter, is that correct?

5    A    Yes.

6    Q    And that you occasionally drive to your grandson's

7    basketball games?

8    A    Yes.

9    Q    About how far away are those games?

10   A    Maybe a mile.

11   Q    When you -- you indicated you had -- you possess a

12   North Carolina's driver's license still, is that correct?

13   A    Yes.

14   Q    Did I hear you correctly say that's still valid?

15   A    Yes, it is.

16   Q    Do you know when that expires?

17   A    Yes.

18   Q    When does that expire?

19   A    March 15th.  My birthday.

20   Q    Of this year?

21   A    This year.

22   Q    This year.  So March 15th of this year, do you plan

23   to renew that, or obtain a Virginia's driver's license?

24   A    I plan to renew my North Carolina.

25   Q    And to do that, do you know what you have to do?

1  A     Yeah.  I just have to take the sign test.

2  Q     I'm sorry.  Say that again.

3  A     I have to pass the sign test.

4  Q     And that would be in North Carolina?

5  A     Uh-huh.

6  Q     You talked about your 2014 experience at the polling

7  place.

8  A     Uh-huh.

9  Q     And I understand that's a very emotional experience

10 to go through.  But ultimately, was your provisional

11 ballot, to your understanding, counted?

12 A     Yes.

13 Q     So the ballot that you cast, even though you did have

14 to go through that experience with the identification, was

15 nonetheless counted, as you understand it?

16 A     Yes.

17 Q     You said your address was on XXXXX Xxxxxxxxx Drive,

18 is that correct?

19 A     Uh-huh.

20 Q     About how far is it from there to, say, the

21 Department of Motor Vehicles office, the Virginia

22 Department of Motor Vehicles office on Manville Road?

23 A     Well, it's not on Manville.  It's Caton Bridge Road,

24 I think is the name of it.

25     COURT REPORTER:  I'm sorry.  The name of the road

1  again, please.

2       THE COURT:  Could you repeat your answer for my court

3  reporter.

4       MS. OKIAKPE:  Oh.  I think it's Caton Bridge Road.

5  C-A-T-O-N.

6       COURT REPORTER:  Thank you.

7  BY MR. HEARNE:

8  Q    Would that be within, say, five miles or less of your

9  home?

10 A    Probably so.

11 Q    And you said you went to the Office of Elections out

12 in Manassas to get the photo ID card, is that right?

13 A    Yes.

14 Q    And about how far is that from your home?

15 A    All together, about 17 miles.

16 Q    One way?

17 A    Yes.

18 Q    And if I understood you correctly, did you say that

19 it was easier to get that free photo ID card than it was

20 to vote the provisional ballot?

21 A    Yes.

22      MR. HEARNE:  I have no further questions.

23      THE COURT:  All right.

24      Any redirect?

25      MR. KAUL:  No, Your Honor.

1        THE COURT:  May she be excused?

2     MR. KAUL:  Yes.

3        THE COURT:  Ma'am, you may step down.  You're

4  excused.  Thank you very much for your testimony.  We

5  appreciate you coming in.

6     MS. OKIAKPE:  Thank you.

7                    **WITNESS STOOD ASIDE**

8        THE COURT:  Who'll be your next witness?

9     MS. BRANCH:  Your Honor, the plaintiffs call Megan

10 Cotten to the stand, please.

11       THE COURT:  Could you repeat that name for me?

12    MS. BRANCH:  Megan Cotten.

13       THE COURT:  Megan Cotten, okay.

14    Ms. Cotten, if you would be kind enough to raise your

15 right hand, left hand on the Bible, and face the Clerk of

16 the Court, please.

17       THE CLERK:  You do solemnly swear that the testimony

18 which you are about to give, in this case, before this

19 Court, shall be the truth, the whole truth, and nothing

20 but the truth, so help you God?

21    MS. COTTEN:  Yes.

22       THE COURT:  Have a seat on the witness stand,

23 Ms. Cotten.

24    Ms. Cotten, would you please put your full name on

25 the record, and spell your last name for my court

1   reporter.

2       MS. COTTEN:  Yes.  It's Megan Lynn Cotten,

3   C-O-T-T-E-N.

4       THE COURT:  All right.

5       You may inquire.

6           Whereupon, **Megan Cotten**, having been

7   duly sworn in, testifies as follows:

8                   **DIRECT EXAMINATION**

9   BY MS. BRANCH:

10  Q    Good morning, Ms. Cotten.

11  A    Good morning.

12  Q    Could you please state your age for the record.

13  A    I'm 32.

14  Q    And where do you live currently?

15  A    In Arlington, Virginia.

16  Q    What is your address, for the record?

17  A    XXXX XXth Street Xxxxx, Apartment X, Arlington,

18  Virginia, XXXXX.

19  Q    How long have you lived in Virginia?

20  A    I have lived in Virginia since 2008.

21      THE COURT:  Since 2008?

22      MS. COTTEN:  Yes.

23      THE COURT:  Okay.

24  BY MS. BRANCH:

25  Q    And where did you live prior to moving to Virginia in

```
 1  2008?

 2  A    I was in college at Ohio University in Athens, Ohio.

 3  Q    Where are you originally from?

 4  A    From Huntsville, Alabama.

 5  Q    And what do you do for work, Ms. Cotten?

 6  A    I work at the American Council on Education in their

 7  public affairs team.

 8  Q    And where is that located?

 9  A    It's in DuPont Circle in Washington, D.C.

10  Q    How long have you worked for the American Council on

11  Education?

12  A    I was hired in December of 2014.

13  Q    And where did you work immediately prior to being

14  hired?

15  A    The Hatcher Group.  It's a public relations firm in

16  Bethesda, Maryland.

17       THE COURT:  Could you spell the name of that group

18  for my court reporter, please.

19       MS. COTTEN:  Sure.  It's three words.  The Hatcher,

20  H-A-T-C-H-E-R, and then Group.

21       THE COURT:  Okay.  Thank you.

22       Got right ahead.

23       MS. BRANCH:  Thank you, Your Honor.

24  BY MS. BRANCH:

25  Q    Have you ever worked in federal or state government?
```

1   A       No.

2   Q       Have you ever been a member of the military?

3   A       No.

4   Q       Do you have a car, Ms. Cotten?

5   A       I do.

6   Q       And do you drive regularly?

7   A       I do not.  It sits in the garage.

8   Q       About how often would you say you drive?

9   A       Probably only every couple of months if I need to

10  take an out of town trip.

11  Q       What mode of transportation do you typically use to

12  get around?

13  A       I rely on the bus and train, or the metro system.

14  Q       Did you have to show a photo ID to get into this

15  courthouse today?

16  A       Yes.

17  Q       And what type of ID did you show?

18  A       My Alabama driver's license.

19  Q       Ms. Cotten, are you registered to vote in Virginia?

20  A       Yes.

21  Q       And when did you first register to vote?

22  A       In 2008.

23  Q       And why did you register to vote?

24  A       I really believe voting is important.  And I've

25  always tried to vote in major elections.  I was a

1   journalism major, and I've always really believed in the

2   Democratic process.

3   Q      Do you vote in Virginia?

4   A      Yes.

5   Q      And about how often would you say you vote?

6   A      I try to vote in every major election, and I try to

7   vote in every primary as well.

8   Q      Do you consider yourself to be a member of any

9   political party?

10  A      Yes.  I'm a Democrat.

11  Q      And is there a party whose candidate you typically

12  vote for?

13  A      Yes.  The Democratic Party.

14  Q      So we're going to focus on the 2014 election.  And to

15  start out, I want to ask you a few questions about the

16  types of ID that you had in 2014, and the types of IDs

17  that you currently have.  So at the time of the 2014

18  election, did you have any type of ID that had your photo

19  on it?

20  A      Yes.  My Alabama driver's license.

21  Q      And did you have any other types of IDs with your

22  photo on it?

23  A      No.

24  Q      Did you have a photo ID issued by the DMV?

25  A      I had an expired state ID card.  I had originally

1   tried in 2009 to get a Virginia driver's license.  I tried

2   five times.  I was eventually told that due to

3   miscommunication between the Alabama DMV and the Virginia

4   DMV, that they -- because they could not call each other,

5   they could only communicate via fax, and it was showing a

6   pit of about a thousand faxes to which they said they were

7   not checked, that they were unable to get the final

8   document I would need to get a Virginia driver's license,

9   so instead I was issued a Virginia state ID card.

10          THE COURT:  Hold on just one second.  Could you

11   explain that in a little more detail?  I couldn't hear all

12   your testimony.

13          MS. COTTEN:  Sure.

14          THE COURT:  You went down, you passed the test, is

15   that right?

16          MS. COTTEN:  Well, I never took a test in Virginia.

17   I already had a Alabama driver's license.  But I had lost

18   my Alabama driver's license, and so I decided that it was

19   time to get a Virginia driver's license.  So I compiled

20   all the necessary documents, went down to the DMV to apply

21   for a Virginia driver's license.  I had everything I

22   needed except for a driving record.  I had actually bought

23   a driving record on-line that was fraudulent, so it didn't

24   count, apparently.  I thought I had everything I needed.

25          THE COURT:  You produced a fraudulent --

1          MS. COTTEN:  Well, it was like a scam cite.

2          THE COURT:  Pardon me?

3          MS. COTTEN:  I thought I bought my driving record off

4     the Internet.

5          THE COURT:  So Virginia DMV would not honor that,

6     obviously?

7          MS. COTTEN:  They would not honor it.  Yeah.

8          THE COURT:  Okay.

9          MS. COTTEN:  So they said in order for me to get a

10    Virginia license, I would need to produce the final

11    document, which is my driving record.

12         So I actually had my sister, who lives in Alabama, go

13    down to the Alabama DMV and have them fax it over.  She

14    tried five separate times.  They claimed that they did not

15    get the fax.

16         One time I was called at work by the Virginia DMV,

17    asked to come down right away.  That they had just

18    received the fax finally.  So I took off from work, went

19    down to the Virginia DMV, got there, and I said, "Okay,

20    where's the fax?

21         And they said, *"What are you talking about?  Who*

22    *called you?"*

23         I said, *"I don't know."*

24         And so he said, *"Well, we don't have it."*

25         So, the bottom line is I had to get a flight pretty

DIRECT EXAMINATION OF MEGAN COTTEN          73

1  soon because I needed some form of ID, so he -- or they

2  give me a Virginia ID card.

3       THE COURT:  Okay.

4  BY MS. BRANCH:

5  Q    And so how many times did you yourself have to go to

6  the Virginia DMV to try to get a Virginia driver's

7  license?

8  A    I went five separate times.

9  Q    And did you have to take off work to do that?

10 A    I did.  My boss was not happy with me.  I was told

11 that I could no longer spend anymore time on this project.

12 Q    And so you mentioned you were given a DMV photo ID?

13 A    Yes.

14 Q    At the time of the 2014 election, was that current?

15 A    No.  It had expired in September of 2013.

16 Q    Do you currently have a Virginia driver's license,

17 Ms. Cotten?

18 A    It should be in the mail.  I went to the DMV about a

19 month ago.  I did get, you know, a printout saying I now

20 have a Virginia license, but it hasn't arrived.

21 Q    And do you remember the date of the first time that

22 you tried to apply for a Virginia driver's license?

23 A    It was in November of 2009.

24 Q    At the time of the 2014 election, did you have a

25 passport?

1 A      I did not.  I had applied for a passport.  The State

2 Department had misclassified my paperwork as someone who

3 was born outside of the United States, so I was sent a

4 letter asking for additional documentation, unfortunately,

5 none of which applied to me.  I think like my travel

6 history, my family Bible history, things that I just

7 couldn't produce.  I had a certain amount of time to

8 respond, and then was told I'd have to start all over.  So

9 I waited, tried to figure out ways to get around it, but

10 ultimately had to apply again and pay all over again.

11 Q      And how much did you have to pay to get a passport?

12 A      It was $140 each time.  So $280 in the end.

13 Q      And when did you first try to get a passport?

14 A      It was in the summer of 2014.

15 Q      And do you now have one?

16 A      Yes.  It came in May 2015.

17 Q      What types of documentation did you ultimately have

18 to show to get your passport?

19 A      Well, yeah, it was extensive.  I called the State

20 Department ahead of my appointment, and they said just to

21 be sure -- they give me a list of up to 31 supporting

22 documents I needed to provide.  I obviously didn't have

23 all 31, but I provided every single document that I could

24 off that list the second time I applied because I wanted

25 to apply to avoid applying a third time.

1  Q     And what type of documents were those?

2  A     Student transcripts, my lease information, my

3  renter's insurance, my photo ID badge from my job at the

4  American Council on Education, my birth certificate, my

5  social security card.  On and on.

6  Q     You just mentioned your photo ID badge from the

7  American Council of Education.  Did you have that ID at

8  the time of the 2014 election?

9  A     I did not.  The Hatcher Group did not have photo ID

10 for its staff.

11 Q     Let's shift and talk, actually, about the 2014

12 election.  And at that time you were employed by The

13 Hatcher Group, is that correct?

14 A     That's correct.

15 Q     And where is The Hatcher Group located?

16 A     It's in Bethesda, Maryland.

17 Q     And were you living in Arlington at the time?

18 A     Yes, I was.

19 Q     And how did you get to work, Ms. Cotten?

20 A     I walked to the metro, and took the train to

21 Bethesda.  And then I walked from the metro to The Hatcher

22 Group.

23 Q     And about how long did it take you to get from where

24 you lived in Arlington to where you worked in Bethesda

25 every day?

1   A      Anywhere from an hour and 20 minutes, to an hour and

2   a half, or even more depending on the trains.

3   Q      Did you attempt to vote in the November 2014

4   election?

5   A      Yes, I did.

6   Q      And where did you go to vote?

7   A      I went to my neighborhood polling place I had been

8   using for years, the library right down the street from my

9   house.

10  Q      And how did you get to the polls on election day?

11  A      I walked.  It only took about like five to 10

12  minutes.

13  Q      About what time would you say you got to the polls?

14  A      Probably near 8:00.

15  Q      Is that 8:00 in the morning?

16  A      Yes.

17  Q      And did you have to take any time off work in order

18  to go to the polls?

19  A      I did.  You know, it was understood at my job that

20  you could either take the morning or you could take the

21  night.  You could take a certain amount of time to vote,

22  but that you'd have to be making up that time at work

23  either way.

24  Q      And why was that?

25  A      We worked on a billable system, and it was a very

 1  strict work environment.  It was just an understood

 2  environment that you just didn't leave early, and you

 3  didn't arrive late unless there was a very good reason.

 4  And voting was one of those reasons they allowed us to

 5  either arrive late or leave early.

 6  Q    About how much time would you say you were allowed to

 7  take off work to go vote?

 8  A    I mean, you know, I tried to get there early.  It was

 9  a long line.  I was probably a little over an hour late to

10  work.  So I had to stay an hour later.

11  Q    So what happened when you got to the voting location?

12  A    You know, everything was fine.  I got -- until I got

13  to the place where you have to show your documents.  And I

14  brought what had always worked for me, which is my Alabama

15  State driver's license and my utility bill showing where I

16  lived in Arlington.  And I was told that that wasn't going

17  to be enough documentation in order to vote that day.  I

18  was given a list of additional documents I could provide,

19  but none of them really applied to me.  I wasn't in the

20  military, I wasn't a student, I didn't work for the

21  federal government, so I didn't have any of those

22  documents.

23      I was asked very loudly if I had a passport, in which

24  I was going through the passport situation.  I said I

25  applied for one, but I didn't have one.  And in a very

1  loud conversation in a quiet room, you can imagine,

2  everyone is turning around to see what the commotion is.

3  I'm in Arlington, so it's a bunch of wealthy, white,

4  well-traveled people all looking at me, and the fact that

5  I don't have a passport, it was pretty humiliating, to be

6  honest.

7       And I looked at the other poll workers who at this

8  point had turned to see what was going on, and they were

9  listening to the conversation to see what they would say,

10  but they didn't say anything.  And she said, *"I'm sorry.*

11  *Next in line.   You can't vote."*

12       So I started to walk out, and I started looking at

13  other polling workers to see if they were going to say

14  something, but they didn't, so I left.

15  Q    And so you mentioned earlier that you had a

16  DMV-issued photo ID?

17  A    Yes.

18  Q    Did you have that with you at the polls in 2014?

19  A    No.  It was in a drawer somewhere.  I didn't think I

20  needed it.

21  Q    And was it your understanding prior to going to vote

22  that the types of IDs that you were planning to present

23  would be acceptable?

24  A    Yes.  They had always worked before.

25  Q    And were you aware of the photo ID requirement prior

1  to going to vote?

2  A     No, I wasn't.

3  Q     Had you seen any TV adds or newspaper adds about the

4  photo ID law?

5  A     No.  And I do read multiple newspapers a day.  I

6  usually try to read the Washington Post, the New York

7  Times.  I hadn't seen anything.

8  Q     Do you read any Virginia newspapers regularly?

9  A     You know, I usually read the Washington Post as my

10 newspaper.

11 Q     So you mentioned that you left the polling place

12 after you were told that you didn't have acceptable ID.

13 Were you offered a provisional ballot before you left?

14 A     No, I was not.

15 Q     Were you aware of the provisional ballot process in

16 2014?

17 A     No, I was not.

18 Q     And can you describe for the Court your interactions

19 with the election officials on election day.

20 A     It was very hard to be singled out.  I felt very

21 singled out in a room full of people that maybe felt, you

22 know, better than me and that they somehow had, you know,

23 passports or were somehow more prepared.  Like I said, it

24 was a very quite room.  And this person was very, I felt,

25 intentionally loud about the fact that I didn't have what

 1  I needed.

 2      And when I let them know I didn't have a passport,

 3  the shock that was expressed by this person was very loud

 4  that I didn't have a passport.  They were very surprised.

 5  It just made me, you know, feel like there was something

 6  wrong with me that I didn't have a passport and I was

 7  embarrassed and I just wanted to get out of there.

 8  Q    Ms. Cotten, were you ultimately able to cast a ballot

 9  on Election Day in 2014?

10  A    No, I wasn't.

11  Q    Now, after you left the polling place, what happened?

12  A    Well, you know, I was in public relations, and I was

13  aware that public officials monitor their social media

14  accounts, and especially on a day like this.  And I knew

15  the Secretary of State would be monitoring his, so I

16  looked him up on Twitter and tweeted at him and let him

17  know what had happened to me.  I wanted him to be aware of

18  what this consequence of this new law was, which was the

19  fact that people were being turned away from the polls.

20  Q    And you said you Tweeted at him.  For those persons

21  in the courtroom who are not as familiar with Twitter, can

22  you explain what you mean by that?

23      THE COURT:  I think most of us are familiar with it,

24  for the record.

25      MR. SPIVA:  She's talking about me, Your Honor.

1  A    I looked up his user handle, and I used it, and I

2  Tweeted at him so he would see it in a Tweet.

3  Q    And when you say *he,* you're talking about the

4  Secretary of the Commonwealth?

5  A    Yes.

6  Q    And do you remember his name, by chance?

7  A    Levar Stoney.

8  Q    Now, did Mr. Stoney, Secretary Stoney, responded to

9  your Tweet?

10 A    He did.  He responded to my Tweets.  He ultimately

11 private messaged me on Twitter and asked me for my e-mail,

12 which I gave him.  Somebody from his staff followed up

13 with me and gave me a call and explained that I should

14 have been offered a provisional ballot, and that there

15 were additional steps that I would need to take even if I

16 did get a provisional ballot.  But because I knew that I

17 wasn't going to be able to go back to my polling place, I

18 didn't inquire about those additional steps.

19     I wasn't really aware of exactly what he was talking

20 about.  I heard him say something about the registrar's

21 office.  Of course, I don't know where that would be, so I

22 didn't ask him to clarify because I just told him it

23 wasn't going to be possible for me to make it back to my

24 polling place before it closed.  But I just wanted him to

25 be aware of what had happened so that they could track it.

1  Q    And why wasn't it going to be possible for you to get

2  back to the polling place before it closed?

3  A    You know, I mean, I had to stay and make up the hours

4  that I missed and I couldn't leave early.

5  Q    And do you know what time the polling place closed?

6  A    At 7:00.

7  Q    And about what time did you leave work that day?

8  A    I didn't leave until after 6:30.

9  Q    And how long would it have taken you to get from work

10 to the polling place at about that time?

11 A    If everything was running smoothly on the metro, it

12 would be an hour and 10 minutes to the metro and walk.

13 Q    Ms. Cotten, did you attempt to vote in the 2015

14 election?

15 A    No, I didn't.  I -- finally, I was planning on voting

16 with my passport that I got in May, but we were also

17 moving that month and my passport ended up at the bottom

18 of a box, which I just located a couple weeks ago,

19 actually.  So I -- you know, election year rolled around

20 and I thought I knew where my passport was.  I went to go

21 grab it and it wasn't there, so I just didn't have the

22 documents I needed to go vote, so I didn't.

23 Q    And, you know, during the 2015 election, around that

24 time, were you aware of the fact that you could have

25 gotten a photo ID from the registrar's office?

1  A     You know, I had never heard of this free ID.  When I

2  sat in the opening statements, I saw the worksheet you

3  have to fill out for it.  But I had never heard of someone

4  saying a free ID to vote.  You know, if someone had

5  mentioned it, I think I would have just thought they were

6  talking about a voter registration card, which I had.

7        But, no, it wasn't on my radar.  I had no idea what

8  this free ID thing is, or was.  And I didn't know anybody

9  else who knew either.

10 Q     Had anyone ever explained to you either when you were

11 in the polling place, or when you received the follow-up

12 from the Secretary of the Commonwealth's office, anything

13 about the free photo ID?

14 A     I think the staffer, in retrospect, now that I'm

15 hearing that you have to go to the registrar's office to

16 get it, I think he was probably trying to tell me about

17 it.  But in my mind, at the time, he was just telling me

18 it was part of the step that I'd have to go to the

19 registrar's office and get additional documents, or

20 whatever, and he didn't refer to it as a free ID.  And

21 this whole free ID thing, I don't -- I didn't know that

22 vernacular until I started talking to you guys about this.

23 Q     Do you know where the closest registrar's office is

24 to where you live?

25 A     I don't.

1  Q     Ms. Cotten, what ID do you show at airport security

2  when you travel by plane?

3  A     My Alabama driver's license.

4  Q     Has it always worked?

5  A     Yes.

6  Q     What type of ID do you show at a store when you're

7  using your credit card and they ask for proof of identity?

8  A     My Alabama driver's license.

9  Q     And has it always worked?

10 A     Yes.

11 Q     How did the fact that you were not able to use your

12 ID in 2014 to vote make you feel?

13       THE COURT:  She's already testified to that twice.

14       MS. BRANCH:  Okay.

15 BY MS. BRANCH:

16 Q     Did the fact that you were not able to use your

17 2014 -- or your ID to vote in 2014 affect your view of the

18 Virginia election system at all?

19 A     Well, I mean, I felt like if this is happening to

20 somebody like me who reads the news every day, who's

21 well-informed, who votes regularly at the same polling

22 place that I've been going to for years, I just felt like

23 if it's happening to me, it's happening to other people.

24 And that made me really sad for the state of affairs in

25 Virginia.

Cotten - cross

85

1  Q    Is it important for you to vote, Ms. Cotten?

2  A    It is.  I mean, I feel like in this day and age, you

3  know, people use social media to complain a lot, but it's

4  really our only voice and our only chance to try and

5  change things politically.

6       MS. BRANCH:  No further questions, Your Honor.

7       THE COURT:  We're going to take a 10-minute recess.

8  We'll come back and proceed with cross-examination.

9       You may step down, Ms. Cotten, for 10 minutes.  Don't

10 discuss your testimony with any other witness.

11      We'll stand in recess for 10 minutes.

12                     (Recess taken.)

13          (Gil Halasz is now the court reporter.)

14      THE COURT:  Take your seat on the witness stand,

15 please.

16                   CROSS EXAMINATION

17      THE COURT:  All right.  You may inquire.

18 BY MR. FINBERG:

19 Q    Thank you very much.

20      I am Dana Finberg, and I am one of the attorneys

21 representing the defendants.  I just have a few questions

22 for you.

23 A    Okay.

24 Q    You have lived in Virginia since 2008; that is right?

25 A    Yes.

Cotten - cross                    86

1   Q      Okay.

2          And you are Caucasian, are you not?

3   A      Yes.

4   Q      And at the time of the 2014 general elections you

5   were 30 years old; is that about right?

6   A      Yes.

7   Q      And you own a car?

8   A      I do.

9   Q      And you have been a Virginia resident since 2008?

10  A      That's correct.

11  Q      I am unclear on part of your earlier testimony about

12  at the time you went to the polls in 2014.  Did you have

13  an ID at that time?

14  A      I had an expired Virginia ID card starting in 2013.

15  Q      Did you mention, I think at some point during direct

16  testimony that you had some DMV ID that was in the drawer

17  when you went to the polls?

18  A      Right.  I didn't bring it with me.  That is what I

19  was talking about.

20  Q      You are talking about the expired one.  Okay.  I want

21  to be clear.

22  A      Yes, yes.

23  Q      Okay.

24         When you went to the polls in 2014 you testified that

25  you got to the front of the line and the poll worker

1   turned you away because you didn't have the right form of

2   ID; isn't that right?

3   A      That's correct.

4   Q      And when you went there you were dealing with a local

5   poll worker in Arlington County?

6   A      Yes, I would assume so.

7   Q      You voted in Arlington County?

8   A      Yes, yes.

9   Q      Did you ask anybody there at the time what you could

10  do to obtain an ID?

11  A      I didn't know the questions to ask, because I didn't

12  understand that there was another ID to be had.

13  Q      Okay.

14         After you were turned away at the polls, you said

15  that you tweeted the Secretary of the Commonwealth?

16  A      That is true.

17  Q      And as a matter of fact that very same day, the date

18  of the election, you were contacted by the Department of

19  Elections, weren't you?

20  A      Yes.

21  Q      And somebody by the name Myron McClees, Department of

22  Elections, contacted you, reached out to you?

23  A      Yes.

24  Q      Called you by phone?

25  A      Yes.

1  Q    And explained to you what the process was, right?

2  A    Yes.  He told me I had to go get an original valid

3  permit for my polling place.

4  Q    You didn't feel like you were blown off by the

5  Department of Elections of your concerns?

6  A    No.  I thought they were very responsive.

7  Q    You said in 2015 you attempted to vote, or you -- or

8  didn't attempt to vote because you had a passport but it

9  was packed away somewhere?

10  A    Exactly.

11  Q    But you had a valid passport at the time?

12  A    I did.

13  Q    You are currently living in Arlington, right?

14  A    Correct.

15  Q    And you lived at XXXX XXth Street?

16  A    Correct.

17  Q    How did you get to Richmond to today?

18  A    I drove my car.

19  Q    And that is over a hundred miles, right?

20  A    Yes.

21  Q    Give or take a few?

22  A    Okay.  Yes.  I don't know.

23  Q    And where did you live at the time of the 2014

24  elections?

25  A    In Arlington, Virginia.

1   Q    Were you at XXX XXst Street at that time?

2   A    Yes, I was.

3   Q    Okay.

4        Are you familiar with the Office of Elections on

5   Clarendon Boulevard?

6   A    No.

7   Q    You don't know where Clarendon is in Arlington?

8   A    Yes.

9   Q    About four miles from where you live, right?

10  A    Yes.  I mean, yes.

11  Q    And are you familiar with the DMV office on Four Mile

12  Run in Arlington?

13  A    Yes.

14       I went there to get my Virginia state --

15  Q    Okay.  Also about four miles from where you lived at

16  that time?

17  A    That's correct.  Yes.

18  Q    Is there anything that is going to prevent you from

19  voting in the up-coming elections?

20  A    No.

21  Q    As a matter of fact, you now have three forms of

22  valid identification to vote in the up-coming election; do

23  you not?

24  A    Yes.

25  Q    You have a Virginia driver's license?

1  A    Don't ask me that.  Now, yes, driver's license.

2  Q    You have passport?

3  A    I do.

4  Q    And you have an employer ID with the photo on it,

5  now?

6  A    I don't -- I am not exactly sure if it is current,

7  but an ID badge without the name of my company on it.  I

8  am not sure if that would work or not, but I don't need it

9  to vote.

10 Q    Because you are going to have a passport and driver's

11 license.

12 A    Yes.

13 Q    You said that you identify as Democrat.

14 A    That is right.

15 Q    That is true?  Ever filled out an application to join

16 the Democratic party?

17 A    I am not sure what application you would fill out to

18 join the Democratic party.  I don't know that.  I have no

19 idea.

20 Q    Have you ever filled out an application thinking that

21 you were applying to join the Democratic party?

22 A    It doesn't ring a bell.

23 Q    Ever paid dues to the Democratic party?

24 A    Definitely not.

25 Q    Ever gotten a membership card from the Democratic

1   party?

2   A     No.

3         MR. FINBERG:  I don't have any further questions,

4   Your Honor.

5         THE COURT:  Any redirect?

6         May she be excused, Mr. Finberg?

7         MR. FINBERG:  Yes.

8         MR. SPIVA:  Yes, Your Honor.

9         THE COURT:  You are excused to go.  Thank you for

10  coming today.  We appreciate it.

11                    (Witness stood aside)

12        THE COURT:  Who is the next witness?

13        MS CALLAIS:  Jennifer Tidd.

14        THE COURT:  T-I-D-D.  Okay.

15        Raise your right hand, place your left hand on the

16  Bible and face the Clerk of the Court, please.

17                      JENNIFER TIDD

18            WAS SWORN AND TESTIFIED AS FOLLOWS:

19                    DIRECT EXAMINATION

20        THE COURT:  Would you please give us your full name,

21  and spell the last name for the court reporter, please?

22        THE WITNESS:  My name is Jennifer Tidd.  Last name T

23  as in Thomas, I-D-D.

24        THE COURT:  Thank you.

25        You may inquire.

1  BY MS CALLAIS:

2  Q     Ms. Tidd, where do you live?

3  A     We live in Reston, Virginia.

4  Q     What is your address?

5  A     It is XXXXX Xxxxx Lane.

6  Q     You said "we."  Who do you live with?

7  A     My husband and my four sons.  Alex, 24.  Lucas is 20.

8  Xxxxxxx is nine.  And Xxx is six.

9  Q     Ms. Tidd, are you employed currently?

10 A     I work part time while my two younger children are in

11 school.  I have to be home for my severely impaired

12 nine-year-old, for his school bus because he takes a lot

13 of additional care.

14 Q     You said severely impaired.  What impairment is that?

15 A     Both he and my 24-year-old son are autism spectrum.

16 Q     Are you involved in any community organizations?

17 A     Yes, I am.  I am involved with the Virginia Autism

18 Project.  We work in state advocacy for the 14,000

19 autistic children in Virginia for educational and health

20 care reform.

21 Q     Have you ever done any type of voter registration

22 work?

23 A     Yes, I have done voter registration every election

24 cycle since I moved to Virginia in 1994.

25 Q     Now, Ms. Tidd, you mentioned that your oldest son is

Tidd - direct                    93

1   on the autism spectrum.

2        THE COURT:  You have to speak louder and more clearly

3   so the court reporter can understand you.

4        Why don't you pull the mic to you.

5        MS CALLAIS:  No, it is me.

6        THE COURT:  Pull the microphone a little closer,

7   okay?

8        Go ahead.

9   BY MS CALLAIS:

10  Q    Ms. Tidd, you mentioned that your older son is on the

11  autism spectrum?

12       Please tell the Court his name.

13  A    His name is Alex.

14  Q    And what is the last name?

15  A    Alexander Highland.

16  Q    And today you are here to testify about the

17  experience that you had when you went to vote with him in

18  2014?

19  A    Right.

20  Q    Can you explain to the Court why you are here

21  testifying about your experience today?

22  A    Because with autistic people about 40 percent of them

23  are entirely non-verbal, which is my son, who is nine

24  years old.  He speaks via sign language.

25       About 25 percent more autistic people are verbal, but

1   considered non-verbal because their communication skills

2   are so impaired, and their inter-social skills are so

3   impaired.   And Alex is in that 25 percent margin.

4   Q    And being in that 25 percent margin does that affect

5   his ability to testify in court or speak in front of

6   people?

7   A    Absolutely.   Actually he was going to come with me

8   today, but he felt very anxious.   He is also medicated for

9   anxiety having to do with autism and his lack of

10  inter-communicational skills, his ability to relate out in

11  the world.   So he didn't really feel comfortable coming

12  here today.

13  Q    Are you registered to vote?

14  A    Yes.

15  Q    Is that here in Virginia?

16  A    Yes, I am.

17  Q    Why did you register to vote?

18  A    I was raised by a military officer and my mother, who

19  strongly believed that your vote was your voice.   And that

20  voting in every single election possible was your duty as

21  an American.

22  Q    And elections you instilled in your family?

23  A    Absolutely.

24  Q    Are your children registered to vote?

25  A    Yes, they are.   The two who are eligible, yes.

Tidd - direct                                   95

1   Q     And, Ms. Tidd, do you also vote in Virginia?

2   A     Yes, we do.

3   Q     You specifically go to the polls alone or with your

4   family members?

5   A     Now that my son Alex is eligible to vote, I take him

6   with me.

7   Q     Why is that?

8   A     Because he keeps -- firstly, he can't drive because

9   of anxiety and autism.  And that then he also needs help

10  at the polls to communicate with the poll workers, get it

11  valid, and everything else.

12  Q     And, Ms. Tidd, do you consider yourself to be a

13  member of any political party?

14  A     Yes, I'm a member of the Democratic party.

15  Q     And you typically vote a Democrat ticket?

16  A     Yes.

17  Q     And I would like to focus on 2014 elections.  Did you

18  vote in the 2014 general election?

19  A     Yes, I did.

20  Q     Did your son Alex accompany you to vote?

21  A     Yes, he did.

22  Q     Where did you vote in 2014?

23  A     We voted in the Hunter Mill precinct in Reston,

24  Virginia.

25  Q     About what time did you arrive at the polls?

Tidd - direct                                96

1  A    We were running late that day because I got caught in

2  rush hour and we couldn't go until after work.  So I

3  called home and told Alex to be ready to run out the door

4  as soon as I got home.  He was a bus boy at a restaurant.

5  So he actually had to take off a little bit at the

6  beginning of his shift to meet me after I was running

7  late.

8  Q    What happened when you arrived at home?

9  A    I immediately asked him if he had his voter

10  identification card.

11      THE COURT:  Did he have what?

12      THE WITNESS:  His Virginia identification card.

13      THE COURT:  Okay.  Go ahead.

14  BY MS CALLAIS:

15  Q    And what type of Virginia identification card, did he

16  have?

17  A    He has a Virginia State ID.

18  Q    When did he get that ID?

19  A    He got that just before he went to college.

20  Q    About when was that?

21  A    That was in 2010, just after he graduated from high

22  school.

23  Q    Is Alex still in school?

24  A    He is not.  Even though his grade point in high

25  school was very high, he wasn't able to -- academically he

1   could hack it, because he is very intelligent, but with

2   all the anxiety and the inability to advocate for himself

3   he was not able to live independently at college.

4   Q     So in 2014 did Alex have an identification card?

5   A     He did not.

6         THE COURT:  I couldn't hear the question.

7         MS CALLAIS:  Did Alex have a student ID card?

8         THE COURT:  Student ID card.

9         Go ahead.

10  BY MS CALLAIS:

11  Q     Ms. Tidd, did you accompany Alex to get his

12  Virginia-issued photo ID card?

13  A     Yes, I did.

14  Q     Why is that?

15  A     Because he, dealing with day-to-day things like that

16  where he has got to interact with someone else, sometimes

17  he can, most of the time he can't.  He needs help.  He is

18  impaired socially that way.

19  Q     About how long did it take to get the photo ID card?

20  A     Actually we were surprised because I thought it would

21  be a lot shorter because it was just getting an ID, not

22  taking the driver's test or getting a license.  But it was

23  a day where there was a very long line and we had to take

24  the number and we waited for quite a while, a couple

25  hours, before we got out.

1  Q     When you say got out, is that -- are you referring to

2  the DMV?

3  A     With the ID yes, before we got the ID.

4  Q     Where did you bring Alex to get that ID?

5  A     I brought him to the Department of Motor Vehicles.

6  Q     Do you remember about how far that is from your home?

7  A     It is near my old job, so it is about six miles, six

8  and a half miles from my house.

9  Q     Is that a walkable distance?

10 A     I don't think so.  You know 13-mile round trip.  I

11 think that is a little far.

12 Q     Is that a distance that can be reached by public

13 transportation?

14 A     That -- for him, also, a lot of times on the bus the

15 interaction of getting on and off the bus it is just

16 easier to drive him.  Also, that bus trip is, I don't

17 know, it would be over an hour, probably hour and 15 or

18 hour and 20 minutes.  There would be a transfer.  It just

19 seems like a lot of hassle when he can be driven.

20 Q     Going back to 2014 when you were at your home, you

21 mentioned that you told Alex to find his ID.  Why did you

22 do that?

23 A     Because his skills of, you know, his functional

24 skills of life are terrible.  I mean, he is a vociferous

25 reader, reads a book a day, but as far as his functional

Tidd - direct

1  skills to get through a day they are lacking.  So it

2  is pretty sure he wouldn't have it.  So -- and as it

3  turned out he couldn't find it.  So, at that point it was

4  very late.  I said, you know what, don't worry about it,

5  you will go tell them you don't have your ID and you get a

6  provisional ballot and vote.

7  Q    How did you know Alex would need ID to vote?

8  A    Because I read it in the Washington Post when the law

9  passed.

10  Q    Had you heard any radio advertisements about the --

11  A    No.

12  Q    Had you received any mail from the Department of

13  Elections about it?

14  A    No.

15  Q    You also mentioned that you told Alex he could cast a

16  provisional ballot.  How did you know he would be able to

17  cast a provisional ballot?

18  A    As I stated before, I have -- I am a voter activist.

19  We learned Virginia laws to be able to convey to new

20  voters.

21  Q    Those new voters that you convey those laws to, is

22  that generally the first time they are hearing about a

23  provisional ballot?

24  A    Well, the provisional ballots, I have only started

25  conveying that to my voters since what occurred to my son,

1   because I didn't realize, even though I had read about the

2   voter ID law, I didn't realize how strict they were.

3       So -- I have forgotten the question.

4   Q    Ms. Tidd, going back to when you were leaving the

5   home, after you realized Alex had forgotten his ID,

6   couldn't --

7   A    Couldn't find it.

8   Q    Right.  What happened next?

9   A    We went to the polls.  He -- I wanted to try to give

10  him a chance to speak for himself.  He was right behind me

11  in the line.  He said he would be fine.  And we do, even

12  though he is disabled, we try to teach him to get through

13  life because I won't be alive forever to advocate for a

14  him.

15      So I went and I got my ballot.  And went over to the

16  voting booth.  And I could see him speaking to the people

17  at the thing, you know, at the table.  And I thought he

18  was fine.  And I voted.  And it took me a few minutes

19  because there were, you know, things to read through on

20  that ballot.  And I brought my ballot back to be -- to the

21  people.  And I noticed he was standing over by the door.

22  Q    And what happened next after you noticed him standing

23  by the door?

24  A    I walked over to him and asked him if he ever had

25  voted, because I didn't see him at the ballot boxes.  And

1  he indicated to me that he had not voted.  When I asked

2  him why he had not voted, he said that he was not offered

3  a provisional ballot.  And I asked, you know, why didn't

4  he ask for a provisional ballot?  And at that point he was

5  very anxious because that is part of who he is.  He

6  doesn't, you know -- that is why he needs the advocacy is

7  to -- once anything is off he just completely shuts down.

8  Q    So when you learned that Alex had not been offered a

9  provisional ballot, did you take any steps to help him

10 receive a provisional ballot?

11 A    Yes.  I went over to the desk where you check in and

12 said that my son here who had conveyed that he doesn't

13 have an identification card, he needs a provisional

14 ballot.  And the woman at the table looked kind of

15 dumbfounded.  And she said -- I said, could I get a

16 provisional ballot for him to be able to vote?

17      And she said, just a minute.  And she got up from the

18 table and went and spoke to somebody over by the voting

19 booths.  And then returned to me.  And she indicated to me

20 that I would not be able to get the ballot for him.  That

21 he would have to ask himself.

22      So I conveyed to her that my son is on the autism

23 spectrum, he is very anxious, I speak for him a lot.  And

24 I am his power of attorney, you know, it is okay.

25      And she went back over to the ballot box to talk to

1   this other gentleman.  At this point my son was getting

2   very agitated and just wanted to leave.  He was just

3   embarrassed.  He was embarrassed in public to be, to have

4   people hear he was autistic.  He felt -- he felt ashamed.

5        She came back and she said I can hand him a ballot,

6   but I can't -- I can't hand it to you to give to him.

7        I said, that is fine.  That is all we need.

8        So he was given a ballot.  He did actually vote on

9   the provisional ballot.

10  Q    So, after Alex voted on the provisional ballot,

11  Ms. Tidd, did you have any understanding of whether or not

12  that provisional ballot would be counted?

13  A    The woman who had gone back and forth a couple times,

14  she told me -- I asked what we needed to do next.  And she

15  told me that he needed to appear at the registrar's office

16  in the next 48 hours to certify the vote.

17  Q    Did she tell you there was an option to scan, fax, or

18  e-mail identification to registrar's office?

19  A    No.

20  Q    Ms. Tidd, after you left the polling location, was

21  Alex able to certify his provisional ballot?

22  A    He was.  Two days from then I took off from work.  I

23  wasn't able to take off the next day, but I felt, you

24  know, the election was very close.  I wanted to make sure

25  his vote was certified.  He took off.  I drove him to the

 1  Fairfax County Government Center to certify his vote.

 2  Q    How far is the Fairfax County Government Center from

 3  your home, Ms. Tidd?

 4  A    That is about in the same area where the DMV is.

 5  About six and a half to maybe seven miles.

 6  Q    So, Ms. Tidd, what happened when you arrived at the

 7  Fairfax Government Center?

 8  A    There was a long line there.  It was pretty crowded

 9  in the office.  Because of the time of day it was I had to

10  bring both my younger children, who at the time were four

11  and seven.  My four-year-old is fine.  My seven-year-old

12  is an extremely low functioning autistic person.  He is in

13  Extreme Behaviors Program.  So, having him in an office

14  full of people like that, it was very, it was a difficult

15  situation.  We waited in line for a while.  We got to the

16  front of the line and Alex realized that he had left his

17  ID in the car.

18  Q    At that point when Alex realized that, what happened

19  next?

20  A    I said to the woman, excuse us, because it was

21  getting to the end of the day, frankly I had been there

22  for a long time with Crazy Child, my younger son, and I

23  said, you know, we are going to truck out to the car and

24  get his ID.  It is end of the day.  Are you guys going to

25  be -- how much longer will you guys be open?  And she

1   said, oh, don't worry about it, he doesn't need an ID to

2   certify his vote.

3   Q     What was your reaction when you learned that?

4   A     Rage.  Because I asked her, I said, if he doesn't

5   need an ID to certify his vote here, why did he need an ID

6   at the poll?

7   Q     And Ms. Tidd, is it your understanding that Alex's

8   ballot was certified that day?

9   A     Yes.  I actually, because that election was very,

10  very close, I was very nervous.  I wanted it to be

11  certified.  And, you know, I asked her a couple times, are

12  you sure without the ID?  Because he says he feels

13  comfortable to run down by himself to get his ID card.

14  And she said, no it is fine.  He is certified.

15  Q     And, Ms. Tidd, drawing on your experience assisting

16  Alex in casting his ballot, has that had any effect on you

17  perception of the Virginia election systems?

18  A     Twenty-one years ago my oldest son was diagnosed with

19  autism.  And for that 21 years my life has been his.  And

20  it has only been compounded with my nine-year-old.  And

21  that includes daily care.  It includes constant advocacy

22  and includes fighting for health care.  It includes

23  fighting for accommodations.  Everything that he does

24  every day that he has is a struggle.  And we will have

25  him, and his younger brother with him, for the rest of our

Tidd - cross                                    105

 1   lives.  And we have come -- we have -- we accept that, and

 2   we will be happy with that.  And we have arranged our

 3   lives that way.  But what I realized in this is that every

 4   step of process if I had not been there his vote wouldn't

 5   have been counted in a very important election.  And I

 6   wonder when we die who will be there for him to help him.

 7   Will his vote be counted?  Will he be like the other 40

 8   percent of autistic children who are entirely non-verbal?

 9   Will he be silenced and no longer able to vote?  And it

10   breaks my heart.  I am angry that -- voting should not be

11   difficult for somebody whose life is already so difficult.

12        I am sorry.

13        THE COURT:  Go ahead with the next question.

14        MS CALLAIS:  No further questions, Your Honor.

15        THE COURT:  All right.

16        Very well.  Cross?  Mr. Hearne?

17                        CROSS EXAMINATION

18   BY MR. HEARNE:

19   Q    Ms. Tidd, I am Thor Hearne for the Commonwealth

20   defendants in this case.  I am just going to ask you a few

21   questions if I could.

22        For the record, would you state your race?

23   A    My race?

24   Q    Your race, yes.  How you would answer a census form?

25   In terms of Caucasian --

1   A     I am Caucasian.

2   Q     Your son is as well?

3   A     My son is Caucasian.

4   Q     You had mentioned that you had spent time advocating

5   for him to participate in the election process and

6   informing them of the process; is that correct?

7   A     Yes.

8   Q     In the course of that, does that cause you to become

9   familiar with Virginia election administration law as it

10  requires somebody to cast a ballot?

11  A     It does.  Not extensively.  I mean, we are

12  registering them to vote.  We tell them that you will get

13  your information in the mail, to get to the precinct and

14  everything else, but I couldn't argue a case on Virginia

15  case law on voting.

16  Q     Well, I am not saying I could either.  I'm asking

17  that question.

18        It is actually a little more basic.  I just wanted to

19  see if you are familiar with Virginia's absentee balloting

20  rules?

21  A     I am.  Vaguely.  But again, I am registering voters.

22  We are registering voters.  They will get information in

23  the mail with their cards.

24  Q     I will ask it real specifically.  You know somebody

25  in Virginia can request an absentee ballot?

1   A       Absolutely, yes.

2   Q       Are you aware that Virginia even has an emergency

3   absentee ballot provision for those who become disabled on

4   election day or election week?

5   A       Yes, I am aware of that.

6   Q       Has your son ever voted absentee?

7   A       I guess that is a question that a lot of people would

8   ask about a lot of things in his life.  I think that he

9   should be able to go to a poll and just vote.  He has not

10  voted absentee, but he has to learn skills to get through

11  life, and one of the things once I die he will have to be

12  able to go and vote on his own.  So, the absentee ballot,

13  it is, I think, better for him to go and vote and learn

14  how to do it.

15  Q       And when you say that, you mean vote at the polling

16  place?

17  A       Vote at the polling.

18  Q       Do you know of any reason that would prevent him from

19  casting an absentee ballot?

20  A       I think that we are going -- the organizational part

21  of it -- organization is not something he is good at --

22  keeping to a calendar.  He has had a hard time holding

23  jobs.  So to have to think about when is this, let me mail

24  this in, he is very not diligent.  Very high IQ, but

25  some -- the organizational side of his brain would -- when

1  he was away at school the reason we had to take him out is

2  because he didn't remember to go to eat.  He couldn't

3  figure out how to use the washer and dryer.  He couldn't,

4  you know.  So those basic skills that you and I would just

5  pick up easily, and I think applying for the ballot,

6  knowing when to be getting it in the mail, I think that is

7  probably beyond -- I would be worried he wouldn't get his

8  vote counted.

9  Q    Would -- in 2014 with your assistance he could have

10 requested an absentee ballot; is that correct?

11 A    Yes.  With my assistance he could have requested an

12 absentee ballot.

13 Q    And in fact in 2014 you testified, as I understood

14 it, he did in fact cast a ballot for a provisional ballot,

15 and ultimately that ballot was counted?

16 A    That ballot was counted.  Hopefully.

17 Q    And in 2014 he possessed identification sufficient to

18 satisfy the Virginia identification law?

19 A    Yes.

20 Q    He possessed ID sufficient under the current law to

21 cast a ballot in future elections; is that correct?

22 A    Yes.

23 Q    You had testified about you consider yourself a

24 Democrat.  Have you ever filled out an application to

25 become member of the Democratic party?

Tidd - cross          109

1   A     No, I contribute to the candidates, canvass for them

2   in every election.  Some in my district, some outside, out

3   of my district in closer races.

4   Q     In terms of the Virginia Democratic Party

5   specifically, have you ever paid dues as a member of that

6   party?

7   A     I contribute to candidates.  I don't pay dues to the

8   Virginia Democratic Party.

9         MR. HEARNE:  No further questions.

10        THE COURT:  Any redirect?

11        MS CALLAIS:  No, Your Honor.

12        THE COURT:  All right.

13        Ms. Tidd, you are excused.  Thank you very much for

14   coming today.  We appreciate your testimony.

15        THE WITNESS:  Thank you.

16        THE COURT:  Yes, ma'am.

17                    (Witness stood aside)

18        THE COURT:  This testimony, a lot of the testimony is

19   becoming, obviously, cumulative.  I will allow only a

20   finite number.  You may have two more witnesses that cover

21   this identical ground.  So pick them carefully.

22        Okay, sir.

23        MR. SPIVA:  Like people with disability?

24        THE COURT:  No.  For one reason or another were not

25   able to vote.  You can, if you want to put the rest of

Tidd - cross                          110

1  these on and just go to the main point I will give you a

2  little bit more room.  But this is becoming cumulative.

3  So unless there is something unique about the testimony, I

4  am only going to allow two more.

5       MR. SPIVA:  Okay.  I appreciate Your Honor's ruling,

6  and we will try to abide.  I want to state for the record

7  we object, just because we -- I don't -- it is technically

8  cumulative, but there is a weight to the evidence, Your

9  Honor.  I mean, I know Your Honor wanted to see people who

10 had trouble voting.  I am not arguing with Your Honor's

11 ruling.  And we will certainly abide.

12      THE COURT:  Why not?  Other people do.

13      But, I think as a good lawyer you can see that you

14 are plowing the same ground repeatedly with these

15 witnesses.  To the extent that there is a different issue,

16 you may call them in abbreviated fashion, bypass some of

17 the information that is not really relevant, and just go

18 to the one point that you want to develop.  I will give

19 you that tolerance.  But I can't sit here for the rest of

20 the day and hear people going over the same kind of

21 problems they encountered at the polls.

22      All right.  So you develop your own strategy.  Okay,

23 sir?

24      MR. SPIVA:  Thank you, sir.

25      THE COURT:  All right.

1        If you would like five minutes to assess --

2        MR. SPIVA:  Yes.  There is another issue.  I mean, we

3   have a witness we weren't actually going to call until

4   after the lunch break, but he doesn't have an ID, so he is

5   actually stuck downstairs.  So we were trying to figure

6   out what to do about that.

7        THE COURT:  Marshal, could you have someone escort

8   the witness up?  We will take care of that for you.  Okay?

9   Is he the next witness?

10       MR. SPIVA:  He is not next.  We could use five

11  minutes, Your Honor, if --

12       THE COURT:  I will give you five minutes to get the

13  other witness up here.  We will move right along.  Okay.

14  Five-minute recess.

15                      (Recess)

16       THE COURT:  All right.  Next witness.

17       MR. SPIVA:  Your Honor, Ms. Branch will be putting on

18  the next witness.  I we will bring the witnesses and try

19  to truncate their other testimony.

20       THE COURT:  I want to let you present your case, but

21  I have to impose a reasonable limitation.  All right?

22       MR. SPIVA:  Thank you, Your Honor.

23       THE COURT:  Very well.

24       Ms. Branch, who is your next witness?

25       MS BRANCH:  Your Honor, the plaintiff calls Ellen

```
 1  Lamb to the stand.

 2       THE COURT:  Okay.

 3       Place your left hand on the Bible, raise your right,

 4  and face the clerk of the Court.

 5                       ELLEN LAMB

 6            WAS SWORN AND TESTIFIED AS FOLLOWS:

 7                  DIRECT EXAMINATION.

 8       THE COURT:  Have a seat on the witness stand,

 9  Ms. Lamb.  If you will be kind enough to give us your

10  name, spell the last name for the court reporter, please.

11  A    Ellen Clarence Lamb, L-A-M-B.

12       THE COURT:  All right.

13       Go right ahead.

14  BY MS BRANCH:

15  Q    Good afternoon, Ms. Lamb.

16       Could you please state your address for the record?

17  A    XXXX South Xxxx Street, Unit Xxxx, Arlington,

18  Virginia.

19  Q    How long have you been lived in Virginia?

20  A    I lived -- moved back to Virginia at the end of 2013.

21  Q    Where did you leave from?

22  A    I moved from Maine.

23  Q    Is that where you are originally from?

24  A    Originally from Virginia.

25  Q    What do you do for a living?
```

1    A     Freelance writer and editor.

2    Q     Where do you work?

3    A     I work from home.

4    Q     Do you have a Virginia driver's license?

5    A     I do not.

6    Q     Why is that?

7    A     I no longer drive.  I don't see well enough to pass

8    the driver's test.

9    Q     Do you have any type of photo ID?

10   A     I have my Maine driver's license, which is valid

11   until the end of the year, although I no longer drive.

12   Q     Do you have any other type of photo ID?

13   A     I do have a passport.

14   Q     How did you travel here today, Ms. Lamb?

15   A     My sister gave me a ride.

16   Q     Are you registered to vote in Virginia?

17   A     I am.

18   Q     And why did you register to vote?

19   A     I have always voted.  I love to vote.  I don't miss a

20   chance to vote if I can.  I think it is not only my right,

21   but my responsibility.

22   Q     Do you consider yourself to be a member of any

23   political party?

24   A     As a Virginia resident I am officially not a member

25   of any party.  I have previously been registered as a

1  Democrat.

2  Q    And is there a party whose candidates you typically

3  vote for?

4  A    I tend to vote by candidate, not by party.

5  Q    I want to ask you a couple of questions about 2014

6  elections.  Did you attempt to vote in the November of

7  2014?

8  A    Yes, I did.

9  Q    Where did you vote?  Where did you go to vote?

10  A    I went to the senior center in Virginia Highlands, in

11  Arlington.

12  Q    How did you get there?

13  A    I walked.

14  Q    How long did it take you to walk there?

15  A    It took ten minutes.  Fifteen minutes.

16  Q    Around what time would you say you arrived?

17  A    Around 4:00 in the afternoon.

18  Q    What happened when you got to the voting location?

19  A    I stepped up to the poll workers' desk and gave them

20  my Virginia registration card, by Maine photo ID, and

21  recent utility bill to show residence.

22      I was told -- I was asked for a Virginia State photo

23  ID, and I said I did not have one.  I was told I could

24  file.  I could vote provisionally.  But that I would not

25  be able to cast a ballot without a Virginia State photo

1  ID.

2  Q    Were you aware of the photo ID law prior to going to

3  vote?

4  A    I knew I had to bring some form of ID.  I thought

5  that the combination of voter registration card, my name

6  ID, and a current, something that showed current address

7  would be enough to vote.  It was enough to get my library

8  card.

9  Q    Were you -- so, did you ultimately cast a provisional

10 ballot at the polls?

11 A    I did cast a provisional ballot.

12 Q    What was your understanding as to what you had to do

13 in order to make your vote count?

14 A    I was told that I had to bring a valid ID to the

15 registrar's office within a certain number of days and

16 cure my ballot that way.

17 Q    And how long would it have taken you to get to the

18 registrar's office from your home, do you think?

19 A    It would have taken -- I don't know.  Depends on the

20 time of day.  Between one and two hours.  The Arlington

21 registrar is not convenient to a metro station.  And I

22 really only travel by metro and cab.

23 Q    Did you end up curing your ballot?

24 A    I did not.

25 Q    Why is that?

1   A     Because the results of the election were announced

2   that night.  And I didn't have time to go to the registrar

3   that afternoon.  And with the results of the election

4   reported, I didn't feel that my vote would really be valid

5   if I did go to the bother of curing it.

6   Q     And you said you didn't have time that afternoon to

7   cure your ballot.  Why is that?

8   A     I am self-employed.  I work for clients who set

9   deadlines and who pay by the hour.  November is a

10  particularly busy time for me.  I need to work as much as

11  I can in November.  Before the holidays start my clients

12  stop calling on me.  If I don't work, I don't get paid.

13  Q     Were you, Ms. Lamb, aware of the fact that you could

14  scan, e-mail a copy of a valid ID you might have to the

15  registrar's office to make your vote count?

16  A     No, I was not aware of that.

17  Q     And you mentioned earlier that you have a passport;

18  is that right?

19  A     Yes.

20  Q     And did you have your passport with you when you went

21  to the polls in 2014?

22  A     I didn't.  I don't habitually carry it around.  It

23  stays in the drawer if I am not leaving the country.

24  Q     Why is that?

25  A     Because a passport is expensive.  If I were to be

Lamb - direct                        117

1  robbed, or if I were to leave it somewhere, it would be a

2  real hassle and expense to replace.

3  Q    So was your ballot ultimately counted in the 2014

4  elections?

5  A    No, it was not.

6  Q    You --

7  A    I got a letter about a week or two later from the

8  registrar saying that the provisional ballot had not been

9  cured, so it wasn't counted.

10 Q    Did you vote in 2015?

11 A    I did.

12 Q    Did you show an ID to vote?

13 A    I knew this time to bring my passport.

14 Q    And what information did the Maine driver's license

15 contain?

16 A    It has my full name, my date of birth, the Maine

17 driver's license number, my hair color, eye color, height

18 and weight.

19 Q    What about the passport?  What identifying

20 information does that have?

21 A    Has my name and my date of birth and place of birth.

22 Q    Between the two types of ID, the Maine ID and

23 passport, which would you say contains more identifying

24 information about you?

25 A    The Maine ID.

```
1  Q      Why is that?

2  A      It has my height, my weight, and my hair color and my

3  eye color.

4  Q      Turning back to the 2014 election, how did the fact

5  that you weren't -- how did the fact that you weren't able

6  to vote in 2014 make you feel?

7  A      I was embarrassed.  I was frustrated.  And then I was

8  angry when I found out that I could have e-mailed or faxed

9  that information to the registrar and I didn't have that

10 information.

11 Q      Is it important for you to vote, Ms Lamb?

12 A      It is very important for me to vote and very

13 important for me to vote in Virginia.  I'm always aware

14 that my grandmothers were born without the right to vote.

15 I mean, this is not a new thing that women can vote.  And

16 yet, in my family I know people who weren't always allowed

17 to vote.  So I think it is really important.

18 Q      Thank you, Ms. Lamb.

19        No further questions, Your Honor.

20        THE COURT:  Cross examination.

21                      CROSS EXAMINATION

22 BY MS HART:

23 Q      Good morning.  My name is Kirsten Hart.

24        I am one of the attorneys who represents the

25 defendants in this case.  I just have a few questions for
```

1   you.

2        First, do you consider yourself Caucasian?

3   A    Yes, I do.

4   Q    You mentioned you moved here from Maine in 2013.   Did

5   you drive?

6   A    I did.   At that time, yes.

7   Q    When did you stop driving?

8   A    I stopped driving in May of 2014.

9   Q    You work from home; is that right?

10  A    I do.

11  Q    You also do some blogging?

12  A    I do.

13  Q    Blog regularly?

14  A    Not any more.   I kept a regular blog for several

15  years, but have pretty much discontinued it.

16  Q    When you voted provisionally in 2014 were you given a

17  notice of provisional ballot to describe how to cure your

18  ballot?

19  A    I don't believe that I was.   I remember putting the

20  ballot in an envelope marked "provisional," but I don't

21  think anybody gave me a piece of paper, no.

22  Q    When you were at home after voting provisionally did

23  you do any research yourself on how to cure your

24  provisional ballot?

25  A    I looked up the address of the registrar and went on

1   line to see what it would take to get me there.  I went to

2   Google Maps to see, you know, by transit how I would get

3   there.  And when I saw it was not close to a metro

4   station, I would have to connect to a bus, I realized I

5   wasn't going to be able to do that that day.

6   Q     Did you find the registrar's office on, is it

7   Clarendon in Arlington?

8         THE COURT:  Clarendon.

9         MS HART:  Thank you.

10        THE WITNESS:  I don't remember the address.

11  BY MS HART:

12  Q     How far did you say it was from your residence?

13  A     I am in South Arlington.  As I recall, I seem to

14  recall going on line and looking and seeing I would have

15  to take the blue line to the orange line, and then a bus

16  from there.  So it was going to take at least an hour

17  depending on the time of day.

18  Q     Does three miles sound about right.

19  A     Possibly.

20        I mean, and as maybe three miles in Arlington,

21  sometimes you can walk it faster than you can get there by

22  public transportation.

23  Q     And you mentioned also that you did have a passport

24  at that time.  Do you have any capability to scan

25  documents from your home?

Lamb - cross

1   A    I do, which is why it was incredibly frustrating to

2   learn that I could have scanned it and I didn't know that

3   I could do that.  I didn't receive that information.

4   Q    You also mentioned in Virginia you are not a member

5   of any particular party.  But have you ever filled out an

6   application to become a member of the Democratic Party?

7   A    No.

8   Q    Ever paid any dues to the Virginia Democratic Party?

9   A    No.  I am unaware that parties charge dues.

10  Q    All right.

11  A    I guess -- no the answer is.

12  Q    Okay.  Thank you.

13       I have no further questions.

14       THE COURT:  Any redirect?

15       MS BRANCH:  No, Your Honor.

16       THE COURT:  All right.

17       Ms. Lamb, you may be excused.  Thank you for coming.

18  We appreciate your testimony this morning.

19                    (Witness stood aside)

20       Next?

21       MR. KAUL:  We call Pettus Hilt.

22       THE COURT:  Okay.

23       MR. KAUL:  I will spell her name for the record.

24       THE COURT:  Ms. Hilt, if you would raise your right

25  hand, place your left on the Bible and face the clerk of

```
 1  the Court, please.

 2                      PETTUS HILT

 3            WAS SWORN AND TESTIFIED AS FOLLOWS:

 4                   DIRECT EXAMINATION

 5        THE COURT:  Have a seat on the witness stand,

 6  Ms. Hilt.

 7        Could you please give us your full name and spell

 8  both the first and last name, please?

 9        THE WITNESS:  Sure.  Pettus Hilt.

10        Pettus spelled P-E-T-T-U-S.  Hilt, H-I-L-T.

11        THE COURT:  Go right ahead.

12  BY MR. KAUL:

13  Q    Good afternoon, Ms. Hilt.

14        Would you please say for the record where you live?

15  A    Ashland, Virginia.

16  Q    How long have you lived there?

17  A    Three years this June.

18  Q    Ashland is just north of Richmond; is that right?

19  A    Yes.

20  Q    Where did you live before you moved to Virginia?

21  A    In Arizona.

22  Q    Do you typically vote for members of any particular

23  political party?

24  A    Yes.

25  Q    Can you explain?
```

1  A     Well, I used to vote -- I am a Republican, registered

2  Republican, but I have recently switched a little bit.  I

3  vote for whoever I feel is the -- I like the views better.

4  So --

5  Q     Now, is there now a party whose candidates you

6  typically support?

7  A     Typically Democratic candidates.  After George W.

8  Q     I want to ask you about your experience voting since

9  you moved to Virginia.  First, did you register to vote in

10 Virginia?

11 A     Right away.

12 Q     After you moved here, did you vote?

13 A     Yes.

14 Q     And what year would that have been when you first

15 voted?

16 A     That was in 2013.  And we, and I am sorry.  What was

17 the question again?

18 Q     I was asking the first year you voted.

19 A     Yes.  Yes.  2013.  I am sorry.

20 Q     Did you have any trouble voting that year?

21 A     No.

22 Q     Did you try to vote again in 2014?

23 A     Yes.

24 Q     What happened when you tried to vote that year?

25 A     I still had my Arizona driver's license.  And they

1   told me I needed to get a Virginia-issued ID.  They gave

2   me the paper work to vote.  I can't remember the

3   terminology.  But that my vote would count if I went

4   before Friday to the state government building and

5   completed the paper work to get an ID.

6   Q    I want to go back a step to make sure the time line

7   is clear.  So in 2014 you attempted to cast a ballot,

8   right?

9   A    Correct.  Yes.

10  Q    You were asked to present an ID?

11  A    I was.

12  Q    What did you present?

13  A    Well, the only thing I had with me was my Arizona

14  driver's license still.

15  Q    Because of that you were asked to cast a different

16  type ballot?

17  A    Yes.

18  Q    Were you asked whether you had other types of ID?

19  A    No.

20  Q    So, did you cast that alternative type ballot?

21  A    No.  My husband and I discussed it, and it was

22  actually, sounded like kind of an embarrassing kind of a

23  pain, and we had said that if the race was tight and my

24  vote would, was needed, we would go down and do all the

25  paper work.  But otherwise, I wouldn't bother.

Hilt - direct                          125

1  Q    Just so the record is clear I want to separate out

2  two separate things.  One is filling out a provisional

3  ballot.  And one is going to fix it.  So did you fill out

4  a provisional ballot on the spot?

5  A    Yes.

6  Q    Okay.

7       Then later did you attempt to fix or cure that

8  ballot?

9  A    I did not.

10  Q    Is that what you were explaining was because of the

11  hassle?

12  A    Right.

13  Q    What were you informed about?  What you would have to

14  do to cure the provisional ballot?

15  A    I was told that I had to go to -- I can't remember

16  the name of the government agency, but a building that I

17  needed to go to get a state-issued ID card.

18  Q    Now, did you feel like you had an understanding of

19  that process based on what was described to you?

20  A    Not completely.  I think I am pretty intelligent.  I

21  mean, it was rushed.  I mean, people in line.  And I, you

22  know, feel kind of silly to be an adult and not have, you

23  know, the right stuff.  So I didn't completely understand

24  what I needed to do.  I figured out, maybe if the time

25  came.

```
 1  Q    Let me ask about the 2015 election.  Did you attempt
 2  to cast a ballot in that election?
 3  A    No.
 4  Q    Why not?
 5  A    I had not gotten the ID, nor -- don't tell anybody --
 6  my Virginia license yet.
 7  Q    In preparing for your testimony for this case you
 8  spoke to me, right?
 9  A    Um hum.
10       THE COURT:  You have to answer "yes" or "no" --
11       THE WITNESS:  Yes.
12       THE COURT:  -- so this gentleman can take it down.
13       Go right ahead.  Next question.
14       THE WITNESS:  Yes.
15  BY MR. KAUL:
16  Q    Did you learn in the course of that conversation that
17  your passport could be used in Virginia?
18  A    When I received a call from someone that you worked
19  with, that was the first time I heard of that, that you
20  could use a passport, yes.
21  Q    And do you own a passport?
22  A    I do.
23  Q    Okay.
24       So could you -- you have used that to vote in prior
25  elections?
```

```
 1  A    Apparently.

 2  Q    Did anybody tell you that?

 3  A    No.

 4  Q    Do you follow the news?

 5  A    I do.

 6  Q    Have you seen anything about Virginia's voter ID

 7  requirement on the news?

 8  A    Never.

 9  Q    See any advertisements?

10  A    Never.

11  Q    How did your experience in 2014 affect your

12  confidence in Virginia's electoral system?

13  A    I think it affected maybe me just as much, but it was

14  frustrating because I didn't go back and into 2015.  It

15  made me feel like I am not ready to vote.  So because of

16  the way things are set up now, with, you know, showing

17  that kind of ID.

18  Q    No further questions.  Thank you.

19       THE COURT:  Cross examination?

20       MS HART:  Yes.

21                      CROSS EXAMINATION

22  BY MS HART:

23  Q    Good morning.  My name Kirsten Hart, one of the

24  attorneys for the defendants in this matter.

25  A    Good morning.
```

1  Q    I have a few questions for you.

2  A    Sure.

3  Q    First, do you consider yourself Caucasian?

4  A    Yes.

5  Q    And when you moved to Virginia you registered to vote

6  right away; is that right?

7  A    Yes.

8  Q    Did you make any attempt to get a Virginia driver's

9  license?

10 A    No.  No.  I have a reason for not.  Do you want to

11 hear the reason?

12 Q    Yes.

13 A    I -- we had prepaid my Arizona registration on my

14 car, and so I wanted the license and registration to

15 match.

16 Q    Since the 2014 election have you made any attempt to

17 get a Virginia driver's license?

18 A    No.

19 Q    Are you aware you are required to have a Virginia

20 driver's license?

21 A    I am, and I do know that.  But I think that since I

22 pay taxes, I should still be able to vote.

23 Q    You mentioned you have a passport.  When did it

24 expire?

25 A    In -- I think it is good for about ten years.  About

```
 1  four years from now.

 2  Q    Do you intend to use your passport to vote in the

 3  up-coming elections in Virginia?

 4  A    I actually -- my registration expires next week, so I

 5  am getting my license.

 6       THE COURT:  Your Virginia or motor vehicle operators?

 7       THE WITNESS:  Arizona registration.  And my car

 8  expires.

 9       THE COURT:  So you are going to register your car in

10  Virginia and get a Virginia operator's license?

11       THE WITNESS:  Correct.

12       THE COURT:  Okay.  Next question.

13  BY MS HART:

14  Q    Since the 2014 election have you made an attempt to

15  get a Virginia ID card?

16  A    No.

17  Q    Since the 2014 election have you made any attempt to

18  get a free voter ID card?

19  A    I have a voter ID, or registration card.

20  Q    From Virginia?

21  A    Yes.  I'm registered to vote, and I have a voter

22  registration card.

23       THE COURT:  But you don't have a voter ID card with a

24  photo on it, right?

25       THE WITNESS:  Sorry, no.  I don't have a voter ID
```

1  card.

2       THE COURT:  Okay.

3       Go ahead.  Next question.

4  BY MS HART:

5  Q    When you cast a provisional ballot in 2014, are you

6  given a notice of provisional ballot along with your

7  provisional ballot?

8  A    I don't recall leaving with anything.

9  Q    Do you recall reading anything about how to cure your

10 provisional ballot?

11 A    No.

12 Q    Did you do any research to figure out how to cure

13 your provisional ballot?

14 A    No.

15 Q    You mentioned you have been voting for Democratic

16 parties.  Have you ever filled out an application to

17 become a member of a Democratic Party?

18 A    No.

19 Q    Have you paid any dues to be a member of the

20 Democratic party?

21 A    I wasn't aware you had to.

22 Q    Is that a "no?"

23 A    Correct.  Yes.  That is a "no."

24 Q    No further questions.

25      Thank you.

1          THE COURT:  Any redirect?

2          MR. KAUL:  No, Your Honor.

3          THE COURT:  May she be excused?

4          MR. KAUL:  Yes.

5          THE COURT:  You are free to go.  Thank you, ma'am,

6    for coming in.

7          THE WITNESS:  Thank you.

8                          (Witness stood aside)

9          THE COURT:  Next witness.

10         MR. SPIVA:  Your Honor, plaintiffs call Laning

11   Polatty.  I will spell that.

12         THE COURT:  Sir, raise your right hand, place your

13   left hand on the Bible, and face the Clerk.

14                        LANING POLATTY

15              WAS SWORN AND TESTIFIED AS FOLLOWS:

16                        DIRECT EXAMINATION

17         Have a seat on the witness stand, sir.  Yes.

18         Please give us your full name, and spell the first

19   and last name for the court reporter.

20         THE WITNESS:  It is Laning, L-A-N-I-N-G.  Polatty,

21   P-O-L-A-T-T-Y.

22         THE COURT:  All right.

23         Go right, ahead Mr. Spiva.

24   BY MR. SPIVA:

25   Q    Good afternoon, Mr. Polatty.  Thank you for coming

1   today.

2        Mr. Polatty, where do you live?

3   A    I live in Oakton, Virginia.

4   Q    And have you lived there for a long time?

5   A    Since 1999.

6   Q    Okay.

7        Mr. Polatty, I understand that you have a disability.

8   Can you describe that disability briefly?

9   A    I have what is called chronic fatigue syndrome, and

10  also fibromyalgia, which most experts consider two facets

11  of the same diseases in what is called ME, myalgic

12  cephalitis.

13  Q    Okay.

14       As a result of that, sir, do you spend a significant

15  amount of time at your home?

16  A    Yes.  I have to, like not just my doctors order, but

17  because it is all I have the energy for, I have to lie

18  down with my legs elevated 23 hours a day.

19  Q    How many times a year do you leave your house?

20  A    Just for doctor appointments and some family events.

21  And maybe in a good year two or three movies.

22  Q    How did you get down here to Richmond today?

23  A    My wife had to take the day off from work to drive me

24  down, and to just to nurse me through all of the

25  difficulties of getting ready to go anywhere.

1  Q    Mr. Polatty, I understand that you have received a,

2  some type of a new photo ID in 2014.  Can you tell the

3  Court about that?

4  A    Sorry.  My brain --

5       THE COURT:  Take your time.

6       THE WITNESS:  Thank you.

7       THE COURT:  The question was whether you got a new ID

8  in 2014.  I think he will ask you to describe it.

9       Can you do that for us?

10      THE WITNESS:  I think so.

11      A photo ID for that, and my driver's license had

12 expired and I couldn't get a new one without proof of who

13 I was, like a birth certificate or something.  And this is

14 a story that I know is very common for other people who

15 have chronic fatigue syndrome, and fibromyalgia who I met

16 through a support group, and on line.  Our lives in terms

17 of paperwork or just staying organized enough in the house

18 to do anything are a mess.  We don't have the energy to do

19 anything about it.

20 BY MR. SPIVA:

21 Q    Let me interrupt.

22 A    I was unable to figure out where my birth certificate

23 or my discharge papers from the Marine Corps or anything

24 else like that that could be used to prove who I was.  I

25 can't find it still.

1  Q     Okay.

2        Does your disability, does it have cognitive effects

3  on you?

4  A     Yes.  You are seeing them.  Sometimes worse than

5  right now.  But, yes, I used to have -- I was tested

6  several times.  I used to have an IQ of 145 to 150.  And

7  now for, not in all ways, but in certain ways that are

8  crucial for the basic tasks of daily living my functional

9  IQ is down to the high 80's or high 70's.  I don't even

10 remember.

11 Q     Okay.

12       That is all right, Mr. Polatty.

13       Let me just ask permission to lead a little bit, Your

14 Honor.

15       THE COURT:  Yes, sir.  I will tell you, go ahead,

16 lead and get through this.

17 BY MR. SPIVA:

18 Q     Did you obtain a photo ID from DMV in 2014?  Is that

19 correct?

20 A     No, I had to go -- I'm sorry.  I had to go to the

21 Fairfax County Government Center where they had set up a

22 place so that somebody like your wife could swear that you

23 were who you were saying you were.  And I brought, you

24 know, correspondence addressed to me at that address, and

25 things like that.  And they issued a photo ID for that,

1  which was just printed out on a piece of paper.  And was

2  supposed to wait to get a permanent one in the mail, but I

3  never saw that come.

4  Q     That is an ID for voting purposes?

5  A     I think so.

6  Q     Okay.

7        Then you went and attempted to vote on election day

8  in 2015; is that correct?

9  A     Yes.

10 Q     What happened when you -- first of all, did you take

11 your wife?  Did the wife have to take you to vote?

12 A     Yes, she has to.  She was --

13       THE COURT:  Did you say '14 or '15?

14       MR. SPIVA:  2015.  I skipped ahead a year.

15       THE WITNESS:  All right.  Go ahead.

16 BY MR. SPIVA:

17 Q     Thank you.

18       So you went to vote in 2015?

19 A     Yes.  By then all I had remembered from the year

20 before was that, oh, yes, we took care of getting me the

21 photo ID so I could vote.  And, you know, with my

22 cognitive problems it never occurred to me two plus two

23 equals four was done.  So I never thought to, you still

24 don't have that ID with you, because it never came in the

25 mail.

1  Q     So when you went to vote in 2015 when your wife took

2  you to vote in 2015, did you have that ID that you had

3  gotten with you when you got to the polling place?

4  A     No.  I didn't.  I don't know what became of it

5  actually.

6  Q     What happened?  Were you permitted to vote?

7  A     The workers at that polling place had always been

8  great.  I always vote in primaries and in elections.  They

9  explained to me that I could go get, basically do the same

10  thing I had done before.  To get a photo ID and come back.

11      THE COURT:  I think the question he asked is whether

12  or not you were allowed to vote.  Did they allow you to

13  vote?

14      THE WITNESS:  Oh, yes, once I jumped through those

15  hoops.

16      THE COURT:  Next question.

17  BY MR. SPIVA:

18  Q     In order to vote did you have to go get another free

19  ID that day?

20  A     Yes.  Some time left to do that.

21  Q     Did that require a trip by you and your wife from the

22  polling place to the registrar's office?

23  A     Yes, it did.

24  Q     When you got to the registrar's office what did you

25  have to do to get the new, the free voter ID?

1   A    The same thing I just described from the year before.

2   Q    Okay.

3        Did you have to present any documentation to get

4   that?

5   A    I think all they wanted was my wife testified I was

6   who I am.

7   Q    Did you take -- and you a got the free ID at the

8   registrar's office that day?

9   A    Yes.  Printed out a temporary one.  I haven't seen

10  the permanent one in the mail yet.

11  Q    Okay.

12       Did you and your wife then go back to the polling

13  place with that ID?

14  A    Yes.

15  Q    Were you able to use that ID then to cast the vote?

16  A    Yes.

17  Q    All right.

18       How long did that process take between getting to the

19  polls, you realized you didn't have the ID, going to get

20  a, driving to get a new one, driving back to the polls and

21  casting your ballot?

22  A    From standing at the desk in the polling station and

23  finding out the problem to being done and back in actually

24  using the voting machine was probably an hour and a half.

25  Q    Okay.

1        Would you have been able to do that without your

2   wife's assistance?

3   A    No.  No.  Really.

4   Q    Did she drive you each step of the way?

5   A    Yes.  An she talked me through what I had to do next.

6   Q    And, Mr. Polatty, do you belong do a political party?

7   A    I am registered as a Democrat because that seems to

8   be where I can make the most differences in the primaries.

9   But I consider myself independent.

10  Q    Do you tend to vote for Democratic candidates?

11  A    Usually.

12  Q    Okay.

13       Thank you so much, Mr. Polatty.

14       I don't have any further questions.  Opposing counsel

15  may have a few for you.

16       THE COURT:  Cross examination, Mr. Hearne?

17                     CROSS EXAMINATION

18  BY MR. HEARNE:

19  Q    Yes, Your Honor.  We will be brief.

20       Mr. Polatty, I am Thor Hearne.  I represent the

21  Commonwealth defendants in this case.  I have a few quick

22  questions for you.

23       First, your 2014 ballot that you cast after going

24  through the process of obtaining another photo ID, is it

25  your understanding that that ballot was counted?

1   A     Yes.   I mean I cast a provisional ballot, but I

2   assumed that that was counted.

3   Q     And you returned to the election board and gave them

4   the information that they asked for in terms of

5   identification to have that, we call cured, is that

6   correct?

7   A     Yes.

8   Q     And you voted in person in the 2014 election; is that

9   correct?

10  A     Yes.

11  Q     And did your vote count in that election?

12  A     As far as I know, yes.

13  Q     Okay.

14        The 2013 election as well?

15  A     Yes.   I always -- that's -- I missed -- since 1975 I

16  missed voting only two times due to sickness.

17  Q     And have any of those times you missed voting been

18  since 2012?

19  A     No.

20  Q     Are you aware that you can vote absentee?

21  A     Yes.

22  Q     Have you ever voted absentee?

23  A     When I was in the Marine Corps.

24  Q     And are you aware that you can vote absentee now as

25  an individual with a disability?

Polatty - direct                    140

```
1    A    Yes, I am.

2    Q    Are you aware that if you vote absentee you don't

3    need to provide a photo ID?

4    A    Sorry.  My brain is going blank.  What was what

5    question again?

6    Q    The question was, if you vote absentee are you aware

7    you do not need to provide a photo ID?

8    A    Yes, I am.

9    Q    And -- I may have failed to ask this question at

10   first -- for the record, would you state your race?  Do

11   you consider yourself Caucasian?

12   A    Yes.  Caucasian.

13   Q    And the ID that you have now obtained in after the

14   2015 experience, do you still have that?

15   A    I have the temporary one that was printed out on the

16   computer printer.  But I have not seen the permanent one

17   come in the mail.

18   Q    Assuming that comes in the mail, do you now

19   understand that you have ID sufficient to vote in future

20   elections?

21   A    Yes.

22   Q    Thank you.

23        No further questions.

24        THE COURT:  Any redirect, Mr. Spiva?

25        MR. SPIVA:  No, Your Honor.  Thank you.
```

```
 1        THE COURT:  All right.

 2        You may step down, sir.  Thank you very much for

 3 coming.  We appreciate you coming down and testifying

 4 today.

 5        THE WITNESS:  I consider it an honor, sir.

 6        THE COURT:  Thank you, sir.

 7                     (Witness stood aside)

 8        Next witness.

 9        MR. KAUL:  Bobbie Smith, Your Honor.

10        THE COURT:  Would you be kind enough, sir, to raise

11 your right hand, place your left hand on the Bible, and

12 face the Clerk?

13                        BOBBIE SMITH

14             WAS SWORN AND TESTIFIED AS FOLLOWS:

15        THE COURT:  Have a seat on the witness stand, sir.

16        Mr. Smith, please provide us your full name, sir, and

17 spell the last name for the court reporter so he can get

18 it right.

19        THE WITNESS:  Bobbie Smith, Jr.  Bobbie with an "I"

20 as opposed to a "Y."

21        THE COURT:  Thank you, sir.

22        Go ahead.

23                     DIRECT EXAMINATION

24 BY MR. KAUL:

25 Q    Mr. Smith, you please tell the Court where you live.
```

1  A    I live in Fredericksburg, Virginia.

2  Q    For the record, what is your race?

3  A    Black.

4  Q    Do you consider yourself a member of a political

5  party?

6  A    Yes.  I considered myself to be a Democrat.

7  Q    Where did you grow up?

8  A    I grew up in Fredericksburg, Virginia, but originally

9  I came to Fredericksburg from Washington, D.C. at the age

10  of ten.

11  Q    How old were you when you moved Fredericksburg?

12  A    I was ten.

13  Q    Sorry.

14      Your Honor, I was going to ask, is it all right if I

15  lead the witness through this portion?

16      THE COURT:  Yes.

17  BY MR. KAUL:

18  Q    Did you attend segregated schools when you went to

19  school in Fredericksburg?

20  A    Yes, I did.

21  Q    And did you ultimately attend integrated schools?

22  A    Yes, I did my freshman year in high school.

23  Q    After you attended integrated schools were there

24  still segregated events at the school?

25  A    Yes, there were.  As a matter of fact there used to

1  be an annual dance sponsored toward by one of the clubs at

2  my high school.  And it was segregated.  And it was held

3  in a segregated venue as well.

4  Q    Did the fair grounds where you live have whites only

5  rest rooms?

6  A    Yes.  They had, actually "white" and "colored" signs

7  over top of the restrooms.

8  Q    When you went to the movies did you have to sit in

9  the balcony because of your race?

10 A    Yes, we did.

11 Q    Have you been called racial epithets?

12 A    Yes.  Several times --

13 Q    In --

14 A    -- in my life time.

15 Q    You grew up in near poverty, is that right?

16 A    Yes, I did.  My home life wasn't really that

17 exemplary.  My father was somewhat not around much.  And

18 financial situation was affected by his not being around.

19 Q    Was the town you grew up in segregated?

20 A    Yes.  Up until about 1968, yes.

21      I would say I moved to Fredericksburg in 1963.  And I

22 attend segregated schools.  One of the things when I was

23 in Washington the schools were integrated, but I found it

24 to be kind of a different situation when I moved to

25 Fredericksburg.

1   Q      Did you make any observation about the counseling

2   that you received at your high school?

3   A      Yes, I did.   I found that the majority of the black

4   students would be steered directly maybe towards

5   vocational types jobs not necessarily towards the

6   academics.   I know myself I was steered towards the

7   general course of studies more so than maybe the academic

8   courses of study.   As a result, I made decisions based on

9   that steering in terms of that that affected my life

10  afterwards.

11  Q      When you and your other African-American friends

12  gathered, did you receive attention from authorities?

13  A      Oh, absolutely, man.   It was -- it seemed to be when

14  we just hanging out together that whenever the police

15  would be around they would slow down and look at us and

16  think maybe perhaps we were ready to commit some type of

17  crime or something that was against the norm and things

18  like that.

19  Q      Did there come a time you became involved with the

20  Virginia Democratic Party?

21  A      Yes, there was.

22         When I was in college I joined the Fredericksburg

23  Democratic Committee.   I was elected sergeant at arms of

24  the committee.   I was also chosen as a delegate to the

25  1978 Virginia State Democratic convention held in

```
 1  Williamsburg at the time.

 2  Q    Let me ask you about your experience voting in 2014.

 3  A    Okay.

 4  Q    Prior to going to vote in 2014 did you know about the

 5  photo ID law that was in place?

 6  A    Yes, I did.

 7  Q    All right.

 8       So, what happened when you went to vote in 2014?

 9  A    Well, when I went to vote -- well here it was.  I

10  knew the people who worked at the polls.  When I went to

11  vote I said to myself, knowing that the law was saying

12  voter identification, I hinged my voting upon the word

13  "identification."  I knew the people who worked at the

14  polls, have known them for years, been my neighbors.  So I

15  felt that they could very well identify me.  It wasn't any

16  problem of me being identified as Bobbie Lee Smith, Jr.

17  seeing that these people have known me over the years.

18  And I felt that I didn't need the state to issue me any

19  type of identification to validate my existence.

20       I mean the people knew me, they know me as Bobbie Lee

21  Smith, Jr.  So there would be, I thought there would be no

22  problem in identifying me as the person who had the

23  identification that I had at the time to use.

24  Q    So when you went to the polls in 2014, were you

25  expecting to be able to cast a regular ballot?
```

Smith - direct                    146

1   A    I was hoping to, yes, sir.  I was, yes.  Yes, I did.

2   Q    And did you have an expired ID at that point in time?

3   A    I had an expired Virginia driver's license at the

4   time.

5   Q    All right.

6        Do you know when that expired?

7   A    Yes.  It expired February 1st, 2013.

8   Q    When you went to vote in 2014 did you bring that to

9   the polls with you?

10  A    I had my expired driver's license.  I had a voter

11  registration card.  I had my social security card with me

12  at the time.

13  Q    Okay.  So when you presented to vote were you asked

14  for identification?

15  A    Yes, I was.

16  Q    Did you provide all of those, or did you show all

17  those forms?

18  A    Yes, I did.

19  Q    So the record is clear -- let me finish let question

20  before you answer.

21  A    Sorry.

22  Q    That is okay.

23       So what happened after you showed those forms of ID?

24  A    I was told that I needed to step aside from the

25  registration table.  And I was led a few feet away to the

1   area where there was a box there and I was told to fill

2   out a form and put the form in the box.  And that the

3   Friday of that week that if I would go down to the

4   registrar's office and present the identification that

5   they required, that my vote would be counted.

6   Q    Okay.

7        Do you know what type ballot it was you filled out

8   when you were brought to the side?

9   A    It was a provisional ballot.

10  Q    Did you put that in some sort envelope?

11  A    Yes, I did.  And then they stuck it in a box after

12  that.

13  Q    Do you remember anything about the color of the

14  envelope?

15  A    I believe it was green, as I remember.  For some

16  reason, green sticks in my memory.

17  Q    After you cast that provisional ballot did you

18  attempt to go to the registrar's office to cure it?

19  A    No, I didn't, because the person that I wanted to win

20  the election had been declared the winner, so I figured,

21  well, since the declaration had been made that I just

22  wouldn't follow through with the rest of it.

23  Q    Okay.

24       Now, let me ask you.  Did you bring some paper work

25  with you today?

Smith - direct                   148

1    A    Yes, sir, I did.

2    Q    I don't need you to pull it out.  But let me ask,

3    what does the paper work show?

4    A    I have two pieces of paper work, my voter's

5    registration card with me, and the original DMV form

6    telling me that I needed to renew my driver's license.

7    Q    Does that form show when your driver's license

8    expires?

9    A    Certainly does.

10   Q    Does that indicate it expired in February 2013?

11   A    It certainly does.

12   Q    Does that also show when you renewed your license?

13   A    I just recently renewed it in June of this year.  So

14   I didn't have that.  Doesn't have that on there.

15   Q    Have you ever seen a printout of your voter history

16   from Virginia?

17   A    No, I haven't.

18   Q    All right.

19        If that voter history indicated that you did not cast

20   a provisional ballot in 2014, that you had voted a regular

21   ballot, would that be incorrect?

22   A    It would be incorrect; yes, it would.

23   Q    When you cast a provisional ballot did anybody say

24   anything about a free ID?

25   A    No, they did not.

1  Q    Did you have, ever see any advertisements or

2  commercials regarding the voter ID law before you voted in

3  2014?

4  A    I saw them in terms of as related on the national

5  level, but as far as Virginia or state or local, I saw

6  nothing to no that effect.

7  Q    No further questions.

8       THE COURT:  Cross examination?

9                    CROSS EXAMINATION

10  BY MS SCHNEIDER:

11  Q    Mr. Smith, my name is Sara Schneider, I'm an attorney

12  for the defendants.  I have a few questions for you.

13  A    Sure.

14  Q    Do you ever drive a car?

15  A    Do I ever drive a car?

16  Q    Yes.

17  A    Yes, I do.

18  Q    You own a car?

19  A    No, I do not.

20  Q    Did you ever drive a car after February 1st of 2013?

21  A    No, I did not.  Because it would be against the law.

22  Q    Are you planning to renew your driver's license?

23  A    I have renewed it.

24  Q    So at this time you have an ID that you can use to

25  vote, correct?

```
 1  A      I hope so.

 2  Q      When did you renew your driver's license?

 3  A      When did I render it?

 4  Q      Renew?

 5  A      Renew it.   June 10 of 2015.

 6  Q      Did you attempt to vote in 2015 general election?

 7  A      No, I did not.

 8  Q      And you live at XXX Xxxxxxx Street?

 9  A      That's correct.

10  Q      And that is in Fredericksburg, Virginia?

11  A      Yes, it is.

12  Q      Do you know where the Office of Elections is on

13  Caroline Street?

14  A      Yes.   601 Caroline Street.

15  Q      Is that just a half mile from your residence?

16  A      I don't know the exact distance, but I would think

17  maybe half a mile would be close to being accurate.

18  Q      Did you do any research when you, after you cast the

19  provisional ballot?

20  A      Research?

21  Q      In terms of you how you could cure your provisional

22  ballot, insure your vote was counted?

23  A      No, I did not.

24  Q      Do you have a cell phone?

25  A      Yes, I do.
```

1    Q     Does it have access to the internet?

2    A     If I pay for it, yes.

3    Q     You didn't -- did you ask any further questions when

4    you were at the polls as to how you could cure your

5    provisional ballot?

6    A     I wasn't concerned about that at all.  No, I did not.

7    Q     Does your cell phone have a camera?

8    A     Yes, it does.

9    Q     So you didn't attempt to go to the Department of

10   Elections about half a mile from your residence to obtain

11   an identification, did you, in 2013?

12   A     No.

13         THE COURT:  He testified to that.

14         He very clearly said he did not have after he learned

15   the winner he didn't see why he needed to vote.

16         MS SCHNEIDER:  No further questions.

17         THE COURT:  Any redirect?

18                       REDIRECT EXAMINATION

19   BY MR. KAUL:

20   Q     Just very briefly, Your Honor.

21         You were asked about why you didn't need a license.

22   Why didn't you?

23   A     I didn't renew my license because I worked for the

24   City of Fredericksburg and the City employees are able to

25   ride public transportation without any cost.  Since

1  Fredericksburg is a relatively small town, and I didn't

2  necessarily need to go any great distances, I felt that

3  having the identification, work for the City of

4  Fredericksburg, would suffice enough for me to be able to

5  travel within the city.

6  Q    Did the cost of obtaining a driver's license present

7  any concern for you?

8  A    Not really.

9       MR. KAUL:  Thank you.

10      THE COURT:  You are welcome.  All right.  May

11 Mr. Smith be excused at this point?

12      MS SCHNEIDER:  I have one question on redirect.

13      THE COURT:  All right.

14      It is not redirect, it is recross.

15      MS SCHNEIDER:  Sorry.

16      THE COURT:  Go ahead.  You can ask one, and then we

17 will move on.

18                    RECROSS EXAMINATION

19 BY MS SCHNEIDER:

20 Q    Do you have a photo ID from the City of

21 Fredericksburg, employment Id?

22 A    There is no photo, but I have ID.

23      MS SCHNEIDER:  Thank you.

24      THE COURT:  You are free to go.  Thank you, sir, for

25 coming today.  We appreciate your testimony.

 1          THE WITNESS:  Thank you for the opportunity.

 2                    (Witness stood aside)

 3          THE COURT:  Yes, sir.

 4          All right.  The testimony of that last gentleman is

 5  almost identical to testimony we have heard before.   I

 6  have given you latitude.  Now I want you to honor it,

 7  okay?  Only to the extent that it is different from the

 8  other individuals' situation.

 9          MR. SPIVA:  Yes.  Understood, Your Honor.  We are

10  trying to limit it.

11          You know, and, you know we have a lot of these people

12  they came in today, some from farther away so, you know,

13  we hate to send them home completely without --

14          THE COURT:  I understand that.  I appreciate it.  But

15  I want you to hew carefully to what I told you to do.  I

16  want to talk about unique problems that distinguishes them

17  from your other witnesses.  Okay?

18          MR. SPIVA:  Okay.

19          THE COURT:  You can get some context, a little bit.

20          MR. SPIVA:  Okay.

21          THE COURT:  But unless it -- if it is not different

22  from the other witnesses, it is cumulative, and I am not

23  going to allow it.  Okay?

24          MR. SPIVA:  Then, Your Honor, I think after lunch,

25  also, we should be, after this next witness, presumably,

 1   based on Your Honor's schedule, the witnesses that we

 2   intend to call in the afternoon are pretty much completely

 3   different.  One is an expert, and the other is a delegate.

 4       THE COURT:  That is fine.  That is fine.  That is

 5   perfectly all right.  But I won't repeat myself.

 6       Who is your next witness?

 7       MS BRANCH:  Mr. Etheredge, Your Honor.

 8       THE COURT:  Okay.

 9       Mr. Etheredge, come on up.

10       If you would be kind enough to raise your right, left

11   hand on the Bible, and face the Clerk of the Court.

12                       JACK ETHEREDGE

13             WAS SWORN AND TESTIFIED AS FOLLOWS:

14                    DIRECT EXAMINATION

15       THE COURT:  Have a seat on the witness stand, sir.

16       All right.  Please give us your full name, sir, and

17   spell the last name for the court reporter.

18       THE WITNESS:  It is Jack Etheredge.  It is

19   E-T-H-E-R-E-D-G-E.

20                    DIRECT EXAMINATION

21   BY MS CALLAIS:

22   Q   Mr. Etheredge, where do you live?

23   A   I live in Ashburn, Virginia.

24   Q   Can you give the address for the Court?

25   A   It is XXXXX Helix, H-E-L-I-X, Drive.

Etheredge - direct                    155

1   Q     How long have you lived in Ashburn?

2   A     Since 2012.

3   Q     Why did you move to Ashburn?

4   A     I moved there to work with the Heritage Medical

5   Institute to get a Ph.D.

6   Q     So are you student, Mr. Etheredge?

7   A     Yes.

8   Q     What University are you a student at?

9   A     It is a collaboration with the University of

10  Cambridge in England.

11  Q     Mr. Etheredge, how old are you?

12  A     Twenty-six.

13  Q     Mr. Etheredge, you mentioned you were a student.  Do

14  you have a student ID?

15  A     Yes, I do.  From Cambridge.

16  Q     So, does that ID, is that a photo ID?

17  A     Yes, it is.  It has my name on it, as well, yes.

18  Q     What other information does it have on it?

19  A     It has the name of the university, my name, my photo,

20  my student ID number, and if I am not mistaken also the

21  college within the university that I am associated with.

22  Q     The university name on that is University of

23  Cambridge?

24  A     Yes.

25  Q     Mr. Etheredge, do you also work.

```
 1  A    Yes, I do, at the Howard Hughes Medical Institute.

 2  Q    Do you have an employee ID?

 3  A    I do.

 4  Q    What is on that ID?

 5  A    That is just my photo and my internal work ID number.

 6  Q    Okay.

 7       Mr. Etheredge, are you registered to vote in

 8  Virginia?

 9  A    Yes, I am.

10  Q    How long have you been registered to vote?

11  A    Since I moved to Virginia in 2012.

12  Q    So you, do you consider yourself a member of any

13  political party?

14  A    Yes.  I am a Democrat.

15  Q    Now, Mr. Etheredge, I want to talk a little bit about

16  2014.  Did you a attempt to vote in the 2014 election?

17  A    Yes, I did.

18  Q    Where did you attempt to vote in 2014?

19  A    The same place where I had voted before, which is

20  just at some school.

21       THE COURT:  What school, sir?

22       THE WITNESS:  I don't remember the name.

23       THE COURT:  What school?

24       THE WITNESS:  Just at a school.

25       THE COURT:  Go ahead.
```

1    BY MS CALLAIS:

2    Q     What time did arrive at the polling location?

3    A     I arrived pretty late, about an hour before they

4    closed.

5    Q     Why is that?

6    A     I went there with two friends.  One of my workmates

7    drove us, drove us there.  And we had to wait for everyone

8    to be done with experiments and meetings and everything

9    for the day before we could go.

10   Q     Why did you go with one of your friends,

11   Mr. Etheredge?

12   A     Only one of the three of us has a car.  So, the one

13   with the car offered to give us a ride and drove us over

14   there.

15   Q     Do you drive, or do you have a car, Mr. Etheredge?

16   A     No, I don't have a car.

17   Q     And do you typically -- how do you get around

18   transportation?

19   A     There is a shuttle that comes to work, and there is

20   also public transportation.  But normally if I need to get

21   off campus I ride with friends.

22   Q     So, Mr. Etheredge, can you tell the Court, explain to

23   the Court what happened when you arrived at the polling

24   location?

25   A     Normal stuff.  In the beginning they just ask for,

1   you know, my name, which they have on file already, and my

2   address, which they had on file.  And then when I went to

3   show them my ID they told me that the law had recently

4   been changed.  So, I wasn't able to use my Georgia

5   driver's license.  And one of the three friends that I

6   went with wasn't able to use his Texas driver's license.

7   So we went through the various other forms of photo ID

8   that the two of us had, and neither of us had anything

9   that now qualified as something that they would use.

10  Q    Mr. Etheredge, let me go back so I can make sure it

11  is clear.  But what was the first form of photo ID you

12  presented?

13  A    My Georgia driver's license.

14  Q    And do you typically use the Georgia driver's license

15  as a form of photo identification in Virginia?

16  A    Yes, for everything.  When I go to the doctors to

17  verify my insurance, when I came here, for instance, to

18  get into this courtroom.  Yes, that is the only time I

19  have ever had a problem using it as my form of official

20  photo ID.

21  Q    Mr. Etheredge, when you arrived at the polls that

22  day, was that the first time you had learned that that

23  form of ID would not be sufficient for voting?

24  A    It was not only the first time I had learned, but it

25  was the first time any of the three of us who arrived

1  learned.

2  Q     And, Mr. Etheredge, you mentioned that you pulled out

3  other forms of photo ID.  What other forms was it?

4  A     I had my Cambridge ID, and my work ID, and I also

5  have a credit card that has both my name and my photo on

6  it.

7  Q     Were any of those forms acceptable?

8  A     No.

9  Q     Mr. Etheredge, after going through those IDs did

10 you -- what happened next?

11 A     I was given a special green ballot to fill out, and

12 then I was told that if I wanted to have it counted that I

13 had a couple of days to arrive in person at the court

14 house with an acceptable form of ID, which either would

15 have required going to the DMV and paying to get a new

16 form of identification or to bring my passport, which I am

17 fortunate enough to have only because I did go to

18 Cambridge.

19 Q     Now, Mr. Etheredge, were you informed that you could

20 scan, fax, or e-mail a copy of your passport to the

21 registrar's office?

22 A     No, I wasn't aware of that.  As far as I understood,

23 I had to turn it in in person.

24 Q     You mentioned that you have a passport.

25 Mr. Etheredge, did you have your passport on you that day?

1  A    No.  I pretty much never carry my passport inside the

2  U.S.  I mean, the only reason I ever need it is to fly out

3  of the country.  So I don't carry my passport.  Like I

4  wouldn't carry around my social security card or birth

5  certificate because I don't need to lose important

6  documents like that.

7  Q    So, Mr. Etheredge, after you left the polling

8  location that day were you able to cure your ballot?

9  A    No, I wasn't.  So, because I had, was under the

10  impression that I had to arrive in person.  That would

11  have involved going during, you know, work hours in the

12  next couple days, 9:00 to 5:00.  And that simply wasn't

13  something that I was able to do.

14  Q    Mr. Etheredge, do you know if your ballot was counted

15  in the election?

16  A    I am pretty sure it was not.

17  Q    Mr. Etheredge, after going through your experience in

18  2014 did that have any impact or your perception of

19  Virginia's election system?

20  A    Yes.  I mean, I am supposed to be able to vote in

21  Virginia.  I had voted in the past.  I had voted after

22  that just fine.  So, I mean, the fact that my vote that

23  was clearly supposed to count didn't count makes me think,

24  you know, a lot more poorly of the Virginia voting system.

25  And I know that it wasn't just my vote that didn't count,

Etheredge - cross                161

1 but plenty of people's votes didn't count.

2      MR. HEARNE:  Objection, Your Honor.

3      THE COURT:  Objection sustained.

4      MS CALLAIS:  No further questions Your Honor.

5      THE COURT:  All right.

6                     CROSS EXAMINATION

7 BY MS SCHNEIDER:

8 Q   Mr. Etheredge, my name is Sara Schneider, and I am an

9 attorney representing the defendants.  I have a few

10 questions for you.

11      Do you consider yourself Caucasian?

12 A   Yes.

13 Q   You voted in the 2015 general election, correct?

14 A   Sorry.  Yes, 2015.

15 Q   2015?

16 A   Yes.

17 Q   Did you show ID?

18 A   Yes.

19 Q   What ID did you show?

20 A   I made a special point to be able to bring my

21 passport.

22 Q   When you cast a ballot in the 2014 election did you

23 receive a notice?

24 A   A notice?

25 Q   Notice of original ballot notice?  Do you know?

1   A    I don't think so.  Is that something that would have

2   been mailed to me?

3   Q    Were you handed a provisional ballot?

4   A    I was given a green ballot that I assumed to be a

5   provisional ballot.

6   Q    Did you conduct any research about how you could cure

7   your provisional ballot?

8   A    I was told that I had to go to the court house.  So I

9   looked up when the court house was open and where it was.

10  And tried to figure out how I would get there.

11  Q    Did do you any research about any alternative?

12  A    Alternative?

13  Q    To going to the courthouse, as you say.

14  A    I don't know what alternatives you are --

15  Q    Did you do research on any other ways you could have

16  your provisional ballot counted?

17  A    No, I don't think so.

18  Q    Did you go to the Department of Elections web site?

19  A    I doubt that I did.

20  Q    Have you ever applied to be a member of the

21  Democratic Party of Virginia?

22  A    No.  I understand that that is not necessary in

23  Virginia.

24  Q    Have you ever paid any dues to the Democratic Party

25  of Virginia?

1   A      No.

2   Q      No further questions, Your Honor.

3          THE COURT:   Any redirect?

4          MS CALLAIS:   No, Your Honor.

5          THE COURT:   You are free to go.   Thank you very much

6   for your testimony.   We appreciate you coming in, sir.

7          THE WITNESS:   Thank you.

8                    (Witness stood aside)

9          This will be the final witness before the lunch

10  recess?

11         MR. SPIVA:   Your Honor, I don't know if we have

12  another witness before lunch, but I wanted to raise an

13  issue, which is, we had two trial depositions that we

14  originally had been planning to present by video.   But I

15  think in lot of Your Honor's orders -- what I was going to

16  suggest is that we just submit both the designations for

17  those two witnesses and the videos into evidence.   And

18  then Your Honor can review at your leisure, you know,

19  whichever media you wanted to --

20         THE COURT:   That would be fine.   Even more preferred

21  would be for you two gentlemen to work out a summary.

22         MR. SPIVA:   The designations are pretty brief, Your

23  Honor.   Pretty much depositions.   They were like maybe 30

24  or 40 minutes tops.   We only designated a sub-portion of

25  it.

Etheredge - cross                    164

1        MR. FINBERG:  If Your Honor wants a summary --

2        THE COURT:  Yes.  I have so many trials coming up,

3   folks, I know you want an opinion in a reasonable amount

4   of time.  I would like to accommodate that, but if I have

5   to spend every Saturday and Sunday looking over items I

6   won't have a lot of time to write opinions on weekends,

7   which I do.  All right.  See what you can do.

8        MR. SPIVA:  Okay.

9        THE COURT:  I appreciate that.  Thank you.

10        MR. SPIVA:  Thank you.

11        THE COURT:  Do you have any other individuals?  If

12   not, we will recess for lunch now.

13        MR. SPIVA:  Next witness is scheduled for after

14   lunch.

15        THE COURT:  Very well.  We will recess one hour for

16   lunch.

17                        (Recess)

18          (Krista Harding is now the court reporter.)

19        THE COURT:  Who'll be your next witness?

20        MR. SPIVA:  Your Honor, our next witness will be

21   Dr. J. Douglas Smith.  Ms. Branch is going to call him.

22        I just wanted to make one note, Your Honor, that we

23   have another witness who's a delegate who has like a brief

24   window at like 3:00.  And it may be possible that the

25   direct of Dr. Douglas -- rather, Dr. Smith might not be

1   done, and we were wondering if --

2        THE COURT:  I'll be more than glad to accommodate

3   you.  Who is your witness?

4        MR. SPIVA:  Dr. Smith, Your Honor.

5        THE COURT:  No.  Who is the delegate?

6        MR. SPIVA:  Delegate Lopez.

7        THE COURT:  Okay.  Sure.  I'll be more than glad to

8   accommodate you.

9        MR. SPIVA:  Thank you, Your Honor.

10       THE COURT:  Sure.  All right.

11       Doctor, come on forward, please.

12       Doctor, if you would be kind enough to raise your

13  right hand, sir, your left hand on the Bible, and face the

14  Clerk of the Court.

15       THE CLERK:  You do solemnly swear that the testimony

16  which you are about to give, in this case, before this

17  Court, shall be the truth, the whole truth, and nothing

18  but the truth, so help you God?

19       DR. SMITH:  I do.

20       THE COURT:  Have a seat on the witness stand, sir.

21       All right, Ms. Branch, you may inquire.

22       Before we begin, is there any challenge to

23  Dr. Smith's credentials?

24       MR. FINBERG:  Your Honor, there are no challenges to

25  his credentials as far as his being an expert on Virginia

1   history.  I do have an objection to the extent that

2   Dr. Smith may be offering opinions about the existence or

3   non-existence of voter fraud.

4        THE COURT:  You can make those objections as the

5   questions are asked.

6        MR. FINBERG:  Yes, sir.

7        THE COURT:  I just want to know whether or not you're

8   disputing his credentials as an expert?

9        MR. FINBERG:  No, not in terms of his expertise on

10  Virginia history.

11       THE COURT:  Then he'll be received as an expert, and

12  permitted to give expert testimony, in the area of

13  Virginia history, I guess with an emphasis on election

14  law?

15       MS. BRANCH:  Yes, with an emphasis on racial

16  discrimination.

17       THE COURT:  All right.  That's fine.  He'll be

18  received for that purpose.

19       Go right ahead.

20       MS. BRANCH:  Thank you, Your Honor.

21       Whereupon, **Dr. John Douglas Smith**, having been

22  duly sworn in, testifies as follows:

23                  **DIRECT EXAMINATION**

24  BY MS. BRANCH:

25  Q   Dr. Smith, could you just describe your professional

1  background briefly for the Court.  You've already been

2  admitted as an expert, but if you can just familiarize the

3  Court with your background.

4  A    Sure.  I received my bachelor's from the University

5  of North Carolina, Chapel Hill.  My masters and Ph.D. in

6  American History from the University of Virginia.

7      Since completing my Ph.D. in 1998, I've lived

8  exclusively in Southern California.  I've taught at Cal

9  Tech, at Occidental College, and currently at The Colburn

10  Music Conservatory where I'm the Director of Humanities.

11      THE COURT:  All right.

12  BY MS. BRANCH:

13  Q    And can you describe some of your academic work

14  that's relevant to this case?

15  A    Sure.  Most specifically I'm the author of a book

16  entitled *Managing White Supremacy:  Race, Politics and*

17  *Citizenship in Jim Crow, Virginia*, which began as my

18  dissertation at the University of Virginia, and

19  subsequently published by the University of North Carolina

20  Press.

21      I'm more recently the author of *On Democracy's*

22  *Doorstep:  The Inside Story of How the Supreme Court*

23  *Brought "One Person, One Vote" to the United States*, which

24  bears less directly on the case, although there is a

25  portion of the -- a reapportionment of rulings, which did

1   come from Virginia.

2        THE COURT:  And, Dr. Smith, it's important, as you

3   know, this young lady has got to take your testimony down,

4   so keep your pace slow, okay?

5        DR. SMITH:  Thank you.

6        THE COURT:  All right.  And I'll remind you from time

7   to time.

8        DR. SMITH:  Okay.

9        THE COURT:  All right.  Go ahead.

10       MS. BRANCH:  Thank you, Your Honor.

11  BY MS. BRANCH:

12  Q    Dr. Smith, have you submitted expert reports on this

13  case?

14  A    Yes.

15  Q    And what methodology did you use in preparing those

16  reports?

17  A    Well, I -- much of the work that I did in this case

18  was based directly on the work that I had done in writing

19  the book *Managing White Supremacy*.  And the methodology

20  for that was an exhaustive analysis of newspaper articles,

21  government documents, the papers of Virgina governors, and

22  other elected officials, during the time under

23  consideration, legislative acts, the Assembly, newspaper

24  reports of those debates.

25       Virginia, for much of that time period had no --

1   there's no documented debates of Virginia committee

2   legislative hearings, either floor debates or committee

3   hearings, up until very recent times.  And certainly most

4   of the time I was looking at -- a great reliance on

5   newspaper articles to get at those debates.  Looked at,

6   you know, Acts of the Constitutional Convention of 1901

7   and 1902.  And various other, you know, manuscripts that

8   are fairly typical of political historians.

9   Q    And you've mentioned your book entitled *Managing*

10  *White* Supremacy.  What year was that published?

11  A    It was published in 2002.

12  Q    Now, Dr. Smith, at a high level, what opinion did you

13  reach regarding Virginia's history as set forth in your

14  expert reports?

15  A    Well, most specifically, to get to the point, I offer

16  the opinion that the voter identification law under issue

17  in this case, Senate Bill 1256, is consistent with the

18  long line of efforts throughout Virginia's recent history

19  to make it more difficult for, and to suppress, the vote

20  of African-Americans and other minorities.

21  Q    And what period of history did you examine in your

22  report?

23  A    Well, roughly the period from the end of the Civil

24  War to the present, but with an emphasis on the 20th

25  century.

1  Q      Why did you choose include that time period in your

2  report?

3  A      Well, I think, you know, we could extend it back

4  further.  But, A, it's certainly not my area of expertise,

5  you know, prior to the Civil War.  And secondly, I think

6  that looking at the post-slavery era, we're looking at the

7  first time that African-Americans were enfranchised, and

8  moving forward from there is the appropriate demarcation

9  point.

10 Q      Now, the focus of my examination today, Dr. Smith,

11 will be on history after the Voting Rights Act was passed

12 in 1965, but I do want to ask you about a couple of

13 broader themes from the earlier history that you presented

14 in your report.  So I'd like to turn your attention to the

15 period right after slavery and the Civil War known as

16 reconstruction.  Can you just provide a brief overview of

17 the participation of blacks in politics during the

18 reconstruction era?

19 A      Sure.  Very briefly.  So, Virginia was actually the

20 only former state of the Confederacy to avoid military

21 rule in the reconstruction, and it did so because it

22 passed a new constitution in 1869 which, most importantly,

23 enfranchised all men.  So all black males were allowed to

24 vote from 1869 forward.  And they exercised that right

25 immediately in tremendous numbers.

1       The first legislature that was elected under that new

2  constitution included 27 black members out of then a 180

3  member legislature.  So it's a little larger than the

4  legislature today.  But there were 27 members, black

5  members, elected.

6       For African-Americans, it was obviously a remarkable

7  step forward.  Something that was quite significant.  For

8  many whites, there were concerns that this was -- you

9  know, this is when you started hearing the phrase that we

10 have to stop this because of negro domination, et cetera,

11 et cetera.  And so right from the very beginning, there

12 were obstacles put up, and the voting process became much

13 more contested after the introduction of African-American

14 males into the voting process.

15 Q    If I can just ask you to slow down.

16 A    I'm sorry.

17      COURT REPORTER:  Slow way down.

18 Q    Can you describe the political climate in terms of

19 partisanship during the reconstruction era?

20 A    Well, sure.  I think with the introduction of

21 African-Americans into the political process, the

22 political process became much more contested.  This is the

23 one era in post-Civil War history were there was actually

24 a lot of voter fraud and vote buying and election rigging.

25 A lot of violent -- election related violence at the polls

1  in sort of the 1870s and 1880s as African-Americans became

2  even more a significant presence in the states' political

3  life.

4      This became especially true in the late 1870s,

5  early -- late 1870s and early 1880s with the diversions of

6  the readjuster movement.  And the readjusters were

7  initially -- and I don't want to get sidetracked too much.

8  But there's basically a big dispute in Virginia over

9  funding the state's pre-Civil War debt.  So this, on its

10  surface, has nothing to do with race.

11     But the dispute over bankers and other corporate

12  interests wanting to fund that debt.  There were others,

13  such as the readjusters, who thought the money would be

14  much better spent on the public school system, and that

15  paying the states' debts first was sort of -- not the best

16  way to spend state funds.

17     So the readjusters is actually a very quite

18  significant political revolt, if you will.  They actually

19  took control of the state after the 1879 elections.

20  Initially, the readjusters were not really so focused on

21  the issue of black voting, and whatnot.  But as

22  African-Americans came to support the readjusters,

23  primarily over the issue of public schools, the

24  readjusters realized that their ongoing political success

25  actually depended upon black voters.  And so there was a

1  great deal of outreach and -- on the behalf of the

2  readjusters.

3      The Conservative Party, which then becomes the

4  Democratic Party a few years later, made race an issue

5  significantly and substantially from the 1870s on.  And so

6  by the mid-1880s, the whole issue of black role in

7  politics becomes more and more contested to the point of

8  where once the readjusters are thrown out of office in

9  1883, that the Conservative Party reconvenes itself the

10  Democratic Parry, makes the elimination of black voters

11  from a political system a priority.

12      COURT REPORTER:  Please slow down.

13  Q   And you mentioned earlier that there were a number of

14  black legislators in the Virginia General Assembly.  Were

15  any of Virginia's representatives in Congress black?

16  A   There were.  And I would say there's two things about

17  that.  So actually, there was so much electorial fraud and

18  shenanigans.  There were actually 20 contested

19  Congressional elections in Virginia between 1870 and 1890,

20  roughly.  But the direct answer to your question is yes.

21      John Mercer Langston, who was well educated.  He had,

22  I think, gone to -- a lawyer.  Was the President of

23  Virginia State College for Negroes.  Actually ran for

24  Congress from I think it the Fourth District in Southside.

25  Maybe the Fifth.  But one of those two districts.

1        And he was not declared the winner initially, but

2   there was an investigation in the House of

3   Representatives, because there was all sorts of

4   allegations of vote fraud, et cetera, et cetera.  And he

5   was actually finally declared the winner of that

6   congressional seat.  But by the time we declared the

7   winner, there were only about six months left in his term.

8        So in 1890 -- he ran for reelection in 1890.  So it

9   was originally the 1888 election that he took part in.  In

10  the 1890 reelection, there was a vicious campaign led in

11  part by the Richmond newspaper, sort of summarized that

12  said, look, this man has accomplished as much as anyone

13  possibly could who is African-American, or otherwise; but,

14  nevertheless, we can't have blacks participating in

15  politics because all it does is lead to fraud and

16  corruption in most of the electorate poll.

17       So Langston actually lost his reelection bid in 1890.

18  And of course, there were no other African-Americans

19  elected to Congress from Virginia until a century later.

20  Q    All right.  So we've moved sort of towards the end of

21  the 19th century.  And you've described the participation

22  of blacks in politics.  Was this a response to the black

23  electorial success that you just described?

24  A    Sure.  Absolutely.  And, you know, the response on

25  one level, as I mentioned, was a lot of vote buying,

 1   election rigging, violence at the polls.  But in 1894, the

 2   state did take the first legislative step and pass what

 3   was known as the Walton Act.  And as I understand, the

 4   Walton Act essentially required that ballots be filled out

 5   in private, which most of us would today think of course

 6   that's what we do.  But it required that there be no

 7   symbols or party markings that went along with the names.

 8        And illiteracy rates were quite high at the time.

 9   They were high amongst whites, but they were even much

10   higher amongst with African-Americans.  And so what the

11   Walton Act did was it meant that -- it also it did provide

12   for electorial marshals, I think they were called at the

13   time, to assist people with the ballot who were

14   illiterate.  But the way it was actually put into practice

15   and carried out, African-Americans were not able to get

16   that assistance, and so they were faced with a ballot with

17   a list of names that they could not read.  Whereas white

18   voters who were illiterate, were able to get help in

19   identifying who was the person that they were trying to

20   look for.

21        So the Walton Act alone actually lowered the number

22   of black voters quite significantly in the 1890s even

23   prior to the 20th century.

24   Q    Were there other responses to the black electoral

25   success of the earlier part of the 19th century?

1 A    Well, I think getting to -- in the wake of the Walton

2 Act, the most significant event, of course, is the

3 adoption of a new constitution.  The 1901 and 1902

4 constitution.  The Convention took a year.  It met in

5 Richmond over the course of 1901 to 1902.  So it's

6 actually -- the constitution itself was adopted in 1902.

7      And it was pretty clear.  And there was no real

8 effort to hide the purpose.  And the constitution did a

9 number of things.  But first and foremost, it created a

10 new suffrage system in Virginia.  And the proponents of

11 this knew and understood that the Fifteenth Amendment

12 forbid them from denying the right to vote to someone

13 based solely on race, so they had to come up with a series

14 of mechanisms to achieve that purpose without actually

15 specifically identifying race as the reason for doing so.

16      This was made possible by -- Mississippi had adopted

17 a similar plan, which the Supreme Court in 1898

18 essentially said, well, we'll allow it because it doesn't

19 specifically identify race as the cause of the

20 disenfranchising people.

21 Q    And what types of devices were you --

22 A    So there was a series.  So the primary mechanisms

23 that were used were a series of literacy tests,

24 understanding clauses, and then of course the poll tax.

25 And so the literacy tests with -- and I'm sure you've had

1  other individuals who may have testified about their own

2  experience with this, or their own family member's

3  experience, the literacy test basically left an enormous

4  power up to local registrars.  So the local registrars

5  could -- when a person comes in to vote, they're asked to

6  fill out, and provide, a certain amount of information.

7  And then the registrars, it was up to them to ask them

8  what kind of questions they would ask voters.  And based

9  on their answers to those questions, they would either

10  register them of not.

11     And so quite typically, white voters would get a

12  piece of paper and ask for, you know, their name and their

13  address and whatever basic information.  Black voters

14  often would come in and just be handed a blank piece of

15  paper and told to fill out the necessary information,

16  without really knowing what that information was.

17     If they were able to do that, they were then often

18  sometimes asked questions about the U.S. Constitution that

19  maybe someone who had just studied the Constitution that

20  week, or someone who was a Constitutional lawyer might now

21  the answer to, but a lay person would not.  And sometimes

22  they were asked ridiculous questions such as, you know,

23  how many jelly beans are in this jar.  How many bubbles in

24  a bar of soap, was one example I came across.  So the

25  registrars, through those mechanisms, have remarkable

1    power to decide who would vote and who wouldn't.

2         Now, as I said earlier, literacy -- illiteracy was

3    quite high, even amongst whites.  And so that's why sort

4    of a series of follow-up questions were necessary to make

5    sure that all illiterate whites were not disenfranchised

6    as well, and why was it that African-Americans were

7    disenfranchised at a much, much higher rate.

8         On top of the literacy tests, and then in the 1902

9    constitution, the state also imposed a poll tax.  There

10   had been a poll tax in the 1870s briefly, but the

11   readjusters, actually, had abolished that.  And then the

12   1902 constitution provided for a poll tax which took

13   effect in 1905.

14        There are a number of other states, of course, that

15   had poll taxes.  But what was interesting or most

16   problematic, or most effective, I should say, about

17   Virginia, is that it required to be paid three years in a

18   row, and six months in advance of an election.  So even if

19   an individual paid their poll tax this year, if they

20   hadn't paid it last year, and the year before, which might

21   not be election years, they had to either -- they wouldn't

22   be able to vote unless they were able to pay the back

23   taxes.

24        COURT REPORTER:  Sir, slow down.

25        THE COURT:  So you had to pay for three years before

1  you could initially vote?

2      DR. SMITH:  That -- I think when you first -- that's

3  a great question.  And the very first -- I don't -- the

4  very first year I don't know how that was actually

5  implemented.  That's a good question.  I would have to go

6  back and doublecheck about that.

7      THE COURT:  All right.

8      DR. SMITH:  I don't actually know whether there was

9  some leeway.  The fact that they -- I actually think, yes,

10 because the poll tax didn't become effective until 1905,

11 which was three years later.  So I think the idea was that

12 people did have to pay in 1903 and 1904 and 1905 before

13 voting.  But I would -- that's one that I'm not 100%

14 certain about that.

15     THE COURT:  Okay.

16     Next question, Ms. Branch.

17 BY MS. BRANCH:

18 Q    Now, you mentioned that Virginia adopted a new

19 constitution during the 1901 and 1902 Constitutional

20 Convention.  Your expert report has already been moved

21 into evidence earlier during the proceedings, and so I

22 want to refer to a specific page in your expert report

23 which I think you should have a set of exhibits at the

24 witness stand.  It's going to be Plaintiffs' Exhibit 208.

25     THE COURT:  Do you want that presented to the

```
 1  witness?

 2       MS. BRANCH:  Yes.

 3       THE COURT:  All right.  Well, we have had numerous

 4  binders of exhibits brought in by a wheel barrel.

 5       MS. BRANCH:  May I approach?

 6       THE COURT:  Sure.  Go ahead.

 7       MS. BRANCH:  It's Plaintiffs' Exhibit 208.

 8  BY MS. BRANCH:

 9  Q    Dr. Smith, if you could open to Tab 208.  Do you

10  recognize this document, Dr. Smith?

11  A    Yes.

12  Q    And what is it?

13  A    This is the initial report that I prepared in

14  connection with this case.

15  Q    And is it a true and accurate copy of your expert

16  report in this case?

17  A    I would assume so.  Yes.

18       MS. BRANCH:  Your Honor, I would like to move

19  Dr. Smith's initial expert report dated December 14, 2015,

20  into evidence.

21       MR. FINBERG:  I think, Your Honor, pursuant to the

22  stipulation we reached this morning, all the expert's

23  reports are in evidence at this point.

24       THE COURT:  All right.  That's fine.  It will be

25  admitted.
```

1           MS. BRANCH:  Thank you, Your Honor.

2                (Plaintiffs' Exhibit 208 is received.)

3    BY MS. BRANCH:

4    Q    Dr. Smith, could you turn to Page 11 on your report.

5    And it looks like there is a quotation at the top of that

6    page.

7    A    Yes.

8    Q    Who -- who made this statement?

9    A    So this is a fairly well-known statement now made by

10   Carter Glass, who was a member of the Virginia Senate, and

11   a newspaper publisher in Lynchburg who went on to serve in

12   Woodrow Wilson's cabinet, and was a United States Senator

13   for about a quarter a century until his death in 1946.

14   And he was one of the most prominent leaders of the

15   Democratic Party in Virginia.

16   Q    Okay.  I'm going to go ahead and read this, this

17   statement.  And this was made at the 1901, 1902

18   Constitutional Convention, is that correct?

19   A    Correct.

20   Q    It says:

21                "By fraud, no; by discrimination, yes.  But it

22                will be discrimination within the letter of the

23                law, and not in violation of the law.

24                Discrimination!  Why, that is precisely what we

25                propose; that, exactly is what this Convention

1    *was elected for - to discriminate to the very*

2    *extremity of permissible action under the*

3    *limitations of the Federal Constitution, with a*

4    *view to the elimination of every negro voter who*

5    *can be gotten rid of, legally, without*

6    *materially impairing the numerical strength of*

7    *the white electorate.  As has been said, we have*

8    *accomplished our purpose strictly within the*

9    *limitations of the Federal Constitution by*

10   *legislating against the characteristics of the*

11   *black race, not against the 'race, color of*

12   *previous condition' of the people themselves.*

13   *It is a fine discrimination, indeed, that we*

14   *have practiced in the fabrication of this plan;*

15   *and now, Mr. President, we ask the Convention to*

16   *confirm our work and emancipate Virginia."*

17        Did I read that accurately?

18   A    Correct.

19        THE COURT:  Now, Dr. Smith, was this a comment that

20   Senator Glass made on the floor?

21        DR. SMITH:  Yes, sir.  This comes directly out of the

22   very long detailed transcript of the debates at the

23   Constitutional Convention of 1901 and 1902.

24        THE COURT:  All right.  And how many years did

25   Senator Glass serve in the Senate, do you know, sir?

DIRECT EXAMINATION OF DR. JOHN D. SMITH   183

1      DR. SMITH:  Well, in the state, I'm not -- in the

2  state Senate, off the top of my head, I don't recall.  He

3  served in the United States Senate from, I think, 1921 to

4  1946.  So 25 years, give or take.  I may be off by a year.

5      THE COURT:  Go right ahead.

6      MS. BRANCH:  Thank you.

7  BY MS. BRANCH:

8  Q    And, Dr. Smith, why did you choose to include that

9  quotation in your report?

10  A    Well, I think I -- in all of the work I've done,

11  looking at race and politics in Virginia, to this day I've

12  never found a statement so, A, boldly honest.  But, B,

13  clearly indicative of what was at work here and what was

14  at play.  And that there was -- you know, Carter Glass,

15  and his contemporaries, certainly felt no need to pretend

16  they were doing anything other than what is described in

17  this plan.  It was quite -- like I said, we noted in the

18  Federal Constitution, it imposes some limitations on us,

19  i.e., the Fifteenth Amendment, but we're going to do

20  whatever we can to get around that, and certainly to

21  violate the spirit of the Fifteenth Amendment.  And that's

22  what was accomplished here quite successfully.

23      And I would just point out, you know, to that point

24  whereas there were roughly 147,000 or so black voters

25  registered in Virginia at the time of the Convention, that

1  number dropped to about 21,000 by 1902.  And after the

2  poll tax went into effect, that was half again.  There

3  were only, I think, 10,500 or so voters, black voters,

4  registered in Virginia from that point forward.

5       THE COURT:  Dr. Smith, what year did Senator Glass

6  make this comment?

7       DR. SMITH:  This would have been -- this was in 1902.

8  And it would have been between -- it was in June of 1902.

9  It was the very, very end of the Convention right before

10  they put the suffrage piece of it up for a vote.  This was

11  sort of their closing comment in the suffrage debate.

12       THE COURT:  Thank you.

13  BY MS. BRANCH:

14  Q    Dr. Smith, at a high level, how would you describe

15  how African-American political participation changed over

16  the course of the reconstruction era?

17  A    Well, I think you see, you know, initial -- a

18  remarkable level of enthusiasm, excitement, an ability to

19  participation in elections - and then met fairly quickly

20  by a backlash.  And there's a lot of back and forth.  It's

21  certainly up and down in terms of there is no direct

22  straight line of progress here.  It's back and forth

23  constantly facing obstacles, reasserting rights, loosing

24  those rights.  And then, you know, in the early 1890s,

25  early 1900s, they end up losing most of those rights for a

1  considerable amount of time.

2  Q    Let's turn now to the Jim Crow era.  So this is from,

3  as you know, the Constitutional Convention which occurred

4  in 1901, to the middle of the 20th century.  Could you

5  briefly describe that period in the history of Virginia?

6  A    Well, sure.  So the Jim Crow period is characterized

7  by, one, the disfranchisement of African-Americans, which

8  we just touched upon.  And also, the introduction and

9  implementation of a series of segregation statutes.  So

10  the law is more commonly referred to as Jim Crow laws.

11       Virginia passed its first Jim Crow laws, I think, in

12  1900 which involved railroads.  Segregating

13  African-Americans from whites on railroads.  And there

14  were a number of other laws that were passed as well

15  involving, you know, public spaces and various

16  municipalities.

17       In Virginia, it's interesting to note that actually

18  the most draconian Jim Crow statues actually were passed

19  in the 1920s, and not around the 1900s.  So

20  disenfranchisement occurred first, 1902.  And then in the

21  1920s, Virginia passed what has often been referred to,

22  maybe not often, but what has been referred to as the most

23  draconian anti-miscegenation statute in American history,

24  which is the Racial Integrity Act of 1924.

25       And the Racial Integrity Act essentially sought to

1  redefine who was black and who was white.  Up until that

2  time, Virginia defined a black person as someone who had

3  1/8th, or more, of black blood.  And anybody else, if you

4  had less than 1/8th black blood, you would be considered

5  white.

6      In the 1920s in response to, as it turned out, an

7  incorrect concern that mixed race persons were passing as

8  white, there was an organization based here in Richmond

9  called the Anglo-Saxon Clubs of Virginia, which was, for

10  lack of a better phrase, sort of a highfalutin version of

11  the Klu Klux Klan, if you will.  And the Anglo-Saxon Clubs

12  believe that maintaining the integrity of the white race

13  was paramount.  And based on eugenics was popular, sort of

14  it was very popular scientifically at the time, not just

15  in the south, but throughout the north, and much of the

16  western world.  The eugenics theory, you know, said that

17  even one drop of black blood will pollute white blood, if

18  you will.

19      And so Virginia passed the Racial Integrity Act,

20  which redefined who was white.  Basically because a white

21  person, you could not have a single drop of black blood

22  and still be considered white.

23      In that law, there actually turned out to be a

24  loophole there because certainly the proponents of that

25  law assumed that anyone who had between one drop of black

1  blood and 1/8th of black blood would be redefined as

2  black, having previously defined as white.  But the law

3  didn't actually state that.  So, actually in 1930, they

4  had to fix that.  And so from 1930 on, Virginia did have

5  essentially a one drop rule.

6      That Act also said that a person who is white could

7  not marry somebody who was not white, hence the

8  prohibitions against marriage between blacks and whites.

9  Virginia did carve out one exception, which was that there

10 were many people in Virginia who were quite proud of their

11 heritage of descending from Pocahontas and John Rolfe, and

12 so Virginia created what was called The Pocahontas

13 Exception.  That's what it was referred to at the time.

14 There were a lot of persons with a certain amount of

15 Indian blood, but no black blood, could still be

16 considered white.

17     In addition to the racial integrity statutes, in

18 1925, Virginia passed the Massenburg Public Assemblages

19 Law, which basically said that blacks and whites must not

20 be allowed to sit next to each in any public place.  So

21 that would have been concert halls, movies theaters.  Any

22 other public place.

23     And the impetus for the Massenburg Law was an

24 incident that took place at Hampton Institute.  Hampton,

25 of course, was a college for black students.  There were

1  many white patrons who supported the school.  And in one

2  case, a white woman whose husband was a newspaper

3  publisher in Newport News, went to a dance recital at

4  Hampton.  She was late.  The only available seat was next

5  to an African-American patron.  She objected, her husband

6  objected, and actually launched a campaign, which led to a

7  year later the passages of Virginia's Public Assemblages

8  Law, which remained on the books until the passing of the

9  Civil Rights Act in the 1960s.  So you had a series of

10  quite significant legislative acts taken by the state.

11       I should add, in the 1920s, the one piece of

12  legislation that was seen as, and certainly at the time

13  as, protecting African-Americans with the passage of an

14  anti-lynching law in 1926.  Virginia was -- I think it was

15  the first state to make lynching a state crime.

16       And it occurred at the end of a series of five or six

17  lynchings that had taken place, sort of one a year,

18  throughout the 1920s, which business leaders, political

19  leaders were concerned with besmirching the state's name,

20  its reputation, at the time when they were trying to

21  attract business from the north.  And so they did pass an

22  anti-lynching law in 1926.

23       Ironically, that law was actually never used to

24  prosecute white persons for committing violence against a

25  black person.  In the 1930s, there was a couple of cases

1  that evidence points to them having been lynchings, but

2  the law was never used.  The only time the law, to my

3  knowledge, was ever used was to put down the labor

4  strikes.

5       THE COURT:  Show down a little bit.

6  A    -- put down the labor strikes in the late 1930s and

7  1940s.

8       So those are sort of the core legislative acts, the

9  laws that were put on Virginia's books, during the height

10 of the Jim Crow period, and remained in effect, all of

11 those, into the 1960s.

12 Q    And you mentioned the 1924 Racial Integrity Act.  Was

13 there an agency that was created in connection with that

14 law?

15 A    Yes.  Well, the Bureau of Vital Statistics --

16      THE COURT:  I didn't hear your question.  Could you

17 repeat it, please.

18      MS. BRANCH:  Sure.

19 BY MS. BRANCH:

20 Q    Dr. Smith, you mentioned earlier the 1924 Racial

21 Integrity Act.  Was there an agency that was created in

22 connection with that law?

23 A    All right.  So the Bureau of Vital Statistics, which

24 was -- already existed.  It wasn't created specially, but

25 it did -- it did -- it was a state agency that enforced

1   the law, if you will.  And in particular, the Director of

2   Bureau of Vital Statistics, a doctor by the name of Walter

3   Plecker, really made it his mission to insure that no

4   person, as he saw it, who had any black blood, would you

5   be able to pass as white in Virginia.

6        And he really -- he and his staff made it their

7   mission to look at all genealogical charts, look at old

8   birth certificates to try to build a case and prove that

9   somebody was white.  The presumption being that you were

10  actually guilty until proven innocent.

11       And one of the big problems with what Plecker was

12  doing is that from I think it's 1896 to 1912, so in that

13  16-year period, there were no records kept.  There were no

14  birth or marriage records kept by the state of Virginia.

15  So he actually had a pretty big gap.

16       So when those people started having children in the

17  1920s and 1930s, Plecker was often just going -- basing

18  his decisions on antidote, on appearance, without actually

19  having real evidence.  And so for, you know, hundreds of

20  Virginians, there were quite severe consequences.  He

21  would write people and say you've registered as white, our

22  records show that you're black.  You can't go to white

23  schools.  You cannot enjoy any of the privileges of white

24  citizenship.  And he remained in office until he died in

25  the 1940s.

1  Q      Dr. Smith, could you turn to Page 25 of your report.

2         THE COURT:  Of your Exhibit 208?

3         MS. BRANCH:  Yes.  This is Plaintiffs' Exhibit 208 on

4  Page 25.

5  BY MS. BRANCH:

6  Q      And I'd like to focus your attention on the end of

7  that last paragraph, the third paragraph on Page 25.

8  A      Sure.

9  Q      And it kind of bleeds into Page 26.

10        And this is, as I understand, a letter that Walter

11  Plecker wrote to a citizen of Virginia.  And could you

12  explain the significance of this letter, and why you

13  included it in your report?

14  A      Sure.  Well, this is an example of the work that

15  Plecker was doing, and the work that he -- what he saw as

16  his charge in enforcing the Racial Integrity Act.  And

17  this comes right out of the -- this particular letter,

18  I'll have to look and see where I actually found it.  It's

19  his letter that he wrote to a person -- the point I was

20  going to make is that most of the records from the Bureau

21  of Vital Statistics were either destroyed or they're not

22  available.  But Plecker sent copies of much of his

23  correspondence to John Powell, who is an internationally

24  renowned Richmond pianist, who was actually the head of

25  the Anglo-Saxon Club.  So the only reason we actually have

1  this documentation anymore is because he had shared it

2  with John Powell, whose papers are at the University of

3  Virginia.

4       And there's many others like this.  But this is an

5  example of Plecker.  You know, he said that he was

6  objecting to the fact that this particular couple had

7  registered their child as white.  He said that according

8  to the Lynchburg Health Department, though, her husband is

9  actually black.  *"This is to give you warning that this is*

10 *a mulatto child and you cannot pass it off as white."*

11      *"It is an awful thing."*

12      And then he warns the midwife that, you know, *"it is*

13 *a penitentiary offense to willfully"* misstate the color of

14 the child whose birth she had attended.

15 Q    So you've described several Jim Crow laws that were

16 enacted during this period.  What was the effect of these

17 laws on African-Americans in Virginia?

18 A    Well, along with the disfranchisement Constitution of

19 1902, it absolutely, you know, cemented African-Americans

20 as second-class citizens.  And as Plecker points out in

21 that letter, it mean that African-American, you know -- in

22 this particular case, it only affected, you know, mixed

23 race kids, but they were then sent to black schools which

24 everybody knew were inferior.  That African-American

25 educational opportunity were paled in comparison to white

1  opportunities.  That had an affect, of course, on jobs, on

2  incomes, on housing, and the generational affects, you

3  know, spirals.

4      There's no other way to look at this other than a

5  state regime guaranteeing second-class citizenship for a

6  class of citizens.

7  Q    And what area of life would you say the Jim Crow laws

8  were felt most significantly?

9  A    Well, that's a hard question to answer because, you

10  know, there were the daily indignities that your hear

11  people report regularly about the daily indignities of

12  life under Jim Crow.  But certainly the issue that seemed

13  to galvanize African-Americans most significantly was

14  education.  And the idea that their children weren't --

15  you know, the amount of money being spent on black

16  education was so small and so paltry.

17      There were some locals which did not even spend the

18  amount of money per black child that they got from the

19  state.  So if the state contributed $6 per child, they

20  were spending less than that.  And I'm just using that as

21  an example.

22      So certainly education was an area in which I think

23  African-Americans recognized that they -- that the -- you

24  know, the notion behind segregation was supposed to be

25  that separate facilities were supposed to be equal because

1   the Supreme Court had recognized in *Plessy v. Ferguson*

2   that there was nothing equal about segregation from day

3   one.

4        COURT REPORTER:  Slow down, please.

5   Q    So moving forward a little bit.  Did there come a

6   point when African-Americans started reasserting their

7   claim to the right to vote, and to be active in other

8   areas of life?

9   A    Sure.  And I think of the things that's actually

10  quite interesting about Virginia is that usually the

11  narrative that is taught in high schools, and even

12  introductory college courses, sort of suggest that once

13  the Jim Crow system is in place that nothing really

14  changes until the 1950s and post-World War II, and the

15  advent of the Civil Rights Movement.  But Virginia is

16  actually quite interesting in that in the 1930s you

17  actually really begin to see a blossoming of activism.

18  Not in all of Virginia.  Certainly, in rural areas, in the

19  Southside, there would have been very little, you know, to

20  have in any way, shape, or form, whether it's to try to

21  vote or to express dissatisfaction would have -- could

22  have meant, you know, violent harm.

23       But in the cities, and places like Northern Virginia,

24  a little bit in Richmond, and certainly in the Norfolk

25  area, you began to see in the 1930s increasing activism on

1   the part of African-Americans demanding the right to vote,

2   demanding to right to equal educational facilities.

3        There's actually a court case filed here in Richmond

4   in which a black plaintiff succeeded in Federal District

5   Court to guarantee that he would be allowed to vote in

6   what would have been the all white Democratic primary.

7   The primaries were all white.

8        And it was interesting that at time instead of

9   fighting the case, the Democratic officials led by Harry

10  Byrd decided just to let it go because they knew that --

11  you know, because of the registration laws, the literacy

12  test law, that very few African-Americans would be able to

13  vote.  So they kind of just let that one pass.

14       In the mid-1930s, Alice Jackson, another resident of

15  Richmond, applied to the University of Virginia, who had

16  never admitted a black student.  She was turned down, but

17  that made some headlines.

18       A couple years later in Alexandria, a group of young

19  African-American men sat down at the Alexandria library to

20  demand equal facilities, equal library facilities.  And

21  about the same time in Norfolk, there was a series of

22  protests around the firing of an African-American teacher

23  who had -- was fired because she had allowed herself to be

24  used as a plaintiff in a case that was going to require

25  equal salaries for black and white teachers with the same

1  qualifications.  She was fired, but a subsequent plaintiff

2  was found, Melvin Austin, and sent the case *Austin v.*

3  *Norfolk*, which was decided in the District Court and in

4  the Appeals Court in 1940.  And it was not appealed to the

5  Supreme Court.

6       But that was sort one of the first big steps in the

7  equalization strategy that the NAACP was following, trying

8  to equalize facilities.  So there was -- even prior to

9  World War II, there was a great deal starting to happen.

10 Q    And so it sounds like you've described events leading

11 up to the *Brown v. Board of Education* case in 1954, is

12 that correct?

13 A    Yes.  And I've talked about certainly the Norfolk

14 case is the first step in that.  I think, you know, by the

15 late 1940s, there were equalization suits clogging the

16 dockets of Virginia's courts.

17      Where, you know, Oliver Hill, who was the leading

18 NAACP attorney told me one time when I had a chance to

19 interview him, that World War II actually interrupted the

20 work they were doing because they had started all these

21 suits.  In the late 1940s, there were these suits, you

22 know, filed all over the state alleging, you know, unequal

23 facilities in education.

24 Q    And so *Brown v. Board* came down in 1954, and how did

25 Virginia respond to *Brown*?

1  A     Well, Virginia -- and we should -- I think it's

2  helpful to keep in mind that the *Brown* case itself came

3  from Kansas, but it was one of just five cases that had

4  been bundled together, and one those did come from

5  Virginia.   The *Davis* case from Prince Edward County was

6  one of the cases clumped together as part of the *Brown*

7  decision.

8       And, you know, Virginia did not respond well.   There

9  was an initial -- an initial thought that perhaps, you

10 know, Virginia would allow Arlington, for instance, who

11 made it clear that it was prepared to admit some black

12 students into white schools.   So there was an initial

13 response that perhaps would allow local options -- it

14 would allow areas of Virginia that were ready for this to

15 integrate or desegregate on a small basis, but certainly

16 not in parts of the state that did not want to.

17      But even that initial plan was chucked aside in early

18 1956 when Senator Harry Byrd led Virginia, and the south,

19 down the path of what comes to be known as Massive

20 Resistance.   So Massive Resistance to the Supreme Court's

21 decision.

22      And that then led in Virginia to a special session of

23 the legislature which convened in August of 1956.   And

24 that legislature passed what often was referred to as the

25 Massive Resistance Laws or the School Closing Laws.   And

1 what those laws did was to require the governor to close

2 any school in the state where District Courts ordered

3 black students into those -- into those schools.

4    There was a last ditch effort in that special session

5 to amend the law to allow for some local options, that,

6 Arlington, for instance, could go ahead and desegregate,

7 which proponents said that will get the courts off our

8 back.  If we allow Arlington to allow limited

9 desegregation, then that will satisfy the Supreme Court's

10 requirement.

11    But the legislature in special session of 1956

12 rejected that local option amendment.  They passed the

13 School Closing Law which required the governor to close

14 any states -- sorry, close any schools in which black

15 students were ordered admitted.

16 Q    And so you've describe the period of Massive

17 Resistance.  Did that period end at a certain point?

18 A    Well, eventually.  So what happened after the passage

19 the School Closing Laws is that then the NAACP has to go

20 back to court and file individual lawsuits in the

21 individual school districts to try to force desegregation.

22 That process takes a while.  And it was not until October

23 -- I believe it was October, the fall of 1958, when

24 Federal District Court judges did order black students to

25 be admitted to public schools in Charlottesville, Norfolk,

1  and Warren County.  So in those three jurisdictions.

2      And with that, Lindsay Almond, who by then was the

3  governor, ordered those schools closed.  So Virginia did

4  in fact close schools in the fall of 1958 in response to

5  the order for integration.  Those schools remained closed

6  for three months until January of 1959 when both state and

7  Federal Courts, more or less simultaneously, issued a

8  series of rulings that said the Massive Resistance Laws

9  were unconstitutional.

10      THE COURT:  Doctor, would you go back again.  What

11  law was declared to be unconstitutional?

12      DR. SMITH:  The School Closing Laws.  The Massive

13  Resistance Laws that were passed during the special

14  session of 1956.

15      THE COURT:  Go ahead.

16  A   So once -- so in January of 1956 -- sorry, January of

17  1959, the School Closing Laws were ruled unconstitutional.

18  And that was sort of the official end of Massive

19  Resistance, if you will, but certainly hardly the end of

20  the issue.

21      Prince Edward County actually chose to close its

22  schools for five years rather than complying -- rather

23  than opening public schools on a desegregated basis.  They

24  simply closed their school system from 1959 to 1964.

25      So there are, you know, a generation of students not

1  a whole lot older than I am who if they were in Prince

2  Edward County, did not have access to a public school

3  education.   And many of the white students, there were a

4  number of private academies set up to accommodate them.

5  Some black parents were able to get their kids admitted to

6  neighboring county's schools, schools in neighboring

7  counties, or to send them to live with out of state

8  relatives.   But there were -- for those five years, there

9  was no public education provided for the Prince Edward

10  County students.

11       So the ending comes closely.   It's -- certainly

12  there's is a great deal of reluctance amongst, you know,

13  Virginia officials to comply with the court orders.   There

14  were many, including Senator Byrd, who thought that the

15  state should continue to resist.   Finally, once the

16  publicity got bad enough, business leaders stepped in and

17  said, you know, enough is enough.   We need to comply with

18  the court orders.   And we want Virginia to be seen as a

19  good place to live and to do business.

20  Q    Was there legislation passed in the 1960s that

21  changed the course of Virginia's history?

22  A    Sure.   And I think in this case, it's primarily

23  legislation coming from -- legislation and court orders

24  from outside Virginia that are most significant.   I tried

25  in my original report just to briefly summarize them.   But

1   most importantly, there is the ratification of the

2   Twenty-fourth Amendment in early 1964 which abolished the

3   poll tax in all Federal elections.  And that's crucial

4   because it did not affect state elections.

5       Later that same year, in June of 1964, the Supreme

6   Court handed down its reappointment decisions in *Brown v.*

7   *Sims.*  Again, one of those cases, just as with *Brown*

8   actually came from Virginia, the case of *Davis v. Mann*

9   dealt with malapportionment in Virginia.

10      So the Supreme Court established the principle of one

11  person one vote in all redistricting.  Just weeks later,

12  Congress passed the Civil Rights Act which abolished

13  Virginia's Massenburg Law.

14      In 1965, of course was the passage of the Voting

15  Rights Act.  I'm sure we'll talk more about that.  In

16  1966, the Supreme Court in the case of *Harper v. Virginia*

17  *Board of Elections* abolished the poll tax in state

18  elections.  And that was certainly significant.

19      In Virginia -- you know, many of these cases were

20  coming from Virginia.  In 1967, the Supreme Court in the

21  *Loving* decision abolished the anti-miscegenation statute.

22  So that put an end to Virginia's Racial Integrity Laws.

23      And then finally in 1968, another case from Virginia,

24  *Green v. New Kent County,* which is widely considered to be

25  the most important education decision after *Brown* really

1  put an end to the stalling tactics that most jurisdictions

2  had been using.  So even though *Brown* comes down in '54,

3  there was very, very, very little desegregation of the

4  schools throughout Virginia because various freedom of

5  choice plans that allowed parents to send their kids to

6  segregated -- or continue to send them to segregated

7  schools.  So that comes down.

8      So all of those decisions between 1964 and 1968 with

9  both court decisions and judicial action, judicial action

10 and legislative action, really forced significant change.

11 Virginia did not go lightly in this regard.  When it was

12 clear that the Twenty-fourth Amendment was about to be

13 ratified in late 1963, the Virginia legislature actually

14 met in special session and passed a Bill which said that

15 rather than just simply going along with the Twenty-fourth

16 Amendment said that the Bill actually said that if you

17 want to continue to vote in a state election -- or sorry.

18 To vote in a Federal election, you have to actually be

19 current on your poll tax, your state poll tax, or you have

20 to sign a certificate of continuing residence, I think it

21 was called, which essentially had to be filed six months

22 in advance of an election, and asserted that you were in

23 fact a resident of this jurisdiction.  So it was a clear

24 effort to circumvent the abolition of poll tax.

25     And it was actually Republicans in 1964 who went to

1  court to have this Bill struck down.  And they were

2  successful in that.  They got an Appeals Court ruling

3  right away that struck the Bill down in time for the 1964

4  elections so that you did not have to pay a poll tax for

5  the 1964 general election.

6      And then Supreme Court actually issued a ruling in

7  the spring of 1965 affirming that lower court decision.

8  And in that decision, Earl Warren actually quoted, and

9  cited the very same Carter Glass quote that we had up on

10  the screen a few minutes ago, making clear that Virginia's

11  long history of racial discrimination was very much

12  relevant to this decision, and this was yet another

13  obstacle being placed in the way of African-American

14  suffrage.

15  Q    So I want to shift now to post-Voting Rights Act,

16  post-1965 history, but before I do that, do you have an

17  opinion as to whether the history that you've just

18  described has had an affect on life in Virginia today for

19  Virginians?

20  A    Well, I mean, I'm a historian, so I'm trained to

21  think about the historical relevance, and to think about

22  the ways in which, you know, change over time is connected

23  with the present.  So, yes, I mean, absolutely, on some

24  different levels.

25      As I said earlier, there are -- I was born in 1965.

1  So anybody older than me has had some experience.  Anybody

2  older than me who has lived in Virginia has had some

3  experience with issues of segregation and desegregation.

4  And it wasn't until 1973 when I was in 3rd grade that my

5  school in Alexandria was desegregated.  It took that much

6  time to finally happen.

7       So I think for anybody who, you know, is roughly 50

8  years or older now, there's a very, you know, absolute

9  reality to the system of Jim Crow and to second-class

10  citizenship.  And those things have -- you know, whether,

11  for instance, the students who didn't get to go to school

12  in Prince Edward County for five years, certainly that

13  affected their education, it affected their future

14  earnings, their future income, they're ability to provide

15  for families in the future.  So, absolutely, I see a

16  tremendous affect.

17       I think it's not coincidental that African-Americans

18  today by, you know, any study you look at that measures

19  home ownership, that measures income, that measures

20  employment, et cetera, et cetera, shows that

21  African-Americans trail whites significantly.  And

22  certainly the Jim Crow system bears on that.

23       MS. BRANCH:  I have just been informed that Delegate

24  Lopez has arrived, and is ready for his direct

25  examination.

1          THE COURT:  All right.  Fine.

2          Dr. Smith, we need to take a witness out of chair.

3    Would you be kind enough to step down.

4          DR. SMITH:  Certainly.

5          THE COURT:  We'll get back to you shortly, all right?

6          DR. SMITH:  Sure.

7          THE COURT:  Delegate Lopez, if you would be kind

8    enough to raise your right hand, place your left hand on

9    the Bible, and face the Clerk of the Court.

10         THE CLERK:  You do solemnly swear that the testimony

11   which you are about to give, in this case, before this

12   Court, shall be the truth, the whole truth, and nothing

13   but the truth, so help you God?

14         DELEGATE LOPEZ:  I do.

15         THE COURT:  Have a seat on the witness stand, sir.

16         Actually, would you put your full name on the record

17   please, and spell your last name for the court reporter.

18         DELEGATE LOPEZ:  Certainly.

19         Alfonso Hoffman Lopez.  My last name is spelled

20   L-O-P-E-Z.

21         Whereupon, **Delegate Alfonso Lopez**, having been

22   duly sworn in, testifies as follows:

23                     **DIRECT EXAMINATION**

24   BY MS. CALLAIS:

25   Q    Delegate Lopez, how are you currently employed?

1    A     I'm a member of the Virginia House of Delegates.    I

2    represent the Forty-Ninth House of Delegates District,

3    Arlington and Fairfax counties.

4    Q     And for the record, what political party are you a

5    member?

6    A     I'm a Democrat.

7    Q     And also for the record, what is your race?

8    A     Latino.

9    Q     Delegate Lopez, how long have you served as a

10   representative for Virginia's Forty-Ninth Delegate

11   District?

12   A     I was elected in -- this is my fifth term.  So I was

13   elected in 2011.  And I was first sworn in in 2012.

14   Q     And how many times have you run for that seat?

15   A     One primary, and three general elections.

16   Q     And have all of those been contested?

17   A     No.  My first primary, of course, was contested.

18   There was no opponent in the general election in 2011.  In

19   2013, I did have a contested general election, but I had

20   no contested election in 2015.

21   Q     And, Delegate Lopez, in the process of running for

22   office and running for your seat, have you engaged in

23   voter registration work?

24   A     Yes.  Almost constantly.  Voter registration work and

25   get-out-the-vote.

1  Q    And have you also reviewed polling data for your

2  district?

3  A    Yes.

4  Q    And throughout the course of your work, do you

5  interact directly with the constituents in your district?

6  A    Yes.  I go door-to-door, phone banking, phone

7  calling, meeting folks at events, at parks, at festivals

8  in my district on a fairly regular basis.

9  Q    And can you just describe generally the

10  characteristics of your district for the Court?

11  A    My district is really the rich tapestry of what

12  Virginia is becoming.  There are 100 languages spoken in

13  my district, 58 languages in my local high school,

14  Wakefield High School.  And we have every level of

15  socioeconomic.  We have people who live in McMansions,

16  people who are living with the help of a social safety

17  net.

18  Q    And do you know what proportion of your district is

19  compromised of minorities?

20  A    My district is just slightly -- a majority white, but

21  there's a sizable Latino population, a sizable Asian

22  population, a sizable African-American population.  But we

23  have -- they refer to my district as the world in a zip

24  code - 22204.  You've got literally folks from every

25  corner of the globe.

1  Q    And can you just give a brief description as to the

2  geographic confines of your district?

3  A    My district goes from Pentagon City in Arlington, all

4  the way to Bailey's Crossroads in Fairfax, with Columbia

5  Pike as basically the spine of my district.  I mean, you

6  can -- it's relatively small compared to other districts

7  around the state.

8  Q    Prior to being elected to office, Delegate Lopez, did

9  you engage in any other types of political activities?

10  A    Yes.  I did -- I was very involved for almost two

11  decades working from a precinct captain to being a deputy

12  chair of the Arlington Democratic Party, to being on the

13  -- I was the young Democrat of the Year for Virginia in

14  2004.  I was also in the State Central Steering Committee

15  for several years for the DPVA.  I was on the State

16  Central Committee for several years.  I was also the chair

17  and president of the Democratic Latino Organization of

18  Virginia.  And I was also an at-large member of the

19  Democratic National Committee representing Virginia for a

20  few years.

21  Q    And throughout that work, did you engage in any voter

22  registration work?

23  A    Yes.  Constantly.  Everything.  We're constantly

24  trying to get folks engaged with the Democratic Party and

25  getting them excited about voting and getting them excited

1    about the next campaign and the next election.

2    Q     And did you also engage in get-out-the-vote work?

3    A     Yes.  Yes.  That's almost entirely what we did.

4    Q     And did any of your registration, or get-out-the-vote

5    work, focus on any particular population of individuals?

6    A     I personally did a lot of work with the Latino

7    community, especially when I was the chair and president

8    of the Democratic Latino Organization of Virginia.  I

9    wanted to make sure that we were focusing on its

10   population because it was growing in Virginia, and

11   because, as the polls bear out, 79% have been voting for

12   Democrats in years past.

13   Q     And did you ever work with any young voters when you

14   were conducting your previous political activities?

15   A     Yes.  I was the former president of the Young

16   Democrats of Arlington, as well.  And when I was working

17   with the Young Democrats of Virginia, the focus was on

18   getting young folks registered early and excited about

19   campaigns as well.  The idea is that the earlier you get

20   someone sort of engaged with the Democrat Party, and

21   making a habit of voting, the more likely that they'll

22   just continually do it.  And so that's important to long

23   term stability and growth of the party.

24   Q     Delegate Lopez, I'd like to focus particularly on the

25   work that you've done in your district with your voters.

1  In the course of conducting, you know, registration and

2  get-out-the-vote activities you talked about earlier, have

3  you encountered any challenges to getting voters in your

4  district out to vote?

5  A    Yes.  We have, like I said, you know, folks from all

6  around the world.  A considerable number of immigrants and

7  new Americans.  And so you find there are transportation

8  issues, language barriers, cultural barriers,

9  socioeconomic barriers.  And it becomes -- and it's just

10 basically time issues for folks to come out to vote.  And

11 we find that a large number of votes in my community,

12 especially, are working -- especially new Americans and a

13 lot of Latinos in my district, they're working two, three,

14 even four jobs just trying to keep food on the table and

15 pay their rent or their mortgage and keep their kids in

16 school.

17      And so the idea of spending, you know, the amount of

18 time it takes to get from Point A to Point B in Arlington

19 County sometimes using public transportation, and so to

20 vote in some cases when it might take up to two, three,

21 even four hours, like it did in 2012 and 2008 in

22 Arlington, it can be a huge impact on someone's time and

23 their job.  And it's hard to do on a random Tuesday.

24 Q    Can you just describe in a little bit more detail the

25 language barriers that you mentioned or language

1    challenges?

2    A    If -- even if someone is a naturalized citizen, if

3    they speak halting English, their ability to sort of

4    navigate election day, especially if it's a presidential

5    election year, and there's a large number of people in

6    line and they're trying to move quickly, it can be very

7    difficult if they're not familiar with the process.

8         And so, you know, even for -- this is also very true

9    for elderly folks who might be naturalized.  But still,

10   it's hard for them to navigate the voting process.

11   Q    And have you done any work on your own to help your

12   voters overcome that barrier?

13   A    Yeah.  In 2002 and 2003, I worked with the Arlington

14   County Democratic Committee and the State Board of

15   Elections to create a pilot program for Arlington so that

16   we could have signage in both English and Spanish.

17   Q    And why were you having signage in both English and

18   Spanish?

19   A    Anything we could do to help folks navigate the

20   process and navigate the system and make the polls move

21   faster.

22   Q    And have you encountered any voters in your district

23   who had cultural challenges?

24   A    Yes.  Especially my voters who are Latino.  I have a

25   large segment of my district that are from El Salvador or

1   Honduras or Guatemala that where culturally they've had

2   issues with being involved in the government, it's

3   dangerous.   Being involved in the electorial process,

4   that's a dangerous proposition.   And even though they

5   might be naturalized, even though they might, you know,

6   understand, and do understand, the differences between the

7   way we do voting and other folks, and the way maybe where

8   they came from, there's still always that trepidation.

9   They're wary of the process, especially with older folks,

10  I find.

11  Q    And I believe you touched upon this, but could you

12  just describe some of the transportation challenges that

13  you mentioned?

14  A    A lot of folks in my district -- I mean, Columbia

15  Pike is the spine of my district.   And it is the most

16  heavily used transit corridor in all the Commonwealth of

17  Virginia.   A huge proportion of my voters and my

18  constituents use buses and public transportation.   And

19  getting from -- during rush hour, or any part of the day,

20  really, from Columbia Pike to the DMV, or getting from

21  Columbia Pike to the courthouse area where the electorial

22  office is, is at least a half hour.   And so that's an hour

23  back and forth.   And then that's not included in the time

24  it might take to it get an ID or to go through the process

25  at the electorial office.   And so you're talking about a

1  huge amount of time sometimes for folks who are just

2  trying to get from Point A to Point B in northern

3  Virginia.

4  Q     And can you give any specific instances of voters

5  you've encountered who've had these problems or

6  challenges?

7       MR. HEARNE:  Your Honor, if I may object.  This

8  witness is testifying largely of hearsay.  He's not been

9  offered as an expert, there's been no studies --

10      THE COURT:  And I don't receive it as such.  But

11 certainly it's a mere fact of utterance, and a constituent

12 has told him that.  You can cross him as to the basis for

13 it.  The objection is overruled.

14      You may respond.

15 A     Yes.  I have had constituents of mine who have

16 contacted me.  One individual contacted my office who I've

17 known for -- who said that she's a cleaning lady.  And

18 it's been very hard for her to get from job to job to job,

19 and then also bring her supplies and then be able to get

20 from Columbia Pike to the DMV and back again because what

21 happens is that hurts her -- the amount of time she has

22 for --

23      THE COURT:  Well, I'm going to sustain the objection

24 at this point.  He can recite what someone told him

25 concerning the inconvenience, but he can't add the details

1  and any kind of his own impression.

2       No impressionistic evidence, Delegate.  Just exactly

3  what they told you.  That's all.

4       You may continue.

5       MS. CALLAIS:  Okay.  I think we can move on.

6       THE COURT:  Okay.  Fine.  Go right ahead.

7  BY MS. CALLAIS:

8  Q    Delegate Lopez, have you also encountered any voters

9  who have had difficulties understanding the electoral

10 process?

11 A    With naturalized citizens, sometimes.  Yes.  What

12 happens is they're confused.  I've actually had a couple

13 folks call me saying that they had been able to use their

14 utility bill in years past, but then they weren't able to

15 use it the next time they voted.  And, actually, I get

16 phone calls -- an equal number of folks will call me from

17 outside my district who are simply Latinos as will call me

18 from my district.  And so -- and it's happened a couple

19 times where folks have asked about why am I not allowed to

20 vote this year.  What happened?  What happened with my

21 voting?  Why couldn't I go through the process?

22      And so what I'm finding is that what we were talking

23 about when this bill was before the House of Delegates

24 is -- and the concerns we had, are coming to pass.  People

25 are confused about the process.

1          MR. HEARNE:  Your Honor, again, I object not to him

2    recounting specific statements, phone calls, even concerns

3    generally that his constituents have expressed to him, but

4    testifying that the individuals are confused as to the

5    state of mind of people who aren't in court, what affect

6    it's having on them.  He's not an expert, and there has

7    been no studies.

8          THE COURT:  I agree with your objection, but I think

9    it's harmless under the circumstance, so we'll just go

10   ahead and move on.

11   BY MS. CALLAIS:

12   Q    So, Delegate Lopez, is it your understanding that in

13   2013, Virginia passed a photo ID law?

14   A    Yes.

15   Q    And did you support that law?

16   A    No.  I was very opposed to it.

17   Q    Why were you opposed to that law?

18   A    Well, it was my impression that -- and from the facts

19   that I had before me at the time, that there were

20   significant unintended consequences for new American

21   populations and minority populations, and people living on

22   the margins of society, and for poorer populations because

23   it would make it much harder for them to be able to vote.

24   Q    Why did you believe it would make it much harder for

25   them to be able to vote?

1  A     Well, going back to what I said before about the

2  impact on just the confusion aspect, and then also the

3  fact that for some people it would be harder because of

4  the time it would take or the -- to go and get a new ID,

5  for the education aspect of it.  And what happened after

6  the fact is that we actually -- I actually spoke at a

7  couple of forums where we were trying to explain to the

8  community, between community groups and working with

9  outside organizations, to explain, you know, here's what

10 the new law is.  Here's what you need to do to comply with

11 the new law.  And then also talking about how we got from

12 Point A to Point B during the General Assembly session.

13 So I worked with VACOLAO and, you know, Virginia New

14 Majority, and speaking at different events.

15 Q     Can you please explain to the Court what VACOLAO is?

16 A     I'm sorry.  It's the Virginia Coalition of Latino

17 Organizations.

18 Q     And these forums that you spoke at, and where you

19 worked with voters, were they focused on any particular

20 population groups?

21 A     More often than not we were dealing with the Latino

22 population.

23 Q     And why were you working with the Latino population?

24 A     Because more often than not, in my community you have

25 people in the Latino community who were actually

1  expressing concerns about it.  And the organizations that

2  were organizing it, were organizing around, in large part,

3  the Latino community, VACOLAO, but also Virginia New

4  Majority, even though they represent almost all new

5  Americans and -- or try to work with all new Americans.

6  The Latino community was the one that was really out in

7  force.

8  Q    And you mentioned that you were opposed to the law

9  because of the number of barriers.  Were those the same

10  challenges you discussed before that you had seen when you

11  worked with your constituency?

12  A    Yes.

13  Q    Delegate Lopez, how long have you lived in Virginia?

14  A    Since 1974.

15  Q    So, is it safe to say, you grew up here?

16  A    Yes.  I was born in Pennsylvania, but I got here as

17  quick as I could.

18  Q    And I understand that was by way of many different

19  cities?

20  A    And countries, yes.

21  Q    So throughout your time growing up and living in

22  Virginia, have you personally experienced any

23  discrimination on account of being a Latino?

24  A    I have a unique situation.  To the typical person, I

25  look white.  I have the face of my mom, but the nose of my

1  father.  And what that means is I have a Lopez nose, but I

2  have my mom's skin complexion.  She's from Pennsylvania.

3       And the idea is that what I have experienced is

4  instances where individuals will assume that I can't be

5  Alfonso Lopez, and they'll say something about Latinos in

6  front of me.  Or I remember a couple of instances where I

7  was at a health clinic, and it was said to me -- I was

8  very sick.  I had mononucleosis.  And it was said, *"It was

9  just like a Hispanic to be late."*  And so that kind of

10 thing is what I see.

11      Where I really have seen, and I felt it more acutely,

12 is through my father.  My father is what one would

13 consider a more stereotypical Latino looking man.  He has

14 black hair, very dark complexion.  He has Indio features.

15 He's from Venezuela.

16      And he has suffered sort of the --

17      MR. HEARNE:  Your Honor, in terms of testifying as to

18 what some individual that is not in court --

19      THE COURT:  I'm going to have to sustain that

20 objection.  He's obviously testifying about what his

21 father told him about his father's experiences.  The

22 objection is sustained.  If you can approach it

23 differently without hearsay evidence, that would be fine.

24      MS. CALLAIS:  Okay.

25 BY MS. CALLAIS:

1  Q    Delegate Lopez, have you ever been with your father

2  and witnessed discrimination that he has faced?

3  A    Yes.

4  Q    Can you describe that for the Court, what you

5  witnessed.

6  A    In -- when I was a teenager, my dad -- we were in a

7  snow storm, and our car broke down.  And my dad was being

8  told by the mechanic, or the owner of garage, that he

9  should go back to where he came from.  And that has -- and

10  my father has -- I've also been in the car with my dad on

11  a couple of occasions where he was driving and his car was

12  stopped.  And I was in the back of the car.  And to this

13  day, I still don't know why he was stopped.  But that

14  happened on more than one occasion when I was growing up.

15  Q    And have you experienced, over the course of your

16  life here in Virginia, changes and attitudes towards

17  Latinos?

18  A    Yes.

19  Q    Can you describe those?

20  A    It's not the way it has been in the past.  In the

21  '50s and '60s and '70s, you would see much more soft

22  racism.  And there was -- like referring to all Latino

23  men, no matter how old they were, not by Mr. or Sir, but

24  by calling the person Pablo.  You don't see that -- or I

25  don't see that anymore.

1          But just yesterday my dad was at BJ's big lot store

2    up in northern Virginia.

3          THE COURT:  Were you with him?

4          DELEGATE LOPEZ:  I was not.  But he called me about

5    it.

6          THE COURT:  Objection sustained.

7          DELEGATE LOPEZ:  He called me about it immediately.

8          THE COURT:  Objection sustained.

9    BY MS. CALLAIS:

10   Q    As to attitudes, you were saying?

11   A    It has gotten better, but I have seen increased

12   evidence recently, especially over the last four or five

13   years, for instance, regarding racial profiling with laws

14   in different counties, like Prince William County, the

15   legislation in 2012 about stop and frisk that was geared

16   toward the Latino populations.

17         You see that there is -- there are attacks.  And just

18   in the rhetoric you see nowadays in the political realm of

19   it's okay to refer to entire communities, especially

20   Latino communities, as rapists or thieves.  And you find

21   that infecting other aspects of political discourse, as

22   well as personal discourse.

23         MS. CALLAIS:  No further questions, Your Honor.

24         THE COURT:  All right.

25         Cross-examination of Delegate Lopez.

1          MR. HEARNE:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3   BY MR. HEARNE:

4   Q     Delegate Lopez, I'm Thor Hearne.  And I'm

5   representing the Commonwealth and the defendants in this

6   case.  I appreciate you coming today to testify, and I

7   will be as brief as I can in the cross-examination.

8          You testified, as I understood, that you're from the

9   Forty-Ninth District?

10  A     Yes.

11  Q     And you have been for five terms?

12  A     No, three terms.

13  Q     Five elections?

14  A     Four elections.

15  Q     Then I got my numbers wrong.  What would you estimate

16  to be -- and your testimony, as I heard it, was that the

17  district was made up of mixed different ethnic groups, is

18  that correct?

19  A     It's literally the world in a zip code.

20  Q     And what percentage of that, that would be your

21  district, would you say is Latino?

22  A     Around 23%, 24%.

23  Q     And yet in that district, they've elected you as an

24  identified Latino or Hispanic, is that correct?

25  A     Yes.

1  Q    I mean, in other words, even though you describe

2  yourself as not perhaps as outwardly appearing as much of

3  a Latino as you describe others have --

4  A    Well, whenever someone asked me that and they say,

5  *"You're not a real Latino"*, I say, well, *"What's a real*

6  *Latino?"*

7       And I describe blond-haired, blue-eyed Argentineans,

8  and I describe folks -- well, I just try to -- it's a very

9  narrow idea about what a real Latino is.

10 Q    And I guess my question may be a little more narrow

11 than that.  Just going to your testimony, it seems to me

12 you identify yourself to your constituents as a Latino, is

13 that how you would characterize yourself?

14 A    I identify myself as a Latino and also as a Democrat,

15 and as a longtime servant of the community.

16 Q    And given the ethnic percentage of your district

17 roughly, if I understood your testimony, 30% or so?

18 A    It's 23%, 24%.

19 Q    And yet despite your ethnicity, you've been elected

20 to be their delegate?

21      THE COURT:  He testified that he had.

22      MR. HEARNE:  Yes, sir.

23 BY MR. HEARNE:

24 Q    Delegate Lopez, did you support the -- and let me

25 clarify because we've developed a vernacular in this case

1   of two different voter identification requirement laws in

2   Virginia, what we're referring to as the 2012 law and the

3   2013 law.  Are you familiar with that?

4   A    Could you clarify the differences as that's known

5   here in the court?

6   Q    Certainly.  The law in 2012, and I will summarize the

7   critical difference, or one of the critical differences

8   that we've discussed, is the provision in the 2012 law for

9   a voter registration card which does not have a photo on

10  it that is mailed by the election officials to voters, and

11  is sufficient for identification.  Does that refresh your

12  recollection of the difference?

13  A    I believe so.

14  Q    Okay.  And you opposed the 2013 law, your testimony

15  was, *"vigorously,"* is that correct?

16  A    Yes.  I spoke against it.

17  Q    And why was it that you spoke against it?

18  A    For any number of reasons I thought that making -- a

19  photo ID was actually a backdoor way of depressing overall

20  voter turnout, and making it harder for people to vote.

21  Q    And did you oppose the 2012 law?

22  A    I believe I did.  I don't recall.  I take hundreds of

23  votes, in some cases, everyday.

24  Q    But in the context of opposing the 2013 law, which

25  was a change to the 2012 law, did you have occasion to say

1  whether or not you opposed or favored the existing law?

2  A    I don't recall.

3  Q    And I stated -- or you stated, and I heard your

4  testimony earlier, you said you felt that the 2013 law had

5  some unintended consequences, is that correct?

6  A    Right.

7  Q    What were those that you identified?

8  A    It would make it harder for folks who were poorer who

9  have numerous jobs.  Might have -- a halting English to

10 truly avail themselves and make it easier for folks to

11 vote as opposed to making it harder for folks to vote.

12 Q    In terms of other similar legislation that requires

13 identification, have you had occasion to support

14 legislation requiring identification, photo

15 identification, in the context of purchasing firearms?

16 A    You would have to give me the example.

17 Q    I'm going to ask you --

18 A    I would definitely want -- I have been an active

19 proponent of more sensible gun violence protection

20 measures in the Commonwealth.

21 Q    Would it recall your recollection if there was a

22 measure that required some photo identification to

23 transfer firearms, or certain magazines for firearms?

24     THE COURT:  Now, I don't think he's asking the

25 question hypothetically.  He's asking you if you have

1  voted for that genre of legislation.

2      DELEGATE LOPEZ:   I'd like to know the specific bills.

3      THE COURT:   Do you ever recall a bill that you have

4  voted for or against that has required photographic

5  identification for the purchase or trafficking in

6  firearms, Delegate?

7      I don't mean to preempt your question.   I'm trying to

8  get to the core here.

9      DELEGATE LOPEZ:   Actually, I'd love to know the

10 specific bill.   But I couldn't give you an answer about a

11 direct piece of legislation.

12     THE COURT:   Okay.   Fair answer.

13 BY MR. HEARNE:

14 Q    Have you sponsored a bill called House Bill 97?

15 A    Could you tell me which year?

16 Q    It would have been, I think, within the last two

17 years.   It had to do with driver's licenses being issued

18 to non-citizens.

19 A    Yes, I did that this year.   It was specifically for a

20 very small portion of population that is dealing with

21 folks who are in a weird doughnut hole.   They have -- they

22 are under the torture -- the federal torture statutes.

23 And if they are -- because they're in the process of

24 getting a temporary protective status, and if they go back

25 to their nation of origin, they will be tortured or

1   killed.   And they've been deemed as such by the federal

2   government.

3         But we do not allow them to get a driver's license.

4   They might be able to work here, but we haven't given them

5   a driver's license.   I was trying to fix that loophole in

6   the law.   And that's what my bill did.

7   Q    Would those individuals subject to that bill be

8   individuals who are eligible to vote otherwise as citizens

9   of Virginia and the United States?

10  A    No.   They could avail themselves of the

11  naturalization process.   But they were in the process --

12  we're saying if you have a temporary protective status in

13  the United States, you should be allowed to have -- and

14  you're allowed to work here, and you might be given, you

15  know, some identification, some ID, and green card status,

16  you should at least be allowed to get a driver's license.

17  Q    Has your bill passed?

18  A    No.   It was -- all of those bills that were put

19  forward in that area, I think all four of them were set

20  aside for a study over the course of the summer.

21  Q    If your bill were to pass, would that allow or

22  authorize the State of Virginia issuing a driver's license

23  to an individual who is not a citizen of Virginia, or a

24  citizen of the United States?

25  A    Yes.   But these are, like I said, individuals who are

1  covered by the federal torture statutes, and would be

2  allowed to be in the United States through a fairly

3  rigorous process.

4  Q    You've talked about your work with voter

5  registration, voter turnout, correct?

6  A    Yes.

7  Q    And you've talked in that context about you refer to

8  the young Democrats or young voters.  Do you recall that

9  testimony?

10 A    Yes.

11 Q    What is a young voter, in your mind?

12 A    Anyone between the ages of 18 and 35.

13 Q    Why do you use that age range of 18 to 35?

14 A    That's how we define young Democrats in the

15 Democratic Party of Virginia.

16 Q    And is there some source for that, or is there some

17 resolution?  Where would I go to find that information?

18 A    The bylaws of the Virginia Young Democrats bylaws.

19 And I don't know why that's designated as that grouping.

20 Q    I mean, as opposed to 18 to say 21, or 18 to 30?

21 A    I can't give you a reason as to why.

22 Q    Are you familiar with the federal Help America Vote

23 Act?

24 A    Very tangentially.

25 Q    Okay.  In the context of your voter registration, and

1  as I understand you were active in get-out-the-vote

2  efforts, do you work with voter registration drives?

3  A     Yes.

4  Q     And are you familiar with the requirements of voters

5  who are newly registered under the federal Help America

6  Vote Act?

7  A     No.

8  Q     After the 2013 law was passed, again, over your

9  objection, have you had occasion to work with your

10  constituents, to work with the Virginia election officials

11  to try and make it easier for people to obtain ID who may

12  not have any?

13  A     What I've been trying to do is explain the process,

14  the new process to folks, the new rules, and address any

15  confusion that might be out there about what is -- what

16  ID, and what proof of ID, is allowed to be taken and used

17  at the polls.  And so I'm trying to explain to folks how

18  we got to this point, and then also explain to folks what

19  they can do as they try to vote to make their vote count.

20  Q     Have you reached out to, say, for example, Mr. Cortes

21  with the Election Board, or others in the election

22  community, to specifically aid your constituents to obtain

23  free ID?

24  A     No.

25        MR. HEARNE:  I have no further questions.

1        THE COURT:  Any redirect?

2        MS. CALLAIS:  No, Your Honor.

3        THE COURT:  May the Delegate be excused?

4        MS. CALLAIS:  Yes, Your Honor.

5        MR. HEARNE:  Yes, sir.

6        THE COURT:  Delegate Lopez, you're excused and free

7   to go.  Thank you, sir, for taking your valuable time to

8   come in and testify.

9        DELEGATE LOPEZ:  Thank you.

10                     **WITNESS STOOD ASIDE**

11       THE COURT:  Dr. Smith, if you would come back up,

12   sir.

13       Actually, before Dr. Smith testifies, I think we'll

14   take about a 5-minute recess.  Make it 10.  A 10-minute

15   recess.

16                     (Recess taken.)

17            (Gil Halasz is now the court reporter.

18            DIRECT EXAMINATION (Continued)

19       THE COURT:  We will continue with the direct

20   examination of Dr. Smith.

21   BY MS BRANCH:

22   Q    Welcome back, Dr. Smith.

23       When we stopped before, we were just finishing up

24   talking about on-going facts of the history of

25   discrimination in Virginia.

1       Did you have anything else you wanted to add to that?

2  A    Well, the only thing I think I would add is that in

3  referring to the more recent period, I would make a

4  comment and observation similar to what I noted with

5  regard to the late 19th century or early 20th century,

6  which is that there is no straight line in one direction

7  toward, you know, racial equality or racial progress.  It

8  comes and goes in fits and starts.  Even since, you know,

9  since the end of the official Jim Crow era in the 1960's,

10 I think that has still certainly been the case that while

11 things are certainly far better than they were half a

12 century ago, it hasn't been a straight line.  It is up and

13 down, back and forth.

14      There is constant obstacles and barriers that have

15 been thrown in the way and litigated in many cases.  So

16 it's, I mean -- I will add that.

17 Q    Let me turn your attention now to the end of the

18 1960's, beginning of the 1970's.  Can you describe the

19 political climate in Virginia at that time?

20 A    Sure.  I think certainly any political historian

21 would see the late '60's and early '70's as one of the

22 more tumultuous and uncertain periods in Virginia history,

23 if you will.  And that is primarily the result of the fact

24 that because of the end of the Jim Crow era and for the

25 fracturing of the old Democratic machine.  And it's not

1   going to happen overnight, it didn't happen in one day, in

2   one year.  It took -- you know, the transition took a

3   number of years.

4       For instance, I think the 1969-1973 gubernatorial

5   elections really highlight this transition, highlight the

6   possibility that existed, and the reality of sort of what

7   came out of that.

8       In the 1969 elections, Linwood Holton, who had been a

9   long-time sort of the head of the Republican party, if you

10  will, actually won.  He was elected, first Republican

11  elected Governor of Virginia since the reconstruction era.

12  And his coalition that he put together was actually quite

13  remarkable.

14      On the other side, the Democrats were completely

15  fractured.  You had sort of the old-line Byrd element of

16  the Byrd machine through folks who still wanted to, wish

17  we had held on, wished the Commonwealth had held on, to

18  segregation.  You had a more moderate liberal faction of

19  the party that was moving in step with the national

20  Democratic party which had the support of the Civil Rights

21  Act, support of the Voting Rights Act.

22      And then you had a third group actually of either

23  more liberal Democrats, mostly -- many of them union

24  voters who supported Henry Howell, who was a civil rights

25  and labor attorney from Norfolk.  Actually had a three-way

 1   split among Democrats in the primary.

 2       Henry Howell, who was the most liberal of the

 3   candidates; and Bill Battle, who was more moderate of the

 4   two, emerged.  The third candidate, who was the more

 5   conservative one, the old Byrd member, Byrd machine

 6   member, lost in the primary.  So you actually had a

 7   run-off in which you had sort of a centrist moderate and a

 8   very liberal Democrat, and the old, you know, what was

 9   left of the Byrd machine was adamant that Henry Howell,

10   liberal, would not win.  And so they threw their support

11   behind the more moderate candidate.

12       In the general election, you had a very interesting

13   set of occurrences.  Linwood Holton had the support of the

14   Republican people that had been voting Republican for a

15   long time.  And he, like most of his party, that was sort

16   of based in the southwest part of the state, but you also

17   simultaneously had old-line -- some old-line Byrd

18   Democrats who were afraid that Bill Battle was actually

19   more liberal than he had let on.  So they supported, and

20   had been actually voting for a Republican in presidential

21   politics since the '40's.  They supported the Holton

22   coalition.

23       And then you had some liberal Democrats who actually

24   saw Holton as more racially liberal than the Democratic

25   candidate.  And he probably was.

1          So Linwood Holton had this remarkable coalition.  He

2   got 37 percent of the black vote, large segment of the

3   labor vote, and as I said, both liberal and very

4   conservative voters.  And he won in 1969.

5          What followed, though, was equally interesting, which

6   is that, by the time Linwood Holton left office in, I

7   guess January of 1974, he had really lost control of the

8   party.  He had lost control of the leadership of the party

9   to Richard Obenshain, a lawyer here in Richmond, who by

10  all accounts is described as a brilliant political

11  strategist.  And where Holton had been determined that the

12  Republican party, which had fought so hard for so long as

13  an alternative to the Byrd machine, Holton insisted that

14  the Republican party not bring old-line Byrd Democrats in

15  to the Republican party and build the party that way.

16  Obenshain saw a different political reality, and I guess

17  also proved right, so he put together really a coalition

18  again drawing in the old-line Byrd Democrats.  And then

19  also largely increasing the numbers of new voters moving

20  to Virginia who might be described as suburban voters who

21  were concerned about issues like busing, for instance.

22         So, by 1973, the 1973 gubernatorial election, the

23  Democrats are still remarkably fractured.  Ended up not

24  putting up a candidate.  Henry Howell decided to run as an

25  independent.  And the Republicans actually prevailed upon

1   Mills Godwin, who was the very last of the Byrd

2   governors -- he had been governor in the late '60's.  He

3   had been prior to that a southside senator, and was one of

4   the real architects of massive resistance.

5        So in 1973, he comes out of retirement and runs as a

6   Republican and defeats Henry Howell in a very narrow,

7   very, very fiercely-contested election.

8        But I think the symbolism is there.  Holden got, I

9   think, 37 percent of the black vote in 1969.  Godwin only

10  six percent of the black vote in 1973.  And that really is

11  a reflection of the very deliberate turn the Republican

12  party took in the early '70's in terms of membership, in

13  terms of who it was going to appeal to.

14       And that level of racial polarization has, for the

15  most part, remained to this day in that Republican

16  candidates for state-wide office generally receive a very

17  small percentage of the vote.

18       John Warner would be the one exception, who was more

19  moderate.  He also ran unopposed several times and got a

20  larger percentage of the black vote.

21       For the most part, no Republican candidate for

22  governor in a state-wide office, to my knowledge, received

23  more than 15 or 16 percent of the black vote since '69.

24  Q    And that change that you described that occurred in

25  the Republican party, what are some of the -- or how would

1  you describe that change?

2  A     Well, as I say, I think the main thing was, whereas,

3  you know, up until the late 1960's, the Republican party

4  was fairly small in Virginia.  It never competed

5  successfully in state-wide elections.  It was a minority

6  party.  But it was the -- it was the alternative to the

7  Byrd machine.  So in matters of race, it was the

8  Republican party that was always more moderate.  That was

9  something that Holton himself, you know, desperately

10  wanted to hold on to, is that commitment to racial

11  equality.  And Holton himself while governor, you know,

12  the biggest issue while he was governor was busing.  And

13  so it is during -- during the first year of his

14  administration where Judge Merhige - who I see, his

15  portrait is right there - issued the orders in the

16  Richmond school desegregation.

17       Holton responded by escorting his children to public

18  schools in Richmond.  And his kids were the only white

19  kids in the otherwise all-black schools.  Other whites

20  wouldn't go along.

21       So symbolically I think it is sort of a remarkable

22  moment of statesmanship in the state of Virginia.  In

23  fact, one that Colgate Darden, former governor, referred

24  to it was the greatest act of, I think, leadership or

25  statesmanship he had ever seen in his lifetime when

Smith - direct

1  Linwood Holton escorted his children into the black

2  schools.

3      But that was a battle Holton lost ultimately in terms

4  of busing for all sorts of reasons as a hot button issue.

5  No one -- you know, people never objected to busing when

6  it is about bringing rural kids into schools in town, or

7  vice versa.  Busing became an issue when it involved

8  racial integration in the schools.

9      That became, you know, along with, you know,

10 residential segregation, educational segregation, came to

11 sort of define Virginia, like many other states and in new

12 ways.  So, you see real development in the 1970's.

13 Otherwise, mostly color-blind, neutral politics, but one

14 that is really committed towards residential segregation

15 and school segregation.

16 Q    You mentioned earlier the passage of the Voting

17 Rights Act of 1965.  What affect did that have on the

18 ability of African-Americans to participate in politics in

19 Virginia?

20 A    Well, it certainly is a seminal event and seminal

21 moment.  You know, Virginia was one of the six states

22 covered in its entirety from inception from '65 until all

23 of Virginia was a covered jurisdiction.  And, you know,

24 there were certainly, but not just the Voting Rights Act,

25 but the abolishment of the poll tax, allowed more

1   African-Americans into the political process.

2        Protected and enforced the law, from -- you know, in

3   the '80's and '90's alone, there is something like 18 or

4   20 Department of Justice objections based on Section V.

5   So the point being, that, again, it is not a smooth -- not

6   a smooth ride.  You know, the Voting Rights Act passed,

7   everything is great.  You continue to have localities and

8   counties resist through the use of multi-member districts,

9   municipal annexation, at large districts.

10       And time and again by the early 1980's, you have the

11  City of Petersburg with 60 percent African-Americans and

12  still city council controlled by whites because of, you

13  know, racial jerrymandering.

14       That eventually changes.  But if it had not been for

15  the presence of the Voting Rights Act, and continued

16  efforts by the Department of Justice to enforce that, I

17  think you would -- change would have come even much slower

18  and taken a lot more longer.  And who knows where we would

19  be today.

20  Q    Has the Voting Rights Act been renewed since it

21  originally passed?

22  A    Yes.  There were renewals 1970, '75, '82 and then

23  2006 was the last one.

24  Q    Had Virginia politicians supported the renewal of the

25  Voting Rights Act?

1  A    At the outset, no.  Certainly, the original passage

2  in '65 and reauthorization in '70 and '75.  The vast

3  majority of Virginia representatives were opposed.

4  Remember, in 1965 there was almost mostly Democrats.

5  There were a few Republicans in Congress, but mostly

6  Democrats.  And there were one or two, I think two,

7  members of Congress in 1970 and '75 who voted to

8  reauthorize it.

9       More recently, in 2006, as we discussed, you know,

10 especially in the depositions, the reauthorization at the

11 end turned out to be nearly unanimous.  I think there were

12 a couple dozen, I think three dozen, representatives,

13 members of the House of Representatives, who opposed it.

14 None from Virginia that I am aware of.

15      So there was by 2006 a general consensus that the

16 Voting Rights Act was something that was worth protecting.

17 And the Republican president, of course, signed it.

18 Q    Did the passage of the Voting Rights Act have any

19 black politicians who had been elected to state-wide

20 office in Virginia?

21 A    Only Doug Wilder, who in 1969, he was the first

22 African-American elected to the state Senate.

23      And then in 1985 when he was elected Lieutenant

24 Governor, and then he was the first person elected to

25 state-wide office.  And then four years later in '89 when

1  he was elected governor, he became the first -- the first

2  elected African-American governor in the United states.

3  Q    Can you describe for the Court Doug Wilder's campaign

4  for governor and his rise in politics?

5  A    Sure.

6       To back up a little bit, I think it is important to

7  recognize that Doug Wilder was, you know, he had been in

8  the state Senate since 1969.  By the early 1980's he, like

9  many other African-Americans, felt the Democrat party was

10  taking, you know, black votes for granted.  But he also

11  recognized that Democratic candidates did not win

12  state-wide without black support by the 1980's.  So he

13  sort of -- he threatened at one point in the early 1980's

14  to run as an independent in I think it was the U.S. Senate

15  race.  That got the attention of the Democratic leaders.

16  And so he was then supported in the 1985 campaign for

17  Lieutenant Governor.  Which he did win.

18       For the most part, his opponent actually controlled

19  until the end of the campaign.  Race, more or less, was

20  kept out of it in terms of -- in the closing weeks of the

21  campaign, race was made much more of an issue in the

22  campaign.  Wilder did win by a much narrower margin than

23  his ticket mate, Chuck Robb, who won the governorship.

24  But he was elected Lieutenant Governor, and then became

25  the Democratic candidate for governor in 1989 when, again,

1  he, you know, won with overwhelming support among black

2  voters.  Got enough of the white vote just barely to win

3  the election.

4  Q    During Doug Wilder's campaign for governor, were

5  there any racial appeals?

6  A    There were.  I think, you know, not surprisingly, but

7  yes, there were certainly -- there were certainly ads.

8  Wilder himself did his best to try to not make race an

9  issue, because he wanted to appeal to a broader swath of

10 the population.  But certainly during the campaign there

11 were references to his race and to the fact that he was

12 African-American.  And one of the statistics often cited

13 is that he led by, I think, ten or 12 points in the polls

14 right down to the very end.  And then the margin of

15 victory was only six or seven thousand votes.

16     And most observers noted, you know, have referred to

17 that as a reflection that individuals being polled are

18 reluctant to admit there might be racial bias in their

19 votes, so were reluctant to say they would not vote for

20 him.  But --

21 Q    So since Doug Wilder's election in '89, has Virginia

22 elected an African-American to office?

23 A    Well, certainly it is not to, you know -- you know

24 state-wide governor, U.S. Senator, in the legislature, I

25 mean, I think now there are 13 representatives, 13

1   delegates, which is the most there have ever been.  Well

2   into the 1980's, there was only four African-American

3   delegates, but the number is now 13 out of a hundred.  In

4   the state Senate, beginning with Wilder in '69, there is

5   first this one black senator and now for a while there

6   have been five.  Five out of 40.  Up 12 and a half

7   percent.  So, certainly there has been progress.  So

8   African-Americans still trail.

9        If you are looking straight in terms of population

10  numbers, they certainly trail, their percentage of

11  population, if that makes sense.

12       The one area in terms of important state offices

13  where African-American is equitably represented, or

14  perhaps now even more, slightly over-represented are on

15  the state Supreme Court.  There are seven justices there.

16  And as I discussed in my reply report -- in my initial

17  report, I erroneously stated there have never been more

18  than one black member of the Virginia Supreme Court, which

19  had been the case up to the 1980's and '90's.  But for the

20  last several years, there had actually been two members.

21  So two out of seven members of the Supreme Court are

22  currently African-American.

23  Q    You described earlier racial appeals employed during

24  the Doug Wilder campaign for governor.  Have there been

25  other instances of use of appeals to race in politics

1  since then in Virginia?

2  A    Well, I think certainly things have changed over

3  time.  The sort of overt appeals, overt racial appeals

4  that were quite common back in the earlier part of the

5  century up through the Jim Crow era, and even kind of, you

6  know, the kind Doug Wilder faced, are no longer, you know,

7  considered, you know, politically smart.  But on occasion,

8  there have certainly been perhaps unexpected outbursts,

9  might be a way to say it.

10      And most famously, of course, Governor -- former

11 Governor and Senator, George Allen in 2006 during his

12 re-election campaign when he sort of spur-of-the-moment

13 referred to a member, a person of south Asian descent as

14 "macaca," which he was widely pilloried for.  But that was

15 2006, only ten years ago.  So you have someone as

16 prominent as George Allen who still felt comfortable

17 enough using a racial epithet in a state-wide election for

18 Senate.

19 Q    Have there been other instances of racial appeals in

20 Virginia as well in terms of --

21      THE COURT:  What is the question?

22      MS BRANCH:  Have there been any other instances of

23 racial appeals in politics in Virginia?

24 A    Well, I think in terms of, I guess I would separate

25 them as a different category.  So that sort of direct

1   derogatory comment would be one.  There was an incident a

2   couple of years ago where a member of the legislature

3   referred to somebody as "tar baby," which is an old Jim

4   Crow term.

5       I would say that there have been people arguing on

6   this in terms of the actual meaning of it, but beginning

7   with George Allen, and continuing to Governor McDonnell,

8   the last three Republican governors have all declared

9   April, you know, Confederate Heritage and History Month.

10      Depending on your point of view, some would point out

11  that this is about heritage.  This is, you know,

12  Confederacy, like it or not, is part of heritage.  Others

13  would argue -- and I would fall in this category -- that,

14  you know, you can't, you know, sort of declare a month as

15  an official -- declare as an official of the state that we

16  are essentially celebrating Confederacy.  You can't do

17  that without recognizing that slavery was the

18  under-pinning of that.  That has certainly been racially

19  divisive.  Did it affect elections or not?  I can't say

20  that.

21  Q   Has race been involved in redistricting in Virginia?

22  A   Well, certainly.  I think, as in most states, and,

23  you know, most recently I know a case pending before the

24  U. U.S. Supreme Court now that involves 13 congressional

25  districts, I think -- so, certainly, I think,

1    redistricting is one.  If you look at the Section V

2    objections the Department of Justice has made over the

3    last 20 or 30 years, many of those involved redistricting.

4        So, yes, there continues to be, and now even as we

5    speak now, there are cases that are pending that involve

6    racial jerrymandering claims.

7    Q    One of the conclusions you come to in your report is

8    that the photo ID law at issue in this case is "But the

9    latest in a long line of attempts to suppress the vote of

10   African-Americans, a racial and ethnic minority."  Why did

11   you come to that conclusion?

12   A    Well, I tried to set it out.  I think as a historian,

13   I am trying to think about change over time.  And I see --

14   you know, while I do see a great deal of change, I also

15   see historical context in which these changes take place.

16   Sometimes changes are fast, and sometimes slow.  Sometimes

17   there is movement forward, sometimes there is movement

18   backwards.  And I think that the conclusion that I reach

19   is based on two factors.  One is that there has been, that

20   I have seen, no credible evidence of actual voter fraud in

21   Virginia.

22       THE COURT:  Objection sustained.  I won't let him

23   offer his opinion as to whether or not there is any racial

24   discrimination enacting this.  It is pure speculation on

25   his part.

1          MS BRANCH:  Thank you, Your Honor.

2          THE COURT:  And -- go ahead.  I will leave it there.

3          MS BRANCH:  Okay.

4      I will just note for the record that Dr. Smith

5  testified earlier about the frequency of voter fraud in

6  earlier eras.  And as a historian, he is trained to look

7  at change over time.  And I think he comes to the

8  conclusion in his report that voter fraud is no longer

9  present.  But I understand, Your Honor, your ruling.

10         THE COURT:  Go ahead.

11 BY MS BRANCH:

12 Q    All right.

13     So not to weigh in on the ultimate conclusion about

14 legislative intent here, can you talk about the factors

15 that as a historian you would look at when you are

16 assessing whether or not the photo ID law was passed with

17 the intent to suppress the vote of African-Americans?

18 A    In looking at the legislative history, to me the most

19 obvious point of comparisons, looking at what came just

20 before that, that is the 2012 law, which passed the

21 Department of Justice.  You know, the Department of

22 Justice is, you know, the Department of Justice -- the

23 Department of Justice said this is okay.  And that law

24 eliminated the sworn statement, which had been around for

25 a while, but also greatly expanded the number of types of

1  photo IDs, or types of IDs.  Wasn't just photo IDs.  A

2  broad range of IDs that people could use.  That bill

3  passed the Department of Justice scrutiny.  In my report,

4  I make no claim that there is any problem with the 2012

5  bill.

6      But, the immediate, the very, very soon, nine month

7  passage of time was all that took place between the 2012

8  bill and the 2013 bill.  So it has to be some credible

9  explanation for why the exact same group of legislators --

10     MR. FINBERG:  I object.

11     THE COURT:  Objection sustained.  He is simply

12 speculating on the motives of the members of the General

13 Assembly based on his own personal views.

14     Objection is sustained.

15     MS BRANCH:  Thank you, Your Honor.

16 BY MS BRANCH:

17 Q   Dr. Smith, you note on Page 62 of the report -- this

18 is the last page of your report.  And this is again

19 Plaintiffs' Exhibit 208.

20     "That contemporary Republicans in Virginia have

21 learned well the lessons taught by Carter Glass and the

22 Democratic party in the 20th century."  Is it your

23 contention that nothing in Virginia changed in terms of

24 racial politics since the days of Carter Glass?

25 A   Of course not.  I never make that claim, and I was

1   very clear in the reply report when it was suggested by

2   the rebuttal that I had made that claim.   I was very clear

3   that I did not make that claim.   An enormous amount has

4   changed.   Lots of changes.   But, there continues to be, as

5   I said, you know, efforts and barriers to full

6   African-American participation.   They come up constantly.

7   There is -- requires constant effort, activism, litigation

8   to try to fully -- to have -- to fully realize the rights

9   of citizenship for African-Americans.   That has been a

10  consistent theme throughout Virginia's, you know, history.

11  Q     Is it your opinion, the legacy of official racial

12  discrimination in Virginia has persisted?

13  A     Not officially.   Again, the point raised in the

14  rebuttal report, and I tried to reply to that earlier,

15  that, no, I think that in terms of official, what you

16  might refer to as official disenfranchisement or official

17  discrimination, has to be seen to have kind of fallen

18  apart in the 1960's.   There is no particular time or date.

19  It didn't end one day.

20        But over the course of the 1960's, and the

21  constant -- the series of forces from outside the state

22  that required the dismantling of the structures of Jim

23  Crow, that that official disenfranchisement has ended.

24  But, again, it doesn't mean that everyone was happy about

25  it or that beginning the next day everyone accepted it.

1    And there have been, you know, repeated efforts over the

2    course of the last half century to slow down progress, to

3    minimize the ability of permanent African-Americans, and

4    now more recent time, other non-white voters, to

5    participate fully in the electoral process.

6    Q    Is it your contention the photo ID law is one of

7    those such efforts?

8    A    I have argued that in the absence of any --

9         MR. FINBERG:  Objection.

10        THE COURT:  Objection sustained.  I am not going to

11   let you give me political speculation here.  The answer is

12   "no."  The answer is "no."  You can't do that.

13        THE WITNESS:  Okay.

14        THE COURT:  Rephrase the question.

15        MS BRANCH:  Actually, we can end there.

16        No further questions.

17        THE COURT:  That is fine.

18        Cross examination of Dr. Smith?

19        MR. FINBERG:  Thank you, Your Honor.

20                      CROSS EXAMINATION

21   BY MR. FINBERG:

22   Q    Good afternoon.  Good to see you again.  Just to

23   remind you, I am Dana Finberg, one of the attorneys

24   representing the Commonwealth in this case.

25   A    Right.

1  Q    Dr. Smith, is it fair to say you spent your career

2  focusing on, and drawing attention to, race in the

3  American south and in Virginia in the 19th and early 20th

4  century?

5  A    Well, I could qualify only to say, I think through

6  the middle half of 20th century.  I am willing -- yes.

7  Beyond the early part of the 20th century certainly.

8  Q    And you spoke about on direct the book that you

9  authored entitled "Managing White Supremacy."

10       Is that correct?

11  A    Correct.

12  Q    And the time period covered by your Managing White

13  Supremacy book ends in roughly 1960 with the end of the

14  Jim Crow period; isn't that right?

15  A    Correct.

16  Q    You haven't published any books on contemporary

17  Virginia political history, have you?

18  A    Not from 1970 to the present.  If that is what you

19  mean by contemporary, no.

20  Q    Now, your expert report has been admitted into

21  evidence.  The first two thirds of your report in this

22  case are verbatim, or paraphrase, of sections of your

23  "Managing White Supremacy" book; aren't they?

24  A    Most of it is.  We talked about it before.  I would

25  add that that was written after years of exhaustive

1  research and not as an advocate in a court trial, but as a

2  neutral scholar.  So it seemed only appropriate that, you

3  know, given there has been no scholarship I am aware of

4  since then that would counter, you know, my findings,

5  that that would be an appropriate use of that work.

6  Q    When was that book published, sir?

7  A    2002.

8  Q    In compiling your report in this case, you didn't

9  speak to any of the individual plaintiffs, did you?

10 A    I did not.

11 Q    You didn't speak to anybody at the Democratic Party

12 of Virginia?

13 A    Did not.

14 Q    And you did not speak with any individual voter who

15 has not been able to cast a vote for lack of a photo ID;

16 did you?

17 A    I did not.

18 Q    In compiling your report in this related to the

19 General Assembly's consideration of Senate Bill 1256, you

20 did not review any legislative documents in connection

21 with that, did you?

22 A    No.  I reviewed newspaper reports.  But assuming I

23 understand what you mean by legislative documents, the

24 answer would be no.

25 Q    Didn't review any video tapes of the legislative

1  debates?

2  A     No.

3  Q     You didn't review any audio recordings of the

4  legislative debates?

5  A     No.

6  Q     You didn't speak to any individual in the

7  legislature?

8  A     Did not.

9  Q     For example, Delegate Lopez, who is here today?

10 A     I did not.

11 Q     And you didn't review any of documents produced by

12 the defendants in this case?

13 A     Correct.  I did not.

14 Q     Let me talk a bit about the conclusions that you

15 reached in your report.  I am going to pick up where Ms.

16 Branch left off.  That is, "That Republicans in 2013 have

17 learned well the lessons taught by Carter Glass in the

18 Democratic Party in the early twentieth century."  That is

19 kind of how you summarize your report, isn't it?

20 A     Yes.

21 Q     To be clear, you are not saying that Republicans in

22 the Virginia legislature in 2013 are racist like Carter

23 Glass?

24 A     No.  I have been very clear that is not what I said.

25 That was not my intention.  The point there is that in

1 1902, Carter Glass, and his contemporaries, understood

2 they could not legislate specifically on the basis of

3 race.  So they said, based on characteristics.  And that

4 is the comparison I was making, was the use of rather than

5 overt racial laws, using, targeting, passing laws or

6 legislation that would have the effect of suppressing the

7 vote of certain minorities.

8 Q     You agree Virginia now has a professional

9 non-partisan election administration?

10 A     Yes.

11 Q     And it has had since at least the 1960s?

12 A     I would assume so.  Certainly late '60's, early

13 '70's, presumably, yes.

14 Q     That is not a condition that existed back in the

15 Carter Glass era, is it?

16 A     Well, I might ask you to restate the question.  One

17 thing I would say, Virginia certainly, actually had a

18 reputation after the late 19th century throughout the 20th

19 century, had a reputation for a clean, fair, election.  It

20 is just very few people were able to participate in them.

21     So I wouldn't want to assume for answering the

22 question, I am suggesting that the electoral machinery was

23 corrupt up until that time, because the one thing that

24 whatever you think of the Byrd machine is, they did,

25 apparently, ran clean, fair elections except for the fact

1   most people couldn't vote in them.  Or many people.

2   Q    To focus, you are not saying since the 1960's the

3   electoral administration in Virginia has been corrupt?

4   A    Correct.  I am not saying that.

5   Q    Virginia's current elections administration doesn't

6   resemble the system under the Byrd machine in the early

7   20th century, does it?

8   A    No, not in terms of the one-party domination.  No.

9   Q    You would agree, since the 1960's, Virginia elections

10  have been open, transparent, and that they have been

11  subject to public scrutiny?

12  A    Yes.

13  Q    Dr. Smith, would you agree it is important to

14  distinguish between racial polarization in voting versus

15  racial voter suppression?

16  A    Between racial polarization and racial suppression?

17  Can you tell me exactly what you mean by that, or make

18  sure I understand your distinction?

19  Q    Well, let me ask you this.  You would agree with me

20  that racial polarization would describe the leanings -

21  A    Yes.

22  Q    - of particular ethnic or racial groups -

23  A    Yes.

24  Q    - in terms of their voting patterns?

25  A    Yes.

1   Q      That is different, isn't it, than racial voter

2   suppression?

3   A      Yes.

4   Q      Okay.

5          And as somebody who studied election laws in

6   Virginia, would you agree that the degree of polarized

7   voting in Virginia is roughly consistent with the degree

8   of polarized voting nationwide?

9   A      I hesitate to be -- try to be precise on that.  I

10  would think that that is roughly right.  But I would, you

11  know, I would have to see some actual data to be certain

12  of that.

13  Q      What was --

14         THE COURT:  What was the question again that you

15  asked the Doctor?  The last question.

16         MR. FINBERG:  Your Honor, it was whether the degree

17  of polarized voting in Virginia is roughly consistent with

18  the degree of -

19         THE COURT:  Thank you.

20         MR. FINBERG:  - of polarized voting nationwide?

21         THE COURT:  Thank you.

22  BY MR. FINBERG:

23  Q      Are you aware white voters in Virginia were more

24  supportive of Obama in 2012 than they were of John Kerry,

25  white Democrat, in the 2004 election?

1  A      Yes.   That sounds right.

2  Q      Does it sound roughly right that President Obama in

3  2012 got approximately 37 percent of the white vote in

4  Virginia?

5  A      I take your word for that.

6  Q      And Senator Kerry, he ran in 2004, only garnered 32

7  percent?

8  A      Again, I will take your word without having those

9  figures in front of me.

10  Q      You would agree with me that many factors other than

11  race play an important part in southern politics,

12  including politics in Virginia?

13  A      Of course.

14  Q      And you would agree with me, wouldn't you, Virginia

15  has changed in many profound and significant ways since

16  the 1950s?

17  A      Yes.   And I testified to many of those.

18  Q      One of the ways that it has changed is, for instance,

19  Virginia's economy has developed from predominantly

20  agrarian, or farming, to a mix of industry and services?

21  A      Certainly.   Yes.

22  Q      And the population of Virginia has grown dramatically

23  since the 1950's?

24  A      Yes.

25  Q      Since then, political power in Virginia shifted from

Smith - cross

1   rural communities to the cities and suburban communities?

2   A    That is fair.

3   Q    Since the 1950's, overall public opinion in Virginia

4   has become more liberal rather than conservative?

5   A    Again, I remember being asked this question at the

6   deposition.  It is hard for me to, having grown up in

7   Virginia, think of Virginia as a liberal state.  It has

8   grown -- has public opinion grown more liberal?  In many

9   respects.

10       But certainly electorally, Virginia has remained very

11  conservative.  Of course, didn't elect a Democratic or

12  liberal president between -- only once between 1948 and

13  2008.  So again, I would be careful about characterizing

14  Virginia as a liberal state.

15  Q    The question is more liberal than now than it was in

16  1950?

17  A    By most reasonable measures.  But I am not entirely

18  comfortable referring to Virginia as a liberal state.

19  Q    Since the 1960s, politics in Virginia has changed in

20  profound and significant ways, hasn't it?

21  A    Absolutely.

22  Q    Since the 1960s, you would agree that modern southern

23  politics involved much more than obvious racial positions?

24  A    Sure.

25  Q    Economic class plays an important role in politics?

```
 1   A     Yes.

 2   Q     Gender plays a very important role in politics?

 3   A     Yes.

 4   Q     Religion?

 5   A     Yes.

 6   Q     Taxation plays a very important role in politics?

 7   A     Yes.

 8   Q     Opposition to unions?

 9   A     Sure.

10   Q     Emphasis on individual liberties?

11   A     Yes.

12   Q     So-called family values?

13   A     Um-hum.

14         THE COURT:  You have to answer 'yes' or 'no.'

15         THE WITNESS:  Yes.  Yes.

16   BY MR. FINBERG:

17   Q     Gun control?

18   A     Yes.

19   Q     National defense?

20   A     Yes.

21   Q     All these issues, you would agree, that the two major

22   political parties have clearly different views?

23   A     Well, especially at the national level.  I think

24   within state parties there is, but even within each party

25   you can pick any issue, and there are likely to be
```

1  differences of opinion among Democrats or Republicans.

2  But on, you know, from the high level, yes, there tend to

3  be profound differences to most of these issues.

4  Q    You would agree with me that unlike the Carter Glass

5  era, or the era of the Byrd machine, that race as a

6  political issue no longer predominates in the political

7  discourse?

8  A    Certainly not in the overt political discourse.

9  Q    You would agree that voting rights for minorities

10 have evolved and are continuing to evolve?

11 A    Yes.  And they continue to evolve in fits and starts.

12 I think while you are absolutely correct in every one of

13 those issues you raised, it is an important issue.  And

14 given a different -- depending on the election year,

15 depending on the candidates, those issues get different

16 priorities and different rankings.  But, you know, again,

17 we talked about many times, sort of looking at Virginia's

18 history, including the post-1965 period, you know, race

19 and politics are so inextricably intertwined that I don't

20 know that you can simply discount and say things have

21 gotten better and race no longer is a factor.  I think it

22 remains certainly a factor, and for many people one of the

23 most important, if not the most important.

24 Q    You would agree that that official disenfranchisement

25 no longer exists in Virginia?

1  A    Not in the way we have talked about previously, yes.

2  Q    You would agree with me, wouldn't you, Dr. Smith,

3  most of your expert report submitted in this case deals

4  with efforts to suppress minority voting rights prior to

5  1965?

6  A    About two-thirds of it does, yes.  Correct.

7  Q    Ms. Branch asked questions about the Voting Rights

8  Act.  Not only its original enactment, but then subsequent

9  votes on reauthorization of the act.  Do you recall that?

10 A    Yes.

11 Q    And would it be accurate that the position of

12 Virginia's representatives to Congress with regard to the

13 Voting Rights Act has swung from opposition in the 1960s

14 to bi-partisan support in 2006?

15 A    In 2006, there was bi-partisan support both in

16 Virginia and in the nation for that.  As I have tried to

17 indicate in, I think in my reply report, though, I think

18 that there are a number of factors that have to be

19 considered.  And to simply suggest that means everybody is

20 on board, and fully supportive of, it is one thing to say

21 that accepting the knowledge that African-Americans are

22 going to vote, it is another thing to vote for the fairly

23 strict enforcement mechanisms of the Voting Rights Act.

24      Yet more recently, though, I think that the -- if you

25 want to look at a measure of support for the Voting Rights

1  Act and its enforcement, you have to look more recently at

2  the reaction to *Shelby County v. Holder* when the Supreme

3  Court, you know, gutted the coverage formula which

4  included all of Virginia.  And to my knowledge, no

5  Republican official in Virginia stepped forward to support

6  the bills offered in Congress to actually restore the

7  coverage formula.

8       The Supreme Court invited Congress to do that.  There

9  have been bills in Congress.  Some, a few Republicans

10 naturally supported that, but for the most part have not.

11 And no one in Virginia, no Republican official in

12 Virginia, has come out in support of restoring,

13 essentially restoring, the Voting Rights Act.

14 Q    Virginia is not alone in that regard?

15 A    No.

16 Q    There are many states other than Virginia, and

17 particularly in states that don't have Virginia's racial

18 history, where they also have not come forward and tried

19 to reinstate those provisions of the Voting Rights Act;

20 isn't that correct?

21 A    Sure.  There are states all across the country that,

22 you know, tend to, especially, for the most part, broken

23 down as a partisan issue.  Here is the intertwining of,

24 you know, party realignment and race, which I don't think

25 you can get away from.

1  Q    I just want to clear up for the record, because the

2  expert reports in this case have been submitted into

3  evidence.   In your reply report, which you submitted in

4  response to the expert report of Dr. Palazzolo, you make

5  the point that in the reauthorization vote in 2006 for the

6  Voting Rights Act that there was dissension in Congress on

7  the reauthorization.

8  A    Correct.

9  Q    By implication, you made the argument in your reply

10 report that some of that dissension was present on the

11 Virginia representative's congress, didn't you?

12 A    Well, did I say that directly?  I certainly remember

13 the -- I know what you are referring to.  I did --

14 Q    Let me ask you this.  You do know, don't you, that

15 the Virginia Congressional Delegation voted unanimously in

16 favor of the reauthorization?

17 A    Which -- with one absentee abstention, yes.

18 Q    You are not aware, are you, of any published reports

19 of Virginia members of Congress standing up during the

20 debates in Congress and speaking out against

21 reauthorization?

22 A    Right.  I am not making that claim, no.

23 Q    So seven years before the enactment of Senate Bill

24 1256, no Virginia Republican voted against the 25-year

25 extension of the Voting Rights Act?

Smith - cross                   262

1  A     Correct.

2  Q     Let's talk a little bit about Governor Wilder's

3  election -

4  A     Okay.

5  Q     - in 1989.

6        Would you agree this is evidence of a break in any

7  pattern of African-American voter disenfranchisement?

8  A     Well, it certainly was a remarkable historical

9  election.  But I don't know that I could necessarily -- it

10 doesn't necessarily mean that there weren't still voters

11 whose votes were suppressed.  I am not quite sure -- I

12 know certainly African-Americans turned out in large

13 numbers.  That contributed mightily to his election.  So I

14 am not claiming that there was X number of black voters

15 who were not able to vote in that election.  I don't think

16 you can assume that there weren't still obstacles to black

17 voting at the local level or state level.

18 Q     He was the first African-American to be elected

19 governor of any state; isn't that correct?

20 A     Correct.

21 Q     And there have only been two since then of any state

22 in the country?

23 A     Yes.  Only one elected, and then one who became

24 governor when Spitzer stepped down.

25 Q     That would be Paul Patrick in Massachusetts?

1    A      Correct.

2    Q      Governor Wilder's election to governor in 1989 is an

3    event that would have been impossible in Virginia prior to

4    1965?

5    A      Of course.

6    Q      Although he may have tried to downplay it, race was

7    an issue during the Wilder campaign?

8    A      Yes.

9    Q      And as a matter of fact, it worked to his benefit by

10   mobilizing African-American voters, didn't it?

11   A      Well, it certainly mobilized African-American voters,

12   but also clearly turned off many white voters.  I would

13   think in balance you are probably correct, probably

14   mobilized more black voters.  But who knows how many white

15   voters voted against him based on race.  It is impossible

16   to know.

17   Q      Governor Wilder, in fact, had a bi-racial coalition

18   and could not have won without the support from white

19   voters; isn't that right?

20   A      Yes.  He had a certain -- he did not have anywhere

21   close to a majority of white voters.  He had some white

22   voters, absolutely.

23   Q      Two-thirds of Wilder's votes came from white voters?

24   A      Yes.  But he didn't get anywhere close to two-thirds

25   of the white votes.

1  Q     41 percent of the people that supported Doug Wilder

2  were white, white voters; weren't they?

3  A     Yes.

4        Again, doesn't mean he got his percentage of the

5  white -- I don't know exactly of the top of my head what

6  percentage of white voters it was.  It would be a

7  different number.

8  Q     In Virginia, Democrats haven't nominated an

9  African-American candidate for state-wide office since

10 Governor Wilder, have they?

11 A     Not to my knowledge.

12 Q     In fact, Virginia Republicans during that time period

13 since '89 have nominated two African-American candidates,

14 haven't they?

15 A     I assume you are right about that.

16 Q     You are aware of Maury Stockins who ran for Senate in

17 '88?

18 A     Vaguely.  I was here in 1988, but I don't remember

19 that specifically.  I don't remember who he is.

20 Q     How about E. W. Jackson for Lieutenant Governor

21 nominated in 2013?

22 A     Yes.  I was not here, and so I do not remember.

23 Certainly wasn't involved in that election.

24 Q     Let's talk for a minute about redistricting.  You

25 touched on this briefly.  You talked about the City of

Smith - cross

1   Petersburg and how in the '60's and '70's Petersburg was

2   an example of how redistricting prevented the election of

3   minority candidates; isn't that right?

4   A     Yes.

5   Q     You would agree with me now - and I don't think this

6   is mentioned in your report - but all seven of Petersburg

7   City Council are African-Americans, aren't they?

8   A     Currently, yes.

9   Q     Is that to you not a sign of progress that has been

10  made?

11  A     Of course it is a sign of progress.  But it is a sign

12  that progress would not have been made without the

13  enforcement of the Voting Rights Act over time.  And I

14  think in, what, 1982 there was 60 percent black, and there

15  was still a majority white City Council.  So, yes, that is

16  absolutely a sign of progress, but progress that has come

17  on the heels of, you know, strict enforcement and constant

18  pressure applied under the guise of the Voting Rights Act.

19  Without that, with Petersburg having -- you know, with

20  Petersburg also going from 60 percent African-American to

21  77 or 78 percent now, almost 80 percent of the population,

22  if it didn't have a majority on City Council I think

23  something would be very wrong.

24  Q     But it is also a sign that something is right?

25  A     Yes.

1   Q      They now have a totally black City Council?

2   A      Better than it was before, certainly.

3   Q      Let's talk briefly about the Virginia Supreme Court.

4          I think you testified that contrary to what you

5   originally said in the original report, the Virginia

6   Supreme Court currently has two African-American justices

7   on it; is that right?

8   A      Correct.

9   Q      And you are aware there is a possibility there will

10  be a third?

11  A      Correct.  That has been pending a couple months now.

12  Q      Okay.  And as you know, or are you aware, that Judge

13  Alston, who is the African-American candidate who is being

14  considered for the Virginia Supreme Court, was supported

15  by Republicans; is that right?

16  A      Yes.

17  Q      And you know the nomination was stalled because of

18  his year-long gay rights, and had nothing to do with his

19  race?

20  A      That is my understanding, is that the Republicans who

21  first supported him, that is the issue they stalled on,

22  yes.

23  Q      This reflects, as we are talking about before, the

24  emphasis that modern Republicans place on family values

25  and social issues, doesn't it?

Smith - cross

1   A    I suppose.  I have not followed his nomination that

2   closely.  It would make sense if gay rights is the issue,

3   that would be tied in with family values.  I am not

4   prepared to testify as an expert on his beliefs or the

5   particular issues that the current legislature had with

6   him.

7   Q    Talk about Senator George Allen for a moment.  Would

8   you agree with me that whereas that but for his infamous

9   "macaca" remark, he might have gotten elected to the

10  Senate in the 1950s, and the fact he used that comment was

11  his undoing in 2006?

12  A    I would agree that a number of voters saw that as

13  important and did not vote for him as a result, and that

14  might have cost him the election.  Certainly cost him the

15  chance to run for president in 2008.  As I have said

16  previously in my report, that, you know, again, the issue

17  isn't that he is no different from Carter Glass and others

18  before him, but that well into the 21st century, a public

19  official of his stature would feel comfortable enough

20  using that remark.  He regretted it later, but he still

21  used it, and it also did not prevent him almost getting

22  his old seat back six years later in 2012.  So it did not

23  necessarily destroy him politically.

24  Q    So apart from that comment, his senate seat was safe?

25  A    Absolutely.

1  Q    And you would agree with me this race statement on

2  his part ended his chances of seeking national elective

3  office?

4  A    Certainly my view of it.

5  Q    You would agree this wouldn't have hurt George Allen

6  if he was running in the Carter Glass era?

7  A    Well, I don't know about nationally.  I think it

8  wouldn't have hurt him in the south.  There might have

9  been parts of the north where that might have been an

10 issue.  There is certainly many areas of the north where

11 people would not have had an issue, but I'm not sure if

12 someone was overtly, you know, racist as Carter Glass

13 would have done on the rational stage.  I am not quite

14 sure.  I am not comfortable answering that definitively.

15 Q    If he was running for the Senate in Virginia during

16 Carter Glass?

17 A    Sure.  I thought you said on a national level.

18 Q    Would it impress you to learn George Allen won in

19 excess of 15 percent of the African-American vote in 2006?

20 A    I am aware he got between 15 and 16 percent, yes.

21 Q    Well --

22 A    I realize that compared to other, you know, that is

23 more than Mills Godwin's six percent.  But that is still a

24 fairly small percentage of the population.

25 Q    He got that percentage despite the fact that he made

1  a racially overt comment?

2  A    He did .

3  Q    Let me touch for just one minute on busing, which is

4  something that you testified about during direct

5  examination.  You would agree with me, wouldn't you, that

6  busing in the late 1960's and '70's wasn't just an issue

7  in Virginia?

8  A    Correct.  It wasn't.  In many ways Boston, for

9  instance, as I pointed out in our reply report, had some

10 of the worst violence related to busing.  Absolutely.

11 Q    And the busing violence and the busing controversy

12 was an issue in many northern states, but didn't have

13 Virginia's racial history?

14 A    Correct.

15 Q    In your report, you touched on racial segregation in

16 housing as well.  Do you recall that?

17 A    Yes.

18 Q    You would agree with me that racial segregation in

19 housing is also present in many northern and mid-western

20 cities that are in states that don't have Virginia's

21 racial history?

22 A    Of course.

23 Q    This would be examples of cities like Boston, New

24 York, Cleveland, Chicago, Milwaukee and Detroit?

25 A    Correct.

1  Q    Dr. Smith, there are some statements in your opening

2  report regarding the rate at which African-Americans and

3  other non-whites are likely to lack the forms of ID

4  necessary to vote in Virginia.  Do you recall that?

5  A    Yes.

6  Q    But you haven't performed any studies on possession

7  of photo identification in Virginia, have you?

8  A    I myself have not.  Only read the reports.

9  Q    Okay.  And the reports that you relied on in your

10  expert report were the GAO report?

11  A    Correct.

12  Q    And a report by the Brennan Center?

13  A    Yes.

14  Q    And you would agree with me, wouldn't you, that the

15  GAO report did not review any study of Virginia voter

16  identification laws?

17  A    Yes.

18  Q    And the national study reviewing the GAO report only

19  looked at possession of driver's licenses and passports;

20  correct?

21  A    My recollection, yes.

22  Q    And you would agree, don't you, that the range of

23  photo ID acceptable in Virginia is much broader than

24  driver's licenses and passports?

25  A    Yes.  There are a few others.

Smith - redirect

1  Q      You also cited, and relied upon, the Brennan Center

2  report?

3  A      Yes.

4  Q      But you only reviewed the summaries and synopsis of

5  that report, correct?  Didn't read the entire report?

6  A      Correct.

7  Q      You would agree with me that even from reading the

8  summary you learned that the Brennan Center report only

9  asked people about possession of government-issued ID's?

10  A      That sounds correct.  I would like to look to be

11  sure, but I will take your word for that.

12  Q      Could I have one moment, Your Honor?

13         I don't have any further questions.

14         THE COURT:  All right.

15         Redirect of the Doctor?

16         MS BRANCH:  Yes, Your Honor.

17         THE COURT:  Go right ahead.

18                        REDIRECT EXAMINATION

19  BY MS BRANCH:

20  Q      Dr. Smith, through the course of your work studying

21  Virginia history, have you become familiar with

22  contemporary "Virginia history?"

23  A      I certainly think so.  I am familiar with the

24  literature and people writing on, you know, the more

25  recent period, yes.

1  Q     Have you authored any books recently?

2  A     My most recent book which looked at the Supreme Court

3  reapportionment decisions of 1960's came out about a year

4  and a half ago.

5  Q     Did you touch on anything related to the history of

6  Virginia in that book?

7  A     Yes.  As I mentioned earlier, one of the core cases

8  that was decided along with *Reynolds v. Simms* was *Davis v.*

9  *Mann,* which challenges malapportionment in Virginia.  So

10  in doing research for the book, I looked extensively at

11  the record in that case.

12  Q     Mr. Finberg asked earlier about your book entitled

13  "Managing White Supremacy."  How long did you spend doing

14  research for that book?

15  A     About seven years from start to finish.

16  Q     Was the research you presented in the book impacted

17  by outside influences in any way?

18  A     Well, I guess I don't know exactly.  I think

19  certainly my best effort to be entirely objective, and to

20  look at all of the sources and using methodology that most

21  historians would agree are correct.  I was not being

22  funded by outside sources with a particular political

23  agenda, if that is what you mean by that.

24  Q     Is the history that you presented in that book still

25  accurate to your knowledge?

1    A    To my knowledge, yes.

2    Q    You also talked earlier about George Allen and the

3    infamous "macaca" statement that he made.  Who was that

4    racial slur, you testified it was a racial slur, the term

5    "macaca," who was that slur directed towards?

6    A    My understanding it was a young man of south Asian

7    descent who was in the audience.  And he, I think, was a

8    college student, I believe at the time, and resident of

9    Virginia of south Asian descent.

10   Q    George Allen was elected to public office after he

11   made that statement; is that correct?

12   A    After the statement?  That was during.  No, he was

13   not elected in the 2006 election.

14   Q    He ran for office?

15   A    He ran that.  Was in the midst of the Senate campaign

16   of 2006, yes.

17   Q    And what percent of the white vote did he win in that

18   election?

19   A    I would -- it was overwhelming.  I mean, he was

20   still -- well, actually, no, I actually don't know.  I

21   would have to look at the exact figures to see the

22   breakdown.  I don't actually know.

23   Q    Mr. Finberg stated earlier he won.  Was it a majority

24   of the white vote?

25   A    I believe so.  I assume he still -- yes, he lost

Smith - redirect

1  votes, but did not lose the majority of white voters.  But

2  he only got -- we talked more about the 15 or 16 percent

3  black vote that he got.

4  Q    Mr. Finberg also asked questions about changes that

5  have occurred in Virginia.

6  A    Yes.

7  Q    Did you take into account the fact that changes have

8  occurred in racial politics in Virginia when you

9  originally drafted your expert report?

10  A    Of course.  I don't know how you wouldn't do that.  I

11  think any credible historian would consider, would

12  consider the pros, the cons, the ups the downs.  That is

13  what our job is to try to look at the sum total, looking

14  at how the history is impacting the present.  But, yes,

15  there is stated over and over in this process that there

16  has been an enormous amount of change, and nobody, no

17  credible scholar would deny that.  But that does not mean

18  there does not remain consistently obstacles of various

19  sorts to sort of full realization actual American

20  citizenship.

21  Q    You would agree there are aspects of racial politics

22  in Virginia that have not changed?

23  A    Well, I don't know that -- I'm not sure that the

24  matter -- the question of -- not so sure that they haven't

25  changed, but evolved in a -- they have evolved in new

1  ways.  And so whereas certainly racial politics are much

2  more overt in the past, I think they are more subtle now.

3  And they work in different ways.

4  Q    No further questions, Your Honor.

5       Thank you, Dr. Smith.

6       THE COURT:  May be he excused?

7       MS BRANCH:  Yes.

8       MR. FINBERG:  Yes, Your Honor.

9       THE COURT:  You are free to go.  Thank you for your

10  testimony.

11                  (Witness stood aside)

12      MR. SPIVA:  We don't have any further witnesses

13  today.  I think we went a little quicker through the ones

14  this morning than we anticipated.  I wonder if Your Honor

15  would mind if we broke for the day?

16      THE COURT:  I will do that today because I know you

17  are probably not accustomed to the pace we move here.  I

18  will tell you, back in the old day when I was practicing

19  law the Judge would say, fine, you have rested your case.

20  But I wouldn't do that.

21      MR. SPIVA:  I appreciate that.

22      THE COURT:  You laugh.  They did.

23      MR. SPIVA:  I always had trepidation of running out

24  of witnesses.  I know some Judges do that.  I thought with

25  nine lined up --

Smith - redirect

1        THE COURT:  I won't do that to you.  We will recess

2  until tomorrow morning at 9:00 o'clock.

3        MR. SPIVA:  Thank you, Your Honor.

4        THE COURT:  How many witnesses will you have

5  tomorrow, do you know?

6        MR. SPIVA:  I need to look at the schedule.

7        THE COURT:  Make sure you have a couple in the bull

8  pen in case you need them.  Okay?

9        MR. SPIVA:  We will.

10       THE COURT:  All right.

11       MR. SPIVA:  Thank you.

12       MR. FINBERG:  Thank you very much, Your Honor.

13       THE COURT:  We will stand in recess until tomorrow

14  morning at 9:00.

15                REPORTER'S CERTIFICATE

16        I, Krista L. Harding, OCR, RMR, Notary
   Public in and for the Commonwealth of Virginia at
17  large, and whose commission expires March 31, 2016,
   Notary Registration Number 149462, do hereby certify
18  that the pages contained herein accurately reflect
   the notes taken by me, to the best of my ability, in
19  the above-styled action.
        Given under my hand this 8th day of March, 2016.

20

21                     _____
                        Krista L. Harding, RMR
22                      Official Court Reporter

23

24

25