277

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2               Richmond Division


3

BARBARA H. LEE, et al.              }
4                                   }
v.                                  }   Civil Action No.
5                                   }   3:15 CV 357
VIRGINIA STATE BOARD OF ELECTIONS,  }
6 et al.                            }


7                                   February 23, 2016


8       **COMPLETE TRANSCRIPT OF BENCH TRIAL**
        **BEFORE THE HONORABLE HENRY E. HUDSON**
9       **UNITED STATES DISTRICT COURT JUDGE**


10 APPEARANCES:

11 Bruce V. Spiva, Esquire
   Joshua L. Kaul, Esquire
12 Aria C. Branch, Esquire
   Ceridwen Cherry, Esquire
13 Amanda R. Callais, Esquire
   PERKINS COIE, LLP
14 700 13th Street NW
   Suite 600
15 Washington, DC  20005
        Counsel on behalf of Barbara Lee, Gonzalo Brescia,
16      and the Democratic Party of Virginia


17

   Mark F. (Thor) Hearne, II, Esquire
18 Dana J. Finberg, Esquire
   Sara Schneider, Esquire
19 Kirsten Hart, Esquire
   Stephen Davis, Esquire
20 ARENT FOX
   55 2nd Street, 21st Floor
21 San Francisco, CA  94105
        Counsel on behalf of James B. Alcorn, Dr. Wheeler,
22      Singleton McAllister, Virginia Department of
        Elections, and Edgardo Cortes

23


24            KRISTA L. HARDING, RMR
            OFFICIAL COURT REPORTER
25       UNITED STATES DISTRICT COURT

```
 1            E X A M I N A T I O N S

 2                      DIRECT    CROSS    REDIRECT    RECROSS

 3  Senator Surovell       279      333       359       ---

 4  Delegate McClellan     367      390       ---       ---

 5  Karen Stallings        399      411       413       ---

 6  Abe Barranca           415      422       ---       ---

 7  Barbara Lee            425      442       446       ---

 8  Jeff Allen             451      463       ---       ---

 9  Delegate Howell, Jr.   469      480       ---       ---

10  Jonathan Rodden, Ph.D. 486

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Gil Halasz is now the court reporter.)

2     THE COURT:   Good morning.

3     Call your first witness.

4     MR. KAUL:   Senator Scott Surovell.

5     THE COURT:   Come forward, sir.

6     Place your left hand on the Bible, raise your right,

7 and face the Clerk.

8                    SCOTT ANTHONY SUROVELL

9               WAS SWORN AND TESTIFIED AS FOLLOWS:

10     THE COURT:   Have a seat on the witness stand, sir.

11     Put the full name on the record and spell the last

12 name for the court reporter, please.

13     THE WITNESS:   Scott A. Survoell.   Scott Anthony

14 Surovell.

15 BY MR. KAUL:

16 Q    Thank you, Your Honor.

17     Senator -- I think I answered my question.   How are

18 you currently employed?

19 A    I am a member of the Virginia State Senate, and also

20 an attorney, partner with the firm of Surovell, Isaacs,

21 Petersen and Levy.

22 Q    And I am going to ask you to do the best to speak

23 slowly to make it easier for the court reporter to

24 transcribe.

25 A    Got it.

1  Q     Where did you grow up?

2  A     Grew up in the Mount Vernon part of Fairfax County.

3  Q     And where do you live now?

4  A     Same place just down from where I grew up.

5  Q     How much of your life have you spent in Virginia?

6  A     The longest time I have been outside the state in

7  any one stretch was about 30 days when driving back

8  across the United States.  Otherwise, I have been in the

9  state for 44 years.

10  Q     And would you please summarize your educational

11  history?

12  A     Graduated from West Potomac High School in '89.

13  Went to James Madison University four years.  Graduated

14  from there in 1993.  Went to the University of Virginia

15  School of Law and graduated there in 1996.

16  Q     How long have you been involved in politics?

17  A     Involved in one way or another pretty much my entire

18  life.  My grandparents were sort of pretty politically

19  involved.  My parents were sort of involved in the party

20  to some extent.  Less so after I was born.

21      The, so through the years I was sort of here and

22  there through campaigns.  When I was in high school my

23  mother worked for Congress for 28 years.  So politics was

24  kind of always around.  After I -- I wasn't so much

25  active in college or in law school, but after I got out I

Surovell - direct                    281

1  had a child and moved back to Mount Vernon.  I got

2  involved with my local democratic committee around 2001,

3  I think it was.  And I became recently active,

4  increasingly active after that.

5  Q    What positions have you held in your local

6  Democratic committee?

7  A    I got to -- the way it was organized in Fairfax

8  County, the county is so large that it actually was

9  organized, the committee, into local committees based on

10  supervisor districts, which is about 120,000 people a

11  piece.  So I initially got involved, I was vice chair of

12  Mount Vernon Democratic Committee for about two years.  I

13  became the chairman of the Mount Vernon Democratic

14  Committee, co-chairman for a year, full chairman starting

15  in the fall of '03 through the fall of '07.  I was

16  elected chairman of the Fairfax County Democratic

17  Committee in the fall of 2007.

18       I resigned that position in June of '09 when I

19  became a candidate for the House of Delegates.

20       I was also involved in the state central committee

21  of Democratic Party for about, I want to say six or seven

22  years.  I can't remember exactly when I started.

23       I got off after I was elected to the House of

24  Delegates.

25  Q    You said you first ran for the House of Delegates in

Surovell - direct                           282

1  2009.

2  A     Right.  Became a candidate around June 23 or 24,

3  something like that, when my incumbent announced she

4  wouldn't run again.

5  Q     Okay.

6        Can you describe the first campaign?

7  A     Well, as I said, I ended up getting in the process

8  pretty late because my incumbent decided after primaries

9  were over she didn't want to run even though she had

10  already declared.  She decided not to run.  It was kind

11  of an abbreviated campaign.  That is not how it usually

12  works, but I spent about seven days getting organized.

13  Started around July 1.  I basically focused on knocking

14  on doors and raising money from July 1 to election day.

15  Between, in those four months it was, I think I knocked

16  on about 8,000 doors personally.  I had a field staff,

17  between five and 12 paid people depending on what time of

18  the race it was.  I did the same thing.  We would meet

19  quickly, talk about whatever the experience was, and

20  stuff like that.

21        And I won the race I think by 12 or 13 percent.

22  Q     Just for the record, I guess so it is clear, can you

23  explain what it means to knock on doors?

24  A     Well, it means different things to different people.

25   Different candidates do it different ways.  The way I

1  personally do it is I carried around a list of every

2  single registered voter in my district.  And some

3  candidates actually use the target and take the names of

4  certain people.  I carried a list of names with me, and I

5  sort of self-target as I go, and I tend to at least in

6  most of the campaigns I have been involved in, I tend to

7  only exclude people who I think I have absolutely no shot

8  with.

9      You know, most of the parties keep people's voting

10  habits, keep data bases.  And we have a pretty good idea

11  who is a supporter and who isn't, who is the middle kind

12  of thing.  The only people I really wouldn't try to talk

13  to were people who were, your know, pretty -- the

14  Republican party, against me.  But one of the other

15  things I did though by, that was by knocking on every

16  single door; otherwise, I was talking to a lot of voters,

17  people I usually don't talk to.  So people that had more

18  voting history, people voting in presidentials, voted in

19  five or six years or something like that, I gave them a

20  pretty good spectrum of who was on the registered voter

21  roles, of who is in my district.

22  Q    How long were you a member of the House of

23  Delegates?

24  A    I served in the House of Delegates for three terms,

25  six years before I went to the state Senate.

Surovell - direct                284

1  Q     I will come back to the Senate elections in a

2  minute, but following the 2009 race, you were there for

3  six years, you must have had a couple more elections,

4  right?

5  A     I had three elections.  Technically all of them were

6  contested.  In reality, only two of them were actually

7  really contested.  The other one was kind of nominal,

8  kind of a marginal candidate.

9  Q     Did you continue knocking on doors in the other

10  campaign?

11  A     I knocked on about four thousand doors in the 2011

12  race.  And the point came I didn't do any door knocking.

13  Q     In your work as a delegate, did you have constituent

14  contacts outside the door-knocking process?

15  A     Yes.

16        If you want to minimize your chances of losing an

17  election typically it is a pretty good idea to have a

18  pretty robust communication program.  One thing I always

19  try to do is I always try to build my e-mail list.  And I

20  did that a number of different ways, including, you know,

21  town hall meetings.  I had a couple petitions.  I drive

22  around to try to get the yellow line extended down the

23  Hybla Valley.  I had another one over the hybrid car tax

24  that came out at one point.  Most importantly I would

25  send out a constituent survey every year at the beginning

Surovell - direct

1  of the session by mail to about, I forget, six to ten

2  thousand households.  People would send me back what they

3  wanted us to focus on as a result of that issue.  Vote by

4  e-mail and stuff.  You know, there was constant

5  communication plus a lot of people, not at the time, but

6  people would call with constituent issues all the time,

7  problems with state government, including -- I hope I am

8  not talking too fast.

9      COURT REPORTER:  You are.

10 A   Slow down?  Okay.

11     My court reporter tells me that, too.

12 BY MR. KAUL:

13 Q   I would not make a good witness.

14     Did -- can you describe the demographics of your

15 district?

16 A   My district is very -- the 44th district is very

17 unusual.  36th Senate district is similar.

18 Q   I'm sorry.  I meant with respect to the House

19 District.

20 A   Yes.  So, the 44th House District, I think Your

21 Honor is a little bit familiar with it, you may have

22 lived there once.

23     THE COURT:  I did.

24     THE WITNESS:  Right.

25     So, before -- I lived my whole life, so at the time

1   the 44th district in 2011 was, I think, about 14

2   precincts.  Basically ran from the Wilson Bridge down to

3   Mount Vernon.

4       And sort of over to Huntley Meadows Park and kind of

5   Fort Belvoir.  And along the Potomac River you had six or

6   seven precincts which were some of the least diverse,

7   whitest precincts in all of northern Virginia.

8       My theory, because of the schools, but they haven't

9   really diversified like the rest of northern Virginia

10  has.  So the precinct I lived in of all precincts is the

11  second whitest precinct in Fairfax County out of 230

12  precincts.  According to the census it is 94 percent

13  white.

14      There are five or six other precincts right around,

15  all pretty much the same.  The street I live on has 20

16  houses.  I think there has been a minority person in

17  those 20 houses maybe three times in my life time.

18      Today I am not sure there is a single minority

19  living on my street.  That will give you an idea what

20  that part of the county is like.

21      Then right next to it, if you go down Convair Road,

22  Short Haul Lane, as Your Honor knows, you get to Gum

23  Springs right up against Route One, which is the oldest

24  historically black community in Fairfax County, home of

25  George Washington's former slave.  And then as soon as

1 you cross the street on Route One from that, kind of the

2 other side of the tracks, and the precincts along the

3 west side of Route One to a limited extent on the east

4 side of Route One, is extremely diverse.

5        So just across the street from Gum Springs the

6 precinct is 12 percent white, and the highest

7 concentrated poverty in northern Virginia right there all

8 up and down Route One.  A lot of apartments.  A lot of

9 subsidized housing.  A lot of single-family housing that

10 is kind of in need of rejuvenation.

11       The Hybla Valley Elementary School has the highest

12 reduced lunch population in all Fairfax County.

13 90 percent of the students who attend there are

14 free-lunch population.  And so it is a very kind of

15 bipolar district.  It has a lot of sort of wealthy, high

16 graduate school educated people along the river, up north

17 to D.C.  And then you have a lot of people live on Route

18 One that sort of do a lot of service level jobs, a lot of

19 retail, construction, and very diverse.  The district I

20 think in general is typically about 20 to 25 percent

21 African-American, 20 to 25 percent Hispanic.  About ten

22 percent other.  29 percent foreign-born, according to the

23 census, I think.

24       It is a very unusual place.

25 BY MR. KAUL:

Surovell - direct                              288

1   Q      And you mentioned that you have been elected to the

2   Senate.  When did you first run for the Senate?

3   A      Ran for the Senate, I declared three days after the

4   State of the Commonwealth address last year.  The State

5   of Commonwealth address, I thought about it a couple days

6   and declared that Friday.  So I started running about a

7   year and a month ago today.

8          THE COURT:  What year was that?

9          THE WITNESS:  2015.

10  BY MR. KAUL:

11  Q      Did you do a lot of campaign work for that election?

12  A      Yes.  That was the most intense campaign I have had

13  yet.

14         I had a primary for about, well, I couldn't do

15  anything but give speeches on weekends and nights during

16  the General Assembly session.  And when the session was

17  over around February 28, plus or minus, I sort of jumped

18  into the campaign stuff head on.  And between, when we

19  got out of session at the end I knocked on about 12,000

20  doors personally.  I had a primary, sort of, for about

21  the first five weeks.  And my opponent, about 500

22  signatures, but unfortunately only 230 were any good.  So

23  he wasn't qualified as a candidate, and I ended up not

24  having a general election opponent.

25  Q      Did you knock on doors in that campaign?

1  A    Yes, I just said 12,000 doors personally.  My

2  campaign, I don't know how many my campaign knocked.

3  Probably something north of 40 or 50,000 with my paid

4  staff.

5  Q    Between elections, how many doors have you knocked

6  on in your current Senate district?

7  A    About 25,000.  Some of the doors I knocked were no

8  longer in the district, but in the sort of very upper

9  middle income part along the river, got excluded in the

10  last redistricting.  So, but, the vast majority, 20,000

11  doors in the current Senate district.

12  Q    Plus 5,000 from the other district?

13  A    Right.

14  Q    In the elections that you have been involved in have

15  you gone to polling places on election day?

16  A    Yes.  I have been working polling places since I

17  became -- since I got more involved in the party actually

18  in 2001.  When I was local committee chairman I was

19  really trying to recruit leadership in the precinct.  So

20  I would go always go to the precincts where we did not

21  have existing infrastructure.  Those tended to be lower

22  income, more transient, more diverse precincts.  I was

23  trying to recruit people that would organize the precinct

24  and help get us, get things done on election day.

25        So starting in 2000 I would do that.  I would do it

1  every year, and not just general elections, but also the

2  primaries.  And specially the primary.  Primary you know

3  a person can walk in the door with a Democrat, and they

4  are usually pretty partisan, so it is a great place to

5  try to recruit new people to work with you.

6       So, I would go out and collect e-mail addresses,

7  talk to people on election day, and, you know, I was

8  always filling polls and going places.

9       Now, once I became a candidate I would always camp

10 out at the precinct where we typically were expected to

11 have the highest voter turn out.  In the last Senate

12 election I went and hung out at the precinct where we

13 expected to have the highest Republican turn out.  The

14 Senate election was a little different than the others.

15 So generally I have been out there every minute the polls

16 are open.

17      And when I was a candidate committee chairman,

18 though I don't think I worked the polling place that day,

19 I think I stayed back and waited for the complaints to

20 roll in to deal with those.  I also had to deal with all

21 kinds of problems.

22      One of the things I did when I was a county chairman

23 was I set up an election protection committee of lawyers

24 to deal with election day voter problems.  I was pretty

25 involved in that, setting up the process to deal with

1  that.  I was pretty familiar with the kinds of things

2  going on in a polling place on a daily basis.

3  Q    When you would actually go to the polling places,

4  what were you doing there?

5  A    Typically, depends on what capacity I was in.  When

6  I was Mount Vernon chairman I was out there trying to get

7  names, e-mail addresses, trying to talk to people into

8  getting more access.  If there was general election day I

9  would be trying to persuade voters.  As a candidate it

10 was all voter persuasion, asking for people's votes and

11 things like that.

12    When I was a Fairfax County chairman, as I said, I

13 would be waiting for problems.  Sometimes go out and find

14 out.  One of the things you try to do is find out what

15 the count is, number of voters who voted.  Sometimes we

16 had problems to go deal with.  Being a lawyer, having a

17 law degree, knowing something about election laws, I

18 would go out and sometimes try and deal with problems

19 that developed throughout the day.  Some elections judges

20 seem to operate the places a little different than they

21 are supposed to.  I would deal with that.

22 Q    Through the various contacts you have had with your

23 constituent base, have you thought a lot about various

24 circumstances that your constituents have?

25 A    Yes.

Surovell - direct                292

1  Q     Have you learned about which of your constituents

2  tend to have forms of identification?

3  A     Yes.

4  Q     What have you learned?

5  A     I have learned, number one, it is easy to generalize

6  and to assume that everybody has an ID.  Even people who

7  you think probably have ID.  But, you know, one of the

8  things -- let me put it this way.

9         Having just said it is easy to generalize, I will

10  generalize.

11        THE COURT:  You can generalize, sir, but I don't

12  want you to speculate.  Make sure there is factual basis

13  for your opinion.

14        Go right ahead, sir.

15        THE WITNESS:  I appreciate that.

16        Yes, Your Honor.

17        It kind of depends on the neighborhood.  Depends on

18  who you are talking about.  So to generalize across

19  everybody is very difficult.  But to give you some

20  examples.  My first election in 2009, two voters visibly

21  jumped out at me every time I think about this.  One is a

22  woman named Mildred Downing.  She is 96 years old.  Lives

23  in Stratford Landing.  I knocked on her door, I don't

24  remember, I think in August.  I think it was August.

25        Mildred, again, was 96 years old.  Original owner in

1  Stratford precinct, old woman, told me she would vote for

2  me.  She is 96.  I said, really?  She said, yes.

3        So I asked her to vote.  Do you need a ride?  I

4  don't need a ride.  Stratford is where I was working

5  election day.  Had a big turn out there, shaking hands.

6  And a car pulls up.  Mildred pops out, gets out her

7  walker, comes up to me and said, I told you I would be

8  here, and I am here to vote.  I am pretty sure Mildred

9  doesn't have ID.  96 years old.  She doesn't drive any

10 more.

11       THE COURT:  Pardon me for stopping, but what year

12 was this?

13       THE WITNESS:  2009.

14       THE COURT:  2009.  Go right ahead.

15       THE WITNESS:  Fall of '09.  November of '09.

16       THE COURT:  Go right ahead.

17       THE WITNESS:  Later that election cycle I was

18 knocking doors in Bell Haven Precinct, which is,

19 surrounds west to Potomac High School in the northern

20 part of the district.  And there is a piece of land that

21 sits in the middle of West Potomac High School, land

22 originally owned by the Quander family, who were also

23 George Washington's former slaves.  But long-time

24 historically black, little nugget in my district.  I was

25 in that land right there, and a whole bunch of black

1  families live right in there.  I was talking to one

2  gentleman in the house.  I think he was about 80 years

3  old.  I can't remember his name.  And he told me he would

4  vote for me.  I was looking at my list.  I said, my list

5  says there is a woman here who is 105.  He said, yes,

6  that is my mom.  She is right there.  And there was this

7  old woman sitting in a recliner who had not said a word.

8  I had not notice her.  I don't think she could hear me

9  very well.  I looked down at her and said, Mrs. Ware --

10  her name was Mattie Lou Ware.  I said, Mrs. Ware?  Yeah.

11  I said, you know, tried to say could I have your vote,

12  too?  And she committed to vote for me.  It was very hard

13  to communicate with her.  But her son went on to tell me

14  she registered specifically for the purpose of voting for

15  President Obama, you know, she is 105, 104 then, 105 now.

16  You know, pretty sure Mattie Lou didn't have ID.  105.

17  You are not going to go to DMV and get a card.

18      MR. HEARNE:  Your Honor, to the extent the witness

19  is, the Senator is testifying to facts --

20      PX LAW THREE:  I will sustain the objection as to

21  the Senator's speculation of whether or not she has ID

22  without some kind of factual basis for it.  With all did

23  Senator.

24      Go right ahead, sir.

25      THE WITNESS:  Right.

1        Well, at the time, at the time ID wasn't required,

2   so it wasn't like I was cross examining people asking

3   them do you have a driver's license or not?  You know, I

4   am pretty sure she didn't.

5        In 2009, you know, remember that, now.

6   BY MR. KAUL:

7   Q    Let me ask you this question, similar question,

8   which I think would be more to the point.  In knocking on

9   doors did you encounter constituents who don't own a

10  vehicle?

11  A    Yes.  One of the things that really opened my eyes

12  this last election cycle was that in April the Speaker of

13  the House got the State Board of Elections to approve

14  electronic signatures on absentee ballot applications.

15  One of the things I did, I went to the web site we

16  created, so that I could go door to door to collect

17  absentee ballots using a Smart phone or tablet.  And so

18  every voter I spoke to who did not vote in the '04

19  election, I would have an exchange with them and try to

20  talk to them about whether they could plan to vote early

21  by mail.

22        And as part of that process, you have to ask them

23  where you work, where you live, what do you do every day?

24  Are you disabled?  There is whole series of reasons you

25  can go through you.  It caused me to find out a lot more

1  about my constituents than I had ever known before.  And

2  I would come across people who, for example, I mean,

3  quite a few people who were disabled.  Sitting at home

4  disabled.  Unable to drive.  And, I met, I remember met

5  an African-American woman who had an expired license.

6  About 88 years old.  Clearly didn't get out a lot.

7      I would also try to sign up people to vote

8  electronically.  The state created a new electronic

9  registration, some of the first legislation I worked

10 with. Delegate --

11     COURT REPORTER:  Wait a second.  Really.  I can't

12 understand you.

13     THE WITNESS:  I am sorry. I talk fast.

14     The state created an electronic voter registration

15 system where you can register to vote on line using a

16 driver's license.

17     They created that pursuant to legislation that I

18 worked with Delegate Ramadan.  And in order to use that

19 system you have to have a driver's license.  And so when

20 I ran in to people not registered, I would try to

21 register them, but I can only register them if they had a

22 license.  So, it had to be a current license and not

23 expired license.

24     So I remember I met this one African-American.

25 Actually she wasn't registered.  She was -- needed to be

1  registered.  Her license was expired.  I couldn't

2  register her to vote because her driver's license was

3  expired.

4      I meet other people who had not gotten their license

5  yet.  I met a couple of young people 18 years old who had

6  not -- young people aren't getting licenses as much any

7  more.  So they hadn't gotten their driver's license yet.

8  I was running into situations like that where I was

9  finding young people without licenses.

10      And then, you know, a whole another range of

11 experiences from my experiences as a lawyer, you know, I

12 can getting into separately.

13 BY MR. KAUL:

14 Q    I will come back to that in minute and ask about

15 that.  But, for now focusing on your constituent contact.

16      What part of your district that you described before

17 was it where you tended to see people who didn't have

18 driver's, or didn't own vehicles or have a driver's

19 license?

20 A    Forty-fourth district, Route One corridor has the

21 highest transient usage in all Fairfax County.  Trying to

22 get the yellow line extended, bus, rapid transit.  It is

23 mainly a lot of people in sort of low income precincts

24 along Route One use transit to commute.  They use the

25 Fairfax connector bus.  They use the Metro bus.  Many

 1  don't have cars.

 2      I remember I represented a woman in a child-custody

 3  case who lived in Woodlawn once.  She lived in a home

 4  with nine people and took three buses to get to her job

 5  in Tysons Corner where she was a janitor.  She would be

 6  gone eleven hours a day, and she didn't have a car.  So

 7  one car for nine people in that house.

 8      So there is people, a lot of people like that that

 9  live in there.

10  Q    That is the heavy minority area you were describing

11  before?

12  A    Right.

13  Q    In the course of this work you have been discussing,

14  did you learn about how much knowledge your constituents

15  had about the rules for voting?

16  A    Yes.  Many of them don't have any idea what the

17  rules are for voting.

18      MR. HEARNE:  Your Honor, to the extent the

19  witness --

20      THE COURT:  The objection is sustained unless you

21  lay some foundation for the Senator's opinion on that.

22  Okay?

23      MR. KAUL:  Absolutely.

24      THE COURT:  All right.

25  BY MR. KAUL:

1 Q     Did you have conversations with your constituency

2 about the rules for voting?

3 A     Sure.  For example, I remember, I remember one or

4 two recent non-native-born voters, immigrant voters.  A

5 lot of folks on Route One are from eastern Africa, Ghana,

6 Nigeria.  I remember a couple conversations with people

7 like that who did not understand that, for example, I

8 remember -- they thought they had to get a registered

9 voter card every single year to vote.  They didn't

10 understand that in the United States once you register to

11 vote, you vote every single year.  I tried to explain to

12 people that that is how the system works.  You don't have

13 to get a card every year to go do it.  That once you are

14 on the list you are good.  It is that level of

15 misunderstanding about how our process works.  You know,

16 people who -- there is some people more informed,

17 obviously, know all the requirements but, you know, you

18 are not talking about people with a high -- that have a

19 high level of sophistication on public policy or the

20 rules or news or anything else.

21 Q     So aside from those two examples, have you been

22 involved in registering voters?

23 A     Yes.

24 Q     In doing that, did you discuss the rules that apply

25 to elections with voters?

1  A      Usually when I sign somebody up to register them to

2  vote I try to reinforce to them what the rules are and

3  what they have to do and all that.  I try to, you know,

4  conversations don't always go the way you want them to.

5  Q      And you talked about signing people up for absentee

6  ballots.

7  A      Yes.  I signing up about 950 people this year to

8  vote absentee electronically, going door-to-door in my

9  campaign.  About seven or eight hundred of them

10 personally.

11 Q      And did you talk to those folks about the rules for

12 voting?

13 A      I talked to them about the rules for voting

14 absentee.  There were a few people who were kind of iffy

15 about wanting to go to the polls.  I explained to them,

16 if they got -- if they got the ballot at their house they

17 could actually take the ballot to the polling place and

18 vote live in person only if they carry the ballot with

19 them to the voting place to make sure they didn't vote

20 twice.

21 Q      Have you spoken to voters about the voters ID law?

22 A      Yes.

23 Q      Through these conversations did you develop an

24 understanding as to the knowledge that voters have

25 regarding the voting laws in Virginia?

Surovell - direct                    301

1 A     Sure.

2 Q     All right.

3       So, did you learn anything about your constituents

4 knowledge about the absentee voting process?

5 A     Most people have no idea how that absentee voting

6 works.

7       MR. HEARNE:  Object to the extent he is speculating.

8       THE COURT:  Objection to the form of the question is

9 sustained.

10      You can ask him whether or not in his conversations

11 with people they evidenced a knowledge of voter ID laws.

12 That is permissible because it doesn't require him to

13 speculate.  But I won't allow him to opine as to what

14 another person thought.  That is the deliberative

15 process.

16      Senator, you understand that, I am sure.

17      Go right ahead.

18 BY MR. KAUL:

19 Q     And, so in your conversations with your constituents

20 about the voting process, what did you learn from them

21 about what they knew or didn't know about the voter ID

22 law?

23 A     The question then goes to absentee voting rules.

24 Q     I will come back to that in a minute.

25      So let me start with this one.

1        The Judge's question was better than mine so I

2    decided I would steal it.

3    A    Okay.

4        Well there is a lot of confusion about what about

5    what the law is and what counts, and if there is a

6    requirement.  It is just, you know, a lot of people don't

7    watch the news or read things that come in the mail.  So,

8    you know, when talking about the last five or ten percent

9    of the electorate you are talking about the extremely low

10   information voters.  Ten percent of the public is

11   liberal.  I mean, you know, it is -- it is, you know, a

12   lot of people might understand, but the ones that don't

13   vote as much don't know the rules.

14       MR. HEARNE:  Your Honor, in terms of, I don't want

15   to constrain the testimony, but to the extent he

16   continues to offer testimony what percentage of the

17   population may or may not understand something, he has

18   been --

19       THE COURT:  I take it at best as the Senator's

20   personal opinion.  All right?

21       MR. HEARNE:  Thank you, Your Honor.

22   BY MR. KAUL:

23   Q    Senator, I am going to ask you a similar question

24   about absentee voting.  And but I want to focus

25   specifically on what you have learned directly from

1 conversations.  To the extent you categorize, if you can

2 do it, according to specifics that would be helpful.

3      So what have you learned about constituents'

4 knowledge about absentee voting?

5 A    Again, it is lots of confusion among people who have

6 a knowledge base, at least of people who tend to support

7 me, tends to be a lot of anger.  And people who don't

8 support me, they tend to be perfectly happy with the law.

9 But then there is a group of people that aren't really

10 all that well informed and you either have folks who

11 don't understand there is a requirement, or they don't

12 understand what the requirement is.  It changes.  It

13 changed once or twice in four years now, I guess.  But,

14 you know, some people think all they have to do is

15 present the voter registration, right?  That that is

16 enough.  I got a card.  I don't need anything else.

17 Q    Have you had direct experience with people who had

18 this sort of confusion?

19 A    I had, yes, because, again, I get called in on

20 election protection problems because I am an attorney and

21 I am supposed to know that.  I know these rules, so I get

22 phone calls all the time on election day about it.

23 Trying to remember if I have had a specific incident at a

24 polling place.  But since this law was enacted I have

25 been an elected official so I haven't -- haven't been any

Surovell - direct

1  moments like that at the polling places I have worked

2  where I have gotten phone calls asking what do we do, who

3  to call, that kind to have thing.

4       THE COURT:  Talking about people that presented a

5  voter registration card to qualify under the present law,

6  is that what you are saying?  I don't quite understand

7  the answer, Senator.

8       THE WITNESS:  I would, if I -- if I could relate to

9  you a specific anecdote with enough particularity to

10  where I could say that, you know --

11       THE COURT:  I don't want you to do that, because

12  that is leading to hearsay, as you well know as a lawyer.

13  I am just interested in whether or not people presented

14  to you the problem that they only had the old voter

15  identification card, the 2012 legislation rather than the

16  2013 legislation that required the photograph.

17       THE WITNESS:  What I can tell you is that I had

18  people at the door tell me, you know, isn't this enough?

19  I have a registered voter card, you know.  Isn't that

20  enough for me to go vote?  And I explained to them, no,

21  that is not enough.

22       THE COURT:  All right.

23       THE WITNESS:  But I can tell you that when I worked

24  at Henderson precinct this last election, which is very

25  white, upper middle income --

Surovell - direct                          305

1        THE COURT:  Yes.

2        THE WITNESS:  -- leaning precinct that somebody came

3  up to me and said they rejected me because I presented

4  this.

5        THE COURT:  Next question.

6  BY MR. KAUL:

7  Q    Let me ask you about that absentee polling

8  specifically.  Are you familiar with voting rules based

9  on experiences you described?

10  A    Very much.

11  Q    Can anybody vote absentee in Virginia?

12  A    No.  Well, they did, they have the ability if

13  circumstances meet the terms for the that election.

14  Q    So there not an excuse required?

15  A    Right.  You are required to have some, meet one of

16  the 18 or 19 reasons.

17  Q    What sorts of reasons are provided?

18  A    If you work outside the county that you live in and

19  be away from your home for more than eleven or hours

20  during the day at the time elections are open.  If you

21  are disabled.  If you are pregnant.  Active duty

22  military.  Spouse of active duty military.  If you are

23  incarcerated.  If you are an election officer.  Away on

24  travel.

25  Q    Is there an age-based exception?

Surovell - direct                     306

1 A     No.  If you are in college away from home, if you

2 are in a college outside the county you live.  But in

3 Virginia you don't have age-based.  We tried to get age

4 enacted, but haven't had any luck.

5 Q     Have you communicated with your constituents about

6 the exceptions that allow them to vote absentee?

7 A     All the time.

8 Q     In those conversations did you make any observations

9 about how knowledgeable your constituents were about the

10 exception?

11 A     Yes.

12 Q     What did you observe?

13 A     Most people think absentee voting is only for --

14       MR. HEARNE:  Your Honor.  Continuing objection.

15       MR. KAUL:  I will rephrase.

16       THE COURT:  Objection sustained.  You have to

17 rephrase the question to ask what he has experienced, not

18 what others told him.  Okay?

19       MR. KAUL:  Yes.  Thank you, Your Honor.

20       THE COURT:  So you are going to have to restructure

21 that, Senator.  But you may respond in an appropriate

22 manner.

23 BY MR. KAUL:

24 Q     Again, I don't want to you talk about most people,

25 but can you talk about what in your experience you

1  observed people having confusion with?

2  A    For example, most of the interactions that I had in

3  the last election were in Prince William County.  After

4  my primary vaporized I focused most of my efforts south

5  of the Occoquan.  Prince William County has some of the

6  worst commutes in the world.  Literally.  And there are

7  very few jobs down there.  So my conversations with

8  people mainly revolved -- I would always start off with,

9  where do you work?  Because the number one reason I found

10 people with me was they work outside the county they live

11 in.  Very rare that I met a person who understood that if

12 they worked outside Prince William County that could vote

13 by mail.

14      So I would always start with that.

15      And kind of a lot of people vote by mail using that

16 reason.  A lot of people would only vote in presidential

17 elections and had no idea they could vote by mail.  No

18 idea.  And then I would ask them about whether they are

19 disabled.  No idea if they were they could vote by mail.

20 A lot of people had no idea if they had a problem with

21 standing in line for 30 minutes or an hour they could

22 vote by mail, which has been approved by, I think, the

23 State Board of Elections.  Specifically I don't know if

24 they count that as a disability.  A lot of people have no

25 idea if they were caring for their bed ridden husband or

Surovell - direct

1  their fully adult disabled child.  A lot of people care

2  for family members at home.  So, I mean, what I found was

3  that very few people had any clue they could vote by

4  mail.

5  Q    In your observation, did you find more confusion

6  about that process in any particular part of the

7  district?

8  A    The most confusion within the lowest income part,

9  but there was confusion everywhere about that law.  I

10  mean 18 different reasons.  Very few people pull out the

11  absentee application and look carefully.

12  Q    If voters do cast their absentee ballot by mail,

13  what form of ID are they required to show?

14  A    If they vote by mail, they are not required to show

15  any ID.  If they vote absentee in person they are

16  required to show ID at the registrar's office where they

17  vote in person absentee.  Voting by mail, no ID is

18  required at this time.  Legislation last year tried to

19  require it, but it got killed, vetoed.

20  Q    I am going to come back to the voter ID legislation

21  in a minute, but I do want to ask you about a couple

22  things here, experience in your district.  Have you first

23  of all seen any TV or radio ads regarding the voter ID

24  law?

25  A    No.

Surovell - direct                309

1       I have asked for some to be made, but never seen

2   one.  Actually, you know, I checked that.  I think I

3   finally was able to convince the -- when was that? -- I

4   think I was able to convince them to create some ads for

5   the last Senate cycle, but I don't think they ever put

6   them up on line.

7       THE COURT:  Who is "they," Senator?

8       THE WITNESS:  It is hard to describe.  The people

9   that were managing the senate races for the Democratic

10  side around Virginia, and, I think it is the

11  Governor's --

12      THE COURT:  Talking about a political-affiliated

13  group, and not any arm of the government; is that right?

14      THE WITNESS:  Correct.

15      THE COURT:  Okay.  Go ahead.

16      THE WITNESS:  I asked them to -- they had some

17  created, but I never think they went out.  It is hard to

18  tell because I am not in that the micro-targeted place

19  where they might put them.  It shows on the computer, but

20  I personally, I personally paid for some FaceBook ads in

21  my own campaign trying to create awareness that targeted

22  people in my district.  It was kind of homemade.

23  BY MR. KAUL:

24  Q    Have you spent time educating voters about the voter

25  ID law?

Surovell - direct                310

1  A     Yes.  Well, yes.  I mean, of course trying to going

2  door to door talking to voters when I was a county

3  chairman.  We tried to put information and material we

4  put out before the election to try to educate people

5  about it to avoid problems at polling places.

6  Q     If you weren't doing that, would you been using that

7  time for other productive uses?

8  A     Of course.  For that state's, for the state's own

9  material we would be using it for something besides that.

10 Q     Where is the registrar's office in your district

11 located?

12 A     In Fairfax County.  It is located in the Fairfax

13 Government Center, which is kind of between Fairfax and

14 Centreville.  In Prince William County it is, I want to

15 say they have two.  In Stafford, Stafford Courthouse.  In

16 Prince William I think it is Manassas, and I want to say

17 they have a satellite in the Government Center.

18 Q     How accessible is that from the different parts of

19 your district?

20 A     Barely.

21 Q     What do you mean by that?

22 A     Well, you know, various -- the Government Center

23 could be on another planet compared to where my people

24 live.  I once did a Google search to figure out how long

25 it would take to get from Hybla Valley to the Government

Surovell - direct                    311

1  Center by transit.  I think it was two hours and three

2  buses and a couple of walks or something.  By car it is

3  about 45 minutes one way with no traffic.  There is

4  always traffic.  Not using express lanes or whatever.

5  But, it is incredibly inconvenient.

6         Now, the County of Fairfax County sets up the

7  satellite for absentee voting, but you can't register to

8  vote there.  Only vote absentee in person closer to

9  elections.

10 Q     Let me shift gears and talk about the legislative

11 base you have been involved in regarding voter

12 identification.  When do you remember the topic of voter

13 ID first coming up during your tenure?

14 A     I think in 2011.  I want to say Delegate

15 Lingamfelter had the first -- I think it was '11, might

16 have been '10.

17 Q     How do you spell?

18 A     L-I-N-G-A-M-F-E-L-T-E-R.

19 Q     And did you take a position on that bill?

20 A     I led the floor debate.

21 Q     Why did you take that position?

22 A     Because I felt very strongly that somebody's

23 Constitutional right to vote shouldn't be limited to

24 qualified by having to present ID to vote.

25 Q     Did you speak about the -- at the point of 2011

1  voter legislation on the floor?

2  A    I spoke about it, and I got other people to speak

3  about it.

4  Q    And what point did you raise about the legislation?

5  A    Well, I have given floor speeches about it maybe

6  four or five times, and to same extent they blend

7  together.  I went back last night trying to remember

8  whether I made different points in different speeches.

9  But I remember I brought up Mildred Downing and Mattie

10  Ware, and experiences that they had.  I talked about what

11  goes on in the courthouse every day in licenses getting

12  suspended.  I talked about license being lost.  I talked

13  about my parents' experiences.  My grandparents moved to

14  Fairfax County in 1935, back when the county had about 30

15  or 40 dairy farmers and nobody else.  They were Jews from

16  Brooklyn, weren't treated very nicely.  My grandmother

17  talked about poll taxes and literacy tests, and putting

18  requirements on voting, always bring up a lot of emotion

19  and memories for a lot of people connected to that time

20  in terms of the restrictions that are placed on voting.

21  So I brought that up.  Kind of echoed by Delegate

22  McClellan when she spoke.  And I also talked about how I

23  felt like this was a problem -- solution in search of a

24  problem.  That the purported reason given for legislation

25  was trying to cut down on voter impersonation.  And I

1  think I talked about how I wasn't aware of any documented

2  cases of voter impersonation.  Even attempted prosecution

3  in the State of Virginia in pretty much forever.  And

4  then I also talked think about how there are some people

5  who don't have ID for religious reasons.  Mennonites.  I

6  think I talked about actually a monastery in my district.

7  I don't know if Your Honor is familiar with it, called

8  the Sister of Poor Clare.  And 20 nuns that live in there

9  that never come out.  They don't have IDs.  They vote

10  absentee sometimes.  I'm pretty sure they don't have IDs,

11  they never come out.  They don't.  And the first voter ID

12  case in the U. S. Supreme Court was a bunch of nuns from

13  Indiana.  I brought that up.

14        So that was some of the stuff I argued about.

15  Q    Did you ask supporters of the bill about the

16  justification for the law?

17  A    In 2011 I don't think I did it back and forth

18  colloquy with them on the floor.  I did in subsequent

19  debates.  I think the chairman of the Privileges and

20  Elections Committee, Delegate Cole, sponsored the bill a

21  couple of times.  I had a back and forth with him about

22  the bill in either '12 or '13.

23  Q    What was that back and forth about?

24  A    Whether he could document any -- whether he was

25  aware of any documented cases of voter impersonation in

1   the Commonwealth of Virginia.

2   Q     And were there any examples of that provided to you?

3   A     I have never been given a single example of voter

4   impersonation in the six years I have been in.

5   Legislation has been bouncing around in three or four

6   sessions that came up.

7   Q     And there was a voter ID bill passed in 2012, right?

8   A     Yes.  That was the first one.

9   Q     And then another bill passed in 2014, is that right?

10  A     Right.  It was photo ID.

11  Q     You might have answered my next question, but do you

12  recall how the two laws were different?

13  A     Right.  First one you could present all kinds of

14  things as ID, including your voter registration card.  I

15  think you might have had to present, like something else,

16  I think.

17        But the one that came the year after that was the

18  government-issued photo ID.  And then there was a debate

19  later about expired versus non-expired counted.  That was

20  the main difference.

21  Q     Did those two photo IDs -- I will call them 2012 and

22  2013 voter ID ballot.  I call them both photo ID bills.

23  Would you explain the difference?

24        Did those bills have any impact budgetarily?

25  A     My recollection is that the 2013 bill there was some

1   kind of, I think Governor McDonnell requested some money

2   to print new photo IDs for people that didn't have a

3   driver's license.  They wanted to, State Board of

4   Elections, to issue photo IDs.  It was like a million

5   dollar impact or something like that.  If I had my

6   computer I could pull it up real quick.  But there was

7   some kind of a budget amendment, budget for IDs.

8   Q     Did the fact there was a budgetary impact come out

9   to you at the time?

10  A     Yes.

11  Q     Why is that?

12  A     From the time I was elected 2009 through this year

13  our budget basically has been in the gutter.  And the

14  average revenue growth in the Commonwealth of Virginia is

15  probably about four percent a year, average, 20 or 30

16  year average.  We haven't had average revenue growth any

17  year I have been elected until now.  So basically the

18  easier way to kill a bill in the legislature for six

19  years was in, they love to kill my bills, because I was

20  in the minority by about 18 votes, was to slap a budget

21  impact on your bill.  So a lot of times if you had folks

22  that didn't like legislation, a fiscal impact statement

23  mysteriously pops up on your bill, and then the next

24  thing you know, the knives are out.  So typically getting

25  a fiscal impact on the bill was a death sentence.  So,

1 trying to get something without a fiscal impact was the

2 hardest thing to do in the legislature.  I was just

3 surprised something like that got prioritized over all

4 the other needs we had.

5 Q    Were there fiscal impacts on both the 2012 and 2013

6 voter ID bills?  If you remember.

7 A    As I said, I think '13 there was an impact because

8 of the photo piece.  On the 2012 bill I can't say.  It is

9 possible.  It is possible it would have been used, I

10 think.

11 Q    Do you know -- do you know if money was spent to set

12 up free IDs in 2012?

13 A    Well, they sent out new IDs in '11 because they did

14 redistricting, and everybody, not everybody, but a lot of

15 people got new precincts and new elected officials.  We

16 did in '11.  In '12, I guess maybe '13, my recollection

17 is that they sent, either '12 or '13, I think it was '13,

18 they sent out new voter registration cards to everybody

19 again.

20 Q    Now, would the fact that both 2012 and 2013 voter ID

21 bills were passed within a year of each would that be

22 notable to you at the time?

23 A    Yes.

24 Q    Why is that?

25 A    Because we usually don't weigh in to policy matters

Surovell - direct                          317

1   like that so substantively two years in a row.

2   Frequently if we have a bill with major policy change we

3   might see a bill the next year to tweak a couple things.

4   You might miss a sentence or a word or forget to include

5   a sentence or a statutory reference or something like

6   that.  But typically the amount of legislative oxygen it

7   takes to push a major policy thing through is usually not

8   a lot of interest in revisiting until there is a chance

9   for the dust to clear, for things to sort out, people see

10  how it is working out, before you revisit something to

11  start doing major surgery on a piece of policy again.

12        And so, if it is rarely, you know, six years I have

13  been in, it is hard for me to think of an example or

14  situations where we have done that kind of major surgery

15  on an area of the code, or a public policy thing, two

16  years in a row like that.

17  Q    Between the passage of the 2012 and 2013 bills were

18  there any intervening House of Delegates or Senate

19  elections?

20  A    Couple special elections.  I think that was the

21  year.  Wait a minute -- usually a couple special

22  elections after the federal elections because things

23  happen.  But there was no major.  We didn't have any.  We

24  go on the odd years, so --

25  Q    Based on all the experience you have described so

Surovell - direct               318

1  far, did you learn about selection administration

2  problems that occurred in Virginia in the 2012 elections?

3  A    Yes.

4  Q    What did you learn about?

5  A    One of the principle main parts of my district there

6  was some massive lines, big lines in '08 all over the

7  place.  For some reason Fairfax --

8      MR. HEARNE:  Your Honor, to the extent the witness

9  is testifying to some sort of general speculation, I

10  would object.  To the extent he has personal knowledge of

11  that, I don't.

12      THE COURT:  I am going to sustain the objection.

13  The area of inquiry is appropriate, but you have to focus

14  on what the Senator actually knows and not what he

15  perceived from just the general trends in electoral

16  activities.

17      MR. KAUL:  Understood, Your Honor.

18      THE COURT:  All right.  Sharpen the question.

19  BY MR. KAUL:

20  Q    So did you have -- did you learn specifically about

21  election administration problems?

22  A    Yes.

23  Q    How did you learn about that?

24  A    In '08 I remember being out there looking at massive

25  lines wrapped around buildings, trying to figure out how

Surovell - direct
319

1   I could keep people in line and not run away.  Talking to

2   people about going to buy doughnuts and candy to keep

3   people out there.  But in 2012 --

4       MR. HEARNE:  Your Honor, the issue of the long lines

5   is one that has been removed from this litigation.  To

6   the extent --

7       THE COURT:  I assume counsel is aware of that.  I

8   will intervene in a moment.  I will give him a little

9   latitude to lead into something else.  I am sure he knows

10  that has already been revolved.

11      Go right ahead.

12      MR. KAUL:  Thank you, Your Honor.

13  BY MR. KAUL:

14  Q    So what about 2012?

15  A    2012.  2012 again in Prince William County, Prince

16  William part of my district, which is like the Fairfax

17  part of the district, the same, although --

18  Q    Let me ask to interrupt you.  I want to make sure

19  the answer is from personal experience.  Did you have

20  communication with constituents in 2012?

21      THE COURT:  Concerning election problems?

22      MR. KAUL:  Exactly.  Thank you, Your Honor.

23      THE COURT:  Okay.  Operations of the polls.

24      MR. KAUL:  Yes, thank you.

25      THE COURT:  All right.  But the long lines, that has

1   been resolved.   You understand that?

2        MR. KAUL:   I do, Your Honor.

3        THE COURT:   As long as you realize that you may

4   respond, sir.

5        THE WITNESS:   Well, yes.   I mean I had one I

6   remember.   There was a June primary in 2012, I think for

7   Congressman Moran where I had one constituent who wrote

8   to me serious, furious because she was forced to cast a

9   provisional ballot, or something had driver's license was

10  in her purse, or something like that.   Her e-mail posted

11  on all my blogs.   And a reminder to people as to why they

12  ought to have ID, I guess.   I remember that.   She was

13  furious about it.

14       THE COURT:   To clarify the answer, sir, she was

15  required and did cast a provisional ballot; is that

16  correct, Senator?

17       THE WITNESS:   She told me -- let me put it this way.

18  She said she had her ID in the wrong purse, showed that

19  ID at the polling place, been going there for 37 years,

20  knew everybody in the place.   They wouldn't let her vote

21  regularly.   She said that, I think she said that they

22  asked her to cast her provisional ballot, told her to go

23  home and get her ID and come back later.   I think she

24  said she cast the provisional, but wasn't sure whether it

25  ever got counted because she was so angry she didn't come

Surovell - direct                321

1  back.

2       THE COURT:  Okay.  All right.

3       THE WITNESS:  Felt violated by the whole process.

4       THE COURT:  Understood.  Next question.

5  BY MR. KAUL:

6  Q    As a member of the legislature do you pay attention

7  to developments in the news?

8  A    Yes.

9  Q    Do you and your colleagues -- do developments in the

10 news affect what you and your colleagues do --

11 A    Yes --

12 Q    -- in terms of legislation?

13 A    -- absolutely.

14 Q    Was there news in the wake of 2012 election about

15 lines at polling places Virginia?

16 A    Yes.

17 Q    Specifically about parts of your district?

18 A    In Prince William part of my district, which I

19 didn't represent at the time but do now.

20 Q    What are the demographics of that area?

21 A    It is almost -- it is the same, more

22 African-Americans, probably more diverse than the Fairfax

23 part of my district.

24 Q    Have you made observations where long lines appeared

25 in your district?

Surovell - direct                    322

1   A      Yes.

2   Q      What types of communities are those?

3   A      They tend to be in the lower income, higher minority

4   parts of my district for a lot of different reasons.  But

5   I remember one gentleman, where I knocked, talking to him

6   about voting by mail, how you get stuck in line all this

7   stuff.  And he pointed out to me he found out Obama had

8   been elected president while he was still waiting in line

9   in 2012.

10  Q      Were there bills introduced in 2013 to address long

11  lines?

12         THE COURT:  Maybe you didn't hear me.  I'm sorry.

13  Let me clarify.  You gentlemen very amicably settled long

14  lines at the polls.  And they responded to that problem.

15  Don't you think we ought to move on to other relevant

16  issues here?

17         MR. KAUL:  We do, Your Honor.  I just ask for a few

18  more questions.  The point I want to get --

19         THE COURT:  I don't think so.  It has been resolved.

20  I commend counsel for doing it.

21         MR. KAUL:  The only point I would make is one of the

22  arguments for the voter ID law that was responding to a

23  public interest in addressing that issue and was trying

24  to increase confidence in elections.  I will point out

25  that there are other issues that the legislature at the

1   same time had before it and did not address?

2        THE COURT:  All right.

3        If you carven your question to solicit that answer,

4   I will let you go ahead.  But we are not going do dwell

5   on something that, thank goodness, you all have settled.

6        Move on.

7        MR. KAUL:  Understood, Your Honor.

8   BY MR. KAUL:

9   Q    So was there legislation introduced in 2013

10  regarding long lines?

11  A    My colleague Delegate Stickles, who had the district

12  next to me, put an amendment, proposed budget amendment

13  to appropriate additional money to buy voting machines in

14  locations that had long lines.  An his amendment, either

15  budget amendment or floor amendment, I can't remember,

16  House budget, rejected.  I think about $250,000 looking

17  for.

18  Q    Was legislation introduced to create no excuse early

19  voting?

20  A    Yes.

21  Q    Was that also defeated?

22  A    It has been defeated every year since proposed.

23  Actually passed the Senate this year.  Died in the House

24  last week.

25  Q    Which party actually was the opponent of those bills

1 belong to?

2 A    Very, very partisan, and almost universe Republican

3 voting against it, and Democrats voting for it, with some

4 exceptions.  I think 23.  One Republican voted it out of

5 committee.  I think seven or eight on the floor might

6 have voted it or passed Senate, but it died in the House.

7        THE COURT:  Let me be sure I understand your answer.

8 The unconditional absentee bill was voted down, is that

9 correct?

10        THE WITNESS:  Voted down every year.

11        THE COURT:  That would have allowed people to vote

12 basically with no, without articulating a rationale for

13 voting absentee.

14        THE WITNESS:  Correct.

15        THE COURT:  Okay.

16        THE WITNESS:  Although the bill limited the period

17 of time where you could do that to 21 days before the

18 election.  That was first time I think they have

19 restricted that way.  And then it passed the Senate, but

20 typically it has been any reason any time before.

21        THE COURT:  Thank you.

22        MR. KAUL:  Thank you, Your Honor.  I will switch

23 gears here.

24 BY MR. KAUL:

25 Q    Let me ask you about your experience as a attorney.

1     What types of cases do you handle?

2     THE COURT:  I'm familiar with that, sir.  He has

3 been in my court many times.

4     MR. KAUL:  I won't ask you who you enjoyed having in

5 front of you more.

6 BY MR. KAUL:

7 Q    Some of the cases involved, many cases have involved

8 traffic, is that fair?

9 A    About a third of my cases nowadays, or in the last,

10 I don't know, ten years, about third of my cases have

11 been criminal work, mostly traffic.

12 Q    Through that work have you made observations about

13 license suspensions, revocations, that sort of thing?

14 A    Yes.

15 Q    What have you observed?

16 A    In the courthouse, to give you an example, Fairfax

17 County courthouse, which is the largest court system in

18 the state, you typically have between four and six judges

19 running traffic dockets on a daily basis.  They have

20 between a hundred and 200 cases per judge.  One

21 prosecutor, usually about ten to 20 lawyers per courtroom

22 with cases.  So, the cases in Virginia you can pre-pay

23 offenses if it is an offense that doesn't involve

24 potential jail time.  So a lot of traffic offenses get

25 washed out before they come up.  The cases in the

Surovell - direct                    326

1  courtroom tend to be people who don't know they can

2  prepay, or some of the more serious, like reckless

3  speeding, high speed, DUI, driving on a suspended,

4  driving without a valid operator's license and then the

5  whole range of other kinds of things, hit-and-run and

6  some other things.  So, typically, you will see about, I

7  would say, in Fairfax at least, ten to 20 licenses get

8  suspended every day.  Maybe five, you know, to ten on a

9  day per courtroom.

10       So, you know you can extrapolate from that the range

11 you are talking about, four to six courtrooms a day how

12 many licenses are taken away.  But between that.  And you

13 have got upstairs.  You have two dockets running criminal

14 docket, one of which has a marijuana docket where usually

15 you see between 15 and 30 people charged with marijuana

16 possession.  Most of them end up doing what is called a

17 251 disposition, which the charge is continued for a

18 period of time for dismissal.  So you are required to

19 pay, you have a six-month license suspension, turn in

20 your license.  So, about 80 percent of those people end

21 up losing their license that day.  If you go upstairs to

22 the circuit court you have a few judges up there, usually

23 one or two running criminal dockets taking pleas.  And

24 then on Fridays all felons, felony cases get sentenced.

25 So, you know, there are easily a hundred cases a week

1  that the license gets suspended in Fairfax County alone.

2  Probably more like multiples of that.

3       But, so that is typically what you see in terms of

4  suspensions.

5       And when you are suspended in court they always

6  require you to surrender the actual physical copy of the

7  license to the deputy.  Some courthouses don't actually

8  allow you the suspension period to begin until you

9  surrender the license to try to incentivize you to turn

10 it in, not carry it around in your pocket.

11 Q    Have you made a observation about demographics of

12 individuals who have had their license physically taken

13 from them in Fairfax County?

14 A    Well, most of my clients tend to be, who can afford

15 me, tend to be higher income or have parents paying the

16 bill.  They also, just because, of my network, tend to be

17 less diverse than the county.  My clients tend to be

18 white, tend to be, not always, but tend to be white, tend

19 to be higher income.  It is not very hard for me to find

20 my clients in the courtroom in general district court.

21 There is usually out of the hundred people sitting in the

22 room, I would say maybe ten percent are white in the

23 traffic docket.  If you go upstairs, a little bit more.

24 Hit the drug docket it is a little bit more, maybe 20 or

25 30 percent white.  But because of that, you know, I would

1 say there is no question that Fairfax County only is only

2 sixty percent white today.  The vast majority, I would

3 say majority of people with licenses suspended in court

4 tend to be minorities.

5      And, of course, Prince William County is even worse.

6      MR. HEARNE:  Object to the extent he is speculating

7 what the percentage is --

8      THE COURT:  I have to sustain the objection.  You

9 can rephrase it and limit it to what the Senator has

10 personally experienced.  But for his speculation without

11 some empirical data I won't permit.  So the objection is

12 sustained, but you may rephrase it.

13     MR. KAUL:  Thank you, Your Honor.

14 BY MR. KAUL:

15 Q    Have you made observations about whether the

16 majority of the individuals whose licenses are suspended

17 are white or minority?

18 A    In court -- in court the majority are minority in

19 court in Fairfax.  In Fairfax, and also I think in --

20 majority.  But other suspensions can happen

21 electronically based on DMV computer and all that.  That

22 is a whole different ball of wax.  But in terms of what

23 happens in the courthouse, licenses are surrendered, the

24 majority are minority.

25     THE COURT:  And you are basing this on your personal

Surovell - direct                        329

1  observations, Senator; is that correct, sir?

2       THE WITNESS:  Yes.  Sitting in the courtroom

3  watching.

4       THE COURT:  We will receive it.  Go ahead.

5  BY MR. KAUL:

6  Q    And are the crimes -- are the reason that people are

7  in traffic court, do those reasons -- I want to rephrase

8  that.  The type of cases involved in traffic court, are

9  those the types of cases that cause somebody to lose

10  their right to vote?

11       THE COURT:  Make sure you understand.  Are the types

12  of offenses being handled ones that would require you to

13  lose the right to vote?

14       MR. KAUL:  That is what I meant.  Thank you.

15       THE COURT:  You may respond, Senator.

16       THE WITNESS:  Not on the 9:30 docket.  The felony

17  cases pretty much, felonies are two o'clock.  What I was

18  describing a minute ago were misdemeanor dockets.  So you

19  can't lose your right to vote, Virginia permit.

20  BY MR. KAUL:

21  Q    In the course of your work as an elected official

22  have you requested information from DMV about license

23  revocation and suspensions and lost licenses?

24  A    Repeatedly.

25  Q    What have you learned?

1  A     I always wanted to have the data for the photo base.

2        THE COURT:  The photo base?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  Go ahead.

5        THE WITNESS:  For the photo base.  I always found

6  that the data numbers are more persuasive to my

7  colleagues on the other side than sitting around throwing

8  stuff out there.  So one of the data points that I

9  always -- I started asking for -- I had a child custody

10 case where the father was a narcotics addict.  And one of

11 the things I noticed on the license was that he lost his

12 license five times in like 24 months because he was drunk

13 all the time, kept losing it.  So it occurred maybe I

14 ought to ask about lost licenses.  One of the data points

15 on how many people reported license lost every year, and

16 it is always north --

17       THE COURT:  I don't mean to interrupt.  Individuals

18 that report license, or the courts report license

19 suspended?

20       THE WITNESS:  Lost.  Individuals who reported.

21       THE COURT:  Misplaced?

22       THE WITNESS:  Yes.

23       THE COURT:  Excuse me.  Go ahead.  I'm sorry.

24       THE WITNESS:  People who lost licenses, asked for a

25 duplicate.  Technically DMV said the number of people who

1  lost their licenses, you only get a duplicate if you lost

2  it.

3        THE COURT:  I follow.

4        THE WITNESS:  It is always north of 200,000.  I

5  think the last time the number was 245,000.

6  BY MR. KAUL:

7  Q     What period of time?

8  A     Fiscal year, like July 1 to June 30.

9  Q     What does that include, that total just lost?

10 A     People that call up DMV and said, I need a duplicate

11 license.  DMV says we can only give you if you surrender

12 yours or you certify you lost it.  So you have to say, I

13 don't have a license to get that.

14       MR. HEARNE:  Your Honor, in terms of Senator's

15 understanding of what the DMV is, I believe a foundation

16 is lacking.

17       THE COURT:  I will permit.  It is innocuous here.  I

18 think he is probably correct.  I don't think anybody

19 questions it.

20       Go ahead.  You were mentioning you must certify your

21 lost license.  Continue.

22       THE WITNESS:  I took notes.  I gave you a wrong

23 number.  It was 177,184.  I took notes this morning.  It

24 is 177,184 duplicate licenses were issued in 2015.

25       THE COURT:  You say you have to certify you lost

1  your license.  What else, Senator?  You were cut off.

2  Complete your testimony.

3       THE WITNESS:  To get a duplicate you turn your old

4  one in.  Like with a new picture.  Some people want a new

5  picture because the DMV says you can smile now.  A lot of

6  people don't like the fact that you have a scowl.

7       THE COURT:  Okay.

8  BY MR. KAUL:

9  Q    How about suspended licenses?

10 A    That is the interesting number.  So, it gets

11 complicated.  But the DMV issues about a million

12 suspensions a year.

13      THE COURT:  Now I am not going to allow you to go in

14 to depth with the DMV records.  I think that is hearsay

15 and inadmissible.  I gave him latitude on the other

16 because it was innocuous, but I am not going to go that

17 far.

18      MR. KAUL:  I understand, Your Honor.

19      THE COURT:  Okay.

20 BY MR. KAUL:

21 Q    Let me ask you a slightly different way.  I don't

22 want to ask about specific numbers.  Do you have an

23 understanding based on research you have done in the

24 legislature, as a legislator as to, you know, the ball

25 park for the numbers of people in terms of tens of

1  thousands who have licenses or have lost possession of

2  their licenses such that they can't --

3  A    As I said, 137,000 last year.  It was always in that

4  range.

5  Q    That is the lost licenses?

6  A    Yes.

7  Q    And is that in addition to any other revocations or

8  suspensions?

9  A    Totally separate.  Lost licenses has nothing to do

10 with suspensions.

11 Q    All right.

12      No further questions.

13      THE COURT:  All right.  Very well.

14      Cross examination of the Senator?

15      MR. HEARNE:  Thank you, Your Honor.

16                   **CROSS-EXAMINATION**

17 BY MR. HEARNE:

18 Q    Good morning, Senator.  I am Thor Hearne.  I am

19 representing the Commonwealth defendants in this case.

20 A    Good morning.  What was your name?

21 Q    Thor Hearne.

22 A    Hearne.

23 Q    Okay.

24      Senator, we have discussed voter identification

25 legislation that has been presented.  We talked about in

Surovell - cross                        334

1  your direct a 2011 bill.  You addressed that.  Do you

2  recall?

3  A     Right.  Lingamfelter's bill.

4  Q     That bill didn't pass.

5  A     Correct.  It was sent back to committee.

6  Q     And then in the course of the this litigation we

7  have also discussed a bill that, for the vernacular, we

8  call the 2012 legislation, which did pass and become law.

9  A     Right.

10 Q     Are you familiar with that?

11       Did you support that legislation?

12 A     No.

13 Q     Were you aware that that legislation was submitted

14 to the Justice Department under Section V of the Voting

15 Rights Act?

16 A     After it was passed.

17 Q     Correct.  Are you aware that it was approved or

18 pre-cleared by the Justice Department?

19 A     That is what I read in the paper.

20 Q     Do you know of anything that suggests otherwise,

21 that it was not?

22 A     No.

23 Q     Why did you oppose the 2012 legislation?

24 A     I think the same reasons I described in my direct

25 examination a minute ago.  You know, my whole family

1  history, which has brought up a lot of memories about my

2  grandparents, grandmother mainly, telling me about the --

3  I didn't think it was the kind of Constitutional right to

4  have a restriction on it like that.  I thought it had a

5  disparate impact on a lot of people.  I thought it would

6  prevent a lot of people from voting who otherwise had the

7  right to vote.  You know, I can go not with a whole

8  explanation again.  The whole -- I could give you five,

9  six, eight, ten reasons.  Generally, that is the idea.

10 Q    The same reasons that you would oppose, that you

11 would the 2013 bill.

12 A    Yes.  The 2013 bill was even worse from my point of

13 have view, so yes.  Yes, and then same for '13.

14 Q    Are you aware that the 2013 bill actually expanded

15 the number of identification forms of identification that

16 could be used to vote?

17      MR. KAUL:  Objection to the form.

18      THE COURT:  Objection is overruled.  The question is

19 whether or not he knew that.

20      You may respond, Senator.

21      THE WITNESS:  My recollection was the '13 bill

22 restricted it, the government issued photo ID in the same

23 way the voter registration card went out the window.  I

24 didn't see it as expanding.  I thought it was more

25 limiting.

Surovell - cross

1  Q     You understand that under the 2013 bill that photo

2  identification from private colleges, student ID, can be

3  used to vote?

4  A     Yes.

5  Q     Did you understand that that was acceptable under

6  the 2012 bill?

7  A     I don't remember.  If you put it in front of me, I

8  could probably tell you.

9  Q     You spoke of your efforts in absentee balloting, or

10  you also called it vote-by-mail; is that correct?

11  A     Right.

12  Q     In terms of absentee voting you indicated your

13  understanding that that can be done by an individual

14  without providing any photo identification; is that

15  correct?

16  A     As long as they do it by mail.  If they want to do

17  absentee in person, you have to present ID at the

18  registrar's office when they vote.

19  Q     So by mail it would be done without photo

20  identification; is that correct?

21  A     Right.

22  Q     You have testified, as I understand, that you had

23  substantial outreach to your constituents to make them

24  aware of that, of that option of voting in that form; is

25  that correct?

1 A     Yes.  I don't know what "substantial" means, but I

2 had the door-to-door, piece I sent out e-mails.  I can't

3 remember whether I did a mailer or not.  But, I have a

4 limited budget.

5 Q     Okay.

6       Senator, are you familiar with House bill 233?  It

7 was in the 2013 legislature having to do with handguns,

8 guns, regulation of firearms?

9 A     No.  We have so many bills numbers they get kind of

10 meaningless.

11 Q     Do you recall a bill -- if I were to represent you

12 that this bill had to do with the requirement that those

13 with a concealed carry permit have photo identification

14 to carry a loaded firearm?

15 A     That sounds familiar.

16 Q     Do you recall if you supported that bill?

17 A     I can't tell you.  I would have to go back and look

18 at how I -- to tell you whether I voted for or against,

19 spoke for it or against it.

20 Q     If I were to represent to you that the bill has

21 passed unanimously and it required photo identification,

22 does that help your recollection?

23 A     I probably would vote for it if that were the case.

24 Q     So you would support the requirement somebody

25 carrying a concealed weapon provide photo identification

1  as a condition of exercising that right.

2  A     I believe any Second Amendment issue would be -- gun

3  issues to me carry a lot more public danger than voting.

4  So I always had a sort of lower threshold for conditions

5  placed on voting rights in terms of my personal political

6  belief.

7  Q     A person who would have a concealed carry permit

8  would be somebody who has already gone through that

9  process of being vetted to be qualified to carry a

10  weapon; is that correct?

11  A     If they have a concealed carry permit, yes.  People

12  that conceal carry without permits, but people who have

13  permits have been vetted.

14  Q     Your recollection that that law which requires photo

15  ID in conjunction concealed carry permit would apply to

16  those people who already obtained a concealed carry

17  permit and gone through that background process; is that

18  right?

19  A     It sounds like it to me.  I don't have the bill in

20  front of me but --

21      THE COURT:  I think it is tough for the Senator to

22  respond if he can't see the legislation, Mr. Hearne.

23      MR. HEARNE:  I will get to the point.

24      THE COURT:  Okay.

25  BY MR. HEARNE:

Surovell - cross
                                                                    339

1   Q      Let me refer to -- and I can provide a copy -- to

2   plaintiffs' exhibit 22.

3          THE MARSHAL:  Which book?

4          MR. HEARNE:  Here.

5   BY MR. HEARNE:

6   Q      Plaintiffs' 22, that is correct?

7          We can provide a copy for the Court.  I think we

8   can.  It is multi -- to describe it for the record, Your

9   Honor, if I ma --

10         THE COURT:  All right.

11         MR. HEARNE:  This is a transcript of the

12  deliberations in the Virginia House of Delegates dated

13  February 20, 2013.  Since the House does not maintain an

14  official transcript of their proceedings this is actually

15  one that plaintiffs themselves had transcribed from video

16  records, an exhibit the plaintiff had proposed.

17         It is, again, marked plaintiffs' exhibit 22.

18         And I would refer the Senator to that exhibit.  If

19  you have had a moment to --

20         THE COURT:  Give the Senator a chance to read it

21  over.

22         MR. HEARNE:  Certainly.

23         MR. KAUL:  Your Honor, may I just raise one point?

24  We don't have any objection to Mr. Hearne using that by

25  any stretch, but I believe this is an exhibit that they

1  are objecting to.  That is maybe something to work out,

2  but to the extent it is --

3       THE COURT:  I think that puts him on pretty soft

4  footing as far as his objection is concerned.  Yes?

5       MR. HEARNE:  Certainly we understand that.

6       THE COURT:  At this point, go ahead.  All right.

7       MR. HEARNE:  In light of the direct examination.

8       THE COURT:  Yes, sir.

9       MR. HEARNE:  And I would note two points.  One point

10 may be since this was done privately as a transcription

11 by the plaintiffs.

12      THE WITNESS:  I am Soto.

13      MR. HEARNE:  Yes, it refers to Delegate Soto.  As

14 you look at that document, that actually refers to you;

15 is that correct?

16      THE WITNESS:  Looks like something that I said.

17 BY MR. HEARNE:

18 Q    You testified on direct examination about the

19 deliberations that you were very involved in during the

20 course of the legislature, or considering both 2012 and

21 2013 bill; is that correct?

22 A    I was pretty involved on the floor debates.

23 Q    And this was, again, dated February 20th of 2013,

24 which would be some of the deliberations referencing the

25 2013 bill; is that correct?

Surovell - cross                341

```
 1  A     I think so, yes.

 2        MR. FINBERG:  Could we ask the courtroom deputy to

 3  switch over the monitor so we can project it on the

 4  screen?

 5        THE COURT:  Can you do that?

 6        THE CLERK:  Yes, Your Honor.

 7        THE COURT:  All right.

 8        MR. FINBERG:  Thank you, Your Honor.  Sorry to

 9  interrupt.

10        THE COURT:  We will do that.

11        Would you explain -- I know you mentioned this, and

12  I apologize, what page are you referring to of this

13  exhibit?  Twenty-two?

14        MR. HEARNE:  At this point I haven't referred to a

15  specific page.  I will do that shortly, Your Honor.

16        THE COURT:  All right.

17        MR. HEARNE:  Right.  Now just setting the context

18  for this, I particularly wanted to clarify --

19        THE COURT:  Go right ahead.

20        MR. HEARNE:  The reference in this to Delegate Soto

21  was actually to the Senator himself.  It was a

22  transcription issue.

23        THE COURT:  All right.

24  BY MR. HEARNE:

25  Q     Senator, you described at the time that you had
```

1   discussions with, Senator, during your direct, you

2   described that you had discussions with Delegate Bell; is

3   that correct?

4   A      No.   I said Delegate Cole.   Actually Chairman of the

5   Privileges and Elections Committee.

6   Q      But in the course of this you were very involved in

7   the deliberations; is that correct?

8   A      For the base.   When you are the minority, you don't

9   get to put periods and commas in things.   One chance to

10  have input in the floor debates or committee debates, and

11  things.

12  Q      And during direct you testified you didn't see any

13  evidence, or any reason to support the legislation

14  because of concerns about voter fraud; is that correct?

15  A      Voter impersonation.

16  Q      Could you refer to page 26.   Plaintiffs' exhibit 22.

17  Page 26.   And about two thirds of the way down beginning

18  on line 12.   Do you see the reference beginning "As the

19  gentlemen is aware?"

20  A      Yes.

21  Q      If you could read that one paragraph and then I will

22  ask you a question about that.

23  A      Read out loud.

24  Q      If you could read out loud just for the record,

25  please?

1 A     "As the gentlemen is aware, I am sure there is a

2 video on the internet by a campaign operative who said,

3 if you want to vote for somebody, what you do is forge a

4 utility bill."

5 Q     Do you recall that there was a video of that nature

6 at that time?

7 A     I remember that somebody surreptitiously recorded

8 somebody in Arlington throwing around ideas like that.

9 Q     If I could, I will show you what has been marked

10 defendants' exhibit 393, actually a video.

11        Could you display that?

12        THE COURT:  Hold on is.  Is it in evidence?

13        MR. KAUL:  We object, Your Honor.  I believe we have

14 an objection, but may we take a moment to look?

15        THE COURT:  Yes, sir.  Sure.  Go right ahead.

16        What was the exhibit number?

17        MR. HEARNE:  393, Your Honor.  And I believe the

18 objection that was noted was one of relevance in terms

19 of, I think that --

20        THE COURT:  Let me ask you.  Are you offering this

21 as substantive evidence, or offering this to refresh the

22 Senator's recollection?

23        MR. HEARNE:  At this point I want to refresh the

24 Senators's recollection.  I believe later we will

25 introduce it as evidence, or offer it as evidence.

1        THE WITNESS:  I don't think I have a recollection

2   problem.

3        THE COURT:  I didn't hear you, sir.

4        THE WITNESS:  I don't think I said I had any problem

5   remembering anything at this point, but --

6      MR. HEARNE:  I want to ask him specific questions

7   about this in the context of that.

8        THE COURT:  Well, wouldn't it has to be in evidence

9   for you do that?  You can offer it to him for a past

10   recollection refreshed, but he said it doesn't need to be

11   refreshed.  He can answer your questions.

12      MR. HEARNE:  Then I would offer it as evidence, Your

13   Honor.  It is referenced in the record.  I would note

14   also referenced --

15        THE COURT:  All right.

16        And your objection?

17      MR. KAUL:  Your Honor, our objection its hearsay.

18   Most obviously, but also objecting, untimely produced.

19   And at the time we got the exhibit list we had not

20   received it?

21        THE COURT:  I can't hear you.  I know my court

22   reporter can't either.  Why don't you come up to the

23   podium so my court reporter can hear you.  Step aside,

24   Mr. Hearne, if you don't mind.

25      MR. KAUL:  Your Honor, my primary objection is

1  hearsay, although we also have a late disclosure

2  objection because we had not received it as of the time

3  of the exhibit list.

4      THE COURT:  You don't have any exhibits that were

5  late; is that right?

6      MR. KAUL:  Certainly not ones that are nearly so

7  substantive.  We have census data, which I don't think is

8  in dispute.

9      THE COURT:  All right.

10      MR. HEARNE:  Your Honor, we would note that this

11  very video is also referenced several times by the

12  plaintiffs' expert in their expert reports as well.  And

13  we anticipate referring to it at that point of the

14  proceedings as well.  But particularly at this point it

15  is relevant to the specific direct testimony of this

16  witness.

17      THE COURT:  Since I haven't seen the video it is

18  difficult for me to rule on the hearsay objection.  Who

19  is the speaker here?

20      MR. HEARNE:  The speaker is Patrick Moran, Democrat

21  operative, in a video conversation that has been made.

22  And, again, we are offering it not for the truth of the

23  statements made, but for the context that this witness --

24      THE COURT:  Maybe we can do something.  Why not ask

25  the Senator whether he is familiar with Mr. Moran's

1 presentation.  And if he is, you can examine him with the

2 necessity of putting it in evidence.  Why don't you try

3 that first?  Okay?

4     MR. KAUL:  Since I think this will come up, likely,

5 I guess two points.  One is, I have learned there are two

6 speakers, apparently, only one identified on video.  But

7 the bigger issue I guess goes to the hearsay point.  We

8 don't have any objection to their discussing what was

9 discussed in the legislature, what members of the

10 legislature had before them.  I don't know there is any

11 evidence this video was placed to the legislature, or

12 that any legislators specifically saw this piece of

13 evidence.

14     THE COURT:  Well, he obviously has to lay the

15 foundation to make sure that the Senator is aware of it

16 and saw it.  And what, if any, effect it had on him.  So

17 there is a predicate that has to be laid here.  Why don't

18 you determine whether or not Senator Surovell is aware of

19 this?  If he is, you can examine it based on his

20 knowledge.  And there is no need to put this into

21 evidence.  If not, we will take it from there.  Okay?

22     MR. HEARNE:  Thank you, Your Honor.

23     THE COURT:  Start by asking the Senator that

24 question.

25 BY MR. HEARNE:

1  Q    Senator, I refer to a particular paragraph out of

2  the transcription of the deliberations for the 2013

3  legislation.  Do you recall, do you remember moments ago

4  I referenced that paragraph?

5  A    Yes.

6  Q    And you obviously heard our discussion referencing

7  the video.  In light of that discussion and in light of

8  this specific paragraph in the deliberations do you

9  recall any details of the video that was part of those

10  discussions about voter fraud?

11  A    I mean I have a general recollection of the video

12  from when it came out.  I watched it.  I don't remember

13  on YouTube, on blogs, or might have been a news story

14  about it.  I don't remember exactly.  But remember I was

15  aware when it happened.

16  Q    Would you describe what you recall of the video?

17  A    Well, my recollection is that I just saw the name, I

18  knew the last name was Moran, Patrick Moran, I think, who

19  I have met before once or twice.  But, my recollection is

20  that it was two people talking about ways to get people

21  to vote using different kinds of documents.

22  Q    Would they be non-photo documents that they were

23  using to vote?

24  A    From reading the transcript I guess so.  I haven't

25  watched that video in three or four years, and so -- but

1   my recollection it was trying to figure ways to get

2   people to vote impersonation or something like that.

3   Q    You had earlier testified, if I understood your

4   testimony, that you never were presented with any

5   evidence supporting a justification for photo ID law in

6   the course of that legislation.  Is that what you

7   testified to earlier?

8   A    My recollection is that I testified that nobody has

9   ever been able to cite for me a single example of

10  somebody being prosecuted for voter fraud impersonation

11  or convicted of voter impersonation.  And that is my

12  recollection.

13       The justifications that were given were sort of

14  generalized suspicion that it was going on, but no actual

15  firm, specific examples that it had actually ever

16  occurred.

17  Q    So, this video was referenced in the legislative

18  discussions as an example of a specific situation in

19  which, certainly in this reference, Delegate Bell was

20  concerned that there was in fact this kind of voter fraud

21  going on with non-photo ID documents; is that fair?

22  A    I see Delegate Bell referenced two people talking

23  about doing it.  But, talking about felonies and

24  committing them are two different things.

25  Q    Wouldn't you think it was a legitimate concern for

1  the legislature if somebody says there is a video which

2  says here is how to commit voter fraud with a utility

3  bill, with no photo ID?  That that would be a legitimate

4  reason for the legislature to be concerned?

5  A    Anytime anybody is talking about, or anytime anybody

6  is actually corrupting the vote by committing felonies, I

7  think is a legitimate concern.  But there was some guy

8  having a conversation in a coffee shop, I think, about

9  possible things to do.  Not actually acting on it.

10       And, you know, getting people to commit felonies,

11 one felony at a time to cast a vote, I've never seen a

12 person actually want to take that risk, to put their

13 liberty in jeopardy to cast one vote in an election by

14 pretending to be somebody else.

15 Q    Do you recall other colleagues during the course of

16 that discussion referencing this video as an example of a

17 concern about how votes could be illegally cast by using

18 a non-photo utility bill or other non-photo forms of

19 identification?

20 A    That specific floor debate I don't recall.  I would

21 have to read this.  I mean we have had probably ten or 12

22 different floor debates on this things as they have come

23 through.

24 Q    You testified, if I understood correctly, that you

25 watched the entire video at one point?

Surovell - cross                    350

1  A      Back in 2012.  I haven't watched it since.

2  Q      And do you recall it being referenced in terms of

3  the legislative discussions about the bill, other than

4  this one citation that I just directed your attention to?

5  A      I don't have a specific recollection of it.  Also

6  remember, I am not present for the discussions in the

7  Privileges and Elections Committee or the debates on

8  things on that side at that time.

9  Q      So this video could have been discussed in that

10 committee, and you would not have knowledge of that?

11 A      Anything is possible.

12 Q      Your Honor, we would, if the witness testified he

13 had seen this some time ago, he doesn't recall some

14 specific aspects of it.  It is a short clip.  We would

15 ask that it be both admitted and presented.

16     THE COURT:  All right.  Let's break it into parts.

17         With respect to it being admitted as substantive

18 evidence, okay, it is hearsay.  And there is no

19 independent foundation that has been laid for the truth

20 of the information.  That objection is sustained.

21         As far as it being offered to refresh his

22 recollection, what point do you wish to refresh?  If

23 there is a legitimate point you wish to refresh I will

24 allow you to play it for that limited purpose.

25     MR. HEARNE:  Correct, Your Honor.  The specific

1  limited point would be the Senator testified he didn't

2  recall specifically the means by which there was a

3  discussion of how to commit voter fraud with these

4  documents.  I wanted to show him the video and then ask

5  him specifically about the specific suggestion in the

6  video about how to commit, which the video will represent

7  vote fraud using utility bills and other documents in the

8  context of the legislative discussion?

9       THE COURT:  It will not be received for anything

10 other than to refresh Senator Surovell's recollection.

11 Period.  Okay?  Not substantive evidence, not being

12 offered, not being received as evidence, it is solely to

13 refresh his recollection.  You can play it for that

14 purpose.

15      MR. HEARNE:  Thank you, Your Honor.

16                  (Tape being played)

17      THE COURT:  I don't expect my court reporter to be

18 able to take that down.  It is offered as an exhibit.  It

19 will be made part of the record, but not as an exhibit.

20      MR. HEARNE:  Yes, sir.

21                  (Tape being played)

22      THE COURT:  Are we getting beyond?

23      MR. HEARNE:  It is almost at the very end.

24      THE COURT:  All right.

25      MR. HEARNE:  We can stop it.

Surovell - cross                   352

1        THE COURT:   Okay.   You can cut at this point.

2   BY MR. HEARNE:

3   Q     Senator, now that you have had a chance to view that

4   the video, do you recall, is that the one that you said

5   you had seen before?

6   A     Yes, I have seen that before.

7   Q     You testified, as I understand, that there were also

8   press accounts of this video at the time?

9   A     I think so.

10  Q     And this is the video which you recall that was

11  referenced in that statement in the legislative

12  transcription of the debates of the 2013 legislation?

13  A     Looks like it's the same.

14  Q     Sir, you are not aware --

15  A     I am not aware of any other video.

16  Q     In looking at that video did it refresh your

17  recollection in terms of the specific reference to use of

18  non-photo forms of utility bills or bank statements that

19  were the subject of this video?

20  A     Yup.

21  Q     Do you recall in the context text of these

22  legislative concerns about the use of non-photo forms of

23  documentation, such as utility bills or bank statements

24  being used to vote or to cast a ballot by somebody who is

25  not eligible to do so?

1  A     Having read the transcript, I remember from, I guess

2  now, I think Delegate Bell brought it up, the discussion

3  with Delegate Morrissey about the photo identification

4  bill, I guess.

5  Q     That would be under the 2013 ID bill which allowed

6  those forms those non-photo forms of identification?

7  A     Right I think in 13 we were debating the photo ID

8  bill so let other bill was already in effect.

9  Q     Correct.  So this video this discussion about the

10 use of utility bills and bank statements as

11 identification was something that was allowed in '12 but

12 not be allowed in 2013; correct?

13 A     After the '13 law was passed, yes.

14 Q     Are you familiar with the Carter-Baker commission --

15 A     No.

16 Q     -- work?

17       Have you heard of reference to the Carter-Baker

18 commission on election reform?

19 A     No.

20 Q     You testified earlier that legislators respond to

21 public opinion.  Is that a fair statement of your

22 testimony?

23 A     I don't remember saying that.

24 Q     I will ask the question.  Is it fair as a politician

25 that was elected, politicians, that you are sensitive to

1  and respond to the opinions of your constituents?

2  A    Sure.  They don't govern what I do, but it is one of

3  inputs of many.

4  Q    If there is popular support for a measure, large

5  majorities, is that a factor that you as a legislator

6  consider before deciding whether to support or oppose a

7  particular piece of legislation?

8  A    One variable you input in your equation, whatever

9  your personal equation is.

10  Q    Are you aware of what public support is in polling

11  data for the concept of photo identification requirements

12  to cast a ballot?

13      MR. KAUL:  Objection, Your Honor.  Vagueness, Your

14  Honor.

15      THE COURT:  Not vague at all.  The question is

16  whether or not he is aware of public opinion from a poll

17  relating to the voter ID law.

18      MR. KAUL:  I guess there can be all sorts of

19  different ways in which photo ID laws are constructed,

20  expired licenses and out-of-state licenses.

21      THE COURT:  That is grist for the cross for the

22  redirect mill.

23  BY MR. HEARNE:

24  Q    Are you aware of polls, public opinion polls on the

25  concept of photo ID required to cast a ballot?

Surovell - cross                        355

1    A     I can't remember whether I ever polled for it.  I

2    think in my races, I think I might have.  I know I have

3    asked about it in constituent surveys.  I know that much.

4    And I can't recall whether I have ever read anything in

5    the papers about either state-wide or national polling

6    about it.

7    Q     So you don't recall any statewide or national polls

8    on that question?

9    A     Not sitting here today.  But, you know, I'm sure if

10   I had Google at my fingers I could figure some stuff out

11   pretty quick.  But I have more of a recollection of what

12   my own experience is in my district from what my

13   constituents told me in constituent surveys, which are

14   not scientific, not a poll, but they are somewhat of a

15   measure.

16   Q     In terms of the -- you testified earlier, Senator,

17   about efforts to reach into your constituent community to

18   make sure that they are aware of absentee balloting and

19   vote by mail options, and to educate them on the election

20   administration process; is that correct?

21   A     Right.

22   Q     Since the 2013 legislation was adopted, the photo ID

23   bill that is the subject of this litigation, what efforts

24   have you taken to inform your constituents of the

25   requirements necessary to satisfy that law?

1  A     Well, I write weekly columns in the local paper.  I

2  mentioned it to some extent, not every week, but during

3  session.  I write weekly columns.  And I know I mentioned

4  the passage of the law in my columns, of course.  The

5  ones that get that, are people that happen to pick up

6  that paper, or look at my blog on the internet.  I have

7  trained my staff to talk to people when they go

8  door-to-door talking to voters.  I don't know if they do

9  or not, but I tell them to.  You know -- you know, we try

10 to have people that have some understanding about the

11 work on at the polling places.

12 Q    As I understood your direct testimony, your personal

13 effort and that of staff is to inform the individual

14 voters, particularly in your constituency, of what is

15 necessary for them to cast a ballot; is that fair?

16 A     We try to.  We have limited resources.  We try to.

17 Q    Have you worked with the defendants in this case,

18 from the Commonwealth, the election officials, requested

19 that they assist you in that effort to inform your

20 constituents?

21 A     I'm not sure if could I say I asked them to inform

22 voters about the voter ID requirements.  I asked them to

23 get out more information about absentee voting and how to

24 be responsible for that.  I always get back, there is not

25 resources for that.

1  Q      Have you spoken specifically with Mr. Cortez, or any

2  of the other election officials in Virginia about

3  specific measures they should take to address this issue

4  with your constituents?

5  A      The absentee issue or the voter ID?

6  Q      Voter ID requirement.

7  A      I never talked with Mr. Cortez about that.  I have

8  talked to people above him about the absentee.

9  Q      As I understood your testimony, and correct me if I

10 am wrong, you have no personal knowledge of any

11 individual who was in fact denied the right to vote by

12 reason of the Virginia voter ID requirements?

13 A      Could I give you a name and a date?  No.  I have

14 generalized recollection of some people that have been

15 turned away and unhappy, and got sent home.  And I don't

16 know whether they came back or not.

17 Q      But I am asking a specific question.  Do you know of

18 an individual who was denied the right to vote, not

19 because they chose not to come back, not because they

20 chose not to provide the ID, but by reason of the voter

21 identification law as written?

22 A      Again, I don't think I can give you a specific name

23 of a person today.  I have to really think about it.  I

24 know some people have had, like I told you, the lady who

25 told me she had to cast provisionally.  Never clear to me

1 whether the provisional ballot, whether she didn't cast

2 the original or whether it actually got counted.  There

3 was another whole floor debate we had about a provisional

4 voting bill that required you to defend your identity at

5 the Fairfax County Center with the head of elections. and

6 I had a floor debate about that with Delegate Cole, you

7 know.

8 Q    As I understood your direct testimony about the

9 woman you mentioned who cast a provisional ballot, you

10 testified she actually possessed the ID, but it was in a

11 different purse; is that correct?

12 A    Right.  That is what she said.

13 Q    Thank you.

14     No further questions, Your Honor.

15     THE COURT:  How long will redirect take?

16     MR. KAUL:  Probably about 15 minutes, Your Honor.

17     THE COURT:  Fifteen.  Then we will take a 10-minute

18 recess and come back and resume at that time.

19     Stand in recess ten minutes.  All right.

20                         (Recess)

21     (Krista Harding is now the court reporter.)

22     THE COURT:  All right.  We'll resume with the

23 redirect of Senator Surovell.

24     Go ahead.

25     MR. KAUL:  Thank you, Your Honor.

1                    **REDIRECT EXAMINATION**

2  BY MR. KAUL:

3  Q      Senator, first of all, my apologies for having

4  misspelled your name in the transcript by four letters.

5  A      Happens all the time.

6  Q      You were asked before about polling data regarding

7  voter ID.  And you mentioned you had conducted a

8  constituent survey.  Do you recall that?

9  A      Yes.

10  Q      What did you find in your constituent survey?

11  A      Again, these are self-selected individuals and not

12  -- it's not a scientific poll.  But I found it was

13  either -- I can't remember.  It was either an even split,

14  or a slight majority in favor of ID.

15          THE COURT:  How many people responded to your

16  survey, Senator, if you know?

17          SENATOR SUROVELL:  Typically, between 400 and 600

18  out of 80,000.

19          THE COURT:  And these were all in your senatorial

20  district?

21          SENATOR SUROVELL:  Delegate district.

22          THE COURT:  Your Delegate district?

23          SENATOR SUROVELL:  I don't think I put the issue in

24  the survey in my Senate request survey.

25          THE COURT:  Go ahead.

REDIRECT EXAMINATION OF SENATOR SUROVELL   360

1  BY MR. KAUL:

2  Q    Is it possible you're misremembering which way that

3  split broke?

4  A    No.  I was always kind of surprised by it.

5  Q    You mentioned some outreach efforts that you did

6  before related to voter ID on cross.  Do you recall that?

7  A    Right.

8  Q    Are you a member of the Democratic Party of

9  Virginia?

10 A    The party doesn't really have members.  I'm a member

11 of the Fairfax County Democratic Committee.  So, to the

12 extent that makes me a member of the Democratic Party of

13 Virginia, you could say I'm a member.

14 Q    Do you consider yourself to be a member?

15 A    I consider myself to be a Democrat.  You don't like

16 pay dues and become a member of the party.  That's not

17 how it works.

18 Q    Let me ask you about the video that you were shown

19 to refresh your recollection.  My first question is do

20 you -- did you -- when that video came out, did you learn

21 about who had prepared that video?

22 A    I remember at the time following it.  And I think

23 that was part of what came out.

24 Q    And did that video appear to be edited to you?

25 A    It was heavily edited.  I know where it was filmed.

REDIRECT EXAMINATION OF SENATOR SUROVELL   361

1  It was right next to the Arlington Courthouse.  A lot of

2  those scenes in there I was familiar with.  And you could

3  see it moving around the different places.  You could see

4  the bricks, and everything else.

5  Q    And have you heard the name Project Veritas before?

6  A    Yes.

7  Q    What does that name mean to you?

8  A    I -- I remember hearing about it.  I don't remember

9  sitting right here off the top of my head what it is.

10  Q    Do you know whether that group had any connection to

11  the video?

12  A    Let me put it this way, I remember the video.  I

13  remember it being filmed by some partisans that were --

14  went out and cherry-picked Congressman Morans' nephew or

15  his -- I can't remember if it was his nephew or his

16  grandson, and then goaded him into talking about those

17  things, which from what I can tell, were never acted on

18  by anybody.

19      But I remember some of the context about it after it

20  all came out because I remember -- I think Mr. Moran was

21  fired, I think.  But I don't remember much more beyond

22  that.

23  Q    And do you remember whether the person who took the

24  video was actually attempting to commit fraud?

25  A    Well, I know nobody was ever prosecuted.  So given

1  the fact that nobody got prosecuted, no.  Nobody clearly

2  was attempting to commit fraud because the person who was

3  doing the video should have gone to jail if they were

4  actually intending to do what they did.

5  Q    Now, did you hear discussion in that video about

6  utility bills?

7  A    Yes.

8  Q    Okay.  When the legislature passed the bill in 2013,

9  did it just eliminate utility bills from the list of

10 forms of ID that could be used for voting?

11 A    No.  We eliminated, I think, the registered voter

12 card, and some other things.  I'd have to have the two

13 bills side by side, but I know you can't use your voter

14 registration card anymore to vote.

15 Q    Did you hear a discussion of bank statements in that

16 video?

17 A    Yes.

18 Q    What do you recall about that?

19 A    There was some discussion about how to fake a bank

20 statement using Microsoft Word, which to me is pretty

21 silly.

22 Q    And do you recall a discussion about how it would be

23 very difficult to forge a bank statement?

24 A    Mr. Moran expressed skepticism about that.  And he

25 said you're a tech dude, and maybe you can figure it out,

1  or something like that.

2  Q     Did you also hear Mr. Moran discussing a better

3  option than committing voter fraud?

4  A     Right.  He suggested maybe you ought to just call

5  them up and try to get them to vote.  He said GOTV, which

6  is, you know, get-out-the-vote.  He said that might be a

7  better way to pull it off rather than what you're talking

8  about.

9        I mean, the whole thing was comical to me.  I mean,

10 these people who they're talking about, who don't vote

11 very often, you can't even find their phone number.  Half

12 the time when you look at the voter list, their

13 information is bad, bad address, their numbers are wrong.

14 Trying to reach out and they're going to call them, all

15 this stuff they were talking about, two people who had no

16 idea what they were talking about.  I mean, it was

17 completely infeasible and impracticable, everything they

18 were discussing.  That's why I just saw it as a partisan

19 hit job that was put out there to raise suspicion.

20 Q     Do you know whether Mr. Moran made any statements

21 after this video came out?

22 A     I have a recollection that he made some apology, or

23 something, in connection with his resignation or leaving

24 the campaign.

25 Q     Do you recall him making any statements about him

1 thinking that a person filming it was essentially crazy?

2 A    I can't say that I have a specific recollection of

3 that.  If you showed me a newspaper article, I might

4 remember that.

5 Q    Now, other than this video we've been discussing,

6 was there any discussion of voter impersonation fraud

7 during the legislative debates regarding the voter ID

8 bill, actual cases of it?

9 A    I don't remember any specific allegations of a

10 specific situation that anybody could cite to.  And that

11 was something that we were always asking for is please

12 just show us an example of somebody who's been

13 prosecuted, somebody who's been convicted, or a situation

14 you know occurred and not just mere speculation or

15 surmise or concern.

16 Q    Okay.  So the only piece of evidence you had was

17 this sting video?

18 A    To the best of my recollection right now, that's all

19 I remember.

20 Q    Was there information in front of the legislature at

21 the same time about actual election administration

22 problems?

23 A    We're always given information.

24 Q    And you talked before about lines, right?

25 A    Right.

1  Q     And did the legislature take action with respect to

2  problems that were actually documented with the election

3  administration?

4  A     I would have to think about it on the lines side of

5  things.  You know, I've been in office for six years now,

6  and I know there's been some talk and some stuff about

7  switching over to optical scan machines which are easier

8  to -- you put one machine in a polling place and get a

9  lot more people to vote in the place because you don't

10  have a mock-up on your computer screen.  And I can't

11  remember whether we've appropriated any money to make

12  that easier or not.  But I know that's been a topic of

13  discussion even just this session.

14      But in general, I don't feel like we've done a whole

15  lot to make it easier to vote with the exception of the

16  fact that the electronic registration, electronic voter

17  registration, which I thought has been a big help, you

18  know, to register to vote on-line without having to fill

19  out a piece of paper.

20      And secondly, in this last election, the State Board

21  of Elections created this electronic absentee application

22  portal for the last four weeks of the election, partly at

23  my urging.  But that made it a little easier to vote.

24      Other than that, I mean, and the Governor has

25  restored a lot more voting rights in the last two and a

DIRECT EXAMINATION OF DELEGATE McCLELLAN   366

1  half years than any other Governor has in the last --

2  ever.  And so since the Governor's mansion changed

3  control of the party, it's become easier.  I can't think

4  of anything else specifically right now.

5       MR. KAUL:  Okay.

6       I don't have any further questions.  Thank you.

7       THE COURT:  May the Senator be excused?

8       MR. HEARNE:  Yes, Your Honor.

9       THE COURT:  Senator Surovell, you're excused and

10  free to go.  Thank you very much for coming in today.  We

11  appreciate your testimony very much.

12      SENATOR SUROVELL:  Thank you.  And good to see you,

13  Your Honor.

14      THE COURT:  Yes, sir.  Good to see you, Scott.

15                    **WITNESS STOOD ASIDE**

16      THE COURT:  Who'll be your next witness?

17      MR. SPIVA:  It's going to be Delegate McClellan,

18  Your Honor.

19      THE COURT:  All right.

20      Delegate McClellan, if you would be kind enough to

21  raise your right hand, place your left hand on the Bible,

22  and face the Clerk of the Court, ma'am.

23      THE CLERK:  You do solemnly swear that the testimony

24  which you are about to give, in this case, before this

25  Court, shall be the truth, the whole truth, and nothing

1 but the truth, so help you God?

2       DELEGATE McCLELLAN:  I do.

3       THE COURT:  Have a seat on the witness stand.

4       DELEGATE McCLELLAN:  Thank you.

5       THE COURT:  Delegate, would you please give us your

6 full name, and spell your last name for the court

7 reporter.

8       DELEGATE McCLELLAN:  Sure.  It's Jennifer Leigh

9 McClellan.  M-C-C-L-E-L-L-A-N.

10      THE COURT:  Go right ahead.

11      MS. BRANCH:  Thank you, Your Honor.

12          Whereupon, **Delegate Jennifer McClellan**, having

13 been duly sworn in, testifies as follows:

14                    **DIRECT EXAMINATION**

15 BY MS. BRANCH:

16 Q    Good morning.

17 A    Good morning.

18 Q    How old are you?

19 A    I'm 43.

20 Q    Could you please state your birth date for the

21 record?

22 A    Xxxxxxxx XX, 19XX.

23 Q    Thank you.

24      Where are you from, Delegate?

25 A    Born in Petersburg, Virginia.

DIRECT EXAMINATION OF DELEGATE McCLELLAN   368

1  Q     And would you consider yourself as a native

2  Virginian?

3  A     Yes.

4  Q     You've lived in Virginia all your life?

5  A     Yes.

6  Q     And where do you currently live?

7  A     In Richmond.

8  Q     What part of Richmond?

9  A     In the fan.

10 Q     And could you just describe where the fan is

11 located?

12 A     Sure.  About a mile west of here.  Sort of right

13 west of VCU.

14 Q     How are you currently employed?

15 A     I am a full-time attorney at Verizon Communications,

16 and a part-time member of the Virginia House of

17 Delegates.

18 Q     Could you please just summarize your education for

19 the Court?

20 A     Yes.  I -- you don't want me to go back to high

21 school, do you?

22 Q     No.

23 A     I graduated from Matoaca High School in 1990.

24 Graduated from the University of Richmond in 1994 with a

25 BA.  And then graduated from UVA law school in 1997.

DIRECT EXAMINATION OF DELEGATE McCLELLAN    369

1  Q    And as you stated before, you're a Delegate in the

2  Virginia House of Delegates.  Which district do you

3  represent?

4  A    The Seventy-First.

5  Q    And what party are you a member of?

6  A    The Democratic Party.

7  Q    Can you please provide a brief overview of your

8  history in elected office.

9  A    Yes.  I was first elected in 2005 in a contested

10  primary.  And it was uncontested in the general.  I've

11  been reelected every year since, and including this past

12  cycle.

13  Q    And are you a member of the Democratic Party of

14  Virginia?

15  A    Yes.

16  Q    What type of work do you do with them?

17  A    A number of things.  I'm a member of the Democratic

18  National Committee.  As such, I'm a member of the

19  Democratic Party of Virginia's Steering Committee and

20  Central Committee.  I am a former vice-chair of the

21  Democratic Party of Virginia, and a former congressional

22  district chair.

23  Q    And when were you vice-chair of the Democratic Party

24  of Virginia?

25  A    I held two different positions.  In 2002, I was

1  elected to vice-chair of outreach.  And then I don't

2  remember the exact year, but I became vice-chair of

3  operations, which is considered to be the first

4  vice-chair.  And then resigned in 2010 when my husband

5  became the executive director of the party.

6  Q    And could you describe the demographics of your

7  district?

8  A    Yes.  It is a majority minority district.  The

9  voting age African-American population is around 56%.

10  The actual African-American population is significantly

11  higher.  There is a large difference between the voting

12  age population and the actual African-American

13  population.

14       It is economically fairly diverse.  I have

15  everything from, you know, million dollar mansions on

16  Monument Avenue to every housing project north of the

17  river.  I have a significant number of senior citizens,

18  and a significant number of children 18 and younger.

19  Q    About what percent African-American population would

20  you say your district is?

21  A    Actual population I think is around 70%.  I just --

22  I remember the exact number of voting age population, but

23  not the exact --

24       THE COURT:  Now, when you say 70%, all of that

25  number is not voting age, is that correct?

1    DELEGATE McCLELLAN:  Right.  The voting age is

2  around 56% African-American.

3    THE COURT:  Okay.  Thank you.

4  BY MS. BRANCH:

5  Q    Delegate McClellan, what is your race?

6  A    African-American.

7  Q    And are you member of the Black Caucus in the House?

8  A    Yes.

9  Q    Do you hold any leadership positions in the House?

10 A    Yes.  I am the vice-chair for operations for the

11 House Democratic Caucus.  Prior to that, I was the

12 vice-chair for outreach.  And have been a vice-chair

13 since, I believe, 2009.

14 Q    And can you describe some of your responsibilities

15 in your various leadership positions?

16 A    Yes.  When I was vice-chair for outreach, which I

17 was up until this past December, I was the liaison

18 between the caucus and various affiliate groups and

19 various campaigns.  My job was sort of to be the chief

20 person who would connect the House Democratic caucus

21 members to the various statewide campaigns to ensure our

22 participation.

23    I also was in charge of our incumbent protection

24 program which when we have freshmen members who come in,

25 I help them develop their plan for how they're going to

1  go do outreach to their constituents, including we do a

2  newsletter and a survey every year.  And I developed both

3  of those, and write most of what goes in there.

4      My current job, I've kept the incumbent protection

5  piece, but focused more on policy than outreach.

6  Q    Delegate McClellan, are you familiar with the ways

7  in which Virginia's voter ID requirements have changed

8  since 2012?

9  A    Yes.

10 Q    Can you describe the Virginia voter ID requirements

11 prior to the 2012 election?

12 A    Yes.  There were a number of IDs listed in the Code

13 that you could bring that included an ID issued by the --

14 what was then the State Board of Elections.  It included

15 a driver's license, and various other IDs.  But it also

16 included if you did not have an ID, you would sign a

17 sworn affidavit that you were who you said you were, and

18 you could vote.

19 Q    And you could vote at the polls, is that correct?

20 A    Yes.

21 Q    And now in 2012, is it your understanding that the

22 voter ID requirements changed?

23 A    Yes.

24 Q    And how so?

25 A    The -- in 2012, the affidavit was changed so that

1  you could -- you no longer would vote at the -- a regular

2  ballot.  You would vote by provisional ballot.  And you

3  would have to bring a ID to your local registrar, I

4  think, by the Friday after the election.

5  Q    And that's if you didn't have an acceptable ID under

6  the law?

7  A    Correct.  And that law also changed what forms of ID

8  were permissible.  As the bill originally passed the

9  House, you had to have a photo ID that would have

10 included a valid driver's license, a valid student ID,

11 employer ID.  I believe it included the card from the

12 State Board of Elections.  And then with amendments from

13 the Governor, it included a utility bill, a bank

14 statement.  I think there was one other similar ID that

15 would be permissible.

16 Q    So what's your understanding between the way that

17 the bill -- the 2012 bill was originally passed and the

18 law that is -- that came on the books?

19 A    Governor McDonnell's amendments added the non-photo

20 ID options.

21 Q    And is it your understanding -- or do you know

22 anything about why those non-photo ID options were added?

23 A    I do.  The first voter ID bill that was introduced

24 that made it to the floor was in 2010.  It was a bill

25 that would have required various forms of

1  government-issued photo ID.  I opposed that bill.  I

2  spoke against that bill on the floor.

3      And around the same time, Governor McDonnell had the

4  Legislative Black Caucus to the mansion for dinner.  I

5  sat beside him, and we had a conversation.  He asked me

6  sort of to opine on race relations in Virginia.  Through

7  that conversation, I told him that I was concerned about

8  legislation that had been introduced that would have a

9  disproportionate impact on African-American communities.

10  He asked me for an example.  I pointed to that original

11  voter ID bill.

12      He asked me, *"Why is that a problem?  Shouldn't we

13  be concerned about voter fraud?"*

14      I said, *"Well, what do you need to have a

15  government-issued photo ID?  You need a birth

16  certificate."*

17      He said, *"What's wrong with that?"*

18      I said, *"Well, in Virginia did you know that there

19  were people born as late as the 1940s who don't have

20  birth certificates?"*

21      He said, *"I didn't.  Why is that?"*

22      And I told him about the Racial Integrity Act of

23  1925, which was the first law in Virginia that required

24  registration of black births.  It was implemented by a

25  man named Walter Plecker who would -- he was the one that

1  issued birth certificates.  On the application for a

2  birth certificate under race, there were only two

3  options:  White and colored.  If an applicant did not

4  check the colored box, and Dr. Plecker believed them to

5  be colored, he would not give them a birth certificate.

6      So I recounted that story.  And he told me he was

7  not aware of that.  And so he had that knowledge

8  subsequently when voter ID legislation came in.

9  Q    Did you also discuss the presence of voter fraud in

10 Virginia with Governor McDonnell?

11 A    I did.  I had asked several times when that 2010

12 legislation was introduced, where's your evidence of

13 people showing up to vote claiming to be someone they

14 were not?  I was never given any examples of that.  And,

15 you know, I expressed that to Governor McDonnell.

16 Q    Now, in 2012, did you support the voter ID

17 requirement?

18 A    I did not.

19 Q    And did you make any statements on the House floor

20 about the voter ID requirement?

21 A    I did.

22 Q    And what was the product of those statements?

23 A    Well, in 2012, the bill passed anyway.  In 2010, it

24 -- so we debate bills on second reading, and then they're

25 voting on on third reading.  In 2010, I spoke against the

1 voter ID bill, particularly focusing on the history of

2 suppression of African-American votes -- voters in

3 Virginia.  And how I felt that the voter ID law was a

4 step backwards, and also was in effect a poll tax.  I

5 repeated that same -- and in 2010, the next day, the

6 patron of the bill withdrew -- I think he referred the

7 bill back to committee, which effectively killed it.

8       In 2012, I gave pretty much the same speech, but it

9 passed the next day.

10 Q    And you've mentioned some of the reasons why I think

11 you don't support -- or you didn't support the 2012 voter

12 ID law.  But can you just state for the record why

13 specifically you didn't support it?

14 A    Sure.  I was particularly concerned, again, given

15 the number of people born as late as the '40s who don't

16 have a birth certificate, and for many forms of ID that

17 you would expect most people to have, requires a birth

18 certificate.  I thought that was a problem.

19       I felt that the -- again, the way the bill passed,

20 because it required either a valid driver's license,

21 there are a number of people who do not have valid

22 driver's licenses either because it has expired or been

23 suspended and so they wouldn't be able to use that.  I

24 was concerned that if you had one of those individuals

25 who is not employed with an employer that uses a photo ID

1  and is not a student, they would have to get an ID.   If

2  they went to DMV to get an ID, it would cost $10, which,

3  in my opinion, is a poll tax.

4      And I believe that because there was not evidence of

5  people showing up at the polls claiming to be somebody

6  they were not, I felt that the bill was unnecessary and

7  it would lead to some individuals not being able to

8  exercise the right to vote.

9  Q    Did you think that the 2012 voter ID bill would have

10  any impact on your constituents?

11  A    Yes.  Absolutely.

12  Q    How so?

13  A    Again, as I mentioned, I represent four, I believe,

14  housing projects where there are a lot of people who are

15  unemployed, where there are a lot of people who do not

16  have driver's licenses and don't drive, and who are not

17  students.  And so particularly for them, I was concerned

18  about their ability to vote.

19      I was also concerned about -- I mean, that was the

20  main thing.  I was also concerned even as amended, the

21  bill would set up barriers to individuals in my district

22  being able to vote.

23  Q    So going forward to 2013, the photo ID bill that's

24  at issue in this case, did you support that piece of

25  legislation?

1  A    No.

2  Q    And why not?

3  A    The same reason, but this one, the 2013 bill,

4  removed the non-picture ID forms of ID that the

5  Governor's amendment had put in.  So I, again, felt it

6  was a step backwards.  That would add even more

7  impediments to people being able to vote.

8       I was concerned about voter confusion because in the

9  span of a year you would have had changes to the types of

10 ID that you would use to vote.  In 2012, -- well, in 2011

11 after the redistricting, people got new voter ID cards to

12 reflect their new districts.  And some people got more

13 than one because the first one was wrong.

14      In 2012, you have everybody got a new voter ID card

15 from the State Board of Elections because Governor

16 McDonnell ordered the State Board of Elections to do

17 that.  So now you would have citizens who had just

18 received an ID from the State Board of Elections that

19 they could use to vote, all of the sudden that would no

20 longer be a valid form of ID.  So I felt that many

21 changes to the ID requirements in such a short period of

22 time, particularly when the state had spent a significant

23 amount of money making sure everyone had that form of ID,

24 was just bad -- it was a bad thing to do.

25 Q    And did you express these concerns on the House

1  floor when the 2013 bill was being debated?

2  A    I did.

3  Q    Was there anything notable about the fact that the

4  legislature passed a voter ID bill in 2012, and then

5  later passed a voter ID bill within a span of a year, as

6  you have testified?

7  A    Can you restate your question?

8       THE COURT:  I don't understand your question.  I

9  don't know how the Delegate could.  Why don't you go back

10 and rephrase.

11      MS. BRANCH:  Yeah.  I apologize, Your Honor.

12 BY MS. BRANCH:

13 Q    Is there anything notable about the fact that the

14 voter ID requirements in Virginia changed within the

15 course of the year, in your opinion?

16      THE COURT:  I think she just answered that by

17 explaining the difference, and the concerns she had.  Are

18 you seeking something else?

19      MS. BRANCH:  Only if the Delegate was going to.

20      THE COURT:  All right.

21      Anything else noteworthy, Delegate?

22      DELEGATE McCLELLAN:  Well, I guess nothing had

23 changed between 2012 and 2013 except that President Obama

24 had been reelected, the *Shelby* decision had been issued

25 by the Supreme Court, and there was a -- there were

1  multiple attempts to get Virginia to a voter ID

2  requirement.  And I saw 2012 as just the next step in

3  trying to get to the bill they really wanted that was

4  introduced in 2010.

5      THE COURT:  All right.

6      Go ahead.  Next question.

7  BY MS. BRANCH:

8  Q    And so you talked about some of the House floor

9  statements that you made about the photo ID bill in 2013.

10 Was there any reaction from other legislators to your

11 statements?

12 A    There were other members of the Democratic caucus,

13 and I believe the Legislative Black Caucus, who made

14 similar statements.  And I believe the patron of the bill

15 got the last word, and again focused on the bill was

16 trying to prevent voter fraud.  Unfortunately, in 2012

17 and 2013, the patron did not withdraw the bill.

18 Q    Did any members of the -- or did any

19 African-American legislators vote in favor of the 2013

20 photo ID law?

21 A    No.

22 Q    Do you remember there being any discussion on the

23 House floor about potentially having a reasonable

24 impediment exception to the 2013 photo ID requirement for

25 voters who are reasonably impeded from obtaining a photo

1  ID?

2  A     No.  I just remember statements on the floor from

3  delegates who were concerned that there would be an

4  impediment.  But there were no amendments made on the

5  floor to address those concerns.

6  Q     Do you remember there being any discussion, or

7  amendments made, to allow those who didn't have photo ID

8  to have their identity confirmed through signature

9  verification requirements?

10 A     There were no amendments adopted to do that.  There

11 were -- I don't remember if it was on the House floor or

12 in the committee, but there were -- there was a desire

13 raised that at one time you could just do your signature

14 and that it would count, and that is what was preferable

15 to the voter ID or a provisional ballot.

16 Q     Have any of your constituents contacted you to urge

17 you to support the 2013 photo ID law?

18 A     No.  Quite the opposite.

19 Q     And can you describe those interactions.

20 A     Yes.  The -- there were organizations that opposed

21 the bill, including the NAACP, the Richmond Crusade for

22 Voters.  And I heard from, by either e-mail and phone

23 calls, individuals who wanted me to vote against it.

24       When we are not in session, I also do what I call

25 the neighborhood association circuit.  So I do a

1   legislative update to various neighborhood associations,

2   organizations, tenant councils in my district.  And

3   starting with the 2010 bill, the voter ID proposals was

4   always something that I talked about.  And whenever I

5   talked about it, there were people who were in the

6   audience who said they opposed those bills and thanked me

7   for voting against them.

8   Q    And you mentioned the Richmond Crusaders {sic}.  Can

9   you explain what that is?

10  A    The Richmond Crusade for Voters is an organization

11  that was founded in, I think, 1954 by Dr. Ferguson Reid.

12  And he's the most prominent founder.  It was founded in

13  response to both the school desegregation issue and voter

14  suppression issue.  And it was -- it was designed, and

15  they advocated, to give blacks in Richmond the right to

16  vote and to push for integration of the schools.  That

17  organization still exists today.  It eventually focused

18  on helping to get African-Americans elected to office,

19  and was instrumental in Dr. Ried becoming the first

20  African-American elected to the General Assembly since

21  reconstruction.

22  Q    And did you ever -- are you a member of the Richmond

23  Crusade for Voters?

24  A    Yes.

25  Q    And did you ever attend any meetings where the photo

1  ID bill was discussed?

2  A    Yes.  That was one of the groups that I speak to

3  when we're not in session.  They meet once a month, and

4  whenever I am there they either ask if I want to speak,

5  or sometimes I'll specifically be on the agenda to give a

6  legislative update.  And every time I've done a

7  legislative update before the last bill passed, I would

8  discuss efforts to have the voter ID starting with the

9  2010 bill, and what happened.  And, again, people would

10  say -- they would thank me for voting and speaking

11  against it.  And said that if it comes back, you know, we

12  want you to vote no again.

13  Q    You have mentioned a couple times, I think, voter

14  fraud was presented as one of the reasons in support of

15  having a photo ID law, is that correct?

16  A    Yes.

17  Q    Did any legislators ever present any evidence of

18  voter fraud in Virginia?

19  A    No.  The only evidence that I was aware of was, I

20  believe, an individual who had -- who was charged with

21  throwing away -- I can't remember if they were absentee

22  ballot applications or absentee ballots, but that was the

23  only case of voter fraud that I was aware of at any point

24  when the legislation was being considered in either year.

25  Q    Did any legislators present any evidence of

1 in-person voter fraud, in-person voter impersonation

2 voter fraud?

3 A     No.

4 Q     Delegate McClellan, based on your experience in

5 politics, are you aware of issues that have come up that

6 involve election administration, and the efficiency of

7 elections?

8 A     Yes.

9 Q     And what types of issues have come up in Virginia?

10 A     A number.  Specific to ID, there has been confusion

11 over what forms of ID were acceptable.  There were issues

12 with -- when the State Board of Elections sent the new

13 IDs both in response to redistricting and in response to

14 the 2012 legislation, some of the cards that were for

15 people who lived in split precincts were incorrect and

16 had to be redone.  I think those were the main ones

17 related to IDs.  And just people who came without an ID

18 who then were either turned away or told they have to

19 vote provisionally.

20 Q     Are you aware of other election administration

21 issues in Virginia that are not related to ID

22 requirements?

23 A     Yes.  This past election, there was quite a bit of

24 -- well, several elections there have been instances

25 where people would come to vote at a precinct and there

1 was a problem with the poll book either in some areas

2 where there was an electronic poll book and it didn't

3 work.  That happened this past election.

4      There were instances where someone in a split

5 precinct was given the wrong ballot.  There were

6 instances of long lines more so in presidential years,

7 more so in Virginia.  But in presidential years in

8 Virginia, and in Richmond, there were also very long

9 lines.  And there were concerns about whether people who

10 were in line when the poll closed would be permitted to

11 vote.

12      There were concerns about the training for poll

13 workers and poll workers telling voters incorrect

14 information.  Those are the ones that I can recall off

15 the top of my head.

16 Q   Are you aware of any legislation that has been

17 proposed to address those types of issues?

18 A   Yes.  I didn't mention we -- absentee balloting in

19 Virginia is limited to a very few cases.  And that has

20 become an issue over time as we have people who have to

21 work on election day who can't get off, or in northern

22 Virginia in particular where people get stuck in traffic

23 and can't get to the polls.  And there has been an effort

24 to have automatic voter registration for many, many

25 years.  And that's never been successful.

1     There has also been efforts to have sort of no

2  excuse absentee for seniors.  And, you know, that is sort

3  of if we can't get it for everybody, can we get it for

4  seniors.  That has not happened.

5     There has been legislation and funding proposed in

6  the budget to address the lines by authorizing more

7  voting machines.  There -- this is more dealing with

8  eligibility, but there have been efforts to streamline or

9  have automatic restoration of rights, which would include

10  voting rights for nonviolent felons, every year because

11  there are a significant number who are not able to vote.

12  And that's sort of the last visage of Jim Crow that we

13  have in Virginia.  That has been unsuccessful.

14  Q    So you mentioned issues of long lines and issues

15  with electronic poll books.  Do you know if any of the

16  legislation that has been proposed to try to fix those

17  problems has been successful?

18  A    It has not.

19  Q    What criteria do you use when determining whether to

20  support or oppose a piece of legislation?

21  A    I tend to ask myself sort of what is the problem

22  this bill is trying to address.  Is this the best way to

23  address it?  Who does it hurt?  Who does it benefit?  And

24  who pays?

25     So that's sort of my own individual calculus.  And

1  then I look at who supports it and who opposes it.  Have

2  I heard from a significant number of constituents.  And

3  to me, if I get more than two calls or e-mails on a bill,

4  it gets my attention.  So I look at what my constituents

5  are saying, and why.

6  Q    And how did that calculus play out with regard to

7  the 2013 photo ID law?

8  A    Both my personal calculus, and what my constituents

9  were telling me was to vote no.

10 Q    And why was that?

11 A    Because -- and particularly because you're talking

12 about a constitutional right to vote.  And because of the

13 history of voter discrimination in Virginia, and in this

14 country, and I have family experience of relatives who

15 were -- their vote was suppressed, or tried to be

16 suppressed, I take very seriously any bill that I think

17 will impede an individual's right to vote.  I am

18 automatically inclined to vote against unless there is a

19 very compelling reason to vote for it, and that bill is

20 very limited in how it's going to do it.  And I have

21 never seen a bill that would restrict a person's ability

22 to vote that I could support.

23 Q    Are you aware that under the 2013 photo ID law,

24 voters can get a free ID to use specifically for voting?

25 A    Yes.

DIRECT EXAMINATION OF DELEGATE McCLELLAN   388

1  Q    And I know you mentioned on the House floor that

2  certain Virginia residents don't have birth certificates,

3  and you mentioned today that that is as a result of

4  Virginia's history of racial discrimination.  But are you

5  aware that a voter can receive a free ID from the

6  registrar's office without presenting any documentation?

7  A    Yes.

8  Q    And how does that play -- how did that play into

9  your calculus in terms of whether or not to support the

10  law?

11  A    Well, it begged the question why is this bill being

12  used if you're concerned about voter fraud.  Because

13  nothing would prevent -- if you don't have to present

14  documentation when you go to the registrar's office to

15  get your ID, then someone theoretically could go to the

16  registrar's office and lie about who they are and get an

17  ID.  That was the type of voter fraud the proponents of

18  the bill said they were trying to stop, but this bill

19  didn't do it.

20      And then there was another bill that dealt with IDs

21  where you would have to present for absentee ballots.

22  And again, if your goal was we went to stop people from

23  showing up at the polls and lying about who they are,

24  you've left two very huge loopholes and you haven't

25  solved that problem.

1  Q       Has the history of racially-motivated voter

2  suppression had an impact on your life, Delegate

3  McClellan?

4  A       Mine personally, no.  My family's, yes.  Which has

5  shaped how I view these bills.  My great grandfather

6  wrote a book about his life, and in that book he told the

7  story -- he was born a slave, and during reconstruction

8  when African-Americans were given the right to vote, he

9  registered to vote and he voted.

10         After reconstruction as the laws changed, and a

11  literacy test was put in place, he tells the story in his

12  book how he went to registor to vote.  He knew he was

13  going to get a literacy test.  He studied.  He got all

14  the questions right.  And the person administering the

15  test turned to the registrar and said, *"We need more*

16  *questions because this nigger got 'em all right."*

17         That is a story that not only has, you know, -- it's

18  on paper, it has been told in my family.  My parents were

19  very active members of the Civil Rights movement sort of

20  fighting for leading up to the Voting Rights Act.  And so

21  they were very involved in doing whatever they could to

22  make sure blacks got the right to vote.

23         With that legacy, I -- and I said this on the House

24  floor, any bill that puts up a barrier to someone who --

25  that could either keep them from, or make it more

1  difficult, exercising the right to vote, that people,

2  including my family, fought for, and some people have

3  died for, I'm going to do everything in my power to stop

4  it.  And that's what I tried to do with these bills.

5      MS. BRANCH:  No further questions.

6      THE COURT:  All right.

7      Cross-examination of Delegate McClellan.

8      MR. HEARNE:  Thank you, Your Honor.

9                 **CROSS-EXAMINATION**

10 BY MR. HEARNE:

11 Q    Thank you, Delegate McClellan, for coming to testify

12 today.

13 A    Thank you.

14 Q    I am Thor Hearne, and I'm representing the

15 Commonwealth and the defendants -- the defendant election

16 officials and agencies here in the case.

17 A    Okay.

18 Q    You told of your concerns about the 2010

19 legislation, voter identification legislation, that was

20 then proposed?

21 A    Yes.

22 Q    And if that was -- if I understand your testimony,

23 it was then proposed it would have required a birth

24 certificate as part of the process of obtaining an ID, is

25 that correct?

CROSS-EXAMINATION OF DELEGATE McCLELLAN    391

1  A    Well, it would have required a government-issued ID.

2  And my understanding is for every ID that was included,

3  you would need a birth certificate to get one.

4  Q    So the 2010 legislation was much stricter in terms

5  of the acceptable forms of identification documents than

6  what was adopted in 2012, is that correct?

7  A    Yes.

8  Q    And the 2010 proposal was also more strict than what

9  was adopted in 2013, is that correct?

10 A    Yes.  I'm sorry.  Say that -- 2010 was more strict

11 than 2013, yes.

12 Q    Correct.  That was my question.

13 A    Okay.

14 Q    And you recounted how you had an opportunity to

15 discuss your concerns with Governor McDonnell, is that

16 correct?

17 A    Yes.

18 Q    And for the record, Governor McDonnell is a

19 Republican?

20 A    Yes.

21 Q    Did you feel he was responsive to your concerns?

22 A    Yes.

23 Q    And in response to your concerns, and those of

24 others, if I understand your testimony, the 2010

25 legislation was killed in committee, or it didn't pass?

CROSS-EXAMINATION OF DELEGATE McCLELLAN   392

1  A    Yes.

2  Q    And then the legislation in 2012 did not require a

3  birth certificate -- to obtain some of the forms of ID

4  that were required to vote?

5  A    Right.

6  Q    And in the 2012 legislation, you voted that you

7  opposed that legislation, is that correct?

8  A    Yes.

9  Q    And that legislation would allow somebody to vote

10  with the utility bill as the only form of identification,

11  is that correct?

12  A    As it was amended by the Governor.  Yes.

13  Q    And you voted against it even as it was amended by

14  the Governor, is that correct?

15  A    Well, I -- well, I voted for the bill on final -- I

16  mean, I voted against the bill on final passage, then the

17  Governor's amendments were brought down.  So the vote was

18  on the Governor's amendments.  And I honestly can't

19  remember how I voted on the amendments because I still

20  opposed the underlying bill, but I thought the amendments

21  made it less bad.

22  Q    So let me ask the question more generally, and not

23  about a specific vote.  In terms of the 2012 legislation

24  as it was finally adopted, was that legislation that you

25  supported or opposed?

1  A     I still opposed it because the 2012 legislation

2  removed the ability to sign a sworn affidavit and vote.

3  It said if you don't have any of these IDs, you can only

4  vote provisionally.  And I still opposed -- even with the

5  Governor's amendment, I still opposed it.

6  Q     And you are aware that the 2012 version of the voter

7  ID law was submitted to the Justice Department under

8  Section 5 of the Voting Rights Act?

9  A     Yes.

10  Q     And that the Justice Department approved it, or what

11  we call precleared that legislation?

12  A     Yes.

13  Q     And then in terms of 2013, are you aware that that

14  legislation, or do you understand that that legislation,

15  actually added some additional forms of identification

16  that were not acceptable under the 2012 law?

17  A     As I recall, the 2013 law still required a photo ID.

18  There were different IDs, and it provided that you could

19  go get one if you don't have one.  But as I recall, all

20  of the IDs in the 2013 legislation were photo IDs.

21  Q     Did 2013 add to the list of acceptable forms of

22  identification photo IDs issued by, for example, private

23  colleges to students -

24  A     Yes.

25  Q     - that were not acceptable under the 2012 law?

CROSS-EXAMINATION OF DELEGATE McCLELLAN    394

1   A    Yes.

2   Q    Are you aware -- and I understand you reference

3   *Shelby County*, meaning the Supreme Court's decision *in*

4   *Shelby County v. Holder?*

5   A    Yes.

6   Q    The 2013 law was passed before the *Shelby County*

7   decision, is that correct?

8   A    I don't remember.

9   Q    If -- are you aware of whether the 2013 bill was

10  submitted for preclearance under Section 5 because *Shelby*

11  *County* had not yet been decided?

12  A    I don't know.  I don't remember.

13  Q    Okay.  Are you familiar with former President Jimmy

14  Carter?

15  A    Yes.

16  Q    Are you familiar with Andrew Young, the former mayor

17  of Atlanta, Georgia?

18  A    Yes.

19  Q    Are you familiar with their work on the Carter-Baker

20  Commission report?

21  A    No.

22  Q    In terms of the implementation of the legislation,

23  the -- and I'll speak now, just so the record's clear, to

24  the 2013 bill.

25  A    Okay.

CROSS-EXAMINATION OF DELEGATE McCLELLAN    395

1  Q    And first let me ask, what's your understanding of

2  the year in which that law became first effective?  I

3  mean, it was passed in 2013, but it was not immediately

4  effective, is that correct?

5  A    That is -- I think that's correct.

6  Q    Would it be consistent with your recollection if I

7  were to represent to you that the first year it became

8  effective was 2014?

9  A    Yes.

10 Q    So there was a period of time for these new

11 requirements to be implemented?

12 A    Yes.

13 Q    What steps did you take in regard to your

14 constituency or, even though you opposed the legislation,

15 you had concerns about it, so my question is what steps

16 did you take to help folks comply with this after it did

17 pass?

18 A    I think a number.  I do, as I mentioned,

19 newsletters, both electronic and hard, that I put in

20 information about the bill.  And then leading up to

21 election day, I always send a newsletter out that says

22 election day is coming.  Here are the deadlines.  Here is

23 what you need to vote.  And I would include a list of ID

24 requirements, as well as all -- so, anything you would

25 need to show up and be able to vote I put in that

1 newsletter.

2     I also, as I -- in the years that I was on the

3 ballot, and sort of going door-to-door and campaigning, I

4 would make sure to tell people either, you know,

5 face-to-face or speaking at associations.  I worked with

6 the Richmond Crusade For Voters on voter education and

7 voter registration efforts making sure people knew.  And

8 I believe that those are the main ways.

9 Q     And you're familiar, of course, with Virginia's

10 election system of administration with the Election

11 Board, which is the named defendant here, is that

12 correct?

13 A     Yes.

14 Q     Did you have occasion to interact with them in terms

15 of the implementation of the law?

16 A     Through their Website, yes.  They list -- they put

17 pretty much comprehensive information about what you

18 would need to be able to vote.  And I include information

19 from that Website in whatever I give to people.  I either

20 will print it off, or if I'm sending electronic

21 communications, I'll submit a link to that.

22     I know at one time under the Help America Vote Act

23 they had palm cards that explained sort of voter

24 requirements.  And I don't know if they still do that.

25 But at one time, I would use those to hand out to people.

1  Q     Are you aware of whether the Election Board worked

2  with other groups, such as the NAACP and others, who were

3  concerned about the implementation of this law to try to

4  reach out to those organizations?

5  A     I believe they did.

6  Q     You've talked about some of your observations and

7  issues at polling places.  Do you recall that?

8  A     Yes.

9  Q     What's your understanding in terms of Virginia

10  election administration, who is actually responsible for

11  training the individuals at each polling place?

12  A     The local registrar and the electoral boards train

13  the local workers with some assistance from the state.

14  Q     And this is just a question because I was not

15  listening as closely as I should of, or I couldn't hear

16  clearly, you had said there was the last vestige of Jim

17  Crow.  I was just unclear what you were referring to.

18  A     I was asked about legislation to sort of remove

19  barriers to voting, or address issues with voting.  And

20  what I meant was it is still the law that if you're

21  convicted of a felony, you can only have your rights

22  restored by the Governor.  And there have been bills

23  introduced every year to either have automatic

24  restoration of rights, or to create a legislative process

25  for restoring rights.

CROSS-EXAMINATION OF DELEGATE McCLELLAN   398

1  Q    And I think you've helped me clarify my

2  understanding, if I'm correct, that that reference you

3  made from the last vestige of Jim Crow referred to the

4  felon re-enfranchisment issue, is that correct?

5  A    Yes.

6       MR. HEARNE:  Thank you very much.  I have no further

7  questions, Delegate McClellan.  Thank you for coming.

8       THE COURT:  Any redirect of Delegate McClellan?

9       MS. BRANCH:  (Inaudible).

10      THE COURT:  Pardon?

11      MS. BRANCH:  No, Your Honor.

12      THE COURT:  May the delegate be excused?

13      MR. HEARNE:  Yes, Your Honor.

14      THE COURT:  Delegate McClellan, you're excused and

15  free to go.  Thank you so much for your time today.  We

16  appreciate it.

17                    **WITNESS STOOD ASIDE**

18      THE COURT:  Who will be your next witness?

19      MR. KAUL:  Your Honor, we call Karen Stallings.

20      THE COURT:  Karen Stallings?

21      MR. KAUL:  Yes.

22      THE COURT:  All right.

23      Ms. Stallings, if you would be kind enough to raise

24  your right hand, left hand on the Bible, and face the

25  Clerk of the Court.

1        THE CLERK:  You do solemnly swear that the testimony

2   which you are about to give, in this case, before this

3   Court, shall be the truth, the whole truth, and nothing

4   but the truth, so help you God?

5        MS. STALLINGS:  I do.

6        THE COURT:  Have a seat on the witness stand,

7   Ms. Stallings.

8        Ms. Stallings, would you please give us your name,

9   and spell your last name for the court reporter.

10        MS. STALLINGS:  It's Karen Stallings.

11   S-T-A-L-L-I-N-G-S.

12        THE COURT:  All right.

13        You may inquire.

14        Whereupon, **Karen Stallings**, having been

15   duly sworn in, testifies as follows:

16                   **DIRECT EXAMINATION**

17   BY MR. KAUL:

18   Q    I think it's good morning still, Ms. Stallings.

19   A    Good morning.

20   Q    Would you please tell the Court where you live.

21   A    I live in Alexandria, Virginia.  Actually, it's

22   Fairfax County.  The Mount Vernon area.

23   Q    And how long have you lived in Virginia?

24   A    I have lived in Virginia since 1988.

25   Q    And what do you do for a living?

1  A    I'm an independent contractor.  I do contract work

2  for the federal government.

3  Q    Have you been involved in political activities since

4  you've been in Virginia?

5  A    I have.

6  Q    Can you just provide us sort of a brief overview of

7  what that involved?

8  A    I'm a member of the Mount Vernon District Democratic

9  Committee.  I am a past co-chair of that committee.  I

10  was also the past operations chair for that committee.

11  And as such, a lot of the education of not only voter

12  education, but also our democratic folks that we had

13  working at the polls, and that kind of thing.  I've done

14  a lot of lobbying.  I've worked for different candidates.

15  So I've been very involved politically.

16  Q    And do you remain involved in those activities to

17  this day?

18  A    I do.

19  Q    Are you also a poll worker?

20  A    Only for the Democratic party.  Not inside the polls

21  as a paid worker.

22  Q    And what do you do as a Democratic party poll

23  worker?

24  A    One of the things that we do is observe.  So I'm an

25  inside observer at the polls to make sure that all of the

1  voters are getting an even -- I don't know who I'm

2  supposed to be talking to.  We have quite an audience

3  here.

4  Q    You can talk to me or the Court.

5        MS. STALLINGS:  I don't mean to ignore you, Judge.

6        THE COURT:  I'm not offended.  But the most

7  important thing is that the court reporter take it down,

8  so be sure she can hear what you say, all right?

9        MS. STALLINGS:  All right.  I'll try to speak a

10 little more slowly.

11 A    One of things that we do is observe inside the polls

12 to make sure that the voters are getting a fair shake,

13 and if there's a question of what -- whether they can

14 vote or not, we help them work through that.  We also, of

15 course, work on the outside of the polls in greeting

16 people, giving them sample ballots.  So we have an inside

17 and outside.

18 Q    And do you do any training in connection with that

19 work you're describing?

20 A    I do.  As the operation's chair, I put together

21 training programs for not only our poll workers, and the

22 people who are working inside and outside, but also for

23 the public to help them when new laws come into effect,

24 or when something changes that they need to know about.

25 Q    Why do you do those trainings?

1  A     Why?

2  Q     Yes.

3  A     Because the general public is not well informed.

4  I'm trying to put that kindly.  They don't know, and

5  oftentimes the rules, or whatever, are relatively

6  difficult to understand.

7  Q     And have your trainings involved trainings about the

8  voter ID requirements that are in place?

9  A     Yes.

10  Q     And why have you been training about that law,

11  specifically?

12  A     When the law first came into effect -- and I hope

13  I'm getting the dates correct.  I'm not sure that I've

14  got the years right.  But I think in 2012 when the first

15  law came into effect when you didn't have to have a

16  picture ID, but you had to have some sort of ID, I think

17  the state sent out cards.  I don't know if any of you

18  remember that.

19      But anyway, we got some sort of cards.  And you

20  could vote with that, but you could also vote with other

21  things.  And there was a long list of things that you

22  could vote with.  And things like your utility bill.

23  Several different things that would tell you what you

24  could use for ID.  But it wasn't real clear that you had

25  to have that and an ID, or not, and what that list was.

1 The list was put in the newspaper, but not everybody saw

2 it.

3       THE COURT:  You need to speak slowly because this

4 young lady has got to take everything down that you say,

5 okay?

6       MS. STALLINGS:  I'm sorry.

7       THE COURT:  All right.  Go ahead.

8 BY MR. KAUL:

9  Q    And I'll try to break it into a bit smaller pieces.

10 A    Okay.

11 Q    So you were talking about the 2012 law?

12 A    Right.

13 Q    Did you do training about that law?

14 A    We started then.  Yes.

15 Q    And then another law was passed in 2013?

16 A    That's correct.  And that's when the photo ID was

17 put into place.  But as I recall, we didn't have to have

18 it for the 2013 election.  It was going to actually go

19 into effect for the 2014 election.  I believe that's the

20 sequence of events.  So we began early trying to educate

21 folks on how to get a photo ID in time for their --

22       THE COURT:  Yes, sir.

23       MR. FINBERG:  Your Honor, I'm sorry to interrupt.

24 On the witness disclosure that was provided by the

25 plaintiffs in this case, Ms. Stallings is identified as

1  being here to testify about problems her father

2  encountered in trying to vote.

3       She was not identified as somebody who was going to

4  be offering testimony on training of poll workers, or the

5  general matter that she's testifying about now, Your

6  Honor.

7       THE COURT:  I would assume that this is a predicate

8  to a question that is related to the disclosure.  If not,

9  I will not consider the testimony.

10      MR. FINBERG:  Thank you, Your Honor.

11      THE COURT:  So your objection is granted in part and

12  denied in part, okay?

13      MR. FINBERG:  Thank you, Your Honor.  Understood.

14  BY MR. KAUL:

15  Q    And let me ask you a follow-up.  So you did training

16  on the 2014 law?

17  A    Yes.

18  Q    And is that -- if you hadn't been spending that time

19  training, would you have been doing other stuff at that

20  time?

21  A    Other stuff politically?

22  Q    Yes.

23      MR. FINBERG:  Again, Your Honor, she was disclosed

24  as somebody who was going to testify regarding issues

25  that her father experienced in trying to cast a ballot.

1  The inquiry that counsel is going into now is going to

2  more questions of organizational burden, and things of

3  that nature.  That's not what she was put on the witness

4  list for.

5      THE COURT:  Is that part of your disclosure?

6      MR. KAUL:  I don't actually know what her disclosure

7  says, to be honest with you, Your Honor.

8      THE COURT:  All right.

9      MR. KAUL:  But I will -- may I ask that question?

10     THE COURT:  If you need some time, I'll let you

11 take -- I'll let you go through this briefly, all right?

12 But I'm not going to consider it as substantive evidence

13 unless it's part of your disclosure, all right?

14     MR. KAUL:  We will look at that, Your Honor.

15     THE COURT:  Let's move on.

16     MR. FINBERG:  Thank you, Your Honor.

17 A    Yes.

18 BY MR. KAUL:

19 Q    So let me talk about your father.  Did your father

20 move to Virginia at some point?

21 A    He did.  He moved to Virginia in December of 2012.

22 Actually, I moved him here to live with us.  He had a

23 ischemic problem with his eyes and went blind.  And I had

24 to go out to Arizona and get him and bring him home with

25 me.

DIRECT EXAMINATION OF KAREN STALLINGS   406

1  Q     And when did your father come to Virginia?

2  A     December 2012.

3  Q     And you mentioned he had some health conditions.

4  Can you just describe what he had, specifically?

5  A     At that time he had vertigo, several

6  non-life-threatening issues that elderly folks have.

7  Couldn't walk very well, had a back problem.  Things like

8  that.  But the big thing was that he lost his eyesight

9  and could no longer drive or live by himself, so we had

10 to bring him here with us.

11 Q     So after he moved to Virginia, did you attempt to

12 help him register to vote?

13 A     I did.

14 Q     And can you explain what you did?

15 A     Let's see.  He moved here in December.  He had a

16 heart attack in the spring.  So we waited until summer.

17 And I believe it was summer or early fall when he wanted

18 to be able to vote come the fall elections.

19 Q     And just to be clear, we're talking about 2013 right

20 now?

21 A     Now we're into 2013.  Correct.

22 Q     Okay.

23 A     So he would have been 84.  He couldn't drive, of

24 course.  Had difficulty walking, even.  So, anyway, I

25 decided that we needed to take him to the DMV to get one

1  of these IDs.  He had an expired New Mexico driver's

2  license, but he needed something that showed he lived

3  here.  And as far as the list of things that we had been

4  training people on, he didn't have any of those.  He

5  didn't pay utility bills.  He had none of that

6  information.  So we needed something to prove that he was

7  a Virginia citizen in that precinct, as far as I

8  understood.  So that's why I decided the best way to do

9  that would be to take him to DMV and get an ID card.

10 Q     Now, how far was the DMV in relation to where you

11 lived?

12 A     It's about a 30 to 45-minute drive, depending on the

13 traffic.  It's not so far in miles, but as far as time,

14 it takes at least 30 minutes, and could be up to an hour,

15 hour and a half.

16 Q     Do you know where the general registrar's office is?

17 A     It's in the Fairfax Government Building in the

18 western side of Fairfax County.

19 Q     How long does it take to get there from where you

20 live?

21 A     About an hour and a half.

22 Q     Okay.  So did you and father ultimately go to the

23 DMV?

24 A     We did.

25 Q     And what happened there?

1 A    We arrived at the DMV in the middle of the day in

2 the middle of the week so it wouldn't be crowded, and it

3 was not crowded.  We got there and you know how the DMV

4 works.  You go in, you go to cue up in one line.  You get

5 a ticket with a number, and then you sit down and you

6 wait for them to call your number from a certain window.

7       So we got our number, sat down to discover that

8 there were only two numbers ahead of us.  There was one

9 window that was working with the IDs.

10 Q    I don't know if I clarified this before, but just to

11 be clear, you said your father is blind.  So what type of

12 ID were you obtaining?

13 A    We were obtaining a -- just a regular -- not a

14 driver's license.  Just a Virginia ID that gives the

15 picture ID that just says he is a citizen of Virginia.

16 Q    Okay.  Did that cost any money?

17 A    It does.  And to tell you the truth, I can't

18 remember -- it's not prohibitively expensive for most

19 people, but seems to me it was $10 or $20.

20 Q    I'm sorry.  I interrupted you.  You were saying you

21 got to the DMV?

22 A    So we got cued up, we got our number, and we sat

23 down.  Now, one of the things dad has is this vertigo.

24 And so he can't sit or stand in any one place for very

25 long.  So we sat there about 30 minutes, and I noticed

1  him beginning to weave.  So I went up to the manager of

2  the DMV and asked her if perhaps, since she was sitting

3  at a desk with no people in front of her, that if perhaps

4  she might expedite our being able to do this since he was

5  beginning to not feel well.

6        And she told me no.  That she was a manager and that

7  she didn't do those sort of things.  That we would have

8  to wait our turn.

9        Meanwhile, there was nobody at the window for the

10 ID, and other people were moving in and out and around.

11 And in fact, several people offered me their numbers to

12 let us go ahead of them, but the DMV refused that because

13 it was the wrong window.

14       So we sat there a little while longer, and dad began

15 to weave a little bit more.  And I went back to the

16 manager and said, *"Look, is there no one that's coming to*

17 *this window?  He's getting worse."*

18       And while I was there talking to her, dad got up and

19 laid down on the floor because it's the only way that he

20 can stop the vertigo so that, you know, he wouldn't be

21 sick.

22 Q    And so let me just ask you.  I think we have a sense

23 of what the conditions were like.

24 A    Yeah.

25 Q    So how long were you at DMV?

DIRECT EXAMINATION OF KAREN STALLINGS    410

1  A    We were there three hours.

2  Q    And did that -- first of all, did you actually

3  obtain an ID for your father?

4  A    No.

5  Q    Why not?

6  A    Because by the time they finally called us up to the

7  window, he was so sick he fell and I had to take him

8  home.

9  Q    And did that cause any medical problems for your

10  father?

11  A    Well, yes.  I blame it on that, and I would -- yes,

12  he was in the hospital the next day.  He was relatively

13  fragile anyway, and that just put him over the edge, and

14  back in the hospital he went.

15  Q    Did you subsequently figure out a way to register

16  your father?

17  A    I did.

18  Q    How was that?

19  A    I was able to use his passport, because he had a

20  passport.  Not everyone does.  But, anyway, I was able to

21  use his passport and do it on-line.  I got the

22  registration form off the Internet, and I used that.  And

23  I sent them a bank statement that he receive at the

24  house.

25      Now, a bank statement was not on our list, so I

1   didn't know that that would work.  But I was subsequently

2   able to do it electronically and get him registered.

3   Q     And had you known about that at the time that you

4   went to the DMV?

5   A     No.

6   Q     And did your dad later vote?

7   A     He did.

8   Q     How did he vote?

9   A     He voted absentee because he didn't have a picture

10  ID to go to the polls, but you don't need a picture ID to

11  vote absentee.

12  Q     Well, he had a passport, right?

13  A     Yes, he had a passport.  But what he didn't have was

14  the proof that he lived there.  Well, once he got his

15  registration form card though, he would have.

16        MR. KAUL:  All right.  Thank you.  No further

17  questions.

18        THE COURT:  Cross-examination of Ms. Stallings.

19        MR. FINBERG:  Very brief, Your Honor.

20                    **CROSS-EXAMINATION**

21  BY MR. FINBERG:

22  Q     Good afternoon, Ms. Stallings.

23  A     Well, good afternoon.

24  Q     How are you?

25  A     I'm fine.

1   Q      Thank you for coming here today.

2   A      Sure.

3   Q      I just want to get a couple things clear.  Your

4   father had a passport, and it was a valid passport,

5   before you had this bad experience at the Division of

6   Motor Vehicles?

7   A      That's correct.

8   Q      And you testified, I think, that the Division of

9   Motor Vehicles -- well, let me ask it this way.  Are you

10  familiar with the Gunston Plaza Drive DMV in Lorton?

11  A      That's where we were.

12  Q      And that's about seven of eight miles from your

13  house, right?

14  A      Well, it's probably -- no 10 or 12 miles.  And it --

15  I drove it this morning, and it took me 30 minutes.

16  Q      I use to live up in northern Virginia, so I know

17  what northern Virginia traffic is like.

18  A      Just to say, I took him home in rush hour, and it

19  took us an hour and a half to get home.

20  Q      Are you also familiar with the location of the

21  Fairfax County Registrar?

22  A      I am.  Yes.

23  Q      And that's about 25 miles from your house?

24  A      It is an hour and a half drive.

25  Q      And did you know at the time that you took your

1 father to the DMV to try to get the DMV ID that it also

2 would have been possible for him to go to the general

3 registrar to get a free ID?

4 A    Yes.

5 Q    But you chose to go to the DMV instead?

6 A    Because it's an hour and a half drive.  And that

7 would have been three hours, and Lorton can be a 30

8 minute drive, and it would have been way better.

9 Q    And before you went to the DMV with your father,

10 were you aware of the fact that he had the ability

11 because of his disability to vote absentee?

12 A    Yes.

13      MR. FINBERG:  No further questions.

14      THE COURT:  Any redirect of Ms. Stallings?

15 A    Oh, no we couldn't.

16      THE COURT:  No, no.  Wait a minute.  Hold on, ma'am.

17 You can only respond to questions, all right?  Let the

18 lawyers guide you.

19      MS. STALLINGS:  I'm sorry.

20                    **REDIRECT EXAMINATION**

21 BY MR. KAUL:

22 Q    Were you about to say something?

23 A    Yes.  Yes.  He couldn't vote because he wasn't

24 registered.  So, no, he couldn't have voted before that.

25 Q    And do you know whether your dad could have obtained

1  that free ID if he had another form of ID that could be

2  used for voting, like a passport?

3  A     Could he?  Let's see.

4  Q     I'm just asking if you know.

5  A     Off the top of my head, I don't know.  I'd have to

6  kind of think it through.  But, no, I don't know.

7        MR. KAUL:  No further questions.

8        THE COURT:  Any further questions of Ms. Stallings.

9        MR. FINBERG:  No thank you, Your Honor.

10       THE COURT:  Ms. Stallings, you're excused and free

11  to go.  Thank you for driving up this morning.  We

12  appreciate it.

13       MS. STALLINGS:  Thank you.

14                    **WITNESS STOOD ASIDE**

15       THE COURT:  Who'll be your next witness, Mr. Spiva?

16       MR. SPIVA:  Your Honor, it will be Abe Barranca.

17       THE COURT:  Abe Barranca.  Okay.

18       Mr. Barranca, if you would raise your right hand,

19  place your left hand on the Bible, and face the Clerk of

20  the Court.

21       THE CLERK:  You do solemnly swear that the testimony

22  which you are about to give, in this case, before this

23  Court, shall be the truth, the whole truth, and nothing

24  but the truth, so help you God?

25       MR. BARRANCA:  I do.

DIRECT EXAMINATION OF ABE BARRANCA       415

1           THE COURT:  Have a seat on the witness stand, sir.

2           Mr. Barranca, would you please put your full name on

3     the record for me, please, and spell your last name for

4     the court reporter.

5     A     Abraham Antonio Barranca.  Last name is

6     B-A-R-R-A-N-C-A.

7           THE COURT:  Go right ahead.  You may inquire.

8           Whereupon, **Abraham Barranca**, having been

9     duly sworn in, testifies as follows:

10                    **DIRECT EXAMINATION**

11    BY MS. CALLAIS:

12    Q     Mr. Barranca, where do you live?

13    A     In Alexandria, Virginia.

14    Q     And how long have you lived in Alexandria?

15    A     Since October of 2014.

16    Q     And what brought you to Alexandria?

17    A     My significant other got a promotion with her job.

18    She moved down a few months before I moved.

19    Q     And where were you at before you moved to

20    Alexandria?

21    A     Brooklyn, New York.

22    Q     Are you currently employed, Mr. Barranca?

23    A     Yes.

24    Q     And where is that?

25    A     The District of Columbia Department of Housing and

1  Community Development.

2  Q     And what do you do at the Department of Housing and

3  Community Development?

4  A     I work for the cities inclusionary zoning program

5  which monitors compliance for multiple housing units in

6  the city.

7  Q     Mr. Barranca, are you registered to vote in

8  Virginia?

9  A     Yes.

10  Q     And how long have you been registered to vote in

11  Virginia?

12  A     I went on election day, November 2014 in order to

13  register.  And I knew I couldn't vote at that time.

14  Q     And why did you register to vote in Virginia?

15  A     Because I knew I'd be living in Virginia for quite

16  some time and wanted to fulfill my civil duty by voting.

17  Q     Mr. Barranca, do you consider yourself to be a

18  member of any political party?

19  A     I have always been registered as a Democrat.

20  Q     And do you typically vote for Democratic candidates?

21  A     I do.

22  Q     And, Mr. Barranca, have you been able to vote in

23  Virginia since registering?

24  A     I attempted to vote last election day,

25  November 2015.

DIRECT EXAMINATION OF ABE BARRANCA          417

1  Q      So I'd like to focus a little bit on your experience

2  in November of 2014, Mr. Barranca.  Where did you attempt

3  to vote in 2015?

4  A      The polling place where I'm registered near my home.

5  Q      And about what time did you arrive?

6  A      It was shortly before the polls closed.  I would say

7  no more than 10 minutes.

8  Q      And why is that?  Why did you arrive at that time?

9  A      I work pretty late.  And I got out of work late that

10 day, stopped at home, dropped my things and went straight

11 to the polling place.

12 Q      And how did you get to the polling location?

13 A      I walked.

14 Q      And why did you walk?

15 A      Because it's about 10 minutes from my home.

16 Q      And what happened when you arrived at the polling

17 location, Mr. Barranca?

18 A      I presented my New York State driver's license, and

19 I brought a piece of mail with my Alexandria address on

20 it.  I attempted to get my ballot, and was informed that

21 I would have to fill out a provisional ballot.

22 Q      And prior to going to the polls that day, did you

23 know that your New Your state license would not be

24 sufficient for you to cast a regular ballot?

25 A      I didn't know.  But I brought the additional piece

1  of mail as security in case the license itself didn't

2  suffice.

3  Q    And why were you concerned that the license wouldn't

4  suffice?

5  A    Because it still had my parent's address in Brooklyn

6  on it.  So I assumed a piece of mail with the matching

7  name and my new Alexandria address would confirm my

8  identity.

9  Q    And were you -- you said confirm your identity.

10 Were you also concerned about confirming your residence

11 in Alexandria?

12 A    Yes.

13 Q    So, Mr. Barranca, after you learned that your New

14 York State ID would not be sufficient for you to cast a

15 regular ballot, did you gain any understanding of other

16 types of IDs that might be sufficient?

17 A    I was told my work ID would be a sufficient form of

18 identification, or a passport.

19 Q    And where did you work at that time?

20 A    At the Department of Housing, Community Development

21 for the District of Columbia.

22 Q    And did you have a work ID?

23 A    I didn't bring it with me to the polling place, but

24 I had a work ID at home.

25 Q    And what was on that work ID?

DIRECT EXAMINATION OF ABE BARRANCA          419

1  A     It has my first and last name, the agency I work

2  for, and the expiration date -- issue and expiration of

3  the identification.

4  Q     And so the state that it's issued by, is that agency

5  in the District of Columbia?

6  A     Yes.

7  Q     And, Mr. Barranca, what is on the face of your New

8  York ID?

9  A     It has my height, my eye color, my, as I said,

10 parent's address in Brooklyn, that I'm an organ donor, my

11 first and last name, and middle initial.  I think that's

12 most of the information.

13 Q     And, Mr. Barranca, would you say that your

14 information on your New York ID, that there's more or

15 less information than what's on your work ID?

16 A     There is more information, definitely, on my New

17 York State driver's license.

18 Q     So, Mr. Barranca, you also mentioned that you

19 learned that a passport would suffice as a sufficient

20 form of ID.  Do you have a passport?

21 A     My passport expired in October of 2014.

22 Q     Have you since attempted to renew that passport?

23 A     I'm about to submit the paperwork.  I have to take

24 the photo for it.

25 Q     And to take the photo for your passport, are you

1 able to do that at home, or do you have to go somewhere?

2 A    I definitely have to go elsewhere to produce the

3 photo.  Either a drugstore, or a place that prints

4 passport photos.

5 Q    And do you have to pay for that?

6 A    Yes.

7 Q    And, Mr. Barranca, do you know about how long it

8 will take you to obtain your passport?

9 A    The -- when I checked the Website for it, it said to

10 expect six weeks processing time.

11 Q    And about how much is your new passport costing you?

12 A    I believe about a couple hundred dollars.

13 Q    So, Mr. Barranca, going back to your 2015 voting

14 experience after you learned about the additional forms

15 of IDs that you could present, did you take any steps to

16 cast a provisional ballot?

17 A    I did compete a provisional ballot and submitted it.

18 Q    And did you learn what you would need to do in order

19 to have that ballot count?

20 A    I was told that I either would need to fax or e-mail

21 a copy of my work ID to the Department of Elections.

22 Q    So after leaving the polling location that day, were

23 you able to fax or e-mail a copy to the registrar's

24 office?

25 A    I, frankly, forgot in the ensuing couple of days.  I

1  had a busy work schedule that week.  And as I said, I get

2  out of work quite late.  And by the time I realized on

3  Friday, the deadline for submission had passed.

4  Q    And so, Mr. Barranca, do you know if your

5  provisional ballot was counted in the 2015 election?

6  A    I believe it was not.

7  Q    And is your experience in attempting to cast a

8  ballot in 2015, has that affected your perception of

9  Virginia's voting system in any way?

10 A    It left me vexed and frustrated.  I'd never had any

11 difficulty voting before.  I've voted in Maryland when I

12 was a university student there.  And for many -- for the

13 years that I lived in Brooklyn, I never had experienced

14 difficulty voting.  And it felt like there was an

15 impediment between me and my ability to demonstrate my

16 commitment to my civic duty.

17 Q    And, Mr. Barranca, you mentioned that you were

18 planning to stay in Virginia for a while, but you still

19 had your New York State ID.  Why is it that you have not

20 gotten a Virginia driver's license?

21 A    I don't drive in Virginia.

22 Q    So how do you get around?

23 A    I walk, I bike.  I take the metro in order to get to

24 work.  Public transportation.

25 Q    And, Mr. Barranca, do you have a vehicle?

CROSS-EXAMINATION OF ABE BARRANCA          422

1  A     I do not.  No.

2  Q     Do you have access to a vehicle?

3  A     My significant other has a car through her employer,

4  but it's a company car that I'm not permitted to drive.

5  Q     And, Mr. Barranca, your New York ID, are you able to

6  use that when you go to the grocery store to validate

7  your credit card?

8  A     Yes.

9  Q     And have you flown since moving to Virginia?

10 A     Yes.  Last summer I flew to Boston and had no issues

11 using my New York State driver's license.

12 Q     And, Mr. Barranca, has there ever been any other

13 instance outside of your voting experience in 2015 in

14 which your New York State license had not counted as

15 sufficient identification in Virginia?

16 A     No.

17       MS. CALLAIS:  No further questions.

18       THE COURT:  All right.

19       Cross-examination.

20                   **CROSS-EXAMINATION**

21 BY MS. HART:

22 Q     Good afternoon, Mr. Barranca.  I just have a few

23 questions for you.

24       First, what race do you consider yourself?

25 A     Caucasian.

1  Q    Caucasian.  Thank you.

2       And I just want to follow up on a few things.  I

3  believe you testified that you have an ID from your

4  current employer at the Office of the Director of the

5  D.C. Department of Housing and Community Development?

6  A    Yes.

7  Q    And it's your understanding that that ID would have

8  been acceptable with which to vote during the 2015

9  election?

10  A    I didn't know that prior to going to the polling

11  place, but I was informed about that at the polling

12  place.

13  Q    Did you the still have that ID with you?

14  A    I do.

15  Q    Is that what you plan to use to vote in the upcoming

16  elections?

17  A    I hope it will suffice.  As I said -- well, I don't

18  know if I've said.  It doesn't demonstrate at all that I

19  live in Virginia.  It just says that I work for the D.C.

20  government, but I'll bring it.

21  Q    Do you have any reason to believe that it won't

22  suffice?

23  A    Not if what I was told was correct.

24  Q    And just to be clear, after the 2015 election, you

25  didn't cure your ballot because you forgot?

1  A      I did.  It was an extra step to voting that I had

2  never experienced before.

3  Q      Do you have a Smartphone?

4  A      I do.

5  Q      Could you have taken a picture of that ID and just

6  e-mailed it in to cure your ballot?

7  A      I was told that it had to be scanned or faxed.  So

8  I'm not sure if a photo would suffice the same way.

9  Q      Did you have the means to scan or fax your ID?

10  A      I have a scanner at home.  I don't have a fax

11  machine.  But, as I said, I had a busy week at work that

12  week, and by the time Friday afternoon rolled around I

13  realized it was in my ballot, but it was a step I'd never

14  experienced before.

15  Q      Have you ever filled out a membership application to

16  become a member of the Democratic Party of Virginia?

17  A      I don't believe so.

18  Q      Have you paid any dues to the Democratic Party of

19  Virginia?

20  A      No.

21      MS. HART:  I have no further questions.  Thank you.

22      THE COURT:  Any redirect of this gentleman?

23      MS. CALLAIS:  No, Your Honor.

24      THE COURT:  Sir, we appreciate your testimony very

25  much.  You're excused and free to go, sir.

1     MR. BARRANCA:  Thank you.

2                    **WITNESS STOOD ASIDE**

3     MR. SPIVA:  Your Honor, our next witness will be one

4  of our plaintiffs, Ms. Barbara Lee.

5     THE COURT:  All right.

6     Ms. Lee, would you be kind enough to raise your

7  right hand, place your left hand on the Bible, and face

8  the Clerk of the Court.

9     THE CLERK:  You do solemnly swear that the testimony

10  which you are about to give, in this case, before this

11  Court, shall be the truth, the whole truth, and nothing

12  but the truth, so help you God?

13     MS. LEE:  I do.

14     THE COURT:  Have a seat on the witness stand.

15     Ms. Lee, if you would please give us your full name,

16  and spell your last name for the court reporter.

17     MS. LEE:  My full name is Barbara Hawkins Lee.

18  L-E-E.

19     THE COURT:  Thank you.

20     Go right ahead.

21     Whereupon, **Barbara Lee**, having been

22  duly sworn in, testifies as follows:

23                    **DIRECT EXAMINATION**

24  BY MS. BRANCH:

25  Q    Good afternoon, Ms. Lee.

DIRECT EXAMINATION OF BARBARA LEE              426

1  A    Good afternoon.

2  Q    What is your address, for the record.

3  A    My address is XXX Xxxxxxx Street, Xxxxxxxxx X,

4  Xxxxxxxx, Virginia.

5       THE COURT:  Ms. Lee, you need to talk slowly because

6  this young lady had got to take it down, all right?

7       MS. LEE:  Okay.

8  BY MS. CALLAIS:

9  Q    How old are you, Ms. Lee?

10 A    I'm am 67 years old.

11 Q    And which is your birthday?

12 A    Xxxxxx XX, 19XX.

13 Q    Where are you from?

14 A    I was born and raised in Staunton, Virginia.

15 Q    Have you lived -- do you currently live in Staunton,

16 Virginia?

17 A    Exactly.  Yes.

18 Q    And have you lived in Staunton all of your life?

19 A    All my life.

20 Q    Are you currently employed, Ms. Lee?

21 A    I am retired.

22 Q    And what job did you retire from?

23 A    I retired from General Electric after 26 years.

24 Q    And when did you retired?

25 A    I retired in 19 -- 2000.

1  Q     What type of work did you do at General Electric?

2  A     I held various positions.  I worked in production,

3  quality control, I worked in the shipping department, I

4  worked maintenance, I worked in the relay department.

5  And my final job was shipping.

6  Q     Are you registered to vote in Virginia?

7  A     Yes, I am registered to vote.

8  Q     And when did you first register?

9  A     I registered -- I attended the March on Washington

10 in 1963.  And after the Voting Rights Act passed, I was

11 excited about getting my voter registration card, which I

12 received.  And I'll never forget the day.  I turned 21,

13 and I got my first voter registration card on October 5,

14 1971.

15 Q     Do you consider yourself to be a member of any

16 political party?

17 A     I am a member of the Democratic Party.  But when I

18 do voter registration, I am a citizen.

19 Q     And what do you mean by that?

20 A     I mean that I do not carry an affiliation.  That's

21 not what we're supposed to do when we do voter

22 registration.  We don't -- we shouldn't hold a party.

23 This is part of our democracy.

24 Q     And do you typically vote for Democratic candidates?

25 A     Yes, I do.

DIRECT EXAMINATION OF BARBARA LEE                428

1   Q     Ms. Lee, do you drive?

2   A     Yes, I do.

3   Q     Do you have a Virginia driver's license?

4   A     Yes, I do.

5   Q     And is it current?

6   A     It's current until this year, Xxxxxx XXth, 2016.

7   Q     Do you have any other types of photo ID?

8   A     I received a new voter registration card back in

9   August of 2013.

10  Q     But that doesn't -- does that have your photo on it?

11  A     No, it does not.

12  Q     Do you have any other types of photo ID?

13  A     No, I don't.  Except I do have a Costco card.

14        THE COURT:  Does that have your photo on it,

15  Ms. Lee?

16        MS. LEE:  Yes, it does.

17        THE COURT:  It does.  Okay.

18  BY MS. BRANCH:

19  Q     Have you had to show your photo ID to vote in

20  previous elections?

21  A     In previous elections, no.  No, because most -- I've

22  worked inside the polls most of the time.

23  Q     Ms. Lee, have you been involved in Democratic

24  politics in Virginia?

25  A     Yes, I have.

DIRECT EXAMINATION OF BARBARA LEE

1  Q    And in what capacity?

2  A    I have been vice-chair for three chair persons, and

3  then I became the chair person in 2003.

4  Q    And that's vice-chair of what?

5  A    Vice-chair of the Democratic Committee.

6  Q    And where is that?

7  A    In Staunton, Virginia.

8  Q    And are you currently a member of the Staunton

9  Democratic Committee?

10  A    Yes, I am.

11  Q    And do you currently hold any leadership positions?

12  A    No, I do not.

13  Q    Can you describe some of the work that you've done

14  with the Staunton Democratic Committee?

15  A    I have done a lot.  I -- as vice-chair, I help set

16  up committees.  We did get-out-the-vote.  We did --

17  mainly making sure that our committees are working in the

18  communities and doing what we're supposed to do as

19  Democrats.

20  Q    Any other types of voter engagement efforts that you

21  have been engaged in through the Staunton Democratic

22  Committee?

23  A    Just going around and going to the apartments and

24  making sure people have their voter registration cards,

25  and updated.  Because in those neighborhoods, people move

1  and come and go, and that's how we keep up with them.

2  Q    Have you had other occasions to be involved in

3  Democratic politics in Virginia?

4  A    Yes.  I became Democrat of the Year, and I was an

5  alternate in Denver for then Senator Obama.  And I came

6  back and I continued my work.

7  Q    And who named you Democrat of the Year?

8  A    The committee did because of my work ethic and

9  getting people registered to vote.

10  Q    And that's a Staunton Democrat?

11  A    Staunton.  Uh-huh.

12  Q    And can you describe your experience as an alternate

13  delegate in 2008?

14  A    It was -- it was amazing because for the first time,

15  Virginia had the largest delegation to show up at a

16  convention.  And it was amazing that I met so many people

17  from down here in Richmond.  It was an amazing

18  experience.  Yeah.  Uh-huh.

19  Q    Now, you mentioned some of your get-out-the-vote

20  efforts earlier.  Have you also been engaged in voter

21  registration efforts?

22  A    Yes, I have.  I do voter registration all the time.

23  Yes.

24  Q    Can you describe in detail some of those efforts for

25  us.

1  A    Now, we have been very successful in getting people

2  registered to vote.  But in the -- I did voter

3  registration back in October and November of 2015 of last

4  year, and it's just become frustrating because people are

5  just turned off with these new laws.  And it's been

6  frustrating to me because I enjoy getting people in the

7  heart of democracy.  That's just what I do.

8       Since the Civil Rights March, that has just been my

9  baby.  You know, just making sure that people have part

10 of this democracy that we have today.  But it has

11 frustrated me because I hate to keep explaining to people

12 why we keep changing.  The question is we just got new

13 cards, why do we have to have our picture on it?  I can't

14 explain it.  I didn't do it.

15      And it has frustrated me because I have tried to get

16 the City of Staunton to do off-site voter registration to

17 help these people.  They have no transportation.  I can't

18 put them in my car.  I need car seats.  I have no way of

19 taking those people downtown.

20      They have to walk to the corner in order to catch

21 the city transit which doesn't run at the time they get

22 off from work, which is at 6:00.  The registrar's office

23 is closed at 5:00.

24      So I'm now trying to work on doing off-site voter

25 registration because I want these people to be able to

1  vote.  I mean, the thrill of having a voter registration

2  card --

3       THE COURT:  I think you need to proceed by question

4  and answer at this point.

5  BY MS. CALLAIS:

6  Q    Let me stop you there and ask you specifically if

7  your voter registration efforts have been impacted at all

8  by the photo ID law?

9  A    Yes.

10 Q    Can you describe specifically if there are any types

11 of populations that you serve through your voter

12 registration efforts?

13 A    My voter registration efforts has always been the

14 low income neighborhood.  And it's not that it's just

15 everybody is on welfare.  It's just some people have had

16 hard times and living in neighborhoods where they can

17 afford the rent.  So it has hurt me because I can't help

18 them to do photo ID.  They don't live near the DMV, which

19 I would take them there anyway because you shouldn't have

20 to pay to vote.

21 Q    And in your experience, do many of the voters that

22 you've tried to register have photo ID?

23 A    No, they do not.  They don't drive.

24 Q    Do they have cars?

25 A    No, they don't.

DIRECT EXAMINATION OF BARBARA LEE          433

1  Q     And what types of jobs do they work?

2  A     These are people who work at McDonald's, or people

3  who work at motels.   These are people who work at dry

4  cleaners, which you know they don't close until 6:00.

5  These are people that don't hold what I call 9:00 to 5:00

6  jobs.   And the registrar's office is only open from 9:00

7  to 5:00.

8  Q     So when you go out and do voter registration work,

9  do you inform voters about the option to get a free ID?

10 A     Yes, I do.

11 Q     And you described earlier the types of jobs that

12 these persons work.   Does that impact their ability to

13 get a free ID based on your experience?

14 A     Yes, it does.

15 Q     And how so?

16 A     Because they -- these people either have to catch

17 rides to work, and catch rides home from work.   So

18 getting to the register's office, that's another problem

19 for them.   Now, we do have trollies in town, but the

20 trollies don't run the hours that they can get down.

21 Even if they could get downtown, the trollies are not

22 available at the times that they can get downtown.

23      But it's hard for me because most of these are

24 mothers who have children.   Of course mothers do have

25 children.   But I would have to have car seats in order to

DIRECT EXAMINATION OF BARBARA LEE      434

1  get them downtown.  Well, that's another stumble for me.

2      THE COURT:  Go ahead with your next question.

3      MS. BRANCH:  Sure, Your Honor.

4  BY MS. BRANCH:

5  Q    So did you get feedback from voters when you try to

6  register them about the photo ID law?

7  A    Yes, I do.

8  Q    And what's that feedback been like?

9  A    It's been frustrating.  People just don't know --

10  well, they're feeling like they just don't want us to

11  vote.

12      MR. HEARNE:  Your Honor, just to clarify, it seems

13  to be in the area of hearsay.

14      THE COURT:  I think it's just mere fact of

15  utterance.  You can cross-examine her on what weight it's

16  entitled to.

17      Go ahead.

18  BY MS. BRANCH:

19  Q    Go ahead, Ms. Lee, with what you were saying.

20  A    Well, these people that we have registered to vote,

21  they're feeling like, well, they just done want us to be

22  a part of it.  I mean, what can I tell them?  I'm doing

23  all I can.

24  Q    And have you been engaged in voter registration and

25  get-out-the-vote efforts in the lead up to the 2016

1  election?

2  A     Yes, I have.

3  Q     And when most recently did you do voter registration

4  drives?

5  A     When I did a voter registration drive back in

6  October and November, I had gone to the register's office

7  and I had asked her because I had been down to an event

8  in Roanoke, Virginia where they were doing off-site voter

9  registration drives.  All they had was a laptop and

10  Skype.  And I asked the registrar's office if there was

11  any way we could get that here in Staunton where we could

12  do off-site voter registration drives.  Which go to the

13  low income apartments and -- and they have office space

14  where we could do voter registration drives, which I'm

15  going to work on when I get back.

16     And she told me they had put it in the budget, but

17  when I was doing the voter registration drive I wanted to

18  do it on Martin Luther King Day, which I knew a lot of

19  people would be off for a holiday.  Well, she told me

20  that she did have the equipment.

21  Q     And when you say "*she*," who are you referring to?

22  A     This is the registrar's office downtown.

23  Q     And now, Ms. Lee, you understand you don't have a

24  photo ID to register to vote in Virginia, is that right?

25  A     Yes.

DIRECT EXAMINATION OF BARBARA LEE          436

1  Q     So how does that play into your ability to register

2  voters?

3  A     Well, when -- even when you register -- when we did

4  voter registration, even with this new law, it really

5  didn't help because with the photo ID it's not going to

6  do them any good.  Because as a poll worker, they can

7  come in and fill out the provisional ballot, but

8  eventually it goes in the trash because you have to show

9  by Friday to prove who you are.  It used to be voting was

10  a pleasure.  Now it's a hinderance for a lot of us.

11  Q     And now you just mentioned a poll worker.  Have you

12  ever worked the polls?

13  A     Yes.  Inside and out.

14  Q     And how often have you served as a poll worker?

15  A     I have worked the polls since the late '80s.  And

16  I've worked inside and outside.

17  Q     Is that almost every election?

18  A     Every election.

19  Q     And have you worked in any particular wards in

20  Staunton?

21  A     We had five wards in Staunton.  I've worked at four

22  of them.  Uh-huh.

23  Q     And as a poll worker, have your responsibilities

24  included checking a voter ID?

25  A     Before this new law, all we had to check was the

1  voter registration card or a utility bill.  Now, with

2  this new law, we have to do photo ID, which takes up

3  time.

4       But when I look at photo ID, it hurts me because I

5  know and I've had friends who had cancer.  They do not

6  look like their driver's license.  And when they come in

7  there, and with this new ID law, and we're having people

8  coming in there not looking like their photo ID, what did

9  we do?

10      THE COURT:  I think we need to proceed by question

11  and answer at this point.

12      MS. BRANCH:  Yes, Your Honor.

13  BY MS. BRANCH:

14  Q    And so as a poll worker, what would you do if a

15  person came to vote and didn't have the required ID?

16  A    If they didn't have the required ID, I would to

17  offer them a provisional ballot.

18  Q    And have you worked the polls since the photo ID law

19  was passed?

20  A    To be honest with you, I use to working with it, but

21  I'm hoping they don't call me again because this new law

22  is going to put me in a spot where I'm going to have to

23  say you don't look like your driver's license, or you

24  don't look like your photo.  And as much as I like it, I

25  hope I never get called to do that again.

DIRECT EXAMINATION OF BARBARA LEE

1  Q    But you have worked the polls since?

2  A    Yes.

3  Q    Since the photo ID law was passed?

4  A    Yes.

5  Q    And based on your observations at the polls, has the

6  photo ID law impacted voter turnout in any way?

7  A    I have noticed that, yes.  And I worked the

8  primaries this time, and it shows.  It shows.

9  Q    And how would you describe the change that you've

10  seen?

11  A    It used to be people were coming in 10 or 20 at a

12  time.  Now, we sit in there from 6:00 in the morning to

13  7:00 at night, and you may see somebody come in every

14  three hours.  One here and one there.  The State of

15  Virginia is putting up money for us to just sit because

16  people are not voting any more.

17       THE COURT:  I think we need to proceed by question

18  and answer at this point.

19  BY MS. CALLAIS:

20  Q    Are you aware, -- so you mentioned the Staunton

21  general registrar earlier.

22  A    Uh-huh.

23  Q    And do you have a relationship with her?

24  A    Yes.  Uh-huh.

25  Q    Are you aware of whether Staunton has a mobile unit

1  that can be used to go out to communities to take

2  pictures of people and supply them with free IDs?

3  A    Well, I have not talked to Amanda since before

4  Martin Luther King Day.  I have not talked to her since

5  then, and she has not called me.

6  Q    Have you ever inquired as to whether Staunton can

7  acquire a mobile unit that could be used to go out?

8  A    I have inquired.  Yes, I have.

9  Q    And what was the result of that?

10 A    I still haven't heard anything from her.  Uh-uh.

11 Q    Ms. Lee, do you believe that the photo ID laws are

12 connected to Virginia's history of racial discrimination?

13 A    Oh, certainly.

14 Q    And how so?

15 A    Because everybody keeps saying -- and I'll never

16 forget this statement of this guy in Pennsylvania that

17 said *"Photo ID, Mitt Romney wins."*

18      MR. HEARNE:  Your Honor, --

19      THE COURT:  Objection sustained.  This is opinion

20 and not fact.

21      MS. BRANCH:  Understood, Your Honor.

22 BY MS. BRANCH:

23 Q    Did you attend college, Ms. Lee?

24 A    No, I did not.

25 Q    Did you attend high school?

DIRECT EXAMINATION OF BARBARA LEE          440

1  A    I attended high school.  Yes, I did.

2  Q    And where did you attend high school?

3  A    Booker T. Washington High School.

4  Q    What year did you graduate from high school?

5  A    In 1969.

6  Q    And did you attend segregated schools growing up?

7  A    No.

8  Q    You did not?

9  A    Well, it was all black schools.

10 Q    So you did attend segregated schools growing up?

11 A    Well, yeah.  Uh-huh.

12 Q    Was your elementary segregated?

13 A    Yes.

14 Q    And was high school?

15 A    And high school.  Yes.

16 Q    Would you say that your high school had more or less

17 resources than the white school?

18 A    We had less resources, but we had -- when I went to

19 school, we had small classes.  So our learning was

20 different from what kids are learning now.  The way the

21 kids are learning now is different from the way we were

22 taught.

23 Q    And how would you describe how you had less

24 resources at your school?

25 A    Well, I used to walk, I think it was, 11 miles to

1  school when I was growing up to get to high school.  And

2  we didn't ride the bus.  We weren't allowed to ride the

3  bus.  We had to walk to school.  We didn't have snow

4  days.

5      Now, the white kids would ride the city transit.

6  And back in those days they could open up the windows and

7  they would throw things at us.  And if they were sitting

8  at a stoplight, which we tried to avoid because they

9  would throw things at us and they would spit on us.  And

10  that's what I knew growing up.

11  Q    And when you were growing up, did that type of

12  racial animosity extend to voting?

13  A    That's what kept me into politics because of -- I

14  felt like our growing up to see what went on in our

15  communities, my father was beaten by the Staunton Police

16  Department, thrown in jail with broken bones.  My father

17  served in World War II.  And when I saw this kind of

18  thing -- he wasn't the only one.  But it seems like we

19  were picked on.

20  Q    And specifically with regard to voting?

21  A    Yes.

22  Q    Were black voters required to take certain steps

23  that the white voters weren't?

24  A    Yes, we were.  Because I remember when growing up my

25  parents used to talk about getting their dollar together.

1 And this was in the summertime.  They would talk about

2 getting their dollar together to go vote.  Learning the

3 preamble to the Constitution.  Trying to figure out how

4 many jelly beans were in a jar.

5       And when I hear this as a young child, this kept me

6 fighting in the NAACP.  I was young into NAACP.  This is

7 what kept me fighting for our democracy in our

8 communities.  Like I say, to me, voting is not a black

9 and white issue.  It's about democracy and our freedom.

10      THE COURT:  Next question.

11 BY MS. BRANCH:

12 Q    When you returned to Staunton, will you be engaging

13 in voter registration efforts that lead up to the 2016

14 election?

15 A    As a matter of fact, I'm going to stay here in

16 Richmond and try and find me a laptop and a Skype so I

17 can do voter registration drives.

18 Q    And do you think that the photo ID law will continue

19 to impact your voter registration?

20 A    Yes, I do.

21      MS. BRANCH:  No further questions, Your Honor.

22      THE COURT:  All right.

23      Cross-examination of Ms. Lee.

24      MR. HEARNE:  Thank you, Your Honor.

25                    **CROSS-EXAMINATION**

1  BY MR. HEARNE:

2  Q    Ms. Lee, thank you coming and testifying today.   My

3  name is Thor Hearne, and I'm representing the

4  Commonwealth and the defendants with the Election Board

5  here in this case.

6       If I understood your testimony correctly, you

7  currently have a valid Virginia driver's license, is that

8  correct?

9  A    Yes, I do.

10  Q    And you said that's set to expire this year?

11  A    In August.  Yes.

12  Q    And do you plan to renew that before the next

13  election?

14  A    Certainly I do.

15  Q    Can you identify in your experience, any Virginia

16  citizen who is eligible to vote that has been unable to

17  vote because of the photo ID law as it's currently the

18  law in Virginia?

19  A    Do I know someone?

20  Q    Yes.  By name.  Any person?

21  A    By name?  I cannot think of her name.  I think her

22  name is Joyce.  But I can't remember Joyce's last name.

23  Q    And do you -- can you tell me why you believe the

24  law denied her the right to vote?

25  A    Because Joyce is a single mom and, she's had it

1   rough.  She lost her job.  Of course, she had low income

2   to live because of the rent.  But Joyce lost her car, so

3   she's not driving anymore, so that means her license has

4   expired.  So trying to get Joyce registered to vote, it's

5   a difficult thing with three kids.

6   Q     And do you understand, you don't need an

7   identification card of any sort to register to vote in

8   Virginia?

9   A     I understand that.

10  Q     And so you -- my question was, has this individual

11  been prevented from voting?  Has she been preventing from

12  obtaining the free ID law -- or the free voter ID card?

13  A     At this time, yes.

14  Q     How is that?

15  A     Because she -- like I say, she's a single mom with

16  three children.  She has no car.  She lives in a low

17  income neighborhood, which there's no transportation that

18  can get her there.  She -- by her not having a car -- and

19  if I were to take her, I would need car seats to take her

20  downtown to get a free ID.

21  Q     Have you discussed with her the possibility of

22  voting by absentee ballot?

23  A     No, I did not.

24  Q     You had indicated that voter registration in

25  Virginia was frustrating.  Do you recall that testimony?

DIRECT EXAMINATION OF BARBARA LEE          445

1  A    Yes.

2  Q    Are you aware that Virginia has now made it easier

3  to register by having electronic voter registration,

4  which is a new law that Virginia has passed since 2012?

5  A    Sir, those low income people don't have laptops and

6  computers.

7  Q    You had testified that you had worked in a polling

8  place and that your concern with the photo ID was that

9  you would have to say to somebody I can't let you vote

10 because you don't look like the picture on the ID?

11 A    Exactly.

12 Q    Have you ever done that?

13 A    No.

14 Q    You testified you're a member, or have been a

15 member, of the NAACP, is that correct?

16 A    Yes.

17 Q    Do you pay dues to the NAACP?

18 A    I have not been an active member for at least 10

19 years.

20 Q    Well, when you were, did you have to pay dues?

21 A    Certainly, we paid membership dues.  We didn't have

22 to, but we did pay membership dues.

23      MR. HEARNE:  I have no further questions, Your

24 Honor.

25      THE COURT:  All right.

REDIRECT EXAMINATION OF BARBARA LEE       446

1    Redirect of Ms. Lee.

2        MS. BRANCH:   I have a very, very short redirect,

3    Your Honor.

4                    **REDIRECT EXAMINATION**

5    BY MS. BRANCH:

6    Q    Ms. Lee, since you started doing voter registration

7    work, how many voters would you say you've registered?

8    A    I could not tell you how many I've done.

9    Q    More than you can count?

10   A    More than I can count.

11   Q    And when you go to register voters, do you keep

12   lists of every individual voter that you've tried to

13   register?

14   A    We -- legally, we're not supposed to.

15   Q    So you don't have a list of names?

16   A    No.  I don't keep that.  No.

17       MS. BRANCH:   No further questions.

18       THE COURT:   All right.

19       May Ms. Lee be excused at this point?

20       MS. BRANCH:   Yes.

21       MR. HEARNE:   Yes, Your Honor.

22       THE COURT:   Ms. Lee, you're excused and free to go.

23   Thank you very much for coming in from Staunton to

24   testify.  We appreciate your testimony.

25       MS. LEE:   Well, thank you.

1    THE COURT:  Yes, ma'am.  You're excused and free to

2  go.

3                    **WITNESS STOOD ASIDE**

4    THE COURT:  I'm going to go ahead and recess for

5  lunch at this point for one hour.  We'll come back

6  shortly before 2:00.  At 3:25, I'm going to have to

7  recess for 20 minutes.  I've got another matter I've got

8  to handle by conference call, so I may be tied up for 15

9  or 20 minutes on that.  So you can plan around that.

10    MR. SPIVA:  Thank you.

11    MR. HEARNE:  Thank you.

12    THE COURT:  We'll stand in recess for an hour.

13                    (Recess taken.)

14    (Gil Halasz is now the court reporter.)

15    THE COURT:  Who will be your next witness?

16    MS CALLAIS:  Okay.  Next we expect --

17    MR. SPIVA:  I have a preliminary -- sorry, Your

18  Honor -- I have preliminary matter I want to raise

19  briefly.

20    THE COURT:  Sure.

21    MR. SPIVA:   We have seen Congressman Wittman on the

22  witness list.  We have a subpoena out.  The Congressman

23  has given us a declaration which I shared with opposing

24  counsel, and it is basically in connection with

25  plaintiffs' exhibit 89 A, which is a e-mail that the

448

1  Congressman sent to Paul, somebody that works for the

2  caucus, Republican caucus, works with the leadership in

3  the House of Delegates.  And, you know, I wanted to see

4  whether the declaration -- all we want to call him for

5  was to authenticate and get past any kind of hearsay

6  problem we have with the underlying document.  We don't

7  actually, you know, need or want his testimony concerning

8  any greater than that.  We wanted to see whether the

9  declaration would suffice, or whether we need to, you

10 know, to actually bring the Congressman in.

11      This is -- we have been in communication with his

12 office, you know --

13      THE COURT:  You don't need to bring him in at my

14 behest.  I think the declaration is fine.

15      MR. FINBERG:  If I could address this exhibit one

16 moment it might help.  If I could hand a copy of it up to

17 the Court.

18      THE COURT:  Sure.

19      MR. SPIVA:  I have some things.

20      MR. FINBERG:  Absolutely.

21      MR. SPIVA:  I mentioned that right now it has an

22 electronic signature it.  The Congressman told us he is

23 out of the country and will provide the original

24 signature when he gets back in.  Apparently getting back

25 to the country today.  But I wanted to mention that.

1          THE COURT:  Yes, sir.

2          MR. FINBERG:  Your Honor, we do have two objections,

3  at least to the introduction this exhibit.  The first is

4  that it is obviously hearsay.  We believe that the

5  plaintiffs are introducing it for the truth of the matter

6  of the statements set forth in Mr. Wittman's --

7          THE COURT:  I think the only issue, though, is

8  whether or not this is sufficient authentication.  Merely

9  because it is authenticated does not necessarily make it

10 admissible, in my analysis.

11         MR. FINBERG:  That is the issue we are having.

12 Because plaintiffs think the authentication issue gets

13 them over the hearsay hurdle.  We are reserving all

14 hearsay objections.  We are also objecting on the grounds

15 that if Your Honor looks at the e-mail itself, this a

16 printout that says it is page one of three.  Yet the

17 other two pages are missing.  So I think there is

18 important context that might be missing.  It is an

19 incomplete e-mail.  So all objections set forth on the

20 exhibit list are not only hearsay, but also completeness.

21         THE COURT:  Well, when the document is offered in

22 evidence I will address the issue of hearsay.  The only

23 question for me is whether or not this is sufficient

24 authentication for Congressman Wittman.  You don't want

25 the Congressman to come in and testify to this, do you?

1        MR. FINBERG:  My question is this, then.  What

2   witness are they planning to use this with --

3        THE COURT:  That is not something I should address.

4   I don't do strategy.

5        MR. FINBERG:  The reason I am saying that, Your

6   Honor, I believe there are a lot of exhibits that are

7   coming into evidence that may or may not get discussed in

8   actual testimony in court.  And so I want to make sure

9   that by agreeing to anything this doesn't somehow make

10  its way into evidence without the objection to the

11  hearsay and other issues ever being heard.

12       THE COURT:  Your objection is noted to it.  It will

13  not be admitted without addressing your hearsay

14  objection.

15       MR. FINBERG:  Thank you, Your Honor.

16       THE COURT:  What is your position with respect to

17  authentication?

18       MR. FINBERG:  Your Honor, I believe it is authentic.

19  I have no basis to say it is not an authentic e-mail.

20       THE COURT:  You are over that hurdle.

21       Marshal, give this back to Mr. Spiva.

22       MR. SPIVA:  Your Honor, one more question on this.

23  Because I think to get over the hearsay hurdle, at least

24  with respect to one of the e-mails that is contained in

25  the document, we would need the Congressman's testimony

1  if the declaration is not sufficient for that purpose.  I

2  do understand the distinction being drawn between

3  authenticity and hearsay, of course.  But if the

4  Congressman is here testifying, and basically will have,

5  you know, to verify that he wrote the e-mail, and --

6      THE COURT:  I was able to assist you with the

7  authentication issue.  I cannot do it with the hearsay

8  issue.

9      MR. SPIVA:  Okay.  We will proceed with the subpoena

10 then, I guess.

11     THE COURT:  All right.

12     MR. SPIVA:  Thank you, again.

13     THE COURT:  That is fine.

14     MR. FINBERG:  Thank you, Your Honor.

15     THE COURT:  Who is the next witness?

16     MS CALLAIS:  Plaintiffs call Jeff Allen.

17     THE COURT:  Jeff Allen.  Okay.

18     Mr. Allen, come forward, sir.

19     Raise your right hand, sir, place your left on the

20 Bible, and face the Clerk of the Court.

21              JEFFREY TAYLOR ALLEN

22          WAS SWORN AND TESTIFIED AS FOLLOWS:

23     THE COURT:  Have a seat on the witness stand, sir.

24     Would you please give me your full name, sir, and

25 spell your last name for the court reporter?

Allen - direct                    452

1        THE WITNESS:  Jeffrey Taylor Allen.  A-L-L-E-N.

2                      DIRECT EXAMINATION

3        THE COURT:  Please speak slowly.  This gentleman has

4   to take everything down.  Okay, Mr. Allen?

5        THE WITNESS:  I will do my best.

6   BY MS CALLAIS:

7   Q    Mr. Allen, where do you live?

8   A    I live in Alexandria, Virginia.

9   Q    How long have you lived in Alexandria?

10  A    Coming up on one year.

11  Q    Where did you live before that?

12  A    Arlington, Virginia.

13  Q    Did you live anywhere else before Arlington?

14  A    I did.  While I was in college I lived in

15  Washington, D.C.

16  Q    Are you currently employed, Mr. Allen?

17  A    I am.

18  Q    Where are you employed at?

19  A    I am employed by a political consulting firm called

20  Spirits Consulting located in Washington, D.C.

21  Q    What do you do at Spirits Consulting?

22  A    I am research and communications consultant.

23  Q    Mr. Allen, I understand you have also done some

24  political work in Virginia.

25  A    I have.

Allen - direct

1  Q     What is that?

2  A     Well, most recently was the campaign for a state

3  senate race in the 29th district, 29th Senate District of

4  Virginia.  Before that, I was a field organizer for the

5  Democratic Coordinated Campaign in 2014.

6  Q     Do you know approximate dates of when you were as a

7  field organizer for the Democratic Coordinated Campaign?

8  A     June 1st through election day.

9  Q     2014?

10 A     2014.

11 Q     Do you have approximate dates for when you worked as

12 campaign manager in 2015?

13 A     January 2015 through June 9 of 2015.

14 Q     Mr. Allen, I would like to focus on the work you

15 did as unit organizer in 2014.  You mentioned that you

16 worked for the Democratic Coordinated Campaign.  Is that

17 run by the Democratic Party of Virginia?

18 A     Yes.

19 Q     During the period of time that you worked as field

20 organizer can you just describe what you did?  Just

21 generally.

22 A     Yes.  I was tasked with organizing volunteers and

23 activists within my set turf, which was within Arlington

24 County, with the goal of reaching out to and educating

25 voters about the elections, about the issues around the

1  elections, and also the photo ID law.

2  Q    As part of activities that you, that you were tasked

3  with, focus on get out to vote activities?

4  A    They did.

5  Q    Can you describe what you did as part of these get

6  out to vote activities?

7  A    We would contact voters directly at their doors or

8  over the phone and speak with them about the election and

9  what they needed to do in order to vote.

10 Q    Can you just generally describe the community that

11 you worked with?

12 A    So the area that I had in Arlington County stretched

13 as far north as -- I was referred to as the orange line

14 corridor along the metro orange line all the way to the

15 southern tip of Arlington County.  Generally speaking,

16 from the orange line to a dividing line of Route 50.  In

17 Arlington you have generally higher education, higher

18 income households.

19      And as soon as you get past the dividing line into

20 South Arlington you generally have larger immigrant

21 communities, Latino, African-American, and generally

22 lower income and lower education levels.

23 Q    Mr. Allen, did you work with both communities during

24 your field organizing work?

25 A    I did.

1  Q    Do you know about how many voters you worked with

2  directly that you had direct contact with during 2014?

3  A    I don't know the exact number, but it would easily

4  number in the thousands.

5  Q    Mr. Allen, did you target any particular populations

6  of voters in your field organizing work?

7  A    Generally we focused on low turn-out voters, voter

8  turn out democrats, in order to educate them about the

9  election to make sure that they had the appropriate

10 information that would allow them to go vote.

11 Q    Mr. Allen, I want to focus on the work that you did

12 specifically with voters, the ones that you worked with

13 at the doors and on the phone.  Did you encounter any

14 challenges to getting the voters you were working with

15 out to vote?

16 A    Yes.  There were some general problems that we

17 noticed across the board for all voters that we targeted.

18 One of which was education about the election.  You know,

19 a lot of people did not know that the election was going

20 on, who the candidates were, what the issues were

21 surrounding the election, that there was a photo ID law,

22 a new requirement for that year.

23      We also ran into what I would say is an employment

24 problem in terms of --

25      THE COURT:  Hold on.

1         MR. HEARNE:  My objection is to the extent of the

2   hearsay when he refers to "we."  I don't know who he is

3   talking about.  If it is his personal observation, I have

4   no objection.

5         THE COURT:  He is talking about what he and other

6   people did, not what they said.  If he was talking about

7   what they said, and it is to the truth of the matter, I

8   would agree with you, but in the present form the

9   objection is overruled.

10        You may respond.

11  BY MS CALLAIS:

12  Q    Just so that it is clear for the record, I am just

13  asking about what you observed in your own experience,

14  Mr. Allen?

15  A    Okay.

16        Yes, and so I absolutely observed that we had a

17  problem with folks who were either working long hours,

18  or, well, you know, had a single job or working long

19  hours at multiple jobs, which we knew would hinder their

20  ability to vote.  And there were definite transportation

21  limitations within northern Virginia.  A pretty

22  inconsistent metro system.  And, you know, I feel like

23  inconsistent is generous for the bus system as well.  So

24  those were, you know, some major problems that we ran

25  into and were major concerns.

Allen - direct

1  Q    I think at the beginning you said you saw these

2  problems across the board.  Did you see any problems that

3  were any different than the problems you saw between high

4  income and low income communities?

5  A    I think most specifically in terms of low income

6  communities, you know, we did see an exacerbation of

7  those problems.  You know, when I was knocking on doors

8  and speaking with voters in lower income areas there was

9  a huge concern about whether or not, you know, folks

10 working multiple jobs would be able to go vote.  You

11 know, there was an even worse education problem with, you

12 know, who knew about the election, who knew about the

13 requirements.  And we also ran into people who had to

14 rely on, again, inconsistent transportation.  Because

15 those communities were especially likely to not have a

16 car.  And the others also definitely a language barrier.

17 I don't speak Spanish, you know.  There is a heavy Latino

18 population in South Arlington.  And it made it difficult

19 to communicate with them at the doors.  So that was a

20 problem that I ran into.

21 Q    I believe you mentioned a couple of times that one

22 of the challenges you faced was knowledge about the photo

23 ID law.  Can you just describe for the Court what that

24 challenge was?  Why that was a challenge?

25 A    I think, generally speaking, most folks that I spoke

1  to, a huge percentage, did not know that that was a

2  requirement for that election year because it was the

3  first year that that form of photo identification was

4  required.  We ran into a lot of people across, you know,

5  the whole spectrum of socioeconomic statuses, you know,

6  educational levels.  We ran into people who consistently

7  needed reminding that there was this law in place.  Most

8  of them did not know.

9  Q    Mr. Allen, did you engage in any voter ID activities

10  regarding the photo ID law?

11  A    Yes.

12  Q    Would you describe those for the Court?

13  A    Every time that I would go knock on a door -- and I

14  instructed, you know, interns and volunteers who were

15  working for me as well -- and this was a practice that

16  was done across our region -- we would always finish our

17  conversation with voters at the door with two questions.

18  One was, did you know that there is a new photo ID law in

19  place?  The second one was, do you have a proper form of

20  photo identification?

21  Q    Why did you engage in that photo -- in that voter

22  education?

23  A    Well, we had certainly seen the impact of it in

24  other states that had tried to implement these laws, and

25  we were concerned that we would have numerous voters that

Allen - direct                459

1  would be turned away from voting.

2  Q    So you mentioned you had these two ask at the door,

3  one of them was, did you have a photo ID law?  Through

4  the course of your canvassing --

5      THE COURT:  Did you have a photo ID law?

6      MS CALLAIS:  Photo ID.  My apology.

7  BY MS CALLAIS:

8  Q    The first question, or second question that you

9  asked is, do you have a photo ID.  Through the course of

10 your direct work with voters did you encounter voters who

11 did not have a photo ID?

12 A    Yes.

13 Q    Did you take any steps when you encountered those

14 voters to assist them with obtaining a photo ID?

15 A    Yes.  You know, within our own campaign efforts we

16 had put together the best fact sheet we could to carry

17 around with us when we spoke to voters.  And, you know,

18 when they had questions we would do our best to educate

19 them on what would qualify, what wouldn't.

20     If they had a problem, how they could obtain it, and

21 what potential restrictions were on them.

22 Q    What kind of questions would you field?

23 A    We would field questions about, you know, I have

24 this ID, but it is expired.  How long can it be, you

25 know?  If it is expired, can I use it?  You know, I don't

1  have a driver's license, but I have, you know, any number

2  of particular IDs.  I have a federally issued ID that is,

3  you know, an ID badge for work, does that count?  You

4  know, in some cases there are, like I have this ID, but I

5  don't work there any more.  Does that, you know -- so

6  those were a small sampling of the questions we got.

7  Q    Were you able to answer all of the questions that

8  you received?

9  A    Sometimes I did, to the best of my ability.

10  Q    And what types of things would you do in order to

11  answer questions of voters?

12  A    You know, the hope was that our fact sheet was

13  sufficient, but, you know, there were plenty of times

14  that I tried to look it up on my phone while I was at a

15  door for a voter.  You know, if there was a language

16  barrier I would have to take down a phone number to

17  contact people so we could hopefully find someone to

18  speak to them.  You know, so, those were, you know, some

19  of the steps we took.

20  Q    And the voters that you were working with did you

21  notice, or did you observe, any particular challenges for

22  voters in obtaining an ID?

23  A    Yes.  Definitely.  And they were generally in lower

24  income neighborhoods.  I did, you know, one that sticks

25  in my mind is I knocked on a door and a nurse answered

1  the door.  And I was invited inside where I went down

2  into the basement of a townhouse and found a woman who,

3  you know, was in a hospital bed being cared for.  And I

4  sat with her and, you know, we went through the questions

5  of who do you plan on voting for?  And, you know, I asked

6  about the photo ID.  She didn't have one.  She was

7  bed-ridden.  And, you know, one of the concerns was how

8  are we going to get her an ID?  That was the one that

9  really sticks in any mind, because I really, really,

10 wanted her to be able to vote.

11      So, you know, we definitely -- there were absolutely

12 challenges.  And beyond that, you know, people who said

13 they weren't going to be able to take two hours off to

14 try to commute to the registrar's office to get their

15 photo taken and get a temporary ID and go back to their

16 job, because they were worried they would get fired.

17 Q    Mr. Allen, did the work that you, the education work

18 that you did around the voter ID law, did that take extra

19 time?

20 A    Yes, absolutely.

21 Q    Is that time you could have otherwise spent

22 educating voters about your candidate?

23 A    Yes.

24 Q    Now, I would like to focus a little bit on the work

25 that you did, briefly, in 2015.

1      Can you describe generally the work that you did as

2   a campaign manager in 2015?

3   A      Sure.  It was, you know, overseeing the operation,

4   all operations on the campaign.  Overseeing a field

5   department that was, you know, reaching out to voters.

6   Overseeing a department that was set to raise money for

7   the campaign.  I personally oversaw communications for

8   the campaign.  So it was a, you know, upper level

9   oversight position.

10  Q      Did you develop any strategies for the campaign?

11  A      Yes.

12  Q      As part of your strategies did you have any focus on

13  voter ID education?

14  A      Yes.  I took what we had done in 2014 for the

15  coordinated campaign and directed my staff to implement

16  the same final two questions just to make sure that we

17  were educating voters to the best of our ability to make

18  sure they could go vote.

19  Q      Did your campaign encounter individuals who did not

20  have voter ID in 2015?

21  A      Yes.

22  Q      Through the work that your campaign did, was it your

23  observation that voters were generally aware of the photo

24  ID law?

25  A      I wasn't on the ground, but I can tell you that

1  there were plenty of reports back to me that we were

2  running into it as a problem.

3  Q    Mr. Allen, are you registered to vote in Virginia?

4  A    I am.

5  Q    And when did you register to vote?

6  A    July 20, 2014.

7  Q    After you registered to vote did you take steps to

8  get a photo ID?

9  A    I did.

10 Q    Can you describe for the Court your steps you took

11 to get that ID?

12 A    Yes.  I went down to the DMV at 8:00 a.m. and stood

13 in line.  And it took me all of about, you know, about

14 two hours.

15 Q    Did you have to take time off work to do that?

16 A    I did.

17 Q    Were you able to do that?

18 A    I was.  I was lucky then.  I worked for an

19 organization that highly valued voting.

20      MS CALLAIS:  No further questions, Your Honor.

21      THE COURT:  All right.

22      Cross examination?

23                      CROSS EXAMINATION

24 BY MR. HEARNE:

25 Q    Thank you, Your Honor.

1  A      Thank you for coming to testify, Mr. Allen.  I am

2  Thor Hearne.  I am counsel for the Commonwealth and

3  election officials who are the defendants in this case.

4         If you could describe your position.  I know you

5  did.  I don't want to replow that ground.  But what

6  generic description would you use to describe the

7  activities or title for the position you had?

8         Which one?

9  Q      Just for the most recent one.

10 A      Most recent one.  I was a campaign manager.

11 Q      Okay.  Whether campaign manager, and before that,

12 would you say a field operative?

13 A      Field organizer.

14 Q      Field organizer.  And the duties are similar in the

15 sense of your concern with getting out the vote,

16 informing the voters, identifying voters.  Is that fair?

17 A      Generally speaking, yes.

18 Q      And how many Virginia elections have you done this?

19 A      Two.

20 Q      In any capacity, whatever your title might have

21 been?

22 A      Specifically Virginia, two.

23 Q      What years were those?

24 A      The 2014 and 2015.

25 Q      And the 2014 election was the first election, do you

1  understand, that this current voter identification law

2  was in place?

3  A    Yes.

4  Q    And how significant in terms of the time that you

5  spent on voter education related to the voter

6  identification requirements, what percentage of your

7  efforts would you say were devoted to that?

8  A    I would say at the average door when you spoke with

9  a voter, the majority of the time was taken up by

10 education on the voter ID law.

11 Q    And how many voters do you think in the course of

12 that you and those under your supervision had contact

13 with?

14 A    Had contact with?

15 Q    Or would reach out to in the manner you described.

16 A    I know that within my particular turf, is what we

17 refer to it as, within my particular turf there were

18 between 17,500 and 21,000 voter targets.  But that does

19 not include the number of people that we would speak to

20 on the street, or, you know, speak to at a public event.

21 Q    So would the total number of voters actually

22 contacted actually be greater than that number, then

23 potentially?

24 A    Probably.

25 Q    And you testified, if I heard you correctly, you

1  inform your staff part of the question, part of the

2  information you made sure that you communicated to each

3  voter were in fact the current voter ID requirements; is

4  that correct?

5  A     That is correct.

6  Q     Did you all, as -- I say "you all" -- did you, the

7  organization, whether the campaign or whether it was the

8  Democratic Party, or whatever group you were affiliated

9  with, contact or work with the election officials in

10 Virginia as well?

11 A     I am not sure.  I can't speak to their actions.

12 Q     Would you have -- well, I am just asking about your

13 actions.

14 A     Oh.

15 Q     Would you have reached out to the election officials

16 as part of your voter out reach?

17 A     Per our campaign structure we were instructed to

18 send issues that we had up the chain of command.  Aside

19 from that, actions that we would take would basically be

20 going to the Board of Elections web site.

21 Q     So you were describing to me a particular instance.

22 You were at the door and you said somebody asked you a

23 question.  You wanted the answer to it, so you were using

24 your phone.  What would you do to find the answer to that

25 question?

1  A      I would go on my phone and navigate to the Board of

2  Elections website and try to find information on it.

3  Q      Did you generally find the information that you were

4  looking for in their web site?

5  A      Kind of.  If I am being completely honest, you know,

6  I think that the problem that I ran into was that there

7  were situations in which the IDs that folks had, you

8  know, the issue is not cut and dry.

9        I know that I left plenty of houses where I had to

10 take notes to follow up with people because it was not

11 clear to them, it was not clear to us, and so we would

12 have to go back and attempt to re-contact those folks.

13 Q      As part of your voter out reach informing voters of

14 the qualifications that are necessary to vote, did you

15 also inform them of the potential for absentee ballots,

16 or what has been called mail-in voting?

17 A      Basically, if they asked.

18 Q      So you told the story of the nurse who took you down

19 to see the bed-ridden woman.  Do you recall that?

20 A      Yes.

21 Q      In the context of that did you reach out to her and

22 suggest the possibility of voting by absentee ballot?

23 A      I did attempt to follow up.  I was not able to

24 contact her.  But, you know, when I brought it up to her

25 as a potential, she actually got upset with me because

Allen - cross

1  she was very determined to try to vote in person.  So,

2  you know --

3  Q    You knew, or did you know, that she could have voted

4  without any photo ID by absentee ballot?

5  A    I did know she could vote by absentee ballot.

6  Q    And have you yourself voted by absentee ballot?

7  A    I have.

8  Q    Why did you vote by absentee ballot?

9  A    I was going to be working more than, I believe,

10  until eleven hours on election day.

11  Q    If you had a long day, it is your understanding

12  under Virginia law you could vote by absentee ballot --

13  A    Yes.

14  Q    -- on election day?

15  A    Yes.

16      MR. HEARNE:  I have no further questions, Your

17  Honor.

18      THE COURT:  All right.

19      Is there redirect of Mr. Allen?

20      MS CALLAIS:  No, Your Honor.

21      THE COURT:  May Mr. Allen be excused?

22      MR. HEARNE:  Yes, Your Honor.

23      THE COURT:  Sir, you are excused to go.  Thank you

24  for coming in today.  We appreciate it.

25                  (Witness stood aside)

Howell - direct                469

1        MR. SPIVA:  Your Honor, our next witness is former

2   Delegate Howell.

3        THE COURT:  All right.  Thank you, sir.

4        If you would raise your right hand, left hand on the

5   Bible, and face the Clerk of the Court, please, sir.

6                        A. T. HOWELL, JR.

7             WAS SWORN AND TESTIFIED AS FOLLOWS:

8        THE COURT:  Have a seat on the witness stand, sir.

9        THE WITNESS:  All right.

10       My full name is Algie T. Howell, Jr., A-L-G-I-E  T.

11  H-O-W-E-L-L Jr.

12                      DIRECT EXAMINATION

13  BY MR. KAUL:

14  Q    Mr. Howell, are you employed currently.

15  A    Currently I am vice chairman for the Virginia Parole

16  Board.

17  Q    How long have you been doing that?

18  A    A little over a year and a half.

19  Q    And prior to that what position did you hold?

20  A    I was serving as the Delegate for the Ninth House

21  District.

22  Q    How long were you been a Delegate?

23  A    Ten and a half years.

24  Q    And what year did you switch from being a delegate

25  to your current position?

Howell - direct                          470

```
 1  A     A year and a half ago.

 2  Q     Sorry.

 3        So you were in the House of Delegates until what

 4  year?

 5  A     This is 2016.

 6  Q     It would have been 2014?

 7  A     Yes.

 8  Q     Let me go back further.

 9        Where were you born?

10  A     Holland, Virginia.

11  Q     Where did you grow up?

12  A     In Holland, Virginia.

13  Q     How long did you live in Holland?

14  A     Eighteen years.

15  Q     What year were you born?

16  A     January 8, 1938.

17  Q     And just for the record, what is your race?

18  A     I am classified as black.

19  Q     And what kind of schools did you attend in Holland?

20  A     The first school that I attended was Pleasant Grove

21  Elementary School.  This was a one-room school that the

22  teacher taught six grades, first through the sixth grade.

23  The same teacher taught all of the classes together.

24        THE COURT:  As a native Virginian I am embarrassed

25  to ask you this question.  Would you tell me what county
```

Howell - direct                     471

1  Holland is in?

2  A    It is now in the City of Suffolk.  It used to be

3  Nansemond County.

4       THE COURT:  Okay.  I know where you are referring

5  to.  Thank you.

6  BY MR. KAUL:

7  Q    And was your school segregated?

8  A    Yes.

9       All schools in that area were segregated.

10 Q    So you went to the same school for the first six

11 years?

12 A    The same school the first six years.  We walked to

13 that school.

14 Q    What did you do after that for school?

15 A    We went to the Nansemond County Training School,

16 which went to 11th grade.  And you needed 16 units to

17 graduate.

18 Q    Why only the 11th grade?  Do you know?

19 A    That is the way it was for most black schools in the

20 State of Virginia.  I think that was true also for Isle

21 of Wight Training School, Nansemond, well, South Hampton

22 County Training School.  And in Virginia Beach, what was

23 then Princess Anne County, that was a also a county

24 training school.

25 Q    Was high school segregated also?

Howell - direct                              472

1   A      Yes.

2   Q      Did you observe any incidents of discrimination

3   growing up?

4   A      Did I experience any?  My entire life.

5   Q      I don't want to go through in great detail all the

6   incidents, but did you have siblings who also went to the

7   schools in Holland?

8   A      Yes, sir.

9   Q      What did they go into with their education?

10   A      There were seven children.  The two youngest ones,

11   my brother and I, we were the two only two that finished

12   high school.

13   Q      What did the others do?

14   A      They just -- the girls got married at a very young

15   age.  Just, I guess they wanted to get away from that

16   hard work.

17   Q      What hard work were you doing?

18   A      Farming.

19           THE COURT:  Doing what, sir?  I didn't hear you.

20           THE WITNESS:  Farming.

21           THE COURT:  Farming.  Okay.

22           THE WITNESS:  My father was a farmer.

23           THE COURT:  Okay.  Thank you.

24   BY MR. KAUL:

25   Q      What kind of financial circumstances did you grow up

Howell - direct

1  in?

2  A      Financial?  Well, my father bought, I think in 1946

3  he brought his first farm for four thousand dollars.  And

4  then the one across the street, across the road from

5  that.  That was 15 hundred dollars.  But it was always --

6  he was always trying, as I recall, to -- he was never

7  able to pay all of his bills off at the end of the year.

8  He was always in debt.

9  Q      What did you do after graduating high school?

10  A      After graduating from high school I joined the

11  United States Air Force.

12  Q      Can you explain the process of joining the Air

13  Force?

14  A      Well, I went down to the recruiter in what was -- in

15  Suffolk, Virginia.  You probably know where Suffolk is.

16         And I took the test.  At that time there was three

17  different tests.  Well, the questions were probably about

18  the same, but it was A, B and C.  So, there was three

19  blacks that took the test.  As I recall, about 15 people

20  there.  And the recruiter after we had turned the test

21  in, he walked over and he said, you, you and you -- which

22  were the three blacks -- you did not pass.  And the test

23  seemed relatively easy to me, so I asked him, I said,

24  sir, I said, could you tell me what part of the test I

25  missed?  He said in somewhat of a loud tone, no, I can't

1  tell you what you missed.  The only thing I can tell you

2  is you failed the test.

3       Well, I was somewhat, you know disgruntled.  So I

4  caught the bus from little Holland the next morning.  It

5  was eleven dollars to go to 42nd Street in New York.  And

6  the next day I walked over to 32nd Avenue, which was

7  across from Northern Boulevard, and took the test again.

8  And it was 70 some people that took the test that day,

9  because New York, of course, is a larger place.

10      And when we finished, he called out the names of the

11 people that did not pass, which was about seven people.

12 Since he didn't call my name I knew that I had passed it.

13 So I asked him the same question that I asked the other

14 recruiter.  Sir, could you tell me you know how well I

15 did on the test?  So, he said, what is your name?  I said

16 Howell.  He had a list there.  And when he got down to my

17 name he said, you made the third highest score on the

18 test.  So if I lived with what they told me in Virginia,

19 of course, I never would have been able to join the Air

20 Force.

21 Q    So you did join the Air Force after that?

22 A    Yes.

23 Q    So this would have been the mid-fifties or late --

24 A    This is in July of 1956.

25 Q    How long have you in the Air Force?

1  A      Four years.

2  Q      Did you have any experiences in the Air Force that

3  caused you to become interested in politics and public

4  service?

5  A      I would think so.  To a certain degree.  I know in

6  Lackland Air Force Base, that is a four-week course.  And

7  the second week that I was there I was awarded the Airman

8  of the Month.  Only stayed there four weeks.  Then I went

9  to Francis E. Warren Air Force base in Cheyenne, Wyoming.

10 And the first month that was there I made Airman of the

11 month, and Airman Group, Airman of the Quarter.  But I

12 could sense a certain degree of discrimination even in

13 Cheyenne.  I left there and went to Germany.  We were

14 stationed up in the Hunsruck Mountains, a little town

15 right outside of Hahn Air Force base.  That base is no

16 longer in existence.  But there were nine bars in that

17 little town, but there was only one that would serve

18 black Airmen.

19 Q      Let me ask you, did you have experience with

20 driving, being transported when you were in the Air Force

21 when you had to change your seat as you moved across the

22 country?

23 A      When we left, Frank Burgess is a good friend of

24 mine.  We were best friends.  When we were coming back

25 from Wyoming to Virginia, when we arrived in Virginia I

1  had to give up my seat and move back to the back of the

2  bus because at that time blacks could not ride in the

3  front of the bus.  It was somewhat humiliating, and as a

4  matter of fact I remember Frank crying as a result of

5  that.

6  Q     Now, after the Air Force did you go to school again?

7  A     Yes.  When I was discharged from the Air Force, I

8  thought it was a GI bill, but the GI bill was eliminated

9  in January of 1956 because it was peace time.  So I had

10 to pay my way through college.  So I had to go to a

11 relatively cheap university.  I wanted to go to Hampton

12 Institute, but that cost about eleven hundred dollars a

13 year.  So I went to Norfolk Division of Virginia State

14 college.  That was only $170 a semester.  So I was able

15 to borrow money from people for that.

16 Q     Did you graduate?

17 A     Yes.

18 Q     What did you do afterwards?

19 A     When I graduated I was the first person of my color

20 to teach social studies at the all-white Hampton High

21 School in Hampton, Virginia.  I went there in 1967.

22 Q     Did you do work registering voters?

23 A     Yes, sir, I did.  When I was discharged, the Air

24 Force -- that was in the early '60s -- I was the senior

25 missionary for the Sunday School Union.  I would go

1  around to the various churches and urge blacks to vote,

2  because at that time I believe that, because it was the

3  county, the blacks out-numbered the whites two to one,

4  but no blacks were holding any elected offices in

5  Nansemond County.

6       So when it was learned that I was registering people

7  to vote, the sheriff of that county came to me at my

8  mother's house, and father's house, in her presence.  My

9  father wasn't there.  And used the "N" word.  He said, if

10 you don't quit what you are doing I am going to put you

11 under the jail.  That was in '60s.

12      THE COURT:  What county was that?

13      THE WITNESS:  Nansemond County.

14      THE COURT:  Which one?

15      THE WITNESS:  Nansemond.

16      THE COURT:  Nansemond.

17      THE WITNESS:  Now in the City of Suffolk.

18      THE COURT:  I know where it is.  Yes, sir.  Thank

19 you.

20 BY MR. KAUL:

21 Q    Did you become involved in the civil rights

22 movement?

23 A    Yes, I did.  When I was in college I was one of the

24 student leaders in the sit-in demonstrations in Norfolk

25 when we integrated the lunch counters there.  And then,

Howell - direct                478

1  of course, in college I honestly say I had some of the

2  best, even though the school was all black, I had some of

3  the best teachers in the world, especially history

4  teachers.  And they encouraged me, Dr. William T.

5  Robinson, some of you might know, he was the head of the

6  social -- the political science department there.  They

7  got me involved in politics, and I supported him when he

8  ran for the seat that he just relinquished a few months

9  ago.

10  Q    So did you support political candidates?

11  A    Yes, I did.

12  Q    Did you support any Republicans for governor?

13  A    I certainly did.  Former Governor Linwood Holton.

14  Q    All right.

15       So you supported his campaign?

16  A    I certainly did.

17  Q    After his campaign did you support any Republican

18  candidates for governor?

19  A    No.

20  Q    And you eventually ran for office; is that right?

21  A    Yes, sir.

22  Q    As a member of what party?

23  A    The Democratic Party.

24  Q    All right.

25       Let me ask you.  Do you recall during your time in

1  the House of Delegates, that voter identification

2  legislation was introduced?

3  A     Yes, I do.

4  Q     Did you make statements on the floor about that

5  legislation?

6  A     Yes, sir, I did.

7  Q     Okay.

8        Do you recall talking yourself about the

9  discrimination you experienced?

10  A     Yes, I do recall it.

11  Q     Did you urge your colleagues to take a position on

12  that legislation?

13  A     Yes, I did.

14  Q     What position did you urge them to take?

15  A     I urged them to vote against it because based on

16  more than 50 years of experience, discrimination in my

17  own life, I just thought it was a bad bill.  I thought

18  about the fact that because I was born in '38, and in the

19  '40s I used to go with my mother and father to the polls

20  to vote.  And at that time my mother never had a driver's

21  license, no identification, no picture identification.

22  But she never had any problems at the height of

23  segregation to vote, because her name was on the book.

24  And she would simply go in and vote.

25        So, when I see what is happening now, it seems to me

1  that it is worse now to put this picture ID than it was

2  then even.  My parents didn't have to go through that.

3  Q    No further questions.

4       THE COURT:  Cross examination of the Delegate?  I

5  should say Vice Chairman.  Sorry.

6                    CROSS EXAMINATION

7  BY MR. HEARNE:

8  Q    Would you excuse me if I called you Delegate Howell,

9  or would you prefer Vice Chairman?

10 A    Well, someone told me that you never lose that

11 title, so whatever you would like to call me is fine.

12 Q    You have had a very distinguished career.  I just

13 want to respect that in my questions for you.

14 A    Thank you, sir.

15 Q    I am Thor Hearne, attorney for the Commonwealth

16 elections officials here in this case.

17 A    Okay.

18 Q    I wanted to ask you just a few questions.

19 A    Okay.

20 Q    In the context of the legislation you were asked on

21 direct exam whether you support or oppose the legislation

22 which was introduced while you were a delegate.  Do you

23 recall that question?

24 A    Yes.

25 Q    Do you recall there were actually several different

1  versions of the legislation introduced while you were a

2  delegate?

3  A     I believe there were.  Many of them came before the

4  Privileges and Elections Committee, on which I served.

5  Q     You were on the committee that considered this --

6  A     Yes.

7  Q     -- this legislation; is that correct?

8  A     Yes.

9  Q     Do you recall the initial legislation?  I shouldn't

10 say "initial?"  But legislation that was introduced in

11 2010?

12 A     I think I do.

13 Q     There were several editions of it.

14       Do you recall that at one time there was a proposal

15 as part of that legislation that would have required

16 individuals to present an ID to vote, but the type of

17 documentation that they needed would have required that

18 they obtain a birth certificate?  Do you recall that as

19 part of the legislation at one time?

20 A     I can't exactly remember that, but vaguely I think I

21 do recall something about a birth certificate.

22 Q     As a member of the committee that heard that

23 legislation, is it your understanding that the

24 legislation went through some various amendments both in

25 committee and then afterwards?

Howell - cross                                        482

1  A     Right.

2  Q     And is it your understanding the final legislation

3  that was -- well, is it your understanding that the

4  legislation introduced and considered in 2010 was never

5  actually passed?

6  A     Right.

7  Q     That subsequently that the voter ID legislation

8  ultimately passed in 2012 was different from what was

9  introduced in 2010?

10  A     I believe so.

11  Q     Is it your -- do you recall why the changes were

12  made in the legislation from 2010 to 2012?

13  A     As I recall, I don't remember the exact wording of

14  all that because, you know, you have something like 3,000

15  bills that you have to look and it is kind of difficult

16  unless you make notes of it or go back and read over it

17  to recall specifically everything that was in it.

18  Q     There was -- and I will represent to you there was

19  earlier testimony in response to concerns that Governor

20  McDonnell introduced or sponsored or encouraged some

21  amendments to the legislation that became the legislation

22  in 2012.  Is that consistent with your recollection?

23  A     I believe so.

24  Q     And is it consistent with your recollection as well

25  that those amendments made the photo identification

1  requirements less strict than had been under earlier

2  versions?

3  A    I believe so.

4  Q    And in terms of the 2000, the legislation that

5  became what we have been referring to in the course of

6  this litigation as the 2012 legislation that ultimately

7  did pass, is that a bill, as I understand your testimony,

8  that you opposed?

9  A    Yes.

10 Q    And that version of the legislation would have

11 allowed voters to vote with non-photo ID, including

12 copies of things such as utility bills, or bank

13 statements; is that consistent with your recollection?

14 A    Vaguely, as I remember.  I think that is the way it

15 was.  I am not sure.

16 Q    And you opposed it even with those non-photo

17 identification requirements?

18 A    I recall opposing the one that required you to have

19 a photo; yes, I opposed that.

20 Q    Well, in terms of the -- would, as you sit here

21 today, do you recall opposing legislation that would

22 require identification, even non-photo identification,

23 such as a utility bill or a bank statement?

24 A    I don't recall opposing that, because that was some

25 of the same things that people used.  I used to serve on

1   the, on that committee in my community.  And people were

2   allowed to show their social security card, or, you know,

3   the gas bill or something as proof that they were that

4   person.  Of course the name was already on the book.  But

5   they did not have to show a picture ID.  I guess you

6   could, but it wasn't required.

7   Q     Are you familiar with the 2013 legislation as

8   compared to the previous version actually increased the

9   list of potential, or ID that were qualified to be

10  presented to be allowed for a person to be allowed to

11  vote?

12  A     I believe that is the one that was passed, right?

13  Q     I would -- I was referring to the 2013 legislation.

14  A     Right.  I believe so.  I am not sure.

15  Q     And do you think it was a good amendment that

16  improved that bill by including a provision for the

17  provision of free photo ID to those who may not have it?

18  A     Well, if you want to insist that people have, must

19  have an ID card, I saw it as a means that they were

20  saying that if you can't afford to pay for it, we will

21  pay for it.  But, I think you also have to understand you

22  are dealing with a large number of blacks that have not

23  been exposed to that kind of thing, you know, and they

24  somewhat resisted it.  When they would come up to my

25  precinct to vote, and maybe they forget their social

1  security card or what not, they would say, you know, why

2  do I need this?  You know who I am.  My name is on the

3  book there.  And it was kind of discouraging to them to

4  have to go through that.  As I mentioned before, you

5  know, even my mother and father in the '40s, they didn't

6  have to go through that at that time.

7  Q     But you do understand that the version that did pass

8  in the current law here in Virginia does provide for that

9  free photo identification?

10  A     I understand that, yes.

11  Q     Have you worked in your voter out reach or voter

12  education effort to inform voters of the requirements

13  necessary to vote?

14  A     I do that all the time.  And I speak at a lot of

15  churches even now.  And I try to the best of my ability

16  to explain to them that it is the law and, you know, we

17  have to obey the law.  But even with that, many of them

18  will walk away and do not come back to vote.  So I think

19  it appears to me when I compare that with what's

20  happening today and what happened in the '40s with my

21  mother and father, it just appears to me a way to

22  discourage people from voting.  I think the way the set

23  up is in America now, talking to some younger people

24  earlier that is in their 30s, they are in the minority in

25  terms of about 34 percent of people around 30 are college

1    graduates.  So, you know, a person that goes to college

2    four years, you know, he or she learns a lot.  And when

3    people do not have that opportunity, it hinders them,

4    believe me.

5         MR. HEARNE:  I have no further questions.

6         THE COURT:  All right.

7         Any redirect of Delegate Howell?

8         MR. KAUL:  No, Your Honor.

9    A    May the Delegate be excused?  Thank you very much

10   for coming today.  We really appreciate your testimony.

11        THE WITNESS:  Thank you, sir.  It was an honor.

12        THE COURT:  Thank you.

13                   (Witness stood aside)

14        MR. SPIVA:  Next witness will be Dr. Jonathan

15   Rodden.  Was Your Honor's appointment at 3:00 or 3:25?

16        THE COURT:  By 3:25 or quarter to 4:00.  Hopefully

17   we will finish earlier.  If I have my way we will.

18        MR. SPIVA:  We should go ahead and start?

19        THE COURT:  Yes, sir.  Go right ahead.

20        If you would raise your right hand, sir, place your

21   left hand on the Bible, and face the Clerk of the Court.

22                   JONATHAN RODDEN

23             WAS SWORN AND TESTIFIED AS FOLLOWS

24        THE COURT:  Have a seat on the witness stand, sir.

25        Is there any challenge to Dr. Rodden's credentials

1  as an expert without waiving any objection to the

2  testimony, just his credentials as an expert to be

3  received as such by the Court?

4       MR. FINBERG:  No, Your Honor.

5       THE COURT:  He will be received as an expert witness

6  in what area?

7       MR. SPIVA:  He is an expert in political science and

8  the use of geospatial quantitative methods to examine

9  questions about, you know, political science questions.

10  He can probably explain it a little bit better.

11       THE COURT:  I think I will have him explain it, if

12  you don't mind.

13       MR. SPIVA:  I don't have a Ph.D.

14       THE COURT:  Please give me your full name, sir, and

15  spell your last name for the court reporter.

16       THE WITNESS:  Yes.  It is Jonathan Rodden,

17  R-O-D-D-E-N.

18       THE COURT:  Could you describe perhaps a little more

19  succinctly your area of expertise?

20       MR. SPIVA:  And more accurately.

21       THE WITNESS:  I am a political scientist.  A lot of

22  the work I do involves quantitative data.  Much of it

23  involves very fine disaggregated data that is geospatial

24  in the sense that we can locate individuals or census

25  blocks on a map.  We know the XY coordinates of houses.

1  We can place them on a map and then put those houses,

2  those households together with data from the census at

3  the level of blocks, or census of block groups, and then

4  we put that together with political data at the level of

5  precincts.  So it is that type of analysis, what we call

6  geospatial data in the United States and elsewhere that

7  is brought to bear here.

8      THE COURT:  We will accept you as an expert in that

9  area.

10     Proceed.

11     MR. SPIVA:  Before I start asking questions, we

12  submitted a second amended exhibit list last night, which

13  just included that declaration, added declaration that

14  Dr. Rodden had done.  We have come to an agreement --

15  Your Honor is glad to know we have an agreement on

16  something -- but, that there was a declaration that

17  Dr. Thornton had submitted about a week ago.  And we --

18  Dr. Rodden did a declaration in response.  I'm not sure

19  that I am going to need to use it in the testimony, but

20  we have both agreed not to object to essentially the

21  declarations of Dr. Rodden, and the declaration of

22  Dr. Thornton would both come in like the rest of the

23  reports.

24     THE COURT:  Let me just tell you one thing as far as

25  the administration of the case is concerned.  You all

1  have offered thousands of documents here, a wheelbarrow

2  full.  Okay?  At some point in time I will call upon you,

3  perhaps as part of final submissions, to go through them

4  and pinpoint line by line what you want me to read,

5  because otherwise I will be retired before I finish

6  reading all of this stuff.  Okay?

7      All right.

8      MR. SPIVA:  Understood.

9      THE COURT:  All right.

10                 **DIRECT EXAMINATION**

11  BY MR. SPIVA:

12  Q    Okay.

13      So, Dr. Rodden, where are you employed?

14  A    Stanford University.

15      THE COURT:  Did you say "Catholic University," sir?

16      THE WITNESS:  Stanford.

17      THE COURT:  Stanford.

18      THE WITNESS:  Palo Alto.

19  BY MR. SPIVA:

20  Q    And can you briefly describe your educational

21  background, Dr. Rodden?

22  A    Sure.  I am a graduate of McClure High School in

23  Missouri.

24      THE COURT:  You are going to have to speak very

25  slowly so this gentleman can take it down.  Okay?  Just

1  keep it slow.  We may remind you from time to time.

2       THE WITNESS:  Sure.

3       THE COURT:  Go ahead.

4       THE WITNESS:  Then I was an undergraduate at the

5  University of Michigan in Ann Arbor.

6  BY MR. SPIVA:

7  Q    What did you receive your undergraduate in?

8  A    It was in political science.

9       Next, I received my Ph.D. from Yale University.  I

10 then spent a year --

11 Q    Let me stop you.  What did you get your Ph.D. in at

12 Yale?

13 A    Also in political science.

14      I spent a year as a Fulbright scholar, and was then

15 an assistant professor at Massachusetts Institute of

16 Technology.

17      I spent the first eight years of my career there

18 before moving on to Stanford.

19 Q    Let me just ask one more question about your Ph.D.

20 Did you have a focus in the Ph.D. program at Yale?

21 A    Comparative and American politics with use of

22 statistical analysis.

23 Q    And then you said that you then began teaching at

24 MIT.  How long were you at MIT, Dr. Rodden?

25 A    I was there about eight years.  Did tenure at MIT.

1   And then went for a year of sabbatical at the Center

2   for Advanced Studies in the behavioral sciences, which is

3   in Palo Alto.  And it was at that time that I was

4   recruited to come to Stanford, and have been out there

5   ever since.

6   Q    And what courses do you teach at Stanford?

7   A    I teach an introductory course to undergraduates in

8   comparative and American politics.  I also teach a

9   variety of more advanced courses using quantitative

10  methods for both undergraduates and graduate students.

11  In particular right now I'm focusing a lot on teaching

12  students GIS, geographic information systems analysis,

13  teaching a lot of techniques related to the use of GS

14  spatial data, mapping, some of the things I was just

15  describing earlier.  So I teach students how to use the

16  software, how to use some of the programs, and how to do

17  some basic forms of spatial analysis in the social

18  sciences.

19  Q    Have you written any articles, Dr. Rodden?

20  A    Yes.  A number of academic articles in journals.

21  Q    How many peer-reviewed articles do you have?

22  A    A little over 20, I believe.

23  Q    What is the focus of your, if you can broadly

24  characterize it, of the articles that you have written?

25  A    I have worked a lot on the relations between central

1   government, states, and local governments around the

2   world.  I wrote a book on Federalism.  That involves the

3   United States, but it is also broadly comparative.

4        Since then I have also come to do a lot of work on

5   political geography, and that is some of the work that

6   bears more directly on this case.

7        I am interested in the spatial geographic locations

8   of groups and political behavior.  And I am interested in

9   districting.  I have done a lot of work on trying to map

10  political behavior and demographics and understand what

11  happens when we draw electoral districts on top of that

12  geography.  And then examine how that affects the

13  representations that voters receive, again both in the

14  United States and other places, that use single-member

15  districts, or some other places that were colonized by

16  Great Britain that have this form of representation.  I

17  am interested in understanding how those districts are

18  affected.

19  Q    Have you done any work either in your teaching or in

20  your scholarship that relates to the type of quantitative

21  methods that you have employed in this case?

22  A    Yes.  I have done a lot of work teaching, and also

23  the director of something called the Stanford spatial

24  Social Science Lab.  And it's something that started in

25  the last couple of years.  We have a small space.  And a

1 number of faculty affiliates and graduate student

2 affiliates, and then also feeds into our teaching where

3 we teach students and facilitate research related to

4 using census data and using household level data.

5      We actually use a lot of voter files of the kind

6 that were used in this analysis.  So putting together

7 data at the household level from geo-referenced voter

8 files.  So, again, attaching every individual in a voter

9 file to a pair of XY coordinates which allows us to place

10 them somewhere in space.  Doing that allows us to combine

11 that information with census data, which opens up a lot

12 of very interesting forms of analysis.

13      So I have undergraduates and graduate students using

14 these voter files and using the census data to conduct a

15 variety of different types of research.

16 Q    You said you are Director of the Spatial Social

17 Science Lab at Stanford?

18 A    Yes.

19 Q    Were you one of the founders of that lab?

20 A    Yes, it was my idea to start up a space to pull

21 together work from various social sciences, including

22 economics, some people at the business school.  We have

23 some affiliates at the law school.  We wanted to bring

24 together something cross discipline, not just political

25 scientists.

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 494

1    THE COURT:  His credentials are not in issue.  He

2  has been received as an expert.

3    MR. SPIVA:  Understood, Your Honor, just trying to

4  lay a foundation for the testimony.  I think we are

5  there.

6    So, let me put before you, I believe, the report

7  that you wrote in this case, which is Plaintiffs' Exhibit

8  209, and the reply report.  Is that 216?

9    May I approach, Your Honor?

10    THE COURT:  Yes, sir.  Go ahead.

11 BY MR. SPIVA:

12 Q   Let me ask you to just turn in that first notebook

13 that I handed you, Dr. Rodden, to Plaintiffs' Exhibit

14 209.

15 A    Yes.

16 Q   If you could just take a look at that for a minute.

17 Is that the initial report that you submitted in this

18 case?

19 A    Yes.

20 Q   What did we -- what did the plaintiffs' counsel ask

21 you to do in this case?

22 A    Yes, sir.  Using some of the techniques and skills

23 that I just described, I was asked to attempt to get the

24 best possible accounting of who does and does not have a

25 valid form of voter identification in Florida -- I am

1 sorry -- in Virginia after the promulgation of the voter

2 ID law that is in question.  So I was asked to examine in

3 particular the breakdowns of ID possession by race, and

4 by age, and to the extent possible, by partisanship.

5 Q    I think I know the reason for the Florida-Virginia

6 slip, and it reminded me of a question that I wanted to

7 ask you.  Have you been an expert in any other cases,

8 Dr. Rodden?

9 A    Yes.  In fact, I was recently an expert in a

10 redistricting case in Florida.

11 Q    Did you employ some of the same methodology that you

12 employed in this case in that case?

13 A    Yes.  That was a case that relied on fine grain

14 census data and election results, and doing analysis of

15 districting.

16 Q    Did you -- you have also have been involved in a

17 case in Missouri as well?

18 A    Yes.  I was recently an expert testifying on behalf

19 of the defense in a voting rights case in the school

20 district in St. Louis County.

21 Q    Coming back to this case, what kind of general

22 level -- we will get down to the specifics in a minute --

23 but what kind of methodology did you employ to address

24 the question, the questions that we asked you to address?

25 A    This was a case in which it was possible to obtain a

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 496

1 very rich set of data at the level of individuals.

2      So the starting point, the basis for the analysis,

3 is several snapshots or instances of the Virginia voter

4 file.  So the analysis was really about taking the

5 individuals on the voter file and attempting to match

6 them to a separate list of individuals from the DMV.  So

7 that the starting point was understanding who in Virginia

8 had a DMV ID, and then going from there adding additional

9 forms of ID for which it was possible to collect data.

10      So we also received data from the Commonwealth on

11 the free ID that has been in discussion.  So we have the

12 names and the identification numbers of all the

13 individuals who had the free IDs.  And it was also

14 possible on the voter file to understand who was a member

15 of the military.  So we got a number of individuals who

16 were designated as military members.

17      And then I developed some approaches to try to also

18 understand military ID a little further by going beyond

19 the individuals on the voter file.  One thing I noticed

20 was the number of individuals designated as military

21 members wasn't nearly large enough given basic

22 information we have about the size of the force in

23 Virginia.

24      So it was then possible to get what is called a

25 shape file, geographic boundary file, of all the military

1 bases in Virginia.  So I was able to determine by mapping

2 every individual, getting the XY coordinates of every

3 individual and knowing where they live, I was able to

4 figure out who lives on a military base.  So individuals

5 who live on a military base then also were classified as

6 having voter identification.

7        So then that left the last really difficult one, was

8 to try to understand students.  And it is something that

9 the Commonwealth I think also struggled to do.  It hasn't

10 really included, at least in the published reports I have

11 seen.  So I also developed a technique for trying to

12 understand whether or not individuals were students.

13        So this is a type of analysis that required me to

14 move beyond just the information on that voter file, but

15 to use the geospatial again to understand those

16 coordinates knowing where people live.  It is very

17 valuable, because it turns out the census tells us that

18 the level of the census tract that tells us the

19 percentage of the population that is a college student or

20 university student.

21        So not only does it tell us those percentages, it

22 tells us those percentages by gender and by age.  So I

23 can also know those things from the voter file.  So when

24 I know your gender, your age, and your address, I can

25 then use the census data to generate a probability that

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 498

1   you are a student.

2       So in that way I developed some estimates of ID

3   possession that go beyond the simple DMV search.  So, to

4   be clear, throughout my report there are two types of

5   analysis.  One type in which I focus on the DMV ID and

6   the free ID.  And that is something that I think is very

7   similar to the type of analysis that the Commonwealth has

8   done and published on its web page.

9       Then I do a further type of analysis in which I try

10  to assess military membership in the way that I described

11  and assume that everyone on a base, whether they are a

12  military member, a spouse, or an adult child, I assume

13  that all of them have identification.

14      And also I do this student probability approach.  So

15  that is a much more inclusive approach to ID.  And, of

16  course, both estimates end up with higher percentages of

17  ID holders.

18  Q   We will come back to that in a minute.

19      But first I want to ask you whether, you know, using

20  a combination of the individual level and aggregate data

21  analysis, did you reach any conclusion?  What were your

22  kind of top, bottom line, conclusions?  And then we will

23  go through and talk about them.

24  A   Yes.  There were three categories that I was asked

25  to examine.  I discovered that it was clearly the case

1 that ID possession was more common than -- ID possession

2 rates were higher among whites than among

3 African-Americans and Hispanics.  And I determined that

4 ID possession rates were lower for young people

5 especially right after college age.  And also, determined

6 that in precincts where Democrats received large, higher

7 support, that the ID possession rates were lower in those

8 neighborhoods.

9 Q    Let me ask you.  In your analysis of the various

10 types of -- in your analysis trying to determine how many

11 people, or the rates at which people held the various

12 types of IDs, did you have a focus on registered voters

13 as opposed to the population at large?

14 A    Yes.  I ended up with a focus on registered voters

15 purely for reasons of data.  As I described, what made me

16 capable of doing analysis that I really felt confident in

17 was the possession of the voter file and the ability to

18 take all the individuals on that voter file and to match

19 them, or not match them, with individuals in the DMV

20 file.  And also the ability to map those individuals.

21 That is what allowed me to do the analysis I wanted to

22 do.

23      I would have much rather had a list of all

24 Virginians, all Virginians above the age of 18.  I would

25 have liked to have examined the overall voting age

1    population.  In fact, really tried hard to come up with

2    some ways to approximate that type of analysis.  But

3    never satisfied myself that the data quality were there

4    to do that.  So I felt that studying registered voters

5    was really a second best option, but one that allowed for

6    a great deal of confidence in the results.

7         The problem is that the number of individuals who do

8    not have voter ID, who are not registered for various

9    reasons, I have lots of reasons to believe those numbers

10   are actually quite large.

11        People who are not registered but lack ID are not

12   people unable to study.  I can only examine an individual

13   in the way I am doing this analysis if they are

14   registered to vote.  That is the way the analysis

15   proceeds.

16   Q    Let me ask you to turn to figure one in your initial

17   report of Plaintiffs' Exhibit 209.  That is page eleven.

18   If we could bring figure one up on the screen.  I ask

19   if -- figure one on page eleven, so while everybody is

20   getting to it, says -- it is a graph that is labeled

21   "*Estimated Rates of Voter ID Possession Among Registered*

22   *Voters By Year*."

23        Can you explain to the Court what figure one is

24   showing?

25   A    Yes.  Before getting in to any of the breakdowns I

1  wanted to give a snapshot of the estimated rates of ID

2  possession.  So throughout the report, because of the

3  availability of voter files that were complete and DMV

4  files that were complete, I was limited to examining

5  2012, 2014, and 2015.

6      So, throughout the report there will be a lot of

7  quantities of interest expressed for these years.  So I

8  am starting here by showing overall rates of ID

9  possession.  And we see that in the dark line here, this

10 represents what I described earlier, and will describe

11 throughout, as a kind of minimalist approach, the ID

12 possession that only considers DMV ID in 2012.  And then

13 once the free ID becomes available, that is also included

14 in 2014 and 2015.  So the black line only includes those

15 forms of identification.

16     The dotted line is an estimate that includes also my

17 corrections for military and student ID.  And as one

18 would expect, that line is a bit higher.  So the ID

19 possession rates appear to be higher with that way of

20 measuring ID possession.

21     So, one of the things that is striking here is, of

22 course, that ID possession rates are quite low on the eve

23 of the passing of the law.

24     And we do see an increase in ID possession rates

25 over time.

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 502

1  Q     I notice that looking kind of from the left side of

2  the figure to the right side it at least makes it appear

3  that there is an increase in the share of registered

4  voters with IDs.  Did you come to any conclusions about

5  why that is the case, or if that is the case?

6  A     I did.  So this -- these percentages, of course,

7  involve a numerator and a denominator.  So the numerator

8  is the estimated number of registered voters with ID, and

9  denominator is the number of people on the voter file.

10        One of the striking things that is going on here is

11  that the number of people on the voter file in Virginia

12  is going down.  It is going down by a surprisingly large

13  amount.  This is in a state that is gaining population.

14  Virginia is one of the states in the U.S. that is

15  attracting migrants, gaining population.  It is gaining

16  voting-age population.  But at the same time the size of

17  the registered voting population is decreasing.  So, we

18  see a steady increase in the number of people in the

19  voter file up until around this time.  And then we have

20  seen a big decrease since around 2012.  We have seen a

21  big decrease in the number of people on the voter files.

22  So there has been some sort of increase in activity

23  related to removing individuals from the voter file.

24        So the denominator is changing a lot.  The numerator

25  is changing a little.  So there has been some, from 2012

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 503

1  to 2014, there was a small increase in the number of DMV

2  matches.  So the number of individuals who had a DMV

3  identification, that number went up a little.  Then it

4  went down again from 2014 to 2015.

5        So the main thing that is driving this is simply the

6  fact that people that are located in the analysis who

7  don't have ID, they don't stick around on the voter file.

8  They are removed from the voter file.  So there is kind

9  of a process of churn where people without identification

10  are on the voter file, and then we see them falling away

11  from the voter file over time.

12        So this is the main reason for the increase.  This

13  is why I expressed at the beginning my somewhat

14  displeasure of being forced to focus only on registered

15  voters, because a lot of the -- a lot of the individuals

16  without identification are being, are moving from the

17  status of registered to unregistered over time.

18        But this is just a snapshot of the people who are

19  registered at a particular moment.

20  Q    So, if I understand you correctly, Dr. Rodden, the

21  upward line doesn't represent a large number of people

22  who are getting IDs; is that an accurate understanding?

23  A    It depends how you define "large."  There are

24  some -- to me it seems like a small number.  There has

25  been a -- I don't remember the exact figure, but the

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 504

1  number of DMV matches, it was increased by, I want to

2  guess maybe around 40,000 or something like that.  But,

3  you know, the voter file itself during this period is

4  shrinking by 250,000 or something like that.

5  Q     The voter file shrinks over this period?

6  A     I don't mean that as a percentage of the population

7  or something.  I mean, the raw number of Virginians

8  registered to vote is decreasing, which I find somewhat

9  striking.

10  Q     Did you come to any understanding in your analysis

11  of reasons why, or the reasons why people are removed

12  from the voter file?

13  A     Certainly I read the official documents about the

14  way the list is maintained.  I have no reason to dispute

15  them.  My understanding is that when the Commonwealth has

16  reason to believe that an individual has moved, they send

17  information to that individual on a postcard of some

18  kind.  If that postcard is not returned, or if that

19  person does not then actually show up to vote in some

20  specified period of time, the first step is they are

21  moved to inactive status.  That is what begins this

22  process.

23        And then if there is no reply, or no voting behavior

24  in a certain period, then the individual is removed from

25  the voter file.

1    And so one of the things that concerns me in this

2  analysis is that individuals who frequently move are also

3  in the neighborhoods where we see a lot of rental

4  housing, people who have unstable addresses and move a

5  lot.  It is the same pool of individuals who are lacking

6  ID that also are in the pool of individuals who are in

7  danger of being removed from the voter files.  It is that

8  kind of process I think that people are at the same time

9  finding their way off the voter file and also don't

10  possess identification.

11  Q    Is the characteristic of the voter file a changing

12  demographic in terms of getting, you know, more, a larger

13  percentage of one racial or ethnic group versus another?

14  A    I don't recall.  I would have to go back to the data

15  to examine.  I don't recall at the moment.

16  Q    And then the other question may be unfair, because

17  this chart doesn't actually show it, but do you have --

18  this is in terms of share of registered voters.  Do you

19  know how many people this represents in 2012 as opposed

20  to 2015 who, according to your calculation, don't have an

21  ID, a DMV ID?

22  A    Yes.  So the 2012, the number, the raw number of

23  individuals without DMV ID I estimated to be something in

24  the order of 74,000.  And then by 2015 that number is

25  something like 280,000.

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 506

1  Q      Let me ask you.  Do you have the same numbers when

2  you use kind of more expansive calculations that includes

3  military and student IDs?

4  A      Yes.  That number, that raw number is lower to the

5  tune of maybe 90,000.  So I think it is something like, I

6  think something like 650,000 for 2012.  And then it was

7  lower in 2015.  I think it was 230,000 or something like

8  that, was the estimated number.

9  Q      The number of people who continue to have these

10 types IDs?

11 A      Yes.  I should stress, I think that number -- by the

12 time we get to 2015 with the expansive measure of

13 identification, I think we are probably dealing with an

14 over-estimate of ID possession because I took such a

15 liberal set of assumptions about ID possession among

16 students.  I assumed that every single student in

17 Virginia has a photo ID.  And I have really no idea

18 whether that is true.  I suspect it is not.

19        And I also took a very inclusive approach to

20 military members.  So I was trying to make the most

21 conservative estimate of the lack of ID.  And I think I

22 have done so.  I produced a fairly large number here.

23 Q      When you say "conservative estimate" you mean, I

24 take it, an estimate that assumes as many people as

25 possible have an ID?

1 A   Yes.  Essentially whenever I do a report like this I

2 want to -- especially if there is some question about the

3 right way to proceed -- and certainly we can argue about

4 the best way to examine student status.  One way is

5 ignore them altogether.  There are other ways.  We can

6 try to find universities.  Again use geospatial analysis

7 to determine how far one lives from a campus.  So when

8 you are doing that kind of thing, whether it is

9 debatable, reasonable people can disagree how to conduct

10 the analysis, I think it is useful to establish a kind of

11 a -- some bounds on where things might be.

12     So that is what this analysis was meant to do, not

13 just take the most aggressive set of assumptions we can

14 about who has identification and apply those and see what

15 happens.  So I think the dotted line should be read in

16 that spirit.  It is kind of a -- it is an upper bounds, I

17 think, on ID possession.

18 Q   Let me ask you to turn to figure two in your report,

19 which is on page 13.

20     Yes, make it as large as you can.

21     This is titled "*Registered Voters With and Without*

22 *Photo ID.*"  Could you explain what you are conveying with

23 figure two?

24 A   Yes.

25     In case I wasn't clear enough earlier about what it

1  is that geospatial data analysis involves, and why we do

2  it, one reason is it is nice to make pretty maps.  So

3  what I have tried to do is just place on a map what I

4  have learned about identification possession.  And this

5  is using the most recent data.  Again, this is in 2015

6  data.  So, what we can do.  Remember, we have every

7  household mapped.  And so then we can -- the map would be

8  a little too cluttered if we tried to show one dot for

9  every household.  What I am doing is showing a blue dot

10 for every hundred registered voters that don't have

11 identification.  And the white dot for every hundred

12 registered voters that do have voter identification.  The

13 reason for doing this, is what we call a dot density map.

14 The reason for doing it is it shows us not just -- we

15 have all seen the red and blue county level maps of the

16 United States that don't really convey where the people

17 are.  We want to see where the actual individuals are.

18     So we see that rural places here are just gray,

19 there are dots in places where there are no people.  But

20 you see in the clusters of human settlements, in the

21 cities, we see that there is often in the city center a

22 clustering of blue dots.  We see clusters of voters

23 without identification.  I think building on some of the

24 things I heard this morning from the fact witnesses,

25 these are clustered around places where individuals live

1  in low-income housing, and in many cases within access to

2  public transportation.

3       One of the things that is not so clear in this, and

4  it is unfortunate, and it is my mistake using that gray

5  background, is that there is also a lot of blue dots in

6  rural areas in the southern part of the state.  And those

7  are -- those are more disbursed.  So they don't catch the

8  eye quite as well.

9       But there are a number of rural African-American

10 communities where we see clusters of individuals that

11 don't possess identification.  So I don't want to over

12 emphasize the urban clustering, but certainly I think

13 that is one of the things that stands out in this map.

14 Q     The white dots, what do those represent?

15 A     Sorry.  Those are voters that do have

16 identification.  So what -- I think the pattern that we

17 see is that surrounding every metro area is an

18 auto-dependent suburban area that has extremely high

19 rates of ID possession.  So the suburban Virginia for the

20 most part has very high rates of ID possession, but --

21 and saying the same thing with most of rural Virginia.

22 But it is in these clusters of the city centers where we

23 start to see the blue dots.

24 Q     I don't know if you are comfortable doing it.  I was

25 going to ask you to circle around the clusters of blue

1   dots.  You can do that at the computer monitor.

2   A    Sure.

3        We can look, in particular I think it is useful to

4   look at the D.C. area.

5   Q    Is that what that region is that you just circled?

6   A    Yes.  And we can look at this kind of, this

7   metropolitan statistical area that includes Norfolk and

8   Hampton and so forth.

9   Q    Hampton Roads?

10  A    Yes.

11  Q    And --

12  A    And then we can look at Richmond, Richmond.  Greater

13  Richmond area as well.

14  Q    What does that tell you, that there are clusters of

15  blue dots in those three areas?

16  A    It would be helpful to zoom in on those with the

17  additional set of maps.  But when you --

18  Q    We can do that if you want.  Is now a good time to

19  turn to that?

20  A    I think that would be.

21       THE COURT:  I have to take a recess.  I have another

22  matter I have to handle.

23       So I will be in recess for about 15 or 20 minutes.

24  I will come back and we will complete the Doctor's

25  testimony.  Okay?

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 511

1   MR. SPIVA:  Thank you, Your Honor.

2   THE COURT:  I'm sorry I have to do this, but I have

3  an obligation to handle this matter.

4   MR. SPIVA:  I understand.  Thank you.

5                    (A recess was taken.)

6    (Krista Harding is now the court reporter.)

7   THE COURT:  All right.  We're conducting the

8  direct-examination of Dr. Rodden.  Go right ahead.

9   MR. SPIVA:  Thank you, Your Honor.

10  BY MR. SPIVA:

11  Q   We were discussing Figure 2 of your report,

12  Dr. Rodden.  I'd like to ask you to turn to Figure 3,

13  which is on Page 15 of your report.

14   MR. SPIVA:  And if we could turn on the monitor.

15  BY MR. SPIVA:

16  Q   So Dr. Rodden, what can you tell us about Figure 3?

17  A   It's a little bit difficult to move from the

18  previous map to this one.  So let me try to explain what

19  we're looking at here.  I now am taking ID status, and

20  instead of representing that as dots, the presence or

21  absence of an ID is now represented with colors.  And so

22  when we see transitions from one color to another, we're

23  looking at that rate at which people do not have

24  identification using that most conservative estimate that

25  I described earlier.

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 512

1    So we see that the light shade of blue is 0 to 3%,

2  that medium shade of blue is 3 to 5%, and that darkest

3  shade of blue is more than 5%.

4    And so you can see the places that have relatively

5  high numbers of registered voters without ID are the ones

6  represented in the darkest blue.  So, again, as we were

7  learning earlier with that dot map, it's the places that

8  are in city centers.  But what I wanted to also examine

9  here was something that, to me, just popped out in the

10  data.  It was actually not something that I initially set

11  out to study, but I noticed a real correspondence not

12  just -- it's not about population density per se.  I

13  noticed a real correspondence with the public

14  transportation network in these different cities.  And

15  that's an interest of mine.

16    So what I show in this map with dots now, going from

17  the census data, the census tells us at the level of

18  census block groups, the percentage of the population

19  that relies on public transportation exclusively, that

20  does not own an automobile and that uses public

21  transportation for getting around.  And so here every dot

22  represents 50 users of public transportation.  And so

23  what we see in this map is that the dots are clustered in

24  roughly the same places as the darkest blue areas in the

25  map.  The places that have the highest rates without

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 513

1 voter ID.

2      So for people who know the D.C. metro area and know

3 the transportation system, these dots will not be

4 surprising.  These are largely along the main lines of

5 both the train and bus.  And we see almost kind of linear

6 spokes that head out, along which we see clusters of lack

7 of ID possession, as well as public transportation usage.

8 Q    And I noticed that there are some darker blue areas

9 that are a little further out from the places with the

10 public transportation clusters.  Is there anything else

11 you can tell us about that?

12 A    Well, as we'll see in some of the other graphs and

13 charts, many of these are non-metro, or outside the main

14 metro area.  These are places that have relatively large

15 minority populations.

16 Q    Let me ask you to turn to the next page, and the

17 next figure, Figure 4.  And if you can just explain what

18 that shows.

19 A    Well, that is one that I think others in the room

20 would be in a better position perhaps to discuss than I

21 am, but it's exactly the same type of analysis of the

22 Richmond area.  And again, I think you can see sort of

23 lines through the city and out into the surrounding areas

24 of public transportation users.  And those basically

25 correspond to bus lines.  So we see that those without ID

1  are clustered along the bus routes.

2       And we can also look down in Petersburg, which

3  people may be surprised to know there is a bus.  There is

4  some bus service between Richmond and Petersburg.  And we

5  do see some clustering there.  But I think the bigger

6  story we see in Petersburg is there's also a substantial

7  amount of -- there is substantial numbers of individuals

8  without identification who live in the periphery with no

9  public transportation options.

10       So we see both things in that map.  And, again, that

11  area, that is a largely African-American population that

12  is represented there without identification.

13  Q    And then turning to Figure 5, which on the next

14  page, the Hampton Roads area.  What did you find there?

15  A    Again, the story is rather similar.  We see

16  corridors of public transportation usage where there is

17  also people who know the area can see that this is the

18  case, where there are clusters of low income housing,

19  primarily African-American neighborhoods, that have high

20  rates of -- sorry, low rates of ID possession that are

21  also clustered along these corridors of public

22  transportation.

23  Q    And then turning to Figure 6 on Page 18.  It appears

24  to be the Roanoke area.  Is that basically the same story

25  there?

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. [515]

1  A    Yes.  Again, we see a clustering in the

2  neighborhoods that are most auto dependent -- I mean that

3  are most public transportation dependent.  And we see

4  that as soon as we get out into the suburbs and the rural

5  areas where automobile possession is more common, we see

6  far less incidents of lacking voter identification.

7  Q    And then turning to -- to Figure 7 on Page 19, it's

8  titled *Voter ID and Public Transportation Use in*

9  *Virginia.*"  Is this some kind of regression analysis, and

10  what does that show?

11  A    We are just looking at the scatter plot here that is

12  another way of communicating the same information.  So

13  it's one thing to look at the map and to tell stories

14  about different places.  It's another thing to just take

15  all of the analysis, all the data and put it on one

16  graph.  So here we see on the horizontal axis is simply

17  that public transportation share from the block groups in

18  Virginia.  These are the percentage of individuals that

19  use public transportation.  And on the vertical axis is

20  simply the share of the population that I estimated, my

21  conservative estimate, of the share of the population

22  that does not have voter identification.

23  Q    And again, the conservative estimate is the one that

24  includes the estimates of military and student ID

25  holders?

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 516

1  A    Yes.  It's the one that I tried to take the most

2  liberal approach to possession of ID.  So I've been

3  conservative in its estimation of no ID status.

4  Q    Okay.

5  A    And that's what's represented on the vertical axis.

6  And then the blue line is the best linear fit.  It's a

7  regression line.  And it's a highly significant

8  relationship.

9       But I also would like to draw attention to the fact

10 that there are lots of observations of places where there

11 is no public transportation where there's still a rather

12 high percentage of the population without identification.

13 And those outliers in this graph do tend to be places

14 with large African-American populations.

15 Q    And a minute ago you said this shows a highly

16 significant relationship.  Can you just, you know, spell

17 out in laymen's terms for the record, the relationship

18 between what and what?

19 A    Between the use of public transportation and the

20 lack of voter identification.

21 Q    And can you turn to Figure 8 on Page 21.  This is

22 titled *"Voter ID, Race, and Ethnicity in Virginia's*

23 *Census Block Groups, 2015."*  What is your analysis

24 showing here?

25 A    Yes.  Moving from the last set of maps and graphs to

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 517

1  the current one, one of the things that I think was

2  relatively clear just from eyeballing the data in the

3  maps, is that there's a clustering of the no ID

4  population in African-American neighborhoods.  And so

5  those graphs take the same approach, the scatter plot

6  approach, again using the census block groups, again

7  using the 2015 data, and again focusing on that more

8  inclusive measure of voter identification.

9       We're looking at scatter plots on the left.  The

10  horizontal axis is the African-American share of the

11  voting age population.  And on the vertical axis is the

12  percentage of the population that I estimate not to have

13  the voter ID.  And so we see a rather strong positive

14  relationship.  So that as the African-American share

15  increases, the no ID share also increases.

16      And we see a very similar thing in the right-hand

17  panel when we look at the Hispanic share of the voting

18  age population on the horizontal axis.  And the same

19  thing on the vertical axis.  We see a strong positive

20  relationship.  And in both cases, these are highly

21  statistically significant.

22      THE COURT:  Doctor, let me ask you.  On this

23  particular figure, Figure 8, is this a scatter plot

24  involving registered voters, or just the census

25  generally?

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 518

1       DR. RODDEN:  That's a good question.  The

2  observations are based on the -- no ID share, as I

3  described earlier, I'm only looking at registered voters

4  when I'm addressing the question of voter ID possession.

5  The horizontal axis, though, is at the census block group

6  level.  It is the African-American share of the voting

7  age population.  So it's not the African-American share

8  of registered voters, which is -- the idea here was to

9  use the census.  The census does not tell me this

10  information in a fine grained level about registered

11  voters.  So the effort here was to use census data for

12  the horizontal axis, and these individual level data from

13  the voter file for the vertical axis.

14       THE COURT:  Okay, sir.

15  BY MR. SPIVA:

16  Q    Let me ask you to turn to Table 1 on Page 23, which

17  is labeled "*Estimate Rates with which Registered Voters*

18  *Lack Either DMV or Free ID in Racially/Ethnically*

19  *Homogeneous Blocks.*"  Can you explain the analysis you

20  did to create this table and what you found?

21  A    Yes.  Again, this is based on locating individuals

22  from the voter file in space and putting them at a

23  particular set of coordinates on a map.  And then in this

24  case, we're taking those coordinates and placing those

25  inside of census blocks.  So we have a file that gives us

1  the boundaries of every census block in the United

2  States.   And so we superimpose that map of blocks, and we

3  place all these individuals into blocks which then allows

4  us to estimate some quantities of interest.

5       And so the overall goal here is to learn something

6  about ID possession by race.  And so the data do not make

7  this necessarily as easy as one might like.  In some

8  states, self-identified race is included on the voter

9  file.  That is not the case in Virginia.  So one has to

10  come up with another way to try to understand ID

11  possession by race.

12       So in these situations in the past where one is

13  trying to learn something about an aggregate -- an

14  individual quantity of interest, but one has aggregate

15  data, the courts have relied on a couple of different

16  approaches.  One of them is to examine homogeneous

17  places.  Typically, in voting rights cases, these are

18  precincts.  And so the expert witness will take

19  homogeneously African-American precincts, and compare

20  those with homogeneously white precincts.  That

21  homogeneous precinct analysis has been in use for some

22  years in voting rights cases.

23       I've also conducted other forms of analysis that I

24  think are probably better, but this one has the great

25  virtue in that it's very simple to explain.

1    THE COURT:  Let me see if I can translate this.

2 Doctor, you're saying that you're not using for the

3 purpose of this chart individuals who self-identify

4 themselves being in their group.  You used your

5 geospatial analysis to put them in a precinct of other

6 folks of similar race and nationality, et cetera, in

7 making your calculation, is that right?

8    DR. RODDEN:  That's right.  We don't know.

9    THE COURT:  Do you think that's statistically

10 accurate, do you, sir?

11    DR. RODDEN:  We have -- I'm going to go through a

12 few different approaches.

13    THE COURT:  Okay.

14    DR. RODDEN:  Each of which I think has costs of

15 benefits in this analysis.  So I will in fact present

16 analysis that attempts to classify individuals -- the

17 race of the individual based on the things we know about

18 them.

19    THE COURT:  Okay.

20    DR. RODDEN:  That's the third thing that I do in the

21 report.

22    The first thing is to use what courts have most

23 frequently examined in the past, which was to look at

24 aggregate data from the census on the presence of

25 African-Americans in a precinct not knowing -- so what

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 521

1  often is the case in a voting rights case is one needs to

2  know voting behavior of different racial groups in a

3  community.  And one -- we have a secret ballot.  One

4  never knows what individuals have done with their voting.

5      So the way the courts have done this is to examine

6  through homogeneous precinct analysis, and then also the

7  next form of analysis is ecological inference analysis.

8  So I'll go through those.

9      But we also have access in this case to something

10  that one didn't usually have, which is individual level

11  data, which we can then use to make inferences about

12  individual race.

13      THE COURT:  What was the individual level data you

14  relied upon?

15      DR. RODDEN:  So we have data in the voter file.  And

16  then as I described, we know the XY coordinates of each

17  individual, and so we know their name.  And so we also

18  know from the census the probability that a person with a

19  certain name is a certain race.  So this comes from past

20  census tables.

21      THE COURT:  Okay.

22      DR. RODDEN:  So based on an individual's name,

23  combined with information about their place of residence,

24  if an individual lives in a census block that is 100%

25  African-American, one can make a very good determination

1 that that individual is African-American.  If the person

2 lives in a census block that is 70% African-American, and

3 they have a last name that has been determined to give

4 them an African-American probability of say 70%, then

5 again we have, putting those two bits of information

6 together, we have a pretty strong confidence that that

7 individual is African-American.

8      And so if we have a sufficiently geographically

9 segregated population where a lot of people live in

10 census blocks that are very homogeneous, which is the

11 case in much of Virginia, then we can estimate race with

12 a reasonably high degree of accuracy at the level of

13 individuals.

14      That is a form of analysis that has been used only

15 recently in the courts only in the last few years.

16 Before that, courts relied exclusively on homogeneous

17 precinct analysis, and then ecological inference

18 analysis, which is perhaps the most frequently used form

19 of analysis in recent -- I'd say in the last decade for

20 this type of work.

21      MR. SPIVA:  Your Honor, he's done all three.  And

22 we're going to go through each.

23      THE COURT:  Okay.  Go ahead.

24 A    But I think it's useful to give an overview of

25 whether of the three -- what are the cost and benefits of

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 523

1  the three.  Because I think I detect some skepticism

2  initially about the first one, and I say that I share

3  that skepticism.  There are some things about homogeneous

4  block analysis that are not ideal.  I think what's nice

5  about it is it's simple.  It gives us a simple first cut

6  where we know we don't -- we know we're not

7  misattributing individuals.  We know that if we look at

8  100% African-American blocks, and contrast those with

9  100% white blocks, we're not misclassifying individuals.

10      The down side of it is that we're looking at a very

11  narrow slice of the data.  We're looking at only some of

12  the blocks in Virginia, and ignoring a lot of others.  So

13  I think that captures many of the costs and benefits.

14      And so when we look at homogeneous blocks, I'm doing

15  it here in two ways.  Looking at the -- a large number.

16  It surprised me how large the number is.  A large number

17  of blocks that are completely homogeneous.  A census

18  block is very small.  It's just really sometimes not very

19  many houses.

20      So we look at the homogeneous -- the completely

21  homogeneous blocks in the first column, and then the

22  second column we look at the ones that are 90%

23  homogeneous.  And that introduces a far larger number of

24  blocks.  So that's what this first analysis does.  It

25  does it for 2012, '14 and '15.  And again, I'm looking

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 524

1  here at the analysis of DMV or free ID.  So that first

2  form of analysis that I discussed.

3  Q     What did you find?

4  A     So we see here that in 2012 there's a large gap

5  between the ID possession rates of African-Americans and

6  non-Hispanic whites.  We see rather similar estimates of

7  ID possession among Hispanic voters as African-Americans.

8  So we see between those minority groups and non-Hispanic

9  whites, a relatively large gap.

10 Q     And when you say "large gap," a large gap in, just

11 to be clear for the record?

12 A     In the rates with which individuals possess ID.  So

13 here we're expressing this in the negative.  So these are

14 individuals without identification.  So we see in 2012,

15 the estimate is somewhere between 17 and 18% of

16 African-Americans are lacking DMV ID.  And the figure for

17 whites is somewhere on the order between 9 and 11%.

18     THE COURT:  And this is for the entire Commonwealth

19 of Virginia, is that right, Doctor?

20     DR. RODDEN:  Yes.  These are registered voters only.

21     THE COURT:  And you reviewed every registered voter

22 in Virginia and did the coordinates, every one of them,

23 is that right?

24     DR. RODDEN:  Yes.  There was some -- there was some

25 uncertainty at first as to whether we would have access

1  to the hashed Social Security numbers of the individuals

2  on the voter file and in the DMV files.  And so there

3  would be some concern about the matches had we not

4  received those Social Security numbers.  So we received

5  those numbers very late in the process.

6      Previously, we had done matches based on name,

7  address and date of birth.  But these matches are done

8  with Social Security numbers.

9      THE COURT:  All right, sir.

10     Go ahead, Mr. Spiva.

11     MR. SPIVA:  Thank you, Your Honor.

12 BY MR. SPIVA:

13 Q   So then turning to Table 2.  Is that also

14 homogeneous blocks analysis?  How does it differ from

15 Table 1, and what does it show?

16 A   I believe this is Table 1.

17     MR. SPIVA:  I think we're still on Table 1.  If you

18 can flip to Table 2 on Page 25 of the report.

19 BY MR. SPIVA:

20 Q   Do you have it there?

21 A   Yes.  That is the same homogeneous block analysis,

22 but using the other measure of identification that I

23 described as more expansive.  And here we see the

24 estimates are simply lower.  The estimates of non-ID

25 possession are lower, but the gaps between groups are

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 526

1  roughly the same in percentage terms.

2  Q    Okay.  And why don't we turn to Page 27, Table 3.

3  And I think this appears to discuss something you

4  mentioned a minute ago, ecological inference.  Can you

5  explain what that is, and what your analysis is here?

6  A    Yes.  So I think in large part as a reaction to some

7  of the critiques I just made of homogeneous precinct

8  analysis, social scientists have tried to come up with

9  better ways of making estimates about individuals from

10  aggregate data.  And so this is an approach, the

11  ecological inference approach, that has been developed

12  explicitly for use in Voting Rights Act cases where,

13  again, we know some things about the aggregate level like

14  precincts, sometimes counties.  And we'd like to know

15  some things about individuals.  We want to do the best we

16  can with the data.

17       Taking homogeneous blocks is probably not the best

18  thing that we can do with the data.  There's a lot more

19  information there, especially in all those blocks that

20  are not so homogeneous.  We can take the entire

21  distribution of precincts, although in this case, we're

22  doing much better than that.  We're not looking at

23  precincts which there are a much smaller number of

24  precincts, of course, in Virginia than blocks.  And

25  blocks are very small.  So we can do this ecological

1  inference analysis at the level of blocks where we know

2  at each --

3  Q    When you say *"blocks,"* you're referring to census

4  blocks?

5  A    Yes.  Census blocks.

6      So we can look at the number of individuals from the

7  census, we can know the number of individuals who are

8  African-American, white and Hispanic at the block level.

9  And then we know the information about the number of

10  people without ID, and the number of people with ID.

11     The thing we don't know here is how many people are

12  in each of these groups.  So how many African-Americans

13  have ID and how many don't have ID.  So ecological

14  inference analysis is a way of trying to take all that

15  information, and in each block put bounds around the

16  estimates for -- given what we know about the data, how

17  many African-Americans might be -- how many

18  African-Americans are most likely to have ID in every

19  block knowing the things we do about that block, and then

20  estimating a statistical model that takes the information

21  from all of the blocks to get the best estimates we can

22  within each individual block about the ID possession

23  rates.

24     THE COURT:  How did you determine they *"are most*

25  *likely to have ID"*?

1    DR. RODDEN:  The -- we know in each block the number

2  of individuals in each racial group, and the number of

3  individuals within each -- within each ID category yes

4  and no.  And so we can figure out combinations that are

5  impossible.  So we can rule out levels of ID possession

6  for each group that can't be true given what we know

7  about those quantities of interest.  So then we have some

8  bounds in each block, some bounds around which the

9  estimate has to fall.  It has to fall in these bounds.

10    THE COURT:  Okay, sir.

11    DR. RODDEN:  And so then we take that information

12  from all the blocks and we estimate a statistical model

13  that then spits out an estimate about the most likely

14  place within that bound where that estimate is.  And then

15  we can estimate confidence intervals as well.  So then we

16  tell ourselves we can be 95% confident that the estimate

17  falls within the lower and upper confidence interval.

18    So that's what's going on here.  We're using the

19  whole range of information we have to make some estimates

20  about ID possession by race.

21  BY MR. SPIVA:

22  Q    Dr. Rodden, is this statistical method, ecological

23  inference methodology, is that something that is widely

24  used within social sciences, political science?

25  A    Yes.

1  Q     Is it a well-established, and something that's

2  accepted as a valid methodology?

3  A     Yes, certainly.  And it's especially been useful in

4  the courts.  And it is the most commonly used form of

5  analysis not just for voting rights cases, but for any

6  situation in which the only way to proceed in a court

7  case is to come up with individual level inferences when

8  one has aggregate data.  This has become the standard

9  procedure, and it's used in quite a few expert witness

10 reports and has been accepted by courts in many cases.

11 Q     And what did you find using the ecological inference

12 method?

13       THE COURT:  Could you repeat that again?

14       MR. SPIVA:  Sure.

15       What did you find using the ecological inference

16 method?

17       THE COURT:  Ecological inference method.  Okay.

18       Go ahead.

19 A     These results are not much different than the ones

20 we saw in the previous table that relied on the

21 homogeneous blocks.  So we see that the testaments of ID

22 possession -- for instance, starting in 2012, we get an

23 estimate, a point estimate of 17.5%.  We get a point

24 estimate for whites of around 9 1/2%.

25 Q     And I don't think you said it.  We get a point

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 530

1  interest of 17.5% for African-Americans?

2  A     Yes.  The 17% that do not have identification.

3  Q     Sorry.  Go ahead.

4  A     And then as in the previous table, we see that those

5  estimates -- we want to think back to that initial graph

6  that showed overall rates of ID possession increasing

7  over time.  We see the same thing reflected here in these

8  estimates.  That the estimates from non-Hispanic whites,

9  African-Americans, and Hispanics are decreasing over

10  time.  So we see that the estimates of -- of the

11  percentage of the registered voters that do not have

12  identification are decreasing within each group, but yet

13  we see that the gap is relatively stubborn.  In

14  percentage terms, it's not changing very much.

15  Q     And I think you talked about this towards the

16  beginning, but does the decrease within each group of the

17  percentage of each group that lacks ID, the decrease in

18  that, is that because a lot of people are going out and

19  getting IDs?

20  A     I think the most important thing that's happening is

21  that people without identification are no longer on the

22  voter file.  It is the case that some individuals have

23  gone out and gotten IDs.  So there's some individuals

24  between 2012 and 2014 -- as I described earlier, there's

25  been a slight uptick in the number of matches between the

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 531

1  voter file and the DMV file, but that number is not

2  nearly large enough to have produced this.

3      We also see that we've gone from no free IDs,

4  because there was no such thing earlier to a situation

5  where, you know, a handful of people, I think on the

6  order of 4,000 or something, have gotten free IDs.  But

7  again, those numbers are not nearly large enough to

8  account for the differences here, the increases in

9  estimates of ID possessions.  So it's mainly what's

10  happening with the denominator, not the enumerator.

11  Q    And the denomination being the size of the voting

12  file?

13  A    Yes.  And who is -- who is represented there.

14  Because it's clear that individuals who do not have ID,

15  as identified in my matches, are much more likely to fall

16  off the voter file over time.  So that's just an

17  important perspective to have.

18      THE COURT:  Now, is that your assumption, or did you

19  have some factual basis for that conclusion, Doctor, that

20  they fall off the voter role?

21      DR. RODDEN:  So, yes.  What we can do is we can look

22  at an individual that has a voter ID --

23      THE COURT:  No, I'm looking for a source of

24  information.

25      DR. RODDEN:  Well, it's analysis that I've done.

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 532

1    THE COURT:  Okay.  Go ahead.

2    DR. RODDEN:  So what I've done is I've looked at

3 individuals who are on the voter file at a particular

4 time and then asked what is the probability that they are

5 on the voter file two years later.  So if someone has a

6 voter ID in the first period, their probability of being

7 on the voter file again is very high.  Like 96%.  If

8 someone does not have a voter ID the first time I see

9 them on the voter file, the next time I check two years

10 later, their probability is still being there is

11 something like 60%.

12    So there's is real asymmetry in the probability that

13 one stays on the voter file.  And that is a function of

14 ones ID status.

15    THE COURT:  Okay, sir.

16    DR. RODDEN:  And that does not indicate that anyone

17 is intentionally removing people who doesn't have ID.  As

18 I described earlier, it's a group of individuals that

19 tends to move a lot and lives in really unstable rental

20 housing, and so forth.

21    THE COURT:  Okay.

22 BY MR. SPIVA:

23 Q    And just maybe concluding with this table, what was

24 the bottom line, your bottom line conclusion in terms of

25 what the ecological inference method shows about the

1 difference among non-Hispanic whites and

2 African-Americans and Hispanics in terms of rates of ID

3 possession?

4 A    Rates of ID possession are significantly higher for

5 whites than for minority groups.

6    MR. SPIVA:  And then Table 4, if we could pull that

7 up briefly on Page 28.

8 BY MR. SPIVA:

9 Q    Is this a representation of what you found with the

10 ecological inference method, but using the broader

11 category of IDs?

12 A    Yes.

13 Q    Was there anything else that you wanted to say about

14 Table 4, or should I move on to the next group?

15 A    It gives us a rather similar story, again, with the

16 numbers of -- with the estimates of no ID moving down

17 because of college and military.  But no big difference

18 in inference we would draw from the table.

19 Q    And then let me ask you to turn to Table 5, which is

20 on Page 32 of your report.  And maybe before diving into

21 the details of what Table 5 shows, if you can maybe

22 explain -- I think you gave a high level overview of kind

23 of the individual analysis you had done a minute ago in

24 answer to His Honor's question, but maybe if you can give

25 a little bit, you know, more complete explanation of what

1  analysis you did that ultimately led to Table 5 and 6?

2  A    Yes.  I don't think the analysis, that discussion,

3  was complete.  I would like to describe in a bit more

4  detail how this works.  So precisely because one worries

5  about drawing inferences about individuals from aggregate

6  level data, social scientists always would like to use

7  individual level data if possible.  And in this case, of

8  course we would use individual level data if we knew the

9  race of every individual with certainly, or with near

10  certainty because of the self-identification, we would

11  use that.  We don't have it.

12      However, there has been a technique developed mainly

13  in medical research.  There are large-scale panels of

14  individuals examining things like mortality rates where

15  race is not one of the variables that the researcher has,

16  but race is of great interest.  And so there's been an

17  entire area of research devoted to using names and

18  associated information.  And by associated information

19  much of it is geographic.

20      So placing individuals with certain names and birth

21  dates and genders in space and then leveraging what we

22  know about -- from the census about race, about a variety

23  of other neighborhood characteristics, we try to get the

24  best possible estimate of race.  And so this is some

25  analysis of race that was conducted by a research firm

1 called Catalyst.  And so in my work in the spatial social

2 science lab, as I was describing, I've had a number of

3 students work with voter files.  And Catalyst is a vendor

4 for voter files that we have relied on.

5     And one of the things that is provided in some of

6 these voter files by Catalyst is the Catalyst estimate of

7 race.  And so the Catalyst approach is to use information

8 not only about the individual's last name, but also the

9 individual's first and middle name, and to combine that

10 with the information about the date of birth of the

11 individual.  So that someone with a particular first name

12 born in the 1940s might get a different probability than

13 someone with that same first name born in the 1990s

14 because of the different usage of names by different

15 racial groups over time.  So they have all those data.

16     And so, in my experience, the Catalyst race codes

17 are surprisingly accurate.  So there is some data sets we

18 have.  North Carolina is one example, Florida is another

19 where we do know the self-reported race, and then we can

20 look at the Catalyst race codes and we can see how well

21 they line up.  And so we get a degree of accuracy that is

22 something like -- depending on the group, is somewhere

23 between 80 and 90%.  So it's not perfect, but it's

24 something that seems worth pursuing if one still has

25 skepticism about ecological inference analysis.

1    If one says, no, I don't trust ecological inference

2  analysis even though you have data from the blocks, which

3  is very disaggregated level of analysis, if one is still

4  skeptical about that, the idea here is to just do pure

5  individual level analysis where the estimates are of the

6  race of individuals.  But we need to be clear about the

7  fact that those estimates still contain a lot of

8  geographic information.

9    Someone -- as I described earlier, someone named

10  Washington from a 50/50 census block is going to get a

11  different race probability than someone named Washington

12  from a 95% African-American block.  So the geography is

13  still a big part of these estimates.  So that's what's

14  going on here.  We're taking those race codes that I

15  received from Catalyst.  So just to be clear, I took the

16  voter file, zipped it and sent it to Catalyst who sent

17  back these estimates, these estimates of the probability

18  with which a person fell into each of these different

19  racial categories.  So to use those individual level data

20  to then estimate -- and then I also know whether the

21  person has an ID or not, the amount --

22  Q    Before you get -- I think you're going to get to

23  what you did here, but I had a couple of follow-up

24  questions.  So a race estimate, is that the Catalyst

25  estimate of the probability that the person is one race

1  or ethnicity or another?

2  A    Yes.  It's based on a model that has lots of things

3  that go into it.  And it says based on this model, this

4  person is African-American with a probability of .7 in a

5  range of from 0 to 1.  And then there's also, of course,

6  we can look at every individual as a race probability for

7  African-American, a race probability for white, for

8  Asian, and for Hispanic.  And so we can look at which of

9  those probabilities is larger, and then we can make a

10  binary determination about their race if we want to do

11  that.  But that's how the data came to me from Catalyst.

12  Q    And is that method that Catalyst employed, is that

13  something that is accepted within the social sciences?

14  A    It's been accepted, as I was describing, in medical

15  research for a while.  And it has found its way into

16  political science and sociology and economics more

17  recently.  And I think it's been gaining traction, and

18  has been used also in the courts in some recent cases

19  that had exactly the same question at hand.  So it was

20  used, for instance, in a case in Texas where the effort

21  was to understand ID possession by racial group.

22  Q    And are there -- you talked about some of the

23  drawbacks to the other two methods that you employed.

24  Are there any drawbacks to this method to try to estimate

25  the differences in terms of ID possession among race and

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 538

1 ethnic groups?

2 A    There's a drawback here that I've been really

3 pouring over the data and trying to understand.  But the

4 drawback is that if it flows from the residential

5 geography of African-Americans and whites, so

6 African-Americans are more likely to live in integrated

7 neighborhoods than are whites.  Whites are more likely to

8 live in homogeneously white neighborhoods.  So what I

9 described is something for a lot of African-American

10 names, some of the most common African-American names,

11 are not very distinguishing.

12    So the same is not true of Hispanic names.  Many

13 Hispanic names do a lot of work in this analysis.  A lot

14 of African-American last names are not very

15 discriminating between African-Americans and whites.  So

16 when we look at African-Americans in more heterogeneous

17 neighborhoods in say a place like a middle ring suburb of

18 one of the major metro areas that we were just looking

19 at, when we look at people in those areas, we see that

20 there will be some African-Americans who we will

21 misclassify as white because they have a name like

22 Washington and they live in a predominately white

23 neighborhood.  So we're always going to have some error.

24 Some misclassification.

25    That's fine.  We always have error.  But the things

1  that concerns me is that that error is asymmetric across

2  groups so that there's a little bit better match rate for

3  whites.  We get a better probability for whites than we

4  do for African-Americans.

5       And what I mean by that is I also asked Catalyst to

6  provide me with the data set of their -- using the same

7  approach that they used for me in Virginia, in a state

8  that has data on self identified race.  And so they gave

9  me a sample from Florida where I know the race of the

10 individuals so that I could test how well did they do.

11 Because if the matches weren't very good, I wasn't going

12 to include this in my report.  But overall, the matches,

13 as I described, are in the 80 something percent range.

14 Close to 90, I believe.

15      But the match rate for whites was higher than for

16 African-Americans.  So what I know is that there's some

17 percentage of African-Americans who I've misclassified as

18 white.  And so that's one of the things that is less than

19 ideal about this approach.  So I'm trying to create a

20 sense that each of these approaches has its costs and

21 benefits.  There are tradeoffs.  There is no one perfect

22 approach to this difficult question.

23 Q    And then I don't know if you would call it a bias or

24 an error rate, does that have an overall effect on your

25 analysis in the sense that it makes it more or less

1 conservative?  Can you speak to that?

2 A    Well, it creates attenuation bias.  And what I mean

3 by attenuation bias is if there are two groups that have

4 many observed differences, and I'm measuring these groups

5 with some error like that, and especially I've

6 misclassified one group a bit more than I'm

7 misclassifying the other, then the direction of the bias

8 is that I will be less likely to identify the difference

9 between these groups in the quantity of interest.

10      And so in this case, the quantity of interest is

11 possession of ID.  So I have conducted again an analysis

12 that is extremely conservative.  The idea here is if

13 there is a difference between African-Americans and

14 whites in ID possession, I'm trying to do everything I

15 can to make it go away.  That's my approach as a social

16 scientist.  When I have a finding, and I want to present

17 it to people, and present it with some confidence, I need

18 to do everything to try to make it disappear.

19 Q    What happened here?  Did it go away when you applied

20 the individual level analysis?

21 A    No.  The difference is still there.  But it's

22 attenuated somewhat, especially the 2015, the difference

23 is not quite as large as in the other graphs.  But it's

24 still a sizeable difference.

25 Q    Is it a statistically significant difference?

1  A     Well, in this analysis, these are not -- this is not

2  a sample for which I can put confidence intervals around.

3  This is a count.  This is everyone.  And these are my

4  estimates.  So I don't have an approach to put in

5  confidence intervals around these estimates.  But

6  substantively, the difference is quite large.

7  Q    Okay.  And then looking at Table 5, what difference

8  did you find as between non-Hispanic whites and

9  African-Americans in 2012, 2014 and 2015?

10  A    Again, as in the previous tables, the difference in

11  the rate of ID possession is the same.  African-Americans

12  and Hispanics are less likely to be in possession of ID

13  than non-Hispanic whites.

14  Q    And then Table 6, which is right below Table 5, what

15  does that show?

16  A    Again, it's the same analysis using the more

17  expensive approach to identification.  And again, we see

18  increases in these estimates for each group, but we still

19  see a similar gap between the groups, especially in

20  percentage terms.

21  Q    And going back to the attenuation bias just for a

22  minute.  Would you say that Tables 5 and 6, because of

23  that attenuation bias, tend to -- are likely to

24  understate the differences between non-Hispanic whites

25  and the two minority groups?

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 542

1  A     I believe so, especially as we get into 2015 where

2  so many of the no ID individuals are no longer on the

3  voter file.  And especially on Table 6 where I am making

4  my very aggressive estimates of ID possession among

5  students and military members, and we add to that the

6  attenuation bias that I think is present in the

7  individual level analysis, and we still see this

8  persistent gap.  So I think this is probably a lower

9  bound estimate of what that gap would be.

10  Q     And you use kind of three different methods which

11  come out with different calculations.  Do they all point

12  in the same direction?

13  A     They do.  And the size of the difference in the gaps

14  is really not all that large.

15  Q     Dr. Rodden, if I could ask you to turn to Figure 9

16  on Page 35.  These figures, say changes in the racial

17  ethnic composition of the enfranchised electorate, can

18  you explain what these figure mean?

19  A     Right.  So what I mean here by the enfranchised

20  electorate is all of the individuals on the voter file

21  who I estimate have a valid photo ID.  So I'm thinking

22  about the electorate in this graph in a couple of

23  different ways.  One is simply all registered voters.  So

24  we're just taking everyone on that voter file, and we are

25  asking for each racial group what share is that group of

1   the entire voter file, all registered voters, and what

2   share is that group of those who have a valid photo

3   identification.  So by construction, since I'm saying a

4   valid photo identification, according to this current

5   law, I'm representing in 2012 that those dots are right

6   on top of each other.  And then looking at --

7   Q    And what does that mean?  Why is that that the dots

8   are right on top of each other?

9   A    I'm sorry.  It means that there's no difference

10  between the voter file and the share of the enfranchised

11  electorate.  There's no picture ID requirement in 2012.

12        And so I'm then asking what happens when we

13  introduce the photo ID requirement?  What happens to the

14  groups as a share of the enfranchised electorate?  So

15  again, that's just the number of estimated non-Hispanic

16  whites, number of African-Americans, the number of

17  Hispanics as a share of all of those individuals who we

18  have estimated have identification.

19        So in other words, this is just another way of

20  slicing the same data we were looking at just a moment

21  ago.  It's just simply a different way of representing

22  the name numbers.  And so what we see is that

23  non-Hispanic whites are actually decreasing as the share

24  of registered voters by a very small amount.  But as a

25  share of the enfranchised electorate, they're increasing

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 544

1 substantially.

2      And then African-Americans as a share of registered

3 voters are roughly flat, increasing a little bit, but

4 then decreasing as a share of the enfranchised

5 electorate.

6      And then Hispanics, of course, the estimates here,

7 it's not a very large share of either group.  We're

8 looking at less than 4% of the registered voters.  But we

9 do see also a dip in Hispanics as share of the

10 enfranchised electorate.

11 Q    Let me ask you to turn to Figure 10, which is on

12 Page 38 of your report.  And I take it this a figure that

13 comes out of your analysis you've done on IDs, possession

14 by age, is that correct?

15 A    Yes.  This is another instance where it's very nice

16 to have individual level data and not have to try to

17 infer things from aggregate data.  So one of the columns

18 in these massive voter files that the Commonwealth

19 provided me with is the birth date of the individual on

20 the voter file.  And so we can calculate everyone's age.

21 And what I've done here is simply place everyone into a

22 bin, a one year bin, based on when they were born, and

23 then we can look at rates of ID possession by age group.

24      And just to kind of follow on the theme that we were

25 just on, it's impossible then, once we had the individual

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 545

1  level estimates of race, it's possible to display the

2  data by race as well.  But the most important observation

3  here is the shape of that relationship by age.  And so

4  the dark line is a smoothed fitted line that captures all

5  those circles.  And that is for -- the dark line is for

6  minorities.

7       The dotted blue line is for whites.  And that

8  corresponds to the blue circles.  So the blue circles

9  are, for each age group, they are -- the size of the

10  circle corresponds to how many people are in that age

11  group.  So by looking at the size of the circle as your

12  eyes travel across the graph, you can see something about

13  the age distribution of Virginia registered voters.  You

14  can see those circle get smaller as you move to the right

15  as you move into the Virginians who are above the age of

16  75.

17       And you can also get a sense for the relative size

18  of the population in each age group of whites, vis-a-vis

19  minorities by contracting the blue circle with the gray

20  circles.  And so the thing we see with respect to age is

21  that there's a dip in the percentage of individuals with

22  an ID that it's around age 25, and there's a period there

23  were individuals in their late 20s, and really throughout

24  their 30s, are much less likely to have valid ID.  And

25  then it starts to pick up as we go into the 40s and up to

1  the 50s.  And we see there's a plateau up there of

2  Virginias up above the age of 50, all the way until we

3  surpass 75, and venture on to 80, then we start to see a

4  real decline again.

5      So I hope that the figure kind of gives the complete

6  picture about age.  It's -- there is a really interesting

7  trough there in the late 20s and early 30s.

8  Q    And in that trough, what does that say in terms of

9  the rate of -- average rate of ID possession among

10  younger Virginians?

11  A    Well, it's lower than other groups.  So it's down

12  there around 85%.  And this is in recent years where the

13  overall estimate is quite a bit higher than that.  So

14  this is another group that is clearly affected by the

15  law.

16  Q    Turn briefly to Figure 11 on page 39.  What does

17  that represent?

18  A    I think Figure 11 is important to follow-up Figure

19  10 because Figure 10 had estimates on the far left side

20  that I would not want to hang my hat on because they

21  ignore student ID.  This is now that second approach to

22  ID in which I have tried to correct for military and

23  student status.  And you can see here, I probably have,

24  as I've tried to describe, probably overcorrected for it

25  by assuming with probability one that anybody who is a

1   student has a photo ID.  So if you're a student, if

2   you're likely to be a student, I have classified you as

3   having an ID.

4        So what we see in this graph is on the far left,

5   that first cluster has moved way up, and we now estimate

6   a higher level of ID possession, perhaps unrealistically

7   high, among college-age individuals.  But then right

8   after that, we still see that big fall off.  And once we

9   get into the age range from 25 to 40, it's moved up a bit

10  because of the college adjustment and the military

11  adjust.  But the shape of the relationship is still the

12  same.  It still has the trough in the late 20s and the

13  early 30s.

14  Q    In the next section of your report, you analyze

15  partisanship and voter identification.  And I wanted to

16  ask you -- I guess we can skip Figure 12 and go to Figure

17  13 on Page 42.  And it's labeled *Precinct-level voting

18  behavior and percent without DMV ID, October 2014."

19       I guess, if you can tell what that figure conveys.

20  A    Yes.  Once again, this is a representation of

21  individuals that we would like to have, but we have to

22  look at aggregate data because we don't have a primary

23  system in Virginia that requires people to choose one

24  ballot or another.  So we don't have a designation on

25  voter file that tells us individual's partisanship, so we

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 548

1   can't simply count up the Democrats and Republicans who

2   have ID and who don't have ID.  In some other states,

3   perhaps we can do that.

4        But in this instance, what we do have again is some

5   useful aggregate data.  And really aggregate data are at

6   a slightly higher level of analysis.  Previously, we were

7   examining blocks and we were examining block groups, but

8   of course the Department of Elections does not collect

9   data at those levels.  It collects data at the level of

10  precincts.  The lowest level that which we can know

11  election results in the United States.

12        So, again, geographic information system is helpful.

13  We can use the boundaries of the precincts, and then we

14  can gather census information about those precincts.  So

15  we can get information about the vote shares of

16  Democratic candidates at a level of precincts, and

17  examine how those connect to information about ID

18  possession.

19        In the same way that we saw those scatter plots

20  earlier for African-Americans, we went on to do a bunch

21  of other things.  But in this case, this is essentially

22  the best we can do is look at the aggregate level

23  analysis.  And again, when we do that scatter plot, it's

24  quite striking that as the Democratic gubernatorial vote

25  share goes up, the share of registered voters without DMV

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 549

1  ID goes up.  This is again at the level of the precincts.

2       And this is something that to save space I didn't go

3  into.  We could have used election results from a variety

4  of other elections.  They're high correlated at the

5  precinct level.  The gubinatorial results are highly

6  correlated with other statewide offices, and with

7  presidential races, and so on.  And those graphs would

8  look very similar to this one.

9       And I should say that just the data source here,

10  this is not anything that I assembled myself.  I actually

11  went to the -- the Commonwealth has a Website in which

12  they report at the precinct level the population without

13  DMV ID.  So this is taken directly from that Webpage.

14  They have a list of precincts, and they have the

15  information about DMV ID.  That's where the vertical axis

16  of the graph comes from.  Not from any calculations I

17  conducted.  And the horizontal axis also comes directly

18  from the Commonwealth.  This is just a presentation of

19  data that I received from the Commonwealth.

20  Q    Let me -- if you need me to go back to Figure 12 to

21  do this, but if you can do in a way that you can just

22  describe, did you make any findings in terms of the

23  partisan -- the way that the various demographic groups

24  you've been looking at in the report; Latinos -- rather

25  Hispanics, non-Hispanic whites, and African-Americans,

1 and how they're -- how voting behavior in terms of

2 partisanship correlates -- how those two things

3 correlate?

4 A    Well, after I did the analysis that started with

5 something like population density where we could see that

6 no ID population was concentrated in the city centers.

7 And then I examined race, and then I examined age.

8       I find this next graph to be completely

9 unsurprising.  I think anyone who pays attention to

10 politics in the United States knows that there is a

11 correlation between residents in a city center and voting

12 for Democrats.  There is a correlation between race and

13 voting for Democrats.  There is also a sizeable advantage

14 for the Democrats in exactly that age group that I showed

15 in the previous graph is more likely to be without ID.

16 So this graph comes as no surprise.

17       MR. SPIVA:  Could we just briefly put Figure 12 up.

18 BY MR. SPIVA:

19 Q    Is that a representation of what you just described?

20 A    Yes.  This just basically shows us some basic things

21 about American political geography.  I think we could

22 make similar graphs for any other state that there is a

23 relationship between population density and democratic

24 voting at the level of precincts.  There's an

25 interesting -- kind of a bit of a u-shape to that

1 relationship on the upper left, which is composed of

2 African-Americans, rural African-Americans.  So every

3 southern state in the United States has a bit of this

4 u-shape where there are low density places that have

5 large numbers of Democrats.  Those tend to be places --

6 rural places in the south.  There are also some other

7 states that have mining history, and other things in

8 rural areas that are associated voting.  But for the most

9 part, we see a strong positive relation between

10 population density and Democratic voting.

11      The next graph of the right is simply

12 African-Americans as a share of voting age population

13 plotted against Democratic gubernatorial vote share.

14 Then there again, we see a strong positive relationship.

15      The next one on the lower left is Hispanics as a

16 share of voting age population.  We see a similar

17 relationship.

18      And then in the final graph there, we simply have

19 the share of the population, the voting age population,

20 between the ages of 25 and 34, which you will recall is

21 that trough in the graph we looked at.  And there's a

22 strong positive correlation between the share of voters

23 in that age group and that Democratic gubernatorial vote

24 share.

25 Q    And why don't we turn to Figure 14 on Page 44 of

1 your report labeled "*Precinct-level voting behavior and*

2 *estimated percent without valid photo ID, August 2015*."

3 What does that represent?

4 A    Well, it follows the same progression as the other

5 tables and graphs we've looked where we first look at DMV

6 and free ID only, and then we expand the set of IDs to

7 examine.

8        So that first graph I showed, as I explained, the

9 data came from the Webpage of the Commonwealth that used

10 their estimates of individuals without DMV ID.  But, of

11 course, those estimates don't address military and

12 student status.  So to do that, I had to then go and take

13 the estimates that I've been using all along here, those

14 individual level geocoded estimates, and then I had to

15 aggregate up to the level of the precincts and then

16 generate my own estimate, a more conservative estimate,

17 of the share of registered voters without identification.

18       So, again, it's a bit of a robustness check using

19 this more expansive definition of identification.  And

20 again, we see essentially the same relationship.

21 Q    Is that a statistically significant relationship?

22 A    Yes.  And I think it's highly significant.  It's

23 hard to see there are gray around -- gray bands around

24 the blue line which calculate the confidence interval.

25 And so, you know, if we saw that those gray bands were

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 553

1 flat, we would then realize that it's not a statistically

2 significant relationship if one of those gray bands was,

3 you know, crossed over into zero territory.  But we see

4 this has a highly significant relationship.  We have a

5 healthy number of observations, and we can say with good

6 deal of confidence this is a strong relationship.

7      What I think is especially important about Figure

8 14, relative to the previous figure, is this one does --

9 Q    The previous figure, Figure 13, you mean?  Because I

10 skipped back to 12, so I want to make sure you meant the

11 previous figure as Figure 13.

12 A    Yes.  Contrasting this one with Figure 13, which

13 does not address students, I think is also a sizeable

14 advantage of Democratic candidates among college

15 students.  And we are adjusting for that in this analysis

16 where we're assuming that every single one of those

17 students has an identification.  Probably over estimate

18 the extent to which students are unaffected by the voter

19 ID law.  And there's still a strong relationship here.

20 So it's certainly not an artifact of something happening

21 on college campuses.

22 Q    What would you say your overall conclusions are

23 about the affect of the voter ID law -- or rather the

24 difference among -- let my strike that and ask a better

25 question.

1    What were your overall conclusions from your

2    analysis, Dr. Rodden?

3    A    My overall analysis concludes that ID possession

4    rates are higher among whites than minorities.  They are

5    higher among middle aged voters than younger voters.  And

6    that they are higher among Republicans than Democrats.

7    Q    Let me ask you to turn to Plaintiffs' Exhibit 216,

8    which is in that other notebook, and ask you to confirm,

9    if you will, that that is a copy of the reply report that

10   you submitted in this case?

11   A    Yes, it is.

12   Q    Okay.  If you can turn to Page 3.  You have a

13   section here labeled *Alternative Forms of*

14   *Identification*."  And I guess my question is what about

15   the other forms of ID that you didn't analyze that are

16   acceptable under the photo ID law?  Did you do anything

17   to satisfy yourself that that wouldn't undermine any of

18   your conclusions?

19   A    I did.  This was something that concerned me from

20   the beginning of this process.  I asked the plaintiffs'

21   attorneys to -- well, I asked for the moon.  I asked for

22   lists of everything.  Of course, such lists turn out not

23   to exist.  There are no lists of all enrolled college

24   students in Virginia.  There are certainly no lists of

25   everyone who has a workplace ID.

1    There are even some simpler things that I was hoping

2    to gain access to that I did not have, including lists of

3    holders of passports, and other Federal forms of ID.  But

4    the question I had to ask myself was after I've accounted

5    for DMV ID, which is very common form of identification,

6    what do we know from a lot of supplementary data?  What

7    can we learn about that population of individuals that

8    does not have DMV ID that might have some of these other

9    forms of ID.

10    So for those results that I just described to fall

11    apart in the presence of some additional information

12    about other forms of ID, two things would need to be

13    true.  First of all, we'd need to have a large number of

14    individuals who did not have DMV ID, but who do possess

15    these other forms of ID.  And second of all, we'd need

16    for that group to be disproportionately African-American,

17    Hispanic, young, and Democratic to go through each of

18    those results.  But just focusing on race, the question

19    is can we, for each of these forms of ID, identify a

20    plausible situation in which there are sufficient numbers

21    of individuals who don't have DMV ID who do have this

22    other form of ID who are disproportionately

23    African-American.

24    So that is a question that I tried to answer with

25    respect to these various forms of identification.  And to

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 556

1   do that, I had to draw upon a variety of additional

2   sources of information.  So there has been a nice set of

3   surveys conducted by my former colleague at MIT, Charles

4   Steward, called *The Survey of the Performance of*

5   *American Elections."*  And that data resource involved a

6   large sample of individuals from around the country.

7   Unfortunately, the sample from Virginia itself not

8   terribly large, but at least it's something we can look

9   at and put things in context.

10      So we can learn from these surveys how many people

11  who have DMV ID -- I'm sorry, how many people who do have

12  DMV ID do in fact have other forms of identification.

13  And so we can look at passport possession.  We can look

14  at workplace ID possession, and so forth.  And in those

15  various surveys I looked at, the numbers of individuals

16  that had these other forms of identification but did not

17  have DMV ID were very small.

18      But more importantly, I was able to look at the

19  racial characteristics of the individuals who might have

20  this other form of identification.  So in the case of

21  passports, there's really no question.  There have been

22  many studies to suggest that African-Americans are far

23  less likely to possess passports than are whites.  So I

24  think there's very little danger that if we had

25  information about passports, somehow the results of my

1  study would fall apart.

2      The same thing I believe is true for military

3  identification.  I have already captured the individuals

4  who lived on base.  And indeed, there are a number of

5  individuals who did not have DMV ID who I now classify as

6  having identification by virtue of the fact that they

7  live on the military base.  But once you move off base,

8  and we start looking at military members living off base,

9  the probability that large numbers of those have military

10  ID, but do not have DMV ID, that starts to seem less

11  plausible to me given everything I've learned.

12      And then I have to ask myself a question:  Are they

13  likely to be disproportionately African-American?  And

14  then we can look at data on forces in the United States

15  and ask ourselves does the racial composition of the U.S.

16  military look different than the racial composition of

17  Virginia's electorate?  It's voting age -- I'm sorry,

18  it's registered voting population.  It doesn't look

19  different at all.  So there's no reason to think that

20  African-Americans would be overrepresented among this

21  small group of individuals living off of military bases

22  that might have an additional form of ID.

23      One of the other big ones within the workplace ID,

24  and the problem there for this type of supposition that

25  this might effect my results, is that the unemployment

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 558

1 rate for African-Americans is double of the unemployment

2 rate for whites.  So it, again, seems very unlikely that

3 there's a group of holders of workplace ID who are

4 disproportionately African-American in such numbers as to

5 reverse or undermine the results I've presented.

6      So then when I go further and I think about tribal

7 identification, I have a hard time thinking of a story

8 that would make a difference there.  Nursing homes, and

9 so on.  None of these strike me as forms of

10 identification that would be disproportionately held by

11 minorities.

12 Q    And -- I lost my train of thought there.  Why don't

13 I ask you to turn to Figure -- I had a follow-up, but it

14 just went out of my head.  So why don't we go to Figure

15 on 1 on Page 14.

16      Can you tell us what this figure represents?

17 A    This was simply a response to some analysis

18 Dr. Thornton had done in which she challenged the use of

19 -- my use of data that came from the Department of

20 Elections and from the Commonwealth of Virginia.  I was

21 merely demonstrating that when I -- when I use data that

22 comes directly from the Department of Elections Webpage

23 that she had cited in her report, and when I use the data

24 that I use in my report they are highly correlated.  The

25 only difference between them is they are a couple of

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 559

1  months different slices of the voter file.

2      And people are always, as I describe, moving on and

3  off the voter files.  So there will be small differences.

4  But in fact, I am using data provided to me by the

5  Department of Elections by the Commonwealth of Virginia,

6  and so there is no discrepancy or no problem here with

7  the data.

8  Q    And then gave me a moment to remember what I was

9  going to ask you with respect to the other forms of ID.

10  Did you do any further analysis in your declaration

11  that's been marked Plaintiffs' Exhibit 219 to check

12  whether, even if you've kind of hypothesized about some

13  areas that you don't think are likely, whether that would

14  have an affect on the difference in the rate of

15  possession of IDs as among non-Hispanic whites,

16  African-Americans, and Hispanics?

17      I don't know if we have a copy of 219 in that book.

18  If you need that, I can hand it to you.

19  A    That's fine.  I can describe what I did, which was

20  merely an attempt to do some calculations corresponding

21  to what I just did descriptively, which is try to

22  entertain some, what to me seem like, fanciful scenarios

23  where I take the most conservative estimate in my -- of

24  the gap between African-Americans and whites in ID

25  possession.  And that was the estimate from 2015 in Table

1  6 of my initial report.  That was the most conservative

2  estimate of the gap.  And it was one that Dr. Thornton

3  had asked some questions about.

4      So what I try to do is imagine scenarios in which we

5  took the remaining voters who still in spite of my

6  adjustments for military and student and DMV and free ID,

7  people who are still marked in my data set as not having

8  an identification form.  What if I imagine that one-third

9  of those people, and I tried it with other even higher

10 numbers, but I think that's already a very

11 unrealistically highest estimate, what happens if

12 one-third of those individuals do have some other form of

13 ID.

14     And then let's imagine, first of all, that the

15 disproportionately in African-Americans and whites

16 observing other forms of ID also applies to those forms

17 of ID.  Well, of course that wouldn't make any

18 difference.  We're just increasing the number of people

19 with ID without changing the disproportionality.

20     But now what if we imagine there is a reverse

21 disproportionately.  So we take the same observed

22 disproportionately and ID possession, and we just imagine

23 that African-Americans are as overrepresented among those

24 additional ID holders as whites are among the IDs we know

25 about.  So when we do that in reverse disproportionately

1  analysis, very little happens to the gap.  It shrinks

2  just a tiny amount.

3      And then if we just take that disproportionately and

4  we even increase by a lot, multiply it by 10, then we can

5  get a little more action.  We can get the estimates to

6  move a little closer together.  But there still are in

7  percentage terms a large difference between the groups.

8  Q    Is there anything in your background in political

9  science that would lead you to think that any of those

10  hypothesized scenarios could plausibly be true?

11  A    No.  I tried hard to come up with relatively

12  implausible scenarios just to poke the data as hard as I

13  can.  But I don't believe, as I described, that there's

14  any reason to expect that there are large numbers of

15  people that don't have DMV ID, or these other forms of

16  ID, who do possess some other form of ID and have -- and

17  imagine that those groups are disproportionately members

18  of a particular race.  That just does not seem plausible

19  to me.

20  Q    Let me ask you to go to Page 17 of your reply

21  report, Plaintiffs' Exhibit 216.  And there you asked the

22  question does SB 1256 affect actual voters?  And let me

23  just ask you to describe your analysis there, and what

24  your conclusion was.

25  A    There I had the concern that thus far I've analyzed

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D.    562

1 registered voters, but it might be the case that a large

2 number -- of course it is the case that a large number of

3 registered voters don't vote.  And it's useful to examine

4 a smaller and narrower group of voters, and ask about the

5 impact of the law on people who do vote.

6       And what's nice, again, about having individual

7 level data from the voter file is we have individual's

8 voter history.  So for each of those individuals in that

9 file of 5,000,000-something observations, we have columns

10 for did the individual vote in 2010, did they vote in

11 2008, and so on.  So I thought I would limit the analysis

12 to individuals who did vote in 2012, who I knew in 2012

13 did not have identification who I estimated in 2012 did

14 not identification.  I know with certainty that they did

15 not have DMV identification.

16      So I can take that group and look at what happens to

17 them over time relative to individuals who also voted,

18 but who did have ID, in my estimation.  So I look at a

19 group of individuals who voted in 2012 who did not have

20 ID, and I see that going from a presidential year to a

21 midterm year -- of course turnout falls a lot for

22 everyone.  But the turnout for the group that did not

23 have ID, not surprisingly, fell dramatically.

24      So it fell by twice as much as the turnout fell for

25 individuals who did have an ID.  And, again, these are

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 563

1  individuals who voted.  We're not dealing with voters

2  versus non-voters.  We're comparing individuals who voted

3  in 2012.

4       So the one who do not have an ID at that time, when

5  the law comes into effect and the 2014 election is held,

6  turnout falls dramatically for that group.  And that

7  group is also disproportionately African-American.  Very

8  disproportionately African-American.  So that is -- that

9  is evidence of the law's impact that focuses only on

10  people who vote, and does not look at this larger

11  universe of registered voters.

12       The analysis goes a little bit further in that I

13  asked, well, let's not just look at people who voted in

14  2012.  Some people are presidential voters, and they

15  never turn out for midterms.  Let's look at people who

16  voted in 2010 and 2012, and let's call them habitual

17  voters.  But let's do the same thing for people who voted

18  in 2008 and 2010 and 2012.  Let's call them really

19  habitual voters.

20       In either of these forms of analysis, we get the

21  same thing.  The individuals whose are in the habit of

22  voting, the ones who did not have identification, were

23  less likely to vote in 2014 than individuals who did have

24  identification.  It's almost an obvious point to make,

25  but it's worth observing the size of that difference.

1 And so certainly some of those individuals who in 2012

2 did not have identification, some of them did go to the

3 DMV and get identification.  Some very small number of

4 them did the free ID, but those numbers were relatively

5 small.

6      Some of them also, as we were describing earlier,

7 ended up no longer on the voter file.  But the ones who,

8 you know, those who stayed on the voter file were also

9 less likely to vote after the law was passed.

10 Q    Dr. Thornton criticizes you for making a comparison

11 between the presidential 2012 election and the 2010

12 election.  What is your response to that?  I'm sorry, the

13 2012 and 2014 election.

14 A    My general response is that it is correct that we

15 would not want to -- we would not want to look at overall

16 turnout in a presidential year, and then look at overall

17 turnout in a midterm year and say the sky is falling.

18 Turnout is much lower.  Certainly we would not want to do

19 that.

20      The analysis I just described doesn't do anything

21 like that.  It looks at differential rates of turnout

22 reduction among these groups - those with ID and those

23 without ID.  So it doesn't fall prey to that problem.

24      It's also the case, though, that it's useful to

25 observe that turnout in 2014 and 2015 were low even

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 565

1   relative to other midterms, even if you ignore the

2   presidential election.  If we look at turnout as a share

3   of -- especially if you look at turnout as a share of the

4   voting age population because, as I described, the

5   registered voter population is decreasing.  So if you

6   look at turnout as a share of the voting age population,

7   it's been very low each of the last two major elections.

8   Q    One of the defense experts, Dr. Richman, has

9   submitted a report that argues that there potentially is

10  a large group of noncitizens who have been voting in U.S.

11  elections, and Virginia in particular.  Have you reviewed

12  Dr. Richman report?

13  A    Yes, I have.

14  Q    What are your conclusions about his findings?

15  A    Well, those findings have previously been reported

16  in an academic paper and on a blog post.  And they were

17  --

18  Q    By Dr. Richman?

19  A    Yes, and some co-authors.  And they received

20  considerable attention among political scientists.  And

21  in my view, were thoroughly discredited in an article

22  published in the same journal as the initial article.

23  It's called *Electorial Studies.*"

24       The follow-up article was written by Stephen

25  Ansolabehere, who was the founder and the principal

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 566

1 investigator who collected the data that Dr. Richman

2 used.  So it's the Cooperative Congressional Election

3 Study, which a large survey that started at MIT during

4 the time when I was there, and I had initially worked

5 with Professor Ansolabehere on this survey, so I know

6 some things about it.

7      It's a large survey that was attempting to sample

8 U.S. citizens.  But it was a very large survey, and it

9 did include a somewhat complicated question that was

10 asking at the same time several things about an

11 individual's citizen status, and how long they had been

12 in the country.  And it was a somewhat complicated

13 question that some individuals responded that they were

14 not citizens.

15      And so looking at the very small number of

16 noncitizen responders, Dr. Richman found that some of

17 them reported voting.  And also found that some of them,

18 when the data were actually matched with the voter file,

19 could have been verified to have voted.  And so it took

20 very small numbers of individuals with this status, and

21 said, well, if there are five people like this out of

22 10,000, then let's imagine then there must be 50 people

23 out of 100,000, and so on.  And then came to the

24 conclusion that there was a lot of noncitizen voting

25 going on.

1       And I think in retrospect, a rather obvious response

2 that Dr. Ansolabehere laid out in his electoral studies

3 response paper, was that there is always measurement

4 error associated with individual questions in a survey.

5 So if anyone here who has ever done a survey, perhaps did

6 so not very mindfully, might think of a time or two when

7 they've answered a question rather quickly without

8 answering it with care.  And this is something that

9 survey researchers understand very well and can quantify.

10 And so there were a variety of ways in which

11 Dr. Ansolabehere was able to try to assess the

12 measurement error associated with that particular

13 question.

14       So we always will expect a few -- some random noise

15 associated with any response in a survey.  And so what

16 Dr. Ansolabehere showed was that the noncitizen responses

17 were quite consistent with about what one would predict

18 from pure noise from measurement error.  And that given

19 the percentage of people who do actually vote, and people

20 who do report voting who are citizens, the number of

21 people who incorrectly identify themselves as

22 noncitizens, but who correctly identify themselves as

23 voters, was almost exactly where we would expect them to

24 be from a very standard understanding of measurement

25 error.

1    So I think Dr. Ansolabehere showed that the true

2   estimated number from his own survey of noncitizen voters

3   was basically zero.  And there's nothing in this report

4   that would lead me to believe anything different.  There

5   was some follow-up discussion of the fact that those who

6   reported that they were noncitizens had distinctive

7   pro-immigration views.

8       There was some discussion of the fact that those who

9   reported themselves to be noncitizens came from states or

10   counties were there were relatively large numbers of

11   noncitizens.  But these are things that we would also

12   expect to be true if there were respondents who were

13   citizens, but immigrants, and also whose English language

14   skills may not have been very good.  We would expect

15   those same things to happen under those circumstance.  So

16   I don't find those to be good responses to the

17   Ansolabehere critique, which I view as fairly devastating

18   to the main finding.

19       There was also a presentation of some information

20   from a recent panel survey where there were several

21   observations of the same individuals.  And the effort was

22   to show that in fact there was a sizeable number of

23   individuals who repeatedly claimed that they were

24   noncitizens.  But the important information we would need

25   then would be to know what the voting rates were among

1 those individuals, and that was not provided.

2      So I didn't see anything in that report that changed

3 my basic view, which is that that analysis had been

4 discredited.

5 Q    Has there been any other articles or research within

6 the literature concerning this issue that Dr. Richman

7 raised in his article and report?

8 A    Yes.  There's a group of scholars, the lead author,

9 which was John Alquist, they were intrigued by this

10 finding that, you know, a small number of people in a

11 large sample survey would report casually that they were

12 felons.  So they wanted to understand that a little

13 better and get at this issue of noise and measurement

14 error in surveys, so they did something that I find

15 collabyrinth, and also somewhat amusing.  They replicated

16 the same type of study, but instead of a question about

17 whether one was a citizen, whether they had voted, there

18 was a question about whether individuals had been ever

19 abducted by aliens.  And the finding was exactly the same

20 as Dr. Richman's findings, that a nontrivial number of

21 people in a survey will report that they've been abducted

22 by aliens.

23      So the lesson that we have to draw is either those

24 people were not taking the survey mindfully, or we

25 shouldn't take very seriously their having been abducted,

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 570

1  or alien abduction is far more common than we ever

2  thought.  I prefer personally for the first

3  interpretation.  But I think it shows the problem of

4  taking five people or 10 people in a 10,000 person survey

5  and trying to draw inferences about the possibility that

6  they have broken the law.  And that is something that

7  most social scientists at this point would not believe.

8       MR. SPIVA:  Thank you.

9       May I just confer for one second, Your Honor?

10       THE COURT:  Yes, sir.

11       MR. SPIVA:  Thank you, Dr. Rodden.

12       No further questions.

13       THE COURT:  I assume your cross-examination of the

14  Doctor will take some time?

15       MR. FINBERG:  Actually, my cross-examination of the

16  Doctor is going to be fairly short, certainly by

17  comparison of direct.

18       THE COURT:  That's a broad swath of time.

19       MR. FINBERG:  I don't think it's going to be more

20  than about 20 minutes, Your Honor.

21       THE COURT:  All right.  Go ahead.

22       Actually, on second thought, I'm going to take the

23  cross-examination tomorrow morning.

24       MR. FINBERG:  That's fine, Your Honor, with the

25  hazard it might me a little bit longer.  I'll go ahead

DIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 571

1  and take overnight to prepare it.

2      THE COURT:  You don't think I doubt your estimate,

3  do you?

4      MR. FINBERG:  No.

5      THE COURT:  All right.  Very well.

6      Doctor, you're excused until tomorrow morning.

7  We'll resume at 9:00.  Thank you, sir, for being here.

8      Until 9:00 tomorrow morning, Court will stand in

9  recess.

10      MR. FINBERG:  Thank you, Your Honor.

11

12              REPORTER'S CERTIFICATE

13      I, Krista L. Harding, OCR, RMR, Notary Public in
   and for the Commonwealth of Virginia at large, and
14  whose commission expires March 31, 2016, Notary
   Registration Number 149462, do hereby certify that
15  the pages contained herein accurately reflect the
   notes taken by me, to the best of my ability, in the
16  above-styled action.
        Given under my hand this 8th day of March, 2016
17
                    _____
18                    Krista M. Liscio, RMR
                      Official Court Reporter
19

20

21

22

23

24

25