```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                      Richmond Division

 3
    BARBARA H. LEE, et al.              }
 4                                      }
    v.                                  }   Civil Action No.
 5                                      }   3:15 CV 357
    VIRGINIA STATE BOARD OF ELECTIONS,  }
 6  et al.                              }

 7                                     February 24, 2016

 8          COMPLETE TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE HENRY E. HUDSON
 9           UNITED STATES DISTRICT COURT JUDGE

10  APPEARANCES:

11  Bruce V. Spiva, Esquire
    Joshua L. Kaul, Esquire
12  Aria C. Branch, Esquire
    Ceridwen Cherry, Esquire
13  Amanda R. Callais, Esquire
    PERKINS COIE, LLP
14  700 13th Street NW
    Suite 600
15  Washington, DC  20005
         Counsel on behalf of Barbara Lee, Gonzalo Brescia,
16       and the Democratic Party of Virginia

17
    Mark F. (Thor) Hearne, II, Esquire
18  Dana J. Finberg, Esquire
    Sara Schneider, Esquire
19  Kirsten Hart, Esquire
    Stephen Davis, Esquire
20  ARENT FOX
    55 2nd Street, 21st Floor
21  San Francisco, CA  94105
         Counsel on behalf of James B. Alcorn, Dr. Wheeler,
22       Singleton McAllister, Virginia Department of
         Elections, and Edgardo Cortes
23

24               KRISTA L. HARDING, RMR
                OFFICIAL COURT REPORTER
25             UNITED STATES DISTRICT COURT
```

```
                    E X A M I N A T I O N S

                   DIRECT    CROSS    REDIRECT    RECROSS

Dr. Rodden                    574       607         ---

Cheryl Zando        621       633       ---         ---

Cathy Woodson       637       650       654         ---

Keith Scarborough   656       680       687         ---

Susan Kellom        690       701       706         ---

Gonzalo Brescia     708       731       ---         ---

Kenneth Adams       738       742       ---         ---

Shanna Samson       746       750       ---         ---

Dr. Minnite         754       832       ---         ---
```

1      (Krista Harding is now the court reporter.)

2      THE COURT:  Good morning.

3      MR. SPIVA:  Good morning.

4      THE COURT:  We'll resume this morning with the

5  cross-examination of Dr. Rodden.

6      MR. FINBERG:  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8  BY MR. FINBERG:

9  Q    Good morning, Dr. Rodden.

10  A    Good morning.

11  Q    We've met before, but just for the record, my name is

12  Dana Finberg, and I'll be one of the attorneys

13  representing the defendants in this case.  I know we met

14  when we did your deposition in Palo Alto a few weeks ago.

15  A    Good to see you.

16  Q    Good to see you.

17      Dr. Rodden, I think it's important to define some of

18  the terms that you used in your reports, and in your

19  direct testimony, to help the Court understand some of

20  your opinions.  You've got in front of you Plaintiffs'

21  Exhibit 209, which is your opening expert report.  It's in

22  the binder that's right in front of you on the stand open

23  to the page already.

24  A    Okay.

25  Q    And, for example -- if you can go to Figure 3 on Page

1   15.   And, for example, when you use the term *"No ID"* in

2   this figure, and that same term appears in Figures 1

3   through 8, and in 14 of your report, what you mean is

4   people with no DMV ID, no free voter ID, no student ID

5   using your measure for those, and no military ID using

6   your measure for those, isn't that right?

7   A     That's correct.

8   Q     Okay.  And let's take a look at Figure 9, which is on

9   Page 35.

10       THE COURT:  You said Figure 9, Mr. Finberg?

11       MR. FINBERG:  Yes, Your Honor.

12       THE COURT:  All right.  Go right ahead.

13       What page is that on, sir?

14       MR. FINBERG:  Figure 9 on Page 35 of the report.

15       THE COURT:  Yes, sir.  Go right ahead.

16   BY MR. FINBERG:

17   Q     And, Dr. Rodden, when you use the term *"Enfranchised*

18   *Electorate,"* in Figure 9, what you mean is people that

19   have those four forms of ID, isn't that right?

20   A     Yes.  But in Figure 9, I believe it was created using

21   the first of my two ID possession approaches.  So I

22   believe Figure 9 is based on the possession of DMV and

23   free ID.

24   Q     Isn't that true for the 2012 number there,

25   Dr. Rodden, but as it goes forward in the years you used

1  the proxy for the student ID and the military IDs as well?

2  A    I'm looking at the report to make sure, but my

3  recollection is that I made these graphs using both

4  approaches.   I made one graph using the approach that only

5  considered the free ID and the DMV ID.

6       I made another set of graphs using the more expansive

7  definition.   And since the graphs looked so similar, I

8  didn't make a separate set.

9  Q    Okay.  So we're clear, so in Figure 9 when you're

10 using the term *Enfranchised Electorate,*" it's usually

11 only the two forms of ID - the free DMV ID and the free

12 voter ID?

13 A    My recollection is that that's what this figure does.

14 And I believe the report is clear about that.

15 Q    Okay.  So it's a narrower definition of ID possession

16 than the *no ID*" term that you used when you were talking

17 about figures, for example, Figure 3, which we just looked

18 at?

19 A    Yes.  But again, the result looks very similar if we

20 use the more expansive definition.

21 Q    I'm just trying to talk to you about defining the

22 terms that you used in your report.

23 A    Sure.

24 Q    When you use the term *photo ID,*" you're generally

25 again referring to people with those four forms of ID?

CROSS-EXAMINATION OF JONATHAN RODDEN, Ph.D.   577

1    We're talking about people who do have DMV ID, who have a

2    free voter ID, a student ID using your measure for those,

3    or a military ID using your measure for those?

4    A    Yes.   Those are the four.

5    Q    Okay.   So using your definitions, a person would fall

6    under the no ID category if they didn't have one of those

7    four forms of ID even if they had one of the following

8    forms of ID:   A passport, correct?

9    A    Correct.

10   Q    An employer-issued photo ID, correct?

11   A    Correct.

12   Q    A federal government-issued photo ID, correct?

13   A    Correct.

14   Q    A State of Virginia photo ID, correct?

15   A    Correct.

16   Q    A subdivision of the State of Virginia photo ID?

17   A    Correct.

18   Q    A Department of Defense photo ID?

19   A    Correct.

20   Q    A Department of Veterans Affairs photo ID?

21   A    Correct.

22   Q    A Tribal ID?

23   A    That's right.

24   Q    Dr. Rodden, you were here in Court yesterday when

25   Karen Stallings testified about her father?

1   A    Yes.

2   Q    He was the gentleman who went to the DMV and had

3   problems there?

4   A    Yes.

5   Q    And so you recall her father, who had a passport, but

6   didn't have a DMV ID, a free photo ID, a student ID, or a

7   military ID, would not be a member of the enfranchised

8   electorate using your definition?

9   A    That's right.

10  Q    And he would not be included where you've used the

11  label *valid photo ID*?

12  A    I'm now trying to recollect what the testimony was

13  about what he possessed.

14  Q    He possessed a passport.

15  A    I believe it was -- the claim was that the passport

16  was no longer valid.  I can't remember that.

17  Q    Let's assume that the passport was valid, because I

18  believe that was the testimony, and the record is going to

19  speak for itself, if he had a valid passport, he still

20  would not be included when you used the label *valid photo

21  ID,* isn't that right?

22  A    That's right.  That's one of the forms of

23  identification for which I had no information.

24  Q    And he would not fall within the group that you've

25  labeled *no ID*?

1   A    An individual who is on the voter file who does not

2   have a DMV ID, or one of the others we discussed, would be

3   treated as no ID.  So, yes, that individual would be in

4   this analysis if he was registered.

5        There was some discussion about whether he had been

6   registered.  I believe he was initially not registered.

7   In that case, he would not be in the data set because he

8   was an unregistered individual.  I only have data on

9   registered individuals.

10       So I believe the testimony was that he eventually was

11  registered.  So at that moment that he was registered, he

12  would have entered my data set as a registered voter.  But

13  if he had no DMV ID, and none of these other forms of ID,

14  but he did have a passport, then indeed he's one of the

15  people who would fall through the cracks of my analysis

16  and would be misclassified as not having an ID.  But he

17  would be in the data set if he was registered.  He would

18  have been in the no ID population.

19  Q    Well, on one day we had a witness here named Megan

20  Cotten, who was a registered voter, and testified that she

21  had a passport.  She left it in a box after she moved and

22  she didn't take it with her to the polls on election day.

23  She didn't have any of the forms of ID that you

24  considered, but you would still, in your analysis, have

25  her being unenfranchised, isn't that right?

1  A    That's correct.

2  Q    And you would have classified her as having no ID?

3  A    I was clear in the report, there are some individuals

4  who have other forms of identification other than the ones

5  I've been able to study.  And I'm very clear about the

6  fact that those individuals are misclassified.  It's the

7  inevitable.

8  Q    And on Monday, we also had a Cambridge University

9  student named Jack Etheredge, who was a registered

10 Virginia voter.  And he also testified that he didn't have

11 one of the four forms of ID that you considered, but he

12 had a valid passport.  Under your analysis, he wouldn't be

13 considered an enfranchised voter, would he?

14 A    That's right.

15 Q    And he would have fallen under the category that you

16 testified about as having no ID?

17 A    That's right.

18 Q    And I believe you were here yesterday for the

19 testimony of Abe Barranca, who was the young man who moved

20 to Virginia from New York because his significant other

21 got a job up in the northern Virginia area?

22 A    Yes.

23 Q    And he testified that he didn't have one of the four

24 forms of ID that you considered, but he did have a photo

25 ID issued by his employer.  Do you remember that?

1    A    Yes.

2    Q    And so using your definitions, he's not part of the

3    enfranchised electorate?

4    A    That's right.

5    Q    And using your definitions, he falls into the no

6    voter ID category?

7    A    Yes.

8    Q    And using your definitions, he would not be included

9    in the category of having a valid photo ID?

10   A    That's right.

11   Q    Dr. Rodden, let's talk a little bit more --

12       MR. FINBERG:  Darren, you can take that off the

13   screen.   Thank you.

14   BY MR. FINBERG:

15   Q    Let's talk a little bit more about the scope of the

16   opinions that you provided in this case.  You have not

17   provided an opinion, have you, as to the racial and ethnic

18   composition of Virginians who are eligible to vote, but

19   are not registered, right?

20   A    That's right.   It's something I would have liked to

21   have done, but did not have the data required.

22       MR. FINBERG:  Actually, Darren, I spoke too soon.   If

23   you can put Page 23 of the opening report on the screen,

24   please.

25   BY MR. FINBERG:

CROSS-EXAMINATION OF JONATHAN RODDEN, Ph.D.    582

1   Q    And if I can direct your attention, Dr. Rodden, to

2   Table 1 in your opening report.   It's on Page 23 of

3   Plaintiffs' Exhibit 209.   This is Table 1 in your opening

4   report.

5       And, Dr. Rodden, you performed the analysis

6   represented by Table 1 using only data from census blocks

7   that are either 100 or 90% homogeneous by race, isn't that

8   right?

9   A    That's right.

10  Q    Table 1 does not account for any voters in Virginia

11  who live outside of census blocks that are either 100 or

12  90% by race, isn't that right?

13  A    Yes.   As I testified yesterday, that's one of the

14  disadvantages of this approach.

15      MR. FINBERG:   If we could go to Page 24 of your

16  report.   Table 2.   Twenty-five, excuse me.   Not Page 24.

17      THE COURT:   Page 25?

18      MR. FINBERG:   Yes, Your Honor.   I apologize.

19  BY MR. FINBERG:

20  Q    And again, you performed that analysis represented in

21  Table 2 also using only data from census blocks to either

22  100 or 90% homogeneous by race?

23  A    That's correct.

24  Q    And so Table 2 also does not account for any voters

25  in Virginia who live outside of census blocks that are

1  either 100 or 90% homogeneous by race?

2  A    That's right.

3      MR. FINBERG:  You can take that off the screen,

4  Darren.  Thank you.

5  BY MR. FINBERG:

6  Q    Let's talk a little bit about military IDs,

7  Dr. Rodden.  Do you know whether a military ID can be used

8  to vote under Virginia law?

9  A    Yes.  I believe it can.

10  Q    And do you know who's eligible for a military ID?

11  A    I know that there is military members, but there are

12  also forms of ID that are issued by the military for

13  family members.

14  Q    So it's your understanding, isn't it, that spouses

15  and dependents of members of the military can obtain

16  military IDs?

17  A    I know they can.  What I don't know is the percentage

18  of them who have done so.

19  Q    And, for example, spouses and dependents of military

20  members would need an ID to get access to military

21  benefits?

22  A    I believe that's correct.

23  Q    And you would agree with me that contractors who work

24  on military bases also need military ID to get on base?

25  A    That is something I've not known before.

CROSS-EXAMINATION OF JONATHAN RODDEN, Ph.D.   584

1  Q     In order to estimate whether a registered voter

2  possessed a military ID, you relied in part on the field

3  in the voter registration list indicating whether the

4  voter is a member of the military, right?

5  A     Yes.

6  Q     Do you know how that information is collected?

7  A     I believe it's self-reported by the individual

8  military member.

9  Q     Does the field identify spouses of, or dependents of,

10 members of the military?

11 A     It does not.

12 Q     Does the field identify contractors who possess

13 military IDs?

14 A     No.

15 Q     So in the military field in the Virginia voter

16 registration files you relied on, you do not identify all

17 registered voters with the military ID, correct?

18 A     No.  I was clear about that in the report.  I did

19 more than the Commonwealth has done in that I attempted to

20 account for individuals living on bases.  And that would

21 indeed include family members.  I suspect it would not

22 include contractors if they did not have a residential

23 address on the base.

24       But I was clear in the report about the fact that

25 there are certainly additional military members who don't

1  live on base.  And that was, again, one of those

2  categories, like the passport holder we were discussing,

3  who I had no way of including in my analysis.

4  Q    So aside from the field in the voter registration

5  list, you considered only whether the voter had a

6  residential address in a census block contained within the

7  military base between 2010 and 2015, right?

8  A    That's correct.

9  Q    And so your estimates of military ID possession do

10 not account for members of the military who live off base

11 and are not self-identified as members of the military in

12 the voter registration file?

13 A    Yes.  And for them to fall into the no ID category,

14 they would have to be lacking a DMV ID.  And there's good

15 reason to believe that those living off base are more

16 likely to have a DMV ID than those living on base.

17 Q    Your estimates of military ID possession do not

18 account for spouses of the members of the military who

19 live off base?

20 A    Not if they live off base.  No.

21 Q    Your estimates of military ID possession do not

22 account for dependents of the military who live off base?

23 A    That's correct.

24     THE COURT:  And, Doctor, when you say they have DMV

25 ID, that would be both an operator's license as well as a

1   personal identification you can purchase through DMV, both

2   species of ID?

3        DR. RODDEN:  Yes.  The DMV files I received had

4   information on every form, any DMV-issued ID.  That's

5   correct.

6        THE COURT:  Go ahead.

7        MR. FINBERG:  Thank you, Your Honor.

8   BY MR. SPIVA:

9   Q    Dr. Rodden, do you know the number of military

10  members, and their families, who live off base?

11  A    I once knew the number.  I don't have that in my head

12  right now.

13  Q    And your estimates of military ID possession don't

14  account for contractors who work on military bases?

15  A    That's right.

16  Q    Do you know the number of contractors who work on

17  military bases?

18  A    I have no idea.

19  Q    If you could, take a look at the other binder that I

20  placed up on the stand this morning which has your reply

21  report.  It's Plaintiffs' Exhibit 216.  Dr. Rodden, it's

22  the other binder.

23  A    If I may finish the answer to the previous question?

24  Q    I think you did answer the question.

25  A    Okay.

1    THE COURT:  Did you not have a chance to complete

2 your answer, Doctor?

3    DR. RODDEN:  Well, I only wanted to point out that it

4 would be difficult for a contractor to bring materials

5 into the base without a DMV ID.  That would seem unlikely

6 to me.  But I suppose it's possible one could hitch a

7 ride.

8    THE COURT:  All right.  Clarification is noted.

9    Go right ahead.

10    MR. FINBERG:  Thank you, Your Honor.

11 BY MR. FINBERG:

12 Q    If I could direct your attention to Page 7, the first

13 paragraph.  Do you see that?

14 A    Yes.

15 Q    And in your reply report, you compared the percentage

16 of African-American registered voters in Virginia to the

17 percentage of African-Americans who are active duty forces

18 in the United States, is that right?

19 A    Yes.

20 Q    But for purposes of estimating ID possession, the

21 relevant population is actually Virginia voters that have

22 a military ID, but don't have a Virginia-issued DMV ID,

23 correct?

24 A    That's correct.

25 Q    And you don't know anything about the racial and/or

1   ethnic demographics of that group, do you?

2   A    No.  I can only report what I've reported here, the

3   overall information for the military.  I would like to

4   have reported information that was Virginia specific, but

5   I was unable to find that information.

6   Q    In your reply report, you don't dispute

7   Dr. Thornton's assertion that there are 830,000 veterans

8   in Virginia, do you?

9   A    I didn't look up the number.  But that seems entirely

10  plausible.

11  Q    And your estimates in your reports don't account for

12  the veterans who possess military IDs?

13  A    It's unclear to me whether the military designation

14  on the voter file might include that trend.  That's

15  something I've not been able to get clarity on.  But

16  beyond that, if they're living off base, then exactly, I

17  don't have any information that would allow me to code

18  them as veterans, unfortunately.

19  Q    And your estimates also don't account for spouses of

20  veterans who possess military IDs?

21  A    That's right.

22       THE COURT:  The figure of 830,000, was that military

23  veterans with ID, without ID, or unspecified?

24       MR. FINBERG:  Your Honor, that's 830,000 veterans.

25       THE COURT:  Veterans.  Unspecified whether they have

 1  military ID?

 2       MR. FINBERG:  Correct, Your Honor.

 3       THE COURT:  Okay.  Go ahead.  Next question.

 4  BY MR. FINBERG:

 5  Q    And on Page 7 of your reply report, the section that

 6  we've been talking about, you state that Virginia's

 7  veteran population has a similar racial and ethnic

 8  composition to the population of registered voters, right?

 9  A    That's correct.

10  Q    Again, the relevant population is veterans that have

11  a military ID, but not the Virginia DMV ID, right?

12  A    That's correct.  But I have no reason to believe that

13  demographics are substantially different of the group that

14  does not have -- that possesses a card identifying them as

15  a veteran but does not possess a DMV ID.  I can't think of

16  a good theory for why that group would be racially --

17  would have a different racial composition.

18  Q    But you haven't conducted that analysis?

19  A    Because I don't have the data.  If I could conduct

20  that analysis, then I suppose we wouldn't be having this

21  conversation.

22  Q    No.  But you didn't have the data to do that?

23  A    That's correct.

24  Q    If we can go back to your initial report.  And I'm

25  sorry to be jumping back and forth between these.  It's

1    Plaintiffs' Exhibit 209.  And ask you to go to Page 32,

2    Table 6.  Are you with me here?

3    A     Yes.

4    Q     Thank you.  Looking at Table 6 of your initial

5    report, based on just the DMV ID, and the two proxies for

6    military and student IDs that you used, you account for

7    95% of the registered voters in Virginia, right?

8    A     Yes.  And as I described yesterday, I think that's a

9    rather high estimate.

10   Q     In Table 6, you report that 4.1% of non-Hispanic

11   whites did not match based on those criteria, right?

12   A     That's right.  That's the estimate.

13   Q     And then this analysis would then show that at a

14   minimum, 95.9% of whites have an ID, right?

15   A     Yes.  I would say at a maximum.

16   Q     At a maximum?

17         Table 6, you report that 5.4% of blacks did not match

18   based on these criteria, right?

19   A     That's right.

20   Q     This analysis would then show that at a minimum,

21   94.6% of blacks do have an ID, right?

22   A     Again, I would say that's as a maximum.

23   Q     As a maximum?  Okay.

24         And at Table 6, you report that 5.6% of Hispanics did

25   not match based on this criteria?

1   A      Yes.

2   Q      So this analysis would then show that at a maximum,

3   94.4% of Hispanics have an ID?

4   A      Yes.

5   Q      Okay.  Did you conduct any analysis to support your

6   suggestion on Page 33 of your report, which is on the next

7   page, "*that urban renters who frequently change addresses,*

8   *and hence are in greater danger of falling into 'inactive'*

9   *status,*" account for the reduction of number of voters

10  without ID?

11  A      Yes.  The --

12  Q      You say you did conduct an analysis?

13  A      Yes.  The individuals -- this is something that one

14  can find in the reports of the Commonwealth.  The no ID --

15  to no ID status of someone who is an inactive voter is

16  very different than the no ID status of people who were

17  active voters.  So we know that there are larger numbers

18  of inactive voters without ID.  And we know that when one

19  is an inactive voter, one is in danger of being removed

20  from the voter file if one does not have some activity

21  very quickly.

22          So I did report -- in the report, I show that

23  individuals who are without ID are much less likely to

24  stay on the voter file than individuals that have ID.  So

25  we put those facts together, and I think that explains

1  where this claim --

2  Q    Dr. Rodden, do you remember being asked that question

3  in your deposition?

4  A    No.  Not particularly.

5  Q    You don't recall being asked in your deposition did

6  you conduct any analysis to support your opinion about --

7  the opinion that urban renters who frequently change

8  address, and hence are in greater danger of falling into

9  inactive status, account for the reduction of voters

10 without ID?

11 A    Well, I may have -- it's true that I did not conduct

12 analysis of renters in urban status and show that city

13 residents were more likely to fall off the voter file.

14 What I showed was that inactive voters, again, just using

15 the information from the Commonwealth, were more likely,

16 almost by construction obviously.  And we know that these

17 groups -- we went through some maps yesterday showing that

18 those groups, those no ID groups, are concentrated in city

19 centers.

20     THE COURT:  Doctor, would you be able to quantify the

21 number of individuals who perhaps were deceased and

22 therefor off the voting rolls?

23     DR. RODDEN:  The Commonwealth of Virginia is very

24 good at very frequently checking the death registry.  So

25 my understanding, and perhaps there will be another

1   witness from the Commonwealth later who can clarify this,

2   my understanding is that when an individual is discovered

3   in the death registry, they are gone from the voter file

4   very quickly.

5          And this is not true of the DMV file.  I believe

6   there are individuals who have been deceased for some time

7   who are still on the DMV files, because those files were

8   larger than they should have been.  They're very large.  A

9   lot of entries on there that seemed wrong.

10         THE COURT:  Thank you, Doctor.

11         Go right ahead.

12  BY MR. FINBERG:

13  Q    And those potential voters also could have moved out

14  of state, right?

15  A    Those who are being removed from the voter file?

16  Q    Yes.

17  A    Absolutely.  Yes.

18  Q    But I do want to revisit, because you've testified

19  here this morning that you did conduct an analysis to

20  support the suggestion that urban renters who frequently

21  change addresses are in greater danger of falling into

22  inactive status, because I'd like to just show you what

23  you said at your deposition.  You remember being deposed,

24  right?

25  A    Yes.

1  Q    And do you remember taking an oath to tell the truth

2  during your deposition?

3  A    Yes.

4  Q    Same oath you took when you testified here this

5  morning?

6  A    Yes.

7        (Video deposition being played at this time.)

8        THE COURT:  You're going to need to increase the

9  volume a little bit.  I can't hear it very well.

10       (Video deposition being played at this time.)

11  BY MR. FINBERG:

12  Q    So, Dr. Rodden, when we took your deposition, you

13  testified under oath that you had not conducted that

14  analysis, yet this morning, testifying under the same

15  oath, you're telling us that you did?

16       MR. SPIVA:  Object, Your Honor.  There was no

17  contradiction in the testimony.

18       MR. FINBERG:  There's a clear contradiction in the

19  testimony, Your Honor.

20       THE COURT:  I'll let you clarify that.  I'm not sure

21  I have enough of a base of information to really respond

22  to the objection, quite frankly, without some

23  clarification, all right?  Seems to me very clearly he

24  said he did conduct the analysis, did he not?

25       MR. FINBERG:  This morning, Your Honor.  Yes, he did.

1        THE COURT:   Okay.   And he said in his deposition that

2   he did not have the time because of our scheduling here.

3   So I think the Doctor should have an opportunity to

4   clarify his answers.

5        And you may do so, Doctor.

6   A    The sentence that you asked about was a rather long

7   sentence that involved several components.   The answer I

8   gave was -- and I believe if we would continue in the

9   deposition, there would be a bit more on this.   I don't

10  recall.

11       But what I was referring to is I did not have the

12  chance to break the data down by urban residents versus

13  suburban residents and rural residents.   I did not get a

14  chance to analyze whether individuals were renters or

15  owners.   These are all things I could have done.   These

16  data are available in the census at the block level.

17       So what I was referring to -- the thing that as a

18  political scientist, whose interested in urban form and

19  urban economics, this is something I like to do.   It's a

20  rare treat for me to have individual level data with

21  millions of observations that I don't really get to keep

22  at the end of the trial.

23       So one of the things I would love to have learned is

24  what is the rate at which renters versus owners end up

25  leaving the voter file.   Because one of the things

1  political scientists believe is happening, based on

2  surveys, is that renters are moving around a lot and they

3  don't have stable addresses.  And when they get that card

4  that then puts them in the inactive status, and puts them

5  in danger of being removed from the voter file, that

6  renters are more likely to then fall into inactive status.

7  That is the type of analysis I was stating I did not have

8  the opportunity to do.

9      What I did have the opportunity to do is what I've

10  already described, which is in the report.  And I think

11  it's very clear.  I was able to look at one's probability

12  of staying on the voter file if one has ID, vis-a-vis the

13  probability of staying on the voter file if one does not

14  have ID.  And what I also have shown rather clearly is

15  that those who do not have ID tend to concentrated in

16  urban neighborhoods where we can see -- even without doing

17  a lot of analysis, we can see these are renters.  We can

18  look at those maps.

19      Anyone who knows Richmond or knows Roanoke, can look

20  at those maps and see that we're talking about a

21  population of renters.  When we zoom in on the kinds of

22  Section 8 housing that was discussed by some of the fact

23  witnesses, we can zoom in at the individual level and see

24  that there are very high rates of no ID possession in

25  those places.  So that is all analysis that I had

1   conducted.

2        But I was referring to a very specific question of

3   whether I had analyzed renters, and whether I included a

4   report -- a table in my report about renters versus owners

5   or urban versus rural.  I did not.  I relied on maps for

6   that.  And I assume that the reader could look at the maps

7   and draw some of those conclusions.  I did not have the

8   time to include additional tables about renters versus

9   owners, urban versus suburban residents.

10        THE COURT:  Next question.

11        MR. FINBERG:  Thank you, Your Honor.

12   BY MR. FINBERG:

13   Q    Dr. Rodden, the photo ID issued by the Department of

14   Veterans Affairs can be used to vote in Virginia, right?

15   A    Yes.

16   Q    But in none of the estimates of the rate of ID

17   possession in your opinions account for registered voters

18   in Virginia that lack a DMV ID, but possess a photo ID

19   issued by the Department of Veterans Affairs?

20   A    That's correct.

21   Q    And you don't provide any opinion about the racial

22   and/or ethnic demographics of that group, do you?

23   A    I merely reported data from the census on the racial

24   and ethnic composition of veterans in Virginia.

25   Q    But you don't break that down and give an opinion

1   about the demographics of the group of people who have

2   Department of Veterans Affairs IDs, but don't have a DMV

3   ID?

4   A     That's right.  I don't have the ability to do that.

5   Q     And as we're learned, a passport can be used to vote

6   in Virginia, right?

7   A     That's right.

8   Q     But none of the estimates of the rate of ID

9   possession, in your opinions, account for registered

10  voters in Virginia that lack a DMV ID but possess a

11  passport?

12  A     That's correct.

13  Q     And as we've seen from the testimony in this case,

14  there are people that fall into that category, don't they?

15  A     Certainly.

16  Q     And you don't provide any opinion about the racial

17  and or ethnic demographics of that group, do you?

18  A     No.

19  Q     And the only information you provide on the

20  demographics of passport holders generally is from a

21  survey of 200 residents in Virginia, right, the SPAE?

22  A     I also report information about the United States

23  more generally.  But the Virginia sample I had was small.

24  That's correct.

25  Q     And of that survey of 200 residents of Virginia,

1  approximately 20% of those would be black or

2  African-American?

3  A    I don't remember the demographics of the survey.

4  It's meant to be nationally representative.  Whether it

5  was representative of the racial groups in Virginia, I

6  don't know.

7  Q    Do you know whether the sample was representative of

8  the population of Virginia?

9  A    I know that the study authors attempted for it to be

10 nationally representative.  Whether they achieved that

11 within individual states is largely a matter of luck.  And

12 whether they achieved it in Virginia, I don't know.

13 Q    Well, if 20% of that group of the survey of 200

14 residents was African-American, that would mean that 40 of

15 the 200 would likely be African-American respondents,

16 isn't that right?

17 A    If that was the -- if those were the correct numbers,

18 yes.

19 Q    And so extrapolating the math of that 200, then you

20 had the 40 black respondents, 19% would have had a

21 passport?

22 A    We just don't know that.  The -- what we know is that

23 passport possession among African-Americans is far lower

24 than among whites nationally.  And I have no reason to

25 believe that Virginia is any different.  And I don't

 1   believe that that survey suggested that it was different

 2   in Virginia.

 3   Q     But if 19% of the respondents to that survey had a

 4   passport, that would have been about 8 out of those

 5   potentially black respondents, wouldn't it?

 6   A     I would not have any reason to imagine that

 7   African-Americans have passports at a rate other than what

 8   is reported in the survey.  Are you representing that

 9   those are the number of African-American passport holders

10   in the survey.  The question is asked, and it's broken

11   down by race.  So I wouldn't want to extrapolate some

12   numbers.  The numbers should be there in the survey.  I

13   thought I had reported those numbers.

14   Q     A photo ID issued be the Department of Defense can be

15   used to vote in Virginia, correct?

16   A     Yes.

17   Q     None of the estimates of the rate of ID possession

18   that you give, account for registered voters in Virginia

19   that lack a DMV ID, but possess a photo ID issued by the

20   Department of Defense?

21   A     That's correct.

22   Q     And you don't provide any opinion about the racial

23   and/or ethnic demographics of that group?

24   A     That's correct.

25   Q     Any photo ID issued be the federal government can

1   also be used to vote in Virginia?

2   A     That's correct.

3   Q     But again, none of your opinions or estimates of the

4   rate of ID possession account for registered voters in

5   Virginia that lack a DMV ID, but possess any type of photo

6   ID issued by the federal government?

7   A     The one thing I did to combat that concern was

8   reanalyze --

9   Q     Could you answer that yes or no before you explain?

10  A     I don't remember now the formulation of the question.

11  I believe it's, no, I did not directly study individuals

12  with forms of identification for which I had no data.

13        But I -- in order to satisfy myself that there wasn't

14  a big problem with holders of federal forms of

15  identification, I did drop the localities surrounding the

16  Washington, D.C. area from the analysis, and confirmed

17  that the gaps between groups presented in the rest of the

18  report were very similar, even if we get rid of the metro

19  Washington, D.C. area, which would just remove from the

20  analysis all the types of individuals who might be

21  commuting to federal employment opportunities in

22  Washington, D.C.

23        THE COURT:  And what counties did you include in that

24  given the long commute that so many folks have in northern

25  Virginia?  What was the geographic area that you backed

1   out here, Doctor?

2       DR. RODDEN:   I would have to go back to my files and

3   check.   I don't think I had an expansive -- it's possible

4   that people commute father than I imagine they do.   But I

5   took the immediate localities, you know, the obvious ones

6   that are surrounding the Washington, D.C. area.

7   BY MR. FINBERG:

8   Q    It's possible, isn't it, Dr. Rodden, that people

9   having a federal ID live outside the Washington, D.C.

10  area?

11  A    Indeed it is.   And I'm sure there are some

12  individuals working in federal jobs throughout Virginia.

13  That's true in other states as well.

14  Q    And you don't provide any opinion about the racial or

15  ethnic demographics of the group of people who have a

16  photo ID issued by the federal government, but don't have

17  a DMV ID?

18  A    No.   Again, I can only look at the racial composition

19  of the federal workforce and see that it is not

20  disproportionately made up of minorities.

21  Q    You read Dr. Lichtman's reports in this case, didn't

22  you?

23  A    I looked very quickly at them.   I can't say that I've

24  read them carefully.

25  Q    And do you have any basis to dispute the data

1  referenced by Dr. Lichtman showing that African-Americans

2  are more likely to hold a government job?

3  A     In Virginia?

4  Q     Yes.

5  A     I have no reason to dispute it.  I don't know the

6  data source, but it seems plausible that the percentage of

7  African-Americans with a government job is slightly higher

8  than the percentage of whites with a government job.

9  Q     Any photo ID issued by the State of Virginia can be

10 used to vote in Virginia, right?

11 A     That's correct.

12 Q     And none of your estimates or opinions regarding the

13 rate of ID possession account for registered voters in

14 Virginia that lack a DMV ID, but possess a photo ID issued

15 by the State of Virginia?

16 A     No.  I was satisfied on that count that the

17 Commonwealth had analyzed those data, and they did not

18 provide them to me.  But there was a study by the

19 Commonwealth that didn't match those individuals to the

20 voter file, and found -- and the DMV file, and found that

21 those in possession of state identification, who did not

22 already have DMV identification, were such a trivial

23 number that the Commonwealth didn't pursue that analysis

24 any further.

25 Q     And you don't provide any opinion about the racial or

1  ethnic demographics of the group of voters that have a

2  photo ID issued by the State of Virginia but don't have a

3  DMV ID?

4  A    I'm sorry.  Which type of photo?  Employment, did you

5  say?

6  Q    No.  The photo ID issued by the State of Virginia.

7  A    No, I did analyze the free ID issued by the State of

8  Virginia.  It's included in all of my tables and charts.

9  Q    I'm not including what's -- I understand the

10 confusion.  It was an inartful question.  Take out of that

11 the free voter ID.  I'm talking more about somebody who

12 works for the State of Virginia.

13 A    That's right.  I did not have access to those data.

14 Q    And apologies for the question.  It was not artfully

15 stated.

16      A photo ID issued by a political subdivision of the

17 State of Virginia can be used to vote in Virginia?

18 A    That's correct.

19 Q    And none of your estimates or opinions of the rate of

20 ID possession account for registered voters in Virginia

21 that lack a DMV ID, but possess a photo ID issued by a

22 political subdivision in the State of Virginia?

23 A    No.  I don't think anyone has any information on

24 whether these subdivisions issued photo IDs, or how many.

25 Q    Well, you know that some of them issued photo IDs,

CROSS-EXAMINATION OF JONATHAN RODDEN, Ph.D.   605

1  don't you?

2  A     I don't really know.  I assume some do you.  I just

3  have no data on this, and neither does the Commonwealth.

4  Q     And since you didn't have any data, I'm assuming that

5  the answer to this question is no.  But you didn't provide

6  an opinion about the racial or ethnic demographics of that

7  group of voters?

8  A     That's correct.

9  Q     The tribal photo ID can also be used to vote in the

10  State of Virginia?

11  A     That's correct.

12  Q     But none of your estimates of ID possession account

13  for registered voters in Virginia that lack a DMV ID, but

14  possess the photo ID issued by a tribe recognized by the

15  State of Virginia?

16  A     That's correct.

17  Q     And you don't provide any opinion about the racial or

18  ethnic demographics of that group?

19  A     I -- no, I do not.

20  Q     And the photo ID from a private or public high school

21  can you used to vote in Virginia.

22  A     Evidently so.

23  Q     But none of the estimates of ID possession, or the

24  opinions that you give about ID possession, account for

25  register voters in Virginia that lack a DMV ID but possess

1  a private or public high school ID?

2  A     No.

3  Q     And you don't give any opinions about the racial or

4  ethnic demographics of that group?

5  A     No.

6  Q     Harkening back to somebody like to Mr. Barranca who

7  testified yesterday, an employer-issued photo ID can be

8  used to vote in Virginia?

9  A     That's right.

10  Q     But none of the estimates of the rate of ID

11  possession that you give account for registered voters in

12  Virgina that lack a DMV ID, but possess an employer-issued

13  ID?

14  A     That's correct.

15  Q     And you don't provide any opinion about the racial or

16  ethnic demographics of that group?

17  A     That's correct.

18  Q     Dr. Rodden, you haven't provided an opinion as to the

19  number of registered voters without an acceptable form of

20  ID to vote, have you?

21  A     I believe my tables consist of percentages.  And I

22  did not report the raw numbers in the reports.

23  Q     And so while you may have given percentages, you

24  haven't provided an opinion as to the actual number of

25  African-American registered voters in Virginia without an

1    acceptable form of ID to vote, have you?

2    A    I did not provide that in my report, no.  But it

3    certainly could be calculated from all the numbers that

4    are there.  The data that were also turned over to

5    counsel, could be easily calculated from those data.

6    Q    But you haven't provided those numbers with regard to

7    any of the categories of the valid forms of ID, or the

8    photo IDs that we've talked about?

9    A    Not in the reports.  No.

10   Q    And in your report, you had a narrower category of

11   what you considered the types of IDs that you considered,

12   correct?

13   A    Yes.  I had two categories.

14   Q    And for neither of those categories did you provide

15   the actual number of affected voters.  You provided

16   percentages?

17   A    That's correct.  But if someone simply looks at the

18   number of registered voters in the state, one can back out

19   those numbers.

20        MR. FINBERG:  No further questions, Your Honor.

21        THE COURT:  All right.  Redirect of Dr. Rodden.

22        MR. SPIVA:  Yes, Your Honor.

23                    **REDIRECT EXAMINATION**

24   BY MR. SPIVA:

25   Q    Good morning, Dr. Rodden.

REDIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D. 608

1  A      Good morning.

2  Q      Dr. Rodden, do you recall at the beginning of

3  cross-examination that counsel asked you about a number of

4  people who had provided testimony in this case who had one

5  form of an ID or another, but not a DMV ID?  Do you recall

6  that?

7  A      Yes.

8  Q      And one of those was Karen Stallings, whose father, I

9  think, -- what race was Karen Stallings, do you recall?

10 A      I believe she was white.

11 Q      And would her father have fallen within the data set

12 that you were analyzing?

13 A      Only at the point that he was registered.

14 Q      And then Megan Cotten, I believe the testimony that

15 was referred to was that she had a passport but no DMV ID.

16 Do you recall what Ms. Cotten's race was?

17 A      I believe that testimony took place before I was

18 here.

19 Q      Okay.  Okay.  And then there was Jack Etheredge.

20 Were you here for his testimony?

21 A      You might have to remind me of which --

22 Q      He had a passport, but didn't have one of the

23 required forms.

24 A      Yes, I believe I was -- well, I'm sorry.  There were

25 a lot of witnesses.

609

1   Q    Sure.  Sure.  Well, let me ask you this -- and Abe

2   Barranca was the other one.  Were you here for that one?

3   A    Yes, I was here for that one.  Yes.

4   Q    Okay.  And do you recall that Mr. Barranca was white?

5   A    I recall he self-identified as white.

6   Q    Okay.  Assuming for a minute that all of the

7   individuals who you were asked about were white, if you --

8   and assuming that they had a form of ID that you weren't

9   able to capture but did not actually have a DMV ID, what

10  would that -- and assume also that you were able to

11  actually account for them, what would that have done in

12  terms of your analysis in terms of the relative ID holding

13  between whites and blacks and Hispanics?

14  A    That's right.  It's one of the concerns that I've had

15  with my analysis from the beginning that these additional

16  forms of ID are disproportionately held by whites.  So

17  I've introduced some error into all of these analyses by

18  overestimating.  You know, there are -- I've

19  underestimated, I'm sorry, ID possession among whites.

20       So there is probably a slight -- you know, if we

21  account for these additional individuals, they're likely

22  to be disproportionately white, especially when it comes

23  to passports, which is the second most commonly held form

24  of identification by far, after drivers licenses and other

25  forms of DMV ID.  So we know that possession of passports

1   is something that is highly correlated with income.  And

2   around the country, we know that African-Americans are

3   half as likely to hold passports as whites.

4       So a story in which passport possession among those

5   who do not have DMV ID is disproportionately

6   African-American is just hard to imagine how that would

7   work.  It seems more likely that if we accounted for those

8   individuals, like the ones who have been in the courtroom,

9   that in fact we would have come up with a higher rate of

10  ID possession estimate among whites, and the gap between

11  whites and African-Americans would have grown.

12      So all of these estimates, by missing these other

13  forms of ID, and only focusing on DMV ID, military ID, and

14  student ID, student ID is probably disproportionately held

15  by African-Americans because, as Dr. Thornton has

16  testified, the student population is actually a bit

17  disproportionately African-American in Virginia.  So I've

18  accounted for the forms of ID that are typically held by

19  African-Americans.

20      The ones I've not been able to account for are ones

21  that I'm worried are asymmetrically held by whites.  So if

22  anything, my estimates of the gaps in ID possession

23  between African-Americans and whites are likely attenuated

24  as a result of that.  It's just the cost of doing this

25  type of analysis.  We can only deal with the data that

1 have been provided, and can't really go much further.  We

2 can ask questions from other sources like the military

3 reports on the racial and ethnic composition of the force.

4 We can look at census data on veterans.  We can look at

5 survey data on ID possession to examine who has these IDs,

6 and are they likely to have a DMV ID already.  And the

7 answer to that question is overwhelmingly yes.  And

8 Dr. Thornton has produced data to also indicate that.

9        So we then have to ask this narrower question, which

10 is what is likely to be the race of those individuals?

11 And in certainly the case of passports, it's more likely

12 to be white.  But I don't have reason to suspect that the

13 opposite is true of any of these other forms of

14 identification.

15 Q    And you mentioned in terms of passport holding when

16 you were asked about that on cross, that you believed you

17 had reported the data, or the survey data that is out

18 there on that.  Could you turn to Page 5 of your reply

19 report.

20      MR. SPIVA:  And I don't know if we have control of

21 the screen.  Is it possible to put that on there?

22 BY MR. SPIVA:

23 Q    And I'll just ask you, is this where you reported --

24 was this what you were referring to in terms of the

25 numbers that you had reported on passport holding in your

1  reports?

2  A    Yes.  I believe so.

3  Q    Is this consistent with what you were just saying

4  about the relative rates of passport holding between

5  African-Americans and whites?

6  A    Yes.  That 55% of whites reported possessing a

7  passport, and 34% for African-Americans.  In an earlier

8  survey, it was 53% versus 19%.

9       I believe the question though pertained to the

10 individuals who do not have DMV ID, but who do have

11 passports.  And my recollection was that -- and I thought

12 I had provided that information somewhere else in the

13 report, but that number was very low.  I think it was --

14 there may have been only one person in Virginia.  And I

15 don't recall the race of that person.

16 Q    Okay.

17 A    But overall, one of the things we know is that these

18 -- possessing these forms of ID is highly correlated.  If

19 you have one, you're very likely to have the other.  So we

20 don't get a lot of additional people when we introduce

21 passports.

22      And this was also discovered in the Texas case.

23 There was -- there have been a couple of cases in which

24 the plaintiffs did have -- and actually because the

25 federal government was the plaintiff, they had access to

1  federal data resources that I did not have access to.  So

2  those plaintiffs' experts did have a nice list of passport

3  holders.  And they discovered that the numbers of

4  individual who had passports who did not have DMV ID were

5  very small.  There were certainly some --

6      THE COURT:  Now, were those statistics based upon

7  people in Texas who were eligible to vote?

8      DR. RODDEN:  There was also a registered voter

9  analysis.  It was a very similar type of analysis where

10 the researcher had access to the DMV files, and the voter

11 file, and the voter file was really the heart, the anchor,

12 of the analysis.  And then matches were done with all

13 these other --

14     THE COURT:  And how did that determine which voters

15 had passports?

16     DR. RODDEN:  They got from the federal government a

17 list.  I believe these data are very well-protected for

18 good reason for privacy.  I think they actually got

19 someone at the federal government to conduct a matching

20 exercise using Social Security numbers, and then the

21 plaintiffs were given a list of voter ID numbers of

22 individuals in Texas who possessed passports.  And then it

23 was possible to merge on the voter ID number, and do the

24 analysis.

25     THE COURT:  Thank you, Doctor.

1    DR. RODDEN:  That's what I would like to have done

2  here, but did not have the data.

3    THE COURT:  All right.

4    MR. SPIVA:  Thank you.

5  BY MR. SPIVA:

6  Q    And, Dr. Rodden, you were asked about your

7  homogeneous block analysis.  And that's just one of the

8  three forms of analysis that you did in your report to try

9  to determine the gap in photo ID holding, is that correct?

10  A    Yes.

11  Q    And do you know, I don't mean to put you on the spot,

12  do you know how many, say, homogeneous blocks there are in

13  Virginia, you know, as among the races?  And again, I

14  don't mean to put you on the spot.

15  A    It's in the report.  It's in the thousands.  This is

16  a fact of life in the United States.  People are

17  residentially segregated.  A lot of people do live in very

18  homogeneous blocks.

19      It's also the case that -- if we think about it, the

20  homogeneous block analysis is -- if we think about what we

21  don't like, and I say "we," meaning there are things I

22  don't like about it, and I gather a reasonable person

23  would have the same critique, well, why do you want to

24  ignore all the heterogeneous suburbs where

25  African-Americans and whites live on the same block?  One

REDIRECT EXAMINATION OF JONATHAN RODDEN, Ph.D.  615

1 of the things we might imagine is that in heterogenous

2 suburban areas, these are higher income areas where

3 African-Americans and whites are both very likely to have

4 DMV ID.  And indeed, in those maps, remember we saw a ring

5 of white dots surrounding every metro area where there

6 were, you know, very high rates of ID possession.  These

7 are higher income suburbs that tend to be more racially

8 integrated.

9      So if we imagine that everyone has an ID in those

10 places, then we're going to estimate interracial

11 differences in ID possession.  It ultimately comes down to

12 a comparison of very African-American urban block groups

13 and rural, overwhelmingly white, block groups if we're

14 assuming -- if we believe that suburbs tend to be very

15 high ID possession rates, and those are the racially

16 integrated places.

17      So if we believe that is the way the world works,

18 then the homogeneous block analysis is not so far off the

19 mark.  It's not so bad a first cut at the data.  And I

20 meant to present the data in a way that just allowed for

21 explorations or poke at the data from a variety of

22 different ways.

23      I find that different individuals respond to these

24 data very differently.  If I explain to someone like my --

25 you know, just in the classroom, some undergraduates, what

1  homogeneous block analysis is or homogeneous precinct

2  analysis is, some of them think that makes a lot of sense.

3  It really resonates with them.  Others think that's crazy.

4  Why would you do that.  My own personal view is that

5  ecological inference analysis is a better way to confront

6  the data.

7      But I do think that it's almost -- it's a nice first

8  cut.  It's useful to look at.  I would direct the Court to

9  the ecological inference analysis, especially because --

10  and I want to stress, we have block level data.  And this

11  is rare.  This is a new era in data analysis in the

12  courtroom.  Only in the last few years are we in a

13  situation where experts can get data sets that have

14  millions of observations.

15      And I had several instances of the voter file, each

16  of which we had over 5,000,000 lines, and lots and lots of

17  columns, and then I received DMV data that had information

18  for over 6,000,000 individuals, and lots of different

19  columns.  Only recently did we actually have the ability

20  to just play around with there type of -- it still takes a

21  long time to do the analysis, but we now can get

22  individual-level data.  We can place people in blocks, and

23  we can look at homogeneous blocks.  This was not something

24  expert witnesses could do even seven or eight years ago.

25      So the ability to geocode all the individuals, do the

1  matches, this is, I think, a very attractive form of

2  analysis.  And even the homogeneous block analysis is, I

3  think, quite convincing.

4  Q    Thank you.  You were asked about the spouses of

5  veterans having ID.  Have you seen any evidence in this

6  case, any documents, anything from either from -- that was

7  produced by the defendants, or anywhere else, that

8  suggested that the spouses of military veterans have some

9  type of veteran or military ID?

10 A    That is not something I've heard before.  But it's

11 plausible.

12 Q    And you were asked, I think at least twice, about the

13 various forms of IDs for which you didn't have data and

14 therefore didn't directly consider veterans subdivisions

15 in Virginia, et cetera.  Did you conduct any kind of

16 robustness check to satisfy yourself that if you had data

17 on those various forms of ID, that it wouldn't totally

18 change your conclusions?

19 A    Yes, I did some analysis of -- well, I believe I've

20 already described kind of verbally a lot of the logic of

21 what I did, which is to examine empirically from the bits

22 of evidence we have whether individuals in large numbers

23 have other forms of ID but do not have DMV ID.

24     Certainly, such -- there are such individuals.  I

25 don't have reason to believe the numbers are very large.

1  But then going further, I've also examined the likely

2  racial and ethnic composition of those groups.

3       But then to take it a bit further, I've done

4  calculations where I take the most conservative estimates

5  of the gap in ID possession between African-Americans and

6  whites, which are the estimates in Table 6.  And then I've

7  tried to poke even a little harder at the data and say,

8  well, let's imagine then a situation in which indeed a lot

9  of people have some other form of identification.  Let's

10 imagine that one-third of the remaining people I've

11 classified as no ID, so let's take the individuals we've

12 been discussing in the courtroom, and let's imagine that

13 in fact this is a sizeable group of individuals.  Let's

14 say one-third of the remaining people are people who I've

15 missed who actually do have ID, and then let's ask

16 ourselves what type of a racial asymmetry would we need in

17 order for my most conservative estimate to disappear.

18      And so I've done calculations like that.  I've taken

19 one-third.  We could even go to one-half of the group.

20 But if we look at the, I think, very unlikely hypothetical

21 of one-third, then we imagine first -- let's just imagine

22 that the same racial asymmetry that exists in the known

23 forms of ID also carries over to that other set of

24 identification holders.  And of course if that's the case,

25 nothing changes the gap.  Perhaps it closes a little

1  because that group of no ID holders is already

2  disproportionately African-American.  So even that

3  analysis brings it together a little bit.

4      But then let's imagine that the rate with which

5  whites are overrepresented among known ID holders, let's

6  revers that.  Imagine that African-Americans are

7  overrepresented by that same amount, and then play with

8  that hypothetical.  And that brings the estimates together

9  only a slight bit more.  But still, the gap in percentage

10  terms, is almost the same.

11      And then we can go further and come up with crazier

12  hypotheticals where that is 10 times the amount -- with

13  that asymmetry, is even 10 times higher.  And that brings

14  it together a little further.  But still, the rates of ID

15  possession don't converge to the same.

16      So we would have to make completely implausible

17  stories in which these alternative forms of identification

18  are overwhelmingly held by African-Americans to make that

19  gap disappear.  And I can't -- no one has presented to me

20  any kind of stories in which --

21      THE COURT:  I think we can move on to the next

22  question.

23      MR. SPIVA:  Sure.  And I'm almost done, Your Honor.

24  BY MR. SPIVA:

25  Q    And with respect to passports, Dr. Rodden, that type

1  of a hypothetical in fact would contradict what we know

2  about the relative rates of passport holding as between

3  whites and blacks, correct?

4  A    That's right.  We reported that the rates are much

5  higher among whites.

6       MR. SPIVA:  Actually, if I can just confer for one

7  second?

8       THE COURT:  Yes, sir.

9       MR. SPIVA:  Thank you, Dr. Rodden.

10      I don't have anything further.

11      THE COURT:  May the Doctor be excused, Mr. Spiva?

12      MR. SPIVA:  Yes.  We may call him back for our

13  rebuttal case.

14      THE COURT:  Fine.  You may do so.

15      Mr. Finberg, may he be excused?

16      MR. FINBERG:  Yes, Your Honor.

17      THE COURT:  Doctor, thank you very much for your

18  testimony.  You're excused and free to go, sir.

19      DR. RODDEN:  Thank you.

20                    **WITNESS STOOD ASIDE**

21      MR. SPIVA:  Your Honor, our next witness is Cheryl

22  Zando.

23      THE COURT:  Ms. Zando, if you would raise your right

24  hand, left hand on the Bible, and face the Clerk of the

25  Court, please.

1       THE CLERK:  You do solemnly swear that the testimony

2  which you are about to give, in this case, before this

3  Court, shall be the truth, the whole truth, and nothing

4  but the truth, so help you God?

5       MS. ZANDO:  I do.

6       THE COURT:  Have a seat on the witness stand.

7       MS. ZANDO:  Thank you.

8       THE COURT:  Ms. Zando, would you please give us your

9  full name, and spell your last name for the court

10 reporter.

11      MS. ZANDO:  Cheryl Lane Zando.  Z-A-N-D-O.

12      THE COURT:  Go right ahead with your first question.

13          Whereupon, **Cheryl Zando**, having been

14 duly sworn in, testifies as follows:

15                    **DIRECT EXAMINATION**

16 BY MS. CALLAIS:

17 Q    Ms. Zando, where do you live?

18 A    In Henrico County.

19 Q    How long have you lived in Henrico County?

20 A    Since 2007.

21 Q    Are you currently employed?

22 A    I am.  I have a small consulting practice called

23 Cheryl Zando Consulting.

24 Q    And what do you do in your consulting practice?

25 A    I do political consulting.

DIRECT EXAMINATION OF CHERYL ZANDO      622

1  Q    Ms. Zando, are you member of any community

2  organizations?

3  A    I'm the chair of the Henrico County Democratic

4  Committee.  And I serve on the Central Committee of the

5  Democratic Party of Virginia.

6  Q    And how long have you been chair of the Henrico

7  Democratic Committee?

8  A    Since December of 2013.

9  Q    And how long have you served on the Central

10 Committee?

11 A    Since 2011.

12 Q    And, Ms. Zando, this may go without saying, but do

13 you consider yourself to be a member of the Democratic

14 Party?

15 A    I do.

16 Q    Have you ever paid dues to the Democratic Party?

17 A    I pay dues to the Henrico County Democratic

18 Committee, but not to the Democratic Party of Virginia.

19 Q    Have you ever filled out a membership list for the

20 Democratic Party of Virginia?

21 A    No.

22 Q    And you sit on the Board of the Central Committee for

23 the Democratic Party of Virginia?

24 A    Yes.

25 Q    Ms. Zando, did you also serve in any other roles with

1   the Democratic Party of Virginia in 2014?

2   A     Yes.  I served as co-chair of the task force that the

3   Democratic Party of Virginia started for voter ID

4   education.

5   Q     And can you just describe for the Court what the

6   voter ID task force was?

7   A     The voter ID task force was a committee of members

8   from across the Eleventh Congressional Districts in

9   Virginia that came together for two purposes.  The first

10  was to do outreach to the voters that had been identified

11  by the State Board of Elections who did not have

12  DMV-issued ID.  And so there was fear that they would not

13  have a proper ID, photo ID, to be able to vote in the

14  November 2014 election.

15        And the second purpose was to do general voter ID

16  education so that all voters would be aware that they

17  would need to bring a photo ID with them to the polls in

18  November.

19  Q     And to your knowledge, had the Democratic Party of

20  Virginia had a voter ID task force before?

21  A     Not to my knowledge.

22  Q     And can you just describe for the Court the type of

23  work that the voter ID task force actually did?

24  A     Yes.  We discussed the scope of the issue that the --

25  of the number of voters who didn't have DMV-issued IDs.

1 And we developed a list of strategies for local Democratic

2 committees in the various cities and counties across

3 Virginia that they could implement to, one, reach out to

4 that list of voters without the DMV-issued ID.  And, two,

5 to just do the broad outreach to voters about the need to

6 bring IDs to the polls.

7 Q     And what sort of strategies did you come up with, did

8 the task force come up with?

9 A     For the voters without the DMV-issued IDs, we

10 recommended that local committees do phone banks either

11 with a paid vendor, or with volunteers that they do

12 door-to-door canvasing to those voters to have one-on-one

13 interaction with the voters to explain the law, describe

14 the IDs that voters would need to bring with them to the

15 polls, see if they had that ID.

16     If they did not, let them know about the ID that they

17 could get through the State Board of Elections, or their

18 local registrar, and determine if they needed help getting

19 to the registrar.

20     And then for broader education, we recommended

21 community outreach partnering with faith communities,

22 partnering with other progressive organizations and other

23 communities within their community.  We talked about doing

24 mailers and other -- or other volunteer driven voter

25 contact to let folks know about the new law.

1  Q    And in forming your plans and strategies, Ms. Zando,

2  did you learn about the outreach that the State Board of

3  Elections was doing?

4  A    We did.

5  Q    And the outreach that you were doing, was that

6  similar or different the State Board of Elections

7  outreach?

8  A    We were trying to augment their work, which to our

9  understanding was primarily sending a mailer to the voters

10 who do not have the DMV-issued ID.  We were trying to have

11 conversations with those folks instead of just a simple

12 outreach piece.  We also -- our understanding is that for

13 the broader community, they were putting up fliers in

14 public spaces like libraries, and other locations

15 throughout the community.

16     And we were trying to reach folks directly through

17 the church communities and other one-on-one interactions

18 through outreach at metro stations, and things of that

19 nature.

20 Q    And why were you trying to take these augmented

21 actions?

22 A    We were worried that having just one communication

23 through a piece of mail would not be sufficient to educate

24 folks of the new law.  We wanted to let folks know what

25 they needed to bring with them to the polls on election

1  day, and how they could get the free ID if they didn't

2  have one of the other forms of ID.

3  Q    And, Ms. Zando, what did you do specifically in your

4  roll as co-chair of the voter ID task force?

5  A    I helped to convene our meetings.  I wrote the plan

6  that was sent out to local committee chairs that included

7  our strategies.  And I answered any questions that local

8  committees had.

9      I also developed support materials, including a

10 script for phone conversations and door-to-door

11 conversations.  And developed materials, including flyers

12 and brochures that had a graphic on the front including

13 the types of ID that were acceptable, and on the back a

14 list of frequently asked questions and their answers.

15 Q    And you did all this work in your capacity as a

16 volunteer for the Democratic Party of Virginia?

17 A    I did.

18 Q    Now, Ms. Zando, as part of your role as co-chair, and

19 the task force in general, did you have the opportunity to

20 monitor or track how your plans were implemented?

21 A    We did.  We encouraged local chairs to get back to us

22 with the work that they were doing in various communities.

23 And we heard back from a number of communities across the

24 state.

25 Q    And do you know if the plans of the task force were

1   implemented around the state?

2   A    Yes.   In Roanoke, we know that that committee worked

3   very closely, through the course of the year, with the

4   faith community encouraging members to get the

5   registrar-issued voter ID that was free.   In Harrisonburg,

6   they did a number of phone banks throughout the course of

7   the year, and door-to-door canvasing.   In Arlington and

8   Alexandria, they did outreach at metro stations letting

9   folks who were commuters know about the new ID law.

10        And as chair of Henrico County, I am aware of the

11   work that we did that included outreach with faith

12   communities, a paid phone call program to the voters in

13   our area who didn't have the DMV-issued ID, a

14   participation in a statewide Day of Action where we made

15   calls to voters.   And also we did a mailed sample ballot

16   program which we did primarily to notify voters in Henrico

17   of the new voter laws, and the type of ID that they would

18   need to bring with them to the polls.

19   Q    So, Ms. Zando, I'd like to focus a little bit on the

20   work that Henrico County did specifically.   Did you

21   personally participate in any of the activities you

22   listed?

23   A    I did.

24   Q    And can you just describe for the Court which

25   activities you participated in?

1   A     I participated in the Day of Action, which was

2   organized by the Democratic Party of Virginia where the

3   statewide coordinated campaign for Senator Mark Warner

4   took a day off from contacting voters to get candidate

5   IDs, and promote our candidates for Senate and

6   Congressional districts, and instead called our list of

7   voters who did not have the DMV-issued ID.  I also

8   participated in some of our faith outreach at St. Paul's

9   Baptist Church.

10  Q     And St. Paul's Baptist Church is a predominantly

11  African-American church?

12  A     It is.  It's one the largest in Henrico County.

13  Q     And what sort of activities did you do at St. Paul's

14  Baptist Church?

15  A     We had a table in the lobby area of the church where

16  we could talk with parishioners before and after their

17  services, and encourage folks to learn about the new law

18  and have materials for them, the brochure and flyer that I

19  mentioned.

20  Q     And did you actually sit at that table and interact

21  with voters?

22  A     I did.

23  Q     And did you ever receive any questions from voters

24  about the new law?

25  A     I did.  There were a number of questions about the

1  change in law, and a number of voters were unaware that

2  the law had changed again, and a number of voters were

3  confused about what IDs would be acceptable, what types of

4  photo IDs would be acceptable to bring.

5  Q      And in your experience working with those voters, I

6  think you mentioned for some of those voters, this is the

7  first time they learned about the law?

8  A      It was.

9  Q      And, Ms. Zando, I think you also mentioned a

10 statewide Day of Action.  Who is the statewide Day of

11 Action planned by?

12 A      It was planned by the Democratic Party of Virginia.

13 Q      And did you participate directly in that?

14 A      I did.

15 Q      And during that statewide Day of Action, was that

16 time that you would have typically spent doing other work

17 with the Democratic Party?

18 A      Yes.  Normally, we would have had volunteers make

19 calls for our candidates, both Senator Warner and our

20 Congressional candidates.  And instead, we had them focus

21 on educating voters about the new voter ID law.

22 Q      And why is that?

23 A      Because of the concerns that we had that.  That, one,

24 voters without a DMV-issued ID wouldn't have a proper ID

25 to vote.  And, two, just to make sure that all voters

1   would bring the proper ID with them to have their -- to be

2   able to vote without voting on a provisional ballot.

3   Q     And was that important to the get-out-the-vote

4   efforts that you were doing?

5   A     It was.

6   Q     And why is that?

7   A     It was just very important to make sure that voters

8   didn't feel disenfranchised by not having -- not knowing

9   about the law and not bringing proper ID and not being

10  able to vote on a regular ballot.  And then the risk of

11  their vote not being able to count increased

12  significantly.

13  Q     And the voter ID task force, is that outreach that

14  the task force -- do you focus on any particular groups or

15  individuals?

16  A     We focus a lot on minority voters.  We also focused

17  on older voters who we were worried might have previously

18  had photo ID but that had expired since the State Board of

19  Elections had ruled that the ID had to be valid within the

20  past 12 months.

21  Q     Did you have any focus on rural voters?

22  A     We also had focus on rural voters.  There was a fear

23  that voters who did not have a DMV-issued ID wouldn't be

24  able to drive themselves to the registrar to get a free ID

25  that was being offered.

1  Q     And, Ms. Zando, in the work that you did personally

2  in Henrico County, did you actually encounter anyone who

3  did not have an ID through the course of your work?

4  A     I did.  I encountered voters at a senior center who

5  approached me within the final two weeks prior to the

6  election who had learned about the new law, and did not

7  have photo ID that was -- that met the requirements.  And

8  they had concerns about how to get that ID.  I worked with

9  them to get transportation to their registrar to be able

10 to get their IDs.

11 Q     And to your knowledge, before you worked with them,

12 did they have transportation to the registrars's office?

13 A     No.

14 Q     And did you encounter any other individuals who did

15 not have the proper ID during your work?

16 A     Yes.  In the days following the election, I worked

17 with a voter who had mailed her ID accidentally, and so

18 she had to vote provisionally on election day.  And she

19 had not yet retrieved her driver's license by the

20 deadline -- by the Friday deadline to show your photo ID,

21 and showed up at one of our registrar's offices to get an

22 ID and was told on that day that she wouldn't be able to

23 get her photo ID because the majority of the staff were at

24 the other registrar's office in Henrico working to

25 calculate the results of the election.

1       I was able to intervene to get her photo ID taken and

2   faxed to the other location so that her vote could be

3   counted.

4   Q    And, Ms. Zando, when you were doing all this work in

5   2014, did you encounter any challenges when educating

6   people about the law?

7   A    One of the main challenges that we encountered is

8   that we just could not contact all of the voters who don't

9   have the DMV-issued ID.  We just simply didn't have the

10  time and financial resources to do that.

11  Q    And when you say *financial resources,* how much did

12  it take to contact these voters?

13  A    The photo -- or the paid program that we did in

14  Henrico cost over $500, and only spoke to about a quarter

15  of the people that we were trying to reach.  And the

16  sample ballot program that we sent to educate all voters

17  about the types of ID, cost just under $5,000.

18  Q    Ms. Zando, do you plan to continue your photo

19  education activities regarding the voter ID law in 2016?

20  A    We do.  We already have started.  We are partnering

21  again with members of the faith community.  We're already

22  spending time at St. Paul's Baptist Church again this year

23  notifying voters there of the ID law.  We have also been

24  partnering with other faith communities, including the

25  Muslim community.

1      MS. CALLAIS:  No further questions, Your Honor.

2      THE COURT:  All right.

3      Cross-examination of Ms. Zando.

4                    **CROSS-EXAMINATION**

5  BY MR. HEARNE:

6  Q   Ms. Zando, I'm Thor Hearne.  I'm the attorney for the

7  Commonwealth and the election officials.  And I appreciate

8  your testimony today.  I just have a few questions for

9  you, if I could.

10 A   Okay.

11 Q   For the record, what race do you consider yourself to

12 be?

13 A   Caucasian.

14 Q   And is it fair to say that your description of your

15 activities professionally with the Democratic Party of

16 Virginia would be as a political consultant?  Is that a

17 fair title?

18 A   No.  Most of my work with the Democratic Party of

19 Virginia is as a volunteer.

20 Q   Okay.  And when did you begin your work with what you

21 described as the voter ID task force?

22 A   In early -- probably around April 2014.

23 Q   Okay.  So that would be -- the voter ID law, of

24 course, became effective for the first time -- the current

25 law in Virginia became effective for the first time in

1    2014, is that correct?

2    A    Yes, sir.

3    Q    And do you continue to be active in this capacity?

4    A    The task force is no longer active, but we are --

5    since then, we have -- the Democratic Party of Virginia

6    has hired a full-time voter protection staff person who is

7    leading efforts on the voter ID education.

8    Q    Okay.  And so the -- do you know how many elections

9    have been -- statewide elections in Virginia that have

10   been conducted since this law became effective?

11   A    Statewide meaning involving every jurisdiction, or

12   across the state?

13   Q    Across the state.

14   A    I am not certain of how many there have been.

15   Q    Do you have an general idea?

16   A    I mean, I can't remember -- I know that there are

17   elections in -- there were elections again.  Obviously,

18   the November 2014, and I assume in May of 2015, primaries

19   in June 2015, and then the general, plus special election.

20   Q    And then we'll have another one next week, of course?

21   A    Yes.  Of course.

22   Q    And of those -- so there's been at least four

23   elections that you're aware of since the voter ID

24   requirements became effective?

25   A    Yes.  Yes.

1  Q     And with each election, a voter appearing at the

2  polling place would learn of -- if they didn't know

3  through your outreach or through the work of the Election

4  Board, or some other source in the press, if they didn't

5  know the voter ID requirements, they would learn of them

6  when they went to vote, is that a fair observation?

7  A     Yes.

8  Q     And so each election that a voter participates in,

9  they then learn of the voter ID requirements and they have

10 an opportunity to obtain the ID?

11 A     Yes.

12 Q     And did the Democratic Party engage in voter

13 registration efforts even before the photo ID requirement

14 became effective, to your knowledge?

15 A     To my knowledge, yes, but not -- I mean, that was

16 left up more to the campaigns and to the individual

17 committees.

18 Q     In terms of voter registration?

19 A     Yes.

20 Q     Okay.  So the committees you've been involved with,

21 what other voter outreach have they done, or voter contact

22 have they engaged in, beside specific to the voter

23 identification law?

24 A     So speaking primarily on Henrico, which I know the

25 best, when we do community outreach events, whether it's

 1 partnering with the faith community, we actually focus on

 2 voter ID education, voter registration, and restoration of

 3 rights.

 4 Q    Do you also talk about absentee voting so that

 5 individuals who are not able to physically get to the

 6 polling place know they have that option?

 7 A    We do.

 8 Q    And do you assist people in doing that as well?

 9 A    We let them know the process.  I don't believe we

10 usually bring absentee ballot applications with us.

11     MR. HEARNE:  I have no further questions.  Thank you,

12 Your Honor.

13     THE COURT:  All right.

14     Any redirect of Ms. Zando?

15     MS. CALLAIS:  No, Your Honor.

16     THE COURT:  May Ms. Zando be excused?

17     MR. HEARNE:  Yes, Your Honor.

18     THE COURT:  Ms. Zando, you're excused and free to go.

19 Thank you very much for coming in today.

20     MS. ZANDO:  Thank you.

21                   **WITNESS STOOD ASIDE**

22     MR. SPIVA:  Your Honor, our next witness will be

23 Susan Kellom.  K-E-L-L-O-M.

24     THE COURT:  I think your colleague --

25     MR. KAUL:  She's having some transportation

 1  difficulties.  She's not here yet.

 2       THE COURT:  Okay.

 3       MR. KAUL:  So we'll move her back.

 4       THE COURT:  All right.  Then who will be next?

 5       MR. KAUL:  Cathy Woodson.

 6       THE COURT:  All right.  Cathy Woodson.

 7       Ms. Woodson, if you would raise your right hand,

 8  place your left hand on the Bible, and face the Clerk of

 9  the Court.

10       THE CLERK:  You do solemnly swear that the testimony

11  which you are about to give, in this case, before this

12  Court, shall be the truth, the whole truth, and nothing

13  but the truth, so help you God?

14       MS. WOODSON:  I do.

15       THE COURT:  Have a seat on the witness stand,

16  Ms. Woodson.

17       Ms. Woodson, if you would give us your full name, and

18  spell your first and last name for the court reporter so

19  she gets it right, okay?

20       MS. WOODSON:  My first name is Cathy, C-A-T-H-Y.  My

21  maiden name is Peace, P-E-A-C-E.  My last name is Woodson,

22  W-O-O-D-S-O-N.

23       THE COURT:  Go right ahead, Mr. Spiva.

24       MR. SPIVA:  Thank you, Your Honor.

25            Whereupon, **Cathy Woodson**, having been

1   duly sworn in, testifies as follows:

2                    **DIRECT EXAMINATION**

3   BY MR. SPIVA:

4   Q    Good morning, Ms. Woodson.  Where do you live?

5   A    I live in Henrico County.

6   Q    And how long have you lived there?

7   A    Oh, I've lived in Henrico County over 45 years.

8   Q    And just for the record, Ms. Woodson, what race are

9   you?

10  A    I identify as African-American.

11  Q    And what party do you belong to?  Let me back up.  Do

12  you consider yourself to be a member of a party?

13  A    I'm a member of the Henrico County Democratic

14  Committee.

15  Q    And what about the Democratic Party of Virginia, do

16  you consider yourself to be a member of the DPVA?

17  A    Because I'm affiliated -- I'm a member of the

18  committee, I do as an affiliation of the state party.

19  Q    Okay.  And I take it this is probably an obvious

20  question, but I assume you generally support Democratic

21  candidates?

22  A    Yes.

23  Q    And where do you work, Ms. Woodson?

24  A    I'm currently retired.  I retired June 1, 2015.  And

25  I retired from a statewide nonpartisan nonprofit

```
 1  organization that we did social justice work.
 2       THE COURT:  I couldn't hear the last of your
 3  testimony.  You did what, ma'am?
 4       MS. WOODSON:  Social justice work.
 5       THE COURT:  Social justice work.  Thank you.
 6  BY MR. SPIVA:
 7  Q    Congratulations on your retirement.
 8  A    Thank you.
 9  Q    And what was the name of the organization that you
10  worked at before you retired?
11  A    I worked at Virginia Organizing.
12  Q    How long did you work there?
13  A    I worked there -- I started as a volunteer in 1996.
14  And I went on staff in '97, I think.
15  Q    Can you describe Virginia Organizing's mission, you
16  know, what it did?
17  A    Yeah.  Our goal as organizers was to engage community
18  members, and educate community members on processes, and
19  find out what they wanted better in their communities,
20  what was directly affecting them, issues that they were
21  concerned about, and get them engaged and advocate for
22  themselves.  And that included a lot of education on
23  policy, a lot of education on the process of participating
24  in civic engagement, as well as understanding how social
25  policy and laws are completed.
```

1  Q    And I think you might have said this, but I just want

2  to make sure.  Was the organization nonpartisan, partisan?

3  A    It's a nonpartisan nonprofit.  It's a 501(c)(3).

4  Q    And what was your role with Virginia Organizing?

5  A    I was a community organizer.  And I worked the

6  Richmond region, and I worked in Louisa County.

7  Q    And did you have any -- in that role, did you do any

8  voter registration, voter education, get-out-the-vote

9  work?

10 A    Yes.  We did nonpartisan -- I did nonpartisan voter

11 work, not only registering voters, but the restoration of

12 rights process.  Also educating people on how they could

13 vote -- what they needed to use to vote on election day.

14      And so as the voter IDs changed in Virginia, a lot of

15 my work was centered around educating people and making

16 them aware of what they needed to take with them to the

17 polls on election day.

18 Q    And in terms of the types of organizations or

19 communities that you worked with when you were at Virginia

20 Organizing, can you describe those?

21 A    I worked with a lot of communities of color, a lot of

22 communities that were low income, low to middle income.  I

23 worked with rural communities.  I worked in urban, as well

24 as suburban rural communities.

25 Q    And the rural communities that you worked in,

1    demographically were they varied?  Was it

2    African-American?

3    A    I was invited to -- in Louisa County, to work with an

4    African-American church that they -- the church members

5    and I put together an outreach plan that anybody in the

6    county was welcome to come to the community education

7    forum.

8    Q    And in terms of the types of groups you've worked

9    with, did you work with faith communities?

10   A    I worked with faith communities, neighborhood

11   associations, different social organizations as well as

12   sometimes it was just like a neighborhood watch that

13   wanted to bring someone in.  So some were very organized,

14   some were just loosely organized neighborhood block

15   parties.

16       Anytime there was an opportunity to attend some type

17   of public event to help people understand what the ID laws

18   were or voter registration or restoration of rights, what

19   the processes are, I was invited to come and provide

20   information.

21   Q    And over the years that you were doing this work, do

22   you have a sense, a rough sense, of how many people you

23   interacted with to try to help educate in terms of the

24   voting process?

25   A    I don't have an exact number, but there were quite a

 1  few.  I would say probably hundreds of people around the

 2  Richmond area, as well as in Louisa.

 3  Q    You mentioned a minute ago that you worked on

 4  educating people about the voter ID laws.  First of all,

 5  let me ask you about the 2012 law.  You're familiar that

 6  there was a new voter ID law that was passed, and went

 7  into effect, in 2012?

 8  A    Yes.  That was -- actually, my work started prior to

 9  that law going in effect because prior to that law, people

10  could go to the polls if they didn't have proper ID, and

11  they could sign an affidavit.  And so educating people

12  that, you know, if you didn't have ID that the workers

13  were asking for, you could still vote.  And you were just

14  asked to sign an affidavit.

15       But when the new law came in 2012, we had to go

16  back -- I had to go back to communities and say, you know,

17  these are the documents now that qualify as ID.  And so it

18  was an extensive education process to get people to

19  understand that they had options.  That you could have

20  your voter registration card, you could use a bank

21  statement, they could use their employee ID, along with a

22  passport and a driver's license.  But really to give

23  people an opportunity to say that they had something that

24  they could take to the polls to identity themselves.

25  Q    And was that an extensive -- did that require an

1 extensive process to try to educate people about the 2012

2 law?

3 A    Yes.  As Virginia Organizing, we used palm cards,

4 flyers.  I used our database to reach voters in my area.

5 I used Facebook and social media to reach people.  And

6 that was all the compliments of what the hands-on grass

7 roots work that was being done.  But the most effective

8 work was actually talking one-on-one to people, and

9 explaining to them what they could do to be ready to vote

10 on election day.

11 Q    In the course of doing that work in connection with

12 the 2012 voter ID law, did you encounter any people who --

13 for whom the new law presented a challenge?

14 A    Actually, the law was very helpful for people because

15 I could go through the list and I could just do a

16 checklist with them right standing at the table on the

17 street to say, you know, do you have this.  And I would go

18 down the list, and usually we would find something that --

19 I could find something that would qualify and say, okay,

20 take this with you.

21 Q    And then tell me, after -- you're aware that there

22 was a photo ID law that was passed in 2013?

23 A    Yes.  That required us to go back to communities and

24 educate people again, which provided another opportunity

25 to talk to people.  But it also provided questions from

1 community members because I got questions like, well, you

2 told me that I could use this last time.  Before, you told

3 me I could do this.  And now you're saying I've got to

4 have a photo ID, a voter photo ID, and it has to be one of

5 these things.  So right now, where are you getting this?

6 How are you -- so the questions became, you know, am I

7 giving you credible information.

8 Q    And did you encounter individuals who lacked an

9 understanding of what the new law required?

10 A    I remember in Louisa County I was doing a community

11 day, and there was a gentleman who his nephew, or somebody

12 in his family, I don't remember exactly who, went to pick

13 him up and bring him.  And he came in with a paper bag of

14 lots of paper and dumped it in front of me.  And they were

15 actually every voter ID card he had ever received since he

16 had registered to vote.  And he was explaining to me that

17 he had everything he needed.

18     And I was telling him about the photo ID.  He was

19 elderly, and I said, *"Well, do you have a driver's*

20 *license?"*  Well, he didn't drive anymore.  So, actually,

21 that brought another opportunity to have to really try to

22 talk through what is it you can get.  And I talked about

23 the free photo ID, but then I had to go another step and

24 explain to him where the registrar's office is in the Town

25 of Louisa, what building it's in, what floor it's on.  He

1   didn't have transportation, so we need to see what day a

2   family member could take him, you know, Monday through

3   Friday.  So there were lots of layers to try to get him to

4   understand, and get a family member committed to take him

5   to get a photo ID.

6   Q    And was that a process that you went through with a

7   number of individuals while you were doing this outreach

8   work?

9   A    In the rural communities in Louisa, it was a number

10  of conversations I had with people if the elderly came,

11  some senior citizens came, and they said oh, I have a

12  driver's license.  And my next question would be, you

13  know, are you still driving?  If they said, yes, then I

14  would say you can take that.  If they said, well, I

15  haven't driven in years, my question would be do you know

16  where your driver's license is?  Has it expired?

17       And just more conversation trying to kind of help

18  them think through what they needed, what they have, and

19  how they would be ready to vote on election day.

20  Q    And this work in Louisa County, the community, would

21  you also describe that demographically as a predominately

22  African-American community?

23  A    It was predominately African-American.  But I also

24  did outreach in voter education at the public library in

25  Louisa that was open to anyone.  And I offered to set up

1  at Goodwill, as well as the local grocery store, and also

2  put information at the local laundry mat in the Town of

3  Louisa so that it would be available for people.  So any

4  community boards that I could post information, I did

5  that.  Some of the church members who could not come on

6  the days I was present, they asked me to mail them

7  information.  So I dropped off fliers and mailed them

8  information.

9  Q    And do you think you got everybody who lacked the

10 photo ID in doing your work?

11 A    I don't know how -- you know, I would like to say I

12 did, but I know I didn't because there is just too many

13 people.  I never know how many need outreach, especially

14 as I was giving information, where did it go next.  Did

15 they keep it.  If I e-mail a packet to a faith community,

16 I don't know how many people actually received it.

17 Q    And did you also do some similar type work in

18 Richmond as a result of the 2013 photo ID law?

19 A    I did.  In the Richmond region, which is the City of

20 Richmond, Henrico, a little bit of Chesterfield, trying

21 again to be present to people at public events, whether it

22 was a neighborhood association or a community fair.  Or

23 anyplace that we could go and set up a table and talk to

24 people and make them aware of what they needed to vote on

25 election day so that they would be able to vote.

1  Q     And in the Richmond area, were these predominantly

2  low income or African-American communities, typically?

3  A     Predominately.  But, again, in some public place it

4  was a very mixed crowd.  But, you know, my job was to

5  really reach as many voters as I could, and so I chose the

6  tool of public events to try to reach as many people as I

7  could.

8  Q     Okay.  And did you find in the Richmond work that you

9  also encountered people who also had challenges in terms

10 of having the -- one of the valid IDs?

11 A     In the Richmond area, transportation was not as much

12 of a problem if you needed to get to the registrar's

13 office.  But it still was difficult to explain to people,

14 and make them aware, of what they needed - a photo ID -

15 and what do you have, and if it qualified as an item that

16 could be used.  Then the next conversation is about, you

17 know, did you know you can get a free photo ID at the

18 registrar's office.  The registrar's office is located at

19 this place.  Can you get there?  What's your work

20 schedule?

21       And really trying to go through helping community

22 members think through how do I get my photo ID in order to

23 vote on election day.  So I took them through each

24 question or step that I could think about that was

25 relevant to them to help them figure it out.

1  Q      And you also, I think, have been active in -- apart

2  separate from your work with Virginia Organizing, you've

3  been active in Democratic Party activities, is that true?

4  A      Yes.  I have been a member of the Henrico County

5  Democratic Committee, and did some work with them on voter

6  education, voter registration also.  And that was under a

7  partisan hat.  And I was very clear with people that I was

8  not there as Virginia Organizing.  That I'm here as a

9  Democrat.

10 Q      Okay.  And can you tell me -- describe for me any

11 activities that you had to undertake in connection with

12 the Henrico Democratic Party to educate people about the

13 new photo ID law?

14 A      It's basically the same.  Asking people where they

15 registered to vote.  Asking people if their registration

16 is up-to-date.  Going through the list of IDs that they

17 could use, and making them aware that they could get a

18 free photo ID from the Henrico registrar's office, the

19 location of the registrar's office, the hours it's open,

20 and asking if they had transportation.

21 Q      Had you done any of that work in connection with the

22 county party prior to the photo ID law being put into

23 effect?  Had you done any voter registration education,

24 get-out-the-vote work?

25 A      Yes.

1  Q    And I assume you didn't have to do any education on

2  the photo ID law before it was enacted?

3  A    No.  I was still educating people on the fact that if

4  they had -- if they didn't have something, they could vote

5  earlier and sign an affidavit.  And then when the 2012 law

6  came in effect, we had to also educate people on you could

7  still vote by provisional ballot, and explain to people

8  what the provisional ballot is, how they would be

9  processed, but that they also had the responsibility of

10 showing their ID by 12 noon on Friday.

11 Q    Okay.  And if the photo ID law had not gone into

12 effect, would you have been able to use the time that you

13 spent educating people about the need to get, and bring a

14 photo ID, for other types of voter registration and

15 education activities?

16 A    Yes.

17 Q    I think you also, either in connection with your work

18 with Virginia Organizing or the Henrico County Democrats,

19 did some work at the polls on election day during election

20 time, is that true?

21 A    That is true.  As Virginia Organizing, there were

22 election days that I did -- checked in at different polls

23 or precincts to see what was happening.  Again, as

24 Virginia Organizing non-partisan and mainly I was asking

25 people when they walked up, I would just kind of select --

1   randomly select precincts, stand outside, and say are you

2   ready?  Do you have your ID?

3   Q    This is after the photo ID law had gone into effect?

4   A    It was after the photo ID law had gone into effect.

5   And there was one gentleman -- a couple of people had to

6   go back to their vehicles and get IDs.  There was one

7   gentleman I remember specifically in the City of Richmond

8   at a precinct that he stood out there with me, and he was

9   going through all his pockets and checking.  He thought he

10  had an ID, and he thought he had his voter registration

11  card.

12        And so I had to say, *"Look, you need a photo ID.  And

13  if you don't have -- do you have it at home?  Do you have

14  something at home?"*  And I was going through showing him

15  this is what you can use.  And, you know, he left.  I

16  don't know if he ever came back to vote.  But he just left

17  because he didn't have anything on him.  He had gotten off

18  his lunch hour to come vote, and wasn't able to because he

19  didn't have the ID.

20        MR. SPIVA:  Thank you very much, Ms. Woodson.  I

21  don't have any further questions.

22        THE COURT:  Cross-examination of Ms. Woodson.

23        MR. HEARNE:  Thank you.

24                    **CROSS-EXAMINATION**

25  BY MR. HEARNE:

1  Q    Good morning, Ms. Woodson.  Thank you for coming to

2  testify today.

3  A    Good morning.

4  Q    I just have a few questions for you.

5       In terms of the efforts you have made to have voter

6  outreach and inform and educate the voters about the

7  requirements of voting through the voter ID requirement,

8  do you think those efforts have been successful for the

9  most part in informing voters?

10 A    I think for some folks I was successful.  I don't

11 have any stats to say, you know, that everyone I talked to

12 or everyone I gave information to was able to vote or they

13 got -- they followed through and got the ID that was

14 needed.  The best I can say is that I did my best in

15 educating people on the process.

16 Q    And that's very good.  And you mentioned you were

17 doing this with the 2012 law, too?

18 A    I did.

19 Q    I mean, even before we had the current law, just

20 making sure folks knew what they needed to have in order

21 to make sure their vote counted when they went to vote,

22 correct?

23 A    That's correct.  And that was part of -- you know,

24 one of things that I did in my work is one thing we were

25 talking about, things that they care about, and what

1  affects them, and trying to help them understand that, you

2  know, the elected leaders and appointed leaders need to

3  hear their stories.  And so part of the education process

4  was to kind of almost explain to them how laws become

5  effective, and how important it is to share with their

6  elected leaders.  So that was all part of the education

7  process, and to understand how the voter law came into

8  effect.

9  Q    And we've had the current law now for several

10 elections.  It's been enforced since it first became

11 effective in 2014, is that correct?

12 A    Yes.

13 Q    And has it been your experience that people in each

14 different election, they're getting more used to this law,

15 or the requirements of the law?

16 A    I think depending on how often they vote.  If people

17 vote -- Virginia has an election every year.  I think some

18 people are getting used to what they need, and they'll

19 say, oh, I'm ready.  I've got my ID.  Folks who are

20 infrequent voters, I'm not sure that they still understand

21 what is required.

22 Q    And you continue your efforts even now to try to make

23 sure forks are educated, is that correct?

24 A    Yes.

25 Q    And in terms of what you tell them, would you tell

1  them not just what they need to bring to the poll, but

2  also, as I understood your direct testimony, if they don't

3  have the ID, would you tell them where to get one or how

4  to get one for free?

5  A    Yes.  And I use some of the tools from the Department

6  of Elections Website to make it official, in addition to

7  trying to use social media again.  But really, to be sure

8  people know where they can go.  And, again, that's several

9  conversations of do you have transportation, do you know

10 where to go, the hours that the registrar is open, what

11 floor they're located on, and all of that.

12 Q    And that was really my next question.  You

13 anticipated it perfectly.  And that was really how the

14 local election officials in Virginia have been.  Have they

15 been cooperative with your efforts from your perspective?

16 A    Yes.

17 Q    Do you also educate folks when you talk to voters

18 about the option to obtain an absentee ballot if they

19 can't get to the polling place or if they have a

20 disability?

21 A    I have talked to people about absentee ballots, and

22 how to be an absentee voter if they're not sure how they

23 can get to the polls on election day.  That process seems

24 a little confusing for folks because, you know, they have

25 got to figure that out.  And I went over that whole

1    process with them.  And I also tell them that they can

2    vote absentee in-person.

3         MR. HEARNE:  Well, thank you very much for coming in

4    and testifying today.

5         I don't have any further questions.

6         THE COURT:  Mr. Spiva, any redirect?

7         MR. SPIVA:  Very briefly, Your Honor.

8         THE COURT:  All right.

9                    **REDIRECT EXAMINATION**

10   BY MR. SPIVA:

11   Q    Ms. Woodson, you were asked on cross-examination

12   whether people were getting, I think, used to the new

13   photo ID law, and you mentioned that there were some

14   infrequent voters who might not be.  I guess my question,

15   follow-up question, is are you planning to do more

16   education work concerning the voter ID law for this 2016

17   election coming up?

18   A    Absolutely.  I've already been doing it for two

19   months now preparing people for the primary.  Encouraging

20   people to be election-ready for the primary.  Do you have

21   your photo ID?  And how to get a free photo ID.  And that

22   will continue.

23   Q    And why do you believe it's necessary to continue

24   doing that type of work in terms of educating people about

25   the photo ID law?

1   A     I think it's a good reminder for folks so that they

2   don't forget what they need if they have it so that, you

3   know, they don't go to the polls unprepared.  I want

4   people to go to their polling stations prepared.  And I

5   don't want them to get there and they can't vote and not

6   know what to do.  I'm not sure how many people once they

7   walk away if they'll come back.

8        And I've just learned over the years in my community

9   work, we don't want people to walk away.  We want people

10  to vote while they're there, and to do all that is

11  possible to make sure they can.

12       MR. SPIVA:  Thank you very much.

13       THE COURT:  May Ms. Woodson be excused at this point?

14       MR. SPIVA:  Yes, Your Honor.

15       MR. HEARNE:  Yes, Your Honor.

16       THE COURT:  Ms. Woodson, you're excused and free to

17  go.  Thank you so much for coming in today.  We appreciate

18  your testimony.

19       MS. WOODSON:  Thank you.

20                      **WITNESS STOOD ASIDE**

21       THE COURT:  Court will take a 15 minute recess.

22  We'll come back and resume.

23                      (Recess taken.)

24           (Gil Halasz is now the court reporter.)

25       THE COURT:  Who will be the next witness?

1          MS BRANCH:  Your Honor, Mr. Scarborough.

2          THE COURT:  Mr. Scarborough, come forward, sir.

3          Mr. Scarborough, raise your right hand, sir, left on

4    the Bible, and face the Clerk of the Court, please.

5                        KEITH SCARBOROUGH

6              WAS SWORN AND TESTIFIED AS FOLLOWS:

7                       DIRECT EXAMINATION

8          THE COURT:  Have a seat on the witness stand, sir.

9          THE WITNESS:  Thank you.

10         THE COURT:  Mr. Scarborough, be kind enough to give

11   your full name, sir, and spell the last name so the court

12   reporter can get it right.

13         THE WITNESS:  Keith Scarbrough,

14   S-C-A-R-B-O-R-O-U-G-H.  My address 26 --

15         THE COURT:  You don't have to put the address on the

16   record.  That is fine.  Remember to speak slowly because

17   the court reporter has to take the testimony down.  Okay?

18         Go ahead.

19   BY MS BRANCH:

20   Q    Good morning.

21   A    Good morning.

22   Q    Where do you live?

23   A    I live in Prince William County.

24   Q    And how long have you lived there?

25   A    Just over 20 years.

Scarborough - direct                657

```
 1  Q     Where are you originally from?

 2  A     I grew up in Nebraska.  Moved to Virginia about 30

 3  years ago.

 4  Q     What type of work do you do?

 5  A     I am an attorney and a lobbyist for an advertising

 6  trade association in Washington.

 7  Q     What is that trade association called?

 8  A     It is the Association of National Advertisers, ANA.

 9  Q     Do you do any work related to elections in Virginia?

10  A     Yes.  Both politically and I am also currently the

11  secretary of the Prince William County Electoral Board.

12  Q     Where is Prince William County located?

13        THE COURT:  I am familiar with where Prince William

14  County is.

15  BY MS BRANCH:

16  Q     Can you tell me a little bit about the demographics

17  of Prince William County?

18  A     As of the latest census, Prince William is now the

19  first minority majority county in all of Virginia.  We

20  have a sizable population of African-Americans, Latinos,

21  probably 20 or 22 percent.  And then a significant Asian

22  and Pakistani community.

23  Q     Can you describe the partisan demographics of the

24  county?

25  A     Well, Prince William is truly sort of a battle
```

Case 3:15-cv-00357-HEH-RCY   Document 202   Filed 03/11/16   Page 87 of 319 PageID# 4241

1  ground.  It swings back and forth in terms of, I think

2  both parties are probably fairly evenly divided.  Although

3  the local offices, the board of supervisors are controlled

4  by the Republicans.  The Democrats now have majority of

5  the school board.  And most of the General Assembly

6  delegation are Democrats.

7  Q    Have there been any instances regarding racial

8  profiling in Prince William County in recent memory?

9  A    Well, in 2007 there was a significant effort by the

10  chairman of the board of county supervisors, Cory Stuart,

11  to crack down on illegal immigration.  There was a concern

12  that he and other supervisors have that there were large

13  numbers of people who weren't U.S. citizens that were

14  living in Prince William County that had an impact on

15  residential issues, quality of life issues.  So he pushed

16  a resolution through the board of the county supervisors

17  to essentially have the police department in Prince

18  William County do background checks on anyone that they

19  arrest, do a background check to see whether they were

20  U.S. citizens or not.  And then if someone was not a U.S.

21  citizen they were supposed to be referred to ICE.

22  Q    Can you describe the socioeconomic makeup of the

23  county?

24  A    Well, the median income is about 80 or 85,000.

25  Prince William is becoming a more urban suburban county.

1  We still have fairly large pockets of low and moderate

2  income, especially on the east end of the county, the

3  older parts of the county.  And on the west end it is more

4  affluent, probably, you know, more white, more upper

5  class.

6  Q    Do residents of Prince William rely on public

7  transportation?

8  A    We have a limited amount of public transportation.

9  Not nearly as extensive as Fairfax or Arlington or

10 Alexandria.  But we have commuter buses that go to D. C.

11 and north, and we also some local transportation that goes

12 back and forth across the county.

13 Q    Is there a sizable commuter population in Prince

14 William County?

15 A    Yes.  Actually, probably at least 40 percent of the

16 people in Prince William County work outside the county.

17 So they are on the road either north, or people coming

18 south to Richmond, or so there is a large number of people

19 that commute outside the county for work every day.

20 Q    Mr. Scarborough, you mentioned that you are a member

21 of the Prince William Electoral Board.  And that you are

22 secretary of the board.  How long have you been a member?

23 A    I was first appointed in 2007 to fill a vacancy.  And

24 then I have been reappointed three times since then.  So,

25 I have been a member since 2007.

1  Q      Who were you appointed by?

2  A      The electoral board members are appointed by the

3  circuit judges in our county or city.   Every city and

4  county has a three-person electoral board.   And we are, we

5  are nominated by our political party.   And the party

6  submits names, and the appointment is ultimately made by

7  the circuit court judges.

8  Q      How is the composition of the board determined?

9  A      Under the code, the party of the Governor's office

10 has two members, and then the other party has one.   So,

11 when we have a Democratic governor, now there are two

12 Democrats and one Republican on the board.

13 Q      What political party do you represent on the board?

14 A      Democratic party.

15 Q      Is there a limit to the number of terms you can

16 serve?

17 A      No.

18 Q      Does Prince William board hold meetings?

19 A      Yes, we hold meetings every month.   And then there

20 are also meetings that are held in conjunction with an

21 election.   We do, after every election we do an after

22 ascertainment and certifying the results.   So the

23 electoral board meets as a group to do all of that paper

24 work and processing.

25 Q      Where is the meetings held?

1  A    We have our main office for the registrars in

2  Manassas, so our board meetings are held there.

3  Q    You described a little bit, but can you describe in

4  some detail your responsibilities as a board member?

5  A    So the electoral board, our major responsibility I

6  guess is hiring a full time registrar, at least in the

7  larger counties.  And the registrar does all the

8  day-to-day management of the elections, hiring office

9  people.  The electoral board works with the local board of

10  supervisors.  If we need to move a precinct because of

11  growth in population, if we need to change the name of a

12  precinct.  So we are sort of the board of directors and

13  the registrar does the day-to-day management of the

14  office.

15  Q    Do you have any other responsibilities as a board

16  member aside from hiring the registrar?

17  A    Well, we work with the training.  You know, every

18  election officer receives training for every election.

19  And depending on their level of experience, every officer

20  has to complete at least three hours of training for an

21  election.  So we help with the training.  And help with

22  recruiting election officials.

23  Q    Do you have any specific responsibilities on election

24  day?

25  A    On election day we, the board roams around.  You

1  know, we try to visit as many precincts as we can just to

2  deal with any issues that come up.  For example, you know,

3  we carry a spare electronic poll book.  So if an EPB goes

4  down at a precinct we can replace it.  If there is an

5  issue at a polling place, sometimes there have been

6  occasions where the volunteers for the political campaigns

7  make it -- may get a little aggressive outside the

8  precinct and the chief may call and ask us to come and

9  sort of referee those kinds of disputes.  And basically

10 make sure that the equipment is all set up, the

11 appropriate signs are there.  And that the, you know, the

12 election proceeds as it is planned.

13 Q    You mentioned one of the duties is hiring a

14 registrar.  How often do you do that?

15 A    The registrar is appointed for a four-year term.  You

16 know, then we do annual evaluations.  So, you know, we

17 have some continuity with the registrar.

18 Q    Where is the registrar's office located in Prince

19 William County?

20 A    Manassas.

21 Q    Is there another office as well?

22 A    We have a full-time satellite office at the DMV in

23 Woodbridge on the east end of the county.  And it is

24 basically all of the services that a voter needs,

25 registration, applying for absentee ballot, anything that

1   a voter needs to do.  Interact with our office, they can

2   do either at our main office in Manassas or the satellite

3   office in Woodbridge.

4   Q    How many staff members work in the main office in

5   Manassas?

6   A    We have about ten or eleven full-time, and that

7   includes the registrar.

8   Q    Is there any part-time staff?

9   A    We have some part-time staff.  And then we

10  traditionally hire more part-time staff as it gets closer

11  to an election season, especially if it going to be a

12  major turnout election.

13  Q    How many staff members are in the satellite office in

14  Woodbridge?

15  A    We have two part-time people that work mornings and

16  afternoons, and so it is essentially one, equivalent of

17  one full-time person there.

18  Q    The area where the main office is located in

19  Manassas, how would you describe the demographic

20  composition of that area?

21  A    There are some pockets right around the City of

22  Manassas that are, you know, older, established

23  neighborhoods that are, you know, more low and moderate

24  income.  But the western, you know, third of the county is

25  much more up-scale and so that when you get much west of

1  Manassas it is pretty up-scale.

2  Q     The main office in Manassas, when is it open?

3  A     It is open regular hours 8:30 to 5:00 Monday through

4  Friday.

5  Q     And the area where the satellite office is located,

6  can you describe the demographic composition of that area?

7  A     It is in Woodbridge.  So it is the older part of

8  Prince William County.  So there is a much greater

9  concentration of low and moderate income people that use

10 the DMV facility on the east end.

11 Q     What are the hours the satellite office is open?

12 A     Satellite, normally from 8:30 to 5:00 Monday through

13 Friday.  And we also have Saturday morning hours during

14 the regular year, the satellite office in Woodbridge is

15 opened from 8:30 to noon every Saturday.

16 Q     That is year round?

17 A     Yes.

18 Q     Are the offices accessible by public transportation?

19 A     There are, you know, bus lines that are fairly close.

20 It is not -- yes, there is public transportation available

21 to both offices.

22 Q     How long has the satellite office been opened?

23 A     It has been opened as long as I have lived in the

24 county.  So it, you know, at least from my knowledge, at

25 least more than 20 years.

1   Q      Has there ever been any discussion about closing it?

2   A      Yes, we actually a couple of years ago were going

3   through the budget processes to be submitted to the Board

4   of County Supervisors, and one of the -- there was a

5   recommendation by one of our staff members to save some

6   money by closing the Woodbridge office the Saturday

7   morning hours for the DMV.  And so, you know, we because

8   it was -- it would have had significant impact, we

9   actually put a notice on our web site informing people

10  that as part of the budget process we were considering

11  this.  And, you know, there was a -- there was an

12  overwhelming --

13      THE COURT:  The relevance of this eludes me, but I am

14  delighted to hear from Mr. Scarborough.  But I don't see

15  where it is relevant to any issue that I have.  So, could

16  you stay on track?  We have a lot of witnesses we have to

17  accomplish here in this case, so keep your questions

18  targeted to information that is truly relevant to the

19  issues we have to resolve.

20      Go ahead.

21  BY MS BRANCH:

22  Q      Sure, Your Honor.

23      What type services are available at the registrar's

24  offices?

25  A      Well, that is where someone can go to register to

1   vote, pick up voter registration applications, to apply

2   for an absentee ballot.  It is also where we conduct

3   in-person absentee voting at both the main office and the

4   satellite office.

5   Q     Now, if for some reason a voter has to vote a

6   provisional ballot in an election, can they cure the

7   ballot at either office?

8   A     If they have voted provisional because they don't

9   have a photo ID, then, yes, there is.  When the General

10  Assembly passed the law they provided cameras and

11  equipment for each of the registrar's office.  So we have

12  the equipment in both Manassas and Woodbridge.  If a voter

13  doesn't have a photo ID that qualifies, they can go to an

14  office and get one that day they can use for voting.

15        THE COURT:  That is free, is that correct?

16        THE WITNESS:  Yes.

17        THE COURT:  Okay.

18  BY MS BRANCH:

19  Q     You mentioned that the electoral board hires the

20  registrar.  Who is responsible for hiring the election

21  officers in the polling places on election day?

22  A     Well, we have a full-time person in the office whose

23  job is basically recruiting election officials.  We have

24  91 precincts in the county, so we have a pool of over a

25  thousand election officials that we draw from.  So the

1  parties will submit names.  You know, the people in the

2  office are constantly -- we put a notice in the county

3  employee news letter asking if county employees that are

4  interested.  Bus drivers.  We try and look for as many

5  different avenues as possible because we are always

6  looking for more election officials.

7  Q    What time do the polls open in the county?

8  A    6:00 a.m.  And they close at 7:00.

9  Q    Is there a chief election officer at every precinct?

10 A    Yes.

11 Q    And can you describe the chief election officer's

12 responsibilities?

13 A    Well, the chief is in charge of the precincts on that

14 day.  And the chief is typically someone who has worked in

15 the precincts a number of years.  They have a team of --

16 and they make sure all that all the requirements are met.

17 They make sure the equipment is set up and ready to open

18 when voters --

19      MR. KAUL:  Your Honor, Mrs. Kellom has problems, has

20 fallen several times. I think that is what happened.

21      THE COURT:  Let's pause in place for a moment.

22      Everything okay out there?

23      MR. SPIVA:  Let me double check.

24      THE COURT:  All right.

25      All right.  Go ahead.  I think everything is all

1   right.

2        MR. SPIVA:  It is all right.

3        THE COURT:  Thank you, sir.

4        MS BRANCH:  Thank you, Your Honor.

5   BY MS BRANCH:

6   Q    So, Mr. Scarborough, you were giving the

7   responsibilities of the chief election officers.

8        THE COURT:  I think it is responsive, the same every

9   place.  It is statutory, is it not?

10        THE WITNESS:  Yes.

11        THE COURT:  It's established.

12        Let's move on to something that really pertains to

13   the issues here.

14   BY MS BRANCH:

15   Q    Fair enough.

16        Mr. Scarborough, are you familiar with Virginia's

17   voter ID requirements?

18   A    Yes.

19   Q    How have you become familiar?

20   A    Over the course of the time that I have been on the

21   board, part of our responsibility is training the officers

22   about what a voter needs to do when they walk in the

23   precinct in order to vote.  And so when I first was

24   appointed to the electoral board there was a requirement

25   that voters provide some form of ID.  But it could be

1   their voter registration card, utility bill, a bank

2   statement.  And, in fact, when I was first was appointed

3   there was a form called "affirmation of identity," which

4   basically said, if I walk into a precinct on election day

5   and I don't have any of the valid IDs that the state

6   requires, I could sign a piece of paper that says, I am

7   who I say I am.  And I was allowed to vote --

8        And then several years later with the first step in

9   changing the voter ID laws the General Assembly did away

10  with the affirmation of identity and said that you have to

11  have these specific forms of identification.  And if you

12  don't have those, then you vote a provisional ballot.  The

13  General Assembly went even furthermore recently to change

14  that to require a photo ID.  So before, you know, there

15  wasn't a photo ID requirement but you could still vote a

16  provisional ballot.

17       Now if you show up without one of the qualified photo

18  IDs, then the voter has to be given a provisional ballot.

19  And when given the provisional ballot there is an envelope

20  they fill out and they sign.  There is a sheet of

21  instructions.  That is a green sheet, I think SBE form,

22  that is given to every voter that has to vote a

23  provisional ballot.  It describes to them how they are

24  required to come in with some form of photo ID by noon on

25  Friday after the election if their vote is going to be

1  counted.

2  Q    And that sheet that you are describing, do you know

3  if it includes any information about the option to get a

4  free ID?

5  A    I am not sure that it does.  It would make sense, but

6  it has been a while since I read the form.  I know it lays

7  out what their legal options are, but not sure it

8  specifically tells them they can get the photo ID you need

9  at our office.

10 Q    As a member of the board have you observed elections

11 in various precincts in the counties since you were

12 appointed?

13 A    Yes.

14 Q    And you visit precincts every election?

15 A    Right.

16 Q    How many precincts do you visit in any given election

17 about?

18 A    Depends on what the issues are.  Sometimes it is, you

19 know, five or six, sometimes it is ten or 15.  Just

20 depends on how, you know, what issues crop up at a

21 specific precinct.

22 Q    Over the course of the time that you have been on the

23 board, have you observed anything when you have gone to

24 visit these precincts that would support the need for a

25 change in the voter ID requirement over time?

1  A    No.  I mean, actually it seems like it is an ever

2  moving ball or goal post.  And, you know, we have never

3  had a situation where someone has come in and tried to

4  vote and impersonate someone else.

5      So, there is nothing that has happened specifically

6  in Prince William County that to me would justify moving

7  to a more restrictive photo ID regime.

8  Q    Are there election administration challenges in

9  Prince William County?

10 A    Well, every county has challenges.  In 2012, Prince

11 William, and a number of other jurisdictions, had long

12 lines at a number of our precincts.

13     MR. FINBERG:  I don't know whether she was planning

14 to go into long lines.

15     THE COURT:  I'm sure she is not.  I instructed her

16 not to.

17     MR. FINBERG:  Thank you.

18 BY MS BRANCH:

19 Q    If you could just complete the sentence.

20 A    Sure.

21     THE COURT:  Sure.  Complete your answer.

22     THE WITNESS:  There are challenges, you know, there

23 may be a precinct where the EPBs don't synch up, so you

24 are checking in people with one or two electronic poll

25 books rather than four.  There may be a situation with our

1    old touch-screen voting equipment where one of the

2    machines went down.  Or, you know, there may be other

3    issues.  But, you know, typically you know there is always

4    something that happens at an election.  It is not always

5    what we predict it is going to be to.

6    BY MS BRANCH:

7    Q    Let me talk about the training of election officers.

8    Can you tell the Court what requirements there are for

9    training for election officers?

10   A    So every officer is required by the code to go

11   through training.  So we do a three-hour training.  We

12   have an officer's manual that sets out basically all of

13   the requirements of the code.  It has various sections on

14   how to handle the voter ID issues.

15        One of the challenges we had in 2012 was the number

16   of inactive voters.  Frankly, the higher the turnout in

17   presidential races are usually the races where we have the

18   most issues because we have infrequent voters who may not

19   be aware of changes in technology, changes in law, or they

20   may also just have moved, you know, once or twice since

21   the last time they voted.  So when an inactive voter comes

22   in and they check in, if they tell the officers they have

23   a different address than what shows up on the poll book,

24   then there is a process that we have to do.  It is called

25   the "What Ifs."  And we have to determine whether that

1  voter is still entitled to vote in this precinct even

2  though they have moved out of the precinct.

3  Q    Is the office's manual that you described, is that

4  provided by the state?

5  A    No.   The county.

6  Q    Do you use training materials provided by the state

7  with election officers?

8  A    Some of the forms, but most of the materials that we

9  use are ones that we developed.

10 Q    You said that the training does include a session on

11 voter ID requirements.

12 A    Right.

13 Q    Are election officers trained to determine whether an

14 employer ID is acceptable?

15 A    Well, we basically -- our policy is if someone walks

16 in with an employer ID and it has a photo, we don't ask

17 our officers to go beyond then any kind of inquiry to find

18 is it still a current ID, do you still work there?   We

19 basically take it at face value if someone walks in with

20 an employer ID that is a photo ID, that, for us,

21 qualifies.

22 Q    Are election officers trained to determine whether a

23 driver's license is expired and therefore potentially

24 unacceptable under the law?

25 A    Yes.   The state board issued, or regulations that

1    basically tried to establish a one-year period.  So, when

2    a voter comes in with a driver's license, we train our

3    officers to look to see whether it is expired.  And if it

4    is expired, whether it is still within the one-year

5    window.

6    Q    To your knowledge does an ID have to have an

7    expiration date on it to be acceptable under the law?

8    A    No.  There are some versions of photo IDs that don't

9    have any expiration dates at all.

10   Q    Do you know if the free ID has an expiration date on

11   it?

12   A    I don't believe it does.  No.

13   Q    Can you describe the process for a voter who needs to

14   get a free ID in Prince William County?

15   A    Sure.  If an individual needs to get the free ID,

16   they walk into our office and tell us who they are.  And

17   we make, we check and make sure they are registered in the

18   county.  And if they are a registered voter in county then

19   we automatically issue the photo ID.

20   Q    Does the voter have to show any documentation to get

21   a free ID?

22   A    No.

23   Q    To your knowledge then, voters can get a free ID if

24   they already have acceptable ID under the law?

25   A    I know the state board -- and we discourage this -- I

1   mean one of the questions when a voter comes in asking for

2   a free photo ID is, our staff is trained to ask them,

3   well, do you have a passport?  Do you have an employer?

4   Do you have any other form of ID that will qualify you to

5   vote?  And if they do, they say they do, then we would ask

6   them to use that rather than giving them a photo ID.

7   Q     Do you know why that is?

8   A     Pardon me?

9   Q     Do you know why that requirement exists, or why what

10  you just described is the protocol?

11  A     I am not sure, no.

12  Q     How are elections in Prince William County funded?

13  A     Most of the funding comes from the county.  The state

14  provides, covers part of the cost of most of the salary of

15  the registrar.  They provide part of the cost of the per

16  diem that electoral board members get.  But by far the

17  largest percentage of cost of an election is all provided

18  by the county.

19  Q     When the photo ID, the 2013 photo ID law was passed,

20  did Prince William Electoral Board engage in voter

21  education and outreach efforts regarding the law?

22  A     Well, we did, you know, I guess you would say a

23  minimal amount.  Election offices are typically under

24  staffed and under funded at every level.

25        So, we don't have the budget for the staff to do a

```
1  lot of outreach.  We would put something on the web site,
2  you know.  I know that the state board provided some
3  flyers, and we made those available in libraries and other
4  public buildings, but that was about the extent of what
5  the office did.
6  Q    Did the board receive funding from the state to
7  engage in voter outreach or education efforts regarding
8  the photo ID law?
9  A    No.
10 Q    Are you familiar with the idea of a mobile unit
11 related to getting a free ID?
12 A    Yes, I know there is some jurisdictions that use it.
13 We have never used it in Prince William.
14 Q    Can you describe what it is?
15      THE COURT:  You already had three witnesses do that.
16      MS BRANCH:  Okay.
17 BY MS BRANCH:
18 Q    Are you aware of any localities that have mobile
19 units?
20 A    Not personally.  I have heard them discussed, but I
21 don't know any specific locality that uses them.
22 Q    Separate from work as an electoral board member, have
23 you engaged in voter outreach or education efforts
24 regarding the photo ID law?
25 A    Yes.  One of the -- an electoral board member wears
```

 1  basically two hats.  I mean there is the official

 2  responsibility that we have to carry out elections and the

 3  post election things where, you know, 95 percent of

 4  everything that we do is bi-partisan, non-partisan.  But

 5  then electoral board members also, you know, we also have

 6  the ability to do our own personal outreach.

 7      So because of my interest in having Democratic

 8  elected officials elected, you know, I have done --

 9      MR. FINBERG:  Objection.

10      THE COURT:  Objection sustained.  Not really

11  responsive to the question.  The question was whether or

12  not he does his own outreach aside from electoral board

13  member.

14      MR. FINBERG:  Your Honor, I have an additional

15  objection.  That is, when the witness disclosure provided

16  for Mr. Scarborough, we were informed he would be

17  testifying about the fact that he is a member of Prince

18  William Electoral Board, he will testify about the

19  implementation of Virginia photo ID law.  It was not

20  disclosed as a witness who was going to talk about his own

21  personal activities doing voter outreach.

22      MR. KAUL:  May I ask?

23      THE COURT:  No, you may not.  The only person that

24  can address the Court on a witness is the person

25  examining.  You may confer with her, but you can't address

1   the Court on that.

2        MR. KAUL:  My apology, Your Honor.

3        THE COURT:  Yes, sir.

4        MS BRANCH:  For clarification, I have a question for

5   defense counsel.  Which document is he referring to?  Is

6   he referring to our witness disclosures or witness list?

7        MR. FINBERG:  Referring to the witness list which was

8   filed on February 11th, document number 155 in the Court's

9   records.

10        MS BRANCH:  Yes.  Your Honor, we disclosed all of our

11   witnesses on our initial disclosures, and we did so

12   frequently.  Defense counsel had the opportunities to

13   depose all of the individuals who were listed on the

14   initial disclosure.

15        THE COURT:  We could have gone through this and been

16   finished with the exam in the time it has taken up.

17        Go ahead and be brief.  I will give you latitude on

18   this.

19   BY MS BRANCH:

20   Q    Can you describe the outreach efforts that you have

21   undertaken?

22   A    Sure.  I have developed relationships with a number

23   of pastors in African-Americans churches.  And I have

24   also -- so I have done outreach in the churches, voter

25   registration.  Education about ID law, changes in

1   technology, new polling locations.  I have done outreach

2   in the Latino community at Hispanic churches, outreach at

3   the NAACP and groups like that to make sure that their

4   members were aware of any changes that are made in

5   election laws.

6   Q    Have you chosen to do the voter outreach in the

7   communities you have described for any particular reason?

8   A    Well, two reasons.  I mean, I am still a good

9   government enough person to believe that the process, you

10  know, everybody should be encouraged to vote.  So there is

11  a good government hat.  And also the partisan hat that,

12  you know, I want to make sure that the constituencies and

13  the people that support Democrats are fully aware of how

14  they vote, what they need to do to vote, and how their

15  vote is going to be counted.

16  Q    This is the last question.  In your experience what

17  has been the reaction of voters you have done outreach

18  with to the new photo ID law?

19  A    Basically it has been a negative approach.  And

20  voters, when voters will say, well, why do we need a photo

21  ID?  I voted for years and years with my -- we had -- for

22  years we had a voter registration card, and that was fine.

23  And then, so what happened now that we have to get a photo

24  ID?  They feel like it is an attempt to make it much more

25  restrictive for certain people to vote.

1    Q       Okay.   No further questions.

2            THE COURT:   Cross examination?

3                          CROSS EXAMINATION

4            MR. FINBERG:    Thank you, Your Honor.

5    BY MR. FINBERG:

6    Q    Good morning, Mr. Scarborough.

7    A    Good morning.

8    Q    Thank you for coming today to give your testimony.    I

9    am Dana Finberg, one of the attorneys representing the

10   Commonwealth election officials who are the defendants in

11   this case.   I have a few questions for you.

12        I think you testified on direct that the electoral

13   board which you are a member of hires a general registrar;

14   is that right?

15   A    Yes.

16   Q    The general registrar is responsible for the

17   day-to-day management of the registrar's offices?

18   A    Yes.

19   Q    You testified that there are two registrar offices in

20   Prince William County.

21   A    Right.   Yes.   The full-time office is Manassas and

22   satellite office in Woodbridge.

23   Q    Okay.

24        Miss Branch asked you questions about the hours of

25   those offices.

1      Are there also expanded hours at the registration

2  offices closer to election time?

3  A    Yes.  During -- when we get closer to elections we

4  actually, when we are doing in-person absentee voting, at

5  the beginning of the process we have in-person voting at

6  those two offices.  And then -- so this coming weekend we

7  will actually have five locations around the county in

8  addition to our two main offices.  We have locations at

9  three other places where anybody who is registered can go

10 if they qualify to vote absentee in person.

11      THE COURT:  What are the standard hours,

12 Mr. Scarborough?

13      THE WITNESS:  For the last two weekends we have

14 Tuesday and Thursday evening hours to, I think

15 8:00 o'clock.  And we have Saturday hours from 8:30 to

16 5:00.

17      THE COURT:  Thank you, sir.

18      THE WITNESS:  The last two Saturdays before the

19 election.

20 BY MR. FINBERG:

21 Q    You talked about required training, three hours of

22 required training.  Who trains the chief election officer?

23 A    The registrar does the bulk of the training.  We also

24 have two staff people that are the equipment specialists.

25 And so we have a general training course that covers

1    everything that happens on election day.  And then we have

2    specific training for the electronic poll book people, and

3    the people that operate the voting equipment.  So they get

4    two hours, basically, and that is done by a staff person

5    in our office.

6    Q    Okay.

7         I think you also testified that there were close to a

8    thousand election officials who get hired to work at

9    elections?

10   A    Right.

11   Q    Who is responsible for training those thousand

12   elections officials?

13   A    It is the registrar and the other staff people.  The

14   -- we attend as many of the training sessions as we can.

15   But we have training basically four or five days a week

16   before the voting starts.  So the bulk of the training is

17   done by the registrar and her staff.

18   Q    Okay.  The staff that works in the registrar's

19   office, who is responsible for training them?

20   A    Well, the registrar, and then also training that is

21   provided by the State Board of Elections has training.

22   The associations.  There is five or six Virginia

23   Association of Voter Registrars.  So there are basically

24   professional development courses that are available for

25   the staff of the registrar.

1    Q      Okay.

2           Would you agree with me, Mr. Scarborough, that the

3    election officials who the average voters comes in contact

4    with on election days are trained by the local registrar's

5    office?

6    A      Yes.

7    Q      Those election officials receive training in

8    provisional balloting I think you testified.

9    A      Right.

10   Q      And to your knowledge are they all trained to give

11   voters who need to vote provisional, supply them with

12   information on how to complete the process?

13   A      Yes.  That is part of the training.  And so there

14   are, yes, so there are different reasons why someone would

15   vote a provisional ballot, but for our purposes a

16   non-photo provisional ballot there is an explanation given

17   to the voter.  They fill -- there is an envelope they fill

18   out that the chief signs, and that the voter signs.  And

19   they are given a green sheet of paper that describes to

20   the voter, here is what you need to do in order to have

21   your vote counted.  You need to provide a valid photo ID

22   to our office by noon on the Friday after the election.

23   Q      To your knowledge the election officials who interact

24   on the front lines, for lack of a better term, with the

25   voters on election days, are specifically trained that

1   they are supposed to give them that flyer; correct?

2   A    Yes.

3   Q    I want to ask you a question about the free voter

4   IDs.  Ms. Branch was asking about whether a voter with

5   another form of valid ID could get a free voter ID.  I

6   believe the testimony was it was discouraged.

7   A    Exactly.

8   Q    What happens if a voter insists, is insistent?  He

9   tells the person at the registrar's office that my license

10  is going to expire in six months, I would like to have

11  this.  Would that voter be issued a free voter ID?

12  A    Well, if the voter insists that they don't have

13  another form, then, you know, we are not in the business

14  of, you know, trying to argue with voters that come in.

15  If they come in and make a legitimate request, we will

16  provide them with that photo ID.

17  Q    She asked you about -- strike that.

18       You were asked some questions about administration of

19  elections and events that go on at the polls.  Are you

20  familiar with the Help America Vote Act?

21  A    Yes.

22  Q    Referred to as HAVA.

23  A    Yes.

24  Q    Prior to enactment of the photo ID law, election

25  officials had to make a determination whether a voter had

1   a HAVA or a non-HAVA ID, correct?

2   A    Right.

3   Q    Did making that determination cause issues at the

4   polls?

5   A    Well, there were some times that confusion, just

6   because when you have a different ID requirement for

7   federal elections than when you do for state or local

8   elections.  There are times when a voter would come in and

9   we would explain that, well, because this is a federal

10  election as opposed to state election, the ID requirements

11  are different.

12  Q    But now that the new photo ID law in Virginia has

13  gone into effect, that HAVA determination no longer has to

14  be made.

15  A    Right.

16  Q    Ms. Branch asked you about the outreach efforts that

17  were made by the Prince William County Electoral Board.

18  Before the November 2014 general election the electoral

19  board discussed what the county was going to be doing to

20  insure that voters without photo ID would be properly

21  equipped to vote right?

22  A    Right.

23  Q    And there are minutes maintained of those electoral

24  board meetings, right?

25  A    Right.

Scarborough - cross                    686

```
 1  Q    Do you recall that issue being discussed at a March
 2  28, 2014 meeting?
 3  A    I don't recall, but I am sure it is completely
 4  possible that it was.
 5  Q    Do you recall whether it was at that meeting or some
 6  other meeting -- this isn't a memory test for dates -- the
 7  electoral board approving actions to prepare an outreach
 8  to educate the public on voter ID laws and provide voter
 9  ID laws as required?
10  A    I know that we were given flyers that were
11  distributed by the State Board, and so we instructed the
12  registrar and the staff to post those in government
13  buildings.  To do -- I mean, our office does voter
14  registration in high schools for seniors that are eligible
15  to vote, or will be by the November election.
16       But that is about the extent of the outreach that,
17  you know, that the electoral board itself does.  I am sure
18  we posted something on the web site.  You know, we would
19  put, probably put something in the county employees
20  newsletter just informing them there is a new voter ID
21  requirement.
22  Q    Thank you.
23       No further questions.  Thank you for your testimony
24  today.
25       THE COURT:  Miss Branch, any redirect?
```

Scarborough - redirect                    687

1          MS BRANCH:   Just one.

2          THE COURT:   Go right ahead.

3                      REDIRECT EXAMINATION

4   BY MS BRANCH:

5   Q     Your Honor, is it okay if I ask one followup question

6   about the lines in Prince William County in 2012?   Because

7   we go through the openness of the political system and the

8   ballot.

9          THE COURT:   All right.   Go ahead.   One question.

10  BY MS BRANCH:

11  Q     One question.

12         What was the longest line, or what was the longest

13  line, that you observed or were reports of in Prince

14  William County?

15  A     In 2012, we had about a third of our precincts still

16  had people in line at 7:00 o'clock.   Most of those were

17  able to process them within the next hour or two.   But

18  there was one precinct, River Oaks precinct, which is --

19  it was a heavy minority precinct along the Route One

20  corridor.   There were, I was there most of the afternoon.

21  And so at 7:00 o'clock we closed the doors to make sure no

22  one else came in, but every one who was in line at

23  7:00 o'clock was able to vote.   And the last person, I

24  think it was ten minutes to 11:00.   So there were people

25  that waited, you know, three or four hours at that

1  precinct.

2  Q      Thank you.

3         THE COURT:  May Mr. Scarborough be excused at this

4  point?

5         MS BRANCH:  Yes.

6         MR. FINBERG:  He may be, Your Honor.

7         THE COURT:  You are excused and free to go, sir.

8  Thank you very much for your testimony.  We appreciate you

9  coming in today.

10                    (Witness stood aside)

11        MR. SPIVA:  Your Honor, plaintiffs' next witness is

12 Susan Kellom.  It will be a second.  Mr. Kaul has gone to

13 get her.

14        MR. FINBERG:  Preemptively may I raise the same

15 objection to Ms. Kellom's testimony as I tried to raise

16 with Mr. Scarborough in terms of disclosures made?  We

17 have absolutely no objection to her testifying about her

18 role as a member of the Alexandria Electoral Board, and

19 about the implementation of the photographic

20 identification jurisdiction, but to the extent that

21 counsel wants to get into the same types questions about

22 the personal activities, that was not part of the witness

23 disclosure provided in this case.

24        MR. SPIVA:  That is not accurate, Your Honor.  We

25 served initial disclosures that gave a full disclosure.

1   What he is talking about is the witness list.  The

2   defendants' witness list has absolutely no information

3   about what the witnesses are going to testify about.  Ours

4   provided like a sentence.

5       THE COURT:  Do I need to take the time to review the

6   witness disclosure?

7       MR. FINBERG:  I would like to see which he is talking

8   about.  We have gotten numerous amounts of witness

9   disclosures throughout the course of this case.  Some as

10  recently as a couple weeks ago.

11      MR. SPIVA:  As I said, Your Honor, but we have --

12  what I am talking about is our Rule 26 initial disclosures

13  in which we disclosed witnesses and what they were going

14  to -- what their knowledge was.  We were not obligated to

15  put anything on the witness list as the defendants did

16  not.

17      THE COURT:  All right.  We will take the time.  You

18  may go ahead and seat her on the witness stand.

19      MR. KAUL:  Thank you.

20      THE COURT:  Yes, we will go ahead and just stop for a

21  while and resolve this.

22      Ms. Kellom, if you would turn and face the Clerk of

23  the Court.

24      Can you raise your right hand?  Go ahead.

25                        SUSAN KELLOM

Kellom - direct                              690

```
 1              WAS SWORN AND TESTIFIED AS FOLLOWS:

 2         THE COURT:  Very well.  We will get you situated on

 3    the witness stand.

 4         Do you need a short recess for this purpose?

 5         MR. SPIVA:  Well, I think I have it.  My colleague,

 6    Mr. Kaul, will be putting on the testimony.  I can hand it

 7    up to Your Honor if you prefer.

 8         THE COURT:  Why don't you show it to counsel.  If you

 9    can convince him, I am satisfied.

10         MR. SPIVA:  Okay.

11         MR. FINBERG:  Can you put that on the screen, please?

12         Your Honor, this is the sixth and last initial

13    disclosure that we received.  And in paragraph six is

14    where Ms. Kellom is identified.  She is the first one.

15         And if I could, or if you would read, I will read in

16    it into the record.

17         THE COURT:  I can read it.

18         MR. FINBERG:  You can.  Didn't mean to imply

19    otherwise.

20         THE COURT:  As I read this it doesn't disclose really

21    clearly whether or not their information is based upon

22    their official duties or personal experiences.

23         MR. FINBERG:  I think it is fair to say given the

24    distinction elsewhere in the initial disclosures where

25    they clearly talk about people going to come and testify
```

1  about their personal experiences and get out to vote

2  efforts and those types activities, she would not fall in

3  that category.  Additionally, the objection is it is

4  cumulative.

5      THE COURT:  Oh, it is cumulative.  I am going to

6  restrict it significantly as we go forward.  But reading

7  this over -- and I understand your objection -- you could

8  read this either way as being strictly testifying in their

9  official capacity or giving their take on this from both

10  perspectives.  I am going to overrule the objection, but I

11  will hold you to -- we have been over this stuff so many

12  times.  So you can expect the Court intervening from time

13  to time.

14      All right.

15      MR. SPIVA:  Absolutely.

16      THE COURT:  Keep both feet in bounds.  All right.

17      Would you be kind enough to give your full name,

18  ma'am, and spell the last name for this gentleman here,

19  the court reporter.

20      THE WITNESS:  Susan.  Middle name Bulkley,

21  B-U-L-K-L-E-Y.  Last name is Kellom, K-E-L-L-O-M.

22      THE COURT:  Okay.  Go right ahead.

23                    DIRECT EXAMINATION

24  BY MR. KAUL:

25  Q    Thank you, Your Honor.

1          Ms. Kellom, where do you live currently?

2   A     XXX South Xxxxxxx Street in Alexandria.

3   Q     And I am going to ask how long have you lived in

4   Alexandria?

5   A     We moved here in 1983.

6   Q     I am going to start right there.  Since you have

7   moved to Virginia, have you been involved politics?

8   A     We got, I got involved in politics after I left the

9   Army in 19 -- I left Army in 1982. '81.  I got involved

10  the first time in '82 in the Herb Harris campaign for

11  Congress.

12  Q     During your involvement in Virginia politics have you

13  served on your local Democratic committee?

14  A     Yes.

15  Q     Did you serve as chair?

16  A     I served as chair for ten years.

17  Q     And in that role, did you interact with the

18  Alexandria County Electoral Board?

19  A     Frequently.  Ubiquitously.

20  Q     Did there come a point in time when you became a

21  member of the electoral board?

22  A     Yes.

23  Q     When was that?

24  A     I believe that was in 1972 or '3.  I apologize for

25  the lapse.

```
 1        THE COURT:  Are you talking about an Electoral Board

 2 in Alexandria, or a board someplace else?

 3        THE WITNESS:  In Alexandria.

 4        THE COURT:  You said you moved -- you said you moved

 5 there in 1983.

 6        THE WITNESS:  Pardon?

 7        THE COURT:  I thought you testified you moved to

 8 Alexandria in 1983.  Am I wrong?

 9        THE WITNESS:  Did I say - ask it again.

10        THE COURT:  Why don't you clarify that?

11        THE WITNESS:  It would have been 2013.  I apologize.

12        THE COURT:  Okay.

13 BY MR. KAUL:

14 Q    In your role as chair of the local Democratic

15 committee and electoral board have you become familiar

16 with the demographics of Alexandria?

17 A    Yes.  I have to apologize.  I am having a hard time

18 hearing you.

19 BY MR. KAUL:

20 Q    Thank you.

21      Have you also become familiar with which parts of

22 Alexandria have large communities of people who rely on

23 public transportation?

24 A    Yes.

25 Q    Which part of Alexandria is that?
```

Kellom - direct                       694

1    A     Commonly called the west end.  It is that, you have

2    to take a look at the demographics of the buildings and

3    everything to see.  Because it is mostly people who live

4    in apartments and condos.

5    Q     Does your board have meetings?  Does your board have

6    meetings, public meetings?

7    A     Yes.

8    Q     Are various election issues discussed at those

9    meetings?

10   A     Yes.

11   Q     Has the subject of voter ID come up at those

12   meetings?

13   A     Yes.

14   Q     What sorts of issues have been raised regarding voter

15   ID at your public meetings?

16   A     Several.  Number one was first the comparison with

17   our registered voter list with people on the DMV list who

18   either had a driver's license or a DMV ID to see how many

19   people did not have that.

20   Q     Who conducted that analysis that --

21   A     That was conducted I am going to have to say by the

22   registrar's office.  But I am not -- it could have been a

23   state analysis.  I believe it was a state analysis that

24   was given to us.

25   Q     Who brought it to your attention?

```
 1   A    I would like to say just about everybody, because

 2   everybody was concerned about it.   Bringing the analysis

 3   to our attention was our general registrar.

 4   Q    Okay.  Did that analysis indicate where in Alexandria

 5   individuals were least likely to have DMV-issued ID?

 6   A    It appeared it was most likely the west end.

 7   Q    How did the demographics of the west end compare to

 8   the rest of Alexandria?

 9   A    This is my personal impression.   It's not --

10   Q    I don't want an impression, but what have you

11   observed?

12   A    My observation is that the demographics of the west

13   end are people who tend to commute to work, not have, not

14   have driver's licenses or vehicles.

15   Q    How does their age compare to other people?

16   A    Tend to be younger.

17   Q    Have you done, "you," meaning the board and the

18   registrar, done outreach regarding the voter ID law?

19   A    Yes, we have.

20   Q    Can you describe what that has been?

21   A    Okay.  We have gone out to the senior facilities in

22   the west end where we also found that there were people

23   who did not have any ID.  We have made attempts to do

24   outreach in the apartments and condos, but it is not a

25   very successful or easy thing to do.
```

1          Mainly because --

2     Q    Can you explain that?

3     A    Yes.

4          You have to get permission from each building, and

5     then you have to do timing.  And the timing is so off that

6     you miss sending somebody out, and we would miss people so

7     often.

8          You don't know when they are coming, when they are

9     going, what they are doing.

10    Q    You said you did outreach at senior centers?

11    A    Yes.  And we also, we also have at the library when

12    we have the absentee voting we also do the ID.

13    Q    You said before that the west end consists of a lot

14    of younger people.  Where in the west end do those people

15    tend to live based on your observation?

16    A    In the apartments and the condos.

17    Q    The areas you say you have trouble getting into?

18    A    It is a tough thing to do.  And an expensive thing to

19    do.

20    Q    Have you received any money from the state to do

21    outreach?

22    A    Not to my knowledge.

23    Q    Does the cost of doing outreach impose a barrier?

24    A    It's footed by the City and it has been very, very

25    helpful.

Kellom - direct                         697

1  Q     What are costs that you have for doing outreach?

2  A     It is hourly pay for the election officials who have

3  to go out there.   You have to send a team.   Off the top of

4  my head I can't tell you exactly how much it would cost

5  each time.   But it would be at least a couple hundred

6  dollars.

7  Q     Can you tell the Court what the election board

8  members do on election day?

9  A     Yes.   Each of us is assigned to one school board

10  district, and we travel around and around and around to

11  the precincts in the school board district that we are

12  assigned to.

13  Q     Have you observed voters at the precincts that you

14  have gone to?   Have you observed voters at the precincts

15  that you have gone to?

16  A     Yes.   I am sorry.   I am having a hard time hearing

17  you.

18  Q     That is my fault.

19        Do you also receive reports following election day?

20  A     Yes, we do.

21  Q     Based on your observations in person and the reports

22  that you have received, have you learned about issues that

23  voters have had with the voter ID requirement?

24  A     Yes.

25  Q     Can you -- can you describe those?

1   A       Several.

2           Number one, people don't understand that they need to

3   have it.  And if they don't have it, it is sometimes a

4   problem.  If they don't have a photo ID they have to go

5   over to the chief election official or his or her deputy

6   and fill out a provisional ballot.  And he instructs on

7   how to come back before noon on Friday after the election

8   to present proper ID.  And they are given -- it is -- I

9   don't want to say a complicated form, but it takes a while

10  to fill out, ten or 15 minutes, and a lot of people just

11  don't want to do it.

12  Q       Do voters, or have you observed or learned about

13  voters who have to wait in line to cast a provisional

14  ballot?

15  A       I don't want to say in line, because we try and

16  process them as soon as possible.  But the main reason

17  that I have heard that people have problems is they don't

18  have the time to stay.  They need to get on to work.  And

19  they can't take the ten or 15 minutes that it is going to

20  take.

21  Q       Are these voters who have already gone through the,

22  whatever line there is?

23  A       They have stood in line and they have tried to check

24  in at the poll book.  And then they have not had an ID to

25  present.

1   Q     Have you made observations or received reports of

2   voters who walk away rather than cast a provisional

3   ballot?

4   A     Yes.   Yes.   We have numerous reports of that on our

5   election official --

6         THE COURT:  Ms. Kellom, wait until they ask you a

7   question.

8         THE WITNESS:  Okay.

9         THE COURT:  All right.  Go ahead.

10  BY MR. KAUL:

11  Q     Could you describe what sorts of reports and quantity

12  you have received?

13  A     We have incident reports from the chief election

14  officials at the polls.  And I personally have observed it

15  several times I have been going around.

16  Q     Have you made observations about election

17  administration difficulties that the college ID limitation

18  to Virginia IDs creates?

19  A     There are approximately 300 colleges and universities

20  across the country who have some sort of a presence in

21  Virginia.  That makes their ID legitimate even though it

22  is not a Virginia ID.

23        And it takes time to check and see if that college or

24  university is on the list.  And we have to send, if the

25  person presents that ID from a non-Virginia university or

1   college, and we have to send them to another person to

2   check.

3   Q    Have you observed incidents in which voters had

4   expired IDs but couldn't vote with those IDs?

5   A    I personally have not, but I have heard about it.

6   Q    Is this through your work as a member of the board?

7   A    Yes.

8        THE COURT:  Next question.

9        THE WITNESS:  Not sure exactly.

10       MR. KAUL:  I will ask a different question.

11       THE WITNESS:  I apologize.

12       THE COURT:  Ms. Kellom, if you don't have any

13   personal knowledge, don't answer.  Okay?

14       Next question.

15   BY MR. KAUL:

16   Q    Have you made observations or reviewed reports about

17   voters who were confused by the voter ID requirements?

18   A    Yes.

19   Q    Now, to get a free ID a voter can go to the electoral

20   board, correct?

21   A    Yes.

22   Q    Sorry.  The registrar's office.

23   A    Um hum.

24   Q    And what does a voter need to show?

25       THE COURT:  We have been through this with numerous

```
 1  witnesses.

 2       MR. KAUL:  I apologize.

 3       THE COURT:  If it is different in Alexandria, that is

 4  fine.  But if not, we have been through this.

 5       MR. KAUL:  I was going to lay the foundation.

 6       THE COURT:  Okay.

 7  BY MR. KAUL:

 8  Q    What -- in your experience as an election

 9  administrator is there anything more secure about having

10  voters obtain the free ID at the registrar's office than

11  voting with an affirmation at the polls?

12  A    Absolutely not.

13  Q    Thank you.

14       No further questions.

15       THE COURT:  All right.

16       Cross examination of Ms. Kellom?

17       MR. FINBERG:  Very briefly, Your Honor.

18                       CROSS EXAMINATION

19  BY MR. FINBERG:

20  Q    Good afternoon, Ms. Kellom.  Thank you for being here

21  today to testify.  My name is Dana Finberg, one of the

22  attorneys that is representing the Commonwealth election

23  officials who are the defendants in this case.

24       I just want to ask you a couple questions.

25  A    All right.
```

1  Q    Are you currently the secretary of the Alexandria

2  Electoral Board?

3  A    Yes, I am.

4  Q    And have you been serving in that capacity since

5  2012?

6  A    Yes.  No. No, no.

7  Q    When were you elected the chair?

8  A    I was elected chair in 2012.

9  Q    Yes.

10  A    But secretary just since last year since we took

11  over.

12  Q    Okay.  Sorry for my confusion there.

13      Were you the chair after the photo ID law was enacted

14  in 2013 and went into effect in 2014?

15  A    Yes.

16  Q    That clears up my confusion.

17      After the photo ID law was enacted did Alexandria

18  plan and conduct an outreach program to insure eligible

19  voters would have a photo ID?

20  A    Yes, we did.

21  Q    As part of that outreach program Alexandria

22  identified voters who might be adversely effected by the

23  law, right?

24  A    What we did was, is part of the state-wide program to

25  compare the DMV list with the registered voters because

1   the presumption was that somebody on the DMV list would

2   have a voter ID.  And perhaps, but not definitely, someone

3   who is not on the DMV list would not.

4   Q    Did the Alexandria Electoral Board in the process of

5   coming up with the outreach program make a determination

6   that elderly voters as a population were most likely to be

7   impacted by the photo ID law?

8   A    No.  When we looked at what the demographics were of

9   what it was, it turned out that it was probably more

10  younger voters.

11  Q    Really?  Do you know who Tom Parkins is?

12  A    Pardon?

13  Q    Do you know who Tom Parkins is?

14  A    Sure do.

15  Q    He served as general registrar for the City of

16  Alexandria, didn't he?  Have you read any publications,

17  articles, that he has written regarding the outreach

18  programs that the City of Alexandria engaged in?

19  A    Educate me.

20  Q    Are you aware of an article in which he said that the

21  City of Alexandria in 2014 began their outreach efforts by

22  contacting groups representing voters who were

23  traditionally adversely impacted by voter ID laws?

24  A    Um hum.

25  Q    Would you -- are you aware that he has said that

1   based on experiences of other states and discussions with

2   election officials in jurisdictions with similar

3   demographics Alexandria election officials have determined

4   that elderly voters at retirement homes and care centers

5   will likely be the largest group in need of photo IDs?

6        MR. KAUL:  I ask we get a copy of that document.

7        THE COURT:  Sure.

8        THE WITNESS:  I do not remember that.  But what we

9   have felt as a board since then, yes, that elderly are

10  very, very likely not to have it because either their

11  driver's license or their DMV ID has expired.  But what we

12  have also discovered is that young people who use public

13  transportation and live in apartments and condos and don't

14  have cars, are also very, very likely not to have them.

15       We have made outreaches in both of those areas.

16  BY MR. FINBERG:

17  Q    Ms. Kellom, how many registrar's offices are there in

18  Alexandria?

19  A    One.

20  Q    Where is that located?

21  A    132 North Royal Street.

22  Q    What are the hours of the registrar's office?

23  A    Normal hours are 8:00 to 5:00.

24  Q    Are there expanded hours at registrar's offices

25  closer to elections?

1  A      Absolutely.

2  Q      Can you describe for His Honor what those expanded

3  hours are?

4  A      Off the top of my head I cannot give you the exact

5  hours.  I don't have the schedule.  We have a schedule, we

6  have evening hours for absentee voting, and Saturday hours

7  for absentee voting.  But the exact hours I cannot give

8  you.

9  Q      Ms. Kellom, were you a member of the voter ID work

10 group that was formed after the enactment of the voter ID

11 law?

12 A      For the State Board of Elections, yes, I was.

13 Q      And this group met several times in the months

14 leading up to the effective date of the statute; isn't

15 that correct?

16 A      Um hum.

17 Q      Isn't?

18       THE COURT:  You need to answer "yes" or "no" so this

19 gentleman can take it down.  Okay?

20       THE WITNESS:  I thought I said, "yes."  I am sorry.

21 BY MR. FINBERG:

22 Q      So you had the opportunity to participate in

23 developing the implementation of the voter ID law?

24 A      I would not describe it that way.  I had opportunity

25 to listen to what the State Board of Elections was

1  thinking of doing.

2  Q    Did you have an opportunity to provide input?

3  A    Yes.

4  Q    No further questions, Your Honor.

5       THE COURT:  All right.

6       Redirect?

7                    REDIRECT EXAMINATION

8  BY MR. KAUL:

9  Q    Ms. Kellom, you were just asked about an article by

10 Mr. Finberg.  Do you recall that?

11 A    Um hum.

12 Q    Do you remember precisely what that article said?

13 A    The Tom Parkins article, no, I don't.

14 Q    Would it refresh your memory to see a copy of that

15 article?

16 A    Sure.

17 Q    May I approach?

18      THE COURT:  The Marshal will do that.  Just take a

19 moment for her to look it over.

20      Why don't you point to the portion you want her to

21 see.  Okay.

22      THE MARSHAL:  The bottom portion here.

23      THE WITNESS:  Okay.  Okay.

24 BY MR. KAUL:

25 Q    All right.

Kellom - redirect                        707

1        And does taking a look at that article refresh your

2   memory about what it says?

3   A    Okay.  It says "elderly voters, voters who were

4   disabled, minority voters, students, and the poor."

5   Q    And may I just ask.  That indicates that the

6   Alexandria board was going to reach out to groups that

7   were historic -- or had tended to lack identification

8   right?

9   A    Um hum.

10  Q    One of those groups as you just discussed with

11  Mr. Finberg is the elderly, right?

12  A    Um hum.

13  Q    But that list goes on to identify other groups,

14  right?

15  A    (The witness nodded).

16  Q    Is that right?

17  A    Yes.

18  Q    And that includes students, right?

19  A    Yes.

20  Q    And the poor?

21  A    And the poor.

22  Q    And minorities?

23  A    Um hum.

24  Q    And those with disabilities, is that right?

25  A    Yes.

1   Q    No further questions.

2        THE COURT:  All right.  May she be excused?

3        MR. FINBERG:  Yes, Your Honor.

4        THE COURT:  You are excused, free to go.  Thank you

5   for coming up and testifying today.  We appreciate it.

6                    (Witness stood aside)

7        MR. SPIVA:  Our next witness is one of the

8   plaintiffs, Gonzalo Aida Brescia.

9        THE COURT:  All right, sir.

10       Have a seat on the witness stand, sir.  Excuse me.

11  Raise your right hand, place your left hand on the Bible,

12  and face the Clerk of the Court.

13                  GONZALO J. AIDA BRESCIA

14             WAS SWORN AND TESTIFIED AS FOLLOWS:

15       THE COURT:  Have a seat on the witness stand, sir.

16       Will you please give us your full name, and spell

17  your first and last name for the court reporter so he can

18  get it right.

19       THE WITNESS:  Gonzolo Aida Brescia.  A-I-D-A,

20  B-R-E-S-C-I-A.

21       THE COURT:  All right.  You may inquire.

22  BY MS CALLAIS:

23  Q    Mr. Aida, where do you live?

24  A    Richmond, Virginia.

25  Q    How long have you lived in Richmond?

Aida - direct                          709

```
 1  A    Since August of 2007.

 2  Q    Where did go to college?

 3  A    VCU.

 4  Q    When did you graduate?

 5  A    2011.

 6  Q    Are you currently employed, Mr. Aida?

 7  A    Yes.

 8  Q    Where are you employed at?

 9  A    I work at the Richmond Metro Transportation

10  Authority.

11  Q    What do you do there?

12  A    I am executive assistant.

13  Q    For are the record, Mr. Aida, what is your race?

14  A    Latino.

15  Q    How old are you?

16  A    Thirty.

17  Q    Are you registered to vote in Virginia?

18  A    Yes.

19  Q    When did you register to vote?

20  A    In July of 2008.

21  Q    Why did you register?

22  A    I got my citizenship.  I got -- I registered to vote

23  the day I got my U.S. citizenship.

24  Q    Why did you register that day?

25  A    It was a long desire, and it was offered to me at the
```

Aida - direct

1  place where I received my citizenship, so I took advantage

2  of the opportunity.

3  Q     Do you consider yourself to be a member of any

4  political party?

5  A     I consider myself a Democrat.

6  Q     Do you typically vote for Democratic candidates?

7  A     Yes.

8  Q     Mr. Aida, are you involved in any community

9  organizations?

10 A     Yes, a few.  I am a member of the Richmond City

11 Democratic Committee.  A member of the Metro Richmond Area

12 Young Democrats.  Also a member and officer of the

13 Democratic Latino Organization of Virginia.

14 Q     Have you had any involvement with the Virginia Young

15 Democrats?

16 A     Yes.  I was previously President of the Virginia

17 Young Democrats.  And prior to that, a Director of

18 Campaigns for the Virginia Young Democrats.

19 Q     Were you involved in any Democratic organizations

20 when you were at VCU?

21 A     Yes.  I was a member and officer of the Young

22 Democrats at VCU.

23 Q     So, Mr. Aida, I would like to talk more about the

24 types of activities that you engaged in in your work in

25 the different organizations you have been a member of.

1   Let's start with the Democratic Latino Organization of

2   Virginia.

3       Did you hold any leadership position in that

4   organization?

5   A    Yes, I was recently elected as the vice chair for

6   central Virginia.

7   Q    How long have you been a member of the Democratic

8   Latino Organization of Virginia?

9   A    Since 2011.

10  Q    Can you just describe generally what the purpose of

11  the organization is?

12  A    The Democratic Latino Organization of Virginia is

13  basically the Latino caucus for the Democratic Party of

14  Virginia.  So the president of the Democratic Latino

15  Organization of Virginia and its officers and its members

16  are basically representative of Democratic leanings or

17  voting Latinos active in the Commonwealth.

18  Q    What do you do as vice chair, I think you said, of

19  that organization?

20  A    It is a fairly recent position, but I am charged with

21  organizing and engaging with Democratic Latino activists

22  in the central Virginia region.  Mainly have meetings and

23  information sessions, and hopefully create a group we can

24  engage with Democratic Latinos that are not as active as

25  ourselves in the organization.

Aida - direct                          712

1   Q     Is one of the focuses of your job to increase

2   political engagement of the Louisiana's in Virginia?

3   A     Yes.

4   Q     Why?  Why is that?

5   A     We believe in the Democratic Party of Virginia.  We

6   believe that the majority of Latinos that do vote, vote

7   Democratic.  And it is within our interest to get them to

8   vote regularly.

9   Q     And in your role as vice chair do you plan

10  registration activities?

11  A     I haven't done that yet.  But that is definitely one

12  of my charges in my position.  I highly anticipate that is

13  going to be part of a very active role over the next

14  couple years.

15  Q     Will you be planning registration activities in 2016?

16  A     Yes.

17  Q     Have you started the planning process for those, yet?

18  A     I had initial conversations with our new president.

19  Our whole board is brand new.  So we just got elected this

20  past December, so we are having fresh discussions

21  currently.

22  Q     Will you be planning or participating in get out to

23  vote activities in your role in the Democratic Latino

24  organization?

25  A     Yes.

Aida - direct

1   Q    I will ask you just to describe those activities

2   generally.

3   A    Well, with regards to the Democratic Latino

4   organization of Virginia we will be identifying and

5   targeting Latinos that have voted previously that usually

6   lean Democrat, or listed as strong Democrats.  We would be

7   calling, calling them, knocking on their doors, probably

8   very, very regularly throughout the fall election season.

9   Q    And then you also mentioned that you were a member in

10  leadership positions in the Virginia Young Democrats.

11  A    Yes.

12  Q    How long have you been a member of the Virginia Young

13  Democrats?

14  A    Well, I guess technically I have been a member since

15  I have personally identified as a Democrat when I was in

16  high school.  With regards to leadership positions, I

17  was -- I became director of campaigns in 2011 at our

18  annual state convention.  And I held that position until

19  2013.  In 2013, elected as president and served until

20  2015.

21  Q    Until what month of 2015 did you serve?

22  A    I served until March of 2015.

23  Q    Can you just describe generally what the purpose of

24  the Virginia Young Democrats is?

25  A    The Virginia Young Democrats are -- basically

En

1   represent Democrats ages 13 to 35 in the Democratic Party

2   of Virginia.  So we basically are the youth caucus of the

3   party.  We represent their interests at the state party

4   level, both on the state steering committee and state

5   central committee.

6   Q     The organization focuses on any increasingly

7   political engagement of young voters?

8   A     Absolutely.

9   Q     What sort of efforts does the organization take?

10  A     Primarily, early on in an election year, which is

11  every year in Virginia, we focus a lot on voter

12  registration in the beginning of the calendar year and

13  subsequently that transitions in the get out to vote

14  efforts closer so the fall.

15  Q     In your role as president, can you just describe

16  generally what you have done in your role as president?

17  A     As well as being a voting member of Democratic Party

18  of Virginia and the State Steering Committee, I

19  represented the Young Democrats on those committees, as

20  well to the leadership of the Democratic Party of

21  Virginia.  I also basically pushed forward an agenda and

22  led the organization as I saw fit into promoting

23  initiatives that engaged more young people and that

24  represented their concerns and issues state-wide.

25  Q     Why are you trying to engage more young people?

Aida - direct

1  A    Based on what I know, and what I experienced, and

2  what the organization has done historically, the work,

3  when we have more young people vote they tend to vote

4  Democratic.  And Democratic candidates are expected to win

5  in November.

6  Q    Can you just describe also your work as director of

7  campaigns for the Virginia Young Democrats?

8  A    So my main responsibility as director of campaigns

9  for the Virginia Young Democrats was to plan, plan and

10  create and execute campaigning for the state-wide

11  organization.  State-wide campaign envisions refer to

12  actively engaging voters on the ground in targeted regions

13  of the Commonwealth, or particular district, or if it is

14  state-wide race, competitive area.  Primarily where we can

15  engage with a lot of young voters or minority voters.

16  Q    Through the course of work as president of the

17  Virginia Young Democrats, and also as director of

18  campaigns, did you participate in voter registration

19  activity?

20  A    Yes.  Every year of the four years of the time you

21  are referring to, the first part of the year was focused

22  on voter registration drives, basically from the top of

23  the organization down to our local chapters.  That is

24  where all of the actual on-the-ground voter registration

25  was happening.

Aida - direct                    716

```
1   Q    Did you participate in planning of those?

2   A    Yes.

3   Q    Did you also sometimes participate on the ground?

4   A    Yes.

5   Q    What about get out to vote activities?  You mentioned

6   the campaign envisions.  Did you ever invade these

7   campaigns?

8   A    Yes.  Very frequently.

9   Q    What sort of work did you, did you do when you were

10  engaging in these get out to vote activities?

11  A    Besides the planning and the execution of getting

12  there to where we were going, it was basically depending

13  on whether and where we were we were going to knock on

14  doors of potential Democratic voters, either sent to -- if

15  we happened be in a college town, or anywhere where there

16  was a nearby university people would go, knock on those

17  doors, try to outreach to students, or if were in a

18  predominantly, like African-American, or minority, go in

19  those and knock on doors to get folks out to vote.

20  Q    Did you personally participate in these door-knocking

21  activities?

22  A    Yes.

23  Q    You also mentioned that you were involved with the

24  Young Democrats at VCU.  Can you just describe the types

25  activities that you did in that role?
```

```
 1   A     Sure.  Majority of my activities while I was a
 2   student was voter registration, during the spring semester
 3   primarily.  We would have a table either in the student
 4   commons or on the campus, or quad as you would call it,
 5   where there was a lot of student traffic going in between
 6   classes.  There would be students walking around and
 7   hanging out.  We would set up a table, and there will be
 8   two, three, four of us with clip boards trying to get
 9   students' attention and stop them and ask if they are
10   registered to vote.  If they weren't, hopefully register
11   them to vote.
12   Q     In the context of doing this registration work as a
13   student at VCU, and also in roles with the Young
14   Democrats, did you encounter any challenges to getting
15   young voters registered to vote?
16   A     One of our frequent challenges was the, taking the
17   time to fill out the form.  Usually we were catching
18   students on the way or coming back from class, usually in
19   a hurry to get where they were going next.  So that
20   usually we had to convince them of, you know -- first we
21   would ask all these questions, and then ask if they would
22   be willing to register to vote, and put the form in their
23   face, and ask them to fill it out.  Some of the other
24   challenges, there was a lot of questions about addresses
25   and identification, mainly because a lot of students
```

Aida - direct                              718

```
 1  weren't, didn't feel a particular need to register at
 2  their address where they were living on campus or going to
 3  school.  A lot of students still had identifications from
 4  back home.
 5  Q    You can slow down a little for the court reporter.
 6  He is making a face over there.
 7  A    Sorry.
 8       So, we had to basically -- there was a lot -- it
 9  depended on the year, usually what was going on,
10  convincing a student or young professional that if it
11  wasn't a presidential year, it was especially challenging
12  to get, to be engaged in the election.  We would have to,
13  you know, explain like what was at stake, what offices
14  were up for election, what districts they lived in, and
15  where they would have to go to vote after they registered.
16  There was a lot of concern, you know, with, you know, most
17  often the meeting a student for the first time when you
18  are registering them.
19  Q    Slow down a little more.
20  A    Sorry.
21       More often -- frequently students, we would be
22  meeting students for the first time.  They didn't know us,
23  we didn't know them.  And they were wondering if you
24  provide a lot of information when you are filling out a
25  voter registration, where you live, et cetera.  So we were
```

```
 1  frequently asked, what are you going to do with our

 2  information?  Are you going to start sending out spamming

 3  e-mails, like come knock on my dorm a bunch of times?  We

 4  constantly had to reassure them that once you hand us the

 5  form it goes into a kind of a box on the table.  We told

 6  them the forms go right in the box and --

 7       THE COURT:  Why not switch to some issues in this

 8  case?  This is nice, but you are going a little bit

 9  astray.

10       MS CALLAIS:  Your Honor, Mr. Aida is a plaintiff.

11       THE COURT:  The testimony still has to be relevant to

12  the issues.  What box the form is put in really does not

13  help me at all.

14  BY MS CALLAIS:

15  Q    We can move on.  I am establishing a basis for his

16  standing in this case.  So going through that.

17       THE COURT:  I understand that.  I think you have --

18  well, go ahead.  Go ahead.  But we are really getting far

19  far astray here.

20  BY MS CALLAIS:

21  Q    Mr. Aida, you were talking about challenges you had

22  when were registering students on campus.  Did you also

23  face those same challenged through your work in the Young

24  Democrats when registering young professionals?

25  A    It was pretty much similar issues at different
```

1    locations.  We were really -- our young professionals

2    chapters tend to not canvass students or have tables to

3    register at campuses.  We do it at metro stations, grocery

4    stores, libraries, places like that.  But it was also

5    often the challenge of getting to be able to stop someone

6    and engage with them in a meaningful way to be able to

7    give them information, get their information, get them

8    registered.

9    Q     Did you ever encounter any challenges with respect to

10   the time that people had?

11   A     Yes, it was, you know, especially at metro stations a

12   lot of our chapters up there had issues with folks on the

13   go trying to catch a train, trying to get to work, trying

14   to get home to do this or that.  So there was definitely a

15   challenge with the amount of time required to engage

16   potential voters about the information they would need to

17   register and follow up questions afterwards from them.  We

18   were willing to provide answers.

19   Q     Mr. Aida, have you done any registration or get out

20   to vote work in Latino communities?

21   A     Yes.

22   Q     Can you describe that for the Court?

23   A     In 2011, I was a field organizer for a state Senate

24   primary in Arlington, Virginia.  I was one of only two, I

25   believe, fluent Spanish speakers on staff.  So more often

1   than not I was sent into very heavy Latino neighborhoods,

2   which usually were also strong Democratic precincts.  And

3   that was where lot of strong Democratic voters were.

4        And most of my encounters with Latino voters was a

5   lot of difficulty getting either, you know, responses at

6   the door, which is typical, but then trying to be able to

7   engage them in a trusting way, was a lot of, I don't know

8   if the word is "stigma" or a "misunderstanding" from new

9   immigrants or folks that come from third world countries

10  or South American countries where there is a general

11  distrust of government.  So when these folks immigrated

12  here, folks started life here in America, when someone

13  comes to the door, even they are, look like you or

14  anything like that, there is bit of distrust with someone

15  with a clip board at the door is asking questions.  So a

16  lot of the issues that I faced knocking on these doors and

17  speaking to folks was to explain I wasn't, you know, with

18  the government.  I wasn't there to ascertain any

19  immigration status, or anything like that.  More often

20  every time I went was because there was a name on my list

21  at that address to engage with Latino voters.

22       And one of the most frequent things once I got there

23  is lot of questions that, oh, I didn't know there was an

24  election.  What is this election for?  Who is on the

25  ballot?  Things like that.  But also a lot of, you know, I

1   don't have -- what do I need to vote with?  What can I

2   vote with?  Where do I vote?  Things like that that you

3   generally provide, but a lot of variables to get there.

4   Q    And through the course of the work -- and, you know,

5   you did it in 2011, which is prior to the passage of the

6   photo ID law in this case, but did you have the

7   opportunity to talk with the voters you were working with

8   in these Latino communities about the type of ID they had?

9   A    Yes.

10  Q    Yes.  Can you just describe your observations to the

11  Court?

12  A    Sure.  So at that time, and in my meetings with those

13  voters in 2011 and since then, has been always just

14  constant clarification on what was acceptable to vote

15  with.  Obviously the law changed a few times since then.

16  But in my primary experiences in 2011 I would explain to

17  them, you don't need a photo ID necessarily, you can vote

18  with your voter registration card.  Bank statements,

19  utility bill, things of that nature.  Something with your

20  name and address is what I was trying to emphasize with

21  them.

22  Q    Did you often -- did you encounter people who did not

23  have a photo ID?

24  A    Yes.  In the heavy Latino neighborhoods that I have

25  been in, yes.

1  Q     Mr. Aida, is it your understanding that in Virginia,

2  that Virgina passed the photo ID law that went in effect

3  in 2014?

4  A     Yes.

5  Q     At that time you were president of the Virginia Young

6  Democrats?

7  A     Yes.

8  Q     Did the passage of the photo ID law have any effect

9  on the registration and get out to vote activities you

10  discussed earlier that you were engaging in with the Young

11  Democrats?

12  A     It definitely added a lot of burden to what we had to

13  do to previously to get what we wanted done.  And with the

14  new law we had to spend a lot of extra time not only for

15  myself personally upon the law passing and becoming law,

16  and the Code of Virginia, was educating myself as much as

17  I possibly could.  And that involved conferring with my

18  fellow officers on the Virginia Young Democrats board, but

19  also with other Democratic activists and fellow

20  organizations that were dealing with the same issue, how

21  to go about educating themselves and members of their

22  constituency and the members of their organization.

23  Q     So you mentioned educating members of your

24  constituency and your organization.  What types of

25  activities have you engaged in to educate your

1  constituency?

2  A     So it really was from a top down kind of method.  As

3  a board of the Young Democrats we discussed with our

4  various directors, but also the various chapter

5  presidents, that we had -- I believe at the time we had 34

6  chapters maybe 35 or 36 -- and we were conferring with

7  them about, you know -- first among -- as an executive

8  board we discussed how do we get this information out the

9  best way to our peers as an organization in the way they

10  will be able to retain and easily convey that information

11  to their membership.  But it is those members that are on

12  the ground at college campuses and metro stations and bus

13  stops everywhere that are actually doing the voter

14  registration on the ground.  So we basically, we did a lot

15  of e-mails, like e-mails from myself to all, anyone on the

16  e-mail list.  We would pass on -- we would create

17  info-graphics and relied heavily on social media, FaceBook

18  and Twitter to disseminate the information that was easily

19  shareable, not only to our chapters, to their members as

20  well, and to the general population, because the

21  information we were providing them was also information

22  that would be useful to anyone that needed to understand

23  what they needed to do to vote.

24  Q     Did you in the meantime prepare any materials you

25  would send out?

1   A      Yes, I spent a lot of time.

2   Q      What sort of materials did you send out?

3   A      Basically we had to craft a lot of spread sheets, not

4   only to make sure that we had correct concrete information

5   for our chapters, but also who we needed to contact.  We

6   also tried to provide them with additional resources

7   outside of the Young Democrat organization.  And by that I

8   mean most of these Young Democrat chapters were adjacent

9   to a congressional committee of the Democratic Party or a

10  county, or county committee.  So we tried to put them in

11  touch with people that we were familiar with in that level

12  to be able to communicate effectively and be able to get

13  the information they needed.

14       I made a lot of spread sheets, drafted a lot of

15  e-mails, communication plans.  I did a lot of photo shop

16  work for graphics that we ended up using on Twitter and

17  FaceBook.  A lot of computer work and information mining,

18  and put it all in one place and sent it out.

19  Q      Was there work that you would have done without the

20  photo ID law being in place?

21  A      No, it probably would have focused on issue advocacy,

22  which is what he had been primarily focused on beforehand,

23  identifying what issues were critical to Young Democrats,

24  and then advocating for them.  Not only to our Democratic

25  legislators in the General Assembly, but also independents

1  and congressional members as well.  So we had to take away

2  a lot of time from usual advocacy work to focus on voter

3  registration re-education and education on the new laws as

4  a result of that.

5  Q    Mr. Aida, why specifically did you couple with this

6  education and registration efforts?

7  A    We were all in the mind set there was no point in

8  registering our peers to vote if they didn't know what

9  they needed to do to be able to vote in November.

10  Q    Was there any concern about them not knowing what

11  they would be able to do to vote?

12  A    Yes.  We were very concerned, a lot of us, honestly,

13  about being able make sure everyone had the information

14  they had.  We consider yourselves, I consider myself very

15  active in what is going on in Virginia government.  And I

16  know a lot of students and a lot of young people aren't

17  that engaged because they have other things in their lives

18  going on.  We tried to approach it as we are going through

19  these efforts to educate ourselves, and it was a lot of

20  time trying to get on the same page as everyone else.  And

21  then to make sure that that information gets to people

22  that are not as engaged, not as, you know, well informed

23  about the history of what was going on.  Why it was

24  happening.  We needed to make sure they knew what they

25  needed to know so they could vote without being hindered.

Aida - direct

1   Q     The education activities that you talked about, do

2   you plan to incorporate them in the registration

3   activities you will be doing in 2016 for the Democratic

4   Latino organization?

5   A     Yes, absolutely.

6   Q     Why is that?  Why would you be conducting voter

7   education activities?

8   A     As I stated before, there is no point in engaging

9   these voters and registering them to vote if they don't --

10  if we don't have these, the resources or the knowledge to

11  impart on them what they need to be able to vote in

12  November.

13  Q     Mr. Aida, have you ever worked as a poll worker?

14  A     Yes.

15  Q     When was that?

16  A     I volunteered as a poll worker in August of 2014.

17  State Senate primary.

18  Q     Was that after the photo ID law had gone in to

19  effect?

20  A     Yes.

21  Q     Can you just describe that experience for the Court?

22  A     Yes.  It was a state Senate primary, one of two

23  polling places where that entire primary -- it was located

24  in, I believe Church Hill in Richmond, City of Richmond.

25  I was -- majority of the time that I spent volunteering

 1  was as a poll book worker.  So I was basically at the

 2  front desk of the polling place.  Once a voter would

 3  approach me at the end, at the front of the line I would

 4  ask them to provide me with a form of identification,

 5  which was the new law.  And then I would try to find their

 6  name in the poll book and allow them to vote.

 7  Q    In the course of that experience did you have,

 8  observe any individuals who came to vote in the primary

 9  who did not have photo ID?

10  A    Yes.  Many.

11  Q    Did all of these individuals, did you observe all of

12  them cast provisional ballots?

13  A    We offered all of those individuals a provisional

14  ballot.  Not all of them cast one.

15  Q    Did they refuse to cast one, or what was that

16  circumstance?

17  A    Some of them refused.  A lot of the folks that were

18  having photo ID issues with us grew very frustrated with

19  not being allowed to vote as per usual.  They were

20  expressing frustration, how they were able to vote last

21  year with what they were giving me.  And I had to explain

22  to them that that was to longer acceptable, but I was very

23  much encouraging that they would cast a provisional

24  ballot.  And then we provided them with the instructions

25  on what to do after they cast the provisional ballot.  But

```
 1  a lot of them didn't, were not interested in the

 2  provisional ballot.

 3  Q    Do you remember, did you make any observation about

 4  the race of the individuals you were never interacting

 5  with?

 6  A    It was heavily African-Americans.

 7  Q    Mr. Aida, do you have a photo ID?

 8  A    Yes.

 9  Q    What photo ID do you have?

10  A    I have my driver's license, my VCU student ID, my

11  work ID.  And I have two passports.  And I have a few old

12  driver's licenses and an old student ID.

13  Q    The two passports, do you have two U.S. passports?

14  A    No, only one.

15  Q    And the VCU identification, you currently attend VCU?

16  A    No.

17  Q    You mentioned that you had a few old IDs.  Are those

18  expired?

19  A    Not all of them.

20       THE COURT:  What relevance does that have at this

21  point in case?  Please.  We have a finite amount of time

22  to try this case.  I know we are going to next week, but

23  just give me some idea what the relevance is of whether

24  his IDs are expired.

25       MS CALLAIS:  Your Honor, one of the arguments that
```

 1  plaintiffs have presented as part of their standing for

 2  the individual plaintiffs is that they have to maintain

 3  and present an ID.  He is going to testify to the fact --

 4       THE COURT:  He said he had ID.

 5       MS CALLAIS:  Correct, and what he will testify to is

 6  that he changed ID a number of times because he has

 7  concerns, because the address does not match on his IDs,

 8  older IDs, that he has.

 9       THE COURT:  Why don't you go to the central question

10  and ask that?

11       MS CALLAIS:  I will.  I wanted to make sure --

12       THE COURT:  Move on, please.

13  BY MS CALLAIS:

14  Q    Mr. Aida, how many older IDs do you have?

15  A    I believe I have five older IDs.

16  Q    Why did you -- why did you -- why did you change your

17  ID multiple times?

18  A    I did it just out of personal abundance of caution.

19  I don't want to go to a polling place and have an ID with

20  on old address, and there be some confusion or encounter

21  an untrained poll worker and be denied my right to vote.

22  Q    Why do you have that concern?

23  A    I have that concern just based on experiences with

24  poll workers not being properly trained, particularly in

25  the City of Richmond.  But also the Governor was refused,

Aida - cross                                    731

1  was not allowed to vote at first when he went to vote last

2  year.  If someone like him can be stopped at the polling

3  place by someone that is not properly trained, who am I to

4  also not be equally inconvenienced?

5  Q    How much does it cost you to change these IDs each

6  time you have moved?

7  A    I believe I paid $20 each time.

8  Q    Okay.

9       No further questions, Your Honor.

10      THE COURT:  All right.

11      MR. FINBERG:  Very brief cross, Your Honor.

12      THE COURT:  Go right ahead, sir.

13                      CROSS EXAMINATION

14 BY MR. FINBERG:

15 Q    Good afternoon, Mr. Aida.  Nice to see you again.

16      As you remember, I am Dana Finberg.  I am one of the

17 attorneys representing the defendant, Commonwealth

18 election officials in this case.

19      Mr. Aida, you have never been unable to cast a ballot

20 in Virginia because you did not have a proper ID; isn't

21 that right?

22 A    Yes.

23 Q    You have been politically active since you registered

24 to vote in 2008?

25 A    I have been active before that, but, yes,

1   politically.

2   Q     You have been engaged in get to out to vote and

3   registration efforts since at least 2008?

4   A     Yes.

5   Q     And you participated in these efforts four to five

6   years before the photo ID law that went into effect here?

7   A     Yes.

8   Q     And you are going to continue to engage in those

9   efforts in the run up to the 2016 election?

10  A     Yes.

11  Q     You talked about your efforts to register young

12  people on campus.  Do you recall that?

13  A     Yes, sir.

14  Q     Most of these students on campus would have access to

15  the internet, wouldn't they?

16  A     I would assume so, yes.

17  Q     In the course of doing your registration with young

18  people have you told them of the ability to go on line to

19  register to vote?

20  A     Personally, recently, no.  But I know that is

21  something our chapters do now.

22  Q     You talked about your experience as a poll book

23  worker in the special election in August of 2014.  Do you

24  remember that?

25  A     Yes, sir.

Aida - cross

```
 1   Q    And you testified that you personally observed voters

 2   attempting to vote who no longer had forms of proper ID?

 3   A    Yes, sir.

 4   Q    Every one of those people were given the opportunity

 5   to cast a provisional ballot, weren't they?

 6   A    Yes, sir.

 7   Q    And, in fact, as you testified in your deposition

 8   only a small hand full of those folks declined the

 9   provisional ballot?

10   A    Yes, sir.

11   Q    That was their choice?

12   A    Yes.

13   Q    You were asked some questions on direct about the

14   burden that the new photo ID law has placed upon your

15   efforts as an activist to go out and get out to vote and

16   regular voters.  Do you recall that?

17   A    Yes, sir.

18   Q    And I believe you testified that part of this burden

19   was that you had to spend time educating yourself and the

20   organizations you are involved in on the new law?

21   A    Yes.

22   Q    And you had to spend time engaging with your

23   volunteers, folks at the local chapters involved in

24   registration?

25   A    Yes.
```

1   Q      And then those volunteers had to spend time educating

2   the people that they worked with?

3   A      Yes.

4   Q      The education and re-education efforts you talked

5   about, in fact what you did is you attended a meeting of

6   your local chapter, who is dedicated to the new voter ID

7   law, right?

8   A      Yes, one meeting.

9   Q      That took about ninety minutes?

10  A      Yes, if I recall correctly.

11  Q      You then educated your executive board of the

12  Virginia Democrats about what needed to be done on a

13  state-wide level?

14  A      Yes, sir.  That was part of my process, yes.

15  Q      And you did that through another meeting?

16  A      The meeting I attended in person was not necessarily

17  beginning of my efforts, but a part of my personal

18  education that I applied towards educating my members down

19  the line.

20  Q      But then there was a meeting with the Young

21  Democrats?

22  A      Yes.  Of the executive board; yes, sir.

23  Q      That lasted about an hour and a half?

24  A      Usually, yes.

25  Q      Okay.  Then you also testified that you prepared some

Aida - cross                                               735

1  documents from, I guess, campaign literature, things to

2  put out educating people on that?

3  A     Yes.

4  Q     Would you say you worked on that for on and off for

5  about a week?

6  A     Yes, on and off over a week, over time, yes, sir.

7  Q     You said you are currently employed by the Richmond

8  Transfer Authority.

9  A     Richmond Metropolitan Authority, yes.

10 Q     You have a photo ID from them, don't you?

11 A     Yes.

12 Q     I don't have any further questions, Your Honor.

13       THE COURT:  Any redirect?

14       MS CALLAIS:  No, Your Honor.

15       THE COURT:  All right.

16       You are excused and free to go.  Thank you for coming

17 in to testify today.

18                    (Witness stood aside)

19       THE COURT:  At this point, we will recess one hour

20 for lunch.

21          (Krista Harding is now the court reporter.)

22                      (Recess taken.)

23       THE COURT:  Yes, sir, Mr. Spiva.

24       MR. SPIVA:  Good afternoon, Your Honor.  We have

25 another attorney on our team who's been admitted pro hac

```
 1  vice who is going to be presenting a couple of the

 2  witnesses this afternoon.  Her name is Ceridwen Cherry.

 3       THE COURT:  We're delighted to have her.

 4       MR. SPIVA:  Thank you, sir.

 5       THE COURT:  Just one word of caution.  I'm not going

 6  to let you go back and -- I've given you a lot of

 7  latitude.  Far more than I've given anybody in the 18

 8  years I've been a trial judge, okay.  I'm not going to let

 9  you go back and duplicate testimony you've already had,

10  typically with respect to witnesses who were denied --

11  went to the polls and their ID was rejected.  I've allowed

12  you to call 11 witnesses on that, all right.

13       With that understanding, go ahead and proceed.

14       MR. SPIVA:  Okay, Your Honor.  The only thing is the

15  next two people are people who had trouble at the polls.

16  I think they are nuanced, but would you just rather we not

17  call them at all?

18       THE COURT:  I am not going to allow them unless you

19  give me -- you can indicate to me how their testimony is

20  materially different, and only ask them those questions.

21  I want to be fair to you, but you've pushed the envelope

22  far beyond the edge, okay?

23       MR. SPIVA:  One of them -- and we would have no

24  problem with keeping within the parameters of what Your

25  Honor just said.  One of them had lost a license, which I
```

1   think is one issue that we haven't raised.  And we can go

2   right to that in their testimony.

3         THE COURT:  I will give you that latitude.  But I

4   want you just to focus on that.

5         MR. SPIVA:  Yes, Your Honor.

6         THE COURT:  And not go through a lot of the other

7   extraneous stuff.

8         MR. SPIVA:  Yes, Your Honor.  We will do that.

9         THE COURT:  Okay.

10         MR. SPIVA:  Thank you.

11         THE COURT:  All right.

12         MR. SPIVA:  And, Your Honor, the name of the witness

13   is Kenneth Adams.

14         THE COURT:  All right.

15         Ma'am, let me make sure I have your name.  I

16   apologize.  I didn't write it down.  We're glad to have

17   you here.

18         MS. CHERRY:  Thank you.  My name is Ceridwen Cherry.

19         THE COURT:  Would you spell that for my court

20   reporter.

21         MS. CHERRY:  I spelled it for her earlier.

22         THE COURT:  Okay.

23         Sir, if you would raise your right hand, place your

24   left hand on the Bible, and face the Clerk of the Court.

25         THE CLERK:  You do solemnly swear that the testimony

```
 1  which you are about to give, in this case, before this

 2  Court, shall be the truth, the whole truth, and nothing

 3  but the truth, so help you God?

 4        MR ADAMS:  I do.

 5        THE COURT:  Have a seat on the witness stand, sir.

 6        Hold on just one second, Ms. Cherry, and I'll be

 7  ready to go.  All right.

 8        Sir, would you be kind enough to give us your full

 9  name, sir, and spell your last name for my court reporter.

10        MR ADAMS:  Certainly.  My full name is Kenneth David

11  Adams.  My last name is spelled A-D-A-M-S.

12        THE COURT:  All right.  Thank you.

13        All right, Ms. Cherry, you may inquire.

14           Whereupon, Kenneth Adams, having been

15  duly sworn in, testifies as follows:

16                        D EXAMINATION

17  BY MS. CHERRY:

18  Q    Mr. Adams, what is your address?

19  A    I live in Woodbridge, Virginia.

20  Q    And is that in Prince William County?

21  A    It is.

22  Q    How long have you lived in Virginia?

23  A    With the exception of a couple of times I was living

24  in Maryland for about a year, ever since I was one.

25  Q    And are you currently employed?
```

1    A    No.  I'm disabled.

2    Q    And do you vote regularly?

3    A    Yes, I do.

4    Q    Is voting something that's important to you?

5    A    Very much so.

6    Q    And why is that?

7    A    I feel it's important that I'm able to represent my

8    own interests.

9    Q    And when you vote, do you tend to vote for candidates

10   of a particular political party?

11   A    I consider myself a moderate, but I tend to vote

12   Democratic more often than not.

13   Q    I'd like to talk about the election in November of

14   2015.  Did you attempt to vote in person during that

15   election?

16   A    Yes, I did.

17        THE COURT:  Ms. Cherry, what year was that?  I'm

18   sorry.  I didn't hear you.

19        MS. CHERRY:  I'm sorry.  November of 2015.

20        THE COURT:  All right.

21   BY MS. CHERRY:

22   Q    And when you attempted to vote, were you able to

23   vote?

24   A    No, I was not.

25   Q    And why was that?

1  A    I had lost my -- I had misplaced my ID.  I was in the

2  process of getting it replaced, but I was waiting on the

3  DMV to send me the new one, and it hadn't arrived in time.

4  Q    And was the ID that you lost, was that your driver's

5  license?

6  A    Yes, it was.

7  Q    And you had applied for a replacement?

8  A    Yes, I had.

9  Q    And when did you apply for that license?

10  A    Thursday previous.

11  Q    And that was the Thursday prior to a Tuesday

12  election?

13  A    Yes.

14  Q    And how did you apply for that replacement license?

15  A    I applied on-line.

16  Q    Did you have to pay for the replacement?

17  A    Yes.  It was $15.

18  Q    And at that time, was $15 a lot of money for you?

19  A    Yeah, it was.

20      THE COURT:  Was this your operator's license or your

21  DMV identification?

22      MR ADAMS:  It was my operator's license.

23      THE COURT:  Your operator's license.  You would have

24  had to have an operator's license anyway to drive a car,

25  would you not?

```
 1          MR ADAMS:   Yeah.

 2          THE COURT:   Okay.  Go ahead.

 3   BY MS. CHERRY:

 4   Q    And in addition to driving, was one of the reasons

 5   that you applied for this replacement license to use it to

 6   vote?

 7   A    Yes.

 8   Q    And when you attempted to vote without your license,

 9   what happened?

10   A    I was told that I did not have an appropriate ID to

11   vote.

12   Q    Did you have any kind of non-photo ID with you?

13   A    I had my Medicaid ID with me, which I showed them,

14   but they told me that was not acceptable.

15   Q    And did you attempt to cast a provisional ballot?

16   A    Yes, I did.

17   Q    And after you casted that provisional ballot, were

18   you able to show a photo ID and cure your ballot?

19   A    No, I was not.  The ID did not arrive until that

20   Friday, and it was late in the afternoon.  By that time,

21   the registrar had already closed.

22   Q    So that was the Friday after the elections?

23   A    Yes.  That was the deadline.

24   Q    And did your experience with the photo ID law,

25   attempting to vote in November of 2015, affect your view
```

1  of elections in Virginia at all?

2  A    It was disheartening.  I mean, I've voted in every

3  election up until then, and this was the first time I had

4  ever been -- I wasn't able to.

5       MS. CHERRY:  No further questions.

6       THE COURT:  Yes, ma'am.

7       Cross-examination of Mr. Adams.

8       MR. HART:  Thank you, Your Honor.  My name is Steve

9  Davis.  I've been admitted pro hac in this case.

10      THE COURT:  Go right ahead, Mr. Davis.

11                    **CROSS-EXAMINATION**

12  BY MR. DAVIS:

13  Q    Thank you, Mr. Adams, for coming in and testifying.

14  Again, my name is Steve Davis.  I'm co-counsel for the

15  defendants in this case, and I have just a very few

16  questions for you, if that's all right.

17      You said that you had been allowed to vote in every

18  previous election, is that correct?

19  A    That's correct.

20  Q    But you had to vote provisionally in the 2015 general

21  election because you had lost your driver's license, is

22  that correct?

23  A    That is correct.

24  Q    Did you have any other photo ID at the time?

25  A    No.  I'm disabled, and any of the other types of

1   photo ID that they had on the list I wouldn't qualify for.

2   Q    Are you employed, sir?

3   A    No.  I'm disabled.

4   Q    Do you drive a car?

5   A    I do.

6   Q    Do you have your own car?

7   A    Yes.

8   Q    Did you drive here today?

9   A    Yes, I did.

10  Q    Were you able to get into the courthouse today with a

11  photo ID?

12  A    Yes, I was.

13       THE COURT:  And you have your Virginia operator's

14  license now, is that correct?

15       MR ADAMS:  That's correct.

16       THE COURT:  Go ahead.

17  BY MR. DAVIS:

18  Q    Have you ever voted absentee in the past?

19  A    No, I haven't.

20  Q    Are you aware that you can vote absentee without

21  showing a photo ID?

22  A    No.  That was never explained to me.

23  Q    When you voted a provisional ballot, were you given a

24  sheet of instructions about how to make your ballot count?

25  A    Yeah.  Only in that I was told that I had to have my

1   ID by Friday, and that I had to get it to the registrar's

2   office by then.   That's all I was told.

3   Q     Were you aware that you can get a free ID at the

4   registrar's office?

5   A     I was not told that.   No.

6   Q     And did you not receive that green sheet of

7   instructions saying that you could?

8   A     Nope.

9   Q     You said you are a Democrat.   Have you ever filled

10  out a member application for the Democratic Party?

11  A     I said that I was independent, and I tend to consider

12  myself a moderate, but that I tend to vote for a Democrat.

13  Q     So you wouldn't consider yourself a Democrat?

14  A     No.

15        MR. DAVIS:   I have no further questions.

16        THE COURT:   All right.

17        Ms. Cherry, is there any redirect of this gentleman?

18        MS. CHERRY:   No, Your Honor.

19        THE COURT:   All right.

20        May he be excused?

21        MR. DAVIS:   Yes, Your Honor.

22        THE COURT:   All right.

23        Mr. Adams, you're excused and free to go.   Thank you

24  for coming in today.   We appreciate you taking your time

25  to come down and testify.

```
 1          MR ADAMS:  Thank you.

 2          THE COURT:  You're excused and free to go.

 3          MR. SPIVA:  Your Honor, we only have one more

 4   affected voter today.  And I just wanted to briefly

 5   explain the testimony we wanted to elicit, which is that

 6   the person attempted to vote with their Missouri ID, was

 7   not able to.  Realized they had a work ID, and ultimately

 8   was able to cure that, but the work ID had much less

 9   information than the driver's license.

10          THE COURT:  That's fine.

11          MR. SPIVA:  Thank you very much.

12          THE COURT:  I'll allow you to do that.  Just get

13   right to that point.

14          MR. SPIVA:  Will do, Your Honor.  And again, it's

15   going to Ms. Cherry.  And the witness's name is Shanna

16   Samson.

17          THE COURT:  Ms. Cherry is doing a fine job.  Come on

18   up.

19          Who is the witness?

20          MS. CHERRY:  Her name is Shanna Samson.

21          THE COURT:  Samson.  Okay.  Thank you very much.

22          Ms. Samson, if you would be kind enough to raise your

23   right hand, left hand on the Bible, and face the Clerk of

24   the Court, please.

25          THE CLERK:  You do solemnly swear that the testimony
```

1  which you are about to give, in this case, before this

2  Court, shall be the truth, the whole truth, and nothing

3  but the truth, so help you God?

4       MS. SAMSON:  Yes.

5       THE COURT:  Have a seat on the witness stand, ma'am.

6       MS. SAMSON:  Okay.

7       THE COURT:  Ms. Samson, would you please give us your

8  full name, and spell your first and last name so the court

9  reporter will get the spelling correct.

10      MS. SAMSON:  Yes.  Absolutely.  It's Shanna Lynn

11 Samson.  First name is S-H-A, N as in Nancy, N as in

12 Nancy, A.  Last name S-A, M as in Mary, S-O-N.

13      THE COURT:  Go ahead.

14      Whereupon, **Shanna Samson**, having been

15 duly sworn in, testifies as follows:

16                  **DIRECT EXAMINATION**

17 BY MS. CHERRY:

18 Q   Good afternoon.  Ms. Samson, could you please let us

19 know your address?

20 A   I live on Xxxxxx Street in Alexandria, Virginia.

21 Q   How long have you lived in Virginia?

22 A   Four years.

23 Q   Where did you move from?

24 A   St. Louis, Missouri.

25 Q   Are you currently employed?

```
1   A      Yes.

2   Q      And where are you employed?

3   A      Alexandria City Public Schools.

4   Q      Are you currently registered to vote in Virginia?

5   A      Yes.

6   Q      How long have you been registered to vote in

7   Virginia?

8   A      Just about four years.

9   Q      Is voting important to you?

10  A      Absolutely.

11  Q      Why is that?

12  A      Because it's my opportunity to participate in the

13  decision-making process which allows me to participate in

14  choosing those elected officials that will make decisions

15  for those in my community, my family, those that I love,

16  so -- and myself.  And so I think that it's important to

17  be able to partake in that decision-making process.

18  Q      I'd like to talk now about the election in November

19  of 2014.  Did you attempt to vote in person during that

20  election?

21  A      I did.

22  Q      And what happened when you attempted to vote

23  in-person?

24  A      Well, I arrived with the identification that I had

25  used in that same polling place in the prior election, but
```

```
 1  I was told that the identification that I had was not

 2  valid.

 3       THE COURT:  And what kind of identification did you

 4  have, Ms. Samson?

 5       MS. SAMSON:  I had my Missouri identification, my

 6  driver's license, as well as the voter registration card

 7  from the Commonwealth of Virginia.

 8       THE COURT:  So you had a Missouri operator's license?

 9       MS. SAMSON:  Yes.

10       THE COURT:  Okay.

11       Go ahead.

12  BY MS. CHERRY:

13  Q    And was your Missouri license expired?

14  A    No.

15  Q    When you attempted to vote using the Missouri

16  license, what happened?

17  A    I was told that those were not valid IDs, and that I

18  couldn't vote.  I lived right behind the polling place,

19  and so I indicated that I could go home and get my lease,

20  utility bill.  I was told those were not valid either.

21  And so the individuals at the polling place guided me in

22  trying to identify types of identification that I may have

23  that would allow me to vote.

24  Q    And did you vote a provisional ballot?

25  A    I did vote a provisional ballot.
```

CROSS-EXAMINATION OF KENNETH ADAMS

```
1   Q      And were you able to cure that ballot?

2   A      I was able to cure that ballot the next day.

3   Q      How did you cure the ballot?

4   A      I was able to use my employee identification card,

5   and I faxed it to the number that was provided to me, a

6   copy.

7   Q      And what information was on your employee card?

8   A      It was just the Alexandria City Public Schools logo,

9   a picture of myself, and my name.

10  Q      Did it have an expiration date?

11  A      No.

12  Q      Did it contain your birth date?

13  A      No, ma'am.

14  Q      Between your out-of-state driver's license and your

15  employee ID, which contained more information about you?

16  A      Absolutely my Missouri operator's license.

17  Q      And did this experience with the photo ID law affect

18  your view of the electoral process in Virginia?

19  A      Absolutely.  I felt like it was a bit of a joke that

20  I could use this employee ID that was a very generic ID

21  that I could have made in my home and then faxed it in,

22  not even in-person, yet my valid government-issued ID was

23  not eligible.

24         MS. CHERRY:  No further questions.

25         THE COURT:  All right.
```

1       Cross-examination of Ms. Samson.

2          MR. DAVIS:   Thank you, Your Honor.

3                       **CROSS-EXAMINATION**

4   BY MR. DAVIS:

5   Q    Hi, Ms. Samson.   My name is Steve Davis.   I'm

6   co-counsel for the defendants in this case.   Thank you for

7   testifying today.

8   A    You're welcome.

9   Q    Glad to see another St. Louisan here.   I'm from St.

10  Louis, and just wanted to ask you where you lived in St.

11  Louis?

12  A    I lived in the City of St. Louis.

13  Q    Great.   And so you've lived here for four years, is

14  that right, and you registered to vote as soon as you

15  arrived?

16  A    Yes.

17  Q    When you were in Missouri, did you vote?

18  A    Yes.

19  Q    Did you use your driver's license to vote in

20  Missouri?

21  A    I believe so.   Or my voter registration card.

22  Q    And you said that when you went to vote on election

23  day that the school that you voted at is right by your

24  house, is that correct?

25  A    Yes.

1    Q      Directly adjacent to your house?

2    A      Yes, sir.

3    Q      So when you were told at the polls that you didn't

4    have the right ID, could you have gone home and gotten a

5    photo ID?

6    A      I didn't have a valid photo ID other than the one

7    that was from my employment, which was in my office at

8    work.  It was the end of the day.  I still had to pick up

9    my daughter.  I'm a single mom.  I work late hours.  I

10   wasn't able to get anywhere that evening.

11   Q      So your photo ID that you used is your public school

12   ID?

13   A      Yes.  And it was in my office.

14   Q      And your office was away from the school where you

15   were voting?

16   A      Yes.  I work for central office.

17   Q      Do you feel you received proper guidance at the polls

18   that day about --

19   A      They were kind.  I don't recall that they told me

20   anything about the voter ID that I could go, you know, and

21   register for.  I don't recall having any information about

22   that at the time.  They had a list, and they did help me

23   to identify that my ACPS employee badge would work.

24   Q      So you got instructions on how to make your ballot

25   count, your provisional ballot count?

1  A      Yes.

2  Q      And they told you where to go, and gave you all the

3  --

4  A      Yes.  They gave me the fax number on which to fax it.

5  Q      And do you feel that you now know for future

6  elections what you need to vote in Virginia?

7  A      Yes.

8  Q      And you have that ID?

9  A      I do have my Virginia ID.

10 Q      And your ballot was counted, correct?

11 A      Yes.  I believe so.

12        MR. DAVIS:  No further questions.

13        THE COURT:  Your Missouri operator's license you've

14 presented when you voted previously, -

15        MS. SAMSON:  Yes.

16        THE COURT:  - was that expired or was that a valid

17 ID?

18        MS. SAMSON:  No.  It actually just expired January of

19 2016.

20        THE COURT:  And did that have your Virginia address

21 on it?

22        MS. SAMSON:  No, it did not.

23        THE COURT:  Ms. Cherry, any further questions?

24        MS. CHERRY:  No, sir.

25        THE COURT:  May Ms. Samson be excused?

```
 1          MR. DAVIS:  Yes, Your Honor.

 2          MS. CHERRY:  Yes.

 3          THE COURT:  Ms. Samson, you're excused and free to

 4  go.  Thank you very much for coming in to testify.  We

 5  appreciate your testimony.

 6                      WITNESS STOOD ASIDE

 7          THE COURT:  Next witness.

 8          MR. KAUL:  Your Honor, the next witness is

 9  Dr. Lorraine Minnite.

10          THE COURT:  Okay.

11          MR. KAUL:  I apologize in advance.  I will not be as

12  fast as Ms. Cherry was.

13          THE COURT:  I have to admit, she knows how to ask

14  questions.  Y'all trained her very well.

15          MR. KAUL:  She's training us, Your Honor.

16          THE COURT:  Doctor, if you would be kind enough to

17  raise your right hand, left hand on the Bible, and face

18  the Clerk of the Court.

19          THE CLERK:  You do solemnly swear that the testimony

20  which you are about to give, in this case, before this

21  Court, shall be the truth, the whole truth, and nothing

22  but the truth, so help you God?

23          DR. MINNITE:  I do.

24          THE COURT:  Doctor, if you will take a seat on the

25  witness stand, ma'am.
```

1      MR. KAUL:  And, Your Honor, if I may approach to

2  bring the exhibits that she'll be using?

3      THE COURT:  Yes, sir.  You may do that.

4      MR. KAUL:  Thank you.

5      THE COURT:  Doctor, if you would be kind enough to

6  put your full name on the record, and spell your last name

7  for the court reporter so we can get the spelling correct,

8  okay?

9      DR. MINNITE:  My name is Lorraine Carol Minnite.  My

10  last name is spelled M-I-N-N-I-T-E.

11      THE COURT:  Could you pronounce your last name again?

12  I want to get it right.

13      DR. MINNITE:  It's spelled M-I-N-N-I-T-E.  E on the

14  end.

15      THE COURT:  And you pronounce it?

16      DR. MINNITE:  Minnite.

17      THE COURT:  Minnite.  I'm sorry for the

18  mispronunciation.

19      DR. MINNITE:  It should have an I on the end, but

20  it's an immigrant story.

21      THE COURT:  I understand.  All right.

22      Go right ahead with your examination.

23      Whereupon, **Dr. Lorraine C. Minnite**, having been

24  duly sworn in, testifies as follows:

25                    **DIRECT EXAMINATION**

1  BY MR. KAUL:

2  Q    Thank you, Your Honor.  Dr. Minnite, would you first

3  explain how you're currently employed?

4  A    Yes.  I'm an associate professor at Rutgers

5  University in Camden, New Jersey in the Department of

6  Public Policy and Administration.

7  Q    And how long have you been employed at Rutgers?

8  A    Since 2011.

9  Q    And what did you do before that?

10 A    I was an assistant professor at Barnard College in --

11 at Columbia University in New York City.

12 Q    How long were you there?

13 A    Eleven years.

14 Q    Did you get your Ph.D. prior to that?

15 A    Yes.

16 Q    What was your focus?

17 A    My Ph.D. is in political science with a

18 specialization in American politics and public policy and

19 urban politics.

20 Q    And what has the focus of your professional work

21 been?

22 A    The focus has been American politics, American

23 elections, electoral procedures, and the study of voter

24 fraud.

25 Q    And I'm not going to go through everything in your

```
 1  resume, because it's in your expert report --

 2      THE COURT:  Excuse me.

 3      Is there a challenge to Dr. Minnite's credentials?

 4      MR. HEARNE:  We have, Your Honor, and the Court has

 5  already ruled on the challenges that we did have in terms

 6  of the scope of her testimony in terms of trying to

 7  counteract the --

 8      THE COURT:  If she gets beyond that, you can object.

 9  But I'm just talking about her qualifications.

10      MR. HEARNE:  No, we do not.

11      THE COURT:  All right.  She'll be received as an

12  expert, and permitted to give expert testimony, in the

13  area of American election law and voter fraud, is that

14  fair?

15      MR. KAUL:  Yes, Your Honor.  I plan to ask about

16  voting restrictions, but I think that covers that.

17      THE COURT:  I think it's encompassed by that.

18      All right, you will be received as an expert, Doctor.

19  BY MR. KAUL:

20  Q   Dr. Minnite, can you explain what the focus of your

21  work has been?

22  A   The focus of my work has been to try to measure the

23  incidents of voter fraud in American elections,

24  contemporary American elections.

25  Q   And what have you done as a part of that work?
```

1  A      I published a University Press book on the subject.

2  I've published another book that treats the subject as

3  well, but in a different way.  I've published articles.  I

4  have testified before Congress on the issue of voter

5  fraud.  And I've also been an expert witness in a number

6  of cases, recent cases, challenging voter ID laws.

7  Q      And you mentioned that you published, I think, and

8  some papers.  Was any of that work peer reviewed?

9  A      Yes.

10  Q      What parts of it?

11  A      Well, the book, *"The Myth of Voter Fraud,"* is

12  considered reviewed because it's published by a University

13  Press, and that's what they do.  I published an article on

14  voter identification laws in a peer reviewed edited book.

15  I've published an article in a peer reviewed journal.

16  Q      Have you also published works regarding voter

17  restrictions?

18  A      Yes.

19  Q      Can you explain what you've written on that?

20  A      Yes.  I co-authored a book called *"Keeping Down the*

21  *Black Vote: Race and the Demobilization of American*

22  *Voters."*  And that was a book that looked at the way in

23  which parties, party politics have used -- partisans have

24  used electorial laws to try to craft their advantage in

25  terms of shaping the electorate.  So both parties over

1  time, over history, have contested election rules and

2  tried to right rules so that they're advantaged over the

3  other party.

4  Q    And has your work involved quantitive analysis and

5  survey design?

6  A    Yes.

7  Q    What were you asked to do for this case?

8  A    I was asked to provide an opinion on the incidents of

9  voter fraud in Virginia in recent years, and also

10 nationally.  And to talk about -- or look at voter

11 restrictions, and how they operate in the partisan

12 context.

13 Q    And did you prepare an expert report?

14 A    Yes.

15 Q    All right.  And let me just direct your attention to

16 Plaintiffs' Exhibit 210.

17 A    Okay.

18 Q    Does that appear to be a copy of your report?

19 A    Yes.

20 Q    And did you also prepare a reply report in this case?

21 A    Yes.

22 Q    And if you will take a look at Plaintiffs' Exhibit

23 214.  Would you let me know if that's your rely report.

24 A    Yes.

25 Q    Okay.  I'll be referring to those throughout your

1    testimony as your report and your reply report.

2         MR. KAUL:  And, Your Honor, I guess I should note for

3    the, and we haven't discussed this with defense counsel,

4    we talked about the expert reports coming into evidence.

5    I know that our 214, Dr. Minnite's report, has some

6    articles attached to it, which are not her articles.  And

7    I note some of the defense experts reports have some.  I

8    think what we were thinking when we agreed to admit them

9    that the reports themselves are the relevant --

10         THE COURT:  With respect to the core report, the

11   Doctor's report itself, not the attachments, is there any

12   objection to the report?

13         MR. HEARNE:  No, Your Honor.

14         THE COURT:  It will be received without objection.

15         Both the report and the rebuttal, Mr. Hearne?

16         MR. HEARNE:  We don't object to either.

17         THE COURT:  They'll be received without objection.

18         MR. KAUL:  Thank you, Your Honor.  And I think her CV

19   is attached to one, but I'll incorporate that.

20         THE COURT:  I'm sure they have no objection to that.

21         MR. HEARNE:  Your Honor just to be clear in terms of

22   the Court's previous ruling, we're saying they would

23   still -- her testimony and the reports would still be

24   subject to that ruling.

25         THE COURT:  Yes, sir.

1           (Plaintiffs' Exhibit 214 is received.)

2    BY MR. KAUL:

3    Q    I'm sorry.  Thank you for taking a look at those.

4         Now, in writing your original report for this case,

5    did you incorporate work that you had previously done?

6    A    Yes.

7    Q    Can you explain.

8    A    Well, my knowledge today is based on the work that I

9    have done since the 2000 election on this issue.  So it

10   would be hard for me to say that what I know today is not

11   based on what I have done in the past.

12   Q    Let me sort of have you walk through that since it's

13   been formed to your analysis.  First, how did you get

14   started researching this topic?

15   A    I got started on it because I was teaching Intro to

16   American Government at Columbia in the fall of 2000, and

17   normally my students would not be interested in something

18   like the way election administration unfolds.  And it

19   turned out that with that election, the disputed election,

20   and the coverage of the recount and the procedures and

21   problems in Florida, that my students were very interested

22   in it, and I became very interested in it.  And I followed

23   it very, very closely, and all the efforts to try to

24   figure out what the problems were, and what the solutions

25   should be in terms of public policy, and new laws and so

1  forth.

2      And so it began with an interest in election reform

3  ideas, and then at the end of the period in which the

4  Congress finally passed the Help America Vote Act in 2002,

5  there had been a little bit of a shift toward a concern

6  about voter fraud which had not been at issue in Florida

7  at all.  Had not been raised in Florida.  But in the

8  debates in Congress, there was a concern, well, we need to

9  also address this issue as well.

10     And so it was a simple question about whether if

11 there was any voter fraud.  In fact, the question was put

12 to me by Myles Rappaport who had just become the executive

13 director of a policy think tank in New York, but he had

14 been a Connecticut legislator and former secretary of

15 state.  And he said, you know, every time we try to make

16 it easier for people to vote in a political context,

17 there's an objection that this will open the door to voter

18 fraud.  So you're political scientist.  Tell me, is there

19 a problem with voter fraud?  And it was a simple question,

20 and I thought perhaps it would be easy to do.

21     And, you know, the upshot of it is I've spent 15

22 years studying it now because it's not.  It wasn't easy to

23 figure it out.  There were no academic studies on it.

24 Political scientists had shown no interest in answering

25 that question.

1    And I want to be clear that I'm talking about fraud

2 that would be committed by voters because the policy

3 debate was about photo ID or more identification

4 requirements which effect voters.  So I was thinking of it

5 that way.  I was not thinking of it in terms of Daily

6 Machine in Chicago or, you know, the Boss Tweed and

7 election corruption, I would call it.  I was a -- I'm a

8 social scientist, and I was trying to design a very

9 precise set of research questions that I could answer.

10 And the challenge was the question of measurement of voter

11 fraud.

12    THE COURT:  Doctor, for the purpose of your research,

13 how do you define voter fraud?

14    DR. MINNITE:  I spent a lot of time trying to figure

15 that out.  I didn't come with any particular definition of

16 it, but as I say, as a social scientist, the first thing

17 you do -- if you're interested in empirical measurement,

18 you have to have precise concepts and measures.  So I

19 thought this question through very much.

20    And the first thing I did was I looked at every state

21 election code to see how it was defined in the law.  I did

22 a complete literature review in the scholarly literature

23 to see how it was discussed there as well.  And my hope

24 was that I would have a useful definition were there was

25 some kind of consensus on the way the term was used, but

1  that wasn't the case.

2      So I thought about it, and my reasoning was that -- I

3  looked at the electorial process and I thought about the

4  actors in the process. So the politicians, the

5  candidates, the parties, the election officials, and the

6  voters, and I thought, you know, people have access to

7  different parts of that process. So voters don't count

8  the ballots, and therefore they can't corrupt the count.

9      And my definition began to take shape around what is

10 it that voters can actually corrupt in the electorial

11 process. And primarily, their own registration in voting.

12 They can lie about who they are, they can try to vote more

13 than once. But the definition is derived out of this

14 process of trying to reason through what voters can

15 actually do because the policy debate was, and solutions,

16 were geared -- were only going to be dealing with voters.

17 And that was not the lesson of Florida in 2000. That was

18 not what we saw.

19     We saw machine breakdowns. We saw disputes over

20 whether it was a hanging chad, whether a ballot should

21 count. We saw a variety of other problems, but we did not

22 see a problem with voter fraud.

23     So my definition ends up being that voter fraud is

24 the intentional corruption of the voting process by

25 voters.

1        And I add that point about intention because fraud

2   means -- it comes from a Latin word that means to deceive.

3   So it has to be intentional.  And in fact, that

4   corresponds with state election codes, federal law, that

5   say, for example, if it's going to be illegal to vote more

6   than once, it's always intentionally willful.  It's in the

7   law itself.  So the issue of intention is very important

8   as well.

9        And that allows me to distinguish voter fraud from

10  broader election fraud, we might call it, or election

11  corruption.  And it also allows me to distinguish between

12  what you might say are technically illegal ballots and

13  fraudulent ballots.  Technically, illegal ballots might be

14  a ballot where say in a state where, like Virginia, where

15  you cannot cast a ballot if you're still under state

16  supervision, but somehow you don't know that and you get

17  registered and you actually vote.  You have a felony

18  conviction, and you're not -- you have not had your civil

19  rights restored, that is a ballot that is illegal under

20  Virginia law.  But if you didn't try to do that on purpose

21  because you didn't know, it's not a fraudulent ballot.

22        So I'm trying to be very precise.

23        THE COURT:  But, of course, I think you would have to

24  agree that the Virginia voter ID law, while it may focus

25  principally on fraud, it also is meant to filter out

1   illegal voting, period, whether you don't belong in that

2   precinct or you're not a resident in the state, et cetera.

3   It's a little more encompassing than pure unadulterated

4   voter fraud.

5        DR. MINNITE:   That's correct.   And we have procedures

6   in place.   You know, all the procedures we have in place,

7   including voter registration, where you have to register

8   beforehand, where we have all these procedures that I

9   think probably you've heard about from the election

10  officials, at least I heard this morning when I was here,

11  but I also know, you know, all these procedures in place

12  to make sure that only eligible voters vote, they only

13  vote once, that vote in the right, and so forth.   So,

14  election codes, which can run 400, 500 pages long, and

15  they're quite detailed, are there to do exactly that.   To

16  filter out the illegal votes.

17        THE COURT:   I'm sorry for interrupting.

18        You go right ahead, Mr. Kaul.

19  BY MR. KAUL:

20  Q    And why -- you talked about why you focused on

21  voters, and not others.   But why have you focused on fraud

22  rather than, you know, casting of ballots unintentionally

23  in the way it's inconsistent with the law.

24  A    It goes primarily to the policy debate as it evolved

25  and then changed in 2002 and 2003, and then continued to

1  build until today where we now have so many states that

2  have passed photo ID laws claiming that it's a necessity

3  because of the problem of voter fraud.  So the answer to

4  your question is because that's the policy issue that I've

5  been interested in.

6       And also, I have to say, as I studied so many

7  different elections, and all of the research that I've

8  done, I've found what was consistent with what we saw in

9  Florida in 2000, which is to say I have a lot of respect

10 for election administrators.  I have -- on election day,

11 they're basically volunteers.  They are like good people,

12 good citizens.  They want to do the right thing.  But

13 election administration has got a lot of problems.  And

14 there's just basic human error that can enter into the

15 process.

16      So I've seen that those kinds of problems are a

17 better explanation for what you might call irregularities.

18 For example, a person goes in to vote and somebody has

19 signed the poll book.  Now, this might not be the case in

20 Virginia with electronic poll books, but in other places

21 where they've signed the poll book on that person's --

22 next to their name.  They say, oh, you can't vote.

23 Somebody has already signed for you.

24      Is that a case of fraud, or is that a mistake?  And

25 most of the time, almost -- I don't want to say all the

1  time, I don't want to be extreme, but most of the time

2  these have turned out to be mistakes.  Voters make

3  mistakes.  They get confused.  Election administrations

4  make mistakes.  Poll workers make mistakes.  We should

5  expect some amount of human error because it exists in all

6  systems that we have.  And we pretend like there is no

7  possibility of error as an explanation for an

8  irregularity.

9      So it's a better -- again, I guess, being a social

10 scientist, we're always looking for possible explanations,

11 alternative explanations, and doing research to figure out

12 which is more likely.  Is it fraud?  Or is it a product of

13 administrative malfunction of sorts, or voter confusion?

14 Q    So you talked about how when you started working on

15 this topic there wasn't much in the way of scholarly

16 literature.  How did you set about trying to determine how

17 much voter fraud there was using your definition?

18 A    So, I did a wide variety of things.  I did a FOIA

19 request at the Department of Justice.  I wrote letters to

20 every Attorney General in the United States, to every

21 Secretary of State in the United States.  I sent surveys

22 to all 2700 District Attorneys in the United States.  I

23 had already done all of the literature review in the

24 academic literature.

25     I followed cases that appeared to be the most

egregious problems, and I developed case studies.  So I did case study of the 2004 election in Washington State, of the 2000 election in St. Louis.  Of voting in Milwaukee around that time, as well.  I looked at court records.  I did as much legal research as I could.

I interviewed people.  I interviewed election officials.  I interviewed the U.S. Attorney of the Eastern District of Wisconsin.  I interviewed defense attorneys. I interviewed some voters who had been accused of voter fraud.

So, basically, the idea -- I call it a mixed methods approach.  And that is that you just look at absolutely everything you can possibly look at.  You look for whatever data there might be.  And I had found a data set that was a complete -- claimed to be a complete record. It was put together by the Administrative Office of U.S. Courts.  It's a complete annual record of all indictments in Federal Court.  And I had hoped to be able to do quantitive analysis of that data, but there just weren't enough cases.  I had hoped to be able to study it in that way.  But if you have no dependent variable, that is to say, you don't have cases that can be the dependent variable, you can't study it that way.

So I used these different methods, and the idea is that no one approach is going to be complete.  Each one is

1  going to have flaws.  They're going to have problems or be

2  incomplete.  But you look at all of that.  You look at all

3  the evidence you can bring together, and then you, in a

4  sense, triangulate it.

5      And you see, for example, if I had in interviews

6  election officials saying to me we have huge problems with

7  this.  Just big huge problems, it happens all the time, et

8  cetera, et cetera, and the data that I could find, say

9  through a news search, didn't align, then I know that I

10 have to figure that out.  I can't have contradictions in

11 the data.

12     So you use each fragment or piece of data that may be

13 incomplete, and you put it altogether and you see if there

14 are contradictions in the data, you tighten that up, and

15 then you know that you can draw conclusions and inferences

16 from that, that should be fairly reliable.

17 Q   In the course of this mixed method approach, did you

18 find examples where investigators had done -- had taken a

19 very close look for voter fraud?

20 A   Yes.

21 Q   Can you describe some of those?

22 A   So going back to the 2000 election.  In 2001, the

23 U.S. Attorney General announced a program in which there

24 was going to be special training for U.S. Attorneys.  And

25 the attorneys in the civil rights division were going to

1  be brought together with attorneys in the criminal

2  division who work on the public integrity section there

3  who work on criminal -- election crimes, forgive me, and

4  to put together a training to heighten awareness,

5  knowledge, and so forth, of U.S. Attorneys on voter fraud

6  and voter intimidation.

7      And the program was called the Ballot Access and

8  Voting Integrity Initiative.  And so part of my analysis

9  was to study the results of the first three years of that

10 initiative which went from federal fiscal year 2002 to

11 federal fiscal year 2005, covering the 2002 and the 2004

12 elections.

13 Q    And who was the Attorney General when that program

14 was in effect?

15 A    That was John Ashcroft.

16 Q    And what did the Ballot Access and Voting Integrity

17 Initiative find based on your research?

18 A    So, in the first three years of that program, there

19 were 95 indictments that were brought in Federal Court.

20 And this number was bandied about a bit.  But what I did

21 was I looked at the case list for all of those cases, and

22 I searched to my best ability using Pacer records.  I

23 looked at each one of those cases, each one of those

24 indictments.  And then, again, applying my method of

25 thinking about who the actors are, in that it was

1   important to identify the perpetrator of the crime if

2   you're interested in the policy issue, you know, what's

3   the problem, what's the solution, I discovered it wasn't

4   actually 95 cases of voter fraud, or even 95 cases of

5   voter intimidation.   There were actually only 40 voters

6   who have been indicted for fraud over those three years.

7   Q     And what was the geographic scope of that project?

8   A     It was nationwide.

9   Q     And of those 40 cases, what types of crimes were

10  charged?

11  A     There were basically three types, I think.   There

12  were people who, as I mentioned before, had felony

13  convictions and had voted before they essentially were

14  allow to.   There was noncitizen voting by people who were

15  not citizens.   And there were a few handful of cases, I

16  think maybe five, that were double voting.   Actually, it

17  was voting over Kansas/Missouri lines were, I think, three

18  of those cases.

19  Q     Were there any cases of voter impersonation fraud?

20  A     No.

21  Q     How many of those 40 cases were in Virginia?

22  A     None.

23  Q     Let me ask you about the Justice Department data.

24  Did you, in the course of your work, obtain Justice

25  Department data regarding voter impersonation fraud for

1   the period from 2004 to 2014?

2   A     Well, I was involved as an expert in the Texas case,

3   the recent Texas photo ID case.  I think it was at that

4   time called *V.C. v. Perry*.  And there was data that the

5   Justice Department presented looking at the period of 2000

6   to 2014 where they had searched their electronic data

7   bases, and so forth, looking at how many people they had

8   charged under various violations of federal law.  And that

9   data was part of the record of that case.  And there were

10  no cases of voter impersonation charged.

11  Q     And that was over a 10-year period?

12  A     It was 14 years.

13  Q     Have you also looked at local or state-specific sort

14  of deep dives into this issue?

15  A     Yes.  I mean, election law is primarily state law.

16  And we like to say that we have really 50 or 51 election

17  systems, because the states have a variety of differences

18  in the way that they run their elections.  And the concern

19  about fraud is that it might be more something you would

20  see at the state and local level rather than at the

21  federal level, which, you know, I don't know if I really

22  agree with that because so many more people actually vote

23  in federal elections than in state and local elections.

24  But let's concede, of course, that it would be important

25  to look at what happens at the state and local level.

1          So the data problem there was even more difficult.

2   Although there were a number of states at that time, and

3   I'm talking about 10 years ago, because it's gotten better

4   since then, but there are still a number of states that

5   had paid attention to the issue and had done some

6   investigations of their own.  But I mentioned to you I

7   asked Attorney's General and Secretaries of State about

8   cases, and about any data they could tell me at all about

9   it, and I got letters back from most of those people

10  saying, essentially, we don't have a problem with that.

11         In some cases, the agency wasn't the right one.  So I

12  would go to the right one.  For example, in North

13  Carolina, they have a little bit of a different

14  arrangement than other states.  They have a state election

15  board that has more authority than the Secretary of State

16  to run the elections.  So I did that kind of work.

17         And then as I said, I developed the case studies

18  based on my analysis of all the news coverage.  And I

19  literally read thousands and thousands of news stories

20  just to get an overview of what was going on because it

21  certainly would be important to do that.  Initially, I

22  tried to -- I felt, well, maybe I can develop numbers from

23  that information, but I didn't really want to go that way

24  because I didn't feel in the end that everything would be

25  covered.  So the issue of how precise can you be from any

1   one source was a problem.

2        THE COURT:  Doctor, one question I want to ask you.

3   You mentioned there were 40 prosecutions by D.O.J.  Did

4   you inquire of D.O.J. how many cases were reported to them

5   that they chose not to prosecute?

6        DR. MINNITE:  In my FOIA request, I asked for the

7   reports that would have come back from the U.S. Attorneys

8   or the -- they had district election officials -- not

9   election official, election officers who were sort of

10   Assistant U.S. Attorneys who might be charged with being

11   the point person.  And they would not -- they refused to

12   give me that information.

13        THE COURT:  Okay.

14   BY MR. KAUL:

15   Q    In looking at state-specific incidents, or

16   local-specific incidents, did you take a look at

17   allegations about potential voter fraud in Milwaukee?

18   A    After the -- yes.  And again, this research was -- I

19   was doing this research after 2001, 2002, all the way

20   through to the publication of the book was 2010.  So I

21   looked at the 2004, the 2004 election in Wisconsin.

22   Q    And what did you find in investigating -- first of

23   all, what was the allegation in Milwaukee?

24   A    Well, the allegations there were that -- the

25   Milwaukee Journal Sentinel had done a very close -- they

1    were really on the issue.  They were investigating it

2    constantly.  They were following, you know, everything

3    that was going on.  And they were able to do things like

4    look at poll books and other materials from the election,

5    and they would match them up.  And they said this number

6    doesn't match that number, and it should.  And they were

7    reporting this in the press.  And it was quite a lot of

8    reporting that was going on in that election in Milwaukee.

9         So that was one of my case studies.  I want to find

10   the cases that were the worst where I would hope to find

11   it.  And the upshot of everything that went on there

12   afterward with respect to the U.S. Attorney being involved

13   and creating a task force with the city, with the

14   Milwaukee police department, and trying to investigate

15   whether there had been some kind of fraud in that

16   election, the overwhelming conclusion was that there

17   essentially was more a Florida style melt down.

18        The explanation for the actual irregularities that

19   were produced by the news investigative reporting were

20   explained by deficiencies in election administration.  And

21   that they could not -- in fact, they could not even --

22   they did not even want to produce a final report because

23   it was so overwhelmingly clear to them that it was an

24   election administration problem, not a fraud problem.

25   Q    When you say "clear to them," who do you mean?

1   A     There was a joint task force that was created under

2   the auspices of the U.S. Attorney of the Eastern District

3   of Wisconsin.   And it included the Milwaukee police

4   department who actually did the investigation.   So, for

5   example, one of the problems was that they have same-day

6   registration in Wisconsin, so if a voter comes in with

7   identification and fills out a registration card and then

8   there's a procedure for checking that person after the

9   election, and there had been breakdowns in that procedure.

10  Election officials are supposed to mail to those people

11  right away to insure they are there, and if they get

12  things back then they have to investigate that.   And there

13  were just like clerks who didn't do that.

14        They had a very severe and chronic problem with poll

15  workers -- not enough poll workers in the City of

16  Milwaukee because they required bipartisan poll workers.

17  So they have to find as many Democrats as Republicans.

18  And they just can't find as many Republicans who live in

19  Milwaukee.   So they have an aging poll worker population

20  there, and they just had huge problems in the election.

21  Q     And I'm not going to go through each of the sort of

22  deep dives within your report, but to sort of summarize,

23  were there other similar cases like this where there were

24  suspicions of fraud, and upon further investigation there

25  turned out to be no fraud?

1  A    Yes.  One of my other case studies was the 2000

2  presidential election in St. Louis.  And there also were

3  various kinds of breakdowns having to do with outdated

4  records with the St. Louis Board of Election Commissioners

5  who were trying to clean up the lists.  They were purging

6  a lot of records, and there was lots of screw-ups.

7       There were people who were put on an executive list,

8  and then when they showed up to vote, they were supposed

9  to be allowed to vote if they had the ID.  And the

10  inactive list didn't make it to the polling places, so the

11  people in the polling places had to call the central

12  office, they couldn't get through.  There were long lines.

13  There were all kinds of problems there in St. Louis.

14       And in the end -- there were allegations of fraud,

15  but in the end, actually, the St. Louis Board of Election

16  Commissioners had to enter into a consent decree with the

17  Justice Department because they had, in a sense, illegally

18  purged so many people, which created a lot of the

19  problems.  But there were other problems.

20       There were problems, for example, with property

21  records that were later checked against the registration

22  lists being 40 years out of date.  So, you know, they do a

23  check of the registration against an address, and there

24  was no building there 40 years ago, but there's a building

25  there now, but they didn't take that into account.  So

1  these list matching exercises were not done carefully

2  enough, but also a lot of the data was out of date.

3       And I remember that the St. Louis Post-Dispatch on

4  their own, investigated some the so-called *ghost voting*,"

5  and they found that almost every one of them there was --

6  could be explained by that problem.  That the records were

7  wrong.  There was actually a building there, and so forth.

8  Q    And you talked a little bit earlier about the state

9  of research and academic development on this issue about

10 how frequent voter fraud is.  In addition to the research

11 you have done, has there been further development of the

12 literature on this issue over the last 15 years?

13 A    I wish I could say yes.  There's been a lot more

14 research on the question of whether voter ID laws suppress

15 turnout.  There hasn't been as much on the question of

16 voter fraud, but there has been some.  And so I'm not

17 aware of any academic research that challenges my findings

18 in any way.

19 Q    Is the limited research that has been done consistent

20 with your findings?

21 A    Yes.

22 Q    Now, you mentioned earlier you testified in some

23 other cases.  What was the first case in which you were

24 retained to be a potential expert witness?

25 A    That case was called *ACORN v. Bysiewicz*.  And it was

1    a case in Connecticut.  And it was 2005.  And at that

2    point, I had only published a single report that ended up

3    being, in fact, the core of what developed as my book.

4    And I was asked by the Brennan Center, who they were the

5    ones bringing this case in Connecticut, and it had to do

6    with Connecticut's 2-week cut off for registration.  And

7    they believed that that was a violation of the 14th

8    Amendment, so they were bringing this case.  And they

9    asked me to be an expert on voter fraud.

10   Q    So what happened in that case?

11   A    So the state objected.  And it was the first -- I had

12   never testified in Federal Court.  I hadn't published a

13   book.  I had only been working on the issue actually at

14   that point for two years.

15       THE COURT:  Let me just say, I'm delighted to hear,

16   and I'm intrigued by the Doctor's analysis on voter fraud,

17   but she's not going to get into a legal analysis.  I

18   respect her too much to require that.

19       MR. KAUL:  I appreciate that, Your Honor.

20   BY MR. KAUL:

21   Q    Let me just ask you this question then.  Did you

22   ultimately testify as a lay witness in that first case?

23   A    Yes.  All I was saying was that I was offered as an

24   expert initially, the state objected.  There was no

25   objection to the objection, so I was offered as a fact

1   witness.  And I testified on a table that I had prepared.

2   Q    Now, since then have you testified as an expert

3   witness in several different trials?

4   A    Yes.

5   Q    And have you qualified as an expert in all of those

6   cases?

7   A    Yes.

8   Q    Which states -- well, let me step back.  What was the

9   subject matter of your expert reports in those cases?

10  A    Well, I testified as an expert on voter fraud in New

11  Jersey, but I did not produce an expert report in that

12  case.  And then in all of the other cases, which were in

13  Wisconsin, Texas, North Carolina and Ohio, all of the

14  cases, the expert reports, were on the same question about

15  the incidents of voter fraud in those states and

16  nationally.

17  Q    And did you do -- did you apply this mixed methods

18  research you've been describing to those specific states?

19  A    In a more limited way.  I did not always have either

20  the time, capacity, or because I had been, in a sense,

21  hired by the plaintiffs, the ability to interview as many

22  people as I would if I were simply doing the research on

23  my own.  So I relied less on interviews in those expert

24  reports, but I used news analysis.

25       I also, have to say, I always look -- the news

1   analysis is to give me a sense of what the public knows

2   and what I might, should want to try to look for.  I don't

3   rely on it solely as the evidence.  And in most of those

4   cases, there have been more official compilations of

5   statistics or material that's been produced by an

6   authoritative agency of some kind that has been the basis

7   of my analysis of the incidents of voter fraud in those

8   states.

9   Q    And what did you find about the incidents of voter

10  fraud in those cases?

11  A    Well, in every case that I've worked on recently, the

12  findings confirm my earlier findings that voter fraud

13  defined, as I have defined it, is rare.

14  Q    All right.  And let me --

15      THE COURT:  Now, did you inquire in those particular

16  states how many cases were reported where someone who was

17  not supposed to vote in that precinct, cast a vote there?

18  What you might call illegal voting, but not intentional;

19  did you make that inquiry?

20      DR. MINNITE:  Yes.  And in some cases, especially in

21  North Carolina, because the North Carolina law changed

22  something that they had there where if you showed up in

23  the wrong precinct, you could vote.  They would only count

24  that part of the ballot that was valid for you.

25      So if it was a statewide election office, it didn't

1    really matter where you lived as long as you lived in the

2    state.   But if it was some smaller jurisdiction where you

3    had to live in that district to vote for that person,

4    judge or whatever, they would count the part of the ballot

5    they could count.   So they were making an effort to do

6    that.

7         So when North Carolina changed their law, they no

8    longer allowed that.   You can walk in -- if you happen to

9    be in the wrong precinct and you say, no, I know I should

10   be able to vote here, they have to give you a provisional

11   ballot.   So there's some measure of that.

12        THE COURT:   My question is though in these states,

13   North Carolina, Ohio, did you determine if there had been

14   cases where people accidentally misrepresented the

15   precinct or their residence that you would call an illegal

16   vote, but not a fraudulent vote; did you consider that?

17        DR. MINNITE:   I certainly considered it.   Yes.

18        THE COURT:   Did you get those statistics, and were

19   there many?

20        DR. MINNITE:   Like I said, they could be reported as

21   people who had to vote provisionally because they showed

22   up at the wrong place.   So I didn't even go to the issue

23   of whether it was fraudulent but was it illegal.

24        And in fact, the U.S. Election Assistance Commission

25   collects data after every federal election from the

1   states, very detailed data, that now has been including

2   reasons why people cast provisional ballots.  And you can

3   look at how many people are being, in a sense, rejected

4   because they don't have ID or because they're in the wrong

5   precinct or they're in the wrong jurisdiction.  So we have

6   some sense of those numbers.

7        And I also -- I would say that I take no illegal

8   ballots.  I mean, I'm trying to capture everything.  And I

9   want to make a distinction between fraudulent and illegal,

10  but I'm not unaware of the illegal part of that.

11       THE COURT:  All right.

12       DR. MINNITE:  And in some cases, I use those numbers

13  as well.

14  BY MR. KAUL:

15  Q   Just to follow-up on the Judge's question.  In

16  precincts in the various states you've analyzed, do

17  precincts particularly uphold folks that only have the

18  voters who are allowed to vote at that precinct listed?

19  A   I don't know if I can answer that question with great

20  knowledge of that, but I -- I don't know if I can answer

21  that.  I mean, in most places that is the case.  I don't

22  know in places like Virginia where you have an electronic

23  poll book.  It can work differently.  Or places like -- I

24  think Maryland also has electronic poll books.  It is an

25  innovation that is beginning to spread.

DIRECT EXAMINATION OF DR. LORRAINE MINNITE  784

1  Q    And so other than places that have same-day

2  registration, when you show up to vote on election day, do

3  you need to be registered in the system somehow?

4  A    I'm sorry.  Say that again.

5  Q    Other than states that have same-day registration, if

6  you show up to vote on election day, do you need to have

7  been registered so that you're in the system in some

8  fashion?

9  A    Oh, yes.

10  Q    And if you misrepresent, or you make a mistake about

11  where you live in submitting that registration, does a

12  voter ID requirement stop you from going forward with

13  casting a ballot despite that error?

14  A    Well, I have to say I'm not aware of any of the

15  recent laws actually requiring that the address on the ID

16  match the address on the poll book.

17  Q    You were talking before about your expert report.

18      MR. KAUL:  Let me ask Ms. Schultz to bring up Page

19  15, Note 43.

20      THE COURT:  Page 15, Note 43?

21      MR. KAUL:  Of the first expert report.

22      THE COURT:  That's 210?

23      MR. KAUL:  That's right, Your Honor.

24  BY MR. KAUL:

25  Q    Have courts in front of which you've testified,

1  relied on your testimony based on the research you've been

2  discussing?

3  A    Yes.

4  Q    And does this footnote summarize some of the findings

5  that courts have made?

6  A    Yes.

7  Q    All right.  Now, based on all this work that you've

8  been describing, have you drawn any sort of overall

9  conclusions about the incidents of fraud in American

10 elections?

11 A    Yes.

12 Q    Can you explain?

13 A    Well, my conclusion is that it is exceedingly rare.

14 Q    And what about voter impersonation fraud,

15 specifically?

16 A    Even rarer.

17 Q    All right.  Now, for this case, did you also conduct

18 a Virginia specific study?

19 A    Yes.

20 Q    And what methodology did you use to conduct that

21 analysis?

22 A    Well, I began with my overinclusive search of news

23 sources in Virginia going back to at least 2000, I'd have

24 to check - but going back for several years - to try to

25 identify anything at all about what was going on.  I also

1    looked at the materials that had been collected by a

2    project that was at the Cronkite School of Journalism at

3    Arizona State University.  This was a couple of years ago.

4    They have a yearlong seminar in investigative reporting,

5    and they wanted to focus on this question of voter fraud.

6        And so they actually contacted me to do like a Skype

7    training session or a class for their graduate students on

8    my methodology.  And so they picked up and, in a sense,

9    replicated my methodology.  And they sent out over 2,000

10   public records requests to election officials, to law

11   enforcement officials.  It was in a sense an update of

12   what I had tried to do, you know, five years before, six

13   or seven years before.

14       And they very helpfully posted everything that they

15   got back.  And there's a data base on-line where you can

16   actually look at these materials that they got back.  And

17   one of the things that they got back from Virginia was a

18   search that was conducted by the State Police on the

19   databases of people who had violated Virginia's illegal

20   voting statute.  And they produced a report, and that

21   report is up on the Website.

22       And so as I was saying earlier, I'm looking for --

23       THE COURT:  Hold that just one minute.  Pardon me for

24   interrupting you.

25       Is that based upon cases reported to the Virginia

1    State Police, or cases that resulted in prosecutions?

2         DR. MINNITE:   The report says investigated and

3    charged.   When I looked at it, everybody was guilty.   So

4    it made me think that it was only people who had been

5    convicted.   That's not what the title of the report says.

6         But, you know, they said they've -- in the e-mail

7    from the person who responded from the Virginia State

8    Police, back to the investigative journalism team, they

9    said this is -- we are willing to write a computer program

10   to do this search for you and we'll find everybody who's

11   been investigated, charged, and so forth.   But if you

12   actually look at the data, everybody is guilty.   So I tend

13   to think it was just the ones --

14        THE COURT:   They only reported the cases in which

15   there was a conviction, correct?

16        DR. MINNITE:   That's my guess.   That's not what they

17   say it is, but that's my guess.

18        THE COURT:   All right.   Thank you, Doctor.

19   BY MR. KAUL:

20   Q    So you reviewed that Virginia police report you're

21   describing?

22   A    Yes.

23   Q    State Police report.

24   A    Yes.

25   Q    Did you also do a survey of news in Virginia?

1  A     Yes.

2  Q     Now, do you remember how many articles you sorted

3  through?

4  A     I actually gave you the precise number.  It's

5  actually more than that, but through the -- somewhere,

6  don't I?

7  Q     I think Page 19 of your report.

8  A     Page 19?

9  Q     There's an appendix.

10 A     Right.

11        1,752 that turned up from this primary search.  I do

12 other searches, but that -- I used something called

13 NewsBank.

14        THE COURT:  Doctor, could you give me that figure

15 again and what it stands for?  I was reaching for my pen

16 and missed it.

17        DR. MINNITE:  Yes.  There is a data base that I have

18 access to as a university faculty, and university

19 libraries would make it available, that's a searchable

20 database of news sources at the state level.  So, in

21 Virginia, they cover 35 news sources.  And those are the

22 major newspapers in Virginia.

23        And going back for some of them as far as 30 years,

24 most of them tend to be 10, 12 years, 15 years.  So I

25 searched that database just for Virginia, and I use a

1  search terminology that is overinclusive.  I search for

2  vote fraud, voter fraud, election fraud, those terms.  And

3  the result for this period of January 1, 2000, to December

4  11, 2015, was 1,752 hits.  And that just means how many

5  articles came up.  But many of them are duplicative

6  because it might be an AP story that's covered in three

7  newspapers.  So it's all counted in three.

8      THE COURT:  Okay.

9  BY MR. KAUL:

10 Q    So how many did you actually review?

11 A    I -- well, so what I did was you get a little

12 abstract of the article, and I'd look at it, and I could

13 tell.  You know, if it's about Afghanistan or the Ukraine,

14 it's out.  But I looked at all 1,752 of them, and I

15 decided that 647 of them I should read in full.  So that's

16 the number.

17 Q    So, reviewing those article is part of your analysis

18 in this case?

19 A    Yes.

20 Q    And is that sort of a more limited version of what

21 you did when you were doing your national analysis?

22 A    Yes.  Limited in the sense it was just one state.

23 Q    And so when you were doing your national analysis, do

24 you have an estimate of how many articles about fraud you

25 reviewed?

1  A     Thousands.

2  Q     Now, in those articles, were there discussions not

3  just of convictions for fraud, but also allegations of

4  fraud?

5  A     Well, you know, most of the news articles, I would

6  say, are about allegations.  But because they're covering

7  something that might just begin to happen, so there's an

8  allegation.  Say there's a close election and the loser

9  says I think there was fraud in this election.  So there's

10  going to be a news story that says that.  But you have to

11  follow it out to its conclusion.

12      So it's a lot of allegations, but it's the

13  information at the time, that's available at the time.

14  Q     And you said you have to follow the allegations to

15  its conclusion.  What, if anything, did you do to try to

16  follow the allegations you learned about to their

17  conclusion?

18  A     In Virginia?

19  Q     Both Virginia and in your work generally?

20  A     Well, I would -- I mean, my work was historical in

21  the sense that I'm looking back in time.  So I had the

22  benefit of time of an allegation made in 2004, if I'm

23  looking at it in 2010, obviously I can see what happened

24  over time.  So I would track issues as they came up to see

25  what happened, and follow the stories as they develop.

1  Q     And is that factored into your overall conclusions

2  about the prevalence of fraud?

3  A     Yes.

4        MR. KAUL:   Let me ask Ms. Schultz to pull up Table 2

5  on Page 21 of your report.

6  BY MR. KAUL:

7  Q     What does that table show?

8  A     So this is the result of me reading those 647

9  articles, and keeping track of the information in those

10 articles.   And I just tried to -- I settled on charges

11 filed here rather than say allegations that went nowhere,

12 or whatever.   But charges filed.   So there had to be

13 something in the story that said this person was charged.

14 It doesn't have to be that they were convicted, just that

15 they were charged.   And I also, by reading the stories, I

16 can tell who was charged kind of and what the issue was.

17 Q     Okay.   And there's a line about halfway down

18 regarding illegal voting.   Do you see that?

19 A     No.

20 Q     Halfway down on the left-hand side.

21 A     Oh, you mean in the table?

22 Q     Yes.

23 A     Yes.

24 Q     Sorry about that.

25       And there is -- it equates to 60 cases of voters.   Do

1   you see that?

2   A     Yes.

3   Q     What does that represent?

4   A     That was the number of people who showed up in this

5   news analysis where it was said so and so was charged with

6   illegal voting because they had a felony conviction and

7   their civil rights hadn't been restored.

8   Q     So this indicates that all 60 of those cases were

9   felons voting, is that right?

10   A     Yes.

11   Q     And that's over a 15-year period?

12   A     Yes.

13   Q     And there is zero cases of voter impersonation

14   listed, is that right?

15   A     Yes.

16   Q     And why is that?

17   A     Well, because I didn't find any.

18   Q     Now, in the course of your research, have you

19   analyzed the types of fraud that voter identification laws

20   can prevent and the types that they don't prevent?

21        THE COURT:  Let's go back to these statistics.  I

22   want to ask you one more question, Doctor.

23        Were you able to capture statistically anywhere the

24   number of cases that were referred to Commonwealth

25   Attorneys' offices in which he or she chose not to charge

1 anybody?

2      DR. MINNITE:  In my initial research when I sent my

3 surveys to county prosecutors, Commonwealth Attorneys in

4 Virginia, I got back information from Commonwealth

5 Attorneys.  I actually did not use that data because I did

6 not have the capacity to do the proper follow-up in a

7 survey, especially a mail survey.  You need to go back.

8 If you don't get a high enough response rate, you need to

9 go back and you send them again and we call them, and you

10 need to make sure that you're not getting biased results

11 back.

12      THE COURT:  And I assume to determine whether the

13 case had any merit at all.

14      DR. MINNITE:  Yeah.  I mean, I reasoned that probably

15 if you knew you didn't have any cases, it was easy for you

16 to just go zero, zero, zero.  Because I gave them the

17 survey, and I asked them -- I think it was 2004 and 2005.

18 And I had it separated into whether they just had

19 complaints.  You know, how many complaints have you had?

20 How many investigations?  How many arrests?  How many

21 prosecutions?  All the way down the chain.  So it was like

22 one whole page where I was just asking them to fill in

23 numbers.

24      And the vast majority that I got back -- I got back

25 like a 14% response rate, which is not bad actually for a

1    mail survey if it's a representative response.  The

2    number, 14%, is not bad.  But if you know that it's

3    representative, then it's good.

4          And I didn't feel I knew that because I know that I

5    didn't go back and try to make sure that I wasn't getting

6    biased results.  But all of that was to say I got back --

7    I'll try to remember how many I got back from Virginia.  I

8    think it was maybe 19 from Commonwealth Attorneys.  And I

9    know that there are what, over 100, I believe.

10         THE COURT:  About 125.

11         DR. MINNITE:  Yes.  And all of them -- some of them

12   indicated that they had gotten complaints, they had done

13   investigations.  I did look at this material recently, but

14   I don't remember off hand how many said.  But that was my

15   effort to do that.  But, like I said, I didn't actually

16   rely -- I don't even report that in my book.

17         THE COURT:  Fair enough.

18   BY MR. KAUL:

19   Q    Let me ask -- I'll come back to the chart in just a

20   moment.  But pulling back again to your national work.

21   Did you investigate case studies in which there was reason

22   to believe if prosecutors were presented with credible

23   evidence of voter impersonation fraud that they would have

24   charged it?

25   A    Yes.  Actually, the State of Minnesota, the District

1  Attorneys there are required by law to investigate these

2  cases when they come to them.  And so I had -- I was going

3  to do a case study on Minnesota, but the data that I got

4  back from the elections official and the Attorney General,

5  indicated that they didn't have any voter fraud.  And so I

6  actually did part of the same survey I just mentioned of

7  the county prosecutors, I did use -- I think I got maybe

8  30 or so back from Minnesota.  And that was consistent

9  with the same thing.

10      They would get a handful of cases, but very few of

11  them actually would turn into very much.  It's not like

12  they've got hundreds of cases or they did hundreds of

13  investigations and then they never charge anybody.  The

14  numbers, sort of, funneled down.

15      But the numbers -- the biggest numbers actually are

16  the allegations.  And I couldn't even get a handle on how

17  to measure allegations.  But there are far far many more

18  allegations primarily because anybody can -- anybody can

19  charge anybody with anything.  You can accuse anybody of

20  anything.  And in the age of the Internet, this material

21  circulates and circulates and circulates.  So, I couldn't

22  really figure out how to try to measure allegations as a

23  phenomenon.

24      But it's true, it's absolutely true, that it funnels

25  down.  There are going to be more, even say, credible

1  cases than actual convictions.

2  Q    And you talked earlier about the program that was run

3  when Attorney General Ashcroft was the Attorney General.

4  Do you recall that?

5  A    Yes.

6  Q    Based on your examination of that, was there an

7  emphasis on charging cases of voter fraud if possible?

8  A    I think absolutely that was the intent.  And I have a

9  quote, I don't recall actually if it's in this -- I think

10 it is in the report somewhere, from the now former head of

11 the Elections Crimes Branch of the Public Integrity

12 Section inside the Criminal Division who had been there

13 for some 30 years in which he said in an interview that at

14 that time, the finding and prosecution of voter fraud was

15 the second highest priority of the Justice Department

16 after terrorism.

17 Q    Do you recall whether any U.S. Attorneys were fired

18 in 2006 because of the perception that they hadn't

19 prosecuted enough fraud cases?

20 A    Yes.  I actually wrote about that in the book chapter

21 I mentioned in the book, *Law and Election Politics.*"

22 Q    So let me ask you about this chart.  Based on the

23 work you've been describing, have you been able to

24 determine which types of fraud would be prevented by voter

25 identification laws?

1  A      Yes.  I believe voter impersonation could be

2  prevented.

3  Q      Can you sort of walk through why the other types of

4  fraud listed here would not be prevented by a voter

5  identification law?

6  A      Yes.  With felon voting, I tell a story in the book

7  of a man in Milwaukee who was -- had a felony conviction,

8  and was actually still under probation, and he got out of

9  jail, he was living with his aunt.  It was election day,

10 they have same day registration, and she said to him, *"You*

11 *need to go vote."*  Because he had voted in every election.

12 He was in his 40s.  He'd voted in every election since he

13 was 18.

14       So he -- and she said to him, *"You need to bring some*

15 *ID if you're going to register today,"* on same-day

16 registration.  So he thought, I don't drive.  He was poor.

17 He didn't have a car.  He didn't drive.  He thought, what

18 am I going to use?  And he thought I'll bring my prison ID

19 because it has my picture on it.

20       And he brought a letter from his parole officer that

21 was addressed to him at his aunt's house as proof of his

22 address, and he went to the -- he walked to the polling

23 place, and the poll worker registered him.  And she wrote

24 on the card, you know, *"Wisconsin prison ID number."*  And

25 because she had written that on the card, he was one of

1    the cases that the U.S. Attorney was going to prosecute

2    because he obviously, you know, had a -- he -- I don't

3    know if she thought it was an okay ID to use, but they

4    checked him out and they realized he was not allowed to

5    vote.

6         And so with respect to felon voting, I mean, this was

7    a case where it obviously a mistake on both of their parts

8    or confusion.  But he actually presented an ID with his

9    picture on it, and it didn't prevent him from not casting

10   an illegal ballot.

11        With respect to double voting, all of the cases

12   except for maybe I can think of one case with double

13   voting where the person voted in their own name.  They may

14   have been, as I mentioned earlier, the cases that the

15   federal government under this ballot access and voting

16   integrity project prosecuted.  There were three people who

17   voted in Kansas and Missouri.

18   Q    I just want to be clear about what you're saying.  Is

19   what you're saying that the double voting cases you've

20   seen the person votes in his or her own name twice?

21   A    Right.

22   Q    And that means two different states, essentially?

23   A    Or there have been some cases within a state.

24   Q    And so those people could present an ID with their

25   own name on it presumably?

1  A    Right.

2  Q    And felons, by the way, are allowed to drive when

3  they're out of jail?

4  A    I assume.  Yes.

5       And then with respect to noncitizen fraud, those

6  cases, all of them that I know of, people were not

7  impersonating other people to do that.

8  Q    All right.  Let me direct your attention to Page 28

9  of your report.  Did you review legislative debate from

10 Virginia regarding voter ID laws that were considered?

11 A    Yes.

12 Q    And on this page, do you recall one of the exchanges

13 from that debate?

14 A    Yes.

15 Q    And focusing just on the exchange between Delegate

16 Morrissey and Delegate Cole, what did you observe?

17 A    Well, I observed one legislator asking the other for

18 evidence of fraud, and none being presented.

19 Q    Were there some examples of fraud generally discussed

20 in legislative debate?

21 A    I don't recall much discussion at all.  I certainly

22 don't recall in the sessions that I looked at there being

23 any evidence presented that there was a problem with

24 fraud.

25 Q    And let me direct your attention to the second

1   sentence from the end.

2   A    Right.

3   Q    Does this refresh your recollection on that point at

4   all?

5   A    Yes.

6   Q    I'm not sure if --

7   A    Yes.  Yes.  And it's the case of one of the two vote

8   buying cases that I highlight in the report.

9   Q    Okay.  And would vote buying be effected by photo

10  identification?

11  A    No.

12  Q    In fact, the person whose vote was bought, under

13  current Virginia law, would have to show their ID to go

14  cast that purchased vote, is that right?

15  A    Also, in one of the cases it was reported that a

16  voter who -- went to the polls with the person who was

17  corrupting the election, and actually that person went in

18  with them and cast their ballot.  So if you have poll

19  workers who are breaking the law, it doesn't matter if you

20  have an ID or not.  If they're the ones who are committing

21  the crime, then you have a different kind of a problem.

22  Q    Did you reach any overall conclusions about the

23  prevalence of voter fraud in Virginia?

24  A    Yes.

25  Q    What was that?

1  A    My conclusion is that voter fraud is rare in

2  Virginia.

3  Q    And what about voter impersonation fraud?

4  A    I didn't find any case of voter impersonation fraud

5  in Virginia in recent elections.

6  Q    All right.  Let me ask you about an overlapping

7  topic, which is your research into voter restrictions.  I

8  don't want to go through everything in your report, but I

9  do want to ask in your study of the history of voter

10 restrictions in the United States, have you observed

11 allegations of fraud in connection with the passage of

12 voting restrictions?

13 A    Well, allegations tend to be made when there are

14 efforts to expand access to the ballot.

15 Q    Okay.  And let me direct your attention to Page 6 of

16 the report, and the one full paragraph there.  Is that the

17 paragraph of the report that relates to this point?

18 A    Yes.

19 Q    And what are some examples of efforts to expand

20 access to voting in which fraud allegations have come up?

21 A    Well, all of the major national efforts going back to

22 the Voting Rights Act of 1965, when you look at the

23 legislative record, which I did for all of these cases,

24 there's always the claim that if we make it easier to

25 vote, we're going to open the doors to fraud.

1  Q    And when efforts to expand access have been passed,

2  what's the result then with respect to whether there's

3  been an increase in the amount of fraud?

4  A    There's no connection to it.  That is just an

5  unjustified fear, I think.

6  Q    And let me next ask you about the preceding

7  paragraph, which starts on Page 5 and goes over to Page 6.

8  About halfway through that first paragraph.

9      Did you, in your report, discuss an example in which

10 fraud was discussed in connection with the poll tax?

11 A    Yes.

12 Q    Can you explain that?

13 A    Well, what I say here, this quote, or this section

14 from my report, I'm saying that the chief architect of the

15 Texas poll tax actually argued that it would prevent fraud

16 because it would prevent vote buying.  And I then cite to

17 a report that was prepared for the plaintiffs in that

18 case, *Texas League of Young Voters v. State of Texas*, who

19 concluded that *"The fraud prevention argument was only a*

20 *pretext for disguising supporter's true intent to*

21 *disfranchise African-American voters."*

22 Q    All right.  And has recent social science been done

23 regarding the introduction and passage of measures that

24 restrict access to voting?

25 A    Yes.

1  Q    All right.  And let me direct you to Page 17 of your

2  report.  At the top of that page, you discuss a study by

3  Rocha and Matsubayashi.  Do you see that?

4  A    Yes.

5  Q    All right.  And what's that study about?

6  A    That was a statistical study -- that methodology used

7  was a statistical modeling.  *They find that unified*

8  *Republican control of state government increases the*

9  *likelihood of approval of a photo indication law 16 times*

10  *over that of other configurations of state governmental*

11  *party representation and control.*"

12      And this is their analysis over a period from 1980 to

13  2011 across almost all the states in the United States.

14  Q    All right.  And the footnote indicates that that was

15  published in Political Research Quarterly.  Do you see

16  that?

17  A    Yes.

18  Q    And is that a peer reviewed publication?

19  A    Yes.

20  Q    All right.  And then after that, do you discuss

21  another study in your report?

22  A    Yes.

23  Q    Okay.  And what's the other study?

24  A    The other study is called "*Jim Crow 2.0? Why States*

25  *Consider and Adopt Restrictive Voter Access Policies,*" by

1  Keith Bentele and Erin O'Brien.  And that was published in

2  Perspectives on Politics, which one of the two major

3  journals published by the American Political Science

4  Association.

5  Q    Was this an empirical study?

6  A    Yes.

7  Q    What did the authors do, specifically?

8  A    Well, like they did a different kind of modeling than

9  the previous article.  But they used various kinds of

10  progression analysis, and they had different variables

11  that they were throwing into their models.

12  Q    And let's focus on that indented paragraph.  Is this

13  paragraph a summary of their conclusions from the report?

14  A    Yes.

15  Q    And I'm not going to go through everything there, but

16  about two-thirds of the way through -- I'm sorry,

17  one-third of the way through, do you see a reference

18  *"identifying a very substantial and significant*

19  *association between the racial composition of a state's*

20  *residents or active electorate and both the proposal and*

21  *passage of voter restriction legislation"*?

22  A    Yes.

23  Q    Can you explain in laymen's terms what that means?

24  A    Well, it means that they looked beyond just say the

25  partisan composition of state government to add in more

1  information into the model about the demographics of the

2  populations there.  So they're saying that the race of the

3  electorate also contributed to whether or not the state

4  adopted the restrictive photo ID law.

5  Q    And what specifically is the relationship they're

6  finding?

7  A    Well, they're finding that there is partisan

8  competition, but also the issue of whether the population

9  is non-white is going to contribute to the likelihood of

10  the adoption of restricted ID laws.

11  Q    So increase in the non-white population is correlated

12  to an increase in the likelihood of voter restriction

13  laws?

14  A    Yes.

15  Q    And you mentioned electoral competition?

16  A    Right.

17  Q    Can you explain what that finding was?

18  A    I don't exactly remember how they modeled that.

19  There are different ways that political scientists model

20  competition.  They may look at how close the margin is in

21  the series of elections, or something of that nature.  I

22  don't exactly remember the variable they used.  But there

23  are sort of accepted different ways to measure the

24  intensity of competition in a district.

25  Q    And what was the basic finding about the relationship

1  between the intensity of competition and the likelihood

2  that restrictive voting measures were passed?

3  A    Well, you know, those are their words, so I want to

4  get it right.   They say *these findings demonstrate that*

5  *the emergence and passage of restrictive voter access*

6  *legislation is unambiguously a highly partisan affair,*

7  *influenced by the intensity of electoral competition.  The*

8  *fact that in the context of heightened competition*

9  *Republican control increases while Democratic control*

10 *reduces, the rate of restrictions passed underlies the*

11 *highly strategic nature of these efforts."*

12       MR. KAUL:  Your Honor, I'm going to switch to

13 Dr. Minnite's reply report.  I know that we often take a

14 break around this time.  I'm happy to keep going, or to

15 stop now, whichever the Court would prefer.

16       THE COURT:  We can take a 10-minute break, come back

17 and proceed at that point with her testimony.  Sure.

18       MR. KAUL:  Thank you, Your Honor.

19       THE COURT:  Doctor, you may step down for 10 minutes.

20                   (Recess taken.)

21       THE COURT:  Okay.  We resume our direct examination.

22 Go right ahead.

23       MR. KAUL:  Thank you, Your Honor.

24 BY MR. KAUL:

25 Q    Doctor, I'd like to turn your attention to your reply

1   expert report.  And that's PX 214.  Now, much of this

2   report is in response to defense expert, Dr. Richman, is

3   that right?

4   A    Yes.

5   Q    And does Dr. Richman discuss what's known as the

6   Carter-Baker Commission report?

7   A    Yes.

8   Q    And in your reply, do you have some responses to his

9   discussion of that report?

10  A    Yes.

11  Q    Let me start by asking you just a little bit about

12  the Carter-Baker Commission.  How was that commission

13  convened?

14  A    Self-appointed.

15  Q    And was it a government commission?

16  A    No.

17  Q    Did it have sort of an operating base?

18  A    It was a successor commission to something that was

19  called the Carter-Ford Commission.  And that was former

20  President Gerald Ford and President Carter getting

21  together after the 2000 election, and concerned about

22  reform and the need to address problems in election

23  administration.  And former President Ford's health was

24  failing, but that commission did its own work and

25  investigation and public hearings, and issued a report.

1    And that report, I believe, was 2001.  So it was several

2    years before.   The Carter-Ford Commission is seen as a

3    successor to that work because former President Carter

4    stayed involved.

5    Q     And what was the focus of that first report, the

6    Carter-Ford report?

7    A     I think the focus was to really dig into the

8    administrative problems and to focus on what you might

9    call modernization of election administration, in

10   particular the use of computers and technology and

11   assuring the integrity of the voter rolls, cleaning them

12   up.  Because before the Help America Vote Act of 2002,

13   there were many states where election administration was

14   very, very decentralized down to a town level, down to a

15   county level.  There was no statewide list.

16        And that was the case, for example, in Wisconsin.

17   Wisconsin did not require registration in towns of less

18   than 5,000 people.  So when the Help America Vote Act was

19   passed in 2002, that legislation basically required the

20   states to create statewide databases that were centralized

21   and controlled to try to clean things up.  And given the

22   mobility of the population, be able to track people.   So

23   it was easy for them to change their address, and so

24   forth.

25        So the concerns in the earlier commission were very

1 focused on these maybe somewhat technical issues about

2 improving election administration.

3 Q    And did the Carter-Baker Commission have the same

4 focus?

5 A    I would not say so.

6 Q    What was its focus?

7 A    I think it's stated in its mission statement.  Its

8 focus was more about what was perceived to be a confidence

9 gap.  That the public had lost confidence in the integrity

10 of elections.

11 Q    And you've talked about which Carter this is

12 referring to.  Am I right that the Baker being referred to

13 is former Secretary of State, James Baker, who served

14 under the first President Bush?

15 A    That's correct.

16 Q    How many academics, or former academics, were part of

17 that commission?

18 A    Which commission?

19 Q    I'm sorry.  The Carter-Baker Commission.

20 A    I think only five of the 21 were academics, or former

21 academics.

22 Q    And how many of the commissioners had direct

23 experience with election administration?

24 A    I believe only two.

25 Q    How long was the commission doing its work?

1    A    I think it was about five months or so.

2    Q    How many hearings did it hold?

3    A    They only had -- as I understand, they only had two

4    hearings.  They weren't really -- they were public, but

5    the public didn't participate in the hearings.

6    Q    And the result of that commission's work was the

7    issuance of a number of recommendations, is that right?

8    A    A report and recommendations.

9    Q    And how many recommendations were issued?

10   A    It was over 80.  I believe it was 87.

11   Q    And what did those recommendations -- I mean, not

12   each of them, but just generally speaking, what did they

13   relate to?

14   A    Well, they address different aspects of the system.

15   But the focus was restoring confidence.  I believe that

16   was even the title of the report.

17   Q    Now, did one of the recommendations of those 87

18   relate to voter identification?

19   A    Yes.

20   Q    What did the commission recommend in that respect at

21   a high level?

22   A    They recommended that the real ID card be used --

23   first of all, that it be modified so that there could be

24   an indication on it as to whether a person is a citizen.

25   And that that card be used as a voter ID card.  And that

1   real ID refers to legislation that was passed, I think, in

2   2005, maybe earlier, to increase the security of the

3   driver's license.  And actually, there's still a number of

4   states that are not in compliance with that law.  The

5   federal government has given waivers, and so forth.

6        But the idea was to make the driver's license have

7   more technology built into to keep it -- to be able to use

8   it to get on a plane.  So that's the hook that is going to

9   be that I think by 2020, maybe 2018, if you don't have a

10  real ID compliant driver's license, you may not be allowed

11  to fly under the -- this law.  But they keep changing it

12  and they keep extending it.

13  Q    And those measures were tied to post-September 11th

14  hearings, is that right?

15  A    Yes.  Because it was shown that some of the 9/11

16  hijackers had driver's licenses.  And people were just

17  really were concerned about if they were in the country

18  legally or illegally.  So there was a lot of

19  investigation, of course, in looking at how did this

20  happen.  And part of it was to look at the presence of

21  those people in the United States, how they had gotten

22  there.  And some of them had obtained driver's licenses.

23  My recollection is that they were -- some of them it was

24  okay, but they were out of compliance.

25  Q    And let me follow-up.  So did the voter

1    identification requirement in the Carter-Baker Commission

2    report generate any controversy?

3    A    Yes.

4    Q    Did it generate controversy among the members of the

5    commission itself?

6    A    Yes.

7    Q    And can you explain?

8    A    Well, one of the commissioners who's a law professor

9    named Spencer Overton, very much dissented against this

10   recommendation to use the real ID card as a voter ID.  And

11   he wanted to provide a more expansive dissent, like a

12   dissenting report as an appendix to the main report, and

13   he wasn't allowed to do that.  And there were two other

14   commissioners who also were in dissent on that issue, so

15   he separately published his dissent.

16   Q    All right.  And let me direct your attention to Pages

17   4 and 5 of your report.  Actually, we'll focus on the part

18   on Page 5.

19        THE COURT:  Are you referring to the rebuttal report?

20        MR. KAUL:  Yes, Your Honor.  I apologize.

21        THE COURT:  That's okay.  Go ahead.

22   BY MR. KAUL:

23   Q    And the Judge just pointed out I was talking about

24   the wrong report.  Did you quote from that dissent at some

25   length in your report?

1  A    Yes.

2  Q    And what were the issues that the dissent raised with

3  the Carter-Baker Commission report?

4  A    I think the overwhelming concern was that the ID card

5  would -- that requirement would cause many more ballots to

6  be lost than it would protect against fraudulent ballots

7  being cast.

8  Q    All right.  And in that dissent, did Mr. Overton

9  indicate the forms of fraud that could be prevented by

10 vote ID are exceedingly rare and risky?

11 A    Yes.  He was also concerned, as he says here, that

12 there just was not any study of the issue.  That they

13 didn't bring any social scientists and experts, as the

14 previous commission did, but they didn't bring in enough

15 of that analysis to lay a foundation for the

16 recommendation.

17 Q    Now, as you were talking about, much earlier in your

18 testimony, had the state of the scholarship in terms of

19 the frequency of voter fraud developed at this point in

20 time to the extent that it has now?

21 A    No.

22 Q    Let me go back to the voter ID recommendation.  And

23 I'll direct your attention to Page 2 -- no, 8 of this

24 reply report.  Did the commission indicate whether its

25 recommendation was for all states, a one size fits all

1   recommendation?

2   A     You're looking at Footnote 8?  That's actually

3   referring to the Carter-Ford Commission.

4   Q     I apologize.

5   A     The Carter-Ford Commission did not recommend the

6   photo ID requirement.  The Carter-Baker Commission did.

7   Q     Okay.  That was my confusion.  Sorry about that.

8         Did the Carter-Baker Commission report pair its

9   recommendation for voter identification with

10  recommendations about expending access to identifications?

11  A     Yes.  I think you can see the effort, if you will, at

12  bipartisanship and compromise in the Carter-Baker

13  Commission recommendation, which is to say, that there is

14  an ID recommendation for an ID, but then there's also a

15  recommendation that states become -- do affirmative work

16  to register people.

17        That we -- the system we have we call "*personal*

18  *registration.*"  And the onus is on the voter or the

19  citizen to get themselves registered.  And they're saying

20  we think states should be more proactive in getting people

21  registered.  They should go out in mobile registration

22  units.  They should seek out people who are not

23  registered.  And in the process of doing that, of

24  registering more people, they'll find out who has and

25  doesn't have the right kind of ID.  They can issue the ID.

1  And we'll get to a happy place where everybody is

2  registered and everybody has the proper ID.

3  Q    All right.  And let me direct your attention to Page

4  6 of the reply.  There's a block quote on that page I'd

5  like to ask you about.  And is this block quote from the

6  report, the Carter-Baker Commission report?

7  A    Yes.

8  Q    Now, in the first sentence here, the report is

9  indicating that voter ID requirements raise a concern

10  about the presentation of a barrier of voting,

11  particularly by traditional marginalized groups, such as

12  the poor and minorities, some of who lack a

13  government-issued ID.  Do you see that?

14  A    Yes.

15  Q    And is the rest of this going to the point you were

16  just making about how the report thought that that concern

17  should be addressed?

18  A    Yes.

19  Q    All right.  And you italicize some language at the

20  end here.  Why did you emphasize that?

21  A    Well, because I think they were saying don't look at

22  this recommendation in isolation.  That it is paired with

23  an effort to register everybody, get everybody registered.

24  And through that process, be able to find out who has and

25  don't have the ID, and get them the ID.

1          But the concern that the ID will be used to block

2    some people from voting will be removed because the state

3    will take action to go and say it's our responsibility to

4    get everybody registered.

5    Q     Following the issuance of that report, did President

6    Carter and Secretary Baker continue to issue public

7    statements in prominent forums about voter identification

8    legislation?

9    A     Yes.

10   Q     And does your report discuss some of those?

11   A     Yes.

12   Q     All right.  And specifically, do they weigh in on

13   Georgia's voter ID law in a New York Times op-ed?

14   A     Yes.

15   Q     And how did they characterize Georgia's voter ID law?

16   A     They called it discriminatory.

17   Q     And that was both President Carter and Secretary

18   Baker?

19   A     They co-authored the op-ed.

20   Q     And turning to Page 7, there's a block quote from

21   that article, is that right?

22   A     From the op-ed?

23   Q     I'm sorry.  Yes.  Thank you.

24          And this indicates that their understanding was that

25   about 12% of citizens at that time lacked a driver's

1    license, is that right?

2    A    Yes.

3    Q    And they, again, emphasize this point you made about

4    the importance of outreach, aggressive outreach, in

5    connection with voter identification?

6    A    Yes.  They say, *"States should open new offices, use*

7    *social service agencies and deploy mobile offices to*

8    *register voters.  By connecting ID's to registration,*

9    *voting participation will be expanded."*

10   Q    And I'm not going to go through every other statement

11   they've made, but did they make subsequent statements that

12   were critical of voter ID laws as well?

13   A    President Carter did.

14   Q    All right.  Now, aside from Professor Richman's

15   discussion of the Carter-Baker report, did he have

16   criticisms of your report?

17   A    Yes.

18   Q    And one of those related to your definition of voter

19   fraud, is that right?

20   A    Yes.

21   Q    And did you address that criticism?

22   A    I believe I did.

23   Q    And can you sort of summarize, first of all, what you

24   understand his critique to be, and then what you explain

25   in your response.

1  A    His critique is -- and I've heard it a couple times

2  before, that it's too narrow.  My definition is too

3  narrow.  And he offered an alternative definition in which

4  he said a better definition would be, *"Actions by voters*

5  *which are illegal under election laws."*

6       And I responded to that by saying that's not actually

7  a definition of voter fraud.  That's a definition of

8  illegal voting.

9       And as I've tried to stress the distinctions, I -- if

10  your definition is illegal voting, then what you're going

11  to measure is illegal voting.

12       I also, if I may, would like to respond to something

13  Your Honor asked me earlier about illegal voting.  I had

14  forgotten that in my book I analyze data that I had

15  obtained from the State of California.  They have, in

16  their Secretary of State's Office, an election fraud unit.

17  And they take complaints people have where they have seen

18  fraud or something.  They don't have as much control over

19  local registrars, but they -- over this period of time of

20  data that they gave me from their complaint unit, there

21  were something close to 1,600 complaints made between 1994

22  and 2006.  And I analyzed that data very carefully, and I

23  present a table in my book to show the difference between

24  what turned out to be perhaps illegal votes that were cast

25  without intent, and then those that -- where they

1   determined later because they got back the disposition of

2   those complaints from prosecutors so they could trace

3   through what happened, they could separate out.

4          And so, for example, of the somewhat close to 1,600

5   complaints altogether, it boiled down to 83 convictions

6   over that period.  And well more than half of them, I

7   think 52 of them, were for just registration fraud.

8          THE COURT:  But you didn't have the information to do

9   that kind of study in Virginia, is that right?

10         DR. MINNITE:  That's right.

11         THE COURT:  Okay.

12  BY MR. KAUL:

13  Q   Did Professor Richman also address the frequency with

14  which election outcomes have been overcome by courts?

15  A   He mentioned that.  Yes.

16  Q   And let me direct you to Page 10 of your report which

17  relates to that point.  Is that a topic that you learned

18  about through your work on voter fraud that you've been

19  discussing?

20  A   Yes.

21  Q   And is it accurate that it's not hard to find

22  instances in which fraud has been the cause of an election

23  being overturned?

24  A   No.  What's accurate is that there is not really much

25  of a record of courts overturning elections based on voter

1  impersonation.  There are -- there seem to be different

2  predilections and traditions in different states, and

3  making the different laws that go to whether -- how

4  comfortable a court is in overturning an election.  I

5  cover some of that in my book.

6      One of my case studies was the election -- the

7  gubernatorial election in Washington State in 2004, which

8  was an extremely close election in which the -- after a

9  recount the winner flipped.  And so that was investigated.

10 There was a huge record of the administrative process of

11 that election.  And the I guess it was the plaintiffs

12 wanted the Judge to overturn the election, and he wouldn't

13 do it.

14     There are other cases that I found.  For example, in

15 Miami in 1997, there was also a contested mayor's race

16 there in which the Florida courts did do that.  They threw

17 it out and they actually gave the election to the

18 challenger, if you will.  I say *gave.*  They put him in

19 office.

20     But the claim that it's not hard to find instances in

21 which fraud has been confirmed as the cause of an election

22 outcome, and election outcomes have consequently been

23 overturned, implies that there are lots of them because

24 they're not hard to find, and that's just not true.

25 Q   Are you aware of any election in American history

1    that's ever been overturned because of voter impersonation

2    fraud?

3    A    Well, I haven't studied, you know, 200 years of

4    American history.   But certainly in recent elections, I've

5    never come across one.

6    Q    You also respond to Professor Richman's critique of

7    you for not using survey research in your analysis, is

8    that right?

9    A    Right.

10   Q    Is that something that you had considered using in

11   your research?

12   A    No, not for the purposes of measuring the incidents

13   of voter fraud.   That wouldn't be an appropriate tool.

14   Q    And why is that?

15   A    Because surveys take samples.   And I was trying to

16   compile a complete count.   Surveys -- what would you

17   survey?   In a sense, I did a survey because I tried to get

18   information from every Attorney General, every prosecutor.

19   Actually, it wasn't even a survey because it wasn't a

20   sample.   It was a complete -- an attempt at a complete

21   count.

22        Surveys, because they use sample data, have error

23   rates, if you will.   There's going to be measurement

24   error.   There are going to various kinds of error in a

25   survey.   And what makes the findings of a survey valid and

1  reliable is what you know about that error in the survey.

2      So I wouldn't use survey data really to get at the

3  incidents of fraud.  I mean, you could.  There are a

4  couple of papers that have tried different type -- using

5  different types of experiments with survey data where the

6  survey is asking a person have you ever committed fraud.

7  Q    How is that different from what Professor Richman

8  did?

9  A    Well, what Professor Richman did was he used an

10 on-line survey.  And I don't know if you want me to go

11 into the mechanics of it, but it's an on-line survey that

12 collects information from people, and then matches it to a

13 representative sample framework.  So that -- they're

14 trying to get -- they're trying to deal with the problem

15 that it's an opt-in survey rather than the respondents to

16 the survey being selected through a random selection

17 process, because that's what makes a survey representative

18 is if the people that you're surveying, you've chosen them

19 in a random way.  That's not the case with an Internet

20 survey because you have to ask people to answer the

21 survey.

22      But the technology that has been developed to try to

23 do on-line surveys is to have a sampling frame, like a

24 model, and then you have your panel of people who have

25 agreed in the past to be a part of the survey.  And they

1  do the survey, and then you match them, through waiting

2  and other techniques, to the representative samples.  It's

3  like an analogue, really, of a representative sample.

4       So he used data from a survey like that that was

5  designed to be representative of the citizen population of

6  the United States.

7  Q    And I -- you discussed some literature in response to

8  that report, right?

9  A    To which?

10 Q    To Dr. Richman's report.

11 A    Oh, yes.

12 Q    And I don't want to ask you -- Dr. Rodden already

13 testified about the alien abduction study, but is that

14 something that's discussed in your report?

15 A    Yes.

16 Q    And you also discussed a response from

17 Dr. Ansolabehere, is that right?

18 A    Yes.

19 Q    And Dr. Ansolabehere is the -- well, what is his

20 relationship to the data Dr. Richman was using?

21 A    So he, in a sense, created the data.  It was his

22 idea, and he -- you know, I wasn't involved with him, but

23 part of the process of creating it was to go to other

24 universities to get them to buy into it, provide some

25 money to do the funding, and you get to put some questions

1   on the questionnaire.  And I was at Columbia at the time,

2   and Columbia did it for a couple of times, and then they

3   dropped out of it.

4        But he's really the person who designed it, came up

5   with it.  He's still the principal investigator of it.

6   It's called the Cooperative Congressional Election Study.

7   Q    And Mr. Spiva reminded me that Dr. Rodden testified

8   about that study too, so I'm not going to ask about the

9   details.  But I do want to ask you in your experience in

10  political science work, is Dr. Ansolabehere's writing in

11  response to a political scientist using his data, is that

12  unusual?

13  A    Yes.

14  Q    Why so?

15  A    Well, to be frank, that article, Dr. Ansolabehere's

16  article, would be something that you would hope that the

17  person writing the original article would get through the

18  peer review process.  That read to me like a report that

19  you get back in the peer review process so you would have

20  an opportunity to correct the problems, and you get

21  something like a revise and resubmit from the Journal.

22  They'd say, here, you've got some criticism, how are you

23  going to address it?  If you address it, we'll publish

24  your article.

25       I have never seen that kind of a critique published

1  of a study like that.

2  Q    Did you also take a look at the survey questions that

3  Dr. Richman was relying on?

4  A    Yes.

5  Q    Based on that review, and your experience doing

6  survey work, did you draw any conclusions about whether

7  the specific survey questions used were reliable for the

8  purposes for which Dr. Richman was using them?

9  A    Yes.

10 Q    Okay.  What conclusion did you draw?

11 A    Again, I spent eight years doing an exit poll in New

12 York City where the goal of it was to capture the

13 attitudes of foreign-born voters.  So these are

14 naturalized citizens.  But because New York has such a

15 diverse and large foreign-born population, there was an

16 interest in finding out whether foreign-born citizens had

17 different, you know, vote choices and attitudes.  And it

18 was extremely hard to do.

19      But I know a lot about -- I know quite a lot about

20 using survey research to survey immigrant populations, and

21 I have never seen the question that is the screening

22 question here about your status, whether you're a citizen

23 or a noncitizen.  I've never seen it worded like that

24 before ever.

25      And there are problems, as I lay out in the report

1   with what the problems are.  And I guess the main point of

2   this is I would have a lot of concern about data that

3   funneled people into the category of citizen or noncitizen

4   using those questions because I think it's going to

5   generate a lot of error and confusion on the part of the

6   person answering the survey.  There's going to be

7   measurement error in that data.

8   Q    Now, in your report, do you assess whether photo ID

9   would prevent noncitizen voting?  I'll direct your

10  attention to Page 19.

11  A    Yes.

12  Q    And what do you find?

13  A    Well, here I'm responding to the conclusion that

14  Professor Richman makes about photo identification.  He

15  says it would prevent it.

16  Q    In his report?

17  A    Yes.

18       MR. KAUL:  And let's blown up the paragraph that

19  begins with *"The first obvious point."*

20  BY MR. KAUL:

21  Q    What point are you making here?

22  A    Well, in the article that he references in his report

23  that got a lot of attention, the 2014 article, he's

24  actually basing his report mostly on that article, he

25  comes to the opposite conclusion.

1  Q     Meaning what?

2  A     Well, he says that *"The fact that most non-citizen*

3  *immigrants who showed identification were subsequently*

4  *permitted to vote suggests that efforts to use*

5  *photo-identification to prevent non-citizen voting are*

6  *unlikely to be particularly effective."*

7        So in his expert report, he's essentially saying

8  photo ID should stop this problem.  In his article, he's

9  saying photo ID won't stop this problem.

10 Q     And then I'd like to direct your attention to the

11 next paragraph.  About halfway down, you refer to a point

12 that Professor Richman neglected to point out.  What point

13 were you making there?

14 A     Simply that legal permanent residents, for example,

15 who are not citizens, are able to obtain driver's

16 licenses.  And that can be used as a form of voter ID in

17 Virginia.

18 Q     All right.  So let me go back.  We were talking

19 earlier about your research into voting restrictions.  And

20 let me ask, did you, in the course of your work

21 investigating restrictions, draw any conclusions about the

22 role that voter demobilization plays in political

23 strategies?

24 A     Yes.  It's really the subject of my co-authored book,

25 *"Keeping Down the Black Vote."*  And that was an argument

1  with political -- long-standing political science, if you

2  will, on the party system in the United States, which says

3  that parties compete by trying to expand their base.

4  Because American political parties really aren't parties

5  in the sense that they are in Europe.  They're these more

6  loose coalitions of somewhat shifting populations.

7       And we certainly see that in the history of the

8  United States going back to the 19th century when it was

9  the Democratic party that was so hostile to

10 African-Americans.  And even through the 1950s, the

11 Republican party was quite liberal on civil rights issues.

12      So the shift in time of the issues and the

13 populations and the coalitions, American political parties

14 are these kind of loose, large aggregates of different

15 coalitions.  That's the challenge for the parties is to

16 hold those coalitions together.  And political science has

17 tended -- American political science has tended to take

18 the view that because of that, in the two party system,

19 the parties are always going to be bidding to expand their

20 base, each of them.

21      And we, in the book, took the view that, yes, that's

22 one strategy parties can engage in.  We see that from time

23 to time.  But another strategy is to demobilize.  And by

24 that I mean try to shrink the voting constituencies of

25 your opponent because you can win that way, too.

1        It has to do with the institutional logic of the two

2   party system where as long as you get one vote more than

3   the opposition, you win.  You don't have to actually have

4   a majority to win.  So the closer an election, the more

5   intense the competition, the more appealing a strategy

6   could be to try to win by holding your coalition together

7   and shrinking the phony constituency of the other side.

8   There's a sort of institutional logic there.

9        And that book took that view, and made the argument

10  and drew on history to show, on how both the Democratic

11  and Republican parties have engaged in that kind of

12  demobilization behavior in the past.

13  Q    And did that finding relate to your findings about

14  the reasons that voting restrictions have been passed in

15  the United States?

16  A    Yes.

17  Q    And how so?

18  A    Well, I'm approaching it from the point of view of

19  this question of voter fraud.  And because that is such a

20  common justification for restrictions that we're seeing in

21  the last few years on voting, and the fact there's been no

22  showing of fraud in any legislature that I've looked at

23  that has passed these restrictive laws, I've looked at all

24  of them, there's been no showing in courts that there's

25  evidence of voter fraud.  There is simply no evidence that

1  voter fraud is a rational justification for photo ID laws,

2  for example, or restricting laws.

3       There could be other rationals, but the principal one

4  is that it's a fraud prevention technique, or fraud

5  prevention rule.  And if there is no voter fraud, then the

6  question is what is this all about?  And I've drawn the

7  inferences from my past work on it and, you know, frankly,

8  you don't need statistical analysis to show you that it's

9  been the Republican party that has promoted these

10 restrictions on the voter.  It's been the Democratic party

11 that's resisted them.  It's simply an empirical fact.  And

12 this is analysis that shows that.

13      So, you know, the question is why are the two parties

14 fighting so intensely over this challenge of photo ID

15 laws.  The Democrats are resisting as much as the

16 Republicans are pushing it.  And it goes to the logic and

17 the strategy of trying to win elections.

18 Q    And what do you mean by that?

19 A    Well, it's what I was saying earlier about there

20 being --

21      MR. HEARNE:  Your Honor, I will just raise again the

22 Court's order.  I'm not objecting to her making these

23 general observations, but to the extent she seeks to apply

24 them to the Virginia General Assembly, and their --

25      THE COURT:  I think she's talking about a national

 1  trend.  She is not talking about the Virginia General

 2  Assembly.  And as long as she stays within those

 3  boundaries, I think it's permissible.  Objection is

 4  overruled.

 5      You may continue.

 6  A    So I'm saying I'm drawing -- I'm drawing inferences,

 7  but I'm also puzzling over the intensity of the fight.  I

 8  know that we have become an increasingly polarized country

 9  of both the level of the electorate and politics and

10  governmental institutions.  But, you know, if you were

11  watching this issue, as I have been, since 2000, the fight

12  started a lot earlier than we even see the polarization.

13      And it goes -- for me, it goes to what I know about

14  political parties and election, electorial campaigns

15  having some experience myself in my earlier years in

16  working on them, and that is that technical -- you can win

17  elections on technical matters.  I don't even need my

18  personal experience.  We can see what happened in the 2000

19  election.  And that is to say, once the election shifted

20  from the vote counting into the courts, it became a

21  different contest.  There are a different set of rules, a

22  different set of actors.  The voters are no longer

23  involved.  The election officials are no longer involved.

24  There are lawyers and judges that make decisions that

25  impact what happened in the election.

1        THE COURT:  Why don't you pause one second.

2        I think with all due respect to the Doctor, she's

3   going beyond your question.  I think we need to proceed by

4   question and answer here.

5        MR. KAUL:  And that was actually the end of my

6   examination.  So I have no further questions for her, Your

7   Honor.  Thank you.

8        THE COURT:  Sorry, Doctor.

9        DR. MINNITE:  That's okay.

10        THE COURT:  Cross-examination of the Doctor.

11        MR. HEARNE:  Thank you, Your Honor.

12                      **CROSS-EXAMINATION**

13   BY MR. HEARNE:

14   Q    Dr. Minnite, it's great to see you again.  And I look

15   forward to asking you just a few questions following up on

16   your direct examination.

17        As you know, I'm Thor Hearne.  And I'm representing

18   the Commonwealth defendants in this litigation.

19        First, I want to go back to some of the questions the

20   Judge was asking you just in terms of your definitions,

21   and understanding the distinction, and you may recall we

22   discussed this during your deposition as well, between

23   your definition for voter fraud, or vote fraud, and

24   illegal voting.

25        And so I want to ask first -- let me just give you

1   some specific examples.  If I were to vote in the wrong

2   precinct, in other words, vote in a polling place where

3   I'm casting a ballot for races that I'm not a registered

4   voter for, would that -- as I understand your definition,

5   that would be illegal voting but not vote fraud?

6   A    Well, explain that to me because if you're not on the

7   registration list, you're not going to be allowed to vote.

8   So how do you mean?

9   Q    If I went into a polling place or cast a ballot in a

10  polling place that I was not otherwise qualified to, if

11  there was not some registration process or identification

12  process to prevent me from doing that.

13  A    So do you mean if I had a felony conviction but

14  somehow I was still on the registration list and I was

15  able to cast a vote?

16  Q    Well, I'll take that as an example, too.  How would

17  that be for felons voting?  Would you consider that one

18  who's not legally entitled to cast a ballot, would you

19  count that as vote fraud, or do you count that as illegal

20  voting?

21  A    Well, I say that all fraudulent voting is illegal

22  voting.  All fraudulent voting is illegal voting, but not

23  all illegal voting is fraudulent.  So it goes to the issue

24  of intent.  If you knew that you were not allowed to vote,

25  you were hoping, well, maybe they won't catch me, and you

1  did that, then it would be voter fraud.

2  Q    But, and again, your definition is different than the

3  definition which you actually quote from the Virginia

4  state law in your report, is that correct?

5  A    Which?

6  Q    In your report you quote the Virginia Code.  I think

7  it's on Page 7 of your report, where you reference the

8  Virginia state statute of what defines election fraud or

9  illegal election activity, correct?

10  A    Well, yes.  I don't think I'm being inconsistent.  I

11  point out here the word "*intentionally.*"

12       "*Any person who intentionally votes more than once in*

13  *the same election, whether those votes are cast in*

14  *Virginia or in Virginia and any other state or territory*

15  *of the United States.*"

16  Q    I guess here's the point.  It's maybe a more simple

17  point, and I may not be making it as clear with my

18  questions as I'd like to.  As I understood your definition

19  that you used for your study for the term "*vote fraud,*"

20  that definition is narrower than the statutory definition

21  under Virginia law that you quote.  In other words,

22  activities that would violate this Virginia statute are

23  not vote fraud in your nomenclature, is that correct?

24  A    I'm going to look at this again.  But my recollection

25  is that this would be mostly -- this would mostly fit my

1   definition of voter fraud.  I think there's one part of it

2   here that wouldn't.  Let me see.

3        Right, so under B, B(iv), so it would read, "*Any*

4   *person who intentionally procures, assists, or induces*

5   *another to vote knowing that such person is not qualified*

6   *to vote where and when the vote is to be given is guilty*

7   *of a Class 6 felony.*"

8        Because that's talking about somebody trying to

9   manipulate somebody else.  Here in Virginia, that falls

10  under illegal voting and registration.  I would probably

11  call it something more like -- it depends on the context,

12  but it might be something more like voter intimidation or

13  it could be vote buying.  It could fall under that

14  definition.

15  Q    And my question was real simple.  Is that -- your

16  definition of vote fraud would not include that activity

17  you just described?

18  A    It wouldn't include it.  Yes, that's right.  Because

19  it's not the voter who's committing the fraud.

20  Q    So let's talk about voter registration, as an

21  example.  If somebody submits false fraudulent

22  registrations to put names on the voter roll that are not

23  names of lawful eligible voters, is that vote fraud under

24  your definition?

25  A    I would call that election fraud.  So I have the

1   specific definition which requires that the perpetrator is

2   the voter, that the crime was intentional.  That's my

3   definition of voter fraud.

4        But I include other things like what you've just

5   described as election fraud.  My study focused on voter

6   fraud, but I did not ignore election fraud.

7   Q    In terms of the conclusions you made in your study,

8   they were confined to voter fraud as you've defined it, is

9   that correct?

10  A    Yes.

11  Q    And in your study, do you recall mentioning a video

12  clip with a fellow named Patrick Moran?

13  A    Yes.  I mean, I know about it from when you were also

14  discussing it in the deposition.

15  Q    But you're aware of that?

16  A    Yes.

17  Q    And are you aware that that portrayed somebody

18  proposing to use utility bills and bank statements as a

19  means to gain identification and cast ballots?

20  A    My recollection of the video was that it was somebody

21  going to this person, Moran, and saying I want to --

22  basically, I want to commit fraud.  How can I do it?  You

23  know, help me figure it out.

24  Q    And the point of bringing that up right now is just

25  simply to note that you are aware of that, but to find,

1   because of your awareness of that video, if that activity

2   that was suggested in the video, whether it did or didn't

3   happen, would that activity, should it happen, fall within

4   your definition of vote fraud, or would it be election

5   fraud?

6   A    Well, if the voter did that, if that person who was

7   asking for help in figuring it out then did that, it would

8   be voter fraud.

9   Q    Within your definition?

10  A    Yes.

11  Q    Would the -- what if an individual was aware, say it

12  was even a family member who had died before election day

13  and said, hey, my dad always wanted to vote Republican, I

14  know who he would want to vote for, I'll go to my polling

15  place and cast his ballot for him sort of to make sure

16  he's voted, even though he's not able to.  Would you

17  consider that to be vote fraud or election fraud?

18  A    I would consider that -- I don't use vote fraud.  I

19  say voter fraud.

20  Q    Okay.  So, voter fraud.

21  A    Voter fraud.

22  Q    What if the person thought they could do that in

23  behalf of their dad because he was alive right before the

24  election?

25  A    You know, if the person said I didn't know I wasn't

1   allowed to sign his name, or whatever, I would still

2   include it.  I mean, there are many places in my work and

3   in my book, and even in this report, where I'm showing you

4   that I'm counting those things.  I'm exposing them, if you

5   will.  So it gets a little -- you know, I'm trying to find

6   the right balance to do the analytical work without

7   looking like you're trying to ignore everything else.  I'm

8   not trying to do that.  I'm trying to be precise because

9   of the policy questions about how do we solve that

10  problem.

11       So if we have a lot of people who are signing off on

12  ballots of somebody who just died in their family -- and I

13  guess the example that I can give you is what I was

14  mentioning earlier from the California data, and I also

15  had similar data from Oregon.  And I talked to them about

16  what is this data.  Explain to me what's going on.  And in

17  those states, they had people who did things like that.

18       And they had an administrative procedure for

19  addressing it first.  They would call them, or they would

20  tell them, you can't do that.  It says right here, you

21  can't sign somebody else's ballot when they thought the

22  person didn't know.  If they thought the person knew, they

23  would prosecute them.

24  Q    And again, just to clarify the concept of somebody

25  submitting false registrations, not casting a ballot, but

1  putting in false registrations and submitting them to

2  election officials to add those names, that, in your

3  definition, is election fraud?

4  A    Yes.

5  Q    Not voter fraud?

6  A    That's correct.

7  Q    Let me ask you to turn to Page 28 of your first

8  report.  And on this page, you state your conclusion.  Let

9  me enlarge just the first paragraph of the conclusion, and

10  direct your attention there.

11      And let me start with the word *There is*."  If you

12  would just look at that.  It's really a longer sentence.

13  And I'll just give you a chance to look at that sentence,

14  and tell me when you're familiar with reviewing it, and

15  then I'll ask you a question about that.

16  A    Okay.  I've read it.

17  Q    You indicate that there are -- there's virtually no

18  evidence to suggest that the voters are systematically

19  corrupting the election process at the national level, and

20  then you list these specific states, is that correct?

21  A    Yes, because those are the states where I have more

22  recently done these various expert reports.

23  Q    And then you said, and I'm just going to quote near

24  the very end of that sentence, *"or other types of voter*

25  *fraud because as the empirical record makes clear, fraud*

1   *committed by voters either in registering to vote or at*

2   *the polls on Election Day is exceedingly rare."*

3        Do you see that?

4   A    Yes.

5   Q    Are you familiar with the newspaper reports virtually

6   surrounding every major presidential election of phony

7   registrations?  Particularly at one point, there was an

8   organization called ACORN that had submitted those, are

9   you familiar with that?

10  A    Very familiar.

11  Q    Okay.  So are you aware that the allegation was made,

12  and I think proven in some cases, that literally hundreds

13  of fraudulent or false registrations were submitted to the

14  election officials?

15  A    In many of the cases with ACORN, which I'm intimately

16  aware of, and know very very well, the fraudulent cards

17  were so flagrant that the organization was the one that

18  flagged them.  But in most states, because the

19  registration document is sort of an official document, it

20  must be turned in.  And they can't just say, oh, you tried

21  to register Mary Poppins and throw it in the trash.  They

22  have to turn it in.

23       So in many of the cases involving ACORN, it was the

24  organization that was, in a sense, being ripped off by the

25  people they had hired, and flagging them.  You know, they

1  had to turn them in, and they flagged them as fraudulent.

2  Q    And I'm just, in that context, I was trying to -- so

3  you would agree that there were thousands of fraudulent

4  registrations submitted to election officials?

5  A    Over what time period?

6  Q    Over, say, since 2000.

7  A    Yes, I would agree with that.  I'm also not aware of

8  any single one of them every turning into a vote.

9  Q    But I'm going to go back to the words I read to you

10  from your conclusion, and particularly where you can see

11  they're highlighted *fraud committed by voters either in*

12  *registering to vote.*  So I'm picking up on the words

13  *"registering to vote."*  Would that activity that we just

14  described, submitting a fraudulent registration for Mary

15  Poppins, be within the scope of that conclusion?

16  A    No, because it wasn't the voter submitting their own

17  fraudulent registration.

18  Q    Okay.  So -- and that's really what's helping me.  So

19  you're saying it has to be the same person who submits

20  this fraudulent registration, and then the same person who

21  also then casts a fraudulent ballot to be within your

22  definition?

23  A    Again, because I'm always thinking of the solution to

24  the problem in that you have to have a proper diagnosis of

25  the problem to develop the best solution.  So in that

1  case, for example, the discussion around that has been

2  that -- you know, even liberals who want to do a lot of

3  voter registration have said these kinds of voter

4  registration campaigns are too difficult to do.  They're

5  too hard to control when you hire people to work

6  temporarily and they're not part of any legal

7  organization.  You don't pay them very much.  It's very

8  hard work.  There are too many incentives for people to

9  cheat in that respect.

10       And so the discussion among groups that are doing

11  this is like how do we solve this problem?  Can we do

12  these kinds of voter registration campaigns and eliminate

13  that problem?  And there's a debate.  Some people say yes,

14  some people say no.

15       And I guess I'm saying that because I'm trying to

16  point out that that problem that you've identified does

17  not necessarily lead us to let's require all voters to

18  show ID.

19  Q    Okay.  So let me just take this sort of step-by-step,

20  and, again, in light of your definition, then I'll move on

21  to some other topics.  So in terms of the registration,

22  somebody submits a fraudulent registration for Mary

23  Poppins, somebody such as that, maybe one not so obviously

24  fraudulent that is then submitted to the election

25  officials, and at that point there's no ID required before

1  that name is added to the voter roll, correct?

2  A     No, that's not correct anymore, I mean, with the Help

3  America Vote Act mandate that states collect driver's

4  license numbers or the last four digits of a social

5  security number.  Now, I am aware of in Virginia that

6  Virginia checks the full social security number.  So in

7  terms of ID, the person has to submit that number, whether

8  it's a driver's license number, or in Virginia they submit

9  a social security number.

10  Q     And let me ask you about that.  Is it your

11  understanding they have to submit that ID to get the name

12  on the voter roll, or they have to submit what I'll call

13  the HAVA ID before they can cast a ballot in the name of

14  that registration?

15  A     Well, HAVA says that if you don't submit your

16  driver's license number, and you don't submit the last

17  four digits of your social security number, and you

18  register by mail in a jurisdiction in which you've never

19  voted before, then the first time you vote you're supposed

20  to be flagged to show the HAVA compliant ID.

21  Q     Correct.  But that -- in other words, the step of the

22  process at which the HAVA ID comes in is not to prevent

23  the registration from being added to the roll, but to

24  prevent somebody from casting a ballot the first time

25  under that registration?

1  A     That's correct.

2  Q     Let me ask you a little bit about your methodology.

3  You talked -- and there's a table.

4       MR. HEARNE:  If you can pull the table up.  It's

5  Table 1 on Page 12.

6  BY MR. HEARNE:

7  Q     And you talk about criminal indictments.  And just

8  the table at the top.

9       In terms of your methodology, and this was discussed,

10 I think, certainly during your direct, and some of the

11 questions from the Court that asked you about this as

12 well, I mean, you looked at actual indictments, actual

13 convictions for, in this case, this variety of vote fraud,

14 is that correct?

15 A     Well, this is a summary of data from one fiscal year

16 of that data set I mentioned earlier that's produced by

17 the Administrative Office of U.S. Courts in which they

18 code every indictment, every indictment, all indictments

19 brought on an annual basis.  And there's a lot of

20 information about each indictment so that you can actually

21 track it to its conclusion.  But I only looked at

22 indictments.  Not convictions.  Just indictments.

23 Q     So this table reflects indictments?

24 A     It reflects indictments.  And the indictment is coded

25 by them.  And in my book, I have a whole appendix on this

1  very technical issue of how they're coding the data.  And

2  they have a category they call -- I think they call it

3  election violations.  And that actually is a bigger

4  category than my category of voter fraud because in the

5  original data it includes any kind of election crime, plus

6  campaign finance crimes.

7       And I was able to figure out how to exclude the

8  campaign finance crimes.  But this number here would

9  include something that I don't call voter fraud, like,

10  say, a vote buying case where the vote buyer was indicted.

11  That's going to be included in this number here.  I

12  excluded it in other places, but I couldn't do that with

13  this data, so I reported it the way it is.

14  Q    And you infer from that that it's rare, correct?

15  A    Yes.

16  Q    The incidence is rare because there's only, according

17  to this chart, 60 indictments?

18  A    That's correct.  That would have been following the

19  2004 election, which if my memory is correct, there was

20  something like 120 million votes cast.

21  Q    So then in terms of tax evasion, you report from the

22  same compilation of data, only 781 indictments?

23  A    That's correct.

24  Q    So if we use that same reasoning, then we would infer

25  that when we figure there's probably 200 million tax

1 returns filed, that 781 indictments means tax fraud is

2 very rare?

3 A     At least the way it's being prosecuted.  Yes.

4 Q     Then, you would admit, it doesn't actually tell us

5 the incidence of tax fraud, just how it's being

6 prosecuted?

7 A     That's correct.  And I don't anywhere say, as I was

8 explaining earlier, that any one piece of data that I use

9 is definitive in an absolute perfect measure.  We don't

10 have those perfect measures.  They don't exist.  So the

11 idea is to line it all up from different sources and see

12 if you start to get very different pictures of what's

13 going on.

14     So knowing something about election fraud, and -- you

15 know, how much is this capturing?  Are we missing half of

16 everything that's happening, or one-fifth, or 5%, would be

17 important to know.

18 Q     Let me ask you to turn to Page 14 of your report, if

19 you could.  It's under the heading *"D."*  It says *"The*

20 *Question of Evidence."*  And it will be essentially the

21 first sentence in there.  You just mentioned the Help

22 America Vote Act, and I want to ask you about that a

23 little bit.  So take a moment and look at that paragraph,

24 if you don't mind.

25     THE COURT:  Page 14?

1          MR. HEARNE:   Page 14.  And I'll highlight it, Your

2  Honor.  Yeah, Page 14 of her original report.

3      If you would enlarge that first paragraph after the

4  heading.

5  BY MR. HEARNE:

6  Q    And you talk -- I'm just going to direct your

7  attention to the reference to the *Senate election reform*

8  *bills that became the Help America Vote Act slipped a*

9  *voter identification requirement into the final bill."*

10  A    Yes.

11  Q    *"Slipped into the final bill."*  What did you mean to

12  communicate with that?  Somebody, you know, was able to

13  sneak it into the federal legislation without the others

14  knowing?

15  A    Well, it was put in during the conference on the

16  bill.  It had been rejected in the House.  And there had

17  been some discussion in the Senate.  But ultimately, the

18  bill that was -- the two sides went into conference on,

19  did not have any kind of an ID requirement in it.  And in

20  part of the negotiating over the bill in conference when

21  it came out -- because we don't always know what all the

22  conversations are, but when it came out it had the

23  identification requirement in it.  And it was

24  controversial because groups that had been pushing -- and

25  people were pushing from different sides.  But certainly

1  probably the liberal groups pushing for election reform

2  were very upset about it.  And they were threatening --

3  like the NAACP were trying to figure out do we withdraw

4  our support in order to try to stop this bill.

5        And the feeling was that it's such a difficult thing

6  to do to get to the point to have a bill that the

7  President would sign, that they would not do that and they

8  wouldn't object, and the bill went forward.

9        THE COURT:  What was the vote in committee on this

10 particular amendment?

11       DR. MINNITE:  I don't know offhand.  I don't

12 remember.

13 BY MR. HEARNE:

14 Q    But you followed the HAVA legislation, it sounds

15 like, from your answer in terms of the implementation of

16 it, the drafting of it, and ultimately the passage of it,

17 is that correct?

18 A    Yes.

19 Q    And you're aware it was broadly bipartisan support

20 for HAVA?

21 A    Yes.

22       MR. HEARNE:  Could I put up an exhibit?  This is just

23 a quote taken -- it's Page 9 of that document, I believe.

24 BY MR. HEARNE:

25 Q    And I'll ask you if you can -- I'll give you a moment

1  to read this quote.  It comes from the Congressional

2  Record.  And then let me know when you're done reviewing

3  it, and I'm going to ask you a question or two about that.

4  A    Yes.

5  Q    So HAVA, when you talk about it in your report, the

6  provision that you refer to as getting slipped in was the

7  HAVA ID provision, is that correct?

8  A    I believe it's Section 301(b), maybe.  I think I have

9  it in my report somewhere.

10 Q    And I don't want to take the time to go over

11 something we have.  But that's the same provision we just

12 discussed about HAVA ID where if you do a new mail-in

13 registration, you have to show one of these designated

14 forms before you cast a ballot, is that correct?

15 A    That's correct.

16 Q    And that's what -- this statement is from Senator

17 Bond, who's a member of the committee that was responsible

18 for this legislation, is that correct?

19 A    It was his idea, the ID.

20 Q    And what motivated that provision, if you know, to be

21 included in this what -- well, let me phrase the question

22 much more directly.

23     Wasn't it concern about fraud that caused the HAVA ID

24 provision to be added to the Help America Vote Act?

25 A    That's what Senator Bond said.  I have this case

 1  study in my book.

 2  Q    Right.  And in that, in your book which I've read,

 3  nicely written, by the way -

 4  A    Thank you.

 5  Q    - you also note that there was reference to a dog

 6  that was registered.  Do you recall that discussion?

 7  A    Yes.

 8  Q    Do you recall Ritzy Meckler being the name of the

 9  dog?

10  A    I do.

11  Q    So when HAVA was being passed, the Senate held

12  hearings on the legislation, correct?  Do you recall that,

13  or did you follow those?

14  A    Yes.

15  Q    And in the course of those discussions, those

16  hearings, the issue of election fraud, vote fraud, they

17  called it *vote fraud,* was discussed, was it not?

18  A    I can't remember all of it.  I know that there was

19  some in the Senate.  As I said, there was some discussion,

20  but it was not the understanding that it was going to be

21  in any final bill.

22  Q    And my question was specifically to the hearings.  I

23  think, even in your book, you reference the fact that

24  Senator Bond brought in a picture of Ritzy Meckler, which

25  was a cocker spaniel, to show the members of the Senate

1    one of the people who had been registered -- animals that

2    was registered.

3    A    Right.  He had -- blew up a big picture of the dog,

4    which I think he kept the picture on his desk, or

5    something.

6    Q    Let me direct you to Page 3, if I could, of your

7    rebuttal report.  So the rebuttal report would be Exhibit

8    214.  And you had mentioned the Carter-Ford Commission,

9    which preceded the Carter-Baker Commission, correct?

10   A    That's correct.

11   Q    And in your report, you quote from the Carter-Ford

12   report, is that correct?

13   A    That's correct.

14   Q    And is it fair to say, you think more highly of the

15   Carter-Ford report recommendations than you do of the

16   Carter-Baker recommendations?

17   A    I don't know if I'd put it that way.  I think that

18   the Carter-Ford recommendations seem to be more rooted in

19   more information, more data.  And I guess the focus of it,

20   I thought, was very important; whereas, the focus of the

21   Carter-Baker Commission about confidence, I didn't believe

22   that that was the issue.

23   Q    Then let me just ask you generally about the

24   Carter-Ford Commission and the Carter-Baker Commission,

25   and as to both of those commissions, as somebody studying

 1  election law, would be your professional sense that those

 2  -- I mean, did you personally read both of those

 3  commission reports?

 4  A     Yes.

 5  Q     And were you familiar with the work of those

 6  commissions as it was being done?

 7  A     Yes.

 8  Q     And did you follow that?

 9  A     I had a good friend who was part of the research team

10  for the Carter-Ford -- not research, but staff supporting

11  the Carter-Ford Commission, and I also knew others

12  tangentially to the Carter-Baker Commission as well.

13  Q     And would you consider these kind of commission

14  reports to be authoritative, whether you agree with them

15  or not?

16  A     Not necessarily.

17  Q     And you would consider them -- would they be

18  something that social scientists and political scientists,

19  such as yourself, who follow election law, would go to?

20  A     No.

21  Q     So they wouldn't look at the Carter-Ford Commission?

22  A     I mean, they would look at it in terms of what a

23  group of people, you know, respectable people coming in

24  with different points of view and different skills and

25  different knowledge, thought about it.  But it's not

1   something like, you know, the Commission on Civil

2   Disorders, for example.  The commissions that were put

3   together in the 1960s to study the riots.  It's not

4   something like that.

5         Those commissions are -- or that commission, the

6   McComb Commission, the commissions that studied the riots

7   in the cities, and the famous statement about moving

8   toward two societies, those commissions, their work is

9   absolutely fascinating.  And there's a huge volume of it.

10  They commissioned dozens and dozens of social scientists

11  to prepare studies.  And it went on for many, many months.

12  Neither one of these commissions can compare to those.

13  Q    But they, at the same time, did research.  They had

14  eminent practitioners in the area of election

15  administration, and others testified before them, is that

16  correct?

17  A    Yes.  The Carter-Ford more so than Carter-Baker.

18  Q    Let me direct your attention to your Page 3, the

19  quote, the inset quote that you have which begins *All*

20  *states.*"  I'm just going to read the sentence embedded in

21  the middle of that inset paragraph.  And this is, again,

22  from the Carter-Ford Commission, correct?

23  A    Yes.

24  Q    And you quoted, it includes the phrase, *"Non-citizens*

25  *do vote, albeit illegally."*  Do you see that?

1   A    Yes.

2   Q    So it's fair to say that among the other concerns

3   that the Carter-Ford Commission had was voting by

4   illegals?

5   A    Yes.  They're talking there about the issue of

6   verifying citizenship.  And they're saying that it's a

7   weakness in every state's voter registration system.  And

8   it goes to the issue of elections being administered by

9   the states, and immigration citizenship by the federal

10  government.

11  Q    And you talked with opposing counsel during direct

12  examination about the Carter-Baker Commission, and their

13  specific recommendations, correct?

14  A    Yes.

15  Q    And what I'm going to refer you to is one of your

16  deposition exhibits.  I have both some excerpts from it,

17  and actually the report itself.  The report itself,

18  Carter-Baker, is Exhibit Number 328.  And that's a report

19  that you've read, correct?

20  A    Is that in this book?

21  Q    There's a picture of it, the actual Carter-Baker

22  Commission report.  As I understood your testimony, you've

23  read it.

24       THE COURT:  Hold on just one moment.

25       Yes, sir.

 1          MR. KAUL:  We object to the admission of this

 2  exhibit.  Certainly, it's appropriate for him to use it in

 3  his cross-examination.

 4          THE COURT:  He hasn't offered it as an exhibit yet.

 5          MR. KAUL:  It looks like it's going to be published.

 6  That's why I mentioned it.

 7          THE COURT:  What do you intend to use this for?  To

 8  refresh her recollection?

 9          MR. HEARNE:  I actually will ask her some questions.

10  She cites it rather extensively throughout --

11          THE COURT:  You can ask her questions about it.  It's

12  not in evidence.

13          I tell you what, I won't look at the screen.

14          MR. KAUL:  I don't actually mind, Your Honor.  But I

15  just wanted to --

16          THE COURT:  Go ahead.  I won't look at the screen.

17          MR. HEARNE:  Well, Your Honor, if it would help, we

18  would move for the admission of this exhibit.  It's

19  referred to by this expert.

20          THE COURT:  I don't know if it's necessary.  You're

21  trying to refresh her recollection.  You go right ahead.

22  You're doing it perfectly.

23          MR. HEARNE:  Okay.

24          If I may talk to my assistant very quickly?

25          THE COURT:  Sure.  Go ahead.

1          MR. KAUL:  And just to be clear, for his convenience,

2   we certainly have no objection to his doing the

3   refreshment on the screen.  It was more of an objection to

4   the admission.

5          THE COURT:  All right.

6   BY MR. HEARNE:

7   Q    So I will represent to you, and I can show you the

8   actual page in the report, but for the convenience of

9   reading and refreshing your recollection, I've extracted a

10  quote from the report.  And I'll give you a moment to read

11  this.  This is from Section 2.5 of the Carter-Baker report

12  at Pages 18 and 19.

13         Now, I would note that the emphasis that's been added

14  to the quote I supplied.  That's not in the original.  But

15  otherwise, that quote was taken direct from there.  When

16  you've had a chance to read it, if you would let me know.

17  A    Okay.

18         MR. KAUL:  I guess we would ask that the ellipses be

19  shown.

20         THE COURT:  Pardon me?

21         MR. KAUL:  There's some ellipses in there.  We would

22  ask about that too since we doesn't have it.

23         THE COURT:  I can't hear you.

24         MR. KAUL:  I apologize, Your Honor.

25         There's some ellipses, and I didn't know if that was

1   in the original report.

2        MR. HEARNE:   The ellipses were added as well for

3   that.   And if you want, it's on Page 18 and 19.   And I've

4   taken this from Exhibit 328.

5        THE COURT:   Well, the important thing is she reads it

6   over and determines whether or not it refreshes her

7   recollection.   The ellipses are not going to refresh her

8   recollection.

9        MR. KAUL:   Thank you, Your Honor.

10        THE COURT:   All right.

11        Go ahead.   Let's move on.

12   BY MR. HEARNE:

13   Q   So, Dr. Minnite, the questions I wanted to ask you

14   and direct your attention, and the reason I extracted

15   these quotes from the report is because it would be less

16   tedious then going through it page by page.

17        And again, this is a report you've said you've read,

18   correct?

19   A   Yes.   Many times.

20   Q   And you've referenced it many times in the course of

21   your discussion.   Does this refresh your recollection as

22   to one of the reasons why the Carter-Baker Commission

23   included their recommendation for photo identification to

24   vote?

25   A   Yes.

1  Q    And what is your understanding of why the commission

2  recommended that be included?

3  A    They're simply taking a position that -- on what they

4  think is fraud, voter fraud.  That it occurs, and they

5  base their recommendation, they say, "*A good ID system*

6  *should deter, detect, or eliminate several potential*

7  *avenues of fraud, and thus it can enhance competence.*"

8       But it doesn't mean that it's rooted in any evidence

9  or in careful study.  It's their conclusion of their

10 report.

11 Q    And where I'm going to pick up on a distinction in

12 that quote right now is part of your -- in your report,

13 you indicated that you were asked to determine whether

14 vote fraud was widespread, is that correct?

15 A    I was asked if I could provide an opinion on the

16 incidents, not whether it was widespread or rare, but the

17 incidents of it in Virginia and nationally.

18 Q    And it is your conclusion that it's not widespread?

19 A    That's correct.

20 Q    And is it a fair statement that this portion of

21 Carter-Baker said "*It doesn't matter if it's widespread,*

22 *and there may be debate over how extensive vote fraud is,*

23 *but that the existence of it or the perception of it*

24 *undermines public confidence in the election process*"?

25 A    That's what they say.  Yes.

1  Q     And you had earlier said that one of the motivating

2  factors for the Carter-Baker Commission was public

3  confidence in our election system?

4  A     That's what they said.  I mean, that is their own

5  explanation of why they had convened and what they were

6  going to look at.  They were primarily concerned about

7  that, and that's -- that's why they gave their report the

8  title *Building Confidence."*

9  Q     And their conclusion, as you understand it, was that

10 their recommendations, including the photo ID

11 recommendation, would restore or increase confidence

12 because it would address the perception of fraud, however

13 extensive it may or may not be?

14 A     Yes.  But you have to -- I mean, we can accept what

15 they say.  It doesn't mean we accept it uncritically.  And

16 we ask what's the basis of this opinion, what's the

17 evidence.

18 Q     Right now I'm just asking what you understand they

19 communicated.

20 A     I understand, you know, what they wrote here.  Yes.

21       MR. HEARNE:  Let me go to Page 5.

22 BY MR. HEARNE:

23 Q     I'm going to refer you to another excerpt.  This is

24 from Page 4 of the Carter-Baker report.  And I'll give you

25 a moment to refresh your recollection.  There aren't any

1  ellipses in there.  There is a bracket.  I added that.

2  A    Okay.

3  Q    And you see, don't you, Dr. Minnite, that this refers

4  to two of the different issues, or particular incidents or

5  allegations, of vote fraud that you talked about in your

6  direct exam and in your report, particularly Milwaukee and

7  Wisconsin and King County, is that correct?

8  A    That's correct.

9  Q    So is the race in King County the one you referred

10  to, the one for Christina Gregory, the race that you

11  indicated you studied to come to your conclusions?

12  A    Yes.  I studied the state.  And this is referring to

13  superintendent of King County testifying, who I believe I

14  interviewed that person.

15  Q    And that indicated that the race was one of the

16  concerns that the Carter-Baker Commission said for having

17  concern over fraud, isn't that it was widespread, but they

18  cite that specific race, which you studied, because it had

19  a 129 vote margin, correct?

20  A    That's correct.  But it's important to point out that

21  the court in that case found -- did not find any fraud was

22  committed in that election.  He found that there were some

23  illegal ballots.  There were some people who had felony

24  convictions.  But he said they weren't fraud because it

25  turned out that the election administrators mailed the

1  ballots to those people.  So if you got a ballot in the

2  mail, you would probably assume you're eligible to vote.

3       And that was the case with -- I think were 18.  I'm

4  sorry, there were more than that.  But there was testimony

5  about a number of them who said they mailed the ballot to

6  me in the mail.  That's why I sent it back in.  So if I'm

7  not allowed to vote, they shouldn't have mailed the ballot

8  to me.  But the more important point there is that the

9  judge who oversaw the contest concluded there was no

10  fraud.

11 Q    So, again, let me just make sure I understand

12 definition of voter fraud.  So somebody gets mailed a

13 ballot, they know they're not legally entitled to vote,

14 but they say, hey, it showed up in my mailbox.  I'm going

15 to vote it, and they do, and they return it.  Would this

16 act count or not count as voter fraud under your

17 definition?

18 A    These people didn't know they couldn't vote the

19 ballot.  If they did, it would -- and in a hypothetical

20 they would.  But in the particulars that you're pointing

21 to here, you're giving me the impression, you know, that

22 there was vote fraud.  That's not what the judge found in

23 that case.

24 Q    And let me go to the last paragraph of this where it

25 begins "In Milwaukee, Wisconsin."  Do you see that?

1  A    Yes.

2  Q    And do you recall in your direct testimony you talked

3  about Milwaukee, Wisconsin, and how you studied that

4  election in 2004, I believe?

5  A    Yes.

6  Q    And you see where, at least according to the view of

7  the Carter-Baker Commission, they cite investigators.  And

8  I'm going to quote, *"Said they found clear evidence of*

9  *fraud, including more than 200 cases of felons voting*

10  *illegally, and more than 100 people who voted twice using*

11  *fake names or false address or voted in the name of a dead*

12  *person."*  Do you see that?

13  A    Yes.

14  Q    Are you aware investigators in Milwaukee, Wisconsin

15  made that finding?  Whether they were prosecuted or not,

16  I'm not asking, I'm just saying that's what the

17  investigators reported.  Is that your understanding?

18  A    No, I don't think that's correct either.  There was

19  no clear evidence of fraud.  There were ballots that

20  should not have been counted because they were ballots

21  cast by people who had felony convictions.

22      I've learned from doing my research in Wisconsin that

23  you can be convicted of a felony and never go to jail.

24  And I interviewed people who had -- a woman who had been

25  convicted of a felony assault charge who never went to

1  jail, and actually did not realize it was a felony charge.

2  So there were people who did not know that they were --

3  should not be casting those ballots.

4  Q    And I'm just going to refer to the specific statement

5  that the Carter-Baker Commission made, and then ask for

6  your interaction with it, particularly the statement that

7  ballots were cast, more than 100 people voted twice, used

8  fake names, false addresses, or voted in the name of a

9  dead person.  You see that statement there.  And then I'm

10 just going to ask the question, was the Carter-Baker

11 Commission wrong to conclude that?

12 A    Yes.  They were doing their work, I believe, in 2005,

13 in the spring of 2005, just after the election.  And one

14 of things that I have been trying to hope to contribute to

15 this debate over voter fraud is that we have many, many

16 allegations that upon investigation turn out to be

17 something else.  And that we should say, look, there are

18 at least two good explanations for this.  One is it could

19 be fraud.  Another, it's probably likely these are piles

20 of mistakes that are causing these problems.  And

21 that's -- the facts point that out.

22     And I can see why if you were doing your work in the

23 spring of 2005, and reading the news, that you might

24 believe this was true.  But if you followed it closely the

25 way I did, and you continue to track it -- and as I said,

1  I interviewed the U.S. Attorney there, that this is not an

2  accurate statement of what happened in Milwaukee in 2004.

3  Q     If we can look at page -- just Page 6.  It's also

4  from the Carter-Baker report at Page 21.  And this is

5  their actual recommendation.  It's the text of their

6  recommendation.  I believe you footnote or cite it in your

7  report.  Take a quick moment to familiarize yourself with

8  it.

9  A     This on the screen is from my report?

10 Q     No.  What's on the screen is actually just from

11 Carter-Baker.  It is their recommendation with regard to

12 voter identification.

13 A     I'll look at the one on the screen.

14 Q     And that's taken straight from the report in toto.

15 I've not done any ellipses, or anything on this one.

16      MR. KAUL:  What page is that?

17      MR. HEARNE:  It's Page 21.  It's the actual inset

18 recommendation.

19 A     Okay.

20 Q     And the question I'm going to ask you, because you

21 were asked this same question about this same

22 recommendation on direct, was the reference to the real ID

23 law.  And you've explained that the real ID law is a

24 federal ID -- or a federal requirement for states to adopt

25 for driver's licenses to make them more secure, is that

1  correct?

2  A      That's correct.

3  Q      The recommendation as presented by Carter-Baker, and

4  your knowledge or understanding of Virginia's photo

5  identification requirements, which of the two is stricter?

6  A      Well, certainly the real ID.

7  Q      So Carter-Baker would be recommending something

8  stricter than in fact Virginia adopted, is that correct?

9  A      That's correct.

10 Q      And Carter-Baker didn't have a recommendation at that

11 point for a bypass, if you will, or for a way to obtain a

12 free ID and still vote on election day the way Virginia

13 allows a voter to do?

14 A      I don't recall all the recommendations in the

15 Carter-Baker report.  But I do recall in places in the

16 report where they said these -- you know, the states

17 should make these IDs free to people who can't get them.

18 So it was kind of a general recommendation, but not a

19 mechanism whereby a person could do that.

20 Q      And you said that Carter-Baker also had

21 recommendations, including the recommendation to make it

22 easier to register more voters to be registered.  Sort of

23 twin goals of making it easier for people to register,

24 while at the same time making the voting process more

25 secure by requiring an ID, is that fair?

1   A    I think the concern was that they didn't want the ID

2   card requirement to be the reason why an eligible citizen

3   was not able to cast a ballot.

4   Q    And so there in Virginia, are you aware, has in fact

5   made registration easier by making it now available to

6   register electronically?

7   A    That's my understanding.

8   Q    Let me actually refer now to the actual exhibit.   And

9   I'm going to have to -- the Carter-Baker Commission

10  exhibit.   You talked a little bit about who was on that.

11  Let me refer you to Exhibit 328.   And it will be near the

12  very end of that.

13       MR. HEARNE:   If you could put up Page Number 93.

14       THE COURT:   Page 93 of Exhibit 328?

15       MR. HEARNE:   That is correct, Your Honor, of Exhibit

16  328, which is the actual Carter-Baker Commission report.

17       THE COURT:   Okay.

18  BY MR. HEARNE:

19  Q    And I'm going to be very brief.   I just want to put

20  that in front of you to refresh your recollection because

21  you testified on direct as to who were the members of that

22  commission.

23       Well, let me ask this question while he looks for the

24  particular page to refresh your recollection.   I don't

25  want to delay the process.

1        Are you familiar with the fellow, he's now deceased,

2   but Dr. Pastor, Robert Pastor?

3   A    Yes.

4   Q    Would you describe what you know of him.

5   A    I believe he was an aide to former President Jimmy

6   Carter when Carter was in office.  And was involved with

7   international politics in different ways.  And then ended

8   up at American University running -- I think he started an

9   election management program there.  It doesn't exist

10  anymore, but I believe he founded that there.

11  Q    And he was the Executive Director of the Carter-Baker

12  Commission -

13  A    Yes.

14  Q    - when that was conveyed.  And you had mentioned some

15  other election officials.  I'm not going to take the time

16  to go through them, but if I represent to you there were

17  two secretaries of state on that commission who ran

18  elections for those states, Arkansas and Washington, would

19  that be consist within your recollection?

20  A    I know there were some election officials.  I don't

21  remember the states.

22  Q    And I don't want to take the time to go through the

23  actual text of the document.

24       MR. HEARNE:  You can take it down.

25  BY MR. HEARNE:

1  Q    But you indicated they had some hearings, were trying

2  to compare the weight of their recommendations to those of

3  Carter-Ford in your direct testimony.  If I represent to

4  you that they had three hearings, would that be consistent

5  with --

6  A    My recollection was two.

7  Q    I'm trying to avoid going to the page, but I would

8  represent to you that there was one at American

9  University, one down in Houston at James Baker, and one at

10 the Carter Center.  If I make that representation to you,

11 do you know of any reason that I would be wrong in doing

12 so?

13 A    No.

14 Q    And in each of those hearings, they had academics who

15 testified.

16 A    Yes.  I think that's right.

17 Q    That they had a number of witnesses, including

18 academics and election officials?

19 A    Yes.

20 Q    We'll switch topics now.  You had talked during your

21 examination, you had referred to sort of the report, and I

22 can't remember the two authors that you had quoted

23 concerning the -- I don't want to say the motive, but at

24 the national level they did some correlation between which

25 party is in control over the state when they adopt photo

```
 1  ID requirements.  Do you recall that discussion?
 2  A    Yes.
 3  Q    And you had also mentioned that you've done some
 4  reports that you have prepared that have been peer
 5  reviewed and published, is that correct?
 6  A    Yes.
 7  Q    I'm going to refer you now to Defendants' Exhibit
 8  397.
 9       MR. HEARNE:  If you can put that on the screen.  Just
10  the first page now.
11  BY MR. HEARNE:
12  Q    And if you can identify this.  And I'll represent to
13  you it's a paper we discussed during your deposition,
14  "Modeling Problems and Voter Identification," and ask you
15  if recognize this document?
16  A    Yes.
17  Q    And is that a document that you co-authored?
18  A    Yes.
19  Q    And I'm going to direct you to the last -- and I'll
20  try to give you the exhibit page.  At the conclusion of
21  this, which is on -- well, it's on the page of the study
22  that is 98.
23       THE COURT:  On Page 98?
24       MR. HEARNE:  Of the study.  Correct.
25       THE COURT:  All right.  And 397 is the study.
```

1          MR. HEARNE:  It's Exhibit 397.  That's correct, Your

2    Honor.

3          THE COURT:  All right.  Go ahead.

4    BY MR. HEARNE:

5    Q    And the conclusion, I would ask you just to read that

6    first paragraph to yourself, then I'll ask you a question

7    about that.

8    A    Okay.

9    Q    And that's a conclusion that you wrote, is that

10   correct?

11   A    Yes.

12   Q    And the conclusion states, in essence, that you can't

13   determine whether photo ID requirements in fact suppress

14   voter turnout?

15   A    Well, this paper was published in 2009, and it was us

16   looking at the new research, virgining research, if you

17   will, that was being done at that time.  None of it peer

18   reviewed at that point.  And we were trying to make an

19   intervention about both the data sources that were being

20   used, which were primarily the current population survey

21   data, and the modeling choices that were being made by the

22   analysts because we didn't think that those were the best

23   choices.

24          So we were trying to -- I would think of this as a

25   kind of technical paper where we were talking to the

1  researchers who were just beginning to do this study of

2  looking for an impact of photo laws on turnout where the

3  only experience at that time really was the Georgia and

4  the Indiana laws, primarily.  And we were saying, first of

5  all, we haven't had enough elections.  We only have a

6  couple of states that have these so-called stringent ID

7  laws.  We haven't had enough elections.  We don't have

8  enough data.  We have to be careful about how we do the

9  modeling.  That's what this paper was doing.

10 Q    And, you know, turnout is not a factor of one

11 variable, of course?

12 A    That's correct.

13 Q    And so is that not one of the great challenges in

14 trying to see what the effect of turnout is, as you have a

15 whole host of factors that influence turnout who -- which

16 candidates are running, if it's an off year election, you

17 know, variety of advertisement, money spent on it.

18 There's a lot of variables that go into that conclusion,

19 is that a fair statement?

20 A    Yes.

21 Q    In your direct testimony, you talked about how you

22 began studying vote fraud, and how the conclusions that

23 you've offered to the Court today are the result of your

24 study of vote fraud, and your experience since 2000, is

25 that correct?

1  A      That's correct.

2  Q      And in that discussion, you also mentioned that

3  you've studied -- we talked about Milwaukee.  You

4  mentioned that you studied voter fraud in St. Louis, is

5  that correct?

6  A      That's correct.

7  Q      And that was St. Louis in 2000?

8  A      Yes.

9  Q      And do you recall whether -- what was your conclusion

10 about that?  Was there any vote fraud in St. Louis in 2000

11 that you found?

12 A      No.  My conclusion was that that was another scenario

13 in which there was kind of a Florida meltdown in

14 administration that had caused problems.

15 Q      And did I hear your testimony correct about the

16 Post-Dispatch confirmed your view that there was no vote

17 fraud?

18 A      Well, my comment about the Post-Dispatch was simply

19 that they had gone out and tried to find the -- whether

20 the -- to try to comment on whether the data were accurate

21 about dead people voting or -- I think it actually was

22 people voting from addresses that didn't exist.  And they

23 confirmed that none of that really was true.

24        There was a state commission, there was a city

25 investigation.  There were a number of reports that were

1  done on that election that I looked at.

2  Q    Do you recall that both the outgoing Democratic

3  Secretary of State, Rebecca Cook, and the incoming

4  Secretary of State, a Republican, Matt Blunt, both did

5  reports on that election?

6  A    Yes.  I know Matt Blunt did.  Yes, Rebecca Cook did,

7  too.  I had a hard time getting that one.

8  Q    And you're familiar with both of those reports?

9  A    Yes.

10     MR. HEARNE:  Let me, if I could, display Exhibit 386

11 on the screen, and just ask you --

12     THE COURT:  Defense 386?

13     MR. HEARNE:  Yes.  386, Your Honor.  That's correct.

14 BY MR. HEARNE:

15 Q    And you indicated as part of your methodology before,

16 and I talked specifically about that, that you did

17 archival research, you searched newspaper reports as part

18 of how you came to your conclusion, is that fair?

19 A    That's correct.

20 Q    Let me look at -- I'll ask you to look at

21 Exhibit 386, which is a story reported contemporaneous

22 with the 2000 election.  It's February 28, 2001,

23 concerning the St. Louis election from the Los Angeles

24 Times.

25     MR. HEARNE:  If you can make it a little larger.

1    BY MR. HEARNE:

2    Q    Just read the first paragraph, or as much of it as

3    you would like to familiarize yourself with it.

4         MR. KAUL:  Your Honor, I'm not sure she was asked if

5    she had read this, or if she said this was something she

6    had seen before.  She said she read the report, but this

7    is a news article.

8         MR. HEARNE:  And I'm going to ask her that question.

9         THE COURT:  Okay.  Premature objection.

10        Go right ahead.

11   BY MR. HEARNE:

12   Q    You testified you did extensive archival search.  I'm

13   just going to ask you if you recall seeing this article

14   from the Los Angeles Times about the St. Louis election,

15   and if now that you've seen it, if you recall ever reading

16   it?

17        THE COURT:  What's the date of the article?

18        MR. HEARNE:  The date of the article, Your Honor, is

19   February 28, 2001.  It's Page A-1 of the Los Angeles

20   Times.

21   BY MR. HEARNE:

22   Q    And the point, and I will summarize it, the article

23   accounts that a number of ballots were cast in the name of

24   dead people, including some famous former alderman in St.

25   Louis in the 2000 election, the one that you've mentioned

1  that you have studied.

2  A     Right.

3  Q     And so my question would be first, do you recall

4  reading this article?

5  A     I think I do.

6  Q     And this isn't an article that you included in your

7  report, is it?

8  A     I wouldn't be surprised if I cited it in my book.

9  But I didn't include it in my report, no.

10  Q     And this indicates that not only for the ballots cast

11  in the name of the dead voters, or voters who are known to

12  be dead, but that in fact a lawsuit was indicted in the

13  name of -- on behalf of the voters by somebody who was

14  also dead.  Are you aware of that in your study of the St.

15  Louis election of 2000?

16  A     You know, I'd have to go back and look at it again.

17  It's one article.  If you showed me all of the articles on

18  this story, it might be different.  So I would want to go

19  back and look at this particular -- I do remember this

20  case, and in particular the issue around, which is stated

21  here, the issue around addresses that turned out to be

22  vacant lots.  It's like the third paragraph.  Convicted

23  felons and deceased voters.  I do remember that.

24        And I remember the issue with Red Villa.  Is that how

25  you pronounce his name?

1  Q      Yes.   That is him.

2        Let me just give you -- I'm not going to go through

3  all these articles.  You cited an awful lot of them.  So

4  I'm only going to give you another one.  If you could go

5  to Exhibit 355.

6        You mentioned again that part of your conclusion you

7  looked to the St. Louis Post-Dispatch.  This is an

8  article, I would represent to you, is from the St. Louis

9  Post-Dispatch.  It should be Exhibit 355.

10       THE COURT:   Your Exhibit 355?

11       MR. HEARNE:   Defendants' Exhibit 355, Your Honor.

12  BY MR. HEARNE:

13  Q    And the title of this article is dated December 11,

14  2005.  And it's titled, *A Miserable Tradition."*  Do you

15  see that?

16  A    Yes.

17  Q    I'm particularly going to direct your attention to

18  the last paragraph, which is on the second page of the

19  document.  This is an article that is an editorial from

20  the St. Louis Post-Dispatch.  I'd ask you first if you

21  recognize or recall seeing this article before?

22  A    It's very hard to identify an article by one sentence

23  at the end of it.

24  Q    I can flip back to the first page, if you would like

25  me to.  Let me do that.  I want to make sure, Dr. Minnite,

1   that you have a chance to look at it.

2   A     Okay.

3   Q     And then if you could just -- the final conclusion on

4   the second page.  And it's -- is it an accurate statement

5   to say this is an editorial by the Post-Dispatch that's

6   calling for criminal sentences and criminal prosecution of

7   voter fraud activity that occurred in St. Louis in that

8   election?

9   A     It's saying criminal investigations are appropriate.

10  And the St. Louis tradition is vote fraud will continue to

11  be seen as a quaint St. Louis tradition.

12        I read that as -- because it also in the beginning of

13  that editorial talked about Tracy Campbell's book, which

14  I'm very familiar with.  But this is an example of how the

15  -- all of the popular culture that we have around machine

16  politics and crooked politicians, and so forth, kind of

17  feeding into this.  That's actually why I call my book

18  *The Myth of Voter Fraud.*"  Because we have -- yes, we

19  have a tradition of corruption in politics in elections.

20  I don't deny that.

21        I'm saying that that myth is so powerful that people

22  can make judgments about fraud that isn't fraud, or kinds

23  of fraud that won't be stopped by photo ID.  And I'm

24  trying to bring a clear analytical framework so that we

25  can get to the important public policy issues.  I'm trying

1  to get through the myths of it, which I love that history,

2  and I talk about it in my book.  It's fascinating.

3  Q    And I guess my question is a very direct one.  And

4  that is your testimony here earlier was that, as I

5  understood it, you studied the St. Louis election, the

6  aftermath of that, and your testimony on direct was that

7  you thought that it was resolved without any instances of

8  actual vote fraud, is that a fair statement of --

9  A    I'm saying my recollection of it is that there were

10 these irregularities, we can call them.  It looked like

11 there were people registering and voting from vacant lots.

12 And it looked like there was some dead people who had cast

13 ballots.  And the eyes will glaze over if I go through all

14 the details of these things with respect to the

15 administrative problems that were happening, that it was

16 primarily a big problem.  And we're talking here about

17 2005, the St. Louis Board of Election Commissioners

18 continued to have major management problems that had

19 started much earlier and were addressed.

20     So I'm saying that this is fine.  I don't disagree

21 with the editorial that criminal investigations of

22 fraudulent activity in elections should be prosecuted.

23 Q    And again, I'm just coming back to the central point

24 that I wanted to clarify your testimony on direct when you

25 mentioned Milwaukee, you mentioned St. Louis, you

1  mentioned you studied those, you mentioned the race in

2  Washington as examples that based on your review no fraud

3  actually occurred, it was all an administrative

4  malfunction, is that right?

5  A    I never say no.  I say it's rare.  There are -- we

6  have some examples of people who have deliberately voted

7  twice knowing they can't do that.  But it is rare relative

8  to both how many votes are cast.  And, again, this is me

9  wearing my policy hat.  We are not spending enough time on

10 the problems that are preventing lots of eligible citizens

11 to have their legitimate ballots counted.  That is a huge

12 concern.  And we have to make choices in public policies.

13 And this obsession with voter fraud is --

14 Q    And again, my question is not getting into the

15 broader public policy debate.  I just was asking some

16 specific questions concerning your specific conclusions,

17 and some of the facts underlying that.

18 A    Well, I mean, I studied the 2000 election in St.

19 Louis.  I don't remember, going back, if this is about

20 2000 or 2004.  This editorial is written in 2005?

21 Q    That may be the date it was printed.  I would look at

22 the document itself.

23 A    I think it is because I see there on the first page

24 they were saying they still have 100,000 wrong names, or

25 whatever, on the election list.  And my recollection is

1  that that agency continued to have problems after they

2  were sued by the federal government the first time, and it

3  went into a consent decree.  They had had problems

4  managing their voter registration rolls properly.

5  Q    And we talked about the HAVA ID, and I showed you the

6  statement from the Congressional Record by Senator Bond.

7  You know Senator Bond is from Missouri?

8  A    Yes, I do know that.

9  Q    And let me go back and really sort of close with that

10 point with your question about when we talked about HAVA

11 ID.  If we had a state that did not have any, say, HAVA ID

12 that was slipped into the Help America Vote Act, somebody

13 could in fact file a voter registration form, then cast a

14 ballot in the name of that person if there was no step in

15 the process where somebody had to present some

16 identification, is that fair?

17 A    You can ask these hypothetical questions about how to

18 commit fraud.  And you pretend that there are no existing

19 safeguards against it.  You're saying let's take away the

20 HAVA requirement.  But you're sort of implying that there

21 aren't existing criminal penalties, there aren't other

22 procedures for checking.  Many states, for example, when

23 they get a registration they do a mailing.  And if the

24 mailing comes back, because they do a non-forwarding

25 mailing, it comes back, it raises a flag, and then they

1  investigate again.

2      I know, for example, in Oregon, they call people up

3  on the phone to track them down when they have inaccurate

4  information.  So this question about taking it away is

5  sort of presuming there's absolutely nothing already in

6  place and that anybody can walk into any polling place and

7  pretend that they're Bozo the Clown if they're registered.

8  Q    And I guess my question was a little more -- a very

9  direct specific question.

10 A    Okay.

11 Q    If Virginia did not have any identification

12 requirement, and I'm talking HAVA as well, if it did not

13 have an identification requirement, that somebody could

14 submit a voter registration form and then there would be

15 no barrier to them casting a ballot in the name of that

16 registration?

17 A    Well, we actually know in Virginia what happened when

18 they didn't have the requirement they have now.  We know.

19 And we have evidence that there is very little -- there

20 was very little fraud from 2000 to 2012, 2013 when the law

21 changed.  So we actually have the empirical evidence to

22 answer your question of what would happen.

23     You know, there's nothing that stops me from trying

24 to get as many voter registration applications as I want,

25 to make up names, sit in my room, make them up and mail

1  them in.  Anybody can do that.  The question is are there

2  procedures that will prevent that kind of activity from

3  corrupting voter registration rolls.  And in the event

4  that somebody, actually like the dog, gets registered, are

5  there procedures in place that prevent the dog from

6  casting a vote.  That is what we have to think about it.

7  Q    And my question was would requiring an ID be a

8  procedure that would prevent the dog from voting, or

9  somebody voting in the name of the dog?

10 A    Yeah, I would hope if the dog walked into the polling

11 place that people would have their wits about them and

12 would not be allowed to cast the ballot.

13      THE COURT:  I think that may be a good closing point

14 for you right there.

15      MR. HEARNE:  I think it does, Your Honor.

16      THE COURT:  All right.  Anything else you want to ask

17 here, any other reasonable questions?

18      MR. HEARNE:  No, I don't.  I had some questions about

19 her -- some of the articles she cites in her report, but I

20 recognize the hour.

21      THE COURT:  Well, if you feel it's important, you go

22 ahead.  We'll stay here as long as we have to.

23      MR. HEARNE:  Well, I certainly wouldn't want to tarry

24 too long, Your Honor.

25      THE COURT:  No.  That's fine.  I'm here.  We're here.

1   BY MR. HEARNE:

2   Q    I wanted to refer to Appendix A of your report, which

3   includes articles that you referenced as part of your

4   study.   Some news accounts.

5   A    Yes.

6   Q    Do you have that in front of you?

7   A    Yes.   These are the 697 articles that I reviewed in

8   full.   Or, sorry, 647.

9   Q    And these articles contain various accounts of vote

10  fraud and voter registration fraud, is that correct?

11  A    I think there's a few.   Yes.

12  Q    And these were specific to Virginia, is that correct?

13  A    Yes.

14  Q    And I'll direct you to Page 41 to be more -- a little

15  quicker about this.   Do you see the -- you mentioned

16  ACORN, and I'm mentioning it in these articles, do you see

17  the first three -- well, Items Number 283, 284, 285 and

18  289 in your report.   Do you see that?   It's on Page 41 of

19  your report.

20  A    283, 284 and?

21  Q    285 and 289.

22  A    Yes.

23  Q    Those are newspaper accounts which indicate that in

24  the State of Virginia there was in fact this kind of

25  registration fraud going on?

1  A    I don't recall whether all of these were referring to

2  an investigation.  I don't believe the FBI investigated

3  ACORN in Virginia.  They investigated them in Nevada.  But

4  I'd want to look at the article to be sure.  This was

5  coverage from the Virginia newspapers.

6  Q    And this would be newspaper coverage that Virginia

7  voters, the Virginia citizens, the Virginia legislature

8  would read?

9  A    Presumably, yes.

10 Q    To change to Page 42 of your report.  And again, I

11 don't want to belabor it, but you note Article 319 about

12 the headline is *Louisa Woman Indicted in Voter Fraud.*

13 Do you see that?

14 A    Yes.

15 Q    But in your report you didn't include her, or

16 apparently that indictment, in your study under the

17 definition of voter fraud?

18 A    Well, she may have been one of the felons.  If you

19 will remember the table that summarized all of information

20 that we looked at earlier, I believe it might have been

21 Table 2.  I'd have to go find it.

22 Q    So when it -- and again, I know that I can recall the

23 table.  I believe it is Table 2.  And it does reference

24 felon voting.  So I don't want to take the time to belabor

25 that.  I just want to note these articles.

1      Article Number 322, states, second person indicted

2   for vote fraud in Louisa.  Would that be your recollection

3   too that that was also a criminal -- I mean, a felon that

4   was illegally voting?

5   A    It might have been because almost all of them were.

6   There were four voters indicted for residency issues,

7   which I mentioned earlier in the report, and someplace

8   else.  So it must have been a felon.  But again, I would

9   want to look at the article.

10      As I was going through the material, I was keeping

11   like a running tab of what these cases were so that I

12   could summarize them in a table form.

13   Q    And again, I don't have -- I don't want to belabor by

14   asking further questions on these other than just to say

15   looking, if you could, at Article Number 326, Page 42,

16   *"State Police Investigates Possible Voter Fraud."*  Do you

17   see that article?

18   A    Yes.

19   Q    And these are all articles, these are all news

20   stories, which did occur, as well as the other ones in

21   your report, in Virginia press, meaning Virginia

22   newspapers, which are part of the state?

23   A    That's correct.

24      MR. HEARNE:  I have no further questions.

25      THE COURT:  All right.

1        How long will your redirect take?

2        MR. KAUL:  I guess about 20 minutes, Your Honor.

3        THE COURT:  Okay.  Then we'll do that tomorrow

4   morning.

5        MR. KAUL:  Your Honor, may I ask, is there a rule

6   that witnesses shouldn't be spoken to while they're on the

7   stand at all?

8        THE COURT:  That is true of a fact witness, but not

9   an expert witness.  You can talk to your expert witness.

10       MR. FINBERG:  Your Honor, I just have one brief

11  housekeeping matter.  It is very brief.  And I apologize

12  that I didn't notice this earlier.

13       Somehow between the finalizing of the final pretrial

14  order, and the submission of the final pretrial order, our

15  four expert witnesses got left out.  I'm sure it was

16  completely inadvertent.  I should have noticed it before

17  it went in.  But clearly we've got four expert witnesses

18  that are going to testify in this case.

19       MR. SPIVA:  It was inadvertent, Your Honor.  I didn't

20  actually realize it until Mr. Finberg brought it to my

21  attention.

22       THE COURT:  You can't criticize him for

23  self-reporting, can you?

24       MR. FINBERG:  So I just wanted the Court not to be

25  surprised if it looks at the witnesses from the final

1  pretrial order, and all of sudden we're calling four

2  experts that weren't there.

3       THE COURT:  That's fine.

4       MR. FINBERG:  Thank you, Your Honor.

5       MR. SPIVA:  One other question, Your Honor.  We only

6  had two other --

7       THE COURT:  Excuse me one second.

8       Dr. Minnite, you're excused until tomorrow morning at

9  9:00, okay?  So you're excused and free to go at this

10 point.

11      DR. MINNITE:  Thank you.

12      MR. SPIVA:  We only have two other affected voter

13 witnesses that we were planning to call tomorrow.  We

14 could try to call them off.

15      THE COURT:  Well, if they're going to testify to the

16 same thing that the other 13 now have testified to, I

17 think it's cumulative.  I don't think that an appellate

18 court in America that would disagree with me on that.

19 Don't you agree?

20      MR. SPIVA:  Well, I think there are some nuances,

21 Your Honor.  I guess I wanted to ask.  We're having to

22 take the Court's guidance on that, and we will try to get

23 them not to come if Your Honor would prefer.

24      THE COURT:  If you can abbreviate it only to the one

25 thing you want to get out, that is fine.  I want to let

1    you put your case on.  But I'm not going to sit here for

2    20 minutes for two people to plow the same ground that

3    I've heard 13 times.

4         MR. SPIVA:  Understood, Your Honor.  Thank you.

5         THE COURT:  All right?  Okay.

6         Anything else this evening?

7         MR. HEARNE:  We have nothing.

8         MR. KAUL:  Your Honor, this may just affect the way

9    we proceed tomorrow.  I believe we will finish with our

10   witnesses tomorrow, so I have sort of two questions we

11   should probably address briefly.

12        One is I suspect that having the weekend for us to

13   work out our objections with defense counsel before we

14   formally rest will save the Court a lot of work with us

15   working those out.  So we haven't discussed this with

16   defense counsel, but I'm guessing they will be okay with

17   it, too; would it be okay with the Court if we wait to

18   formally rest until we've dealt with those things and then

19   deal with that on Tuesday?

20        THE COURT:  I'll be willing to work with any

21   parameters that you-all set that's convenient.  I know

22   this is a challenging and complex case in some respects.

23   I'll work with you in any way what I can.

24        What I intend to do at the end of the case, so you

25   know right now, is I'm going to have in lieu of final

1   argument, you can have a final argument if you want, but I

2   think it's better use of your time and mine to let you

3   file posttrial memoranda that recites exactly what your

4   argument is, and precisely what evidence you, or the other

5   side, have presented that supports that.

6       I know you want an opinion in this case in a

7   reasonable amount of time.  That will save me a tremendous

8   amount of time, and allow me to focus exactly on what your

9   argument is, as well as the defense argument.

10      MR. KAUL:  That makes sense, Your Honor.  Thank you.

11      And the second related question was I know there are

12  a couple of witnesses the defendants are calling tomorrow

13  who are witnesses we had been considering calling as

14  adverse witnesses.  Our inclination would be to hopefully

15  do them all at once.  And so on our cross, potentially go

16  outside the scope just for ease of everyone's convenience,

17  but I -- and again, we haven't had a chance to talk to

18  defense counsel about that.  And I apologize for that.

19      But if they're okay with it, and the Court is, I just

20  wanted to raise that.

21      THE COURT:  Well, fine.  I'll be glad to consider

22  that.  You know from a legal perspective there is a

23  difference between a witness who is legally adverse and

24  one that is practically adverse?  The standard is legal

25  adversity.

1          MR. KAUL:  Yes, Your Honor.  I believe these are

2     State Board of Elections witnesses.

3          THE COURT:  All right.  They're public officials.  I

4     mean, I don't -- well, we'll deal with that at the time,

5     okay?

6          MR. KAUL:  I appreciate that, Your Honor.

7          THE COURT:  All right.

8          Anything further this evening?

9          MR. HEARNE:  Nothing further, Your Honor.

10          THE COURT:  All right.  I'll see you tomorrow morning

11     at 9:00.

12               (The proceeding concluded at 5:45 p.m.)

13                    REPORTER'S CERTIFICATE

14

15          I, Krista M. Liscio, OCR, RMR, Notary
        Public in and for the Commonwealth of Virginia at
        large, and whose commission expires March 31, 2016,
16     Notary Registration Number 149462, do hereby certify
        that the pages contained herein accurately reflect
17     the notes taken by me, to the best of my ability, in
        the above-styled action.
18          Given under my hand this 8th day of March, 2016.

19                    _____
                         Krista M. Liscio, RMR
20                       Official Court Reporter

21

22          THE FORGOING IS A TRUE AND CORRECT TRANSCRIPT

23               GILBERT FRANK HALASZ, RMR

24                 OFFICIAL COURT REPORTER

25