UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

BARBARA H. LEE, et al.                    }
                                          }
v.                                        }    Civil Action No.
                                          }    3:15 CV 357
VIRGINIA STATE BOARD OF ELECTIONS,        }
et al.                                    }

                                          February 25, 2016

**COMPLETE TRANSCRIPT OF BENCH TRIAL**
**BEFORE THE HONORABLE HENRY E. HUDSON**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

Bruce V. Spiva, Esquire
Joshua L. Kaul, Esquire
Aria C. Branch, Esquire
Ceridwen Cherry, Esquire
Amanda R. Callais, Esquire
PERKINS COIE, LLP
700 13th Street NW
Suite 600
Washington, DC  20005
      Counsel on behalf of Barbara Lee, Gonzalo Brescia,
      and the Democratic Party of Virginia

Mark F. (Thor) Hearne, II, Esquire
Dana J. Finberg, Esquire
Sara Schneider, Esquire
Kirsten Hart, Esquire
Stephen Davis, Esquire
ARENT FOX
55 2nd Street, 21st Floor
San Francisco, CA  94105
      Counsel on behalf of James B. Alcorn, Dr. Wheeler,
      Singleton McAllister, Virginia Department of
      Elections, and Edgardo Cortes

                KRISTA L. HARDING, RMR
               OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT

```
                    E X A M I N A T I O N S
```

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Minnite | --- | --- | 894 | --- |
| Myron Mcclees | 919 | 987 | 997 | --- |
| Matthew Davis | 999 | 1027 | 1049 | --- |
| Rebecca Slutzky | 1052 | 1062 | ---- | ---- |
| Dr. Lichtman | 1078 | | | |

```
 1              (The proceeding commenced at 8:51 a.m.)

 2          (Krista Harding is now the court reporter.)

 3      THE COURT:  Good morning.

 4      MR. SPIVA:  Good morning.

 5      MR. HEARNE:  Good morning.

 6      THE COURT:  We resume this morning with the redirect

 7  examination of Dr. Minnite.  Doctor, if you'd resume the

 8  seat on the witness stand, ma'am.

 9      One other bit of housekeeping.  I'm going to begin

10  tomorrow morning at 9:30 and recess at 4:00.  Over the

11  course of the week, a lot of things have been accumulating

12  in my in-box I've got to address before the end of the

13  week.  So I hope that doesn't inconvenience you-all too

14  much.

15      MR. KAUL:  We will appreciate the extra half hour of

16  sleep, Your Honor.

17      THE COURT:  I didn't think you-all would mind when I

18  thought of that.

19      MR. KAUL:  I think I speak for everybody on both

20  teams.

21      THE COURT:  Go right ahead with your examination of

22  the Doctor.

23      MR. KAUL:  Thank you, Your Honor.

24                     REDIRECT EXAMINATION

25  BY MR. KAUL:
```

1  Q    Dr. Minnite, I just want to briefly touch on two of

2  the topics that you and Mr. Hearne discussed a moment ago

3  -- a day ago.  Let me start with this one.

4       You were asked some questions about the form of ID

5  required for HAVA.  Do you recall that?

6  A    Yes.

7  Q    And I believe you were asked about whether if HAVA

8  were not in place, a person could go to the polls and

9  register without ever showing identification and vote

10 without showing identification.  Do you recall that

11 hypothetical?

12 A    Yes.

13 Q    Now, HAVA was in place prior to either of the voter

14 identification requirements being passed in Virginia, is

15 that right?

16 A    Yes.

17 Q    Okay.  So when HAVA was in place, was there a system

18 for identifying a registrant?  And this is before the

19 voter ID laws, I'm talking now.  Was there a system in

20 place for confirming the identity of a registrant, even if

21 the registrant didn't register in person?

22      THE COURT:  Are you talking about in Virginia or

23 nationwide?

24      MR. KAUL:  Virginia.

25      THE COURT:  Okay.

1   A    Yes.

2   Q    And can you just explain how that works?

3   A    Well, Virginia had an identification requirement --

4   are you talking about after they've registered or before

5   they've registered?

6   Q    I'm talking about sort of how it worked for HAVA

7   registrants before the voter ID laws were in place.

8   A    Okay.

9   Q    Let me back up a step.  My question wasn't clear.

10  A    No.

11  Q    So when people would register prior to the voter ID

12  law, they were either subject to the HAVA identification

13  requirements or not, right?

14  A    Right.  I mean, HAVA was passed in 2002.

15  Q    Yes.

16  A    And Virginia already had an identification law.  I

17  believe it was passed in 1996.

18  Q    Okay.

19  A    That was in place until 2012.  So, are you talking

20  about the period between 2002 and 2012?

21  Q    Yes.  I'm sorry.  That is what I was aiming for.

22  A    Okay.  So a person who registered to vote in Virginia

23  between 2002 and 2012 would supply their social security

24  number on the registration application.  And then going --

25  they would go to the polls, and they would be subjected to

1   the existing law that was in place from 1996, which

2   allowed them to show a voter registration card, a social

3   security card, a driver's license, a government-issued

4   identification, or they could, if they didn't have that,

5   they could attest to their identity.

6   Q    And what if a voter who registered did not provide

7   their social security number?

8   A    I'm not sure what -- I don't know that I remember

9   what the rules were for that.

10  Q    Were there certain voters who had to provide a form

11  of identification at the polls under HAVA?

12  A    Yes.

13  Q    And who were those voters?

14  A    Well, they would be the ones who were registering in

15  a jurisdiction and voting for the first time in that

16  jurisdiction if they had registered by mail.

17  Q    So anybody who was showing up at the polls who had

18  already registered by either providing their social

19  security number or providing an identity at the polls, or

20  having previously registered in Virginia?

21  A    Yes.

22  Q    And you were asked about some statements that Senator

23  Bond made regarding HAVA.  And you mentioned that you had

24  done a case study of that in your book?

25  A    Yes.

1  Q    What did you find in your in-depth study of that

2  situation that you were referring to yesterday?

3  A    Well, I guess, as I described yesterday, the passage

4  of the bill took a while.  And it had to go through the

5  House, had to go through the Senate.  There were hearings,

6  and so forth.  And it was when the conference committee

7  was put together, and Senator Bond was in that, was part

8  of that, that the identification requirement got put back

9  in.

10       So, in other words, once the conference version of

11  the bill came out, both the House and the Senate then have

12  to repass that bill, and it had the section -- again, I

13  think it was 301(b) in it, which is this HAVA requirement

14  that we've been discussing.

15       That wasn't in the bill when it went into conference.

16  When it came out of conference it was there.  And Senator

17  Bond was on the conference committee, and it was his

18  strong belief that it should be there.

19  Q    Okay.  So that wasn't something that was passed by an

20  amendment in either of the Houses?  It came out of

21  conference?

22  A    That's right.

23  Q    And then the full bill was passed?

24  A    Right.

25  Q    You were asked about some newspaper articles

REDIRECT-EXAMINATION OF DR. MINNITE          898

1  yesterday.  Do you recall that?

2  A    Yes.

3  Q    And some of them relate to St. Louis.  Do you recall

4  that?

5  A    Yes.

6  Q    Is that a topic that you, in the course of your

7  research, have studied in-depth?

8  A    Yes.

9  Q    And so the article that you were shown, at what stage

10 in the sort of process of those allegations did that

11 article come out, if you know?

12 A    It came out at the -- in a sense, at the beginning,

13 were there had been this incident of voter registration

14 applications that were collected by a voter registration

15 drive being kind of, you know, given to the Board of

16 Elections on the last day.  And I think there were

17 something like 1,200 or 1,500 of them that were submitted

18 by the group.  It was called Operation Big Vote.  It was

19 submitted by them on the last day.

20     And there was some flagrant fake registration cards

21 in there.  My recollection is that someone on the -- one

22 of the workers at the Board of Elections recognized, you

23 know, her dead mother.  And then there was the famous case

24 of the very well known alderman in St. Louis who had been

25 dead since 1990.  His name was on one of the applications.

1   So it was immediately recognized as problematic.  And

2   there was an investigation.

3       And I believe that article, I don't recall exactly

4   the date of the article, but it was talking about this

5   problem that had happened where there were these fake

6   cards that were submitted.

7   Q    So you said there was an investigation conducted?

8   A    This was a grand jury investigation into it.  The

9   woman who was the supervisor of the organization that

10  collected these registration applications actually was --

11  ended up being convicted of perjury to the grand jury

12  because she told the grand jury she didn't have any way of

13  keeping control of the people who were working for her, or

14  tracking the cards.  And she was bound to turn them in.

15      And I think there was testimony by somebody else who

16  contradicted that and said, no, there was a meeting.  They

17  had copies of the cards.  She could have figured it out.

18  She wasn't convicted of fraud.  She was convicted of

19  perjury.  And she had a suspended sentence for it.

20      I think there were five or six of the workers who

21  collected the cards who admitted that they put fake names

22  on them who were convicted as well.

23  Q    Okay.  So this is the case where there clearly was

24  prosecutorial interest in bringing charges, right?

25  A    Oh, yes.

1  Q     Was there any voter impersonation found in that

2  investigation?

3  A     Not to my recollection.  I mean, those people didn't

4  get registered.  I think they flagged, you know, like a

5  third of all the cards that had been turned in as just

6  flagrant -- you know, going through a phone book, and the

7  handwriting is all the same, and so forth.  So it was easy

8  to catch by the election workers.

9  Q     So this is something that election workers caught in

10 the ordinary course?

11 A     Yes.

12 Q     Was the -- well, what was the motive for the people

13 who filled out the false registration?

14     THE COURT:  How would she know what someone else is

15 thinking about?

16 BY MR. KAUL:

17 Q     Were there statements made about why the people who

18 filled out the registrations?

19 A     No.  I mean, what was reported was that this

20 organization wasn't affiliated with any candidate.  But

21 there was a sort of tense competition.  It was a

22 Democratic primary.  There was a competition between two

23 candidates, and I think somebody was trying to come back

24 into office and to challenge.

25     Even though that was going on, this wasn't an

1  operation related to those candidates, and therefore there

2  was even less of an incentive to make sure that what they

3  were doing was correct.  It was just one of the women who

4  was convicted of the fake cards was also convicted of

5  possession of crack cocaine.  So there were problems with

6  the people who were collecting the cards, and no showing

7  of like a conspiracy on the part of one of the candidates

8  to commit the fraud.

9  Q    Was there any indication that these were being filled

10  out so that individuals could go and vote in the names of

11  those registrations?

12  A    No.

13  Q    And is this something that you recall -- recount

14  in-depth in your book?

15  A    I don't actually talk about that story, but I was

16  tracking it.  You know, all my files on the case, I was

17  tracking that story because the conviction came a little

18  bit later.  This actually was -- that was the 2001 mayoral

19  primary that happens in the spring, and my case was on the

20  2000 presidential election in the previous November.  But

21  I was very aware of it.  I didn't quite remember it when

22  the article came on on my screen here.

23  Q    So is this something that was accounted for in your

24  overall findings and conclusions in the work you've done?

25  A    Yes.

```
 1  Q    Going back to the false voter registration issue.  In

 2  your, I guess, 15 years or so of study of this issue, are

 3  you aware of any case ever in which a registration was

 4  submitted in a fake name, and a voter then used that

 5  registration and cast a ballot?

 6  A    No.

 7       THE COURT:  I assume you're talking about whether or

 8  not that resulted in a charge or conviction?

 9       MR. KAUL:  I'm asking if she has any knowledge of any

10  context.

11       THE COURT:  All right.  That's fine.

12  A    No.

13  Q    You were asked about a news article from Milwaukee.

14  Do you recall that?

15  A    Vaguely.

16  Q    Let me just ask you briefly about Milwaukee.  Is that

17  another issue that you studied in-depth?

18  A    Yes.

19  Q    And I think you said on cross-examination that you

20  actually talked to the U.S. Attorney?

21  A    Yes.  I interviewed the U.S. Attorney.

22  Q    And this was during the Bush Administration when

23  there was an emphasis on prosecuting fraud cases?

24  A    That's correct.

25  Q    Did -- and can you explain sort of what was going on
```

1  with that, the investigation in Milwaukee, at that time?

2  A    Well, as I was talking about yesterday, the Milwaukee

3  Journal Sentinel really focused like a laser on the

4  problems in Milwaukee.  There were problems both in 2000,

5  and then in 2004.  And the county DA wanted to try to

6  prevent some of the problems they had in 2000, so he

7  approached the U.S. Attorney, the police department in

8  Milwaukee, and they said, well, let's put a task force

9  together to monitor, be aware of, what's going on.

10      And after the 2004 election, they followed up on a

11  lot of the irregularities that had been uncovered and

12  reported on by the Milwaukee Journal Sentinel.  Some of

13  them were things I've mentioned, like the newspaper got a

14  hold of the poll log books, and they looked at the number

15  of people who were signing in, and they looked at the

16  number of ballots.  And there were cases where they didn't

17  match.  There were same-day registration applications

18  where the required follow-up hadn't been done.  And there

19  was a kind of, you know, massive dysfunction in the

20  Milwaukee Board of Elections.

21      And when I interviewed the U.S. Attorney, he had

22  brought more cases in a single place than almost anybody

23  else as a U.S. Attorney.  He focused on trying to

24  prosecute voter fraud.  And I said, well -- I think he had

25  charged 14 people.  There were 10 who were charged because

1  they had felony convictions, and there were four who were

2  charged as double voters.  But he didn't have a very high

3  conviction rate.  I don't recall exactly, but there were,

4  you know, maybe half of them were -- either pled guilty or

5  were convicted.

6       I told him that I had talked to defense lawyers in

7  Milwaukee who all said to me *"We've never seen the federal*

8  *government do something like this before."*  All of these

9  people are indigent.  All but one was African-American.

10  They had never seen the federal government go after people

11  for this charge.  You know, bringing the full weight of

12  the federal government against these people.  What's going

13  on?

14       So I said to him, *"This is what they say to me."*

15       *"What do you say to that?"*

16       He said, *"We didn't"* -- and he said this publically

17  as well.  *"We didn't find any conspiracy to try to*

18  *manipulate the election.  In the end, we didn't even*

19  *finish our report, our task force report, because there*

20  *were some problems, administrative problems.  We could not*

21  *prove that people did this deliberately.  There were*

22  *better explanations for those irregularities."*

23       So that was the outcome.  And the report that a lot

24  of people cite, which was the preliminary findings, which

25  was actually leaked many years -- several years after the

1   fact, that was something that the -- when it was leaked by

2   somebody who worked on it, that was when the police chief

3   came out and he was very unhappy that it had been leaked.

4          There was no final report.  I kept following up.  I

5   had interviewed the director -- the Executive Director of

6   the Election Board.  And I kept following up with her.

7   When are they going to come out with their final report?

8          And there was no final report because there was

9   nothing -- they sort of abandoned it, I would say, from my

10  point of view.  They abandoned it because they just

11  decided that the real problems were with the election

12  administration, and not a problem with criminality and

13  fraud.

14  Q    And just to sort of summarize, this was an intensive

15  investigation into fraud in Milwaukee?

16  A    Yes.

17  Q    And how many cases of voter impersonation were

18  charged?

19  A    None.

20  Q    All right.  Was that case study accounted for in the

21  work that you've done over the years?

22  A    Yes.

23  Q    And then I want to ask you about the last point that

24  he asked about, which is in Washington, in the State of

25  Washington, during the year where there was a recount.  Do

1  you recall that?

2  A     Yes.

3  Q     And just briefly, you probably learned a lot about

4  recounts in examining this, right?

5  A     Yes.

6  Q     And in recounts, literally, the lawyers go ballot by

7  ballot arguing about circumstances they can use to kick a

8  ballot out and put a ballot in, is that right?

9  A     Yes.  When I interviewed lawyers who worked on that

10 case -- I didn't actually see this.  But they told me they

11 had an entire room full of boxes of materials that had

12 been collected as part of that litigation that involved,

13 you know, copies of records and depositions of everybody

14 involved, and lots of documentation.

15      And I think at that time that was considered one of

16 the most documented elections in the history of the United

17 States until we get to the Minnesota Senate race with Al

18 Franken.  And that was an extremely close race as well.

19 And a recount was involved.  And that one may end up being

20 more documented than the one in Washington.  But it was

21 intensively documented for the litigation.

22 Q     Having seen that documentation, was there widespread

23 voter impersonation fraud in that case?

24 A     No.  What there was, if I may?

25 Q     Please.

1  A    I believe that the article referred to King County.

2  And the District Attorney in King County charged eight

3  people with having submitted absentee ballots for other

4  people, but seven of them were people who had spouses who

5  died just before the election, and they were still

6  charged.  They didn't receive prison sentences.  But two

7  of them -- I recall the comments from two of them where

8  they were elderly people.  The ballot had arrived in the

9  mail because everybody votes by mail.  They didn't know

10 what to do with the ballot.  One said she just signed the

11 name and sent it back in.  That was in King County.

12     So I don't count that as voter impersonation.  I

13 counted it as fraud because you're not supposed to do

14 that.  And I think somebody should know that in that

15 instance.  They said they did.  But one man apologized.

16 He said, you know, in my grief, I didn't know what to do

17 and I just signed it and sent it back in.

18 Q    So in that case, what fraud there was was absentee

19 voting?

20 A    Yes.

21 Q    And it was seven out of eight times a person whose

22 spouse had died and they cast the ballot?

23 A    Yes.

24 Q    So I think Mr. Hearne asked you about news articles

25 popping up around every election about allegations of

1  fraud.  Is that consistent with the observations you've

2  made?

3  A    Yes.

4  Q    Okay.  And a lot of what your work has been doing

5  over the last year is chasing those down, is that right?

6  A    Absolutely.  Yes.

7  Q    And have you observed a pattern in doing that?

8  A    Well, the pattern has been, at least over the last 10

9  or 15 years, that the fraud arguments rise to the level

10  of, you know, media coverage well before an election.  And

11  the allegations are thrown around, and then when you --

12  you both have to follow what happens if there are

13  legitimate concerns, but also, you know, they become part

14  of the campaign, I would say.

15  Q    What do you mean by that?

16  A    Well, we're seeing it a little bit in the

17  presidential primary contest right now with charges being

18  thrown by one candidate against another about fraud on

19  both sides.  And, you know, when you -- you have to look

20  at them.  You have to try to figure out what's going on.

21  And in most cases in terms of the pattern, they boil down

22  to something other than fraud.

23  Q    And have you made observations about claims of fraud

24  being used as a political tactic?

25  A    Yes.

REDIRECT-EXAMINATION OF DR. MINNITE

1  Q     Have you observed groups that popped up, made

2  allegations of fraud, and then disappeared?

3  A     Yes.

4  Q     Now, when you were cross-examined, I don't believe

5  you were shown any scholarly articles, but you have

6  reviewed the scholarship on voter fraud, right?

7  A     Yes.

8  Q     In the cases that you were describing before, defense

9  experts have testified about their research regarding

10  voter fraud, right?

11  A     Which defense experts?

12  Q     Let me ask about Dr. Hood.  Do you recall him

13  testifying about work he's done?

14  A     In other cases?

15  Q     Yes.

16  A     Yes.

17  Q     And he's testified on the opposite side of cases from

18  you, is that right?

19  A     Well, I haven't actually observed his testimony, but

20  I've read his expert reports.

21  Q     And he's done scholarly work on fraud, right?

22  A     He did do one early article.  Right.

23  Q     What did he find?

24  A     He found no fraud.

25  Q     And going back to this point about fraud being a

1   tactic.   Do you recall being asked some questions about a

2   video of James Moran?

3   A     Patrick Moran?

4   Q     Thank you.   Do you recall being asked some questions

5   about that?

6   A     A few questions.

7   Q     And was that a -- was that a -- well, that was a

8   sting video, right?

9   A     That's how I would see it.

10  Q     So, it was essentially manufactured evidence of

11  fraud?

12  A     Well, yeah.   Well, manufactured in trying to trap

13  somebody into doing something stupid, which I think that

14  fellow admitted later he did.

15  Q     Briefly, you were asked about tax fraud cases before?

16  A     Yes.

17  Q     Was that a priority subject matter for the Bush

18  administration prosecuting, do you know?

19  A     I don't know.   It didn't rise to the level of Number

20  1 or Number 2 according to Mr. Donsanto, who was the

21  election crimes branch director.

22  Q     But election fraud was Number 2?

23  A     That's what he said.

24  Q     All right.   I want to ask you about two documents you

25  were questioned on.   The first is DX 397, which is your

REDIRECT-EXAMINATION OF DR. MINNITE      911

1  article about modeling problems.

2      THE COURT:  Is that the defenses' exhibit or the

3  plaintiffs' exhibit?

4      MR. KAUL:  I'm sorry.  Defendants' Exhibit 397.

5      And I'm going to ask Ms. Schultz to bring it up just

6  to refresh her memory about what the conclusion says.  And

7  I apologize, I don't have the page number, but it's the

8  very end of the article.

9  BY MR. KAUL:

10  Q    Now, you were asked -- and I'm not going to use it

11  quite yet.  But you were asked about a couple of

12  paragraphs in this conclusion, is that right?

13  A    Yes.

14  Q    Now, I'm going to ask Ms. Schultz to pull up the

15  third paragraph now.  And in your article, did you, after

16  discussing problems with statistical analysis at the time

17  of modeling turnout, did you discuss a promising

18  alternative to determining whether voter ID laws impose a

19  disproportionate impact on minority voters?

20  A    Yes.

21  Q    And what was that?

22  A    Well, we said he didn't think the science was up to

23  the task.  We didn't think that the data or the

24  statistical methods we had for analyzing it would allow us

25  enough precision to measure something like a 1 or a 2 or

1   even a 3% suppressive effect on turnout.  So if voter ID

2   laws in the aggregate had only say like 1 or 2%

3   suppressive effect, that is, you could isolate that voter

4   ID law as the single causal effect of something like 1 or

5   2% on turnout, we would not be able to measure it

6   effectively - this was at the time - because we didn't

7   think the data that has been developed and the tools give

8   us that level of precision.

9        What I'm saying is that suppressive effect could be

10  within the bands of kind of an error rate.  And you

11  wouldn't know are you looking at an actual causal effect,

12  or are you seeing an effect, but it's caused by other

13  random problems -- or random noise in the data.  So we

14  said given that, why don't you just ask how many people

15  don't have the ID.  That should help give you a sense of

16  what the problems could be better than arguing at this

17  point about turnout because we've only had a couple of

18  states really put these restrictive laws in.  We don't

19  have, you know, a big enough sample in that regard.  And

20  we don't have enough time to see because turnout is such a

21  complex phenomenon, and many things impact it.  We need a

22  longer range of time to see if we can tease out the

23  effects of any single law.

24       It becomes very complicated because both -- because

25  there are many factors involved in turnout.  But also

1  because, as we see now, the states, actually when they are

2  adopting these laws, I don't know if any two states are

3  exactly the same.  You have to look at what are the

4  exceptions, you know, what do you do if you don't have it.

5  All these things factor into the comprehensive impact of

6  the law on turnout, and it becomes very complicated to

7  model it.

8      And we said it's reasonable to ask how many people

9  actually have this ID at this point, and worry about that.

10 It was easier to do that kind of analysis then to put a

11 lot of weight on the statistical analysis that was getting

12 you into the debate of is it suppressing turnout or not.

13 Q    Did you review Dr. Rodden's expert report in this

14 case?

15 A    I did not.

16 Q    Now, you refer to at the time of the article, has the

17 state of the data available to analyze voter

18 identification laws changed since this article came out in

19 2009?

20 A    Well, only to the extent that we now have, you know,

21 five, six, seven, eight more years of experience that

22 people have been using the data set that Professor Richman

23 relied on, the Cooperative Congressional Election Study,

24 and adding that to the mix.  Although, I don't know that

25 I've seen any studies using that to measure the impact of

1  photo ID laws.

2      But the main thing that's happened is the passage of

3  time, which gives us more leverage on it.  And so I have

4  been seeing just recently some more studies that are kind

5  of beginning to build a picture of what's going on.

6  Q    And have more states also adopted voter

7  identification laws since the time of this article?

8  A    Yes.

9  Q    Does that also give you more statistical leverage?

10  A    Yes.

11  Q    And you mentioned some recent studies.  Are you

12  familiar with the recent study conducted by the GAO?

13  A    Yes.

14  Q    I'm not going to ask you about the details of that

15  because it will come up elsewhere, but how is the GAO

16  regarded in terms of the quality of its studies within the

17  profession?

18  A    I think it's generally -- I say the term *"gold*

19  *standard"* in terms of professionalism and the quality of

20  the statistical research that they do.

21  Q    And then last I want to ask you a couple of questions

22  about the Carter-Baker report, which is Defendants'

23  Exhibit 328.  And I'm going to bring up a couple of pages

24  to refresh your recollection with respect to some

25  questions you were asked about before.

```
 1          MR. KAUL:  Let's pull up Exhibit Page 27.

 2          THE COURT:  Page 27 of your Exhibit 328, correct?

 3          MR. KAUL:  That's right.  It's a defense exhibit.

 4          THE COURT:  Defense Exhibit.  Thank you.

 5          MR. KAUL:  And an actually, I guess it's 326 and 327.

 6  BY MR. KAUL:

 7  Q    The bottom paragraph on Page 26, do you recall being

 8  asked about that?  And it continues on to 27.

 9  A    Yes.

10  Q    Am I right that you were asked about the portion that

11  leaves off there?

12  A    Are you pointing up or down?

13  Q    The portion you were asked about left off at the word

14  "Confidence"?

15  A    I don't actually recall.

16  Q    Fair enough.  But the last sentence in that paragraph

17  stated, "We viewed the other concerns about IDs that they

18  could disenfranchise eligible voters" and I think there's

19  a word there, "have an adverse effect on minorites, or be

20  used to monitor behavior as serious and legitimate, and

21  our proposal below aims to address each concern."

22          Is that what the report stated to the best of your

23  recollection?

24  A    Yes.

25  Q    And you talked earlier about what the Carter-Baker
```

1  report had proposed with respect to aggressively reaching

2  out to registered voters and get them IDs, right?

3  A     That's correct.

4  Q     And let me also ask you about Page 29 in this report.

5  And these were some of the recommendations on voter

6  identification, is that right?

7  A     Yes.

8  Q     And I believe you were asked about the first three of

9  these.  Does that look right?

10  A     Let's see.

11  Q     Let's look at all five of them.

12  A     Yes.

13  Q     Now, point Number 5 there was another recommendation

14  there, right, or 2.5.5, I guess it is?

15  A     Yes.

16  Q     And this indicates that "*In the event there's a*

17  *national identification card mandated, it should include*

18  *information related to voting and be connected to voter*

19  *registration.*"  Is that right?

20  A     That's correct.

21  Q     Now, I think you were asked about whether Virginia

22  had made it easier to register on cross-examination by

23  adopting on-line registration?

24  A     Yes.

25  Q     Do you know what percentage of individuals who lack

1  DMV identification are on-line, or how that compares to

2  the population at large?

3          THE COURT:  At what point in time?

4          MR. KAUL:  Currently.

5          THE COURT:  Okay.

6  A    Not offhand.

7  Q    Is it your understanding that a number of voters lack

8  access to the Internet?

9  A    People do.  Yes.

10         MR. KAUL:  I have no further questions.

11         THE COURT:  All right.

12         May the doctor be excused at this point?

13         MR. HEARNE:  Yes, Your Honor.

14         THE COURT:  All right.  Doctor, thank you.  You're

15  excused.  Thank you very much for your time in the case.

16                    **WITNESS STOOD ASIDE**

17         MR. FINBERG:  Your Honor, at this time, by agreement

18  with the plaintiffs, and we've talked to the Court about

19  this, we're going to call two witnesses on behalf of the

20  defendants out of order due to their obligations next week

21  with the primary.

22         THE COURT:  That's fine.  As I mentioned to

23  yesterday, I'll give you-all as much latitude as possible.

24         MR. FINBERG:  Thank you, Your Honor.

25         The first witness is going to be Myron Mcclees.

```
 1        THE COURT:  Could you spell that last name for me,
 2  please.
 3        MR. FINBERG:  M-C-C-L-E-E-S-E.
 4        THE COURT:  All right.  Very well.
 5        MR. FINBERG:  No E at the end, Your Honor.
 6        We'll get him to spell his name on the record once
 7  he's on the stand.
 8        THE COURT:  Okay.  I'm counting on you.
 9        MR. FINBERG:  And, Your Honor, we've prepared binders
10  of the exhibits we intend to use with our witnesses so
11  that they're not fishing through the various volumes
12  there.  So if it's all right with the Court, we'd like to
13  give a copy to plaintiffs' counsel, put a copy on the
14  stand, and we will provide a copy as well to the Court.
15        THE COURT:  That will be fine.
16        Sir, if you would please raise your right hand, left
17  hand on the Bible, and face the Clerk of the Court.
18        THE CLERK:  You do solemnly swear that the testimony
19  which you are about to give, in this case, before this
20  Court, shall be the truth, the whole truth, and nothing
21  but the truth, so help you God?
22        MR. MCCLEES:  I do.
23        THE COURT:  Have a seat on the witness stand.
24        MR. FINBERG:  Your Honor, may I approach the witness
25  stand to put the binder on there, please.
```

1      THE COURT:  Yes, sir.

2      Mr. Mcclees, if you would be kind enough to put your

3   full name on the record, and spell your first and last

4   name so my court reporter can make sure we have it

5   correct?

6      MR. MCCLEES:  Yes, Your Honor.

7      THE COURT:  Go right ahead.

8      MR. MCCLEES:  Myron Demarcus Mcclees.  Myron,

9   M-Y-R-O-N.  Demarcus, D-E-M-A-R-C-U-S.  Mcclees,

10  M-C-C-L-E-E-S.

11     THE COURT:  All right.  Very well.

12     All right, Ms. Hart, go right ahead.

13     MS. HART:  Thank you, Your Honor.

14         Whereupon, **Myron Mcclees**, having been

15  duly sworn in, testifies as follows:

16                    **DIRECT EXAMINATION**

17  BY MS. HART:

18  Q    Good morning, Mr. Mcclees.

19  A    Good morning.

20  Q    Could you please describe your education background,

21  starting after high school.

22  A    Certainly.  I went to Virginia Tech for undergrad.

23  From there, I got a bachelor of science in psychology and

24  a bachelor of arts in art history --

25     COURT REPORTER:  Your Honor, I --

1       THE COURT:  Mr. Mcclees, you need to speak slowly so

2  this young lady can take it down, okay.

3       MR. MCCLEES:  My apologies, Your Honor.

4  A    So a bachelor of arts in art history, with a

5  concentration in classical studies, and a bachelor of

6  science in psychology.  After that, I went to the William

7  & Mary School of Law, class of 2010.

8  Q    Where are you currently employed?

9  A    I'm currently employed with the Department of

10 Elections, which was previously part of the State Board of

11 Elections.

12 Q    How long have you worked there?

13 A    I have worked there for -- it will be five years this

14 coming May.

15 Q    And what is your current job title?

16 A    I am a policy analyst.

17 Q    Is that the job that you held the entire time that

18 you've been there?

19 A    Yes, it is.

20 Q    As a policy analyst for the Department of Elections,

21 do you typically have a role in pending or enacted

22 legislation?

23 A    Yes, I do.

24 Q    What is your role?

25 A    I draft -- sometimes I draft actual legislation where

1  the genesis of it is the agency.  So we have our agency

2  bills, as well as I review various election-related bills

3  that are introduced by the actual legislators themselves.

4  We have three policy analysts, and so if it falls into my

5  subject area then I would draft a legislative active

6  summary on that legislation.

7  Q      What is your subject matter area?

8  A      My subject matter area is election day procedures,

9  recounts, contests of elections.  Things of that nature.

10  Q      Are you familiar with SB1256?

11  A      Yes, ma'am, I am.

12  Q      Could you describe briefly your general understanding

13  of SB1256?

14  A      Certainly.  SB1256 changed the identification

15  standards for the Commonwealth of Virginia requiring

16  different IDs, and all the IDs have photographs upon them.

17  So, for instance, a social security card, which was

18  previously acceptable, was no longer acceptable due to the

19  lack of photo upon it, as well as the concealed handgun

20  permit was removed.  But there were others that were added

21  on that also had photos.

22  Q      How did you first hear about SB1256?

23  A      I believe it was first referred to me by my immediate

24  supervisor, Susan Lee.  She stated to me that there was

25  another photo ID bill that was coming down the pike, and

DIRECT EXAMINATION OF MYRON MCCLEES          922

1   so that's where I first heard about it.

2   Q    So did SB1256 fall into your subject matter

3   expertise?

4   A    Yes, ma'am, it did.

5   Q    So once you received SB1256, what did you do with it?

6   What was your first step in the process?

7   A    Certainly.  The first step of the process, I looked

8   at the summary of the bill to get a general idea of what

9   the bill is going to try to accomplish.  And then I look

10  at the specific wording of the bill.  From there, I would

11  draft an LAS.

12  Q    What is an LAS?

13  A    Certainly.  An LAS is a Legislative Action Summary.

14  First things it asked for is the affected constituents of

15  the bill.  So I would look at how does it affect voters.

16  How does it affect different members of the election

17  community.  How does it affect us as an agency.  So that's

18  the first section of a Legislative Action Summary.

19       The second section is recommendations.  So on that

20  area, I would cover things saying whether it was related

21  to another bill, you know, was it completely synonomous

22  with another bill that was introduced.  Generally, how it

23  would affect Virginia.  How would it change all of our

24  procedures.  Does it even do what the sponsor thinks it

25  does.  Sometimes they don't.

1    So I give all of those recommendations in a second

2 section.

3 Q    So did you draft a Legislative Action Summary

4 regarding SB1256?

5 A    Yes, ma'am, I did.

6 Q    And did the agency provide that Legislative Action

7 Summary to the governor's office?

8 A    Yes, ma'am, it did.  It goes through a couple of

9 procedures internally before it gets all the way out of

10 the agency.

11 Q    And did the agency take a position on SB1256?

12 A    No, ma'am.  That one was a no position.

13 Q    Did you personally attend committee hearings at which

14 SB1256 was debated?

15 A    Yes, ma'am, I did.

16 Q    Which committees?

17 A    That would be the subcommittee for Privileges and

18 Elections in the Senate, as well as the full committee of

19 the Privileges and Elections Committee in the Senate.

20 Q    In your role as a policy analyst, is that something

21 you typically do, attend committee hearings?

22 A    Yes, ma'am, it is.

23 Q    What is your role at those committee hearings?

24 A    My role at the committee hearings, it can be two

25 things.  First of all, it can be if the sponsor of the

DIRECT EXAMINATION OF MYRON MCCLEES

1  bill needs specific information, that's normally an agency

2  sponsored legislation.  If they don't know the technical

3  aspect of something, sometimes I give input there.

4      And then also just to hear exactly what is occurring,

5  the debate on the bills, so that way I know -- first, it

6  helps me know exactly what the sponsor intends for the

7  bill to do, as well as it lets me know of other concerns

8  that I can take into account when giving further input on

9  the bill in a enrolled bill review, or when implementing

10 the bill itself.

11 Q    So what was your role when you attended the committee

12 hearings specific to SB1256?

13 A    Specific to SB1256, I wanted to see its progression

14 to find out what the arguments were for and against.  What

15 were they attempting to accomplish.  How I could go about

16 implementing it.  So just to get input to help me do a

17 better job if it were to make it all the way through.

18 Q    In the committee hearings that you attended, did

19 anyone speak out in favor of the bill?

20 A    Yes.

21 Q    What were the general arguments in favor of the bill?

22 A    The general arguments in favor of the bill were they

23 were going to help reduce voter fraud.  That was -- that

24 was the main thing is just to avoid voter fraud, that I

25 can remember specifically.

1  Q     So you drafted the legislative action summary, you

2  attended the hearings, at what point does SB1256 come back

3  inside the agency?

4  A     Certainly.  After it passes both Houses, we're asked

5  to create a enrolled bill review.  So after -- what we do

6  at that point in time is we kind of do another LAS.  But

7  it takes into account we change the habit along the way

8  during the process.  So if this is amended in any way, we

9  take that into account.

10       Also, sometimes arguments come up in the middle of

11 committee meetings where things that I didn't anticipate,

12 or I didn't look at from the specific wording of the bill,

13 then I can put those into my analysis as well.

14 Q     Does the agency also draft regulations with respect

15 to bills that come back to it?

16 A     The point of drafting regulations would be after the

17 bill fully passes and is signed by the governor.

18 Sometimes they're vetoed, and to draft an entire

19 regulation and go through the regulatory process would be,

20 you know, utterly superfluous is we were to -- if it were

21 to be killed along the process.  So we won't get involved

22 in that portion of it until after it's fully signed and we

23 know it's going to become law.

24 Q     Is part of your role as a policy analyst to draft

25 regulations?

1  A    Yes, ma'am, it is.

2  Q    Did you end up drafting any regulations regarding

3  SB1256?

4  A    Yes, ma'am, I did.  There was one that I drafted from

5  scratch.  It was 1 VAC 20-40-90, as well as I amended the

6  definition section in 1 VAC 20-40-10.

7  Q    All right.  Talk to me about 20-40-90.  What did you

8  draft there?

9  A    20-40-90 states exactly what a person needs to do in

10  order to obtain a free ID from our office.  So that was

11  basically stating that they need to fill out an

12  application, they need to a provide a signature.  I think

13  all the steps that are necessary there in order to -- for

14  a person to get an ID are contained in 20-40-90.

15  Q    Is that the regulation that you drafted first, and

16  the bill came back after it was passed?

17  A    Yes, ma'am.

18  Q    All right.  And then you mentioned 20-40-10.  What is

19  that?

20  A    20-40-10 is the definition section.  And in there, I

21  included a definition of what is a valid ID.  So, in

22  20-40-90, it states that a person without a valid ID can

23  get a free ID from us.  We needed to find exactly what is

24  considered a valid ID, and so what's what I was putting

25  into -- one of the things I specifically remember putting

1   in 20-40-10.

2   Q     When you began drafting the definition of *valid,*

3   where did you start?

4   A     I started with our definition that we previously

5   relied upon.  So in the *What-If* document, it had

6   "What-If" -- you know, what IDs would be acceptable at

7   that point in time.  So I started there and I worked out

8   from there.

9        So I think that at that point in time, the definition

10  of valid said that -- you know, valid and current said

11  that it was either unexpired or expired within 30 days

12  previously, so I worked from there and moved forward.

13       THE COURT:  Did you come up with the expiration date

14  restriction, or was that in the bill?

15       MR. MCCLEES:  No, Your Honor, that was -- I came --

16  we already had determined that it preexisted the passage

17  of this, Your Honor.  And then after -- but it wasn't

18  based on a specific statute.

19       THE COURT:  So the restriction on expired

20  identification, was that by regulation or by statute?

21       MR. MCCLEES:  That was by regulation, Your Honor.

22       THE COURT:  Regulation issued by your office, right?

23       MR. MCCLEES:  Yes, Your Honor.

24       THE COURT:  All right.

25       Go right ahead, Ms. Hart.

1       MS. HART:  Thank you, Your Honor.

2       MR. MCCLEES:  If I can just address something else

3  for Your Honor?

4       THE COURT:  All right.  Go ahead, sir.

5       MR. MCCLEES:  Certainly.  I just wanted to state that

6  the 30 days was not based on a regulation.  The one that

7  preexisted the drafting of -- my drafting of 20-40-10, it

8  was just in guidance documents.  It was not a regulatory

9  standard, the 30 days, Your Honor.

10      THE COURT:  So what expiration date did you-all

11  publish by regulation?

12      MR. MCCLEES:  By regulation, the first one that we

13  published with the no expiration date -- the expiration

14  date was inconsequential was the very first regulation

15  that I passed in 20-40-10.  We just had a general standard

16  of 30 days, but it was not based on regulation before

17  that.

18  BY MS. HART:

19  Q    Why don't you walk us through the process.  You had

20  the 30-day guidance.  You ultimately recommend something

21  to the Board.  Walk us through the process.

22  A    Certainly.  So in the first version I brought before

23  the Board, I had a definition of valid.  It had other

24  things within it.

25  Q    And if I may interrupt you.  Just for now, specific

1  to the expiration date, what were your recommendations,

2  what did the Board --

3  A    Certainly.  I had no recommendations in my very first

4  version I brought before the Board for consideration.

5  With a regulatory process, you bring forward a regulation,

6  it's reviewed, then the Board can vote to put it up for

7  public comment.

8      After a public comment period, then the Board can

9  fully adopt the regulation at that point in time.  So the

10  very first time I brought it up, I believe it was in

11  February of 2014.  I brought a regulation -- it did not

12  state anything specific to expiration dates.  At that

13  point in time, the vice chair during the hearings asked me

14  about --

15      THE COURT:  Your suggested regulation did not have an

16  expiration date, right?  It was "inconsequential," as you

17  called it?

18      MR. MCCLEES:  Yes, sir.  Well, I -- okay.  What

19  happened was that the -- I was not addressing expiration

20  within the first version I brought; however, during the

21  hearing, it was -- I was specifically asked how do we

22  handle expired IDs.  It was there that I had informed the

23  Board on what our current standard was, which was that we

24  have guidance documents saying that if they're expired for

25  30 days, or less, then they'll be acceptable.

1      It was at that time that the Board -- or two members

2  of the Board stated that they did not like that standard,

3  and they wished for me to address that standard in the

4  final version of the regulation that I was to bring to

5  them.

6          THE COURT:  So as a result of that Board meeting, no

7  resolution of that issue occurred, is that right?

8          MR. MCCLEES:  That is correct, Your Honor.

9          THE COURT:  They asked you to study it?

10          MR. MCCLEES:  They wanted me to put it for public

11  comment.

12          THE COURT:  Okay.

13          MR. MCCLEES:  Yes, Your Honor.

14          THE COURT:  Take it from there.  What happened?

15          MR. MCCLEES:  Yes, Your Honor.

16  A    So at that point in time, I drafted the regulation

17  fully for 20-40-10.  It did not specifically state

18  expiration upon it because both the chair and the

19  vice-chair stated that they did not want an expiration

20  date to affect the acceptability of the document for

21  identification purposes.  So I drafted the regulation

22  saying that here are the criteria to be taken into account

23  for whether a ID is valid, and it did not have expiration

24  within it.

25          So, by omission --

1    COURT REPORTER:  Sir, can you please slow down.

2    MR. MCCLEES:  I apologize, ma'am.

3    COURT REPORTER:  I appreciate it.  Thank you.

4  A    So, by omission, the fact that I stated these are the

5  criteria that can be considered when considering whether

6  an ID is valid, then all IDs that are expired would be

7  allowed.  When I brought this before the Board, the Board

8  stated they wanted a specific statement within the

9  regulation that stated that unexpired IDs were acceptable.

10 And when I said "*the Board,*" I mean the chair and the

11 vice-chair.

12    So from there, I -- during the meeting, they -- I

13 went upstairs.  This meeting was held in the basement of

14 our building.  I went upstairs, put together a sentence,

15 brought it back down, passed out copies of my proposed

16 language, and the Board adopted that into 20-40-10 for

17 their final version.

18    THE COURT:  And just to clarify, that amended

19 language indicated that there was no expiration date

20 requirement on the ID for it to be valid, is that correct?

21    MR. MCCLEES:  Yes, Your Honor.

22    THE COURT:  Okay.

23    Ms. Hart, go ahead.

24 BY MS. HART:

25 Q    In the currently operable language of the

1  regulations, is there an expiration date?

2  A    Yes, ma'am.

3  Q    What is the regulation on that?

4  A    The regulation now currently states that it's -- an

5  ID is valid if it is unexpired or expired for 12 months or

6  less.

7  Q    How did it get from a 30-day expiration date, to no

8  expiration date, to 12 months?

9  A    Sure.  The original version that passed, I want to

10  say it was June of 2014, had the language that I was

11  speaking about stating that the expiration date was

12  inconsequential.  I left on vacation.  I came back from

13  vacation, and I heard that there was concern about this in

14  that the Board opened it up for public comment again, and

15  they wished to put a time period on when ID -- expired is

16  to be acceptable.

17  Q    So the public comment is what initiated the 12-month

18  expiration date -- expiration limitation?

19  A    I would state there were other pressures that were

20  put upon -- there were -- it was the genesis was the

21  Board.  I think the chairman changed his mind on the idea,

22  and that is what promoted the public comment.  It wasn't

23  just public comment came out of nowhere.  It was the Board

24  wanted to put it up for public comment because they wished

25  to make a change.  And then after that there was a public

1  comment period, a full public comment period, we received

2  more public comment than I had ever seen on any regulation

3  at that point in time.

4      THE COURT:  Explaining to me how you conduct the

5  public comment.  What is the vehicle you use, and how many

6  responses did you get in this case, if you know?

7      MR. MCCLEES:  Yes, Your Honor.  What we do is we take

8  the regulation, we put it up on Virginia Town Hall.  It's

9  a Website that all Virginia agencies use when putting

10  forward proposed regulations, Your Honor.

11      THE COURT:  And that allowed viewers to respond, I

12  assume?

13      MR. MCCLEES:  Yes, Your Honor, it does.

14      THE COURT:  Okay.

15      MR. MCCLEES:  And I believe we received over 500

16  comments on that one.  And just to give Your Honor an

17  idea, on most regulations, I might get 12 comments.

18  Somewhere in there.  Less than 20, certainly.  And so this

19  was certainly way more than I was accustomed to.

20      THE COURT:  Go right ahead, Ms. Hart.

21  BY MS. HART:

22  Q    And in your practices and procedures, do you provide

23  those public comments to the Board for their review?

24  A    Yes, ma'am, I do.

25  Q    So ultimately the Board passed a 12-month expiration

```
 1  limit?

 2  A     Yes, ma'am.  It did.

 3  Q     Would it be fair to characterize that as a

 4  compromised position?

 5  A     Yes.  There was a -- there were people asking for no

 6  expired IDs within some of the comments.  There were

 7  people asking for absolutely unexpired IDs, which is the

 8  version that they had previously adopted.  So, to say, you

 9  know, certainly one year falls between nothing and

10  something.  So, certainly.

11  Q     Fair enough.  So after SB1256, you drafted the

12  regulations, the regulations were adopted, were you

13  involved in any outreach efforts to educate the community

14  on the new law and the regulations that implemented it?

15  A     Yes, I was to an extent.  Certainly.

16  Q     Were you specifically involved in any outreach

17  efforts to the African-American community regarding

18  SB1256?

19  A     Yes.

20  Q     Could you describe those efforts?

21  A     Certainly.  I met with the NAACP in Hanover County at

22  one point in time.

23        THE COURT:  What county?

24        MR. MCCLEES:  Hanover County.

25        THE COURT:  Hanover County.
```

1    A    I also met with -- let's see.  There was a letter

2    that went out to the clergy.  To the members of the black

3    clergy.  A lot of them were in highly populated areas -

4    Tidewater, Richmond.  So I sent out a letter to them,

5    along with a flier, I believe, that explained the voter ID

6    standard.

7    Q    Let's start with your presentation to the NAACP.  How

8    was it that you came to speak in front of the NAACP in

9    Hanover County?

10   A    I believe that the registrar, Teri Smithson, asked

11   the agency to -- you know, said that she was going to be

12   speaking with NAACP, and asked us for information.  And we

13   volunteered to actually come and speak ourselves if she

14   wanted.  And she jumped at the opportunity.

15   Q    And the information that you provided the

16   African-American churches, what prompted you to do that?

17   A    If I remember correctly, I believe it was Don Palmer,

18   the secretary of the agency.  I believe he stated he had a

19   list of people that he wished to send this out to.  So I

20   drafted an e-mail, and sent out the materials.

21   Q    And it was your understanding that those were clergy

22   members?

23   A    Yes.  I believe they were clergy members.  And I'm

24   positive that at least of them was because it went to the

25   church that my mother attends.

1  Q      All right.  Did you speak at any other meetings where

2  the NAACP had a presence?

3  A      Yes, I did.  There was a meeting to be held at the

4  Patrick Henry Building where the NAACP was one of them.

5  There were multiple other organizations there; Virgina

6  Majority League, Women Voters.  I remember that we were

7  talking about how we were going to get the word out to the

8  public about the voter ID change.

9  Q      So at that particular meeting at the Patrick Henry

10 Building, you were not only working with those groups to

11 figure out how to get the word out, but also describing

12 what the new law was?

13 A      Certainly.  But mind you, this is a very savvy group,

14 so a lot of them know what the standard is.  But,

15 certainly, I was in the room to help make sure that we

16 were fully describing the law correctly and talking about

17 things that were within the proper procedures.

18 Q      Do you know if the SBE conducted any specific voter

19 outreach to the poorer communities?

20 A      Let's see.  Oh, yes.  When it comes to -- there was a

21 meeting that we had with Virginia Organizing in

22 Charlottesville.  I remember that one.  And Virginia

23 Organizing, they have groups that there within -- they

24 have branches that are within Richmond, Petersburg,

25 Danville.  And I remember that meeting as well.

DIRECT EXAMINATION OF MYRON MCCLEES

1  Q     Can you describe the typical demographic that

2  Virginia Organizing services?

3  A     I would say it was lower income, as well as minority

4  groups.

5  Q     Did the SBE do any outreach in the Latino community?

6  A     I know that we had to produce all of our -- any

7  official document we had to produce in Spanish as well

8  for -- specifically for -- because Fairfax County, they

9  are covered under Section 205 of the Voting Rights Act,

10 and so therefore they have to produce things in a minority

11 language, specifically Spanish for Fairfax.

12 Q     What about on-line?  Did the SBE undertake to educate

13 the public via any on-line method?

14 A     Yes.  I believe we changed our voter ID chart.  Our

15 materials on the Website were changed to reflect the -- to

16 guide the voters.  In addition, we have a full section

17 that talks about voter ID law on the Website now.

18 Q     Which Website is that?

19 A     Elections.Virginia.gov.

20 Q     Did you make any specific efforts to target --

21 outreach efforts specifically to target those groups that

22 had been opposed to the bill during committee hearings?

23 A     Well, certainly.  First of all, the Patrick Henry

24 meeting, you know, all the groups that were there were

25 groups that worked on it that specifically spoke against

1  the bill during its consideration in the General Assembly.

2  Q    Why were you targeting them specifically?

3  A    Because they had certain concerns about making sure

4  that the voters were able to get a hold of IDs.  You know,

5  these groups were certainly against the idea of the bill.

6  But they wanted to make sure that the impact of the bill

7  wouldn't affect, you know, voters that didn't have IDs.

8  You know, that they would be given a proper opportunity.

9  Q    Did the SBE provide any guidance materials to the

10 general registrars specifically regarding implementation

11 of 1256?

12 A    Certainly.

13 Q    Did you have any role in drafting those guidance

14 materials?

15 A    Certainly.  So, for instance, the GRE book, I would

16 certainly draft chapter -- well, not draft chapters.  I

17 would edit chapters because it's a preexisting document.

18      In addition, there was a "What-If" guide for them.

19 There was a webinar for them that I conducted.  Multiple

20 webinars for them that I conducted.  So there were

21 multiple outreach efforts for the general registers that I

22 was involved in.  Certainly.

23 Q    Let's start with the GRE handbook.

24      MS. HART:  I would like to introduce Defendants'

25 Exhibit 404.

 1          THE COURT:  When you say *"introduce,"* you're moving

 2   that into evidence?

 3          MS. HART:  I would like to if I've laid an adequate

 4   foundation.

 5          THE COURT:  Pardon?

 6          MS. HART:  If I've laid an adequate foundation, yes,

 7   I'd like to.

 8          THE COURT:  I don't know that you've laid any

 9   foundation at all at this point, frankly.

10          MS. HART:  Well, may I show him the document?

11          THE COURT:  Yes, ma'am.  You may go right ahead and

12   do that.

13          Is there any objection to 404?  If there's not, I'll

14   just go ahead and let it in.

15          MR. KAUL:  I believe there's not, Your Honor.  And to

16   be clear, we don't have any objection to them publishing

17   their documents as they're establishing foundation.

18          THE COURT:  That will make things very easy.

19          If they don't object to it, we'll admit 404.

20          MS. HART:  Thank you.

21              (Defendants' Exhibit 404 is received.)

22          THE COURT:  And 404, again, Ms. Hart, what is that?

23          MS. HART:  It's the general registrar's handbook.

24          THE COURT:  Thank you.

25   BY MS. HART:

1  Q      And I'd like to shortcut this 500-page document by

2  asking if --

3         THE COURT:   That would be appreciated.

4  BY MS. HART:

5  Q      If you flip to Page 490, I believe Tab 29

6  specifically deals with provisional voting.

7         You can use either one.

8  A      I'll use the screen.   Thank you.

9  Q      Do you recognize the document in front of you?

10 A      Yes, ma'am, I do.

11 Q      What is that?

12 A      This is Chapter 29 of the GRE book.   And Chapter 29

13 specifically deals with provisional voting.

14 Q      Did you have a hand in drafting Chapter 29 regarding

15 provisional voting?

16 A      Yes, ma'am, I did.

17 Q      Can you just walk us through the recommended process

18 for provisional voting that you provided to the general

19 registrars through the handbook?

20 A      Certainly.   So a lack of -- a person that

21 provisionally votes due to lack of ID is different from a

22 regular provisional voter.   A regular provisional voter,

23 there's a possibility of their situation be ameliorated

24 without any action whatsoever by the voter.

25        However, when it comes to voter ID, the statute

1   specifically states that the voter is to provide a copy of

2   their photo ID in order for their ballot to be accepted.

3   So we have a whole different procedure that's involved

4   there.   There's a separate provisional ballot envelope

5   that colloquially is referred to as the *"lime green,"* or

6   voter ID envelope.   And that one is specifically for

7   voters who lack IDs, and is easily discernible from the

8   other darker green envelope that is normally.

9        One of the reasons we did that is because the general

10  registrar could separate them before the canvas of the

11  ballots, knowing that these you only act on when you get

12  something from the voter, and these you will actually need

13  to do research before the full canvas.

14       In addition, on the regular ballot envelope, we had

15  to establish a check box for a person who was a compound

16  provisional voter.   So let's say somebody is already

17  marked at the poll books having, plus they lack ID, that's

18  a compound situation where there's two deficiencies that

19  we have.   And so in that situation, we added a check box

20  so that we could fully demark that on the regular

21  envelope.   As well as we just guide them on accepting the

22  copies of the IDs through e-mail, things of that nature,

23  and to provide that to the Board.

24  Q    When you say you *"guide them on accepting copies of*

25  *the IDs,"* do you mean after the voter has cast a

DIRECT EXAMINATION OF MYRON MCCLEES

1  provisional ballot, and that would be the curing process?

2  A    Yes, ma'am.

3  Q    How did you communicate these procedures to the

4  general registrars?

5  A    We have annual training that we conduct, as well as

6  we had webinars on this.  We had also -- let's see, with

7  this one -- well, of course the GRE book itself is

8  involved.  So there were multiple things to specifically

9  get this information out because it was a brand-new

10 process for everyone.

11 Q    How did you distribute the GRE handbook among the

12 general registrars?

13 A    Sure.  Every year, we updated the GRE book, and make

14 it available, before July 1 when legislation goes into

15 enactment.  So once it's all fully available, we send a

16 communication out to the field and let them know that the

17 GRE book is ready, and they can, therefore, go ahead and

18 start reviewing it, printing it for their purposes.

19 Q    Where is the GRE handbook available?

20 A    It's available through our Website as well.  So I

21 know there was a Town Hall, which I -- a Town Hall Website

22 which I previously mentioned.  I know it's available

23 there, as well as there are certain Share Point, which is

24 something internal to our agency as well as the general

25 registrar electoral community.  It's also available

1  there.

2  Q    And you mentioned Town Hall.  Is that a publically

3  accessible Website?

4  A    Yes, ma'am, it is.

5  Q    So the general public could have access to the GRE

6  handbook if they wanted it?

7  A    Yes, ma'am, they could.

8  Q    Did the SBE provide any guidance materials

9  specifically geared towards election officials?

10 A    Well, certainly.  So this was geared towards, you

11 know, general registrars who are considered election

12 officials.  But also Officers of Election, we have

13 guidance documents that are specifically geared towards

14 them.  And the What-Ifs document is certainly one of

15 those.

16 Q    Could you briefly describe the difference between an

17 election official and a general registrar?

18 A    Sure.  Can I say Officers of Elections?  Is that

19 okay?  I'm kind of statute guy.

20 Q    Please.  My apologies.

21 A    Certainly.  Officers of Election are people who man

22 the polling places on election day.  And so they're

23 registered voters, but it's not *their day job.*  Where

24 general registrars are people who are responsible

25 year-round for registering, applications, and taking care

1   of general election matters.  And they are under an

2   electoral board who oversee them.

3   Q    So did the SBE undertake any educational efforts to

4   communicate information to the boots on the ground, the

5   Officers of Election, regarding the new regulations?

6   A    Yes, ma'am.  With the What-If guide, certainly.  As

7   well, I believe, we have also other training available,

8   and training tools available.

9        MS. HART:  All right.  If there's no objection, I'd

10  like to introduce Defendant's Exhibit 69-A, the What-If

11  Guide.

12       THE COURT:  What's the number again?

13       MS. HART:  S 69-A.

14       THE COURT:  Okay.

15       MR. KAUL:  No objection.  Although, if you could just

16  let us know what the date is because I think we both have

17  some in our exhibit list.

18       MS. HART:  I believe it's August 2014.

19       MR. KAUL:  Thank you.

20       THE COURT:  That's the date of the document?

21       MS. HART:  Yes.

22       THE COURT:  Go ahead.

23          (Defendants' Exhibit 69-A is received.)

24  BY MS. HART:

25  Q    Do you recognize the document in front of you?

DIRECT EXAMINATION OF MYRON MCCLEES          945

1   A     Yes, ma'am, I do.

2   Q     What is that document?

3   A     This is the What-If document.  The August 11, 2014

4   version.

5   Q     Did you have a hand in drafting that document?

6   A     Yes, ma'am, I did.

7   Q     What is the purpose of the document?

8   A     The purpose of the document is to provide an easy

9   guide for Officers of Election to handle specific issues

10  that they might face in the polling place on election day.

11  Q     Why don't we cut to the chase.  If you can turn to

12  Page 13 of that document.  What does Page 13 describe?

13  A     This describes the provisional ballot process for

14  when a person lacks ID, and how to process a voter who

15  lacks ID.

16  Q     Can you just walk us through the process as you

17  communicated it to the Officers of Election?

18  A     Sure.  In that situation, the voter is to be --

19  they're given an envelope.  They're to enter the voter's

20  information on the log, the provisional ballot log, which

21  kind of serves as the poll book for provisional voters.

22  They're also to mark that photo ID is the reason the

23  person is voting the provisional ballot.

24        They're also to place it in the sealed lime green

25  envelope, and sign the lime green envelope.  And it's to

DIRECT EXAMINATION OF MYRON MCCLEES

1  be -- then they're to be provided a provisional ballot --

2  a provisional ballot notice of identification, which gives

3  them the information necessary to ameliorate and have

4  their ballot counted.

5  Q    Did you draft the provisional voter notice document?

6  A    Yes, I did.

7  Q    What guidance does that give the voter who has just

8  cast their provisional ballot?

9  A    Sure.  It let's them know that the reason that

10 they're voting provisionally is due to lack of ID.  And

11 let's them know they have until Friday noon -- the Friday

12 following the election day at noon to provide a copy of

13 their ID in order to have their ballot counted.  And that

14 they can do so through e-mail, fax, as well as within the

15 registrar's office.

16     And it provides the specific -- and then the

17 registrars fill that specific information in - their fax

18 number, their e-mail address, their specific office

19 address.  That is all, you know, specifically put in there

20 by the general registrars.

21 Q    Does it mention the free voter ID?

22 A    Yes.  The current version specifically mentions that

23 a person could obtain a free ID just by applying at their

24 registrar's office.

25 Q    And is that a notice that the Officers of Election

1  are required to provide to voters who cast provisional no

2  ID ballots?

3  A     Yes, ma'am.

4  Q     How did the SBE communicate these What-If guidance

5  documents to the Officers of Election?

6  A     This is one of the election day documents that is

7  specifically required to be given to the Chief Officer of

8  Election for every polling place.  So there's multiple

9  things that are to be given to those Chief Officers of

10 Election.  This is among them.  As well as it's publicly

11 available on our Website.  But it is certainly an election

12 day document that must be provided over to the polling

13 place.

14 Q     How does the document make its way from the SBE to

15 the Officers of Election?

16 A     What we do is we normally send something out to let

17 the general registrars know that the document is final.

18 They print it off.

19       Also, I believe in our Share Point, when we edit

20 these documents, there's a check box to say that this is

21 an election day document.  I believe that they're given

22 the ability to just print out all election day documents,

23 and they will print them all out, and go over them, is my

24 understanding of the technical aspect.

25 Q     Is it your understanding that the general registrar

1   is the entity responsible for ensuring that the Officers

2   of Election have these document?

3   A    On the ground what normally happens is the general

4   registrar does that.   Statutorily, it might be an

5   Electorial Board duty.   But who normally handles this,

6   from my experience, is it's always the general registrar

7   that handles this sort of thing.

8   Q    And is that document, the What-If guide, specifically

9   also publically available?

10  A    Yes, ma'am, it is.

11  Q    It's on the Town Hall?

12  A    Yes, ma'am, it is.

13  Q    Is it on the SBE's Website?

14  A    I believe what happens now with Town Hall, and with

15  our Website, is I believe it directly hyperlinks to a page

16  with our forms warehouse, and it's within the forms

17  warehouse.

18  Q    And that's a document that if I went on-line I could

19  find?

20  A    Yes, ma'am, you could.

21  Q    You mentioned that you attended these committee

22  hearings on SB1256, is that right?

23  A    Yes, ma'am.

24  Q    And one of the topics of the hearings was voter

25  fraud?

1   A      Yes, ma'am.  Certainly.

2   Q      Do you recall any debates specific to voter fraud?

3   A      Yes, ma'am, I do.  Certainly.

4   Q      What was the nature the concerns expressed with

5   respect to voter fraud?

6   A      I believe that there were a lot -- multi groups who

7   were stating that there is no voter fraud, or no

8   discernable voter fraud; therefore, to try to create a

9   standard that gets rid of voter fraud that doesn't exist,

10  that that shouldn't be undertaken at all.  They were

11  stating that, you know, this is being enacted for other

12  reasons other than for voter fraud.

13       And so that was an argument that was consistently

14  levied during the meetings.  And I specifically remember

15  the counter to that was Senator Garrett who said that he

16  had prosecuted voter fraud.

17  Q      Are you aware of any ways in which SB1256, and any

18  regulations that you drafted, would combat voter fraud?

19  A      Well, certainly.  If a person is going -- if a person

20  is going to attempt to vote in my name, and they lack any

21  sort of document stating my name, and everything, and they

22  go and attempt to vote, they would be thwarted by this

23  law.  Sure.  So I guess in that situation.

24  Q      And you've also mentioned a public comment period.

25  As part of your job, did you review and respond to any

DIRECT EXAMINATION OF MYRON MCCLEES        950

1  constituent complaints with respect to SB1256?

2  A    Well, certainly.  Yes.

3  Q    And is that also true in general -- during any

4  regulation, any law that affects election procedures,

5  would you be the recipient of those constituent

6  complaints?

7  A    If they fall into my subject area, then, yes, a lot

8  of times they'll make it to my desk.

9  Q    If I refer to SB1, do you know what I'm talking

10 about?

11 A    Yes.  I believe that was the previous photo ID.

12 Q    The 2012 voter ID law?

13 A    Yes.

14 Q    Does that sound right?

15 A    Yes.

16 Q    After SB1, the 2012 law was passed.  Do you recall

17 receiving any constituent complaints regarding that bill?

18 A    Yes.  Yes.

19 Q    Could you describe the general nature of those

20 complaints?

21 A    We would have some people arguing that it was

22 unnecessary, and then we would have people who were

23 arguing that they needed to be more stringent.

24 Q    What was the prevailing sentiment?  What the majority

25 of the complaints?

1   A    The majority were actually asking for something more

2   stringent.

3   Q    Do you also field constituent complaints on election

4   day?

5   A    Yes, I do.

6   Q    On election day in 2015, do you recall receiving any

7   constituent complaints specific to the photo ID law?

8   A    Yes, I do.

9        THE COURT:  What year were you talking about,

10  Ms. Hart?

11       MS. HART:  In 2014.

12       THE COURT:  Go right ahead with your question.  I'm

13  sorry for interrupting you.

14  BY MS. HART:

15  Q    How do constituent complaints find their way to you

16  on election day?

17       THE COURT:  Did you get an answer to the prior

18  question?

19       MS. HART:  I'm just trying to lay the foundation for

20  what he's about to talk about with respect to the specific

21  complaints.

22       THE COURT:  All right.  Go right ahead.

23  A    I'm sorry.  Could you restate your question?

24  Q    Sure.  How do constituent complaints find their way

25  to your desk on election day?

1  A    Sure.  We normally have a phone bank of multiple

2  people who handle what we consider Tier 1 level things.

3  Inquiries such as where is my polling place.  Things like

4  that.  How long are the polls open for.

5      Then we have, you know, if the person asking the

6  question is how -- you know, it merits more -- it's

7  unique, more of an expertise in order to answer, then they

8  work their way up the chain until eventually it gets to

9  me, is my understanding of how it works.

10     So unless they are asking something that is policy

11  based, then it would specifically be routed towards or me,

12  or one of the other policy analyst, or somebody else

13  within the agency whose expertise it falls under.

14  Q    So in 2014, did you field any specific constituent

15  complaints regarding the photo ID law?

16  A    Oh, certainly.

17  Q    Approximately, how many did you receive?

18  A    On election day or in general in 2014?

19  Q    On election day through whenever those provisional

20  voters could cure.

21  A    Okay.  Yes, I received people who were stating that

22  they weren't able to vote because they didn't have an ID.

23  I had some people who stated that they had to cast a

24  provisional ballot because somebody -- an Officer of

25  Election had challenged their ID on the fact that it

1  didn't have an address, which greatly upset me.  So there

2  were multiple that I received on that day.

3  Q     How did you address those constituent complaints?

4  A     Normally what I do is if I can give specific

5  information to empower the voter to handle it, I do that

6  specifically on the phone.  And thereafter, if this is a

7  misapplied standard, which is the case when somebody says

8  that the voter ID has to have an address on it, in that

9  situation I contact the general registrar for the locality

10 that it's in, and informing them so they can get

11 specifically get in contact with that polling place to

12 make sure that they immediately curtail that and hopefully

13 ameliorate the entire situation.

14 Q     Is that what you did in 2014 in response to the

15 constituent complaints you received?

16 A     Yes, ma'am, it is.

17 Q     Can you specifically identify a single individual

18 voter who was wrongly denied the right to vote in 2014

19 based on the photo ID law?

20 A     Sure.  I remember this lady in northern Virginia,

21 Ms. Cotten.

22 Q     And how is it your understanding that she was wrongly

23 denied the right to vote?

24 A     If I remember correctly, she didn't have one of the

25 IDs, but I don't remember her being given the opportunity

DIRECT EXAMINATION OF MYRON MCCLEES

1  to cast a provisional ballot, is my understanding.  That's

2  my recollection.

3  Q    Did you get in contact with her specifically?

4  A    I did.  I did.  I spoke with her.  And that was the

5  first time I had ever spoken with somebody who hadn't been

6  offered a provisional because of lack of ID.

7  Q    What kind of guidance did you give her on election

8  day?

9  A    I stated to her what the specific forms of

10 identification were.  At this point in time, the polls

11 hadn't closed, so I was trying to see if she would be able

12 to retrieve an ID, and get back to the polling place.  And

13 so that's what I was worried about was her being able to,

14 you know, fully cast a ballot.

15 Q    Did you explain to her the process of provisional

16 voting?

17 A    Yes, I did.  I specifically -- I don't specifically

18 remember whether or not she already knew about provisional

19 voting, but I specifically talked about provisional

20 voting.

21 Q    What about on election day in 2015, do you recall

22 receiving any constituent complaints specific to the photo

23 ID law?

24 A    Certainly, yes.

25 Q    Approximately, how many complaints did you receive in

1  2015?

2  A    I would say around 10 or so.  Somewhere in there.

3  Q    Did you personally respond to those complaints?

4  A    Yes, ma'am, I did.

5  Q    What did you do to address the constituent complaints

6  regarding the photo ID law in 2015?

7  A    The same as I always did in 2014.  Empower the voter

8  with information as much as I possibly could.  And if they

9  can ameliorate, great.  If not, I would -- either way, I

10  was going to contact the general registrar and inform them

11  that the standard has been misapplied, if the standard is

12  being misapplied, in the polling place.

13  Q    Can you specifically identify a single voter who was

14  wrongly denied the right to vote in 2015 based on the

15  photo ID law?

16  A    In 2015, I don't really remember.  It doesn't stick

17  out.  I just remember Ms. Cotten because she specifically

18  stuck out.

19       THE COURT:  You remember who?

20       MR. MCCLEES:  Ms. Cotten.

21       THE COURT:  That was in 2014.

22       MR. MCCLEES:  That was in 2014.  That's why I

23  remember that one.  But I don't remember a specific one

24  from 2015.

25       MS. HART:  Thank you, Mr. Mcclees.

1        I have no further questions.

2        THE COURT:  All right.

3        Cross-examination of Mr. McClees.

4        MR. KAUL:  Thank you, Your Honor.

5                    **CROSS-EXAMINATION**

6   BY MR. KAUL:

7   Q    Mr. McClees, good morning.

8   A    Good morning, sir.

9   Q    Let me introduce myself.  I'm Josh Kaul.  I'm one of

10  the lawyers for the plaintiffs in this case.  And you were

11  deposed before by my colleague, Ms. Cherry, is that right?

12  A    Yes, I was.  She's very good, by the way.

13  Q    We agree.

14       Let me ask you a few questions about some of the

15  topics that you've been discussing today.  But I guess

16  before I do that, I just want to be clear about a couple

17  of things.  You're the lead policy analyst for the

18  Department of Elections for voter ID?

19  A    For voter ID.  Yes.

20  Q    Okay.  And let me bring you back in time a bit.  When

21  you started working at what was then the State Board of

22  Elections, the rules in place allowed a voter to cast a

23  ballot with an affirmation of identity, is that right?

24  A    Yes, sir, that is correct.

25  Q    And you're not aware of any election administration

1  problems that occurred with an affirmation of identity,

2  right?

3  A     No, sir.

4  Q     And in 2012, I new voter ID bill was placed that put

5  in place that eliminated the affirmation of identity, but

6  expanded the number of forms of ID that could be used,

7  right?

8  A     Yes, sir.

9  Q     And you're not aware of any fraud in 2012 that

10 occurred with that voter ID law in place, are you?

11 A     No.   Fraud isn't something normally that I handle.

12 Q     Let me ask you about a few questions towards the end

13 of your examination there.   Do you remember discussing a

14 provisional voter notice document that's given to

15 provisional voters?

16 A     Yes, sir.

17 Q     Now, that form provides various information about how

18 a voter can cure a provisional ballot, right?

19 A     Yes, sir.

20 Q     But it does not tell a voter how they can get a free

21 ID, does it?

22 A     Yes, the current version does.   Certainly.

23 Q     How long has that version been out?

24 A     I don't know, specifically.   But the current version

25 does state how you go about getting a free ID.

1   Q    Was that version in place for prior elections?

2   A    I think it was in place especially for 2015.  I don't

3   know the timeline of whether it was available in 2014 or

4   not.

5   Q    Okay.

6        THE COURT:  Do you know whether the current version

7   is on your Website, Mr. Mcclees?

8        MR. MCCLEES:  I'm speaking about the current version

9   of the provisional voter notice/identification, Your

10  Honor.

11       THE COURT:  Okay.  Thank you.

12       MR. MCCLEES:  Certainly.

13  BY MR. KAUL:

14  Q    And when a voter casts a provisional ballot, they're

15  given an envelope that's a particular color, right?

16  A    Yes.

17  Q    And it's meant to be distinctive?

18  A    Yes.

19  Q    What's that color?

20  A    It's a lime green color.  I think it's officially

21  called vulcan green, I want to say.  But we call it lime

22  green.

23  Q    Okay.  And there's another color called bolt, which

24  is like the Highlighter color.  So vulcan green, I'll add

25  that to my list.

1   A      Yes.

2   Q      And you were discussing the handbook that you guys

3   use?

4   A      Yes, sir.

5   Q      And I think we said that was 500 pages, is that

6   right?

7   A      I'll defer to you-all.  I just review my chapters,

8   and then I luckily check that box off and walk away.

9   Q      It's several hundred pages long, right?

10  A      Yes, sir.  It certainly is.

11  Q      And have you ever read it all the way through?

12  A      I have.  When I first started with the agency, I

13  wanted to get abreast as possible on all of our processes.

14  So, yes, I did read it when I first joined the agency.

15  Q      Do you know how many people read that the full way

16  through?

17  A      It would be my hope that every registrar reads it all

18  the way through.  But judging by some of the calls I get,

19  I don't know.

20  Q      The calls would indicate that they don't read it all

21  the way through, right?

22  A      I get calls on weapons in the popping place all the

23  time.  And, you know, there's a specific section --

24  specific details of weapons in the polling place.  So that

25  one, yeah.

1   Q     But it's 500 pages long, so you can forgive the

2   registrars for not remembering all the details, right?

3   A     I'm not the best at forgiveness.

4   Q     Fair enough.

5         Do you know how many of the pages in that book relate

6   to photo ID?

7   A     I don't know specifically how many of them relate to

8   photo ID.

9   Q     I don't know if we have Plaintiffs' Exhibit 155

10  loaded.  Well, actually before I bring this up, let me ask

11  you, you said that you thought the provisional notice that

12  was in place in 2015 had directions for how to get a free

13  ID?

14  A     I believe so, yes.

15  Q     What about the one for 2014?

16  A     I can't guarantee on that one.  I specifically

17  remember someone bringing to my attention that you needed

18  to have it, and we included it in there.  So I don't know

19  the timeline fully on that.

20  Q     If I showed you a copy of that, would that refresh

21  your recollection?

22  A     Perhaps.

23        MR. KAUL:  This is going to be Plaintiffs' Exhibit

24  155 at Page 26.

25        THE COURT:  When you say "a copy of that," a copy of

 1  what?

 2       MR. KAUL:  Thank you, Your Honor.  The 2014

 3  provisional voter notice.

 4       THE COURT:  Okay.

 5       MS. HART:  I have no objection, Your Honor.

 6       THE COURT:  All right.  It will be received.

 7            (Plaintiffs' Exhibit 155 is received.)

 8  BY MR. KAUL:

 9  Q    What page did I give you?  Sorry.  On the bottom

10  there should be a page number.

11  A    It is VSBE 0045909.

12  Q    All right.  And it's up on the screen now, too.  Does

13  that appear to you to be a copy of the notice that was

14  used, at least in 2014?

15  A    I -- it's hard to tell based on the revision number

16  down at the bottom.  But I think that revision numbers are

17  one of those things where you will update a document, and

18  whether or not the revision of it really gets changed, I

19  worry about that.

20       Now, to let you know, this document did not

21  previously --

22  Q    Well, let me ask you, and direct your attention to

23  the middle.  Do you see where it indicates that this

24  relates to photo ID, specifically?

25  A    Yes.

1   Q     So this must have been for at least the first photo

2   ID election, right?

3   A     I would imagine so.  I would imagine so.

4         THE COURT:  If he doesn't know, he doesn't know.  He

5   said a couple times that he's unsure.

6         MR. KAUL:  He did, Your Honor.  And I thought maybe

7   looking at that part of the document might help him.

8         THE COURT:  All right.  That's fair.

9   A     There's things that would lead me to believe that

10  this would be after the passage of 1256 based on the

11  acceptable forms of identification.  Within there, it's

12  only listing photo IDs.  It doesn't list, you know, a

13  current utility bill, bank statements.  So I think this is

14  based on the 1256 standard as opposed to the SB1

15  standards.  And that would lead me to believe that, yes,

16  this would be one that was after the passage of 1256.

17  Q     Okay.  And just so we're clear, 1256 is the 2013

18  voter ID law?

19  A     Yes, sir.

20  Q     And SB1 is the 2012 law?

21  A     Yes, sir.

22  Q     And so this does not indicate how a voter can get a

23  free ID, does it?

24  A     Correct.

25  Q     You were asked on direct about some outreach you've

1   conducted.  Do you recall that?

2   A    Yes.

3   Q    And you said you spoke to the Hanover NAACP, is that

4   right?

5   A    Yes, at some point.

6   Q    Now, they asked you to come out to speak to them,

7   right?

8   A    Yes.  Well, they -- if I can correct?

9   Q    Please.

10  A    They stated that they were going to -- the registrar

11  stated that she was going to be meeting with the NAACP,

12  and we volunteered to come help.  So she wasn't requesting

13  our presence, specifically.

14  Q    Do you remember being asked about that topic in your

15  deposition?

16  A    Yes.

17  Q    Go ahead.

18  A    That's just it.

19  Q    Do you remember what you said about that?

20  A    No, I don't remember, specifically.

21       MR. KAUL:  Could we pull up Page 41, Line 22.

22       THE COURT:  Of what?

23  BY MR. KAUL:

24  Q    This is your deposition transcript, is that right?

25       THE COURT:  Where is that going to be found in the

1  record?  Does it have an exhibit number?

2       MR. KAUL:  We were going to do the admission

3  separately.  I was just using this to refresh -- to

4  impeach.

5       THE COURT:  Okay.  You're going to use it for

6  refreshment.  All right.  You can use it for past

7  recollection revived.

8       MR. KAUL:  Thank you, Your Honor.

9       THE COURT:  Mr. Mcclees, read over the document and

10  see whether or not that refreshes your recollection.

11       MR. MCCLEES:  Yes, it does.

12       THE COURT:  It does?

13       MR. MCCLEES:  Yes, Your Honor.

14       THE COURT:  He's prepared to respond.  Go ahead.

15  A    Yes, I'm looking at the deposition.  Do you have a

16  question on that, sir?

17  Q    And the NAACP had asked you to come speak, right?

18  A    Well, in this period I said they ask me to come

19  speak.  But it was actually the NAACP asked the general

20  registrar to come and speak, and the registrar contacted

21  us, and then I went and spoke and the NAACP introduced me.

22  So, yes.

23  Q    I see.  And so was the Department of Elections doing

24  affirmative outreach to minorities groups?

25  A    I wasn't the person in charge of voter outreach, but

1  we hired a person to specifically do an outreach, and I

2  think that they were contacting organizations.

3  Q     But you weren't involved in that?

4  A     Well, when we went to Virginia Organizing in

5  Charlottesville, that was specifically at the behest of

6  the person who was in charge of that who wished to bring

7  me along.

8  Q     And you mentioned discussions at some churches, or

9  outreach at some churches?

10 A     It was just a letter.  I never went to the churches.

11 Q     So you didn't go to churches?

12 A     No.

13 Q     Okay.  Do you recall talking a little while ago about

14 Megan Cotten?

15 A     Yes.  Yes.

16 Q     And how did her situation come to your attention?

17 A     It was through an e-mail.  And if I remember

18 correctly with the e-mail chain, she had contacted the

19 Secretary of the Commonwealth, the Secretary of the

20 Commonwealth had contacted Edgardo Cortes, and then I

21 believe Edgardo Cortes --

22     THE COURT:  You need to speak a little more slowly so

23 she can take it down.

24     MR. MCCLEES:  My apologies, madam.

25     It's just I always speak too quickly.

1  A    It was Secretary -- she had contacted the Secretary

2  of the Commonwealth, is my understanding.   The Secretary

3  of Commonwealth contacted our agency, and then our agency,

4  Edgardo Cortes, contacted me and asked me to reach out to

5  her.

6       MR. KAUL:  And I'm going to ask for Plaintiffs'

7  Exhibit 94 to be brought up.

8  BY MR. KAUL:

9  Q    That's up on the screen there.  And I can get you a

10 hard copy, too.  Would that be helpful?

11 A    The electronic would be perfectly fine, sir.

12 Q    Okay.  And this is a document that goes through three

13 pages.

14      MR. KAUL:  If we can just click through those quickly

15 so he can see them all.  All right.  And then go back to

16 the first page.

17 BY MR. KAUL:

18 Q    So is this the e-mail string that you were involved

19 in regarding Ms. Cotten?

20 A    Yes, sir, it is.

21      MR. KAUL:  And, Your Honor, we will move that this be

22 admitted as Plaintiffs' Exhibit 94.

23      THE COURT:  Any objection?

24      MS. HART:  No, Your Honor.

25      THE COURT:  Received.

 1              (Plaintiffs' Exhibit 94 is received.)

 2    BY MR. KAUL:

 3    Q     Now, this circumstance came to your attention because

 4    she had first reached out to Mr. Stoney?

 5    A     Yes.

 6    Q     When voters have issues with provisional ballots

 7    generally, are the poll workers instructed to raise those

 8    issues to your attention, or was this an unusual

 9    situation?

10    A     Poll workers aren't asked to bring -- well, it

11    depends on what your definition of poll worker is.  We use

12    very precise terms in Virginia.

13    Q     I think you said election officer.

14    A     Officers of Election.  So, Officers of Election are

15    going to -- first of all, if it comes to a regular Officer

16    of Election, they're going to consult their chief Officer

17    of Election.  And if their chief Officer of Election can't

18    handle that situation, they would contact their general

19    registrar, and then their general registrar might contact

20    me on election day.

21          When it comes to voters, voters often are going to

22    immediately contact the -- at that time, the Department of

23    Elections, and then from there it goes through the phone

24    call tree that I was talking about before, and then it

25    could reach me.

1  Q     Let me ask you about another document.  I'm doing to

2  direct your attention back in time to the 2012 voter ID

3  law that was in place.

4  A     Sure.

5        MR. KAUL:  Let's look at PX 68.

6        THE COURT:  Is that your exhibit or a defense

7  exhibit?

8        MR. KAUL:  Plaintiffs.  Your Honor, and I keep saying

9  PX.  I apologize.  I'll be clearer.

10       And let's show the second page so he can see the full

11 document.

12 BY MR. KAUL:

13 Q     Now, do you recognize this?

14 A     Yes, I do.

15 Q     And this is an e-mail exchange that you were involved

16 in.  And the last e-mail was sent by you, right?

17 A     Yes.

18 Q     Who is Susan Lee?

19 A     Susan Lee is my direct manager.

20 Q     And how would you pronounce that first word in your

21 e-mail?

22 A     *"Woooooowwww."*

23 Q     So you were excited, it's fair to say?

24 A     Certainly.  Certainly.

25 Q     So the implementation of the 2012 ID law went well,

```
 1  is that right?

 2  A    Compared with disastrous scenarios we've been

 3  presented before that, certainly.

 4  Q    And then a few months later, the legislature changed

 5  the law, right?

 6  A    That's correct.

 7  Q    You were mentioning before some issues that were

 8  brought to your attention on election day in 2014 and

 9  2015?

10  A    Yes.

11       MR. KAUL:  Let's bring up Plaintiffs' Exhibit 96.

12       Actually, before we discuss this, Your Honor, I'd

13  move that 68, Plaintiffs' 68, be admitted.  That was the

14  one we just discussed.

15       THE COURT:  If you feel it has value, I'll admit it.

16       MR. KAUL:  I do, Your Honor.

17       THE COURT:  Okay.

18       MR. KAUL:  And I'll have Ms. Schultz just briefly

19  walk you through 96 here.  Can we just flip to the next

20  couple pages.  Thank you.

21  BY MR. KAUL:

22  Q    And do you recognize that one as well?

23  A    I remember from the depositions.  So, yes.

24  Q    Okay.  And going back to the first page, this is an

25  e-mail that you sent, right?
```

CROSS-EXAMINATION OF MYRON MCCLEES          970

```
 1  A     Yes.

 2  Q     And this relates to one of the complaints that you

 3  received on election day in 2014, right?

 4  A     Yes.  Well, yes, it was received by Chesterfield, if

 5  I'm not mistaken.  And then I responded about it, yes.

 6        MR. KAUL:  Let's go to Page 2 of that document.

 7  BY MR. KAUL:

 8  Q     The complaint you received was that -- related to

 9  whether voters could use electronic forms of ID to vote,

10  right?

11  A     Correct.

12  Q     And what's the rule in Virginia?

13  A     The rule in Virginia is that you need to provide a

14  form of an identification document.

15  Q     A hard copy?

16  A     Correct.

17  Q     So if you have something electronically, you could

18  print it out, and you walk in with that, can you use that?

19  A     Not initially, no.

20  Q     What do you mean by that?

21  A     I mean, the -- that wouldn't entitle you to a regular

22  ballot at that point in time because it's not the original

23  document.  You need to provide the original document when

24  you're entitled to a regular ballot.

25        MR. KAUL:  And, Your Honor, we move that 96 be
```

1  admitted.

2      THE COURT:  Now, you identified this as a document

3  you saw at the deposition.  Do you have any other

4  recollection of it?

5      MR. MCCLEES:  No.  I just remember it from the

6  deposition.

7      MR. KAUL:  May I ask a follow-up, Your Honor?

8      THE COURT:  Yes.  Go ahead.  If you think it's of

9  value, go right ahead.

10      MR. KAUL:  Just briefly.

11  BY MR. KAUL:

12  Q    The top of the first page.  This is an e-mail that

13  you sent, right?

14  A    It certainly looks that way.

15  Q    You don't have any doubt about that?

16  A    I have no doubt.

17      MR. KAUL:  Your Honor, we would move this one in.

18      THE COURT:  All right, sir.

19          (Plaintiffs Exhibit 96 is received.)

20  BY MR. KAUL:

21  Q    All right.  I'd just briefly like to ask you about a

22  couple of the What-If guides you discussed before.

23  A    Sure.

24      MR. KAUL:  And let's bring up Plaintiffs' Exhibit 61.

25  BY MR. KAUL:

1  Q    You talked before about the most recent What-If

2  guide?

3  A    Yes.

4  Q    All right.  And does this appear to be the first of

5  several pages of the 2010 What-If guide?

6  A    Judging from the revision date, yes.

7        MR. KAUL:  I'm not sure if there's an objection to

8  this one or not?

9        MS. HART:  No objection, Your Honor.

10        THE COURT:  Be received.

11        MR. KAUL:  Thank you, Your Honor.

12            (Plaintiffs' Exhibit 61 is received.)

13  BY MR. KAUL:

14  Q    Now, you used that as a base for future What-IF

15  guides that you prepared, right?

16  A    Correct.  I joined the agency in 2011, so the What-If

17  guide certainly preceded me.  So when I joined the agency

18  and I was starting to update this, I certainly would have

19  used versions that were previously available.

20  Q    Let me next show you Plaintiffs' Exhibit 57.  And

21  this is a What-If guide from 2012, is that right?

22  A    Yes, sir.  It looks that way.

23        MR. KAUL:  Unless there's any objection, I'll move in

24  Plaintiffs' Exhibit 57.

25        THE COURT:  Any objection, Ms. Hart?

```
 1            MS. HART:  No objection.

 2            THE COURT:  Be received.

 3                 (Plaintiffs' Exhibit 57 is received.)

 4  BY MR. KAUL:

 5  Q    And the point I'm getting to with these, and I'm not

 6  going through each of these guides in detail, but as

 7  additional laws have been passed, these What-If guides

 8  have become increasingly complex, right?

 9  A    Well, I don't know if I can state "complex" because

10  sometimes we take information out, and so that would -- in

11  some situations it simplifies it.  I will say that I don't

12  know if I can agree with the word "complex," sir.

13  Q    Okay.  As more voter ID laws have been passed, you've

14  added information about --

15  A    I would it state it's become more comprehensive.  But

16  as far as being more complex, I don't believe it asks them

17  to do things that are -- there are some things in the

18  election's world that are complex.  I don't believe this

19  fits into being complex with this.  Just my personal

20  opinion.

21  Q    Okay.  So when you say "comprehensive," you mean

22  there's more information there?

23  A    Sure.  Certainly.

24  Q    You were asked about the debate regarding voter ID

25  legislation?
```

1    A     Yes, sir.

2    Q     And I think you mentioned that one supporter had

3    mentioned some case of fraud?

4    A     That would be Senator Garrett.  I remember him

5    talking specifically, you know --

6         THE COURT:  Senator Gary or Senator Garrett?

7         MR. MCCLEES:  Garrett.  My apologies, Your Honor.

8    BY MR. KAUL:

9    Q     And the case he discussed was not a case of voter

10   impersonation fraud, was it?

11   A     I have no clue.  I was just listening in the crowd,

12   and he stated that he had prosecuted cases of voter fraud.

13   That stood out in my mind because that was the first time

14   I'd heard of somebody saying that they had prosecuted

15   cases of voter fraud like that.

16   Q     Do you remember if he was talking about vote buying?

17   A     I haven't the slightest of what he was referring to.

18        THE COURT:  Is your office involved in criminal

19   investigations of voter violations?

20        MR. MCCLEES:  No, sir, we are not.  We are not an

21   investigatory agency.

22        THE COURT:  Okay.

23   BY MR. KAUL:

24   Q     Now, there were a number of groups that spoke out in

25   opposition to the voter ID bill, correct?

1    A       Yes.

2    Q       And that includes the League of Women Voters?

3    A       Yes, sir.

4    Q       And former State Board of Elections Secretary, Mike

5    Brown?

6    A       Yes.  Yes.  I don't remember him specifically from

7    the Senate meetings, but I remember him making his case

8    known at the NAACP meetings, certainly.

9    Q       And the NAACP also opposed that law?

10   A       That is correct, sir.  Yes.

11   Q       And that was in the hearings?

12   A       Yes.  I remember them coming to the hearings.  Yes,

13   sir.

14   Q       And what were the concerns that those groups were

15   raising?

16   A       They were raising concerns about persons that didn't

17   have ID.  They were raising concerns that there was no

18   provable instances of voter impersonation fraud.  They

19   were raising concerns about students.  They were raising

20   concerns about people being able to traverse to get the

21   IDs.  They were raising multiple concerns.

22   Q       And the supporters said -- responding to those

23   concerns by saying what?

24   A       They were stating that, you know, why not make the

25   process harder.  They were also stating that because we

1  didn't have the mechanism to detect whether fraud was

2  taking place or not, we didn't know if fraud was taking

3  place.

4  Q    And did they claim that everybody had an ID?

5  A    I think they would intimate that.  I don't know if

6  they specifically said those words.  But they were

7  certainly stating that, you know, I have an ID, all these

8  other people have driver's licenses, and things.

9  Q    And you said the debate was highly partisan, is that

10 right?

11 A    Sure.  Sure.

12 Q    And you said the Democrats were opposed and the

13 Republicans supported it?

14 A    I thought it was quite plain.

15 Q    I want to ask you about the adoption of the rule

16 regarding expiration dates.

17 A    Okay.

18 Q    And I sort of want to walk you through the timeline

19 and make sure we've got the details right.  So when this

20 bill passed, *"this bill"* meaning the 2013 voter ID law,

21 the staff at the State Board of Elections had

22 communication with the board members about their view as

23 to what the expiration date rules should be, right?

24 A    No, sir.  Well, when you say *"should be,"* or are you

25 stating as what our current guidance was, or what we

1  personally believed it should be, or professionally

2  believed it should be?  Because I don't inform the

3  Board -- I didn't inform the Board on, you know, what my

4  opinion was on what it should be.  I work at the will of

5  the Board.

6      So I would state what I believe the current standard

7  was, what our current standard was, our lack of statutory

8  basing on that.  I would inform the Board of that.  But I

9  did not give a recommendation on what it should be.

10 Q    Let me ask, did you inform the Board members of what

11 your practice had been prior to the law?

12 A    Yes, sir.

13 Q    And what was that?

14 A    It accepted unexpired IDs, or expired within the

15 previous 30 days.

16 Q    Okay.  And so that was the practice before the 2013

17 bill was passed?

18 A    Yes, sir.

19 Q    And Board Member Bowers and Mr. Judd agreed that that

20 time frame should be expanded, right?

21 A    That is correct.

22 Q    And based on their guidance, you proposed draft

23 language that would have permitted all expired IDs to be

24 used for voting?

25 A    That is correct.

1  Q     All right.

2       MR. KAUL:  And let me bring up Plaintiffs'

3  Exhibit 140.  And then let's take a look at the second

4  page.

5  BY MR. KAUL:

6  Q     Do you recognize this document?

7  A     Yes, I do.  This is a draft of 20-40-10, sir.

8  Q     Okay.  And this talks about valid meaning voter ID

9  that means documents that appear to be genuinely issued by

10  the agency, or the agency are issuing entity.  Do you see

11  that?

12  A     Yes.

13  Q     And so this draft language that was prepared has no

14  reference to an expiration date, right?

15  A     Correct.

16  Q     And subsequent to this, there was language added that

17  specifically spelled out that an expiration date was not

18  relevant, right?

19  A     Yes, sir.

20  Q     Okay.  And the Board adopted a policy that said that

21  expiration dates were not relevant, right?

22  A     That's correct, sir.

23  Q     Now, that changed, right?

24  A     Yes, sir.

25  Q     And it's your understanding specifically that people

1  who worked with Senator Obenshain approached Chairman Judd

2  because they were unhappy about the regulation, right?

3  A    I don't know who contacted who.  I was not privy to

4  that specific information.  I was just made know that

5  Chairman Judd switched his opinion.  I didn't know exactly

6  how he was contacted, or anything.  But it was definitely

7  something that I was alerted to when I came back from

8  Brazil.

9        MR. KAUL:  And I want to come back to that in a

10  minute.

11       Your Honor, I move that Plaintiff's Exhibit 140 be

12  admitted.  That's the document that shows the draft

13  regulation.

14       THE COURT:  I have no objection.  It's an uncontested

15  point.  I mean, it's not even an issue here.  But if you

16  want it in evidence, I will put it in there.  I mean, my

17  goodness.

18       I assume there's no objection?

19       MS. HART:  No objection, Your Honor.

20       THE COURT:  Okay.

21       Very marginally relevant.

22            (Plaintiffs' Exhibit 140 is received.)

23  BY MR. KAUL:

24  Q    All right.  So do you recall being asked in your

25  deposition about why the regulation changed?

1  A     Yes.

2  Q     Okay.  And do you recall saying that you learned that

3  Chairman Judd has been approached by Obenshain's people?

4  A     I might have said that.  Sure.  Certainly.

5  Q     Well, let's see if you look at your deposition if it

6  refreshes your recollection.

7  A     Sure.

8        MR. KAUL:  Can we pull up Mr. Mcclees' deposition

9  transcript.  And it's Page 119.

10 BY MR. KAUL:

11 Q     And let me ask you to read through Lines 4 to 24, and

12 see if that refreshes your recollection.

13 A     Okay.  Thank you.

14       Okay.  Yes.  Yes.

15 Q     And so it is your understanding that Senator

16 Obenshain's -- I guess his staff approached Chairman Judd?

17 A     Yes.

18 Q     Is that right?

19 A     Yes.

20 Q     And Senator Obenshain then sent a letter to the Board

21 as well indicating that he was criticizing the regulation,

22 is that right?

23 A     I don't know, specifically.  If you give me a -- I'll

24 be more than happy to -- if you can refresh my memory,

25 I'll be more then happy to look at that.

1  Q    That's okay.  After at least that meeting, or that

2  meeting that we were just discussing, the Board did in

3  fact issue a new proposed regulation, right?

4  A    That is correct.  Yes.

5  Q    All right.  And this one, rather than allowing all

6  expired licenses, the proposed regulation would only allow

7  licenses that had been expired for 30 days, is that right?

8  A    I don't remember the specific date.  If you have an

9  exhibit, I would love to have my memory refreshed on that.

10 I remember that it was something that was less than a

11 year, and certainly was -- it was between a year and

12 infinity.

13 Q    Okay.  And that was after the Board had originally

14 made clear that an expiration date was irrelevant?

15 A    Yes.  That's correct.  Yes.

16 Q    Now, you were talking about the number of comments

17 you received on this new proposed regulation?

18 A    Absolutely.  Yes.

19 Q    And it was something like 600, right?

20 A    I remember it was around 500.  It might have been up

21 to 600.  But I know it was a heck of a lot more than I was

22 used to.  Yes, sir.

23 Q    And let me show you --

24     MR. KAUL:  Can we bring up on the screen Plaintiffs'

25 Exhibit 152.  And I'm just going to ask Ms. Schultz to

1  sort of scroll through this very briefly.

2  BY MR. KAUL:

3  Q    But does this appear to you to be the set of comments

4  that you received?

5  A    Yes, sir, it does.

6       MR. KAUL:  And, Your Honor, this is Plaintiffs'

7  Exhibit 152, which I would move into evidence.

8       THE COURT:  Any objection?

9       MS. HART:  Your Honor, I think there's some clear

10 hearsay issues with it.

11      THE COURT:  Well, I don't think it's offered for

12 anything other than the fact that he received this.  The

13 truth of the matter is really not at issue.  The question

14 here is whether or not he received that language via that

15 particular document.

16      The objection is overruled.  It will be admitted.

17          (Plaintiffs' Exhibit 152 is received.)

18 BY MR. KAUL:

19 Q    Did the significant majority of the comments you

20 received oppose reducing the period of expiration?

21 A    Absolutely.  Absolutely.

22 Q    Have you ever received nearly so many comments on a

23 regulation?

24 A    Not at this time.  Certainly, not.

25 Q    What would you typically do when you get comments on

1   a regulation to prepare the Board for its meeting?

2   A    Normally, not only would I do this sort of table with

3   the raw input -- normally, I would go through each and

4   every single comment and pull out every issue lodged, and

5   then create a table of how many instances of that argument

6   were made.

7   Q    Did you do that here?

8   A    No, I did not.

9   Q    Why not?

10  A    Because the turnaround time between the closing of

11  the comment period and the hearing of the Board was so

12  close that I didn't have time to sift through these and do

13  that sort of issue spotting.

14  Q    And was this an unusually fast process?

15  A    I would say so, yes.

16  Q    And why was -- do you know why the Board was trying

17  to move quickly with this?

18  A    I haven't the slightest.

19  Q    Let me ask you about another document, Plaintiffs'

20  Exhibit 145.  And let's start on -- well, you see at the

21  bottom of the first page there's an e-mail from you to

22  Susan Lee and Mr. Cortes?

23  A    Yes.  I see.

24       MR. KAUL:  Okay.  Let's turn to the second page.

25  BY MR. KAUL:

1   Q      And this is the body of that e-mail, is that right?

2   A      I believe so.  Yes, sir.

3   Q      I mean, you raise some questions for your colleagues

4   in this e-mail?

5   A      Yes.  Yes.

6   Q      All right.  And the first one was what to do with

7   people who had a religious objection to having their

8   photograph taken?

9   A      Yes.

10  Q      Is there an exception to the voter ID law that allows

11  -- that deals with the circumstances for people to have

12  religious objections to being photographed?

13  A      Not within 24.2-643(b).  No.

14  Q      So can people who have a religious objection to being

15  photographed vote in person in Virginia?

16  A      Not that I'm aware of.

17  Q      The only option they have available is to vote

18  absentee?

19  A      Yes.  That's my understanding.

20  Q      You also raised an issue about what happens if a

21  person's name changes from what's on their ID?

22  A      Can I say something on the original -- your previous

23  question?

24  Q      Sure.

25  A      There is a photo ID chart that states that Tribal

1  enrollment IDs are acceptable.  And I don't know what

2  those have on them.  So theoretically, if one of the

3  acceptable Tribes doesn't have a photo ID, it might be

4  able to be shoehorned in.  But I've never come across that

5  situation or know the statutory backing based on it.  It

6  was just something that preexisted.

7  Q     Okay.  Just to be clear, the law that passed in 2013

8  requires all IDs that are used to vote to have a

9  photograph on them, right?

10  A     What it does is it gives you a list of acceptable

11  forms of identification.  And all those acceptable forms

12  of identification have a photo upon them.  But it is my

13  understanding that it doesn't state that only -- it

14  doesn't state photo IDs -- it is my understanding that it

15  states -- it gives a list of IDs, and all the IDs that it

16  lists contain photographs upon them.  So it's a little bit

17  different.

18  Q     Okay.  And the statute will speak for itself on that

19  point?

20  A     Absolutely.

21  Q     So other than that circumstance with the possibility

22  of Tribal IDs, a voter with a religious exception can't

23  vote in-person?

24  A     Yes, sir.

25  Q     All right.  Now, the second issue you raised in this

1  e-mail was what happens with a person who has changed

2  their name?

3  A    Yes.

4  Q    So, for example, if a couple gets married and they

5  have the same last name following the marriage, but the ID

6  has the old last name, this is the type of circumstance

7  you're talking about?

8  A    Yes, I believe so.  Yes.

9  Q    So did you resolve this issue?  What happens?

10 A    I believe that Cameron created a document based on

11 this.  And I don't know if it ever got final approval and

12 went out.  But I know that Cameron was certainly concerned

13 with this sort of situation.

14 Q    So what happens now if a voter shows up at a poll

15 with -- you know, say, a couple gets married and the woman

16 changes her name and she's got her old last name on the

17 license, but the voter roll has her married name, what

18 happens?

19 A    Sure.  The standard -- the underlying standard has

20 changed as of July 1, 2015.  Delegate, I want to say,

21 Watts, introduced a bill saying that if the name is

22 substantially similar to the name within the poll book,

23 that it can be accepted.  So now that "*substantially*

24 *similar*" is the standard, what that means to a person

25 actually checking the polls, you know, an Officer of

1  Election in a polling place, I don't know.  But it is the

2  standard now.

3  Q    But so if my name were Kaul and I got married and it

4  became Mcclees, that's not substantially similar, right?

5  A    Not in my opinion.  But once again, it's left in the

6  hands of an Officer of Election.

7  Q    Okay.  So those people who changed their name, but

8  have the old name on their ID, they can't vote under that

9  old name unless it's substantially similar?

10  A    Unless it's substantially similar in the eyes of an

11  Officer of Election.

12      THE COURT:  Substantially similar to the name on the

13  voting roll, right?

14      MR. MCCLEES:  Yes, Your Honor.

15      THE COURT:  Okay.

16      I think before you get into another topic, we're

17  going to take a 10-minute recess, okay?

18      MR. KAUL:  Thank you, Your Honor.

19                  (Recess taken.)

20          (Gil Halasz is now the court reporter.)

21              CROSS EXAMINATION (continued)

22      THE COURT:  All right, you may continue.

23  BY MR. KAUL:

24  Q    Could we bring that document back up that I was just

25  talking to Mr. McClees about?

1           I want to qualify a couple points on this.  We were

2    talking about the religious objection and how somebody,

3    with the exception you noted could only vote absentee,

4    right?

5    A     Yes.

6    Q     But a voter has to have an excuse to vote absentee in

7    Virginia, right?

8    A     That's correct.

9    Q     There is no religious objection excuse?

10   A     Yes, there is.  Yes, sir, there is.

11   Q     Can you tell me about that?

12   A     I believe it is in -- I am not the absentee person

13   but I believe in 24.2-701, sir.

14   Q     24.2-701?

15   A     701.

16         THE COURT:  Code of Virginia.

17         THE WITNESS:  Yes, I believe in there.  It is -- I

18   know it is within chapter 7 of title 24.2.  And it

19   gives -- obligation occasioned by my religion.  So it is

20   within there.  So we have interpreted that to allow even

21   atheists who don't wish to venture into a church for a

22   polling place to assert an excuse for voting absentee.

23   BY MR. KAUL:

24   Q     Okay.

25         There is language that says that a voter can vote

1   absentee because of an obligation due to their religion?

2   A    Right.

3   Q    And you have interpreted that in that religious

4   objectors to being photographed can vote absentee?

5   A    Right.

6   Q    Okay.

7        So, but that is, other than the tribal exception, the

8   only way to vote?

9   A    Yes, sir.

10  Q    And do voters have to mark the reason they are being

11  excused, their excuse for voting absentee?

12  A    Yes.  Yes, they do, sir.

13  Q    Do you inform voters about that option to mark that

14  box to vote absentee?

15  A    What do you mean by "inform voters," sir?

16  Q    Do you do out reach to tell religious objectors they

17  can vote absentee that way?

18  A    Oh, no.  No.  My apology.  I am not the person who

19  handles absentees, so I am not aware of any out reach.

20  Q    Okay.

21       You have received questions about religious

22  objectors, right.  E-mail?

23  A    In a hypothetical sense.  I have yet to receive

24  anything specifically that I can remember from a person

25  who actually said, I object to being photographed.  So it

1  always comes from groups who are asking questions, well,

2  what if?  But I don't remember specifically somebody

3  saying, hey, I am not going to take a photograph, or I'm

4  not able to take a photograph.  I don't remember that sort

5  of thing happening.

6  Q    Any of these groups that advocate on behalf of

7  voters, right?

8  A    Absolutely, yes.

9  Q    And so could we go back to the first page of this

10 e-mail?

11      Let's zoom in on your e-mail to Mr. Edgardo Cortez.

12 Do you see here you say, "You are free at any time to meet

13 on both this and the Obenshain letter?"

14 A    Yes.

15 Q    Does that refresh your memory from before about

16 whether Senator Obenshain's letter regarding the

17 definition of what a valid ID is?

18 A     No.  Because, if that -- is this before the World

19 Cup?  Looking at the date, this is June 16, so this is

20 before I left.  I don't remember specifically addressing,

21 speaking about a letter from Senator Obenshain before I

22 left.  Because I remember when I came back I was caught a

23 little bit unaware.  At least that is what I think I

24 remember coming back and being kind of surprised a little

25 bit.  Not too much, but surprised a little bit.

1   Q    To be clear, you did send this e-mail?

2   A    Sure, yes.

3   Q    Your Honor, we move this be admitted as plaintiffs'

4   exhibit 145.

5        THE COURT:  Any objection?

6        MS HART:  No objection, Your Honor.

7        THE COURT:  It will be received.

8                   (Plaintiffs' Exhibit 145 was

9                   offered and received in evidence)

10  BY MR. KAUL:

11  Q    You were also talking about the volume of comments

12  you received on your regulation?

13  A    Yes, sir.

14  Q    Was there also an unusual volume of people speaking

15  at the legislature, members of the public speaking about

16  the voter ID law?

17  A    For, I would say for the Privileges and Elections

18  Committee it ranked up there certainly.

19  Q    You said the line went out the door, right?

20  A    It was all the way down the aisle.  Certainly all the

21  way down the aisle in the chamber.  I want to say Senate

22  chamber A.  It was a long line of people, certainly.

23  Q    Most of those people were expressing their opposition

24  to the voter ID bill, right?

25  A    I would say that is what my recollection was.

1  Q     You said that is what your recollection --

2  A     That is what my recollection is, yes, sir.

3  Q     We were talking before about the change to the

4  definition of "valid."  And we discussed expiration date

5  and the 30-day limit.  Ultimately the board adopted a rule

6  that allowed for identifications to be expired for up to

7  one year if they were going to be used for voting; is that

8  right?

9  A     Yes, sir.

10 Q     That is not the recommendation that the staff of your

11 agency had provided, right?

12 A     Well, it is, again, when it comes to recommendation,

13 if I did not specifically recommend something based on my

14 analysis, I work at the will of the board, so my input to

15 the board was, here is what we have been operating under.

16 Then it was, we are going to go no expiration.  And then

17 after that, I made no recommendation on a specific time

18 period.  So, it is not like I used my professional

19 analysis to provide something.  I was just working at the

20 will of the board.

21 Q     Were you present at the meeting when the board passed

22 that the final regulation, the one that --

23 A     Yes, I was at that one, yes.

24 Q     And Kimberly Bowers, who is one of the three board

25 members, was not present, right?

1  A      That's correct.

2  Q      And she is the Democratic appointee to the board, is

3  that correct?

4  A      Yes.  She was vice chair.

5  Q      Is it unusual for the board to have meetings with

6  members absent?

7  A      With that board I don't remember meetings with -- I

8  don't remember a lot of meetings without other members.

9  And I think the current board, they have had situations

10 where they have met without a member present.  But I don't

11 remember multiple meetings with members not present then.

12 Q      Is the only one you remember with the board involving

13 Chairman Judd, Ms. Bowers, Mr. Palmer, in which a board

14 member was missing, the one when the definition of "valid"

15 changed; is that right?

16 A      It is the one that stands out, I would say, but I

17 can't guarantee that there weren't others.  It is one that

18 I certainly remember.  It is one that I remember, but I

19 cannot speak assuredly that there weren't others, but it

20 certainly stands out.

21 Q      I want to ask you a couple quick questions about the

22 implementation of the voter ID rules.

23 A      Yes, sir.

24 Q      A voter -- an employer ID to be used for voting has

25 to be issued in the ordinary course of business, right?

1  A     Yes.

2  Q     You are smiling.  Why is that?

3  A     Because we get multiple questions from people on this

4  situation.  For instance, realtor business card.  And, you

5  name it, we get all kinds of questions from people.

6  Normally it is from registrars who like to pepper me with

7  hypotheticals.  But, yes, we even have people say, if a

8  person runs their own company and, you know, they are

9  self-employed and they issue themselves an ID.  So, I

10  mean, I get all kinds of questions on it.  It is a sticky

11  wicket.

12  Q     What guidance do you give on that sticky wicket?

13  A     I say in the ordinary course of business where it is

14  normal to provide an ID, and it isn't just being produced

15  solely for this sort of situation, and it is not -- and

16  the purpose is to identify that person to an employer as

17  opposed to for public purposes.  Whereas, you know, a

18  realtor business card is for me, if I were a realtor for

19  me to introduce myself to a general person, a client, or

20  something.  Not for me to introduce or to prove my

21  identity to my employer.

22  Q     So I can't use my realtor business card?

23  A     I have never given official guidance on this, but it

24  would be something that I would lean towards not,

25  probably.

1   Q     And the registrar is sort of told to do whatever they

2   think is right, or how does that work?

3   A     We -- normally what we will do is, if they ask for

4   official guidance, we will provide official guidance.  If

5   they ask for -- if they call me up and ask for my general

6   opinion on that one, I would probably punt, and say, it is

7   one I probably wouldn't normally think would fit, but I

8   leave it in your discretion.  That is the sort of

9   situation.

10  Q     Is it possible if I live in Fairfax County I can use

11  my realtor ID to vote, but if live in Arlington I can't?

12  A     Without official guidance specifically issued by our

13  agency, yes, it would be a little bit of gray area, sure.

14  Q     Now, out-of-state driver's licenses issued by state

15  governments.  I can't use those, right?

16  A     That's correct.

17  Q     And a license issued by the DMV in Virginia, if it

18  has been expired a year and a day, I can't use that,

19  correct?

20  A     Correct.

21  Q     How does the reasonable resemblance part of the ID

22  process work?

23  A     It is left in the discretion of the officers of

24  election in the polling place.  So, I think all of --

25  well, not all -- but the great majority of the standards

1  within our Title 24.2 are based on a community standard

2  where your neighbors are the ones who are vetting you,

3  quote unquote, vetting you.  So it is kind of based on

4  that notion, idea, that your neighbor is the one who is

5  checking you out.

6        So, in that situation when you go up, if you present

7  ID they don't think you resemble, they give you the

8  opportunity to direct you towards the provisional voting.

9  Q    Why do you have that community standard you have been

10 describing?

11 A    It has just been a part of the code for, you know,

12 certainly preceded me.  But it is something that is a very

13 integral part of our process.

14 Q    Is it the idea your neighbors are more likely to know

15 who you are than --

16 A    I think so.  The reason why the school year lets out

17 in summer, so you can go harvest.

18       THE COURT:  Let's move on here.

19 BY MR. KAUL:

20 Q    I want to get to your neighbors are more likely to

21 know you than the general registrar, right?

22 A    Theoretically, yes, sir.

23 Q    So if I show up to the polls and the poll worker says

24 I don't reasonably resemble my ID, I can still cast a

25 provisional ballot, right?

1    A      Correct.   Or if you have another ID that you

2    resemble, you can present that.

3    Q      If I cast a provisional ballot I can cure that by

4    faxing an ID or e-mailing an ID, right?

5    A      Yes, sir.

6    Q      I could even use the same ID I wasn't allowed to vote

7    with to cure the ballot?

8    A      Yes, sir, you could.

9    Q      There is no way for the election worker to check when

10   I fax that if I resemble the person?

11   A      No, sir, there isn't.

12   Q      Instead I could vote absentee if I had an excuse

13   without any ID at all, correct?

14   A      That's correct.

15          So long as there is HAVA involved there, but assuming

16   you have met those HAVA standards, yes.

17   Q      No further questions.

18          THE COURT:  Any redirect?

19          MS HART:  Yes, sir.

20          THE COURT:  All right.

21                        REDIRECT EXAMINATION

22   BY MS HART:

23   Q      A couple more questions for you, Mr. McClees.

24          The first one has to do with fraud.  Fraud isn't

25   something that you normally handle.  Is it voter fraud

1   specifically?

2   A    No, it is not.

3   Q    So if there were voter fraud issues that is not

4   something would come to your desk, typically?

5   A    Not specifically.  Sometimes people will ask us

6   questions about fraud.  Or will try to ask us, give us a

7   scenario.  We always refer those to the Commonwealth's

8   attorney.

9   Q    Why is that?

10  A    Because we are not an investigatory agency.  We don't

11  have the mechanism in order to go out and check that sort

12  of thing.

13  Q    And the Commonwealth's attorney does?

14  A    Absolutely.

15  Q    All right.

16       The next question has to do with provisional voter

17  notice.  The 2015 version of the provisional voter notice

18  does advise the provisional voter about the free voter ID

19  option, correct?

20  A    That is correct.

21  Q    Do you have any reason to think that future versions

22  of that provisional notice would not contain that notice?

23  A    Heavens, no.

24  Q    When the 2013 law, SB 1256, was passed it included

25  additional forms of acceptable photo ID; is that right?

1   A      I believe so, yes.

2   Q      And when you updated the What If guide, you included

3   those additional forms of photo IDs, right?

4   A      Correct.  After passage stage of 1256, yes.

5   Q      I have no further questions.

6         THE COURT:  Okay.  May this gentleman be excused?

7   You are excused and free to go.  Thank you for coming.  We

8   appreciate your testimony.

9         THE WITNESS:  Thank you.

10                      (Witness stood aside)

11        THE COURT:  Who will be your next witness?

12        MR. FINBERG:  Defense calls Matthew Davis.

13        THE COURT:  Mr. Davis.  All right.

14        Mr. Davis, if you would raise your right hand, left

15  hand on the Bible, and face the Clerk of the Court.

16                  MATTHEW JAMES DAVIS

17            WAS SWORN AND TESTIFIED AS FOLLOWS:

18                    DIRECT EXAMINATION

19        MR. FINBERG:  Could I ask the Court Security Officer

20  to give one copy of this binder to Mr. Davis?

21        THE COURT:  Yes, sir.

22        MR. FINBERG:  Then a copy for the law clerk and for

23  Your Honor.

24        THE COURT:  All right.

25        MR. FINBERG:  May I proceed?

1        THE COURT:  Yes, sir, you may.

2   BY MR. FINBERG:

3   Q    Thank you.

4        Good morning, Mr. Davis.

5   A    Good morning.

6   Q    Could you please state your full name for the record,

7   spelling the last name.

8   A    Matthew James Davis.  D-A-V-I-S.

9   Q    Thank you.

10       Mr. Davis, can you briefly describe your educational

11  background since high school.

12  A    Bachelor's in government, minor in astronomy, masters

13  in teaching from the University of Virginia.

14  Q    Okay.

15       When did you obtain those different degrees?

16  A    I graduated in the spring of 2000.

17  Q    Where do you currently work?

18  A    Department of Elections.

19  Q    What is your job title at the Department of

20  Elections?

21  A    Chief Information Officer.

22  Q    Could you describe for the Court what your job duties

23  are as the Chief Information Officer at the Board of

24  Elections?

25  A    I am essentially the information technology manager

1  for the department.  I manage the statewide voter

2  registration system, which is also election management

3  system for the Commonwealth.  As well as the campaign

4  finance disclosure application, and all of the IT needs

5  for the agency.

6  Q    How long have you been in that position?

7  A    Just over six years.

8  Q    Mr. Davis, I am going to ask you some questions about

9  list maintenance guidelines.  Can you briefly describe

10 what list maintenance guidelines are?

11 A    Certainly.  Under the National Voter Registration Act

12 state election offices are required to maintain voter

13 registration roles.  And to do so we compare our data to

14 other trusted data sources, such as the National Change of

15 Address data from the Postal Service.  The State Police

16 provide us felon data that we compare our data to.  We

17 obtain data from the Bureau of Vital Statistics, from the

18 Department of Health for death records, as well as from

19 Social Security Administration and as other sources along

20 those lines.  We also participate --

21 Q    Mr. Davis, I don't mean to interrupt.  Could you

22 maybe slow down a little bit.  We have a court reporter

23 here who has to take down your answers.

24 A    All right.

25 Q    I will remind you if I catch you speeding up again.

1   We would appreciate it if you would just slow down a

2   little bit.

3   A      Certainly.

4        We also participate in several cross-state data

5   exchanges with other chief election officials in other

6   states to compare our voter registration records with the

7   registration records in those states.

8   Q      Thank you.

9        You have got a binder in front of you, Mr. Davis.

10       If I could you to take look at what is tab 16.

11       Your Honor, that is Defendants' exhibit 326.

12       THE COURT:  Okay.

13       THE WITNESS:  I might not have the same tab numbers.

14       MR. FINBERG:  Tab 16?

15       May I approach the witness, Your Honor?

16       THE COURT:  Yes, sir.

17       MR. FINBERG:  Let me call out the exhibit number.

18   Sorry.

19       THE COURT:  I don't see 326 in my binder as well. I

20   do see, I am sorry.

21       MR. FINBERG:  I think the issue is I have an earlier

22   iteration that doesn't have tabs, that have the exhibit

23   numbers.  Mr. Davis has the exhibit numbers.  So if I tell

24   you Defendants' exhibit 326.  Can you find 326 on the tab?

25       THE COURT:  Maybe the third from the end.

1      MR. FINBERG:  Yes.  I apologize for the confusion.

2 BY MR. FINBERG:

3 Q    If I could ask you to look at this document and let

4 us know whether you recognize this?

5 A    I do.

6 Q    What is this document?

7 A    This is the first report that our agency put out as

8 required by the Code of Virginia on our list maintenance

9 activities in the commonwealth.

10 Q    Do you appear as an author of this document?

11 A    I do.

12      MR. FINBERG:  Your Honor, I would like to move this

13 document into evidence.

14      THE COURT:  Any objection?

15      MR. KAUL:  No, Your Honor.

16      THE COURT:  It will be received.

17           (Defendants' Exhibit 326 was

18           offered and received in evidence)

19 BY MR. FINBERG:

20 Q    What is voter regulation list maintenance activities?

21 A    So this is where we compare our voter registration

22 list with other trusted data sources to insure the

23 accuracy of our data.

24 Q    Are you personally involved in the list maintenance

25 activities?

1  A     Yes.

2  Q     If I could direct your attention to pages ten and

3  eleven of this exhibit.

4       Do you see the heading towards the bottom third of

5  the page, other list maintenance activities, identifying

6  moving voters?

7  A     Yes.

8  Q     What is the process that is described on page ten and

9  eleven?

10  A     This is our activity related to comparing our data

11  with the national change of address data provided by the

12  Postal Service.  Where at least once a year as required

13  under the National Voter Registration Act we match our

14  voter registration data to the change of address data with

15  the Post Office.  When we find a match we then send a

16  mailer to the voter's registration address by forwardable

17  mail requesting that the voters confirm their registration

18  record with the commonwealth.

19       If the voter fails to respond to that notice within a

20  minimum of 30 days they will be moved from what is

21  considered an active registration status to inactive

22  registration status.  Once --

23  Q     What is the criteria then being moved from active to

24  inactive?

25  A     So in this occasion it would be where a voter has

1  moved according to what they have self reported to the

2  Post Office and then failed to respond to our attempts to

3  contact them.

4  Q    All right.

5  A    Once they are in an inactive status if that voter

6  fails to update voter their registration record through a

7  new voter registration form change of address, or the

8  like, or if they fail to vote any time between the time

9  they moved to inactive and the next two federal elections,

10 which can span anywhere from two to four years depending

11 on the timing of the mailing, they would then be canceled.

12 Q    What is the effect of classifying voters inactive?

13 A    The voter is still eligible to vote in the election

14 as long as they show up to vote and provide proper

15 identification.  And they do, I believe, have to sign a

16 statement of affirmation if they show up to vote

17 confirming that they are still registered at that

18 location, or still a resident at that location.  There are

19 some varied exceptions to that depending on the type of

20 election I am not as well versed in.

21 Q    Okay.

22      Essentially the moving of a voter from active to

23 inactive status, is it an accurate to say that has to do

24 with their participation in elections?

25 A    Yes.

Davis - direct                     1006

1   Q     You can take that down.

2         Mr. Davis, are you familiar SB 1256?

3   A     I am.

4   Q     Do you have a general understanding as to the

5   substance of SB 1256?

6   A     Yes.  It was the bill that now requires voters to

7   provide proof of photo identification when they show up to

8   vote in person.

9   Q     Was your department in charge of any out reach

10  efforts related to state bill 1256, or Senate bill 1256?

11  Excuse me.

12  A     Yes.

13  Q     What did your department do to assist in out reach

14  efforts regarding SB 1256?

15  A     The department did several activities.  They hired a

16  marketing firm to help coordinate advertisements, both

17  with radio, billboards and bus ads.  We also participated

18  in social media out reach campaign where we leveraged our

19  Twitter and Facebook accounts to try to spread the word

20  about the photo ID requirements.  And we also mailed

21  86,000, approximately, post cards to voters who we

22  identified did not have a DMV-issued photo identification

23  card notifying of the law.

24  Q     Let me ask you about that mailing you just described.

25  Who were the intended recipients of that mailing?

1  A     In that mailing they were voters, they were actively

2  registered voters, meaning had not been moved to inactive

3  status, who had done some sort of activity related to

4  their voter record, either having registered or updated

5  their registration, or having participated in elections

6  going back to including the November 2012 federal general

7  election.

8  Q     How did you go about identifying the potential

9  recipients of that mailing?

10 A     We compared our data to the Department of Motor

11 Vehicles data based off of social security number match.

12 In this instance where we did not find a match with the

13 Department of Motor Vehicles data, we assumed they did not

14 have a DMV-issued photo ID card.  And in doing so, we

15 identified approximately 200,000 active voters that did

16 not appear to have a DMV-issued card.  We then looked at

17 other sub-classes of voters, specifically individuals who

18 notified they were members of military, or individuals who

19 have a standing absentee status, absentee voting status

20 with us, which could be military, overseas, and in some

21 cases, disabled voters.  In this case voters would be

22 voting absentee, and would not be voting in person.  So

23 they would not need voter ID.  We narrowed the window down

24 to about 86,000 voters that we did the mailing to.

25 Q     So one of the criteria was possession of DMV ID?

1  A      Correct.

2  Q      I ask you to take a look at plaintiffs' exhibit 55.

3  PX 55.

4  A      Okay.

5  Q      Do you recognize this document?

6  A      I do.  It's a report we published on our web site in

7  the fall of 2014 outlining the counts by precinct of

8  active and inactive voters, and it also provided by

9  precinct the counts of active and inactive voters who did

10 not appear to have a DMV record.  And then a final column

11 titled "filtered," which is that filtered criteria I just

12 described.  A definition of the filtered criteria appears

13 on the final page.  Page 40 at the bottom.  That is where

14 it is voters who self-identified as being military,

15 overseas or federal only voter who does not have active

16 FPCA, federal positive card application, or 7031 absentee

17 application.  Those are ongoing absentee voters.  And also

18 who had a last activity date in our system, or had

19 participated in elections going back to the last

20 presidential, which would have been the November 2012

21 election.

22 Q      You participated in creating the document that is

23 exhibit 55?

24 A      I did.

25 Q      Plaintiffs' exhibit 55?

1  A      I did.

2  Q      Did you work with anyone inside the agency to

3  identify appropriate mailing recipients?

4  A      Yes.  Commissioner Cortez and I developed the formula

5  for the filtered count.

6  Q      Did you provide the resulting data that is reflected

7  in Plaintiffs' 55 to anyone outside the agency?

8  A      Yes.  This report and regular reports just like this

9  were posted on our agency public web site so anybody in

10  the world could have seen the reports.

11  Q      Did you provide that data to any special interest

12  groups?

13  A      We did.  That particular list of addresses that we

14  mailed to was provided directly through the Freedom of

15  Information Act request to the Democratic Party of

16  Virginia, the Virginia New Majority, third party voter

17  registration group.  To the Advancement Project, another

18  third party voter registration group.  And the League of

19  Women Voters in Virginia.

20  Q      Do you know why you provided it to those

21  organizations?

22  A      They were also interested, from my understanding, of

23  doing their own out reach to the same voters.

24  Q      Did any of the special interest groups you just

25  identified, Mr. Davis, request additional data regarding

1  active voters likely to vote in the 2014 election?

2  A    We have a system in the commonwealth that allows any

3  of those political party candidates and third party voters

4  registration type groups to obtain data from us on a

5  regular basis.  So I know for the Democratic Party of

6  Virginia receives data monthly from us on registered voter

7  and absentee voting information.  Any other groups could

8  have.  I'm not specifically familiar with their requests,

9  though.

10 Q    Did you have any way to evaluate or judge how you --

11 strike that.  Did you have any way to judge the efficacy

12 of the mailing?

13 A    Not the mailing specifically.  However, the shear

14 lack of no ID provisional ballots cast in the

15 November 2014 election in my opinion indicates that the

16 out reach efforts were effective.

17      MR. KAUL:  Object to that as statement of opinion.

18 That he is not qualified.

19      THE COURT:  I think we have to sustain the objection.

20 I think he can testify to how many he received, but I

21 don't know that he can gloss that with his opinion.

22 BY MR. FINBERG:

23 Q    All right.

24      We will talk about the professional ballots later.  I

25 will move along.

Davis - direct                    1011

1         And I think you answered this before, but was there

2    social media-based out reach effort as well?

3    A    Yes.  We used our Twitter and Facebook accounts to

4    help spread the record about the photo ID requirements.

5    Q    Do you know whether there were any radio ads that

6    were done?

7    A    There were.  Not familiar with all of the content of

8    them, but there were radio ads done.

9    Q    Did you have any other duties or tasks in connection

10   with the implementation of SB 1256?

11   A    Yes.  My team actually built the software that is

12   used by the 133 general registrar offices around the state

13   to capture the photo and signature of individuals applying

14   for the free photo ID.  And then we print those IDs in our

15   office?

16   Q    Okay.  Why did the State Board of Elections develop

17   the free voter ID software internally?

18   A    The initial plan had been to seek a vendor to build a

19   system and support a system for us; however, through the

20   procurement process there wasn't a viable vendor solution

21   presented with the funding that was available.  So, the

22   agency administration turned to my team to see if we could

23   do something, and we are able to build a system in just a

24   couple of months using --

25        THE COURT:  Would you explain how the system worked?

1    What the objective was of this system?

2        THE WITNESS:  Sure.  It is a very simple system.  A

3    member in the registrar's office can sign into the system.

4    They can look up a voter.  If a voter is not in the system

5    already because maybe they are a new applicant, they can

6    enter in the individual's name and information.  They then

7    use a web camera to capture the individual's photo.  A

8    signature pad to capture the individual's signature.  And

9    then submit that data packet to our office where we then

10   process and make the photo ID.

11       THE COURT:  This is through a process request by

12   voters for the free identification that the registrar

13   issues; is that correct, Mr. Davis?

14       THE WITNESS:  Yes, sir.

15       THE COURT:  Go ahead Mr. Finberg.

16       MR. FINBERG:  Thank you, Your Honor.

17   BY MR. FINBERG:

18   Q    Is there both a software and hardware component?

19   A    Yes.  We were able to leverage off-the-shelf web

20   cameras and signature pads.  And the software runs on

21   Windows Seven or newer computers.  So the individual

22   offices provide the actual computer that they hook those

23   devices up to and install our software on.

24   Q    And does the software require an internet connection

25   to work?

1   A    It does not.  We prefer that it run with the internet

2   connection, but it can run in an offline mode.  So the

3   device, the computer can be taken out of the office to

4   events, or maybe a nursing home facility by the local

5   registrar to capture the data needed for photo IDs.  It

6   also served as an emergency backup in the event, like last

7   night we had several areas that are now without power or

8   internet access.  We can still use the software.  Once the

9   internet access is restored, it automatically uploads to

10  our system.

11  Q    Did you conduct any in-person training for localities

12  to learn how to use the software and the equipment?

13  A    The Department conducted 13 in-person regional

14  training sessions around the state in the summer of 2014.

15  That is where we actually provided the hardware to the

16  localities at those meetings.

17       And we also conducted training at our annual training

18  events that we are required by law to provide, and the

19  localities are required to attend.  Both in 2014 and in

20  2015.  And additionally in the 2014 electoral board

21  association annual meeting we were invited to present a

22  training session on photo ID.

23  Q    Okay.

24       Is the Department of Elections planning to conduct

25  additional training in 2016?

Davis - direct                    1014

1   A    Yes.  So we have our annual training event.  It is

2   not scheduled yet, but it will be this summer.  We have to

3   do procurement for that.

4   Q    Did you conduct any kind of online training in

5   connection with the free voter ID software and hardware?

6   A    There were seminars conducted, and there are online

7   training modules.  There were online training modules as

8   well that were provided by the agency.

9   Q    And who has access to those online training modules?

10  A    They would have been made available to the registrars

11  and their offices.  In some cases, officers of election.

12  Q    Mr. Davis, do you know whether the State Board of

13  Elections keeps track of the free voter ID it issues?

14  A    Yes, sir.  All of that data comes into our systems,

15  and we track that with the individual voters when we issue

16  IDs.

17  Q    In your position as State Board of Elections chief

18  information officer, do you have access to those records?

19  A    I do.

20  Q    Are you aware that there was a witness earlier this

21  week by the last name of Polatty that testified?

22  A    Yes, sir.

23  Q    And subsequent to his testimony, did you have the

24  opportunity to look up whether Mr. Polatty ever applied

25  for a free voter ID?

1  A     I did.

2  Q     What did you find out?

3  A     Mr. Polatty applied for a free photo ID in 2014 and

4  2015.  At the time of the election he was issued temporary

5  ID both times.  And a permanent ID both times.  And our

6  system, also, you know, IDs is -- we mailed the photo IDs

7  to the voter registration address.  If that ID comes back

8  undeliverable, there is a place in our system the

9  registrar is to record that.  And neither one of the

10 permanent IDs are recorded as being undeliverable.

11 Q     Because they are not recorded as being undeliverable,

12 what does that lead you to conclude?

13 A     Our assumption at that point is that the Postal

14 Service delivered it to the address we mailed it to.

15 Q     I think now we are going to turn to the topic that I

16 promised we would get to, this is, provisional ballots.

17 In your role as State Board of Elections chief information

18 officer, do you have access to the number of provisional

19 no ID ballots cast in 2014?

20 A     Yes.

21       THE COURT:  You say 2014?

22       MR. FINBERG:  2014, Your Honor.

23 BY MR. FINBERG:

24 Q     How do you have access to that information?

25 A     So we have a report or data entry point in our system

1  on election night that we ask the 133 registrars to

2  complete, which is a count of locality wide how many no ID

3  provisional ballots were cast, and how many regular

4  provisional ballots were cast.

5  Q    Do you know how many localities in 2014 did not

6  report provisional no ID ballots cast?

7  A    Four localities did not complete their report.

8  Q    That is four out of 133?

9  A    Correct.

10 Q    Based on the 129 localities that did report, do you

11 have an estimate of the number of provisional no ID

12 ballots that were cast in 2014?

13 A    According to what the localities told us, it was just

14 over 400.

15     THE COURT:   That encompasses the entire 129 precincts

16 or localities that reported?

17 A    Yes, sir.

18     THE COURT:   Okay.

19     These ballots were cast because no ID was produced at

20 the polling place?

21     THE WITNESS:   Correct.

22     THE COURT:   Okay.

23 BY MR. FINBERG:

24 Q    And that number of provisional no ID ballots, do you

25 know -- do you know what the total number of provisional

1   ballots was?  Cast for whatever reason.

2   A    In 2014?

3   Q    In 2014.

4        If you don't know, is fine.

5   A    I don't recall.

6   Q    I don't want you to guess.

7   A    Sorry.

8   Q    If I could ask you to look at plaintiffs' exhibit

9   162.

10       Mr. Davis, are you familiar with this document?

11  A    Yes, sir.

12  Q    What is this document?

13  A    This is the report that I was referring to in the

14  previous question.  It would appear that the 400 I gave

15  was incorrect.  It appears to be 773.  My memory fails me.

16  I apologize.

17  Q    So --

18       THE COURT:  773?

19       THE WITNESS:  Correct.

20       THE COURT:  Okay.

21  BY MR. FINBERG:

22  Q    Just so the record is clear, though, after reviewing

23  plaintiffs' exhibit 162, what do you believe the correct

24  number of provisional no ID ballots cast in the 2014

25  election?

Davis - direct                            1018

1    A     773 based on what was reported to us that night.

2          And then the answer to the other question, if I may,

3    about how many total were cast?  It was a total number of

4    provisional ballots in 2014 as reported to us was 3,622.

5    Q     In your role as State Board of Elections chief

6    information officer do you have access to the number of

7    provisional no ID ballots that were cast in the 2015

8    election?

9    A     Yes, sir.

10   Q     Do you know what the response rate was from the

11   different localities in terms of reporting that

12   information to the State Board?

13   A     We had 27 localities that did not report out of the

14   133.

15         THE COURT:  How much?

16         THE WITNESS:  Twenty-seven.

17   BY MR. FINBERG:

18   Q     Based on the 106 localities that did report, do you

19   have an estimate of the number of provisional no ID

20   ballots that were cast in 2015?

21   A     I believe that number was the 400 number that was in

22   my head.

23   Q     Let's take a look, then, at defendants' exhibit 225.

24         THE COURT:  225.

25         MR. FINBERG:  225, Your Honor.

```
 1  BY MR. FINBERG:

 2  Q     Do you recognize this document, Mr. Davis?

 3  A     Yes, sir.  It is the same report that we just looked

 4  at, only for the 2015 election instead of 2014 election.

 5  Q     This was a report that was generated by the

 6  Department of Elections in the regular course of business?

 7  A     Yes, sir.

 8  Q     Something that you were involved in producing.

 9  A     Yes, sir.

10  Q     I move its admission, Your Honor.

11        THE COURT:  225?

12        MR. FINBERG:  225.

13        THE COURT:  Any objection?

14        MR. KAUL:  No, Your Honor.

15        THE COURT:  It will be received.

16              (Defendants' Exhibit 225 was

17              offered and received in evidence)

18  BY MR. FINBERG:

19  Q     So we can verify that the numbers that you just

20  testified about are accurate, looking at this report, what

21  is the number of provisional no ID ballots that were cast

22  in 2015?

23  A     408.

24  Q     And do you know the number of total provisional

25  ballots that were cast in 2015?
```

Davis - direct                        1020

 1  A    Based on what was reported to us in this report 1763.

 2  Q    Mr. Davis, during the course of this litigation have

 3  you been involved in the State Board of Elections document

 4  production?

 5  A    Yes, sir.

 6  Q    Probably more than you wanted to be.

 7  A    Yes, sir.

 8  Q    Did you identify voter histories for individuals who

 9  were going to testify in this case?

10  A    Yes, I did.

11       MR. FINBERG:  Your Honor, I spoke to your courtroom

12  clerk about this earlier.  The voter histories have been

13  designated as attorneys' eyes only under the protective

14  order in this case.  They were previously the subject of

15  order sealing one of the previous filings based on that

16  ground.

17       I am going to run through some of the voter histories

18  with Mr. Davis.  I would ask that they not be displayed on

19  the public two large monitors.  They are in the notebooks

20  that are in front of witness and Your Honor.

21       THE COURT:  All right.

22       MR. FINBERG:  And what I would propose is, we did not

23  lodge them with the clerk's office.

24       THE COURT:  I understand.  Protected by statute.  I

25  did a carve out in my discovery order to protect that.

```
 1          MR. FINBERG:  We will lodge them separately with the
 2  Clerk after they are admitted --
 3          THE COURT:  All right.
 4          MR. FINBERG:  -- in its own separate binder.
 5          THE COURT:  All right.  That is fine.
 6          MR. KAUL:  We don't object to that.
 7          THE COURT:  You don't object.  Okay.
 8  BY MR. FINBERG:
 9  Q    So, Mr. Davis, let me ask you to take a look at
10  defendants' exhibit 240.
11          THE COURT:  Defendants' 240.
12          MR. FINBERG:  240, Your Honor.
13  BY MR. FINBERG:
14  Q    Can you put it up there?
15          Mr. Davis, what is defendants' exhibit 240?
16  A    This is a report from the voter registration system
17  for the commonwealth that provides an overview of voter
18  records, an individual's voter record.
19  Q    Okay.  So that the Court understands, what is
20  contained in these documents?  Let me ask you to run
21  through some of the different fields that are contained in
22  the voter history.
23          What information is provided in the -- first of all,
24  what is the name of the voter in this?
25  A    Mary Joanna Jones.
```

1  Q    What information is provided in the overview section?

2  A    Here we have the voter ID number, which is our

3  identification number for each individual voter.  Their

4  gender.  The year of their birth.  We do have their full

5  date of birth in our system, but for security purposes

6  only.  We don't publish that when we can help it.

7       Their registration status, and in the case of this

8  voter her status is active.  The registration address.

9  The locality of registration, which in the case here would

10 be Albemarle County.  The voter's precinct, which is

11 precinct 601 Crozet.  The last date they voted.  In this

12 voter's case would have been November 2015.  And last

13 activity date, which in this case was the last time of the

14 voter voted.  If we have an electronic signature on file,

15 it would appear as well.  And there is also a long

16 preference.

17 Q    Mr. Davis, what is the difference between last vote

18 date and last activity date?

19 A    So, let's suppose that Ms. Jones submitted a voter

20 registration form in January of 2016.  Her last activity

21 date would reflect that date, whereas her last vote date

22 was the last time that she voted.

23 Q    Let's move down this document to the registration

24 history section.

25      If you could just describe to the Court what is

Davis - direct                    1023

1  reflected in the registration history section?

2  A     So, this shows essentially the information that would

3  have been on our registration form received by the

4  locality, or the department for this voter.  So this voter

5  had a record that was in existence from February 1981

6  through October 2015.  And she updated her registration

7  through a form.  It doesn't appear her address or anything

8  like that changed, but we get duplicate registrations of

9  that fairly frequently in our world.

10 Q     Let's move down and talk about the voting history

11 section.

12 A     Shows the voter's history in elections.  So you can

13 see this voter voted in each of the November general

14 elections going back to 2005.  Actually continues on to

15 the second page, all the way back to 2003.  It appears

16 maybe she missed the 2009 and '11 elections in there.  But

17 you can see what we looking at it.  You can also see if

18 she voted absentee.  And in those elections whether she

19 cast a provisional ballot in those elections.  If it was a

20 provisional, whether it was counted or not.

21 Q     Along those lines, let me direct your attention to

22 the entry in Ms. Jones' voter history for the 2014

23 November general election.  Do you see that?

24 A     I do.

25 Q     What does this document tell you about Ms. Jones'

Davis - direct                          1024

1  experience voting in that election?

2  A    Ms. Jones cast a provisional ballot and it was

3  counted.

4       MR. FINBERG:  Your Honor, I am going to get the

5  witness to identify the following exhibits as being the

6  exhibits for witnesses who have testified during the case.

7  Not intending to go through them one by one with him.

8       THE COURT:  I appreciate that very much.

9       They will be in evidence, and I can review them as

10 necessary.

11      MR. FINBERG:  That is the intention, Your Honor.

12      THE COURT:  Fine.  Proceed.

13 BY MR. FINBERG:

14 Q    Can you please take a look at Defendants' trial

15 exhibit 241.

16 A    Yes, sir.

17 Q    Whose voting history is exhibit 241?

18 A    Ellen Lamb.

19 Q    Thank you.

20      If you can go to trial exhibit 243, please.

21 A    Okay.

22 Q    Whose voting history is contained in exhibit 243?

23 A    I apologize to the voter for the pronunciation of the

24 name.

25 Q    Could you spell it instead of pronouncing it, then?

1   A    Sure can.   Josephine Okiakpe.   Last name is spelled

2   O-K-I-A-K-P-E.

3   Q    Thank you, Mr. Davis.

4        Look at exhibit 247, defendants' exhibit 247.

5   A    Okay.

6   Q    Whose voting history is that?

7   A    Laning Polatty.

8   Q    Defendants' exhibit 248, please.

9   A    Okay.  This is Sharon -- Shanna Samson.

10  Q    Defendants' exhibit 249, Mr. Davis.

11  A    Bobbie Lee Smith.

12  Q    Defendants' exhibit 250?

13  A    Karen Stallings.

14  Q    Defendants' exhibit 251?

15  A    Jennifer C. Litton Tidd.

16  Q    Defendants' exhibit 255?

17  A    Clayton Stallings.

18  Q    Defendants' Exhibit 270?

19       THE COURT:  What was the last number?  I'm sorry.

20       MR. FINBERG:  Quite all right, Your Honor.

21       251 was the last.

22       THE COURT:  I got that one.

23       MR. FINBERG:  Then 255.

24       THE COURT:  Thank you.  Go right ahead.  Didn't mean

25  to interrupt you.

1        THE WITNESS:   270 is that where we are at?

2   BY MR. FINBERG:

3   Q     270, yes.

4   A     Barbara Hawkins Lee.

5   Q     231.  Defendants' 231.

6   A     I am missing.  It must be out of order.  231.

7   Charles Steven Benagh B-E-N-A-G-H.

8   Q     Defendants' exhibit 234?

9   A     Megan Lynn Cotten.

10  Q     Defendants' exhibit 237?

11  A     Jack Nixon Etheredge.

12  Q     And defendants' exhibit 238?

13  A     Pettus Hilt, H-I-L-T.

14       MR. FINBERG:  Your Honor, if memory serves me, I

15  think we have forgotten to include one for Abe Barranca,

16  which I would ask permission to proffer at a later time.

17       THE COURT:  You may submit that.

18       MR. KAUL:  We have no objection.

19       THE COURT:  Any objection to these exhibits?

20       MR. KAUL:  No, Your Honor.

21       THE COURT:  They will be received without objection.

22          (Defendants' exhibits 231, 234, 237, 238,

23         241, 243, 247, 248, 249, 250, 251, 255, 270,

24            were offered and received in evidence)

25       MR. FINBERG:  Thank you.

1        No further questions for Mr. Davis.

2        THE COURT:   Cross examination of Mr. Davis?

3        MR. FINBERG:   Thank you.

4        THE COURT:   Yes, sir.

5                        CROSS EXAMINATION

6   BY MR. KAUL:

7   Q    Mr. Davis, how you doing today?

8   A    Doing okay.   Thank you.

9   Q    My name is Josh Kaul, one of the attorneys for the

10  plaintiff in this case.   Let me start out by asking you

11  about the voter history we just reviewed.

12  A    Okay.

13  Q    Who submits the information that is used to generate

14  those files?

15  A    The local registrars.

16  Q    So that is not something that your office -- not

17  based on data that your office generates, you just collect

18  it?

19  A    Correct.

20  Q    Would it be fair to say local registrars sometimes

21  make mistakes on data they send you?

22  A    Yes.

23  Q    Sometimes they don't even send you the data they are

24  supposed to, it looks like, right?

25  A    Correct.

1   Q     Speaking of which, in 2014 the provisional count, you

2   said four localities didn't provide data?

3   A     Correct.

4   Q     And this was plaintiffs' 162, if you want to look at

5   it.

6         Looking at the exhibit I see asterisks next to

7   Rockingham County, but it doesn't spell out which

8   localities didn't provide data.  Do you know which four

9   they were?

10  A     Yes.  Looking at the report where it says "not

11  reported," which is also with the asterisk, means that

12  would indicate the localities that did not report.  So in

13  this case Amhurst.

14  Q     Which one are you looking at?

15  A     The 2014 report, exhibit 162.

16  Q     Is this plaintiffs' or defendants'?

17  A     Plaintiffs', sorry.

18        THE COURT:  What exhibit number are you referring to

19  at this point?

20        MR. KAUL:  Sorry.  162.  I just learned my exhibit is

21  two-sided.

22        THE COURT:  Plaintiffs' 162.  Okay.

23  BY MR. KAUL:

24  Q     Actually four counties.

25  A     Correct.  We use the term "localities" because cities

```
 1  and counties are independent units.

 2  Q    And you don't know how that affected the total,

 3  right?

 4  A    Not from this report, no.

 5  Q    Do you know any other way?

 6  A    We don't have a statewide record that provides a

 7  count beyond that.  So I don't have that number.

 8  Q    All right.

 9       In 2015, this is plaintiffs' -- I don't know if 162

10  was moved or not, but if it wasn't, I would move it in.

11       MR. FINBERG:  I was under the assumption --

12       THE COURT:  It was not moved in.

13       MR. FINBERG:  I used it.  Any objection I might have

14  had was probably waived at that point.

15       THE COURT:  I will receive it without objection.

16       Go ahead right.  You are right, it was not in

17  evidence.

18                 (Plaintiffs' Exhibit 161 was

19              offered and received in evidence)

20  BY MR. KAUL:

21  Q    Plaintiffs' 161 was data for 2015, right?

22  A    I don't know that I have Plaintiffs' 161 in front of

23  me.

24  Q    Sorry.  Defendants' 225?

25  A    225, Defendants' exhibit, is the 2015 report.
```

Davis - cross                    1030

1  Q    At that time you said that the 27 localities didn't
2  report.
3  A    Correct.
4  Q    So clearly the numbers here are going to be an under
5  count of the total numbers for 2015, right?
6  A    Correct.
7  Q    So, first of all, everybody who is listed as a no ID
8  provisional is somebody who had to cure their ballot
9  somehow in order to have that are ballot counted, right?
10 A    Correct.
11 Q    All right.
12      In both of these elections about half of the people
13 who cast provisional ballots cured them, and about the
14 other half their votes weren't counted; is that right?
15 A    I do not know the statistics on that.  Sorry.
16 Q    You have the total number of no ID provisionals?
17 A    Correct.
18 Q    Do you have any data on the number of people who
19 showed up to vote who learned they didn't have the
20 appropriate ID and then left the polling place?
21 A    No.
22 Q    Do you have any data on the number of people who just
23 didn't show up to vote because of the ID requirement?
24 A    No.
25 Q    The data regarding provisional ballots, is that data

1  that the localities are required to provide to you?

2  A    It is complicated question.   They are required to

3  enter the details of provisional ballots that are counted

4  into our system.   If it is a registered voter and for some

5  reason it is not counted they are supposed to enter it as

6  well.   If it's somebody who is not yet registered at the

7  area it is a little more gray whether they are required to

8  enter it or not.

9  Q    But you are at least supposed to get the provisional

10 ballot counts for each locality, right?

11 A    Yes.   The data entry that generates the two reports

12 we have been looking at here is not required of them to

13 enter it.   It is requested.   They do, because we get

14 questions on election night from media and the parties

15 about how many provisional ballots were cast.

16 Q    Okay.   So in 2015, 27 counties ignored that request?

17 A    Yes.

18 Q    Did that raise any concerns within the agency?

19 A    Certainly.

20 Q    Did you take any steps to address that?

21 A    We asked nicely to fill it out.

22 Q    Would it be fair to say you are limited in the degree

23 to which you can exercise control over the localities by

24 resource constraints and a variety of other factors?

25 A    And legal constraints and things, yes, sir.

1  Q     Are there other areas the counties don't follow your

2  requests?

3  A     So our agency's mission is to provide uniformity, so

4  we provide procedures and guidance and training for that.

5  We don't have an enforcement arm or power in most cases to

6  enforce compliance.  Except for in very certain areas that

7  I am not all that familiar with.  But it is an on-going

8  problem for the agency.

9  Q     Okay.  You talked a little bit about out reach.  You

10 are not in the out reach department, right?

11 A     No, sir.

12 Q     And you talked about having done a filtered mailing,

13 is that right?

14 A     Yes, sir.

15 Q     And what that means is that you didn't send your

16 mailing to all active voters, you picked a subset to send

17 it to?

18 A     Correct.

19 Q     What percentage of registered voters did you send

20 that to approximately?

21 A     There were approximately five point two million

22 registered voters, and we mailed to 86,000.  My math is

23 not that great.  I apologize.

24 Q     You didn't just filter from active voters, you also

25 filtered among the population of people who didn't have

Davis - cross                    1033

1   DMV ID, correct?

2   A    Based on, I believe it was 55 -- the total number of

3   active voters without ID was just shy of 200,000, and we

4   mailed to 86,000.

5   Q    Why didn't you mail it to all 200,000 or so?

6   A    The agency has limited resources, so we were trying

7   to use our resources to the best that we could.

8   Q    If you are going to appropriate more money for out

9   reach, you could have mailed to everybody who didn't have

10  a DMV identity?

11  A    Certainly.

12  Q    Would you like to have done that?

13  A    We would like to do a lot of things in our agency

14  with proper funding.

15  Q    Were you at the State Board of Elections in 2012 when

16  the 2012 ID law was being implemented?

17  A    Yes.

18  Q    When the 2012 law was implemented did the agency send

19  out voter registration cards?

20  A    Yes, sir.  The 2012 law, the implementation time line

21  occurred at the same time that congressional redistricting

22  was completed in the commonwealth.  And as result the law

23  requires us to provide voter cards for impacted voters.

24  And at that time a voter card combined with a brochure was

25  sent to all actively registered voters in the

Davis - cross                           1034

1   commonwealth.

2   Q     To be clear about that.  Voter cards were sent to a

3   number of voters in relation to redistricting prior to the

4   2012 mailing, right?

5   A     Redistricting during that cycle was quite an

6   interesting time in our office and still is.  We get to do

7   it again in a couple weeks.  I am so excited.  So the

8   General Assembly did their state districts in 2011.  And

9   then the congressional districts in 2012.  And because of

10  that, and because of some special elections and things

11  that ended up being done in like three or four different

12  phases I forget the exact breakout.  We did lots of

13  batches of voter cards over the course of that time

14  period.

15  Q     You say you send those voter cards in connection with

16  redistricting to any voter whose district from one of the

17  different offices had changed because of redistricting?

18  A     Correct.

19  Q     It wouldn't be state-wide, it would just be the

20  subset of people impacted?

21  A     It ended up -- sorry.  Trying to remember the full

22  details on that.

23        Most voters received two voter cards over that two

24  year time period, but we did that final mailing at that

25  time just because there had been so much fog and confusion

1  to get that information out there to make sure folks know

2  where they were supposed to vote.  It also provides the

3  poll location.

4  Q    So in connection with the 2012 voter ID law, though,

5  the Governor insured that money was available to send

6  voter registration cards, which at the time would be used

7  to vote to every registered voter in Virginia, right?

8  A    I don't know who insured the funding was there or

9  not, but I believe the Federal Help America Vote Act was

10 used for that mailing.

11 Q    In 2012 everybody got a permissible form of ID.

12 A    Active voters, yes, sir.

13 Q    And in the 2013 law you contacted only 88,000.

14 A    Approximately, yes, sir.

15 Q    Because of limited in funds, right?

16 A    Yes, sir.

17 Q    Let me ask you about mobile ID units.

18 A    Okay.

19 Q    What does a locality need to have a mobile free voter

20 ID unit.  Before I ask that, could you explain what that

21 is?

22 A    Sure.  They need a computer, a Windows seven or

23 better computer they can take with them that has a place

24 to plug in a web camera and a signature capturing device

25 that has our software installed.  It could be a lap top,

Davis - cross                    1036

1   could be a Windows tablet, or desk top if they wanted to

2   hoof it around with them.

3   Q     But you need a camera with the software, you said?

4   A     Correct.

5   Q     And so every jurisdiction, every locality has a set

6   up at their general registrar's office, right?

7   A     Correct.

8   Q     And so if a locality wants to do mobile units, they

9   would need to get an additional camera, correct?

10  A     Correct.  We provided all the localities with a quote

11  from a state vendor for purchasing additional cameras and

12  signature pads if they wanted to do so.

13  Q     And it is my understanding that Fairfax is the only

14  county you know that has an extra camera?

15  A     To my knowledge, the only one I am aware of.

16  Q     So that means that Fairfax is the only county you are

17  aware of that has a mobile unit for free IDs?

18  A     That I am aware of, yes.

19        There was no requirement to tell us that they had a

20  mobile unit, so I just know because Fairfax bought the

21  wrong equipment when they started.  So I got involved to

22  fix that.

23  Q     As a member of the agency you weighed in with your

24  colleagues about whether expired forms of identification

25  should be accepted for voting; is that right?

Davis - cross

1037

```
 1  A     I was not involved in the policy decisions in regards
 2  to that.   But I was involved in the decision to not put an
 3  expiration date on the IDs that we print.
 4  Q     The same thing Ms. Cherry was just informing me of.
 5  A     Okay.
 6  Q     So, what position did you take in that, in that
 7  discussion?
 8  A     For logistics and cost reasons we, and for lack of
 9  specific direction in the law, we did not put an
10  expiration date on the photo IDs that we printed.
11  Q     Also because there was no reason to have an
12  expiration date for an identification form, correct?
13  A     The law did not tell us it needed to have one.   So we
14  were trying, we try to implement minimally when it comes
15  to things like that.
16  Q     You discussed one of the matching analyzes that the
17  agency conducted, which I guess would be the most recent
18  one; is that right?
19        By matching analyzes, I mean analyzes that you use
20  comparing the DMV data to voter registration to determine
21  how many voters didn't have a DMV identification.   The one
22  that you have talked about on direct, the most recent
23  version of that analyzes.
24  A     We receive a new file every month from the Department
25  of Motor Vehicles, and have our automated process that
```

1   matches voters to that data every month.  But in terms

2   actually doing analyzes of it, I have not looked at it

3   personally in quite some time.

4   Q    Okay.

5        Now, you generated at least one of those matching

6   analyzes before the voter ID law was passed; is that

7   right?

8   A    Yes, sir.

9   Q    Do you know why that was generated?

10  A    It would have been at the request of the agency

11  leadership at the time.  Probably during the legislative

12  cycle.

13  Q    Let me have Plaintiffs' exhibit 97 brought up to the

14  screen.

15       I am going to ask you to take a look at that.  If we

16  could scroll through the three pages.

17       Did we pass page two?  I think.  All right.

18       So, go back to page three.  Do you recognize this

19  document?

20  A    It looks like something that I produced.  I don't see

21  a date on it, so I don't know like when it was run, but it

22  is a format of something that I would produced.

23  Q    To the best of your understanding you produced this?

24  A    Correct.

25  Q    And this is one of those matching tables, correct?

1  A      Yes.

2  Q      In the far -- well, there are titles to each column,

3  correct?

4  A      Yes.

5  Q      Each column?

6         I want to be clear.  Inactive voters, are they

7  eligible to vote?

8  A      Yes, sir.

9         If they sign their affirmation of identity when they

10 show up.

11 Q      What do you mean by that?

12 A      I believe there is a form they have to sign if they

13 show up to vote and they are flagged as inactive in our

14 system.

15 Q      What are they signing?  What are they attesting to?

16 A      They are still a resident I believe at that

17 registration address.

18 Q      There are not identification required for that?

19 A      Nothing additional that -- outside the other

20 identification requirements that I am aware of.

21 Q      You were describing before what filtered and active

22 and inactive meant, right?

23 A      Yes, sir.

24 Q      And the filtered inactive voters, did they receive,

25 those people who did receive your contacts?

1    A    The inactive voters did not receive a mailing from us

2    in 2014 or in 2012.

3    Q    This indicates that as of the time that this was

4    generated, which you are not sure of, there were just

5    under 200,000 active voters who had no DMV ID in Virginia?

6    A    Correct.

7    Q    Another 120,000 inactive voters with no DMV ID?

8    A    Correct.

9    Q    All of those 120,000 are eligible Virginia voters

10   right?  Let me rephrase that.

11        All registered to vote in Virginia, and can vote with

12   that registration so long as they fill out the affirmation

13   you described?

14   A    That is my understanding, yes, sir.

15   Q    Then I will ask to bring up Plaintiffs' 156.

16        While she is doing that, Your Honor, I move

17   Plaintiffs' exhibit 97, which is the one I was just

18   showing.

19        MR. FINBERG:  Already in without objection.

20        THE COURT:  Okay.

21   BY MR. KAUL:

22   Q    I believe this will provide clarity as to the date.

23   A    Yes, sir.

24   Q    This is --

25        THE COURT:  What was the number of this exhibit?

```
 1  Sorry.
 2       MR. KAUL:  This is 156.
 3       THE COURT:  156.  All right.
 4       This is already in evidence, is that correct?
 5       MR. FINBERG:  This one is not, but we have no
 6  objection.
 7       THE COURT:  All right.  Plaintiffs' 156 will be
 8  received.
 9                  (Plaintiffs' Exhibit 156 was
10              offered and received in evidence)
11  BY MR. KAUL:
12  Q    Thank you, Your Honor.
13       This is the same basic data, but you have slightly
14  different categories of data here; is that right?
15  A    Yes.
16  Q    And so this indicates data generated as of September
17  of 2014?
18  A    Correct.
19  Q    This one has columns that refer to out reach target
20  and out reach target percentage.  Do you see that?
21  A    I do.
22  Q    What does that mean?
23  A    I do not know.  Is there a second page maybe where
24  the asterisk has a definition?
25  Q    That is a very good idea.  There we go.
```

Davis - cross                                  1042

1   A      This is the same definition I provided earlier in my

2   testimony of the filtered counts.

3   Q      So the out reach target reflects the filtered count?

4   A      That is what it appears, yes, sir.

5   Q      All right.

6          The target percentage would be the percentage of

7   active voters who are in the filtered count in the

8   locality, is that right?

9   A      That would be my assumption without a calculator.

10  Q      I won't hold you to the math.

11  A      Thank you.

12  Q      You have also statistics regarding the number of free

13  IDs issued; is that right?

14  A      Yes, sir.

15  Q      I am going to run through those documents to confirm

16  they are what they appear.  If counsel has no objection, I

17  will do it that way.  I have got Plaintiffs' exhibit 56.

18         THE COURT:  Fifty-six.

19         MR. KAUL:  153.

20         THE COURT:  153.

21         MR. KAUL:  And 163.

22         THE COURT:  Any objection, Mr. Finberg?

23         MR. FINBERG:  No, Your Honor.

24         THE COURT:  It will be received.

25               (Plaintiffs' Exhibit 153 and 163

Davis - cross                          1043

1          were offered and received in evidence)

2       THE COURT:  These are what?

3       MR. KAUL:  Are charts that you have prepared showing

4  the number of voters who have obtained the no fee or free

5  voter ID, correct?

6       THE WITNESS:  Correct.

7  BY MR. KAUL:

8  Q    I'm not sure if you have had a chance to look, but do

9  those appear to be charts of that to you?

10 A    Yes, sir.

11 Q    And they are data broken down by locality, among

12 other things.

13 A    Yes, sir.

14      MR. KAUL:  May I confer with Mr. Finberg just a

15 moment, Your Honor?

16      THE COURT:  Yes, sir.

17 BY MR. KAUL:

18 Q    Briefly I want to ask you, have you could you call up

19 Plaintiffs' exhibit 66.

20      I am going to ask Ms. Schultz to briefly scroll

21 through this and ask if you recognize it.  So do you

22 recognize that?

23 A    I have seen this report before, yes, sir.

24 Q    What is this?

25 A    From -- my understanding is that it is a report that

1  was produced out of a survey that was by our agency asking

2  for this information from the different localities.

3  Q    This is a survey in which you collected the number of

4  voters who used an affirmation of identity to establish

5  their identity before the 2012 voter ID law was passed, is

6  that right?

7  A    It covers '08 and '12 elections.

8       THE COURT:  2008 to 2011?

9       THE WITNESS:  '12.  Through the March primary.

10      THE COURT:  Thank you.

11 BY MR. KAUL:

12 Q    That is because of the voter ID law in 2012 wasn't in

13 effect until after the primary, right?

14 A    I believe so, yes, sir.

15      MR. KAUL:  Your Honor, I would move in as plaintiffs'

16 exhibit 66.

17      THE COURT:  Any objection?

18      MR. FINBERG:  Your Honor, my objection is this.  I

19 don't believe that he established a proper foundation that

20 this is a document that came from the State Board or this

21 witness had any part in generating.

22      THE COURT:  You may want to firm that up.  He was

23 very equivocal.  So why not explore that a bit?

24 BY MR. KAUL:

25 Q    I appreciate that.

1        Is this a document that you reviewed in the course of

2   your work with either the State Board or Department of

3   Elections?

4        Let me ask a different way.  You said you have seen

5   this before, right?

6   A    Yes, sir.

7   Q    Where did you see it?

8   A    In the process of providing information for this

9   case.

10  Q    So you produced this document in discovery.

11  A    I was involved in the collection of all that, so it

12  was part of the stuff that I would have turned over.

13  Q    And the documents you were producing were documents

14  that were Department of Elections or State Board of

15  Elections documents; is that right?

16  A    Correct.

17       MR. FINBERG:  The issue, I guess, Your Honor, is that

18  everything that was produced by the Department, by the

19  defendants in this case has a bates number on it.

20       THE COURT:  A what?

21       MR. FINBERG:  A bates number on it with the VSB

22  prefix, and this document does not have the VSB prefix.  I

23  am not sure where it came from.

24       THE COURT:  You may not be able to get it in, but you

25  can refresh his recollection, if you can, and have him

1   testify to it.

2       MR. KAUL:  Just to respond.  My understanding is that

3   the documents produced in native format, like EXCEL

4   sheets, does not have a bates number, which is why this

5   one does not.

6       MR. FINBERG:  On the exhibit list it is noted that it

7   has a TLF prefix.

8       MR. KAUL:  Oh. I see.

9       Did you produce documents in response to a FOIA

10  request in this case?

11      THE WITNESS:  Yes.

12      MR. FINBERG:  FOIA is separate from the case.

13      MR. KAUL:  I apologize.

14  BY MR. KAUL:

15  Q   I was confused.  This is one of the documents you

16  produced in response to FOIA?

17  A   I don't remember the specifics of that, but I am the

18  person who provides all of that stuff for a FOIA request

19  in our agency.

20  Q   Let me ask this way.

21  A   Certainly.

22  Q   Are you certain you provided this document in

23  response to either to a FOIA request or a production

24  request in this case?

25  A   I am reasonably certain it was something that I

Davis - cross                  1047

1   provided in the course of my job.  I don't remember the

2   specifics of which response it would have been part of.

3        MR. KAUL:  Your Honor, I believe that is certainly a

4   preponderance of the evidence that this is a document in

5   their possession.

6        THE COURT:  To say it is in is to be generous, but I

7   will let it in.  Actually, in the interest of the

8   shortness of life.  Okay.  All right.  I will let it in.

9                   (Plaintiffs' Exhibit 66 was

10                  offered and received in evidence)

11  BY MR. KAUL:

12  Q    All right.

13       I think we already talked about what is in the

14  document.  I will leave it at that.

15       The DMV matching analysis that you have conducted,

16  how, if at all, are expired DMV licenses accounted for in

17  that analysis?

18  A    We only receive -- the monthly file we receive is

19  just the people who currently have a license with DMV.

20  Q    If somebody has an expired license are they listed as

21  having one?

22  A    No.  I don't have expiration dates or anything like

23  that from DMV.  I just get a list of, here everybody who

24  has a DMV license today.

25  Q    Do you know if they include expired licenses on that

Davis - cross                1048

1  list?

2  A      Not included as far as I am aware.

3  Q      But the DMV, I guess, would know best.

4  A      Yes.

5  Q      Do you know if suspended licenses are included on

6  that list?

7  A      I don't believe that they are.  But I don't have --

8  there is not a flag to indicate whether a license is

9  suspended or not.

10 Q      You are not certain?

11 A      Not a hundred percent, no, sir.

12 Q      What about lost licenses.  Presumably would be

13 included on the list unless that were reported, right?

14 A      Yes.

15 Q      And what about revoked licenses?  Again, fair to say

16 you don't know for sure?

17 A      My understanding is revoked is not included.  That

18 would be a Department of Motor Vehicles that would remove

19 that license as being a license.

20 Q      DMV would be the best source?

21 A      Correct.

22 Q      No further questions.

23        THE COURT:  Redirect?

24        MR. FINBERG:  Very brief.

25        THE COURT:  All right.

```
 1                    REDIRECT EXAMINATION

 2  BY MR. FINBERG:

 3  Q     Mr. Davis, you were asked some questions about that

 4  spread sheet that was Plaintiffs' exhibit 66.  Do you

 5  recall?  It's the one produced in response to the FOIA

 6  request.

 7  A     Yes, sir.

 8  Q     Do you know the source of the data in that document?

 9        THE COURT:  Excuse me.  What document are you

10  referring to?  I didn't catch it.

11        MR. FINBERG:  Plaintiffs' 66.

12        THE COURT:  66.  Go ahead.  Sorry.

13        THE WITNESS:  It would have been the result of a

14  survey, online survey process that our agency requested

15  the localities respond to.

16  BY MR. FINBERG:

17  Q     Mr. Kaul asked you some questions about mobile units

18  and web cams and signature pads.  Do you recall that?

19  A     Yes, sir.

20  Q     What is the cost for a web cam?

21  A     The two devices that we purchased, one was about $75

22  and the other one was about $140.  I don't remember which

23  was the web cam and which was the signature pad.

24  Q     Would any web cam that somebody could pick up at Best

25  Buy work for this purpose?
```

1  A     Potentially it could.  We specifically went with a

2  specific model so we could support it with our resources.

3  Q     Okay.  But the cost of the two pieces of equipment

4  combined would be how much?

5  A     Approximately $220.  Again, my math may not be

6  correct.

7  Q     Better than mine, I guarantee you that.

8        Mr. Kaul asked you some questions about the

9  approximately 88,000 people that received the mailing.

10 A     Okay.

11 Q     Just so we are clear, how did the Department go about

12 making a determination of who those 88,000 people should

13 be?

14 A     We looked at what information we had available to us

15 so that we could best use the resources available.  If a

16 voter self-indicated being a member of military, the

17 assumption was made they had a Department of Defense

18 issued identification card.  If they had taken action to

19 be on absentee, absentee voter, they will be voting by

20 mail, would not have to show a form of photo

21 identification.  So they were excluded.  And then we

22 looked at whether there was someone who was in our opinion

23 more likely to show up to vote in an up-coming election.

24 So we looked at people with some form of voter activities

25 over the last roughly two years at the time.

1   Q    I don't have any further questions, Your Honor.

2        THE COURT:  May Mr. Davis be excused?

3        MR. FINBERG:  He may, Your Honor.

4        MR. KAUL:  Yes.

5        THE COURT:  Thank you for coming in.  We appreciate

6   your testimony.

7                    (Witness stood aside)

8        Does anybody have a short witness?

9        MR. SPIVA:  I think the witness that we have is

10  probably fairly short, but I don't know how long the cross

11  will be.

12       THE COURT:  We will go ahead with direct and hope the

13  cross will be short.  Okay?

14       Call the next witness.

15       MR. SPIVA:  Your Honor the plaintiff calls Rebecca

16  Slutzky, Executive Director of the Democratic Party of

17  Virginia.

18       THE COURT:  All right.

19       Come forward.  Is she here?  Yes, come forward.

20  Raise your right hand, left on the Bible, face the Clerk

21  of the Court.

22                    BARBARA SLUTZKY

23            WAS SWORN AND TESTIFIED AS FOLLOWS:

24       THE COURT:  She is your witness?

25       MR. SPIVA:  Yes, Your Honor.  Yes.

```
 1          THE COURT:  All right.

 2                    DIRECT EXAMINATION

 3  BY MR. SPIVA:

 4  Q    Good morning, Ms Slutzky.

 5  A    We can go with that.

 6  Q    Okay.  Where you do you work?

 7  A    At the Democratic Party of Virginia.

 8  Q    How long have you worked there?

 9  A    I started May 2015.

10  Q    What is your role and title there?

11  A    I am the executive director.

12  Q    Can you briefly describe your political experience

13  before coming to work as the Executive Director of the

14  Democratic Party of Virginia?

15  A    Absolutely.

16       After graduating college I worked several campaigns

17  in different states.  In terms of Virginia, I was the

18  regional field director in 2008 for the Obama/Warner

19  campaign.  And in 2009 I was, worked in the political

20  department of both Terry McAuliffe's first race, and then

21  Senator Deeds' governor race in 2009.

22  Q    In those roles did you work at all with the

23  Democratic Party of Virginia?

24  A    I did.  In 2008 I worked for what is considered the

25  coordinated campaign, which worked basically as the
```

1  Democratic Party of Virginia.  So worked closely on all of

2  the races.

3  Q    All right.

4      As part of your job as executive director have you

5  had to become familiar with the Democratic Party of

6  Virginia's plans and strategies in the past to the extent

7  you were not already familiar with them?

8  A    Absolutely.  We spent a lot of time, obviously,

9  reviewing things we have done each year so we can always

10  improve.

11  Q    What is the, I will call it DP/VA if that all right

12  with you, what is DP/VA's mission?

13  A    We had two missions.  To get Democrats elected and

14  keep them in office.

15  Q    Can you describe briefly the organizational structure

16  for the DP/VA?

17  A    Absolutely.  We have what we consider our local

18  parties, which is every basic locality, the cities and

19  counties, across the state.  Each have their own, you

20  know, representation, if you will.

21      We then, from the state-wide level as a steering

22  committee, a central committee, and then we have the

23  staff.

24  Q    Can you briefly describe what kinds of activities the

25  DP/VA engages in?

1    A    Of course.

2         We do a lot of field training and voter education.

3    We particularly focused on what I would consider both

4    first persuasion and then turn out.  We also work with

5    current elected to kind of have their back across the

6    board in anything that they are doing.

7    Q    Who do you consider to be a member of the DP/VA?

8    A    Anyone who leans Democratic can vote Democratic.

9    Q    Is that set forth in one of the DP/VA's governing

10   documents?

11   A    It is laid out in the party plan.

12        THE COURT:  Anyone who leans Democratic and votes

13   Democratic; is that correct?

14        THE WITNESS:  Yes, basically anyone who considers

15   themself associated with the Democratic Party is a member.

16        THE COURT:  Thank you.

17   BY MR. SPIVA:

18   Q    Is that definition of membership or constituency set

19   forth in any governing documents of the DP/VA?

20   A    I don't have the exact wording, but it is laid out in

21   the party plan.

22   Q    What if someone only votes for Democrats some of the

23   time?  Do you still consider them a member or a

24   constituent?

25   A    We do.  Again, it is anyone who we think might vote

1  for us is.  You know, we are a party of inclusion, so we

2  want to include them in our efforts and persuade them for

3  our candidates and turn them out.

4  Q    Can you describe the types of groups that DP/VA

5  considers to be its most reliable voters?

6  A    Absolutely.  Certainly minority voters, young people,

7  and to some extent seniors as well.

8       THE COURT:  Would you repeat that for me one more

9  time?

10 A    And how --

11      THE WITNESS:  Absolutely.

12      THE COURT:  Slow down just a little bit so this

13 gentleman can take it down.

14      THE WITNESS:  I apologize.

15      Minority populations, young people, and to some

16 extent seniors.

17 BY MR. SPIVA:

18 Q    How do you come to your understanding of that, who

19 those reliable Democratic voters are?

20 A    I would say it is kind of my business to know that.

21 We have done, you know, it is the nature of the business.

22 We know who our -- we know who votes Democrat.  We track

23 it, and analyze it.  We track it.  Kind of common

24 knowledge within the industry.

25 Q    Let me turn your attention to the recent voter ID

1   laws.  And in particular, the 2013 photo ID law.  Do you

2   have some familiarity with that?

3   A    I do.

4   Q    Does the DP/VA oppose the 2013 photo ID law?

5   A    Yes, we do.

6   Q    Why is that?

7   A    Because it disenfranchises other voters.  It makes it

8   harder for Democrats to show up and vote.

9   Q    How do you know down that?

10  A    Because, again, it is kind of common knowledge within

11  the industry.  The specific types of registered voters in

12  the state that are less likely to have an ID tend to be

13  more Democratic.

14  Q    Have you received any knowledge from people who work

15  for you within the organization that support that view?

16  A    Absolutely.  We have a voter protection director on

17  staff.  She is extremely focused on making sure from a

18  legal perspective everyone has the opportunity to vote,

19  and she keeps me updated on this sort of thing.  She spent

20  a lot of time talking to me about the ID laws.

21  Q    Has DP/VA had to undertake any efforts to overcome

22  the effects of the 2013 voter law.  First focus on past

23  efforts.  I will ask in minute what you are planning to

24  do, or what you are doing now.  But in previous elections

25  since it has been enforced has the DP/VA had to undertake

1  any efforts to overcome the effects of the 2013 ID law?

2  A    We have had.

3       We have had to dedicate a significant portion of our

4  both organizer training and our volunteer training to

5  basically -- historically, in 2008 for example, our focus

6  was with turn out our voters, and then register and get

7  them to the polls.  Now the extra step is we need to

8  register our voters, persuade them to vote for our

9  candidate, and teach them how to vote.  So we have had to

10 do a decent amount of training through kind of all our

11 different training mechanisms to educate them.

12      On top of that, our local committees have acquired

13 lists from of likely voters who do not have photo IDs.

14 And they have culled through, and basically educate them

15 on the rules with the voter IDs, and they have in some

16 situations gone out and even transported them, taken them

17 to the registrar's office and had basically walked them

18 through all the steps.  Any voters we find that doesn't

19 have ID, we make sure they can vote.

20 Q    Have you had to hire anybody in particular as a

21 result of the 2013 photo ID law?

22 A    That was certainly a factor in our decision to have a

23 voter protection director year round instead of two

24 months, and now it is now a full time, year round salary.

25      THE COURT:  Voter protection director?

1       THE WITNESS:  Voter protection director.

2   BY MR. SPIVA:

3   Q    What did the director do?  What is her

4   responsibility, if you can briefly describe that?

5   A    Absolutely.  She works with the State Board of

6   Elections.  She works with the registrar's office.  The

7   electoral board.  She is working on building up those

8   relationships.  She will kind of prepare photo ID

9   education documents for both local committees.  She has

10  done field training when we have been out there educating

11  our activists.  She will walk them through the steps to

12  make sure that anyone we have that is recruiting and

13  training and working with voters is as informed as

14  possible.

15  Q    And not just limiting this to the voter protection

16  director, but all of the other activities that you have

17  described a minute ago, does that cost money?

18  A    Yes, it does.

19  Q    Did that cost time in terms of staff resources?

20  A    Yes, it does.

21  Q    Did it involve the use of volunteer time?

22  A    Absolutely.

23  Q    If the 2013 photo ID law had not gone into effect,

24  would DP/VA have used those resources for something else?

25  A    Absolutely.

1  Q     What kind of things would you have done?

2  A     We would have used -- we are the Democratic Party.

3  We are going to spend every dollar we can get our hands on

4  persuading and turning out voters.  So every dollar we

5  raise, we will have, we spend on those efforts.  And by

6  not having to focus a percentage of those -- not saying

7  there wouldn't be any voter education, but I would say

8  significantly more education associated with the these ID

9  laws.  And we would have been able to use those resources

10 on other avenues to get our voters out to vote.

11 Q     Does the DP/VA know of people who have been

12 disenfranchised by the laws, by the photo ID law?

13 A     The organization does.

14 Q     How do you learn about that?

15 A     Obviously this is, again, information that we track.

16 It is, we also hear about it.  And, you know, it is kind

17 of, again, common knowledge.  Every single time we hear

18 about someone, we do everything we can to remedy the

19 situation.  But, we know we are not catching everybody.

20 Q     Does DP/VA know of people who have been burdened by

21 the photo ID law?  Even if they were ultimately able to

22 cast a vote?

23 A     Of course.  I would consider those the individuals

24 that we had to go out and to spend time and energy maybe

25 going to the registrar's office getting these IDs, you

 1  know.   Absolutely.

 2  Q     For the 2016 general election, what is DP/VA planning

 3  to do to try to overcome barriers presented by the photo

 4  ID law?

 5  A     We are particularly concerned about 2016 because this

 6  will be the first presidential year that our, that the ID

 7  laws have been in effect.   It is pretty well known that

 8  there is a lot of people that only vote every four years.

 9  So this will also be the first time we will be doing

10  massive voter registration undertaking, given those

11  factors, there is going to be a significant amount of

12  individuals that this will be the first time voting with

13  these new laws in place.   So we are going to have to spend

14  even more time and energy training, focusing on these,

15  doing greater education.   We would love to send out

16  mailers, and currently we are kind of thinking of

17  everything we could possibly do.   Again, it comes back to

18  funding.

19  Q     Do Democratic voters tend to only vote in, or tend to

20  be voters who are more likely to vote in presidential

21  years?

22  A     Something we are working on, but yes.   If you look at

23  the historical background, especially in a state like

24  Virginia, it is kind of known the higher the turnout, the

25  more likely the Democratic Party is to win.   So when less

 1  people vote, it increases the odds.  If you can look at

 2  the last two presidential elections compared to state

 3  senate and house races in 2015, those races have lower

 4  turnout and voters tend to lean Republican.

 5  Q    If the photo ID law were not in place, would you

 6  spend the time, money, and effort that you are either

 7  already spending or planning to spend on the 2016

 8  election?

 9       THE COURT:  Hasn't she answered that question?

10       MR. SPIVA:  I asked about her about past efforts.

11  Now asking about the 2016.

12       THE COURT:  All right.  Go ahead.

13  BY MR. SPIVA:

14  Q    If the photo ID law were not in place, would you

15  spend the time, money and effort that you either are

16  already spending or planning to spend on something else?

17  A    We are going to spend every dollar we get.  So

18  absolutely.

19  Q    Now, the DP/VA is asking for the photo ID law to be

20  struck down; isn't that right?

21  A    We are.

22  Q    If it its struck down, wouldn't that mean that you

23  would have to engage in further efforts to educate people

24  about another change in the law?

25  A    I would say we likely will, but the time and energy

```
 1  associated with telling someone, yes, you can vote is very

 2  different than the time and energy of training, you know,

 3  what we have to do now with the laws in place.  So some

 4  training, but not nearly the amount that we would.

 5  Q    Thank you very much.

 6       I have no further questions.

 7       THE COURT:  I am going to recess for lunch.

 8       Before you do your cross.

 9       I omitted in discussion with the lawyers to put the

10  name on the record.

11  A    Of course.  It is Rebecca Slutzky.  Last name is

12  S-L-U-T-Z-K-Y.

13       THE COURT:  Thank you very much.  We will recess for

14  one hour.  Come back and have cross examination.  You are

15  excused until then, Ms. Slutzky.

16       Stand in recess.

17                        (Recess)

18                  CROSS EXAMINATION

19            (witness resumed the stand)

20       THE COURT:  All right.  Continue with the cross

21  examination of Mrs. Slutzky.  Go right ahead.

22       MR. FINBERG:  Thank you, Your Honor.

23  BY MR. FINBERG:

24  Q    Good afternoon.

25  A    Good afternoon.
```

Slutzky - cross                    1063

1   Q     We met before in your deposition.  I am Dana Finberg,

2   one of the attorneys who is representing the Commonwealth

3   agencies, the defendants in this case.

4   A     Good to see you again.

5   Q     Good to see you, too.

6         You are executive director of the Democratic Party of

7   Virginia?

8   A     Yes, sir.

9   Q     Is it all right if I refer to that as DP/VA?

10  A     That is what we do.

11  Q     Okay.

12        You held the executive director position since May of

13  2015?

14  A     Correct.

15  Q     When did you first come to be employed by the DP/VA?

16  A     With this position it was in May.  I was a regional

17  director on the coordinator team in 2008, which I believe

18  falls directly under the Democratic Party of Virginia.

19        THE COURT:  You say since 2008?

20        THE WITNESS:  No, no, I was in 2008.

21        THE COURT:  So it's a one year-one position?

22        THE WITNESS:  It was six months.

23        THE COURT:  Six months.  Okay.

24        Go right ahead, Mr. Finberg.

25  BY MR. FINBERG:

1  Q     Have you been employed in one capacity or another by

2  the Democratic Party of Virginia since 2008?

3  A     No.

4  Q     When did you become employed by the DP/VA?

5  A     Again, this stint starting in May of 2015.  I was

6  employed, I believe it was, May to November of 2008.

7  Q     Okay.

8        As executive director, you run the day-to-day

9  operations of the organization?

10 A     Correct.

11 Q     You are in charge of the staff?

12 A     Correct.

13 Q     And you held the position of executive director of

14 the DP/VA when this case was filed in June of 2015, right?

15 A     Correct.

16 Q     You have a law degree, but don't serve in any

17 capacity as a lawyer for the DP/VA, is that right?

18 A     Correct.

19 Q     You are familiar with the party plan of the

20 Democratic Party of Virginia?

21 A     I am.

22 Q     Okay.

23 A     I couldn't quote it exactly, but --

24 Q     You won't have to.

25        Could you put on defendants' exhibit 448, please.

1       Do you recognize this as the Democratic Party plan of

2  Virginia's as of March 7 of 2015?

3  A    I do.

4  Q    Okay.

5       Let me ask you to look at section 2.1.

6  A    Page?

7  Q    Good question.  2.1 is on DX 448006.

8       If you look at section 2.1, and just read that into

9  the record for us, please.

10 A    "Every resident of the Commonwealth of Virginia who

11 believes in the principals of the Democratic Party is

12 hereby declared to be a member of the Democratic Party of

13 Virginia."

14 Q    So, if I understand this correctly, the DP/VA

15 declares people to be members of the Democratic Party of

16 Virginia if they are Virginia residents and they believe

17 in the principals of the Democratic Party, is that right?

18 A    Correct.

19 Q    The Democratic Party of Virginia does not have an

20 application process for membership, does it?

21 A    Correct.

22 Q    And the DP/VA does not charge dues for membership?

23 A    Mostly correct.  There are local committees, and

24 local committees do pay dues.

25 Q    But if you are not a member of the local committee?

1  A    Not every member pays dues.  Some members -- there

2  are a dues payment system for some.

3  Q    Okay.

4       And the DP/VA doesn't issue membership cards to

5  members, or otherwise notify residents of Virginia, that

6  they have been declared to be a member of your

7  organization?

8  A    The party plan which is on here is publicly posted

9  and referenced, so you could argue that it is public in

10  that sense.

11  Q    I'm not arguing with you.  The question is, the DP/VA

12  doesn't issue membership cards, does it?

13  A    We do not.

14  Q    You do not otherwise notify directly residents of

15  Virginia that they have been declared to be a member of

16  the DP/VA, do you?

17  A    I mean, no, we don't call each individual person up

18  and say, you are a member, if that is what you are getting

19  at.

20  Q    The only way an individual would know that you

21  consider them to be a member of the party is if they went

22  to the web site, looked at section 2.1 of the party plan?

23  A    No.  I think that we are a constituency organization.

24  I think that members that believe in our -- individuals

25  that believe in our ideals probably believe that they are

 1  members.  I think if you were to walk into a random

 2  shopping center and started interviewing people, you would

 3  ask, are you a Democrat?  Plenty of people would say yes.

 4  And I would take that assertion of yes as being a member

 5  of our organization.  I don't think they need a membership

 6  card to be able to safely answer that question.

 7  Q    The Democratic Party of Virginia doesn't maintain a

 8  list of members, does it?

 9  A    There is not -- in Virginia you don't register with a

10  party affiliation.  So, we do track individuals.  I mean,

11  we know who our members are.  I would say we don't

12  necessarily with a hundred percent accuracy have the name

13  of every single person that -- I think we -- so, yes, yes.

14  Did that answer it?

15  Q    It is pretty much a pretty simple yes or no question.

16  Does the DP/VA maintain a list of current members?

17  A    We have lists of individuals that we target for

18  elections, but it is not a hundred percent inclusive every

19  single person would be on that list.

20  Q    Do you recall when I took your deposition?

21  A    Yes.

22  Q    Do you recall when I asked you about whether or not

23  the DP/VA maintained a membership list?  You testified

24  that it would be an extremely burdensome process to

25  produce such a list?

1  A      Yes.

2  Q      Do you agree with that testimony that you previously

3  gave?

4  A      I definitely do.

5  Q      The membership of the DP/VA as the DP/VA defines its

6  membership includes people that might vote for Republican

7  or third party candidates from time to time; isn't that

8  right?

9  A      Again, I think it is if you generally go with the

10 democratic ideals you are a member.  Obviously, there is,

11 you know, somebody might chose to support a candidate, but

12 that doesn't mean they are no longer a member forever.

13 Q      So, does the membership of the DP/VA as the DP/VA

14 defines its membership include people that might vote

15 Republican or third party candidates from time to time?

16 A      I think they could.

17 Q      Are there members of the DP/VA who support the photo

18 ID law that the DP/VA is trying to invalidate in this

19 case?

20 A      Could you repeat the question?

21 Q      Are there members of the DP/VA as you defined

22 membership who support the photo ID law that the DP/VA is

23 trying to invalidate in this case?

24 A      I don't know that I could speak for the millions of

25 individuals, but I would say across the board the

1    Democratic Party does not support this voter ID law.   I

2    can't say it is not plausible there could be one exception

3    out there, but generally speaking.

4    Q    Has the DP/VA ever polled its membership to determine

5    whether there is support among the Virginia residents that

6    the DP/VA has declared to be its members for the

7    invalidation of this law?

8    A    To my knowledge, we have not run a specific poll.

9    That being said, I think we certainly regularly converse

10   with our members, and from conversations myself and other

11   party members have had, there is general understanding

12   that everybody is opposed.

13   Q    Everybody is opposed.

14   A    I personally have never heard of a situation where

15   somebody supported the law --

16   Q    Are you aware --

17   A    -- unilaterally.  But I am not aware of anyone.

18   Q    Are you aware of Democratic delegates to the Virginia

19   legislature who have polled their constituency and found

20   that a majority of the constituency support the voter ID

21   law in this case?

22   A    I was not aware of that.

23   Q    Did the membership of the DP/VA get to vote on

24   whether this law suit should get filed?

25   A    No.

1  Q      You testified on direct exam that the DP/VA serves

2  essentially two roles, is that right?

3  A      Yes.

4  Q      Is that to get Democrats elected to office?

5  A      Yes.

6  Q      And to support Democrats once they are in office?

7  A      Correct.

8  Q      Is one of the purposes of the DP/VA to litigate on

9  behalf of its members?

10 A      I think when there is litigation that affects the

11 party membership, the party membership in the way that

12 this legislation does, that it is important for us to step

13 in and take on that role.

14 Q      Can you show me where in the Democratic Party plan it

15 says anything about litigating on behalf of the Party?

16 A      To my knowledge it is not in there.

17 Q      In fact, neither the steering committee nor the

18 central committee of the Democratic Party of Virginia

19 authorized the filing of this law suit, did they?

20 A      There was not a formal vote; however, the steering

21 committee did vote to elect both our party chairwoman, and

22 they voted on me when I first took office to be

23 responsible for these types of decisions.  And we have

24 kept them apprized of the details of this litigation on

25 all of our meetings since then.  They Have been kept

1  updated throughout.  But not a formal vote.

2  Q    Did the DP/VA itself finance this litigation?

3  A    They are not.

4  Q    The Democratic Party of Virginia has not itself

5  performed any studies or surveys to quantify whether the

6  voter ID statute has disproportionately reduced voter

7  turnout to Democratic parties in Virginia; is that right?

8  A    A scientific study, no.  But again, I would say it is

9  the nature of what we do that we understand the effects,

10 and we see it through casual conversations and feedback

11 and the way our party works.

12 Q    I think you have testified on direct that you had

13 attempted to reach out to "disenfranchised" voters?

14 A    I personally have not, but individuals in the

15 organization absolutely.

16 Q    The Party has?

17 A    The Party has, yes.

18 Q    I think you testified on direct that the DP/VA has

19 gotten in contact with voters who could potentially lack

20 valid photo IDs; that is right?

21 A    Yes, they have.

22 Q    How did the DP/VA come to know the identity of those

23 voters, who to contact?

24 A    The Democratic Party knows who are registered voters

25 in the State of Virginia.  And we generally know,

1   obviously we have the ability to identify voters who are

2   likely Democrats.  And that list was compared to the DMV

3   listing, and my understanding is anyone who didn't have a

4   driver's license was put on a reach out to list.

5   Q    As a matter of fact, to assist the DP/VA in its

6   outreach efforts the DP/VA got information from the

7   Department of Elections, didn't it?

8   A    At the moment I am not positive.

9   Q    Do you understand that the DP/VA reached out to the

10  State Board of Elections, or the Department of Elections

11  to request information to allow them to conduct outreach

12  efforts?

13  A    I know that we are regularly in touch with the

14  Department of Elections.  I personally have not had a

15  direct conversation with them on that.  I think I would

16  assume individuals from the Party have.  I just can't say

17  with certainty.

18  Q    The Democratic Party of Virginia contends that it has

19  had to divert resources as a consequence of the enactment

20  of the voter ID law, right?

21  A    Um hum.

22  Q    And that it has had to spend time and energy,

23  resources, educating voters on the requirements of the

24  law?

25  A    Correct.

1  Q     And you say that this time and effort would have been

2  spent on growing, enhancing voter outreach and

3  registration?

4  A     Correct.

5  Q     And persuasion?

6  A     Yes.  Communicating with our voters with other goals

7  in mind, other than educating them on how to vote.

8  Q     Okay.

9      At least in terms of the monetary cost, it is hard to

10 quantify that, right?

11 A     Correct.

12 Q     As part of that did the DP/VA develop media that it

13 can give to folks describing the requirements of the voter

14 ID law?

15 A     We have talked in 2016 about doing direct mailings

16 with voter education based on the voter ID lays.  To my

17 knowledge we have -- it is pretty significant monetary

18 amount to do those type of direct mailings.  To my

19 knowledge I don't believe we have in the past, but that is

20 a thing we would like to do this year.

21 Q     Between the enactment of the voter ID law and now

22 DP/VA hasn't yet expended the resources to do that?

23 A     We at the state party haven't done a massive direct

24 mail piece across the state, no.  Have our local

25 committees done any sort of, you know, written

1  information?  I would certainly assume so.  I can't speak

2  directly on, you know, a flyer or anything that I have

3  seen.  But that would certainly fall in line with the text

4  of outreach we have done, and our voter protection

5  director certainly created materials and training.  And,

6  you know, I can't say -- I can't give you a specific

7  example of the direct mail piece, but the likelihood that

8  there has been some sort of written material sent out to

9  some segment of the population I would say is reasonable.

10  I just don't know specifically.

11  Q    So, in terms of quantifying the amount of time that

12  has been spent since the enactment of the voter ID law and

13  now developing written materials that can be handed to

14  voters to educate them about the requirements of the voter

15  ID law, you don't believe that much has been done yet?

16  A    I believe there has been some done.  I know our voter

17  protection director who works with our field director, so,

18  again, I don't know if they have created a piece that

19  might have gone out in the walk packets when they were

20  knocking on doors last year.  I can't speak personally to

21  that.  But that would certainly go in line with the types

22  of work that they have been doing.  So --

23  Q    Ms Slutzky, you are aware that the Virginia law

24  requiring acceptable voter IDs changed in 2012, right?

25  A    Correct.

1   Q     And in connection with the change of law that

2   occurred in 2012, did the Democratic Party of Virginia

3   divert time, energy and resources to educate voters

4   regarding what those new requirements were?

5   A     My understanding is yes.

6   Q     Yet the Democratic Party of Virginia didn't sue to

7   try to invalidate that law, did it?

8   A     I don't know what specific activities they might have

9   done in 2012.  I know that it increased more dramatically

10  after 2013.  So I think as the laws have gotten stricter

11  so has our training and the resources that we have had to

12  effectively educate voters.

13  Q     After the 2012 law was enacted changing the voter ID

14  requirements did they DP/VA sue to try to invalidate that

15  law?

16  A     We did not sue in 2012 to my knowledge.

17  Q     And the DP/VA was conducting voter outreach long

18  prior to the enactment of the voter ID law, wasn't it?

19  A     Correct.

20  Q     And it has always been a part of the mission of the

21  Democratic Party of Virginia to engage in voter outreach

22  and voter registration efforts?

23  A     Absolutely.

24  Q     And to some extent those voter outreach and voter

25  registration efforts have always involved an educational

1  component, haven't they?

2  A    Yes.

3       However, for example in 2008 we spent a very minimal

4  amount of time doing education on how someone can vote

5  compared to this past year in 2015.  I would say, as an

6  example, I would like to use the Iowa caucuses.  In Iowa,

7  your know, there is videos out there on, you know, how

8  caucusing is easy and there is a lot of time and energy of

9  what that process looks like because it is more elaborate

10 and complicated.  I would say now that we are in 2015 and

11 2016 we are having to take on more of those types of

12 activities than we did in previous years.

13 Q    You testified on direct exam about the hiring of, I

14 think, her name is Ms Georgina -- how do you pronounce her

15 last name?

16 A    Cannan.

17 Q    Is that C-A-N-N-A-N?

18 A    I believe so.

19 Q    Okay.

20      So, you testified on direct about the hiring of Ms

21 Cannan.

22 A    Yes.

23 Q    There is a voter protection director for the

24 elections in 2012 prior to the enactment of the statute,

25 right?

1  A    In past years we have, the Democratic Party has hired

2  either, you know, either the Party or the campaigns have

3  hired someone to do voter protection.  But usually a short

4  term position that gets hired in roughly September to

5  November.  Georgina has been that person in I believe '13

6  and '14, but not '12.  I will double check her resume to

7  confirm that, who it was in '12.

8  Q    But there was someone in 2012.

9  A    I would a assume so.

10  Q    So there has been somebody in 2012, somebody in 2013,

11  and now in 2014?

12  A    Yes.  But, again, these efforts have been very

13  specifically related to those campaigns, and it is a very

14  different role, kind of basically having poll watchers and

15  the types of activities the voter protection director

16  would have done in previous cycles compared to it being a

17  year-round salaried possession.  You know.  There is a lot

18  more you can do in 12 months than in two months.  So to

19  that extent the program has changed dramatically.

20  Q    But you would agree with me, wouldn't you, that her

21  full time hiring was only brought about in part as a

22  result of the enactment of the voter ID law?

23  A    Yes.  I don't think it was a hundred percent.

24  Q    It was not the only reason she was hired.

25  A    Yes, yes.  Certainly it was a significant reason.

Lichtman - direct                    1078

1  Q     Not the only reason?

2  A     Not the only reason.

3  Q     Your Honor, no further questions.

4        THE COURT:  All right.  Thank you, sir.

5        Any redirect?

6        MR. SPIVA:  No redirect, Your Honor.

7        THE COURT:  All right.  Very well.

8        Thank you.  You are free to go.  Thank you very much

9  for coming.  We appreciate your testimony.

10       THE WITNESS:  Thank you, very much.  Appreciate it.

11                    (Witness stood aside)

12                    Lichtman - direct.

13       MR. SPIVA:  Our next witness will be Dr. Allan

14 Lichtman.

15       THE COURT:  Dr. Allan Lichtman.  Okay.

16       Raise your right hand sir, place your left hand on

17 the Bible, and face the clerk of the court:

18                    ALLAN LICHTMAN

19            WAS SWORN AND TESTIFIED AS FOLLOWS:

20                   DIRECT EXAMINATION

21       THE WITNESS:  I have a personal issue.

22       THE COURT:  Yes, sir.

23       THE WITNESS:  I have a medical issue, prostate cancer

24 survivor, and I may get hit unpredictably.

25       THE COURT:  Sure.  All you do is raise your hand.

Lichtman - direct                    1079

```
 1  That will be my signal to call a recess.  Okay?

 2       THE WITNESS:  Thank you, sir.  It may be no issue.  I

 3  hope.

 4       THE COURT:  We will accommodate you.  Glad to do it.

 5       THE WITNESS:  Thank you, sir.

 6                    DIRECT EXAMINATION

 7       THE COURT:  If you would identify yourself with your

 8  full name and spell the last name for the court reporter

 9  so we make sure we get it right.

10       THE WITNESS:  Happy to do it.  It is Allan J.

11  Lichtman.  L-I-C-H-T-M-A-N.

12       Is there water up here?

13       THE COURT:  Yes, sir, we have water.

14       You may want to spell the first name since --

15       THE WITNESS:  Yes.  It is A-L-L-A-N, Your Honor.

16  A. L. L. A. N.

17       THE COURT:  Thank you.

18       THE WITNESS:  Thank you.

19  BY MR. SPIVA:

20  Q    Good afternoon.  Where are you employed?

21  A    I am employed at American University.

22       I actually sometimes hate to admit it, but I have

23  been employed there for 43 years.  Since 1973.  My one and

24  only adult job.

25  Q    What is your job there?
```

1   A     I am a distinguished professor of history.

2   Q     What is a distinguished professor of history?

3   A     Not something I made up.  It's not a department

4   title.  It is a university title, the highest academic

5   rank in the university above professor.  Only three or

6   four of us out of 850 at the university.

7         THE COURT:  All right.

8   BY MR. SPIVA:

9   Q     Can you describe your educational background,

10  Dr. Lichtman?

11  A     BA from Brandeis in 1967.

12        Spent three years as a biology major, saw the light

13  and switched to history my senior year.  So science and

14  math background.  And then a PhD from Harvard University

15  in 1973 with a specialty in American political history and

16  the quantitative or mathematical analysis of social

17  science information.

18  Q     Can you describe what areas you published in that are

19  relevant to this litigation?

20  A     Yes.  I would say there are three relevant areas.

21        The first one is quantitative and historical

22  methodology.  This goes back to the late 1970s when I

23  published a book in the sage series on the quantitive

24  applications in the social sciences called Ecological

25  Inference.  Nothing to do with the environment, but had to

1    do with mathematical methods for drawing inferences from

2    data for political units, like wards or precincts.  I have

3    also published quantitative methodological articles in

4    such journals as Social Science History, Journal of

5    Interdisciplinary History, Political Methodology, and

6    Journal of the United States National Academy of Sciences.

7        I have also co-authored a book on historical methods

8    called Historians and the Living Past.  The theory and

9    practice of historical study.  And I have taught both

10   quantitative and historical methodology as well as written

11   about them.

12       The second area would be the application of

13   quantitative and historical methods and research to the

14   study of American political history and current American

15   politics.

16       This approach grounds many of my books, including,

17   again, going back to the late 1970s, Historians and the

18   Living Past -- excuse me -- Prejudice and Geo Politics,

19   the Presidential Election of 1928, and more recently my

20   series of books on the Keys to the White House, sixth

21   edition is about to come out, predicting who is going to

22   win in 2016.  As well as books such as White Protestant

23   Nation, as well as the Rise of American Conservative

24   Movement.  And my most recent book, F.D.R. and the Jews.

25   I have also published articles on these topics in journals

1  such as the American Historical Review, the Journal of

2  Social History, International Journal of Forecasting, The

3  International Journal of Information Systems, and others.

4        THE COURT:  Is there any challenge to the Doctor's

5  credentials?

6        MR. HEARNE:  No, Your Honor.

7        THE COURT:  He will be received as an expert witness.

8        Go right ahead.

9  BY MR. SPIVA:

10  Q     Thank you, Your Honor.

11        Have you published or had expertise in the

12  application of social science methodology in voting rights

13  and redistricting issues?

14  A     Yes.  In many different contexts.  Very quickly, I

15  have published articles in the Journal of Legal Studies,

16  Evaluation Review, the Journal of Law and Politics, and

17  others on that topic.

18  Q     Have you previously served as an expert in other

19  voting rights cases?

20  A     Yes, I have.

21  Q     How many?  Approximately, how many times?

22  A     I haven't counted, but I would say more than 80

23  voting rights cases of various types since the 1980s.

24  Q     Have you worked on behalf of plaintiffs and

25  defendants?

1   A    I worked for plaintiff and defendants.  I have worked

2   for independent commissions.  I have worked for state and

3   local jurisdictions.  I have worked for the U.S.

4   Department of Justice.  I have worked for civil rights

5   groups.  I have worked for private plaintiffs.  I have

6   worked for Republican and Democratic interests insofar as

7   they can be defined in various cases.

8        THE COURT:  Okay.  Next question.

9   BY MR. SPIVA:

10  Q    Can you describe some of the work for Republican

11  interests?

12  A    Yes.  In 1990 I was an expert for the Massachusetts

13  Republican redistricting task force.  I also was working

14  in concert with Republican interests in the famous

15  DeGrandy case in Florida that went to the Supreme Court,

16  sitting with Benjamin Ginsberg, the head of the Republican

17  redistricting task force.

18       And the longest job I ever did as a consultant was

19  for the then Republican mayors Giuliani and Bloomberg in

20  New York City.  I was their voting rights adviser in their

21  effort to create non-partisan elections.  Quite a thing

22  for New York City.  And a lot of opposition, of course,

23  was the Democratic Party that controlled City politics.

24  Q    Had you previously testify on the issue of intent in

25  legislative enactment?

Lichtman - direct                    1084

1  A     Yes, I have.  I think about four times, both in voter

2  ID cases, redistricting cases, and in North Carolina, a

3  case that combined voter ID with a number of other issues.

4  And way back in the '80s in the landmark Garza case.   I

5  wasn't directly testifying on intent, but my testimony

6  bore on that.

7  Q     Have you been accepted by courts as an expert on

8  intent?

9  A     Yes.  In four, all four cases in which I directly

10 testified on that.

11 Q     Please tell us in a summary fashion to begin with

12 what issues you were asked to address as an expert witness

13 in this case.

14 A     Yes.  I was asked primarily to address the issue of

15 whether the voter identification law, SB 1256 in 2013, was

16 adopted and implemented by the Commonwealth of Virginia

17 with the intent to discriminate against African-American

18 voters and would-be voters by placing disparate burdens

19 upon this minority group when it came to voting

20 opportunities relative to whites.

21     I would also say, while I mention adopted and

22 implemented, I didn't just mean to quickly pass over

23 implemented.  That is a very important element here

24 because, as they say, the devil is in the details.

25     THE COURT:  You are going -- you just answer the

1    questions he asks, okay?  I know you have a lot to say, I

2    respect you very much, but please answer the questions

3    counsel gives you.  Okay?

4         Go ahead.

5         THE WITNESS:  And I was also asked to look at the

6    so-called Senate factors that were part of the totality of

7    circumstances, and to respond to any testimony, reports,

8    analysis --

9         THE COURT:  All right.

10        THE WITNESS:  -- by defendants' expert.

11        THE COURT:  Go ahead.

12   BY MR. SPIVA:

13   Q    What information did you rely on in conducting your

14   analysis, Dr. Lichtman?

15   A    I relied on the kind of standard information that

16   historians and political analysts rely on.  Data from the

17   Virginia Department of Elections data base.  Scholarly

18   books, articles, reports, newspaper, journalistic

19   articles, demographics, socioeconomic information,

20   election returns, e-mails, court opinions, briefs,

21   government and organizational reports, academic studies

22   and scientific surveys.

23   Q    What methodology did you follow in your analysis?

24   A    I relied on my standard methodology that I have used

25   in numerous historical studies which is consistent with

1   the methodological guidelines by the U. S. Supreme Court

2   in the Arlington Heights case where the court focused on a

3   number of issues, discriminatory history, discriminatory

4   impact, sequence of events, procedural or substandard

5   deviations, and contemporary statements.

6   Q    Did you attempt to a draw legal conclusion in your

7   work?

8   A    I did not.  I simply drew substantive conclusions as

9   I would in any voting rights case.

10  Q    How did your work differ from conclusions that the

11  Court could reach for itself?

12  A    Well, I would certainly expect the Court to assess

13  and evaluate my work and compare it to the work of

14  defendants' experts, and one of the defendants' experts,

15  Dr. Owen, engaged the issue of intent, drew her own

16  findings about intent, but I would not expect the Court to

17  do the research, the analysis, and the writing that goes

18  into my reports and testimony.  I presented more than 35

19  statistical charts and tables in my report.

20       I analyzed a wide range of primary source materials

21  ranging from e-mails to legislative debates.  I

22  scrutinized scientific surveys, academic studies, reports,

23  and election returns and put it together in a narrative

24  for the Court to weigh and assess and draw legal

25  conclusions from.

1  Q    Have you analyzed issues of intent in your scholarly

2  work?

3  A    Oh, numerous times.  You would have to shut down

4  historical scholarship if you shut down analysis of

5  intent.  This includes, of course, my two recent books on

6  the Rise of the American Conservative Movement, and F.D.R,

7  both of which won major national awards.

8  Q    Can you briefly summarize your overall findings in

9  this case?

10 A    Yes.  To do it really quickly.  My analysis of

11 historical and quantitative evidence indicates that both

12 the enactment of SB 1256 and the interpretation of SB 1256

13 the following year, indicate discriminatory intent in both

14 the adoption and the implementation of this law.

15     In addition, I found that, I think, eight of nine of

16 the Senate Factors that we are guided to look at by the

17 courts apply here in the Commonwealth of Virginia.

18 Q    Did any of the reports submitted by experts for the

19 defendants cause you to question any of these findings?

20 A    They did not.

21 Q    I would like to now turn to detailed analysis.  Did

22 you find that there is a history of discrimination against

23 African-Americans in Virginia?

24 A    I did.

25     MR. HEARNE:  Your Honor, it appears the witness is

1   reading from prepared remarks.  And if they are exhibits

2   or his report, then that would be fine, but if it could be

3   identified.  That being said, he appears to be reading

4   something in the record.  If it is something we have not

5   been provided, I would like to be provided that.

6        MR. SPIVA:  These are his own --

7        THE WITNESS:  Sorry.

8        THE COURT:  It may be.  But I think he ought to set

9   them aside and testify from his own knowledge.  If he

10  needs to refresh his recollection, I am sure you can do

11  that.

12       MR. SPIVA:  Sure.  Yes.  These are his own notes.

13       THE WITNESS:  Just my notes, excerpts from my

14  reports.  As you can see, I am not reading.

15       THE COURT:  If you need to refresh your recollection,

16  you can do so, but you need to testify independently.

17       Go ahead.

18  BY MR. SPIVA:

19  Q    And what were your findings with respect to the

20  history?  First of all, have you done something separate

21  and apart from what Dr. Smith has already provided to the

22  Court?

23  A    Dr. Smith, of course, did a lot of historical work.

24  What I provided in my supplemental report on pages 40 and

25  41 was some recent examples that go along with the longer

1  history of racial discrimination.   I am not going to read

2  them all, but will briefly summarize them.   They had to do

3  with many years of pushing for restrictive voter ID laws.

4  They had to do with court findings that the post 2010

5  congressional redistricting plan violated the Constitution

6  because of a racial gerrymandering in congressional

7  districting.   That was reaffirmed after the Alabama

8  decision came down from the Supreme Court.   I was an

9  expert witness in that Alabama case, so I am very familiar

10  with it.   And also pointed out that recently, as well,

11  Republican members of Congress from Virginia have not been

12  supportive of efforts to restore the pre-clearance

13  provisions of the Voting Rights Act in a way that comports

14  with the United States Supreme Court striking down of the

15  formula for section V of the Voting Rights Act.

16  Q   Does Virginia history of racial discrimination have a

17  present-day manifestation from a socioeconomic standing of

18  African-Americans and whites?

19  A   Yes, it does.   I have done extensive socioeconomic

20  analysis of factors that are standard in gauging such

21  things, and factors that bear directly upon voting and

22  upon voter ID laws, Your Honor.

23  Q   Are these disparities quantified in tables one

24  through four and charts one through eight --

25  A   That is correct.

1  Q      -- of the expert report?

2  A      Yes.

3  Q      If we could turn to your initial report, which is

4  Plaintiffs' Exhibit 215.  All the expert reports, as I

5  understand it, Your Honor, have been received in evidence.

6       THE COURT:  What was the number again?

7       MR. SPIVA:  Sorry.  I misspoke.  I gave you the

8  rebuttal report number.  It is actually Plaintiffs'

9  Exhibit 212.

10       THE COURT:  212.  That will be received without

11  objection.

12       MR. FINBERG:  Yes, Your Honor.

13       THE COURT:  It will be received.

14                   (PX- 212 was offered and

15                    received in evidence)

16  BY MR. SPIVA:

17  Q      If we could turn -- first of all, Dr. Lichtman, take

18  a quick -- you have the hard copy up there, do you need --

19  A      I think I have a hard copy, and I see what is on the

20  screen.

21  Q      Okay.

22       Does that appear to be your initial report in the

23  case?

24  A      Yes.

25  Q      Let me ask you to turn on the screen to table one,

1   which is on page seven of your initial report.

2   A    Yes, I see it.

3   Q    Actually got the wrong page.  It is page six.

4        So, can you explain your findings as set forth in

5   table one?

6   A    Certainly.  A lot of findings there, but let me begin

7   by indicating this comes from the American Community

8   Survey, official survey by the U.S. Census for 2009 to

9   2011.  And the reason, Your Honor, I use that particular

10  survey was it was information available at the time of the

11  adoption of SB 1256 rather than information that was

12  produced later.

13       This looks at standard economic measures including

14  median household income, per capita income, poverty rates,

15  unemployment, and asset poverty.

16       Asset poverty is probably the only one that is a

17  little odd, but as I indicate in the footnote there, it is

18  the lack of sufficient net worth to subsist at the poverty

19  level for three months without access to income.  In other

20  words, we often focus on income, but assets are very

21  important as well because they are a cushion if you lose

22  your income.

23       All of these measures, I'm not going to go through

24  them individually, but they all show essentially the same

25  picture; that is, African-Americans have much lower income

 1  than whites.  They are far more likely to be in poverty,

 2  poverty rate is more than double.  They are far more

 3  likely to be unemployed.  The unemployment rate is about

 4  double.  And they are far more likely to be in asset

 5  poverty.  Asset rate is about triple.

 6  Q    Turning to chart one on page 67.  Can you briefly

 7  describe what that -- what you are conveying with that

 8  chart?

 9  A    That just puts it in graphic form.  People are often,

10  you know -- I find this a lot in my teaching -- a little

11  phased by tables with numbers.  And this is the same

12  information in pictorial form that just shows how large

13  the gap is in this case on income levels between

14  African-Americans and whites in Virginia.

15  Q    In chart two on page eight, is that the asset poverty

16  rate, unemployment rate shown?

17  A    It is actually three things.

18  Q    Okay.

19  A    I couldn't put it on the other chart because the

20  other chart was in dollars.  This is in percentages.  And

21  this, again, for poverty, unemployment, and asset poverty

22  graphically shows how large the gap is in Virginia between

23  African-Americans and whites.

24  Q    Turn to table two on page nine, and explain what that

25  shows.

1  A     Yes.  This is education measures.  Very important in

2  dealing with voting and voters IDs.  It shows most blacks

3  and whites are high school graduates, as we might expect

4  in Virginia, but that there is still a considerable gap

5  between blacks and whites when it comes to college degrees

6  or more, there is a very large gap between blacks and

7  whites in Virginia.  About double.

8       And when it comes to scores, this is just indicative

9  of those below a basic math capacity.  It is almost triple

10 for eighth grade African-Americans as opposed to whites.

11 And the drop-out rate from nine to 12 is slightly more

12 than double.  For African-Americans than whites.  So there

13 are pretty severe educational barriers being faced by

14 African-Americans, unfortunately, in the Commonwealth of

15 Virginia versus whites.

16 Q    Chart three on page ten.  Is that just a graphic

17 representation of what you were just talking about?

18 A    It is a graphic representation of part of it.  It is

19 that part that deals with percentages.  It shows

20 African-Americans are slightly lower, but not dramatically

21 so for high school graduates, but dramatically lower when

22 it comes to college degrees or more.

23 Q    And what is chart four on page eleven showing?

24 A    Well, it just shows the percentages below basic math

25 and the drop-out rate, showing that the African-American

1  percentage lacking basic math at the eighth grade is

2  nearly triple that of whites.  And the drop-out rate,

3  those who don't get out of high school, is slightly more

4  than double for African-Americans than whites.

5  Q    In table three on page 12, can you explain what this

6  conveys?

7  A    Yes.  Now we are getting into another area covered by

8  the census, and that is housing measures.  Kind of got a

9  separate census of housing and population.

10      I am looking at a few things here.  The

11  owner-occupied housing, that is, what percentage of blacks

12  and whites own as opposed to rent?  And you can see it's,

13  about 50 percent higher for whites.  Median home value is

14  substantially higher for whites.  And I would like to

15  highlight the next one because I think it is particularly

16  pertinent to our analysis of voting and our analysis of

17  voter ID laws in the Commonwealth.  And that is percent of

18  households with no vehicle available.  And it is nearly

19  triple for African-Americans as compared to whites.

20      And percent with no telephone service, it is small

21  for both, but it is about twice as high for

22  African-Americans as compared to whites.

23  Q    What about chart five on page 13?

24  A    That looks at the home value.  Showing, you know,

25  that the home value of whites is substantially higher for

1  its median, that is the midpoint, as compared to

2  African-Americans.

3  Q    How about chart six on that same page?

4  A    Yes.  Chart six looks at those other measures, home

5  ownership, about 50 percent higher.  Lack of vehicle in

6  the household, almost triple.  And the lack of telephone

7  in the household, about double.

8  Q    In table four on page 14, what is that representing?

9  A    This looks at some basic health measures.  And first

10  it looks at those who don't have health insurance.  Nearly

11  double for African-Americans as compared to whites.

12       The life expectancy of African-Americans is a bit

13  lower than that for whites, although births are about

14  twice as high, nearly, for African-Americans than whites.

15  And the infant death rate per one thousand births is more

16  than double.

17       So you have got other burdens on African-Americans

18  relative to whites in the Commonwealth with respect to

19  availability of health insurance -- big issue these

20  days -- as well as other health measures.

21  Q    Just the last two for now.  I think that they are

22  just representations in graphic form, but look at chart

23  seven and chart eight.  If there is something to add, that

24  is fine?

25  A    No.  It is representation in graphic form if you

1   actually want to see the picture.

2   Q     Okay.

3   A     And the same thing for chart eight on the other

4   health measures.  Again, just showing it in graphic as

5   opposed to having, trying to manipulate numbers in your

6   head.

7   Q     Did those tables and charts relate to the Senate

8   Factors at all, Dr. Lichtman?

9   A     I think they relate to two things.  As I said, they

10  relate to voter ID, and voting, and clearly this is one of

11  the Senate Factors that is posed for us to analyze.  It's

12  lingering effects of discrimination in terms of

13  disparities on these kinds of socioeconomic measures.

14  Q     Did you next consider the sequence of events leading

15  to the adoption of SB 1256?

16  A     I did.

17  Q     What did you consider first?

18  A     Well, what I first considered in terms of the

19  sequence of events was the history, at least recent

20  history, of voter ID laws in the State of Virginia.  And

21  before that, even in the bigger context, I also considered

22  the underlying politics of it.

23        In terms of voter turnout, and in terms of partisan

24  politics in voting.  That is the bigger context of the

25  specific sequence of voter ID laws.

1  Q    What was the first sequence of political events that

2  you analyzed?

3  A    The first sequence of political events that I

4  analyzed is in my, report -- I believe starts on page

5  18 -- and that is the patterns of voter turnout by race

6  and ethnicity from about 2004, 2006 to the present.

7  Turnout is part of the life blood of politics.  The two

8  fundamental elements of electoral politics are getting

9  people to vote for you, and getting the kind of people who

10  vote for you to turnout to vote.

11  Q    Is this represented in table five of your report?

12  A    That is correct.

13  Q    What does table five show?

14  A    Table five shows several things.

15      First of all, if you look at the U.S. Senate

16  elections, table five shows that there has been a steep

17  decline in white turnout relative to minority turnout in

18  the Commonwealth since 2006.  Let me explain these turnout

19  numbers.

20      These turnout numbers are not the rate at which the

21  various groups turn out.  There is something much more

22  important.  They are the life blood of politics, and that

23  is, of the entire electorate who shows up in these

24  elections, what percentage of the electorate is white,

25  what percentage of the electorate is black, what

 1   percentage is Hispanic, and others.  And this is taken

 2   from exit polling, a very standard source for looking at

 3   turnout and does.

 4        First, if we compare U.S. Senate to U.S. Senate

 5   elections we can see that back in 2006 the white share of

 6   the U.S. Senate electorate was 78 percent.  That went down

 7   to 70 percent in the 2012 U.S. Senate election, which may

 8   not be entirely comparable, of course, because 2006 is a

 9   mid-term election year and 2012, of course, is a

10   presidential election year when you might expect more

11   minorities to show up.  However, we can fast forward to

12   2014, the most competitive Senate election in the country,

13   and white turnout remains constant at 70 percent, and the

14   other numbers are roughly the same.

15        We can see black turnout rises from 16 percent back

16   in 2006 to 20 and 19 percent, essentially, with rounding

17   errors in 2012 and 2014.  And we can see, not surprisingly

18   in the Commonwealth, as elsewhere, the most rapidly rising

19   component of the turnout is Hispanic.

20        So over time in U.S. Senate elections we have three

21   patterns.  Smartly falling white turnout as a component of

22   the electorate, rising black turnout as a component of the

23   electorate, and rising Hispanic turnout as a component of

24   the electorate.

25        The next element of the table, which should be

1   separately examined, is gubernatorial elections.  In the

2   Commonwealth, of course, gubernatorial elections are not

3   entirely unique, but a little unusual in that they are

4   held on the off year.  We can see from the off year of

5   2009 to the off year of 2013 a similar pattern of

6   declining white and rising minority turnout.

7        The white component of the electorate drops.  That is

8   from 78 percent to 72 percent.  The black component rises

9   from 16 to 20.  We don't have for 2009 the other groups

10  parsed out, but by simple subtraction you can see the

11  other groups would be slightly rising as well.

12       And, of course, as you get into these lower white

13  turnout elections, like 2012 and 2013, 2014, you see

14  Democratic victories.

15  Q   What does table six show on the next page related to

16  the patterns of turnout for whites and minorities?

17  A    Table six does the same thing for presidential

18  elections.  And we see a similar, although not quite as

19  stark a pattern in presidential elections, because even

20  going back to 2004 there is a pretty robust minority

21  participation in presidential elections.  Minorities tend

22  to turn out more robustly in presidential elections

23  relative to whites than in mid turn elections or in off

24  year elections.

25       So we can see the decline, more modest, but it is

1   there.   2004 whites comprise 72 percent of the electorate.

2   In 2012, 20 percent.   Excuse me.   70 percent in both 2008

3   and 2012.   And not a whole lot of change in the black

4   component.   And, again, a rise in the Hispanic component.

5        So, similar, but not as sharp a pattern for

6   presidential elections.

7   Q    Did you analyze the political implication of these

8   turnout changes?

9   A    Yes, I did.

10  Q    How did you do that?

11  A    I used exit polls again, Your Honor, because exit

12  polls not only gage turnout, they also gauge how various

13  groups in the electorate -- but not just racial groups --

14  but age groups, income groups, education groups, a

15  standard tool in political history and political science.

16  Q    Can you turn to Table 7, please.

17       Would you look at Table 7 in Chart 9 up at the same

18  time, Dr. Lichtman?  We can put them both on the screen.

19       THE COURT:  Let me ask you a question.

20       THE WITNESS:  Certainly.

21       THE COURT:  In determining these various percentages,

22  your exit polls, did you do an exit poll at every voting

23  precinct, or did you just take a sample and extrapolate

24  from that?

25       THE WITNESS:  I didn't do the exit polling.  The

1   polling is done in every year by a single group that is

2   independent of everybody.  It is called Edison Research.

3   And they are obviously not going to be at every single

4   polling place.  They are going to be at a representative

5   sampling of polling places.

6        THE COURT:  Fine.  Thank you, Doctor.

7        THE WITNESS:  Thank you.

8        THE COURT:  Go ahead.

9   BY MR. SPIVA:

10  Q    Does table seven in chart nine, is that part of the

11  analysis of the political implications of these turnout

12  changes?

13  A    That is correct.

14  Q    Can you explain?

15  A    Yes.  I don't think these charts should be a big

16  surprise to anyone familiar with political patterns in the

17  Commonwealth.  They are a little hard to see.  Maybe we --

18  Q    One at a time?

19  A    I am having trouble seeing.

20  Q    Start with table seven?

21  A    Yes, I think maybe so.

22  Q    Table seven, make it a little bit bigger.

23  A    I won't go through every number.  I will look at some

24  of the summaries.  These are rounded numbers, of course.

25  You know, they are not exact to the penny, but they tell a

1  picture.

2      You can see here that Republicans in the Commonwealth

3  are dependent on white voters.  On average of 59 percent

4  of whites cast their ballots for Republican candidates.

5  That includes president, U.S. Senate, and governor.  Only

6  one is kind of a blow-out election in 2008 when Republican

7  candidates get less than 56 percent support from the white

8  electorate.

9      Sometimes we talk about the political base, Your

10 Honor, of political parties.  Well, the political base of

11 the Virginia Republican Party is among white voters.  We

12 can see very sharp contrasts when we turn to

13 African-Americans, and less sharp, but still clear

14 contrast when we turn to Hispanics and Asians.

15     Basically African-Americans are about 90 percent

16 Democratic in their voting loyalty on average, voting only

17 nine percent for Republican candidates.

18 Q   All right.

19 A   That is about a 50 percentage point gap.  That is a

20 huge gap.  And then we see for Hispanics and Asians they

21 are part of the Democratic base, although not as

22 monolithically Democratic, but still overwhelming in a

23 majority at about a third, almost a 27 percentage point

24 gap.

25     So those turnout numbers have real political

1   significance.  The more whites go down in the component of

2   the electorate, relative to minorities, the more that

3   hurts Republicans and helps Democrats, simply put.

4   Q     In terms of chart nine, how does that play in that

5   analysis?

6   A     Chart nine.  It's the same thing.  It just gives you

7   a picture and, you know, the picture up there is not quite

8   60 percent.  I think it is 59 something.

9   Q     Okay.  This is basically in graphic form?

10  A     Yes, just graphically shows the major differences,

11  particularly between African-Americans and whites.  Some

12  thing that we saw in the other table.

13  Q     Okay.

14  A     It is about a 50-point gap.

15  Q     All right.

16        Move to table eight.  Explain what significance that

17  has.

18  A     Yes.  It is a little complicated.  I will really cut

19  to the chase on this table.

20        As we saw, there is a 50-point gap between whites and

21  African-Americans, about slightly more than 25 percent

22  point gap between Asians and Hispanics and whites when it

23  comes to partisan voting in Virginia.

24        But as I mentioned a moment ago, the exit polls also

25  include information on other demographic groupings in the

```
 1  electorate that at least potentially have political
 2  significance.  Men versus women.  I don't mean that in the
 3  battle of the sexes.  Age groups.  High school versus only
 4  college graduate.  Income levels.  And while all of these
 5  have some political resonance, none come close to the
 6  gaps, not just for blacks and whites, but for whites and
 7  any minority.  Biggest gap is an age gap of about ten
 8  points.  41 percent versus 51 percent Republican for young
 9  people versus people of my age or older.  That compares to
10  much larger gaps.
11      So if you are looking at a gauge of what makes
12  partisan politics in the Commonwealth of Virginia, it is
13  not any of these other things.  It is race.  That is the
14  most fundamental divide politically.  That is what really
15  matters between Republicans and Democrats.  And
16  particularly the racial gap between whites and
17  African-Americans.  Not just because it is the widest, but
18  because by far and away African-Americans are the largest
19  minority voting block in the Commonwealth.
20  Q    What do you conclude from these recent patterns of
21  turnout and partisan alignment?
22  A    What I conclude from these is, first of all, none of
23  this can possibly be lost on Republicans in Virginia.
24  This is well-known information.  Politicians live and die
25  on this kind of information, turnout and voting.
```

1    And they could not miss the fact that the demography

2  of voting has been cutting against them, and that they

3  could reap significant political benefits by limiting the

4  voting of minorities, particularly the voting of

5  African-Americans relative to whites.

6    And so there is this motivation here for such

7  limitations.

8  Q    Did you next consider specific decision-making by

9  Republicans in Virginia regarding voter photo ID laws?

10 A    Yes, I did.

11 Q    What did you consider first?

12 A    Well, the first thing I considered was a very

13 important distinction conceptually and practically when it

14 comes to voter ID laws, and that is the distinction

15 between strict and non strict voter ID laws.  This has

16 nothing to do with the particular components, that is,

17 what IDs are allowed, what IDs are not.  It rather has to

18 do with the options available or not for a voter who does

19 not have an authorized ID.  In a non-strict state there

20 are alternatives.  Even without a acceptable voter ID in a

21 non-strict state, you could cast a regular ballot or cast

22 a provisional ballot that could be counted without you

23 having to take any more steps.  For example, in states

24 like South Carolina and North Carolina if you don't have a

25 requisite ID you could still cast a regular ballot by

1  signing an affirmation of reasonable intent, it is called.

2  Why couldn't I get an ID?  Transportation problems,

3  medical problems, a whole range of it.  That is a

4  non-strict example.  Virginia used to have a non-strict

5  option under pre-2012 law.  And that is, you could sign an

6  affirmation of identity at the polls and vote.

7      Now, we move to the strict.  And under the strict

8  voter ID if you don't have an acceptable voter ID,

9  whatever it may be, and whoever the election official

10  makes that decision, because it is not as if there is some

11  absolutely objective template up there.  You have only one

12  option, and that is to vote what is called a provisional

13  ballot, ballot that may or may not count.  And to make it

14  count, you take two steps.  You have to get an acceptable

15  ID, and there are different procedures in different states

16  for doing that.  And then you have to return that

17  acceptable ID to the polls, the election officials have to

18  agree that it is acceptable, and if all of that is

19  fulfilled, your provisional ballot can be counted.   If

20  that is not fulfilled, your provisional ballot will not be

21  counted and you are, in effect, disenfranchised in that

22  election.

23  Q    Why is that distinction important between a

24  non-strict and strict ID law?

25  A    It is critically important because it affects how you

1  can make your vote count.  It directly affects the

2  implication of a voter ID law upon the voter.

3      I just finished testifying in the North Carolina

4  case.  And right before that case North Carolina actually

5  changed its law from strict to non-strict, saying this

6  makes the law much more acceptable because now poor

7  people, minorities, can sign a reasonable impediment and

8  will not be disenfranchised.  That was a big debate in

9  that litigation in which I was involved, and a big change

10  in the law.

11  Q   Thank you.

12      In '96 did Virginia enact a voter ID law?

13  A   It did.

14  Q   What did that law involve?

15  A   Well, it was not a photo identification law.  The

16  identification laws don't have to be photo.  You could

17  present things like utility bills, government pay checks,

18  voter registration cards, which are not photo.  And it was

19  not strict.  That is, you could sign an affirmation of

20  identity even if you didn't have one of the many available

21  photo or non-photo identifications that would enable you

22  to vote in the Commonwealth, Your Honor.

23  Q   What followed in terms of proposed legislation to

24  change the 1996 law?

25  A   Well, there was a lot of push by Republicans in the

1  state legislature to do two things; eliminate the

2  non-photo option so it would become a photo voter ID law,

3  not a non-photo voter ID law; and to eliminate the

4  affirmation of identity option so that it would become a

5  strict photo voter ID law.

6  Q    Were there proposals for this in or around 2010?

7  A    Yes.  And there was a bill, I think it was called HB

8  498, if I remember correctly, introduced at the time.  And

9  I think there was a divided government then, so the

10  Democrats in the House killed the legislation.  So as of

11  2010 you still had the old 1996 non-photo, non-strict law

12  in force.

13  Q    What changed after that?

14  A    Well, several things changed after that.

15       First of all, Virginia elected a Republican governor.

16  And the Republicans gained control of the legislature by

17  2012.

18       So the political complexion of the decision-makers

19  switched from mixed to reasonably unified Republican.  I

20  believe it was pretty close in the Senate, almost equally

21  divided.  But with the deciding vote going to the

22  Republicans.

23  Q    What happened in 2012?

24  A    Yes, it is a pretty complex story.  I am not going to

25  try to relate it all.  But, basically two bills came out

1  of the legislature.  I think the one that was ultimately

2  enacted -- essentially identical, called SB 1, to the best

3  of my --

4       THE COURT:  What year was this?

5       THE WITNESS:  This was 2012, Your Honor.

6       THE COURT:  Go right ahead.

7       THE WITNESS:  Yes.

8       And basically what these bills did, was they didn't

9  create a photo voter ID law.  They maintained the option

10  to use non-photo forms of ID; government pay checks, bank

11  statements, utility statements, among others.

12       But this is why this distinction is so important,

13  they moved from a non-strict to a strict form of voter ID

14  law.  That is, they eliminated the option to vote if you

15  didn't have an acceptable ID by an affirmation of

16  identity.  These bills, of course, then went to the

17  governor.

18  BY MR. SPIVA:

19  Q    How did the governor respond to the legislation?

20  A    Again, it is complex.  He had a number of amendments

21  and suggestions, many of which were adopted.  But there

22  was one critical recommendation of the governor that was

23  not adopted.  That was, in effect, to have a non-strict

24  option in the 2012 voter ID legislation through something

25  called signature comparison.  That is, if you cast a

1   provisional ballot and signed it, they could compare your

2   signature on the registration rolls.   If there was

3   reasonable consonance in the signatures, that provisional

4   ballot would be counted.   So, in other words, there was an

5   option, as in non-strict states to count a provisional

6   ballot without the voter actually having to take another

7   step.   That was rejected by the legislature, and so in its

8   final form the 2012 legislation was non-photo, but strict.

9   Q     What else did the governor do?

10  A     The governor also ordered voter registration cards to

11  be sent out.   And registrars to remind, contact voters who

12  were voting provisionally, and remind them of the law's

13  requirements.   But there is no actual requirement that

14  registrars do this.   So you had differences across the

15  state in what registrars were actually doing.

16  Q     Was this -- at that point was section IV of the

17  Voting Rights Act still enforceable, in effect?

18  A     You mean section V, the pre-clearance section.

19  Q     Yes, but section IV was --

20  A     IV right, of course.   Yes.   At this time obviously

21  this law, or any new law affecting elections and voting

22  had to be pre-cleared by the United States Department of

23  Justice because Virginia was a pre-clearance state under

24  the Voting Rights Act.   And the burden of proof was on the

25  State of Virginia.

1          That is, Virginia had to demonstrate to the

2    satisfaction of the United States Department of Justice

3    that this new law, or any new law, did not, did not do one

4    of two things.   Did not retrogress minority voting

5    opportunities.   In other words, turn back minority voting

6    opportunities.   And was not enacted with the intent to

7    discriminate against minorities.   So, Justice could fail

8    to pre-clear a law either because it was retrogressive or

9    because it was intentionally discriminatory.   If that

10   happened, the state still had the option of going into the

11   D.C. courts and seeking a judgment from courts to overturn

12   the lack of pre-clearance.

13   Q    Was the 2012 law pre-cleared?

14   A    It was.   It was, I believe pre-cleared in August of

15   2012 in time for the presidential and other elections that

16   took place that year.

17   Q    Obviously the presidential election in Virginia was

18   that President Obama won the electoral votes in Virginia

19   in 2012, and Tim Kaine won the Senate race.   What were the

20   implications of this election?

21   A    You know, there is the old saying that elections have

22   consequences.   And this election had a lot of

23   reverberating consequences in the Commonwealth of

24   Virginia.

25        First of all, it was the first time since 1948 the

1  Democrats had won consecutive presidential elections, with

2  Obama winning in '08 and '12.  Last time that happened was

3  Franklin Roosevelt in 1944, Harry S. Truman in 1948.

4  Q     With respect to Virginia.

5  A     Only with respect to Virginia, of course, confirming

6  that presidential elections in Virginia had become a swing

7  state.  Highly competitive.  And, of course, a Democrat

8  also won an open United States Senate seat and won it

9  pretty handily, I think Kaine by about six points.  And

10 moreover, apropos of what we are looking at here,

11 Republicans were very concerned with what they saw as this

12 juggernaut Democratic turnout machine, particularly in the

13 minority community, and particularly among young people.

14     MR. HEARNE:  Your Honor, in terms of the witness'

15 responses or conclusions of Republican's feared for a

16 juggernaut, there has been no foundation laid for that

17 kind of speculation.

18     THE COURT:  I am not accepting it as fact.  I am

19 accepting it as something he concluded in drawing his

20 ultimate conclusion.  Not taking it as a fact, just his

21 view.

22     MR. HEARNE:  Thank you.

23     THE COURT:  I understand.

24     THE WITNESS:  I was about to document it.

25     THE COURT:  I am not going to let you conclude things

1  like that, Doctor.

2       THE WITNESS:  I understand.  That is why I was going

3  to turn to my documentation.

4       THE COURT:  You can do that as you wish, but I am not

5  going to let you testify what the intent was of the

6  reaction of the Republican party.

7       THE WITNESS:  I understand.

8       THE COURT:  Okay.

9       THE WITNESS:  History --

10      THE COURT:  Not out of disrespect, but I am just

11  putting some limitations on you.  All right?

12      THE WITNESS:  Of course, Your Honor.  If I may

13  finish.

14      THE COURT:  Yes.  Sorry.  Go ahead.

15      THE WITNESS:  Thank you very much.

16      I just saw yesterday an e-mail from Republican

17  Congressman Rob Wittman who had met with --

18      MR. HEARNE:  Your Honor, that is not in evidence,

19  what he is referring to is a --

20      MR. FINBERG:  It is the e-mail we talked about.

21      THE COURT:  The objection is sustained.  You may not

22  publish that.  You can certainly consider it, but you

23  can't publish it in the record.  All right.  Okay.

24      MR. SPIVA:  We were not intending to, but as a expert

25  I think, Your Honor --

1          THE COURT:  He can rely upon it, but not publish it

2   in the record.

3   BY MR. SPIVA:

4   Q    We are not intending to.

5   A    Thank you.  I was going to say, this e-mail is pretty

6   explicit.  It talks about the sophisticated voters

7   registration and turnout efforts of the Democrats.  It

8   talks about Hispanic turnout being a significant part.

9   And it talks about how the Obama folks are reaching into

10  youth, and particularly youth, with minority community

11  ties.  So it directly relates to the issue of the response

12  to what is politically happening in Virginia, and at least

13  the assessment of some within the Republican party that

14  this is tied to turnout efforts, successful turnouts

15  efforts by Democrats and particularly the successful

16  turnout efforts by Democrats, Your Honor, within the

17  minority community.

18         THE COURT:  Okay, sir.  Go ahead.

19  BY MR. SPIVA:

20  Q    What then followed this election, the 2012 election

21  with respect to voter ID, Dr. Lichtman?

22  A    Yes.  Something, you know, that really caught my eye

23  as a political analyst and historian.  The 2012

24  legislation had just been pre-cleared in August of 2012.

25  Of course you know the public pre-cleared document talked

1  about how effective this law was in meeting the twin

2  objectives of safeguarding the ballot and making sure that

3  nobody gets disenfranchised.  But then what we have is

4  less than a half a year later Republicans in the state

5  legislature led by Senator Mark Obenshain -- I hope I am

6  pronouncing that correctly -- introduced a brand new bill.

7  Not just an amendment of the 2012 legislation, but SB

8  1256, which represented an entirely different type of

9  voter ID law.  Because it now moved to a strict photo

10  voter ID law eliminating such readily-available non-photo

11  IDs as utility bills, bank statements, pay checks,

12  government checks, et cetera.

13  Q    Let me direct your attention to page 26 of the

14  initial report.  Plaintiffs' Exhibit 212.  Does this

15  reflect a list of the types of ID that were permissible

16  under the 2013 photo ID law?

17  A    Yes.  With one small caveat, which I guess I will get

18  into, and that is you notice some say "valid" and some

19  don't.  But leaving that aside, these are the types of IDs

20  that, all of which are photo IDs that are acceptable under

21  this bill that was introduced, I believe, January 1st,

22  2013, SB 1256.

23  Q    Did the photo ID requirement of the 2013 law extend

24  to mail-in absentee ballots?

25  A    It did not.  So voters could, with an excuse -- and

1    they are pretty broad -- get an absentee ballot and send

2    it in without ever having a photo ID.

3    Q      What would happen if a voter did not present an

4    authorized ID at the polls?

5    A      Under this strict law you couldn't vote if you didn't

6    have acceptable ID, and that is both in terms of the list

7    and in terms of what the election official decides at the

8    polls.  You then can walk away and decide, you know, all

9    right, I am not going to bother.  Or, you are supposed to

10   be offered a provisional ballot.  I think I indicated my

11   understanding of provisional ballot previously.

12   Q      What were the implications?

13   A      I didn't finish.

14   Q      Pardon me.

15   A      And then if you cast a provisional ballot you have

16   three days in which to return or have --

17          THE COURT:  We have already had detailed testimony

18   from numerous witnesses about that.

19          THE WITNESS:  I am done.

20          THE COURT:  Thank you.

21          THE WITNESS:  I don't know what other witnesses have

22   said.

23          THE COURT:  All right.

24   BY MR. SPIVA:

25   Q      Let me ask you to put table nine up on the screen.

Lichtman - direct                    1117

1          What were the implications of elimination of the

2   affirmation -- I'm sorry --

3   A     I think it says "affirmation of identity" there on

4   page nine.

5   Q     Yes.   What were the implications of elimination of

6   the affirmation of identity?

7   A     Yes.   One of the big issues that I have seen in

8   examining the materials in this case is the differing

9   percentages and real people.   Virginia is a big state.   It

10  has got, you know, five million registered voters.   Close

11  to four million can turn out in an election.   So a small

12  percentage can still mean a lot of real people.   And

13  according to the source from the State that I have cited

14  here, you get about a .25 percent average in these

15  previous elections when you could use an affirmation of

16  identity, and while it seems kind of inconsequential, it

17  is not because of the large number of people voting in

18  Virginia.   And in the 2008 general table, it shows that

19  9,382 voters taking advantage of this.   And in 2010

20  general, a mid term, we get a lot of turnout it is:

21  5,536.

22         So we are talking about an option that affected

23  substantial numbers of voters in the presidential and

24  congressional year elections when that option was

25  available, no longer available under SB 1256.

```
 1   Q    What was the position of the governor's office with

 2   respect to the enactment by the legislature of SB 1256?

 3   A    Yes, that is one of the more interesting features of

 4   what was going on in this enactment.  I didn't have this

 5   e-mail series from the governor's office for my initial

 6   report, but it is in my rebuttal report.

 7   Q    If we could put Plaintiffs' Exhibit 119.  This is in

 8   evidence, Your Honor.

 9        THE COURT:  All right.

10   BY MR. SPIVA:

11   Q    Go ahead, Doctor.

12   A    Yes, I was going to say the e-mail series indicates

13   that the governor and the governor's high level staff did

14   not see any need to change the 2012 law to move into a

15   strict voter photo ID law.  And it is exactly the course

16   responsible for administering the election laws and

17   overseeing them.  And e-mails from high level staffers in

18   the governor's office indicate specific reasons why they

19   had this opposition six months after everyone had affirmed

20   the 2012 law, including the submission to Justice to move

21   towards the new law.  I think that is the first in the

22   series of --

23   Q    Turn to the next page.  You quoted this in the

24   rebuttal report, Dr. Lichtman.

25   A    Yes.  I can't quite see it.  I can see it in my
```

1  report.

2  Q    Is it easier if I had the rebuttal report pulled up

3  to the page where you cite this?

4  A    Yes, this, I think this is, at least for my eyes, is

5  too small to see.

6  Q    Can you put up Exhibit 215, which is Dr. Lichtman's

7  reply.

8  A    Yes.

9       THE COURT:  119 and 215 are in evidence, Mr. Spiva?

10       MR. SPIVA:  Yes, 215 is Dr. Lichtman's rebuttal

11  report, which is, along with all the other expert reports,

12  is in evidence.

13       THE COURT:  Okay.

14       MR. SPIVA:  119 is --

15       THE COURT:  All right.

16       MR. SPIVA:  -- also stipulated, not objected to.  I

17  guess maybe I should move to --

18       THE COURT:  Any objection?

19       MR. FINBERG:  Not to that exhibit.

20       THE COURT:  It will be received.

21  BY MR. SPIVA:

22  Q    And so then maybe we can maybe make it a little

23  larger, the one that begins, I'm trying to get some stats.

24  A    Okay.  So this is an e-mail on January 18, 2013.  At

25  the beginning of the legislative session.  It is from

1  Tucker Martin, Governor McDonnell's communications

2  director, a high-level staffer.  And it was sent to six

3  other members of the governor's staff.

4      And what this e-mail demonstrates is that from the

5  perspective of the governor's staff they did not want to

6  get involved in what they call Republican's titan voter

7  restrictions.  They saw moving to a photo voter ID law and

8  eliminating such regularly at hand IDs such as pay checks,

9  and utility bills as a tightening of voter restrictions,

10  and critically, they did not see any real issues under the

11  2012 law in a very high turnout presidential election year

12  of 2012.  They specifically cite Governor McDonnell for

13  saying he believes "*Virginia's system as currently*

14  *constructed has strong safeguards against any voter fraud.*

15  *And he supports it in its current form.*"

16      That goes to the heart of justification for changing

17  the law.  Not only does it have safeguards presently in

18  the view of the Governor, it has strong safeguards.  And

19  why should we tighten up voter restrictions when we don't

20  need to.

21  Q    Was there a follow-up e-mail, if you can --

22  A    There was.

23  Q    -- go to that.  If we can do the part, which is the

24  follow-up e-mail.  Maybe down to the next page.

25  A    The whole thing.

1  Q     What does that e-mail show?

2  A     It is a follow-up e-mail, and it makes reference to

3  what we have been talking about, the 2012 law, which the

4  Governor, the submissions to the Department of Justice,

5  the sponsor, Senator Obenshain, other Republican members

6  of the legislature, and all affirmed would protect the

7  integrity of the ballot, guard against fraud, but not

8  disenfranchise anyone.  So following the expansion last

9  time to protect the integrity of the democratic process we

10  got the high turn out presidential year, this is the

11  critical sentence, "It was a successful test of our

12  system."

13      You weren't getting a whole lot of provisional

14  ballots being filed.  And, again, this is critical.  "The

15  system worked as designed to prevent voter fraud, and to

16  insure that registered voters were able to cast their

17  ballot and have their vote counted."

18      Again it reiterates that the current system has

19  strong safeguards against fraud.  And is proven, not just

20  theoretical as might have been at the time of its passage,

21  whenever one was saying it would safeguard against voter

22  fraud and not disenfranchise anybody, but it has in

23  practice worked exactly as intended.

24  Q     Did other officials in the Governor's office also

25  weigh in on that matter?

Lichtman - direct                    1122

1   A      Yes.

2          That is correct.

3   Q      We may need to zoom back to the, if we can, maybe,

4   blow up a little bit.  It starts at later down to where

5   the bates number is.

6          What did other officials in the Governor's office --

7   what significance did you find in how they weighed in?

8   A      This is Lisa Hicks's comments, who is the Governor's

9   Secretary of Administration, very significantly a former

10  Deputy Attorney General, so she would be quite familiar

11  with voter ID laws and their implications given her former

12  position.  And she indicates that any new laws and

13  regulations should be focused on the registration process.

14  Not upon any new requirements for voting at the polls.  I

15  don't know what she had in mind on the registration

16  process, but it is clear from this that she didn't see any

17  need to change voter photo ID, which had nothing to do

18  with the point of registration.  The voter photo ID would

19  only come into play when she would register and try to

20  vote.

21  Q      What did Senator Obenshain do subsequent to this?

22  A      Senator Obenshain went ahead and pushed through the

23  adoption of SB 1256, which was the strict photo voter

24  identification law.  New law, not just amendment of the

25  old law.

1  Q    Was it openly signed?

2  A    It was ultimately signed by the Governor, although he

3  issued a statement very similar to what is in these

4  e-mails reaffirming that he thought the present system was

5  working.

6  Q    What was your ultimate assessment of the

7  implications, as a historian, of these e-mails for the

8  issue of intent?

9  A    I think it has direct bearing on the issue of intent.

10  Here you had the Governor's office, executive responsible

11  for overseeing and administering elections saying on a

12  substantive basis there is absolutely no need to change

13  the existing law.  It safeguards against fraud.  It

14  doesn't disenfranchise anyone.  It has worked in a very

15  high turnout presidential election, there is no need for

16  change.

17      So, this raises the issue, you know, what is the

18  other motivation for Senator Obenshain and his allies in

19  the legislature for pushing this through?  And I think we

20  saw in all of the previous analyzes that any measure that

21  potentially would limit African-American, or more

22  generally minority turn out relative to whites would

23  benefit Republicans within the State of Virginia.

24  Q    In your research, issue of intent, do you typically

25  expect to see decision-makers openly express the

1  discriminatory intent behind the laws if there is

2  discriminatory intent to the laws they are passing?

3  A    Quite the contrary.

4  Q    Why not?

5  A    First of all, politicians are sophisticated,

6  particularly in the modern era.  And particularly in the

7  modern litigious post-Voting Rights era.  They are highly

8  unlikely to express openly anything smacking of

9  discriminatory intent.  This is particularly true in --

10  remember, this is when section V was still in force.

11  Section IV had not been invalidated yet by the court.

12  That didn't come until after the passage of SB 1256.  And

13  one of the provisions of the Voting Rights Act that could

14  get a new law invalidated was that it was passed with

15  discriminatory intent.  So certainly no politician in the

16  State of Virginia is going to risk having the law

17  invalidated by expressing open discriminatory intent.

18      THE COURT:  Let me ask you a couple of quick

19  questions.  Did this bill come out of committee on a

20  straight party line vote?  Coming out of committee.

21      THE WITNESS:  I am trying to remember.  I think

22  everything was, including committee, was either straight

23  party line or very close to straight party line vote yes.

24      THE COURT:  And the floor vote was a straight party

25  line vote?

1        THE WITNESS:  Virtually straight.  May have been one

2  or two strays, but virtually straight party line.  Might

3  have been completely straight party line vote.

4        THE COURT:  Now, I think we have heard testimony that

5  Obenshain's provision may have been added by a committee

6  to resolve the differences between the House and the

7  Senate bill.  Am I correct on that?

8        THE WITNESS:  I am not certain.  Which provision are

9  we talking about?

10       THE COURT:  The provision that added the voter ID.

11  The requirement of the voter ID.

12       THE WITNESS:  My understanding, I could be wrong, but

13  my understanding is that that was in the initial version

14  of the bill.

15       THE COURT:  I am sure you have read it closer than I

16  have.  Go ahead.

17  BY MR. SPIVA:

18  Q    Is there evidence of political non-substantive

19  motivation in the interpretation of SB 1256 by the State

20  Board of Elections?

21  A    Yes.  And this is important because there are two

22  pivot points here.  One is obviously the introduction and

23  adoption of the law.  The other is the construction of the

24  law the following year by the State Board of Elections,

25  which became an extremely political process.

1  Q      How did that evolve?

2  A      Well, again, that evolved in kind of a complex way.

3         The State Board of Elections had to draft regulations

4  as to what counted as a valid ID.   Remember when we saw

5  the list, some said "valid," some simply listed the ID.

6         But, the Board, three-person board, had to decide

7  what was meant by "valid."   And in particular, the issue

8  was accepting expired ID, particularly for the most common

9  forms of ID, that is, licenses, of course, passports.   And

10 this also implicated student IDs as well.

11        That process began with the State Board of Elections.

12 I think I have something on this from a deposition.   Can

13 you put it up from the reply report, page 35?

14 Q      Before you hone in, could you direct us to what you

15 are referring to?

16 A      Says, McClees testified and then there is something

17 from the deposition.

18 Q      Now, if we could --

19 A      Highlight that.

20 Q      Yes.

21 A      That will help.

22        So the Board originally makes the decision that we

23 are not going to invalidate IDs because of an elapsed

24 expiration.   So if my -- driver's license.

25        THE COURT:   I think some members of the Board already

 1  discussed that.  We have had a detailed discussion of that

 2  by the person who drafted it.

 3       THE WITNESS:  Okay.

 4       THE COURT:  Okay.

 5       THE WITNESS:  I didn't know that.

 6       THE COURT:  I know you didn't.  Go ahead.

 7       THE WITNESS:  I will be quick.

 8       THE COURT:  I already went to the next question.

 9  Okay.

10  BY MR. SPIVA:

11  Q    Let me ask you.  Did you consider on, I guess page

12  five and six of your reply report statements by Charles

13  Judd, the former chair of the Republican -- sorry.  Former

14  chair of the Board of Elections?

15  A    I did.  This is important because, very quickly -- I

16  don't know if it was covered already, Your Honor -- Judd

17  said there is a reason why we are going to allow expired

18  IDs, because we don't care whether a person is still

19  capable of driving or not.  We just want to establish

20  identity.  Expired ID can establish identity.  This is

21  very important, Your Honor.

22       We don't have in Virginia data directly on how many

23  expired IDs, let's say, licenses expired.  We had it in

24  North Carolina, though.  Some of the experts defendants

25  brought in North Carolina, for example.  There were many

1  hundreds of thousands of persons with expired, just

2  looking at DMV IDs.  And they were very disproportionate

3  minorities.  This is not just a technicality.  This is a

4  decision that could affect the voting rights of hundreds

5  of thousands of individuals within Virginia.  Also,

6  there's been data presented by the state that in one year,

7  more than 500,000 persons had their licenses suspended.

8  To get them renewed, you have to pay money.

9       MR. HEARNE:  To the extent this witness is trying to

10 present his view of what evidence has been presented by

11 the Commonwealth, I think it is inaccurate, first off.

12 Secondly, if it is part of his opinion I don't mind him

13 saying that, but I don't think its certainly evidence or

14 an accurate statement.

15      THE COURT:  I am only accepting it as a premise to

16 his ultimate expert conclusion.  That is all I will say at

17 this point.  Go ahead.

18      THE WITNESS:  My point was this involves a lot of

19 people.

20      THE COURT:  Okay.

21 BY MR. SPIVA:

22 Q    What if the ID is so old the picture no longer

23 resembles the person?  Did you review any testimony

24 concerning that?

25 A    Yes.  It is not in my report, but it is in deposition

1   testimony.

2   Q    The deposition testimony of Mr. Alcorn?

3   A    Yes.  I just got that three days ago.

4   Q    That deposition was just taken on Saturday, Your

5   Honor.  That is why it wasn't available at the time of his

6   reply report.

7       MR. HEARNE:  Your Honor, to the extent that this

8   witness is now going to be testifying about things that he

9   didn't --

10      THE COURT:  I am not going to allow him to recite

11  portions of Mr. Alcorn's deposition.  As we know, the

12  expert can rely upon that.  But you cannot recite it in to

13  the record as substantive evidence.  So that objection is

14  sustained.

15      MR. HEARNE:  Right.  And I would note also, Your

16  Honor, to the extent he is going to bring in new facts or,

17  something that wasn't the basis for his report, it was

18  something that didn't exist at the time of his report.

19      MR. SPIVA:  That is because Mr. Alcorn wasn't made

20  available to depose until Saturday.

21      THE COURT:  Go ahead.

22  BY MR. SPIVA:

23  Q    I won't put up the quote, but did you rely upon and

24  consider once it was available to you the statements by

25  Mr. Alcorn in his deposition concerning expired or

1  out-of-date license?

2  A    Yes.   It confirmed the common sense that there is a

3  requirement for reasonable resemblance.   So if your

4  license is 30 years old, you don't look like it any more,

5  you are not going to have it accepted.

6       THE COURT:   All right.

7       Are we at a good point for a short recess?

8       MR. SPIVA:   Yes.

9       THE COURT:   We will take a ten or 15 minute recess. I

10 will come back -- how much longer do you think direct will

11 take?  Five minutes?

12      MR. SPIVA:   I think we have got some time, Your

13 Honor.

14      THE COURT:   Okay.   Hope springs eternal.

15      MR. SPIVA:   I believe he will be the last witness

16 other than potentially Congressman Wittman, which is

17 another issue.

18      THE COURT:   All right.   Fine.

19      Take a ten minute recess.

20                  (A recess was taken.)

21      (Krista Harding is now the court reporter.)

22      THE COURT:   All right.   We'll continue with the

23 direct examination.

24      MR. SPIVA:   Thank you, Your Honor.

25 BY MR. SPIVA:

1   Q     Dr. Lichtman, what happened after the Board made the

2   decision to accept expired IDs?

3   A     Senator Obenshain, I think I've mentioned previously,

4   chief sponsor of 1256, wrote a letter to the Board asking

5   the Board to reconsider this decision saying that he saw

6   tension between elements of this rule and provisions of

7   state election law.

8         MR. SPIVA:  Actually, if we can put up Plaintiffs'

9   Exhibit 132.  Leave the one page for a second, and then go

10  to the second page.

11  BY MR. SPIVA:

12  Q     Let me just ask you if this is the letter that you

13  considered?

14  A     Yes.

15  Q     Okay.  And on Page 2, was there anything in

16  particular that you drew upon in coming to your -- in

17  considering -- in your analysis?

18  A     He also talked about the need for the public comment

19  period in order to create rules for what is to be defined

20  as valid as opposed to not valid.  But no where here on

21  this page, or on the previous page, does he directly

22  challenge the logic of Chairman Judd, a Republican, by the

23  way I believe, at the majority on the Board, that in terms

24  may not necessarily be using a license to drive or a

25  passport to travel, but for purposes of identity, valid,

1    could perfectly well be an expired ID.

2        And by the way, the legislature had also, and this is

3    in my report, discussed modeling it on Georgia, an older

4    ID law which accepted expired IDs.

5        MR. SPIVA:  If you can bring up the last paragraph of

6    this.

7    BY MR. SPIVA:

8    Q    You quoted this in your report, part of this

9    paragraph, Dr. Lichtman, is that right?

10   A    That is correct.

11   Q    Why did you quote that?

12   A    Because this is urging the Board of Elections, this

13   is, you know, a leading politician within the legislature

14   to revisit the matter immediately.  It to revisit its

15   already made decision to accept expired photo IDs, and to

16   open any subsequent action to public comment.  It's also

17   interesting that he says *whether or not the new rule can

18   be justified on policy grounds,*" indicating that perhaps

19   indeed the Board made a reasonable policy decision.  And

20   he also is very strong here in talking about the need for

21   transparency.  The need to get public involvement in this

22   decision.

23       MR. SPIVA:  And we can take that down.

24   BY MR. SPIVA:

25   Q    How did the Board respond, Dr. Lichtman?

1  A    Well, the Board responded with a new rule that was

2  very tight which said we'll accept expired IDs, but not

3  IDs expired 30 days or more.

4  Q    And did the Board follow this process and wait until

5  the end of the public comment period to make a final

6  decision?

7  A    It's a little more complicated, but the answer is no.

8  Q    And we've heard some testimony on this this morning,

9  but I want to basically know what you drew into your

10 analysis in terms of the process for defining a valid ID

11 in looking at the various documents.

12 A    Yes.  I had two -- well, I had a critical document in

13 my -- I think it's in my response report because I hadn't

14 seen it before then, and that was the deposition of

15 Mr. McClees who pointed out that well before the end of

16 the public comment period in August, a decision as a

17 result of this political intervention had already been

18 made.  And that decision was to not accept IDs that had

19 been expired for more than a year.

20      In addition, Mr. McClees indicated that he is the one

21 to sift through and analyze and pass on the comments to

22 the Board.  But the final Board vote was so close to the

23 end of the comment period that he had no opportunity to do

24 so.  In other words, this push for transparency, and

25 public comment, was never real.  The decision was made

1  before the public comments were in.  And the public

2  comments were never seriously considered in the final

3  vote.

4       MR. HEARNE:  Your Honor, --

5       THE COURT:  Objection sustained.

6       He is drawing a conclusion that they were never

7  considered.

8       MR. HEARNE:  That was my objection, Your Honor, as

9  well as that this is again going back over the testimony

10 the Court already noted.

11      THE COURT:  Well, he's already gone over it, so

12 that's fine.

13      MR. SPIVA:  I was trying to not have him put up the

14 testimony we've heard again.

15      THE COURT:  That's fine.  You handled it well.  I'm

16 just not allowing the conclusion in.

17      MR. SPIVA:  Okay.  The testimony supports the

18 conclusion, Your Honor.  That's the only reason why -- and

19 I was trying to kind of cut to the chase.

20      THE COURT:  That's his opinion.

21      MR. SPIVA:  All right.

22 BY MR. SPIVA:

23 Q    And let me ask you, what conclusion did you -- did

24 your analysis lead you to in terms of the effectiveness of

25 Senator Obenshain's writing to the Board?

1  A    Obviously, in my view, and based on the evidence I've

2  looked at, and also some other deposition evidence I

3  believe from Mr. Cortes that I just saw in the last couple

4  of days, also went through the same process that -- same

5  description as Mr. McClees, that the political

6  intervention of Senator Obenshain was critical in getting

7  the Board to switch from its initial decision, which not

8  only had accepted, but justified to changing that

9  decision, and -

10      THE COURT:  Okay.

11      Go ahead.

12  A    - and to not accepting certain kinds of expired IDs.

13  Q    Did the regulations on the eliminations of IDs

14  expired more than one year apply to all IDs?

15  A    They didn't.  I think we see it, Your Honor, in that

16  list.  Some were called valid and some were not called

17  valid.  They only applied to IDs that had the term *valid*

18  attached to them.  For example, they applied to licenses,

19  and other DMV IDs.  They applied to passports, and they

20  applied to student IDs.

21      And so, you know, there was distinctions among the

22  kinds of IDs that a voter would have to understand were

23  acceptable or not acceptable.

24  Q    I'd like to now turn to a slightly different topic -

25  the timing of the 2013 law.  You had testified earlier

1   that the 2012 law was signed and precleared in 2012, May

2   and August of 2012, and followed by the 2013 law.  In your

3   experience as a political historian, has any other state

4   enacted a voter ID law, and then replaced it with a

5   fundamentally different law in less than a year?

6   A    I'm always reluctant to affirm a negative.  But in my

7   experience, I've not seen that.  Not that quickly and not

8   that fundamentally.

9   Q    And could this substantive change be a result of

10  voter fraud in Virginia?

11  A    No.

12  Q    What type of voter fraud could potentially be

13  prevented through SB1256?

14  A    Based on the Virginia law, the only type of voter

15  fraud that could plausibly be prevented is voter

16  impersonation at the polls.  That doesn't apply to

17  absentee ballots.

18  Q    And did you consider any deposition testimony by

19  Mr. Cortez or Mr. Alcorn regarding their assessment of --

20  as representatives respectively at the Department of

21  Elections and the SBE, of the type of voter fraud that

22  could be prevented by SB1256?

23  A    Yes.  This is what historians do.  We reach our

24  conclusions, and when additional evidence becomes

25  available we look at it.

1  Q     And what -- what role did that play in your analysis?

2  A     Well, it confirmed what I had already concluded from

3  my analysis of SB1256, that only voter impersonation, not

4  other types of fraud, could be prevented by this

5  particular law in Virginia.

6  Q     And did you assess, through the lens of a historian,

7  whether voter impersonation fraud could plausibly explain

8  the enactment of the 2013 law?

9  A     I did.

10  Q     And what did you find?

11  A     I found that to the contrary it couldn't explain it.

12  Q     What was that based on?

13  A     That was based on two studies that appeared shortly

14  before the adoption of the 2013 law.  The first one came

15  out in November of 2011 by the Republican National

16  Lawyer's Association.  This is important because their

17  avowed purpose was kind of to debunk what they believed

18  was the Democratic myth that there's no voter fraud.  And

19  they looked at both charges and convictions, and they

20  found, I think, over a broad period of time, going back to

21  2000 to 2010, no instances of voter impersonation in

22  Virginia.

23      And nationally, looking at 19 states with no

24  requirements whatsoever for ID at the poll, like Maryland

25  where you just walk in and vote, there were something like

1  five cases of voter impersonation in all of those states

2  out of hundreds of millions of ballots cast.   Then more

3  shortly before enactment of SB1256 in August of 2012, in

4  this critical period, in fact, between passage of the 2012

5  law and passage of the 2013 laws, pivotal period, an even

6  more ambitious study came out by News 21, a national

7  reporting project made up of 11 universities.

8         And it went beyond the Republican National Lawyer's

9  Association.   It looked at allegations as well as charges.

10         THE COURT:   In Virginia?

11         DR. LICHTMAN:   Did every state.   And it did the State

12  of Virginia, and it found not a single case in Virginia.

13  And it also went back to 2000, covering a very broad swath

14  of time.   You know, huge numbers of ballots being cast.

15         THE COURT:   And there's never been an allegation of

16  voter fraud in Virginia?

17         DR. LICHTMAN:   I have not found an allegation that is

18  specific.   In other words, you get them.   When I was

19  reading through the transcripts of the General Assembly, I

20  found a couple of instances where a member would provide

21  kind of an antidote.   You know, someone told me that.

22  Someone came to the polls and then ran.   There were two or

23  three of those antidotes.   No names were named, so it

24  wasn't an allegation that anyone could check, obviously.

25         And, you know, it was the kind of story that you

Lichtman - direct                    1139

1  often hear, but it's totally unproven.  So beyond that, I

2  have not seen, looking at all of these studies, and

3  reading the testimony in the deposition of Mr. Cortes and

4  Mr. Alcorn, who also could not recall -- I'm not sure if

5  they were specifically asked allegations.  They talked

6  about cases.  They could not recall any cases.

7       So in terms of a checkable, credible, named

8  allegation of voter impersonation, I have not seen one in

9  Virginia, and there is not one in either of these very

10 large studies, including the News 21 study that looked not

11 only at charges and convictions, but any allegations that

12 I could find in the press.

13      THE COURT:  Okay.

14 BY MR. SPIVA:

15 Q   Is it possible that there were no allegations or

16 confirmations of impersonation voter fraud in Virginia

17 because such fraud is hard to detect?

18 A   You hear that argument often, and the answer, for a

19 couple of reasons, is no.

20 Q   And can you cite studies of academic studies and

21 their findings?

22 A   Yes.  I'm not going to go through all of the academic

23 studies, but there are number of academic studies, Your

24 Honor, a couple of them documented in my report, that

25 don't depend upon allegations that use different

1   methodologies.

2        Let me give you one example.  It's a study by M.V.

3   Hood, III and Charles Bullock, III.  He's an authority

4   that is actually cited by experts for the defendants.  And

5   this study looked at --

6        THE COURT:  Can you kind of abbreviate it a little

7   bit, please.

8        DR. LICHTMAN:  Sure.

9        It looked at the issue of dead people -- or people

10  voting in the name of dead people.  The most common

11  allegation you can find.  And it found in the State of

12  Georgia, out of more than 2 million ballots cast, no

13  fraudulent votes were cast in the name of dead people.

14       And there are other studies that don't depend on

15  allegations that come to the same conclusion.

16       THE COURT:  Thank you.

17       DR. LICHTMAN:  Yes.

18  BY MR. SPIVA:

19  Q    And, Dr. Lichtman, can you cite an example of a

20  postelection scrutiny of voter fraud that you were

21  actually involved in?

22  A    I was, believe it or not.  In 1994, the Democrat,

23  Parris Glendening, won a very close gubernatorial election

24  in my home state of Maryland.  The results were challenged

25  by his opponent, Ellen Sauerbrey.  And she charged

1  election fraud.  A variety of charges.  The most prominent

2  was voting the dead, or voting from addresses that don't

3  exist.  Things like that.  Some of which involved directly

4  voter impersonation.

5       I was hired by a very respected long-time Attorney

6  General then, Joe Curran.  And Curran said to me, *"If*

7  *there's voter fraud going on in my state, I want to know*

8  *about it.  I want you to check out that every allegation*

9  *that Ms. Sauerbrey has made."*

10      We checked them all and found not a single instance

11 of voter fraud.  We found mistakes, which you always do.

12      THE COURT:  Okay.

13 A    And the case went to trial, by the way.

14      And Judge Thieme, in the District Court, said, *"Hey,*

15 *I voted for Ms. Sauerbrey, but there's no case here."*  And

16 he dismissed it.

17 Q    Did you consider what the proponents of SB1256 cited

18 as justification, a video involving a Democratic

19 operative, Patrick Moran?

20 A    I did.

21 Q    And did this video provide a credible basis for the

22 new photo ID law?

23 A    I think just the opposite.

24 Q    Why do you say that?

25 A    I think this video, though it showed a lot of foolish

1  talk by Patrick Moran, showed just how difficult, if not

2  impossible, it is, even under the old law, which was

3  confirmed by the Governor well after he knew about the --

4  you know, at least the Moran video was well publicized

5  before that.

6       And here is why:  First of all, even with utility

7  bills, and they said, you know, it would be much harder

8  with things like bank statements, even with a utility

9  bill, you have to have the following:  Number one, you

10 have to find a forger.  You have to find someone willing

11 to engage in the crime of forgery and risk prosecution.

12 Cast a vote.

13      Two.  You have to find targets.  You have to find

14 people in whose name you can vote.  And you have to be

15 sure they haven't voted already.  And as the video

16 indicated, you can't call them and ask them because you'd

17 then be alerted to the scheme.

18      Three.  You have to find people willing to cast a

19 single vote to be convicted, to be prosecuted, to be sent

20 to prison for several years.  In addition, you had to make

21 sure that the person would not be recognized as not the

22 person he is impersonating.

23      And I turn to a respected survey of the electorate.

24 And that survey found in Virginia, specifically, 13.1% of

25 voters knew the person who checked them in.  That's one

1   out of seven or eight.  So you're risking a one out of

2   seven or eight chance to go to prison in order to cast one

3   vote.  That's why, in the end, even someone as foolish as

4   Moran basically said, look, you're better off spending

5   your time and your energy and your efforts getting out the

6   vote.

7        This video, to me, as an expert in this field, shows

8   even under the old law, it's implausible, if not

9   impossible, to orchestrate voter impersonation.

10  Q    And is that sustained by other findings, for

11  instance, by the United States Election Commission?

12  A    Yes.  The United States Election Commission addressed

13  this issue of types of voter fraud.  And it concluded that

14  voter impersonation was certainly among this least likely

15  because the risk reward was terrible.  That is, to cast

16  one vote, you're creating such a risk of being -- going to

17  prison, being severely punished, if in fact there was --

18  and we don't know of anyone, if there was anyone in the

19  State of Virginia who wanted to vote in someone else's

20  name or arrange voter fraud.  A much more efficient and

21  much safer way is through absentee ballots, which don't

22  require any kind of identification, either under the old

23  law or under SB1256.

24  Q    Did you study the alleged examples of voter fraud in

25  the defendants' proposed findings of fact?

Lichtman - direct                    1144

1  A     I did.

2  Q     And what did you conclude about that?

3  A     Well, first of all, what I found was very interesting

4  was the time period.  It covered 50 years, billions of

5  ballots were cast, and a couple of things.  One, the last

6  example, even if you take it at face value, which you can,

7  is in 2005.  There were no examples from the last 11

8  years.

9        So for you to objectively look at it, you would

10  conclude maybe a decade ago, and more, there were problems

11  with voter fraud, but no longer.  No examples of any kind

12  from Virginia.  Not of any kind of fraud, much less a

13  voter impersonation.  No credible examples of voter

14  impersonation anywhere.

15        And for the most part, it relied on newspaper

16  articles.  And even when you looked at citations that

17  weren't newspaper articles, like the Carter-Baker

18  Commission Report, when you actually looked at what the

19  underlying source was, particularly for this very

20  spectacular allegation of, you know, 181,000, I think it

21  was noncitizens on the voting rolls, the source was a

22  Chicago Tribune Newspaper article.  And sometimes it

23  sources to things that doesn't have any underlying

24  sources.

25  Q     Let me -- how many allegations of voter fraud did the

1  findings cite specifically to Virginia over this more than

2  50-year period?

3  A    None of any kind, much less voter impersonation.   Not

4  even newspaper cites.

5  Q    Let me shift gears.   Did you make -- also make

6  findings relative to the disparate impact on

7  African-American voter opportunities relative to white

8  opportunities under SB1256?

9  A    Yes.   That's one of the things the Arlington Heights

10 guidelines and basic historical methodology would have you

11 do.

12 Q    And were these findings based on information

13 available at the time of adoption of SB1256?

14 A    That is correct.

15 Q    And what -- at the time of the adoption of SB1256,

16 were photo ID laws the subject of controversy?

17 A    To put it mildly.   It was one of the most hotly

18 debated controversial issues.   A whole voters march in

19 commemoration of the Selma March.   It was launched in

20 Alabama.   It was the subject of debate in the press.

21 There had been court cases.   A couple of laws in

22 Pennsylvania and Texas were blocked.

23      So, yes, any politician was well aware -- had to be

24 well aware of these controversies.   As I say, politicians

25 live and die on these kinds of things.

1  Q    Were there studies available at the time of the

2  adopting of SB1256 documenting racial disparities in the

3  possession of voter photo IDs?

4  A    Oh, yes.

5  Q    And was the Virginia General Assembly made aware of

6  charges, at least, that voter photo ID laws discriminated

7  against minority voters?

8  A    Yes, they were.

9       MR. HEARNE:  Your Honor, in term of whether the

10 General Assembly was made aware, he's not talking about

11 any specific article, any specific person.  I think that's

12 speculative.

13      THE COURT:  I'll sustain the form of the answer.

14 I'll take it to mean that there was information publicly

15 available.

16      DR. LICHTMAN:  No, Your Honor.

17      THE COURT:  Pardon?

18      DR. LICHTMAN:  What I meant was we have evidence from

19 the Court -- the Cortes' deposition that he was working

20 for the Advancement Project at the time, and the

21 Advancement Project specifically communicated with members

22 of the General Assembly their findings that voter ID laws

23 discriminate.

24      THE COURT:  They were advised of it.

25      All right.  Let's move on.

1  BY MR. SPIVA:

2  Q     And were there studies that were publically available

3  about the documented racial disparities in the possession

4  of the most commonly available forms of photo

5  identification?

6  A     Yes.  Of course there were well-known national

7  studies, but there were also Virginia-specific studies.

8  Q     Okay.

9        MR. SPIVA:  And can we put up Table 10.  I believe

10  it's from Dr. Lichtman's initial report.

11  BY MR. SPIVA:

12  Q     And first of all, can you cite to any such studies

13  you just mentioned, Dr. Lichtman?

14  A     The Brennan Center had produced a number of studies

15  nationally, national studies, on disparate rates of

16  possession.  And there were also studies available from

17  the survey of the Performance of American Elections.

18  Nationally, I've pulled out this study specifically for

19  Virginia, but they also had national results showing

20  similar patterns.

21  Q     And can you explain what Table 10 shows?

22  A     Yes.  The survey of the performance of American

23  elections is a standard survey of registered voters.  And

24  it samples individual states, as well as accumulates the

25  samples for the nation.  And I have excerpted out that

1   part of the survey from 2008, so it was available.

2   There's always a gap, a time gap, between when these

3   surveys are done and when they were produced.  So this was

4   available at the time of the adoption of SB1256.

5        And I've looked at whites and blacks in terms of

6   their possession -- and this question was asked in the

7   survey - that's why it's useful - of the two most common

8   forms of photo voter ID.  And that is, Your Honor,

9   driver's licenses and U.S. passports.  And as you can see,

10  this Virginia-specific data shows substantial racial

11  disparities in the possession of these two forms of

12  identification.

13       With respect to driver's licenses, 98.1% of whites

14  reported possessing them, and 84.6% of blacks.  A

15  difference of 13.5 percentage points.  With respect to

16  U.S. passports, 52.8% of whites reported possessing them,

17  compared to 19.2% of African-Americans.  A difference of

18  33.6 percentage points.

19       And although the sample sizes are small for blacks,

20  the magnitude of the difference is great enough so that

21  these differences are statistically significance at the

22  very stringent .01 level in social science.  That means

23  the likelihood of obtaining these differences merely by

24  chance or random processes are very, very small.  So

25  social scientists could confidently conclude that these

1  differences within Virginia are real.

2  Q    Did the information from Virginia enable you to

3  distinguish the direct impact on race, of racial

4  disparities, in driver's license and passport possession

5  as compared to the impact on party?

6  A    Yes.

7       MR. SPIVA:  If he can turn to Table 10, please.

8  A    Yes.  I was able to disentangle race and party.

9       MR. SPIVA:  Can we turn to Table 11, please.

10  BY MR. SPIVA:

11  Q    And if you can explain, Dr. Lichtman.

12  A    Yeah.  To try to hold party constant, it's not

13  perfect, but it's a pretty good measure, I looked at Obama

14  voters only to see if in fact there were racial

15  distinctions between whites and blacks among Democratic

16  voters in 2008, the year that this survey was taken.  And

17  what I found was that there were comparable differences by

18  race, even among Obama voters.  And that these differences

19  remained statistically significant at standard levels

20  within social science.

21       So the purpose of this was to see whether the effect

22  on the most common forms of ID operated by race or

23  directly by party.  And this shows, even though the law is

24  obviously racially neutral on its face, that the political

25  derivations of the law stem from the impact of the law on

Lichtman - direct                    1150

1  blacks versus whites.  It's similar to the old poll tax.

2      And the old poll tax was racially neutral on its

3  face.  It was justified by preventing voter fraud and

4  other measures.  The players were reversed.  It was the

5  Democrats in those days who benefited it.  And they

6  benefited from it by impacting the votes of

7  African-Americans who were the base of the Republican

8  party.  And that's who was targeted in the poll tax.

9      It gained political benefits for Democrats through

10 its impact on race, and that's similar to what's going on

11 here.  I'm not comparing the two measures.  I'm just

12 showing how they operate.

13 Q   Was there also evidence available at the time of the

14 enactment of SB1256 regarding the disparities by age in

15 license and passport possession?

16     MR. SPIVA:  And if we can turn to Table 12, please.

17 A   Yes.  Same survey also available.  You get a little

18 bit different pattern with respect to age.  Remember, age

19 was not nearly as significant a political determinate as

20 race.

21     With respect to the possession of passports, there

22 was no significant difference between the age groups.  But

23 with possession of driver's licenses, not surprisingly,

24 there is a difference that is statistically significant.

25 And it is about 10.7 percentage points.  The older

1  registered voters are more likely to possess driver's

2  licenses than the younger register voters.

3  Q    Was there evidence at the time regarding racial

4  disparities in employer photo IDs?

5  A    Yes.  And that gets a little trickier because these

6  are people who say we have driver's licenses or say we

7  have passports.

8        When you're turning to employer IDs, Your Honor, we

9  know who's employed, but we don't know if they have

10  picture IDs.  But we know a few things.  And on balance,

11  it's not a huge racial difference there.  We know that

12  African-Americans are much more likely to be unemployed

13  than whites.  About double the unemployment rate.  So

14  whites are much more likely to be employed, and even have

15  the option to obtain picture employment IDs.

16        We also know that by about three percentage points,

17  whites lead African-Americans in private employment.  But

18  by about one or two percentage points, African-Americans

19  lead whites in government employment.  Whites are more

20  likely to be in the private sector.  African-Americans are

21  more likely to be in the government sector.  But overall,

22  African-Americans are more likely to be unemployed.  So

23  it's a close balance that probably tips towards whites,

24  but it's hard to say without knowing what employees have

25  IDs.

1       THE COURT:   Next question.

2    Q    Was there evidence at the time of the enactment of

3    SB1256 regarding racial disparities and student and

4    veteran's IDs?

5    A    Yeah.  Again, we don't know actually who has student

6    IDs.  And student IDs have very stringent requirements

7    that universities may not have, like expiration dates.

8    But African-Americans are slightly more likely to be

9    enrolled in institutions of higher learning, and whites

10   are slightly more likely to be veterans.  So these other

11   IDs, the balance are close.  But on the most common forms

12   of ID, the balance is very wide towards whites as opposed

13   to blacks.

14   Q    Let me shift again, did you do any assessment of the

15   budget that was included for SB1256 for voter education

16   and outreach?

17   A    I did.

18   Q    And what did you conclude regarding that?

19   A    As I point out in my report, the budget was about

20   $200,000 per year through 2017.  We don't know what the

21   budget might be after that, or if there is going to be any

22   budget after that.  For a big state like Virginia, where

23   you've got 5,000,000 plus registered voters, that's a

24   very, very miniscule budget.

25       THE COURT:   What was that number again, Doctor?

 1          DR. LICHTMAN:  $200,000 per year through 2017, Your

 2   Honor.

 3          THE COURT:  Thank you, sir.

 4          DR. LICHTMAN:  And that's less than a nickel per

 5   registered voter.  And I read in the depositions of the

 6   spokespersons for the Board and the Department of

 7   Elections that they did not believe the budget was

 8   adequate.

 9   BY MR. SPIVA:

10   Q    According to the latest information available to you,

11   how many free voter ID cards had Virginia issued?

12   A    I think that's in my report.

13          THE COURT:  During what time period?

14          MR. SPIVA:  I've said the latest available to him,

15   but I think it is in his report.

16          DR. LICHTMAN:  I have it.  It's through September 24,

17   2015, Your Honor.  And it was 4,622.

18          THE COURT:  Okay.  And that's through September 2014?

19          DR. LICHTMAN:  No.  September 2015.

20          THE COURT:  Thank you, sir.

21   BY MR. SPIVA:

22   Q    Dr. Lichtman, is there evidence from other states

23   relevant to the motivations behind the adoption of SB1256?

24   A    Yes.  An historian would look at the bigger picture

25   and the bigger context to see if Virginia is somehow not

1  consistent with national trends and what is going on in

2  other states.

3       MR. SPIVA:  Can we put up Chart 11 from

4  Dr. Lichtman's initial report.

5  BY MR. SPIVA:

6  Q    And what did you find?

7  A    Yeah.  This is exit polls looking at the white share

8  of voters from the voter turnout from the United States

9  election project.  And it's the white component of voters.

10 And I don't have to dwell on this chart a great deal.  But

11 the reason you see the sawtooth pattern is, obviously,

12 turnout differs in midterms and in presidential elections.

13 But whether you isolate the midterms going from '02 to '06

14 to '10 to '14, you can see the trend is downward.  And the

15 same thing if you isolate the presidential elections.

16      In other words, the pattern of declining white

17 components of voters that we saw in Virginia is not an

18 atypical pattern.  It is a typical pattern across the

19 United States over more than a decade of time.

20      MR. SPIVA:  And if we can put up Table 13 from Page

21 37 of Dr. Lichtman's --

22      DR. LICHTMAN:  If you can wipe out those lines.  I

23 don't know how to do it.  Maybe I can.  Wait a minute.

24 No.  It just makes it worse.  There we go.

25 BY MR. SPIVA:

1    Q     And how does Table 13 play into your analysis,

2    Dr. Lichtman?

3    A     Well, Table 12 was the replication of the Virginia

4    data for turnout.

5    Q     Did you want me to put that up?

6    A     This is the replication of the Virginia data

7    nationwide from exit polls for voting.  And you see almost

8    identical patterns nationwide that we saw in Virginia.

9    That is, the political base of the Republican Party is

10   white voters at 57%.  Again, black voters only giving up

11   very minimal support to Republican candidates at about 7%.

12        That same, about, 50 percentage point gap between

13   white and black support for Republican candidates.  And a

14   very close pattern as well for Hispanic, Asians, and

15   others that we see in Virginia.  Maybe a little less of a

16   gap, but pretty close in the low 20s as opposed to the mid

17   and higher 20s.  So what this shows is that Republicans

18   benefit from the votes of whites, and do not benefit from

19   the votes of blacks, Hispanics, Asians, and others,

20   nationwide.

21        MR. SPIVA:  And if we could turn to Table 14, which I

22   believe is -- it's on Page 38 of his initial report.

23   BY MR. SPIVA:

24   Q     And what does that show?

25   A     We are now looking at, in light of our findings, are

1   these findings sustained?  That is the declining pattern

2   of white turnout, the racial polarization?  Has there been

3   a response to this, not just in Virginia, but nationwide,

4   in terms of Republican dominated governments adopting

5   photo voter ID laws?

6        And this table looks at the adoption of photo voter

7   ID laws after the 2008 presidential election.  And there

8   are 14 states.  Ten had straightforward Republican

9   control.  In two of them, although there wasn't statewide

10  Republican control, Republicans were still able to adopt

11  photo ID laws by overriding the votes of -- veto, rather,

12  of a Democratic governor.  So that's 12 of 14 either

13  straightforwardly adopted by Republicans, or adopted by

14  Republicans by overriding a Democratic veto.

15       In a 13th state, Mississippi, voters enacted the

16  voter photo ID law in a statewide referendum.  That leaves

17  only one state, and that's the State of Rhode Island.  A

18  very small state where a voter photo ID law was passed

19  when you had a Democratic state legislator and an

20  independent Governor.

21       But overwhelmingly since Barack Obama's victory in

22  2008, there has been a clear partisan pattern consistent

23  with the Virginia pattern of adoption voter photo ID laws.

24       THE COURT:  Now, was the voter ID law in these 14

25  states identical, or at least similar, to the one in

1   Virginia?

2        DR. LICHTMAN:   They are by no means identical.   Some

3   are similar, some are not entirely similar.   North

4   Carolina --

5        THE COURT:   I don't need you to go on.   I just wanted

6   to ask the question.

7        DR. LICHTMAN:   Sure.

8        THE COURT:   Next question.

9        MR. SPIVA:   Yes, Your Honor.

10  BY MR. SPIVA:

11  Q    Do the provisions of SB1256, and the interpretation

12  by the State Board of Elections, create issues regarding

13  voter confusion?

14  A    I think they do.   I think, you know, Your Honor was

15  asking me about the Virginia law compared to other state's

16  laws.   I think the Virginia law is the most confusing of

17  all voter ID laws in the nation.

18       THE COURT:   Why?

19       DR. LICHTMAN:   I sketched this out in my report, and

20  raised the issues, and cite sources for this.

21       MR. SPIVA:   Can we go to Page 40 of Dr. Lichtman's

22  report.

23       THE COURT:   Are you talking about Plaintiffs' 212?

24       MR. SPIVA:   Yes, Your Honor.

25       THE COURT:   Page 40?

```
 1         MR. SPIVA:  Yes.

 2         THE COURT:  Okay.  I'll take a look at it.

 3  BY MR. SPIVA:

 4  Q    And what conclusions did you draw there,

 5  Dr. Lichtman?

 6  A    Well, these questions were drawn out of e-mails from

 7  election officials - and I cite them in my report - in the

 8  State of Virginia who are even among themselves having

 9  difficulty figuring out exactly what voter IDs count and

10  what don't.

11         And the first couple derived from this whole issue of

12  certain kinds of IDs have to be valid, but other kinds of

13  IDs don't have to be valid.  And so there's the question

14  of which IDs are unacceptable if they're expired.  In this

15  case, expired by more than a year.  So that also raises

16  for the voter the question what is the length of the

17  expiration period.

18         There are issues with respect to revoked, suspended,

19  or canceled driver's licenses.  As far as I know, the law

20  does not address that.  Can a voter use a learner's

21  permit?  What counts as a valid employer ID?  Can an ID be

22  used if it does not contain an expiration date?  Can

23  voters use a government issued ID that's not on the list

24  of authorized IDs?  Must the voter's name on the ID match

25  the voter's name on the registration roles?  Must the ID
```

1    contain an address?  And must this address be current?

2        These aren't necessarily every issue raised by the

3    various distinctions among the IDs, but these are the

4    issues that I parsed out by looking at communications

5    among election officials themselves in Virginia.

6    Q    And did you consider anything from the deposition

7    testimony of Mr. Alcorn who was the representative of the

8    State Board of Elections?

9    A    I did.  I recall that he made some comments about

10   voter confusion.  I'd have to see it to --

11       MR. SPIVA:  I guess I can put it up to refresh his

12   recollection, Your Honor?

13       THE COURT:  Yes, sir.

14       MR. SPIVA:  If we can put up Page 83 of Mr. Alcorn's

15   deposition.

16   BY MR. SPIVA:

17   Q    If you can take a look at that, and see if it

18   refreshes your recollection, Dr. Lichtman.

19   A    Yep.  It shows a concrete example.  I did recollect

20   this.  A concrete example from the City of Richmond.

21   Right here, I guess.

22       And election officials demanded an additional ID,

23   even when they were presented with an acceptable ID.  This

24   was errors made by election officials themselves.  And the

25   deponent indicates that this was accurate as far as he can

1  tell.  So this puts some flesh and blood on this issue of

2  confusion that can even affect election officials

3  themselves.

4  Q     And why is voter confusion important?

5  A     Because studies have shown that voter confusion can

6  be one of the most important influences of a voter photo

7  ID law in deterring people from showing up at the polls.

8  And I cite a specific study in my report from the State of

9  Texas that directly addresses this issue of, A, does voter

10 confusion deter voters.  And, B, what is its magnitude.

11      And this is a study in 2014, a recent study, in

12 Congressional District 23.  A majority Hispanic district.

13 Very competitive.  One of the few competitive districts in

14 Texas.  And it found that in looking at non-voters, 5.8%

15 gave as their principal reason for not voting the lack of

16 an acceptable ID.  And 12.8 cited it as one reason for not

17 voting.

18      But the interesting thing that makes this study

19 informative was the researchers found that the great

20 majority of these non-voters who said they weren't voting

21 because they didn't have acceptable IDs, actually had

22 acceptable IDs but were simply confused about whether or

23 not their IDs would be acceptable, so didn't bother to

24 vote.

25      THE COURT:  Okay.  Next question.

```
 1  Q    Would this be especially important for minorities,

 2  Dr. Lichtman?

 3  A    Absolutely.  This study found that the impact was

 4  much greater for Hispanic - this is a Hispanic district -

 5  than it was for whites.  And when you're dealing with

 6  minorities, turning to African-American's, because that's

 7  our focus, whose educational levels and educational

 8  background and grasp of education is unfortunately lower

 9  than that of whites, it's going to be a particular problem

10  for minorities, and also for Hispanics if they have

11  language issues.

12       THE COURT:  Next question.

13  Q    And did the study reach any conclusions regarding

14  whether the deterrent affect had any influence on the

15  outcome of the election?

16  A    Well, they said it affected larger numbers of voters.

17  And while they couldn't prove it turned the election, they

18  said that it was possible that it did.

19       MR. SPIVA:  Your Honor, I'm going to turn to another

20  topic, and I anticipate an objection, possibly even from

21  Your Honor.  I just want to explain what --

22       THE COURT:  Pardon me?

23       DR. LICHTMAN:  Can I take a quick break?

24       THE COURT:  Yes, sir.

25       DR. LICHTMAN:  Thank you.
```

```
 1            (Witness stood down from the witness stand.)

 2       MR. SPIVA:  Do you want me to do my explanation now,

 3  or when he gets back?

 4       THE COURT:  I don't think the witness needs to be

 5  here.  You can go ahead and proceed without him.

 6       MR. SPIVA:  I have just a few questions I want to ask

 7  him about what the legislature did with respect to long

 8  lines.  I'm not trying to litigate the long lines claim.

 9       THE COURT:  We've already been through that so many

10  times.  You know, we only have a finite amount of time for

11  this case.  And this gentleman's testimony is taking far

12  long than anybody could expect.

13       MR. SPIVA:  Well, he's our key witness, Your Honor.

14       THE COURT:  I know he is.  Fine fellow.  Bright as he

15  can be.  But we don't get short answers to anything.

16       So I really think going back into the long lines --

17  we've already have had three, four, five witnesses that

18  have gone through it, what are you going to go into now?

19       MR. SPIVA:  I'm not going to ask him about whether or

20  not there were long lines.  It's what was the -- he's

21  looked at the specific legislative history, and is going

22  to testify that while the legislature, you know, enacted

23  the voter ID law purportedly in response to a problem of

24  voter fraud for which there was no proof, they -- there

25  were undisputed questions of long lines.  And when
```

1  presented with solutions, potential solutions for those,

2  rejected all of those.  I think it would take about a

3  minute.

4       THE COURT:  I'm not going to allow that.

5       MR. SPIVA:  Oaky.  Just so it's clear on the record,

6  I mean, obviously, this is over our objection, Your Honor.

7       THE COURT:  Understood.

8       MR. SPIVA:  But we understand your ruling.

9          (Witness has returned to the witness stand.)

10      THE COURT:  Okay, Mr. Spiva, go right ahead.

11      MR. SPIVA:  Thank you, Your Honor.

12 BY MR. SPIVA:

13 Q   Dr. Lichtman, I'm going to turn to a different topic.

14 Is there any relationship between voter ID laws and voter

15 confidence?

16 A   If anything, there is a negative relationship.  It

17 may seem counterintuitive, but there is either no

18 relationship or a negative relationship.

19 Q   And were there any studies available at the time that

20 SB1256 was enacted that supports that conclusion?

21 A   Yes.  There was a study by Professor Ansolabehere,

22 which was available at the time, which looked at the

23 relationship between voter ID laws and voter confidence,

24 and found no relationship.  I also used data available at

25 the time to do my own analysis.

1        MR. SPIVA:   Can we put up Page 58 of his initial

2   report, please.

3   BY MR. SPIVA:

4   Q    And first of all, Dr. Lichtman, does Page 58 reflect

5   either Dr. Ansolabehere's study or your own analysis?

6   A    Well, this is Dr. Ansolabehere's conclusion where he

7   says, *"The use of photo ID requirements, bears little*

8   *correlation to the public's beliefs about the incidents of*

9   *fraud.   The possible relation of such beliefs to*

10  *participation appears even more tenuous.   This lack of*

11  *empirical support leads us to conclude that at least in*

12  *the context of current American election practices and*

13  *procedures, public perceptions do not provide a firm*

14  *justification for voter identification laws."*

15       And that's a study by Ansolabehere personally, and

16  the Harvard Law Review, from 2008.   So it was available.

17  Q    And you said that you had also conducted your own

18  analysis?

19  A    Yes.

20  Q    And what did you find?

21  A    What I found was if you looked at confidence on the

22  part of voters, that the voters in their community,

23  county, city would be counted.   And you compared states

24  with strict photo voter ID laws to other states, in seven

25  out of eight instances, including Virginia, voters were

1  less confident in the voter photo strict ID states than in

2  the rest of the states.  And that seven out of eight was

3  strategically significant.  I also posited reasons for

4  this.  It wasn't just a random affect.

5  Q    And what were those reasons?

6  A    The reason I explained, in my view, was in these

7  states you're getting a constant drumbeat - rightly or

8  wrongly, it's politics - of voter fraud.  The need to

9  protect the integrity of the ballot, big problems with

10  fraud.  And that's going to affect public perceptions in

11  those states as compared to other states where that's not

12  made an issue.  So it's kind of a self non-fulfilling

13  prophecy.

14  Q    Did contemporary statements by legislators, and

15  others in Virginia, indicate a need to switch from the

16  2012 voter ID law to the 2013 law in order to promote

17  voter confidence in the integrity of the electoral system?

18  A    They did.  That was a major point of persuasion here

19  in Virginia, as it was in all the states that I've looked

20  at with respect to voter ID.  This idea of public

21  confidence in elections is a very central argument.

22  Q    Did legislators cite the report of the Carter-Baker

23  Commission on electoral reform to justify enactment of

24  SB1256?

25  A    They did.

1  Q    And are you familiar with the Carter-Baker

2  Commission?

3  A    I'm extremely familiar.  The Carter-Baker Commission

4  was housed at my institution, The American University.  It

5  was directed by the, unfortunately, now late Robert

6  Pastor, who was my cousin by marriage.  I sat in on

7  academic advisory meetings of the Carter-Baker Commission

8  and discussed the Commission extensively with Professor

9  Pastor.

10 Q    And what did you learn?

11 A    I learned that the Carter-Baker Commission, not

12 surprisingly, given that, you know, a very eminent

13 Republican in Secretary Baker and a very eminent Democrat

14 in President Carter, was a compromise.  That Secretary

15 Baker wanted a recommendation for photo ID, and President

16 Carter wanted recommendations for expanding access to the

17 ballot.  And that's why you have both of those elements in

18 the Carter-Baker Commission report.

19      And I also cited a later joint op-ed written by both

20 Baker and Carter, which indicated we both needed ballot

21 security, and at the same time doing what you can to open

22 access.  So that's the nexus.  And you couldn't pull apart

23 one from the other, because that's the very nature of the

24 compromise.

25 Q    Did backers of SB1256 also cite the Georgia voter ID

1  legislation as a model?

2  A     They did.

3  Q     And did they follow this model?

4  A     No.  As we saw, we talked about with respect to

5  expirations, they did not follow the Georgia model.  The

6  Georgia model is much simpler, much less confusing than

7  the model in the State of Virginia.  They didn't totally

8  tear up the Georgia, but in fundamental ways that

9  critically affect people's voting, they departed from the

10 Georgia model.  And I talked about that, I think, in my

11 initial report.

12 Q     Did backers of SB1256 make the common sense argument

13 that it brings identification for voting in line with

14 photo ID requirements for such activities like receiving

15 Social Security, Medicare, Medicaid, et cetera?

16 A     Yes.  You often get that common sense requirement --

17 that common sense argument.  And we got it here.

18 Q     And what is your analysis of that?

19 A     I'm not going to go through all the details of my

20 analysis, but I showed that none of those examples hold.

21 That you can get Social Security, you can get Medicare,

22 you can get Medicaid without having to have a photo ID.

23 In other words, not strict.  And that you can get many,

24 many forms of prescriptions in the State of Virginia

25 without having a photo ID as well.

1  Q      I'd like to now turn to your analysis of the Senate

2  Factors.   And I think with respect to some of them you've

3  already discussed, but if you can just tell me I've

4  already discussed this so we can move on to the next one.

5       What is Senate Factor 1, and what did you find?

6  A     We already discussed that.   That's history of

7  discrimination.

8  Q     Okay.   And Senate Factor 2, is that the extent to

9  which voting, and the elections of the state or political

10  subdivisions, is racially polarized?

11  A     Already discussed and laid out in my tables.

12  Q     And Senate Factor 3 is the extent to which the state

13  or political subdivision has used unusually large election

14  districts, majority vote requirements, anti-single shot

15  provisions, or other voting practices or procedures that

16  may enhance the opportunity for discrimination against the

17  minority group.

18  A     That we haven't discussed.

19  Q     And have you looked at that?

20  A     Yes.   And what I found is on Page 61 of my report is

21  that Virginia was one of only 14 states that offered

22  voters neither early voting, nor no excuse absentee

23  balloting.   That Virginia has one of the worst records in

24  the nation when it comes to the duration of waiting times

25  at the poll, both in the general election of 2008 and

1   2012.  It was among the five states with the longest

2   waiting times at the polls.  I mean, very significant for

3   voters.  And that the waiting times at the polls --

4   Q    Dr. Lichtman, I should tell you that while you were

5   out, His Honor said we should move on from the long lines

6   or waiting times.  So if you can maybe, you know, focus on

7   the other part of your findings.

8        You made a finding with respect to long lines, I take

9   it?

10  A    One more point.  A study by the Center for American

11  Progress found that Virginia ranked sixth from the bottom

12  among all states in access to voting.  This is a liberal

13  leaning think tank, you know, but they have a list of

14  objective criteria.  And, you know, Democratic states also

15  get grades of a D or F.

16       MR. SPIVA:  Let me ask you, Ms. Schultz, to put up

17  Table 18 on Page 50 of Dr. Lichtman's report.

18  BY MR. SPIVA:

19  Q    And let me ask you, what is Senate Factor 5, and what

20  did you find?

21  A    Senate Factor 5 is the extent to which members of the

22  minority group of the state bear the effects of

23  discrimination in areas such as education.

24       MR. SPIVA:  I'm sorry.  We can take the table down.

25  I got my notes mixed up.

1   A      That was the table I referred to previously.

2   Q      So going back to Senate Factor 5, if you can tell us

3   what that is and what you found.

4   A      We've already discussed that.   That's disparities in

5   such things as education, employment, health, and others.

6   Q      Okay.   And then Senate Factor 6, what is that, and

7   what did you find?

8   A      Yeah.   That's whether political campaigns have been

9   characterized by overt or subtle racial appeals.   And I

10  found three recent examples of racial appeals, racial

11  slurs, or however you want to put it.   One is pretty

12  well-known.   And it's detailed specifically in my report

13  with quotations on Page 61.   And that's in the 2006

14  campaign for U.S. Senate, Republican candidate, and former

15  Governor, George Allen, called a volunteer for Democrats

16  of east Indian descent, macaca, and kind of repeated this

17  slur.

18      I also found other examples.   I found in Loudon

19  County five years later on Halloween of 2001, the

20  Republican Party of --

21  Q      You said 2001.   Did you mean 2011?

22  A      I'm sorry, 2011.   It's getting late.   Circulated by

23  e-mail a photomontage showing President Barack Obama with

24  a bullet in his head.   And Obama supporters as grotesque

25  zombie figures.   This was even condemned by the Republican

```
 1  Party.  But even after that, and even after the macaca
 2  incident in the run-up to the 2012 election, the
 3  Republican Party of Mecklenburg, Virginia posted on its
 4  Facebook, images of Obama as a witch doctor, a cave man,
 5  and a thug.
 6       MR. SPIVA:  Can you put up Page 63 from
 7  Dr. Lichtman's report.
 8  BY MR. SPIVA:
 9  Q    Is this the image you were referring to from the
10  Loudon County --
11  A    Yes.  I couldn't find the image from Mecklenburg
12  County, but I did find the image from Loudon County.  I
13  think it speaks for itself.  I don't need to comment.
14       MR. SPIVA:  We can take that down.
15  BY MR. SPIVA:
16  Q    What is Senate Factor 7, and what did you find?
17  A    The extent to which members of the minority group, in
18  this case we're looking at African-Americans, Your Honor,
19  have been elected to public office.  And of course we know
20  that no African-American has been elected statewide since
21  Doug Wilder, which made headlines back in 1989.  I don't
22  think there's even been much nomination by either party.
23  I don't know if the Democrats have nominated anyone
24  statewide.  Republicans may have nominated one or two, but
25  no one has been elected.
```

1          And African-Americans are substantially

2    underrepresented in the General Assembly.  They are about

3    13% of both the State House and the Senate, which is just

4    64% of their percentage in the citizen voting age

5    population.  This is a shortfall of three State Senate

6    seats, and seven State House seats.

7          I also looked at data compiled by the American Bar

8    Association.  They have a national database of judicial

9    diversities.  And for the courts they looked at - it

10   wasn't Federal Courts, Your Honor - African-Americans

11   comprised 10.7% of judges.  56% of their citizen voting

12   age population.  The equivalent of a shortfall of 15

13   judgeships.  So certainly that Senate Factor applies.

14   Q     And what is Senate Factor 8, and what did you find?

15   A     The report says these last two Senate Factors are

16   still relevant, but not as relevant as the first seven,

17   but I still analyzed them.  Factor 8 is whether there is a

18   significant lack of responsiveness on the part of elected

19   officials to the particularized needs of the minority

20   group.

21         And I mention here many, many years of advocacy by

22   the NAACP, and no response -- I don't think I can talk

23   about waiting times, but maybe in this context, the issue

24   of waiting times.

25         And another critical issue for African-Americans in

1    Virginia is the expansion of Medicaid.  We saw the great

2    disparity between African-Americans and whites in

3    insurance coverage in health.  And that includes all kinds

4    of health coverage.  And African-Americans would

5    particularly benefit from Medicaid expansion.

6         I cite a study by the Kaiser Foundation which

7    indicates that of more than 500,000 uninsured Virginians

8    in 2011 who would be eligible for Medicaid expansion, 28%

9    are African-Americans.  Much higher than the 19, or so,

10   percent of Virginia adults that are African-American.

11        And the Virginia General Assembly has consistently

12   blocked Medicaid expansion, which would have benefits for

13   African-Americans.  And has been a particular point of

14   advocacy by African-American groups, not just in Virginia,

15   but across the nation, obviously.

16        MR. SPIVA:  Would you please put up Table 19 on Page

17   65 of his initial report.

18   BY MR. SPIVA:

19   Q    Did you find some relationship between the states

20   that had not expanded Medicaid under the Affordable Care

21   Act as of November 2015, and the adoption -- and those

22   that adopted voter photo ID laws?

23   A    Yes.  There is a remarkably strong correlation,

24   although the great majority of states don't have photo

25   voter ID laws.  The great majority of states that have not

1   expanded Medicaid have, in fact, adopted photo voter ID

2   laws.  So the same political dynamics that we see with

3   respect to Medicaid expansion, as indicated by this table,

4   also applies to the adopting of voter photo ID laws.

5   Q    And what, finally, what is Senate Factor 9, and what

6   did you find?

7   A    Whether the policy underlying the state or political

8   subdivision's use of such voting qualification,

9   prerequisite to voting, or standard practice or procedure

10  is tenuous.  And I'm not going to repeat my discussion of

11  the rationales, which I think are contextual, and the lack

12  of voter fraud and the lack of relationship to voter

13  confidence.

14  Q    I'd like to now turn your attention to the reports of

15  the defendants' experts, which you analyzed in your

16  rebuttal report.  First, considering Dr. Owen's report.

17  Does the Owen report indicate that it is not appropriate

18  for a social scientist to analyze the intent behind

19  legislation?

20  A    No.  Quite to the contrary.  And I found this very

21  interesting, because I hadn't seen it before.  The Owen

22  report directly engages the issue of intent.  It quotes an

23  authority, John Kingdon, on intent analysis, and offers an

24  alternative explanation to discriminatory intent.

25  Q    And what is that explanation that Dr. Owen offers?

Lichtman - direct                    1175

```
 1  A    The explanation that Dr. Owen offers is that the
 2  adoption of photo voter ID law in Virginia was a response
 3  to public opinion as opposed to a calculation of political
 4  advantage on the part of decision-makers.
 5  Q    And is this explanation -- in offering this
 6  explanation, does she follow standard methodology
 7  according to historical practice, or the Arlington Heights
 8  guideline?
 9  A    Not at all.  It was a very abbreviated discussion of
10  this alternative explanation.  She does not examine the
11  history or current manifestation of discrimination in
12  Virginia.  She does not follow the sequence of events, or
13  the bigger political picture, related to the adoption of
14  SB1256.  She does not examine the contemporary statements
15  of decision-makers.  And so the whole extended analysis
16  that you would need to prove intent, although she engages
17  intent, is not present here.
18  Q    Do you find other problems with her explanation?
19  A    Yes, I found numerous other problems with her
20  explanation.
21  Q    And what were those?
22  A    First of all, to connect public opinion with policy,
23  she quotes an authority, John Kingdon, saying government
24  officials may make some rather general judgments about the
25  state of public opinion that affects policy agendas.  Then
```

1   there's an ellipsis, and the quote goes on to say, *"There*

2   *might be instances in which they feel the public at large*

3   *virtually directs them to pursue a course of action."*

4       But the ellipses actually contains something very

5   important that's left out here.  Kingdon says *"at most*

6   *there might be instances."*

7       And further, this is not in Dr. Owen's report, but it

8   is in Kingdon's book, he found in his case studies of

9   policy, general public opinion is important only in 26%.

10  It's a very small minority.  He also points out, and this

11  is not present in her compilations from Dr. Kingdon, that

12  the issue is much more likely to prevent government

13  action, even in the few cases where it works, rather than

14  prompt government action.  He says, quote, *"Public opinion*

15  *may sometimes direct government action to do something,*

16  *but it more often constrains government from doing*

17  *something."*

18      He concludes that, quote, *"Public opinion acts more*

19  *as a constraint on what is possible, than as a promoter of*

20  *a particular item."*  Finally, he points out that the

21  public has to thrust the issue to make it part of the

22  agenda for vote-seeking politicians.

23      And Dr. Owen presents no evidence to demonstrate that

24  even a small number of Virginians are sufficiently

25  interested in the issue of photo voter ID.  Remember,

1    there was non-photo law already existing to make it a

2    voting issue to make what we call a *salient issue*.  So

3    that's the conceptual problem.  There are also very

4    particular problems with it.

5    Q    She cites a Quinnipiac University poll.  Are there

6    problems with her explanation in that regard?

7    A    Yes.  The only Virginia-specific evidence that

8    Dr. Owen cites in support of her proposition that it was

9    public opinion that promoted the adoption of SB1256, is a

10   Quinnipiac opinion poll issued on February 21, 2013.  I

11   don't dispute that the poll shows strong public support

12   for photo voter ID, but this poll, the only specific

13   Virginia evidence she supplied, cannot possibly explain

14   SB1256 because it was issued after SB1256 was introduced,

15   and after SB1256 passed the House and passed the Senate in

16   Virginia.

17        THE COURT:  Okay.  Next question.

18   Q    And are there other problems with Dr. Owen's

19   analysis?

20   A    Yes.  Sticking to the same poll, if the argument is

21   that it's public opinion that prompts response, there's

22   another issue equally strongly supported by the public,

23   and that is the automatic enfranchisement of former

24   felons.  The numbers are almost identical, and yet the

25   same -- in the same legislative session that they adopted

1 SB1256, a Republican-dominated subcommittee killed by

2 voice vote SJ266, which was an amendment to restore voting

3 rights to just nonviolent former felons.

4      She also cites another survey, which is a SurveyUSA

5 Poll taken in April of 2013.  I'm very familiar with this

6 poll because it was actually taken in the neighboring

7 state of North Carolina.  But Dr. Owen cites it as

8 applicable to Virginia.

9      And, again, yes, it does show substantial public

10 support for photo ID, but there is some very important

11 other questions in this poll that Dr. Owen does not

12 disclose that contradict her theory on the enactment of

13 SB1256, and the substance of SB1256.  Specifically, the

14 survey found that 74% of registered voters agreed that

15 *"legislators should show evidence of significant problems,*

16 *such as real voter fraud, before they pass laws that make*

17 *voting more difficult."*

18      The poll also found that 66% of registered voters,

19 quote, *"Would allow persons to vote if they signed an*

20 *affidavit of identity under penalty of perjury."*  That's

21 what they could do before SB1256, but SB1256 eliminated

22 that.  And again, I didn't conduct that poll.

23 Q    I just want to clarify one thing.  It was the 2012

24 law that eliminated the affirmation of identity?

25 A    Right.  But it was also not in the 2013 law.  I might

1    have been a little unclear about that.  That's right.  It

2    existed before the 2012 law.

3    Q    And finally with regard to Dr. Owen's analysis, does

4    she recognize whether public opinion, and discriminatory

5    intent, could potentially not contradict each other?

6         THE COURT:  Could you repeat the question?

7         MR. SPIVA:  Yes.  I think it was probably an awful

8    question, Your Honor.  Maybe I should just restate it

9    altogether.

10        THE COURT:  If you would.  Thank you.

11   BY MR. SPIVA:

12   Q    Was there another problem with Dr. Owen's analysis?

13   A    Yes.  It's certainly possible that the legislators,

14   although it's not proven since the poll occurred after the

15   law, could have been sensitive to public opinion on this,

16   but that by no means contradicts discriminatory intent.

17   To again give the example of the Southern Manifesto.  The

18   key document in opposition to *Brown v. Board of Education*,

19   and in support of the old Jim Crow south, it's certainly

20   possible that they were sensitive to the opinions of their

21   all white constituencies.  But quite clearly, the Southern

22   Manifesto was based on discriminatory intent to maintain a

23   highly discriminatory system of segregation in Jim Crow.

24   Q    Did you consider Dr. Owen's deposition testimony

25   regarding the example you just gave?

1  A     Yes.

2        MR. SPIVA:  Can we put up Page 30 of Dr. Owen's

3  deposition testimony.

4  BY MR. SPIVA:

5  Q     And what -- what was your analysis of this testimony?

6  A     This doesn't seem to be the right page.

7        MR. SPIVA:  We may have the wrong page number.  Why

8  don't I -- why don't we take that down.

9  A     I remember it.  I remember it.  She was asked

10 actually about literacy tests.  Literacy tests was

11 justified on the grounds of informed voters.  Does that

12 mean it wasn't racially intentionally discriminatory?  And

13 she responded by saying, well, if they said it, that was

14 it.  But I am sure there were other motives involved.

15       In other words, recognizing you can have more than

16 one motive, including discriminatory intent behind a piece

17 of legislation, including legislation that is not racially

18 tinged on its face.

19 Q     And did you read Dr. Owen's discussion of a Southern

20 Manifesto in her deposition?

21 A     I did.

22 Q     And what was your assessment?

23 A     I think maybe we have can put up the --

24 Q     Hopefully we have the right page number up.  I

25 believe it's Page 28 of Dr. Owen's deposition.

```
 1  A    I mean, I remember it.

 2  Q    Does that help to refresh your recollection?

 3  A    This seems to be, again, about Virginia being -- it's

 4  possible our page numbers don't line up.

 5       MR. SPIVA:  I have the wrong page number.

 6  A    But I was surprised to see it.  I remember it very

 7  well.  I was surprised to see someone who teaches southern

 8  history was unwilling to say that the Southern Manifesto

 9  was clearly a racially intentionally discriminatory

10  document.

11  Q    And was the Southern Manifesto framed in race neutral

12  terms?

13  A    Yes.  I mean, politicians who signed it were very

14  cleaver.  They talked about States rights, and they talked

15  about the encroachment of the Courts.  But they certainly

16  did not put into the Southern Manifesto any racially

17  discriminatory inflammatory language.

18       THE COURT:  Next question.

19  Q    Does Dr. Owen attempt to challenge your finding of

20  declining white turnout relative to minority turnout in

21  Virginia in recent years?

22  A    Not directly.  She didn't come up with any

23  alternative numbers of her own, but she did suggest I was

24  doing a kind of apples to oranges comparison.

25  Q    And what is your assessment of that challenge?
```

Lichtman - direct                    1182

1  A    I don't think it was correct.  As you saw, I was

2  comparing Senate elections to Senate elections.  I

3  compared midterm to midterm, 2006 to 2014.  I compared

4  governor elections to governor elections, 2009 to 2013.

5  And I compared presidential elections to presidential

6  elections.

7  Q    Does Dr. Owen also claim that photo ID has limited

8  affect on turnout?

9  A    Yes, she does.

10 Q    And what does she say about that issue?

11 A    Well, she primarily relies upon provisional ballots.

12 That is, she states there were fewer than 800 no ID

13 provisional ballots in 2014.  And fewer than 450 no ID

14 provisional ballots in 2015.

15 Q    Did you find problems with that analysis?

16 A    Yeah.  First of all, she didn't provide any source.

17 And then later, she interprets fewer than 800 as 494.

18 That's incorrect, as I point out from the documentation

19 directly on no ID provisional ballots from the Virginia

20 Department of Elections.  The correct number is 773.  So

21 she correctly described it once as fewer than 800, and

22 then incorrectly described it as 494.  And I didn't find

23 her explanation that 494 is less than 800 particularly

24 persuasive for that big problem with her analysis.

25      But more broadly, number one, the percentages may be

1   small, but we're still talking about large numbers of

2   voters.  And moreover, these statistics cover only a

3   midterm and an off year election.  Both Dr. Owen and

4   another expert for defendants, Dr. Palazzolo, acknowledge

5   that the electorate is very different in midterm and off

6   year elections than it is in presidential years.  More

7   engaged, more experience.  The kind of voters who would be

8   less likely to be impacted by voter photo ID, as well as

9   much lower turnout.

10      So I did some examination comparing presidential and

11  midterm years in terms of no ID provisional ballot.

12      MR. SPIVA:  Can we put up Table 1 from the reply

13  report, please, which is Plaintiffs' 215.

14  BY MR. SPIVA:

15  Q   And what was your analysis?  Can you explain what it

16  shows?

17  A   In 2012, a high turnout presidential year, we did not

18  have a photo voter ID law in effect.  We had a non-photo

19  voter ID law in effect.

20      In 2014, a much lower turnout election, we did have

21  SB1256.  And despite the tail off in turnout, you had a

22  42% increase in no ID provisional ballots cast, indicating

23  the affects of moving from a non-photo to a photo ID.  And

24  I specify this more precisely in the next table.

25      MR. SPIVA:  Can we turn to -- not turn, but bring up

1  Table 2.

2  A     Table 2 looks at, again, 2012 when you didn't have a

3  photo ID law in effect.  And it looks at the no ID

4  provisional ballots as a percentage of provisional ballots

5  cast.  There can be lots of other reasons besides not

6  having an acceptable ID why you might have to cast a

7  provisional ballot.

8        And the no ID provisional ballots in this

9  presidential year were just 5% of all provisional ballots.

10 But when you got to the non-presidential year, after the

11 adopting of SB1256, the number of all provisional ballots

12 drastically drops, whereas the number of no ID provisional

13 ballots rises.  And so the no ID provisional ballots are

14 now 21.3% of all provisional ballots, or four times what

15 they were in 2012.

16       So if you got the same 11,000, or so, provisional

17 ballots in 2016, you might expect well over 2,000 no ID

18 provisional ballots the next time around.

19 Q     Are there other problems with her analysis of the

20 turnout implications of voter photo ID?

21 A     Yes.  I think there's a much bigger problem than the

22 issues with provisional ballots, and that is it's

23 well-known that provisional ballots are only the tip of

24 iceberg when it comes to the deterrent affects of voter

25 photo ID laws.  Much more significant are those who don't

1  show up either because they don't have acceptable IDs, or

2  as we saw in the Texas case, that they don't believe they

3  have acceptable photo IDs.  And we saw that could

4  implicate as many as 20,000 votes in just one

5  congressional district.  It could implicate well over

6  100,000 votes in an entire state like Virginia, or even

7  more.

8  Q    And is there another issue with Dr. Owen's analysis

9  of the provisional ballot corrected?

10 A    Yes.  She doesn't take into account the voters who

11 might just have walked away rather than cast a provisional

12 ballot.  And rather than discussing the turnout

13 implications of photo voter ID using recent on-point

14 studies, like the Texas study, she cites older,

15 non-germane studies.  She cites, for example, a finding

16 from an 8 to 10-year old study which shows that a lack of

17 voter ID accounted for only a small fraction of

18 non-voters.  But that covered only the 2016 midterms and

19 the 2008 primaries.  I didn't include a presidential.

20      And at the time of the 2006 midterms, only one state

21 had strict photo ID - Indiana.  And at the time of the

22 2008 primaries, only two states had this.

23      Moreover, the studies -- the surveys on which she

24 relied way back then have now been updated.  We now have

25 the 2014 post-SB1256 survey of the Performance of American

1   Elections which asks voters whether lack of identification

2   was a major or a minor factor in not voting.  And

3   nationwide, 4.5% of non-voters, a very large percentage,

4   cited the lack of ID as a major factor for not voting.

5       The authors of the study projected this nationwide,

6   and found 3.1 million lost votes nationwide because

7   voters, rightly or wrongly, believe they didn't have the

8   acceptable ID.  And this was with still a lot of states,

9   like Maryland, not having any ID laws at all.

10      The survey also found substantial racial disparities

11  between whites and blacks, with blacks much more likely to

12  cite a lack of ID as a reason for not voting than whites.

13  And it also found even greater disparities when you looked

14  at states with strict voter IDs.

15      There's also Virginia specific information.  Small

16  sample.  It's not statistically significant.  But in

17  Virginia, 7.9% of non-voters cited the lack of an

18  acceptable ID as a major factor.  Projected to all

19  non-voters, again, you're talking about very, very large

20  numbers.  Even if you projected the lower 4.5% nationwide

21  finding, you'd be talking about very large numbers of

22  non-voters.

23      And so these updated studies show 3.1 million voters

24  nationwide, and we don't know how many in Virginia, but

25  it's many tens of thousands likely, and it may be over

1  100,000.

2  Q    Does Dr. Owen also cite a Pew 2007 survey?

3  A    She does.

4  Q    Do you have issues with her analysis of this study?

5  A    The Pew Study indicates that 98% of registered voters

6  told the Pew survey takers that they are confident that

7  they possess the IDs needed to vote in their state.  But

8  that's nationwide.  It doesn't limit it to those with

9  states with strict voter IDs.

10      THE COURT:  What was that percentage again, Doctor?

11      DR. LICHTMAN:  It's 98%.

12  A    It was 98% in response to the Pew 2012 study before

13  the election - this is September of 2012 - were confident

14  they had the IDs needed to vote in their state.  But at

15  that time, only four states had strict, and relatively

16  small states - Georgia, Indiana, Kansas, and Tennessee -

17  had strict photo identification requirements in effect.

18  So it doesn't tap into confidence in strict voter ID

19  states like Virginia would become later.

20      Moreover, again, while 2% might seem like a small

21  number, when you're talking about nearly five and a half

22  million registered voters in Virginia in 2012, that's

23  109,000 registered voters who, if you use the nationwide

24  projections, wouldn't be confident they had the necessary

25  IDs.

1        And I'm not going into the details.  The Pew study

2   also showed considerable confusion among voters about the

3   identification requirements in their states.  Not

4   surprising.  Voters are not, you know, up on these fine

5   details on election administration.

6   Q    Does Dr. Owen's report address other issues?

7   A    Yes.  She also addressed my findings of the

8   correlation since 2008 of the enactment of photo ID laws,

9   and the partisan control in the States showing that except

10  for, I think it was, one state, Rhode Island, it was

11  Republicans who pushed voter photo ID through those

12  states.

13       And she says first, quote, *"Support for Professor*

14  *Lichtman's logic requires that states in which Republicans*

15  *passed photo ID laws, have black populations roughly equal*

16  *to or greater than that of Virginia."*

17  Q    Is that claim accurate?

18  A    Not of all.

19  Q    Why not?

20  A    First of all, I never made the claim.  And second of

21  all, it doesn't make a lot of sense for two reasons.

22  Virginia is very high.  I'm talking 19%.  You can

23  certainly get political benefits, given the enormous

24  voting gap between blacks and whites.  That black

25  percentage is less than 19%.  In fact, you get political

1   benefits at every level of African-American population.

2        Moreover, in not every state are African-Americans

3   the primary minority.  And so looking only at

4   African-Americans, like in Texas where the predominate

5   minority is Hispanics, is not necessarily accurate either.

6   So those are my three problems with it.

7   Q    And what other claims did Dr. Owen make?

8   A    She also says that most of the states adopting photo

9   ID laws lack motivation to suppress minority votes because

10  their presidential elections were not competitive.

11  Q    And what is your response to that claim?

12  A    I have two responses.  Certainly having a competitive

13  presidential election might be one factor, but it's hard

14  to tell when a presidential election is going to be

15  competitive.  For example, Indiana adopted its voter photo

16  ID law after the 2004 election where Bush won by a near

17  landslide, but four years later Barack Obama won in

18  Indiana.

19       In Pennsylvania in 2008, before they passed their

20  law, Obama won by 14 points.  But Pennsylvania is

21  typically a swing state.  And Republicans believed their

22  prospects in 2012 were sufficiently bright for State House

23  Republican leader, Mike Turzai, to say in June of 2012

24  that the State's new photo ID law, quote, *"Is going to*

25  *allow Governor Romney to win the State of Pennsylvania."*

Lichtman - direct                    1190

1   And of course I'm not going to go into this.  I detail

2   lots of examples.  Advantages accrue to lots of elections

3   other than presidential elections, including statewide,

4   State House, and congressional elections.

5   Q    Let me ask you to -- does Dr. Owen address the issue

6   of increasing voter confidence as a justification for a

7   strict voter photo ID law in Virginia?

8   A    She does.  She says, you know, that there are

9   indications that the adoption of photo voter ID laws

10  increases confidence in elections; however, it's not

11  sourced.  I couldn't find any source for that statement in

12  her report.  And as we have seen evidenced from the

13  surveys of voters directly contradict that showing either

14  that there is no relationship, or for the reasons I

15  explained, the relationship goes the other way it turns

16  out.

17  Q    And I believe you've already spoken about the survey

18  of Performance of American Election Survey, is that right?

19  A    I have.

20  Q    Okay.  And does Dr. Owen cite studies of voter photo

21  ID and voter turnout?

22  A    She does.  She does attempt to demonstrate that the

23  affects of voter ID do not reduce voter turnout, but there

24  are serious problems with the study she cites.

25  Q    And just briefly, what are those?

1  A    Mostly, she relies on obsolete studies that do not

2  reflect the current reality.  She cites five studies that

3  go back 2006, or farther.  She cites only one out of all

4  her studies, a post-2006 study, a study in Georgia, which

5  does show in fact reduction in turnout.  And she doesn't

6  get the number right.  She says it shows that turnout was

7  depressed in Georgia by 16,642.  But in fact, the authors

8  say the different was 24,692.

9      She also inaccurately quotes the authors as saying

10  that in Georgia, more African-Americans than whites had

11  the most common forms of voter ID.  The authors never say

12  that.  And the data from the survey of the Performance of

13  American Elections shows quite the contrary.  It's on Page

14  26 of my report that African-Americans are 10 percentage

15  points less likely to possess driver's licenses in

16  Georgia, and 14 percentage points less likely to possess

17  U.S. passports in Georgia.

18  Q    And are there recent relevant studies that you

19  haven't already discussed concerning this issue of the

20  affect on turnout of voter ID laws?

21  A    There's a very well-known, and very highly publicized

22  study, that came out in 2014 by the General Accountability

23  Office of the United States Government.  A very respected

24  nonpartisan arm of the government.  And it looked at two

25  strict photo ID states - Kansas and Tennessee.  And unlike

1   many studies, did comparison with other states.

2         And to cut to the chase, the study found that both

3   voter turnout was suppressed by the strict voter photo ID

4   laws in these two states, and was suppressed

5   disproportionately for African-Americans in both states.

6   Q    And did Dr. Owen indicate any awareness of the study

7   in her deposition?

8   A    Yes.  I looked at her deposition, and she said she

9   was not aware of this study, which was very highly

10  publicized, even in the general public.

11  Q    And does Dr. Owen also point to aggregate voter

12  turnout as an indicator of the affects of SB1256?

13  A    She does.

14  Q    And what's your response to that?

15  A    I have a couple of responses.  One, there are lots of

16  influences on aggregate voter turnout.  So aggregate voter

17  turnout by itself will not isolate the affects of photo

18  voter ID law.  And I cited lots of evidence that actually

19  did isolate its affect from the survey of Performance of

20  American Elections.

21        Moreover, looking at the two midterm elections from

22  2010 to 2014, aggregate turnout did drop in Virginia by

23  2.4 percentage points.  Not an insignificant amount

24  despite the fact that there was no top of the ticket

25  election in 2010.  And we know, of course, in 2014,

1   Virginia, had the most competitive Senate election in the

2   country.

3   Q      Did Dr. Owen compare SB1256 with voter ID laws in

4   other states?

5   A      She did.   She looked at -- she had a table on Page 19

6   of her report looking at Virginia's law as compared to

7   five other states - Georgia, Indiana, Texas, South

8   Carolina and North Carolina - and said Virginia has more

9   acceptable IDs than other states with similar strict voter

10  requirements.

11  Q      And what's your response to that?

12  A      Well, first of all, the statement is not correct.   As

13  I think I've already mentioned, I'm not sure I have,

14  neither North Carolina nor South Carolina have strict

15  voter photo ID laws.   They both have reasonable impediment

16  requirements.   So that's two of the five.

17         In Texas, we know that both the District Court, and I

18  was an expert witness in that case, and the Fifth Circuit

19  Court of Appeals found that their law violated Section

20  5 -- excuse me, violated Section 2 of the Voting Rights

21  Act.

22         With respect the final two comparisons, Indiana and

23  Georgia, there are also problems.   The table indicates

24  that in Virginia, unlike these states, a person could use

25  a concealed carry.   But Virginia's concealed carry does

```
 1  not include a photograph.  And the table also indicates
 2  that Indiana does authorize expired IDs.  In fact, it does
 3  over a 2-year, not a 1-year, period.  And Georgia, of
 4  course, authorizes expired IDs.
 5       THE COURT:  Next question.
 6  Q    Does Dr. Owen's analysis, or table, address the issue
 7  of voter confusion?
 8  A    It does not.  And of course we know that's a very --
 9       THE COURT:  Next question.
10  Q    Does Dr. Owen address your table showing racial
11  disparities in the possession of the most common forms of
12  photo ID?
13  A    She does.
14  Q    And what else -- and what does she address on these
15  disparities?
16  A    She addresses it in two ways.  First of all, she says
17  the sample size is too small.  In fact, there's no such
18  thing as a too small sample size when you measure
19  statistical significance.  Statistical significance, as I
20  explicitly stated in my report, is a function both of the
21  size of the sample and the magnitude of the difference.
22  And here, despite small samples for African-Americans, the
23  magnitude of the difference was great enough to have
24  statistical significance.
25       The second thing she does is do what's called an
```

1   *"overlapping confidence interval analysis."*  Even though

2   the direct statistical tests show statistical

3   significance, she says there isn't statistical

4   significance because when you compute a 95% confidence

5   band around the black estimate and the white estimate, the

6   two confidence bands touch.  However, you cannot use

7   overlapping confidence bands as a test of statistical

8   significance because you're using two separate

9   probabilities.  And the probability can be very low that

10  there is -- that they're not statistically significant,

11  even when they overlap.

12      I cite three very powerful statistical authorities on

13  this.  The Statistical Consulting Group at Cornell

14  University, and --

15      MR. HEARNE:  Your Honor, I note that the witness is

16  basically reading his report into the record.  The report

17  has been admitted.

18      THE COURT:  I think -- I don't want to be impolite,

19  but we're going a little bit far afield here, okay?  How

20  much longer do you think you're going to be this evening,

21  my friend?

22      MR. SPIVA:  Well, I think he is addressing directly

23  the rebuttal report of Dr. Owen, and I -- you know, I

24  think probably another 20 minutes, Your Honor.

25      THE COURT:  Then we'll recess until tomorrow morning.

1   MR. SPIVA:   Okay.   Thank you.

2                    REPORTER'S CERTIFICATE

3          I, Krista Liscio Harding OCR, RMR, Notary
     Public in and for the Commonwealth of Virginia at
4    large, and whose commission expires March 31, 2016,
     Notary Registration Number 149462, do hereby certify
5    that the pages contained herein accurately reflect
     the notes taken by me, to the best of my ability, in
6    the above-styled action.
           Given under my hand this 10th day of March, 2016.
7                     _____
                         Krista L. Harding, RMR
8                        Official Court Reporter

9       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT

10            GILBERT FRANK HALASZ, RMR

11              OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25