# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| BARBARA H. LEE, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,<br><br>        Defendants. | Civil Action No. 3:15-CV-357-HEH |

## PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.     SB 1256 Violates the First and Fourteenth Amendments by Imposing Severe Burdens on the Right to Vote That Are Not Justified by Any Legitimate Interest ............................................................................. 1

     A.     The Anderson-Burdick Legal Standard ..................................... 1

     B.     Virginia's Strict Photo ID Law Severely Burdens Voters ......................... 2

          1.     The Law Severely Burdens Virginians Without Qualifying ID ......................................................................... 2

          2.     The Law Imposes Additional Burdens on Nearly All Voters ........ 7

          3.     Provisional Voting Does Not Eliminate the Severe Burdens on Voting ................................................. 13

          4.     Empirical Evidence from Virginia and Other Voter ID States Shows that Virginia's Photo ID Law Is Causing Thousands of Virginians Not to Vote ......................................... 15

     C.     Virginia's Strict Photo ID Law Does Not Serve Any Legitimate State Interest ......................................................... 17

          1.     The Law Does Not Prevent Voter Fraud ..................................... 17

          2.     The Photo ID Law Does Not Increase Voter Confidence ............ 20

          3.     The Law Is Not Justified By the Goal of Having a Uniform ID Standard ........................................................... 21

     D.     The Voter ID Law Must Be Struck Down Under the Anderson-Burdick Test .......................................................... 22

II.     SB 1256's Restrictions on Out-of-State and Expired IDs Are Irrational ............ 22

III.     SB 1256 Violates Section 2 of the Voting Rights Act ......................................... 23

     A.     The Photo ID Law Disproportionately Burdens Minority Voters .......... 24

          1.     Minority Voters are Less Likely Than White Voters to Possess Photo ID ................................................. 24

# TABLE OF CONTENTS
(continued)

**Page**

   2. The Law Will Disproportionately Suppress Minority
    Turnout ........................................................................................ 27

  B. The Disproportionate Burdens on Minority Voters Are Caused by
   or Linked to Virginia's History and the Ongoing Effects of
   Discrimination ............................................................................. 28

 IV. SB 1256 Was Intended to Suppress the Vote of Minority, Young, and
  Democratic Voters and Violates the First, Fourteenth, Fifteenth, and
  Twenty-Sixth Amendments ................................................................ 31

 V. Plaintiffs Have Standing ................................................................... 38

CONCLUSION ................................................................................................ 40

**INTRODUCTION**

The record in this case overwhelmingly demonstrates that Virginia's photo ID law imposes a heavy burden on the right to vote of thousands of Virginia residents. Many of these citizens have been entirely disenfranchised, and many more will be in the 2016 presidential election if this law is not enjoined. The Commonwealth has utterly failed to articulate a legitimate, evidence-based interest to justify the severe burden the photo ID law imposes on these citizens' constitutional right to vote. For this reason alone and without regard to its disparate racial effects, this law must be struck down under the First and Fourteenth Amendments. What is worse is that this law disproportionately impacts African Americans and Hispanics in violation of the Voting Rights Act. And worst of all, the evidence shows that the General Assembly *intended* to burden the rights of these minorities, as well as young and Democratic voters, in violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments. For each of these independent reasons, the Court should enjoin Virginia's photo ID law.

**ARGUMENT**

I. **SB 1256 Violates the First and Fourteenth Amendments by Imposing Severe Burdens on the Right to Vote That Are Not Justified by Any Legitimate Interest**

A. **The *Anderson-Burdick* Legal Standard**

Courts evaluating the constitutionality of regulations on the right to vote under the First and Fourteenth Amendments must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)). This *Anderson-Burdick* balancing test is a "flexible," sliding-scale test in which "the rigorousness of

1

[the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens" those it impacts. *Id.*; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191, 198, 201 (2008) (Stevens, J., controlling op.). *See generally League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("*LWV*") ("[E]ven one disenfranchised voter—let alone several thousand—is too many."); Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Proposed Findings" or "PF"), Dkt. No. 171 ¶¶200-06. Under this test, "a regulation which imposes only moderate burdens could well fail . . . when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995).

**B. Virginia's Strict Photo ID Law Severely Burdens Voters**

Virginia's strict photo ID law places several burdens on voters. While these burdens fall most severely on the hundreds of thousands of Virginians who likely do not possess a form of ID that can be used for voting, the law also threatens to disenfranchise *all* voters who would cast their ballots at the polls who have not independently educated themselves about a complicated and confusing law that is markedly different from the voter ID law in place for the last presidential election; who fail to maintain a qualifying photo ID; who fail to bring a qualifying ID to the polls, whether it was forgotten, lost, stolen, or not timely issued by the Commonwealth; or who are simply among the unlucky whose attempt to vote is impeded by arbitrary, inconsistent, or erroneous application of the law. The evidence in this case demonstrates beyond question that the law imposes these burdens broadly across the electorate and has deprived thousands, and unless enjoined will deprive thousands more, Virginians of their right to vote.

**1. The Law Severely Burdens Virginians Without Qualifying ID**

Many Virginians lack a qualifying ID. The evidence presented at trial demonstrates that likely hundreds of thousands of registered Virginia voters do not have a qualifying voter ID and

will be disenfranchised unless they are able to surmount the burdens to obtain one. As he testified, Dr. Rodden conducted a painstaking, detailed analysis of Virginia's voter file and DMV records and calculated that, on the low end, approximately 230,000 registered Virginians do not possess a form of ID that can be used to vote. Tr. 506:1–18; PX209 (Rodden Rpt. 11-12). The DOE's own analysis indicates that over 300,000 registered Virginia voters (including 196,902 active and 121,389 inactive voters, all of whom are eligible to vote) did not have a DMV-issued ID as of October 2014. PX055; *see also* PX212 (Lichtman Rpt. 12) (13.1% of African Americans and 4.4% of whites lack access to a vehicle). No estimate presented at trial of the number of voters without ID indicates that fewer than 230,000 voters lack a qualifying photo ID.

Many of these voters must overcome severe burdens to obtain a qualifying ID and cast a meaningful ballot. The vast majority must travel to either a DMV service center or a registrar's office to obtain an ID. PF ¶¶147-48; PX232 (Vaughan Dep. 45:17-25, 89:14-18); Tr. 946:21-24 (McClees).[1] And each of these options can present significant challenges.

DMV-issued IDs. Particularly for voters who do not own a vehicle—the very class of voters who likely do not have a driver's license, the most common form of photo ID—obtaining an ID from the DMV can take a significant amount of time. Testimony at trial showed that a trip to the DMV and back can take Virginians several hours. Tr. 98:4–19 (Tidd) (travel to DMV is one hour and twenty minutes by bus); Tr. 212:11–213:3 (Lopez) (constituents must travel over

---

[1] For those without a qualifying ID, the fact that some forms of photo ID other than DMV-issued and free voter IDs can be used for voting generally will not materially decrease the burden of obtaining a qualifying ID. In particular, a passport costs approximately $110 and takes at least six weeks to receive. PX212 (Lichtman Rpt. 32); Tr. 419:25-420:12 (Barranca); Tr. 73:24-74:16 (Cotten). An applicant must also separately pay for passport pictures and travel to a different location to take them, Tr. 419:25-420:6 (Barranca), and the application process can be complicated. *See* Tr. 73:24-75:12 (Cotten) (paid over $280 and did not receive passport until over a year after submitting application). Other forms of qualifying ID—employee, student, military, veteran's, and tribal IDs—are all directly connected to a specific status and not universally available. *See also* PF ¶157.

an hour roundtrip to get to DMV); Tr. 407:10–15, 412:8–19 (Stallings) (travel to DMV is thirty to forty-five minutes one way and can take over an hour and a half); Tr. 115:17–22 (Lamb) (travel to DMV would have taken between one and two hours one way). Once at the DMV, some voters waited hours to be assisted. Tr. 97:11–98:5 (Tidd) (two hours); Tr. 409:25–410:8 (Stallings) (left DMV after three hour wait without receiving an ID); Tr. 463:10–14 (Allen) (two hours).

Nor is there any guarantee that a trip to the DMV will result in an individual's obtaining an ID. Megan Cotton testified that she traveled to the DMV at least *five separate times* to obtain a driver's license, taking so much time off of work that her boss eventually instructed her that she "could no longer spend anymore time on this project." Tr. 73:5-11; *see also* Tr. 409:25–410:8 (Stallings) (father fell ill—without obtaining a license—after three-hour wait). Even where a voter succeeds in applying for DMV-issued ID, there is no guarantee that the voter will receive it in time to vote. Tr. 741:4-23 (Adams) (unable to cure ballot because new license not received before deadline); PF ¶162; PX232 (Vaughan Dep. 71:6-20) (two weeks to receive ID); Tr. 73:16–20 (Cotten) (has not received her driver's license one month after submitting application).

For voters with inflexible work schedules, disabilities, or other constraints on their time or transportation, incurring these profound burdens is simply not an option. *See, e.g.*, PX220 (Benagh Dep. 15:4-17, 19:22-20:16). Many voters, including those in Latino and new American communities, work multiple jobs and do not have time to obtain a photo ID because it would mean losing income. *See* Tr. 209:24–210:23, 212:11–213:3 (Lopez).

The burdens of gathering the necessary documentation and paying the required fee also work to prevent registered voters from obtaining DMV-issued IDs. To obtain such an ID, a voter must present at least two forms of identification, proof of residency, and a completed application.

PF ¶149; PX232 (Vaughan Dep. 45:17–47:17); PX218. This means that Laning Polatty could not renew his expired license because he did not have a copy of his birth certificate, discharge papers from the Marine Corps, "or anything else like that that could be used to prove who I was." Tr. 133:11–25. Megan Cotten struggled to obtain an ID in part because she was unable to secure her Alabama driving history. Tr. 70:24–71:24. And, as late as the 1940s, African Americans in Virginia were not issued birth certificates, meaning that African Americans born before then are less likely than other voters to have the underlying documentation required. Tr. 374:14–375:5 (McClellan); PF ¶69. It thus is not surprising that DOE admits that requiring underlying documentation increases the burden of obtaining an ID. Tr. 1500:19-1501:10 (DOE Comm'r).

Further, all DMV-issued IDs, including replacements, require payment of a fee, PF ¶149; PX232 (Vaughan Dep. 46:3, 116:18-118:12); PX042, which can be prohibitive for low-income voters and those on a fixed income. Tr. 738:25-739:1, 740:16-19 (Adams) ($15 fee to replace lost license "was a lot of money" as he is unemployed and disabled); *cf.* PX220 (Benagh Dep. 28:17–29:8) ($20 to $40 can be "extremely expensive" for someone on social security disability).

Free ID. Although Virginia's photo ID law requires the Commonwealth to issue free voter ID to certain voters who apply for such an ID, the evidence shows that the process of obtaining a free ID is burdensome—in some cases, prohibitively so. Indeed, DOE acknowledges that it is a burden to obtain a free ID. Tr. 1531:7-10 (DOE Comm'r):

- To begin with, a voter must be aware of the free ID option to obtain one—and many (likely most) voters are not. DOE admits that many voters may not know about the free voter ID program. PX222 (DOE 30(b)(6) 216:18-21). And witnesses testified that they had no knowledge of the free ID option *until the trial in this case.* Tr. 82:23-83:9, 87:9-12 (Cotten); Tr. 148:23-25 (B. Smith); Tr. 751:17–13 (Kellom). Given the Commonwealth's extremely limited outreach (discussed further below), this lack of knowledge about the free ID program is unsurprising.

- Among those who are aware of the program, many have devoted and will have to devote an enormous amount of time to pursuing a free ID. Tr. 58:16-21, 60:19-20

(Okiakpe) (registrar's office 15 miles away); Tr. 98:4-19, 103:2-5 (Tidd) (hour and a half by bus); Tr. 115:17-22 (Lamb) (one to two hours one way); Tr. 212:11-213:3 (Lopez) (at least one hour roundtrip); Tr. 310:10-311:5 (Surovell) (45 minutes one way); Tr. 412:20–413:8 (Stallings) (three hours roundtrip); PF ¶67; *see also* PX220.[2] Some registrar's offices are not even accessible by public transportation. PX222 (DOE 30(b)(6) 161:9-11); PF ¶¶152-53. Some disabled voters such as Charles Benagh—as well as voters who lack access to a vehicle—simply have no reasonable means of obtaining a free ID. *See* PX220 (Benagh Dep. 23:20-26:12, 27:5-20); PX224 (Jones Dep. 22:16-23:1); Tr. 460:20-461:10 (Allen); Tr. 631:1-13 (Zando); Tr. 644:8-645:5 (Woodson); Tr. 443:15-444:20 (B. Lee). And, the burdens associated with obtaining a free ID are exacerbated by the limitations on the hours that registrars' officers are open. Tr. 1451:19-1452:7; 1509:22-1510:9 (DOE Comm'r); Tr. 461:11-16 (Allen); *see also* Tr. 160:7-13 (Etheredge).

- Even where a voter surmounts the burdens of applying for a free ID, there is no guarantee that the voter will receive it by Election Day. PX224 (Jones Dep. 20:3-17) (applied for free ID *twice* and took almost one year to receive); Tr. 134:18-135:5, 135:18-137:10 (Polatty) (*twice* applied for free ID not yet received). Polatty was given a temporary ID for voting, but Jones was not. PX224 (Jones Dep. 20:8-23:22); Tr. 137:7-10 (Polatty). DOE acknowledges that, while its guidance indicates that a temporary ID should be issued before an election, "it is not automatic." PX226 (S. Lee Dep. 91:17-93:2); *see also* Tr. 1456:1-17 (DOE Comm'r).

Perhaps the most powerful evidence of the ineffectiveness of the free ID program is how few people have used it. Of the approximately 230,000 registered voters without a qualifying ID, only 4,622 voters have applied for a free ID over a two-year period. PX212 (Lichtman Rpt. 35); *see also* PX109 (Governor's office expressing concern that number of free IDs issued is low). This extraordinarily low rate of usage, in conjunction with the facts set forth in the preceding paragraphs regarding the burdens associated with obtaining a free ID, establishes that the free voter ID program does little to alleviate the burdens imposed by the photo ID law.

---

[2] The evidence at trial showed that mobile units, while in use in a few select localities, are not used in most of the Commonwealth and have not been extensively deployed even where they are in use. Tr. 1510:11-16 (DOE Comm'r); PX226 (S. Lee Dep. 83:11-84:14, 87:9-88:10); PX222 (DOE 30(b)(6) 162:3-19); PX220 (Benagh Dep 23:20-24:7, 28:17-29:8); PX233 (SBE 30(b)(6) 104:19-105:18); *see also* PX101 at 15 (DOE lacks funds to provide each registrar with more than one set of free ID equipment); PX184 (county lacks time or resources to have mobile program).

Absentee voting. The option to vote absentee—which does not require photo ID—does not materially offset the photo ID law's burdens on voting. Most significantly, absentee voting is not an option for large numbers of voters because Virginia, unlike many other states, does not have no-excuse absentee voting, Tr. 305:11-306:4 (Surovell); Tr. 1359:17-19 (Lichtman), and a lack of photo ID does not qualify voters (other than those with a religious objection to being photographed) to vote absentee. *See* Tr. 984:6-19 (McClees); PX222 (DOE 30(b)(6) 247:5-248:14). Many voters also have no knowledge of the absentee voting process at all, Tr. 306:24–308:11 (Surovell) ("[V]ery few people had any clue . . . ."), much less that it is exempted from the photo ID requirement. Moreover, for a number of disabled voters, voters with low literacy or limited English skills, and voters who do not learn until late in the election cycle that they lack a qualifying ID, absentee voting is not a viable option. Tr. 107:18-108:8 (Tidd); Tr. 133:11-19 (Polatty); PX233 (SBE 30(b)(6) 46:12-22); PX220 (Benagh Dep. 35:15-37:21, 39:7-9).

## 2.    The Law Imposes Additional Burdens on Nearly All Voters

Limited outreach and confusing requirements. All Virginia voters who vote at the polls—regardless of whether they possess a qualifying ID—bear the burden of learning (1) that Virginia has a photo ID law and (2) which IDs can be used for voting. The Commonwealth has made this extremely difficult in two ways.

*First*, the General Assembly appropriated a "very small budget" to educate voters about the photo ID law. Tr. 1473:15-22, 1505:10-12 (DOE Comm'r). In contrast to the over $2.1 million spent on outreach for the much-less-restrictive 2012 voter ID bill, *see* Tr. 1643:20-1645:8 (Palmer); PX067, the General Assembly appropriated only $200,000 for outreach for each of the first three years after SB 1256's implementation. Tr. 1473:15-20, 1506:23-1507:3 (DOE Comm'r); PX181. DOE admits that it is difficult to conduct a statewide outreach campaign with $200,000, Tr. 1509:16-20 (DOE Comm'r); indeed, former SBE Secretary Donald

Palmer, a Republican, estimated that at least $500,000 was necessary to conduct a successful voter ID outreach campaign in advance of a presidential election, Tr. 1644:14-19; *cf.* PX124 at 1.

Because of its limited budget, DOE's direct outreach has been limited to a universe of only 86,000 voters who do not have DMV-issued IDs. Tr. 1006:13-23 (Davis); Tr. 1476:20-1477:2, 1537:2-5 (DOE Comm'r); PX178. As points of comparison, DOE itself estimates that well over three times that number of voters do not have DMV-issued ID, *see* PX055, and the Commonwealth, in connection with the 2012 voter ID law, sent every registered voter in Virginia a voter-registration card that at the time constituted voter ID. *Compare* PX108, *with* PX167. Further, despite the certainty of increased turnout this year, DOE does not "have a lot of funding to go beyond what [it is] currently doing in terms of outreach." Tr. 1502:11-25 (DOE Comm'r). DOE thus admits that its outreach efforts have not been sufficient to inform voters about the photo ID law, *see* PX222 (DOE 30(b)(6) 230:15-18), and that it is trying "to make lemonade out of lemons." Tr. 1505:10-12 (DOE Comm'r).

*Second*, Virginia's photo ID law is "the most confusing . . . voter ID law[] in the nation." Tr. 1157:11-17, 1158:4-1160:3 (Lichtman); *see also* PX212 (Lichtman Rpt. 40). The list of IDs that SB 1256 deems acceptable is contradictory and confusing, *see* PX025; PF ¶¶58-62, and often not easily discernable. Out-of-state employer IDs are acceptable but out-of-state driver's licenses are not. PX227 (McClees Dep. 64:13-21). An ID without an expiration date is acceptable, but not one with an expiration date that has been expired for more than a year. *See* PX151; PX222 (DOE 30(b)(6) 197:21-198:20). An electronic copy of an ID can be used to cure a provisional ballot but not to vote a regular ballot. PX222 (DOE 30(b)(6) 260:10:21-261:18); PX227 (McClees Dep. 136:24-138:9). Only IDs from Virginia universities may be used, but which university IDs count as out-of-state IDs is very difficult to determine. Tr. 699:16-700:2

(Kellom). An employer ID must be issued "in the ordinary course of business," but determining what types of ID qualify is left up to the discretion of the registrar. Tr. 993:24-994:13 (McClees).

As a result of these complex requirements, DOE does not maintain any list of acceptable photo IDs that can be referenced to determine whether a particular form of ID qualifies for voting. Tr. 1517:11-14 (DOE Comm'r). Creating such a list would be "impossible," in part because DOE "doesn't know what entities issue photo IDs" and "often" has to do "analysis" to determine which IDs qualify. PX222 (DOE 30(b)(6) 112:1-17); Tr. 1518:3-9 (DOE Comm'r). Organizers—who bear the brunt of photo ID education efforts due to the DOE's limited budget, *see* Tr. 1491:3-11 (DOE Comm'r)—also attested to the difficulty of determining whether an ID qualifies under the law. *See* Tr. 466:21-467:12 (Allen); Tr. 644:8-645:19 (Woodson).

Moreover, questions remain about precisely which IDs are acceptable. Tr. 1516:22-24 (DOE Comm'r). Myron McClees explained that an ID is acceptable if the name on it is "substantially similar" to the name on the voter roll. However, how to interpret this standard is "left in the hands of an Officer of Election." Tr. 986:14-987:14 (McClees) (whether a voter whose name changed after marriage could use an ID with the voter's previous name is left to the discretion of the poll worker). And, when presented with an unfamiliar ID on Election Day, local election officials using their "discretion" have applied the law differently and disparately across the Commonwealth, causing confusion and voter disenfranchisement. Tr. 1518:10-24 (DOE Comm'r); Tr. 679:16-25 (Scarborough); Tr. 697:21-688:11 (Kellom).

While these complexities alone make it difficult to comply with SB 1256, the fact that this bill was passed less than a year after the adoption of a different, less-restrictive voter ID requirement surely has caused and will continue to cause a significant degree of additional confusion. Given that the Commonwealth engaged in aggressive outreach in connection with the

2012 voter ID bill and fairly meager outreach in connection with SB 1256, many voters will show up to the polls in 2016 having only been informed by the Commonwealth about the requirements of the 2012 law, while many others will have received contradictory information.

Impact of limited outreach and confusing requirements. The impact on the voting process from this lack of outreach and SB 1256's confusing requirements is precisely what one would expect: widespread lack of knowledge of the photo ID requirement and confusion among voters and election officials about the particulars of the photo ID requirement.

Almost all of the voters who testified at trial explained that, prior to Election Day in either 2014 or 2015, they were not aware that Virginia had a photo ID law and/or that the form of ID they presented did not qualify under the law. *E.g.*, Tr. 55:19-58:3, 62:6-12 (Okiakpe); Tr. 78:21-79:2 (Cotten); Tr. 115:1-8 (Lamb). Voters in both categories were disenfranchised. *E.g.*, Tr. 160:7-16 (Etheredge); Tr. 147:17-22, 148:23-25 (B. Smith); Tr. 420:22-421:6 (Barranca). And these voters and their experiences are not outliers. A member of Alexandria County's Electoral Board testified that her "[n]umber one" observation about the photo ID law is that "people don't understand that they need to have [a photo ID]" when arriving on Election Day. Tr. 697:21-698:4 (Kellom). Voter registration and campaign organizers testified that during 2014 and 2015 registration and get-out-the-vote activities, they encountered numerous voters who had no knowledge of the photo ID law and/or were confused about the types of ID that qualified. *E.g.*, Tr. 214:8-25 (Lopez); Tr. 628:23-629:8 (Zando); Tr. 643:21-645:5, 647:8-25 (Woodson). Likewise, DOE received reports of questions related to the photo ID law on Election Day and continues to receive questions about the types of IDs that qualify under the law. Tr. 1516:22-24 (DOE Comm'r); *see also* PX222 (DOE 30(b)(6) 106:7-20, 108:12-18) (lack of clarity). Significantly, voters who learn of the photo ID requirement for the first time when they arrive at

the polls may ultimately not cast any ballot at all because they do not have time to engage in the lengthy and unanticipated provisional ballot process. *See* Tr. 697:7-25 (Kellom).

The photo ID law has confused elections officials as well, resulting in still further burdens on voters. Charles Benagh, a triplegic voter, called the Alexandria and Fairfax County Electoral Boards at least four times to see if his MetroAccess Card—a photo ID issued by a local transit authority for disabled passengers—would be accepted for voting. PX220 (Benagh Dep. 22:6-17). He was told at least twice that it would not be accepted. *Id.* 28:5-16; 30:2-32:2. Only after Benagh insisted that the local board call SBE was he told that the card would be accepted. *Id.* 23:13-19, 27:21-28:16, 31:3-32:19. When Benagh asked if the poll workers would be advised to accept the card, he was told that it would be *his* responsibility to inform them. *Id.* 33:9-35:2. This burden, according to Mr. Benagh, was "onerous," and it left him unsure as to whether his ID would be accepted. *Id.* 34:19, 35:15-36:4. Benagh did not case a ballot in the 2015 election because he was concerned about whether his ID would be accepted at the polls. *Id.* 39:7-9.

Witnesses were also disenfranchised after receiving misinformation or incomplete information from pollworkers implementing the law. Tr. 115:12-117:9, 120:23-121:3 (Lamb); Tr. 159:9-23 (Etheredge); Tr. 148:23-25 (B. Smith); Tr. 123:22-124:5, 125:13-17, 126:1-127:3 (Hilt). And some witnesses who were not disenfranchised by misinformation or incomplete information they received were nevertheless burdened by the additional steps they had to take to ensure that their votes would count. Tr. 58:16-62:5 (Okiakpe); Tr. 747:22-749:6 (Samson); PX224 (Jones Dep. 16:12-17:4); *see also* PX222 (DOE 30(b)(6) 235:12-15).

Additionally, in 2014, voters were incorrectly "told that the address on [their] ID had to match the registration records." Tr. 1512:18-21 (DOE Comm'r); PX222 (DOE 30(b)(6) 177:9-19); Tr. 952:19-953:2 (McClees); PX098. In 2015, DOE received reports from around Virginia

of election officers who were unfamiliar with the ID requirements. PX222 (DOE 30(b)(6) 51:12-53:5) ("being the second general election where the current ID requirements are in place, and still hearing those sorts of occurrences … was a little startling"). DOE concedes that these "election-related problems" will continue in 2016. Tr. 1516:18-21 (DOE Comm'r).

Maintaining "valid" ID and presenting it. Virginia voters who cast their ballots in person are further burdened by the requirements that they maintain a "valid" ID, PX038; PX047, and present it every time they vote. The requirement that voters maintain a valid ID (as that phrase has been interpreted by the SBE) means that some voters who do not want or are unable to obtain a free ID (or are unaware of its availability) must pay costly fees to ensure that their ID has not been expired for more than a year. *See* PF ¶160; PX042; PX212 (Lichtman Rpt. 32); PX232 (Vaughan Dep. 46:3, 116:18-118:12). For many individuals, incurring these fees is unnecessary because they do not drive or travel internationally. *E.g.*, Tr. 145:24-147:1, 151:21-152:5 (B. Smith); PX224 (Jones Dep. 14:4-15:5); PX220 (Benagh Dep. 13:10-15:3, 19:22-21:14); *see also* Tr. 630:13-20 (Zando); Tr. 644:8-645:5 (Woodson). Indeed, several witnesses had IDs that were not acceptable under Virginia law because they had been expired for more than a year. Tr. 57:2-16 (Okiakpe); Tr. 70:24-71:1 (Cotten); Tr. 145:24-147:1 (B. Smith); PX224 (Jones Dep. 14:4-15:5); PX220 (Benagh Dep. 13:10-15:3, 19:22-21:14); *see also* Tr. 443:15-444:5 (Lee).

Voters who lose their IDs similarly must undertake the process of obtaining (and make the expenditures required to obtain) a new ID. This is no trivial matter: Approximately 200,000 Virginians report their licenses lost each year, Tr. 330:24-331:1 (Surovell), and two witnesses in this case were burdened by their loss of an ID. Tr. 739:19-741:23 (Adams) (lost license and unable to cure due to lack of replacement); Tr. 134:18-137:1, 137:18-138:5 (Polatty) (misplaced temporary free ID and incurred burdensome travel to obtain replacement). Further, voters relying

on a driver's license as their voter ID must also ensure that their license is not suspended nor revoked. PF ¶159; Tr. 325:7-327:2, 327:5-10 (Surovell) (witnesses up to 50 licenses per day suspended and surrendered to the court); *see also* PX232 (Vaughan Dep. 77:21-78:11); PX233 (SBE 30(b)(6) 51:23-52:3) (in one year prior to 2014, the DMV suspended approximately 525,000 licenses and another approximately 20,000 licenses were surrendered).[3]

The strict photo ID law can also prevent voters who possess a qualifying form of ID from casting a regular ballot, even if they are aware of the ID requirement. As Jennifer Tidd explained in her testimony, her autistic son misplaced his ID on Election Day and would have been disenfranchised but for her efforts to ensure that he received a provisional ballot and provide transport for him to the registrar's office so that he was able to cure his ballot. Tr. 100:4-102:9; *see also* Tr. 136:1-137:18 (Polatty) (disabled voter misplaced free ID and had to travel to registrar's office on Election Day to apply for a replacement and then back to polling place to cast ballot). And any voter who simply forgets to bring his or her ID on Election Day is required either to leave the polling location, obtain the ID, and return, or to cast a provisional ballot.

### 3. Provisional Voting Does Not Eliminate the Severe Burdens on Voting

That voters who present at the polls without a qualifying ID can cast a provisional ballot and then attempt to "cure" it within two-and-a-half weekdays does not alter the conclusion that the photo ID law imposes severe burdens on voting. For voters who do not possess a qualifying form of ID, the existence of the provisional voting process makes no material difference at all: Such voters must still overcome the burdens of obtaining an ID described above.

For voters who do possess a qualifying photo ID, the provisional voting process is far from a certain failsafe against disenfranchisement. In many cases, Virginians who fail to present

---

[3] In most cases, the offense for which a license is suspended or revoked is not one that results in the loss of the right to vote. Tr. 329:6-19 (Surovell).

a qualifying ID are not even offered a provisional ballot and are disenfranchised as a result. Tr. 1512:25-1513:2 (DOE Comm'r) (DOE received reports of failure to offer provisional ballots); PX159; Tr. 79:11-17, 81:8-82:12 (Cotten); *see also* PX094; Tr. 1056:4-8, 1059:11-13 (Slutzky); PX222 (DOE 30(b)(6) 57:19-58:17, 62:2-62:18); *cf.* Tr. 104:15-105:11 (Tidd). DOE expects that this problem will continue in the 2016 election. *See* Tr. 1516:14-21 (DOE Comm'r).

But even when the provisional voting process is administered properly, it unjustifiably burdens otherwise eligible voters who present to vote without a qualifying ID by requiring them to undertake two extra steps to have their ballots counted: (1) vote provisionally and (2) cure the ballot. PX215 (Lichtman Reply 11); Tr. 1340:8-14, 1414:17-1415:3 (Lichtman); PX222 (DOE 30(b)(6) 246:8-248:14). The time necessary to cast a provisional ballot alone is a deterrent for some voters. Tr. 697:21-698:20 (Kellom); *see also* Tr. 727:13-729:2 (Aida). And, having devoted such time to casting a provisional ballot (in many cases, after waiting in a lengthy line to vote), a number of voters will not have the additional time necessary—during only a two-and-a-half day period during the work week—to travel to the registrar's office[4] to cure their ballots. *See, e.g.*, Tr. 115:23-116:12 (Lamb); Tr. 160:7-13 (Etheredge); Tr. 124:20-12 (Hilt).

Even voters who succeed in curing their provisional ballot risk having it rejected for failure to meet requirements not imposed on voters who cast regular ballots. To cast a valid provisional ballot, a voter—unlike a voter casting a regular ballot—must list information such as his or her name, address, social security number, and signature. Tr. 1518:25-1522:2 (DOE Comm'r). If a voter fails to include any of this information, his or her ballot may be rejected. *Id.*

---

[4] While voters also have the option of curing their ballots by mailing, faxing, or emailing a copy of a qualifying ID to the registrar's office, the evidence shows that this alternative means of completing the second step of the cure process is of limited utility. Many voters are never told they can do this. *E.g.*, Tr. 102:17-19 (Tidd); Tr. 116:13-16, 119:16-120:5 (Lamb). Additionally, many voters plainly do not have access to scanners or fax machines, and the limited cure period leaves very little time for a ballot to be cured by mail.

**4.**    **Empirical Evidence from Virginia and Other Voter ID States Shows that Virginia's Photo ID Law Is Causing Thousands of Virginians Not to Vote**

The evidence also demonstrates that SB 1256 has prevented thousands of Virginians from casting meaningful ballots that were counted, and will prevent thousands more from doing so in the 2016 election. Although the elections in 2014 and 2015 were low-turnout elections, a minimum of 773 and 408 voters (the Commonwealth does not have results from a few localities for 2014 and from a number of localities for 2015) were forced to vote provisionally in those elections due to lack of ID. PX162; DX225. About half of these ballots were rejected. Tr. 1496:7-1497:12 (DOE Comm'r). Based on a comparison of turnout and no-ID provisional ballots statistics between these elections and the 2012 election, Dr. Lichtman projects that approximately 2,000 Virginians will vote provisionally in the 2016 elections due to a lack of ID. Tr. 1183:15-1184:18 (Lichtman); *see also* Tr. 1516:14-21 (DOE Comm'r); PX112.

It is also "well-known that provisional ballots are only the tip of the iceberg when it comes to the deterrent [e]ffects of voter photo ID laws." Tr. 1184:22-25 (Lichtman). As discussed above, the evidence shows that some voters who show up at the polls without qualifying photo ID are simply not offered a provisional ballot (and thus did not cast one), and some voters turn down the opportunity to cast such a ballot due to the time required for the provisional voting and cure process. Others, upon seeing large signs stating that a photo ID is required to vote, *see* Tr. 1712:24-1713:22 (Quinn) (photo ID poster does not advertise option to cast provisional ballot), surely do not wait in line for what they perceive to be a futile exercise.

Most significantly, the very existence of photo ID laws has been shown to suppress voter turnout—sometimes based on voters' accurate understanding, but often based on the incorrect belief, that they do not possess a qualifying form of ID. *See* Tr. 1191:18-1192:5 (Lichtman); PX215 (Lichtman Reply 30); DX300. A study by political scientists Dr. M.V. Hood and Dr.

Charles Bullock found that in 2008, Georgia's voter ID law *deterred over 24,000 voters* from even attempting to vote. Tr. 1974:4-1975:9 (Owen); PX215 (Lichtman Reply 23). More recent nationwide studies have found that voter ID laws can decrease turnout by as much as 4.5 percent, resulting in as many as 3.1 million votes by voters who, rightly or wrongly, believed they did not have an acceptable form of ID. Tr. 1185:23-1186:14 (Lichtman); PX215 (Lichtman Reply 29-30). Defense expert Dr. Thornton agreed that an increase in the cost of voting—that is, requiring extra steps to vote—makes individuals less likely to vote. Tr. 1779:14-1780:13.

Moreover, in 2014, the non-partisan U.S. Government Accountability Office ("GAO") conducted a comprehensive and sophisticated study of the effect of strict voter photo ID laws on voter turnout and found that such laws significantly decreased turnout from the 2008 to the 2012 general election in two states—Kansas and Tennessee—that amended their voter ID laws during that period "to a greater extent than turnout decreased in selected comparison states." DX300 at 57. The GAO concluded that its "analysis suggests that the turnout decreases . . . were attributable to changes in the two states' voter ID requirements." *Id.* The GAO further found that although "turnout declined in all six of the states we analyzed between 2008 and 2012 . . . it declined by a larger amount in Kansas and Tennessee than in the . . . comparison states," reducing total turnout for eligible voters by an estimated "additional 3.0 percentage points in Kansas and by an additional 2.7 percentage points in Tennessee." *Id.* There is nothing in the record to support a finding that Virginia's ID law is likely to have any less of an impact; and, if turnout in the upcoming general election is suppressed by even 2.5%, that translates into over 100,000 Virginians who will be effectively disenfranchised by the law.

### C.  Virginia's Strict Photo ID Law Does Not Serve Any Legitimate State Interest

In stark contrast to the concrete evidence of harm that the photo ID law will cause, the proffered benefits of the law are conjectural and in some cases *undermined* by the photo ID law. These justifications do not withstand even mild scrutiny.

### 1.       The Law Does Not Prevent Voter Fraud

For two reasons, the photo ID law does not serve its principal justification—the prevention of voter fraud: (1) there is absolutely no evidence of voter-impersonation fraud in Virginia and (2) the photo ID law makes hypothetical voter fraud easier to commit, not harder.

*First*, the evidence presented at trial overwhelmingly established that there is no voter-impersonation fraud in Virginia. In preparing her expert report for this case, Dr. Lorraine Minnite, who has studied voter fraud in American elections for over a decade and is the nation's preeminent expert on the topic, conducted a systematic search for reports of voter fraud charges in Virginia from 2000 to 2015, reviewing 647 news articles containing allegations of voter fraud, and tracked those allegations over time. Dr. Minnite did not find a single report of voter impersonation. PF ¶185; Tr. 791:17-792:17, 800:22-801:5. Dr. Minnite also reviewed a report produced by the Virginia State Police regarding individuals charged with voter fraud; she again found no reported cases of voter impersonation. PF ¶185. None of the types of voter fraud that Dr. Minnite's research *did* uncover—registration fraud, double voting, felon voting, and vote buying—are prevented by SB 1256, as discussed further below. *See* Tr. 797:3-799:7 (Minnite).

Dr. Minnite's findings were supported by the testimony of lay and expert witnesses at trial. *See* PF ¶187; Tr. 1528:25-1529:7 (DOE Comm'r) (unaware of any in-person impersonation fraud in Virginia in last 20 years); PX223 (SBE 30(b)(6) 25:25-26:7, 26:19-27:1); Tr. 1985:14-16 (Owen); Tr. 314:3-6, 375:9-15, 383:25-384:3 (McClellan) (never given example of voter-impersonation fraud during legislative debates); Tr. 364:5-19 (Surovell). In 2011, the *Republican*

National Lawyers' Association found no charges or convictions of voter-impersonation fraud in Virginia between 2000 and 2010, and a 2012 News 21 study found no credible allegations of voter-impersonation fraud in Virginia since 2000. Tr. 1137:13-1139:12 (Lichtman).

Tellingly, the *only* "evidence" presented at trial indicating that anyone in Virginia has even *discussed* the possibility of committing voter-impersonation fraud—the video in which Patrick Moran was baited into speculating about forged utility bills—was manufactured. Tr. 1868:21-23 (Palazzolo) ("[I]t was found that Moran never had any intention of committing voter fraud."); PF ¶¶93-94. Even in that video, Moran "noted how difficult it would be to forge other non-photo IDs under the 2012 law, noting specifically bank statements," PX212 (Lichtman Rpt. 55), and highlighted the irrationality of voter-impersonation fraud by explaining that a would-be fraudster's time would more effectively used getting out the vote. Tr. 1143:3-6 (Lichtman).

The conclusion that voter-impersonation fraud is nonexistent in Virginia is corroborated by evidence regarding the lack of such fraud nationwide. Throughout her years of study of the topic, Dr. Minnite has found that voter fraud in general is "exceedingly rare" and voter-impersonation fraud is "even rarer." Tr. 785:7-16 (Minnite); *see also* Tr. 1143:10-23 (Lichtman) (voter impersonation rare because risk of punishment is significant). Among other things, Dr. Minnite found that from 2004 to 2014, neither the U.S. Department of Justice's ("DOJ") Criminal Division nor any U.S. Attorney's Office in the country had brought any charges for voter impersonation. PF ¶185; Tr. 771:23-772:10 (Minnite). Moreover, despite DOJ's creation of a program targeting voter fraud between 2002 and 2005, only 40 voters were indicted for fraud during that time and none of those cases involved voter impersonation or occurred in Virginia. Tr. 769:22-771:22 (Minnite). Dr. Minnite's in-depth study of fraud in several states has yielded similar results. PX210 (Minnite Rpt. 8-13).

This paucity of evidence of voter-impersonation fraud is fatal to the Commonwealth's claim that fraud prevention justifies the photo ID law's burdens on voting. Voter-impersonation fraud is the only type of voter fraud that SB 1256 can prevent. *See* Tr. 797:1-799:7 (Minnite); Tr. 1576:11-15, 1580:19-1581:1 (Riemer); Tr. 1363:10-14, 1136:12-17 (Lichtman); Tr. 1906:16-18 (Palazzolo); PX233 (SBE 30(b)(6) 23:6-25:23); PX222 (DOE 30(b)(6) 249:1-7); PX106.

*Second*, even if there were voter-impersonation fraud in Virginia, SB 1256 would not prevent it; indeed, the photo ID law makes it easier for a hypothetical voter impersonator to commit fraud. The primary reason for this is that the law permits voters to obtain the free voter ID without presenting any form of ID at all. *See* PF ¶¶189-90; Tr. 1661:16-19 (Palmer) (free ID issued upon affirmation of identity); Tr. 1464:22-25 (DOE Comm'r); *see also* Tr. 61:7-62:1; 59:4-19 (Okiakpe) (presented less identifying information to obtain free ID than at the polls); Tr. 104:3-6 (Tidd) (son did not show ID to obtain free ID even though he was required to show ID at polls); PX128 at 2 (receiving free ID without showing ID "defeats the purpose of the law"); PX158. Thus, whereas voters were required to show some form of ID to vote under the 2012 voter ID law, SB 1256 permits a voter to obtain and free ID—that is, a government-issued photo ID that never expires—and then immediately vote (and vote in all future elections) using that ID.

SB 1256's free ID scheme also makes theoretical impersonation fraud easier, not harder, by permitting voters to obtain a free ID at any registrar's office in the Commonwealth or the SBE. Under the affirmation-of-identity system, a voter had to affirm his or her identity at a local polling place, where an imposter could be spotted by the neighbors of the person being impersonated; now the theoretical imposter can obtain the ID required for voting at a location where he or she is far less likely to be spotted as an imposter. *See* PF ¶190; Tr. 996:20-22

(McClees) (neighbors more likely to know voters than the registrar); Tr. 145:8-23 (B. Smith) (had known pollworkers in precinct for years).

Moreover, the photo ID law fails at its purported goal of deterring fraud because it contains two significant loopholes to the ID requirement. In particular, voters are permitted to cast absentee ballots without presenting any form of ID. Tr. 997:12-14 (McClees); Tr. 336:19-21 (Surovell). And, voters are permitted to cure their no-ID provisional ballots by sending in a copy of an ID by fax, scan, or email, without anyone's ever comparing the photo on the ID to the person who cast the ballot. *See* PF ¶190; Tr. 996:23-997:11 (McClees) (a voter who votes provisionally because he presents photo ID that does not "reasonably resemble" his appearance could fax or email a copy of the same ID presented at the polls to cure). For these reasons, as well as those set forth above, the law cannot be regarded as a fraud-prevention measure.

### 2. The Photo ID Law Does Not Increase Voter Confidence

Defendants have also failed to present any credible evidence that SB 1256 increases public confidence in the elections system. While Dr. Owen's expert report included the conclusion—without citation—that photo ID laws increase voter confidence, *see* DX303 (Owen Rpt. 17), Tr. 1163:19-25 (Lichtman), she conceded at trial that there are no studies that have compared states with voter ID laws and states without them and found that voters have more confidence in elections in states with voter ID laws. Tr. 1999:11-16 (Owen). Indeed, political science studies indicate that photo ID requirements bear little correlation to the public's beliefs about the incidence of fraud. PF ¶¶191-92; Tr. 1995:8-1996:13, 1997:10-1198:7, 1999:11-16 (Owen); DX275 at 3 ("[V]oters living in states with stricter identification laws did not report higher levels of confidence or higher rates of voting than those living in states with relatively weak identification laws."); PX212 (Lichtman Rpt. 58); Tr. 1163:13-1165:21 (Lichtman) (analysis showed that voters in strict photo ID states are less confident than those in other states).

Moreover, the convoluted nature of SB 1256 makes it far more likely that this particular photo ID law will decrease, rather than increase, confidence in elections. A regime in which a voter is told at the polls that his ID is insufficient, but that permits the voter to obtain a free ID with less documentation and then to use that ID to vote, is not likely to inspire much confidence. *See generally* PX224 (Jones Dep. 12:20-17:11); Tr. 417:1-421:21 (Barranca). Nor is much confidence likely to result from a scheme that is highly confusing and arbitrary in terms of the IDs that are accepted. Tr. 749:17-23 (Samson) ("I felt like it was a bit of a joke . . . ."). Of course, voters who are denied their right to vote by SB 1256 will almost certainly lose, rather than gain, confidence in an electoral system. *E.g.*, Tr. 58:4-13; 62:13-18 (Okiakpe) (undermined confidence); Tr. 77:23-78:14 (Cotten) (humiliated); Tr. 118:4-10 (Lamb) (embarrassed, frustrated, angry); Tr. 160:17-161:1 (Etheredge) (thinks "more poorly" of election system). Even the DOE does not believe that SB 1256 has increased confidence. Tr. 1529:9-12 (DOE Comm'r).

### 3.     The Law Is Not Justified By the Goal of Having a Uniform ID Standard

The Commonwealth's suggestion at trial that the differences between the HAVA ID requirements and Virginia's ID requirements caused confusion for election officials and thus justified SB 1256 also fails. Initially, this appears to be largely a post-hoc rationale and not a primary motivation for the photo ID law. Former SBE Secretary Palmer explained that the *2012* voter ID law was passed to try "to get it to the HAVA standard." Tr. 1650:5-9. SB 1256, according to Palmer, was enacted because members of the General Assembly did *not* want to have a HAVA standard; they wanted a *photo* ID law. Tr. 1650:10-15 (some legislators were unhappy with what they thought was a HAVA ID standard; they wanted a photo ID standard).

In any event, if the General Assembly were concerned about any inconsistency between the Commonwealth's ID requirements and HAVA's, it could simply have adopted HAVA's requirements. As explained above, moreover, SB 1256 cannot plausibly be justified on the

grounds that it *reduces* confusion; it has increased it. And, any state interest in eliminating confusion resulting from separate HAVA and Virginia ID standards is minimal: the HAVA ID requirements apply only to the small class of voters who register to vote for the first time by mail and do not provide their driver's license number or the last four digits of their Social Security number at the time of registration. *See* Tr. 1600:19-21 (Riemer); Tr. 1355:3-9 (Lichtman).

### D.  The Voter ID Law Must Be Struck Down Under the *Anderson-Burdick* Test

In sum, the photo ID law imposes severe burdens on voters, while failing to further state interests. The law's burdens therefore outweigh its benefits, and it must be struck down under the Equal Protection Clause. *See Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014) ("*NAACP*"), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) (restriction unconstitutional where state provided "no evidence" to support its "vague" justifications).

### II.    SB 1256's Restrictions on Out-of-State and Expired IDs Are Irrational

SB 1256's restrictions on the use out-of-state IDs (other than employer IDs) and IDs expired for more than a year should also be struck down under the rational-basis test. *See generally Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (to survive scrutiny under the Equal Protection Clause, law distinguishing between groups must be rationally related to a legitimate state interest). Simply put, there is no reason for Virginia to require individuals who do not have a qualifying photo ID, but do have an expired photo ID or an out-of-state college photo ID or driver's license, to obtain an additional form of ID. *See generally* PF ¶¶194-99, 247-49.

An out-of-state driver's license is sufficient proof of identity not only to obtain a Virginia DMV ID, PF ¶194, but for nearly any purpose. Tr. 84:1-10 (Cotten) (travel by plane and when using a credit card); Tr. 158:14-20 (Etheredge) (everything from verifying his insurance to getting into courtroom to testify at trial). The refusal to accept such IDs for voting thus simply

means that voters with out-of-state licenses must incur the additional burdens of going to the DMV and paying for a license solely for the purpose of voting.

Moreover, the photo ID law's only purpose is to verify voters' identity, Tr. 1673:9-12 (Palmer), and the fact that a license is expired has no bearing on an election official's ability to do so. PF ¶¶196-97; Tr. 1535:5-8 (DOE Comm'r); PX225 (Judd Dep. 157:10-13) ("[W]e [did not] think that the [expiration] date [was] all that relevant to us for our purposes to identify that voter."); PX233 (SBE 30(b)(6) 38:24-41:7) (reasonable resemblance requirement negates need for expiration date). Remarkably, one of the SBE members who voted to exclude IDs that have been expired for more than a year testified that he "d[id]n't know" why that period was chosen, and that the SBE "just picked 12 months and that's what it is." PX225 (Judd Dep. 157:16-23).

## III.    SB 1256 Violates Section 2 of the Voting Rights Act

In the Fourth Circuit, a Section 2 vote-denial claim has two elements: (1) the challenged law "must impose a discriminatory burden on members of a protected class, meaning that members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," and (2) "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *LWV*, 769 F.3d at 240 (citation and internal quotation marks omitted). As set forth in detail in the Proposed Findings, the analysis of these elements is informed by several principles, including that:

- the VRA "should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citations and internal quotation marks omitted);

- a violation of Section 2 requires a finding only of discriminatory *effects*;

- facially neutral laws can violate Section 2;

- 23 -

- the VRA guards against both the denial and the abridgement of the right to vote;

- "what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities," *LWV*, 769 F.3d at 244; and

- the Supreme Court has identified nine factors, known as the Senate Factors, that are relevant to the analysis of a Section 2 claim.

*See* PF ¶¶217-28. The evidence in this case satisfies both elements of a Section 2 claim.

### A.  The Photo ID Law Disproportionately Burdens Minority Voters

### 1.    Minority Voters are Less Likely Than White Voters to Possess Photo ID

The evidence firmly demonstrates that African Americans and Latinos are less likely than whites in Virginia to possess a form of ID that can be used for voting. As he explained at trial, Dr. Rodden performed several separate analyses, all of which pointed to the same conclusion: a disproportionate share of African-American and Hispanic voters in Virginia lack a valid photo ID for voting. Tr. 542:10–542:14 (Rodden); PX209 (Rodden Rpt. 2-3); PF ¶¶124, 170–73.

Dr. Rodden began by comparing the share of registered voters without a photo ID to the share of African-American and Hispanic voters by census block group in Virginia. Tr. 516:21-517:21; PX209 (Rodden Rpt. 20-21). He found that there was a statistically significant relationship between the share of minority voters and the share of voters without an ID—as the share of minority voters increased, so did the share of voters without ID. Tr. 516:21-517:21.

Next, Dr. Rodden performed a homogeneous block analysis—a comparison of ID possession rates in all-minority and all-white Census blocks—and found a "large gap" in the ID possession rates of whites and minorities. Tr. 524:3-9, 525:13-526:1. In particular, this analysis showed that African Americans and Hispanics who live in homogeneous Census blocks lack DMV-issued IDs at a rate approximately 70% higher than the rate for whites who live in homogeneous Census blocks. PX209 (Rodden Rpt. 24). Notably, this method of analysis is

routinely accepted by courts in voting-rights cases. Tr. 522:16-20 (Rodden); *see, e.g.*, *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 933-34 (E.D. Ark. 2012) (use of homogenous precinct analysis unquestioned by the court); *Levy v. Lexington Cnty.*, 589 F.3d 708, 718-19 (4th Cir. 2009) (use of three methods—homogenous precinct analysis, ecological regression, and ecological inference—found reliable); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009) (recognizing that three accepted methods of statistical analysis—homogeneous precinct analysis, ecological regression, and ecological inference—were used).

Dr. Rodden also conducted an ecological inference analysis—another mathematical analysis that is widely accepted by courts. Tr. 526:2-16, 528:22-529:10 (Rodden); *see, e.g.*, *York v. City of St. Gabriel*, No. CIV.A. 14-00423-BAJ, 2015 WL 926054, at *6 (M.D. La. Mar. 4, 2015) (ecological inference); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *10 (S.D. Tex. Apr. 25, 2014) (ecological inference accepted by several courts in Fifth Circuit); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 768 (S.D. Tex. 2013) (ecological inference data probative), *aff'd sub nom. Gonzalez v. Harris Cnty.*, No. 13-20491, 2015 WL 525464 (5th Cir. Feb. 9, 2015); *Jeffers*, 895 F. Supp. 2d at 933-34 (use of three techniques including ecological inference unquestioned by the court). Using this approach, Dr. Rodden once again found rates of ID possession significantly higher for whites than minorities in Virginia. *See* Tr. 529:11-530:14, 533:4-5 (Rodden); PX209 (Rodden Rpt. 25-26).

Last, Dr. Rodden performed an individual-level analysis of Virginia voters' ID possession. PX209 (Rodden Rpt. 28-37). Dr. Rodden explained that this type of analysis has long been used in medical research and is now being applied in political science, sociology, and economics. Tr. 537:12-21. It has also been accepted by courts in voting-rights cases, such as the

recent Texas voter ID case. *Id.*. Yet again, Dr. Rodden found that African Americans and Hispanics are less likely than non-Hispanic whites to possess photo ID. Tr. 541:7-20.

There is no evidence contradicting Dr. Rodden's findings in this case. While Dr. Thornton critiqued Dr. Rodden's report, she performed no comparable studies of her own. Tr. 1790:1-3, 1791:13-15, 1797:20-23. Moreover, Dr. Thornton's critiques of Dr. Rodden's analysis are not credible. For instance, while Dr. Thornton asserted that Dr. Rodden's analysis did not account for every form of acceptable ID, she provided no reason to believe that consideration of these additional forms of ID would reduce, much less eliminate, the disparities in ID possession documented by Dr. Rodden. In fact, because these additional forms of ID are, for the most part, disproportionately possessed by whites, consideration of these less-common forms of ID would likely *increase* the racial disparity in ID possession rates. *See* Tr. 1801:19-1801:23 (Thornton) (not aware of any studies showing that African Americans hold passports disproportionately to whites); Tr. 1805:16-20 (Thornton) (agreeing that African Americans make up a smaller percentage of the military than of Virginia); Tr. 1806:15-17 (Thornton) (Hispanics are underrepresented in the military relative to their share of Virginia's population); Tr. 1810:23-1811:2 (Thornton) (Hispanics less likely to be veterans than Virginians); Tr. 1820:5-9 (Thornton) (African Americans and Latinos less likely to be employed than whites).

Dr. Rodden's findings are also consistent with the data presented by Dr. Lichtman that shows that whites are far more likely than African Americans in Virginia to have the two most common forms of ID—driver's licenses and passports. Tr. 1147:21-1150:12 (Lichtman); PX212 (Lichtman Rpt. 30-32); *see also* PF ¶¶174-76. Likewise, Dr. Rodden's results are consistent with national research on ID possession, including a study relied upon by Defendants, which

explained that whites possess IDs at a higher rate than minorities. *See* DX279; Tr. 1976:4-1977:1 (Owen) (discussing results of study by Hood and Bullock).

Finally, even DOE believes that photo ID laws disproportionately impact "communities of color," Tr. 1499:18-1500:5 (DOE Comm'r), and is focusing its outreach accordingly. Tr. 1477:18-24, 1483:2-11 (DOE Comm'r). DOE is certainly not alone in this understanding. Tr. 375:19-378:24 (McClellan) (concerned about impact on African-American constituents); Tr. 456:16-457:20 (Allen) (low-income and Latino communities faced challenges in obtaining ID); Tr. 678:20-679:15 (Scarborough) (emphasis on outreach to African-American and Latino communities). In short, the evidence overwhelmingly supports the conclusion that African Americans and Latinos in Virginia are less likely than whites to possess qualifying photo IDs.

**2.      The Law Will Disproportionately Suppress Minority Turnout**

The evidence also establishes that minority turnout will be disproportionately suppressed due to the photo ID law. Given that minority voters in Virginia are less likely than whites to possess a qualifying ID, the only way that minority voters would not be disenfranchised at disproportionate rates is if minority voters without ID were to rush to obtain qualifying IDs at a rate drastically different from the rate at which white voters without ID do so. There is no evidence whatever that this is case, and in light of the educational, transportation, income, and other disparities by race detailed in the Proposed Findings, this is patently implausible. Indeed, the small number of free IDs that has been distributed, *see* PX212 (Lichtman Rpt. 35) (4,622 IDs printed or pending as of September 2015), confirms that it is not happening. *See also* PX127 (DOE predicted 4,299 free IDs during the first year of implementation alone).

Further, recent "studies demonstrate[] that voter ID laws suppress voter turnout, especially among minorities." PX215 (Lichtman Reply 29); *see also* PF ¶¶178-79. In particular, the 2014 Survey of the Performance of American Elections found that the percentage of African Americans

who cited lack of ID as a major factor for not voting was more than two-thirds higher than the percentage of whites who did so. Tr. 1185:8-1187:1 (Lichtman); PX215 (Lichtman Reply 13). In a recent study of the impact of Texas's voter ID law, "researchers found that the deterrent effect of the photo ID law disproportionately impacted minorities, in this case Hispanics in Texas." PX215 (Lichtman Reply 12); Tr. 1160:4-1161:11 (Lichtman).

Most significantly, the GAO's comprehensive 2014 study of strict voter ID laws found that such laws disproportionately suppressed turnout for African Americans. DX300 at 61. Specifically, the GAO found that turnout for African Americans declined by 3.7 percentage points as compared to whites in Kansas and 1.5 percentage points as compared to whites in Tennessee. *Id.* There is no reason to believe that the impact of Virginia's law will be any less substantial. Thus, the weight of the evidence firmly supports the conclusion that Virginia's photo ID law will disproportionately suppress the vote of minority voters.

### B.  The Disproportionate Burdens on Minority Voters Are Caused by or Linked to Virginia's History and the Ongoing Effects of Discrimination

The evidence further establishes that the disproportionate burdens on minority voters are at least in part caused by or linked to Virginia's history of discrimination and its ongoing effects. As noted, the Supreme Court has identified nine Senate Factors that inform the "totality of the circumstances" inquiry required by Section 2 and "shed light on whether the two elements of a Section 2 claim are met." *LWV*, 769 F.3d at 240. The Senate Factors are relevant "particularly with regard to the second element." *NAACP*, 768 F.3d at 554; *Veasey v. Abbott*, 796 F.3d at 487, 505 (5th Cir. 2015) ("[T]he Supreme Court has also endorsed factors . . . to apprehend whether [a disparate] impact exists and . . . is a product of current or historical conditions of discrimination."), *rehearing en banc granted*, 2016 WL 929405 (5th Cir. Mar. 9, 2016).

The evidence in this case overwhelmingly demonstrates that Virginia has a lengthy history of discrimination and that nearly all of the Senate Factors are present. The extensive evidence regarding these factors is discussed in great detail in the Proposed Findings, which demonstrate that Virginia has a lengthy and ongoing history of voting-related discrimination that has included the use of various devices to dilute minority voting power; that heavily racially polarized voting persists; that substantial socioeconomic disparities by race that hinder the ability of minorities to participate effectively in the political process persist; that modern-day campaigns in Virginia continue to feature racial appeals; that underrepresentation of minorities in public office persists; and that legislators have been and continue to be unresponsive to the particularized needs of minorities. *See* PF §§ II, III.F & ¶¶229-30. The evidence discussed elsewhere in this brief, as well as Plaintiffs' Proposed Findings of Fact, also shows that the policies allegedly underlying the photo ID law are tenuous.

It is undisputed that Virginia's legacy of official discrimination has had real effects on the ability of African Americans and other racial minorities to realize their full political, social, and economic power. *See* PX212 (Lichtman Rpt. 3-16); PF ¶174; Tr. 1887:24-1888:2 (Palazzolo) (there are lingering consequences of Virginia's history of discrimination); Tr. 1961:13-16 (Owen) (African Americans who grew up in Virginia during Jim Crow have been disadvantaged). There was extensive evidence introduced at trial demonstrating that Virginia's history of discrimination has particular resonance for older African Americans and Latinos whose life experiences have been and continue to be influenced by Virginia's legacy of official racial segregation and discrimination. *See* Tr. 199:25-200:10 (D. Smith) (African Americans currently living in Virginia were affected by Prince Edward County's decision to close its public schools from 1959 to 1964), 203:15-204:22 ("So I think for anybody who . . . is roughly 50 years

or older now, there's a very . . . absolute reality to the system of Jim Crow and to second-class citizenship . . . . I think it's not coincidental that African-Americans today by . . . any study you look at that measures home ownership, that measures, income, that measures employment . . . shows that African-Americans trail whites significantly."); Tr. 142:18-144:18 (B. Smith) (describing how his race has affected his life and noting that he grew up during the era of legal segregation in Fredericksburg which lasted until about 1968); Tr. 440:6-441:10 (B. Lee) (attended segregated schools in Staunton, Virginia and was subjected to racial animosity during childhood); Tr. 471:7-472:4 (Howell) (grew up during legal segregation and experienced incidents of racial discrimination); Tr. 219:1-220:22 (Lopez) (testifying about how his father was discriminated against and how discrimination against Latinos has evolved in Virginia).

The testimony at trial also demonstrated that minorities in Virginia continue to be impacted by racially charged official and political acts. Tr. 220:10-22 (Lopez); Tr. 658:7-21 (Scarborough) (describing a 2007 effort by the Prince William County board of supervisors that effectively would have permitted racial profiling of Latinos through checks on immigration status). In fact, defense expert Dr. Palazzolo acknowledged in his testimony that the presidential campaign of Donald Trump—who recently won Virginia's Republican primary—has been marked by racial appeals, Tr. 1888:14-22; that opposition by most of the members of Virginia's congressional delegation to the 1970, 1974, and 1982 reauthorizations of the VRA was evidence of continued efforts to suppress the vote of African Americans and other minorities, Tr. 1891:21-1892:19; and that he is not aware of any Republican member of Virginia's congressional delegation who, in the wake of *Shelby County v. Holder*, 133 S. Ct. 594 (2012), has expressed support for amending the coverage formula under Section 4 of the VRA, Tr. 1893:19-1894:10.

This overwhelming showing regarding the Senate Factors alone establishes that the disparate burdens resulting from the photo ID law can be traced to social and historical conditions that produce discrimination against minorities. *See NAACP*, 768 F.3d at 554 (Senate Factors relevant "particularly with regard to the second element" of a Section 2 claim); *Veasey*, 796 F.3d at 505. Here, moreover, the connection between Virginia's history of discrimination and the disproportionate nature of the burdens imposed by the photo ID law is self-evident.

As discussed at length in the Proposed Findings, the ongoing effects of Virginia's history of discrimination against minorities include, among other things, significant racial disparities in socioeconomic indicators such as employment, income, education levels, health, vehicle ownership, and ID possession. *See* PF ¶¶42-43; *accord* PX212 (Lichtman Rpt. 3-16). These disparities result directly in the differences in the impact of the photo ID law by race, because the disparities mean, among other things, that minority voters are less likely than white voters to be able to comply with the photo ID requirement. *See* PF ¶44 (lack of economic means diminishes access to some IDs; lower levels of education result in challenges in navigating the confusing photo ID law; obtaining ID is particularly burdensome for disabled individuals; lack of transportation makes it more difficult to obtain an ID and less likely that voter will have driver's license). Thus, the photo ID law's disproportionate burdens on minority voters are directly related to the Commonwealth's history and the ongoing effects of discrimination.

## IV.   SB 1256 Was Intended to Suppress the Vote of Minority, Young, and Democratic Voters and Violates the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments

Legislation enacted with the intent, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth and Fifteenth Amendments. *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality op.); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). *See generally* PF ¶234 & n.7. Legislation intended to

suppress the vote on the basis of age violates the Twenty-Sixth Amendment. *See* PF ¶¶243-45. Similarly, legislation that fences voters out from the franchise based on their partisan affiliation or viewpoint violates the First and Fourteenth Amendments. *See* PF ¶241.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266; *see also Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("[D]iscriminatory intent need not be proved by direct evidence."). Factors courts must consider include the historical background of the decision at issue; the specific sequence of events leading up to the decision; departures from the normal procedural sequence; substantive departures; the legislative or administrative history; and any disparate impact of the law. *See* PF ¶¶235-37. Here, these and other factors strongly point to the conclusion that the photo ID law was enacted by Republican members of the General Assembly to gain a partisan advantage through the disproportionate suppression of the votes of core Democratic constituencies, including African Americans, Latinos, and young voters. *See generally* Tr. 1325:9-16 (Lichtman).

*First*, the evidence shows that the photo ID law disproportionately burdens minority, young, and Democratic voters. The evidence of disparate impact with respect to race is discussed at length above. With respect to young voters, Dr. Rodden performed an individual-level analysis assessing the rate of ID possession by age and determined that young registered voters are less likely than older registered voters in Virginia to possess a DMV-issued, free voter, student, or military ID. Tr. 544:11-547:13 (Rodden); PX209 (Rodden Rpt. 37-39); *see also* PF ¶180; Tr. 703:25-704:15 (Kellom) (young voters disproportionately likely not to have ID).

Democratic voters are also disproportionately burdened by the photo ID law. Examining the relationship between partisanship and rates of photo ID possession at the precinct level, Dr.

Rodden found that voters in highly Democratic precincts lack ID at more than twice the rate of voters in highly Republican precincts. PX209 (Rodden Rpt. 43); Tr. 548:19-549:8 (as Democratic vote share increases so does the rate of no ID possession). These results persisted even as Dr. Rodden employed more conservative tests and looked at elections for different offices. PX209 (Rodden Rpt. 43-44); Tr. 551:25-553:21. Given that African Americans, Latinos, and young voters in Virginia vote overwhelmingly Democratic, *see* Tr. 1055:4-7 (Slutzsky); Tr. 549:20–551:24 (Rodden); (Rodden Rpt. 40-41); Tr. 1104:11-1105:7 (Lichtman), and that these groups are disproportionately burdened by the photo ID law, this result is hardly surprising.

*Second*, the General Assembly knew or should have known that the photo ID law would disproportionately burden minority and young voters. At the time the General Assembly was considering the photo ID bill, its members had access to a wealth of publicly available data which showed "very sharp racial differences between minorities and whites in their possession of the most common forms of ID" such that the legislature could be "reasonably certain" of the discriminatory effects of a photo ID law. Tr. 1147:2–1149:1, 1150:13–1151:25, 1333:13-18 (Lichtman); PF ¶¶70-71. Publicly available data also showed large and statistically significant differences in driver's license possession rates by age: 97.7% of Virginians over 30 have a driver's license, as compared to only 87% of those ages 18-29. PX212 (Lichtman Rpt. 33). During the committee hearings in the House and Senate, moreover, the Advancement Project presented testimony indicating that a voter ID law would discriminate against minority voters, but the legislature did not take action to address these concerns. Tr. 1530:13–1531:14 (DOE Comm'r). And, during the legislative debate regarding SB 1256, minority legislators urged their colleagues to oppose the photo ID law due to its ties to Virginia's history of racial discrimination. PF ¶¶68-69; Tr. 389:2-3390:4 (McClellan) ("I said this on the House floor, any

bill that puts up a barrier . . . that could either keep [someone] from, or make it more difficult, exercising the right to vote, that people, including my family, fought for, and some people have died for, I'm going to do everything in my power to stop it.").

*Third*, the historical background to the law supports a finding of discriminatory intent. In addition to Virginia's lengthy history of discrimination, the photo ID law was enacted amidst a political upheaval in the Commonwealth. Since 1968, Virginia had reliably voted for Republican candidates in presidential elections; the election of Barack Obama in 2008, in which a Democrat—and the nation's first African-American president—won Virginia for the first time since 1964, was a clear break in history. Tr. 1898:6–18 (Palazzolo).

This colossal shift in Virginia's voting pattern, repeated in 2012, was attributable to large demographic changes in the state, most significantly the decrease in the white share of the electorate, the increase in minority participation, and the shift of young voters in favor of Democratic candidates. PF ¶¶46-51; *see also* Tr. 1154:16–19 (Lichtman); PX89(B) at 1 ("Hispanic turnout was significant part of the new voter turnout"; "The Obama folks are reaching out to 16 year olds and they are focusing on these youth in the minority community"; "An estimated 3.5 million fewer white males voted in 2012."). Republicans in Virginia could not possibly "miss the fact that the demography of voting has been cutting against them, and that they could reap significant political benefits by limiting the voting of minorities, particularly the voting of African-Americans relative to whites." Tr. 1105:1-5 (Lichtman).

*Fourth*, the sequence of events leading up to the enactment of the photo ID law points to discriminatory intent. In an extremely unusual move, the General Assembly passed the photo ID bill at issue *less than a year* after it passed a major, but materially different, voter ID law. Tr. 316:25-317:16 (Surovell) (In six years in the legislature, "it is hard for me to think of an example

or situations where we have done that kind of major surgery on an area of the code, or a public policy thing, two years in a row like that."). *See generally* PX024; PX030; PX167; Tr. 1615:8-14 (Palmer). No other state has enacted a voter ID law and then replaced it with a fundamentally different ID law in less than a year. Tr. 1135:24-1136:8 (Lichtman). And this shift is all the more notable given that there were no General Assembly elections (aside from special elections) between the passage of the 2012 voter ID bill and SB 1256. *See* PX208 (Smith Rpt. 60) ("Quite literally, the very same legislators who, one year earlier had expanded the list of acceptable forms of identification as they simultaneously eliminated the sworn statement, now eliminated many of the same forms of identification adopted in 2012."); *see also* Tr. 317:17-24 (Surovell).

That is not to say that there were no significant, potentially explanatory events between the passage of the two laws. On the contrary, the introduction of SB 1256 (and other proposed photo ID legislation) followed closely on the heels of President Obama's re-election in 2012. It also occurred not long after the Supreme Court granted certiorari in *Shelby County v. Holder*, 133 S. Ct. 594 (Nov. 9, 2012), which gave rise to "a lot of anticipation that the *Shelby* decision, as it did, was in fact going to…invalidate the preclearance provision of the Voting Rights Act." Tr. 1347:19-22 (Lichtman); *see also* PX129, PX130 at 1 ("There is some thought that Section 5 of the Civil Rights Act of 1964 will not stand after the USSC rules [] on the matter this June"); Tr. 1531:15-20 (Cortes) (the 2013 law was passed so soon after the 2012 law because Republicans were pushing for stricter voting laws due to *Shelby County*); Tr. 379:22-380:2 (McClellan) (the timing of the 2013 law was related to *Shelby County*).

*Fifth*, the processes relating to the enactment of the photo ID law and related regulations were notable for a few reasons. In particular, prior to the enactment of the 2012 voter ID law, Governor McDonnell made a point of meeting with members of the Black Caucus, listening to

concerns they had raised about the bill, and proposing amendments to address those concerns. Tr. 374:3-375:15 (McClellan); Tr. 1637:12-1638:6 (Palmer); *see also* PF ¶¶53, 55-56; PX105; PX167. No evidence was presented indicating that such outreach to the Black Caucus occurred prior to the enactment—again, just months later—of SB 1256. Further, the process related to the SBE's adoption of regulations regarding what constituted "valid" photo identification was highly unusual and directly influenced by the intervention of the photo ID law's patron. PF ¶¶70-85. Initially, SBE members Charles Judd and Kimberly Bowers requested that SBE staff draft regulations stating that expired ID was acceptable, Tr. 931:4-21 (McClees); PX140, and on June 10, 2014, the SBE passed a regulation indicating that expiration date was not to be considered in determining the validity of the ID. PX039; PX144. Shortly thereafter, however, Republican State Senator Mark Obenshain contacted the SBE to object to this rule, ultimately resulting in a vote by the SBE's two Republican members to adopt a revised regulation interpreting "valid" ID to mean, for IDs that include expiration dates, an ID that was unexpired or expired for no more than 12 months. Tr. 1135:1-12 (Lichtman); PX036; PX038; PX060; PX133; PX147; PX149; PX151; PX152; Tr. 932:25-933:3, 933:15-19 (McClees).

*Sixth*, there were significant "substantive departures" in the adoption and implementation of the photo ID law. For instance, while the photo ID law was enacted in early 2013 with the purported goal of combating fraud, both the Governor's Office and the Republican-controlled SBE viewed the implementation of the 2012 voter ID law during the 2012 election—the election that immediately preceded the adoption of the photo ID bill—as a great success, and the SBE was not aware of any prosecutions in which the forms of identification that were being eliminated by the photo ID law were used to commit fraud. Tr. 1646:4-6 (Palmer); PF ¶57, PX031; PX068; PX113, PX116 at 1; PX119 ("Virginia's system as currently constructed has

strong safeguards against any voter fraud."); PX123; Tr. 1655:18-1656:3 (Palmer). In addition, and as discussed above, while significant resources were devoted to outreach in connection with the 2012 voter ID law, far less money was spent on outreach in connection with the more-restrictive photo ID law. *Compare* PX180 at 10, *with* PX050.

The Republican-controlled SBE's regulation regarding the meaning of a "valid" ID involved not only a substantive departure but a *direct reversal* of policy. This occurred even though, in both the letter he sent to the SBE on June 16, 2014, and his communications with the Republican members of the SBE, Senator Obenshain did not offer any substantive policy argument for why expired ID should not be accepted. PX132; Tr. 1671:16-24, 1675:25-1676:25 (Palmer). Instead, Senator Obenshain and the other Republican legislators who contacted the SBE opposed the new regulation "[w]hether or not the new Rule can be justified on policy grounds." PX132 at 2; *see also* PX110 at 2; PX111; Tr. 1670:24-1671:4 (Palmer). In contrast, the Democrats who contacted the SBE gave concrete policy reasons, including the expected burden on voters, for their opposition to any change. Tr. 1672:12-14, 1672:22-1673:3 (Palmer). The SBE did not investigate these potential burdens before changing the regulation, Tr. 1672:22-1673:8 (Palmer), though DOE had determined that an expiration date would make the voter check-in process more difficult for election officials to administer and that an expiration date was not necessary to confirm a voter's identity, Tr. 1534:25-1535:25 (DOE Comm'r), and then-SBE Chairman Charles Judd—despite voting for the 12-month expiration date—did not think expiration date was related to the goal of identifying a voter. PX225 (Judd Dep. 157:8-9).

This episode is highly probative of the intent of Senator Obenshain with respect to SB 1256 (of which he was the patron). Why, despite the absence of any policy justification, did Senator Obenshain undertake such extraordinary efforts to persuade the SBE to limit the use of

expired photo IDs? The only plausible answer is that he sought to make it more difficult for certain voters to comply with the photo ID requirement.

*Seventh*, SB 1256 was passed largely along party lines. PX031; PF ¶73. In the Senate, no Democrat voted for the bill in committee or on the Floor. PF ¶73. And no African-American or Latino legislator voted for the bill. Tr. 380:18-21 (McClellan); Tr. 1965:22–25 (Owen).

*Eighth*, emails between activists and Republican members of Congress and the General Assembly and SBE show that the push for a photo ID law was motivated at least in part by a desire to achieve electoral gains for Republicans. *See, e.g.*, PX080 ("without photo ID none of you will win another election and the November 2012 elections will be landslide victories for the liberals"); PX089(B) (Republican Congressman outlines "Work Plan for voter ID" to "[e]nsure continued Republican governance in the Virginia House of Delegates"); PX114 at 3 ("I look [forward] to discussing the way ahead so we- the Republicans - don't get outflanked again!"); PX165 (If the attorney general were to open an investigation into student double voting, "the propaganda value would be invaluable and would thwart the Dems when they start trying to recruit new students in September."). Defendants' own expert acknowledged that one of the potential explanations for the photo ID law was the influence of partisan activist groups on the General Assembly. Tr. 1870:24-1871:10 (Palazzolo).

Taken together, these factors provide powerful support for Dr. Lichtman's conclusion that the photo ID law was enacted for partisan gain through the suppression of minority and youth voting. *See* Tr. 1325:12-16; PX212 (Lichtman Rpt. 67-68). The Court should find that the photo ID law violates the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments.

## V.  Plaintiffs Have Standing

Plaintiffs have standing to litigate these issues. As set forth in detail in other filings in this case, a plaintiff has standing if he has or will suffer a concrete injury that is actual or imminent,

fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision; an organization has standing when it must divert resources from its usual activities to lessen the harm caused by an act that causes injury to the organization's mission or members; an organization may bring suit either on its own behalf or on behalf of its members or constituents; and, where injunctive relief is sought, only one plaintiff with standing is required. *See* PF ¶¶250-51, 254-57, 259-61, 263; *see also* Opp. to Mot. to Dismiss (ECF No. 60); Mot. for Recons. (ECF No. 123); Order Granting Mot. to Reinstate Counts IV and V (ECF No. 136).

Here, the evidence shows that DPVA's key constituencies include African-American, Hispanic, and young voters. PX209 (Rodden Rpt. 40); Tr. 1055:4-7 (Slutzky), and that it is precisely these voters who are most burdened by the photo ID law (as discussed above and in PF § V.B.3). The DPVA has had to and will continue to divert its resources by engaging in voter education about the photo ID law, contacting voters without DMV-issued ID to inform them about the law and its requirements, providing transport for voters to registrars' offices to apply for free IDs, conducting training for Democratic activists regarding the photo ID law, and hiring a full-time voter-protection director in part due to the photo ID law. Tr. 1056:21-1057:24 (Slutzky); Tr. 622:25-623:18, 630:13-5 (Zando); Tr. 648:10-649:10, 654:11-24 (Woodson); Tr. 458:9-20, 459:8-460:19 (Allen). This has been and will be costly to the DPVA, because the time, effort, money, and resources that it has used and will use for these purposes otherwise would have been spent on efforts to mobilize voters to vote for DPVA's candidates. Tr. 461:17-23 (Allen); Tr. 629:9-21, 632:11-25 (Zando); Tr. 649:11-16, 652:22-24, 654:11-22 (Woodson); Tr. 1058:15-1059:10, 1060:2-18, 1061:14-18 (Slutzky). Numerous other Democratic activists and officeholders also testified about the time and effort they have expended as a result of the photo ID law. *E.g.*, Tr. 92:21-24, 95:12-16, 99:15-100:2 (Tidd); Tr. 228:8-19 (Lopez); Tr. 309:24-

310:9 (Surovell); Tr. 395:13-396:8 (McClellan). And, DPVA members testified about harms they suffered as a result of the photo ID law. *E.g.*, Tr. 70:8-80:19, 82:1-83:9 (Cotton); Tr. 113:22-114:1, 114:5-115:1 (Lamb); PX220 (Benagh Dep. 18:20-19:1, 39:10-40:2).

Plaintiffs Barbara Lee and Gonzalo Aida Brescia ("Aida") have standing as well. Lee explained in her testimony that, as a Democratic activist, the photo ID law has harmed her registration and get-out-the-vote ("GOTV") activities; that, instead of being able simply to register voters, she must now educate them about the photo ID law and assist them in obtaining a qualifying photo ID if necessary; that the photo ID law has affected her efforts to register and turn out minority and low-income voters because these voters face many barriers that prevent them from being able to comply with the photo ID law; and that the photo ID law will continue to affect Lee's voter registration efforts in the lead up to the 2016 election. Tr. 432:6-434:1, 435:23-25, 442:12-20. Aida testified that he has engaged and in the future plans to engage in registration and GOTV activities; that these efforts have become more challenging because young voters and Hispanics voters face unique barriers when attempting to comply with the photo ID law; that he has diverted and will divert his time and resources from advocating for issues important to young Democrats to educating voters about the photo ID law; and that he has spent almost $100 ensuring that his DMV issued photo ID is valid so that he does not risk being turned away due to poll worker error. Tr. 711:10-719:6, 719:21-722:25, 725:19-726:3, 726:10-727:12, 729:7-729:19, 730:14-731:7.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court declare Virginia's photo ID law, SB 1256, to be in violation of the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the United States Constitution and Section 2 of the Voting Rights Act, and to permanently enjoin enforcement of the law.

DATED: March 25, 2016

By: */s/ Aria C. Branch*
 Marc Erik Elias (admitted *pro hac vice*)
 Bruce V. Spiva (admitted *pro hac vice*)
 Elisabeth C. Frost (admitted *pro hac vice*)
 Aria Branch (VSB # 83682)
 Amanda R. Callais (VSB # 85891)
 Ceridwen Cherry (admitted *pro hac vice*)
 **PERKINS COIE** LLP
 700 Thirteenth Street, N.W., Suite 600
 Washington, D.C. 20005-3960
 Telephone: 202.434.1627
 Facsimile: 202.654.9106
 Email: MElias@perkinscoie.com
 Email: BSpiva@perkinscoie.com
 Email: EFrost@perkinscoie.com
 Email: ABranch@perkinscoie.com
 Email: ACallais@perkinscoie.com
 Email: CCherry@perkinscoie.com


 Joshua L. Kaul (admitted *pro hac vice*)
 **PERKINS COIE** LLP
 1 East Main Street, Suite 201
 Madison, WI 53703-5118
 Telephone: 608.663.7460
 Facsimile: 608.283.1007
 Email: JKaul@perkinscoie.com

 *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

On March 25, 2016, I will electronically file the foregoing with the Clerk of Court using

the CM/ECF system, which will then send a notification of such filing to the following:

Dana J. Finberg
Sara Schneider
ARENT FOX LLP
55 Second Street, 21st Floor
San Francisco, CA 94105
Tel: 415.757.5500
Fax: 415.757.5501
dana.finberg@arentfox.com
sara.schneider@arentfox.com

Mark F. (Thor) Hearne, II
Stephen S. Davis
ARENT FOX LLP
112 S. Hanley Road, Suite 200
Clayton, MO 63105
Tel: 314.296.4000
thornet@ix.netcom.com
stephen.davis@arentfox.com

Kirsten A. Hart
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Tel: 213.629.7400
Fax: 213.629.7401
kirsten.hart@arentfox.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
Aria C. Branch (VSB # 83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
ABranch@perkinscoie.com

*Attorney for Plaintiffs*

- 42 -