IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| BARBARA LEE, *et al.*,<br><br>     Plaintiff,<br><br><br>v.<br><br>VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,<br><br>     Defendants. | No. 3:15CV357 HEH |

---

## DEFENDANTS' POST-TRIAL BRIEF

---

**ARENT FOX, LLP**

Mark F. (Thor) Hearne, II
(admitted *pro hac vice*)
112 S. Hanley Road, Suite 200
Clayton, MO 63105
Tel: 314.296.4000
Facsimile: 202.857.6395
Email: thornet@ix.netcom.com

Dana J. Finberg (VSB # 34977)
55 Second Street, 21st Floor
San Francisco, CA 94105
Telephone: 415.757.5500
Facsimile: 415.757.5501
Email: danafinberg@arentfox.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

THE FACTUAL RECORD ..........................................................................................3

I.     Virginia Voter ID Requirements Prior To The 2013 Law. ...................3

II.    Virginia's 2013 Voter ID Law – SB 1256 ...........................................4

III.   Virginia Implemented The 2013 Law With A Focus On Mitigating Obstacles To Voting That Arose In Other States With Voter ID Requirements. ......................................................................................8

      A.    The Board and local election officials made sure every eligible voter without acceptable ID could get a free ID .......................9

      B.    The Department trained general registrars and local electoral board members on the 2013 law and the provisional ballot process. ................10

      C.    The Department Engaged Impacted Groups in the Implementation. .......11

      D.    The Department maximized outreach resources to educate Virginia voters. ..................................................................................12

      E.    The Board adopted regulations allowing expired photo-IDs to be used .........................................................................................16

      F.    ID-only provisional ballots cast in 2014 and 2015 elections were *de minimis* ...............................................................................17

IV.   The Plaintiffs' Evidence Does Not Support Their Challenge to the 2013 Law. ......................................................................................................17

      A.    The "affected voters." ...............................................................17

     B.    The plaintiffs' two social science theories. .........................................19

LEGAL ANALYSIS ...................................................................................................28

I.     Virginia's 2013 Voter ID Law Does Not Violate The Fourteenth Amendment. ......................................................................................29

      A.    Virginia's 2013 voter ID law is reviewed under the *Anderson-Burdick* rational basis standard .............................................29

      B.    Virginia had many compelling and legitimate reasons to adopt the 2013 law. ..................................................................................30

      C.    Virginia's 2013 voter ID law does not deny *any* eligible Virginia voter opportunity to vote in Virginia elections .......................................33

      D.    Virginia's 2013 photo-ID law is not racially discriminatory by design or by effect. ...................................................................34

# TABLE OF CONTENTS
(continued)

**Page**

II.     Virginia's 2013 Voter ID Law Does Not Violate Section 2 Of The Voting Rights Act. ....................................................................................................36

III.    The Twenty-Sixth Amendment Challenge. .........................................................39

CONCLUSION .............................................................................................................40

## INTRODUCTION

Two individual political operatives, Barbara H. Lee (Lee) and Gonzalo J. Aida Brescia (Aida), and the Democratic Party of Virginia (DPVA) sued the Virginia State Board of Elections (the Board or BOE) and the Virginia Department of Elections (the Department), as well as the members of the BOE and the Commissioner of the Department in their official capacities. Plaintiffs claim the voter ID law Virginia adopted in 2013: (1) violates Section 2 of the Voting Rights Act;[1] (2) violates the First Amendment and Equal Protection Clause of the Fourteenth Amendment due to "disparate treatment of individuals without a rational basis;" (3) is unconstitutional "partisan fencing;" (4) is "intentional discrimination" by the Virginia General Assembly "abridg[ing] and deny[ing] the right to vote for African Americans and Latinos on account of race;" and (5) constitutes "intentional discrimination on the basis of age" that "abridge[s] and den[ies] the right to vote for young voters on the account of age" violating the Twenty-sixth Amendment.[2] Counts Four and Five allege "the General Assembly…intended, at least in part, to suppress the number of votes cast by African Americans and Latinos" and "the General Assembly intended…to suppress the number of votes cast by young voters."[3]

During an almost two-week trial, plaintiffs presented twenty-eight witnesses, including four expert witnesses. Plaintiffs were given considerable latitude in the presentation of their case, which included being allowed to present cumulative – and often irrelevant – testimony from a number of fact witnesses who claimed to be voters affected by the challenged Virginia

---

[1] Voting Rights Act of 1965, §4(a), 79 Stat. 438. The Voting Rights Act was previously codified as 42 U. S. C. §1973 et. seq., but has been re-codified as 52 U.SC. §10301, *et. seq.*

[2] Amended Compl., D.I. 36, pp. 33-38.

[3] Amended Compl., D.I. 36, p. 36 ¶ 119, p. 37 ¶ 124.

statutes.  Defendants presented the testimony of nine witnesses, including four expert witnesses

and Virginia election officials.

The Court is familiar with the procedural history of the case.[4]  Following discovery,

Defendants asked this Court to enter partial summary judgment against the DPVA on the ground

that it lacks associational standing.  This Court reserved ruling on summary judgment until after

trial.[5]  During trial there was additional testimony concerning the DPVA's lack of standing.[6]

The Court should find that the DPVA lacks standing to bring claims on behalf of voters

allegedly burdened by the 2013 law and Defendants' motion for partial summary judgment

---

[4] *See* D.I. 72, pp. 3-5 .

[5] Order, D.I. 150.

[6] The DPVA serves two roles: getting Democrats elected to office and supporting Democrats
once they are in office.  Tr. 1070:1-7.  The Party Plan states "[e]very resident of the
Commonwealth of Virginia who believes in the principles of the Democratic Party is hereby
declared to be a member of the Democratic Party of Virginia."  *See* DX448 (at DX448.006)
(emphasis added).  The testimony of the DPVA's Executive Director, Rebecca Slutzky,
established that the DPVA is not a traditional membership organization – and does not possess
the indicia of such an organization – because it:  (1) has no application process for membership
(Tr. 1065:19-21); (2) does not charge dues for membership (*Id*. 1065:22-1066:2); (3) does not
issue membership cards or otherwise notify residents of the Commonwealth that they have been
"declared" to be members (*Id*. 1066:4-19); and (4) maintains no list of its membership (*Id*.
1067:7-1068:4).  Moreover, the DPVA's "membership" contains individuals who support
Republican or third-party candidates as well as those supporting the voter ID law the Party is
challenging.  *Id*. 1068:13-1069:3.

Virginia Democrat Senator Scott Surovell testified, during his redirect examination by
plaintiffs' counsel, that "the Democratic Party really doesn't have members."  Tr. 360:8-10.
When asked if he considered himself to be a member Senator Surovell responded: "I consider
myself to be a Democrat.  You don't like pay dues and become a member of the party.  That's
not how it works."  *Id*. 360:14-17.  Senator Surovell conducted a constituent survey of between
400 and 600 of the constituents in his delegate district, and found support for voter ID laws "[i]t
was either an even split, or a slight majority in favor of ID."  Tr. 359:6-360:4.

The Party has further failed to identify any specific harm, monetary or otherwise, it has
suffered as a result of the 2013 law.  *See* Slutzky's testimony, Tr. 1073:9-11 and 1074:11-22.
(Admitting it was not possible to quantify any specific amount of money the party spent due to
the 2013 law.)  And she acknowledged the Party's voter outreach and voter registration efforts
have always involved an educational component.  Tr. 1075:20-1076:2.

2

should be granted.  Moreover, and regardless of how it rules on Defendants' motion, the Court should find plaintiffs have failed to establish the elements of any of the remaining causes of action and enter judgment in favor of defendants on all remaining counts in the Amended Complaint.

## THE FACTUAL RECORD

### I.      Virginia Voter ID Requirements Prior To The 2013 Law.

In 1996 Virginia adopted a law requiring persons to present identification before casting a ballot. Virginia required a person to validate their identity but also allowed a person to cast a normal (as opposed to provisional) ballot without providing any form of identification if the person signed a form affirming their identity.[7]

In the aftermath of the 2000 Presidential election -- which was determined by several hundred votes cast in Florida and was not decided until the Supreme Court ended the post-election recount and litigation with its decision *Bush v. Gore*, 531 U.S. 98 (2000) – there was national interest in how States administered elections.  This, in turn, motivated Congress to adopt the Help America Vote Act of 2002 (HAVA) with broad bipartisan support.[8]  HAVA requires persons who register by mail to provide photo-ID or non-photo-ID (a current utility bill, bank statement, or government check) that contains the voter's name and address.  HAVA applies only to federal elections.  Virginia adopted the HAVA requirements.

After Virginia implemented the HAVA-ID requirements, a number of legislators introduced measures proposing to amend Virginia's voter ID requirements.  One of these measures, SB 1, passed the General Assembly and was signed into law by Governor McDonnell.

---

[7] The relevant text of Virginia's 1996, 2012, and 2013 voter ID laws is reprinted in Exhibit A.

[8] HAVA is discussed more fully in our Proposed Findings of Facts and Conclusions of Law (D.I. 172) pp. 24-27.

SB 1 (the 2012 law) eliminated the ability to cast a regular ballot using an affirmation of identity and required certain forms of photo and non-photo ID to cast a regular ballot.  *See* Va. Code §24.2-643 (2012) (Exhibit A, p. 2).  The 2012 law allowed a non-photo voter registration card to be used for identification.  The 2012 law contained no provision for a free photo-ID.  An individual without one of the designated forms of ID was given a provisional ballot that would be counted if the voter provided acceptable ID before noon the Friday following Election Day. The 2012 voter ID law was submitted to the Justice Department for preclearance under Section 5 of the Voting Rights Act.  Attorney General Holder precleared Virginia's 2012 law.  *See* Tr. 1345:7-9 (testimony of Dr. Lichtman).

## II.     Virginia's 2013 Voter ID Law – SB 1256.

The 2012 law presented some concerns.  Because the 2012 law allowed a non-photo voter registration card to be used for identification, it was still possible for voter registration fraud to turn into actual fraud at the ballot box.  A person could submit voter registration forms by mail (which does not require any form of identification) and a non-photo registration card in the name of the registrant would be mailed to the address on the registration form.  *See* Tr. 1652:6-22, 1577:6-16 (testimony of Justin Riemer).  This non-photo registration card could then be used to cast a regular ballot.  *Id.*; *see also* Va. Code 24.2-643(B) (2012) (Exhibit A, p. 2).  The use of the non-photo voter registration card also raised concerns because it was not one of the specified forms of HAVA-ID.  Consequently, election officials needed to maintain two separate lists of voter identification requirements, one for voters needing to show HAVA-ID and one for non-HAVA voters in state elections.  Tr. 1557:19-22, 24-25, 1558:1-5 (testimony of Justin Riemer); 1611:23-25, 1612:1-11 (testimony of Don Palmer).

In the days before the 2012 general election, an undercover video captured Patrick Moran – Virginia Congressman Jim Moran's relative – discussing how non-photo utility bills and bank

statements could be used as identification to cast fraudulent ballots. Tr. 1613:12-25, 1614:1 (testimony of Don Palmer); Minnite rebuttal report, PX213 at PX213-020; Lichtman rebuttal report, PX215 at PX215-005, n.5. There was no evidence that anyone fraudulently cast ballots using these forms of non-photo ID. But, as former Election Board Supervisor Don Palmer testified, the Commonwealth Attorney found the prosecution of so-called "in-person impersonation" vote fraud difficult because Virginia does not require a person casting a ballot to sign a poll register. Tr. 1632:9-21, 1682:15-25, 1683:1-7. During the period leading up to the 2012 election, there were also numerous newspaper accounts of vote fraud, illegal voting by convicted felons and reports of voter registration cards being left in dumpsters and apartment building hallways. Id. at 1562:12-22, 1575:25, 1576:1-5, 1597:11-24, 1602:18-23 (testimony of Justin Riemer), 1613:5-25, 1614:1-11, 1634:24-25, 1635:1-4 (testimony of Don Palmer). Public opinion strongly supported the adoption of photo-ID laws as a requirement to vote and there was correspondingly strong public belief that vote fraud existed and corrupted the election process. DX277; DX278; Tr. 1922:11-25, 1923:1, 15-25, 1924:1-2, 1925:6-13, 1926:7-24 (testimony of Dr. Owen).

Senate Bill 1256 was introduced in January 2013. This bill (which became the 2013 law) increased the number of acceptable forms of IDs and required state and local election officials to provide free photo-ID cards to anyone lacking the required forms of ID. The 2013 law contained no requirement that a person provide any underlying documents – such as a birth certificate – verifying their identity to receive the free voter photo-ID.[9] *See* Va. Code §24.2-643 (2013)

---

[9] Delegate Bell proposed a much stricter voter ID bill in the same session. Delegate Bell's bill, HB 1787, would have only allowed certain forms of Virginia DMV-issued photo-ID and made no provision for free photo-ID. Tr. 1566:7-25, 1567:1-11.

(Exhibit A p. 4).   The 2013 law also eliminated non-photo IDs (particularly voter registration cards and concealed-carry permits) from the list of acceptable ID.

After SB 1256 was introduced Governor McDonnell hosted a dinner with the Virginia Black Caucus.   Delegate McClellan told Governor McDonnell she had concerns about some of the provisions in the various voter ID proposals pending in the General Assembly.   Tr. 374:3-25, 375:1-15; 391:14-25, 392:1.   In response to these concerns, Governor McDonnell proposed several changes to the 2012 legislation to make the ID requirements more lenient, such as not requiring a birth certificate to obtain some of the forms of ID required.   *Id.* at 392:2-8.   SB 1256 was enacted in 2013 and became law on July 1, 2014.[10]

When it drafted the 2013 law, Virginia's General Assembly considered, among other things, the South Carolina and Georgia voter ID laws that had been reviewed and precleared under Section 5 of the Voting Rights Act.[11]   Tr. 1680:10-14 (testimony of Don Palmer), 1605:15-19 (testimony of Justin Riemer).   The 2013 law was drafted with the expectation it was subject to preclearance review by the Justice Department under then Attorney General Holder.   Tr. 1686:12-18 (testimony of Don Palmer).

Don Palmer (who at the time headed what is now the Department) and his former deputy, Justin Riemer, testified that preventing vote fraud was one of the reasons for the 2013 law. During legislative debate Senator Garrett, who was formerly a Commonwealth attorney, told of his personal prosecutions of voter fraud.   Tr. 1561:24-25, 1562:1-5.

Palmer testified that a match of those voting in Virginia and those voting in other states found numerous instances of multiple voting.   Tr. 1631:2-22, 1682:3-14.   This meant that either

---

[10] SB 1256 (the 2013 law) is codified at Va. Code §24.2-643 and the relevant text is included in Exhibit A, p. 4.

[11] Tr. 1650:16-23 (South Carolina); PX22 (Tr. of legislative debates) at PX22-020, PX22-021 (Georgia).

the same person voted twice – once in Virginia and once in another state – or that a person fraudulently voted in Virginia in the name of a person who had moved from Virginia to another state. The Board referred this matter to the Attorney General's office, which along with the Virginia State Police, investigated. Tr. 1682:3-14. The state police told the Board that prosecution was not possible because Virginia does not capture a voter's signature at the polling place, and signature matches are often necessary in order to prosecute voter fraud. *Id.* at Tr. 1682:19-25 ("Virginia doesn't require an individual when they come to the polls to sign [ ] a register….[s]o [the State Police] decided not to prosecute…."); Tr. 1683:1-7. There is no statement by any member of Virginia's General Assembly that the intent or design of the 2013 law was to burden the opportunity of any eligible Virginia voter to participate in Virginia elections. Nor is there any statement by any member of Virginia's General Assembly even intimating that the 2013 law was adopted to burden the opportunity of minorities to participate in Virginia elections.[12]

The General Assembly also considered the recommendations of the bi-partisan Carter-Baker Commission on Federal Election Reform. Tr. 1615:15-20 (testimony of Don Palmer). The Carter-Baker Commission recommended states to adopt photo-ID laws to prevent vote fraud and restore public confidence in the election process. *Id.* at 1616:3-21; 1617:20-25, 1618:1-5. The Supreme Court found the Carter-Baker Commission's report and recommendations authoritative. *Crawford v. Marion County*, 553 U.S. 181, 237-38 (2008).

---

[12] Palmer also testified he knew of no racial motive in enacting or implementing the photo-ID requirement; nor was he aware of any attempt to prevent minority groups from voting. *Id.* at 1687:20-25, 1688:1-7. This was supported by the testimony of Dr. Owen, who was asked, "did you encounter any evidence that the Virginia General Assembly adopted Virginia's voter identification law to achieve the racist intent of disenfranchising African-Americans?" Owen answered, "No, I did not." Tr. 2009:23 - 2010: 2.

The General Assembly delayed implementing the photo-ID requirement until the following year so voters would learn of the photo-ID requirement and anyone without the requisite ID could get a free ID. In addition to in-person voting at a polling place, Virginia law also provides for mail-in absentee voting, which does not require photo-ID.

### III. Virginia Implemented The 2013 Law With A Focus On Mitigating Obstacles To Voting That Arose In Other States With Voter ID Requirements.

Democratic Governor McAuliffe appointed Edgardo Cortes Commissioner of the Department of Elections to be Virginia's "Chief state election official." Tr. 1443:8-15 and 1439:16-1440:3.[13] Commissioner Cortes did not support the 2013 law because based on his prior background and experience, he had concerns about the potential disparate impact of the law on minority communities. Tr. 1499:18-1500:5. But, as Virginia's chief election official Cortes was responsible for implementation of the 2013 law. He testified that his view of the 2013 law "absolutely" influenced the way he implemented the 2013 law once he was Commissioner:

> The law that was passed left a lot of administrative discretion as to how the law would be implemented…. [M]y focus was wherever possible to make the law, or the implementation of the law, the least burdensome possible on voters. So we focused on trying to address or mitigate the issues that had come up in other states that had resulted in voters not being able to participate because of stricter voter ID laws."

*Id.* at 1500:11-18; *see also* 1446:4-9.

---

[13] Commissioner Cortes has extensive experience in election administration. He was the general registrar for Virginia's largest locality, Fairfax County; conducting voter outreach for Congressional campaigns; administering HAVA grant funding at the United States Election Administration Commission; voter registration among Puerto Rican and Latino communities at the Puerto Rico Federal Affairs; and consulted for left-leaning organizations at Grassroots Solutions. Commissioner Cortes was an advocate for the Advancement Project which is a non-profit dedicated to racial justice and voting rights. *Id.* at 1431:4-1438:15.

A.  **The Board and local election officials made sure every eligible voter without acceptable ID could get a free ID.**

Commissioner Cortes and the Department developed a plan, regulations, and guidance that minimized any burden associated with the 2013 law's voter ID requirement.  Tr. 1446:4-9.  To that end, the Department streamlined the application process for the free voter IDs.  Importantly, unlike in other states such as Indiana, the Virginia regulations does *not* require voters to present documentation validating their identity.  *Id.* at 1447:2-8.  The underlying documentation requirements had been one of the "biggest obstacles" for voters in other states with stricter ID requirements, including in Indiana.  Instead, pursuant to Virginia's regulations, to obtain a free voter ID, a voter need only provide their name, address, birthdate and social security number and sign a form attesting that the information provided is true and correct.  *Id.* at 1450:8-20; 1463:25-2464:6; 1464:22-25; PX155 at PX155-012.   Likewise, the Department designed the free voter ID card to include only information necessary to verify identity.  By excluding extraneous information, such as address and expiration date, the Department ensured that voters would not have to regularly reapply for the card.  Tr. 1467:2-20; DX041.

The Department made the free voter ID easily accessible.  By way of example: (1) free IDs are available even after Election Day and can be used to cure a provisional ballot;[14] (2) voters can apply for a free voter ID at any general registrar's office;[15] (3) mobile units issue free IDs outside of the general registrar's office ; (4) persons registering to vote may apply for a free

---

[14] To avoid imposing a deadline for applying for the free voter ID, the regulations required general registrars to issue a temporary voter ID to any voters who applied within approximately three weeks of the election.  Tr. 1448:1-8; 1455:17-1456:14.  Voters who appear at the polls without an acceptable form of ID also have the opportunity to obtain a temporary ID before the deadline for curing provisional ballots (noon on the Friday immediately following the election).

[15] Pursuant to Virginia code, general registrars' offices all must be open five days a week in the months leading up to the election and the two Saturdays before the election.  Tr. 1451:19-1452:7.  In the three days following the election, voters must go to their local general registrar to ensure that their provisional ballots are cured.  *Id.* at 1450:22-1451:6.

voter ID at the same time; (5) voters who are in the DMV database, but have lost their license, may still obtain a free voter ID; and (6) voters obtain a new free voter ID if they lost theirs.  Tr. 1458:2-13; 1456:18-1457:5; PX155 at PX0155-007-8.   The temporary IDs were particularly important from Commissioner Cortes' perspective because he "did not want any delay at the department in terms of either production or mailing of the ID card to place an obstacle for voters in being able to case the ballot for the election."  *Id.* at 1501:5-10.[16].   Additionally, Fairfax County provides these instructions in both Spanish and English.  Tr. 1717:11-19.

### B.    The Department trained general registrars and local electoral board members on the 2013 law and the provisional ballot process.[17]

The Department trained and provided guidance to the general registrars and local electoral board members on the implementation of the 2013 law, including the forms of acceptable ID and the provisional balloting process.  In turn, the general registrars and local electoral board members were responsible for training the election officers who operate the polls on election day.  Tr. 1471:5-14; 943:16-944:2.

The Department updated relevant guidance materials, including the General Registrar Handbook and the "What-If Guide" that the Department provides to general registrars for reference and training purposes.  Tr. 938:9-22.  The Handbook provides a detailed explanation of voting laws and procedures for general registrars, and the "What-If Guide" instructs election officers how to handle issues that may arise at the polls on election day.  *Id.* at 940:5-24; 945: 2-946:4; 1472:15-21; DX404 at DX404.490; DX069-A at DX069-A.013.   Importantly, both

---

[16] Further, the Department developed in-house a cost-effective and easy-to-use system for the production of the free voter IDs.  This system is integrated with the state-wide voter registration system, so that local general registrars' offices can verify the identity of those who apply.  Tr. 1468:5-1469:14; 1011:9-1013:10.

[17] The statutory responsibilities of the Board, Department, local election boards and Officers of Election are explained in our earlier briefing.  *See* D.I. See D.I. 172 ¶¶14-22.

provide instructions on the provisional balloting process for voters without ID.  Each voter who appears at the polls without an ID should be given: (1) an ID only provisional ballot with a lime green envelope (as opposed to the darker green general provisional ballot envelope); and (2) a provisional ballot notice of identification. *Id.*  The provisional ballot notice of identification informs a voter that he or she is voting provisionally due to lack of ID and that he or she has until noon on the Friday following the election to submit via email, fax, mail or hand delivery a copy of his or her ID in order to have his or her provisional ballot counted. *Id.* at 946:7-20.  The current version further informs the voter that he or she may obtain a free voter ID at their local general registrar's office. *Id.* at 946:21-24.

Localities – namely the general registrar (or a designated staff member) and at least one member of the local electoral board – are required to attend annual training provided by the Department.  Tr. 1443:3-12.  This included training on the 2013 law and use of the software and equipment for processing free voter ID applications. *Id.* at 1013:11-22.  In addition to the annual mandatory training, in May 2014 (prior to implementation) the Department conducted "a number of regional trainings to explain to registrars how to utilize the free ID software [and] answer questions about implementation of the law or acceptable IDs."  Tr. 1471:16-1472:9.

C.      **The Department Engaged Impacted Groups in the Implementation.**

To facilitate communication with local election officials, the Department instituted a voter ID workgroup comprised of six to eight local general registrars and electoral boards from localities varying in size and geographic distribution.  Tr. 1461:9-1462:5.  The voter ID workgroup provided feedback and recommendations on proposed regulations and guidance, as well as on the development of the voter ID software. *Id.* at 1462:11-24.

The Department also hosted and participated in events with groups who had expressed opposition to the voter ID law, including, among others, the NAACP, the League of Women

Voters, and Virginia Organizing (representing lower income and minority groups). Tr. 934:16-25; 936:1-937:4; 937:20-938:8. At one particular event in September 2014, the Department invited representatives of those groups and others "to discuss photo ID implementation and outreach and to hear about any issues or concerns groups ha[d] in the lead up to the November general election." *Id.* at 936:1-8; 1494:22-1494:7; DX084.

> **D.** **The Department maximized outreach resources to educate Virginia voters.**
>
> **1.** *Outreach through advertising and direct mailing.*

In 2014, the Department launched a significant community outreach program informing voters about the: (1) the voter-ID requirement; (2) the types of acceptable IDs; and (3) the availability of free voter IDs. Tr. 1473:3-10; PX155 at PX0155-004. The General Assembly apportioned $200,000 annually to fund these efforts in fiscal years 2014-2017. *Id.* 1473:15-20. To maximize these resources, the Department engaged the King Agency to develop a branding and media strategy for the campaign. *Id.* at 1473:23-1474:19; DX171; DX230.

The King Agency developed marketing materials, including brochures, flyers and posters that educate voters about the photo ID requirement. Tr. 1474:5-19; DX171 at DX0171.017. "As part of that process, [the Department] included some advocacy groups in making a final selection about the messaging for the outreach campaign." *Id.* at 1474:5-19. The Department has provided more than 1 million flyers and 6,000 posters to local voter registration offices to use and distribute.[18] PX155 at PX0155.081-86; PX256 at PX0256.001. With the guidance of the King Agency, the Department has run awareness campaigns for each election since the law has been in effect. Tr. 1483:21-23. The King Agency also developed and placed advertisements throughout the state. Tr. 1645:4-23. The Department ran radio advertising in the five main

---

[18] These materials are also available online as part of the Voter Photo ID toolkit for community groups to use. Tr. 1492:22-25.

media markets in Virginia: Tidewater, Richmond metro, Northern Virginia, Charlottesville, and Roanoke.  Tr. 1483:21-1484:23.  The Department has also run social media advertisements.  Tr. 1011:1-4; 1485:8-13.

In advance of the March 2016 primary, the Department commissioned the King Agency to conduct a Google consumer survey to enhance its outreach strategy.  Tr. 1485:14-24; PX256.  Using this survey information, the Department and the King Agency devised an advertising campaign that maximizes the reach for each region.  PX 256 at PX0256 -001.  In some regions, including Charlottesville/Harrisonburg, the Department is running television and cable advertisements.  *Id.* at PX0256-002.  In Northern Virginia and the surrounding Metro DC area, the Department has opted for bus advertising, including Spanish language advertisements for routes known to have high numbers of Hispanic passengers.  *Id.*  The Department has continued to use radio advertising and newspaper advertising (including in publications targeting African American and Latino audiences).  *Id.* at PX0256-002-3.  For the 2016 presidential election, the Department plans "to continue [its] current outreach strategy of print advertising, social media, radio" and capitalizing on partners' get-out-the-vote efforts.  Tr. 1502:11-23.

Beyond the apportioned funds, Defendants utilized other sources of funds to support further voter outreach efforts.  HAVA grant funding provided reimbursement to localities for the purchase of mobile voter ID kits.  Tr. at 1470:9-22.[19]  In 2014, the Department incorporated information regarding the photo identification law into mandated advertising for a proposed constitutional amendment in newspapers with a total circulation of nearly 1,000,000.  Tr. 1482:9-23; PX155 at PX155-087-88.  This newspaper advertising specifically focused on "rural communities and communities of color, particularly the black and Latino communities in the

---

[19] These mobile voter ID kits allow localities to process free photo identification applications outside of the office, including at retirement communities.  Tr. 1012:24-1013:10; 1712:13-16.

state." Tr. at 1483:2-11.  For example, the Bristol Herald Courier, El Tiempo, and the Richmond Free Press respectively targeted the rural community, the Latino community, and the African American community.  *Id*. at 1483:12-20.

In addition to the broad-reaching advertising, the Department sent a targeted mailer to close to approximately 86,000 active voters in Virginia who "were more likely to be in need of a free ID."  Tr. 1474:20-25; *see also* PX 155 at PX155-089-091 (sample of the mailer).   The Department focused on the universe of active voters without DMV-issued ID, excluding: (1) military voters who have a military ID; (2) overseas voters who did not vote in person; (3) annual absentee voters who do not need ID to vote absentee by mail; and (4) voters who did not have any activity on their record, meaning either registration or voting activities since before the 2012 election.  Tr. 1475:7-20.  Commissioner Cortes decided to exclude the latter group because in "[his] experience…working on campaigns on…voter outreach[] and voter contact, that if an individual had not voted in either the 2012 presidential election, which was one of the highest turnout elections in Virginia history, or the 2013 gubernatorial election, the likelihood they would be voting in [the] 2014 election was extremely low."  Tr. 1475:21-1476:2.  In addition to this targeted mailer, the Department also included information about the voter ID requirement in the mailing the Department sent to "potentially eligible, but unregistered, individuals in the Commonwealth."  Tr. 1477:3-17; 1557:9-14; 1684:12-20; PX155 at PX155.093-094.

## 2.   *General Registrars educated voters about the 2013 Law.*

The Department also worked closely with the 133 general registrars who represent the "frontline" of outreach as they have "direct contact with voters throughout the year."  Tr. 1488:6-14.  The Department provided the local registrars with voter ID materials, including posters and brochures, and offered to send staff to the general registrar's events whenever possible.   Tr. 1481:25-1482:8; 1488:18-24;  PX155 at PX155.083-086.  The general registrars engaged in their

own outreach efforts. Several general registrars, including Petersburg and James City County, "conducted locality-wide mailings to all their voters." Tr. 1490:9-23; DX079. Some localities, Roanoke in particular, hosted events outside the office to give voters any opportunity to obtain a free voter ID. *Id.* The Department conducted an online survey of the general registrars to facilitate sharing of ideas about outreach. *Id.* at 1488:25-1489:7; DX079.

Cameron Quinn, who served as the Fairfax County registrar between 2011 and 2015, testified about her own county's efforts to educate voters about the 2013 law. Quinn explained that in Fairfax County (which is Virginia's largest county) the local Election Board and registrar had established seven satellite offices and that each office provided both voter registration and free photo ID. Fairfax County also bought a mobile unit to issue the free photo ID's and would travel to various locations (including senior centers, libraries, and recreation centers) throughout Fairfax County to provide free photo ID and voter outreach.[20] Tr. 1702:2-11. Quinn testified the registrar's office "made a special effort to reach into the Hispanic communities, to reach into the student populations at GMU and Northern Virginia Community College." *Id.* at 1702:22-25, 1703:1.[21]

### 3.    *The Department worked closely with advocacy and community groups to educate voters.*

The Department has partnered with third parties to facilitate grassroots outreach and education on the photo ID requirement and the availability of free voter IDs, and in fact,

---

[20] For example, her office "actually went back three times to Greenspring [Retirement Community] to ensure that absolutely every single person at Greenspring Retirement would be able to have an ID if they wanted it." Tr. 1712:13-16.

[21] Quinn testified her office had "already traditionally go[ne] into every high school in the county, or work[ed] with a handful of high schools that choose not to have us come in so that they get the information out," and "worked with the Korean community" and "reached through the faith communities because that was a good way of reaching some of the ethnic communities as well." Tr. 1703:1-10.

"depend[s] very heavily" on those partners. Tr. 1491:3-11. The Department had a "substantial focus" on "reaching out to advocacy [and] community groups," particularly those representing "communities of color, rural communities in the state…the disability community" and "new citizens." *Id.* at 1473:111-145-20; 1477:18-1478:7.[22] The Department also worked closely with a number of these groups to create custom materials for distribution and provided lists of voters without DMV-issued ID to groups, including the Virginia New Majority and the Advancement Project, that they used to distributed materials on the voter ID requirement. Tr. 1009:11-23; PX155 at PX155-100-101. Staff from the Department has provided information about the photo ID law at voter outreach events hosted by these third parties. In fact, Commissioner Cortes discusses the voter ID requirements at almost every public presentation or meeting he attends. Tr. 1493:5-15.

### E. The Board adopted regulations allowing expired photo-IDs to be used.

Under the 1996 Virginia ID law, the Board adopted guidance directing registrars to consider ID with an expiration date (such as a Virginia's operator's license) acceptable if it had not expired more than thirty days before the election. This guidance remained the Election Board's policy after the 2012 law. Tr. 1319:16-20; 1453:22-1454:5.

The Board revisited this issue after the 2013 law, and instead of adopting guidance, issued a regulation. Initially, the Board proposed to accept any identification irrespective of an expiration date. Tr. at 931:12-22. Senator Obenshain and others wrote the Board expressing their view that the Board did not have authority to adopt any regulation allowing any form of

---

[22] This includes partnerships with, among others, the NAACP Mid-Atlantic Field, the Virginia Board for People with Disabilities, members of the African American clergy community, AARP, Virginia New Majority, the League of Women Voters, the Young Democrats, the Lawyers' Committee for Civil Rights, and even the DPVA itself. *Id.* at 1491:14-24; PX155 at PX0155-096.

expired document to be used.  The Board then posted the regulation for public notice and comment.  The comments varied significantly – some advocated for no consideration of expiration date and others pushed for only permitting unexpired IDs.  *Id.* at 932:17-934:10. Following this public notice and comment period, the Board rejected Senator Obenshain's strict view and adopted a more lenient regulation providing ID documents with expiration dates were acceptable for a full year after the expiration date.  *Id.* at 1320:13-20, 23-25.  Further, the free photo-ID provided under the 2013 law does not contain any expiration date.

F.     **ID-only provisional ballots cast in 2014 and 2015 elections were *de minimis*.**

Virginia conducted elections in 2014 and 2015 under the new ID requirements.  The Board and local election officials issued nearly 5,000 free photo IDs.  PX056.005.  In 2014, statewide provisional ballots cast for lack of ID numbered less than 800 and accounted for only 0.04% of total ballots cast.  DX301 at DX301.027; PX162 at PX162.004.  In 2015, statewide provisional ballots cast for lack of ID numbered just over 400 and accounted for only 0.03% of total ballots cast.  *Id.*  In both years, about one-half of the no-ID provisional ballots were cured and counted.  Tr. 1496:20-1497:17.  As plaintiffs' "affected voter" witnesses testified those not curing their provisional ballots did not lack the ID (or ability to get a free ID); rather, they just chose not to make the effort to submit a copy of the ID.

IV.    **The Plaintiffs' Evidence Does Not Support Their Challenge to the 2013 Law.**

A.     **The "affected voters."**

Plaintiffs cannot find a single eligible Virginia voter who was denied the opportunity to participate in any Virginia election by reason of Virginia's 2013 voter ID law.  Instead, plaintiffs produced fourteen individuals who testified Virginia's voter ID requirements inconvenienced

them when they sought to vote.  Each was a registered Virginia voter for the 2014 or the 2015 general election.

Table 2, attached to this brief, summarizes the testimony of these affected voters.  Of the fourteen individuals, eleven are white, three are African American, and none Hispanic.[23]  Seven possessed at least one of the requisite ID documents when they voted.  All fourteen currently possess ate least one form of the requisite ID allowing them to cast a normal (not provisional) ballot in the upcoming 2016 general election.  Twelve testified they cast a ballot (normal or provisional) in the 2014 or 2015 election and only six said their provisional ballot was not counted.  Of those six who said their ballot was not counted, four possessed the requisite ID but did not it to the poll and chose to not cure their provisional ballot by email, fax or personally deliver a copy of their ID to the registrar's office by the Friday following Election Day.  The two who did not have ID could have obtained a free ID and cured their provisional ballot but chose not to.

Megan Cotten and Abraham Barranca were typical of those testifying in support of plaintiffs.  Barranca is a twenty-nine year old white male who possessed the necessary ID but forgot to bring it to the poll.  Barranca cast a provisional ballot but, failed to cure his provisional ballot because he simply forgot to email a photo of his employer-issued ID to the registrar.  Cotten is a 32-year-old white female who said she only possessed an Alabama drivers' license – even though she has been a resident of Virginia since 2009 owns and drives a car in Virginia.  Cotten now has a passport and applied for a Virginia driver's license which she will have before the 2016 election.

---

[23] Plaintiff Aida identifies as Hispanic; however, he testified that he has had no issues voting as a consequence of the 2013 voter ID law.  Tr. 731:19-21.

**B.      The plaintiffs' two social science theories.**

Plaintiffs attempted to support their challenge with testimony by several social scientists (Drs. Alan Lichtman, Lorraine Minnite and Jonathan Rodden) and a historian (Dr. John D. Smith).  Plaintiffs advanced this testimony in support of two theories: (1) the General Assembly adopted the 2013 voter ID law to accomplish the invidious discriminatory purpose of denying minorities the opportunity to vote in order to gain partisan advantage for Republican candidates, and that all other reasons for Virginia to enact the 2013 law were pretextual and (2) the 2013 law disparately burdens "young" and minority voters.

**1.      *The plaintiffs' discriminatory intent theory.***

Plaintiffs conclude that Virginia's photo identification law is the product of discriminatory intent.  Plaintiffs' expert Allan Lichtman posits that this discriminatory intent is in reaction to the rise in black voter turnout as compared to the fall in white voter turnout.  Tr. 1098:20-1099:06; 1104:20-1105:07.  However, Lichtman concedes that his conclusion that photo identification laws have a discriminatory intent is untethered to evidence showing no discriminatory impact.  *Id.* at 1330:19-1331:07; 1331:18-1332:10.  Rather, Lichtman assumed the photo identification law would have a deterrent effect on turnout based on his study of a demographically dissimilar district in Texas and a two hundred-person study out of MIT.  *Id.* at 1334:08-18; 1335:01-04; 1403:08-1405:01.  Lichtman's faulty reliance on a two hundred-person study must be considered when weighing his testimony.  Lichtman specifically concluded that Virginia's voter identification law would have a suppressive effect on minority voter turnout based on a survey of 200 individuals, only three of whom did not have the required identification.  *Id.* at 1955:21-1956:21.  But as defendants' expert Karen Owen opined, "[i]t would be very hard to determine a statistical conclusion based off of three.  And the larger the sample size, the greater confidence you have that you have a difference." *Id.* at 1956:14-21.

Significantly, Owen offered a logical alternative to plaintiffs' discriminatory intent theory. She opined on widespread public concern regarding voter fraud fueling Virginia's voter identification law. But in another attempt to distinguish this alternative reason for the law, Lichtman criticized Owen's methodology. Tr. 1174:17-1175:17. But Lichtman's grounds for his critique were merely that Owen did not ascribe to Lichtman's own methodology of relying on so-called "Senate Factors." *Id*. And there is no precedent for using the purported "Senate Factors" as a methodology in a vote denial case, as they have only been used by the courts in vote dilution cases. *Id.* at 1382:03-1383:11.

Out of 200 Virginia respondents in the Stewart study relied upon by Lichtman, only three reported they had not voted because they said they lacked the requisite ID. But when the survey data was consulted all three respondents admitted they actually possess the necessary ID and said they did not vote for other reasons such as being out of town on Election Day. 1405:22-1406:14; 1953:06-1956:13. From these two studies Lichtman drew the magnificently false conclusion that the 2013 voter-ID law potentially prevented 243, 847 individuals from voting. PX215 at PX215.013. Lichtman's supposition of the "disenfranchised" contrasts remarkably with Virginia's actual experience with only less than 800 no-ID provisional ballots being cast in 2014 and just over 400 in 2015 and half of these no-ID provisional ballots were cured, thus only about 400 individual ballots in 2014 and about 200 ballots in 2015 were not counted due to the lack of ID. An individual's failure to cure a provisional ballot does not mean they did not have or could not obtain the ID. Failure to cure a no-ID provisional ballot only means that between Election Day and Friday the individual chose to not submit a copy of ID they possessed or chose to not get a free photo-ID.

Finally, Lichtman disregarded all reasons for the 2013 voter identification law other than his own conclusion regarding discriminatory intent. Namely, he disregarded public concern regarding voter fraud, referring to it as a "constant drumbeat" resulting in a "self non-fulfilling prophecy." Tr. 1165:05-13. And in yet another attempt to buttress his own conclusions at the expense of all contrary authority, Lichtman discounted the findings of the Carter-Baker Commission, disdainfully referring to it as a "compromise," as compared to a well-respected bipartisan authority that has been cited with distinction by the United States Supreme Court. *Id.* at 1166:10-18.

Minnite opined that what she defined as "voter fraud" is rare. Tr. 781:09-13. Minnite based her conclusion on the number of indictments for voter fraud by the Justice Department. *Id.* at 800:22-801:05; 770:16-771:08. Minnite did not consider reported cases the Justice Department chose not to prosecute. *Id.* at 774:02-12. Minnite further conceded the weakness of her methodology by acknowledging that there were only 781 indictments for tax fraud during the time. Minnite acknowledged the number of indictments was less indicative of the rate of fraud and more indicative of the way it was being prosecuted. *Id.* at 845:16-846:06. Minnite also testified about the Carter-Baker commission. Carter-Baker stated that, in the 2004 election, more than 100 people voted twice, used fake names, false addresses, or voted in the name of a dead person. Minnite disagreed, testifying instead that "piles of mistakes […] are causing these problems." *Id.* at 863:04-21. Minnite testified that she studied elections in Milwaukee, St. Louis, and Washington, and found voter was rare. But instead of acknowledging that voter fraud actually occurred in those elections, she instead concluded that the reported incidents of voter fraud were administrative errors. *Id.* at 878:23-880:04. Minnite said her conclusions were based upon reports from newspapers. During cross-examination Minnite admitted the newspaper

accounts, including the *LA Times, Wall Street Journal* and *St. Louis Post Dispatch* actually reported in person vote fraud had occurred by ballots case in names of fictional registrants and the dead. *See* Tr. 874:12-25, 875:10-25, 876:13-16, 877:1-11, 878:3-22.[24]

When plaintiffs asked Dr. Smith, their historian, whether the General Assembly enacted SB 1256 with a discriminatory intent, this Court ruled Smith could not "offer his opinion as to whether or not there is any racial discrimination in enacting this. It is pure speculation on his part." Tr. 244:22-25. Dr. Smith opined that the 2013 Virginia Voter ID law is consistent with the efforts throughout Virginia's history to make it more difficult for and to suppress the vote of African Americans and other minorities. *Id*. at 169:12-20. A significant part of Dr. Smith's testimony, though, was dedicated to a historical overview of the participation of blacks in politics dating back to reconstruction. *Id.* at 170:10-204:22; 229:23-237:19. Defendants do not dispute this historical testimony, but still question its relevance to the 2013 law at issue. This is particularly so because Dr. Smith did not found his testimony regarding factors that could influence legislative intent on interviews with the plaintiffs, anyone who was not able to cast a vote for lack of photo ID, any legislative documents, any legislative debates, any legislators' testimony. *Id.* At 250:08-251:10.

Defendants' expert Dr. Daniel Palazzolo is an expert in modern Virginia legislative and congressional politics and voting rights. Tr. 1840:01-03. Palazzolo reviewed Plaintiffs' expert Smith's expert report regarding the impact of historical racism in Virginia on Virginia's 2013 voter ID law and agrees with his historical accounts up until 1965, yet finds that such history is not relevant to the legislative intent behind SB1256. Tr. 1842:21-1843:02; 1844:01-05. Namely,

---

[24] Minnite also testified about her article, *Modeling Problems and Voter Identification*. In that article, Minnite concluded, "the existing science regarding vote suppression [is] incomplete and inconclusive, DX 272.098. Minnite affirmed this was her and her co-author's conclusion.

Palazzolo finds that Dr. Smith's reference to examples of early 20th century voter suppression efforts are untethered by evidence to Virginia's 2013 law.   Tr. 1844:06-13.   Additionally, Palazzolo notes that conditions today that impact policy are far different than they were in the pre-1965 era.  Tr. 1844:14-18.  Palazzolo specifically references Virginia's 1989 election of its first African American Governor, Doug Wilder, a historic event that would not have been possible in Jim Crow Virginia.    1852:04-13.    Palazzolo likewise noted that Virginia's delegation's unanimous vote in favor of the Voting Right Act of 2006 – just seven years before the passage of SB1256 – is a compelling example of Virginia's modern trend toward political inclusiveness, as opposed to historical efforts to suppress minority votes.  Tr. 1857:10-1859:01.

### 2.    *The plaintiffs' disparate burden theory.*

Plaintiffs contend Virginia's 2013 law is unconstitutional and violates Section 2 of the Voting Rights Act because the law results in a disparate burden upon the "young" and minorities. Plaintiffs premise this contention upon the supposition that "young" (those between eighteen and thirty-five) and minorities are less likely to possess one of the required forms of ID.  Plaintiffs support this supposition by Rodden's testimony where he inferred the purported disparate impact using Virginia DMV data and voter registration information.   As discussed below, Rodden's analysis is too incomplete and flawed to support that conclusion.

### i.    *Rodden based his analysis on only some of the acceptable IDs.*

Rodden's analysis demonstrates that almost every registered voter in Virginia possesses an acceptable form of photo-ID.  Further, Rodden's estimates of registered voters lacking either DMV, free, student or military IDs show only a minor differential among racial and ethnic groups – 4.1% of non-Hispanic whites, 5.4% of African Americans, and 5.6% of Hispanics. PX209 at PX0209-032.

Still, this minor (estimated) differential should in all likelihood be further narrowed because Rodden failed to account for a number of acceptable forms of identification, including: (1) government-issued ID cards from federal, Virginia, or local subdivisions (including political subdivisions); (2) tribal enrollment or other tribal ID; (3) US Passport or Passport card; (4) valid employee photo ID card issued by voter's employer in the ordinary course of business (public or private employer); (5) nursing home resident ID, if issued by government facility; and (6) student ID issued by a public or private high school in Virginia.  Tr. 577:5-23; 580:3-7; 597:13-14; 598:5-12; 600:14-21; 601:3-602:13; 603:9-24; 604:16-24; 609:9-16; 605:20-606:2; 606:6-14; DX301 at DX301.012.

Rodden admitted he provided no opinion about the demographic makeup of Virginia voters who possess one or more of the identifications listed above, but do *not* possess a DMV-issued identification.   *Id.* at 597:13-598:4-18;  600:14-602:20;  603:9-604:13;  604:16-605:8; 609:9-19; 605:20-606:5; 606:10-17.[25]

ii.    ***Rodden underestimated the number of Virginia voters with military and student IDs.***

Rodden inferred the number of Virginia voters with military identification as only those: (1) who either self-reported as military; or (2) who based on Census data lived on a military base between 2010 and 2015.  Tr. 584:1-585:8.  Using this approach, Rodden inferred only 32,500 Virginia voters have a military ID.  Tr. 1727:20-1728:21; DX301 at DX301.009.  Yet, there were

---

[25] Moreover, plaintiffs could have requested federal government agencies, including the Department of Veterans Affairs and the Department of State, match the list of registered Virginia voters to their databases.  Information from such federal agencies has been considered in other voter photo ID cases, including North Carolina.  DX301 at DX301.013; Tr. 1743:15-1744:2. Plaintiffs chose not to even attempt to obtain such information in this case.

129,000 active members of the military as of August 2013.[26]  *Id.*; *see also* DX301 at DX301.10, n. 15.  Even this figure does not account for spouses and dependents of members of the military who likely possess military IDs to access military benefits or military contractors who likely need an ID to enter military bases.  Tr. 585:17-23; 586:13-15.  Rodden further acknowledged that he did not know how many family members of the military lived off-base (and therefore were not captured by his proxy) or how many contractors work on military bases.  Tr. 586:16-18.

Rodden likewise underestimated the number of Virginia voters with student IDs.  Rodden inferred the number of Virginia voters with student IDs using an abstraction – assigning a probability to each person that they are (or are not) a student based on their age, gender, and census.  Defendants' expert Dr. Janet Thornton explained that based on Rodden's abstraction, there were only 467,000 students among the registered voters in Virginia.  This figure, however, is substantially lower than the population of nearly 600,000 students in Virginia.  Tr. 1736:2-1737:22; DX301 at DX301.010.  Second, as Thornton testified, Rodden's proxy for students disproportionately identifies voters of the age of 40 as being students.  Specifically, applying Rodden's calculation, voters over the age of 40 account for more than 20 percent of students in Virginia.  This is not accurate and demonstrates the flaw in Rodden's methodology.  The Integrated Post-Secondary Education System, which track *actual* enrollees in colleges and universities, reports that only 12.2 percent of students in Virginia are over the age of 40.  Tr. 1739:4-1741:20.  This discrepancy is significant because it shows that Rodden may have missed

---

[26] Rodden attempts to explain away this discrepancy in his reply report by comparing the percentage of African-American registered voters in Virginia to the percentage of African-Americans who are active duty forces in the United States.  PX216 at PX216-007.  However, as he acknowledged, "for purposes of estimating ID possession, the relevant population is actually Virginia voters [who] have a military ID, but don't have a Virginia-issued DMV ID."  Tr. 587:20-588:5; *see also id.* at Thornton explained that it is inappropriate to assume the racial and ethnic demographics of members of the military nationally are the same as the demographics of a subset of members of the military in Virginia who do not have a DMV ID.  Tr. 1732:10-25.

voters with student IDs, particularly out-of-state students, who lack Virginia DMV-IDs.  *Id*. at 1742:10-22.

### iii.   *The unaccounted for data undermines Plaintiffs' expert opinion that the 2013 law had a disparate impact.*

Rodden attempts to minimize the consequences of these deficiencies in his analysis by arguing that he has no reason to believe that finding additional voters with ID would undermine his conclusions about the rate of ID possession among the relevant groups.  However, the Court need not look any further than Plaintiffs' other expert, Dr. Lichtman's report to find an example of different ID possession rates among minority groups.  Lichtman reported that African Americans in Virginia have a higher rate of employment with the government, and thus, are more likely to possess an employee ID issued by the government.  PX212 at PX212.038; Tr. 602:25-603:8.  As such, the data points missing from Rodden's analysis undermine his conclusions about the rate of ID possession among registered voters in Virginia.

This is not a hypothetical population of voters who do not have a DMV-issued ID but possesses one or more other forms of acceptable ID.  Indeed, at trial, four of the "affected voters," Etheredge, Lamb, Hilt and Stallings, each had passports, but no Virginia DMV-issued IDs.  Tr. 113:13; 161:19-21; 411:12-13.  All four are white.  Likewise, Barranca and Samson both testified that they had employer-issued photo IDs, but no Virginia DMV-issued ID.  Tr. 423:13-18; 749:4.  Again, both are white.  The shortcomings in Rodden's analysis were thus demonstrated during the trial by the testimony of almost one-half of plaintiffs' fact witnesses who testified they *in fact possessed a form of photo ID acceptable for voting in Virginia* but who

26

would have been classified as "No ID" by Rodden.  Rodden admitted as much on cross.  Tr. 577:24-581:10.[27]

> ### iv.     Rodden's unsupported conclusions about the reason for the increase in the overall rate of ID-possession.

As Commissioner Cortes testified, Rodden misinterprets the fluctuations in the voter registration files, particularly with respect to inactive voters and their removal from the active roll.  Rodden relied upon his hypothesis that "urban renters who frequently change addresses and hence are in greater danger of falling into 'inactive' status" account for the decrease over time in the number of voters without ID.  PX209 at PX209.033.  By his own admission, however, Rodden did not test this hypothesis.  Tr. 592:5-19.

However, Commissioner Cortes' testimony reveals that this hypothesis is flawed when considered in the context of how list maintenance is performed.[28]  *Id.* at 1498:3-1499:17.  First, pursuant to the National Voter Registration Act, voters are categorized as "inactive" if there is reason to believe that they have moved (*e.g.*, their mail has been returned as undeliverable).[29] Second, inactive voters are only removed from the voter registration list if they fail to vote in two consecutive federal general elections.  *Id.*  This criteria "was intended to make sure that even

---

[27] Finally, in Table One of his declaration submitted after his deposition, Rodden claims to show that there is no realistic scenario where the rates of ID possession among minorities equals the rate among whites.  PX219.  These calculations, however, do not withstand the scrutiny of basic arithmetic as Thornton testified.  Tr. 1759:4-1762:14.  The fact remains that even based on Rodden's flawed analysis the alleged disparity among ethnic groups is small and the overall rate of ID possession is high.

[28] Commissioner Cortes is well-versed in this area because not only does he now manage list maintenance for the Commonwealth, he was also "responsible for administering the activities of the agency with regard to [the] Nation Voter Registration Act" when he worked at the Election Assistance Commission.  Tr. 1498:3-1499:17.

[29] The Annual Report on Voter Registration List Maintenance Activities provides further detail on how Virginia determines which voters are "inactive" and which voters should be removed from the voter registration file.  DX326 at DX326.010-11, 15-16; *see also* Tr. 1003:20-1005:25.

infrequent voters had an opportunity to not be removed from the list simply for not voting." *Id.* Thus, in this case, the voters removed from the list likely moved out of state as they failed to vote in the high turnout 2012 Presidential election and in the 2014 midterm election.

Further, the rate of provisional ballots cast due to no valid ID is a more effective measure of the impact of the voter ID law. In Virginia, the rate of no-identification provisional ballots cast in 2014 and 2015 indicate a de minimis impact of the 2013 voter ID law. As detailed in Section III. F., only approximately 0.04% and 0.03% of ballots cast in 2014 and 2015 respectively were provisional ballots cast for lack of ID. In both election years, approximately half of the provisional ballots were cured and subsequently counted. Tr. 1957:03-11. Further, Owen noted that there could be many reasons individuals did not cure their provisional ballots. Some of those reasons were demonstrated by plaintiffs' own witnesses' testimony, including favorable results had already been reported (Lamb, Smith), the voter did not want to bother (Hilt), and the voter forgot (Barranca). *Id.* at 1857:12-24. Thus, it would be wrong to infer from no-ID provisional ballots not cured that those voters lacked the identification to cure. *Id.* at 1857:25-1858:03.

## LEGAL ANALYSIS

We incorporate by reference our discussion of the applicable law and legal standards from our pre-trial Proposed Findings of Fact and Conclusions of Law.[30] We show below how, on the evidence presented at trial, plaintiffs fail to establish the elements of any of the claims remaining in the case.

---

[30] D.I. 172.

I.      **Virginia's 2013 Voter ID Law Does Not Violate The Fourteenth Amendment.**

Plaintiffs claim Virginia's 2013 voter ID law violates the Equal Protection Clause of the Fourteenth Amendment.[31]  Plaintiffs are wrong.

A.      **Virginia's 2013 voter ID law is reviewed under the *Anderson-Burdick* rational basis standard.**

The task of balancing the competing considerations and policies governing the conduct of elections is to be decided by the State – not the federal judiciary.  State laws classifying persons based upon race are subject to strict scrutiny and must be narrowly-tailored to further a compelling government interest.  Racially-neutral laws, on the other hand, are presumptively constitutional and are reviewed under the lenient rational basis standard.  Under the rational basis standard courts have little authority to second-guess a State legislature and analysis of legislative alternatives is irrelevant.  Those seeking to invalidate laws under the rational basis standard must show the *only* purpose of the legislation was arbitrary, irrational or invidiously discriminatory.  *See Railway Express Agency, Inc. v. New York*, 336 U.S. 106 (1949).  In *Personnel Adm'r of Mass. v. Feeney,* the Supreme Court explained, "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.  The calculus of the effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility."  442 U.S. 256, 271 (1979).

Plaintiffs agree "*Anderson-Burdick* governs Plaintiff's First and Fourteenth Amendment claims."  Plfs' Br. D.I. 60, at 7.  The *Anderson-Burdick* standard of review is deferential to state rules regulating the conduct of elections.  As this Court explained "[i]n *Burdick* [*v. Takushi,* 504

---

[31]  Plaintiffs also bring a "partisan-fencing" challenge.  This Court ruled the partisan-fencing claim was nothing more than "Count Two in a slightly different wrapper and it will be treated accordingly."  Opinion D.I. 110, p. 20.  We address the partisan-fencing claim in our prior briefing.  *See* D.I. 49, pp. 8-9, and D.I. 66, pp. 10-14.

U.S. 428 (1992)] the [Supreme] Court reiterates that 'when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.'" *Miller v. Brown*, 465 F.Supp2d 584 (E.D. Va. 2006) (citing and quoting *Burdick*, 504 U.S. at 434 and *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).[32]

The Court proceeded to explain:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'
>
> Election laws will inevitably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends.' ***Accordingly, the mere fact that a State's system 'creates barriers … does not itself compel close scrutiny.
>
> *Burdick*, 504 U.S. at 433.

"The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick*, 504 U.S. at 433-34.

### B.   Virginia had many compelling and legitimate reasons to adopt the 2013 law.

#### 1.   *Preventing vote fraud and increasing public confidence in election integrity was a legitimate reason for Virginia to adopt the 2013 law.*

"Don't lock the barn door after the horse has bolted" is a common American idiom recognizing that it is "foolish to take precautions after the damage they would have prevented

---

[32] Anderson held, "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity'" *Id.* at 793. Burdick held it was an "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold." 504 U.S. at 432.

has already been done." See, *American Heritage New Dictionary of Cultural Literacy*, 3d ed.

Virginia was not required to wait until after prosecutions for vote fraud were widespread to begin

locking the door; it was entitled to address potential problems preemptively.

"Legislatures…should be permitted to respond to potential deficiencies in the electoral process

with foresight rather than reactively, provided that the response is reasonable and does not

significantly impinge on constitutionally protected rights." *Munro v. Socialist Workers Party*,

479 U.S. 189, 195-96 (1986).  That is what the General Assembly did when it enacted the 2013

law.

In *Crawford* the Supreme Court applied these principles to uphold Indiana's photo-ID

law.  The district court in *Crawford* noted, "without a photo identification requirement it is

nearly impossible to detect in-person voter impersonation." *Indiana Democratic Party v. Rokita*,

458 F. Supp.2d 775, 826 (S.D. Ind. 2006); *see also Crawford v. Marion County Election Board*,

472 F.3d 949 (7th Cir. 2008).  Thus, the number of prosecutions, convictions, or indictments of

polling-place fraud undoubtedly underrepresent the actual incidence of such fraud.  Plaintiffs

nonetheless challenge Virginia's 2013 voter ID law contending vote fraud is not "widespread"

and, therefore, they argue that vote fraud is nothing but a pretextual justification for a law really

motivated by a desire to prevent minorities from voting.

Plaintiffs' line of attack fails for the following reasons: (1) Virginia does not need to wait

for vote fraud to be "widespread" before adopting measures to prevent fraud.  *See, Munro, supra.*

(2) Without the requirement that a person provide identification or sign a poll book, polling place

vote fraud cannot be detected or prosecuted.  *See Crawford*, *supra*; Tr. 1632:11-15, 1682:15-25,

1683:1-7.  (3) Even if indictments for in-person vote fraud are not widespread, there is a

widespread public perception of vote fraud which undermines public confidence in the election

process.   (4) Virginia modeled its law upon voter ID laws other states adopted that have been reviewed and precleared by the Justice Department and been upheld by the Supreme Court and lower federal courts.  *See Crawford*; *Frank v. Walker,* 768 F.3d 744 (7th Cir. 2014); Tr. 1651:20-25, 1652:1-3.[33]   (5) The bipartisan Carter-Baker Commission recommended States adopt strict photo-ID laws[34] and Congress adopted HAVA with broad bi-partisan support requiring states to adopt minimal voter ID requirements to prevent vote fraud.[35]   (6) Concerns about in-person vote fraud are legitimate. Tr. 1561:24-25, 1562:1-5 (testimony of Justin Riemer), 1613:12-25, 1614:1-11 (testimony of Don Palmer).

---

[33]   Georgia voter ID preclearance approval memorandum available at: <https://www.brennancenter.org/sites/default/files/analysis/08-25-05%20Georgia%20ID%20Preclearance%20Memo%20-%20DOJ%20Staff.pdf>.   Further, at least thirty-three states currently require persons to provide identification before casting a ballot at a polling place.   Seventeen states require photo identification including states formerly subject to preclearance under Section 5 of Voting Rights.   Voter ID laws in Virginia (the 2012 law), Georgia, Arizona and New Mexico have been precleared under Section 5.   Georgia's photo-ID requirement was precleared twice.   *See*, Table 1 for a comparison of various states' photo-ID laws.   And Exhibit A which reprints the text of the other states.   The photo-ID laws  upheld by the Supreme Court and Seventh Circuit in Indiana and Wisconsin are stricter than Virginia's 2013 law.  *See, Crawford* and *Frank.*

[34] Justice Steven's majority opinion and Justice Breyer's dissent both found the Commission's recommendations and findings authoritative. "Like Justice Stevens, I give weight to the fact that [Carter-Baker], studied the issue and recommended that States should require voter photo IDs. Because the record does not discredit the Carter–Baker Report or suggest that Indiana is exceptional, I see nothing to prevent Indiana's Legislature (or a federal court considering the constitutionality of the statute) from taking account of the legislatively relevant facts the report sets forth and paying attention to its expert conclusions." *Crawford*, 553 U.S. at 237-38 (Breyer, J., dissenting).

[35] HAVA was intended to "change the system to make it easier to vote and tougher to cheat." 148 Cong. Rec. S10488 (2002) (statement of Sen. Bond). The legislation's "one central goal [ ] was to make it easier to vote in America and much harder to corrupt our Federal election system." *Id*. (statement of Sen. Dodd).  HAVA requires voters to provide photo-ID or certain forms of non-photo ID "a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter."  HAVA establishes "minimum requirements," and shall not "be construed to prevent a State from establishing election…administration requirements that are more strict."  42 U.S.C. §15484 (2006).

If concern about vote fraud was merely a pretextual justification for a partisan conspiracy to disenfranchise minorities, President Carter, Andrew Young, Lee Hamilton and other prominent Democrats, a bipartisan majority of the United States Congress, the Supreme Court, lower federal courts and a majority of the state legislatures (including Democrat-controlled Rhode Island) would not have recommended, upheld or adopted laws requiring photo-ID.

> **2.      *The 2013 voter ID law simplified administration of Virginia elections.***

Since 1996 Virginia has required voters to provide ID. In 2002 Virginia implemented the federal HAVA voter ID requirements. In 2012 Virginia adopted a voter ID law which eliminated a self-authenticating affidavit and required voters to present one of several identification documents. But some of the identification documents allowed under Virginia's 2012 law did not comply with the federal HAVA-ID documents that must contain both a voters name and address. Local registrars maintained dual lists of voters noting which needed to present HAVA-ID and which could present one of the non-HAVA non-photo forms of ID. Tr. 1557:15-25, 1558:1-25, 1559:1-19 (testimony of Justine Riemer). The 2013 law eliminated dual voter lists and, under the 2013 law, there was a unified list of acceptable ID documents that satisfied both HAVA and Virginia state law.

> **C.      Virginia's 2013 voter ID law does not deny *any* eligible Virginia voter opportunity to vote in Virginia elections.**

When "assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification." *Personnel Adm'r*, 442 U.S. at 272. The "basic classification" Virginia's 2013 law makes is between: (a) eligible voters who possess one of the designated forms of identification documents or who can get an ID for free; and, (b) eligible voters who do not possess a designated form of identification document and cannot get a free photo-ID. Plaintiffs' great challenge is that they have found no one who is in this second group.

No eligible Virginia voter is (or will be) denied opportunity to vote because of the 2013 voter ID law. Should any Virginian not already possess one of the many forms of acceptable identification, obtaining a free voter identification card is less of a task than registering to vote.[36] Plaintiffs' own witnesses establish this point.

Unable to find anyone actually denied opportunity to vote, plaintiffs shift their theory and argue the "burden" of obtaining one of the many requisite forms of identification documents will discourage some persons from choosing to participate in Virginia elections because, even if they possess ID, they may mistakenly believe they don't have the proper ID. This is Lichtman's theory. But no credible evidence supports Lichtman's theory.[37] This is also an amazing legal argument. To wit: This Court should declare Virginia's law unconstitutional, not because of how the law is written, how the law is implemented or the actual effect of the law, but because of how someone may wrongly interpreted the law.

**D.    Virginia's 2013 photo-ID law is not racially discriminatory by design or by effect.**

Relying upon Lichtman and Virginia history from the 1800s and early 1900s, plaintiffs claim the 2013 law is a modern incarnation of poll taxes and literacy tests devised during the post-reconstruction and pre-civil rights era to disenfranchise blacks. This contention is factually and logically wrong, and offensive

*First*, if Virginia intended to suppress the opportunity for blacks to vote, why did the 2013 law include additional forms of ID? Lichtman testified that minority students have a higher

---

[36] Virginia's 2013 voter ID law is more lenient than Virginia's voter registration law because the 2013 law allows a person with no ID to cast a provisional ballot and cure the ballot through Friday following Election Day. Voter registration, however, closes 22 days before a general or primary election. Election Day. So if a person forgets to register that oversight cannot be cured.

[37] *See supra*, p. 19-21.

enrollment rate than non-minorities and, thus, more minorities possess student IDs which can now be used to vote.  If the legislature intended to suppress minority vote, expanding the list of acceptable ID to include student IDs disproportionately held by minorities is contrary to this purpose.

*Second*, why did the 2013 law provide free photo-ID without requiring any supporting documentation such as a birth certificate?  Virginia wrote the 2013 voter ID law after the Supreme Court upheld Indiana's voter ID law. Indiana required a person provide a birth certificate or other official document before the state would issue a free voter ID.  If Virginia adopted the 2013 law to disenfranchise minority voters, why didn't the legislature adopt the much stricter law that was offered the same session, HB 1787 (2013), or why didn't the 2013 law require a birth certificate to obtain the free ID?  Why did Governor McDonnell meet with members of the Virginia Black Caucus, enlist their comment and require the final version of the 2013 law to include provisions making Virginia's identification requirements more lenient?  And, why did the Board adopt regulations allowing use of expired ID documents for a year after they expired?

Not only that, the 2013 law deferred implementation of the ID requirements for a year and the Department and local registrars informed voters of the new ID requirements and provided free photo-IDs.  They also mobile units that traveled to colleges, nursing homes and low-income communities.  Virginia also adopted laws making it easier to register using on-line electronic registration.  If Virginia intended to suppress minorities' opportunity to vote, the Commonwealth and election officials would not have adopted any of these measures.

Plaintiffs' expert Lichtman contends the 2013 law was "strict" and motivated by racial animus because the law did not include a provision allowing a person to self-authenticate their

identity at the polling place. Tr. 1115:3-12. But Lichtman overlooks the fact the self-authentication provision was eliminated by the 2012 voter ID law, not the 2013 law. And the 2012 law was precleared by Attorney General Holder. The substantive difference between the 2012 law and the 2013 law is that the 2013 law *increased* the acceptable forms of photo-ID to include student ID from private colleges, the 2013 law provided free photo-ID (not available under the 2012 law) and the 2013 law eliminated several non-photo forms of ID, chiefly the voter information card and concealed-carry permits.

II.    **Virginia's 2013 Voter ID Law Does Not Violate Section 2 Of The Voting Rights Act.**[38]

Plaintiffs' Section 2 challenge is to Virginia's race-neutral regulation of the time, place and manner in which Virginia conducts an election – specifically, how Virginia confirms persons seeking to cast a ballot are, in fact, the individual registered to vote. To establish a Section 2 violation plaintiffs must show that "based on the totality of circumstances," the political process is "not equally open to participation by members of a class of citizens" on account of race or color. Section 2 does not require states to maximize minority voting by eliminating the usual burdens of voting to overcome underlying socio-economic disparities that may exist among racial groups. Nor does Section 2 invalidate a voting practice because the practice "has a disparate effect on minorities." *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014). Section 2 is "an equal-treatment requirement," not "an equal-outcome command." *Id.* at 754.

There is no credible evidence that Virginia's voter identification requirements reduce minority voter participation. *See* Minnite and Lichtman's testimony, *supra*. But even if one believed the 2013 law reduced minority participation, the 2013 law would only violate Section 2

---

[38]    A more fulsome discussion of the relevant Voting Rights Act jurisprudence is provided in earlier briefing, particularly our pre-trial brief, D.I. 172, pp. 69-82, and Amicus Brief, D.I. 169.

if it was also proven the 2013 laws' voter ID requirement (and not some other factor) "results" in minorities having "less opportunity" to vote because the political process is not "equally open" to them.  Correspondingly, if Virginia's system of election administration (considered in its totality) is "equally open" and provides "equal opportunity" for minority participation than diminished minority participation (should it exist) cannot be the "result of" or "caused by" the 2013 law. Section 2 does not invalidate Virginia's 2013 law if the difference in minority participation is due to other factors such as different levels of interest in the election or underlying socio-economic factors.

Justice Brennan explained this point in *Thornburg v. Gingles*, 478 U.S. 30, 50 n.17 (1986), a voting practice has a prohibited "result" only if the practice itself, rather than underlying socio-economic factors, 'proximately cause[d]" the disproportionate exclusion of minority voters.  *See also Irby v. Virginia State Bd. Of Elections*, 889 F.2d 1352, 1358 (4th Cir. 1989) (rejecting a Section 2 challenge because there was "no proof that the [challenged] process caused the disparity.")

To violate Section 2, a voting practice must proximately cause harm to minority voters. Section 2 liability is established only if a voting practice "imposed by [the] State" "results in a denial or abridgement of the right of any citizen…to vote on account of race or color."  52 U.S.C. § 10301(a).  Thus, if the alleged "abridgement" "results" from something other than Virginia's 2013 voter ID requirements (such as underlying socio-economic disparities or disparate levels of interest) Section 2 does not apply.

Plaintiffs provide no credible evidence that minorities had less opportunity to participate in Virginia elections.  There is no evidence of *any reduction* in minority voter turnout in Virginia's 2014 and 2015 elections for any reason.  And, like *Irby*, plaintiffs offer no proof that

the 2013 law *caused* any disparity in the opportunity for minorities to participate in Virginia elections.  To the extent plaintiffs' experts seek to infer the 2013 law will result in a disparate impact upon minorities the impact is not the result of the 2013 law but socio-economic factors such as fewer minorities own cars.

Plaintiffs must also establish the 2013 law's voter ID requirements resulted in less minority opportunity compared to an objective benchmark.  *Holder v. Hall*, 512 U.S. 874, 881 (1994) (opinion of Kennedy, J.).  However, plaintiffs offer no benchmark for what identification requirements, if any, should be allowed.  Is the benchmark Virginia's 1996 law?  HAVA-ID requirements?  Virginia's 2012 law?  Or is the benchmark the Wisconsin, Indiana, Georgia or North Carolina laws that have been precleared and upheld?  Section 2 does not impose an "anti-retrogression" standard like Section 5, which compares the state's current voting laws to the prior status quo. It is settled law that "[r]etrogression is not the inquiry [under] § 2." *Holder*, 512 U.S. at 884 (opinion of Kennedy, J.).[39]  Rather, the measure of "abridgement" under Section 2 must be an "objective" benchmark.  Since plaintiffs do not (and cannot) point to any "benchmark" of voting practices that are objectively superior to Virginia's 2013 law, plaintiffs' Section 2 challenge fails.

In sum, plaintiffs' Section 2 theory contradicts the text and history of the Voting Rights Act, overlooks the requirement of proximate causation, ignores the need to identify an objective benchmark against which to measure the challenge to the 2013 law, is contrary to controlling Supreme Court precedent, and violates the Constitution.  The reasonable, race-neutral voter identification requirements in Virginia's 2013 law should be upheld.

---

[39]  And even if Section 2 did consider retrogression, there is no evidence the 2013 law resulted in retrogression from the 2012 law.  Indeed the 2013 law *increased* the types of acceptable ID *and* provided for free photo ID.

III.    **The Twenty-Sixth Amendment Challenge.**

The Twenty-Sixth Amendment granted the right of suffrage to "citizens of the United States who are eighteen years of age or older."  Plaintiffs allege the 2013 law violates the Twenty-Sixth Amendment because the task of obtaining one of the requisite forms of identification documents falls more heavily upon "young voters" than those who are not "young voters."  Plaintiffs appear to define "young voters" in their briefing as those between eighteen and twenty-nine.  Plfs' Findings of Fact, D.I. 171 ¶¶ 49, 71.  However, testimony at trial contradicted this.  See Tr. 227:11-15 (testimony of Del. Lopez defining "young voters" as between 18 and 35).  The Twenty-Sixth Amendment provides no basis for creating a notion of "young voters" as those between eighteen and thirty-five.

In 1970 Congress amended the Voting Rights Act lowering the minimum voting age from twenty-one to eighteen in all federal, state and local elections.  This amendment was challenged on federalism grounds and the Supreme Court held Congress did not have authority to change the voting age in state and local elections but could do so in federal elections.  *Oregon v. Mitchell,* 400 U.S. 112 (1970).  States did not want to have different voting ages for state and local elections and federal elections so the Twenty-Sixth Amendment was proposed and adopted in 1971 in response to *Oregon v. Mitchell*.

The Twenty-Sixth Amendment has nothing to do with the Plaintiffs' lawsuit challenging Virginia's 2013 law that required voters of any age to present photo-ID.  Plaintiffs never explain any relevance of the text or jurisprudence of the Twenty-Sixth Amendment to their challenge to Virginia's 2013 voter ID law nor is there any evidence that the 2013 law in any way "abridges" the right of those eighteen and older to vote.

**CONCLUSION**

Virginia's 2013 voter ID law is evaluated under the rational basis, *Anderson-Burdick* standard. Federal courts are constitutionally instructed to defer to States on race-neutral rules governing the administration of elections.  Racially-neutral election administration rules, such as the 2013 law, must be upheld unless the law is proven to be racially discriminatory in which event strict scrutiny applies.   Plaintiffs provide no evidence proving (or even credibly suggesting) the 2013 law should be evaluated under the strict scrutiny.   Indeed, plaintiffs admit this Court should evaluate their challenge under the *Anderson-Burdick* rational basis standard.

Plaintiffs provide no credible evidence that: (a) the 2013 law was motivated any the *intent* to deny minority voters an opportunity to participate in Virginia elections, or (b) the 2013 law has the *effect* of denying any person (minority or otherwise) opportunity to participate in Virginia elections.  Moreover, the testimony and experience of plaintiffs' own witnesses - the fourteen "aggrieved voters" ("inconvenienced" may be a better description) – demonstrates that the 2013 law (as written and as implemented) does not deny any eligible Virginia voter opportunity to participate in any Virginia election.  Plaintiffs' challenge to the 2013 law, thus, fails.

Respectfully submitted,

**ARENT FOX, LLP**


By: _/s/ Mark F. (Thor) Hearne, II_
    Mark F. (Thor) Hearne, II
    (admitted *pro hac vice*)
    112 S. Hanley Road, Suite 200
    Clayton, MO 63105
    Tel: 314.296.4000
    Facsimile: 202.857.6395
    Email: thornet@ix.netcom.com

    Dana J. Finberg (VSB # 34977)
    55 Second Street, 21st Floor
    San Francisco, CA 94105
    Telephone: 415.757.5500
    Facsimile: 415.757.5501
    Email: danafinberg@arentfox.com

    *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the Court's CM/ECF system on March 25, 2016, to the following:

| | |
|---|---|
| Joshua L. Kaul | Marc E. Elias |
| Perkins Coie LLP | Bruce V. Spiva |
| 1 East Main Street, Suite 201 | Elisabeth C. Frost |
| Madison, WI 53703 | Aria C. Branch |
| | Perkins Coie LLP |
| | 700 13th Street, NW, Suite 600 |
| | Washington, DC 20005-3690 |

    _/s/ Dana J. Finberg_

41