

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| BARBARA H. LEE, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>VIRGINIA STATE BOARD OF<br>ELECTIONS, *et al.*<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:15CV357–HEH |

## MEMORANDUM OPINION

This is an action challenging, on a number of fronts, the constitutionality of

Virginia Code § 24.2-643(B), commonly referred to as the Virginia voter ID law or

Senate Bill 1256 ("SB 1256").  In effect, this statutory provision requires voters in the

Commonwealth of Virginia to present a form of statutorily-approved identification in

order to vote.  The approved forms of identification include a valid Virginia driver's

license, U.S. passport, or other photo identification issued by the Commonwealth of

Virginia, one of its political subdivisions, or the United States; a valid student

identification card containing a photograph of the voter and issued by any institution of

higher education located in the Commonwealth; or any valid employee identification card

containing a photograph of the voter and issued by an employer of the voter in the

ordinary course of the employer's business.  Va. Code § 24.2-643(B);[1] *see also* Pls.' Trial

---

[1] Other portions of the Amended Complaint seeking redress for long lines at polling precincts
and automatic re-enfranchisement of persons convicted of non-violent felonies were either
dismissed or resolved by the parties.

Ex. 151 – Voter Identification Chart.

Voters who are unable to produce valid identification are permitted to cast a provisional ballot which must be cured by the Friday succeeding election day. When voters are provided with a provisional ballot for lack of proper identification, it is noted by the election official in the provisional ballot log. The notation specifically includes that no identification is the reason the person is casting a provisional ballot. The voter is then advised of the procedure to cure, enabling her ballot to be counted. To cure a provisional ballot, voters must present valid identification to the local registrar either in person or by fax or email. (Trial Tr. 945:14–46:15, Feb. 25, 2016 (Test. of Myron McClees).)

Under the regulations implementing SB 1256, voters without valid identification can obtain free photographic voter identification at a local registrar's office. The application process requires the voter to identify herself by date of birth and social security number. After confirming that the applicant is a registered voter, her picture is taken and her signature is recorded on a digital pad. A photograph-bearing identification card is then sent to the voter's address of record free of charge. This form of voter identification can only be issued at registrar's offices because it requires access to a secure computer system containing the voter's personal identification. Consequently, such identification cannot be issued at polling stations. (*Id.* at 1449:9–50:7, 1465:16–66:11, Feb. 26, 2016 (Test. of Edgardo Cortés).)

Plaintiffs urge the Court to issue a permanent injunction enjoining the Commonwealth of Virginia and its agents from enforcing the voter ID law. In addition,

2

they ask the Court to find that the photo ID requirement for voting adversely impacts minority voters in violation of Section 2 of the Voting Rights Act, as well as the First, Fourteenth and Fifteenth Amendments of the Constitution of the United States. Plaintiffs also ask this Court to find that the voter ID law intentionally discriminates against young voters in contravention of the Twenty-Sixth Amendment.

Following resolution of pretrial motions addressing Plaintiffs' standing under Federal Rule of Civil Procedure 12(b)(1) and the adequacy of the underlying allegations under Rule 12(b)(6), this Court conducted a seven day trial without a jury. At the close of the evidence, in lieu of oral argument, the Court afforded each party an opportunity to file post-trial memoranda supporting their respective positions with specific references to pertinent portions of the voluminous documents placed into evidence in this case.[2] This opinion followed.

The core contention in this case is that the voter identification law was enacted by the Virginia General Assembly with the intention of gaining partisan advantage by placing an undue burden on certain classes of opposition voters. Count I alleges a violation of Section 2 of the Voting Rights Act. In support, Plaintiffs contend that the voter ID law has an adverse disparate impact on African American and Latino voters. Plaintiffs maintain that the law imposes a discriminatory burden on a protected class, fostered in part by social and historical conditions in the Commonwealth of Virginia. In Count II, Plaintiffs maintain that the Virginia voter ID law violates the First Amendment

---

[2] The parties introduced approximately 8,000 pages of documents in this case, plus an assortment of video tapes.

and the Equal Protection Clause of the Fourteenth Amendment in that it imposes an undue burden on the right to vote and results in disparate treatment of protected classes without a rational basis. Count III, styled "Partisan Fencing," alleges that the Virginia voter ID law subjects a group of voters to disfavored treatment by reason of their political views. Lastly, Counts IV and V allege intentional discrimination by race and age, respectively. Plaintiffs contend that the Virginia General Assembly enacted the Virginia voter ID law with the specific intent to suppress African American, Latino, and young voters.

In part, Plaintiffs' evidence consisted of testimony from a dozen Virginia voters who alleged that they were burdened by the Virginia voter ID law in casting their ballots during the 2014 and 2015 election cycles. These individuals cited a variety of impediments that allegedly made the voting process unduly cumbersome. But in most cases, complying with the law proved to be a surmountable hurdle. Plaintiffs offered a variety of expert witnesses describing the history of racial discrimination in Virginia politics and a demographic breakdown and analysis of segments of the Virginia population who may not possess valid identification. Virginia election officials and members of the General Assembly provided some legislative history on the enactment on the Virginia voter ID law and its implementation by the Virginia State Board of Elections ("SBOE").

The centerpiece of Plaintiffs' evidence was the expert testimony of several professors with extensive experience testifying in election law related cases. One expert concluded that in person voter identification fraud was rare. Another, after providing an

4

overview of election laws adopted by approximately thirty other states, concluded that there was no rational basis for the adoption of the Virginia voter ID law, and given the history of discrimination in Virginia, must have been adopted for the purpose of suppressing minority votes.

The Defendants countered with a number of expert witnesses who pointed out that the statistical analysis employed by Plaintiffs arguably omitted a large segment of Virginia voters who likely would have valid identification. Defendants' experts also testified that based on their investigation and analysis, the implementation of the Virginia voter ID law resulted in very few individuals being unable to cast a vote during the 2014 election cycle. They described the burden imposed by the Virginia voter ID law as having a fairly even effect on individuals of all ages, races, and nationalities. Furthermore, under the statutory scheme adopted under SB 1256, no voter was actually disenfranchised; each had a means of casting a ballot if he or she chose to exercise alternative voting options.

Lastly, the Defendants' experts pointed out that while the number of actual convictions for voter fraud may be minimal, that statistic may not accurately reflect the number of such cases reported to law enforcement authorities. Irrespective of statistics, one defense expert testified that in her opinion, several legitimate reasons existed warranting passage of the voter ID law, including that a large segment of the Virginia population had a perception that in person voter fraud could potentially occur and supported the legislation challenged in this case.

To provide some insight into the deliberative process underlying the enactment

and the implantation of SB 1256, the Defendants, a former Secretary of the SBOE, and a number of SBOE and Virginia Department of Elections ("VDOE") employees, along with other local election officials, outlined the extensive public information campaign launched in 2014 to educate voters on the necessity for proper identification when voting. Edgardo Cortés ("Cortés"), the current Commissioner of the VDOE, who opposed SB 1256, testified that he and his staff attempted to implement the law in the least burdensome way possible. (Trial Tr. 1500:11–18, Feb. 26, 2016.) While this outreach was not flawless, it included a large swath of voters.

The evidence in this case clearly demonstrated, as both parties will concede, that Virginia has an unfortunate history of racial discrimination and statutory artifice to hinder black voting. The evidence is equally clear that prior to the adoption of the Voting Rights Act in 1965 ("the Act"), legislation was enacted by the Virginia General Assembly that materially affected the rights of African Americans to vote. The Voting Rights Act was intended as a safeguard against policies and practices undermining an equal opportunity by black and white voters alike to elect their preferred representatives. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). While the Act undoubtedly ushered in significant reform measures, underlying issues continued to spark partisan debate.

The evidence also revealed that the Virginia voter ID law has created a layer of inconvenience for some voters. But the question squarely presented in this case is whether Virginia Code § 24.2-643(B) is unconstitutional either in its adoption, implementation, or enforcement. Does it, by design or otherwise, adversely affect the opportunity of minorities to vote or is the burden evenly spread? Is a legislative body's

authority to adopt protective legislation dependent on objective criteria or their delegated judgment?

## I.     A Second Look at Standing

Before turning to the merits of Plaintiffs' claims, the Defendants urge the Court to revisit its earlier finding that the Democratic Party of Virginia ("DPVA") has Article III standing. In a Memorandum Opinion issued December 18, 2015, this Court concluded, based upon a facial review of the Amended Complaint, that "[i]n the immediate case, the DPVA claims direct injury to its raison d'être—electing candidates who support the Democratic platform, as opposed to individualized interests of its members." (Mem. Op. 8, ECF No. 110).

The testimony at trial appears to support this conclusion. While it has no formal membership roster, the DPVA is an umbrella organization encompassing committees of supporters in every city and county in Virginia. Rebecca Slutzky ("Slutzky"), Executive Director of the DPVA, testified that under the party plan, it includes anyone who leans Democratic, votes Democratic, or supports the Party. As the United States Supreme Court explained in *Warth v. Seldin*, 422 U.S. 490 (1975), associations can allege standing based upon two distinct theories. First, the association "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. Second, the association may have standing as the representative of its members who have been harmed. *Id.*; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

The DPVA serves as an umbrella organization overseeing local committees composed of Democratic supporters, coordinating statewide campaign strategies, and promoting voter turnout. The party expended time and resources to educate voters and party members on the requirements of SB 1256. The party obtained lists of individuals who may not possess proper identification for information targeting. It also hired a voter protection director whose responsibilities included the identification and education of voters potentially burdened by identification requirements. Slutzky also testified that the voter education program necessitated by SB 1256 detracted time and resources that would have otherwise been expended increasing voter turnout.

Both the chair and vice chair of the Henrico County Democratic Committee described similar experiences. Both were active in voter identification education. Cheryl Zando ("Zando"), Chair of the Henrico County Democratic Committee, also chaired a task force which organized phone banks promoting free identification available at the registrar's office. Cathy Woodson ("Woodson"), Vice Chair of the Henrico County Democratic Committee, organized outreach projects at community events to familiarize voters with identification requirements and access to free forms of valid identification. Both Zando and Woodson testified that but for the need to educate voters on the requirements of SB 1256, they would have engaged in other campaign-related activity. Near identical experiences were recounted by Susan B. Kellom, Chair of the Alexandria City Democratic Committee, and Jeff Allen ("Allen"), a Democratic Party field organizer.

Collectively viewed, the DPVA has shown sufficient injury primarily in the form

of diversion of time, talent, and resources to educate their voters and implement the requirements of the Virginia voter identification law. *See Crawford v. Marion Cnty. Elec. Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Sevrs. Inc.*, 528 U.S. 167, 180–84 (2000)), *affirmed* 553 U.S. 181 (2008)).

In the Court's opinion, Plaintiffs have satisfied their burden of demonstrating a realistic danger of sustaining direct injury as a result of SB 1256, if in fact it suppresses minority voters likely to support Democratic candidates. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008). Both individual Plaintiffs in this case are registered voters in Virginia who affiliate themselves with the Democratic Party. They express an intention to vote for Democratic candidates in the future and have been involved in voter registration, education, and voter turnout projects. Both Barbara H. Lee ("Lee") and Gonzalo Aida Brescia ("Aida") are members of their local Democratic committee and intend to participate in get-out-the-vote activities during the next election cycle. Aida also testified that as a result of the enactment of SB 1256, he had the additional burden of preparing educational materials on valid forms of voter identification, including emails, graphics, and Facebook postings. These tasks consumed time that he would have otherwise devoted to issue and candidate advocacy.

## II.    Overview of Legal Standards by Which Evidence is Measured

Section 2 of the Voting Rights Act, codified at 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." The statute further explains that "'[a] violation of subsection (a) is established if, based on the totality

of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by' citizens of protected races 'in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014) (second alteration in original) (quoting 52 U.S.C. § 10301(b)).

The central inquiry under Section 2 "is whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44 (internal quotation marks and citation omitted). Proof of intentional discrimination is unnecessary to prevail on a Section 2 claim. Proof of discriminatory results is sufficient. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). "The essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

Based on a thorough analysis of Section 2 vote-denial jurisprudence, the Court of Appeals for the Fourth Circuit in *League of Women Voters of North Carolina* isolated the two critical elements of proving such a claim:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

10

769 F.3d at 240 (internal quotation marks and citations omitted).

The Supreme Court has continually counseled that vote-denial cases brought under Section 2 should not be viewed in isolation, but should be evaluated in light of the totality of circumstances. The court in *Gingles* suggested a number of potentially relevant factors. These include: (1) any history of voting-related discrimination in the pertinent state; (2) the extent to which voting is racially polarized; (3) the history of use of voting practices or procedures that tend to enhance the opportunity for discrimination against minority groups; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of even subtle racial appeals in political campaigns; (7) the extent to which the members of the minority group have been elected to public office in the jurisdiction; (8) evidence that elected officials are unresponsive to the particularized needs of members of the minority group; and (9) the extent to which the policy underlying the state's use of the practice or structure at issue is tenuous. *Gingles*, 478 U.S. at 44–45.

In applying the analytical framework articulated in *Gingles*, "'there is no requirement that any particular number of factors be proved, or [even] that a majority of them point one way or the other.' . . . Instead, courts must undertake 'a searching practical evaluation of the past and present reality,' [with] a 'functional' view of the political process." *League of Women Voters of N.C.*, 769 F.3d at 240–41 (alterations in

11

original) (quoting *Gingles*, 478 U.S. at 45).

Turning to the First Amendment and Equal Protection claims raised in Count II of the Amended Complaint, this Court's review is guided by the balancing framework articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and amplified by *Burdick v. Takushi*, 504 U.S. 428 (1992). The Court succinctly framed the *Anderson-Burdick* controlling standard in *Crawford v. Marion County Election Board*: "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." 553 U.S. 181, 190 (2008) (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks omitted).

Finally, the teachings of the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), are instructive in analyzing the intentional discrimination claims in Counts IV and V. The court in *Arlington Heights* restated the well-established tenet that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265. *Arlington Heights* identified a number of factors to be employed by reviewing courts in evaluating facially neutral laws allegedly passed with a discriminatory purpose. This evaluation requires courts to perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. The court further stressed that the impact of the official action may provide an important starting point under discriminatory purpose analysis. *Id.*

In assessing whether racial discrimination has been demonstrated to be a

substantial or motivating factor behind the enactment of legislation, *Arlington Heights* also delineated a number of non-exhausting factors to guide the court: (1) the historical background of the decision-making process, particularly if it indicates a series of official actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged legislative action; (3) departures from normal procedural sequence; (4) substantive departures, particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached; (5) the legislative or administrative history especially where they are contemporary statements by members of the decision-making body, minutes of its meetings or reports. *Id.* at 267–68.

"Once racial discrimination is shown to have been a substantial or motivating factor behind the enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (internal quotation marks and citation omitted).

### III.   Legislative History of Virginia Voter Identification Bills

To provide historical context for the present litigation, some explanation of the evolution of SB 1256 may serve as an enlightening preface. The stage is set with the adoption of the Help America Vote Act ("HAVA") of 2002 by the United States Congress. With the objective of protecting the integrity of the electoral process, HAVA imposed a number of requirements on the individual states. Congress required every state to create and maintain a computerized statewide list of all registered voters. 52 U.S.C. § 21083(a)(1)(A). In addition, HAVA required states to verify voter information contained on a voter registration application by using the applicant's driver's license

13

number or the last four digits of the applicant's social security number. *Id.* §

21083(a)(5)(A)(i).  Most pertinent to the case at hand,

> HAVA also impose[d] new identification requirements for individuals
> registering to vote for the first time who submit their applications by mail.
> If the voter is casting his ballot in person, he must present local election
> officials with written identification, which may be either "a current and
> valid photo identification" or another form of documentation such as a bank
> statement or pay check.  If the voter is voting by mail, he must include a
> copy of the identification with his ballot.  A voter must also include a copy
> of the documentation with his application or provide his driver's license
> number or Social Security number for verification.  Finally, in a provision
> entitled "Fail-safe voting," HAVA authorizes the casting of provisional
> ballots by challenged voters.

*Crawford*, 553 U.S. at 193 (citations omitted).

The photograph identification requirements established by HAVA applied only to

federal elections.  However, as the Court pointed out in *Crawford*, the safeguard

measures adopted in HAVA did "indicate that Congress believes that photo identification

is one effective method of establishing a voter's qualification to vote and that the

integrity of elections is enhanced through improved technology.  That conclusion is also

supported by . . . the Commission on Federal Election Reform, chaired by former

President Jimmy Carter and former Secretary of State James A. Baker III." *Id.*

The requirement that voters present a non-photo form of identification at the polls

has been in effect since 1996 in the Commonwealth of Virginia.  A registered voter

without any form of identification could cast his or her ballot by simply executing an

affirmation of identity.  (Trial Tr. 956:20–24, Feb. 25, 2016 (Test. of Myron McClees).)

In 2012, it became apparent to the SBOE that the mere signing of an affirmation of

identity for first time voters in federal elections who registered by mail was inadequate to

14

comply with HAVA standards. (*Id.* at 1611:15–12:4, Mar. 1, 2016 (Test. of Donald Palmer).) The differing identification procedures for state and federal elections created considerable confusion among poll workers. (*Id.* at 1611:18–12:11.)

In 2012, the Virginia General Assembly rescinded the self-affirmation procedure and substituted a limited field of non-photograph bearing identification. To promote uniformity, voters in Virginia were required to produce one of the specified forms of identification in all elections, both state and federal. Va. Code § 24.2-643 (version effective until July 1, 2014). Voters could register by mail without submitting any form of identification and receive a non-photo registration card. While largely supported by Republicans, this legislation was adopted with bipartisan support. It was subsequently reviewed and precleared by the United States Department of Justice as required by the Voting Rights Act.

In 2013, just one year after a voter identification bill had been adopted, the General Assembly passed SB 1256. While this legislation expanded the list of permissible forms of identification, it required that the identification include a photograph of the voter. The bill, introduced by Senator Mark Obenshain ("Senator Obenshain"), sparked spirited partisan debate on the floor of the Virginia General Assembly. SB 1256 was ultimately adopted with unanimous Republican support, coupled with one Democrat and one Independent supporter. (Trial Tr. 1615:8–14, Mar. 1, 2016 (Test. of Donald Palmer).) The law as enacted also provided for the issuance of a free photograph-bearing voter identification card by local registrars' offices. If the applicant is a registered voter, no further identification is required to obtain a free photo ID. Va. Code § 24.2-643

15

(version effective from July 1, 2014).  Approximately 4,500 free photo IDs have been

issued.

The language of SB 1256 also required that the photo ID be valid.  Donald L.

Palmer ("Palmer"), Secretary of the SBOE in 2013, testified that the definition of the

term "valid" kindled considerable debate between the SBOE and Senator Obenshain,

patron of SB 1256.  In reviewing SBOE's regulations, Palmer discovered that in either

2000 or 2001, the SBOE had issued guidance to registrars that any form of identification

expired in excess of thirty days should be considered invalid.  In the ensuing discussions

regarding SB 1256's implementation, the SBOE was not in favor of adopting any specific

expiration period.  Senator Obenshain sent a letter to the SBOE challenging its authority

to permit any form of expired identification to be honored by election officials as valid.

The SBOE, over the Senator's objection, voted to define a valid identification as one not

expired over one year.  (Trial Tr. 1621:4–17, Mar. 1, 2016 (Test. of Donald Palmer).)

After inviting public comment, the regulation was adopted.  Palmer also testified

that in his opinion, SB 1256 deterred voter fraud and served as a valuable safeguard.  (*Id.*

at 1634:5–7.)  In fact, he recalled that a computerized interstate cross-check of persons

voting in Virginia against votes cast in other states revealed several cases of possible

multiple voting.  These cases were referred to the Virginia State Police but did not result

in prosecution.  (*Id.* at 1682:3–23.)

According to Palmer, many of the provisions of SB 1256 were modeled after voter

ID laws adopted in other states such as Georgia and South Carolina, which had been

precleared by the Department of Justice pursuant to the Voting Rights Act.  (*Id.* at

1650:16–23, 1680:10–14.)

J. Justin Riemer ("Riemer"), Deputy Secretary of the SBOE from October 2011 through January 2014, testified to several initiatives the SBOE undertook to improve the electoral process in Virginia. For example, the SBOE promoted legislation allowing for the Department of Motor Vehicles ("DMV") to transmit completed voter registration forms electronically to the appropriate registrar's office so that those voters may be registered and added to the voter rolls. (*Id.* at 1554:3–55:11.) Additionally, the SBOE attempted to improve the process for absentee voting by allowing voters to apply for an absentee ballot online. (*Id.* at 1555:17–56:3.) Although this initiative ultimately launched after his tenure with the SBOE, he helped to lay the policy groundwork for its implementation. (*Id.* at 1556:4–6.)

In the debate preceding the adoption of SB 1256, Riemer recalled commentary in the General Assembly concerning the existence of voter fraud. He specifically remembered a comment by Senator Thomas A. Garrett ("Senator Garrett"), in his former capacity as a Commonwealth's Attorney, that Garrett had prosecuted such a case. He also remembered an article in the Richmond Times-Dispatch indicating that voter related fraud may be a "bigger problem in Virginia than [the Times-Dispatch] had realized and . . . had acknowledged." (*Id.* at 1563:11–64:2.) While Riemer recalled reports of voter registration fraud, he admitted no knowledge of any prosecution for in person voter fraud. He noted that the SBOE conducted no formal study of voter fraud before SB 1256 was adopted. (*Id.* at 1573:6–9.)

Riemer did testify that an analysis was conducted to determine how many voters

were in the DMV's system as either having operator's licenses or other forms of DMV identification. The results indicated that 93.22 percent of active voters in Virginia had some form of DMV-issued identification. (Pls.' Trial Exs. 168, 185.) Riemer conceded though that this statistic did not reflect the number of individuals residing in rural areas without access to a motor vehicle or were too disabled to get to polling locations.

The 2012 legislation, in its original form, included a provision requiring voters to present photo identification. Delegate Jennifer McClellan ("Delegate McClellan"), a Democrat representing the Richmond area, testified that she was so concerned about its effect on her minority constituents that she approached Governor Robert McDonnell, a Republican, for assistance. Delegate McClellan described her district as an economically diverse majority-minority district with a total black population approaching seventy percent. She also believed that a number of her constituents born as late as 1940s may not have birth certificates enabling them to acquire the necessary identification. Furthermore, in her opinion, the photo identification issued by the DMV was the equivalent of a poll tax because of the $10 cost. She testified that she found the Republican rationale for the photograph bearing identification to be unpersuasive. She was unaware of any reported incidents of voter fraud that would be deterred by such legislation. (Trial Tr. 376:14–77:8, Feb. 23, 2016.)

Delegate McClellan convinced Governor McDonnell that the photograph requirement would place an undue burden on her less-affluent constituents. At Delegate McClellan's urging, and after conferring with other groups representing minority interests, Governor McDonnell amended the 2012 legislation by adding non-photo ID

options to the list of acceptable forms of identification.  Governor McDonnell also

pressed the General Assembly to include a budget item underwriting the cost of

educating voters on the new identification requirements.  Despite these modifications to

the legislation, Delegate McClellan still opposed the 2012 voter identification bill.  She

testified that she had many constituents who were unemployed, had no driver's license,

or any form of student identification.  (*Id.* at 377:9–18.)  Moreover, she stridently

opposed the 2013 bill which revived the photo identification requirement.  She added that

no African-American member of the General Assembly supported the 2013 bill which, in

her view, burdened her constituency.  Voters in her district were opposed to the 2013

voter identification law because there was no compelling reason to amend the 2012 law

by adding a photo identification requirement.  (*Id.* at 380:18–82:7.)  In their view,

nothing occurred between 2012 and 2013 to justify such action.

Prior to being elected to the Virginia Senate in 2015, Scott A. Surovell ("Senator

Surovell") represented the Mount Vernon area of Fairfax County in the House of

Delegates.  He described his House district as predominately upper class with the

exception of Gum Springs, an historic area with a lower income mix of African American

and Latino population.  The Senator described himself as a life-long political activist

aggressively involved in voter recruitment and working the polls.  Senator Surovell

testified that he dedicated a considerable amount of time as a House member interacting

personally with Gum Springs constituents.  In his campaign for the state Senate in 2015,

Senator Surovell testified that he knocked on approximately 25,000 doors in the area he

represents.

Although Senator Surovell had only anecdotal evidence, and minimal hard numbers, he suspected that many Gum Springs residents had neither the resources nor the transportation to obtain any form of valid photo identification. Many residents of that area had no Virginia driver's license and relied on public transportation. The Fairfax County Registrar's Office, according to Senator Surovell, is located in the government center, which is approximately a two-hour bus ride from his district, and a forty-five minute commute by car. He believed this distance made a free form of voter identification beyond the reach of some lower income voters.

Despite an unscientific poll of residents of his House district narrowly favoring a photo identification requirement to vote,[3] Senator Surovell led the opposition to such legislation on the House floor. He too was unconvinced that there were any reported incidents of voter impersonation in Virginia warranting such legislative action. He remembered asking his Republican colleagues to offer examples of voter fraud. He recalls none. In his view, the 2013 legislation was a "solution in search of a problem." (*Id.* at 312:23–24.) Although Senator Surovell argued forcefully on the floor of the Virginia General Assembly that such legislation limited the constitutional right of his constituents to vote, he admitted that he was unaware of any incidents where someone was actually denied the right to vote as a result of the photo identification law. While Senator Surovell suspected partisan motives for the adoption of the 2013 legislation, he conceded that popular support for photo identification was probably a factor in its

---

[3] In Senator Surovell's informal survey of his constituents, he received between 400 and 600 responses which he described as "either an even split, or a slight majority in favor of ID." (Trial Tr. 359:6–60:4, Feb. 23, 2016.)

adoption.

Algie Howell, Jr., a former member of the Virginia House of Delegates, currently serving on the Virginia Parole Board, opposed voter identification laws. His opposition was based in part on his personal experience attending racially-segregated schools in Virginia, and what he described in his testimony as Virginia's fifty-year history of discrimination. He recalled that many members of his African-American family had no education. (*Id.* at 471:2–72:12.)

Following the adoption of SB 1256, the VDOE launched a statewide pre-election campaign informing voters of the photo identification requirement. This included sending 86,000 postcards to persons on the active voter list who DMV records reflected possessed no DMV-issued ID and would likely need a photo ID to vote under the new law. (*Id.* at 1474:20–75:6, Feb. 26, 2016 (Test. of Edgardo Cortés).) This excluded certain regular absentee voters who would not need photo ID to cast an absentee ballot. To educate local electoral board members, general registrars, and poll workers, the VDOE instituted training programs and issued handbooks and procedural guides. (*Id.* at 1471:5–14; *id.* at 940:5–24, Feb. 25, 2016 (Test. of Myron McClees).)

Matthew J. Davis ("Davis"), the Chief Information Officer for the VDOE, also testified that his agency employed billboard ads, radio, and Facebook, to acquaint voters with the recently enacted identification requirements. (*Id.* at 1006:15–07:24.) The VDOE contracted with a marketing agency to assist in developing an outreach strategy. With the agency's assistance, the VDOE distributed over 500,000 fliers and posters to registrars' offices. (Pls.' Trial Ex. 155.) There are 133 local registrar's offices in

Virginia.

In addition, Davis indicated that VDOE records reflected that 773 provisional ballots were cast by voters without valid identification in 2014, as reported by 129 Virginia jurisdictions. The following year in 2015, 408 provisional ballots were cast by voters with no acceptable form of identification. In 2015, however, twenty-seven jurisdictions failed to report the number of provisional ballots issued to voters without identification. Statistically, this translates to .04 percent of the total ballots cast in 2014 and .03 percent in 2015. (Defs.' Trial Ex. 301.)

## IV.   Plaintiffs' Evidence

To provide a historical overview of racial discrimination in Virginia, particularly as it relates to voting rights, the Plaintiffs began their presentation of evidence with the testimony of Dr. John Douglas Smith ("Dr. Smith"). Dr. Smith, who holds a Ph.D. in American history from the University of Virginia and currently serves as the Director of Humanities at Colburn Music Conservatory, was offered as an expert in Virginia history, with an emphasis on racial discrimination. He is the author of a book entitled *Managing White Supremacy*. Although he provided his impressions of the effects of contemporary voting policies and practices, the bulk of his writings and research appears to focus on the pre-Voting Rights Act era. Dr. Smith recounted in some detail overt measures adopted in Virginia to inhibit minority voting from the post-Civil War era through Massive Resistance. In his view, following the adoption of the Voting Rights Act in 1965, the strategy employed to suppress minority voting took a more subtle form.

According to Dr. Smith, during the post-Civil War era, African Americans initially

enjoyed some success in electing African Americans to the General Assembly, as well as one to the United States House of Representatives. Following the adoption of the revised Virginia Constitution in 1902, African Americans experienced a decline in political power and influence. In Dr. Smith's opinion, with the imposition of literacy tests and enactment of a poll tax, Virginia's African Americans were essentially disenfranchised— and remained second class citizens until the mid-twentieth century.

Turning to the Civil Rights Era, following the decision of the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483 (1954), firmly resolved Virginia political leaders led the Massive Resistance movement to keep public schools segregated. One unyielding county took the extraordinary step of closing its public schools for five years to avoid integration. Laws passed in Virginia to hinder desegregation were repeatedly struck down by federal courts, along with Virginia's poll tax for state elections. In the interim, the Twenty-Fourth Amendment was adopted to abolish the poll tax for federal elections.

In discussing more contemporary times, Dr. Smith highlighted the election of L. Douglas Wilder as the first popularly elected African-American governor in American history. But as examples of continuing racial overtones in modern Virginia politics, he pointed out that Governor Wilder was elected by a smaller than expected margin of victory in 1989. He also noted the Declaration of April as Confederate History and Heritage Month by Republican governors and Senator George Allen's use of the term "macaca" when referring to a man of South Asian descent as further evidence that race

23

continues to play a role in Virginia's politics.[4] As further examples of residual evidence

of racial discrimination in Virginia, Dr. Smith discussed the ongoing litigation over

claims of racial gerrymandering, coupled with approximately twenty objections by the

Department of Justice to changes in Virginia's voting laws under Section 5 of the Voting

Rights Act.

In support of his conclusion that subtle remnants of discrimination remain in

Virginia politics, Dr. Smith points to the fact that Virginia has failed to elect an African

American to a statewide office since Governor Wilder's election in 1989, which was

preceded by his election as Lieutenant Governor in 1985. Dr. Smith does acknowledge

that Republicans have twice nominated African-American candidates for statewide office

in recent years, while Democrats have failed to do so.[5]

In his final analysis, Dr. Smith concludes that Virginia's voter identification law is

consistent with the long line of actions taken over Virginia's history to suppress minority

vote. Dr. Smith appears to assume that the viewpoint of current legislators must be

infected by this inherited legacy. While Dr. Smith's testimony is informative, his broad

conclusions appear to be leavened largely by anecdotal evidence and historical inference

with scant evidentiary support. Dr. Smith neither interviewed any member of the General

Assembly nor reviewed the legislative record.

To demonstrate the burden to voters occasioned by SB 1256, Plaintiffs introduced

---

[4] According to Dr. Smith, Senator George Allen received approximately sixteen percent of the African American vote in his 2006 failed re-election bid after he used a racial slur.

[5] No other African American has pursued state-wide office in a general election as a Democrat since 1989, except Donald McEachin. In 2001, the Democrats nominated now Senator McEachin, an African American, for Attorney General; however, he lost to Jerry Kilgore.

evidence from a series of individuals and local election officials who recounted experiences prior to and during the 2014 election cycle. These witnesses uniformly describe themselves as favoring Democratic candidates. Two of the twelve burdened voter witnesses were African American and the other ten were Caucasian. Of the twelve, four people actually cast votes in the 2014 or 2015 election: two timely cured their provisional ballots, one voted absentee, and one returned to the polls with valid identification.

Eight other voter witnesses made a conscious choice not to pursue other voting options or cure their provisional ballots, either because the winner had been declared, they lost interest, forgot, or were angry. One of these witnesses, who testified that she left the polls in frustration, indicated that no one offered her a provisional ballot. Two other non-voting witnesses testified that they were unaware that they could cure their provisional ballots by fax or email.

In almost every case, the testifying voter was unable to produce a valid identification at the polls. Six of these individuals, despite being bona fide Virginia residents, had either an out-of-state or expired driver's license.[6] One had lost his voter identification; one had no Virginia operator's license, but had a valid passport, which he omitted to bring to the polls. One had an expired passport and another voter reasoned that because the poll workers knew him, no photo ID should be necessary. Finally, two of the voter witnesses failed to timely receive their free voter identification. Each of

---

[6] With certain exceptions for military personnel, Virginia Code § 46.2-308 requires every new resident to obtain a Virginia operator's license within sixty days of residency.

these voters was eligible to cast absentee ballots but some chose not to do so and others were unaware that it was available.

All twelve of the allegedly burdened voters who testified expressed frustration with their initial inability to vote without photo identification. Most testified that they were unaware of the requirement. Each also expressed their disagreement with the need for such unexpired identification. Some were disgruntled by the necessity to travel to the registrar's office to cure their vote, particularly those who were disabled or elderly.

Plaintiffs also designated depositions of two affected voters as evidence. Charles Benagh, a white male, chose not to vote in-person in 2015 even though Fairfax County had informed him that he possessed an appropriate form of identification. (Benagh Dep. 43:1–11, 48:20–50:3, Pls.' Trial Ex. 220.) Instead, he applied for and received an absentee ballot, which he chose not to return because he did not believe that he could mail it and have it delivered in time to be counted. (*Id.*)

Mary Joanna Jones ("Jones"), an eighty-one year-old African American, attempted to vote in-person during the 2014 general election, but she did not have an acceptable form of identification. (Jones Dep. 11:1–14, 13:3–23, Pls.' Trial Ex. 224.) She cast a provisional ballot, which she cured the following Thursday. (*Id.* at 16:12–25, 29:5–14.) She attempted to obtain her free photographic identification from the registrar's office when curing her ballot, but because of a mix-up in Richmond, she did not receive her free identification in a timely manner. (*Id.* at 18:4–22:20.) To accommodate her, an individual from the registrar's office came to Jones's home in September 2015 to take her picture for the free identification. (*Id.* at 22:21–23:25.) She received her identification

before the general election and successfully cast her ballot that fall. (*Id.* at 22:21–25.)

In the final analysis, none of the voter witnesses was actually denied his or her right to vote. Admittedly, for some, the process was cumbersome. Many voters, including a number who testified in this case, were not informed they could cast an absentee ballot, that they could cure the provisional ballot, or obtain a free photo ID. Others had valid identification but failed to bring it to the polls.

To further illustrate the impact of SB 1256, Plaintiffs offered the testimony of a number of Democratic Party activists and election officials. These witnesses recounted the difficulty in educating low income and minority voters on the requirement of photo identification. Most of these witnesses indicated that voters in their community did not understand the need for photograph bearing identification.

The chair and vice chair of the Henrico County Democratic Committee described their voter outreach campaign, which was conducted in league with the SBOE. It included phone banks, palm cards, fliers, and Facebook postings. Their efforts specifically targeted minority and elderly voters. The vice chair described the outreach program as successful.

The secretary of the Prince William County Electoral Board described his community as a "battle ground" district with a fairly even minority-majority population. (Trial Tr. 657:19–58:2, Feb. 24, 2016.) He intimated that because the local police frequently check on members of the Latino community to ensure that they have proper immigration identification, there may be a mistrust of government. In his view, the photo identification requirement was unnecessary and was not well-received by voters in his

county.  He found the requirement particularly problematic in high turnout election years because it contributed to longer lines.

The chair of the Alexandria Democratic Committee, who served on the Electoral Board as well, also described her education outreach as focusing on young and elderly voters.  Particularly challenging for her was maintaining a list of colleges that have some presence in Virginia.  Since this is a prerequisite to the validity of a college identification, she found herself frequently having to check a schedule of approved colleges.  She also questioned the need for a photo ID to vote.

Three other Democratic operatives added their perspective.  Plaintiff Barbara Lee, from Stanton, Virginia, believed that the voter identification requirement lowered voter turnout.  She also believed that the requirement adversely impacted low income areas in which people had neither the time nor transportation required to obtain valid identification.  Lee, however, was only able to identify one person who, she believed, could not vote as a result of the voter identification requirements.  She also admitted on cross-examination that she never advised this individual of her right to cast an absentee ballot.

Jeff Allen, from Alexandria, Virginia, a campaign manager, political consultant, and Democratic field organizer, described the challenge he encountered in educating what he described as lower turnout voters.  He revealed that in explaining the requirements of the voter identification law, he only mentioned the alternative of casting an absentee ballot if specifically asked.  He recalled encountering one bedridden voter who, he believed, had no photo identification.  Allen added on cross-examination that the

28

bedridden voter indicated no interest in casting an absentee ballot.

Plaintiff Gonzalo Aida, a member of the Richmond Democratic Committee, found the voter ID law to be an obstacle during the 2014 elections. Aida focused his get-out-the-vote activities on Latino communities and university campuses. He found university students, by and large, to be unwilling to devote the necessary time to acquire photo identification. As a poll worker, he encountered a number of people without valid photo identification. Only a few people, however, declined to accept provisional ballots. He did encounter some African Americans who were frustrated and refused to accept provisional ballots. Aida admitted on cross-examination that he was unaware of any person who was unable to vote because of the Virginia voter identification law.

## V.   Defense Witnesses

The defense called a number of Virginia election officials, most of whose testimony is recounted in other sections of this opinion. These witnesses include Edgardo Cortés, Commissioner of the VDOE; J. Justin Riemer, former Deputy Secretary of the SBOE; Matthew J. Davis, Chief Information Officer, VDOE; and Donald Palmer, former Secretary of the SBOE. The defense also introduced the testimony of Myron McClees, Policy Advisor, VDOE.

McClees attended a number of the committee hearings on SB 1256. He encountered considerable partisan sparring but remembered arguments in favor of the bill as a vehicle to reduce voter fraud. McClees characterized the decision of the SBOE to adopt a one-year expiration date for voter identification as a compromise. McClees's responsibilities also included educating voters on the identification requirements

prescribed by SB 1256. His personal voter outreach focused on low income and minority voters. For example, he sent letters to members of the NAACP and to members of the clergy explaining the regulations and offering further assistance. McClees was concerned that the provisional ballot used in 2014 did not mention the availability of free voter ID. The present provisional ballot includes such information.

The Defendants also called Cameron Quinn ("Quinn"), former Fairfax County general registrar, as a witness. Quinn described her extensive outreach efforts to educate the 700,000 voters in her county on post-2013 voter identification requirements. To enhance its implementation, she employed both mobile and satellite offices to register voters and issue free forms of identification.

Quinn readily admitted that she encountered a number of complications in implementing the newly-enacted photo identification requirement. She recalled in July of 2014 sending a letter to Commissioner Cortés explaining problems with the mobile system for issuing free voter identification. It required several weeks to bring the system back online.

Quinn testified that during the 2014 election cycle, just under 500 provisional ballots were cast in Fairfax County. Fifty of those were cast because the voter could not present valid identification. Of that number, approximately one half were cured within the statutorily-allotted time frame. (Trial Tr. 1718:19–19:1, Mar. 1, 2016.)

## VI.   The Experts' Interpretation of the Impact of SB 1256 on Minority and Young Voters

To add an interpretative gloss to the factual evidence, each side presented an array

of expert witnesses, most drawn from the academic community. Their widely differing opinions were based on statistical models shaped from surveys, public data, and academic studies. Several experts employed analytical constructs crafted specifically for this type of litigation, purporting to identify burdened segments of the population likely to have no valid identification enabling them to vote. And, each expert, in varying degrees, acknowledged Virginia's undeniable pre-Voting Rights Act history of discriminatory voting policies. The experts, however, presented divergent viewpoints on the justification for photo-bearing voter identification, as well as the motives of the Virginia General Assembly in enacting such legislation.

### a.    Dr. Allan Lichtman

To support their contention that SB 1256 was intended to discriminate against certain groups by placing disparate burdens on voting rights, the Plaintiffs called Dr. Allan Lichtman ("Dr. Lichtman"), a distinguished professor of history at the American University. In formulating his opinions, Dr. Lichtman applied quantitative methodology to draw inferences from political history. His resources included scholarly books, articles, reports, newspapers, demographics, election returns, court opinions, and scientific surveys.[7] The professor noted that he had testified many times previously as an expert in the field of legislative intent.

---

[7] In supporting his conclusion that SB 1256 stifled minority voter turnout, he also relied on a study conducted on a Texas voting district and a survey of 200 Virginia voters. (Trial Tr. 1334:08–35:04, 1405:22–06:14, Feb. 26, 2016.) Defendants' expert Dr. Owen countered that the Texas study involved a distinctly different population base and the sample size of the second survey was too narrow to be of value. (*Id.* at 1956:14–21, Mar. 2, 2016.) She also noted that many individuals who responded to the 200-person survey of Virginia voters that reported lacking proper identification actually chose not to vote for other reasons. (*Id.* at 1953:06–56:13.)

Based upon his historical and quantitative analysis, and relying on eight of the nine factors articulated in *Gingles, supra,* Dr. Lichtman concluded that the Virginia voter ID law in controversy in this case was enacted and implemented with discriminatory intent. He further opined that the law was enacted not only to achieve political advantage but also to burden the Democratic minority base. In his view, race is a fundamental divide politically between the Democratic and Republican parties. He perceives the political base of the Republican Party as white voters and that of the Democrats to be African Americans. Despite significant progress in recent years, African Americans, according to Dr. Lichtman, have a much lower income, are less likely to have a college degree, and more likely to be unemployed than white voters. He describes the present economic status of African Americans as a lingering effect of historical discrimination.

Dr. Lichtman conceded that much of the basis for his conclusions consists of a mosaic of circumstantial evidence. Normally, according to Dr. Lichtman, legislators do not openly state their intent when it is discriminatory. He highlighted the fact that votes cast in the General Assembly on SB 1256, both in committee and on the floor, were either party line or near party line. It was also noteworthy to the professor that Virginia amended the 2012 voter ID law the following year to add the photo requirement without what he believed to be any rational basis. The statistical risk of voter fraud cannot logically explain the addition of a photo requirement in 2013. Dr. Lichtman was quick to add that a Republican National Lawyers Association study was unable to identify any cases of voter impersonation fraud in Virginia. Also significant to the professor in informing his opinion was Senator Obenshain's opposition to the SBOE's decision to

allow expired identification.  He also suggested that members of the General Assembly should have known about academic studies showing that voter identification laws have a disparate impact on African Americans.

In commenting on the so-called "Senate factors" relied upon in *Gingles*, Dr. Lichtman drew particular attention to several factors which he contends are applicable in Virginia.  With respect to subtle racial appeals in campaigns, Dr. Lichtman mentioned a disparaging racial comment made by Senator George Allen during his re-election campaign in 2006 and arguably racial cartoons attributed to Republican sources. Although he presented no information about the number of African Americans running for public office in Virginia, he considered the fact that L. Douglas Wilder was the only African American elected to statewide office and that African Americans are underrepresented in the General Assembly.  He also cited the legislature's rejection of a proposed constitutional amendment enabling the automatic restoration of voting rights to nonviolent former felons.  Lastly, Dr. Lichtman was of the opinion that the failure of the General Assembly to expand Medicaid was an example of elected officials not being responsive to the needs of African Americans.  He offered no explanation as to how Virginia would absorb the cost.

While Dr. Lichtman conceded that evidence of actual suppression is difficult to unearth, he steadfastly disagreed that other states which passed a strict voter ID law did so without a latent motivation to suppress minority vote.  To bolster his conclusion, he elaborated by saying that of the fourteen states which passed voter identification laws after 2008, most had Republican control of the legislature.  In two of those states,

according to Dr. Lichtman, the legislatures overrode the veto of a Democratic governor. Rhode Island was the one state that enacted voter ID with a Democratic state legislature and an Independent governor.

### b. Testimony of Dr. Lorraine Minnite

To provide an assessment of the frequency of voter fraud in Virginia, the Plaintiffs called Dr. Lorraine Minnite ("Dr. Minnite"), an associate professor at Rutgers University, Department of Public Policy and Administration. Dr. Minnite was received as an expert in the field of American election law and voter fraud. She is the author of a book entitled *The Myth of Voter Fraud*. After surveying all available information and statistics, Dr. Minnite concluded that voter fraud is rare in Virginia. Her investigation found no reported cases of voter impersonation fraud in Virginia in recent elections. For the purpose of her analysis, she adopted the definition of voter fraud as the intentional corruption of the voting process by voters. Under her interpretation, the deception by the voter has to be intentional.

Dr. Minnite's findings are based on a combination of national and Virginia state data. She obtained prosecution statistics from the United States Department of Justice, sent surveys to 2,700 district attorneys in the United States, and wrote letters to every state attorney general and secretary of state. She also requested similar information from all of Virginia's Commonwealth's Attorneys. However, she received responses from only nineteen of over 100 Virginia prosecutors. Some of the Commonwealth's Attorneys responded that they had received complaints of fraud-related activities by voters, but none appeared to result in a formal prosecution. Similarly, she received information from

the Virginia State Police reporting convictions for election law violations.  On review,

she concluded that most of these convictions were for illegal voting activities, but not

fraudulent voter impersonation.

In harvesting information concerning the incidences of voter fraud in Virginia, she

read 647 relevant news articles.  She gleaned from these articles that there were

approximately sixty cases of illegal voting by felons, but none involved actual voter

impersonation.

Dr. Minnite confined her statistical analysis to actual convictions and not reports

of alleged violations to law enforcement.  (Trial Tr. 770:16–71:08, Feb. 24, 2016.)  She

also assumed in her study that if there was credible evidence of voter fraud, the

prosecutor would have formally brought charges.  She had no way of determining what

criteria prosecutors may have used to determine whether it was appropriate to pursue an

indictment or merely resolve the matter informally.  Her statistics also did not capture

inadvertent voting in the wrong precinct.

Although Dr. Minnite voiced the opinion that there was insufficient evidence to

conclude that voter fraud is a rational justification for photo ID laws, she admitted that

such laws could prevent voter impersonation fraud.  (*Id.* at 796:22–97:2.)    Dr. Minnite

also hastened to add that while she had testified previously in other cases, and it was

difficult to determine whether voter ID requirements suppress voter turnout, sufficient

information may be available now to conduct a more accurate scientific or statistical

analysis.  She explained that her previous reluctance to draw any conclusion on

suppression of voter turnout was based on the number of varying factors that influence a

voter's decision during any particular voting cycle. (*Id.* at 870:12−71:20.)

Dr. Minnite also testified that she disagreed with other experts' interpretations of the findings and recommendations of the Carter-Baker Commission. She characterized the findings of the Commission as principally animated by a desire to instill voter confidence. In fact, she admitted that the Carter-Baker Commission placed greater weight on the perception that voter ID laws enhance public confidence in the integrity of the electoral system than the actual number of reported voter fraud cases. Dr. Minnite also suggested that the Commission's recommendation of requiring voter ID did not appear to evolve from any significant data base or careful study. She explained that the Commission placed significant reliance on a study of voter fraud in Wisconsin. In her opinion, the results of that investigation revealed that the problems which surfaced were primarily administrative, rather than criminal.

Her ultimate conclusion was that while voter impersonation fraud is not non-existent, it occurs too infrequently to constitute a rational basis for adoption of the voter identification law enacted in Virginia.

### c. Testimony of Dr. Jonathan Rodden

In an attempt to determine the number and types of registered voters who may have an acceptable form of identification comporting with the requirements of SB 1256, Plaintiffs presented the testimony of Dr. Jonathan Rodden ("Dr. Rodden"), a well-respected professor at Stanford University. Dr. Rodden was received as an expert in political science, particularly the use of geospatial quantitative methods. Dr. Rodden employed three analytical constructs to form his conclusions as to which voters would

likely have proper identification.  The underlying methodology entailed using geospatial mapping to plot each voter from the voter file maintained by the SBOE to determine where each registered voter resided.  He relied upon data from the DMV to determine who would have a valid DMV issued photo identification and information from the Commonwealth to ascertain who would have a valid free voter identification card.  He also utilized several assumptions, including his belief that anyone who lived on a military reservation had an acceptable military photo identification card.  To the extent possible, he attempted to identify individuals from the voter file that may be students based upon age, gender, and address.  Dr. Rodden then gathered data using three analytical techniques.  These included homogenous block analysis, ecological inference analysis, and Catalist estimate.

The homogenous block analysis takes individuals who self-identify as a certain race and places them in a precinct with other individuals who self-identify as being of the same race.  The ecological inference analysis, a somewhat esoteric technique developed for voting rights litigation, operates on a census data platform.  Relying on census data, the number of individuals of a certain race in each individual block can be determined.  Dr. Rodden contends that the number of individuals in that particular block can be identified from known data.  What is unknown, however, is how the race statistics match with the identification data.  The ecological inference analysis attempts to take that information base and puts statistical bounds on each block to determine how much of each group most likely has appropriate identification.  Dr. Rodden maintains that this is done by ruling out impossible combinations.  The Catalist estimate uses an individual's

full name, birth date, and associated geographical data to make an estimate of that person's race. Dr. Rodden contends that its estimates are close to ninety percent accurate, with one exception. The estimate is more likely to misclassify an African American as white than vice versa.

Based upon the results of Dr. Rodden's geospatial quantitative analysis, he concluded that identification possession rates of registered voters are higher among whites than African Americans and Hispanics, higher among middle aged and older voters than young voters, and higher in Republican precincts than Democratic precincts. Dr. Rodden limited his quantitative analysis to the years 2012, 2014, and 2015. His analysis revealed that over time there was an increase in identification possession rates. He attributes this, however, to a decline in the number of registered voters, rather than an increase in actual possession of identification among the voters.

Based on his homogenous block analysis, Dr. Rodden estimated that in 2012, between seventeen and eighteen percent of African Americans lacked DMV identification, compared to nine and eleven percent of whites.[8] This statistic reflects only those individuals who lack a form of identification issued by the DMV or the free voter ID offered at local registrars' offices. When Dr. Rodden used a more inclusive measure of identification, which encompassed individuals residing on military bases who probably have a form of military identification or those meeting his criteria for a probable student, the rates of non-possession dropped significantly. Under the inclusive

---

[8] Dr. Thornton critiqued Dr. Rodden's approach by noting that the more heterogeneous the block's population, the higher the potential for inaccuracy. (Trial Tr. 1755:23–56:9, 1758:18–24.)

identification analysis, the number of whites without proper identification dropped to between 3.2 and 3.9 percent, for African Americans between 5.4 and 6.1 percent, and between 5.1 and 6.3 percent for Hispanics for the year 2015.

The ecological inference analysis yields results essentially parallel to those from homogenous block analysis. He estimates that in 2012, approximately 17.5 percent of African Americans and 9.5 percent of whites lacked either DMV identification or free registrar-issued identification. Using the more inclusive analysis, Dr. Rodden estimates that approximately 3.4 percent of whites, 5.7 percent of African Americans, and 6.7 percent of Hispanics lacked appropriate identification in 2015.

Turning to the Catalist estimate, Dr. Rodden estimates that approximately 4.1 percent of whites, 5.4 percent of African Americans, and 5.6 percent of Hispanics lacked some form of valid identification in 2015. Dr. Rodden also testified that in his opinion, younger voters were less likely to have valid forms of identification than older voters. Within the age group twenty-five to thirty, approximately eighty-five percent of individuals have an appropriate form of identification. This same rate applies to individuals in their thirties. This rate gradually increases and eventually plateaus for individuals above the age of fifty. Virginians over the age of seventy-five typically have a declining rate of possession of acceptable identification.

Using precinct data acquired from the Commonwealth of Virginia, Dr. Rodden opined that there is a correlation between precincts that gravitate toward Democratic candidates and residents without valid voter identification.

Dr. Rodden admitted on cross-examination that the absence of hard data required

him to make assumptions with respect to the number of students and persons with military identification. He also acknowledged that his analysis did not include unquantifiable rates of possession of such other forms of valid identification as passports, tribal, and government or employment-issued identification. His numbers also fail to reflect active or retired members of the military who reside off base and possess appropriate identification. (Trial Tr. 584:1–85:8, Feb. 24, 2016.)[9]

### d.    Testimony of Dr. Janet Thornton

To counter the opinions of Plaintiffs' experts, the Defendants offered the assessment of three well-credentialed political scientists. Each identified what they believed to be flaws in the data, logic, and conclusions offered by Plaintiffs' academic experts.

Dr. Janet Thornton ("Dr. Thornton"), an expert in the field of economics and applied statistical analyses, is the managing director of the Berkley Research Group. She has been an economist and applied statistician for over thirty years. She was engaged in this case to review the expert opinions of Dr. Rodden and Dr. Lichtman, with particular emphasis on the allegation that minorities, specifically African Americans and Hispanic voters, as well as young and Democratic voters, would be adversely affected by SB 1256.

With respect to Dr. Rodden's geospatial analysis, Dr. Thornton was able to identity a variety of acceptable forms of identification not included in Dr. Rodden's data base. This is particularly true, in her view, with respect to military personnel and

---

[9] Defendants highlight in their post-trial brief that "almost one-half of plaintiffs' fact witnesses who testified they *in fact possessed a form of photo ID acceptable for voting in Virginia . . .* would have been classified as 'No ID' by Rodden." (Defs.' Post-Tr. Br. 26–27, ECF No. 212.)

students. Initially, she points out that Dr. Rodden failed to accurately identify the number of military personnel in Virginia. He identified approximately 32,500, while the number, according to her research, is closer to 129,000. (Defs.' Trial Ex. 301.) Dr. Rodden's data failed to include military personnel or their spouses living off base. (Trial Tr. 585:17–20, Feb. 24, 2016 (Test. of Jonathan Rodden).) Moreover, there are approximately 830,000 veterans in Virginia, many of whom have identification enabling Veterans Administration services. In Dr. Thornton's opinion, the failure of Dr. Rodden to accurately include the number of military personnel in Virginia undermines the integrity of his analysis. In her assessment, Dr. Rodden may have failed to include as many as seventy-five percent or more of Virginia-based military personnel. (*Id.* at 1730:8–16, Mar. 1, 2016.)

Dr. Thornton took issue with Dr. Rodden's estimate of the number of students in Virginia. Dr. Rodden's projected number was 467,000. Dr. Thornton's research revealed roughly 600,000 students. (*Id.* at 1734:24–35:2, 1736:2–37:22.) She also faulted Dr. Rodden for assuming that individuals who had passports or identification issued by the Veterans Administration, federal government, state and local governments, nursing homes, or high schools, would most likely also have a driver's license. Dr. Thornton testified that this was an unrealistic assumption that skewed the data that Dr. Rodden relied upon. Dr. Thornton stressed that it is important to keep in mind that Virginia has a higher proportion of government workers and military personnel than does the United States generally, a fact lost in Dr. Rodden's analysis.

In construing the data mined by Dr. Rodden, Dr. Thornton agreed with a number

41

of conclusions Dr. Rodden derived from his specific information base. She conceded that African Americans are slightly more likely than whites to lack appropriate identification. Dr. Rodden concluded, in Table 2 of his Report, that 94.6 percent of African Americans and 96.8 percent of Caucasians have identification meeting SB 1256 standards. (Pls.' Trial Ex. 209.) Dr. Thornton also concurred that Dr. Rodden's ecological inference demonstrated that roughly 3.41 percent of Caucasians lack appropriate identification, as compared to 5.59 percent of African Americans. The results of the ecological inference study revealed that roughly 93.3 percent of Hispanics have appropriate identification. Dr. Thornton did not take issue with the statistics based upon Dr. Rodden's data. While Dr. Thornton concurred in Dr. Rodden's conclusions based upon his statistics and his assumptions, she continued to question their reliability because he failed to account for persons with other forms of identification.

### e.    Testimony of Dr. Karen Owen

The Defendants' next expert, Dr. Karen Owen ("Dr. Owen"), focused her testimony on the conclusions offered by Dr. Lichtman. Dr. Owen is an assistant professor at Reinhardt University who was received as an expert in political science, specializing in southern American politics and government. Her opinion of Dr. Lichtman's report, methodology, and conclusions was predicated not only on her experience and expertise in the field of Southern politics, but also scholarly works, public documents, and records and information available on the SBOE's and General Assembly's websites.

Dr. Owen testified that public opinion polling, specifically those conducted by

Pew and Quinnipiac, reflected overwhelming support for photographic identification by voters. (Trial Tr. 1924:7–25:17, Mar. 2, 2016.) Based on her review of the Carter-Baker report, she concluded that the Virginia ID law permitted more forms of identification than recommended in that report.[10] In her opinion, public perception is a significant factor in legislative action. Even if voter impersonation fraud is rare, it is not unreasonable for legislatures to conclude that it is sound public policy to adopt legislation assuring the public of the integrity of their electoral system. Furthermore, adopting laws to deter corruption of the electoral system before it occurs is simply an exercise of wise judgment. (*Id.* at 1932:7–12.)

While Dr. Owen conceded that she found no evidence of widespread voter impersonation fraud nationally, and no concrete examples from Virginia, she disagreed with Dr. Lichtman's conclusion that the Virginia General Assembly enacted the voter ID law with the intent to discriminate against minorities. From her review of the record, she found no evidence of an intent to discriminate. In fact, her study revealed a number of alternative, legitimate reasons why the Virginia General Assembly passed the 2013 voter identification law. This included public opinion favoring such legislation, a public perception of potential voter fraud, promoting confidence in the integrity of the electoral system, and sound public policy in preventing future acts of voter fraud. (*Id.* at 1920:20–21:17.)

---

[10] Dr. Owen was asked on cross-examination about an editorial penned by the authors of the Carter-Baker report. President Carter and Secretary Baker concluded that the voter identification law enacted in Georgia was discriminatory because it did not originally include a provision for a free photo identification. The 2013 Virginia legislation did in fact provide for a free form of photo identification for voters.

### f.    Testimony of Dr. Daniel J. Palazzolo

The Defendants' final expert witness was Dr. Daniel J. Palazzolo, a University of Richmond professor with expertise in Virginia legislative and congressional politics and history. With respect to Dr. Smith's characterization of pre-1965 Virginia political history, Dr. Palazzolo essentially concurred that the period was tainted by discriminatory legislation and practices. Obstacles, such as a poll tax and spurious literary tests, were tactics calculated to suppress African American voting rights. These ploys were fostered by a white-dominated, single political party system which enjoyed substantial public support.

Following the adoption of the Voting Rights Act in 1965, with enforceable safeguards against racial barriers, Dr. Palazzolo perceives a significant course correction. In contrast to Dr. Smith, Dr. Palazzolo views contemporary history differently. As for post-1965 voter participation among African Americans, Dr. Palazzolo discerns a clear trajectory toward greater inclusion. In contrast to the so-called Jim Crow era, in recent years, Virginia has had a vibrant, competitive, two-party system supervised by a non-partisan electoral administration.

Dr. Palazzolo also took issue with Dr. Smith's conclusion that opposition to the Voting Rights Act by the Virginia Congressional Delegation in 1965 supports Dr. Smith's opinion that conscious voter suppression is a continuing legacy in the Old Dominion. Dr. Palazzolo highlights the Virginia Congressional Delegation's unanimous support for the 2006 reauthorization of the Voting Rights Act as compelling evidence of

an evolving acceptance of a more racially inclusive voter base.[11]

As further evidence of a more diverse and vibrant political base, Dr. Palazzolo noted that Virginia was the first state since the enactment of the Voting Rights Act to elect a black governor. In fact, L. Douglas Wilder had also previously served as the state's lieutenant governor. Furthermore, as Dr. Smith also pointed out, Republicans have nominated two African American candidates for statewide office, while Democrats have nominated none.[12]

Unlike Dr. Smith, part of Dr. Palazzolo's portfolio of academic responsibilities is following the Virginia General Assembly. In fact, he directs the University's internship program in the General Assembly. In Dr. Palazzolo's opinion, Dr. Smith's conclusion that the legislature's intent in enacting the 2013 voter ID law was suppression of minority vote was based on pure speculation unmoored to any factual basis. He testified that it was equally plausible that the General Assembly was simply responding to the public's perception that Virginia needed a stronger voter identification law. He also noted that Lieutenant Governor Bill Bolling, a Republican, supported a Democratic amendment to delay implementation of the law until after the 2013 election to allow voters to be informed of the additional identification requirement. Other acts of the General Assembly further demonstrated an absence of intent to suppress minority voters. This included allowing for a broad array of acceptable forms of identification and the issuance of a free voter identification card by the Commonwealth.

---

[11] One member of the Virginia Congressional Delegation did not vote.
[12] Dr. Palazzolo omitted to mention that Donald McEachin was nominated by the Democrats for Attorney General in 2001. However, as previously mentioned, he was not elected.

In his final conclusion, Dr. Palazzolo admitted that reasonable partisan minds could differ as to whether or not there was an actual need for photograph bearing voter identification. He also indicated that the legislative history and public record are insufficient to draw a defensible opinion that any member of the General Assembly voted for SB 1256 with an intent to suppress minority vote.

## VII. Weighing the Evidence in the Context of Plaintiffs' Claims

### a. Count I: Alleged Violation of Section 2 of the Voting Rights Act, codified at 52 U.S.C. § 10301(a)

While this lawsuit wages a comprehensive, multi-faceted constitutional challenge to the Virginia voter ID law, the focal point of this litigation is Plaintiffs' claim under Section 2 of the Voting Rights Act. From an evidentiary perspective, this vote-denial claim is closely allied with Count II, alleging violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

As earlier explained, the determinative inquiry under Section 2 is whether SB 1256 inhibits equal participation by protected classes in the electoral process. More sharply focused, Plaintiffs must demonstrate that the voting requirement at issue—the presentation of photo ID—diminishes the opportunity of protected classes from participation in the political process. *See League of Women Voters of N.C.*, 769 F.3d at 238 (quoting 52 U.S.C. § 10301(b)).

The legal analysis under Section 2 of the Voting Rights Act does not hinge on proof on intentional discrimination; discriminatory results are sufficient. *Chisom*, 501 U.S. at 404. The import of the statute is well-captured in *Gingles*: "The essence of a

[Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." 478 U.S. at 47. The teachings of *Gingles* yield two critical elements of proof. First, that the challenged statute—here SB 1256—imposes "a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process." *League of Women Voters of N.C.*, 769 F.3d at 240 (internal quotation marks and citation omitted). Secondly, there must be proof of some causal link to "'social and historical conditions' that have or currently produce discrimination against members of the protected class." *Id.* (quoting *Gingles*, 478 U.S. at 47).[13] Section 2 of the Voting Rights Act clearly proscribes racial or ethnic discrimination "but does not require states to overcome societal effects of private discrimination that affect the income or wealth of private voters." *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014), *cert. denied* 135 S. Ct. 1551 (2015).

The Supreme Court in *Gingles* suggested a number of potentially relevant factors to be considered in evaluating Section 2 claims. Section 2 vote denial claims should not be viewed in isolation, but in light of the totality of circumstances. *See Gingles*, 478 U.S. at 45.

There is no serious dispute in this case that the Commonwealth of Virginia, like many states, has a regrettable history of discriminatory policies and practices designed to

---

[13] Some consideration of pre-1965 social and historical conditions is an appropriate starting point, but this Court will accord greater weight to more contemporary patterns and practices. *See McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

suppress voting within the black community. The Fourth Circuit in *League of Women Voters of North Carolina* identified polarized voting as a potentially important analytical factor. 769 F.3d at 240. The evidence confirmed the commonly held assumption that African American voters tend to gravitate toward the Democratic Party. In recent years, however, an increasing number of African Americans have run for statewide office on the Republican ticket. As voters embrace individualized views on a wider diversity of issues, political lines are increasingly blurred.

The evidence, however, clearly revealed a progressive pattern of post-Voting Rights Act remediation. For example, the Court heard testimony indicating that voters may now apply for an absentee ballot online and that the state allows electronic transmission of voter registration materials from the DMV to local registrars to streamline registration of eligible voters. Virginia also provides voters with a photographic ID free of charge. In implementing SB 1256, the SBOE adopted a regulation defining a valid ID as one that has not been expired for more than a year. In doing so, the SBOE expanded on its previous guidance by lengthening the applicable time frame from one month to twelve months. In recent years, Virginia has taken aggressive steps to eliminate barriers and ensure that all citizens have an equal opportunity to vote.

While SB 1256 may have added a layer of inconvenience to the voting process, it appears to affect all voters equally. None of the voter witnesses produced by Plaintiffs identified any legal obstacle inhibiting their opportunity to vote. Persons without valid photo identification were able to cast provisional ballots and cure them by presenting

proper evidence within three days, or alternatively, if they were disabled, submitting an absentee ballot. Of the fourteen burdened voter witnesses who testified, either in court or by deposition, three were African American and the other eleven were Caucasian. Five of these fourteen individuals were actually able to cast votes in either the 2014 or 2015 election, and the remainder made a conscious choice not to pursue other voting options when they were initially unable to produce valid identification. Three of the non-voting witnesses were unaware that they could cure their provisional ballot by fax or email, or cast an absentee ballot. Unquestionably, the transition to photograph bearing identification experienced a fair number of glitches. This was primarily attributed to inadequate training of registrars and poll workers on the nuances of casting a provisional ballot under the new law. Some voters received inadequate or incorrect instructions from uninformed election officials.[14] However, none of the voter witnesses who testified in this case were actually denied their right to vote.

As the United States Court of Appeals for the Seventh Circuit explained in *Frank v. Walker*, "the inconvenience of making a trip to the [department of motor vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote." 768 F.3d at 748 (alteration in original) (quoting *Crawford*, 553 U.S. at 198).

As a foundation for their claim of lingering racial discrimination in the electoral process, Plaintiffs called a number of academic experts who expressed their view that the

---

[14] While regrettable, any isolated mistake by an election official does not render the entire statute unconstitutional.

Virginia photo ID requirement was intended to suppress minority vote.  Aside from dusting off bits of superannuation history from the Jim Crow era, such as literacy tests and poll taxes, the evidence offered to support these conclusions were the number of African Americans running for public office; the disproportionality of minority members of the Virginia General Assembly; an isolated derogatory comment by a candidate for the United States Senate; the practice of a county police department to inquire about the immigration status of Latinos; Donald Trump's narrow victory in the 2016 Republican primary; unidentified, unflattering cartoons of the President of the United States and criticisms of his policy positions; the failure of the Virginia General Assembly to expand Medicaid funding, notwithstanding its budgetary impact; and ongoing litigation over racial gerrymandering.

Most of Plaintiffs' experts deduced that discrimination was the motive for SB 1256 because, in their opinions, there was simply no rational basis to require the presentation of photo-bearing identification to vote.  In their view, the General Assembly's proffered rationale was tenuous and simply a veiled vehicle to inhibit African Americans, Latinos, and young voters from participating in the electoral process.  Embracing this explanation for the more stringent identification requirements of SB 1256, Dr. Allan Lichtman testified that legislatures rarely expose their racial or ethnic bias in the legislative record.  Such intent, in his opinion, can only be proven circumstantially.  (Trial Tr. 1123:24–24:9, Feb. 25, 2016.)  In addition to the evidence described above, Plaintiffs highlight the allegedly unprecedented introduction of SB 1256 one year after the General Assembly adopted a non-photo identification bill in 2012

without any intervening circumstances warranting such action.  Additionally, SB 1256 necessitated an elaborate and costly voter re-education program.

Plaintiffs also highlight the action of a single Republican senator who not only introduced SB 1256, but also attempted to persuade the SBOE to require that valid identification include only unexpired documents.  The SBOE, whose then existing policy prohibited identification expired more than thirty days, compromised by adopting a regulation defining valid as not expired over twelve months.  Even assuming, *arguendo*, that a single Republican senator had a latent motive to effect minority vote,[15] such motive could not on the record at hand be imputed to the other Republican senators, along with one Democrat and one Independent in the House of Delegates, who voted for the bill. How many affirmative voters would be necessary to prove that a legislative body adopted a measure with discriminatory objective?  That question remains unanswered!

Approaching the intent of the legislature from a different angle, Plaintiffs contend that fraud prevention was simply a transparent ruse.  Plaintiffs' expert, Dr. Minnite, conducted a comprehensive study of impersonation-type voter fraud convictions and concluded that such criminal activity is rare.  The balance of the evidence seemed to support this conclusion but equally revealed a public perception that it was a legitimate concern.

Even though evidence of actual voter impersonation-type fraud was scant, there was considerable public support for preemptive legislation deterring such criminal activity.  The Supreme Court in *Crawford* acknowledged that photo identification is an

---

[15] The Court does not imply that there was evidence that Senator Obenshain had such motives.

effective method of enhancing the integrity and reliability of the electoral process. 553 U.S. at 204. Although several members of the General Assembly testified that they suspected that Republicans who unanimously supported SB 1256 were seeking tactical advantage rather than voter integrity, there was no evidence to elevate this impression beyond suspicion. In *Crawford*, the Supreme Court noted in the equal protection context, "if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Id.* at 204. The Court further found that "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Id.* at 196.

To further demonstrate the potentially suppressive effect of SB 1256 and to bolster their claim of racially discriminatory impact, Plaintiffs offered extensive demographic and geospatial quantitative analysis. Relying on these statistical models, Dr. Rodden provided an educated estimate of the number of potential voters in Virginia without a valid identification issued by the DMV, local registrars' offices, Virginia-based colleges, or United States military. Across his three analytical constructs using his inclusive analysis, Dr. Rodden concluded for 2014 that approximately 9.5 percent of African Americans and 10 percent of Latinos lacked a valid form of identification. For 2015, he estimated that each figure decreased by nearly half to roughly 5.5 percent of African Americans and roughly 6 percent of Latinos.

While Dr. Rodden undoubtedly based his calculations on the best available data and employed widely accepted methodology, he conceded that his statistics for military personnel and students were based on what he believed to be reasonable assumptions. Dr. Rodden's analysis relied on seemingly trustworthy demographic data from which he identified potential minority voters without certain forms of valid identification. Although the integrity of Dr. Rodden's statistical calculations was unchallenged, its weight in demonstrating denial of equal voter opportunity is questionable.

Dr. Thornton, a defense expert, pointed out that Dr. Rodden's analysis did not include individuals with passports, tribal or government-issued identification, including elderly military veterans who may not possess a valid Virginia driver's license. (Trial Tr. 1743:8−44:13, Mar. 1, 2016.) Dr. Thornton also noted that Dr. Rodden appeared to exclude military personnel living off base, which he admitted was a difficult statistic to accurately capture. Dr. Thornton also testified that in her view, Dr. Rodden had underestimated the number of military personnel and students residing in Virginia. (*Id.* at 1727:3−28:21, 1733:19−23.)

Positing that Dr. Rodden's analysis is sound, his findings would still not provide a reliable picture of demographic groups allegedly denied an equal opportunity to vote. Aside from his inability to include certain forms of valid identification, on close examination it is also apparent that his statistical calculation makes no adjustment for persons prohibited by law from voting, such as some convicted felons or non-U.S. citizens. Even more importantly, his analysis also excludes people who simply have no

interest in voting.[16]

Dr. Thornton acknowledged that Dr. Rodden's statistical analysis supports the conclusion that African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification. Neither this statistical conclusion nor Dr. Rodden's analysis supports a reliable factual finding that African Americans or Latinos are denied an equal opportunity to participate in the electoral process. Nothing presented supports the conclusion that minorities are not afforded an equal opportunity to obtain a free voter ID. As described by numerous witnesses during the course of the trial, eligible voters do not need to present any independent documentation to obtain a free voter form of identification under Virginia Code § 24.2-643 and its implementing regulations. The statute simply requires that a registrant provide her name, address, birthdate, and social security number and sign the registration form swearing that the information provided is true and correct.

In assessing the viability of Count I, alleging a violation of Section 2 of the Voting Rights Act, this Court again draws on the wisdom of the Supreme Court in reviewing a similar photo identification law challenged in *Crawford*. Justice Stevens, speaking for the Court, perceptively described the task at hand in the present case. Significantly, he noted that the statistical evidence in the record did not provide the court with the number

---

[16] In assessing the actual impact of the photo ID requirement, it is important to note that only 41.6 percent of registered voters voted in 2014, and 29.1 percent in 2015. (Defs.' Ex. 324 (Summary of Virginia Registration & Turnout Statistics chart from the VDOE website).) To the extent that Plaintiffs objected to Defendants' Exhibit 324, the Court "may take judicial notice of official government reports and statistics." *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (citing FRE 902).

of registered voters without photo identification. *Crawford*, 553 U.S. at 200.  Justice

Stevens then concluded

> Petitioners ask this Court, in effect, to perform a unique balancing analysis
> that looks specifically at a small number of voters who may experience a
> special burden under the statute and weighs their burdens against the
> State's broad interests in protecting election integrity.  Petitioners urge us to
> ask whether the State's interests justify the burden imposed on voters who
> cannot afford or obtain a birth certificate and who must make a second trip
> to the circuit court clerk's office after voting.  But on the basis of the
> evidence in the record it is not possible to quantify either the magnitude of
> the burden on this narrow class of voters or the portion of the burden
> imposed on them that is fully justified.

*Id.*

This Court finds itself in a similar posture.  Finding the evidence insufficient to

support Plaintiffs' claim that SB 1256 has denied African American, Latino, and young

voters an equal opportunity to participate in the political process and to elect

representatives of their choice, Count I will be dismissed.  Plaintiffs have not shown by a

preponderance of the evidence that the statute has an adverse disparate impact on African

American and Latino voters, imposes a discriminatory burden on those protected classes,

or causes anyone to have less opportunity than others to participate in the political

process.

### b.    Count II:  Undue Burdens on the Right to Vote and Disparate Treatment of Voters Without a Rational Basis

The essence of Count II is well-captured in paragraph 110 of the Amended

Complaint,

> The voter ID law imposes burdens on voters generally and severe burdens
> on African-American, Latino, young, poor, and Democratic voters, as well
> as the class of voters who lack an ID that can be used for voting.  Given

that the law does not materially benefit Virginia or plausibly further any other permissible interest, the burdens imposed by the voter ID law outweigh the benefits of the law and it must therefore be invalidated under the Equal Protection Clause.

(Am. Compl. ¶ 110.)

All parties in this case agree that this Court's review of SB 1256's constitutionality under the First Amendment and Equal Protection Clause of the Fourteenth Amendment is guided by the *Anderson-Burdick* balancing framework. As noted above, the Supreme Court has explained that in applying the framework, a court evaluating a constitutional challenge to an election regulation must "weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford*, 533 U.S. at 190 (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks omitted).

To require that every voting regulation be subjected to strict scrutiny, "and to require that the regulation be narrowly tailored to advance a compelling state interest, . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Accordingly, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson*, 460 U.S. at 788). [17]

---

[17] Although this sounds of rational basis review, *Crawford* did not articulate a bright-line standard for analyzing a voter ID law under *Anderson* and *Burdick*. Mindful that the *Anderson-Burdick* balancing framework amounts to a sliding scale depending on the severity of any restriction and believing that *Crawford* controls analysis, the Court endeavors to hew to *Crawford*'s teachings by balancing any restrictions imposed by SB 1256's facially neutral

The Supreme Court has repeatedly recognized "that States retain the power to regulate their own elections." *Id.* at 433 (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). The Supreme Court also emphasized in *Anderson* as well as *Burdick* that "[e]lection laws will invariably impose some burden upon individual voters. Each provision of a code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote . . . .'" *Burdick*, 504 U.S. at 433 (quoting *Anderson*, 460 U.S. at 788).

Although it is difficult to quantify with any degree of reliable precision, the Plaintiffs' evidence arguably would support the fact that African Americans and Latino voters are slightly less likely to have valid identification than Caucasians. The burden imposed upon them by SB 1256 would be the burden to travel to the DMV or the local registrar's office to obtain an acceptable form of identification. Even if the record evidence was sufficient, the number of such burdened individuals would not be sufficient for this Court to conclude that SB 1256 imposed excessively burdensome requirements on any class of voters. *Crawford*, 553 U.S. at 202 (quoting *Storer v. Brown*, 415 U.S. 724, 737 (1974)). Further, it has already been established and noted that having to take a trip to an office and pose for a photograph does not constitute a substantial burden on the right to vote.

The record evidence fails to support Plaintiffs' contention that the Virginia photo

requirements against the state's important regulatory interests.

ID law is arbitrary, irrational, or invidiously discriminatory, in either its enactment or implementation. While reasonable people can debate aspects of this law, no feature of the law is without some rational basis, including the definition of a valid ID, the ability to obtain a free voter ID without providing underlying documentation, and the fact that IDs issued by other states or out-of-state colleges are not accepted. Again, while debatable, lines must be drawn, and this Court is not convinced that these elements of the regulatory regime lack reasoned justification. No voters have been identified who have been deprived of their opportunity to vote. Those unable to produce valid identification for in-person voting are nevertheless able to vote by absentee or provisional ballots. Despite arguments to the contrary, the statute's stated intention of protecting the integrity and reliability of the electoral process serves a substantial governmental interest. Although statistics reveal few convictions nationally for voter impersonation fraud, the evidence has shown wide public support for adopting such legislation. Outlawing criminal activity before it occurs is not only a wise deterrent, but also sound public policy. As the Supreme Court reasoned in *Crawford*, voter identification requirements may place a heavier burden on a limited number of persons. However, such burden is insufficient to outweigh the state's broad interest in protecting election integrity. *Crawford*, 553 U.S. at 199–200.

### c.     Count III: Partisan Fencing

Count III, styled "Partisan Fencing," alleges that the General Assembly enacted the voter ID law to suppress and fence out the vote of Democrats "because of the way they are expected to vote." (Am. Compl. ¶ 116.) This claim necessarily assumes that all

voters identifying themselves as Democrats vote similarly—in other words, a straight party line. The term "partisan fencing" is derived from *Carrington v. Rash*, 380 U.S. 89 (1965), and is somewhat of an aberration. It has been rarely deployed in election law litigation thereafter. It does not appear to create a separate cause of action but may be a useful analytical tool in evaluating First Amendment and Equal Protection Clause cases.

The circumstances in the *Carrington* case that form the genesis of the term "partisan fencing" were truly unique—an attempt by the Texas legislature to deny certain military personnel who were not permanent residents of that state from voting in any election in Texas. *Id.* at 89. In the immediate case, however, no evidence was presented that would support a credible argument that the Virginia voter identification law was intended, or had the effect, of disenfranchising Democratic voters, much less that the text of the law specifically targeted Democrats as the Texas law did military members. Even if the evidence had revealed that partisan advantage was a latent motive in enacting SB 1256, it would not offend the First or Fourteenth Amendment.

### d.   Counts IV and V: Intentional Discrimination on the Basis of Race and Age (Respectively)

In the final two counts of the Amended Complaint, Plaintiffs allege intentional discrimination on the basis of race and age. Count IV alleges that SB 1256 was intended by the Virginia General Assembly, at least in part, to discriminate on the basis of race in the voting context violating the Fourteenth and Fifteenth Amendments. Count V contends that the voter identification law at issue places unnecessary burdens and barriers on the right of young voters to participate in the election process in violation of the

Twenty-Sixth Amendment.  Unquestionably, as Plaintiffs point out in their post-trial memorandum, "[l]egislation enacted with the intent, at least in part, to discriminate on the basis of race [or age] in the voting context violates the Fourteenth [,] Fifteenth [and Twenty-Sixth] Amendments." (Pls.' Post-Tr. Br. 31 (citing *Vill. of Arlington Heights*, 429 U.S. at 264–65).)[18]  Furthermore, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (*Id.* at 35.)  In examining circumstantial evidence to discern the intent of legislative action, courts consider its historical background, the sequence of legislative events, departures from normal procedures, and its disparate impact on effected populations.

Plaintiffs' evidence of intentional discrimination is animated by undisputed evidence of pre-1965 discriminatory barriers to minority voting, arguable inconvenience to some unidentified minority voters, the adoption of SB 1256 one year after the legislature adopted an identification law which allowed the use of certain non-photographic IDs, and the actions of a single state senator who introduced the bill in question and insisted that the form of identification be unexpired.  This evidence was burnished by a number of expert witnesses offering their opinion that based on the record at hand, they perceived no other rationale for the photo ID law except suppression of minority vote.

---

[18] The Court notes that there is a scarcity of caselaw involving Twenty-Sixth Amendment claims based on an alleged denial or abridgement of the right to vote.  Yet, even accepting Plaintiff's theory that the Twenty-Sixth Amendment essentially acts as the Fifteenth Amendment with young voters as the pertinent class, Plaintiffs have failed to show that SB 1256 was intended, either in its enactment or implementation, to discriminate against young voters.

The evidence, however, demonstrated that irrespective of statistics, a large segment of Virginia voters thought a photo identification requirement for voting was a prudent safeguard measure. As one expert noted, responding to public concern by passing a law to prevent crime before it happened amounted to a reasonable action on the part of the General Assembly. In fact, the Supreme Court agreed in *Crawford*. *See* 553 U.S. at 197. Further, voter confidence, uniformity, and fraud prevention all stood as legitimate reasons to enact SB 1256.

Additionally, the evidence failed to show any departure from normal legislative procedures. Instead, although ultimately passing on a near-party-line vote, the bill was subject to robust debate from all sides. Finally, there was a complete dearth of statements by legislators indicating any sort of discriminatory intent.

The extensive testimonial and documentary evidence offered in this case has failed to reveal by a preponderance of the evidence that the Virginia General Assembly, a legislative body composed of 140 Delegates and Senators, enacted the Virginia photo identification requirement with the intent to suppress minority and young voters.

## VIII.    Conclusion

While the merits of this voter identification law, and indeed all aspects of Virginia's voting regime, can be reasonably debated, it remains true that Virginia has created a scheme of laws to accommodate all people in their right to vote. From in-person voting, to an absentee option, to provisional ballots with the ability to cure, and the provision of free voter IDs, Virginia has provided all of its citizens with an equal opportunity to participate in the electoral process.

Mindful that the Court's mission is to judge not the wisdom of the Virginia voter ID law, but rather its constitutionality, this Court cannot say that Plaintiffs have met their burden of proof in showing by a preponderance of the evidence that the Virginia voter ID law, either on its face or in its enactment, contravenes the Voting Rights Act, the First Amendment, the Fourteenth Amendment, the Fifteenth Amendment, or the Twenty-Sixth Amendment.  The Court finds for Defendants on all counts.

An Appropriate Order shall issue.

The Clerk is directed to file this Memorandum Order electronically and notify all counsel accordingly.

It is SO ORDERED.

/s/
Henry E. Hudson
United States District Judge

Date: May 19 2016
Richmond, Virginia