**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

------------------

**No. 16-1605**

------------------

BARBARA H. LEE; GONZALO J. AIDA BRESCIA; DEMOCRATIC PARTY
OF VIRGINIA,

                 Plaintiffs - Appellants,

          v.

VIRGINIA STATE BOARD OF ELECTIONS; JAMES B. ALCORN, in his
capacity as Chairman of the Virginia State Board of
Elections; DR. CLARA BELLE WHEELER, in her capacity as Vice-
Chair of the Virginia State Board of Elections; SINGLETON B.
MCALLISTER, in her capacity as Secretary of the Virginia
State Board of Elections; VIRGINIA DEPARTMENT OF ELECTIONS;
EDGARDO CORTES, in his capacity as Commissioner of the
Virginia Department of Elections,

                 Defendants - Appellees.

-------------------------------------

VIRGINIA ELECTION OFFICIALS AND VOTERS; JUDICIAL EDUCATION
PROJECT,

                 Amici Supporting Appellees.

------------------

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  Henry E. Hudson, District
Judge.  (3:15-cv-00357-HEH-RCY)

------------------

Argued:  September 22, 2016          Decided:  December 13, 2016

------------------

Before NIEMEYER, SHEDD, and AGEE, Circuit Judges.

------------------

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Shedd and Judge Agee joined.

————————————

**ARGUED:** Bruce Van Spiva, PERKINS COIE LLP, Washington, D.C., for Appellants. Mark Fernlund Hearne, II, ARENT FOX LLP, St. Louis, Missouri, for Appellees. **ON BRIEF:** Marc E. Elias, Elisabeth C. Frost, Amanda R. Callais, Washington, D.C., Joshua L. Kaul, PERKINS COIE LLP, Madison, Wisconsin, for Appellants. Dana J. Finberg, Sara T. Schneider, San Francisco, California, Kirsten Hart, Los Angeles, California, Stephen S. Davis, ARENT FOX LLP, Clayton, Missouri, for Appellees. Michael A. Carvin, Anthony J. Dick, Stephen A. Vaden, JONES DAY, Washington, D.C., for Amici Curiae.

————————————

NIEMEYER, Circuit Judge:

The plaintiffs challenge Virginia Code § 24.2-643(B), the voter identification law enacted as part of "SB 1256." 2013 Va. Acts ch. 725. They allege that the statutory requirement that voters present photo identification when they vote or shortly thereafter violates the Voting Rights Act of 1965 and the Constitution.

The Virginia law provides: (1) that all voters are required to present a photo identification to cast a ballot in all elections but are allowed, without photo identification, to cast a provisional ballot subject to "cure"; (2) that voters who cast provisional ballots can cure their votes by presenting a photo identification in person, by fax, or by email within three days after the election; (3) that a broad range of photo identification satisfies the photo identification requirement, including publicly and privately issued forms of identification, whether current or recently expired; and (4) that if a voter does not possess an acceptable form of photo identification, Virginia's Board of Elections must provide one to the voter free of charge and without any requirement that the voter present documentation. In enacting SB 1256, the Virginia legislature sought to synchronize its requirements with the Help America Vote Act ("HAVA"), 42 U.S.C. § 15483, a federal law that

requires photo identification for first-time voters registering by mail in federal elections.

The plaintiffs commenced this action challenging SB 1256 under § 2 of the Voting Rights Act, the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and the Twenty-Sixth Amendment, arguing that the photo identification requirement "unduly burdens the right to vote, imposes discriminatory burdens on African Americans and Latinos, and was enacted with the intent to discriminate against minorities, young voters, and Democrats."

Following a two-week bench trial, the district court found that the plaintiffs had failed to present evidence sufficient to support their claims. From the district court's final judgment dated May 19, 2016, the plaintiffs filed this appeal. For the reasons that follow, we affirm.

I

Since 1996, Virginia has required voters to present identification before casting ballots. Originally, Virginia law permitted registered voters who lacked identification to vote by executing an affirmation of identity at their polling places. In 2012, the General Assembly enacted SB 1, which eliminated the self-affirmation procedure while broadening the acceptable forms of identification, some of which were non-photographic. 2012

4

Va. Acts ch. 839. Because § 5 of the Voting Rights Act at that time subjected Virginia to preclearance by the U.S. Department of Justice, Virginia submitted SB 1 for approval, and the Justice Department approved it.

A year later, on March 25, 2013, the General Assembly enacted SB 1256, codified in various sections of Title 24.2 of the Virginia Code but principally at § 24.2-643, to require photo identification for all voters in all elections. This change synchronized SB 1 and the federal statute HAVA, which imposed a photo-identification requirement on all individuals who had registered by mail and were voting for the first time in a federal election. For those who did not have any form of identification, SB 1256 required the Board of Elections to provide the voter with a free photo ID without requiring the voter to provide any documentation. Voters could obtain these free photo IDs from the 133 general registrars' offices and additionally from mobile voter-ID stations located throughout Virginia. To obtain a free photo ID, the voter needed only to provide his or her name, address, birthdate, and the last four digits of his or her social security number. The law also authorized voters to use photo IDs that had expired within the last year.

Because Virginia was still subject to § 5's preclearance by the Department of Justice, SB 1256 was enacted with the

understanding that it would be evaluated under § 5.  The law was never subjected to preclearance, however, because, after SB 1256's enactment, the Supreme Court held § 5 unenforceable in Shelby County v. Holder, 133 S. Ct. 2612 (2013).

On June 11, 2015, plaintiffs Barbara H. Lee, an African American and a Democrat who resides in Staunton, Virginia; Gonzalo J. Aida Brescia, a Latino and a Democrat who resides in Richmond, Virginia; and the Democratic Party of Virginia commenced this action against Virginia election officials to challenge SB 1256.  They alleged (1) that SB 1256 violated § 2 of the Voting Rights Act; (2) that SB 1256 imposed undue burdens on the right to vote and disparate treatment of individuals without a rational basis, in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment; (3) that SB 1256 amounted to "partisan fencing" (a law that fences out from the voting franchise a sector of the population), in violation of the First and Fourteenth Amendments; (4) that SB 1256 discriminated on the basis of race in violation of the Fourteenth and Fifteenth Amendments; and (5) that SB 1256 violated the Twenty-Sixth Amendment by failing "to take action to reduce wait times to vote," thus suppressing the number of votes cast by young voters.

The district court conducted a seven-day bench trial over a period of two weeks, beginning on February 22, 2016, and, after

6

receiving post-trial briefs, entered final judgment, concluding that the plaintiffs had "failed to prove by a preponderance of the evidence that the Virginia Voter ID law, either in its enactment or implementation, contravenes the Voting Rights Act, First Amendment, Fourteenth Amendment, Fifteenth Amendment, or the Twenty-Sixth Amendment." Consistent with this conclusion, the court dismissed all of plaintiffs' claims and denied the plaintiffs' request for injunctive relief. In support of its judgment, the court filed a 62-page Memorandum Opinion, reciting the governing legal principles and standards, summarizing the testimony of witnesses presented by the parties, and making findings of fact and conclusions of law.

The court recited the testimony of the Secretary of the State Board of Elections that SB 1256 was modeled after voter ID laws adopted in other States, such as Georgia and South Carolina, that had been precleared by the Department of Justice pursuant to § 5 of the Voting Rights Act. The court also found that, after the enactment of SB 1256, the Board of Elections "launched a state-wide pre-election campaign informing voters of the photo identification requirement." This included the public posting of some 500,000 posters describing the law and the "sending [of] 86,000 postcards to persons on the active voter list who, DMV records reflected, possessed no DMV-issued ID and would likely need a photo ID to vote under the new law."

The court found that during the election of 2014, when SB 1256 was in effect, "773 provisional ballots were cast by voters without valid identification" and that during the election of 2015, "408 provisional ballots were cast by voters with no acceptable form of identification." One-half of these provisional ballots were ultimately cured and counted.

The plaintiffs' evidence about the real-world impact of SB 1256 was presented by 14 voter-witnesses, 2 of whom testified by deposition. Assessing this evidence, the district court found that "none of the voter witnesses was actually denied his or her right to vote," although for some the process was "a bit cumbersome." Of the 14 voter-witnesses, 5 successfully cast their ballots. Clayton Stallings had appropriate identification and could have voted in person, but he voted absentee instead. Shanna Samson, Alex Highland, and Josephine Okiakpe all possessed appropriate forms of identification but forgot to bring their IDs with them when they went to vote. They cast provisional ballots and cured their ballots by sending copies of their IDs to the registrar. Laning Pollaty did not possess an appropriate form of identification but was informed of the availability of a free photo ID at the registrar's office. Pollaty obtained a free photo ID and then cast his ballot.

Of the remaining 9 voter-witnesses, 5 possessed the IDs needed to cast a vote but did not ultimately do so. Abraham

Barranca, Jack Etheredge, Ellen Lamb, and Pettus Hilt possessed appropriate IDs but forgot to bring them when they voted. While all of these voters could have cured their provisional ballots by sending the registrar a copy of their ID, they did not do so. Charles Benagh possessed appropriate identification but usually had voted absentee, and in 2015, he failed to mail in his absentee ballot.

The circumstances of the remaining 4 voter-witnesses varied but did not indicate an inability to vote. Kenneth Adams lost his Virginia driver's license prior to the election. While he could have obtained a free photo ID, he instead elected to apply for a replacement license. That license, however, did not arrive in time for him to cure his provisional ballot. When Bobby Smith, Jr., attempted to vote but did not possess an appropriate form of identification, he cast a provisional ballot and was told he could cure the ballot by going to the registrar's office. He chose not to do so, however, because his candidate of choice had been declared the winner. When Megan Cotten attempted to vote without an appropriate form of identification, a worker at the polling place failed to tell her of the possibility of casting a provisional ballot and obtaining a free photo ID from the registrar. Ms. Cotten sent a Twitter message to Virginia's Secretary of the Commonwealth, who replied, informing Ms. Cotten that she should have received and

could still receive a provisional ballot.  Ms. Cotten, however, stated that she was unable to take off more time from work and accordingly did not cast a ballot.  Finally, Mary Joanna Jones cured her provisional 2014 ballot by receiving a free photo ID from the registrar's office.  Due to an error, however, she did not receive her photo ID in the mail.  When she later called the registrar, she was informed that her card must have been lost in the mail.  When she stated that she was not able to drive herself to the registrar's officer to obtain a new photo ID, the registrar sent someone to her house, who then photographed her for her new ID, and she received her free photo ID.

Both sides presented expert witnesses, drawn mostly from the academic community, who presented widely diverse opinions based on statistical models and academic studies.  The plaintiffs' experts concluded that because legislators do not openly show discriminatory intent, such intent can only be inferred from circumstantial evidence.  In concluding that the Virginia legislators had been motivated by racially discriminatory intent, the plaintiffs pointed to the evidence that the legislators voted on SB 1256 nearly along party lines; that there was an absence of evidence of voter fraud in Virginia, suggesting the absence of any need for SB 1256; that race was strongly correlated with support for the Democratic Party and that the Republican Party controlled the General

10

Assembly that enacted SB 1256; that various members of the legislature had made subtle racial appeals during their campaigns for office; and that the legislature had on other occasions failed to pass laws favorable to African Americans, such as the automatic restoration of voting rights to former nonviolent felons and the expansion of Medicare coverage. The experts also noted that other States that had passed photo identification laws were largely controlled by Republicans. Other experts testifying on behalf of the plaintiffs gave opinions based on disputed data that a greater percentage of African Americans, Latinos, and young voters lacked identification than did Caucasians and older voters. They concluded, therefore, that the burden of possessing a photo ID fell heavier on African Americans, Latinos, and young people.

Virginia's experts criticized the conclusions of the plaintiffs' experts, pointing out what they claimed were flaws in data and logic and identifying omitted or misreported data. Nonetheless, they agreed that African Americans were slightly more likely than Caucasians to lack appropriate identification, concluding that 96.8% of Caucasians and 94.6% of African Americans had appropriate IDs.

Virginia's experts also provided polling data showing that the public overwhelmingly supported a photo identification

requirement, mainly to prevent fraud and to provide confidence in the voting process.

Finally, Virginia's experts found no evidence of any discriminatory intent in connection with the enactment of SB 1256.

While the experts on both sides recognized the history of discrimination in Virginia, they also, to differing degrees, noted a significant correction, with a trajectory toward greater inclusion. They pointed to the robust two-party system in Virginia, to the election of an African American as Virginia's governor, and to other similar indicators.

After considering this evidence and the more detailed evidence of the legislative debates that took place during the enactment process, the district court found the facts that underlay its ultimate conclusion. First, the court concluded that there was no dispute that Virginia had a "regrettable history of discriminatory policies and practices." It also found that the evidence confirmed the commonly held assumption that African American voters tended to gravitate toward the Democratic party, although, in recent years, an increasing number of African Americans had run for statewide office on the Republican ticket, blurring those political lines.

With respect to the impact of SB 1256, the court concluded that while the law added "a layer of inconvenience to the voting

process, it appear[ed] to affect all voters equally." More importantly, the court found that none of the voter witnesses identified any "legal obstacle inhibiting their opportunity to vote." It found that "persons without valid photo identification were able to cast provisional ballots and cure them by presenting proper evidence within three days, or alternatively, if they were disabled, submitting an absentee ballot." At bottom, the court indicated that it found itself reaching the same conclusion reached by Justice Stevens in Crawford v. Marion County Election Board, 553 U.S. 181, 198 (2008) (announcing the judgment of the Court), where he concluded: "[T]he inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." (Emphasis added).

At bottom, the district court found the evidence "insufficient to support Plaintiffs' claim that SB 1256 ha[d] denied African Americans, Latino, and young voters an equal opportunity to participate in the political process and to elect representatives of their choice." It also found as fact that the plaintiffs' evidence failed to demonstrate that SB 1256 "ha[d] an adverse disparate impact on African American or Latino voters, impose[d] a discriminatory burden on those protected

classes, or cause[d] anyone to have less opportunity than others to participate in the political process." While the court recognized that African Americans and Latinos were "slightly less likely" to have appropriate identifications than were Caucasians, it found that the burden to obtain an appropriate identification was the "burden to travel to the DMV or the local registrar's office to obtain an acceptable form of identification." Relying on Crawford, the court concluded that SB 1256 did not impose "excessively burdensome requirements on any class of voters." 553 U.S. at 202.

With respect to the plaintiffs' claim that the legislature intentionally discriminated on the basis of race and age in enacting SB 1256, the court found that the evidence failed "to show any departure from normal legislative procedures." Although it recognized that the enactment of SB 1256 was on a near-party-line vote, the bill was nonetheless subject to a robust debate from all sides and the debate lacked any statements by legislators indicating any sort of discriminatory intent. In sum, the court concluded:

> The extensive testimonial and documentary evidence offered in this case has failed to reveal by a preponderance of the evidence that the Virginia General Assembly, a legislative body composed of 140 Delegates and Senators, enacted the Virginia photo identification requirement with the intent to suppress minority and young voters.

From the district court's judgment dated May 19, 2016, the plaintiffs filed this appeal.

## II

The plaintiffs first contend that SB 1256 violates § 2 of the Voting Rights Act of 1965 in that it imposes a discriminatory burden on African Americans and Latinos, such that they have less opportunity to vote than do Caucasians. This burden, they argue, results from the disparate inconvenience that the photo identification requirement imposes on African Americans and Latinos.

Section 2 provides:

(a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) [similarly protecting members of a language minority group] of this title, as provided in subsection (b).

(b)  A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  Provided, That nothing in this section establishes a right to have members of a protected

15

> class elected in numbers equal to their proportion in
> the population.

52 U.S.C. § 10301 (emphasis added). Thus, the statutory requirements for proving a § 2 violation are: (1) the identification of a qualification, prerequisite, standard, practice, or procedure ("a structure or practice"), (2) which results in a denial or abridgement of the right to vote (3) on account of race or color or because the person is a member of a language minority group ("the protected class") (4) such that, in the totality of circumstances, the political process is not equally open to the protected class (5) in that its members have less opportunity than others to participate in the process and elect representatives of their choice. Congress deliberately omitted any requirement of showing intent, having "revised § 2 to make clear that a violation [can] be proved by showing discriminatory effect alone and to establish as a relevant legal standard the 'results test' applied . . . in White v. Regester, 412 U.S. 755 (1973)." Thornburg v. Gingles, 478 U.S. 30, 35 (1986) (citation altered). The Gingles Court noted that the "essence" of a burdensome structure or practice that violates § 2 is its "interact[ion] with social and historical conditions [that] cause[s] an inequality" in electoral opportunity. Id. at 47; see also League of Women Voters of North Carolina v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014).

In this case, the structure or practice identified by plaintiffs was SB 1256's requirement that every voter provide a photo ID either at the time of voting or within three days thereafter.  The plaintiffs argue that, because members of the protected class are less likely to possess photo identification, SB 1256's requirement imposes an unacceptable, disparate burden that has the effect of denying African Americans and Latinos an equal opportunity to vote.  They state, "[W]hat matters . . . is not how many minorities are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities. . . .   [E]ven one disenfranchised voter -- let alone several thousand -- is too many," quoting League of Women Voters, 769 F.3d at 244.

Virginia contends that there is no evidence that any eligible Virginia voter has been or will be denied an equal opportunity to vote.  It asserts that the evidence of any person's failure to cast a ballot in this case was not attributable to Virginia's ID law but to that person's decision not to cure a provisional ballot.

The district court resolved this issue, finding a lack of evidence to support the plaintiffs' claims:

> African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification.   Neither this statistical conclusion nor Dr. Rodden's [an expert witness for the plaintiffs] analysis supports a reliable factual

17

finding that African Americans or Latinos are denied an equal opportunity to participate in the electoral process. Nothing presented supports a conclusion that minorities are not afforded an equal opportunity to obtain a free voter ID. As described by numerous witnesses during the course of trial, eligible voters do not need to present any independent documentation to obtain a free voter form of identification under Virginia Code § 24.2-643 and its implementing regulations. The statute simply requires that a registrant provide her name, address, birthdate, and social security number and sign the registration form swearing that the information provided is true and correct.

A complex § 2 analysis is not necessary to resolve this issue because the plaintiffs have simply failed to provide evidence that members of the protected class have less of an opportunity than others to participate in the political process. Under the law, as borne out by the record, every registered voter who shows up to his or her local polling place on the day of the election has the ability to cast a ballot and to have the vote counted, even if the voter has no identification. When a voter shows up without identification, he or she is able to cast a provisional ballot, which can be cured by later presenting a photo ID. If the voter lacks an acceptable form of identification, the voter can obtain a free voter ID with which to cure the provisional ballot. Because, under Virginia's election laws, every registered voter in Virginia has the full ability to vote when election day arrives, SB 1256 does not diminish the right of any member of the protected class to have

18

an equal opportunity to participate in the political process and thus does not violate § 2.

The plaintiffs argue that, for some groups of minority voters, this opportunity is disproportionately burdened because a lower percentage of minorities have qualifying photo IDs and the process of obtaining photo IDs requires those voters to spend time traveling to and from a registrar's office. The Supreme Court has held, however, that this minor inconvenience of going to the registrar's office to obtain an ID does not impose a substantial burden. As recognized in Crawford, 553 U.S. at 198, "the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198 (Stevens, J., announcing the judgment of the Court); see also id. at 209 (Scalia, J., concurring in the judgment) ("The burden of acquiring, possessing, and showing a free photo identification is simply not severe," and "the State's interests are sufficient to sustain that minimal burden").

Nonetheless, the plaintiffs press their argument further, asserting categorically that as long as there is disparity in the rates at which different groups possess acceptable identification, § 2 is violated. To make this assertion,

however, the plaintiffs have to make an unjustified leap from the disparate inconveniences that voters face when voting to the denial or abridgement of the right to vote. Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others. To interpret § 2 as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other. Similarly, motor-voter registration would be found to be invalid as members of the protected class were less likely to possess a driver's license. Yet, courts have also correctly rejected that hypothetical. See Frank v. Walker, 768 F.3d 744, 754 (7th Cir. 2014), cert. denied, 135 S. Ct. 1551 (2015).

We conclude that § 2 does not sweep away all election rules that result in a disparity in the convenience of voting. As we noted in North Carolina State Conference of NAACP v. McCrory, 831 F.3d 204, 241 (4th Cir. 2016), "it cannot be that states must forever tip-toe around certain voting provisions" that would have more effect on the voting patterns of one group than another. Rather, § 2 asks us to evaluate whether the Virginia process has diminished the opportunity of the protected class to

participate in the electoral process. If Virginia had required voters to present identifications without accommodating citizens who lacked them, the rule might arguably deprive some voters of an equal opportunity to vote. But where, as here, Virginia allows everyone to vote and provides free photo IDs to persons without them, we conclude that SB 1256 provides every voter an equal opportunity to vote and thus does not violate § 2 of the Voting Rights Act.

### III

The plaintiffs next contend that SB 1256 violates the Constitution in that SB 1256 was enacted <u>with the intent to discriminate</u> on the basis of race, in violation of the Fourteenth and Fifteenth Amendments. In support of this contention, they point: to evidence of Virginia's pre-1965 history when substantial and illegal barriers existed when minorities voted; to the fact that SB 1256 was enacted only one year after the General Assembly had enacted SB 1; to various statements made by legislators during the legislative debate, including the statements of a state senator insisting that only an <u>unexpired</u> form of ID should qualify; to the burden imposed on minorities by requiring a photo ID; to the fact that while the legislators were debating SB 1256, the Supreme Court granted certiorari in <u>Shelby County</u>; to the fact that an African-

21

American President of the United States had been reelected in 2012 and had won Virginia; to the evidence advanced by their experts that several other States, controlled by Republicans, had enacted voter identification laws; and to an alleged lack of any rationale for the law's enactment other than discrimination on the basis of race. They argue that our recent decision striking down portions of North Carolina's ID law presented similar facts, which should dictate the outcome here. See McCrory, 831 F.3d 204.

In response, Virginia points to testimony of the plaintiffs' expert witnesses during which they conceded that there was no direct evidence that Virginia adopted SB 1256 to discriminate against minorities. Virginia also points to the testimony of its own experts, who reviewed the legislative history and public record related to SB 1256 and concluded that evidence did not support a defensible conclusion that any member of the legislature voted for SB 1256 with the intent to suppress the vote of minorities. Rather, the experts concluded that the legislature demonstrated support for the bill for reasons other than vote suppression, such as the prevention of voter fraud and the promotion of public confidence in the voting system -- in particular, because "public opinion favored such legislation, a public perception of potential voter fraud, promoting confidence in the integrity of the electoral system, and sound public

22

policy in preventing future acts of voter fraud." These purposes for enacting SB 1256 were corroborated by testimony of election officials. In addition, Virginia presented some evidence of voter fraud, as well as the conclusions reached by the Carter-Baker Commission (chaired by former President Jimmy Carter and former Secretary of State James Baker), which favored use of photo identification, because, even though there was no evidence of extensive fraud in U.S. elections, "there is no doubt that it occurs" and that "it could affect the outcome of a close election." Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 18 (2005). The Carter-Baker Commission also noted that "the perception of possible fraud contributes to low confidence in the system. A good ID system could deter, detect, or eliminate several potential avenues of fraud -- such as multiple voting or voting by individuals using the identities of others or those who are deceased -- and thus it can enhance confidence." Id. at 18-19. Virginia showed that the General Assembly considered the Carter-Baker Commission report when adopting SB 1256.

In its Memorandum Opinion, the district court recited the extensive testimony of various legislators and the historical facts both with respect to the enactment of SB 1256 and prior historical facts in Virginia. After considering the evidence, the court concluded:

The evidence . . . however demonstrated that irrespective of statistics, a large segment of Virginia voters thought a photo identification requirement for voting was a prudent safeguard measure. As one expert noted, responding to public concern by passing a law to prevent crime before it happened amounted to a reasonable action on the part of the General Assembly. In fact the Supreme Court agreed in <u>Crawford</u>. <u>See</u> 553 U.S. at 197. Further, voter confidence, uniformity, and fraud prevention all stood as legitimate reasons to enact SB 1256.

Additionally, the evidence failed to show any departure from normal legislative procedures. Instead, although ultimately passing on a near-party-line vote, the bill was subject to robust debate from all sides. Finally, there was a complete dearth of statements by legislators indicating any sort of discriminatory intent.

The extensive testimonial and documentary evidence offered in this case has failed to reveal by a preponderance of the evidence that the Virginia General Assembly, a legislative body composed of 140 Delegates and Senators, enacted the Virginia photo identification requirement with the intent to suppress minority and young voters.

The parties agree that the standard for finding racial discrimination under the Constitution in these circumstances is set forth in <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252 (1977). <u>See also</u> <u>McCrory</u>, 831 F.3d at 220-21.

In <u>Village of Arlington Heights</u>, the plaintiffs contended that the Village's denial of a rezoning application to convert a 15-acre parcel from single-family to multi-family homes was motivated by racial discrimination. In addressing the claim, the Supreme Court articulated the standard that the plaintiffs

had to satisfy to prove such a claim:  "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of <u>racially discriminatory intent or purpose</u> is required to show a violation," although that purpose need only be "a motivating factor in the decision." <u>Village of Arlington Heights</u>, 429 U.S. at 264-66 (emphasis added).  Accordingly, when "[d]etermining whether invidious discriminatory purpose was a motivating factor," a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Id.</u> at 266.

The <u>Village of Arlington Heights</u> Court then reviewed the evidence, acknowledging that the impact of the Village's rezoning decision "does arguably bear more heavily on racial minorities.  Minorities constitute 18% of the Chicago area population, and 40% of the income group said to be eligible for [the development at issue].  But there is little about the sequence of events leading up to the decision that would spark suspicion." <u>Village of Arlington Heights</u>, 429 U.S. at 269.  The Court pointed to the fact that the rezoning request progressed according to the usual procedures; that the Commission even scheduled two additional hearings to accommodate further debate; that the statements of board members "focused almost exclusively on the zoning aspects of the . . . petition," although there may

have been "reliance by some neighboring property owners on the maintenance of single-family zoning in the vicinity." Id. at 270. In the end, after applying the announced standard to the facts presented, the Court concluded that the challengers had "simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision." Id.

In this case, the evidence of racially discriminatory intent is similarly lacking. SB 1256 was enacted to streamline Virginia's election laws by imposing on all voters the requirements that HAVA imposes on some. Moreover, in enacting a photo identification requirement, the Virginia legislature went out of its way to make its impact as burden-free as possible. It allowed a broad scope of IDs to qualify; it provided free IDs to those who did not have a qualifying ID; it issued free IDs without any requirement of presenting documentation; and it provided numerous locations throughout the State where free IDs could be obtained. And, as in Village of Arlington Heights, the legislative process here was normal, with full debate, and no evidence was presented of untoward external pressures or influences affecting the debate. While there was a substantial party split on the vote enacting the law, two non-Republicans (one Democrat and one Independent) voted for the measure as

well.   In short, we conclude that the district court's factual
findings with respect to this issue were not clearly erroneous.

The plaintiffs nonetheless argue that the circumstances
here are not unlike those in McCrory and that McCrory therefore
requires us to find that SB 1256 was enacted with discriminatory
intent.  This argument, however, fails to understand our holding
in McCrory.

In McCrory, we held that the facts found by the district
court showed that the North Carolina election law was enacted
"with [racially] discriminatory intent," 831 F.3d at 215, as
revealed by the legislature's conduct leading up to the law's
enactment.   We concluded that, based on the totality of
circumstances, the North Carolina process targeted black voters
with "almost surgical precision." Id. at 214.  As we explained,
for years, North Carolina's election laws were subject to
preclearance by the Department of Justice under § 5 of the
Voting Rights Act and, under that preclearance regime, "African
American registration and turnout rates had finally reached
near-parity with white registration and turnout rates.  African
Americans were poised to act as a major electoral force." Id.
But, we noted, on the day after the Supreme Court eliminated
§ 5's preclearance obligations in Shelby County, the Republican
Chairman of the Senate Rules Committee, whose party had been
rarely supported by African Americans, announced the intention

27

of enacting a new "omnibus" election law. Id. at 214, 216. After the announcement but before the enactment of any law, the legislature requested data "on the use, by race, of a number of voting practices." Id. at 214 (emphasis added). And based on the data, the legislature, acting "swiftly," enacted legislation "that restricted voting and registration in five different ways, all of which disproportionately affected African Americans." Id. at 214, 216. Moreover, the legislature offered "only meager justifications" for the new provisions. Id. at 214. Equally telling, in its efforts to "rush" the omnibus bill through the legislative process, the legislature engaged in "unusual procedures." Id. at 228. As we concluded, "the State took away minority voters' opportunity because they were about to exercise it. . . . [T]his bears the mark of intentional discrimination." Id. at 215 (alterations omitted) (quoting League of United States Citizens v. Penny, 548 U.S. 399, 440 (2006)).

These facts in McCrory are in no way like those found in Virginia's legislative process for the enactment of SB 1256. While the Virginia legislature knew that certiorari had been granted in Shelby County when it was conducting its debates on SB 1256, Shelby County had not yet been decided, and its outcome was not known. The Virginia General Assembly thus necessarily acted as if SB 1256 would be reviewed by the Department of Justice under § 5 of the Voting Rights Act. In addition, the

legislative process contained no events that would "spark suspicion." Village of Arlington Heights, 429 U.S. at 269. Unlike the departure from the normal legislative process that occurred in North Carolina, SB 1256 passed as part of Virginia's standard legislative process, following full and open debate. And the legislature did not call for, nor did it have, the racial data used in the North Carolina process described in McCrory. Moreover, the provisions included in SB 1256 did not target any group of voters, let alone target with surgical precision. Indeed, SB 1256 requires photo identification for all voters and allows the use of photo IDs provided by Virginia's public and private universities, which are, according to plaintiffs' own witnesses, disproportionately possessed by young people and African Americans.

Reviewing the totality of the circumstances involved in the enactment of SB 1256 in light of Village of Arlington Heights and McCrory, we conclude that the evidence in this case was insufficient to prove that racial discrimination was a motivating purpose for the enactment of SB 1256. The law was passed by the Virginia legislature through the normal legislative process, and that process was unaccompanied by any facts or circumstances suggesting the presence of racially discriminatory intent.

IV

The plaintiffs contend next that even if SB 1256 was enacted without racially discriminatory intent, it is, nonetheless, unconstitutional because it places an undue burden on the constitutionally protected right to vote. They point to the "cumbersome" process faced by those who seek to vote but do not possess photo identification, noting particularly that in order to obtain a free photo ID from the government, a voter must travel to the registrar's office and that this process might, for certain plaintiffs, take hours. They maintain that this burden is not justified by the public interests identified by Virginia. The plaintiffs argue that the evidence shows no voter-impersonation fraud in Virginia and that, in any event, a free ID is so easy to obtain that it would not prevent such fraud. They assert, in addition, that requiring photo identification will not increase public confidence in elections and also that Virginia's stated interest in conforming its practices to the federal requirements for photo identification imposed by HAVA was not sufficiently demonstrated.

The parties agree that the legal principles governing resolution of this issue are set forth by the Anderson-Burdick analysis, based on the Supreme Court's decisions in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992). In Anderson, the Court, finding that an early

filing deadline unduly burdened voting rights, articulated the analysis to be applied in evaluating a State's election laws under the First and Fourteenth Amendments.  First, the Court recognized that there must be "a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  Anderson, 460 U.S. at 788 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)).  The Court explained further:

> To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends.  Nevertheless, the States' important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

Id.  After giving this background, the Court then articulated the governing analysis for a constitutional challenge to a State law regulating elections, stating:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forth by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Id. at 789.

In Burdick, the Court further clarified the constitutional analysis by noting that election laws generally are not subject to strict scrutiny, even though voting rights are fundamental under the Constitution.  The Court explained:

> The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.

Burdick, 504 U.S. at 433.  In view of these constitutional assignments of responsibility and the requirements of State regulation, the Court noted that applying a strict scrutiny standard to every voting regulation "would tie the hands of States seeking to assure that elections are operated equitably and efficiently."  Id.  Thus, while "severe" restrictions "must be narrowly drawn to advance a state interest of compelling importance," a reasonable, nondiscriminatory restriction on voting rights is justified by a State's "important regulatory interests."  Id. at 434 (internal quotation marks and citations omitted).

In Crawford, the Supreme Court applied the Anderson-Burdick analysis in upholding the constitutionality of Indiana's photo identification law, which was similar to SB 1256 but in fact

more restrictive.   The Indiana law required that voters present a government-issued photo ID in order to vote, and voters who did not have such identification could obtain one only if they presented proof of residence and identity, such as with a birth certificate.   In conducting the Anderson-Burdick analysis, the Court found that Indiana had a valid interest in adopting standards that aligned with federal election statutes, including HAVA, where Congress had indicated a belief that "photo identification is one effective method of establishing a voter's qualification to vote." Crawford, 553 U.S. at 193 (Stevens, J., announcing the judgment of the Court).   The Court also found that Indiana had valid interests in preventing voter fraud, even though there was no evidence of any in-person voter impersonation having occurred in Indiana, and an independent interest in protecting voter confidence in the integrity of its elections. Id. at 194-97.  The Court concluded that these state interests justified the burdens imposed by the photo identification requirements in its election law. Id. at 202. And for voters who lacked the required identification, the Court explained the ability to obtain a free photo identification meant that the burden was not substantial; the "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote." Id. at 198.   While the Court

33

recognized that for some voters, such as those who lacked a birth certificate or other documentation needed to obtain a free ID, the burden was greater, it nonetheless concluded that this greater burden was not sufficiently substantial to render the statute unconstitutional. <u>Id.</u> at 199-202.

The <u>Crawford</u> Court's application of the <u>Anderson</u>-<u>Burdick</u> analysis to Indiana's election law controls our resolution of the issue here. SB 1256 imposes a lighter burden than did the Indiana law challenged in <u>Crawford</u>, particularly inasmuch as Virginia voters are not required to present any birth certificate or other documentation to obtain a free ID. Even as the burden imposed by SB 1256 is lighter, the justifications that Virginia advances here for SB 1256 are the same as those advanced by Indiana -- alignment with federal statutes like HAVA, prevention of voter fraud,[*] and the preservation of voter confidence in the integrity of elections. Because those same justifications were held to support the greater burden imposed

---

[*] In both <u>Crawford</u> and the record here, there was limited evidence of voter fraud. Nonetheless, we have, since oral argument here, seen that the FBI has announced an investigation into a circumstance where 19 deceased Virginians in Harrisonburg were recently re-registered to vote. Laura Vozela, <u>He fought in World War II. He died in 2013. And he just registered to vote in Va.</u>, Wash. Post (Sep. 29, 2016), https://perma.cc/GXV4-BKAG. And in a separate case, an indictment has been returned in Alexandria against a man charged with multiple counts of voter-registration fraud. Justin Wm. Moyer, <u>Man who registered voters for progressive Virginia group charged with fraud</u>, Wash. Post (Oct. 28, 2016), https://perma.cc/YWX5-TZDW.

on voters in Crawford, they must, a fortiori, justify the
lighter burdens imposed on Virginia voters by SB 1256.
Accordingly, we conclude that SB 1256 does not impose an
unconstitutional burden on the right to vote.

V

Finally, the plaintiffs allege that SB 1256 violates their
rights under the Twenty-Sixth Amendment. The Twenty-Sixth
Amendment provides that "[t]he right of citizens of the United
States, who are eighteen years of age or older, to vote shall
not be denied or abridged by the United States or by any State
on account of age." U.S. Const. amend. XXVI, § 1. This
language parallels the language of the Fifteenth Amendment,
which provides similarly that "[t]he right of citizens of the
United States to vote shall not be denied or abridged by the
United States or by any State on account of race, color, or
previous condition of servitude." U.S. Const. amend. XV, § 1.
Because of the parallel language, the plaintiffs argue that the
Fifteenth Amendment jurisprudence provides the analytical basis
for considering a Twenty-Sixth Amendment claim of discrimination
on the basis of age. Thus, they maintain that just as SB 1256
imposed an undue burden on African Americans and Latinos, it
also placed an undue burden on "young people."

35

First, it is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth-Amendment jurisprudence. Even if it does, however, the plaintiffs point to no evidence in the record that supports their age-discrimination claim other than their evidence that African Americans, Latinos, and young people are less likely to possess photo identifications and that a Virginia legislator made a passing comment that President Obama had been focusing on obtaining the support of young voters. Moreover, if the Twenty-Sixth Amendment functions like the Fifteenth Amendment, the plaintiffs would also need to demonstrate an intent to discriminate on the basis of age. The district court found that the plaintiffs "failed to show that SB 1256 was intended, either in its enactment or implementation, to discriminate against young voters." Based on our review of the record, we agree.

VI

At bottom, just as Congress in HAVA found it beneficial to the voting process and the public perception of the voting process to require photo IDs, and just as the Carter-Baker Commission found similarly, Virginia found it beneficial to require photo identification in all elections. Moreover, Virginia took numerous steps to mitigate any burdens that this

36

requirement might impose on voters, suggesting that a benign purpose underlay SB 1256's enactment.  It allowed a broad scope of acceptable forms of identification, which included most IDs that citizens have and that are reasonably reliable; it allowed citizens attempting to vote without identification to cast provisional ballots and then cure their identification deficiency within three days; it provided those citizens who lacked photo identification a free photo ID without the need to present any documentation; and it provided assistance to citizens expressing difficulty in obtaining free IDs.

   In sum, not only does the substance of SB 1256 not impose an undue burden on minority voting, there was no evidence to suggest racially discriminatory intent in the law's enactment. The judgment of the district court is accordingly

AFFIRMED.